## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| ALTA MESA RESOURCES, INC., *et al.*, | ) |
| | ) Case No. 19-35133 |
| Debtors. | ) |
| | ) (Jointly Administered) |
| ———————————————————— | ) |
| DAVID DUNN, as Trustee of the AMH Litigation Trust, | ) |
| | ) |
| | ) Adv. Pro. No. 21-03909 |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| HPS INVESTMENT PARTNERS, LLC; ARM ENERGY HOLDINGS, LLC; ARM MIDSTREAM, LLC; AND ASSET RISK MANAGEMENT, LLC, | ) **Jury Trial Demanded** |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

## NOTICE OF APPEAL

NOTICE IS HEREBY GIVEN that plaintiff David Dunn, as Trustee of the AMH Litigation Trust ("Plaintiff" or "Appellant"), hereby appeals to the United States District Court for the Southern District of Texas, pursuant to 28 U.S.C. § 158(a) and Federal Rule of Bankruptcy Procedure 8003(a), this Court's *Order Dismissing Proceeding* (Adv. Proc. Dkt. No. 93), entered in the above-captioned adversary proceeding on October 2, 2024 ("SAC Order"), and all associated orders and opinions, including without limitation that certain *Order* (Adv. Proc. Dkt. No. 64) entered on March 3, 2023 dismissing Plaintiff's First Amended Complaint ("FAC Order").

A copy of the SAC Order is attached hereto as **Exhibit A**. A copy of the *Memorandum Opinion* (Adv. Proc. Dkt. No. 92) entered October 2, 2024, setting forth this Court's reasoning for

1

entry of the SAC Order, is attached hereto as **Exhibit B**.  A copy of the FAC Order is attached hereto as **Exhibit C**.  A copy of the *Memorandum Opinion* (Adv. Proc. Dkt. No. 63), setting forth this Court's reasoning for entry of the FAC Order, is attached hereto as **Exhibit D**.

**Part 1: Identification of Appellant**

1.      <u>Name of Appellant</u>: David Dunn, as Trustee of the AMH Litigation Trust.

2.      <u>Position of Appellant in bankruptcy case</u>: Plaintiff.

**Part 2:  Identification of the Subject of this Appeal**

1.      <u>The judgment, order, or decree appealed from</u>: *Order Dismissing Proceeding* (Adv. Proc. Dkt. No. 93), and all associated orders and opinions, including without limitation that certain *Order* (Adv. Proc. Dkt. No. 64) entered March 3, 2023 dismissing Plaintiff's First Amended Complaint.

2.      <u>Dates on which the orders were entered</u>: October 2, 2024 (for Adv. Proc. Dkt. No. 93) and March 3, 2023 (for Adv. Proc. Dkt. No. 64).

**Part 3:  Identification of the other Parties to the Appeal**

The names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys are as follows:

| Appellant | Appellant's Attorneys |
|---|---|
| David Dunn, as Trustee of the AMH Litigation Trust | **COVINGTON & BURLING LLP**<br>Joseph R. Dunn<br>Abigail V. O'Brient<br>1999 Avenue of the Stars<br>Los Angeles, California 90067<br>Telephone:  +1 (424) 332-4800<br>Facsimile:  +1 (424) 332-4749<br>Email: jdunn@cov.com<br>        aobrient@cov.com |

| Appellee | Appellee's Attorneys |
|---|---|
| HPS Investment Partners, LLC | **QUINN EMANUEL URQUHART & SULLIVAN, LLP**<br>Michael B. Carlinsky<br>Benjamin I. Finestone<br>Jacob J. Waldman<br>Courtney C. Whang<br>51 Madison Avenue, 22nd Floor<br>New York, NY 10010<br>Telephone:  +1 (713) 221-7000<br>Facsimile:  +1 (713) 221-7100<br>Email: michaelcarlinsky@quinnemanuel.com<br>        benjaminfinestone@quinnemanuel.com<br>        jacobwaldman@quinnemanuel.com<br>        courtneywhang@quinnemanuel.com<br><br>-and-<br><br>Karl S. Stern<br>Christopher D. Porter<br>711 Louisiana Street, Suite 500<br>Houston, TX 77002<br>Telephone:  +1 (212) 849-7000<br>Facsimile:  +1 (212) 849-7100<br>Email: karlstern@quinnemanuel.com<br>        christopherporter@quinnemanuel.com |
| **Appellees** | **Appellees' Attorneys** |
| ARM Energy Holdings, LLC; Arm Midstream, LLC; and Asset Risk Management, LLC | **EVERSHEDS SUTHERLAND (US) LLP**<br>Mark D. Sherrill<br>1001 Fannin Street, Suite 3700<br>Houston, TX 77002<br>Telephone:  +1 (713) 470-6100<br>Facsimile:  +1 (713) 654-1301<br>Email: marksherrill@eversheds-sutherland.com |

Respectfully submitted,

Dated: October 15, 2024                          COVINGTON & BURLING LLP

                                                 */s/ Joseph R. Dunn*
                                                 _____
                                                 By:   Joseph R. Dunn
                                                       Abigail V. O'Brient
                                                       1999 Avenue of the Stars
                                                       Los Angeles, California 90067
                                                       Telephone:  +1 (424) 332-4800
                                                       Facsimile:   +1 (424) 332-4749
                                                       Email: jdunn@cov.com
                                                             aobrient@cov.com

                                                 *Counsel for Plaintiff David Dunn, as Trustee of
                                                 the AMH Litigation Trust*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing pleading was served upon all parties registered to receive service through this Court's ECF notification system, on October 15, 2024.

<u>*/s/ Joseph R. Dunn*</u>
Joseph R. Dunn

**EXHIBIT A**

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

October 02, 2024

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 19-35133** |
| **ALTA MESA RESOURCES, INC.,** *et al.*, | § | |
| | § | **CHAPTER 11** |
| | § | |
| Debtors. | § | |
| | § | |
| **DAVID DUNN,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 21-3909** |
| | § | |
| **HPS INVESTMENT PARTNERS, LLC,** *et al.*, | § | |
| | § | |
| | § | |
| Defendants. | § | |

## <u>ORDER DISMISSING PROCEEDING</u>

For the reasons stated in the Memorandum Opinion, this proceeding is dismissed, with prejudice. Costs are awarded to the defendants.

SIGNED 10/01/2024

_____
Marvin Isgur
United States Bankruptcy Judge

**EXHIBIT B**

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

October 02, 2024

Nathan Ochsner, Clerk

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 19-35133** |
| **ALTA MESA RESOURCES,** | § | |
| **INC.,** *et al.*, | § | **CHAPTER 11** |
| | § | |
| Debtors. | § | |
| | § | |
| **DAVID DUNN,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 21-3909** |
| | § | |
| **HPS INVESTMENT** | § | |
| **PARTNERS, LLC,** *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

David Dunn, trustee of the AMH Litigation Trust, sued HPS Investment Partners, LLC and the ARM defendants (ARM Energy Holdings, LLC; Arm Midstream, LLC; and Asset Risk Management, LLC) for avoidance and recovery of constructive fraudulent transfers. This is Dunn's second amended complaint, which the Court permitted to file to "set forth a plausible basis as to what direct benefit was received by the Defendants from alleged constructive fraudulent transfers." ECF No. 64. For the reasons stated below, Dunn's second amended complaint is dismissed with prejudice.

# BACKGROUND

## I.   FACTUAL BACKGROUND

Alta Mesa Holdings, LP and Oklahoma Energy Acquisitions, LP filed for chapter 11 on September 11, 2019.  Case No. 19-35133, ECF No. 1.  David Dunn is the Trustee of the AMH Litigation Trust, the successor-in-interest to certain causes of action of the AMH Debtors.  ECF No. 70 at 1.  The Defendants are HPS Investment Partners, LLC, ARM Energy Holdings, LLC, ARM Midstream, LLC, and Asset Risk Management, LLC.  ECF No. 70 at 1.

