# EXHIBIT 1

*Execution Version*

# GAS GATHERING AND PROCESSING AGREEMENT

## Oklahoma Energy Acquisitions, LP

## and

000267

## Kingfisher Midstream LLC

**August 31, 2015**

000268

**TABLE OF CONTENTS**

Article I DEFINITIONS AND INTERPRETATION ..................................................................... 1
    Section 1.1   Definitions.  The following terms shall have the following meanings
               unless otherwise indicated: ........................................................................ 1
    Section 1.2   Interpretation. ......................................................................................... 8

Article II TERM .......................................................................................................................... 9
    Section 2.1   Term. ....................................................................................................... 9

Article III GATHERING AND PROCESSING SYSTEM ........................................................... 9
    Section 3.1   Construction of Gathering and Processing System. .................................... 9
    Section 3.2   Easements, Rights-of-Way and Fee Lands. ................................................ 9
    Section 3.3   Dedication. ............................................................................................. 10
    Section 3.4   Covenant Running With Land. ................................................................. 11
    Section 3.5   Covenant Not to Gather, Market or Process Gas. ..................................... 11
    Section 3.6   Option to Expand Gathering and Processing System. ............................... 11
    Section 3.7   Title Warranty. ...................................................................................... 12
    Section 3.8   Proceeds of Production. .......................................................................... 12
    Section 3.9   Operating Inventory. .............................................................................. 12
    Section 3.10  Receipt Points and Central Receipt Points .............................................. 12
    Section 3.11  Additional Receipt Points; Obligation to Interconnect. ........................... 13

Article IV GAS QUALITY AND PRESSURE ........................................................................... 13

000269

Section 4.1    Measurement, Equipment and Testing. ....................................... 13

Section 4.2    Specifications. ........................................................................... 14

Section 4.3    Delivery Pressure. ..................................................................... 14

Section 4.4    Compression. ............................................................................. 14

Article V GATHERING, PROCESSING AND DELIVERY ................................ 14

Section 5.1    Delivery, Receipt and Processing of Gas. .................................. 14

Section 5.2    Operational Gas. ........................................................................ 15

Section 5.3    Scheduling. ................................................................................ 15

Section 5.4    Equal Receipt and Delivery. ...................................................... 15

Section 5.5    Exchange of Information. ........................................................... 16

Section 5.6    Delivery of Residue Gas and NGLs; Thermally Equivalent Volumes. .......... 16

Section 5.7    Commingling. ............................................................................. 16

Section 5.8    Allocation of Volumes Delivered. .............................................. 16

Section 5.9    Allocation of NGLs and Shrinkage. ........................................... 16

Section 5.10   Transfer of Title and Risk of Loss. ............................................ 17

Article VI SERVICE FEES ................................................................................ 17

Section 6.1    Service Fees. .............................................................................. 17

Section 6.2    Payment for Other Fuel. ............................................................ 17

Section 6.3    Escalation. ................................................................................. 17

Article VII PAYMENT ...................................................................................... 18

i

000270

Section 7.1    Billing. ........................................................................................... 18
Section 7.2    Payment........................................................................................... 18
Section 7.3    Disputed Amounts. ......................................................................... 18
Section 7.4    Taxes. .............................................................................................. 18
Section 7.5    Audit. .............................................................................................. 19

Article VIII NOTICES.................................................................................................19
Section 8.1    Notices. ........................................................................................... 19

Article IX FINANCIAL RESPONSIBILITY ...............................................................19

Article X INDEMNITY ................................................................................................19
Section 10.1    Indemnity. ..................................................................................... 19
Section 10.2    Notification Obligation. ............................................................... 20

Article XI CURTAILMENT AND MAINTENANCE....................................................20
Section 11.1    Curtailment and Temporary Release of Gas. ................................ 20
Section 11.2    Maintenance Events. ..................................................................... 21

Article XII FORCE MAJEURE.....................................................................................21
Section 12.1    Force Majeure. ............................................................................... 21

Article XIII DEFAULT AND TERMINATION ............................................................22
Section 13.1    Producer Events of Default. ......................................................... 22
Section 13.2    Gatherer's Default Remedies Against Producer. .......................... 22

000271

Section 13.3   Gatherer Events of Default. ............................................................22

Article XIV ASSIGNMENT..................................................................................23
    Section 14.1   Assignment. ...................................................................................23

Article XV Limitation of liability .........................................................................23
    Section 15.1   Limitation of Liability...................................................................23

Article XVI CONFIDENTIALITY .........................................................................23
    Section 16.1   Confidentiality. ..............................................................................23

Article XVII DISPUTE RESOLUTION ..................................................................24
    Section 17.1   Dispute Resolution.........................................................................24

Article XVIII MISCELLANEOUS ..........................................................................24
    Section 18.1   Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury
             Trial. 24
    Section 18.2   Survival. .........................................................................................25
    Section 18.3   No Joint Venture. ...........................................................................25
    Section 18.4   Entire Agreement. ..........................................................................25
    Section 18.5   No Third Party Beneficiaries. ........................................................25
    Section 18.6   Regulatory Matters.........................................................................25

ii

Section 18.7   Execution in Counterparts................................................................ 26

Schedule 3.3          Dedicated Area
Schedule 3.4          Form of Memorandum of Gas Gathering and Processing Agreement
Schedule 3.10         Receipt Points
Schedule 3.11(a)      Form of Notice for Designation of Additional Receipt Point
Schedule 4.1          Measurement, Equipment and Testing
Schedule 4.2          Specifications
Schedule 6.1          Service Fees
Schedule 8.1          Notices

iii

## GAS GATHERING AND PROCESSING AGREEMENT

This Gas Gathering and Processing Agreement (this "*Agreement*") is made and entered into this 31st day of August, 2015 (the "*Effective Date*"), by and between Oklahoma Energy Acquisitions, LP, a Texas limited partnership ("*Producer*") and Kingfisher Midstream LLC, a Delaware limited liability company ("*Gatherer*").  Producer and Gatherer may be referred to each individually as a "*Party*," or collectively as the "*Parties*."

## RECITALS

**WHEREAS**, Producer owns, controls or may acquire certain mineral interests and hydrocarbon reserves (collectively, the "*Producer's Interests*," as further defined below), and controls the mineral interests of others (collectively, the "*Other Interests*," as further defined below) in certain lands in Kingfisher, Logan, Canadian, Blaine and Garfield Counties, Oklahoma, described more particularly on **Schedule 3.3** attached hereto (the "*Dedicated Area*"); and

**WHEREAS**, Producer has or contemplates having a supply of natural gas (the "*Gas*") and associated natural gas liquids (the "*NGLs*") from present and future wells located in the Dedicated Area and desires to Dedicate (defined below) the Producer's Interests and Other Interests, and deliver such Gas and NGLs (together, the "*Committed Gas*") to Gatherer for gathering and processing; and

**WHEREAS**, Gatherer shall construct, own and operate Gas gathering and processing facilities (collectively, the "*Gathering and Processing System*," further defined below) capable

000275

of receiving from Producer deliveries of the Committed Gas from the Dedicated Area and subject to the Dedication; and

**WHEREAS**, Producer desires that Gatherer provide gathering and processing services as set forth in this Agreement, and Gatherer desires to provide to Producer gathering and processing services in accordance with the terms and conditions set forth in this Agreement; then

**THEREFORE**, for and in consideration of the mutual covenants set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

**Section 1.1    Definitions.**    The following terms shall have the following meanings unless otherwise indicated:

"***Additional Capacity***" has the meaning set forth in Section 3.6.

"***Additional In-Service Date***" means, with respect to any Additional Capacity, if applicable, the first day of the first full month following the date that Gatherer notifies Producer that such Addition Capacity has been completed and is ready to receive Gas.

1

"***Additional Receipt Point***" has the meaning set forth in Section 3.11(a).

"***Affiliate***" means with respect to a Person, any Person which, directly or indirectly, controls, is controlled by or is under common control with such Person or such Person's members or shareholders.  For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such individual or entity, whether through the ownership of voting securities, by contract or otherwise, *provided*, *however*, that for purposes of this Agreement, Producer and Gatherer shall not be considered Affiliates of each other.

"***After-Acquired Interests***" has the meaning set forth in Section 3.3(a).

"***Agreement***" has the meaning set forth in the introductory paragraph.

"***Allocated Actual Quantities***" means, Residue Gas plus NGLs plus Field Fuel plus Plant Fuel plus Operational Gas.

"***Allocated CRP Volume***" has the meaning set forth in Section 5.9(c).

"***Applicable Law***" means any applicable statute, law, principle of common law, rule, regulation, judgment, order, ordinance, requirement, code, writ, injunction, or decree of any Governmental Authority.

"***Btu***" is a British Thermal Unit and means the amount of heat required to raise the temperature of one avoirdupois pound of pure water from fifty-eight and one-half degrees

000277

Fahrenheit (58.5° F) to fifty-nine and one-half degrees Fahrenheit (59.5° F) at a constant pressure of fourteen and seventy-three hundredths (14.73) pounds per square inch absolute.

"***Business Day***" means any day, other than a Saturday or Sunday, that commercial banks in Houston, Texas are open for business.

"***C&O Agreement***" means that certain Operating and Construction Management Agreement dated as of August 31 2015, by and between the Gatherer and Asset Risk Management, LLC and relating to the construction and operation of the Gathering and Processing System, as the same may be amended, restated, modified or otherwise supplemented.

"***Central Receipt Point***" and "***CRP***" has the meaning set forth in Section 3.10.

"***Chisholm Pipeline***" means the downstream NGL pipeline operated by Chisholm Pipeline Co, an affiliate of Phillips 66 Pipeline LLC.

"***Claims***" means any and all demands, claims, judgments, obligations, liabilities, liens, causes of action, lawsuits, arbitrations, mediations, investigations or proceedings (whether at law or in equity).

"***Committed Gas***" is Gas subject to the Dedication.

"***Confidential Information***" has the meaning set forth in Section 16.1.

2

000278

"***Contract Year***" means each calendar year during the Term, the first of which shall commence on the Effective Date and run through December 31 of that year, and then from January 1 through December 31 for each subsequent year thereafter, but for the last Contract Year, from January 1 through the date that this Agreement terminates or expires.

"***CRP Theoretical Gallons***" has the meaning set forth in Section 5.9(a)(i).

"***Cubic Foot***" or "***cf***" means a volume of Gas occupying a space of one (1) cubic foot at a temperature of sixty degrees Fahrenheit (60° F) and at a pressure of fourteen and seventy-three hundredths (14.73) pounds per square inch absolute.

"***Curtailment Event***" has the meaning set forth in Section 11.1.

"***Curtailment Period***" has the meaning set forth in Section 11.1.

"***Dedicated Area***" has the meaning set forth in the Recitals, as further specifically set forth on Schedule 3.3.

"***Dedicated Wells***" has the meaning set forth in Section 3.3(b).

"***Dedication***" means either the Primary Term Dedication or the Extended Term Dedication, as applicable, based upon the relevant determination time.

"***Delivered Gas***" means the quantity of Gas in MMBtu that is received by Gatherer from Producer at each Receipt Point.

"***Dispute***" has the meaning set forth in Section 17.1.

"***Downstream Pipeline***" means Panhandle Eastern Pipeline, Chisholm Pipeline or any other pipeline into which Gatherer may make deliveries of Gas or NGLs under this Agreement for the account of Producer.

"***Equivalent Quantity***" means, on any day the thermally equivalent volume of Delivered Gas at the Receipt Points on such day reflecting Allocated Actual Quantities of Residue Gas plus NGLs determined in accordance with Section 5.9.

"***Extended Term***" has the meaning set forth in Section 2.1.

"***Extended Term Dedication***" has the meaning set forth in Section 3.3(b).

"***FERC***" means the Federal Energy Regulatory Commission, or any successor Governmental Authority.

"***Field Compression Fee***" has the meaning set forth in Schedule 6.1.

"***Field Condensate***" means the low-density mixture of hydrocarbon liquids that are present as gaseous components in the Gas, but have condensed out of the Gas and into the Gathering Pipeline System between a Receipt Point and the Plant inlet.

3

"***Field Fuel***" means ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████████

"***Final Commercial Operation Date***" has the meaning set forth in the C&O Agreement.

"***Firm***" means a gathering, processing or transportation service that is not subject to being curtailed, interrupted, pro rated or suspended except as expressly provided in this Agreement.

"***Force Majeure***" has the meaning set forth in Section 12.1.

"***Force Majeure Event***" has the meaning set forth in Section 12.1.

"***GAAP***" means generally accepted accounting principles in the United States.

"***Gas***" has the meaning set forth in the Recitals, and further means natural gas consisting predominantly of methane, but including the naturally occurring mixture of NGLs, heavier hydrocarbon gases and any non-combustible gases.

"***Gatherer***" has the meaning set forth in the introductory paragraph.

"***Gatherer Event of Default***" has the meaning set forth in Section 13.3.

"***Gatherer Group***" means any or all of (i) Gatherer, (ii) Gatherer's Affiliates, (iii) any of their respective contractors, and (iv) the officers, directors, employees, agents, advisors, counsel

000281

then respective contractors, and (iv) the officers, directors, employees, agents, advisors, counsel, consultants, members, shareholders, insurers, invitees or representatives of any of the foregoing.

"***Gathering and Processing Capital Expenditures***" means all expenditures, costs and expenses incurred by or on behalf of Gatherer with respect to the Gathering and Processing System, including costs of rights-of-way and other easements, labor, pipelines, stabilization, Plant, compression, metering and measurement, or interconnection of the Residue Gas Pipeline or NGL Pipeline, that are capitalized on the books and records of Gatherer with respect to the Gathering and Processing System according to GAAP, but specifically excluding all expenditures, costs and expenses incurred by or on behalf of Gatherer with respect to any expansion to the Gathering and Processing System to gather or process third party volumes of Gas that are not attributable to the Interests, provided, however, that in the event that Gatherer undertakes any expansion of the Gathering and Processing System to gather or process third party volumes of Gas that are not attributable to the Interests, and Producer thereafter makes use of the Gathering and Processing System so expanded to accommodate third party volumes of natural gas to gather and process Committed Gas, then Producer's pro rata share of all expenditures, costs and expenses of the expansion shall constitute "Gathering and Processing Capital Expenditures" to the extent agreed upon by the Parties at the time of Producer's connection to such expansion, and, provided, further, that this right and obligation of Producer shall not be in derogation of any of the rights and obligations of the Parties under Section 3.6.

"***Gathering and Processing System***" has the meaning set forth in the Recitals, specifically the (i) Gathering Pipeline System, (ii) Plant, (iii) Residue Gas Pipeline System, (iv)

4

000282

NGL Pipeline System, (v) any NGL storage facilities, (vi) any compression facilities, (vii) any custody transfer units, meters or measurement facilities, and (viii) any other equipment or appurtenances associated with the foregoing.

"*Gathering Capital Recovery Fee*" has the meaning set forth in Schedule 6.1.

"*Gathering Fee*" has the meaning set forth in Schedule 6.1.

"*Gathering Pipeline System*" means the pipelines of various diameters interconnecting the Receipt Point(s) to the Plant, including any compression facilities before the inlet of the Plant.

"*Governmental Approval*" means any permit, license, permission, grant or other similar authorization issued by, or required to be issued by, any Governmental Authority and necessary for the performance of the Parties hereunder.

"*Governmental Authority*" means any federal, state, county, parish, municipal or other governmental subdivision, or any court or any governmental department, commission, board, bureau, agency or other instrumentality of any federal, state, county, municipal or other governmental subdivision within the United States of America with authority over the Parties and subject matter in question.

"*GPM*" means gallons of NGLs per Mcf of Gas.

"*Gross Heating Value*" means the number of Btu produced by the complete combustion,

000283

at constant pressure, of the amount of Gas which would occupy a volume of one Cubic Foot at a temperature of 60 degrees Fahrenheit (60°F), when saturated with water vapor and at a pressure equivalent to fourteen and seventy-three hundredths (14.73) pounds per square inch absolute, under standard gravitational force (acceleration 980.665 centimeters per second per second), with air of the same temperature and pressure as the Gas when the products of combustion are cooled to the initial temperature of the Gas and air and when the water formed by combustion is condensed to the liquid state.   The Gross Heating Value so determined will be corrected from the conditions of testing to that of the actual condition of the Gas delivered, expressed in Btu per Cubic Foot and reported at a pressure base of fourteen and seventy-three hundredths (14.73) pounds per square inch absolute; provided, however, if the water vapor content of the Gas delivered is seven pounds or less per one million Cubic Feet, the Gas will be assumed to be dry.

"*Indemnified Party*" has the meaning set forth in Section 10.2.

"*Indemnifying Party*" has the meaning set forth in Section 10.2.

"**In-Service Date**" means first day of the first full month following the date that Gatherer notifies Producer that the Gathering and Processing System has been completed and is ready to receive and process Committed Gas.

"*Interests*" means Producer's Interests, After-Acquired Interests and Other Interests.

5

"***LAUFG***" means Producer's allocated share of the quantity of "lost and unaccounted for Gas" as a result of leakage, venting, flaring, discrepancies due to meter inaccuracies, shrinkage due to variations of temperature or pressure, or any other reason.

"***Line Fill***" has the meaning set forth in Section 3.9.

"***Losses***" means any and all losses, damages, costs, expenses, liabilities, fines, penalties or judgments of whatever kind or character incurred by a Person or Party with respect to a Claim, including reasonable attorneys' fees, court costs and other reasonable costs and expenses of litigation as such may be awarded by a court.

"***Maintenance Event***" has the meaning set forth in Section 11.2.

"***Mcf***" means one thousand (1,000) Cubic Feet.

"***MMBtu***" means one million (1,000,000) Btu.

"***Natural Gas Liquids***" and "***NGLs***" has the meaning set forth in the recitals, specifically hydrocarbons heavier than methane, such as ethane, propane, normal butane, isobutane, pentanes and heavier hydrocarbons, and mixtures thereof separated into the Y-Grade Stream at the Plant.

"***NGL Content***" means quantity of ethanes and heavier hydrocarbons in Gas at the Receipt Point.

"***NGL Delivery Point***" means the point at which the NGL Pipeline System interconnects

000285

"***NGL Pipeline System***" means approximately 4 miles of pipeline interconnecting the Plant to the NGL Delivery Point.

"***NGL Transportation Fee***" has the meaning set forth in Schedule 6.1.

"***Notice***" has the meaning set forth in Section 8.1.

"***Off-Spec Gas***" has the meaning set forth in Section 4.2(a).

"***Operational Gas***" has the meaning set forth in Section 5.2.

"***Other Fuel***" means electricity consumed in the operation of the Gathering and Processing System or Plant.

"***Other Fuel Fee***" means Producer's allocated share of the actual cost of Other Fuel.

"***Other Interests***" means the interests of Persons in the Dedicated Area other than Producer, but whose interests are represented or controlled by Producer, such working interests, royalty interests, overriding royalty interests, net profits interests or other mineral interests.

"***Overdue Rate***" means rate per annum equal to the lesser of (i) an annual rate equal to four percent (4%) per annum above the "prime rate" specified under the caption "Money Rates"

6

in the *Wall Street Journal* (New York Edition) on the date such payment was required to have been made, or (ii) the maximum rate of interest permitted by Applicable Law.

"***Panhandle Eastern Pipeline***" means the downstream interstate natural gas pipeline operated by Panhandle Eastern Pipe Line Company, LP.

"***Partial Commercial Operation Date***" has the meaning set forth in the C&O Agreement.

"***Partial In-Service Date***" means the first day of the first full month following the date that Gatherer notifies Producer that the Partial Commercial Operation Date has occurred and the Gathering and Processing System is ready to receive Committed Gas.

"***Party***" and "***Parties***" have the meaning set forth in the introductory paragraph.

"***Person***" means any individual, firm, corporation, trust, partnership, limited liability company, association, joint venture, other business enterprise or Governmental Authority.

"***Plant***" means any gas processing plant utilized by Gatherer to process Gas, whether or not owned or operated by Gatherer.

"***Plant Fuel***" means ███████████████████████████████████████████████████████████████████████████

"***Plant Recovery Factor***" has the meaning set forth in Section 5.9(a)(ii).

"***Price Index***" has the meaning set forth in Section 6.3.

"*Price Index*" has the meaning set forth in Section 6.5.

"*Primary Term*" has the meaning set forth in Section 2.1.

"*Primary Term Dedication*" has the meaning set forth in Section 3.3(a).

"*Processing Capital Recovery Fee*" has the meaning set forth in Schedule 6.1.

"*Processing Fee*" has the meaning set forth in Schedule 6.1.

"*Producer*" has the meaning set forth in the introductory paragraph.

"*Producer Capacity*" has the meaning set forth in Section 3.6.

"*Producer Event of Default*" has the meaning set forth in Section 13.1.

"*Producer Group*" means any or all of (i) Producer, (ii) Producer's Affiliates, (iii) Producer's contractors and suppliers, of every tier, other than the Gatherer Group, and (iv) the officers, directors, employees, agents, advisors, counsel, consultants, members, shareholders, insurers, invitees or representatives of any of the foregoing.

"*Producer's Interests*" means all mineral interests in lands, leases, wells and Gas that Producer owns or controls in the Dedicated Area.

7

"***Receipt Point***" has the meaning set forth in Section 3.10, as set forth more specifically in Schedule 3.10.

"***Residue Gas***" means Delivered Gas *minus* Field Fuel *minus* Plant Fuel *minus* Operational Gas *minus* LAUFG *minus* Shrinkage, expressed in MMBtu.

"***Residue Gas Delivery Point***" means the point at which the Residue Gas Pipeline System interconnects with the inlet flange of the measurement facilities of Panhandle Eastern Pipeline.

"***Residue Gas Pipeline System***" means approximately 4 miles of pipeline interconnecting the Plant to the Residue Gas Delivery Point.

"***Scheduled Gas***" has the meaning set forth in Section 5.3.

"***Service Fees***" has the meaning set forth in Section 6.1.