The Defendants exercised control over Kingfisher Midstream, LLC at all times relevant to this proceeding.  ECF No. 63 at 2.  On August 31, 2015, AMH and KFM executed a gas gathering and processing agreement and a crude oil gathering agreement.  ECF No. 70 at 12.  Under the 2015 agreements, AMH was to pay KFM certain gathering rates and capital recovery fees, as well as convey or assign rights-of-way to KFM so it could build and maintain gathering systems.  ECF No. 70 at 12–13.  Dunn alleges that the HPS and the ARM defendants played a substantial role in designing these agreements to prop up the value of KFM at the expense of AMH.  ECF No. 70 at 12–13.

On December 1, 2016, AMH and KFM executed amendments to both the gas gathering and processing agreement and the crude oil gathering agreement.  ECF No. 70 at 16.  Dunn alleges that HPS coerced AMH into accepting the amendments by threatening to withhold AMH's funding.  ECF No. 70 at 17.  In 2016, the parties became concerned that their agreements might not sufficiently document that the rights under the agreement "ran with the land."  ECF No. 70 at 17.  If the rights did not "run with the land," then the parties could be subject to substantial losses.

According to the complaint, the 2016 Amendments intended to assure that the agreements contained covenants running with the land.  ECF No. 70 at 17.  The amendments included a purported conveyance

of transportation interests, for which Dunn alleges AMH received no consideration in exchange.  ECF No. 70 at 17.

On February 9, 2018, KFM, AMH, and Silver Run entered into a business combination that resulted in cashing out the owners of KFM and giving AMH's owners equity interest in Alta Mesa Resources, Inc., formerly known as Silver Run.  ECF No. 70 at 19.  Dunn alleges that the Business Combination consummated the "build-and-flip" strategy designed by the owners of KFM.  ECF No. 70 at 19.

## II.  PROCEDURAL BACKGROUND

AMH's confirmed plan created the AMH Litigation Trust, which inherited certain causes of action held by the debtors, including the ones asserted by Dunn as trustee of the AMH Litigation Trust here.  ECF No. 63 at 7.  The Plan charged Dunn with bringing the inherited causes of action on behalf of unsecured creditors.  ECF No. 63 at 7.  Several creditors who remained unpaid on the petition date have claims going back to the period during which Dunn alleges that AMH was unable to meet its financial obligations and was financially strained due to the KFM agreement.  ECF No. 63 at 7.  The confirmed Plan included releases for various KFM debtors, and their current and former equity holders.  Case No. 19-35133, ECF No. 1594 at 10, 37.  But Dunn alleges that the confirmed Plan excluded the release of claims in this lawsuit against the HPS and ARM defendants.  ECF No. 88 at 21.  Those claims were assigned to the Trust.  ECF No. 70 at 4.

### A.  Past Complaints

Dunn's initial complaint alleged actual fraudulent transfers based on the Gathering Agreements and assignment of non-STACK[1] assets.  ECF No. 1.  The Court granted the ARM defendants' motion to dismiss without prejudice to Dunn's ability to file an amended complaint.  ECF No. 34.  At the motion to dismiss hearing, the Court

---

[1] "STACK" is an acronym used in the oil and gas industry denoting a geographic region encompassing the Sooner Trend oil field, Anadarko basin, and Canadian and Kingfisher counties.

required Dunn's amended complaint to meet Federal Rule of Civil Procedure 9(b)'s pleading standards if the basis for relief is actual fraud. ECF No. 33.

Dunn's amended complaint brought six claims for the avoidance and recovery of constructive fraudulent transfer against the Defendants under the Bankruptcy Code and the Texas Uniform Fraudulent Transfer Act. ECF No. 40. The Court granted the Defendants' motions to dismiss, finding that "the complaint fails to sufficiently plead that Dunn may recover from HPS or the ARM defendants for any of the claims for constructive fraudulent transfer on the trustee's theory that defendants are transfer beneficiaries." ECF No. 63 at 11. The Court held that "[t]o reach any value in the hands of a shareholder on the theory that they are a transfer beneficiary, Dunn would need to pierce the veil." ECF No. 63 at 11 (citing *In re Hansen*, 341 B.R. 638, 645 (Bankr. N.D. Ill. 2006)).

The Court dismissed the first amended complaint without prejudice, granting Dunn leave to file a second amended complaint on narrow grounds to "set forth a plausible basis as to what direct benefit was received by the Defendants from alleged constructive fraudulent transfers." ECF No. 64.

### B.    Current Complaint

In the second amended complaint, Dunn brings two claims for the avoidance and recovery of constructive fraudulent transfers. He sues under both the Bankruptcy Code and the Texas Uniform Fraudulent Transfer Act (TUFTA). ECF No. 70. The two claims pertain to the payments and obligations AMH incurred from the Gathering Agreements. Both HPS and the ARM defendants filed 12(b)(6) motions to dismiss. ECF Nos. 74, 75. Following a hearing on the motions on

July 17, 2023, the Court took the matter under advisement.  ECF No. 88.

## JURISDICTION

The District Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(a).  Venue is proper in this District pursuant to 28 U.S.C. § 1409.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(H).  The dispute has been referred to the Bankruptcy Court under General Order 2012-6.

## LEGAL STANDARD

The Court reviews motions under Federal Rule of Civil Procedure 12(b)(6) "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs." *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007).  However, the Court will not strain to find inferences favorable to the plaintiff.  *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 361 (5th Cir. 2004).

Motions to dismiss for failure to state a claim upon which relief can be granted "are viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (quoting *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005)).  To avoid dismissal under Rule 12(b)(6), the plaintiff must provide sufficient factual matter to state a claim for relief that is plausible on its face when accepting that factual matter as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). The plausibility standard asks for more than "a sheer possibility that the defendant acted unlawfully." *Id.*; *see Lormand*, 565 F.3d at 232 ("[A] complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above

the speculative level.'" (quoting *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007))).

The Court holds that Rule 8 applies to claims for a constructive fraudulent transfer. Constructive fraud does not require the plaintiff to prove any facts relating to the defendants' intent, fraudulent or otherwise. It does not make sense to require a plaintiff to plead to the heightened Rule 9(b) standard, which captures the much more specific requirements of actual fraud, where the plaintiff would never be expected to prove those facts at trial to prevail on the claim. For example, the Rule 9(b) standard is interpreted as requiring the plaintiff to plead with particularity the "who, what, where, when and why" of the alleged fraud. *In re Life Partners Holdings, Inc.*, 926 F.3d 103, 117 (5th Cir. 2019) (citing *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)). However, the "why" is noticeably absent from the elements of constructive fraud. *Compare* 11 U.S.C. § 548(a)(1)(A) (requiring a showing of "actual intent to hinder, delay, or defraud"), *with* § 548(a)(1)(B) (not requiring any such intent).

Fifth Circuit case law and the purpose of the pleading standards support our application of the Rule 8 standard in constructive fraudulent transfer. In *Life Partners Holdings*, the Fifth Circuit declined to rule on whether the Rule 8 plausibility standard or the heightened Rule 9(b) standard should apply to a claim under TUFTA for constructive fraudulent transfer. *Life Partners Holdings*, 926 F.3d at 118. The Fifth Circuit noted that

> [t]he elements of a constructive fraudulent transfer under Texas law are the same as actual fraudulent transfer except instead of pleading fraudulent intent, the plaintiff must plead facts demonstrating: (1) a lack of reasonably equivalent value for the transfer; and (2) the transferor was "financially vulnerable" or insolvent at the time of the transaction.