"***Shrinkage***" means Producer's allocated share of the MMBtus of the NGLs contained in the Y-Grade Stream that are removed from Gas during processing at the Plant, described more particularly in Section 5.9(b)(ii).

"***Specifications***" has the meaning set forth in Section 4.2(a).

"***Stabilized Field Condensate***" means Field Condensate that has been stabilized before injection into the NGL stream before the NGL Delivery Point.

"***System Capacity***" means the then maximum capacity of the Gathering and Processing

000289

"**System Capacity**" means the then-maximum capacity of the Gathering and Processing System to gather and process Gas, not to exceed the then-determined compression capacity on the Gathering and Processing System, based on NGL Content of Gas of seven (7) GPM.

"**System Pressure**" has the meaning in Section 4.4.

"**Term**" means the Primary Term and any Extended Term.

"**Theoretical Gallons**" means the number of gallons of NGLs that are present in Gas as determined at a particular point.

"**Y-Grade Stream**" means mixed NGLs that have been removed from the Gas at the Plant by means of processing activities, but which have not been separated into individual NGL components.

### Section 1.2    Interpretation.

All references to any agreement or document shall be construed as of the particular time that such agreement or document may then have been executed, amended, varied, supplemented or modified. Terms defined in this Agreement shall have the meanings given therein when used elsewhere in this Agreement. References in the singular shall include the plural, and references to the masculine shall include the feminine, and vice versa. Words denoting natural persons shall include partnerships, firms, companies, corporations, joint ventures, trusts, associations,

8

organizations or other entities. References to a particular article, section, subsection, paragraph, subparagraph or schedule, if any, shall be a reference to such article, section, subsection, paragraph, subparagraph or schedule in and to this Agreement. The words "include" and "including" shall include the phrase "not limited to." Any reference to a Person shall include that Person's successors and assigns or to any Person succeeding to that Person's functions. Any Schedules are fully incorporated and made part of this Agreement. The Schedules shall be read in conjunction with the provisions of the body of this Agreement, and the Schedules and the body of this Agreement shall be interpreted to give effect to the intent of the Parties as evidenced by their terms when taken as a whole, *provided*, *however*, that in the event of an express and irreconcilable conflict between the terms of a Schedule and the provisions of the body of this Agreement, the provisions of the body of this Agreement shall control.   Capitalized terms appearing in a Schedule shall have the meanings set forth in Section 1.1, unless the context requires otherwise.

**ARTICLE II**
**TERM**

**Section 2.1    Term.**

This Agreement shall be effective as of the Effective Date, and, unless earlier terminated in accordance with any express provision of this Agreement, shall remain in full force and effect for a period of fifteen (15) years from the In-Service Date (the "***Primary Term***"), *provided*, *however*, that, to the extent that at the end of the Primary Term there are wells then-connected to the Gathering and Processing System and then-producing Gas in commercial (paying) quantities, the Term of this Agreement shall extend for so long as such well(s) continue to produce Gas in

commercial (paving) quantities (the "***Extended Term***").

# ARTICLE III
# GATHERING AND PROCESSING SYSTEM

**Section 3.1    Construction of Gathering and Processing System.**

Gatherer shall, at its sole cost and expense, design, engineer, construct, equip and modify, or caused to be designed, engineered, constructed, equipped and modified, the Gathering and Processing System.  Gatherer shall exercise commercially reasonable efforts to (a) achieve the Partial Commercial Operation Date by the date that is nine months after the Effective Date and (b) achieve the Final Commercial Operation Date by the date that is twelve months after the Effective Date.

**Section 3.2    Easements, Rights-of-Way and Fee Lands.**

To the extent that (a) Producer may do so in compliance with all applicable agreements, and (b) Gatherer's activities on the relevant lands do not unreasonably interfere with Producer's operations, Producer shall, where reasonably requested by Gatherer, (i) convey or assign to Gatherer, to the extent that Producer may do so without payment of monies (unless Gatherer agrees to pay), any easements or rights-of-way for purposes of constructing, owning, operating, repairing, replacing and maintaining any portion of the Gathering and Processing System, and (ii) lease to Gatherer, at a price and upon terms as may be then agreed, such fee lands, or portions

9

000292

thereof, owned by Producer, for purposes of constructing, owning, operating, repairing, replacing and maintaining the Gathering and Processing System.

**Section 3.3    Dedication.**

(a)    For the Primary Term of this Agreement, Producer hereby dedicates to Gatherer all Interests within the Dedicated Area shown on **Schedule 3.3** (the "***Primary Term Dedication***") and shall deliver to Gatherer at the Receipt Point(s) all Committed Gas produced therefrom, *provided* that notwithstanding such Primary Term Dedication, Producer shall have the right to (i) administer the Interests as it deems advisable in its sole discretion, including the right to rework, shut in, plug or abandon any well, (ii) form or participate in the formation of any unit, (iii) to use Gas in its operations, and (iv) deliver Gas that Producer is expressly required to deliver under oil and gas leases, contractual agreements or other legal rights under which Committed Gas is produced; *provided further* that any Interests of Producer or Gas produced therefrom subject to the prior dedication contained in that certain Gas Purchase Agreement dated April 1, 2015 by and between Alta Mesa Holdings, LP and Mustang Gas Products will be excluded from the Primary Term Dedication until such prior dedication terminates or expires, at which time such Gas shall become Committed Gas. If, after the Effective Date and before the end of the Primary Term, Producer or any of its Affiliates acquire mineral interests, including by way of joint venture participation, drill-to-earn rights or other means, within the Dedicated Area (the "***After-Acquired Interests***"), then the After-Acquired Interests and all Gas produced therefrom shall automatically be included in the Primary Term Dedication and become Committed Gas; *provided*, *however*, if any of the After-Acquired Interests or Gas produced therefrom are subject to a prior written dedication or

Interests or Gas produced therefrom are subject to a prior written dedication or commitment for gathering as of the time of acquisition by Producer, then that Gas will be excluded from the Primary Term Dedication until the prior dedication or commitment terminates or expires, at which time such Gas shall become Committed Gas, *provided further* that if, with respect to any After-Acquired Interests, Producer has the right or ability, without payment of any material fee or penalty, or incurring any other material disadvantage, to terminate any such prior dedication or commitment with respect to the After-Acquired Interests, then Producer shall terminate such dedication or commitment as soon as reasonably practicable.  Producer shall promptly notify Gatherer in writing of any such termination, and identify the After-Acquired Interests.

(b)     For the Extended Term of this Agreement, Producer hereby dedicates to Gatherer all of the wells that constitute Interests and are connected to the Gathering and Processing System at the end of the Primary Term (such wells, the "***Dedicated Wells***", and such dedication, the "***Extended Term Dedication***") and shall deliver to Gatherer at the Receipt Point(s) all Committed Gas produced therefrom; *provided* that notwithstanding such Extended Term Dedication, Producer shall have the right to (i) administer the Dedicated Wells as it deems advisable in its sole discretion, including the right to rework, shut in, plug or abandon any Dedicated Well, (ii) form or participate in the formation of any unit, (iii) to use Gas in its operations, and (iv) deliver Gas that Producer is expressly required to deliver under oil and gas leases, contractual agreements or other legal rights under which Committed Gas is produced.  From and after the end of the Primary Term all Interests within the Dedicated Area other than the Dedicated Wells

10

shall be permanently released from the Dedication, and Producer may take the volumes produced from such Interests (other than the Dedicated Wells) elsewhere.

**Section 3.4     Covenant Running With Land.**

For its Term, this Agreement shall be a covenant running with the land and the Interests and any After-Acquired Interests.  Contemporaneously with the execution of this Agreement, and from time-to-time during the Term if necessary, the Parties shall each execute for recordation in the public records of the Dedicated Area a "short form" memorandum of this Agreement in the form of **Schedule 3.4** attached hereto, identifying the Dedicated Area, the Interests, After-Acquired Interests and wells thereon.  Producer shall cause any conveyance of all or any of the Interests or After-Acquired Interests, or Gas therefrom, to be made expressly subject to this Agreement, and to cause all transferees to execute a written instrument in a form reasonably satisfactory to Gatherer acknowledging the Dedication and such transferees' obligations under this Agreement.  Gatherer shall likewise cause any assignment or conveyance of all or any segment of the Gathering and Processing System to be made expressly subject to this Agreement, and to cause all transferees to execute a written instrument in a form reasonably satisfactory to Producer acknowledging the Dedication and such transferees' obligations under this Agreement.

**Section 3.5     Covenant Not to Gather, Market or Process Gas.**

Producer shall not gather, market or process Committed Gas, or allow Committed Gas to be gathered, marketed or processed, or otherwise cause or allow NGLs or other constituent components of the Gas to be removed from Committed Gas, other than by means of mechanical

**Section 3.6    Option to Expand Gathering and Processing System.**

Gatherer shall gather and process volumes of Committed Gas up to 60 million cf/day on a Firm basis (the "***Producer Capacity***").  All volumes of Committed Gas above the Producer Capacity shall at all times be Committed Gas.  To the extent that Committed Gas shall exceed the Producer Capacity, Gatherer shall have the option to (a) utilize any available System Capacity in excess of the Producer Capacity on a Firm basis, (b) utilize another Plant or Plants to process such Committed Gas, or (c) expand the Gathering and Processing System as many times as necessary by adding additional System Capacity (the "***Additional Capacity***").  In the event that production from the Interests shall exceed the Producer Capacity, Producer shall provide Notice to Gatherer that production exceeds Producer Capacity, and Gatherer shall provide Notice to Producer within sixty (60) days of Gatherer's receipt of Producer's Notice that Gatherer will or will not accept such volumes of Committed Gas or add Additional Capacity.  In the event that Gatherer provides Notice to Producer that it will not accept such volumes of Committed Gas above the Producer Capacity or add Additional Capacity, then the acreage from which the volumes of Committed Gas above the Producer Capacity are directly produced shall be released from the Dedication, and Producer may take such volumes of Committed Gas elsewhere.  In the event that Gatherer provides Notice to Producer that it will accept such volumes of Committed Gas above the Producer Capacity or add Additional Capacity, then, until Gatherer is able to process such Committed Gas, or until the Additional In-Service Date for such Additional

11

Capacity, Producer may deliver any volumes of Committed Gas above the Producer Capacity of the Gathering and Processing System elsewhere, provided that once Gatherer is able to process such volumes of Committed Gas, all such volumes of Committed Gas shall be delivered to Gatherer at a Receipt Point.  **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, PRODUCER'S RIGHT TO TAKE THE AFFECTED VOLUMES OF COMMITTED GAS ELSEWHERE DURING ANY PERIOD WHERE GATHERER REFUSES TO TAKE VOLUMES OF PRODUCER'S COMMITTED GAS THAT EXCEED PRODUCER CAPACITY, AND THE RELEASE FROM DEDICATION, IF APPLICABLE, SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY, AT LAW OR IN EQUITY, WITH RESPECT TO GATHERER'S INABILITY OR REFUSAL TO TAKE VOLUMES OF COMMITTED GAS THAT EXCEED PRODUCER CAPACITY.**

> **Section 3.7     Title Warranty.**

Producer represents and warrants to Gatherer that:  (i) it owns, or has the right to dedicate all Interests and Committed Gas dedicated under this Agreement, and to deliver Committed Gas to the Receipt Point(s), free and clear of all liens, encumbrances and claims, (ii) there are no prior dedications or commitments covering any Interests or Committed Gas produced from the Interests  within the Dedicated Area.  Producer shall defend, indemnify, protect and hold harmless Gatherer from and against all claims arising out of any breach of such representation and warranty.

000297

> **Section 3.8     Proceeds of Production.**

Producer shall make payment of all royalties, overriding royalties, production payments, and all other payments attributable to the Interests and Committed Gas due to any Person under any leases or agreements in accordance with the terms thereof, and Gatherer shall have no obligations with respect thereto.

**Section 3.9     Operating Inventory.**

Producer shall provide, at no cost to Gatherer, Gas and NGLs as line fill (each, the "***Line Fill***") needed to make the Gathering Pipeline System, Residue Gas Pipeline System, NGL Pipeline System, and other portions the Gathering and Processing System operational.  Line fill shall not be considered transportable volume.

**Section 3.10     Receipt Points and Central Receipt Points.**

Producer shall install one or more central receipt points (each, a "***Central Receipt Point***" or "***CRP***"), where production from multiple wells is aggregated into a single physical connection to the Gathering and Processing System.  Producer shall connect each CRP to the Gathering and Processing System, and the "***Receipt Point***" for Delivered Gas shall be the point of interconnection between a CRP and the inlet flange of the Gathering and Processing System. The proposed design and a list of initial Receipt Points are set forth in **Schedule 3.10**.

12

000298

**Section 3.11    Additional Receipt Points; Obligation to Interconnect.**

(a)    Producer shall have the right to designate additional Receipt Points (each an "***Additional Receipt Point***"), subject to Gatherer's prior approval, for the purpose of connecting additional wells to the Gathering and Processing System, either by construction of an additional CRP or by interconnection of a well to the Gathering and Processing System, *provided* that Producer shall have given Gatherer prior Notice, in the form set forth in **Schedule 3.11(a)**, of such Additional Receipt Points, and that incremental volumes of Committed Gas added to the Gathering and Processing system will not cause the volumes of Committed Gas to exceed the then-System Capacity of the Gathering and Processing System.

(b)    Upon Gatherer's receipt of any Notice from Producer under subsection (a) above, Gatherer shall have ████████ days from its receipt of any such Notice to provide return Notice to Producer that Gatherer will or will not interconnect such Additional Receipt Points.

(c)    In the event that Gatherer provides Notice to Producer that Gatherer will make a requested interconnection for such Additional Receipt Point, then Gatherer shall make such interconnection to the Gathering and Processing Agreement as soon as reasonably practicable, but in no event more than ████████ days from Gatherer's Notice to Producer.

(d)    In the event that Gatherer provides Notice to Producer that Gatherer will not make a requested interconnection for such Additional Receipt Point, then the well in

question shall be released from the Dedication. **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, THE RELEASE FROM DEDICATION SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY, AT LAW OR IN EQUITY, WITH RESPECT TO GATHERER'S REFUSAL TO INTERCONNECT AN ADDITIONAL RECEIPT POINT.**

## ARTICLE IV
## GAS QUALITY AND PRESSURE

**Section 4.1     Measurement, Equipment and Testing.**

(a)     Producer shall be responsible for measurement, equipment and testing at the CRPs, and Gatherer shall be responsible for measurement, equipment and testing downstream of the CRPs, each in accordance with the protocols set forth on **Schedule 4.1**.

(b)     Subject to Producer's safety rules, regulations and procedures, Producer hereby grants to Gatherer, and Gatherer's contractors or agents, a right of entry onto any of the lands covered by the Interests and access to the Producer side of a CRP, as necessary, for the purpose of sampling Gas pursuant to Section 4.2 below, and shall facilitate, as necessary, access with surface owners where requested by Gatherer.

13

**Section 4.2     Specifications.**

(a)     Committed Gas delivered by Producer at the Receipt Points shall meet or exceed the quality requirements set forth in **Schedule 4.2**, and Residue Gas and NGLs delivered to the Delivery Points shall meet the quality requirements, if any, of the Downstream Pipelines (as applicable, the "***Specifications***").  Gatherer shall have a right to reject all Committed Gas that does not meet the Specifications ("***Off-Spec Gas***"), or which causes Residue Gas or NGLs to fail to meet the Specifications of a Downstream Pipeline, and may shut in well(s) of Producer or shut down a Receipt Point or portions of the Gathering and Processing System as necessary to deal with Off-Spec Gas.   The foregoing notwithstanding, Off-Spec Gas shall not be released from the Dedication.

(b)     Except where the average of daily Delivered Gas at a CRP during the prior month has been less than 250 Mcf per day, Gas at each CRP shall be sampled on a quarterly basis.   To the extent the average of daily Delivered Gas at a CRP during the prior month is less than 250 Mcf per day, there shall be no obligation to sample Gas at such CRP.

**Section 4.3     Delivery Pressure.**

Producer shall deliver Gas at the Receipt Point(s) at a pressure sufficient to enter the Gathering and Processing System and shall not exceed the maximum allowable operating pressure of the Gathering and Processing System at such Receipt Point, but in no event less than fifty (50) psig.  Gatherer shall deliver Gas at the Residue Gas Delivery Point(s) at a pressure in accordance with the requirements or directives of the applicable Downstream Pipeline.

**Section 4.4   Compression.**

Gatherer shall install up to seven (7) stages of compression facilities to provide reduced operating pressures at a CRP to at least ███████ psig and to maintain sufficient pressure to operate the Gathering and Processing System (the "***System Pressure***").  Gatherer shall exercise commercially reasonable efforts to install such compression facilities as soon as reasonably practicable.

**ARTICLE V**
**GATHERING, PROCESSING AND DELIVERY**

**Section 5.1      Delivery, Receipt and Processing of Gas.**

Commencing on the In-Service Date, Producer shall deliver or cause to be delivered to the Receipt Point(s) all Committed Gas.  For the Term of this Agreement, Gatherer shall, on a Firm basis up to the Producer Capacity, receive and process the Delivered Gas to separate the NGLs from the Delivered Gas.  If Gatherer enters into any gathering, transportation, processing, marketing or similar agreement with any third party pursuant to which natural gas is received and processed by Gatherer on the Gathering and Processing System on a Firm basis, Gatherer shall deliver to Producer a written notice of such agreement that describes the material terms thereof.  Gatherer shall provide stabilization services for all Field Condensate (the "***Stabilized Field Condensate***"), and Stabilized Field Condensate shall be re-injected into the NGL stream

14

before the NGL Delivery Point, *except* for such NGLs or Field Condensate as may be sold and transported by truck.  The processing services hereunder shall not include processing or treating services for which there is no System Fee expressly set forth on Schedule 6.1, such as treatment for sour gas/hydrogen sulfide ($H_2S$) or other contaminants, or removal of carbon dioxide ($CO_2$), nitrogen (N), or other inert gases or any other types of contaminants.

### Section 5.2    Operational Gas.

Any Delivered Gas consumed by Producer for its operations taken from the Gathering and Processing System as permitted by Section 3.3(iii) (all such Gas, the "***Operational Gas***") shall be metered by Producer at the CRP, and all such volumes shall be communicated to Gatherer by Producer.  Operational Gas shall be accounted for in determining Equivalent Quantities.

### Section 5.3    Scheduling.

Producer shall provide Notice to Gatherer not less than three (3) Business Days prior to the last Business Day of each month of the total volume of Gas (expressed in Mcf per day and MMBtu per day) that Producer expects to deliver in the following month, specifying volumes at each Receipt Point, *provided* that Producer may modify any such nomination upon at least 24 hours advance Notice (all such Gas being "***Scheduled Gas***").  The Parties shall coordinate their respective nomination activities, giving sufficient time to meet the deadlines of the Downstream Pipelines.  If Producer becomes aware that actual deliveries of Committed Gas to the Receipt Point(s) vary by more than five (5%), greater or lesser, of Scheduled Gas, then Producer shall promptly provide Notice to Gatherer, and if Producer fails to give Gatherer any Notice required

by this Section, and Gatherer thereafter incurs any costs or expenses as a result of such a variance from Scheduled Gas of which Gatherer should have received Notice, then Producer shall reimburse Gatherer for such costs or expenses.

### Section 5.4    Equal Receipt and Delivery.

Committed Gas shall be delivered by Producer to and received by Gatherer at the Receipt Points, and Residue Gas and NGLs shall be delivered by Gatherer to and received by Producer at the Residue Gas Delivery Point and NGL Delivery Point in Equivalent Quantities, and Producer shall not be permitted to use the Gathering and Processing System for storage or peaking purposes. To the extent that the volumes of Delivered Gas on any day exceed the Equivalent Quantities of Residue Gas and NGLs being delivered at the Residue Gas Delivery Point and NGL Delivery Point, Gatherer may curtail Delivered Gas until such time as Producer's nominations on Downstream Pipelines bring the Gathering and Processing System into balance. Likewise, to the extent that the volumes of Delivered Gas on any day are less than the Equivalent Quantities of Residue Gas and NGLs being delivered at the Residue Gas Delivery Point and NGL Delivery Point, Gatherer may curtail deliveries of Residue Gas and NGLs until such time as the volumes of Delivered Gas are sufficient to bring the Gathering and Processing System into balance. The Parties acknowledge and agree that a precise balancing may not be possible, but each shall exercise commercially reasonable efforts to maintain the Gathering and Processing System in balance.

15

**Section 5.5    Exchange of Information.**

Each of the Parties shall furnish or cause to be furnished to the other all information as may be reasonably requested and necessary with respect to maintaining the Gathering and Processing System in balance, including meter readings and nominations on Downstream Pipelines.

**Section 5.6    Delivery of Residue Gas and NGLs; Thermally Equivalent Volumes.**

Gatherer shall, as nearly as practicable, deliver to Producer at the respective Residue Gas Delivery Point and NGL Delivery Point, as applicable, Equivalent Quantities of Residue Gas and NGLs. Producer shall be responsible for all nominations of Residue Gas and NGLs for transportation on any Downstream Pipeline, as applicable.

**Section 5.7    Commingling.**

Delivered Gas and NGLs may represent only a portion of Gas and NGLs on the Gathering and Processing System, which may be used by other customers.  Subject to its obligations with respect to delivery of Equivalent Quantities, Gatherer shall have the right to commingle Gas and NGLs with Gas and NGLs from other customers.

**Section 5.8    Allocation of Volumes Delivered.**

Subject to Gatherer's obligations to deliver Equivalent Quantities under Section 5.4, Producer shall be credited with Allocated Actual Quantities delivered at the Residue Gas

Delivery Point and NGL Delivery Point, as applicable. As long as there are no third party volumes on the Gathering and Processing System, the Product Allocation Actual Quantities shall be 100%. If third party volumes enter the Gathering and Processing System, Gatherer shall allocate total delivered volumes and component Btu's on a *pro rata* basis (based on Btu content of Gas delivered to the Gathering and Processing System) among all parties then on the Gathering and Processing System.