*Id*. at 117. Based on these elements, constructive fraud meaningfully differs from actual fraud because "the transaction is based on the

transferor's financial condition and the sufficiency of the consideration provided by the transferee." *Id.* (citing *E. Poultry Distribs., Inc. v. Yarto Puez*, 2001 WL 34664163, at \*2 (N.D. Tex. Dec. 3, 2001)). This Court held in *In re Juliet Homes, LP,* that "with constructive fraud, the actor's intent is irrelevant" when determining whether to apply the heightened Rule 9 standard to a claim for common law constructive fraud. No. 07-36424, 2010 WL 5256806, at \*23 (Bankr. S.D. Tex. Dec. 16, 2010). There, this Court applied the Rule 8 standard to a common law claim for constructive fraud "because constructive fraud does not require proof of scienter." *Id.* at 23 (citing *SIPC v. Stratton Oakmont, Inc.*, 234 B.R. 293, 319 (Bankr. S.D.N.Y.1999)). In *Northstar*, this Court acknowledged the similar lack of an "intent" element in a claim for statutory constructive fraudulent transfer. *Katchadurian v. NGP Energy Cap. Mgmt., LLC (In re Northstar Offshore Grp., LLC)*, 616 B.R. 695, 721 (Bankr. S.D. Tex. 2020). This Court held that Rule 9(b)'s heightened pleading standard applied to actual fraudulent transfers but declined to rule on whether the heightened standard would apply to a claim for statutory constructive fraudulent transfer. *Id.*

The heightened pleading standard imposed on allegations of fraud is meant to protect parties' reputations from unsubstantiated allegations of fraudulent behavior. *Taylor v. Cmty. Bankers Sec., LLC*, No. 12-02088, 2013 WL 3166336, at \*7 (S.D. Tex. June 20, 2013) (citing *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir.1992)). But in the context of constructive fraud, such concern is not warranted. Constructive fraud does not allege fraudulent intent or bad behavior on the part of the actors involved. Instead, constructive fraud looks to the economic realities of a transaction to determine whether the proper, equitable solution is to claw back transfers made in favor of one party to the unfair detriment of another. Because constructive fraud is, definitionally, not actual fraud, the Court declines to hold a plaintiff to the heightened standard of Rule 9(b). To do so would effectively cause every claim for constructive fraud to fail at the pleading stage where there is no "why" or other indicia of an intent element present in the facts of a case even though a claim for constructive fraudulent transfer

does not require a showing of intent.  Instead, the Court applies the Rule 8 pleading standard and requires, simply, "a short and plain statement of the claim, showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  Of course, regardless of whether Rule 8 or Rule 9 applies, one must set forth a plausible case for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

## DISCUSSION

The second amended complaint fails to sufficiently plead an actual benefit that is avoidable and recoverable against the Defendants on the theory of constructive fraudulent transfer.  Further, Dunn's allegation that the Defendants are transfer beneficiaries under § 550 is rejected by Fifth Circuit authority.

Dunn is not at fault here.  He is the successor trustee of a trust established under a confirmed plan.  That confirmed plan gave a release to the initial transferee.  That was the business deal that was negotiated by the parties and confirmed by the Court.

Dunn may view the Plan releases as an unfair result and he is trying to find a way around the Plan.  It is not, however, unfair at all.  There is nothing unfair in enforcing the business deal made by the parties.

## I.  DIRECT BENEFIT

Section 550(a) of the Code provides the trustee three sources of recovery for a fraudulent transfer claim: the initial transferee, subsequent transferee, and the person or entity for whose benefit the transfer is made.  11 U.S.C. § 550(a).  Section 24.009 of TUFTA follows the same language.  TEX. BUS. & COM. CODE § 24.009(b) (allowing recovery from "a person for whose benefit the transfer was made").  Dunn seeks to recover transfers AMH made to KFM, not directly from the corporate entities, but instead from the shareholders of KFM, the HPS and ARM defendants.  ECF No. 70.

His decision is unsurprising. The confirmed Plan released KFM from causes of action, including avoidance actions under §§ 544, 548, and recovery under § 550. Case No. 19-35133, ECF No. 1594 at 3, 10, 37. As a result, Dunn cannot recover from KFM, the initial transferee. To avoid and recover the transfers, Dunn must sue the shareholder-defendants, who were excluded from the release. But Dunn cannot assert that the Defendants are subsequent transferees. They received no cash, no transfers, and nothing at all from Dunn's predecessors. Instead, they were shareholders of a corporation that received actual value from sale proceeds.

Dunn's recovery must rely on the theory that the Defendants are transfer beneficiaries for "whose benefit the transfer is made." § 550(a). The court in *In re Grube* held that a trustee may bring an action against a "beneficiary of the initial transfer, without naming the initial transferee as a necessary party." 500 B.R. 764, 771–72 (Bankr. C.D. Ill. 2013). The initial transferee and the transfer beneficiary are liable parties on "equal statutory footing in the same subparagraph." *Id.* at 772; *see* § 550(a)(1). Nothing in the statute requires Dunn to seek avoidance against one party over another. Under *Grube*, the plan release should not affect Dunn's ability to seek avoidance and recovery of the transfers against the Defendants.

A transfer beneficiary is not explicitly defined in § 550 or in other provisions in the Code. The "paradigm" case is when a guarantor's liability on an underlying debt is reduced when a debtor makes a payment to a lender. *In re Arabella Petroleum Co., LLC*, 647 B.R. 851, 871 (Bankr. W.D. Tex. 2022) (noting that the guarantor receives benefit in the form of having its liability reduced). Courts have extended transfer beneficiary status outside of the guarantor-guarantee context.[2]

---

[2] *See, e.g., In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747, 769–70 (W.D. La. 2013) (transfers were made for the benefit of assignee if chapter 11 debtor continued to contribute labor and resources to shipbuilder after debtor assigned rights to construction contract); *In re Mastro*, 465 B.R. 576, 614–16 (Bankr. W.D. Wash. 2011) (wife of a chapter 7 debtor was liable as beneficiary of self-settled trusts which received fraudulent transfers); *Baldi v. Lynch (In re McCook Metals, LLC)*, 319 B.R. 570, 588–

In this line of cases, the threshold question is identifying the actual benefit, which must be "direct, ascertainable, and quantifiable" and "must correspond to . . . the value of the property that was transferred." *In re Arabella Petroleum Company, LLC*, 647 B.R. 851 (Bankr. W.D. Tex. 2022). An indirect benefit to shareholders is not actionable under fraudulent transfer law. *Id.* at 872.

Dunn was granted leave to amend his complaint on the narrow grounds of explaining the plausible basis as to what direct benefit was received by the Defendants. ECF No. 64. Count I of the second amended complaint alleges that the HPS and the ARM defendants received a "direct, quantifiable benefit" from the purported constructive fraudulent transfer "in the form of the proceeds of the sale of KFM through the Business Combination." ECF No. 70 at 23. Dunn identifies the benefit to HPS as at least $606 million in cash and $177.1 million in stock. ECF No. 70 at 23. The benefit to the ARM defendants is allegedly $92.2 million in cash and $95.8 million in stock. ECF 70 at 23.

The Court previously held that the KFM sale proceeds are not a direct benefit received by the Defendants. ECF No. 63 at 13. The second amended complaint merely supplants the first amended complaint with approximate numerical values of the sale proceeds apportioned to each defendant. This still does not meet the standard put forth by *Arabella*. Dunn does not allege the quantifiable amount of the sale proceeds attributable to the gathering agreement obligations and payments. Instead, Dunn alleges that any sale proceeds received by the Defendants from the Business Combination would not have been possible without the purported fraudulent transfers.

The argument proves too much. If a corporation receives a transfer, and retains the transfer, there are a limitless number of future scenarios, each of which would have a benefit to shareholders. Here are just a few examples:

---

90 (Bank. N.D. Ill. 2005) (transfer of right to purchase assets between corporate entities was made for the benefit of controlling shareholder of both entities).

- The funds could be held by the corporation indefinitely and the share price increases;

- The funds could be used to reduce the debt of the corporation and the share price increases;

- The corporation could be insolvent just before it received the funds, and then sold with just enough money to pay off all of its debt;

- The corporation could be sold and a distribution of sales proceeds could be made to the shareholders.

Under Dunn's argument, shareholder liability would arise only under the last scenario. But why should that be? Should the shareholders who chose to hold their shares with an increased value retain their good fortune, but the ones who decided to sell and reinvest their capital gains be liable? And how are sale proceeds more of a direct and quantifiable benefit than an increase in share price under *Arabella* when the sale is just a reflection of the share value?