**Section 5.9**     **Allocation of NGLs and Shrinkage.**

(a)     The "Allocated ▮▮▮▮ Quantities" of NGLs shall be determined as follows:

(i)



000306



(each, the "***Allocated CRP Volume***").

**Section 5.10    Transfer of Title and Risk of Loss.**

Title to Gas, Operational Gas, Field Condensate, Stabilized Field Condensate and NGLs shall always vest in Producer.  Risk of loss shall always be with Producer except when Gatherer is in possession of Gas, NGLs, Field Condensate or Stabilized Field Condensate, in which case risk of loss shall be with Gatherer, provided that Gatherer shall not be responsible for lost volumes of Gas attributable to Shrinkage or LAUFG, or with respect to Operational Gas.  Risk of loss for Gas and NGLs shall transfer to Producer at the Residue Gas and NGL Points of Delivery.

000307

**ARTICLE VI**

**Section 6.1      Service Fees.**

Producer shall pay to Gatherer the following fees (in the aggregate, the "***Service Fees***") set forth on **Schedule 6.1**.

**Section 6.2      Payment for Other Fuel.**

Producer shall pay to Gatherer the Other Fuel Fee, if applicable.

**Section 6.3      Escalation.**

Commencing with the ███████████████ and on January 1 of each Contract Year thereafter, each Service Fee, except for the Other Fuel Fee, shall be automatically adjusted upward ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

17

# ARTICLE VII
## PAYMENT

**Section 7.1    Billing.**

As soon as reasonably practicable after the end of a month, Gatherer shall render to Producer a statement for the preceding month, setting forth the following, and including or attaching necessary backup information or calculations:

(a)    Delivered Gas in both Mcf and MMBtu by CRP;

(b)    Operational Gas, if any, in both Mcf and MMBtu;

(c)    Allocated Actual Quantities of Residue Gas, and breaking out the constituent components of the calculation in Section 5.9(b);

(d)    Allocated Actual Quantities of NGLs, and breaking out the constituent components of the calculation in Section 5.9(a);

(e)    Allocated CRP Volumes and calculation of the Services Fees due;

(f)    actual cost of electricity as Other Fuel, and the Other Fuel Fee;

(g)    aggregate total of all amounts due Gatherer for all Service Fees and Other Fuel Fees; and

000309

### Section 7.2     Payment.

Producer shall pay to Gatherer the full amount due not later than the earlier of (i) fifteen (15) days from Producer's receipt of Gatherer's statement, or (ii) the last day of month following the statement month, *provided* that if such day is not a Business Day, then on the next Business Day.  Any past due amounts shall bear interest at the Overdue Rate from the date due until paid.

### Section 7.3     Disputed Amounts.

If Producer disputes all or a portion of any statement or amount due, it shall pay the undisputed portion, if any, of any such statement, and shall provide Notice to Gatherer of the specific basis for the dispute, including all supporting information, as soon as practicable after becoming aware of the basis for the dispute.  If after resolution of such dispute it is determined that any of the amount in dispute is due and owing, such amount(s) shall bear interest at the Overdue Rate from the date originally due until paid.  In no event shall any statement or invoice be subject to dispute beyond two (2) years from the date of such statement or invoice.

### Section 7.4     Taxes.

Producer shall pay any and all Taxes levied on Committed Gas, Field Condensate, Residue Gas or NGLs.  In the event a Party is required to pay any Tax for which the other Party

18

000310

is responsible hereunder, the responsible Party shall reimburse the paying Party for the same per invoice provided by the paying Party.  Each Party shall indemnify, defend and hold harmless the other Party from and against any and all Claims and Losses arising out of or related to Taxes for which the indemnifying Party is responsible hereunder.

**Section 7.5    Audit.**

Each Party shall have the right, upon reasonable advance Notice, during normal business hours and not more than two (2) times per Contract Year, at its sole expense and either itself or through its representatives, to audit the books and records of the other Party, at the place where such books and records are ordinarily kept, to the extent reasonably necessary to verify the accuracy of any statement, charge, payment or computation made pursuant to this Agreement, and any such audit must be completed within ninety (90) days of the Notice to the other Party. In the event that an audit is performed, any subsequent audit performed may cover only a time period not covered by a previous audit.  In no event shall any statement or invoice be subject to audit beyond two (2) years from the date of such statement or invoice.

**ARTICLE VIII**
**NOTICES**

**Section 8.1    Notices.**

Any notice, request, demand, statement, payment or bill provided for in this Agreement, or any notice which a Party may desire to give to the other (each, a "***Notice***"), must be in writing and will be deemed duly made when (i) delivered personally, (ii) upon delivery by the U.S.

Postal Service, certified mail with return receipt, (iii) upon delivery by a recognized overnight courier service with return receipt or (iv) upon receipt by the directed recipient when transmitted by electronic means, to the Persons and addresses set forth on Schedule 8.1. Each of the Parties may, by Notice to the other Party, revise its respective Persons and addresses for delivery of Notices without amendment of this Agreement.

## ARTICLE IX
## FINANCIAL RESPONSIBILITY

### [NOT USED]

## ARTICLE X
## INDEMNITY

**Section 10.1   Indemnity.**

**EXCEPT WHERE OTHERWISE SPECIFICALLY PROVIDED HEREIN, EACH OF PRODUCER AND PRODUCER GROUP, ON THE ONE HAND, AND GATHERER AND GATHERER GROUP, ON THE OTHER HAND, SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS THE OTHER PARTY AND ITS RESPECTIVE PRODUCER GROUP OR GATHERER GROUP, AS THE CASE MAY BE, FROM AND AGAINST ANY AND ALL CLAIMS OF THIRD PARTIES AGAINST THEM, OR DAMAGES SUSTAINED OR INCURRED BY THEM AS A RESULT OF SUCH CLAIMS BY THIRD**

19

000312

**PARTIES, TO THE EXTENT CAUSED BY THE NEGLIGENCE OR WILLFUL MISCONDUCT OF THE INDEMNIFYING PARTY OR ITS RESPECTIVE PRODUCER GROUP OR GATHERER GROUP, AS THE CASE MAY BE, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR THE INDEMNIFYING PARTY'S BREACH OF THIS AGREEMENT. THIS PROVISION SHALL NOT BE CONSTRUED TO RELIEVE ANY INSURER OF ITS OBLIGATION TO PAY CLAIMS CONSISTENT WITH THE PROVISIONS OF A VALID INSURANCE POLICY. A PERSON SEEKING INDEMNITY SHALL FIRST SEEK RECOVERY UNDER ANY APPLICABLE INSURANCE POLICY, AND ANY INDEMNITY OBLIGATION OWED HEREUNDER SHALL BE REDUCED BY THE AMOUNT OF ALL INSURANCE PROCEEDS ACTUALLY RECEIVED BY THE INDEMNIFIED PARTY.**

Section 10.2    Notification Obligation.

The Person entitled to indemnification under Section 10.1 above (the "*Indemnified Party*") shall promptly notify the Party providing indemnity (the "*Indemnifying Party*") of any Claim, and the Indemnifying Party shall have the right to assume the investigation and defense of the Claim, including employing legal counsel of its choice. If the Indemnifying Party does not promptly assume the investigation and defense of the Claim, the Indemnified Party may do so, including employing legal counsel of its choice, at the Indemnifying Party's expense. If the Indemnifying Party assumes the defense of a claim, the Indemnified Party shall nevertheless have the right to employ, at its sole expense, separate legal counsel and participate in the defense of the Claim, provided that control over the process and authority to compromise the Claim shall vest solely in the Indemnifying Party.

# ARTICLE XI
## CURTAILMENT AND MAINTENANCE

**Section 11.1    Curtailment and Temporary Release of Gas.**

If for any reason, including Force Majeure or a Maintenance Event, but not for the reasons set forth in Section 3.6, Gatherer needs to curtail receipt, gathering, processing or delivery of Gas on the Gathering and Processing System (each, a "***Curtailment Event***"), (i) Gas deliveries from all Persons that are receiving service on an interruptible or non-Firm basis shall be curtailed prior to any curtailment or interruption of Committed Gas, and (ii) to the extent a third party is receiving service on a Firm basis in accordance with Section 5.1, Producer and such third party shall be curtailed on a *pro rata* basis (based on Btu content of Gas delivered to the Gathering and Processing System). Prior to the Partial In-Service Date, all volumes of Committed Gas shall be temporarily released from the Dedication and Producer shall be free to dispose of all volumes of Committed Gas under other arrangements during such period. From and after the Partial In-Service Date and prior to the In-Service Date, all volumes of Committed Gas that are produced from Producer's wells that are not connected to the Receipt Points that are operational and tested as of the Partial In-Service Date shall be temporarily released from the Dedication and Producer shall be free to dispose such volumes of Committed Gas under other arrangements during such period. At any time after the Partial In-Service Date where Gatherer is unable to accept some or all Committed Gas as a result of a Curtailment Event, Producer shall be free to dispose of such affected volumes under other arrangements during such Curtailment

20

000314

Event (the "***Curtailment Period***").   Gatherer shall notify Producer as soon as reasonably practicable of the circumstances of any Curtailment Event and the beginning and end of any Curtailment Period.   As soon as reasonably practicable after receiving notice of the end of the Curtailment Period, all Gas shall again be subject to the Dedication.   **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, GATHERER'S TEMPORARY RELEASE AND PRODUCER'S RIGHT TO MAKE OTHER ARRANGEMENTS WITH RESPECT TO SUCH AFFECTED VOLUMES SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY AVAILABLE TO PRODUCER, AT LAW OR IN EQUITY, WITH RESPECT TO SUCH AFFECTED VOLUMES.**

**Section 11.2   Maintenance Events.**

Gatherer may, without liability to Producer, interrupt the operation of the Gathering and Processing System for the purpose of performing inspections, pigging, maintenance, testing, alterations, modifications, expansions, connections, repairs or replacements (each, a "***Maintenance Event***"), but such interruption shall be for only such time as may be reasonably necessary.   Gatherer shall give Producer advance written notice of its intention to interrupt operations and of the estimated time thereof, but not less than 24 hours advance notice, except in case of emergency.   Any such Maintenance Events shall not constitute Force Majeure Events, unless such Maintenance Events otherwise meet the definition of a Force Majeure Event.

**ARTICLE XII**
**FORCE MAJEURE**

**Section 12.1    Force Majeure.**

"*Force Majeure*" shall mean any event or circumstance or combination of events or circumstances (each, a "*Force Majeure Event*") that adversely affects or prevents any Party from performing its obligations in accordance with the terms of this Agreement, but only if and to the extent that such events and circumstances are not within the affected Party's reasonable control.    Force Majeure events shall include act of God, fire, storm of an unusual or extraordinary nature, flood, hurricane, tornado, earthquake, epidemic or other natural disaster, action, delay or inaction of any Governmental Authority, war, invasion, emergency, embargo, sanction, sabotage, insurgency, terrorism, civil war, riot or insurrection of any kind, labor strike, loss of electricity supply, failure of any Downstream Pipeline, inability to obtain rights-of-way after the exercise of commercially reasonable efforts; *provided* that the following shall not constitute a Force Majeure Event: (i) failure to obtain or retain, or a delay in obtaining, any Governmental Approval necessary for performance under this Agreement that was the result of action or inaction by the Party responsible for obtaining such Governmental Approval, or a result of failure to timely apply for any such Governmental Approval, (ii) market conditions for Gas or NGLs, (iii) the inability to obtain a favorable price for or to buy or sell Gas or NGLs, or (iv) economic hardship.    Any obligation of either Party under this Agreement shall be excused only to the extent that the Party's inability to perform is caused by Force Majeure. Each Party shall use all Reasonable Efforts to cure, minimize, mitigate or remedy the effects of Force Majeure. Notwithstanding that Force Majeure may otherwise exist, a Force Majeure Event shall not excuse or delay the payment of money when due by any Party.

21

**ARTICLE XIII**
**DEFAULT AND TERMINATION**

**Section 13.1    Producer Events of Default.**

A "***Producer Event of Default***" shall be deemed to have occurred if (i) Producer becomes bankrupt or insolvent or takes any corporate action or other steps towards liquidation, winding up, dissolution, reorganization or amalgamation of Producer, making of any bankruptcy administration order, or appointment of a receiver, administrator, trustee or similar officer over all or any material part of the revenues, assets or business of Producer; (ii) an order is made for the winding up, dissolution or liquidation of Producer, or any analogous or equivalent proceedings by whatever name are undertaken in whatever jurisdiction; (iii) Producer is generally unable to pay its debts as they become due, or Producer stops, suspends or threatens to stop or suspend payment of all or a material part of its debts or makes a general assignment of its assets for the benefit of its creditors; or (iv) Producer is in breach of any of its material obligations under this Agreement, and Producer fails to cure such breach within 30 days following Producer's receipt of a Notice from Gatherer to Producer to remedy such event or condition, or if a remedy cannot be effected within such 30 day period, a period of 60 days, provided that Producer has commenced to remedy within such 30 day period and has diligently pursued such remedy during the extended period, provided further that in no event shall the period to cure a breach of an obligation to pay money be more than 10 days total.

**Section 13.2    Gatherer's Default Remedies Against Producer.**

If a Producer Event of Default shall have occurred and be uncured and continuing, and

000317

Case 4:24-cv-04092    Document 4-5    Filed on 11/21/24 in TXSD    Page 53 of 196

without prejudice to any other of Gatherer's rights under this Agreement. Gatherer shall have the right to terminate this Agreement upon Notice to Producer.

**Section 13.3    Gatherer Events of Default.**

A "***Gatherer Event of Default***" shall be deemed to have occurred if (i) Gatherer becomes bankrupt or insolvent or takes any corporate action or other steps towards liquidation, winding up, dissolution, reorganization or amalgamation of Gatherer, making of any bankruptcy administration order, or appointment of a receiver, administrator, trustee or similar officer over all or any material part of the revenues, assets or business of Gatherer; (ii) an order is made for the winding up, dissolution or liquidation of Gatherer, or any analogous equivalent proceedings by whatever name are undertaken in whatever jurisdiction; (iii) Gatherer is generally unable to pay its debts as they become due, or Gatherer stops, suspends or threatens to stop or suspend payment of all or a material part of its debts or makes a general assignment of its assets for the benefit of its creditors; or (iv) Gatherer is in breach of any of its material obligations under this Agreement, and Gatherer fails to cure such breach within 30 days following Gatherer's receipt of a Notice from Producer to Gatherer to remedy such event or condition, or if a remedy cannot be effected within such 30 day period, a period of 60 days, provided that Gatherer has commenced to remedy within such 30 day period and diligently pursued such remedy during the extended period, provided further that in no event shall the period to cure a breach of an obligation to pay money be more than 10 days total.

22

000318

**Section 13.4   Producer's Default Rights Against Gatherer.**

If a Gatherer Event of Default shall have occurred and be uncured and continuing, and without prejudice to any other of Producer's rights under this Agreement, Producer shall have the right to terminate this Agreement upon Notice to Gatherer.

**ARTICLE XIV**
**ASSIGNMENT**

**Section 14.1   Assignment.**

Neither Party may assign this Agreement without the other Party's prior written consent, which consent will not be unreasonably withheld, conditioned or delayed.

**ARTICLE XV**
**LIMITATION OF LIABILITY**

**Section 15.1   Limitation of Liability.**

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL, PUNITIVE OR EXEMPLARY DAMAGES OF ANY TYPE, INCLUDING LOST PROFITS OR LOSS OF BUSINESS OPPORTUNITY, IN CONTRACT OR TORT (INCLUDING NEGLIGENCE, JOINT OR SEVERAL OR STRICT LIABILITY) ARISING OUT OF THIS AGREEMENT, PROVIDED THAT THIS LIMITATION SHALL NOT APPLY TO ANY INDEMNITY OBLIGATION SET FORTH HEREIN.

# ARTICLE XVI
## CONFIDENTIALITY

### Section 16.1   Confidentiality.

Any information belonging to a Party that is confidential and disclosed to the other Party in the course of performance of this Agreement or has been disclosed during the negotiations leading up to this Agreement, including the Agreement itself (collectively, the "**Confidential Information**"), shall be held in confidence and shall not be disclosed to others without the written approval of the disclosing Party. Confidential Information is not information that (i) is already known to the receiving Party at the time of disclosure by the disclosing Party (ii) is now or hereafter becomes available within the public domain other than as a result of a breach of this Agreement, (iii) is received by a Party from a Person under no obligation to keep the Confidential Information confidential, or (iv) is independently developed by a Party without reliance on Confidential Information. A Party shall have the right to disclose Confidential Information without the consent of the disclosing Party to its Lenders, counsel, advisors, consultants, accountants, auditors, officers, directors, members, shareholders and other Persons of responsibility who have a need to know the Confidential Information, *provided* that such Persons agree to keep the Confidential Information confidential, and that the Party shall be responsible for any breaches of this confidentiality obligation by such Persons. A Party shall also have the right to disclose Confidential Information without the consent of the disclosing Party in connection with a subpoena, interrogatory, request for production, civil investigative

23

demand or other such legal process issued by any court or administrative, legislative, investigative or regulatory body, but only to the extent necessary to fully respond thereto and after providing prior Notice to the disclosing Party.  Upon the reasonable request of the disclosing Party, the receiving Party shall, in its sole discretion, either return the Confidential Information or destroy it, *provided* that the receiving Party may retain a copy of Confidential Information as necessary to comply with Applicable Law.

**ARTICLE XVII**
**DISPUTE RESOLUTION**

**Section 17.1   Dispute Resolution.**

All controversies, disputes or claims between Producer and Gatherer arising out of or in any way relating to this Agreement (each, a "***Dispute***") shall be resolved pursuant to the procedures of this Section 17.1.

(a)      If a Dispute arises between the Parties regarding their respective rights and obligations under this Agreement, the Parties shall use commercially reasonable efforts to reach a reasonable resolution of the Dispute informally.  Initially, the responsible Persons shall attempt to resolve the Dispute themselves. If they are unable to resolve the Dispute within 10 days, then either Party may, by Notice, refer the Dispute to the senior management of the Parties for resolution. If senior management of the Parties are unable to resolve the Dispute within 10 days of such Notice, the provisions of subsection (b) below shall apply.

(b)     Any Dispute not otherwise resolved under subsection (a) above may be submitted by either Party to a court proceeding filed in accordance with applicable law in any court having jurisdiction over the Parties and the subject matter.

# ARTICLE XVIII
# MISCELLANEOUS

**Section 18.1    Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury Trial.**

(a)     THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF OKLAHOMA, EXCLUDING ANY CONFLICTS OF LAWS PROVISIONS CALLING FOR APPLICATION OF THE LAWS OF ANOTHER STATE.

(b)     EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE SOLE AND EXCLUSIVE JURISDICTION OF THE STATE OR FEDERAL COURTS IN HARRIS COUNTY, TEXAS, AND EACH OF THE PARTIES IRREVOCABLY WAIVES ANY OBJECTION TO THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS.

(c)     TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY IRREVOCABLY WAIVES ITS RIGHT TO A TRIAL BY JURY, AND

24

CONSENTS TO A BENCH TRIAL BY A TRIAL COURT JUDGE, IN RESPECT OF ANY LITIGATION ARISING OUT OF THIS AGREEMENT AND ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT FOR EACH OF THE PARTIES IN ENTERING INTO THIS AGREEMENT.

**Section 18.2   Survival.**

The provisions of this Agreement shall survive expiration or termination thereof for so long as necessary to give effect to the rights and obligations of the Parties hereunder, but in no event exceeding any applicable statutes of limitation.

**Section 18.3   No Joint Venture.**

Nothing in this Agreement shall create an association, joint venture or partnership between the Parties or impose any partnership obligation or partnership liability on any Party. Neither Party shall have any right, power or authority to enter into any agreement or commitment or act on behalf of or otherwise bind the other Party without such Party's prior written consent.

**Section 18.4   Entire Agreement.**

This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and there are not any oral or written understandings, representations or commitments of any kind, express or implied, which are not expressly set out herein. No modification of this Agreement shall be effective unless in writing and executed by the Parties. This Agreement supersedes any prior agreements of the Parties concerning the subject matter

**Section 18.5   No Third Party Beneficiaries.**

This Agreement is for the sole and exclusive benefit of the Parties, and does not stipulate any benefit in favor of any third parties.

**Section 18.6   Regulatory Matters.**

(a)     Gatherer has informed Producer, and Producer hereby acknowledges and accepts, that the Gathering and Processing System will be an intrastate pipeline system operating only within the State of Oklahoma, and is not intended to be subject to regulation under any Applicable Law by FERC.  Accordingly, as a principal condition to, and in consideration for, the execution of this Agreement by Gatherer, Producer represents, warrants and covenants that (i) the delivery of Producer's Committed Gas hereunder will not subject the Gathering and Processing System or any portion thereof to regulation by FERC as (x) a natural gas company under the Natural Gas Act or (y) a Section 311 transporter under the Natural Gas Policy Act of 1978 and (ii) none of Producer's Committed Gas delivered at one or more Receipt Points is Gas that has been transported by a natural gas company, as defined in the Natural Gas Act, or by a Section 311 transporter under the Natural Gas Policy Act of 1978, at any point prior to such delivery.  In the event that Producer breaches its representation, warranty and covenant contained in this Section 18.6(a), Gatherer, in addition to all other remedies at law or in

25

equity, shall have the right, upon delivery of written notice to Producer, to refuse receipt of Producer's Committed Gas which has caused a breach of such representation, warranty and covenant. Gatherer's election to refuse receipt of any of Producer's Committed Gas pursuant to this Section 18.6(a) shall not release Producer from any obligation to indemnify Gatherer for such breach under Article X.