Without expanding more about the direct benefit requirement, Dunn alleges that the transfers were intended to increase shareholder value after the Business Combination. Of course, the business decisions made during these agreements were intended to maximize profits. Ordinarily, that would result in an indirect benefit to the shareholders. But intent to benefit is insufficient for recovery without receipt of an actual benefit received by the alleged transfer beneficiary. *In re Arabella Petroleum Co., LLC,* 647 B.R. 851, 872 (Bankr. W.D. Tex. 2022). Receipt of indirect benefits do not transmogrify shareholders into transfer beneficiaries. *Id.*

Dunn further alleges that the AMH Gathering Payments, up to $7,634,360.40, are constructive fraudulent transfers that are avoidable and recoverable under §§ 548(a)(1)(B), 550(a)(1). ECF No. 70 at 23. Dunn alleges that the Gathering Agreement Obligations and AMH Gathering Payments, in the aggregate amount of $147,032,580.27, are

avoidable under TUFTA.  ECF No. 70 at 26.  But Dunn neither alleges how these obligations and payments correspond with the benefit received by the Defendants beyond an intent to sell KFM, nor alleges that any amount of the gathering payments was paid to the shareholder-defendants.  Dunn merely suggests that the transfers increased the sales price of KFM and the Defendants benefitted from the sale. By this reasoning, any transaction that a corporation enters into and results in an increase of share price would subject shareholders to transfer beneficiary liability.

The record reflects that sales proceeds were paid to the Defendants.  However, Dunn is unable to quantify how much the sales proceeds were increased as a result of the transfers.  Applicable law requires that the liability of a party who "benefitted" from a transaction must bear a direct and quantifiable benefit, not the kind of speculative financial effect that Dunn alleges here.

Dunn argues that because the ultimate sales proceeds were enhanced as a result of the transfer, the defendants should be held liable as parties that "benefitted" from the transaction.  But Dunn does not directly confront *Arabella*, a recent decision that does not support that result. If the benefit received is not direct or does not correspond to the value of the transferred property, it is treated an indirect benefit.  *In re Arabella Petroleum Company, LLC*, 647 B.R. 851 (Bankr. W.D. Tex. 2022).

A brief reversion to the all-important facts, taken in the light most favorable to Dunn is appropriate.

- KFM, the initial transferee, received over $147 million from the 2015–16 gathering agreements within a three-year period.  ECF No. 70 at 2.

- Per the 2015 agreements, AMH was obligated to pay capital recovery fees, which are foreign in the gas industry, to KFM.  ECF No. 70 at 11.  Because the fees were 90-100%

higher than market rates, AMH was forced to sell oil and gas at a loss.  ECF No. 70 at 11.

- The 2016 amendments transformed the 2015 agreements into covenants that run with the land and conveyed transportation interests to KFM without any additional consideration to AMH.  ECF No. 70 at 25.  As a result of these obligations and payments, KFM's financial condition greatly improved right before the Business Combination.  ECF No. 70 at 23.

- After the Business Combination, KFM was sold and the Defendants received the increased value of KFM in sale proceeds from the 2015–16 agreements.

- The Business Combination occurred in February 2018, approximately three years after the first of a series of conveyances that Dunn seeks to avoid.

This type of additive value is undoubtedly a benefit.  But, the law does not impose liability on shareholders when the benefit is so attenuated.

Here, the sale price does not correspond to the value of the transfers in any ascertainable way. It is an incidental, indirect benefit from agreements that were entered into years before the Business Combination and sale of KFM occurred.  Dunn cannot directly quantify the amount that the transfers increased the sales price.   The sales price alone does not directly reflect the corresponding benefit from the value of the transfers.  The benefit received by the shareholders is merely an indirect benefit from business agreements.

II.   SHAREHOLDER STATUS

Since Dunn cannot plausibly allege the direct benefit received by the Defendants, Dunn must rely on the Defendants' position as shareholders.  In the Fifth Circuit, shareholders are not liable for transfers to the corporation unless (i) they actually received

distributions of the transferred property; or (ii) there is reason to pierce the corporate veil. *Janvey v. Libyan Inv. Auth.*, 840 F.3d 248, 266 (5th Cir. 2016) (citing *Schechter v. 5841 Building Corp. (In re Hansen)*, 341 B.R. 638, 645–46 (Bankr. N.D. Ill. 2006)). Here, Dunn does not plausibly allege that the Defendants received any distribution of the transferred property. He concedes that he is not seeking recovery from the Defendants as subsequent transferees. Dunn further does not allege grounds for piercing the corporate veil. At the July 17, 2023, hearing, Dunn argues that veil-piercing is only necessary under alter-ego liability where the "control" shareholder is treated as an initial transferee. ECF No. 88 at 28.[3] But even if he pursued veil-piercing, the Fifth Circuit has only recognized veil piercing in cases of actual fraud, which is not plead here.[4] *Spring St. Partners-IV, L.P. v. Lam*, 730 F.3d 427, 442–44 (5th Cir. 2013) (recognizing that limited liability protection can only be removed if complainant proves actual fraud under TEX. BUS. ORG. §§ 21.223(a)(2), (b)); ECF No. 63 at 16.

Dunn creatively alleges that the Defendants had an active role in "diverting value" from AMH to KFM and received that "diversion in the form of cash proceeds." ECF No. 77 at 19. The second amended complaint details how the Defendants, with their substantial ownership rights in KFM and AMH, orchestrated the gathering agreements with the intent of flipping KFM for profit. ECF 74 at 8. Dunn looks outside the Fifth Circuit to find cases conferring transfer beneficiary status on active shareholders.

In *Baldi v. Lynch (In re McCook Metals, LLC)*, the court held that a majority shareholder of an insolvent debtor was a transfer beneficiary

---

[3] The Court previously held that veil-piercing is only applicable in the context of actual fraud. ECF No. 63 at 14. In this complaint, Dunn's claims are limited to the constructive fraudulent transfer theory.

[4] Conversely, Oklahoma does not require a pleading of actual fraud to pierce the corporate veil. *Franzier v. Bryan Memorial Hosp. Authority*, 775 P.2d 281, 288 (Okla. 1989) ("If one corporation is but an instrumentality or an agent of another, corporate distinctions must be disregarded and the two separate entities must be treated as one.").

under § 550. 319 B.R. 570, 589–90 (Bankr. N.D. Ill. 2005). The insolvent debtor transferred its rights to acquire assets worth $11 million to another company controlled by the same shareholder. 319 B.R. 570, 589–90 (Bankr. N.D. Ill. 2005). In exchange, the insolvent debtor received less than reasonably equivalent value in the amount of $7,826,959. *Id.* at 589. The court held that the transfer was constructively fraudulent and was made for the benefit of the shareholder. *Id.*

Here, the second amended complaint follows the reasoning set forth in *McCook*. Dunn's numerous allegations focus on identifying "badges of fraud" in § 548(a)(1)(B). AMH was allegedly "cash-flow insolvent" between 2015–16 and was undercapitalized with a debt-to-equity ratio of 20 to 1. ECF No. 70 at 14. AMH received less than reasonably equivalent value in exchange for making the Gathering Payments and incurring the Gathering Agreement Obligations. ECF No. 70 at 21. Dunn alleges there was common ownership between AMH and KFM by HPS which stood on both sides of the transaction and sought to benefit from the transfers which preceded the Business Combination. ECF No. 70 at 6. Like in *McCook*, Dunn alleges the Defendants are transfer beneficiaries due to their involvement as controlling shareholders.

Perhaps Dunn's allegation that the Defendants are transfer beneficiaries is a plausible one under Fourth Circuit law. But even if Fourth Circuit law governed, Dunn would still need to plausibly allege that the Defendants received an actual benefit that is quantifiable and accessible by the Defendants. *McCook*, 319 B.R. at 590–93 (noting that a "merely theoretical benefit is not sufficient, since it would not be subject to disgorgement"). He has not sufficiently done so.