(b)     If any federal or state statute, regulation, or order by a court of law or Governmental Authority directly or indirectly (a) prohibits performance under this Agreement, (b) makes such performance illegal or impossible, or (c) effects a change in a substantive provision of this Agreement that has a significant material adverse impact upon the performance of either Party's obligations under this Agreement, including without limitation the imposition of terms, conditions, or rate restrictions, then the Parties will use all reasonable efforts to revise the Agreement and any other ancillary agreement to the extent necessary so that: (i) performance under the Agreement is no longer prohibited, illegal, impossible, or is no longer impacted in a material adverse fashion, and (ii) this Agreement and any other ancillary agreement is revised in a manner that preserves, to the maximum extent possible, the respective positions of the Parties. Without liability for its failure to do so, each Party will use reasonable efforts to provide notice to the other Party as to any proposed law, regulations or any regulatory proceedings or actions that could affect the rights and obligations of the Parties. If the Parties are unable to revise the Agreement in accordance with the above within ninety (90) days following the adoption of any such law, regulation or order of a Governmental Authority, then the Party whose performance is prohibited, illegal, impossible or is impacted in a material adverse fashion will have the right, at its sole discretion, to terminate this Agreement upon written notice to the other Party.

**Section 18.**7    **Execution in Counterparts.**

This Agreement may be executed in counterparts, including by electronic transmission, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement.

[Signature Page Next Page]

26

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed in duplicate originals by its duly authorized officer as of the Effective Date.

**PRODUCER**

**OKLAHOMA ENERGY ACQUISITIONS, LP**

By: Alta Mesa GP, LLC, its general partner

By: _____

Harlan H. Chappelle, Manager

Signature page to Gas Gathering and Processing Agreement

000328

**GATHERER**

**KINGFISHER MIDSTREAM, LLC,** a Delaware
limited liability company

By: HMS KINGFISHER HOLDCO, LLC,
Authorized Member

By: _____
Name:   Harlan H. Chappelle
Title:  President and Chief Executive Officer

000329

**SCHEDULE 3.3**
to
**GAS GATHERING AND PROCESSING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
and
**KINGFISHER MIDSTREAM LLC**

**DEDICATED AREA**


**[See Attached]**

000330

000331





Blaine, Canadian, Garifield, Kingfisher, Logan Counties

000333

**SCHEDULE 3.4**
to
**GAS GATHERING AND PROCESSING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**FORM OF**

**MEMORANDUM OF GAS GATHERING AND PROCESSING AGREEMENT**


| | |
|---|---|
| **STATE OF OKLAHOMA** | § |
| | § |
| **COUNTIES OF KINGFISHER,** | § |
| **LOGAN, CANADIAN, BLAINE** | § |
| **AND GARFIELD** | § |


      This **Memorandum of Gas Gathering and Processing Agreement** (this "**Memorandum**") is made and entered into this __ day of _____, 2015, by and between Oklahoma Energy Acquisitions, LP, a Texas limited partnership located at 15021 Katy Freeway, Suite 400, Houston, TX 77094, Attn:  Michael A. McCabe ("**Producer**"), and Kingfisher Midstream LLC, a Delaware

00934

**WHEREAS**, Producer and Gatherer have entered into a Gas Gathering and Processing Agreement (the "**Agreement**") dated the 31st day of August, 2015 (the "**Effective Date**"); and

**WHEREAS**, Producer and Gatherer desire to file this Memorandum to provide record notice of the Agreement.

1.    **Dedication.**

(a)  For the Primary Term of the Agreement, Producer has dedicated to Gatherer all of Producer's Interests within the Dedicated Area shown on Exhibit A attached hereto (the "**Primary Term Dedication**") and shall deliver to Gatherer at the Receipt Point(s) all Committed Gas produced therefrom.  If, after the Effective Date of the Agreement and before the end of the Primary Term, Producer or any of its Affiliates acquire mineral interests within the Dedicated Area (the "**After-Acquired Interests**"), then the After-Acquired Interests and all Gas produced therefrom shall automatically be included in the Primary Term Dedication and become Committed Gas; *provided, however*, if any of the After-Acquired Interests or Gas produced therefrom are subject to a prior written dedication or commitment for gathering as of the time of acquisition by Producer, then that Gas will be excluded from the Primary Term Dedication until the prior dedication or commitment terminates or expires, at which time such Gas shall become Committed Gas, *provided further* that if, with respect to any After-Acquired

Interests, Producer has the right or ability, without payment of any material fee or penalty, or incurring any other material disadvantage, to terminate any such prior dedication or commitment with respect to the After-Acquired Interests, then Producer shall terminate such dedication or commitment as soon as reasonably practicable.  Producer shall promptly notify Gatherer in writing of any such termination, and identify the After-Acquired Interests.

(b) For the Extended Term of the Agreement, Producer has dedicated to Gatherer all of the wells that constitute Interests and are connected to the Gathering and Processing System at the end of the Primary Term (such wells, the "**Dedicated Wells**", and such dedication, the "**Extended Term Dedication**") and shall deliver to Gatherer at the Receipt Point(s) all Committed Gas produced therefrom.  From and after the end of the Primary Term all Interests within the Dedicated Area shown on Exhibit A attached hereto other than the Dedicated Wells shall be permanently released from the Dedication.

2. **Term.**  The Agreement shall commence as of the Effective Date, and shall remain in full force and effect for fifteen (15) years after the In-Service Date (the "**Primary Term**"), *provided*, *however*, that, to the extent that at the end of the Primary Term there are wells then-connected to the Gathering and Processing System and then-producing Gas in commercial (paying) quantities, the Term of the Agreement shall extend for so long as such well(s) continue to produce Gas in commercial (paying) quantities (the "**Extended Term**").

3. **Incorporation of Agreement and Effect of Memorandum.**  The sole purpose of this Memorandum is to give notice of the existence of the Agreement.  This Memorandum shall not modify in any manner any of the terms and conditions of the Agreement, and nothing in this Memorandum is intended to and shall not be used to interpret the Agreement.  The provisions of the

Agreement are hereby incorporated into this Memorandum as if set out fully herein. In the event of any conflict between the terms of this Memorandum and the terms of the Agreement, the terms of the Agreement shall govern and control for all purposes.

      **4.**    **Defined Terms.**  All capitalized terms not defined herein shall have the same meaning assigned such terms in the Agreement.

[Signature pages follow]

**IN WITNESS WHEREOF**, this Memorandum is executed by Producer and Gatherer as of the date of acknowledgement of their signatures, but is effective for all purposes as of the Effective Date stated above.

**PRODUCER:**

**OKLAHOMA ENERGY ACQUISITIONS, LP**

**By:** _____
**Name:** _____
**Title:** _____


STATE OF TEXAS             §
                                  §
COUNTY OF HARRIS         §

This instrument was acknowledged before me this ___ day of August, 2015 by_____, the _____of Oklahoma Energy Acquisitions, LP, a Texas limited partnership, on behalf of said limited partnership.

In witness whereof I hereunto set my hand and official seal.

000338

NOTARIAL SEAL:

_____
Notary Public in and for the
State of Texas

My Commission Expires:  _____
Commission No.: _____

**GATHERER:**

**KINGFISHER MIDSTREAM, LLC**

**By: HMS KINGFISHER HOLDCO, LLC,**
      **Authorized Member**

> **By:** _____
> **Name:** _____
> **Title:** _____

STATE OF TEXAS                    §
                                  §
COUNTY OF HARRIS                  §

This instrument was acknowledged before me this ___ day of August, 2015 by _____, the _____ of HMS Kingfisher HoldCo, LLC, a Delaware limited liability company, authorized member of Kingfisher Midstream, LLC, a Delaware limited liability company, on behalf of said limited liability company.

In witness whereof I hereunto set my hand and official seal.

000340

NOTARIAL SEAL:

State of Texas

_____
Notary Public in and for the
State of Texas

My Commission Expires: _____

Commission No.: _____

**SCHEDULE 3.10**
to
**GAS GATHERING AND PROCESSING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**Receipt Points**

| Operator | Receipt Point Name | Unit | Location |
|---|---|---|---|
| Alta Mesa | Lincoln CRP Manifold 1 | Lincoln | T 18N R 6W NE ¼ Section 34 |
| Alta Mesa | Lincoln CRP Manifold 2 | Lincoln | T 17N R 6W NE ¼ Section 3 |
| Alta Mesa | Lincoln CRP Manifold 2A | Lincoln | T 17N R 6W NE ¼ Section 10 |
| Alta Mesa | Lincoln CRP Manifold 3 | Lincoln | T 17N R 6W SE ¼ Section 10 |
| Alta Mesa | Lincoln CRP Manifold 4 | Lincoln | T 18N R 6W NE ¼ Section 36 |
| Alta Mesa | Lincoln CRP Manifold 5 | Lincoln | T 18N R 6W SE ¼ Section 36 |

000342

| Alta Mesa | Lincoln CRP Manifold 7 | Lincoln | T 17N R 5W NW ¼ Section 7 |
| Alta Mesa | Lincoln CRP Manifold 6 | Lincoln | T 17N R 5W SW ¼ Section 7 |
| Alta Mesa | Lincoln CRP Manifold 8 | Lincoln | T 18N R 5W NE ¼ Section 32 |
| Alta Mesa | Lincoln CRP Manifold 9 | Lincoln | T 18N R 5W NW ¼ Section 34 |
| Alta Mesa | Lincoln CRP Manifold 11 | Lincoln | T 18N R 5W SW ¼ Section 33 |
| Alta Mesa | Lincoln CRP Manifold 10 | Lincoln | T 18N R 5W SE ¼ of SW ¼ Section 33 |
| Alta Mesa | Lincoln CRP Manifold 11A | Lincoln | T 17N R 5W SW ¼ Section 4 |
| Alta Mesa | Lincoln CRP Manifold 12 | Lincoln | T 17N R 5W SE ¼ of SW ¼ Section 8 |
| Alta Mesa | Lincoln CRP Manifold 13 | Lincoln | T 17N R 5W NW ¼ Section 20 |
| Alta Mesa | Lincoln CRP Manifold 14 | Lincoln | T 17N R 5W SW ¼ Section 16 |
| Alta Mesa | Lincoln CRP Manifold 15 | Lincoln | T 17N R 5W NE ¼ Section 29 |
| Alta Mesa | Lincoln CRP Manifold 16 | Lincoln | T 17N R 5W SE ¼ Section 22 |
| Alta Mesa | Lincoln CRP Manifold 17 | Lincoln | T 17N R 5W SE ¼ Section 29 |
| Alta Mesa | Lincoln CRP Manifold 18 | Lincoln | T 17N R 5W SW ¼ Section 29 |

| | | | |
|---|---|---|---|
| Alta Mesa 9 | South of Lincoln CRP Manifold 1 | South of Lincoln | T 17N R 6W NE ¼ Section |
| Alta Mesa Section 8 | South of Lincoln CRP Manifold 2 | South of Lincoln | T 17N R 6W NW ¼ |
| Alta Mesa 16 | South of Lincoln CRP Manifold 3 | South of Lincoln | T 17N R 6W SE ¼ Section |
| Alta Mesa Section 20 | South of Lincoln CRP Manifold 4 | South of Lincoln | T 17N R 6W NW ¼ |
| Alta Mesa 26 | South of Lincoln CRP Manifold 5 | South of Lincoln | T 17N R 6W SE ¼ Section |
| Alta Mesa 26 | South of Lincoln CRP Manifold 6 | South of Lincoln | T 17N R 6W NE ¼ Section |
| Alta Mesa Section 34 | South of Lincoln CRP Manifold 7 | South of Lincoln | T 17N R 6W NW ¼ |
| Alta Mesa Section 32 | South of Lincoln CRP Manifold 8 | South of Lincoln | T 17N R 6W NW ¼ |
| Alta Mesa 4 | South of Lincoln CRP Manifold 9 | South of Lincoln | T 16N R 5W NE ¼ Section |

| | | | |
|---|---|---|---|
| Alta Mesa | South of Lincoln CRP Manifold 10 | South of Lincoln | T 16N  5W SW ¼ Section 5 |
| Alta Mesa | South of Lincoln CRP Manifold 11 | South of Lincoln | T 16N R 5W SE ¼ Section 8 |
| Alta Mesa | South of Lincoln CRP Manifold 12 | South of Lincoln | T 16N R 5W NE ¼ Section 9 |
| Alta Mesa | South of Lincoln CRP Manifold 13 | South of Lincoln | T 17N R 5W SE ¼ Section 26 |
| Alta Mesa | South of Lincoln CRP Manifold 14 | South of Lincoln | T 16N R 5W SE ¼ Section 2 |
| Alta Mesa | CRP Manifold NofL-4 | North of Lincoln | T 18N R 5W NW ¼ Section 30 |
| Alta Mesa | CRP Manifold NofL-5 | North of Lincoln | T 18N R 5W NW ¼ Section 18 |
| Alta Mesa | CRP Manifold NofL-6 | North of Lincoln | T 18N R 6W NE ¼ Section 1 |
| Alta Mesa | CRP Manifold NofL-7 | North of Lincoln | T 18N R 5W SE ¼ Section 17 |
| Alta Mesa | CRP Manifold NofL-8 | North of Lincoln | T 18N R 5WNE ¼ Section 8 |
| Alta Mesa | CRP Manifold NofL-9 | North of Lincoln | T 18N R 5W SW ¼ Section 14 |

000345

| Alta Mesa | CRP Manifold NofL-10 | North of Lincoln | T 18N R 5W NE ¼ Section 10 |
| Alta Mesa | CRP Manifold NofL South-1 | North of Lincoln | T 18N R 5W NE ¼ Section 35 |
| Alta Mesa | CRP Manifold NofL South-2 | North of Lincoln | T 17N R 5W SE ¼ Section 2 |
| Alta Mesa | CRP Manifold NofL South-3 | North of Lincoln | T 17N R 5W SW ¼ Section 13 |

000347

**SCHEDULE 3.11(a)**
to
**GAS GATHERING AND PROCESSING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**FORM OF NOTICE**
**FOR**
**DESIGNATION OF ADDITIONAL RECEIPT POINT**

1.    Operator Contact Name    _____

2.    Phone Numbers    _____

3.    E-Mail    _____

4.    Well and Pad Name    _____

5.    County/Township    _____

6.    Requested Turn on Date

000348

7. Number of Wells _____

8. Projected Initial Volume (Mcfd) _____

9. Projected Initial Volume (Mcfd) _____

10. Requested GPS of:

a. Wellhead (if applicable) _____ 0 _____ , _____ ,, _____ - _____ 0 _____ , _____ ,,
b. CRP (if applicable) _____ 0 _____ , _____ ,, _____ - _____ 0 _____ , _____ ,,
c. Receipt Point Meter _____ 0 _____ , _____ ,, _____ - _____ 0 _____ , _____ ,,

11. Surface site provided by Producer or KFM _____

12. Planned flow into New or Existing Receipt Point _____

13. Producer* or KFM** to Connect _____

14. Estimated Spud and Frac dates _____

15. BTU Content             _____

16.    Please attach gas analysis for each well that will flow through the new Receipt Point.  If not yet available, date it will be available:  _____

000351

**SCHEDULE 4.1**
to
**GAS GATHERING AND PROCESSING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**MEASUREMENT, EQUIPMENT AND TESTING**

     A.     Any terms capitalized in this Schedule shall have the meaning set forth herein, or as indicated by the context, or as set forth in the body of the Agreement.

     B.     Producer, or its designee, will maintain and operate the measuring stations at the Central Receipt Point(s) through which the quantity of Gas gathered and processed under this Agreement is measured. Producer will equip each Central Receipt Point with remote communication facilities and will provide Gatherer with direct access to the data from those facilities. If desired by Gatherer, Gatherer may install, maintain, and operate, at its own expense, check measuring equipment, provided that Gatherer must install such equipment so as not to interfere with the operation of Producer's or its designee's measuring equipment. Gatherer will equip all check measuring equipment with remote communication facilities and will provide Producer with direct access to the data from those facilities. If the measuring stations and/or communication facilities are installed on land not owned by Producer, Gatherer will procure all land rights requested by Producer to place the measuring stations and/or communication facilities on

000352

such property and to enable Producer to operate and access such measuring stations and/or communication facilities in accordance with the following.

C.    Each Party will construct, install, and operate its measuring stations and communication facilities in accordance with the following, depending on the type of meters used:

(i)    <u>Orifice Meters</u> – in accordance with ANSI/API 2530 (American Gas Association Report No. 3), *Orifice Metering of Natural Gas and Other Hydrocarbon Fluids*, Second Edition, dated April 2000, and any subsequent amendments, revisions, or modifications thereof, including the use of flange connections.  If Gas pulsation problems occur upstream of the Receipt Points or downstream of the Delivery Points, Gatherer or its designee will take all reasonable industry-standard corrective actions required by Producer to mitigate such pulsation.

(ii)    <u>Electronic Transducers and Flow Computers</u> (solar and otherwise) – in accordance with the applicable American Gas Association standards, including, but not limited to, American Gas Association Measurement Committee Report Nos. 3, 5, 6, and 7, and any subsequent amendments, revisions, or modifications to such standards.

(iii)    <u>Ultrasonic Meters</u> – in accordance with the American Gas Association Measurement Committee Report No. 9, dated 2007, and any subsequent amendments, revisions, or modifications to such report.

AMABR 0040476

D.      Neither Party is obligated to replace or make any alterations to its measuring equipment as a result of any subsequent amendments, revisions, or modifications of the American Gas Association Reports cited in paragraphs B (i) through B (iii) of this Schedule, unless the Parties mutually agree to a replacement or alteration.

E.      Each Party will give reasonable notice to the other Party in order that such Party may have a representative present to observe any cleaning, changing, repairing, inspecting, testing, calibrating, or adjusting of measuring equipment.   The official charts (recordings) from the measuring equipment will remain the property of the Party owning such or its designee.  Upon a Party's request, the other Party or its designee will submit its records and charts, together with calculations, to the requesting Party for inspection and verification, subject to return to the producing Party or its designee within ten (10) Days after receipt  of such records and charts.

F.      Each Party or its designee will verify the accuracy of all measuring equipment belonging to it at reasonable intervals and, if requested, in the presence of a representative of the other Party.  Each Party or its designee will verify the accuracy of the equipment at least once every Contract Year where daily deliveries of Gas at a Receipt Point are less than one thousand (1,000) Mcf per day, unless the other Party requests a special test as described below; *provided, however*, that when daily deliveries of Gas at a Receipt Point average between one thousand (1,000) Mcf per day and five thousand (5,000) Mcf per day during any month, Producer will verify the accuracy of the measuring equipment once every six (6) months; *provided further, however*, that when daily deliveries of Gas at a Receipt Point average greater than five thousand (5,000) Mcf per day during any month, Producer will verify the accuracy of the measuring equipment once every calendar quarter.  If, upon any test, the measuring equipment is found to be inaccurate by two percent (2%) or less, previous readings of the equipment will be deemed correct in computing the deliveries of

000354

Gas under this Agreement, but the equipment will immediately be adjusted to record accurately.  If, upon any test of the measuring equipment is found to be in error by an amount than ten (10) of a recording corresponding to the average hourly flow rate for the period since the last test, the equipment will immediately be adjusted to record accurately and any previous recordings of the equipment will be corrected to zero error for any period which is known definitely or agreed upon, utilizing the procedure set forth in this paragraph.  If the period for correction is not known or agreed upon, the correction will be made for a period covering one-half (1/2) of the time elapsed since the date of the latest test, but not to exceed sixteen (16) Days when the equipment is tested every Month and not to exceed forty-five (45) Days when the equipment is tested every three (3) Months.  If a Party desires a special test of any measuring equipment, such Party will give the other Party at least seventy-two (72) hours' advance notice, and the Parties will cooperate to perform a prompt test of the accuracy of the equipment.  If the measuring equipment so tested is found to be inaccurate by two percent (2%) or less, the requesting Party may bill the other Party for the costs incurred due to the special test, including any labor and transportation costs, and such Party will pay such costs promptly upon receipt of the invoice for such costs.

G.    If, for any reason, any measurement equipment is out of adjustment, out of service, or out of repair, and the total calculated hourly flow rate through each meter run is found to be in error by an amount of the magnitude described in paragraph E of this Schedule, the total quantity of Gas delivered will be re-determined in accordance with the first of the following methods which is feasible:

(i)    by checking the registration of any check meters, if installed and accurately registering (subject to testing as described in paragraph E of this Schedule); or

(ii)    by correcting the error by rereading of the official charts, or by straightforward application of a correcting factor to the quantities recorded for the period (if the net percentage of error is ascertainable by calibration, tests, or mathematical calculation); or

(iii)    by estimating the quantity, based upon deliveries made during periods of similar conditions when the meter was registering accurately.

H.    The Parties or their designees will retain and preserve for a period of at least two (2) years all test data, charts, and other similar records.

I.    The measurements of the quantity and quality of all Gas delivered at the Receipt Points and Delivery Points will be conducted in accordance with the following:

(i)    The unit of volume for measurement will be one (1) Cubic Foot at an absolute pressure of fourteen and seventy-three hundredths (14.73) pounds per square inch absolute and a temperature of sixty degrees Fahrenheit (60° F). Measured volumes, converted to Mcf, will be multiplied by their Gross Heating Value per Cubic Foot and divided by one thousand (1,000) to determine MMBtu delivered under this Agreement.

(ii)    Computations for Gas measurement will be made in accordance with paragraphs B(i) through B(iii) of this Schedule corresponding to the type of meters used.

(iii)    The temperature of the Gas will be determined by a recording thermometer installed so that it may record the temperature of the Gas flowing through the meters, or other means of recording temperature as may be mutually agreed upon by the Parties.  The average of the record to the nearest one degree Fahrenheit (1° F), obtained while Gas is being delivered, will be the applicable flowing Gas temperature for the period under consideration.

(iv)    The specific gravity of the Gas will be determined by a recording gravitometer or chromatographic device installed and located at a suitable point to record representing specific gravity of the Gas being metered or, at Producer's or its designee's option, by spot samples or continuous sampling standard type gravity methods.

1.    If a recording gravitometer or chromatographic device is used, the gravity to the nearest one-thousandth (0.001) obtained while Gas is being delivered will be the specific gravity of the Gas sampled for the recording period.

2.    If a continuous sampling method is used, the gravity to the nearest one-thousandth (0.001) will be determined once a Month from a Gas analysis. The result will be applied during the Month for the determination of Gas volumes delivered.