The Court is also cautious in disregarding Fifth Circuit precedent when *Janvey* provides us with clear directive that majority shareholders are not liable for transfers they did not actually receive unless a showing for veil-piercing can be made. *Janvey v. Libyan Inv. Auth.*, 840 F.3d 248,

266 (5th Cir. 2016). Dunn instead requests the Court to make a distinction based on *McCook*.

There is reason to avoid making that distinction here. Corporations under common ownership make agreements all the time. Many of these agreements are not as profitable for one side of the transaction. Many of these agreements are intended to increase value of an entity's shareholders. This may be what happened here. But that does not justify disregarding the corporate form and exposing benefitted shareholders to fraudulent transfer avoidance actions by default. It also does not permit a trustee to trace the transfers to a theoretical amount of sale proceeds.

The Fifth Circuit provides Dunn with multiple avenues of recovery. He could have amended his complaint to plead actual fraud, albeit under the higher Rule 9 standard, or to pierce the corporate veil and recover from the Defendants as initial transferees under alter-ego liability. Alternatively, *Arabella* and *Janvey* permitted Dunn to recover on the constructive fraudulent transfer theory if he could have plausibly plead that Defendants received a direct and quantifiable benefit. Dunn did not sufficiently plead any theory.

Dunn has had multiple opportunities to replead. Further efforts would be futile. The second amended complaint must be dismissed with prejudice.

## CONCLUSION

The Court will enter an order consistent with this Memorandum Opinion.

Signed: 10/01/2024

Marvin Isgur
United States Bankruptcy Judge

**EXHIBIT C**

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

March 03, 2023

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 19-35133** |
| **ALTA MESA RESOURCES, INC.**, *et al.*, | § | |
| | § | **CHAPTER 11** |
| Debtors. | § | |
| | § | |
| **DAVID DUNN,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 21-3909** |
| | § | |
| **HPS INVESTMENT PARTNERS, LLC,** *et al.*, | § | |
| | § | |
| | § | |
| Defendants. | § | |

### ORDER

1.  Dunn's First Amended Complaint (ECF No. 40) is dismissed without prejudice.

2.  Dunn is granted leave to file an amended complaint not later than March 17, 2023.

Any amended complaint must set forth a plausible basis as to what direct benefit was received by the Defendants from alleged constructive fraudulent transfers. No other amendments are authorized.

SIGNED 03/03/2023

Marvin Isgur
United States Bankruptcy Judge

1 / 1

**EXHIBIT D**

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
March 03, 2023
Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 19-35133** |
| **ALTA MESA RESOURCES, INC.,** *et al.*, | § | |
| | § | **CHAPTER 11** |
| Debtors. | § | |
| | § | |
| **DAVID DUNN,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 21-3909** |
| | § | |
| **HPS INVESTMENT PARTNERS, LLC,** *et al.*, | § | |
| | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

David Dunn, in his capacity as the trustee of the AMH Litigation Trust, filed this adversary proceeding, bringing claims against HPS Investment Partners, LLC and the ARM defendants (ARM Energy Holdings, LLC; Arm Midstream, LLC; and Asset Risk Management, LLC). Dunn seeks to recover fraudulent conveyances under 11 U.S.C. § 548 and the Texas Fraudulent Transfers Act (TUFTA) via 11 U.S.C. § 544. Both HPS and the ARM defendants filed 12(b)(6) motions to dismiss, arguing that (i) Dunn's claims are barred by prior litigation; (ii) Dunn's claims are at least partially barred by the look-back periods in both TUFTA and § 548; and (iii) Dunn's complaint fails to meet the pleading standards required of a claim for constructive fraudulent transfer. For the reasons stated below, the defendants' motions to dismiss are granted.

## BACKGROUND

Alta Mesa Holdings, LP (AMH) and Oklahoma Energy Acquisitions, LP are oil and gas exploration companies which filed under chapter 11 in September of 2019. (ECF No. 40 at 2).

The defendants exercised control over Kingfisher Midstream, LLC (KFM) at all times relevant to this proceeding. (ECF No. 40 at 5). Defendant HPS directly or indirectly owned or controlled AMH, KFM, High Mesa, Inc., and High Mesa Holdings. (ECF No. 40 at 5). All defendants are shareholders of KFM. (ECF No. 40 at 2). The allegations in Dunn's complaint center around the organizational structure of the parties involved at the time of an agreement they entered into in 2015 and amended in 2016 as well as a transfer of assets and entry into a management services agreement in conjunction with a business combination. (ECF No. 40).

## I. ORGANIZATIONAL STRUCTURE

Prior to the 2018 business combination, AMH was a limited partnership owned by Harlan Chappelle (President and CEO), Michael Ellis (COO), and High Mesa, Inc. (ECF No. 40 at 6). HPS was a substantial owner of High Mesa, Inc. (ECF No. 40 at 6). Alta Mesa Holdings, GP was the sole general partner of AMH. (ECF No. 40 at 6). Alta Mesa Holdings, GP had two members: Alta Mesa Resources, LP and High Mesa, Inc. (ECF No. 40 at 7). As of August 2017, High Mesa, Inc. held 100% of the voting interest in Alta Mesa Holdings, GP. (ECF No. 40 at 7).

High Mesa, Inc. was owned by HPS, Chappelle, and Ellis. (ECF No. 40 at 8). HPS held 50% of all the preferred stock in High Mesa, Inc. and was the beneficial owner of "at least 31%" of High Mesa, Inc.'s common stock. (ECF No. 40 at 8). The boards of Alta Mesa Holdings, GP, AMH, and High Mesa, Inc. were identical. (ECF No. 40 at 6). AMH and High Mesa, Inc. allegedly did not conduct separate board meetings. (ECF No. 40 at 8). As a result of this structure and relationship between and among the entities, defendant HPS exercised a high level of control over AMH: it held substantial voting power and any board-level decision would have required the approval of HPS. (ECF No. 40 at 8).

In 2014, AMH decided to increase its investment in the area of Oklahoma known as the STACK.[1] (ECF No. 40 at 8).  Defendants HPS and Asset Risk Management (ARM) formed KFM. (ECF No. 40 at 8).  At all relevant times, KFM was owned by defendants HPS and ARM as well as High Mesa, Inc.  (ECF No. 40 at 9).  KFM's board consisted of two representatives from ARM, two from AMH, and one from HPS.  (ECF No. 40 at 9).

Dunn alleges several ways in which ARM exercised control over KFM.  (ECF No. 40 at 9).  According to the complaint, ARM charged KFM for the use of facilities, employees, and tech. (ECF No. 40 at 9).  KFM allegedly used an affiliate of ARM to market production.  (ECF No. 40 at 9).

## II.    THE GATHERING AGREEMENT

AMH was the "anchor producer" for KFM.  (ECF No. 40 at 10).  Dunn's complaint alleges that the terms of the 2015 gathering agreement under which AMH became obligated to make payments to KFM was entered into under less-than-desirable terms designed to siphon value out of AMH and into KFM.  (ECF No. 40 at 10).

ARM presented marketing materials to AMH's owners which, allegedly, "touted the purported benefits of paying above market rates to KFM." (ECF No. 40 at 10).  Specifically, Dunn alleges that the presentation demonstrated how a sale of KFM in later years would yield a return on investment in the 400-600% range the more that AMH paid to KFM.  (ECF No. 40 at 10). AMH rejected a proposed term that would have given it additional control over the gas gathering process, allegedly because it would not have benefitted KFM.  (ECF No. 40 at 11).  Dunn alleges

---

[1] "STACK" is an acronym used in the oil and gas industry denoting a geographic region encompassing the Sooner Trend oil field, Anadarko basin, and Canadian and Kingfisher counties.

that HPS was highly involved in putting together the terms of the 2015 gathering agreement.  (ECF No. 40 at 11).

AMH obtained no fairness opinion and did not appoint an independent committee to evaluate the transaction with KFM.  (ECF No. 40 at 11).  According to the complaint, AMH did not pursue competitive offers and even "actively spurned" offers from other midstream gatherers offering lower rates.  (ECF No. 40 at 11).  Regardless, the AMH board voted to approve the agreement.  (ECF No. 40 at 11).