3.    If a spot sample is used, the gravity to the nearest one-thousandth (0.001) will be determined at least once each quarter and will be applied until the next spot sample is taken for the determination of Gas volumes delivered.

(v)    Adjustments to measured Gas volumes for the effects of super compressibility will be made in accordance with accepted American Gas Association standards.  Producer or its designee will obtain appropriate carbon dioxide and nitrogen mole fraction values for the Gas delivered as may be required to compute adjustments in accordance with standard testing procedures. At Producer's or its designee's option, equations for the calculation of super compressibility may be taken from either the API Chapter 14.2 or American Gas Association Report No. 8, Compressibility and Super compressibility for Natural Gas and Other Hydrocarbon Gases, latest revision.

(vi)    For purposes of measurement and meter calibration, the average atmospheric pressure for each Receipt Point and Delivery Point is assumed to be fourteen and four tenths (14.4) pounds per square inch absolute.  If the pressure transmitter being used is capable of measuring actual atmospheric pressure, then actual atmospheric pressure may be used.

(vii)    The Gross Heating Value of the Gas delivered at a Point of Receipt and Point of Delivery will be determined at least once each quarter using either a continuous sampler, spot sampler, or gas chromatograph; provided, however, that when daily deliveries of Gas at any Receipt Point or Delivery Point average five thousand (5,000) Mcf per Day or greater during any Month, the Gross Heating Value of the Gas delivered at that Receipt Point or

000358

Delivery Point will be taken at least Monthly at a suitable point on the facilities to be representative of the Gas being metered.

(viii)   The physical constants used in Btu computation for a perfect Gas will be derived from the "Table of Physical Constants of Paraffin Hydrocarbons and Other Compounds" as published in the GPA Standard 2145-03 and superseding revisions thereof. The analysis will be complete and individual values in mole percent or fraction of each hydrocarbon compound will be listed through $C_6$.   The $C_6+$ values will be as stated in GPA standard 2261, 7.3.6 Table IV (as may be revised from time to time) or, at Producer's option, by use of an extended analysis.   The analysis will further include the mole fraction or percent individually of additional compounds contained in chromatographically measurable quantity contained in the sample.   The method to be used for chromatographic analysis will be that contained in GPA standard 2261, <u>Analysis for Natural Gas and Similar Gaseous Mixtures by Gas Chromatography</u>, latest revision.

(ix)   Other tests to determine water content, sulfur, and other impurities in the Gas will be conducted in accordance with standard industry testing procedures when requested by either Party.   The Party requested to perform those tests will bear the cost of those tests only if the Gas tested is determined not to be within the quality specification set forth in Schedule 3.1.   If the Gas is within the quality specification, the requesting Party will bear the cost of the tests.

(x)     If, during the term of this Agreement, a new method or technique is developed with respect to gas measurement or the determination of the factors used in gas measurement, then, in Producer's commercially reasonable discretion, the new method or technique may be substituted for the method set forth in this Schedule, provided that the new method or technique is in accordance with accepted standards of the American Gas Association.

000361

**SCHEDULE 4.2**
**to**
**GAS GATHERING AND PROCESSING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**SPECIFICATIONS**

A.      All Delivered Gas shall meet the following specifications:

(i)      Hydrogen Sulfide: The Gas will not contain more than ███████████ ████████████████████████████████████████ as determined by quantitative tests.

(ii)      Total Sulfur: The Gas will not contain more than ███████████████████ ██████████████████████ as determined by quantitative tests.

(iii)      Temperature: The Gas will not have a temperature less than the maximum temperature at which a hydrate will form, and in any event not less than ██████████ ████████████████████████████████████

000362

(iv)      Carbon Dioxide: The Gas will not contain more than ██████████

(v)    <u>Oxygen</u>: Producer will make every reasonable effort to keep the Gas free from oxygen. In any event, the Gas will not contain more than ███████████████████████

(vi)    <u>Nitrogen</u>: The Gas will not contain more than ██████████████████████████

(vii)    <u>Non-hydrocarbons</u>: The Gas will not contain more than ████████████ ███████████████████ including, but not limited to, water, hydrogen sulfide, sulfur, carbon dioxide, oxygen, and nitrogen.

(viii)    <u>Water Vapor Content</u>: The Gas will be free of water and will not contain more than ██████████████████████████████████████

(ix)    <u>Objectionable Liquids and Solids and Dilution</u>: The Gas will be free of objectionable liquids and solids (including free water) and will be commercially free from dust, gums, gum-forming constituents, and other liquids or solid matter which become separated from the Gas in the course of gathering.

(x)    <u>Gross Heating Value</u>: The Gas will not have a Gross Heating Value less than ██████████████████████████████

(xi)    <u>Hazardous Waste</u>: The Gas will not contain hazardous waste as defined in the Resources Conservation and Recovery Act of 1976, 42 USC § 690.1, et seq.

B.    Gatherer is not obligated to accept at the Receipt Point or deliver at the Delivery Points any Gas tendered by Producer that does not conform to the specifications set forth in this Schedule 3.2. The gas quality specifications set forth in this Schedule 4.2 are the minimum gas quality specifications that are in place as of the Effective Date of this Agreement for the Downstream Pipelines at the Delivery Points.  If the quality specifications of a Downstream Pipeline at a Delivery Point are modified from those in place as of the Effective Date of this Agreement, this Agreement will automatically be amended without further action of the Parties so that the minimum quality specifications set forth in this Schedule 3.2 conform to the modified quality specifications of any Downstream Pipeline.

C.    Producer will not knowingly deliver Gas to a Receipt Point that fails to meet one or more of the quality specifications set forth in this Schedule 4.2 without the express written consent of Gatherer.  If the Gas delivered at a Receipt Point fails to meet any of the quality specifications stated above, then Gatherer will notify Producer and Producer will make a commercially reasonable effort to correct the Off-Spec Gas.  Gatherer may refuse to accept Producer's Gas to the extent and for so long as Producer is unable to deliver Gas conforming to the applicable specifications. If Gatherer at any time accepts delivery of Off-Spec Gas, such acceptance does not constitute a waiver with respect to any future delivery of Off-Spec Gas.  **NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, IF PRODUCER'S OFF-SPEC GAS IS DELIVERED INTO THE GATHERING AND PROCESSING SYSTEM WITHOUT THE PRIOR EXPRESS APPROVAL OF GATHERER, AND THE QUALITY DEFICIENCY OF THAT GAS DAMAGES ANY PORTION OF THE GATHERING AND PROCESSING**

**SYSTEM, PRODUCER SHALL REIMBURSE GATHERER FOR ALL DAMAGES CAUSED BY OR ATTRIBUTABLE TO THE INTRODUCTION BY PRODUCER OF OFF-SPEC GAS, INCLUDING, WITHOUT LIMITATION, PHYSICAL DAMAGE TO ANY PIPELINE OR APPURTENANT FACILITIES, AND DAMAGE TO GATHERER'S COMMERCIAL OPERATIONS, AND PRODUCER SHALL REIMBURSE GATHERER FOR ALL COSTS INCURRED BY GATHERER IN PURGING THE GATHERING AND PROCESSING SYSTEM AND IN OTHERWISE DEALING WITH THE OFF-SPEC GAS.**

       D.      Any terms capitalized in this Schedule shall have the meaning set forth herein, or as indicated by the context, or as set forth in the body of the Agreement.

**Schedule 6.1**
**to**
**GAS GATHERING AND PROCESSING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**SERVICE FEES**

Any terms capitalized in this Schedule shall have the meaning set forth herein, or as indicated by the context, or as set forth in the body of the Agreement.

The Service Fee for gathering and processing Producer's Gas and delivering to nominated Delivery Points shall be calculated according to the following formula:

Service Fee = (Gathering Fee + Processing Fee + Dehydration Fee + Compression Fee + Gathering Capital Recovery Fee + Processing Capital Recovery Fee + NGL Transport Fee) X the Price Index + Other Fuel Fee

**Gathering Fee ($/MMBtu)**

A gathering fee of ▮▮▮▮/MMBtu shall be assessed on Allocated CRP Volume.

000366

**Processing Fee ($/MMBtu)**

A processing fee of ▆▆▆▆/MMBtu shall be assessed on Allocated CRP Volume.

**Dehydration Fee ($/MMBtu)**

A dehydration fee of ▆▆▆▆/MMBTU shall be assessed on Allocated CRP Volume.

**Compression Fee ($/MMBtu)**

Gatherer shall install compression as necessary on Gathering and Processing System as provided in Section 4.4.  For any volumes of Allocated CRP Volume a compression fee of ▆▆▆▆/MMBtu per stage of compression shall be assessed.

**NGL Transport Fee ($/gallon)**

A transport fee per gallon of NGLs shall be assessed on Producer's Allocated Actual Quantities of NGLs.  The NGL Transport Fee shall be ▆▆▆▆ per gallon with respect to Producer's Allocated Actual Quantities of NGLs.

**Gathering Capital Recovery Fee ($/MMBtu)**

A Gathering Capital Recovery fee of $▮▮▮/MMBtu shall be assessed on Allocated CRP Volume until Gatherer has recovered ▮▮▮ Gathering and Processing Capital Expenditures across all Service Fees.

**Processing Capital Recovery Fee ($/MMBtu)**

A Processing Capital Recovery fee of $▮▮▮/MMBtu shall be assessed on Allocated CRP Volume until Gatherer has recovered ▮▮▮ Gathering and Processing Capital Expenditures across all Service Fees.

000369

**SCHEDULE 8.1**
**to**
**GAS GATHERING AND PROCESSING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**NOTICES**

<u>**GATHERER:**</u>

<u>Notices & Correspondence</u>:

    Kingfisher Midstream LLC
    c/o Asset Risk Management, LLC
    20329 State Highway 249, Suite 450
    Houston, TX 77070
    Attention: Paul Williams
    Phone: 281-655-3234
    Email: pwilliams@asset-risk.com

<u>Scheduling Department</u>:

    Kingfisher Midstream LLC
    c/o Asset Risk Management, LLC

c/o Asset Risk Management, LLC
20329 State Highway 249, Suite 450
Houston, TX 77070
Attention: Gas Scheduling David Puglia
Phone: 281-655-3216
Email: dpuglia@asset-risk.com

Accounting Matters:

Kingfisher Midstream LLC
c/o Asset Risk Management, LLC
20329 State Highway 249, Suite 450
Houston, TX 77070
Attention: Gas Accounting Mamata Sharma
Phone: 281-655-3221

Payment by ACH:

ABA #:
Bank:
Account #:
Credit To:

[Continued on next page]

**<u>PRODUCER:</u>**

<u>Notices & Correspondence:</u>

      Oklahoma Energy Acquisitions, LP
      c/o Alta Mesa Services, LP
      15021 Katy Freeway
      Suite 400
      Houston, TX 77094
      Attn: David McClure
      Phone: 281-530-0991
      Facsimile: 281-530-5278
      Email: dmcclure@altamesa.net

<u>Billing:</u>

      Oklahoma Energy Acquisitions, LP
      c/o Alta Mesa Services, LP
      15021 Katy Freeway
      Suite 400
      Houston, TX 77094
      Attn:  Michael A. McCabe
      Phone:  (281) 530-0991
      Facsimile: (281) 530-5278
      Email: mmccabe@altamesa.net

000372

Payment by ACH:

Bank:           Union Bank (MUFG)

█████████████████████

Account Name:    Alta Mesa Services LP Funding Account

# EXHIBIT 2

000374

*Execution Version*

**CRUDE OIL GATHERING AGREEMENT**

**OKLAHOMA ENERGY ACQUISITIONS, LP**

**AND**

000375

KINGFISHER MIDSTREAM, LLC

**August 31. 2015**

000376

# TABLE OF CONTENTS

Article I

        Definitions and Interpretation ........................................................................1
Section 1.1    Definitions ...................................................................................1
Section 1.2    Interpretation ...............................................................................6

Article II

        TERM .................................................................................................7
Section 2.1    Term ...........................................................................................7

Article III

        CRUDE GATHERING SYSTEM .................................................................7
Section 3.1    Construction of Facilities ..............................................................7
Section 3.2    Easements, Rights-of-Way and Fee Lands ......................................7
Section 3.3    Dedication ...................................................................................7
Section 3.4    Covenant Running With Land ........................................................8
Section 3.5    Covenant Not to Gather Crude Oil ..................................................9
Section 3.6    Option to Expand Crude Gathering System .....................................9
Section 3.7    Title Warranty ............................................................................10
Section 3.8    Proceeds of Production .................................................................10
Section 3.9    Receipt Points and Central Receipt Points ......................................10
Section 3.10   Additional Receipt Points; Obligation to Interconnect .....................10

000370

Section 3.11    Commingling................................................................11

Article IV

                GATHERING AND DELIVERY........................................................11
Section 4.1    Obligation to Gather; No Treating Services. .........................11
Section 4.2    Scheduling....................................................................11
Section 4.3    Separation and Storage. ...................................................12
Section 4.4    Delivery of Crude. ..........................................................12
Section 4.5    Measurement, Equipment and Testing. ...............................13
Section 4.6    Quality.........................................................................13
Section 4.7    Delivery Pressure at Receipt Points......................................13
Section 4.8    Operating Inventory. .......................................................13
Section 4.9    Title and Risk of Loss. .....................................................14

Article V

                CURTAILMENT AND MAINTENANCE..........................................14
Section 5.1    Curtailment and Temporary Release of Crude Oil. ................14
Section 5.2    Maintenance Events..........................................................14

Article VI

                FEES AND PAYMENT.................................................................15
Section 6.1    Fees............................................................................15

i

Section 6.2    Escalation..................................................................................15
Section 6.3    Billing and Payment......................................................................15
Section 6.4    Audit.......................................................................................16
Section 6.5    Taxes.......................................................................................16

Article VII

        INDEMNIFICATION....................................................................................16
Section 7.1    Indemnification............................................................................16
Section 7.2    Notification Obligation. ..................................................................17

Article VIII

        FORCE MAJEURE ......................................................................................17
Section 8.1    Force Majeure..............................................................................17

Article IX

        DEFAULT AND TERMINATION...........................................................................18
Section 9.1    Producer Events of Default................................................................18
Section 9.2    Gatherer's Default Remedies Against Producer..............................................18
Section 9.3    Gatherer Events of Default................................................................18
Section 9.4    Producer's Default Rights Against Gatherer. ..............................................19

Article X

        LIMITATION OF LIABILITY ..........................................................................19
Section 10.1   Limitation of Liability...................................................................19

000379

Article XI   MISCELLANEOUS
Section 11.1    Assignment. ...................................................................19
Section 11.2    Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury Trial. ...19
Section 11.3    Dispute Resolution. ..........................................................20
Section 11.4    Notices. ......................................................................20
Section 11.5    Survival. .....................................................................20
Section 11.6    No Joint Venture. ............................................................20
Section 11.7    Entire Agreement. ............................................................20
Section 11.8    No Third Party Beneficiaries. ...............................................21
Section 11.9    Confidentiality. .............................................................21
Section 11.10   Regulatory Matters. ..........................................................21
Section 11.11   Execution in Counterparts. ..................................................22


Schedule 3.3        Dedicated Area
Schedule 3.4        Form of Memorandum of Crude Oil Gathering Agreement
Schedule 3.9        Receipt Points
Schedule 3.10(a)    Designation of Additional Receipt Point
Schedule 4.4(a)     Schematic of Delivery Point
Schedule 4.5(a)     Measurement, Equipment and Testing
Schedule 4.6        Specifications

ii

000380

Schedule 11.4          Notices

000381

iii

## CRUDE OIL GATHERING AGREEMENT

This **Crude Oil Gathering Agreement** (this "*Agreement*") is made and entered into as of the 31st day of August, 2015 (the "*Effective Date*"), by and between Oklahoma Energy Acquisitions, LP, a Texas limited partnership ("*Producer*"), and Kingfisher Midstream LLC, a Delaware limited liability company ("*Gatherer*"). Producer and Gatherer may be referred to each individually as "*Party,*" or collectively as the "*Parties*."

### RECITALS

**WHEREAS**, Producer owns, controls or may acquire certain mineral interests and hydrocarbon reserves (collectively, the "*Producer's Interests*," as further defined below), and controls the mineral interests of others (collectively, the "*Other Interests*," as further defined below) in certain lands in Kingfisher, Logan, Canadian, Blaine and Garfield Counties, Oklahoma, described more particularly on **Schedule 3.3** attached hereto (the "*Dedicated Area*"); and

**WHEREAS**, Producer has or contemplates having a supply of crude oil (the "*Crude Oil*") from present and future wells located in the Dedicated Area and desires to Dedicate (as defined below) the Producer's Interests and Other Interests, and deliver such Crude Oil (the "*Committed Crude*") to Gatherer for gathering; and

**WHEREAS**, Gatherer shall construct, own and operate Crude Oil gathering facilities (collectively, the "*Crude Gathering System*," as further defined below) capable of receiving from Producer deliveries of the Committed Crude from the Dedicated Area and subject to the

Dedication; and

**WHEREAS**, Producer desires that Gatherer provide gathering services as set forth in this Agreement, and Gatherer desires to provide to Producer gathering services in accordance with the terms and conditions set forth in this Agreement; then

**THEREFORE**, for and in consideration of the mutual covenants set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**ARTICLE I**
**DEFINITIONS AND INTERPRETATION**

**Section 1.1     Definitions.**

The following terms shall have the following meanings unless otherwise indicated:

"*Additional Capacity*" has the meaning set forth in Section 3.6.

"*Additional Receipt Point*" has the meaning set forth in Section 3.10(a).

"*Affiliate*" means with respect to a Person, any Person which, directly or indirectly, controls, is controlled by or is under common control with such Person or such Person's

1

members or shareholders.  For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such individual or entity, whether through the ownership of voting securities, by contract or otherwise, *provided, however*, that for purposes of this Agreement, Producer and Gatherer shall not be considered Affiliates of each other.

"***After-Acquired Interests***" has the meaning set forth in Section 3.3.

"***Agreement***" has the meaning set forth in the introductory paragraph.

"***Applicable Law***" means any applicable statute, law principle of common law, rule, regulation, judgment, order, ordinance, requirement, code, writ, injunction, or decree of any Governmental Authority.

"***Barrel***" or "***bbl***" means forty-two (42) gallons of 231 cubic inches per gallon at 60 degrees Fahrenheit (60° F).

"***Business Day***" means any day, other than a Saturday or Sunday, that commercial banks in Houston, Texas are open for business.

"***C&O Agreement***" means that certain Operating and Construction Management Agreement dated as of August 31, 2015, by and between the Gatherer and Asset Risk Management, LLC and relating to the construction and operation of the Crude Gathering System, as the same may be amended, restated, modified or otherwise supplemented.

000385

"*Central Receipt Point*" and "*CRP*" has the meaning set forth in Section 3.9.

"*Claims*" means any and all demands, claims, judgments, obligations, liabilities, liens, causes of action, lawsuits, arbitrations, mediations, investigations or proceedings (whether at law or in equity).

"*Committed Crude*" has the meaning set forth in the Recitals.

"*Confidential Information*" has the meaning set forth in Section 11.9.

"*Contract Year*" means each calendar year during the Term, the first of which shall commence on the Effective Date and run through December 31 of that year, and then from January 1 through December 31 for each subsequent year thereafter, but for the last Contract Year, from January 1 through the date that this Agreement terminates or expires.

"*Crude Gathering System*" has the meaning set forth in the Recitals, and further means the (i) Gathering Pipelines, (ii) Storage Facilities, and (iii) custody transfer units, crude pumps, meters or measurement facilities, and (iv) any other equipment or appurtenances associated with the foregoing.

"*Crude Oil*" has the meaning set forth in the Recitals.

"*Curtailment Event*" has the meaning set forth in Section 5.1.

2

000386

"***Curtailment Period***" has the meaning set forth in Section 5.1.

"***Dedicated Area***" has the meaning set forth in the Recitals, as further specifically set forth on **Schedule 3.3**.

"***Dedicated Wells***" has the meaning set forth in Section 3.3(b).

"***Dedication***" means either the Primary Term Dedication or the Extended Term Dedication, as applicable, based upon the relevant determination time.

"***Delivered Crude***" means the quantity of Crude Oil in bbl that is delivered by Gatherer to Producer at the Delivery Point.

"***Delivery Point***" has the meaning set forth in Section 4.4(a).

"***Dispute***" has the meaning set forth in in Section 11.3.

"***Effective Date***" has the meaning set forth in the introductory paragraph.

"***Extended Term***" has the meaning set forth in Section 2.1.

"***Extended Term Dedication***" has the meaning set forth in Section 3.3(b).

"***FERC***" means the Federal Energy Regulatory Commission, or any successor Governmental Authority.

000387

"***Firm***" means a gathering and transportation service that is not subject to being curtailed, interrupted, pro rated or suspended except as expressly provided in this Agreement.

"***Flare Gas***" has the meaning set forth in Section 4.3(a).

"***Force Majeure***" has the meaning set forth in Section 8.1.

"***Force Majeure Event***" has the meaning set forth in Section 8.1.

"***GAAP***" means generally accepted accounting principles in the United States.

"***Gatherer***" has the meaning set forth in the introductory paragraph.

"***Gatherer Event of Default***" has the meaning set forth in Section 9.3.

"***Gatherer Group***" means any or all of (i) Gatherer, (ii) Gatherer's Affiliates, (iii) any or their respective contractors, and (iv) the officers, directors, employees, agents, advisors, counsel, consultants, members, shareholders, insurers, invitees or representatives of any of the foregoing.