Dunn alleges many ways in which the agreement was skewed in favor of KFM to the disadvantage of AMH.  (ECF No. 40 at 12).  The rates AMH obligated itself to pay KFM were exorbitant, allegedly reflecting a 90% premium on market rates.  (ECF No. 40 at 12).  KFM charged AMH higher fees than fees than any of its other producers.  (ECF No. 40 at 12).  The agreements included "capital recovery fees," which were not industry standard and had not been historically used by any of the parties involved.  (ECF No. 40 at 12).  The capital recovery fees allegedly forced AMH to sell oil and gas at a loss on occasion.  (ECF No. 40 at 12).

KFM would deduct amounts due to KFM from sale proceeds it would otherwise owe AMH rather than pay according to the terms of the agreement.  (ECF No. 40 at 14).  KFM's services were not measuring up to AMH's needs under the agreement.  (ECF No. 40 at 15).  In 2016, Moody's downgraded AMH's debt.  (ECF no. 40 at 14).  AMH's debt-to-equity ratio was 20:1, reflecting undercapitalization during this period.  (ECF No. 40 at 14).  Tim Turner, a director of AMH, allegedly sent internal analyses to Chappelle demonstrating how harmful the 2015 agreements were to AMH.  (ECF No. 40 at 14).

AMH sought to restructure the gathering rates via amendments to the agreement in 2016.  (ECF No. 40 at 15).  Allegedly due to concerns over the effect of such a restructuring on the value

of KFM, the rates ended up reflecting an even higher premium over market rates than it had under the 2015 version of the agreement.  (ECF No. 40 at 15).  The 2016 amendments replaced "capital recovery fees" with "facility fees," which likewise was not industry standard.  (ECF No. 40 at 15).  The amendments went into effect without a vote from AMH and its board and stakeholders in December of 2016.  (ECF No. 40 at 16).  Dunn alleges that HPS controlled AMH's decisions with respect to the amendments and even threatened to withhold funding from AMH.  (ECF No. 40 at 17).  According to the complaint, AMH received nothing in consideration for the amendments, which purported to act as conveyances of a transportation interest as part of a scheme to turn parts of the agreement into covenants running with the land.[2]  (ECF No. 40 at 17).

KFM continued its practice of not invoicing AMH as the agreements provided, but rather deducting amounts due from sale proceeds between December 2016 and September 2019.  (ECF No. 40 at 17).  As a result of the agreement, AMH consistently lacked sufficient cash flow, had to draw on its credit facilities, and had to refinance its debt, all while the KFM investors allegedly profited from the arrangement.  (ECF No. 40 at 18).

## III.   THE 2018 BUSINESS COMBINATION

Silver Run was a special purpose acquisition company.  (ECF No. 40 at 18).  Three contribution agreements memorialized the terms of a business combination in February 2018 which effectively cashed out the owners of KFM and gave AMH an equity interest in a parent company called Alta Mesa Resources, the successor to Silver Run.  (ECF No. 40 at 19).

---

[2] At the time of the amendments, Dunn alleges that HPS had knowledge of and had concerns about a decision out of a New York bankruptcy court that said a contract with identical terms as the un-amended 2015 agreements did not constitute a covenant running with the land, which would affect the debtors' ability to reject the agreement if AMH filed for bankruptcy.  (ECF No. 40 at 17).

Through the business combination, AMH and KFM both became subsidiaries of a holding company called SRII OpCo. (ECF No. 40 at 19). A proxy statement circulated by Silver Run in anticipation of the business combination stated that the terms of the agreement were higher than current market rates for other, similar agreements. (ECF No. 40 at 15). AMH was still managed by Alta Mesa Holdings, GP, but Alta Mesa Holdings GP was now, in turn, controlled by SRII OpCo. (ECF No. 40 at 19). Silver Run was renamed Alta Mesa Resources, which owned all the general partnership interests in SRII OpCo and a "substantial portion" of the limited partnership interests. (ECF No. 40 at 19). HPS and High Mesa, Inc. held substantial shares of Alta Mesa Resources. (ECF No. 40 at 19).

The parties entered into several agreements in connection with the business combination:

AMH assigned its remaining non-STACK assets to High Mesa Holdings for allegedly no consideration. (ECF No. 40 at 19). In regard to this transaction, AMH neither obtained a fairness opinion nor did it otherwise conduct any kind of meaningful evaluation. (ECF No. 40 at 20). Dunn alleges that the non-STACK assets were valued at "tens of millions of dollars" at the time of this assignment. (ECF No. 40 at 19).

AMH entered into a management services agreement which obligated AMH to provide payroll expenses and other services to High Mesa, Inc. in exchange for the reimbursement of expenses and a nominal fee of $10,000 per month. (ECF No. 40 at 20). Dunn alleges this arrangement was well below market standards. (ECF No. 40 at 20). On top of that, High Mesa, Inc. failed to pay $10,000,000 under the management services agreement, and that balance remains outstanding.[3] (ECF No. 40 at 22).

---

[3] High Mesa, Inc. filed for relief under chapter 7 on January 24, 2020. (ECF No. 40 at 22).

## IV.   PROCEDURAL HISTORY

AMH filed under chapter 11 in September of 2019.  The confirmed Plan created the AMH Litigation Trust, which inherited certain causes of action held by the debtors, including the ones asserted by Dunn as trustee of the AMH Litigation Trust here.  (ECF No. 40 at 4-5).  The Plan charged Dunn with bringing the inherited causes of action on behalf of unsecured creditors.  (ECF No. 40 at 5).  Several creditors who remained unpaid on the petition date have claims going back to the period during which Dunn alleges that AMH was unable to meet its financial obligations and was financially strained as a result of the KFM agreement.  (ECF No. 40 at 22).

Dunn initially filed a complaint alleging actual fraudulent transfers based on the above facts.  (ECF No. 1).  The Court granted the ARM defendants' motion to dismiss the complaint without prejudice to Dunn's ability to file an amended complaint.  (ECF No. 34).  At the hearing on the motion to dismiss, the Court stated that Dunn's complaint must meet the Rule 9 pleading standards if the basis for relief is actual fraud.  (Hr'g Tr. 2:21-25, June 8, 2022).  In the amended complaint, Dunn brings six claims for the avoidance and recovery of constructive fraudulent transfer against the defendants under both the Bankruptcy Code and TUFTA.  (ECF No. 40).  Both HPS and the ARM defendants filed 12(b)(6) motions to dismiss.  (ECF Nos. 48, 49).  Following a hearing on the motions on November 16, 2022, the Court took the matter under advisement.  (ECF No. 61).

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(H).

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) affords defendants relief from a plaintiff's defective complaint. FED. R. CIV. P. 12(b)(6). Federal Rule of Bankruptcy Procedure 7012(b) applies Rule 12(b) to adversary proceedings. FED. R. BANKR. P. 7012(b).

The parties dispute what pleading standard the Court should apply in considering the defendants' 12(b)(6) motions. Certainly, the amended complaint does not meet a Rule 9 pleading standard. At the hearing held on June 8, 2022, the Court stated that, in attempting to sufficiently plead a basis to support a claim for *actual* fraudulent transfer, Dunn's complaint would have to meet the higher Rule 9 standard. (Hr'g Tr. 2:21-25, June 8, 2022). Dunn's amended complaint includes only claims for *constructive* fraudulent transfer. (ECF No. 40). Considering relevant Fifth Circuit case law and the purpose of the pleading standards, the Court applies the Rule 8 standard to the amended complaint's claims for constructive fraudulent transfer.

In *Matter of Life Partners Holdings*, the Fifth Circuit declined to rule on whether the Rule 8 plausibility standard or the heightened Rule 9(b) standard should apply to a claim under TUFTA for constructive fraudulent transfer. *Matter of Life Partners Holdings, Inc.*, 926 F.3d 103, 118 (5th Cir. 2019). The Fifth Circuit noted that

> [t]he elements of a constructive fraudulent transfer under Texas law are the same as actual fraudulent transfer except instead of pleading fraudulent intent, the plaintiff must plead facts demonstrating: (1) a lack of reasonably equivalent value for the transfer; and (2) the transferor was "financially vulnerable" or insolvent at the time of the transaction.