"***Gathering Capital Expenditures***" means all expenditures, costs and expenses incurred by or on behalf of Gatherer with respect to the Crude Gathering System, including costs of rights-of-way and other easements, labor, pipelines, metering and measurement, crude pumps, Storage Facilities, and related expenditures, that are capitalized on the books and records of

3

000388

Gatherer with respect to the Crude Gathering System according to GAAP, but specifically excluding all expenditures, costs and expenses incurred by or on behalf of Gatherer with respect to any expansion of the Crude Gathering System to gather third party volumes of Crude Oil that are not attributable to the Interests, provided, however, that in the event that Gatherer undertakes any expansion of the Crude Gathering System to gather third party volumes of crude oil that are not attributable to the Interests, and Producer thereafter makes use of the Crude Gathering System so expanded to accommodate third party volumes of crude oil to gather Committed Crude, then Producer's pro rata share of all expenditures, costs and expenses of the expansion shall constitute "Gathering Capital Expenditures" to the extent agreed upon by the Parties at the time of Producer's connection to such extension, and, provided, further, that this right and obligation of Producer shall not be in derogation of any of the rights and obligations of the Parties under Section 3.6.

"**Gathering Capital Recovery Fee**" has the meaning set forth in Section 6.1(b).

"**Gathering Fee**" has the meaning set forth in Section 6.1(a).

"**Gathering Pipelines**" means the pipelines of various diameters interconnecting the Receipt Point(s) to the Delivery Point.

"**Governmental Approval**" means any permit, license, permission, grant or other similar authorization issued by, or required to be issued by, any Governmental Authority and necessary for the performance of the Parties hereunder.

"**Governmental Authority**" means any federal, state, county, parish, municipal or other

000389

governmental subdivision, or any court or any governmental department, commission, board, bureau, agency or other instrumentality of any federal, state, county, municipal or other governmental subdivision within the United States of America with authority over the Parties and subject matter in question.

"*Indemnified Party*" has the meaning set forth in Section 7.2.

"*Indemnifying Party*" has the meaning set forth in Section 7.2.

"*In-Service Date*" means the first day of the first full month following the date that Gatherer notifies Producer that the Crude Gathering System, or any Additional Capacity, if applicable, has been completed and is ready to receive Committed Crude and ready to redeliver it to Producer at the Delivery Point.

"*Interests*" means Producer's Interests, After-Acquired Interests and Other Interests.

"*Line Fill*" has the meaning set forth in Section 4.8(a).

"*Losses*" means any and all losses, damages, costs, expenses, liabilities, fines, penalties or judgments of whatever kind or character incurred by a Person or Party with respect to a Claim, including reasonable attorneys' fees, court costs and other reasonable costs and expenses of litigation as such may be awarded by a court.

4

000390

"***Maintenance Event***" has the meaning set forth in Section 5.2.

"***Notice***" has the meaning set forth in Section 11.4.

"***Off-Spec Crude Oil***" has the meaning set forth in Section 4.6.

"***Other Fuel***" means electricity consumed in the operation of the Crude Gathering System.

"***Other Fuel Fee***" means Producer's allocated share of the actual cost of Other Fuel.

"***Other Interests***" has the meaning set forth in the Recitals, and further means the interests of Persons in the Dedicated Area other than Producer, but whose interests are represented or controlled by Producer, such working interests, royalty interests, overriding royalty interests, net profits interests or other mineral interests.

"***Overdue Rate***" means a rate per annum equal to the lesser of (i) an annual rate equal to four percent (4%) per annum above the "prime rate" specified under the caption "Money Rates" in the *Wall Street Journal* (New York Edition) on the date such payment was required to have been made, or (ii) the maximum rate of interest permitted by Applicable Law.

"***Party***" and "***Parties***" have the meaning set forth in the introductory paragraph.

"***Person***" means any individual, firm, corporation, trust, partnership, limited liability company, association, joint venture, other business enterprise or Governmental Authority.

000391

"***Pipeline Loss Allowance***" has the meaning set forth in Section 4.9.

"***Price Index***" has the meaning set forth in Section 6.2.

"***Primary Term***" has the meaning set forth in Section 2.1.

"***Primary Term Dedication***" has the meaning set forth in Section 3.3(a).

"***Produced Water***" has the meaning set forth in Section 4.3(c).

"***Producer***" has the meaning set forth in the introductory paragraph.

"***Producer Capacity***" has the meaning set forth in Section 3.6.

"***Producer Event of Default***" has the meaning set forth in Section 9.1.

"***Producer Group***" means any or all of (i) Producer, (ii) Producer's Affiliates, (iii) Producer's contractors and suppliers, of every tier, other than the Gatherer Group, and (iv) the officers, directors, employees, agents, advisors, counsel, consultants, members, shareholders, insurers, invitees or representatives of any of the foregoing.

5

"***Producer's Interests***" has the meaning set forth in the Recitals, and further means all mineral interests in lands, leases, wells and Crude Oil that Producer owns or controls in the Dedicated Area.

"***Receipt Point***" has the meaning set forth in Section 3.9.

"***Received Crude***" means the quantity of Crude Oil in bbl that is delivered by Producer to Gatherer at a Receipt Point.

"***Scheduled Crude***" has the meaning set forth in Section 4.2(a).

"***Separator***" has the meaning set forth in Section 4.3(a).

"***Service Fees***" means Gathering Fee and Gathering Capital Recovery Fee.

"***Specifications***" has the meaning set forth in Section 4.6.

"***Storage Facilities***" has the meaning set forth in Section 4.3(f).

"***System Capacity***" means the then-maximum capacity of the Crude Gathering System to gather Committed Crude, which shall in no event be less than fifty thousand (50,000) Barrels per day.

"***Tank Bottoms***" has the meaning set forth in Section 4.8(b).

"***Tax***" means any current or future taxes, fees, levies, charges, assessments and/or other

000393

impositions levied, charged, imposed, assessed or collected by any Governmental Authority having jurisdiction.

"*Term*" means the Primary Term and any Extended Term.

### Section 1.2    Interpretation.

All references to any agreement or document shall be construed as of the particular time that such agreement or document may then have been executed, amended, varied, supplemented or modified. Terms defined in this Agreement shall have the meanings given therein when used elsewhere in this Agreement. References in the singular shall include the plural, and references to the masculine shall include the feminine, and vice versa. Words denoting natural persons shall include partnerships, firms, companies, corporations, joint ventures, trusts, associations, organizations or other entities. References to a particular article, section, subsection, paragraph, subparagraph or schedule, if any, shall be a reference to such article, section, subsection, paragraph, subparagraph or schedule in and to this Agreement. The words "include" and "including" shall include the phrase "not limited to." Any reference to a Person shall include that Person's successors and assigns or to any Person succeeding to that Person's functions. Any Schedules are fully incorporated and made part of this Agreement. The Schedules shall be read in conjunction with the provisions of the body of this Agreement, and the Schedules and the body of this Agreement shall be interpreted to give effect to the intent of the Parties as evidenced by their terms when taken as a whole, *provided, however*, that in the event of an express and

6

irreconcilable conflict between the terms of a Schedule and the provisions of the body of this Agreement, the provisions of the body of this Agreement shall control. Capitalized terms appearing in a Schedule shall have the meanings set forth in Section 1.1, unless the context requires otherwise.

## ARTICLE II
## TERM

**Section 2.1    Term.**

This Agreement is effective as of the Effective Date, and, unless earlier terminated in accordance with any express provision of this Agreement, shall remain in full force and effect for a period of fifteen (15) years from the In-Service Date (the "***Primary Term***"), *provided, however*, that, to the extent that at the end of the Primary Term there are wells then-connected to the Crude Gathering System and then-producing Crude Oil in commercial (paying) quantities, the Term of this Agreement shall extend for so long as such well(s) continue to produce Crude Oil in commercial (paying) quantities (the "***Extended Term***").

## ARTICLE III
## CRUDE GATHERING SYSTEM

**Section 3.1    Construction of Facilities.**

Gatherer shall, at its sole cost and expense, design, engineer, construct, equip and modify, or caused to be designed, engineered, constructed, equipped and modified, the Crude Gathering

System. Gatherer shall exercise commercially reasonable efforts to (a) achieve the Partial after the Effective Date and (b) achieve the Final Commercial Operation Date (as defined in the C&O Agreement) by the date that is twelve months after the Effective Date.

### Section 3.2    Easements, Rights-of-Way and Fee Lands.

To the extent that (a) Producer may do so in compliance with all applicable agreements, and (b) Gatherer's activities on the relevant lands do not unreasonably interfere with Producer's operations, Producer shall, where reasonably requested by Gatherer, (i) convey or assign to Gatherer, to the extent that Producer may do so without payment of monies (unless Gatherer agrees to pay), any easements or rights-of-way for purposes of constructing, owning, operating, repairing, replacing and maintaining any portion of the Crude Gathering System, and (ii) lease to Gatherer, at a price and upon terms as may be then agreed, such fee lands, or portions thereof, owned by Producer, for purposes of constructing, owning, operating, repairing, replacing and maintaining the Crude Gathering System.

### Section 3.3    Dedication.

(a)    For the Primary Term of this Agreement, Producer hereby dedicates to Gatherer all Interests within the Dedicated Area shown on **Schedule 3.3** (the "***Primary Term Dedication***") and shall deliver to Gatherer at the Receipt Point(s) all Committed Crude produced therefrom, *provided* that notwithstanding such Primary Term Dedication,

7

Producer shall have the right to (i) administer the Interests as it deems advisable in its sole discretion, including the right to rework, shut in, plug or abandon any well, (ii) form or participate in the formation of any unit, (iii) to use Crude Oil in its operations, and (iv) deliver Crude Oil that Producer is expressly required to deliver under oil and gas leases, contractual agreements or other legal rights under which Committed Gas is produced. If, after the Effective Date, Producer or any of its Affiliates acquire mineral interests, including by way of joint venture participation, drill-to-earn rights or other means, within the Dedicated Area (the "*After-Acquired Interests*"), then the After-Acquired Interests and all Crude Oil produced therefrom shall automatically be included in the Primary Term Dedication and become Committed Crude; *provided, however*, if any of the After-Acquired Interests or Crude Oil produced therefrom are subject to a prior written dedication or commitment for gathering as of the time of acquisition by Producer, then that Crude Oil will be excluded from the Primary Term Dedication until the prior dedication or commitment terminates or expires, at which time such Crude Oil shall become Committed Crude, *provided further* that if, with respect to any After-Acquired Interests, Producer has the right or ability, without payment of any material fee or penalty, or incurring any other material disadvantage, to terminate any such prior dedication or commitment with respect to the After-Acquired Interests, then Producer shall terminate such dedication or commitment as soon as reasonably practicable. Producer shall promptly notify Gatherer in writing of any such termination, and identify the After-Acquired Interests.

(b)     For the Extended Term of this Agreement, Producer hereby dedicates to Gatherer all of the wells that constitute Interests and are connected to the Crude

Gathering System at the end of the Primary Term (such wells, the "**Dedicated Wells**", and such dedication, the "***Extended Term Dedication***") and shall deliver to Gatherer at the Receipt Point(s) all Committed Crude produced therefrom; *provided* that notwithstanding such Extended Term Dedication, Producer shall have the right to (i) administer the Dedicated Wells as it deems advisable in its sole discretion, including the right to rework, shut in, plug or abandon any Dedicated Well, (ii) form or participate in the formation of any unit, (iii) to use Crude Oil in its operations, and (iv) deliver Crude Oil that Producer is expressly required to deliver under oil and gas leases, contractual agreements or other legal rights under which Committed Crude is produced. From and after the end of the Primary Term all Interests within the Dedicated Area other than the Dedicated Wells shall be permanently released from the Dedication, and Producer may take the volumes produced from such Interests (other than the Dedicated Wells) elsewhere.

**Section 3.4    Covenant Running With Land.**

For the Term of this Agreement, this Agreement shall be a covenant running with the land and the Interests and any After-Acquired Interests. Contemporaneously with the execution of this Agreement, and from time-to-time during the Term if necessary, the Parties shall each execute for recordation in the public records of the Dedicated Area a "short form" memorandum of this Agreement in the form of **Schedule 3.4** attached hereto, identifying the Dedicated Area, the Interests, After-Acquired Interests and wells thereon. Producer shall cause any conveyance of all or any of the Interests or After-Acquired Interests, or Crude Oil therefrom, to be made expressly subject to this Agreement, and to cause all transferees to execute a written instrument

8

000398

in a form reasonably satisfactory to Gatherer acknowledging the Dedication and such transferees' obligations under this Agreement.  Gatherer shall likewise cause any assignment or conveyance of all or any segment of the Crude Gathering System to be made expressly subject to this Agreement, and to cause all transferees to execute a written instrument in a form reasonably satisfactory to Producer acknowledging the Dedication and such transferees' obligations under this Agreement.

**Section 3.5    Covenant Not to Gather Crude Oil.**

Producer shall not gather or dispose of Committed Crude, or allow Committed Crude to be gathered or disposed of, prior to delivery to Gatherer at the Receipt Point(s).

**Section 3.6    Option to Expand Crude Gathering System.**

Gatherer shall gather all volumes of Committed Crude up to fifty thousand (50,000) Barrels per day on a Firm basis (the "***Producer Capacity***").  All volumes of Committed Crude above the Producer Capacity shall at all times be Committed Crude.  To the extent that Committed Crude shall exceed the Producer Capacity, Gatherer shall have the option to (a) utilize any available System Capacity in excess of the Producer Capacity on a Firm basis, (b) contract with third Persons to gather such Committed Crude, or (c) expand the Crude Gathering System as many times as necessary by adding additional System Capacity (the "***Additional Capacity***").  In the event that production from the Interests shall exceed the Producer Capacity, Producer shall provide Notice to Gatherer that production exceeds the Producer Capacity, and Gatherer shall provide Notice to Producer within sixty (60) days of Gatherer's receipt of Producer's Notice that Gatherer that will or will not accept such volumes of Committed Crude or

add Additional Capacity. In the event that Gatherer provides Notice to Producer that it will not accept such volumes of Committed Crude above the Producer Capacity or add Additional Capacity, then the acreage from which the volumes of Committed Crude above the Producer Capacity are directly produced shall be released from the Dedication, and Producer may take such volumes of Committed Crude elsewhere. In the event that Gatherer provides Notice to Producer that it will accept such volumes of Committed Crude above the Producer Capacity or add Additional Capacity, then, until Gatherer is able to gather such Committed Crude, or until the In-Service Date for such Additional Capacity, Producer may deliver any volumes of Committed Crude above the Producer Capacity elsewhere, *provided* that once Gatherer is able to gather such volumes of Committed Crude, all such volumes of Committed Crude shall be delivered to Gatherer at a Receipt Point. **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, PRODUCER'S RIGHT TO TAKE THE AFFECTED VOLUMES OF COMMITTED CRUDE ELSEWHERE DURING ANY PERIOD WHERE GATHERER REFUSES TO TAKE VOLUMES OF PRODUCER'S COMMITTED CRUDE THAT EXCEED THE PRODUCER CAPACITY, AND THE RELEASE FROM DEDICATION, IF APPLICABLE, SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY, AT LAW OR IN EQUITY, WITH RESPECT TO GATHERER'S INABILITY OR REFUSAL TO TAKE VOLUMES OF COMMITTED CRUDE THAT EXCEED THE PRODUCER CAPACITY.**

9

000400

**Section 3.7     Title Warranty.**

Producer represents and warrants to Gatherer that:  (i) it owns, or has the right to dedicate all Interests and Committed Crude dedicated under this Agreement, and to deliver Committed Crude to the Receipt Point(s), free and clear of all liens, encumbrances and Claims, (ii) there are no prior dedications or commitments covering any Interests or Committed Crude produced from the Interests within the Dedicated Area.  Producer shall defend, indemnify, protect and hold harmless Gatherer from and against all Claims arising out of any breach of such representation and warranty.

**Section 3.8     Proceeds of Production.**

Producer shall make payment of all royalties, overriding royalties, production payments, and all other payments attributable to the Interests and Committed Crude due to any Person under any leases or agreements in accordance with the terms thereof, and Gatherer shall have no obligations with respect thereto.

**Section 3.9     Receipt Points and Central Receipt Points.**

Producer shall install one or more central receipt points (each, a "***Central Receipt Point***" or "***CRP***"), where production from multiple wells is aggregated into a single physical connection to the Crude Gathering System.  Producer shall connect each CRP to the Crude Gathering System, and the "***Receipt Point***" for Received Crude shall be the point of interconnection between a CRP and the inlet flange of the Crude Gathering System.  The proposed design and a list of initial Receipt Points are set forth in **Schedule 3.9**.

(a)     Producer shall have the right to designate additional Receipt Points (each an "***Additional Receipt Point***"), subject to Gatherer's prior approval, for the purpose of connecting additional wells to the Crude Gathering System, either by construction of an additional CRP or by interconnection of a well to the Crude Gathering System, *provided* that Producer shall have given Gatherer prior Notice, in the form set forth in **Schedule 3.10(a)**, of such Additional  Receipt Points, and that incremental volumes of Committed Crude added to the Crude Gathering System will not cause the volumes of Committed Crude to exceed the then-System Capacity of the Crude Gathering System.

(b)     Upon Gatherer's receipt of any Notice from Producer under subsection (a) above, Gatherer shall have thirty (30) days from its receipt of any such Notice to provide return Notice to Producer that Gatherer will or will not interconnect such Additional Receipt Points.

(c)     In the event that Gatherer provides Notice to Producer that Gatherer will make a requested interconnection for such Additional Receipt Point, then Gatherer shall make such interconnection to the Agreement as soon as reasonably practicable, but in no event more than ███████ days from Gatherer's Notice to Producer.

10

000402

(d)    In the event that Gatherer provides Notice to Producer that Gatherer will not make a requested interconnection for such Additional Receipt Point, then the well in question shall be released from the Dedication.  **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, THE RELEASE FROM DEDICATION SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY, AT LAW OR IN EQUITY, WITH RESPECT TO GATHERER'S REFUSAL TO INTERCONNECT AN ADDITIONAL RECEIPT POINT**.

**Section 3.11    Commingling.**

Received Crude may represent only a portion of Crude Oil on the Crude Gathering System, which may be used by other customers.  Subject to its obligations with respect to delivery of Delivered Crude, Gatherer shall have the right to commingle Received Crude with Crude Oil from other customers.

**ARTICLE IV**
**GATHERING AND DELIVERY**

**Section 4.1    Obligation to Gather; No Treating Services.**

Commencing on the In-Service Date, Producer shall deliver or cause to be delivered to the Receipt Point(s) all Committed Crude.  Gatherer shall, on a Firm basis up to the Producer Capacity, receive Delivered Crude from Producer at the Receipt Point(s) (as set forth in Section 3.9 and in **Schedule 3.9**) and transport Received Crude to the Separator, Storage Facilities and

Delivery Point (each defined below), as applicable. If Gatherer enters into any gathering, transportation, marketing or similar agreement with any third party pursuant to which Crude is received by Gatherer on the Crude Gathering System on a Firm basis, Gatherer shall deliver to Producer a written notice of such agreement that describes the material terms thereof. Gatherer shall provide no treating services for which there is no treating fee expressly provided in Section 6.1, such as treatment for sour Crude Oil/ hydrogen sulfide ($H_2S$) or other contaminants or metals, or removal of inert gases or any other contaminants.

**Section 4.2    Scheduling.**

(a)    Not later than the 15th day of a month, Producer shall deliver to Gatherer a Notice indicating the total volumes of Crude Oil expected to be delivered by Producer for gathering the following month (the "***Scheduled Crude***"). The Parties shall coordinate their respective scheduling activities to take into account the needs of downstream transportation resources. If Producer becomes aware that actual deliveries of Committed Crude to the Receipt Point(s) vary by more than five (5%), greater or lesser, of Scheduled Crude, then Producer shall promptly provide Notice to Gatherer, and if Producer fails to give Gatherer any Notice required by this subsection, and Gatherer thereafter incurs any costs or expenses as a result of such a variance from Scheduled Crude of which Gatherer should have received Notice, then Producer shall reimburse Gatherer for such costs or expenses.

11

000404

(b)    Producer shall provide Gatherer with at least three (3) days advance written Notice of the arrival of Producer's downstream transportation at the Delivery Point to receive Delivered Crude in accordance with Section 4.4 below.

**Section 4.3    Separation and Storage.**

(a)    At the Storage Facilities (defined below), Gatherer shall separate natural gas from the Crude Oil through a 2-phase separator unit upstream of the Delivery Point (the "***Separator***").

(b)    Natural gas separated from the Crude Oil (the "***Flare Gas***") shall be flared by Gatherer.

(c)    Producer shall be financially responsible for disposal of water separated from the Crude Oil (the "***Produced Water***") at the Separator drain or at the Storage Facility water sump connection drain.  Gatherer shall dispose of Produced Water in its discretion either by trucking or by interconnection to Producer's disposal system for Produced Water.

(d)    All Producer-arranged transportation shall comply with all site rules and directives of Gatherer in entering, loading while there and exiting Gatherer's premises.

(e)    As needed, Gatherer shall be granted an irrevocable right to interconnect to Producer's disposal system for Produced Water.  Produced Water injected into Producer's disposal system shall be disposed of by Producer at no cost to Gatherer.

After Separation, Crude Oil shall be directed to the (i) one or more tanks or other facilities within the Crude Gathering System for the purpose of gathering and storage of Committed Crude (the "***Storage Facilities***"), or (ii) the Delivery Point (as defined in Section 4.4 below).

**Section 4.4    Delivery of Crude.**

(a)    Provided that Gatherer shall have received proper Notice under Section 4.2(b) above, Gatherer shall deliver to Producer Delivered Crude FOB Producer's transportation at the outlet flange of the transfer meter connected to the Storage Facilities, as shown more particularly on **Schedule 4.4(a)** (the "***Delivery Point***").

(b)    Producer shall be solely responsible for all arrangements for transportation of Delivered Crude from the Delivery Point. If Producer becomes aware or should have become aware of delays with respect to any scheduled transportation for Delivered Crude, then Producer shall promptly provide Notice to Gatherer, and if Producer fails to give Gatherer any Notice required by this Section, and Gatherer thereafter incurs any costs or expenses as a result of such a delay with respect to transportation of which Gatherer should have received Notice, then Producer shall reimburse Gatherer for such costs or expenses.

12

(c)     All Producer-arranged transportation shall comply with all site rules and directives of Gatherer in entering, loading while there and exiting Gatherer's premises, including that all trucks shall be NSPS Level Tested trucks.