*Id*. at 117. Based on these elements, constructive fraud meaningfully differs from actual fraud because "the transaction is based on the transferor's financial condition and the sufficiency of the consideration provided by the transferee." *Id*. (citing *E. Poultry Distribs., Inc. v. Yarto Puez*, 2001 WL 34664163, at *2 (N.D. Tex. Dec. 3, 2001)). This Court held in *Juliet Homes* that "with constructive fraud, the actor's intent is irrelevant" when determining whether to apply the

heightened Rule 9 standard to a claim for common law constructive fraud. *In re Juliet Homes, LP*, No. 07-36424, 2010 WL 5256806, at *23 (Bankr. S.D. Tex. Dec. 16, 2010). There, this Court applied the Rule 8 standard to a common law claim for constructive fraud "because constructive fraud does not require proof of scienter." *Id*. at 23 (citing *SIPC v. Stratton Oakmont, Inc.*, 234 B.R. 293, 319 (Bankr.S.D.N.Y.1999)). In *Northstar*, this Court acknowledged the similar lack of an "intent" element in a claim for statutory constructive fraudulent transfer. *Katchadurian v. NGP Energy Cap. Mgmt., LLC (In re Northstar Offshore Grp., LLC)*, 616 B.R. 695, 721 (Bankr. S.D. Tex. 2020). This Court held that Rule 9(b)'s heightened pleading standard applied to actual fraudulent transfers but declined to rule on whether the heightened standard would apply to a claim for statutory constructive fraudulent transfer. *Id*.

The Court again holds that Rule 8 applies to claims for a constructive fraudulent transfer. Constructive fraud does not require the plaintiff to prove any facts relating to the defendants' intent, fraudulent or otherwise. It does not make sense to require a plaintiff to plead to the heightened Rule 9(b) standard, which captures the much more specific requirements of actual fraud, where the plaintiff would never be expected to prove those facts at trial to prevail on the claim. For example, the Rule 9(b) standard is interpreted as requiring the plaintiff to plead with particularity the "who, what, where, when and why" of the alleged fraud. *Matter of Life Partners*, 926 F.3d at 117 (citing *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)). However, the "why" is noticeably absent from the elements of constructive fraud. *Compare* 11 U.S.C. § 548(a)(1)(A) (requiring a showing of "actual intent to hinder, delay, or defraud") *with* § 548(a)(1)(B) (not requiring any such intent).

The heightened pleading standard imposed on allegations of fraud are meant to protect parties' reputations from unsubstantiated allegations of fraudulent behavior. *Taylor v. Cmty.*

*Bankers Sec., LLC*, No. CIV.A. H-12-02088, 2013 WL 3166336, at *7 (S.D. Tex. June 20, 2013) (citing *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir.1992)).  But in the context of constructive fraud, such concern is not warranted.  Constructive fraud does not allege fraudulent intent or bad behavior on the part of the actors involved.  Instead, constructive fraud looks to the economic realities of a transaction to determine whether the proper, equitable solution is to claw back transfers made in favor of one party to the unfair detriment of another.  Because constructive fraud is, definitionally, not actual fraud, the Court declines to hold a plaintiff to the heightened standard of Rule 9(b).  To do so would effectively cause every claim for constructive fraud to fail at the pleading stage where there is no "why" or other indicia of an intent element present in the facts of a case even though a claim for constructive fraudulent transfer does not require a showing of intent.  Instead, the Court applies the Rule 8 pleading standard and requires, simply, "a short and plain statement of the claim, showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).

To defeat a 12(b)(6) motion under the Rule 8 standard, the plaintiff must allege "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."  *George v. SI Grp., Inc.*, 36 F.4th 611, 619 (5th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A complaint plausibly states a claim for relief when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  "Plausibility," at the Rule 12(b)(6) stage, does not mean "possibility."  *Id*. at 679.  A complaint that offers bare legal conclusions, unsupported by well-pleaded factual allegations tending to establish a plausible basis for relief, must be dismissed.  *See id*. at 679–80 (citing *Twombly*, 550 U.S. at 551, 555, 565–67, 570) (explaining that legal conclusions cannot be taken as true without factual support).  The Court

reviews motions under Rule 12(b)(6) "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs." *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007).

## DISCUSSION

Even assuming the factual allegations concerning constructive fraudulent transfers are correct, the complaint fails to sufficiently plead that Dunn may recover from HPS or the ARM defendants for any of the claims for constructive fraudulent transfer on the trustee's theory that defendants are transfer beneficiaries.

## I.    COUNTS I AND II

Counts I and II of the complaint allege that recovery from the defendants is appropriate for constructive fraudulent transfers made in the form of payments under the 2015 gathering agreement and 2016 amendments.  (ECF No. 40 at 25-26).  Defendants argue that they are not entities from which the Litigation Trustee may recover because they were not "the initial transferee of such transfer or the entity for whose benefit such transfer was made."  11 U.S.C. § 550(a)(1), (2).  Section 550 of the Code would only allow recovery of a constructive fraudulent transfer from such a transferee or beneficiary.  *Id*.  Section 24.009 of TUFTA houses the same language and therefore the same standard concerning from whom a party may recover a fraudulent transfer. TEX. BUS. & COM. CODE § 24.009(b) (allowing for recovery from "a person for whose benefit the transfer was made").

The legal theory supporting the recovery provisions in the Bankruptcy Code and TUFTA is disgorgement.  The concept of disgorgement requires that an actual, quantifiable benefit is conferred upon a party which must then be disgorged.  *See, e.g., Baldi v. Lynch (In re McCook Metals, L.L.C.)*, 319 B.R. 570, 591 (Bankr. N.D. Ill. 2005).  To state that a transfer is merely

intended to benefit a particular party is therefore not enough—a defendant cannot be reasonably expected to disgorge beneficial intent. *See id*. As the Fifth Circuit explained, any

> "approach that permits recovery based merely on the intent of the debtor/transferor without any benefit being conferred on the third party results in the harsh outcome that the third party can be liable for the return of an avoidable transfer without having received any benefit, which is generally contrary to the disgorgement remedy of avoidance actions."

*Janvey v. Libyan Inv. Auth.*, 840 F.3d 248, 267 (5th Cir. 2016) (quoting COLLIER ON BANKRUPTCY ¶ 550.02[4]).

In *Janvey*, the Fifth Circuit held that shareholders are not liable for transfers made to a corporation unless they actually receive distributions of the transferred property.[4]  *Janvey*, 840 at 266 (citing *Schechter v. 5841 Building Corp. (In re Hansen)*, 341 B.R. 638, 645-46 (Bankr. N.D. Ill. 2006)).  Without some theory beyond the mere ownership of an interest in the corporation which actually received a transfer, the owner cannot be automatically assumed to have received a benefit.  *Id*.  *Janvey* expressly endorsed the logic of *Hansen*.  *Janvey*, 840 F.3d at 266.  *Hansen* noted that the classic example of a beneficiary transferee under § 550 is a guarantor, who does not receive a direct or subsequent transfer, but nevertheless "benefits" by being relieved of an obligation.  *Hansen*, 341 B.R. at 643.  Like Dunn, the plaintiff in that case tried to argue that the defendant could be assumed to have received a benefit because of his position of control over the initial transferee-company.  *Id*. at 645.  As the court noted,

> [n]othing in section 550(a)(1) indicates that corporate form can be thrust aside and all voidable transfers to a corporation recovered from its shareholders on the mere assumption that shareholders somehow automatically 'benefit' from such transfers . . . . The better view—and the one consistent with corporate law—is that shareholders, officers, and directors are not liable for transfers to their corporation unless they actually received

---

[4] Though *Janvey* considered only TUFTA claims, it interpreted the same language as that found in § 550 and relied on case law interpreting § 550 in reaching its conclusions.  *Janvey*, 840 F.3d at 266.  Therefore, the Court finds the *Janvey* logic persuasive here.

distributions of the transferred property (in which case they would be subsequent transferees . . .), or a showing can be made to pierce the corporate veil.