**Section 4.5     Measurement, Equipment and Testing.**

(a)     Producer shall be responsible for measurement, equipment and testing at the CRPs, and Gatherer shall be responsible for measurement, equipment and testing downstream of the CRPs, each in accordance with the protocols set forth on **Schedule 4.5(a)**.

(b)     Subject to Producer's safety rules, regulations and procedures, Producer hereby grants to Gatherer, and Gatherer's contractors or agents, a right of entry onto any of the lands covered by the Interests and access to the Producer side of a CRP, as necessary for the purpose of any sampling of Crude Oil to determine quality in accordance with Section 4 6 below, and shall facilitate, as necessary, access with surface owners where requested by Gatherer.

**Section 4.6     Quality.**

Crude Oil delivered by Producer at the Receipt Points shall meet or exceed the quality requirements set forth in **Schedule 4.6** (the "***Specifications***").  Gatherer shall have a right to reject all Crude Oil delivered by Producer that does not meet the Specifications ("***Off-Spec Crude Oil***"), *provided* that such Off-Spec Crude Oil shall not be released from the Dedication. Crude Oil delivered to Producer at the Delivery Point shall be of a substantially similar grade and

### Section 4.7    Delivery Pressure at Receipt Points.

Producer shall deliver Crude Oil at the Receipt Points at a pressure sufficient to enter the Crude Gathering System and not to exceed the maximum allowable operating pressure of the Crude Gathering System at such points, but in no event to exceed ████████████████ psig.

### Section 4.8    Operating Inventory.

Producer shall provide, at no cost to Gatherer, Crude Oil as:

(a)    line fill (the "***Line Fill***") needed to make and keep the Crude Gathering System operational; and

(b)    fill for any Storage Facility necessary to float tank roofs to working levels or to safely operate fixed roof tanks (the "***Tank Bottoms***").

(c)    Line Fill and Tank Bottoms shall not be considered transportable volumes.

(d)    Producer's obligation for Line Fill and Tank Bottoms shall be *pro rata* with any third party volumes of Crude Oil gathered on the Crude Gathering System, and, to the extent that Producer has provided all Line Fill and Tank Bottoms, Producer shall be

13

credited for any Line Fill and Tank Bottom volumes attributable to third party volumes of Crude Oil brought onto the Crude Gathering System.

**Section 4.9    Title and Risk of Loss.**

Title to Crude Oil and Produced Water shall always vest in Producer.  Risk of loss shall always be with Producer except when Gatherer is in possession of Crude Oil, in which case risk of loss shall be with Gatherer, *provided* that in no event shall Gatherer be responsible for any lost volumes of (i) Flare Gas or Produced Water, at any point, or (ii) Crude Oil between the Receipt Point(s) and Delivery Point due to (A) evaporation less than or equal to ███████████ of the volume(s) delivered (the "***Pipeline Loss Allowance***"), or (B) shrinkage in volume of Crude Oil due to separation of Flare Gas and Produced Water.

**ARTICLE V**
**CURTAILMENT AND MAINTENANCE**

**Section 5.1    Curtailment and Temporary Release of Crude Oil.**

If for any reason, including Force Majeure or a Maintenance Event, but not for the reasons set forth in Section 3.6, Gatherer needs to curtail receipt, gathering or delivery of Crude Oil on the Crude Gathering System (each, a "***Curtailment Event***"), (i) Crude Oil deliveries from all Persons that are receiving service on an interruptible basis or non-Firm basis shall be curtailed prior to any curtailment or interruption of Committed Crude, and (ii) to the extent a third party is receiving service on a Firm basis in accordance with Section 4.1, Producer and such third party shall be curtailed on a pro rata basis (based on volumes of Crude Oil delivered to the Crude

Gathering System).  Prior to the In-Service Date, and at any time after the In-Service Date where Gatherer is unable to accept some of Committed Crude as a result of a Curtailment Event, Producer shall be free to dispose of such affected volumes under other arrangements during such Curtailment Event (the "***Curtailment Period***").  Gatherer shall notify Producer as soon as reasonably practicable of the circumstances of any Curtailment Event and the beginning and end of any Curtailment Period.  As soon as reasonably practicable after receiving notice of the end of the Curtailment Period, all Committed Crude shall again be subject to the Dedication.  **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, GATHERER'S TEMPORARY RELEASE AND PRODUCER'S RIGHT TO MAKE OTHER ARRANGEMENTS WITH RESPECT TO SUCH AFFECTED VOLUMES SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY AVAILABLE TO PRODUCER, AT LAW OR IN EQUITY, WITH RESPECT TO SUCH AFFECTED VOLUMES**.

### Section 5.2    Maintenance Events.

Gatherer may, without liability to Producer, interrupt the operation of the Crude Gathering System for the purpose of performing inspections, pigging, maintenance, testing, alterations, modifications, expansions, connections, repairs or replacements (each, a "***Maintenance Event***"), but such interruption shall be for only such time as may be reasonably necessary.  Gatherer shall give Producer advance written notice of its intention to interrupt operations and of the estimated time thereof, but not less than 24 hours advance notice, except in

14

case of emergency. Any such Maintenance Events shall not constitute Force Majeure Events, unless such Maintenance Events otherwise meet the definition of a Force Majeure Event.

**ARTICLE VI**
**FEES AND PAYMENT**

**Section 6.1     Fees.**

Producer shall pay to Gatherer the following fees:

      (a)                           per Barrel of Received Crude for gathering   (the "*Gathering Fee*");

      (b)                        per Barrel of Received Crude for capital recovery of the Crude Gathering System (the "*Gathering Capital Recovery Fee*"), payable until Gatherer has recovered 1.2X Gathering Capital Expenditures in total accumulated Service Fees; and

      (c)      the Other Fuel Fee, if applicable.

**Section 6.2     Escalation.**

Commencing with the                      and on January 1 of each Contract Year thereafter, each fee set forth in this Agreement shall be automatically adjusted upward by the

000411

**Section 6.3    Billing and Payment.**

(a)    As soon as reasonably practicable after the end of each month, Gatherer shall render to Producer a statement for the preceding month, setting forth: (i) the total Barrels of Committed Crude received by Gatherer at the Receipt Points and redelivered to the Delivery Point, (ii) the number of Barrels representing the Pipeline Loss Allowance, Line Fill, Tank Bottoms and any other deductions allowed hereunder, (iii) the listing of the fees charged as permitted by Article 6.1 of this Agreement, and (iv) the net amount due Gatherer from Producer.

(b)    Producer shall pay to Gatherer the full amount due not later than the earlier of (i) fifteen (15) days from Producer's receipt of Gatherer's statement, or (ii) the last day of month following the statement month, *provided* that if such day is not a Business Day, then on the next Business Day.  Any past due amounts shall bear interest at the Overdue Rate from the date due until paid.

(c)    If Producer disputes all or a portion of any statement or amount due, it shall pay the undisputed portion, if any, of any such statement, and shall provide Notice to Gatherer of the specific basis for the dispute, including all supporting information, as soon as practicable after becoming aware of the basis for the dispute.  If after resolution

15

of such dispute it is determined that any of the amount in dispute is due and owing, such amount(s) shall bear interest at the Overdue Rate from the date originally due until paid. In no event shall any statement or invoice be subject to dispute beyond two (2) years from the date of such statement or invoice.

**Section 6.4    Audit.**

Each Party shall have the right, upon reasonable advance Notice, during normal business hours and not more than two (2) times per Contract Year, at its sole expense and either itself or through its representatives, to audit the books and records of the other Party, at the place where such books and records are ordinarily kept, to the extent reasonably necessary to verify the accuracy of any statement, charge, payment or computation made pursuant to this Agreement, and any such audit must be completed within ninety (90) days of the Notice to the other Party. In the event that an audit is performed, any subsequent audit performed may cover only a time period not covered by a previous audit.  In no event shall any statement or invoice be subject to audit beyond two (2) years from the date of such statement or invoice.

**Section 6.5    Taxes.**

Producer shall pay any and all Taxes levied on Crude Oil.  In the event a Party  is required to pay any Tax for which the other Party is responsible hereunder, the responsible Party shall reimburse the paying Party for the same per invoice provided by the paying Party.  Each Party shall indemnify, defend and hold harmless the other Party from and against any and all Claims and Losses arising out of or related to Taxes for which the indemnifying Party is responsible hereunder.

ARTICLE VII

INDEMNIFICATION

Section 7.1    Indemnification.

EXCEPT WHERE OTHERWISE SPECIFICALLY PROVIDED HEREIN, EACH OF PRODUCER AND PRODUCER GROUP, ON THE ONE HAND, AND GATHERER AND GATHERER GROUP, ON THE OTHER HAND, SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS THE OTHER PARTY AND ITS RESPECTIVE PRODUCER GROUP OR GATHERER GROUP, AS THE CASE MAY BE, FROM AND AGAINST ANY AND ALL CLAIMS OF THIRD PARTIES AGAINST THEM, OR DAMAGES SUSTAINED OR INCURRED BY THEM AS A RESULT OF SUCH CLAIMS BY THIRD PARTIES, TO THE EXTENT CAUSED BY THE NEGLIGENCE OR WILLFUL MISCONDUCT OF THE INDEMNIFYING PARTY OR ITS RESPECTIVE PRODUCER GROUP OR GATHERER GROUP, AS THE CASE MAY BE, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR THE INDEMNIFYING PARTY'S BREACH OF THIS AGREEMENT.  THIS PROVISION SHALL NOT BE CONSTRUED TO RELIEVE ANY INSURER OF ITS OBLIGATION TO PAY CLAIMS CONSISTENT WITH THE PROVISIONS OF A VALID INSURANCE POLICY.  A PERSON SEEKING INDEMNITY SHALL FIRST SEEK RECOVERY UNDER ANY APPLICABLE INSURANCE POLICY, AND ANY INDEMNITY OBLIGATION OWED HEREUNDER

16

000414

**SHALL BE REDUCED BY THE AMOUNT OF ALL INSURANCE PROCEEDS ACTUALLY RECEIVED BY THE INDEMNIFIED PARTY**.

**Section 7.2     Notification Obligation.**

The Person entitled to indemnification under Section 7.1 above (the "***Indemnified Party***") shall promptly notify the Party providing indemnity (the "***Indemnifying Party***") of any Claim, and the Indemnifying Party shall have the right to assume the investigation and defense of the Claim, including employing legal counsel of its choice. If the Indemnifying Party does not promptly assume the investigation and defense of the Claim, the Indemnified Party may do so, including employing legal counsel of its choice, at the Indemnifying Party's expense. If the Indemnifying Party assumes the defense of a claim, the Indemnified Party shall nevertheless have the right to employ, at its sole expense, separate legal counsel and participate in the defense of the Claim, *provided* that control over the process and authority to compromise the Claim shall vest solely in the Indemnifying Party.

**ARTICLE VIII**
**FORCE MAJEURE**

**Section 8.1     Force Majeure.**

"***Force Majeure***" shall mean any event or circumstance or combination of events or circumstances (each, a "***Force Majeure Event***") that adversely affects or prevents any Party from performing its obligations in accordance with the terms of this Agreement, but only if and to the extent that such events and circumstances are not within the affected Party's reasonable

control.  Force Majeure events shall include act of God, fire, storm of an unusual or extraordinary nature, flood, hurricane, tornado, earthquake, epidemic or other natural disaster, action, delay or inaction of any Governmental Authority, war, invasion, emergency, embargo, sanction, sabotage, insurgency, terrorism, civil war, riot or insurrection of any kind, labor strike, loss of electricity supply, failure of any pipelines or other means of transportation, inability to obtain rights-of-way after the use of commercially reasonable efforts; *provided* that the following shall not constitute a Force Majeure Event: (i) failure to obtain or retain, or a delay in obtaining, any Governmental Approval necessary for performance under this Agreement that was the result of action or inaction by the Party responsible for obtaining such Governmental Approval, or a result of failure to timely apply for any such Governmental Approval, (ii) market conditions for Crude Oil or refined products therefrom, (iii) the inability to obtain a favorable price for or to buy or sell Crude Oil or refined products therefrom, or (iv) economic hardship.  Any obligation of either Party under this Agreement shall be excused only to the extent that the Party's inability to perform is caused by Force Majeure.  Each Party shall use all Reasonable Efforts to cure, minimize, mitigate or remedy the effects of Force Majeure.  Notwithstanding that Force Majeure may otherwise exist, a Force Majeure Event shall not excuse or delay the payment of money when due by any Party.

17

## ARTICLE IX
## DEFAULT AND TERMINATION

**Section 9.1    Producer Events of Default.**

A "***Producer Event of Default***" shall be deemed to have occurred if (i) Producer becomes bankrupt or insolvent or takes any corporate action or other steps towards liquidation, winding up, dissolution, reorganization or amalgamation of Producer, making of any bankruptcy administration order, or appointment of a receiver, administrator, trustee or similar officer over all or any material part of the revenues, assets or business of Producer; (ii) an order is made for the winding up, dissolution or liquidation of Producer, or any analogous or equivalent proceedings by whatever name are undertaken in whatever jurisdiction; (iii) Producer is generally unable to pay its debts as they become due, or Producer stops, suspends or threatens to stop or suspend payment of all or a material part of its debts or makes a general assignment of its assets for the benefit of its creditors; or (iv) Producer is in breach of its material obligations under this Agreement, and Producer fails to cure such breach within 30 days following Producer's receipt of a Notice from Gatherer to Producer to remedy such event or condition, or if a remedy cannot be effected within such 30 day period, a period of 60 days, *provided* that Producer has commenced to remedy within such 30 day period and has diligently pursued such remedy during the extended period, and *provided further*, that in no event shall the period to cure a breach of an obligation to pay money be more than 10 days total.

**Section 9.2    Gatherer's Default Remedies Against Producer.**

000417

If a Producer Event of Default shall have occurred and be uncured and continuing, and

without prejudice to any other of Gatherer's rights under this Agreement, Gatherer shall have the right to terminate this Agreement upon Notice to Producer.

**Section 9.3     Gatherer Events of Default.**

A "***Gatherer Event of Default***" shall be deemed to have occurred if (i) Gatherer becomes bankrupt or insolvent or takes any corporate action or other steps towards liquidation, winding up, dissolution, reorganization or amalgamation of Gatherer, making of any bankruptcy administration order, or appointment of a receiver, administrator, trustee or similar officer over all or any material part of the revenues, assets or business of Gatherer; (ii) an order is made for the winding up, dissolution or liquidation of Gatherer, or any analogous equivalent proceedings by whatever name are undertaken in whatever jurisdiction; (iii) Gatherer is generally unable to pay its debts as they become due, or Gatherer stops, suspends or threatens to stop or suspend payment of all or a material part of its debts or makes a general assignment of its assets for the benefit of its creditors; or (iv) Gatherer is in breach of any of its material obligations under this Agreement, and Gatherer fails to cure such breach within 30 days following Gatherer's receipt of a Notice from Producer to Gatherer to remedy such event or condition, or if a remedy cannot be effected within such 30 day period, a period of 60 days, *provided* that Gatherer has commenced to remedy within such 30 day period and diligently pursued such remedy during the extended period, *provided further* that in no event shall the period to cure a breach of an obligation to pay money be more than 10 days total.

18

**Section 9.4     Producer's Default Rights Against Gatherer.**

Except where a specific remedy has been set forth herein, if a Gatherer Event of Default shall have occurred and be uncured and continuing, and without prejudice to any other of Producer's rights under this Agreement, Producer shall have the right to terminate this Agreement upon Notice to Gatherer.

## ARTICLE X
## LIMITATION OF LIABILITY

**Section 10.1     Limitation of Liability.**

**NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL, PUNITIVE OR EXEMPLARY DAMAGES OF ANY TYPE, INCLUDING LOST PROFITS OR LOSS OF BUSINESS OPPORTUNITY, IN CONTRACT OR TORT (INCLUDING NEGLIGENCE, JOINT OR SEVERAL, OR STRICT LIABILITY) ARISING OUT OF THIS AGREEMENT, *PROVIDED* THAT THIS LIMITATION SHALL NOT APPLY TO ANY INDEMNITY OBLIGATION SET FORTH HEREIN.**

## ARTICLE XI
## MISCELLANEOUS

**Section 11.1     Assignment.**

000419

Neither Party may assign this Agreement without the express written consent of the other

Party, which consent shall not be unreasonably withheld, conditioned or delayed.

**Section 11.2   Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury Trial.**

(a)     THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF OKLAHOMA, EXCLUDING ANY CONFLICTS OF LAWS PROVISIONS CALLING FOR APPLICATION OF THE LAWS OF ANOTHER STATE.

(b)     EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE SOLE AND EXCLUSIVE JURISDICTION OF THE STATE OR FEDERAL COURTS IN HARRIS COUNTY, TEXAS, AND EACH OF THE PARTIES IRREVOCABLY WAIVES ANY OBJECTION TO THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS.

(c)     TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY IRREVOCABLY WAIVES ITS RIGHT TO A TRIAL BY JURY, AND CONSENTS TO A BENCH TRIAL BY A TRIAL COURT JUDGE, IN RESPECT OF ANY LITIGATION ARISING OUT OF THIS AGREEMENT AND ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT FOR EACH OF THE PARTIES IN ENTERING INTO THIS AGREEMENT.

19

**Section 11.3    Dispute Resolution.**

All controversies, disputes or Claims between Producer and Gatherer arising out of or in any way relating to this Agreement (each, a "***Dispute***") shall be resolved pursuant to the procedures of this Section 11.3.

(a)    If a Dispute arises between the Parties regarding their respective rights and obligations under this Agreement, the Parties shall use commercially reasonable efforts to reach a reasonable resolution of the Dispute informally.  Initially, the responsible Persons shall attempt to resolve the Dispute themselves. If they are unable to resolve the Dispute within 10 days, then either Party may, by Notice, refer the Dispute to the senior management of the Parties for resolution. If senior management of the Parties are unable to resolve the Dispute within 10 days of such Notice, the provisions of subsection (b) below shall apply.

(b)    Any Dispute not otherwise resolved under subsection (a) above may be submitted by either Party to a court proceeding filed in accordance with Applicable Law in any court having jurisdiction over the Parties and the subject matter.

**Section 11.4    Notices.**

Any notice, request, demand, statement, payment or bill provided for in this Agreement, or any notice which a Party may desire to give to the other (each, a "***Notice***"), must be in writing and will be deemed duly made when (i) delivered personally, (ii) upon delivery by the U.S. Postal Service, certified mail with return receipt, (iii) upon delivery by a recognized overnight

courier service with return receipt, or (iv) upon receipt by the directed recipient when transmitted by electronic means, in the address shown on Schedule 11.4.

### Section 11.5   Survival.

The provisions of this Agreement shall survive expiration or termination thereof for so long as necessary to give effect to the rights and obligations of the Parties hereunder, but in no event exceeding any applicable statutes of limitation.

### Section 11.6   No Joint Venture.

Nothing in this Agreement shall create an association, joint venture or partnership between the Parties or impose any partnership obligation or partnership liability on any Party. Neither Party shall have any right, power or authority to enter into any agreement or commitment or act on behalf of or otherwise bind the other Party without such Party's prior written consent.

### Section 11.7   Entire Agreement.

This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and there are not any oral or written understandings, representations or commitments of any kind, express or implied, which are not expressly set out herein. No modification of this Agreement shall be effective unless in writing and executed by the Parties.

20

This Agreement supersedes any prior agreements of the Parties concerning the subject matter hereof.

**Section 11.8    No Third Party Beneficiaries.**

This Agreement is for the sole and exclusive benefit of the Parties, and does not stipulate any benefit in favor of any third parties.

**Section 11.9    Confidentiality.**

Any information belonging to a Party that is confidential and disclosed to the other Party in the course of performance of this Agreement or has been disclosed during the negotiations leading up to this Agreement, including the Agreement itself (collectively, the "***Confidential Information***"), shall be held in confidence and shall not be disclosed to others without the written approval of the disclosing Party. Confidential Information is not information that (i) is already known to the receiving Party at the time of disclosure by the disclosing Party (ii) is now or hereafter becomes available within the public domain other than as a result of a breach of this Agreement, (iii) is received by a Party from a Person under no obligation to keep the Confidential Information confidential, or (iv) is independently developed by a Party without reliance on Confidential Information. A Party shall have the right to disclose Confidential Information without the consent of the disclosing Party to its Lenders, counsel, advisors, consultants, accountants, auditors, officers, directors, members, shareholders and other Persons of responsibility who have a need to know the Confidential Information, *provided* that such Persons agree to keep the Confidential Information confidential, and that the Party shall be responsible for any breaches of this confidentiality obligation by such Persons. A Party shall

also have the right to disclose Confidential Information without the consent of the disclosing Party in connection with a subpoena, interrogatory, request for production, civil investigative demand or other such legal process issued by any court or administrative, legislative, investigative or regulatory body, but only to the extent necessary to fully respond thereto and after providing prior Notice to the disclosing Party.   Upon the reasonable request of the disclosing Party, the receiving Party shall, in its sole discretion, either return the Confidential Information or destroy it, *provided* that the receiving Party may retain a copy of Confidential Information as necessary to comply with Applicable Law.

### Section 11.10  Regulatory Matters.

(a)    Gatherer has informed Producer, and Producer hereby acknowledges and accepts, that the Crude Gathering System will be an intrastate pipeline system operating only within the State of Oklahoma, and is not intended to be subject to regulation under any Applicable Law by FERC. Accordingly, as a principal condition to, and in consideration for, the execution of this Agreement by Gatherer, Producer represents, warrants and covenants that (i) none of Producer's Committed Crude delivered hereunder has been or will be dedicated to or delivered in interstate commerce, (ii) at the time Producer's Committed Crude is delivered at the Receipt Points, Producer shall not have identified any destination for Producer's Committed Crude which is outside the State of Oklahoma and Producer does not intend to deliver any of Producer's Committed Crude to be sold, transported or otherwise moved outside the State of Oklahoma, (iii) all of

21

Producer's Committed Crude delivered to Gatherer under this Agreement shall be produced in the State of Oklahoma, and (iv) Producer's Committed Crude delivered hereunder is not intended to be transported or sold in interstate commerce in any manner which will subject the Crude Gathering System to regulation by FERC. In the event that Producer breaches its representation, warranty and covenant contained in this Section 11.10(a), Gatherer, in addition to all other remedies at law or in equity, shall have the right, upon delivery of written notice to Producer, to refuse receipt of Producer's Committed Crude which has caused a breach of such representation, warranty and covenant. Gatherer's election to refuse receipt of any of Producer's Committed Crude pursuant to this Section 11.10(a) shall not release Producer from any obligation to indemnify Gatherer for such breach under Article VII.