*Id*. at 645-46.

The complaint contains a plethora of allegations regarding the defendant's exercise of control over AMH and KFM. But "control" alone is not enough to make a defendant a transfer beneficiary. *Janvey*, 840 F.3d at 266 ("if corporate existence is to be observed, transfers cannot be recovered even from a shareholder who by virtue of his majority ownership, ostensibly 'controls' the corporation . . . ."). Dunn alleges that HPS participated in the transactions as something more than a passive shareholder when it threatened to withhold funding from AMH to coerce it into agreeing to the 2016 amendments. (ECF No. 40 at 17). The ARM defendants were allegedly involved in crafting the gathering agreement as well, and the parties' course of performance under the agreements perhaps reflects a less than arms' length arrangement. (ECF No. 40 at 10, 13). While these allegations paint a picture of intent to coerce, the complaint does not allege actual fraud, so intent is irrelevant.

What is relevant to recovery from a transfer beneficiary on a theory of constructive fraudulent transfer is the actual benefit received by the defendant. The complaint does not plausibly plead the receipt of an actual benefit as a result of the transfer. Dunn counters that the defendants did receive an actual benefit in the form of the increased value of KFM. (ECF No. 40 at 19). Dunn alleges that the defendants realized that increase in value at the time of the business combination because the increase in KFM's value was supposedly reflected in the $800,000,000.00 sale price. This theory falls short of the plausibility standard for several reasons.

The base fact of the sale price does not sufficiently allege how it reflects value (a benefit) that the defendants received as a result of payments made under the gathering agreement. The business combination involved the sale of *both AMH and KFM*. (ECF No. 40 at 19). Not only

did the sale involve both entities, but Dunn alleges that HPS and the ARM defendants were not

the only "owners" of KFM who received the benefits of the sale proceeds.  (ECF No. 40 at 19).

Even if that value could be allocated between the two entities, Dunn alleges that the shareholder-

defendants here also held interests in AMH.  It would seem then, if anything, that the realization

of AMH's decreased value at the time of the business transaction would counter-balance the

increase in value of KFM.[5]

Once Dunn did demonstrate how that value would be allocated, he would then need to

connect that increase in value to the alleged fraudulent transfers.  Dunn's theory on this front

appears to run afoul of the Fifth Circuit's teachings.  As the complaint is written, every shareholder

of every corporation that receives a distribution would "benefit" from any increase in the value of

the corporation if the corporation received a constructively fraudulent transfer.  That is not the type

of tangible benefit that is required.  Instead, it is at best an attenuated correlation tantamount to

veil piercing without cause.  To reach any value in the hands of a shareholder on the theory that

they are a transfer beneficiary, Dunn would need to pierce the veil.[6]  *Hansen*, 341 B.R. at 645.  The

complaint brings no veil-piercing claim, which would at the very least present a high bar if veil-

piercing would even apply in the context of constructive fraud.  *See, e.g., Matter of Ritz*, 832 F.3d

560 (5th Cir. 2016) (finding that veil-piercing is only an available remedy to collect from

---

[5] As the complaint explains, HPS substantially owned and controlled High Mesa, Inc., which, in turn, exercised control over AMH.  Therefore, at least with respect to HPS, the complaint does not make clear exactly why or how HPS would benefit from the increased value of KFM if the trade-off was a decrease in value of AMH.

[6] KFM is a limited liability company, so its shareholders (defendants here) enjoy the protection of the liability shield.  *See, e.g., Spring St. Partners-IV, L.P. v. Lam*, 730 F.3d 427, 442-444 (5th Cir. 2013) (piercing the veil in the context of actual fraud and noting the absence of the veil-piercing remedy in cases of constructive fraud).  For the sake of clarity, Dunn does not allege that business combination or sale price itself constituted constructive fraud, in which case no veil-piercing would be necessary because the shareholders would be considered an initial transferee.  The theory is that the gathering agreements constituted constructive fraud, and the defendants are transfer beneficiaries to the extent that those constructively fraudulent transfers increased the value of the KFM, the entity in which they were shareholders.

shareholders where the plaintiff can show that the shareholder engaged in actual fraud when attempting to recover under TUFTA).[7]

While there might be a scenario in which, through their respective positions of control, the defendants might be transfer beneficiaries or subsequent transferees of payments made under the gathering agreement with KFM, the complaint has not plead sufficient facts to support that legal conclusion, particularly in light of the veil-piercing issue. Counts I and II fail to meet the Rule 8 pleading standard, leaving only the claims against HPS concerning the MSA and assignment of the non-STACK assets.

## II.    COUNTS III, IV, V, AND VI

The Complaint further proposes recovery from HPS on account of alleged fraudulent transfers under both § 550 and TUFTA. On the facts plead, HPS was not an initial or subsequent transferee, as Dunn does not allege it ever inherited either the MSA or non-STACK assets from High Mesa, Inc.[8] To recover from HPS, the complaint must plausibly plead that HPS was a beneficiary of the allegedly fraudulent transfer of those assets. For the reasons stated above, the veil-piercing issue also applies to Counts III, IV, V, and VI. But the complaint fails before reaching that issue.

Dunn's claims for recovery from HPS based on the assignment of the non-STACK assets and the MSA fail to sufficiently plead that HPS is a transfer beneficiary from which the Litigation Trust may recover. The *McCook Metals* court required a showing of an actual, quantifiable benefit, in sync with the logic of *Janvey*. *McCook*, 319 B.R. at 591. The complaint contains no specific

---

[7] Dunn conspicuously elected not to move forward on a theory of actual fraud and asserts only claims for constructive fraudulent transfer, as the Court notes in the discussion of legal standards above.

[8] The non-STACK assets were assigned to High Mesa Holdings, which High Mesa Inc. controlled. (ECF No. 40 at 20). High Mesa Inc. itself was the counterparty to the MSA. (ECF No. 40 at 20).

allegations concerning HPS's direct involvement in either the assignment of the non-STACK assets or the MSA beyond blanket statements that HPS exercised "control" over High Mesa, Inc., AMH, and KFM.  There are many factual allegations concerning *High Mesa Inc.'s* involvement in the MSA and the assignment of the non-STACK assets which might imply that High Mesa, Inc. received a quantifiable benefit.  The Court and—more poignantly—the defendant are left to guess as to what benefit Dunn alleges *HPS* received which it now must disgorge.

As in Counts I and II, the complaint's many allegations supporting that idea that, through the corporate structure of these entities, HPS exercised control over both AMH and High Mesa, Inc. does not equate to a factual allegation of an actual, quantifiable benefit conferred on HPS. Though it might show motivation as to why the parties might enter into such agreements, it does not plead how or to what extend HPS received a benefit.  It merely suggests a hypothetical way in which HPS might have been able to access what the complaint alleges was a benefit conferred on High Mesa, Inc. (e.g., the value of the non-STACK assets or payments made under the MSA). Dunn alleges that this access came merely as a result of HPS's ownership interest in High Mesa, Inc.  (ECF No. 40 at 33).  The idea of a derivative benefit has been rejected by the Fifth Circuit for the reasons explained above.  *See Janvey*, 840 F.3d 248.  Dunn does not attempt to pierce the corporate veil, even if that remedy was available in the case of constructive fraud.  *See, e.g., Spring St. Partners-IV* 730 F.3d at 442-444; *Matter of Ritz*, 832 F.3d 560.

The complaint lacks the allegations sufficient to plead a plausible basis for Dunn's theory of recovery.  The 12(b)(6) motion is granted as to Counts III, IV, V, and VI, all of which involve claims against HPS for the recovery of the non-STACK assignment and MSA.

## CONCLUSION

Both the ARM defendants' and HPS's 12(b)(6) motions to dismiss the complaint are granted. A separate order will be entered allowing Dunn the narrow ability to replead allegations showing how the shareholder-defendants received a direct benefit from the alleged constructive fraudulent transfers.


SIGNED 03/03/2023


_____
Marvin Isgur
United States Bankruptcy Judge