(b)     If any federal or state statute, regulation, or order by a court of law or Governmental Authority directly or indirectly (a) prohibits performance under this Agreement, (b) makes such performance illegal or impossible, or (c) effects a change in a substantive provision of this Agreement that has a significant material adverse impact upon the performance of either Party's obligations under this Agreement, including without limitation the imposition of terms, conditions, or rate restrictions, then the Parties will use all reasonable efforts to revise the Agreement and any other ancillary agreement to the extent necessary so that: (i) performance under the Agreement is no longer prohibited, illegal, impossible, or is no longer impacted in a material adverse fashion, and (ii) this Agreement and any other ancillary agreement is revised in a manner that preserves, to the maximum extent possible, the respective positions of the Parties. Without liability for its failure to do so, each Party will use reasonable efforts to provide notice to the other Party as to any proposed law, regulations or any regulatory

000425

provide notice to the other Party as to any proposed law, regulations or any regulatory proceedings or actions that could affect the rights and obligations of the Parties. If the Parties are unable to revise the Agreement in accordance with the above within ninety (90) Days following the adoption of any such law, regulation or order of a Governmental Authority, then the Party whose performance is prohibited, illegal, impossible or is impacted in a material adverse fashion will have the right, at its sole discretion, to terminate this Agreement upon written notice to the other Party.

**Section 11.11  Execution in Counterparts.**

This Agreement may be executed in counterparts, including by electronic transmission, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement.

[Signature Page Next Page]

22

000426

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed in duplicate originals by its duly authorized officer as of the Effective Date.

**PRODUCER**

**OKLAHOMA ENERGY ACQUISITIONS, LP**

By: Alta Mesa GP, LLC, its general partner

By: _____

Harlan H. Chappelle, Manager

000427

Signature page to Crude Oil Gathering Agreement

000428

**GATHERER**

**KINGFISHER MIDSTREAM, LLC**, a Delaware
limited liability company

By:  HMS KINGFISHER HOLDCO, LLC,
Authorized Member

By:  _____
Name:   Harlan H. Chappelle
Title:  President and Chief Executive Officer

Signature Page to Crude Oil Gathering Agreement

**SCHEDULE 3.3**
to
**CRUDE OIL GATHERING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
and
**KINGFISHER MIDSTREAM LLC**

**DEDICATED AREA**

**[See Attached]**

000431





Blaine, Canadian, Garifield, Kingfisher, Logan Counties

**SCHEDULE 3.4**
**to**
**CRUDE OIL GATHERING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**FORM OF**
**MEMORANDUM OF CRUDE OIL GATHERING AGREEMENT**

| | |
|---|---|
| **STATE OF OKLAHOMA** | § |
| | § |
| **COUNTIES OF KINGFISHER,** | § |
| **LOGAN, CANADIAN, BLAINE** | § |
| **AND GARFIELD** | § |

      This **Memorandum of Crude Oil Gathering Agreement** (this "**Memorandum**") is made and entered into this __ day of _____, 2015, by and between Oklahoma Energy Acquisitions, LP, a Texas limited partnership located at 15021 Katy Freeway, Suite 400, Houston, TX 77094, Attn: Michael A. McCabe ("**Producer**"), and Kingfisher Midstream LLC, a

000434

Delaware limited liability company located at 20329 State Highway 249, Suite 450, Houston, TX 77070, Attn: Paul Williams ("***Gatherer***").

Case 4:24-cv-04092    Document 4-5    Filed on 11/21/24 in TXSD    Page 170 of 196

**WHEREAS**, Producer and Gatherer have entered into a Crude Oil Gathering Agreement (the "***Agreement***") dated the 31st day of August, 2015 (the "***Effective Date***"); and

**WHEREAS**, Producer and Gatherer desire to file this Memorandum to provide record notice of the Agreement.

1.     **Dedication**.

(a)  For the Primary Term of the Agreement, Producer has dedicated to Gatherer all of Producer's Interests within the Dedicated Area shown on Exhibit A attached hereto (the "***Primary Term Dedication***") and shall deliver to Gatherer at the Receipt Point(s) all Committed Crude produced therefrom.  If, after the Effective Date of the Agreement and before the end of the Primary Term, Producer or any of its Affiliates acquire mineral interests within the Dedicated Area (the "***After-Acquired Interests***"), then the After-Acquired Interests and all Crude Oil produced therefrom shall automatically be included in the Primary Term Dedication and become Committed Crude; *provided, however*, if any of the After-Acquired Interests or Crude Oil produced therefrom are subject to a prior written dedication or commitment for gathering as of the time of acquisition by Producer, then that Crude Oil will be excluded from the Primary Term Dedication until the prior dedication or commitment terminates or expires, at which time such Crude Oil shall become Committed Crude,

000435

*provided further* that if, with respect to any After-Acquired Interests, Producer has the right or ability, without payment of any material fee or penalty, or incurring any other material disadvantage, to terminate any such prior dedication or commitment with respect to the After-Acquired Interests, then Producer shall terminate such dedication or commitment as soon as reasonably practicable.  Producer shall promptly notify Gatherer in writing of any such termination, and identify the After-Acquired Interests.

(b) For the Extended Term of the Agreement, Producer has dedicated to Gatherer all of the wells that constitute Interests and are connected to the Crude Gathering System at the end of the Primary Term (such wells, "***Dedicated Wells***", and such dedication, the "***Extended Term Dedication***") and shall deliver to Gatherer at the Receipt Point(s) all Committed Crude produced therefrom.  From and after the end of the Primary Term all Interests within the Dedicated Area shown on Exhibit A attached hereto other than the Dedicated Wells shall be permanently released from the Dedication.

2.    **Term**.  The Agreement shall commence as of the Effective Date, and shall remain in full force and effect for fifteen (15) years after the In-Service Date (the "***Primary Term***"), *provided, however*, that, to the extent that at the end of the Primary Term there are wells then-connected to the Crude Gathering System and then-producing Crude Oil in commercial (paying) quantities, the Term of the Agreement shall extend for so long as such well(s) continue to produce Crude Oil in commercial (paying) quantities (the "***Extended Term***").

3.    **Incorporation of Agreement and Effect of Memorandum**.  The sole purpose of this Memorandum is to give notice of the existence of the Agreement.  This Memorandum shall not modify in any manner any of the terms and conditions of the Agreement, and nothing in this

Memorandum is intended to and shall not be used to interpret the Agreement). The provisions of the Agreement are hereby incorporated into this Memorandum as if set out fully herein. In the event of any conflict between the terms of this Memorandum and the terms of the Agreement, the terms of the Agreement shall govern and control for all purposes.

    **4.**    **Defined Terms**. All capitalized terms not defined herein shall have the same meaning assigned such terms in the Agreement.

[Signature pages follow]

000437

**IN WITNESS WHEREOF**, this Memorandum is executed by Producer and Gatherer as of the date of acknowledgement of their signatures, but is effective for all purposes as of the Effective Date stated above.

**PRODUCER:**

**OKLAHOMA ENERGY ACQUISITIONS, LP**

By: _____
Name: _____
Title: _____

STATE OF TEXAS                          §
                                        §
COUNTY OF HARRIS                        §

This instrument was acknowledged before me this ___ day of August, 2015 by_____ _____, the _____of Oklahoma Energy Acquisitions, LP, a Texas limited partnership, on behalf of said limited partnership.

In witness whereof I hereunto set my hand and official seal.

000438

NOTARIAL SEAL:                          _____
                                        Notary Public in and for the

Notary Public in and for the
State of Texas

My Commission Expires:  _____
Commission No.: _____

**GATHERER:**

**KINGFISHER MIDSTREAM, LLC**

**By: HMS KINGFISHER HOLDCO, LLC,**
    **Authorized Member**

      **By:** _____
      **Name:** _____
      **Title:** _____

STATE OF TEXAS                 §
                                     §
COUNTY OF HARRIS        §

This instrument was acknowledged before me this ___ day of August, 2015 by _____ _____, the _____ of HMS Kingfisher HoldCo, LLC,  a Delaware limited liability company, authorized member of Kingfisher Midstream, LLC, a Delaware limited liability company, on behalf of said limited liability company.

In witness whereof I hereunto set my hand and official seal.

000440

NOTARIAL SEAL

NOTARIAL SEAL:

_____

Notary Public in and for the
State of Texas

My Commission Expires:  _____

Commission No.: _____

**SCHEDULE 3.9**
**to**
**CRUDE OIL GATHERING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**Receipt Points**

| Operator | Receipt Point Name | Unit | Location |
|---|---|---|---|
| Alta Mesa | Lincoln CRP Manifold 1 | Lincoln | T 18N R 6W NE ¼ Section 34 |
| Alta Mesa | Lincoln CRP Manifold 2 | Lincoln | T 17N R 6W NE ¼ Section 3 |
| Alta Mesa | Lincoln CRP Manifold 2A | Lincoln | T 17N R 6W NE ¼ Section 10 |
| Alta Mesa | Lincoln CRP Manifold 3 | Lincoln | T 17N R 6W SE ¼ Section 10 |
| Alta Mesa | Lincoln CRP Manifold 4 | Lincoln | T 18N R 6W NE ¼ Section 36 |
| Alta Mesa | Lincoln CRP Manifold 5 | Lincoln | T 18N R 6W SE ¼ Section 36 |
| Alta Mesa | Lincoln CRP Manifold 7 | Lincoln | T 17N R 5W NW ¼ Section 7 |

000442

| Alta Mesa | Lincoln CRP Manifold 8 | Lincoln | T 18N R 5W NE ¼ Section 32 |
| Alta Mesa | Lincoln CRP Manifold 9 | Lincoln | T 18N R 5W NW ¼ Section 34 |
| Alta Mesa | Lincoln CRP Manifold 11 | Lincoln | T 18N R 5W SW ¼ Section 33 |
| Alta Mesa | Lincoln CRP Manifold 10 | Lincoln | T 18N R 5W SE ¼ of SW ¼ Section 33 |
| Alta Mesa | Lincoln CRP Manifold 11A | Lincoln | T 17N R 5W SW ¼ Section 4 |
| Alta Mesa | Lincoln CRP Manifold 12 | Lincoln | T 17N R 5W SE ¼ of SW ¼ Section 8 |
| Alta Mesa | Lincoln CRP Manifold 13 | Lincoln | T 17N R 5W NW ¼ Section 20 |
| Alta Mesa | Lincoln CRP Manifold 14 | Lincoln | T 17N R 5W SW ¼ Section 16 |
| Alta Mesa | Lincoln CRP Manifold 15 | Lincoln | T 17N R 5W NE ¼ Section 29 |
| Alta Mesa | Lincoln CRP Manifold 16 | Lincoln | T 17N R 5W SE ¼ Section 22 |
| Alta Mesa | Lincoln CRP Manifold 17 | Lincoln | T 17N R 5W SE ¼ Section 29 |
| Alta Mesa | Lincoln CRP Manifold 18 | Lincoln | T 17N R 5W SW ¼ Section 29 |

| Alta Mesa Section 9 | South of Lincoln CRP Manifold 1 | South of Lincoln | T 17N R 6W NE ¼ |
| Alta Mesa Section 8 | South of Lincoln CRP Manifold 2 | South of Lincoln | T 17N R 6W NW ¼ |
| Alta Mesa Section 16 | South of Lincoln CRP Manifold 3 | South of Lincoln | T 17N R 6W SE ¼ |
| Alta Mesa Section 20 | South of Lincoln CRP Manifold 4 | South of Lincoln | T 17N R 6W NW ¼ |
| Alta Mesa Section 26 | South of Lincoln CRP Manifold 5 | South of Lincoln | T 17N R 6W SE ¼ |
| Alta Mesa Section 26 | South of Lincoln CRP Manifold 6 | South of Lincoln | T 17N R 6W NE ¼ |
| Alta Mesa Section 34 | South of Lincoln CRP Manifold 7 | South of Lincoln | T 17N R 6W NW ¼ |
| Alta Mesa Section 32 | South of Lincoln CRP Manifold 8 | South of Lincoln | T 17N R 6W NW ¼ |
| Alta Mesa Section 4 | South of Lincoln CRP Manifold 9 | South of Lincoln | T 16N R 5W NE ¼ |

000444

| Alta Mesa Section 5 | South of Lincoln CRP Manifold 10 | South of Lincoln | T 16N  5W SW ¼ |
|---|---|---|---|
| Alta Mesa Section 8 | South of Lincoln CRP Manifold 11 | South of Lincoln | T 16N R 5W SE ¼ |
| Alta Mesa Section 9 | South of Lincoln CRP Manifold 12 | South of Lincoln | T 16N R 5W NE ¼ |
| Alta Mesa Section 26 | South of Lincoln CRP Manifold 13 | South of Lincoln | T 17N R 5W SE ¼ |
| Alta Mesa Section 2 | South of Lincoln CRP Manifold 14 | South of Lincoln | T 16N R 5W SE ¼ |
| Alta Mesa | CRP Manifold NofL-4 | North of Lincoln | T 18N R 5W NW ¼ Section 30 |
| Alta Mesa | CRP Manifold NofL-5 | North of Lincoln | T 18N R 5W NW ¼ Section 18 |
| Alta Mesa | CRP Manifold NofL-6 | North of Lincoln | T 18N R 6W NE ¼ Section 1 |
| Alta Mesa | CRP Manifold NofL-7 | North of Lincoln | T 18N R 5W SE ¼ Section 17 |
| Alta Mesa | CRP Manifold NofL-8 | North of Lincoln | T 18N R 5WNE ¼ Section 8 |

| | | | |
|---|---|---|---|
| Alta Mesa | CRP Manifold NofL-9 | North of Lincoln | T 18N R 5W SW ¼ Section 14 |
| Alta Mesa | CRP Manifold NofL-10 | North of Lincoln | T 18N R 5W NE ¼ Section 10 |
| Alta Mesa | CRP Manifold NofL South-1 | North of Lincoln | T 18N R 5W NE ¼ Section 35 |
| Alta Mesa | CRP Manifold NofL South-2 | North of Lincoln | T 17N R 5W SE ¼ Section 2 |
| Alta Mesa | CRP Manifold NofL South-3 | North of Lincoln | T 17N R 5W SW ¼ Section 13 |

**SCHEDULE 3.10(a)**
**to**
**CRUDE OIL GATHERING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**FORM OF NOTICE**
**FOR**
**DESIGNATION OF ADDITIONAL RECEIPT POINT**

1.     Operator Contact Name     _____

2.     Phone Numbers     _____

3.     E-Mail     _____

4.     Well and Pad Name     _____

5.     County/Township     _____

000448

6.      Requested Turn on Date _____

8.      Projected Initial Volume (bbl/d) _____

9.      Requested GPS of:

        a.      Wellhead (if applicable)        ___°___'___'' - ___°___'___''
        b.      CRP (if applicable)             ___°___'___'' - ___°___'___''
        c.      Receipt Point Meter             ___°___'___'' - ___°___'___''

10.     Surface site provided by Producer or Gatherer _____

11.     Planned flow into new Receipt Point or existing Receipt Point _____

12.     Producer or Gatherer to Connect _____

13.     Estimated Spud and Completion dates _____

000449

**SCHEDULE 4.4(a)**
to
**CRUDE OIL GATHERING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
and
**KINGFISHER MIDSTREAM LLC**

**SCHEMATIC OF DELIVERY POINT**

000450

000451



Outlet flange of transfer meter

Trucking Delivery Point FOB

Demarcation

Producer Takes Delivery

**...ery Point Plan View**



Storage Facility

Midstream System
...d owned by Gatherer)

**SCHEDULE 4.5(a)**
**to**
**CRUDE OIL GATHERING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**MEASUREMENT, EQUIPMENT AND TESTING**

       A.      Any terms capitalized in this Schedule shall have the meaning set forth herein, or as indicated by the context, or as set forth in the body of the Agreement.

       B.      Measurement.  Producer shall own, operate and maintain control and custody of any measurement point at the CRP and shall measure or cause to be measured all Crude Oil delivered hereunder in accordance with industry standards using measurement facilities at the CRP.  Quantities, quality and gravities of Crude Oil delivered hereunder shall be determined in accordance with generally accepted industry practices in effect at the time and place of delivery, using the latest test methods and standards from ASTM International and the API Manual of Petroleum Measurement Standards.  Gatherer shall be given reasonable prior Notice of any measurement or testing to be made hereunder by Producer or its representative.  Gatherer may have a representative present to witness all measurement and testing by Producer or its representative, but in the absence of a Gatherer representative, the measurement and testing as made by Producer or its representative shall be accepted and considered as correct absent

made by Producer or its representative shall be accepted and considered as correct absent manifest error. For pricing purposes only, unless otherwise specified in this Agreement, all Crude Oil received hereunder during any month shall be considered to have been received in equal daily quantities during such month.

      C.     Calibration.    At least semi-annually or as otherwise may be required by Applicable Laws, Producer or Producer's designee shall verify the calibration of all of its meters at the CRP. With respect to any test made hereunder, a result within plus or minus one quarter of one percent (0.25%) of the previous meter calibration shall be considered correct.

      D.     Corrections.   If upon calibration the result exceeds plus or minus one quarter of one percent (0.25%) of the previous meter calibration, then any previous recording of such equipment shall be corrected for any period which is known or agreed upon, but in case the period is not known or agreed upon, such correction shall apply to one-half (1/2) the total volume measured since the date of the last calibration. However, the period for this correction shall not exceed ninety (90) days.

**SCHEDULE 4.6**
**to**
**CRUDE OIL GATHERING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**SPECIFICATIONS**

A.      Any terms capitalized in this Schedule shall have the meaning set forth herein, or as indicated by the context, or as set forth in the body of the Agreement.

B.      Gatherer may, from time to time, and without Notice to Producer, test Producer's Crude Oil for the purpose of confirming whether it conforms to the Specifications.  Crude Oil delivered by Producer to Gatherer hereunder shall comply with the more stringent of (1) the requirements of any receiving transporter, (2) the requirements of any Applicable Laws or Governmental Authority, and (3) the following specifications: (a) be merchantable, of a quality acceptable to receiving transporters, in its natural produced state after normal oilfield separation and treating, and commercially free of dirt, sediment and chemicals foreign to virgin Crude Oil including chlorinated and/or oxygenated hydrocarbons, lead and hazardous or industrial wastes, (b) not contain more than

000456

as determined by the average of the representative samples; and (c) have a Reid Vapor Pressure of not more than ▮▮▮▮▮.

     C.    **IF PRODUCER DELIVERS CRUDE THAT DOES NOT CONFORM TO THE FOREGOING SPECIFICATIONS, PRODUCER WILL BE RESPONSIBLE FOR ALL LIABILITY AND COSTS INCURRED BY GATHERER WITH RESPECT TO THE NON-CONFORMING CRUDE, INCLUDING WITHOUT LIMITATION, COSTS TO DISPOSE OF THE NON-CONFORMING CRUDE, AND COSTS TO REMOVE ANY CONTAMINATION FROM GATHERER'S CRUDE SYSTEM. GATHERER IS UNDER NO OBLIGATION TO ACCEPT SUCH NON-CONFORMING CRUDE, AND GATHERER'S NON-ACCEPTANCE OF NON-CONFORMING CRUDE SHALL NOT BE CONSIDERED A FAILURE OF GATHERER TO RECEIVE COMMITTED CRUDE, NOR SHALL SUCH NON-ACCEPTANCE BY GATHERER BE CONSIDERED AN EVENT OF FORCE MAJEURE, AS DEFINED HEREIN, SUFFICIENT TO RELIEVE PRODUCER OF ITS PERFORMANCE OBLIGATIONS UNDER THE AGREEMENT.**

**SCHEDULE 11.4**
**to**
**CRUDE OIL GATHERING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**NOTICES**

**GATHERER:**

Notices & Correspondence:

      Kingfisher Midstream LLC
      c/o Asset Risk Management, LLC
      20329 State Highway 249, Suite 450
      Houston, TX 77070
      Attention: Paul Williams
      Phone: 281-655-3234
      Email: pwilliams@asset-risk.com

Scheduling Department:

Kingfisher Midstream LLC
c/o Asset Risk Management, LLC
20329 State Highway 249, Suite 450
Houston, TX 77070
Attention: Oil Scheduling David Puglia
Phone: 281-655-3216
Email: dpuglia@asset-risk.com

Accounting Matters:

Kingfisher Midstream LLC
c/o Asset Risk Management, LLC
20329 State Highway 249, Suite 450
Houston, TX 77070
Attention: Oil Accounting Mamata Sharma
Phone: 281-655-3221

Payment by ACH:



[Continued on next page]

**PRODUCER:**

Notices & Correspondence:

    Oklahoma Energy Acquisitions, LP
    c/o Alta Mesa Services, LP
    15021 Katy Freeway
    Suite 400
    Houston, TX 77094
    Attn: David McClure
    Phone: 281-530-0991
    Facsimile: 281-530-5278
    Email: dmcclure@altamesa.net

Billing:

    Oklahoma Energy Acquisitions, LP
    c/o Alta Mesa Services, LP
    15021 Katy Freeway
    Suite 400
    Houston, TX 77094
    Attn: Michael A. McCabe
    Phone: (281) 530-0991
    Facsimile: (281) 530-5278
    Email: mmccabe@altamesa.net

Bank:              Union Bank (MUFG)

Account Name:    Alta Mesa Services LP Funding Account

CONFIDENTIAL

AMRAP-1450419
AMRBK-0019432

000461