# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| ALTA MESA RESOURCES, INC., *et al.,* | Case No. 19-35133 |
| Debtors. | (Jointly Administered) |
| DAVID DUNN, as Trustee of the AMH Litigation Trust,<br><br>Plaintiff,<br><br>v.<br><br>HPS INVESTMENT PARTNERS, LLC; ARM ENERGY HOLDINGS, LLC; ARM MIDSTREAM, LLC; AND ASSET RISK MANAGEMENT, LLC,<br><br>Defendants. | Adv. No. 21-03909 |

## RULE 12(B)(6) MOTION TO DISMISS THE FIRST AMENDED COMPLAINT ON BEHALF OF ARM DEFENDANTS

This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.

Represented parties should act' through their attorney.

There will be a hearing on this motion on November 16, 2022 at 1:30 p.m. central time in person at Courtroom 404, 515 Rusk, Houston, TX 77002 or remotely via GoToMeetings at http://www.gotomeet.me/JudgeIsgur, or Phone at 832-917-1510, access code: 954554.

## TABLE OF CONTENTS

**Page**

INTRODUCTORY STATEMENT......................................................................1

BACKGROUND AND PROCEDURAL HISTORY ...........................................3

    I.      AMH Gathering Agreements and Amendments....................................3

    II.     AMH Bankruptcy and Subsequent Litigation .......................................4

LEGAL STANDARDS ......................................................................................6

    I.      Motion to Dismiss..................................................................................6

    II.     Federal Rule of Civil Procedure 8 ........................................................6

    III.    Federal Rule of Civil Procedure 9(b) ...................................................7

ARGUMENT ....................................................................................................8

    I.      Trustee's FAC fails to adequately plead facts plausibly suggesting the Gathering Agreement Obligations and AMH Gathering Payments were constructively fraudulent transfers.........................................................8

            A.     Trustee fails to allege transfers for less than reasonably equivalent value.....................................................................................10

            B.     Trustee fails to plead the insolvency element of constructive fraudulent transfer. ...............................................................................12

    II.     The FAC fails to state a claim with regard to recovery from ARM under section 550 of the Bankruptcy Code or section 24.009(b) of the TUFTA............14

            A.     ARM is not a transfer beneficiary under Fifth Circuit precedent. ............16

            B.     ARM is not a transfer beneficiary under the McCook Metals Test. .........18

    III.    The FAC should be dismissed because the Gathering Agreements fall outside the applicable lookback periods under Federal and Texas Law..............21

CONCLUSION ...............................................................................................23

000463

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aphton Corp. v. Sonafi Pasteur (In re Aphton Corp.)*,
   423 B.R. 76 (Bankr. D. Del. 2010) ...................................................................10

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................... 6, 7, 8, 9

*In re ATP Oil & Gas Corp.*,
   711 F.App'x. 216 (5th Cir. 2017) ...................................................................12

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................7

*Blackburn v. City of Marshall*,
   42 F.3d 925 (5th Cir. 1995) ..............................................................................6

*Boston Trading Grp., Inc. v. Burnazos*,
   835 F.2d 1504 (1st Cir. 1987) (Breyer, J.) .....................................................22

*Brown v. Douglas (In re Specialty Select Care Ctr. of San Antonio, LLC)*,
   Nos. 17-44248-ELM, 2021 Bankr. LEXIS 1933 (Bankr. N.D. Tex. 2021) ...........10

*In re Crescent Resources, LLC v. Pruet*,
   2012 WL 195528 (Bankr. W.D. Tex. Jan. 23, 2012) ........................................11

*Dorsey v. Portfolio Equities, Inc.*,
   540 F.3d 333 (5th Cir. 2008) ............................................................................6

*In re Dual D Health Care Operations, Inc.*,
   2021 WL 3083344 (Bankr. N.D. Tex. July 21, 2021) .......................................22

*Faulkner v. Korman (In re Heritage Org., LLC)*,
   413 B.R. 438 (Bankr. N.D. Tex. 2009) ...........................................................17

*German Pellets La. LLC v. Wessel GMBH (In re La. Pellets, Inc.)*,
   838 Fed. Appx. 45 (5th Cir. 2020) .............................................................. 10, 12

*Great Lakes Dredge & Dock Co. LLC v. La. State*,
   624 F.3d 201 (5th Cir. 2010) ............................................................................6

*In re Gulf Fleet Holdings, Inc.*,
   491 B.R. 747 (Bankr. W.D. La. 2013) .............................................................23

ii

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Haber Oil Co. v. Swinehart (In re Haber Oil Co.)*,
    12 F.3d 426 (5th Cir. 1994) ...................................................................................7

*Halperin v. Moreno (In re Green Field Energy Servs.)*,
    Nos. 13-12783 (KG), 2018 Bankr. LEXIS 517 (Bankr. D. Del. 2018) ................................19

*In re Hansen*,
    341 B.R. 638 (N.D. Ill. 2006) ................................................................................18

*HBE Leasing Corp. v. Frank*,
    48 F.3d 623 (2d Cir. 1995) ...................................................................................22

*Janvey v. Libyan Inv. Auth.*,
    840 F.3d 248 (5th Cir. 2016) ................................................................. 16, 17, 18

*In re Juliet Homes, LP*,
    2010 WL 5256806 (Bankr. S.D. Tex. Dec. 16, 2010) ........................................21

*Life Partners Creditors' Tr. v. Crowley (In re Life Partners Holdings, Inc.)*,
    926 F.3d 103 (5th Cir. 2019) ..................................................................................8

*Lo v. Lee*,
    234 Cal. Rptr. 3d 824 (2018) ...............................................................................21

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ..................................................................................9

*Marwil v. Oncale (In re Life Fund 5.1 LLC)*,
    Nos. 09-B-32672, 2010 Bankr. LEXIS 1938 (Bankr. N.D. Ill. 2010) ..................................12

*In re McCook Metals, LLC*,
    319 B.R. 570 (Bankr. N.D. Ill. 2005) ..................................................... 18, 19, 20

*In re Northstar Offshore Grp., LLC*,
    616 B.R. 695 (Bankr. S.D. Tex. 2020) (Isgur, J.) ...................................... 8, 12, 14

*Reily v. Kapila (In re Int'l Mgmt. Assocs.)*,
    399 F.3d 1288 (11th Cir. 2005)............................................................................16

*Rodriguez v. Cyr (In re Cyr)*,
    602 B.R. 315 (Bankr. W.D. Tex. 2019) ..........................................................8, 12

*United States ex rel. Williams v. Bell Helicopter Textron Inc.*,
    417 F.3d 450 (5th Cir. 2005) ..................................................................................7

000465

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Wolcott v. Sebelius*,
  635 F.3d 757 (5th Cir. 2011) ...................................................................................6

**Statutes**

11 U.S.C. § 546(a) ..............................................................................................21

11 U.S.C. § 548(a) ................................................................................................3

11 U.S.C. § 548(a)(1) .....................................................................................21, 22

11 U.S.C. § 548(a)(1)(B)(i), (ii)(I)-(III) ...................................................................9

11 U.S.C. § 550(a) ..............................................................................................14

11 U.S.C. §§ 550(a)(1) ..............................................................................15, 18, 19

Bankruptcy Code ........................................................................................*passim*

Bankruptcy Code section 548 ...........................................................................21, 22

Bankruptcy Code section 548(a)(1)(B) ....................................................................9

Bankruptcy Code section 548(d)(2) .......................................................................10

Bankruptcy Code section 550(a) ......................................................................14, 16

Fed. R. Civ. P. 8(a)(2) ...........................................................................................6

Fed. R. Civ. P. 9(b). ..............................................................................................7

Fed. R. Civ. P. 12(b)(6) .........................................................................................6

TEX. BUS. & COMM. CODE § 24.005(a)(2) ...............................................................9

TEX. BUS. & COMM. CODE § 24.009(b) ...............................................2, 14, 15, 16

TEX. BUS. & COMM. CODE § 24.0010(2) ................................................................3

TEX. BUS. & COMM. CODE § 24.010(a) .............................................................21, 23

TEX. BUS. & COMM. CODE § 24.010(a)(1), (2) .......................................................23

Texas Uniform Fraudulent Transfer Act §§ 24.005(a)(2), 24.006(a), 24.008,
  24.009(b) ..........................................................................................................5

TUFTA ......................................................................................................*passim*

iv

Pursuant to Federal Rule of Civil Procedure 12(b)(6), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7012(b)(6), Defendants ARM Energy Holdings, LLC, ARM Midstream, LLC, and Asset Risk Management, LLC (collectively, "ARM") file this Motion to Dismiss the First Amended Complaint (ECF No. 40) (the "FAC"), filed by Plaintiff David Dunn, as Trustee of the AMH Litigation Trust (the "Trustee" or "Plaintiff"), for Failure to State a Claim and ask that the Court dismiss with prejudice all claims asserted against them and respectfully state as follows:

## INTRODUCTORY STATEMENT

This is Trustee's second attempt at stating claims for relief against ARM for alleged fraudulent transfers. Trustee filed the original complaint (ECF No. 1) (the "Original Complaint") in September 2021, two years after Alta Mesa Holdings, LP ("AMH") filed for bankruptcy, asserting claims for actual and constructive fraudulent transfers against ARM and other defendants (collectively, the "Defendants"). Upon reviewing ARM's motion to dismiss the Original Complaint, in June 2022, this Court held Trustee failed to plead his claims with particularity sufficient to satisfy Rule 9(b) and granted leave to amend. *See* ECF No. 33.

As he did in the Original Complaint, Trustee places the lion's share of the blame for AMH's bankruptcy on the Defendants. And as he did in the Original Complaint, Trustee fails once again to state a plausible claim for which relief can be granted. Rather than amending his Original Complaint to satisfy the Rule 9(b) pleading standard, Trustee abandoned his claims for actual fraudulent transfer, asserting only claims for constructive fraudulent transfer—hoping this would absolve the need to satisfy Rule 9. More important, in the FAC, Trustee merely adds additional conclusory allegations, irrelevant facts about ownership structures, and irrelevant and insufficient facts about AMH's finances, none of which can repair the deficiencies of the Original Complaint nor meet Rule 9(b) pleading standard.

Similar to the Original Complaint, the FAC alleges that certain transactions allegedly undertaken by AMH are fraudulent transfers and asserts that they (somehow) benefited ARM. Specifically, he claims that AMH entered into certain oil and gas gathering agreements in 2015 and certain amendments thereto in 2016 under which AMH made payments to Kingfisher Midstream, LLC ("KFM"), an entity in which ARM held an interest. Although Trustee removed his actual fraud claim, Trustee's FAC still fails to state a claim for which relief can be granted. ARM's motion should be granted with prejudice for the following reasons:

First, Trustee fails to adequately plead constructive fraudulent transfers occurred under the Bankruptcy Code and TUFTA (defined below), because he fails to allege facts sufficient to show that the alleged transaction was for less than reasonably equivalent value, nor that AMH was insolvent or undercapitalized at the time the transactions occurred. Trustee cannot meet his burden of pleading AMH's financial condition by relying merely on AMH's cash flow, debt-to-equity ratio, or the fact that AMH ultimately filed for bankruptcy (more than four years after entry into the original gathering agreements).

Second, Trustee fails to plead facts that identify transfers made to, or for the benefit of, ARM, pursuant to section 550 of the Bankruptcy Code and section 24.009(b) of TUFTA. As he did in the Original Complaint, Trustee merely alleges that ARM held an interest in KFM, and that KFM received avoidable transfers. Those allegations, however, are insufficient as a matter of law because they fail to show any transfers were made for the benefit of ARM nor that ARM was an immediate or mediate transferee. Thus, even if Trustee had alleged avoidable transfers—which he has not—he pleads no basis for recovering transfers from ARM, and his claims against ARM should be dismissed in their entirety.

000468

Third, Trustee cannot assert claims under section 548 of the Bankruptcy Code and section 24.0010(2) of TUFTA because the alleged transactions occurred outside the look-back period. Count I purports to reach the Gathering Agreement Obligations and AMH Gathering Payments under the 2015 Agreements and 2016 Amendments under section 548, but these were indisputably incurred before September 11, 2017, and therefore outside section 548's two-year look-back period. *See* 11 U.S.C. § 548. Similarly, in Count II, the obligations under the 2015 Agreements were incurred outside TUFTA's four-year lookback period for constructive fraud claims. *See* Tex. Bus. & Comm. Code § 24.0010(2).

As such, Trustee's FAC fails to cure the defects from the Original Complaint and fails to state claims for which relief may be granted. The Court should therefore dismiss Trustee's FAC with prejudice.

## BACKGROUND AND PROCEDURAL HISTORY

### I.    AMH Gathering Agreements and Amendments

1.    Prior to the February 2018 Business Combination, AMH was owned by its president and CEO, Harlan Chappelle, its COO, Michael Ellis, and High Mesa Inc. ("HMI"). FAC, ¶ 19. Alta Mesa Holdings, GP, LLC was the sole general partner of AMH and had "full, complete, and exclusive authority to manage and control the business, affairs, and properties of [AMH], to make all decisions regarding the same, and to perform any and all other acts or activities customary or incident to the management of [AMH's] business." *Id.* ¶ 20.

2.    In 2014, ARM Defendants and AMH's owners, through Chappelle, "began discussing jointly sponsoring a new entity" to meet AMH's midstream gathering needs. *Id.* ¶¶ 25-26. This entity became KFM, and "ARM had an approximate 30% interest in KFM." *Id.* ¶ 26.

3.    On August 31, 2015, AMH, through affiliated entities, and KFM allegedly executed the Gas Gathering and Processing Agreement ("2015 GGA") and the Crude Oil Gathering

000469

Agreement ("2015 OGA," and collectively with the 2015 GGA, the "2015 Agreements").  *Id.* ¶ 33.  Under the 2015 Agreements, AMH allegedly would pay KFM certain gathering rates and capital recovery fees and "convey or assign" rights-of-way to KFM to build and maintain KFM's gathering systems "where reasonably requested."  *Id.* ¶¶ 34-36.

4.      On December 1, 2016, AMH and KFM agreed to amend the 2015 Agreements by executing the Amended and Restated Gas Gathering and Processing Agreement ("2016 GGA Amendment" and Amended and Restated Crude Gathering Agreement ("2016 OGA Amendment", collectively the "2016 Amendments").  *Id.* ¶ 44.  The 2016 Amendments allegedly decreased the capital recovery fee and increased the gathering rates under the 2015 Agreements, and required KFM to complete construction of a crude oil gathering system for AMH.  *Id.* ¶¶ 44-47.

## II.      **AMH Bankruptcy and Subsequent Litigation**

5.      On September 11, 2019 (the "Petition Date"), AMH and certain of the other Debtors[1] filed voluntary petitions in the United States Bankruptcy Court for the Southern District of Texas for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Although certain Debtors filed their voluntary bankruptcy petitions on a later date, September 11, 2019 is the only pertinent petition date for purposes of this adversary proceeding.

6.      On May 27, 2020, the Court entered its Findings of Fact, Conclusions of Law, and Order (I) Approving the AMR/AMH Debtors' Disclosure Statement and (II) Confirming the First Amended Joint Plan of Liquidation of Alta Meta Resources, Inc. and its AMH and SRII Debtor Affiliates under Chapter 11 of the Bankruptcy Code.

---

[1]    The Debtors in this chapter 11 case are as follows: Alta Mesa Resources, Inc.; Alta Mesa Holdings, LP; Alta Mesa Holdings GP, LLC; OEM GP, LLC; Alta Mesa Finance Services Corp.; Alta Mesa Services, LP; Oklahoma Energy Acquisitions, LP; SRII Opco GP, LLC; SRII Opco, LP; Kingfisher Midstream, LLC; Kingfisher STACK Oil Pipeline, LLC; Oklahoma Produced Water Solutions, LLC; and Cimarron Express Pipeline, LLC. The location of the Debtors' corporate headquarters and service address is 15021 Katy Freeway, 4th Floor, Houston, Texas 77094.

000470

7.      On September 10, 2021, Trustee filed his Original Complaint (ECF No. 1) to Avoid and Recover Transfers Pursuant to 11 U.S.C. §§ 544, 548, 550, TEX. BUS. & COMM. CODE § 24.001, et. seq., and to Disallow Claims Pursuant to 11 U.S.C. § 502 against Defendants.  The Defendants separately filed motions to dismiss the Original Complaint.

8.      The Court held a joint hearing on June 8, 2022, and held from the Bench that the Original Complaint failed to allege facts sufficient to satisfy Rule 9's heightened pleading standard.  The Court expressed skepticism that Trustee could plead actionable fraudulent transfer claims, but granted Trustee leave to amend—demanding Trustee to file an amended complaint that meets the pleading standard of Federal Rules of Civil Procedures Rule 9.  *See* ECF 33.

9.      Trustee filed his FAC on July 11, 2022.  The FAC includes six causes of action, but only Counts I and II assert claims against ARM.  In both Counts I and II, Trustee asserts constructive fraudulent transfer claims against ARM.  In Count I, the fraudulent transfer claims are asserted under the Bankruptcy Code 11 U.S.C. § 548(a)(1)(B) and § 550 for avoidance and recovery of "AMH Gathering Payments" (as defined in the FAC).  In Count II, the fraudulent transfer claims are asserted both under the Bankruptcy Code 11 U.S.C. § 544 and the Texas Uniform Fraudulent Transfer Act ("TUFTA") §§ 24.005(a)(2), 24.006(a), 24.008, 24.009(b)) for avoidance and recovery of "Gathering Agreement Obligations" and "AMH Gathering Payments" (as defined in the FAC).  Unlike the Original Complaint, the FAC limits the claims to constructive fraudulent transfer—abandoning the actual fraudulent transfer in hopes of pleading under a lower standard.

10.     Although Trustee filed his FAC by the July 11, 2022 deadline and abandoned the actual fraudulent transfer claims, Trustee's FAC, nonetheless, still fails to state a plausible claim

000471

for which relief can be granted.  By this Motion, ARM requests that the Court dismiss the claims against it in Counts I and II of the FAC.

## LEGAL STANDARDS

### I.    <u>Motion to Dismiss</u>

11.    Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When ruling on a 12(b)(6) motion, the Court may consider "the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Wolcott v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (internal citations and quotations omitted).  The Court should not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions."  *Great Lakes Dredge & Dock Co. LLC v. La. State*, 624 F.3d 201, 210 (5th Cir. 2010) (internal quotations omitted).  Similarly, legal conclusions masquerading as factual conclusions need not be treated as true.  *See Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Although well-pleaded facts are viewed in the light most favorable to the plaintiff, the Court should "not strain to find inferences favorable to the plaintiff."  *Dorsey v. Portfolio Equities, Inc*., 540 F.3d 333, 338 (5th Cir. 2008) (internal quotations omitted).  Even taking Trustee's allegations as true, which they are not, Trustee's FAC must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) because it fails to state a claim on which relief can be granted against Defendant.

### II.    <u>Federal Rule of Civil Procedure 8</u>

12.    Rule 8 of the Federal Rules of Civil Procedure requires that a pleading stating a claim for relief contain "a short and plain statement of the claim showing that the pleader is entitled to relief…."  Fed. R. Civ. P. 8(a)(2).  The United States Supreme Court has interpreted Rule 8 as requiring more than mere "labels and conclusions" or "formulaic recitation of the elements of a

6

cause of action." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007).   Instead, to survive a motion to dismiss, the pleading "must contain sufficient factual matter…to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).   A claim is plausible when the complaint contains facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*   While not requiring the plaintiff to show it is probable the defendant caused the harm, liability must be more than a "sheer possibility" to satisfy the plausibility requirement. *Id.*   Rule 8 does not permit a plaintiff to proceed with a lawsuit based on "nothing more than conclusions." *Id.* at 679.

### III.    **Federal Rule of Civil Procedure 9(b)**

13.    Rule 9(b) of the Federal Rules of Civil Procedure states that when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  The Fifth Circuit has stated that when alleging fraud:  "At a minimum, [this] requires that a plaintiff set for the 'who what, when, where, and how' of the alleged fraud." *See United States ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 453 (5th Cir. 2005) (*quoting Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)).  The Rule 9(b) particularity requirement applies to adversary proceedings. *See Haber Oil Co. v. Swinehart (In re Haber Oil Co.)*, 12 F.3d 426, 439 (5th Cir.1994) (stating "Bankruptcy courts should and do insist that the stringent standard imposed by Bankruptcy Rule 7009 be observed by parties claiming fraud").  Whether a plaintiff has met the heightened pleading requirement of Rule 9(b) may be the subject of a Rule 12(b)(6) motion to dismiss. *See*, *e.g.*, *Bell Helicopter Textron*, 417 F.3d at 454 (finding the district court "correctly concluded that the complaint, reviewed in the light most favorable to the plaintiff, was too general and conclusory to satisfy the particularity requirements set forth in Rule 9(b)").

14.     Although there is some uncertainty in the Fifth Circuit on whether the heightened pleading standard of Rule 9(b) applies to all fraudulent transfer claims, it undeniably applies to any claim where the "plaintiff alleges fraud or mistake." *Life Partners Creditors' Tr. v. Crowley (In re LifePartners Holdings, Inc.)*, 926 F.3d 103, 116-117 (5th Cir. 2019).  Further, the Fifth Circuit has noted "that at least three other circuits—the First, Second, and Eighth Circuits—have concluded that Rule 9(b) applies" to all fraudulent transfer claims generally.  *Id.* at 118.  Similarly, this Court has also previously held that Rule 9(b) applies to claims of fraudulent transfers.  *See In re Northstar Offshore Grp., LLC*, 616 B.R. 695, 733 (Bankr. S.D. Tex. 2020) (Isgur, J.).

15.     Further, this Court granted Trustee leave to amend the Original Complaint with the instruction that Trustee "meet [R]ule 9."  *See* ECF No. 33.  As such, and as suggested by this Court, Trustee's claims must therefore satisfy Rule 9(b) and must plead the "who, what, when, where, and how" of the fraudulent transfer.  *Rodriguez v. Cyr (In re Cyr)*, 602 B.R. 315, 328 (Bankr. W.D. Tex. 2019).

16.     As set forth in more detail below, Trustee's FAC fails to meet the requirements of either Rule 8 or Rule 9(b) and, as such, should be dismissed.

## ARGUMENT

### I.    Trustee's FAC fails to adequately plead facts plausibly suggesting the Gathering Agreement Obligations and AMH Gathering Payments were constructively fraudulent transfers.

17.     To avoid dismissal for failure to state a claim, a plaintiff must meet the pleading requirements under Rule 8(a)(2) of the Federal Rules of Civil Procedure.  Rule 8(a)(2) requires a plaintiff to plead "a short and plain statement of the claim showing that the pleader is entitled to relief."  In *Ashcroft v. Iqbal*, the Supreme Court held that Rule 8(a)(2) requires that "the well-pleaded facts" must "permit the court to infer more than the mere possibility of misconduct."  *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).  "Only a complaint that states a plausible

8

claim for relief survives a motion to dismiss." *Id.* (citing *Twombly*, 550 U.S. at 556). "[A] complaint does not need detailed factual allegations, but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true raise a right to relief above the speculative level." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (internal quotation marks omitted).

18.    To establish a claim for a constructively fraudulent transfer under either the Bankruptcy Code or TUFTA, a plaintiff must plead sufficient facts, provide evidence and establish each element under section 548(a)(1)(B) of the Bankruptcy Code and section 24.005(a)(2) of TUFTA.

19.    Section 548(a)(1)(B) of the Bankruptcy Code provides, in relevant part, that:

> The Trustee may avoid any transfer ... of an interest of the debtor in property ... that was made ... on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily ... received less than a reasonably equivalent value in exchange for the transfer ...; and ... was insolvent on the date that such transfer was made ..., or became insolvent as a result of such transfer ...; was engaged in business ... for which any property remaining with the debtor was an unreasonably small capital; [or] intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured....

11 U.S.C. § 548(a)(1)(B)(i), (ii)(I)-(III).

20. Similarly, section 24.005(a)(2) of TUFTA provides, in relevant part, that:

> A transfer made ... by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made ..., if the debtor made the transfer ... without receiving a reasonably equivalent value in exchange for the transfer ..., and the debtor ... was engaged ... in a business ... for which the remaining assets of the debtor were unreasonably small in relation to the business ...; or ... intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

TEX. BUS. & COMM. CODE § 24.005(a)(2).

000475

21.     Based upon the statutory language set out above, Trustee's claims for the avoidance as constructively fraudulent transfers requires proof of, among other things, (i) the Debtor's receipt of less than reasonably equivalent value in exchange for each of the contractual payments allegedly made by the Debtors and (ii) that the Debtor was financially vulnerable or insolvent at the time of the transaction.

**A.     Trustee fails to allege transfers for less than reasonably equivalent value.**

22.     "Whether a debtor received reasonably equivalent value is a two-part inquiry: (1) whether the debtor received value, and (2) whether that value was reasonably equivalent." *German Pellets La. LLC v. Wessel GMBH (In re La. Pellets, Inc.)*, 838 Fed. Appx. 45, 49 (5th Cir. 2020).  In relation to the first prong of the inquiry, section 548(d)(2) of the Bankruptcy Code defines "value" as including the "satisfaction ... of a present or antecedent debt of the debtor." *Brown v. Douglas (In re Specialty Select Care Ctr. Of San Antonio, LLC)*, Nos. 17-44248-ELM, 2021 Bankr. LEXIS 1933, at *28 (Bankr. N.D. Tex. 2021).  In relation to the second prong of the inquiry, "[f]or any such value to be reasonably equivalent, the debtor must receive 'value that is substantially comparable to the worth of the transferred property.'"  *Id.*  In general, plaintiffs run afoul of the plausibility standards if they neglect to adequately allege any of these facts: (1) asset transferred, (2) date of transfer, (3) recipient of transferred asset, (4) value of the asset transferred, and (5) value of the asset received.  *Aphton Corp. v. Sonafi Pasteur (In re Aphton Corp.)*, 423 B.R. 76, 93 (Bankr. D. Del. 2010).

23.     The FAC fails to meet the standard articulated by *Aphton Corp.*  The FAC includes vague allegations about the maximum possible aggregate value transferred by AMH to KFM, and it generally identifies the asset transferred and the recipient of the transfers.  There is no mention, however, of the dates of the transfers, the value of each individual transfer, nor the value of the asset (or service) received in return.

10

24.     With respect to the reasonably equivalent value requirement, Trustee has followed the same defective pleading approach as the plaintiff in *In re Crescent Resources, LLC v. Pruet*, 2012 WL 195528 (Bankr. W.D. Tex. Jan. 23, 2012).  There, the plaintiff litigation trust alleged the "general conclusory allegations of insolvency and reasonably equivalent value."  *Id*. at *8.  The court granted a motion to dismiss, finding that the "Trust fails to support its allegations with factual assertions."  *Id*. at *9.

25.     In a conclusory fashion, Trustee makes the following allegation:  "The AMH Debtors received less than reasonably equivalent value in exchange for incurring the obligations under the Gathering Agreements Obligations and making the AMH Gathering Payments."  FAC, ¶¶ 68; 79.  The only details accompanying this conclusory allegation are:

> "(i) the gathering and processing fees in the Gathering Agreements were approximately 90-100% higher than market rates, rates paid to non-KFM midstream gatherers, or rates paid to KFM by non-AMH Debtor upstream producers;

> (ii) the Gathering Agreements required the payment of Capital Recovery Fees or Facility Fees that were completely foreign in the industry and increased the AMH Debtors' price of doing business with KFM even further beyond industry standards;

> (iii) the 2016 Amendments included provisions intended to transform the 2015 Agreements into covenants running with the land, including a purported conveyance of transportation interests, for which the AMH Debtors received no additional consideration; and

> (iv) under the 2016 OGA Amendment, KFM was paid for every barrel of oil produced from the designated area, even though KFM did not carry those barrels and AMH paid another party to transport the barrels away."

*Id.*

26.     Each of these statements is nothing more than conclusory allegations to which Trustee fails to plead sufficient facts.  More specifically, there are no details explaining how the processing fees in the Gathering Agreement were higher than the market rates.  Trustee fails to

11

plausibly allege how the market value was determined and offers no facts suggesting the purported "market" value is the sole measure of reasonably equivalent value. Further, payments made pursuant to the 2016 Amendments are payments in satisfaction of an antecedent contractual liability, which cannot support a fraudulent transfer claim, *In re La. La. Pellets*, 838 F. App'x at 52, and Trustee fails to plausibly allege that an arm's length transaction would not yield similar terms. Accordingly, Trustee has not adequately alleged that AMH received less than reasonably equivalent value for the Gathering Agreements.

### B. Trustee fails to plead the insolvency element of constructive fraudulent transfer.

27. In addition to alleging that the debtor did not receive reasonably equivalent value, a plaintiff must also allege facts concerning the debtor's insolvency at the date of the transfer. *Marwil v. Oncale (In re Life Fund 5.1 LLC)*, Nos. 09-B-32672, 2010 Bankr. LEXIS 1938, at *20 (Bankr. N.D. Ill. 2010). In other words, to plausibly allege a constructively fraudulent transfer, Trustee is required to plead sufficient factual content that would enable the Court to reasonably infer AMH's insolvency or inadequate capitalization at the time of the transfers. *See In re Northstar*, 616 B.R. at 737-38 (stating "[t]o prevail on a constructively fraudulent transfer claim, Trustee must prove insolvency on the date of the transfer"). *See also In re ATP Oil & Gas Corp.*, 711 F.App'x. 216, 223 (5th Cir. 2017) (affirming dismissal of constructive fraudulent transfer claim because "Trustee failed to present any financial data showing that ATP was actually insolvent or had little capital when making the complained-of bonus payments"); *In re Cyr*, 602 B.R. at 332 (dismissing constructive fraudulent transfer claim because the "Trustee presented no allegations regarding the value of the … debt relative to the value of the … assets at the time the transfers were made").

000478

28.    Trustee alleges only that "[o]n information and belief, at the time the Gathering Agreement Obligations were incurred, and each of the AMH Gathering Payments were made, AMH (i) was insolvent, or became insolvent as a result of such transfers or obligations, (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with AMH was an unreasonably small capital, and/or (iii) intended to incur, or believed that AMH would incur, debts that would be beyond AMH's ability to pay as such debts matured."  FAC, ¶¶ 69, 79.  Further, Trustee alleges that "[a]mong other things, during the relevant period, AMH operated at a net loss and was severely inadequately capitalized, with a debt to equity ratio of at least 20-to-1, and was cash-flow insolvent… [a]ccordingly, on information and belief, AMH and its subsidiaries lacked sufficient cash flow to meet its upcoming obligations, continued to draw down on its credit facility, and refinanced its debt."  *Id.* Presumably, Trustee refers only to cash flow so that he does not need to address AMH's other sources of liquidity, such as capacity under its credit facility and the ability to refinance its debt.

29.    Trustee has not adequately alleged that AMH was insolvent or financially vulnerable on the dates AMH incurred the obligations or made the transfers at issue.  As to the 2015 Agreements, Trustee purports to plead AMH's financial condition by repeating verbatim the statutory provisions (on information and belief) without supporting facts.  *See* FAC, ¶¶ 69; 80.  As to the 2016 Amendments, Trustee claims "[b]y mid-2016, Moody's downgraded AMH's debt, citing a 'weak liquidity position, expected deterioration in credit metrics through 2017, and increasing refinancing risk.'"  *Id.* ¶ 38.  But "weak" liquidity—on which Trustee fails to elaborate—asserts at most that AMH had less cash than the rating agencies might have liked but simply does not plead insolvency or undercapitalization, nor even failure to make a single debt payment.  Trustee, therefore, has failed to allege facts sufficient to raise a plausible inference that

13

AMH was insolvent or that AMH did not receive reasonably equivalent value in connection with the transfers.

30.    Finally, even accepting Trustee's conclusory allegations of AMH's financial condition as true, the FAC never alleges that AMH was insolvent.  None of the assertions about AMH leads to the conclusion that "the sum of its liabilities [was] greater than the sum of its *assets* at fair valuation." *In re Northstar*, 616 B.R. at 737 (emphasis added) (quotation omitted).  Trustee surely has access to AMH's balance sheet and financial information for the applicable lookback periods.  It is telling that he does not cite to any specific financial data.

31.    Accordingly, Trustee fails to plausibly plead that AMH received less reasonably equivalent value and its insolvency at the time of any of the alleged fraudulent transfers.  As such, the Court should dismiss Counts I and II.

**II.    The FAC fails to state a claim with regard to recovery from ARM under section 550 of the Bankruptcy Code or section 24.009(b) of the TUFTA.**

32.    Section 550(a) of the Bankruptcy Code allows Trustee to recover from an initial transferee or "entity for whose benefit such transfer was made," or from a subsequent transferee, "a mediate or immediate transferee." *See* 11 U.S.C. § 550(a); *In re Northstar*, 616 B.R. at 729-30. TUFTA's recovery statute is substantively the same. TEX. BUS. & COMM. CODE § 24.009(b).  To meet his burden under section 550(a), Trustee would need to prove the underlying avoidance claim and that ARM was an initial transferee, the entity for whose benefit the relevant transfers were made, an immediate transferee, or a mediate transferee.

33.    Putting aside the underlying avoidance claim requirement (discussed above), the FAC contains no guidance as to how or why ARM is a defendant for the recovery of alleged transfers.  The only relevant statement in the FAC is the conclusory statement: "Upon avoidance of such AMH Gathering Payments alleged in this Count I, Plaintiff is entitled to recovery judgment

000480

from Defendants pursuant to 11 U.S.C. §§ 550(a)(1) and/or (2)…" FAC, ¶ 75. It is unclear whether Trustee's theory of the case is that ARM is an initial transferee, a benefit transferee, or something subsequent. As he did in the Original Complaint, at best Trustee pleads only that ARM held certain minority equity interests in entities that allegedly received fraudulent transfers. *See Id.* ¶ 26 ("ARM had an approximate 30% interest in KFM…"). As a matter of law, that is insufficient to hold ARM liable under section 550 of the Bankruptcy Code or section 24.009(b) of TUFTA. The Court can dismiss all of Trustee's claims against ARM for this reason alone.

34.    As noted above, Counts I and II of the FAC aim to avoid transfers and obligations related to the vaguely and ambiguously defined "AMH Gathering Payments" and "Gathering Agreement Obligations." FAC, ¶¶ 66-86. The FAC defines the "AMH Gathering Payments" to collectively mean the "GGA Payments" (which includes the "2015 GGA Payments" under the "2015 GGA" and the "2016 GGA Payments" under the "2016 GGA Amendment") and the "2016 OGA Payments" under the "2016 OGA Amendment." *Id.* ¶¶ 33, 37, 44, 47. 2015 GGA is defined as the 2015 *Gas Gathering and Processing Agreement* entered into on August 31, 2015, and 2016 GGA Amendment is defined as the 2016 *Amended and Restated Gas Gathering and Processing Agreement* entered into on December 1, 2016, both between OEA and KFM. *See id.* A copy of the 2015 Agreements (including 2015 GGA and 2015 OGA and 2016 Amendments (including 2016 GGA Amendment and 20016 OGA Amendment) were attached to the FAC as Exhibits No. 1 & 2 and Exhibits No. 4 & 5, respectively. *See* FAC, attached Exhibits. Upon review of the agreements, it is clear that ARM was not a party to such contract(s)—rather, the only parties listed on all agreements were Oklahoma Energy Acquisitions, LC ("OEA") and KFM. *See id.* Based on the lack of contractual privity, it seems highly unlikely that ARM was an initial transferee. Further, the FAC makes clear that the initial transferees of the alleged transactions did not include

15

ARM, but rather was KFM. FAC, ¶¶ 37, 47. If Trustee is not alleging that ARM was an initial transferee, then his theory must be either that the transfers were for the benefit of ARM or that ARM was either a mediate or immediate transferee.

35.    As required by section 550 of the Bankruptcy Code and section 24.009(b) of TUFTA, if ARM was an immediate or mediate transferee, then the FAC is required to provide details concerning how the relevant funds were transferred from the initial transferee to ARM. Here, however, there is no such detail. Trustee also fails to plead that ARM is liable as subsequent transferees, as he fails to allege facts establishing any initial transfers were avoidable or that KFM made any subsequent transfers to ARM. The only relevant statement in the FAC is the conclusory statement: "ARM and HPS are subsequent transferees to the extent that KFM made any distributions to them of the proceeds of the Gathering Agreement Obligations and the AMH Gathering Payments." *Id.* ¶¶ 73, 84. Such statements, beginning with the language "to the extent that…," are nothing more than conclusory allegations, and fail to establish if or how ARM was a subsequent transferee.

36.    Here, Trustee relies (albeit incorrectly) on the unsupported theory that ARM was a transfer beneficiary (*i.e.*, an entity for whose benefit the alleged transfers were made). And although Trustee was given the opportunity to re-plead, Trustee fails for the second time to plead that ARM was a transfer beneficiary.

**A.    ARM is not a transfer beneficiary under Fifth Circuit precedent.**

37.    A beneficiary entity under section 550(a) "is typically the guarantor of a debt that was extinguished by the transfer." *Janvey v. Libyan Inv. Auth.,* 840 F.3d 248, 265 (5th Cir. 2016); *see also Reily v. Kapila (In re Int'l Mgmt. Assocs.)*, 399 F.3d 1288, 1292 (11th Cir. 2005) (stating "[t]he paradigm case of a benefit under § 550(a) is the benefit to a guarantor by the payment of the underlying debt of the debtor."). A subsequent transferee "cannot be an 'entity for whose benefit'

16

the initial transfer was made, even if the subsequent transferee actually receives a benefit from the initial transfer." *Faulkner v. Korman (In re Heritage Org., LLC)*, 413 B.R. 438, 495 (Bankr. N.D. Tex. 2009).

38.    Trustee fails to allege that ARM guaranteed the debt owed by AMH, nor that ARM received any particular benefit from the alleged initial transfers.    Rather, Trustee relies on conclusory assertions about financial benefit and control to allege ARM was a transfer beneficiary. More specifically, Trustee makes conclusory allegations about ARM having benefitted, such as:

    a.  "Every above-market dollar paid to KFM benefited KFM's owners, including HPS and ARM, who collectively owned the majority of KFM and controlled its management and operations. In effect, and as intended, the value of AMH's production assets was being diverted to benefit HPS and ARM." FAC, ¶ 40.

    b.  "The Gathering Agreement Obligations were incurred, and the AMH Gathering Payments made prior to the Business Combination were made, for the ***intended benefit*** of HPS and ARM as the controlling equity holders of the closely-held KFM." FAC, ¶¶ 70, 81.

    c.  "ARM and HPS actually received ***quantifiable benefits*** from the Gathering Agreement Obligations and the AMH Gathering Payments, as the controlling equity owners of KFM, in the form of (i) their respective portions of the value of such transfers to KFM, and the subsequent increase of KFM's enterprise value, to which, as owners of KFM, both ARM and HPS had access, and (ii) the proceeds of the sale of KFM through the Business Combination paid to ARM and HPS as a result of such increase in value." FAC, ¶¶ 72, 83.

These new allegations in Trustee's FAC are nothing more than conclusory assertions that ARM somehow benefitted on the back of KFM without actually alleging any facts to show how or when ARM benefited from the alleged transfers.

39.    Further, Trustee's reliance on ARM's equity interest in, and alleged control over, KFM is misplaced.  *See* FAC, ¶¶ 26, 67, 70-72, 78, 81-83.  In *Janvey*, the Fifth Circuit applied corporate separateness to the question of whether a shareholder is the beneficiary of an avoidable transfer to that entity. *Janvey v. Libyan Inv. Auth.*, 840 F.3d 248, 266 (5th Cir. 2016).  The court

000483

in *Janvey*, relying on *In re Hansen*, 341 B.R. 638, 645 (N.D. Ill. 2006), held that "[n]othing in section 550(a)(1) indicates that corporate form can be thrust aside and all voidable transfers to a corporation recovered from its shareholders on the mere assumption that shareholders somehow automatically 'benefit' from such transfers." *Id.* Accordingly, a shareholder such as ARM—even one that exercises some degree of control over an entity, which ARM did not—is not, without more, the beneficiary of a transfer to that entity. *See id.* As such, ARM's 30% equity interest in KFM is insufficient to qualify it as a transfer beneficiary.

### B.    ARM is not a transfer beneficiary under the *McCook Metals* Test.

40.    Based on Trustee's opposition to ARM's first motion to dismiss, and the conclusory allegations in each Count of the FAC regarding ARM's control and quantifiable benefit (described above), Trustee may argue that this Court should disregard the Fifth Circuit's opinion in *Janvey* and instead follow a test set forth in *In re McCook Metals, LLC*, 319 B.R. 570 (Bankr. N.D. Ill. 2005). Unlike the approach in *In re Hansen*, *McCook* has not been adopted or cited by this Court or the Fifth Circuit. *Cf. Janvey*, 840 F.3d at 266 (describing *In re Hansen* as "the right approach.").

41.    Even if one assumes the *McCook Metals* test is applicable in this Court, Trustee fails to plead facts to show that ARM would qualify as a Transfer Beneficiary. Under *McCook Metals*, a transfer beneficiary is said to have received the requisite "benefit" if the benefit is (1) actually received by the beneficiary, (2) is quantifiable, and (3) is accessible to the beneficiary. *McCook Metals*, 319 B.R. at 590. In addressing the first prong, the *McCook Metals* court stated that a benefit from a challenged transfer is actually received "when a transfer to a third party increases the beneficiary's assets." *Id.* at 591. In *McCook Metals*, the ultimate beneficiary, Lynch, received a right to purchase assets from another entity, Longview. The plaintiff alleged that this right to purchase was fraudulently transferred. At trial, the court found that Lynch was a Transfer

18

Beneficiary and *actually received* the benefit primarily because Lynch was the majority owner of the LLC and because Lynch had significant control over the transferee entity.

42.     Here, Trustee's allegations are insufficient under the *McCook Metals* analysis. First, the FAC does not allege any facts that ARM actually received a benefit from AMH's transfers to KFM.  Rather, Trustee merely alleges that ARM, as an owner of KFM, received a respective portion of the value of the transfers made by AMH to KFM after the sale of KFM in connection with the Business Combination.  Trustee fails to plead facts to show how the Gathering Agreement Obligations and AMH Gathering Payments directly increased ARM's assets.

43.     Further, Trustee's allegation that ARM received an actual benefit from the increase of KFM's assets in connection with the sale of KFM pursuant to the Business Combination fails under the *McCook Metals* test.  The *McCook Metals* court held that "an actual benefit rather than a merely intended one must be received in order for the beneficiary to be liable under § 550(a)(1)." Plaintiff has failed to plead any facts to show that any increase in ARM's assets due to the sale of KFM pursuant to Business Combination would be considered an actual benefit rather than an intended or incidental benefit.

44.     In any event, Trustee's allegation that ARM received an actual benefit merely because ARM owned 30% equity interest in KFM is insufficient to pass the muster of the first prong.  In *Halperin v. Moreno (In re Green Field Energy Servs.)*, Nos. 13-12783 (KG), 2018 Bankr. LEXIS 517, at *5 (Bankr. D. Del. 2018), the transfers in question were monetary payments made by the defendant to an LLC, in which the defendant owned a 50% equity interest.  The court held that merely owning an equity interest is insufficient to show "actual benefit" received, and instead, Trustee must prove that the defendant received an actual benefit from those payments.  *Id.* (holding that the trustee's claim that the defendant was the ultimate beneficiary simply because he

19

held a 50% stake was held to be "too conclusory" at this stage of the proceedings; the court held that at trial, the trustee must prove that "an actual benefit rather than a merely intended one" was received by the defendant).

45.    Second, with respect to the second prong, the *McCook Metals* court held that for "purposes of 11 U.S.C.S. § 550, a corollary to the disgorgement-based requirement that a benefit actually be received is a requirement that it be quantifiable.  A merely theoretical benefit is not sufficient since it would not be subject to disgorgement." *McCook Metals*, 319 B.R. at 570.  Here, Trustee merely alleges that the quantifiable benefit obtained by ARM from the Gathering Agreement Obligations and AMH Gathering Payments came from ARM being a "controlling equity owners of KFM, in the form of (i) their respective portions of the value of such transfers to KFM, and the subsequent increase of KFM's enterprise value, to which, as owners of KFM, both ARM and HPS had access, and (ii) the proceeds of the sale of KFM through the Business Combination paid to ARM and HPS as a result of such increase in value." FAC, ¶¶ 72, 83.  Trustee allegations, however, are nothing more than conclusory allegations based on a theoretical benefit.

46.    Third, with respect to the third prong, the *McCook Metals* court held "[e]ven if a quantifiable benefit is actually received, it could not fairly be disgorged if the beneficiary never had *access* to it." *McCook Metals*, 319 B.R. at 570.  In *McCook*, the court held that Lynch's ability to significantly "control" the entity was determinative of whether Lynch had "access" to the benefit.  In this case, Trustee alleges merely that ARM had "access" to the benefit because ARM was an equity owner of KFM and received the benefits of the Gathering Agreement Obligation and AMH Gathering Payments in connection with the sale of KFM during the Business Combination.  It is inaccurate to say that ARM was a primary equity holder—considering the fact that Trustee himself acknowledges that ARM merely owned approximately 30% equity in KFM.

000486

FAC, ¶ 26.  In addition, none of the (conclusory) allegations are enough to allow the court to draw

a plausible inference that ARM had access to the alleged benefit.  For example, in *Lo v. Lee*, 234

Cal. Rptr. 3d 824, 830 (2018), the court held that defendant did not have access to the benefit

because the "funds were transmitted directly to Northeastern… [defendant] had no control over

the funds that [plaintiff] transferred… and the FAC [did] not allege that [defendant] had access to

these funds at any point in time."  Similarly, ARM did not have access to the benefit since the

Gathering Agreement Obligations and AMH Gathering Payments were transmitted to KFM—not

ARM—and because ARM did not have "control" over KFM or the funds AMH transferred at any

point in time.  As such, Trustee has failed to plead sufficient facts to show that ARM would qualify

as a transfer beneficiary.

III.    **The FAC should be dismissed because the Gathering Agreements fall outside the applicable lookback periods under Federal and Texas Law.**

47.     Under section 548 of the Bankruptcy Code, a trustee may seek to avoid a transfer

"that was made or incurred on or within two years before the date of the filing of the petition."  11

U.S.C. § 548(a)(1).  Under section 24.010(a) of TUFTA, a fraudulent transfer claim is extinguished

unless brought under (i) sections 24.005(a)(1) or (a)(2), or 24.006(a), within four years after the

transfer or incurrence of the obligation (where, as here, the discovery rule is inapplicable); or (ii)

section 24.006(b), within one year after the transfer.  TEX. BUS. & COMM. CODE § 24.010(a).

Further, section 546(a) of the Bankruptcy Code, provides that any such claims must be asserted

within two years of the petition date if the claim was viable at the petition date.  *See* 11 U.S.C. §

546(a).  *See, e.g.*, *In re Juliet Homes, LP*, 2010 WL 5256806, at *17 (Bankr. S.D. Tex. Dec. 16,

2010) (trustee has two years to assert state-law fraudulent transfer if "the claim is still viable under

state law by the time the trustee brings the action.").

000487

48.     Here, the Petition Date was September 11, 2019.  Accordingly, the lookback period

under section 548 of the Bankruptcy Code goes to September 11, 2017 and under TUFTA goes to

September 11, 2015.  In the FAC, Trustee attempted to separate the lookback periods applicable

under section 548(a)(1) of the Bankruptcy Code and section 24.010(a)(2) of TUFTA.

49.     In Count I, Trustee seeks to avoid under section 548: (i) the Gathering Agreement

Obligations arising under the 2015 Agreements and 2016 Amendments, and (ii) the AMH

Gathering Payments made in connection with those agreements.  FAC, ¶¶ 66-75.  Avoidance

claims under section 548 may be asserted for obligations incurred or transfers made only up to two

years before the Petition Date.  *See* 11 U.S.C. § 548(a)(1).  Here, two years before the Petition

Date was September 11, 2017.  Trustee alleges the 2015 Agreements were executed on August 31,

2015, and the 2016 Amendments on December 1, 2016—both more than two years before the

Petition Date.  FAC, ¶¶ 33, 44.  AMH thus initially incurred the Gathering Obligations and AMH

Gathering Payments more than two years before the September 11, 2019 Petition Date, and thus

outside the two-year lookback period under section 548(a)(1).

50.     In addition, because the obligations incurred under the 2015 Agreements and 2016

Amendments are unavoidable under section 548, any and all AMH Gathering Payments made in

satisfaction of those obligations constitute "dollar-for-dollar satisfaction of the contractual liability

imposed under the terms of the applicable" 2015 Agreement and 2016 Amendments, and are not

fraudulent as a matter of law.  *In re Dual D Health Care Operations, Inc.*, 2021 WL 3083344, at

*10 (Bankr. N.D. Tex. July 21, 2021); *see also HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d

Cir. 1995) ("[E]ven the preferential repayment of pre-existing debts to some creditors does not

constitute a fraudulent conveyance, whether or not it prejudices other creditors"); *Boston Trading

Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1509 (1st Cir. 1987) (Breyer, J.) (the "basic object of

22

000488

fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy *some* of his creditors; it normally does not try to choose among them"); *In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747, 766 (Bankr. W.D. La. 2013) (dismissing section 544 and 548 fraudulent transfer claims premised on payments of obligations fixed under contract).

51.    In Count II, Trustee seeks to avoid under sections 24.005(a)(2) and 24.006(a) of TUFTA: (i) the Gathering Agreement Obligations arising under the 2015 Agreements and 2016 Amendments, and (ii) the AMH Gathering Payments made in connection with those agreements. FAC, ¶¶ 76-86.  The four-year limitation under section 24.010(a) of TUFTA precludes Trustee's fraudulent transfer claims arising from the execution of the 2015 Agreements because those claims lapsed on August 31, 2019.  *See* TEX. BUS. & COMM. CODE § 24.010(a)(1), (2).  And any AMH Gathering Payments made outside that look-back period are also time barred.  Count II, therefore, is untimely and should be dismissed as to the 2015 Agreement and AMH Gathering Payments made before September 11, 2015.

## CONCLUSION

As Trustee has failed to adequately plead plausible claims against ARM Defendants, the FAC does not state a claim upon which relief may be granted.  Additionally, the FAC does not state or allege fraud against the Defendants with the particularity required under the federal rules, so such claims should also be dismissed.

WHEREFORE, ARM requests that the claims asserted by Trustee in his FAC be dismissed for failing to state a claim upon which relief may be granted, that the Court grant her attorneys' fees and costs to the extent permitted under applicable law, and for all other relief, in law or in equity, to which ARM may be entitled.

000489

Respectfully submitted,


**EVERSHEDS SUTHERLAND (US) LLP**


By:  */s/ David A. Baay*
      David A. Baay (TBN 24027050)
      Mark D. Sherrill (TBN 24035678)
      Jay P. Patel (TBN 24125682)
      davidbaay@eversheds-sutherland.com
      marksherrill@eversheds-sutherland.com
      jaypatel@eversheds-sutherland.com
      1001 Fannin Street, Suite 3700
      Houston, Texas 70002
      Tel: (713) 470-6100
      Fax: (713) 654-1301

COUNSEL TO ARM MIDSTREAM, LLC; ARM
ENERGY HOLDINGS, LLC; AND ASSET RISK
ANAGEEMENT, LLC

24

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| ALTA MESA RESOURCES, INC., *et al.,* | Case No. 19-35133 |
| Debtors. | (Jointly Administered) |
| DAVID DUNN, as Trustee of the AMH Litigation Trust, | |
| Plaintiff, | Adv. No. 21-03909 |
| v. | |
| HPS INVESTMENT PARTNERS, LLC; ARM ENERGY HOLDINGS, LLC; ARM MIDSTREAM, LLC; AND ASSET RISK MANAGEMENT, LLC, | |
| Defendants. | |

**ORDER**

On this day, the Court considered the motion of Defendants ARM Energy Holdings, LLC, ARM Midstream, LLC, and Asset Risk Management, LLC (collectively, "ARM") to Dismiss Plaintiff's First Amended Complaint. Based upon the Court's review of the pleadings and the controlling case law, the Court finds that the motion should be granted.

It is therefore ORDERED that the causes of action filed against ARM are dismissed with prejudice.

Signed on this _____ day of _____ 2022.

_____
UNITED STATES BANKRUPTCY JUDGE

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| ALTA MESA RESOURCES, INC., *et al.*, | ) |
| | ) Case No. 19-35133 |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |
| DAVID DUNN, as Trustee of the AMH Litigation Trust, | ) |
| | ) |
| | ) Adv. Pro. No. 21-03909 |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| HPS INVESTMENT PARTNERS, LLC; ARM ENERGY HOLDINGS, LLC; ARM MIDSTREAM, LLC; AND ASSET RISK MANAGEMENT, LLC, | ) |
| | ) **Jury Trial Demanded** |
| | ) |
| | ) |
| Defendants. | ) |

### PLAINTIFF'S OMNIBUS OPPOSITION
### TO MOTIONS OF ARM DEFENDANTS AND HPS INVESTMENT PARTNERS, LLC
### TO DISMISS FIRST AMENDED COMPLAINT [DKTS. 48, 49]

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   INTRODUCTION ........................................................................................................... 1

II.   FACTUAL BACKGROUND ......................................................................................... 3

  A.   Procedural Background ......................................................................................... 3

  B.   Factual Allegations ............................................................................................... 3

    1.   The Gathering Agreements ............................................................................ 4

    2.   The Non-STACK Assignment and HMI MSA .............................................. 10

III.   LEGAL STANDARD ON MOTION TO DISMISS ................................................... 11

IV.   ARGUMENT .............................................................................................................. 13

  A.   The FAC Adequately Alleges the Elements of Each Claim .............................. 13

    1.   The FAC Adequately Alleges Facts regarding Lack of Reasonably Equivalent Value for each of the Fraudulent Transfers ....................................................................... 13

      a.   The Gathering Agreements .................................................................... 15

      b.   The Non-STACK Assignment ................................................................ 16

      c.   The HMI MSA ........................................................................................ 17

    2.   The Trustee Sufficiently Alleges Payments Made Pursuant to Pre-Existing Agreements were not Made for Reasonably Equivalent Value ................................................. 18

    3.   The FAC Sufficiently Alleges AMH's Financial Condition .......................... 21

  B.   The Trustee Can Recover from Defendants as the Entities for Whose Benefit the Fraudulent Transfers were Made ....................................................................... 24

    1.   HPS Had Sufficient Control over AMH and each of the Transferees .......... 25

    2.   Defendants are Transfer Beneficiaries under the *McCook Metals* Test ....... 26

      a.   The Gathering Agreement Transfers ..................................................... 27

        i.   The benefits were received by HPS and ARM ................................ 27

        ii.   The benefits were quantifiable .......................................................... 28

        iii.   The benefits were accessible to HPS and ARM: ............................. 29

      b.   The Non-STACK Assignment and the HMI MSA .................................. 29

        i.   HPS received the benefits ................................................................ 29

        ii.   The benefits were quantifiab ............................................................ 29

        iii.   The benefits were accessible to HPS: .............................................. 30

  C.   The Gathering Agreement Claims are not Barred by Claim Preclusion ........... 30

    1.   HPS is not a party to, or in Privity to a Party to, the KFM AP .................... 30

2.   The Gathering Agreement Claims were not Brought in the KFM AP ........................... 32

D.   None of the Gathering Agreement Payments Occurred Prior to the Lookback Period of TUFTA Section 24.010 ........................................................................................................... 33

E.   The Adversary Proceeding does not Constitute Impermissible Claim Splitting ............... 33

F.   The Trustee Should be Granted Leave to Further Amend the FAC if Necessary ............. 34

V.   CONCLUSION ..................................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Airport Blvd. Apts., Ltd. v. NE 40 Partners, L.P.*
*(In re NE 40 Partners, Ltd.)*,
   411 B.R. 352 (Bankr. S.D.Tex. 2009) ....................................................................13

*Almazan v. Tex. Nat'l Bank (In re Almazan)*,
   No. 10-70253, 2011 Bankr. LEXIS 776 (Bankr. S.D. Tex. Mar. 7, 2011)............................11

*Ameritox, Ltd. v. Aegis Scis. Corp.*,
   No. 3:08-CV-1168-D, 2009 U.S.Dist.LEXIS 13305 (N.D. Tex. Feb. 9, 2009) .....................34

*AMH, LP v. KFM, LLC*,
   Case No. 4:19-ap-03684 ...............................................................................1, 30

*Aphton Corp. v. Sonafi Pasteur*
*(In re Aphton Corp.)*,
   423 B.R. 76 (Bankr. D. Del. 2010) ......................................................................16

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).......................................................................................12

*Astron Indus. Assocs., Inc. v. Chrysler Motors Corp.*,
   405 F.2d 958 (5th Cir. 1968) ...........................................................................31

*Baldi v. Lynch (In re McCook Metals, L.L.C.)*,
   319 B.R. 570 (Bankr. N.D. Ill. 2005) ............................................................. *passim*

*Boyd v. Sachs*
*(In re Auto Specialities Mfg. Co.)*,
   153 B.R. 457 (Bankr. W.D. Mich. 1993)................................................................18

*Butler v. Endeavor Air, Inc.*,
   805 F. App'x 274 (5th Cir. 2020) .......................................................................31

*Cage v. Davis*
*(In re Giant Gray, Inc.)*,
   629 B.R. 814 (Bankr.S.D.Tex. 2020) ...................................................................23

*Cantu v. Ford Motor Co.*
   2009 Bankr. LEXIS 1071 (Bankr.S.D.Tex. Apr. 17, 2009) .......................................11, 18

*Citizens Nat'l Bank of Tex. v. NXS Constr., Inc.*,
   387 S.W.3d 74 (Tex. Ct. App. 2012).....................................................................28

000495

*Comer v. Murphy Oil USA, Inc.*,
    718 F.3d 460 (5th Cir. 2013) ...............................................................30

*CRS Auto Parts, Inc. v. Nat'l Grange Mut. Ins. Co.*,
    No. 08-2022, 2008 U.S. Dist. LEXIS 78683 (E.D.Pa. Oct. 7, 2008) ......................................33

*Cruickshank v. Dixon*
    *(In re Blast Fitness Grp., LLC)*,
    603 B.R. 219 (Bankr. D. Mass. 2019) ...................................................26

*EBC I, Inc. v. Am. Online, Inc.*
    *(In re EBC I, Inc.)*,
    356 B.R. 631 (Bankr. D. Del. 2006) ...................................................19

*Esse v. Empire Energy III, Ltd.*,
    2010 Tex. App. LEXIS 9543 (Tex. App. Houston 1st Dist., Nov. 23, 2010) ........................25

*Esse v. Empire Energy III, Ltd.*,
    333 S.W.3d 166 (Tex. Ct. App. 2010) ...................................................25

*Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*,
    128 F.3d 1074 (7th Cir. 1997) ...........................................................12

*German Pellets La. LLC v. Wessel GMBH*
    *(In re La. Pellets, Inc.)*,
    838 Fed. Appx. 45 (5th Cir. 2020) ...............................................19, 20

*Greg's Ballroom v. Showalter*
    *(In re Villarreal)*,
    Nos. 08-70002, 08-7001 ...................................................................11

*Halperin v. Moreno*
    *(In re Green Field Energy Servs.)*,
    594 B.R. 239 (Bankr. D. Del. 2018) ...............................................21, 27

*Herrmann Holdings Ltd. v. Lucent Techs., Inc.*,
    302 F.3d 552 (5th Cir. 2002) ...........................................................34

*Hill v. Oria (In re Juliet Homes, LP)*,
    2010 Bankr. LEXIS 4826 (Bankr.S.D.Tex. Dec. 16, 2010) ...............................11

*In re ATP Oil & Gas Corp.*,
    711 F. App'x 216 (5th Cir. 2017) ...............................................18, 22

*In re Bullion Rsrv. of N. Am.*,
    922 F.2d 544 (9th Cir. 1991) ...........................................................28

*In re Crescent Resources, LLC v. Pruet*,
   2012 WL 195528 (Bankr. W.D. Tex. Jan. 23, 2012)..............................................13

*In re Cyr*,
   602 B.R. 315 (Bankr. W.D. Tex. 2019)................................................................22

*In re Green Field Energy Servs.*,
   2015 Bankr. LEXIS 2914 (Bankr.D.Del. Aug. 31, 2015) ................................21, 27

*In re R.M.L., Inc.*,
   92 F.3d 139 (3d Cir. 1996)................................................................................19

*In re Tex. E&P Operating, Inc.*,
   2022 Bankr. LEXIS ..................................................................................16, 17

*Janvey v. Libyan Inv. Auth.*,
   840 F.3d 248 (5th Cir. 2016) ............................................................................25

*Katchadurian v. NGP Energy Capital Mgmt., LLC*
   *(In re Northstar Offshore Grp., LLC)*,
   616 B.R. 695 (Bankr.S.D.Tex. 2020) ................................................................22

*Kinder Morgan., Inc. v. Crout*,
   814 F.App'x 811 (5th Cir. 2020) ......................................................................34

*La. Highway St Gabriel, LLC v. LVS II SPE I, LLC*
   *(In re La. Highway St Gabriel, LLC)*,
   Nos. 20-10824, 21-1007 ..................................................................................32

*Seidel v. Byron*,
   405 B.R. 277 (N.D. Ill. 2009) ..........................................................................28

*Lowrey v. Texas A&M Univ. Sys.*,
   117 F.3d 242 (5th Cir. 1997) ............................................................................11

*Morgan v. Yellowjacket Oilfield Servs., LLC*,
   No. 2:16-CV-129, 2017 U.S. Dist. LEXIS 89359 (S.D. Tex. June 12, 2017)..........34

*N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*,
   No. 4:09-CV-2556, 2016 U.S.Dist.LEXIS 133154 (S.D.Tex. Sep. 28, 2016) ........32

*Official Comm. of Unsecured Creditors v. Fountainhead Grp., Inc.*
   *(In re Bridgeview Aerosol, LLC)*,
   538 B.R. 477 (Bankr. N.D. Ill. 2015) ................................................................26

*Petro-Hunt, L.L.C. v. United States*,
   365 F.3d 385 (5th Cir. 2004) ............................................................................34

*Reily v. Kapila*
    *(In re Int'l Mgmt. Assocs.)*,
    399 F.3d 1288 (11th Cir. 2005) .......................................................................24

*Rizack v. Starr Indem. & Liab. Co.*
    *(In re Grandparents.com, Inc.)*,
    614 B.R. 625 (Bankr. S.D. Fla. 2020)..........................................................19, 20

*Schott v. Massengale*,
    No. 18-759-JWD-RLB, 2019 U.S.Dist.LEXIS 166736 (M.D.La. Sep. 27, 2019) ...........12, 23

*Smith v. Morris R Greenhaw Oil and Gas, Inc.*
    *(In re Greenhaw Energy, Inc.)*,
    359 B.R. 636 (Bankr. S.D. Tex. 2007) ...............................................................11

*Southmark Props. v. Charles House Corp.*,
    742 F.2d 862 (5th Cir. 1984) .........................................................................31

*Southwest Airlines Co. v. Texas Int'l Airlines, Inc.*,
    546 F.2d 84 (5th Cir. 1977) ..........................................................................32

*Steiner v. Southmark Corp.*,
    734 F.Supp. 269 (N.D. Tex. 1990) ...............................................................24, 29

*Stoebner v. Opp. Fin., LLC*,
    909 F.3d 219 (8th Cir. 2018) .........................................................................12

*Texas v. United States Dep't of Labor*,
    929 F.3d 205 (5th Cir. 2019) .........................................................................32

*Think3 Litig. Trust v. Zuccarello*
    *(In re Think3, Inc.)*,
    529 B.R. 147 (Bankr.W.D.Tex. 2015).................................................................22

*U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
    125 F.3d 899 (5th Cir. 1997) .........................................................................23

*Union Tank Car Co. v. Maxwell*,
    No. H-19-1421, 2021 U.S.Dist.LEXIS 96795 (S.D. Tex. May 21, 2021)..............................25

*Yaquinto v. CBS Radio, Inc.*
    *(In re Tex. E&P Operating, Inc.)*,
    2022 Bankr. LEXIS 1932 (Bankr.N.D.Tex. July 13, 2022) ..................................................15

## STATUTES

11 U.S.C. § 550 ................................................................................. *passism*

11 U.S.C. § 544................................................................................................4

11 U.S.C. § 548................................................................................................4

11 U.S.C. § 606..............................................................................................31

Tex. Bus. & Com. Code § 24.001....................................................................3

Tex. Bus. & Com. Code § 24.003..................................................................22

Tex. Bus. & Com. Code § 24.004..................................................................15

Tex. Bus. & Com. Code § 24.006...............................................................4, 19

Tex. Bus. & Com. Code § 24.008....................................................................4

Tex. Bus. & Com. Code § 24.009...............................................................4, 25

Tex. Bus. & Com. Code § 24.010.............................................................19, 33

**OTHER AUTHORITIES**

Fed. R. Civ. P. 8.................................................................................. *passim*

Fed. R. Civ. P. 9.................................................................................. *passim*

Fed. R. Civ. P. 12..............................................................................11

Fed. R. Civ. P. 15..............................................................................34

Fed. R. Civ. P. 19..............................................................................33

Plaintiff David Dunn (the "<u>Trustee</u>"), as Trustee of the AMH Litigation Trust (the "<u>Trust</u>"), hereby submits this omnibus opposition (the "<u>Opposition</u>") to the motions [Dkts. 48, 49] of Defendants HPS Investment Partners, LLC ("<u>HPS</u>") and ARM Energy Holdings, LLC, ARM Midstream, LLC, and Asset Risk Management, LLC (collectively "<u>ARM</u>", and together with HPS, the "<u>Defendants</u>") to dismiss the Trustee's First Amended Complaint (the "<u>FAC</u>"). [Dkt. 40][1]

## I.    INTRODUCTION

HPS was a major equity holder of Alta Mesa Holdings, LP (together with its affiliated debtors, "<u>AMH</u>" or the "<u>AMH Debtors</u>"), High Mesa, Inc. ("<u>HMI</u>") and Kingfisher Midstream, LLC ("<u>KFM</u>").  ARM was a major equity holder of KFM.  HPS, through its equity position and board dominance, controlled AMH and HMI.  Together, HPS and ARM controlled KFM.  Over several years and multiple transactions, significant funds and other assets were systematically transferred from AMH to the closely-held companies owned by Defendants – KFM and HMI – for their benefit, and to the detriment of the creditors of AMH, which received less than reasonably equivalent value at a time when AMH had inadequate financial resources to support its business.

The Trustee's theory in the FAC is straightforward.  The basis for the Trustee's claims are clear.  And the underlying transactions – including Defendants' benefit from such transactions – are no secret to Defendants.  Indeed, the Trustee carefully considered the Court's guidance in ruling on the Defendants' motions to dismiss the original complaint in this action, and *did not* assert in the FAC *any* of the actual fraudulent transfer claims asserted in the original complaint. Instead, the Trustee limited his claims in the FAC to constructive fraudulent transfer claims in an attempt to streamline this litigation and save the parties and the Court the expense and delay of

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the FAC.  The motions to dismiss filed by HPS and ARM are referred to herein respectively as the "<u>HPS MTD</u>" and the "<u>ARM MTD</u>," and collectively as the "<u>MTDs.</u>"

1

unnecessary motion practice on the pleadings. The FAC undoubtedly meets the Rule 8 notice pleading standard applicable to the remaining constructive fraud claims.

Defendants, however, remain steadfast in delaying litigation of these claims and any further inquiry into these transfers of tens of millions of value from the AMH enterprise to KFM, including Defendants cashing out that value when they sold KFM as part of the Business Combination in early 2018. Defendants' MTDs are primarily comprised of recycled challenges to the Trustee's initial complaint, with Defendants continuing to feign unfamiliarity with the relevant transactions. And despite the Court's clear guidance (and Defendants' agreement) on the appropriate standard for pleading the Trustee's constructive fraud claims, Defendants now ask this Court to apply a heightened Rule 9 standard to claims that are not based on the existence of actual fraud – ignoring the weight of the case law and the Court's statements at the June 8, 2022 hearing.

As set forth below, Defendants' assertion that the Trustee has failed to allege sufficient facts regarding the underlying transactions should be rejected. The FAC also adequately alleges facts supporting Defendants' liability for each of the transfers as entities for whose benefit the transfers were made under 11 U.S.C. § 550 and the TUVTA based on Defendants' ownership and control of the transferees and their receipt of the benefits of the subject transfers.

Finally, HPS' accusation of "claim-splitting" and attempt to invoke claim preclusion have no merit. No pending action by the Trustee involves any of the same defendants and or any of the same underlying transactions as this case. And claim preclusion has no application where HPS was not a party to or otherwise involved with the prior adversary proceeding against KFM, had already sold its position in KFM, and none of the claims in the FAC were asserted or could have been asserted against HPS in the previous KFM action. These kitchen sink arguments should also be rejected. The Trustee respectfully requests the Court deny Defendants' Motions to Dismiss.

000501

## II.    FACTUAL BACKGROUND

### A.    Procedural Background

The Trust was created in connection with the Chapter 11 plan (the "Plan") of AMH and its debtor affiliates, effective as of June 8, 2020 (the "Effective Date").  FAC, at ¶ 13.  The Trust was established to provide a vehicle for certain creditor beneficiaries to pursue recoveries to mitigate the substantial losses suffered from the debtors' collapse.  On the Effective Date, the Trustee was appointed as the Litigation Trustee and causes of action held by the AMH Debtors and their estates, including Oklahoma Energy Acquisitions, LP ("OEA"), against certain third parties were assigned to the Trust.  *Id.* at ¶¶ 13-14.  There is no dispute the Plan preserved and vested in the Trust the claims against Defendants in this action.  *Id.* at ¶ 14.

On September 10, 2021, the Trustee filed the initial Complaint (the "Initial Complaint"), asserting causes of action for the avoidance of actual and constructive fraudulent transfers under the Bankruptcy Code and Tex. Bus. & Com. § 24.001, *et seq.* ("TUFTA") related to the Gathering Agreements, the Non-STACK Assignment, and the HMI MSA (each defined below). [Dkt. 1]

On March 7, 2022, the Defendants filed motions to dismiss the Initial Complaint [Dkt. 19, 20] (the "Initial MTDs").  On June 8, 2022, the Court held a hearing on Initial MTDs (the "Initial MTD Hearing"), at which the Court found the Initial Complaint to be insufficiently pleaded and provided the Trustee with the opportunity to amend. [Dkt. 33]  In granting the Initial MTDs, the Court focused on the Trustee's claims to avoid *actual* fraudulent transfers, finding that the Trustee had not met the Rule 9 standard applicable to *actual* fraudulent transfer claims.

### B.    Factual Allegations

On July 11, 2022, the Trustee filed the FAC, asserting six causes of action to avoid and recover constructive fraudulent transfers under the Bankruptcy Code and the TUVTA:

000502

- Counts 1 and 2 (all Defendants): Avoidance and recovery of constructive fraudulent transfers relating to the Gathering Agreements under 11 U.S.C. §§ 544, 548(a)(1)(B) and 550, and Tex. Bus. & Com. §§ 24.005(a)(2), 24.006(a), 24.008, and 24.009(b);

- Counts 3 and 4 (HPS): Avoidance and recovery of constructive fraudulent transfers related to the Non-STACK Assignment, under 11 U.S.C. §§ 544, 548(a)(1)(B) and 550, and Tex. Bus. & Com. §§ 24.005(a)(2), 24.006(a), 24.008, and 24.009(b); and

- Counts 5 and 6 (HPS): Avoidance and recovery of constructive fraudulent transfers related to the HMI MSA, under 11 U.S.C. §§ 544, 548(a)(1)(B) and 550, and Tex. Bus. & Com. §§ 24.005(a)(2), 24.006(a), 24.008, and 24.009(b).

The Trustee's claims arise from a series of transactions by which valuable assets were transferred from AMH for the purpose of benefitting Defendants, as the entities that controlled and primarily owned KFM and HMI. The factual bases for the FAC's claims are summarized below.

### 1. The Gathering Agreements

Prior to February 2018, AMH was primarily owned by (i) its President and CEO Harlan Chappelle ("Chappelle"); (ii) its COO Michael Ellis ("Ellis"); and (iii) HMI, a privately held Delaware corporation, which owned 10% of AMH's Class A shares and 100% of AMH's Class B shares. FAC, at ¶ 19. During this time, HPS was a substantial owner of HMI. *Id.*

Alta Mesa Holdings, GP, LLC ("AMH GP") was the sole general partner of Alta Mesa Holdings, LP. *Id.* at ¶ 20. At all relevant times, AMH GP's board of directors ("AMH GP Board") was identical to the board of directors of AMH and HMI. *Id.* AMH GP, as general partner of AMH, had "full, complete, and exclusive authority to manage and control the business, affairs, and properties of [AMH], to make all decisions regarding the same, and to perform any and all other acts or activities customary or incident to the management of [AMH's] business." *Id.*

000503

In turn, AMH GP had two members: (i) Alta Mesa Resources, LP ("Alta Mesa Resources") and (ii) HMI. *Id*. at ¶ 21. HMI held all of the Class B membership interests of AMH GP. *Id*. Prior to February 2018, HMI, as the sole holder of Class B membership interests in AMH GP, held voting interests in AMH GP and, as of August 2017, 100% of the voting interests in AMH GP. *Id*.

HMI was owned by HPS, Chappelle, Ellis and, by 2016, Bayou City Energy Management LLC ("BCE"). *Id*. at ¶ 22. Prior to February 2018, HPS and BCE held 100% of the preferred stock of HMI and HPS was the beneficial owner of at least 31% of HMI's common stock. *Id*.

HMI's board was identical to the boards of AMH and AMH GP, with Chappelle, Ellis, the CFO of AMH, and Don Dimitrievich of HPS as their board members. *Id*. at ¶ 23. As a practical matter, there was only one board of directors for HMI, AMH, and AMH GP. Indeed, AMH and HMI did not even conduct distinct board meetings during the relevant time period. *Id*.

Accordingly, HPS controlled HMI and AMH, holding substantial voting power through HMI, and participated directly in the decisions of AMH by its board, both at AMH and AMH GP. Any board level decisions made by AMH would have required HPS' approval. *Id*. at ¶ 24.

In 2014, ARM and AMH's owners, including HPS, began discussing joint sponsorship of an entity to serve as AMH's midstream gatherer in the STACK region of Oklahoma. *Id*. at ¶ 25. HPS, ARM, and HMS Kingfisher Holdco, LLC ("HMS Kingfisher")[2] formed KFM. *Id*. at ¶ 26. At all relevant times, KFM was owned by HPS, with a 40% direct interest, HMI, with a 30% interest through its subsidiary HMS Kingfisher, and ARM, with a 30% interest. *Id*. HPS owned a substantial equity stake in KFM, both directly and indirectly through its ownership of HMI.

KFM's board was comprised of two representatives from ARM, two representatives from AMH (Chappelle and Ellis, who also sat on the boards of AMH, AMH GP and HMI), and Don

---

[2] HMS Kingfisher was owned 100% by High Mesa Services, LLC, which was 100% owned by HMI. *Id*.

000504

Dimitrievich of HPS (who also sat on the boards of AMH, AMH GP and HMI).  *Id.* at ¶ 27.

Accordingly, there was substantial overlap between KFM's board and the identical boards of

AMH, AMH GP and HMI.  Prior to the Business Combination, ARM managed the operations of

KFM. *Id.*  ARM's relationship with KFM went beyond equity ownership, as demonstrated by the

fact that (i) Asset Risk Management, LLC charged KFM for use of its facilities, employees and

technology, resulting in KFM paying ARM millions in fees, and (ii) KFM used another ARM

affiliate, ARM Energy Management, LLC, to market production from KFM's producers.  *Id.*

      As early as January 2015, ARM made presentations of the proposed transaction to AMH,

detailing fees that were substantially greater than what AMH was being charged by its existing

midstream gatherer.  *Id.* at ¶ 28.  Under the proposal, KFM's owners (including ARM and HPS)

would benefit substantially on the back of AMH through exorbitant and unprecedented fees.  *Id.*

HPS, along with Chappelle, championed the KFM project because AMH's owners, through their

interests in HMI (and in the case of HPS, directly), would become investors in KFM and realize

profits through the exorbitant amounts to be paid by AMH.  *Id.* at ¶ 29.

      ARM prepared a series of financial analyses touting the purported advantages of paying

above-market rates to KFM by emphasizing the potential rewards that would flow to AMH's

owners by virtue of their equity stakes in KFM.  *Id.* at ¶ 30.  These analyses were presented to

Chappelle and others and focused on the fact that the more that AMH paid to KFM, the greater the

benefit to KFM's owners when KFM was eventually sold.  *Id.*  The overriding concern was the

best interests of KFM and KFM's owners, with Chappelle explicitly acknowledging that

ownership of KFM was "a key deal point and consideration" in the negotiations.  *Id.* at ¶ 31.

      HPS was highly involved in setting the terms between AMH and KFM.  *Id.* at ¶ 32.  As a

result, the final terms were never meaningfully negotiated by AMH.  In fact, they were the same

as those first proposed by ARM. *Id*. AMH did not obtain a fairness opinion or appoint an independent committee to evaluate the transaction. *Id*. AMH failed to pursue competitive offers from other gatherers and spurned lower offers from other gatherers. *Id*.

On August 31, 2015, Chappelle executed the *Gas Gathering and Processing Agreement*, by and between OEA and KFM (the "2015 GGA"), and the *Crude Oil Gathering Agreement*, by and between OEA and KFM (the "2015 OGA" and, together with the 2015 GGA, the, "2015 Agreements") on behalf of OEA (AMH's subsidiary) and, on behalf of KFM. *Id*.

Compared to similar agreements between AMH and non-KFM midstream gatherers, KFM and non-AMH upstream producers, as well as unaffiliated third-party producers and gatherers, the gathering fees in the 2015 GGA were at least a 90% premium to market rates. *Id*. at ¶ 34. The fees charged by KFM to AMH were higher than fees charged by KFM to any other producer. *Id*.

In addition, the 2015 Agreements included "capital recovery fees" (the "Capital Recovery Fees") that are completely foreign to the industry. *Id*. at ¶ 35. Neither AMH nor KFM entered into any other gathering agreements that included Capital Recovery Fees, and the concept was foreign to management personnel at both AMH and KFM. *Id*.

The 2015 Agreements inequitably benefited KFM at the expense of AMH with above-market fees and non-standard fees. As a result, KFM received payments in amounts clearly in excess of the reasonable value of the services it provided.

The 2015 Agreements provided that KFM was to submit invoices on a monthly basis for amounts due by AMH/OEA for the preceding month. *Id*. at ¶ 37. Instead, ARM (as the operator of KFM and entity overseeing the sale of AMH's hydrocarbons) deducted the amounts purportedly due to KFM under the 2015 GGA from the sale proceeds owed to AMH (the "Sale Proceeds"). *Id*.

The exorbitant fees paid by AMH made it difficult for AMH to remain profitable and

000506

harmed AMH's long-term value.  *Id*. at ¶ 38.  AMH was loaded with debt and left little for day-to-day operations.  *Id*.  By mid-2016, Moody's downgraded AMH's debt, citing a "weak liquidity position, expected deterioration in credit metrics through 2017, and increasing refinancing risk."  *Id*.  AMH was at serious risk of breaching its debt covenants.  *Id*.  AMH was consistently running at a net loss in both 2015 and 2016 and was cash-flow insolvent.  *Id*. at ¶ 39.  AMH was severely inadequately capitalized at this time, with a debt to equity ratio of above 20 to 1.  *Id*.

Within weeks of execution of the 2015 Agreements, AMH's managers openly questioned the exorbitant fees that AMH had agreed to pay.  *Id*. at ¶ 40.  AMH further learned that KFM was charging its other customers substantially less than it was charging AMH and that other midstream gatherers were charging their customers substantially less than KFM was charging AMH.  *Id*.

Thereafter, AMH engaged ARM to revise the agreements.  *Id*. at ¶ 42.  As before, the benefit to KFM and its owners remained the top consideration for both sides.  *Id*.  ARM and HPS proposed replacing the Capital Recovery Fees in the 2015 Agreements with so-called "facility fees" (the "Facility Fees"), which would have no negative effect on KFM's revenue.  *Id*.  In fact, the rates under the amendments were an even higher premium (over 100%) to market rates the prior rates.  *Id*.  The Facility Fees were also completely foreign to the industry.  *Id*.

The proposed amendments were not seriously negotiated by AMH, who remained under common control with KFM.  *Id*. at ¶ 43.  The rate changes were not approved by AMH's board or even put to a vote of AMH's board or AMH's stakeholders.  *Id*.  AMH did not prepare a fairness opinion.  *Id*.  ARM's proposal was incorporated virtually wholesale into the amendments. *Id*.

On December 1, 2016, OEA executed the *Amended and Restated Gas Gathering and Processing Agreement* (the "2016 GGA Amendment") and the *Amended and Restated Crude Oil Gathering Agreement* (the "2016 OGA Amendment" and, together with the 2016 GGA

8

Amendment, the "2016 Amendments") with KFM to supplant the 2015 Agreements. *Id*. at ¶ 44.

HPS was heavily involved in the negotiations and ultimately controlled AMH's decisions with regard to the 2016 Amendments, as indicated by HPS's threat to withhold AMH funding unless AMH accepted the amendments that HPS demanded. *Id*. at ¶ 45. The 2016 Amendments included additional provisions intended to transform the 2015 Agreements into covenants running with the land, including a purported conveyance of transportation interests. *Id*. AMH received nothing in exchange for those purported conveyances (the "Conveyances"). *Id*.

The 2015 OGA and the 2016 OGA Amendment also required KFM to construct a system capable of gathering up to 50,000 barrels of oil per day for AMH. *Id*. at ¶ 46. KFM failed to construct such a system and was never able to gather more than a fraction of the expected capacity. *Id*. Nonetheless, under the 2016 OGA Amendment, KFM charged AMH for every barrel of oil produced from the designated area, even though KFM did not transport those barrels. *Id*. Accordingly, KFM received payments clearly disproportionate to the services provided. *Id*.

As with the 2015 Agreements, prior to the Business Combination, the amounts owed to KFM under the 2016 Amendments were not invoiced to AMH/OEA, but were deducted on a monthly basis by ARM, on behalf of KFM, from the AMH Sale Proceeds. *Id*. at ¶ 47.

In February 2018, KFM's owners sold their interest in KFM and received $800 million in cash and substantial stock and other consideration. *Id*. at ¶ 48. Thus, ARM and HPS profited handsomely from the transfer of value from AMH to KFM. AMH, on the other hand, suffered tremendously as a result of the Gathering Agreements. In nearly every quarter between 2016 and 2018, AMH lacked sufficient cash flow to meet its upcoming obligations, continued to draw down on its credit facility, and refinanced its debt. *Id*. at ¶ 49. Toward the end of 2017, AMH had only nominal cash to support its operations and its debt-to-equity ratio remained perilously high. *Id*.

000508

### 2.    The Non-STACK Assignment and HMI MSA

On February 9, 2018, AMH entered into a business combination with Silver Run II Acquisition Corporation ("Silver Run") and KFM (the "Business Combination"). *Id*. at ¶ 50. As a result, AMH and KFM both became wholly-owned subsidiaries of a holding company, SRII Opco, LP ("SRII Opco"). *Id*. Pursuant to the Business Combination, over $800 million in cash, along with significant equity, was paid to HPS, ARM and the other KFM owners in consideration for the purchase of KFM and AMH. *Id*.

The Business Combination also involved several related transactions that benefited HPS, through HMI, at the expense of AMH and its creditors. First, on February 8, 2018, AMH assigned its remaining non-STACK Assets (the "Non-STACK Assets") to High Mesa Holdings, LP ("HMH"), a subsidiary of HMI, for no consideration (the "Non-STACK Assignment"). *Id.* at ¶ 53. HMI owned 91% of HMH's limited partnership interests and 100% of High Mesa Holdings GP, LLC, the general partner of HMH. *Id.* Neither AMH nor HMI obtained a third-party valuation or fairness opinion regarding the assignment. *Id.* At the time of the assignment, the Non-STACK Assets were valued at tens of millions of dollars and were generating positive cash flow. *Id.*

Second, in connection with the transfer of the Non-STACK Assets, AMH agreed to enter into that certain Management Services Agreement with HMI (the "HMI MSA"). *Id.* at ¶ 54. Under the HMI MSA, AMH was obligated to provide payroll, expenses, and other services to HMI in exchange for HMI's reimbursement of all expenses AMH incurred on behalf of HMI, along with a $10,000/month management fee that was well-below market standards. *Id.*

AMH never consulted any third parties or did any studies of what an appropriate monthly management fee would be, or whether HMI could pay the reimbursement amounts. *Id.* at ¶ 55. Nor did AMH or its owners (also owners of HMI) seek any guaranty or other security for payment

000509

of HMI's reimbursement obligations. *Id*. Instead, HMI and its owners (including HPS) ensured any financial risk was borne by AMH. *Id.* at ¶ 56. Ultimately, the risk thrust on AMH came to fruition, as HMI failed to pay approximately $10 million owed to AMH under the HMI MSA. *Id*.

## III.   LEGAL STANDARD ON MOTION TO DISMISS

"A motion to dismiss under rule 12(b)(6) 'is viewed with disfavor and is rarely granted'", and "[t]he complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true." *Lowrey v. Texas A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997) (citation omitted). "When evaluating Rule 12(b)(6) motions, the Court should not grant a dismissal 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Smith v. Morris R Greenhaw Oil and Gas, Inc. (In re Greenhaw Energy, Inc.)*, 359 B.R. 636, 643 (Bankr. S.D. Tex. 2007).

Courts in the Fifth Circuit, including this Court, have applied the pleading standards of Federal Rule of Civil Procedure 8(a)(2) to *constructive* fraudulent transfer claims. *See Hill v. Oria (In re Juliet Homes, LP)*, Nos. 07-36424, 09-03429, 2010 Bankr. LEXIS 4826, at *18, fn. 6 (Bankr.S.D.Tex. Dec. 16, 2010) ("Because constructive fraudulent transfer can be proven without a showing of intent, the constructive fraudulent transfer claims are governed by Rule 8(a)(2) . . ."); *Almazan v. Tex. Nat'l Bank (In re Almazan)*, No. 10-70253, 2011 Bankr. LEXIS 776, at *5 (Bankr. S.D. Tex. Mar. 7, 2011). Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Cantu v. Ford Motor Co. (In re Cantu)*, Nos. 08-70260, 08-07030, 2009 Bankr. LEXIS 1071, at *4 (Bankr.S.D.Tex. Apr. 17, 2009), *quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Greg's Ballroom v. Showalter (In re Villarreal)*, Nos. 08-70002, 08-7001) 2008 Bankr. LEXIS 694, at *10 (Bankr.S.D.Tex. Mar. 14,

000510

2008); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (Rule 8(a)(2) requires only enough facts "to 'state a claim to relief that is plausible on its face'"). The FAC only asserts causes of action to avoid and recover *constructive* fraudulent transfers and satisfies the Rule 8 standard.

Defendants argue that the FAC's constructive fraudulent transfer claims are subject to the more stringent pleading standards of Rule 9(b). HPS MTD at 8; ARM MTD at ¶¶ 14-15. In doing so, Defendants twist the Court's directive in granting leave to amend the Initial Complaint, claiming the Court *only* granted leave to meet the heightened Rule 9(b) standard. This is not so. During the Initial MTD Hearing, the Court correctly held that the Trustee must meet the Rule 9(b) pleading standard with respect to the *actual* fraudulent claims asserted in the Initial Complaint.[3] The Court specifically noted that many courts, including this court, do not apply Rule 9(b)'s heightened standard to *constructive* fraudulent transfer claims. *Id*. at 45:9-12 ("I know there's case law that doesn't apply [Rule 9(b)] nor have I repeatedly applied it in constructive fraudulent transfers but I have consistently applied it in actual [fraudulent transfers] . . .").

In asserting that Rule 9(b) applies to constructive fraudulent transfer claims, Defendants cite non-binding cases that do not address the Bankruptcy Code or TUVTA. *See Gen. Elec. Cap. Corp. v. Lease Resol. Corp.,* 128 F.3d 1074, 1078-79 (7th Cir. 1997) (Illinois Uniform Fraudulent Transfer Act); *Stoebner v. Opp. Fin., LLC,* 909 F.3d 219, 226 & n.6 (8th Cir. 2018) (Minnesota Uniform Fraudulent Transfer Act). The majority approach, including in the Fifth Circuit, is that Rule 8(a)(2) applies in the context of claims to avoid *constructive* fraudulent transfers. *See Schott v. Massengale*, No. 18-759-JWD-RLB, 2019 U.S.Dist.LEXIS 166736, at *56 (M.D.La. Sep. 27, 2019) (refusing to apply FRCP 9(b) to constructive fraudulent transfer claims and noting that the Seventh Circuit went against "the majority approach" in applying Rule 9(b) to constructive

---

[3] *See* Request for Judicial Notice, filed concurrently herewith, at Ex. 1, 35:3-4, 39:8-9, 45:7-13.

000511

fraudulent transfer claims); *Airport Blvd. Apts., Ltd. v. NE 40 Partners, L.P., (In re NE 40 Partners, Ltd.)*, 411 B.R. 352, 365, fn. 9 (Bankr. S.D.Tex. 2009) ("The actual position of most courts is that Rule 9(b) should be applied to claims of intentional fraud but not claims of constructive fraud . . ."). The FAC only asserts *constructive* fraudulent transfer claims and so the relaxed general pleading standard of Rule 8(a)(2) applies to the FAC in its entirety.[4]

## IV.    ARGUMENT

### A.    The FAC Adequately Alleges the Elements of Each Claim

Defendants assert that certain elements of the Trustee's claims have not been adequately alleged, including (i) lack of reasonably equivalent value; (ii) various details of the subject transfers; (iii) the benefit which inured to Defendants from the transfers; and (vi) the financial condition of AMH at the time of the transfers. As set forth below, the Trustee adequately alleged facts supporting each element of his claims under the applicable Rule 8(a)(2) pleading standard.

#### 1.    The FAC Adequately Alleges Facts regarding Lack of Reasonably Equivalent Value for each of the Fraudulent Transfers

Defendants argue the FAC contains only conclusory allegations that AMH received less than reasonably equivalent value for each of the Fraudulent Transfers. *See*, *e.g.*, ARM MTD at ¶¶ 22-26; HPS MTD at 18. In its Motion to Dismiss, ARM compares the FAC with the pleading at issue in *In re Crescent Resources, LLC v. Pruet*, 2012 WL 195528 (Bankr. W.D. Tex. Jan. 23, 2012). *Id*. at ¶ 24. There, the court found the plaintiff had insufficiently pleaded lack of reasonably equivalent value because the complaint *only* included bare, conclusory statements regarding a lack of reasonably equivalent value without *any* supporting factual assertions. *See* 2012 WL 195528,

---

[4]  Even if the Court applied Rule 9(b) to the claims asserted in the FAC, the Trustee submits the detailed allegations in the FAC meet that standard with respect to the elements of the asserted constructive fraudulent transfer claims.

13

at *26-27 (the complaint only stated "[t]he Debtor or Debtors identified on Exhibit B received less than the reasonably equivalent value in exchange for the Transfer(s).").[5]

In contrast, the FAC details how AMH did not receive reasonably equivalent value for the Gathering Agreement Transfers, the Non-STACK Assignment, or the MSA Transfers. With regard to the Gathering Agreements, the FAC alleges: (1) that the gathering and processing fees paid by AMH pursuant to the Gathering Agreements were exorbitant and approximately 90%-100% higher than market rates; (ii) that the Gathering Agreements required the payment of Capital Recovery Fees or Facility Fees that were completely foreign in the industry and increased AMH's price of doing business with KFM even further beyond industry standards; (iii) that the Gathering Agreements included the Conveyances for which AMH received no consideration; and (iv) that the 2016 OGA Amendment required AMH to pay KFM (and that AMH did pay KFM) for barrels of oil, up to 50,000 a day, that KFM did not transport. FAC, at ¶¶ 34-6, 42, 46, 68, 79.

The FAC also alleges that AMH received *no* consideration for the Non-STACK Assets, *i.e.*, necessarily well below market value for Non-STACK Assets that were valued at tens of millions of dollars and were generating positive cash flow. FAC, at ¶¶ 53, 88, 97. Finally, with regard to the MSA Transfers, the FAC alleges AMH received only a nominal monthly management fee of $10,000 (well below market standards) in exchange for effectively operating HMI's entire business, that AMH was caused to incur the obligation of paying HMI's expenses in exchange for only an unsecured (an ultimately worthless) promise of reimbursement, and that AMH ultimately failed to receive approximately $10 million of reimbursements from HMI. FAC, at ¶¶ 54-57.

Further, the FAC included factual allegations demonstrating that none of the transactions were conducted at arm's length due to the overlapping control and ownership of AMH and each

---

[5] ARM undercuts their argument by acknowledging the substantial factual allegations in support of AMH not receiving reasonably equivalent value for the Gathering Agreement Transfers. ARM MTD at ¶ 25.

of KFM, HMH, and HMI. *Id.* at ¶¶ 19-24, 27, 29-33, 42, 43, 45, 53, 54. Accordingly, the allegations in the FAC are undoubtedly sufficient to apprise HPS and ARM of the basis for the Trustee's assertion that AMH did not receive reasonably equivalent value in exchange for any of the Fraudulent Transfers. *Yaquinto v. CBS Radio, Inc. (In re Tex. E&P Operating, Inc.)*, Nos. 17-34386-SGJ-7, 19-03226-SGJ, 2022 Bankr. LEXIS 1932, at *47 (Bankr.N.D.Tex. July 13, 2022) ("Under TUFTA, the 'reasonably equivalent value' requirement is satisfied when the transferee fully performs in an arm's-length transaction in the ordinary course of its business at market rates. Under the Bankruptcy Code, 'reasonably equivalent value' means that 'the debtor has received value that is substantially comparable to the worth of the transferred property.'").

### a.    The Gathering Agreements

HPS specifically singles out "the Trustee's TUFTA claim concerning the 2016 Amendments" as being subject to the standard set forth in TUFTA § 24.004(d) that "'[r]easonably equivalent value' includes without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction." Tex. Bus. & Com. Code § 24.004(d). TUFTA § 24.004(d) expressly provides that this standard for reasonably equivalent value is non-exclusive. Nonetheless, the FAC does contain allegations showing that the above-market rates, payment of industry-foreign fees, transfers of the Conveyances for no consideration, and the payment of fees for services that were not received were directly a result of the fact that the Gathering Agreements were *not* arm's-length transactions. FAC at ¶¶ 27-33, 42-45. Moreover, the question of whether the applicable rates under the Gathering Agreements were "within the range" of market rates is a question of fact, and the Trustee has alleged the gathering rates here were well outside the range of arm's length market rates.

ARM further argues that the Gathering Agreement allegations are insufficient because they

15

fail to allege exactly how the processing fees were higher than market rates, exactly how market value was determined, or that "market value is the sole measure of reasonably equivalent value." ARM MTD at ¶ 26. ARM's conclusory musings are not aimed at clarifying any actual ambiguity in the Trustee's pleading, or addressed to any insufficiency as a matter of law. They are part of Defendants' larger, unsupported argument that the Trustee should be required to set forth its entire case-in-chief in its initial pleading. This is not the law.

ARM cites no authority that it is necessary to plead how market value is determined. Still, the FAC alleges that the fees in the Gathering Agreements were considerably higher than market rates, *i.e.*, rates for similar services charged by non-KFM gatherers to AMH, by KFM to non-AMH producers, and by third-party gatherers to third-party producers. FAC at ¶ 34. Further, the Trustee does not assert that market value is the "sole measure of reasonably equivalent value." As noted above, market value *is* a measure of reasonably equivalent value (*In re Tex. E&P Operating, Inc.*, 2022 Bankr. LEXIS at *47), but the FAC also alleges lack of reasonably equivalent value based on the unprecedented Capital Recovery Fees or Facility Fees, the transfer of the Conveyances for no consideration, and the payment of fees for services KFM did not and could not provide.[6]

### b. The Non-STACK Assignment

HPS contends the Non-STACK Assignment allegations are insufficient because the FAC fails to provide details about the Non-STACK Assets, the calculated "net effect" the Non-STACK Assignment had on AMH, or what the Non-STACK Assets would be worth in an arm's-length

---

[6] ARM also alleges that, in pleading lack of reasonably equivalent value, the FAC fails to meet the "plausibility" standard in *Aphton Corp. v. Sonafi Pasteur (In re Aphton Corp.)*, 423 B.R. 76 (Bankr. D. Del. 2010), requiring allegations of "(1) asset transferred, (2) date of transfer, (3) recipient of transferred asset, (4) value of the asset transferred, and (5) value of the asset received". ARM MTD at ¶¶ 22-23. *Aphton* is a non-binding case that does not apply a "plausibility" standard to allegations of lack of reasonably equivalent value. Nonetheless, the FAC's allegations do satisfy the *Aphton* plausibility standard, alleging that ARM, on behalf of KFM, deducted the amounts on a monthly basis from sale proceeds owed to AMH, and the monthly amounts of such deductions. FAC at ¶ 37, Ex. 3.

16

transaction.  HPS MTD at 21.  The FAC certainly satisfies the Rule 8(a)(2) pleading standard by including allegations regarding (i) the Assignment Agreements, (ii) the assets that comprised the Non-STACK Assets, (iii) the entity to which the assignment was made, (iv) the time period during which the assignment was made, (v) the fact that AMH received *no consideration* in exchange for the Non-STACK Assignment, (vi) a detailed description of the mechanisms through which valuable assets were transferred from AMH through the Non-STACK Assignment, and the lack of arm's-length transaction.  FAC at ¶¶ 19-21, 23, 24, 52-53.

Further, the "net effect" the Non-STACK Assignment had on AMH is not relevant to whether AMH received reasonably equivalent value for the assignment.  The FAC alleges AMH received *no* consideration, that the Non-STACK Assets were generating positive cash flow and worth tens of millions, and seeks damages in the amount of at least $42,000,000.  The exact value of the assets transferred will undoubtedly be the subject of the parties' discovery, including expert analysis, and subject to determination at trial.  HPS undoubtedly has adequate notice of the basis for the Trustee's allegations regarding lack of reasonably equivalent value.

### c.    The HMI MSA

HPS argues the Trustee's allegation that the HMI MSA management fee was well-below market standards is insufficient for purposes of pleading lack of reasonably equivalent value.  HPS MTD at 21. HPS offers no authority in support and does not further develop this argument.  As already noted above, below-market rates are an indicator of a lack of reasonably equivalent value. *In re Tex. E&P Operating, Inc.*, 2022 Bankr. LEXIS at *47.

HPS also argues HMI's refusal to reimburse AMH pursuant to the terms of the HMI MSA is not relevant to a reasonably equivalent value analysis because "bad business decisions without more cannot form the basis for a fraudulent conveyance action."  HPS MTD at 22, *citing In re*

000516

*ATP Oil & Gas Corp.,* 711 F. App'x 216, 223 (5th Cir. 2017). *ATP Oil & Gas Corp.* is inapposite. There, the court held only that allegations the transferor's directors and officers failed to diligently perform their duties is insufficient to support a claim that bonuses paid to the directors and officers were not for reasonably equivalent value. 371 B.R. 589, 651. *See Boyd v. Sachs (In re Auto Specialities Mfg. Co.)*, 153 B.R. 457, 498 (Bankr. W.D. Mich. 1993) ("Where . . . the compensation is commensurate with the undertaking and the [defendant] attempts in good faith to fulfill that undertaking, fair consideration has been given.").

The Trustee's allegations concerning the HMI MSA involve a different scenario. The FAC alleges AMH received *no* value for incurring the obligation to advance millions in expenses to benefit HMI, as the owner of the Non-STACK Assets, and certainly received no value for the millions of expenses it advanced for which HMI failed to reimburse AMH. The Trustee's claims regarding the HMI MSA are not based on whether fair compensation was paid to third parties. They are based on AMH's incurrence of substantial obligations for the benefit of HMI and its owner, HPS, and for which AMH received nothing in exchange aside from an unpaid debt.

Accordingly, the FAC contains sufficient allegations regarding the lack of reasonably equivalent value received by AMH in exchange for the Fraudulent Transfers such that Defendants have fair notice of what the claims are and the grounds upon which they rest. *In re Cantu*, *supra*, 2009 Bankr. LEXIS 1071, at *4.

> **2.    The Trustee Sufficiently Alleges Payments Made Pursuant to Pre-Existing Agreements were not Made for Reasonably Equivalent Value**

Faced with these allegations of lack of reasonably equivalent value, Defendants also contend that any transfers made pursuant to *any* of the Gathering Agreements were made for reasonably equivalent value simply because they were made pursuant to preexisting contractual obligations. ARM MTD at ¶ 22, 26; HPS MTD at 19. HPS further contends that because certain

000517

Gathering Agreements fall outside the applicable statutes of limitations, none of the Gathering Agreement Payments under those agreements can be avoided.  HPS MTD at 16-17.

The only Gathering Agreements that fall outside an applicable limitations period are the 2015 Gathering Agreements, executed on August 31, 2015.  *See* Tex. Bus. & Com. §§ 24.010(1) and (2) (establishing four-year statutes of limitations on claims arising under Tex. Bus. & Com. §§ 24.005(a)(1), (a)(2), and 24.006(a)).[7]  However, the FAC does not seek to avoid the 2015 Gathering Agreement itself, and entry into an agreement outside of a statute of limitations period does not prevent avoidance of payments made pursuant to such an agreement as constructive fraudulent transfers if they were made for less than reasonably equivalent value.  Defendants offer no authorities to the contrary.

"The existence of a binding contract does not foreclose a fraudulent conveyance claim if the elements of the cause of action for constructive fraud are met . . . A transfer made pursuant to a contract may still be avoidable as a fraudulent transfer if the evidence demonstrates the exchange is not for reasonably equivalent value." *Rizack v. Starr Indem. & Liab. Co. (In re Grandparents.com, Inc.)*, 614 B.R. 625, 631-32 (Bankr. S.D. Fla. 2020); *EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.)*, 356 B.R. 631, 640 (Bankr. D. Del. 2006) ("A transfer may be fraudulent even if it is made in accordance with the terms of a contract between the parties."); *In re R.M.L., Inc.*, 92 F.3d 139, 148 (3d Cir. 1996) (non-refundable fees paid pursuant to commitment letter were nonetheless avoidable as fraudulent conveyances because they did not convey reasonably equivalent value on the debtor).  Even the case cited by ARM, *German Pellets La. LLC v. Wessel GMBH (In re La. Pellets, Inc.)*, 838 Fed. Appx. 45 (5th Cir. 2020), acknowledges that a reduction of antecedent debt is a made for reasonably equivalent value only if "*the debt itself was based*

---

[7]  In contrast, the Trustee independently seeks to avoid the obligations incurred by AMH under the 2016 Gathering Agreement Amendments, which were executed within the applicable statute of limitations. *See* FAC at Count II.

000518

*upon value.*" 838 Fed. Appx. at 49 (emphasis added)

In *Rizack*, plaintiff sought to avoid transfers made under a valid agreement, alleging the debtor had not received reasonably equivalent value because the agreed-to services were not provided "and that the value of the services actually provided . . . were less than contemplated . . . and were less than the reasonably equivalent value of the dollars paid by the Debtor for those services." 614 B.R. at 630. In holding that the existence of an underlying contract does not bar a fraudulent transfer claim, the court noted that "just like payment for services under a contract do not always bar a claim for breach of contract, neither does it necessarily bar a claim for constructive fraud, *if* the plaintiff proves the elements of *that* cause of action." *Id.* at 632 (emphasis in original).

Similarly here, the Trustee alleges each of the subject payments under the Gathering Agreements independently satisfy the elements of a constructive fraudulent transfer claim, in that the value AMH received for such payments was not equivalent to the amount of those transfers. The FAC alleges payments made by AMH under the Gathering Agreements were at exorbitant above-market rates, included additional fees that are completely foreign to the industry, and in some cases were made for services that were never rendered. FAC, at ¶¶ 34, 35, 42, 45, 46. These were not fixed payments like one may find under a loan agreement or, as in *In re La. Pellets, Inc.*, under a predetermined payment schedule. The subject payments here were instead made for services ostensibly (but not always) rendered by KFM. 838 Fed. Appx. at 49; FAC at Ex. 1, Schedule 6.1; Ex. 2, Schedule 7.1; Ex. 4, Section 6.1; Ex. 5, Section 7.1.

As the Court noted at the June 8 hearing, "if you had an optional payment [under a pre-existing contract], depending on what you ordered and you ordered things that were overpriced, that might very well be a fraudulent payment . . ." RFJN at Ex. 1, 54:10-12. Such is the case here. The payments made to KFM under the Gathering Agreements were based on AMH's delivery to

20

KFM of oil and gas for gathering, which was subject to AMH's discretion as to how it managed its oil and gas interests.[8]   In other words, those payments were dependent on the gathering *requested* by AMH, and the FAC clearly alleges AMH paid overpriced rates for those services. Thus, regardless of whether the *obligations* under the Gathering Agreements are avoidable, the FAC alleges facts which support the avoidance of *payments* made pursuant to those agreements.[9]

### 3.    The FAC Sufficiently Alleges AMH's Financial Condition

Defendants assert the Trustee has failed to allege adequate facts regarding AMH's insolvency.  This argument should be rejected.  As an initial matter, insolvency is "generally a factual determination not appropriate for resolution in a motion for dismiss."  *Halperin v. Moreno (In re Green Field Energy Servs.*, Nos. 13-12783 (KG), 15-50262 (KG), 2015 Bankr. LEXIS 2914, at *26-27 (Bankr.D.Del. Aug. 31, 2015).  Further, the FAC contains both specific and general allegations of AMH's insolvency and financial condition at the time of the Fraudulent Transfers.

The FAC alleges that "AMH was *running at a net loss* in both 2015 and 2016 and *was cash-flow insolvent . . .* AMH was *severely inadequately capitalized at this time, with a debt to equity ratio of above 20 to 1*."  FAC, at ¶¶ 38-39 (emphasis added).  The FAC also alleges that "[i]n nearly every quarter between 2016 and 2018, *AMH lacked sufficient cash flow to meet its upcoming obligations*, continued to draw down on its credit facility, and refinanced its debt. Toward the end of 2017, *AMH had only nominal cash to support its operations and its debt-to-equity ratio remained perilously high*."  *Id*. at ¶ 49 (emphasis added).  The allegation that AMH lacked sufficient cash flow and/or capital to meet its upcoming obligations is alone sufficient to

---

[8] *See* FAC at Ex. 1, Section 3.3(a); Ex. 2, Section 3.3(a); Ex. 4, Section 4.3(a); Ex. 5, Section 4.3(a).
[9]   Defendants' position that the existence of an underlying contract prevents examination of individual payments made under that business relationship would mean that the Court could not examine payments alleged to be made where no actual services were rendered – simply because the payments were made at the rates agreed to under the contract. That is not the law, and Defendants cite no authority otherwise.

000520

establish a presumption of insolvency. *See* Tex. Bus. & Com. § 24.003(b) ("A debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent.").

In addition, the FAC specifically alleges that AMH "(i) was insolvent, or became insolvent as a result of such transfers or obligations, (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with AMH was an unreasonably small capital, and/or (iii) intended to incur, or believed that AMH would incur, debts that would be beyond AMH's ability to pay [as such debts matured/as they became due]." *Id.* at ¶¶ 69, 80, 89, 98, 106, 115; *Katchadurian v. NGP Energy Capital Mgmt., LLC (In re Northstar Offshore Grp., LLC)*, 616 B.R. 695, 738 (Bankr.S.D.Tex. 2020) (an allegation that the transferor "had insufficient funds to meet its obligations with respect to the bank and the working capital deficit under the purchase agreement" as sufficient to plead insolvency in for a constructive fraudulent transfer claim if coupled with an affirmative pleading of insolvency).[10]

Further, as noted by the Court during the Initial MTD Hearing, not only do the Trustee's constructive fraudulent transfer claims only need to meet the pleading requirement of Rule 8(a)(2), but Rule 9 "would not apply to the pleading of insolvency." RFJN at Ex.1, 5: 22-25; 7:9-10. Accordingly, the Trustee's allegations of AMH's insolvency are sufficient. *See Think3 Litig. Trust v. Zuccarello (In re Think3, Inc.)*, 529 B.R. 147, 200-201 (Bankr.W.D.Tex. 2015) (allegations that the transferor was insolvent and could not pay its debts as they came due, together with allegations of multiple indications of "severe financial distress" of the transferor, are sufficient to plead

---

[10] In contrast, the cases cited by ARM involved allegations less substantial than those in the FAC were not sufficient to plead insolvency. *Northstar Offshore Grp., LLC*, 616 B.R. at 738 (allegation that transferor "had insufficient funds to meet its obligations" was insufficient but granting leave to amend); *In re ATP Oil & Gas Corp.*, 711 F.App'x. 216, 223 (5th Cir. 2017) (conclusory allegations that the transferor "was insolvent or had unreasonably small capital at the time of the" transfers was insufficient *in a third amended complaint*); *In re Cyr*, 602 B.R. 315, 332 (Bankr. W.D. Tex. 2019) (allegation that transferor subsequently filed for bankruptcy was insufficient on its own and granting leave to amend).

000521

insolvency for constructive fraudulent transfer claims under Rule 8(a)(2)); *Schott v. Massengale*, No. 18-759-JWD-RLB, 2019 U.S.Dist.LEXIS 166736, at *59 (M.D.La. Sep. 27, 2019) (allegations that the transferor was unable to make payments as they came due and "a conclusory allegation that [the transferor] was insolvent or became insolvent as a result of the [transfers]" are sufficient to plead a constructive fraudulent transfer claim under the standards of Rule 8(a)(2)).[11]

HPS contends the FAC's allegations regarding AMH's financial condition are insufficient because they are based in part on information and belief. HPS MTD at 23. HPS, however, fails to cite any relevant authority in support, instead only citing to a single case where the court held that pleadings based on information and belief alone were insufficient to satisfy the *Rule 9(b) pleading standard* not the constructive fraudulent transfer pleading standard under Rule 8(a)(2). *See U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 903 (5th Cir. 1997).

HPS contends the Trustee makes no allegations regarding AMH's financial condition at the time of each fraudulent transfer to HPS and ARM. HPS MTD at 23. This is not true. As set forth above, the FAC contains allegations that "AMH was running at a net loss in both 2015 and 2016 and was cash-flow insolvent" and "between 2016 and 2018, AMH lacked sufficient cash flow to meet its upcoming obligations". FAC, at ¶¶ 38-9, 49. The only case cited by HPS held that allegations comparable to those in the FAC were sufficient to even satisfy Rule 9(b). *Cage v. Davis (In re Giant Gray, Inc.)*, 629 B.R. 814, 853 (Bankr.S.D.Tex. 2020) (allegations that the

---

[11]  HPS asserts that claims of insolvency are undermined by allegations that (i) "AMH was valued 'at more than $2.25 billion in early 2018' and had 'hundreds of millions of dollars' and 'billions of assets'"; (ii) AMH received funding from HPS; (iii) the Non-STACK Assets were worth tens of millions of dollars; and (iv) Silver Run raised over $1 billion through an IPO. HPS MTD at 23-24. None of these contradict the allegations of insolvency at the time of the Fraudulent Transfers. The value of AMH following the Business Combination, the fact that AMH lost hundreds of millions of dollars and billions of dollars in assets leading up to its 2019 bankruptcy, or capital raised by Silver Run do not relate to AMH's pre-Business Combination insolvency or the lack of adequate capital at the time of the transfers at issue. Further, the Non-STACK Assets' value does not provide a complete picture of AMH's total assets, let alone its debts.

000522

transferor "was engaged in, or was about to engage in, a business or transaction for which its remaining assets were unreasonably small", together with allegations that the transfers were not made or reasonably equivalent value and left the transferor struggling to meet its obligations were sufficient to plead insolvency under the more-stringent Rule 9(b) standard).[12]   Accordingly, the FAC includes sufficient allegations of AMH's financial condition at the relevant times.

### B.    The Trustee Can Recover from Defendants as the Entities for Whose Benefit the Fraudulent Transfers were Made

In its MTD, ARM misrepresents the Trustee's allegations, arguing the FAC attempts but fails to allege the transfers were made directly to the Defendants or to Defendants as subsequent transferees. ARM MTD at ¶¶ 33-35.  As ARM knows, the FAC does not seek recovery from the Defendants as initial transferees.  And while the FAC does assert that Defendants can be held liable as subsequent transferees to the extent they received distributions of the proceeds of the Fraudulent Transfers, the Trustee seeks to recover from Defendants as the entities that benefitted from the Fraudulent Transfers (each, a "Transfer Beneficiary").[13]   *See* FAC, at ¶¶ 70, 81, 90, 99, 107, 116.

Defendants misstate the law concerning Transfer Beneficiaries, arguing that an entity can only be a Transfer Beneficiary if that entity had guaranteed a debt that was satisfied pursuant to a fraudulent transfer.  *See* ARM MTD at ¶¶ 37-38; HPS MTD at 11.  However, even the cases cited by Defendants demonstrate that there is no such limitation.  *Id.*, *citing Janvey v. Libyan Inv. Auth.,* 840 F.3d 248 (5th Cir. 2016); *Reily v. Kapila (In re Int'l Mgmt. Assocs.),* 399 F.3d 1288 (11th Cir.

---

[12] HPS also argues the FAC does not allege how the Fraudulent Transfers each affected AMH's financial condition.  HPS cites no support for the notion that the Trustee's allegations cited above regarding AMH's financial condition at the time of the transfers are insufficient, and that the Trustee must instead plead in detail the specific "effect" each transfer had on that financial condition.

[13] The extent to which Defendants received proceeds of transferred assets as subsequent transferees is within the knowledge of the Defendants and need not be pleaded with specificity at this time.  *Steiner v. Southmark Corp.*, 734 F.Supp. 269, 273 (N.D. Tex. 1990).

24

2005). While those cases note that satisfaction of a guarantor debt pursuant to a fraudulent transfer is the "paradigm case of a benefit under § 550(a)," those cases do not actually involve such a guarantee scenario. More importantly, those cases do not *limit* Transfer Beneficiary liability to cases involving a guarantee. Defendants have not cited authority imposing any such limitation.[14]

A plaintiff may pursue claims against a Transfer Beneficiary in a number of contexts under both the Bankruptcy Code and TUFTA, including (i) when the beneficiary was in control of both the transferor and the transferee, and (ii) pursuant to the three-prong test established in *Baldi v. Lynch (In re McCook Metals, L.L.C.)*, 319 B.R. 570 (Bankr. N.D. Ill. 2005) (the "*McCook Metals Test*"). As set forth below, the Trustee's claims satisfy both tests.

### 1.    HPS Had Sufficient Control over AMH and each of the Transferees

Courts have been clear that an entity can be a Transfer Beneficiary under both Bankruptcy Code Section 550(a)(1) and TUFTA Section 24.009(b) when it controlled both the transferor and the transferee of the fraudulent transfer. *Union Tank Car Co. v. Maxwell*, No. H-19-1421, 2021 U.S.Dist.LEXIS 96795, at *42-43 (S.D. Tex. May 21, 2021) (defendant who was a corporate officer and sole owner of the transferor and a corporate officer of and/or indirectly owned or controlled the transferees, found to be a Transfer Beneficiary under TUFTA Section 24.009(b)); *Esse v. Empire Energy III, Ltd.*, 333 S.W.3d 166, 180-181 (Tex. Ct. App. 2010), substituted opinion at, vacated by, judgment entered by *Esse v. Empire Energy III, Ltd.*, 2010 Tex. App.

---

[14] Those cases which limit a plaintiff's ability to recover from a shareholder beneficiary under a Transfer Beneficiary theory seem primarily concerned with exposing unwitting or passive shareholders – including shareholders of publicly held companies – to Transfer Beneficiary liability simply because the value of their equity holding may have increased as a result of the fraudulent transfer. *See, e.g.*, *Janvey*, 840 F.3d at 265 (rejecting the argument that status as a *passive* shareholder of the initial transferee, with no involvement in the transfers is, alone, enough to establish that the passive shareholder was a beneficiary of the transfer). The appropriate tests, discussed below, alleviate that concern by focusing on the shareholder's control and access to the benefits of the subject transfer. The FAC contains sufficient allegations that ARM and HPS were more than mere passive shareholders but controlled KFM (ARM and HPS) as well as AMH, HMH, and HMI (HPS) *and* were the intended beneficiaries of each of the Fraudulent Transfers.

25

000524

LEXIS 9543 (Tex. App. Houston 1st Dist., Nov. 23, 2010) (majority shareholders of both the transferor and the transferee were deemed Transfer Beneficiaries because "their actions resulted in more than just an incidental or indirect benefit to them . . . [u]nder the plain meaning of the statute, [the Transfer Beneficiaries] were both 'person[s] for whose benefit the transfer was made.'"; *Cruickshank v. Dixon (In re Blast Fitness Grp., LLC)*, 603 B.R. 219, 224, 236 (Bankr. D. Mass. 2019) (finding the trustee asserted plausible fraudulent transfer claim under the Massachusetts Uniform Fraudulent Transfer Act and 11 U.S.C. § 550 against the debtor's principal as a beneficiary party because principal controlled transferees).

The FAC alleges HPS was at all relevant times a substantial equity owner of the transferor and each of the transferees. *See* FAC at ¶¶ 2, 5, 15, 19, 22 (AMH); 2, 3, 4, 5, 15, 26, 28, 29, 31, 32, 33, 40, 42, 48 (KFM); 5, 15, 19, 22, 24, 54 (HMH); and 6, 15, 19, 22, 24 (HMI). The FAC further alleges how HPS controlled AMH, KFM, HMH, and HMI, including through direct and indirect ownership (*Id*. at ¶¶ 15, 20, 21, 22, 24, 26, 32, 42, 45), controlling voting rights (*Id*. at ¶¶ 20, 21, 24), controlling overlapping boards of directors (*Id*. at ¶¶ 23, 24, 27, 33), and through threats to withhold funding (*Id*. at ¶ 45), in connection with the Fraudulent Transfers. Thus, the FAC sufficiently alleges facts that HPS had control over both the transferor and transferees for each of the Fraudulent Transfers, and can be held liable as a Transfer Beneficiary.

### 2.    Defendants are Transfer Beneficiaries under the *McCook Metals* Test

In addition to the "control test," courts around the country have applied the three-prong *McCook Metals* Test for determining whether an entity can be held liable as a Transfer Beneficiary. Under the *McCook Metals* Test, "transfer beneficiary status depends on three aspects of the 'benefit': (1) it must actually have been received by the beneficiary; (2) it must be quantifiable; and (3) it must be accessible to the beneficiary." *McCook Metals*, 319 B.R. at 576. *See Official Comm. of Unsecured Creditors v. Fountainhead Grp., Inc. (In re Bridgeview Aerosol, LLC)*, 538

000525

B.R. 477, 512-13 (Bankr. N.D. Ill. 2015) (following the *McCook Metals* Test); *Halperin v. Moreno (In re Green Field Energy Servs.)*, 594 B.R. 239, 287 (Bankr. D. Del. 2018).[15]

In *McCook Metals*, the trustee filed an adversary proceeding against the defendant, the debtor's chairman and CEO, as beneficiary of a fraudulent transfer to a limited liability company of which the defendant was also the majority owner.  The court ultimately found the defendant was a Transfer Beneficiary based on, among other things, his ownership and control of the transferee entity.  Applying the three-prong test, the court held that a benefit from the challenged transfer is actually received by the beneficiary – the first prong – "when a transfer to a third party increases the beneficiary's assets."  *Id*. at 591.  There, the court found that the defendant's share of the transfer due to the defendant's equity in the transferee LLC was sufficient.  *Id*. at 592.

With regard to the third prong – whether the benefit is "accessible" to the defendant – the court held that "[e]ven if a quantifiable benefit is actually received, it could not fairly be disgorged if the beneficiary never had access to it" *e.g.*, minority shareholders of transferee would not have control of the transferee and thus would not have access the benefit.  *Id*. at 592.  The *McCook* court focused on whether the defendant, through control of the transferee, can access the benefit conferred on the entity, regardless of whether the benefit was actually accessed.  Using the *McCook Metals* Test, the FAC adequately pleads that both HPS and ARM were Transfer Beneficiaries.

        a.        **The Gathering Agreement Transfers**

        i.        <u>The benefits were received by HPS and ARM</u>:  At all relevant times, HPS and ARM were substantial equity holders of, and controlled, KFM.  FAC, at

---

[15] ARM misrepresents *In re Green Field Energy Servs.*, claiming the court rejected a claim under the *McCook Metals* test where the defendant held a 50% interest in the transferee.  ARM MTD at ¶ 44. Instead, the court held that the defendant – the manager and direct/indirect owner of the transferees – did not receive an actual benefit from the transfers because the transferees were special purpose entities that provided equipment for the transferor, the payments went directly to pay third-party expenses, and the defendant did not draw a salary, dividend or distribution from those entities.  594 B.R. at 288-89.

000526

¶¶ 2, 3, 4, 5, 15, 26, 28, 29, 31, 32, 33, 40, 42, 48, 67, 70, 71, 78, 81, 82.  As owners of KFM, Defendants received their respective portions of the value of the transfers made by AMH to KFM. *McCook Metals*, 319 B.R. at 591 (a benefit from the challenged transfer is actually received by the beneficiary "when a transfer to a third party increases the beneficiary's assets.").  Further, the Defendants received the benefit of the transfers in connection with the sale of their respective shares of KFM pursuant to the Business Combination.  FAC, at ¶¶ 48, 50, 70, 71, 72, 81, 82, 83. *See Citizens Nat'l Bank of Tex. v. NXS Constr., Inc.*, 387 S.W.3d 74, 85 (Tex. Ct. App. 2012) (finding that the bank owner of the transferee was a Transfer Beneficiary because the bank later sold the transferee and the transfer "increased the value of an entity owned by the bank and which the bank needed to sell.").  Accordingly, the FAC contains sufficient allegations under Rule 8(a)(2) that both ARM and HPS received actual benefits from the Gathering Agreement Transfers through control and ownership of KFM and from the later sale of KFM.[16]

        ii.      The benefits were quantifiable:  The benefit obtained by Defendants from the Gathering Agreement Transfers is the increase in KFM's value attributable to the Gathering Agreement Transfers.  The exact amount of that benefit need not be specifically pleaded, *i.e.*, it need not be quantified, just shown to be quantifiable.  *McCook Metals*, 319 B.R. at 576.  Also the actual amount of the benefit need not be specifically pleaded because it is a matter

---

[16]  Defendants challenge the assertion that they received actual benefits from the Gathering Agreement Transfers, but offer no analysis and cite only non-binding and irrelevant case law.  *Seidel v. Byron,* 405 B.R. 277 (N.D. Ill. 2009) held that a person or entity that only "receives the money later on" is not a transfer beneficiary.  HPS MTD at 13-14.  *Seidel*, however, did not involve equity holders but directors and officers of the transferee who did not receive any ownership benefit.  922 F.2d at 283.  HPS also cites *In re Bullion Rsrv. of N. Am.,* 922 F.2d 544 (9th Cir. 1991), holding transfer beneficiary status "applies 'only [to] a person who receives a benefit from the initial transfer.'"  HPS MTD at 14.  *Bullion*, however, did not concern the beneficiary of an initial transfer but a defendant who benefited from a subsequent transfer.  922 F.2d at 548.  HPS also disingenuously argues that it could not have benefited from transfers that increased KFM's value at the expense of AMH because both were sold pursuant to the Business Combination.  While implicitly acknowledging that it owned both KFM and AMH, HPS's argument fails.  There is nothing illogical about HPS benefiting from the draining of one of its assets (AMH) to increase the value of another of its assets (KFM) if the benefit to KFM was more valuable than the status quo.

000527

within the Defendants' knowledge. *Steiner*, 734 F.Supp. at 273. Such benefits are appropriate

targets of the Trustee's claims because they are not theoretical. *McCook Metals*, 319 B.R. at 591

("A merely theoretical benefit is not sufficient, since it would not be subject to disgorgement.").

       iii.    <u>The benefits were accessible to HPS and ARM</u>: As noted

above, the FAC not only alleges that HPS and ARM benefited from the transfers because they

were primary equity holders of KFM and controlled KFM, but that they actually received the

benefits of the Gathering Agreement Transfers in connection with the sale of their respective

interests in KFM in the Business Combination. FAC, at ¶¶ 22-24, 26, 27, 48, 72. HPS argues that

the FAC fails to allege that HPS had actual access to the benefits of the Gathering Agreement

Transfers because HPS, as a shareholder of KFM, would only own KFM and not its assets. HPS

MTD at 14. Ownership, however, is not the standard in *McCook Metals*, only whether the

defendant, through its control of the transferee, could access the benefit conferred on the defendant,

regardless of whether that control was exercised and the benefit was actually accessed.

       **b.**    **The Non-STACK Assignment and the HMI MSA**

       i.    <u>HPS received the benefits</u>: At the time of the Non-STACK

Assignment and the MSA Transfers, HPS was a substantial equity holder of, and had control over,

HMI, and was a substantial indirect equity holder of, and had control over HMH, through HPS**'s**

ownership of HMI. FAC at ¶¶ 22-24, 53-57, 90-92, 99-101, 107-109, 116-118. As such, HPS

received its portion of the value of the Non-STACK Assignment and the MSA Transfers.

       ii.    <u>The benefits were quantifiable</u>: HPS's benefits from the

Non-STACK Assignment and the MSA Transfers were the increase in HMI's value attributable to

the MSA Transfers and the increase in HMH's value attributable to the Non-STACK Assignment.

*Id*. at ¶ 92, 101, 109, 118. Again, the exact amount of these benefits, which are quantifiable, need

29

not be specifically pleaded because it is a matter within the Defendants' knowledge and which will be subject to discovery and expert analysis.

    iii. <u>The benefits were accessible to HPS:</u> The benefits of the Non-STACK Assignment and the MSA Transfers were accessible to HPS as a substantial equity holder of HMI and HMH that controlled HMI and HMH. *Id*. at ¶¶ 22-24, 53, 92.

  The Trustee has alleged facts supporting a finding that HPS and ARM were Transfer Beneficiaries of the Fraudulent Transfers under the *McCook Metals* Test.

  **C.** **The Gathering Agreement Claims are not Barred by Claim Preclusion**

  HPS makes a passing argument that the causes of action for constructive fraudulent transfers relating to the Gathering Agreements are barred by claim preclusion because they were brought, or could have been brought in *AMH, LP v. KFM, LLC,* (the "<u>KFM AP</u>") Case No. 4:19-ap-03684 in this Court.[17]  As set forth below, HPS' argument fails for multiple reasons.

  As noted by HPS, claim preclusion applies when "(1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions."  *Comer v. Murphy Oil USA, Inc.,* 718 F.3d 460, 467 (5th Cir. 2013).  Notwithstanding HPS' arguments to the contrary, the parties in this case and the KFM AP are not identical or in privity, nor were the claims against HPS related to the Gathering Agreement Claims the same claims as those in the KFM AP.

    **1.** **HPS is not a party to, or in Privity to a Party to, the KFM AP**

  HPS contends that HPS was either a "technical party" to the KFM AP or in privity with

---

[17] The KFM AP was an adversary proceeding pursuant to which AMH and OEA asserted claims for constructive fraudulent transfer under the Bankruptcy Code and TUFTA against KFM as an initial transferee of a purported "Transportation Interest" pursuant to the 2016 Amendments.  KFM II at Dkt. 1. The parties to the KFM AP stipulated to the dismissal of the case with prejudice.  KFM AP at Dkt. 2.

KFM with regard to the KFM AP. HPS bases its argument that it was a "technical party" to the KFM AP on the assertion that it was "a shareholder who actively participated in the proceeding." HPS MTD at 15. HPS's argument, however, falls apart immediately. By the time the KFM AP was filed on November 25, 2019, nearly two years after the Business Combination, HPS no longer had *any* ownership interest in KFM. In fact, immediately following the February 2018 Business Combination, KFM was owned 100% by SRII OPCO, L.P. FAC at ¶ 50. Accordingly, HPS could not have been a shareholder of KFM at any time during the KFM AP. Further, HPS provides no support that it had any ownership in KFM at any point during the KFM AP nor does the record of KFM contain any indication that HPS was involved in the case at all.[18] Accordingly, it is clear that HPS was in no way a "technical party" to the KFM AP.

Nor was HPS in privity to KFM in the KFM AP. "The concept of privity is applicable where a court wishes 'to justify the binding effect of a judgment on one who was not a party to the earlier suit, but whose interest was validly represented in that suit' (*Astron Indus. Assocs., Inc. v. Chrysler Motors Corp.,* 405 F.2d 958, 961 (5th Cir. 1968)) and "can exist where —among other things—the non-party's interests were adequately represented by a party to the original suit". *Butler v. Endeavor Air, Inc.*, 805 F. App'x 274, 277-78 (5th Cir. 2020).

Courts in the Fifth Circuit recognize privity for claim preclusion purposes in three instances: "First, a nonparty who has succeeded to a party's interest in property is bound by any prior judgments against that party.... Second, a nonparty who controlled the original suit will be

---

[18] In contrast, in *Southmark Props. v. Charles House Corp.,* 742 F.2d 862 (5th Cir. 1984), cited by HPS, the court found the president and shareholder of a bankrupt debtor had been a "party in interest" to the bankruptcy, and subject to claim preclusion in a later case involving a claim resolved in the bankruptcy, even though he did not make a formal appearance in the bankruptcy because "as a stockholder of the debtor corporation – [he] possessed a statutory right to be heard 'on all matters arising in' the proceedings. 11 U.S.C. § 606 [1109(b)]. The record does show that [he] was actively involved in the reorganization proceedings. By participating in the proceedings, [he] became a party to them, regardless of whether he ever was formally named as such." 742 F.2d at 869-70.

000530

bound by the resulting judgment.... Third, federal courts will bind a nonparty whose interests were represented adequately by a party in the original suit." *Southwest Airlines Co. v. Texas Int'l Airlines, Inc.*, 546 F.2d 84, 95 (5th Cir. 1977), *cert. denied*, 434 U.S. 832 (1977); *La. Highway St Gabriel, LLC v. LVS II SPE I, LLC (In re La. Highway St Gabriel, LLC)*, Nos. 20-10824, 21-1007) 2021 Bankr. LEXIS 1649, at *9-10 (Bankr.M.D.La. June 21, 2021).

HPS does not contend that it is a successor to KFM or that it controlled the KFM AP.  As shown above, there is no indication that HPS was involved *in any way* with the KFM AP or with KFM at all during the pendency of the KFM AP.  Even an argument that its interests were adequately represented by KFM in the KFM AP, which HPS does not actually make, would fail. In the Fifth Circuit, "privity by adequate representation requires 'the existence of an express or implied legal relationship in which parties to the first suit are accountable to non-parties who file a subsequent suit raising identical issues.'" *Texas v. United States Dep't of Labor*, 929 F.3d 205, 211 (5th Cir. 2019); *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, No. 4:09-CV-2556, 2016 U.S.Dist.LEXIS 133154, at *12 (S.D.Tex. Sep. 28, 2016) ("With regard to adequate representation, it is not enough for the parties to have parallel interests. *Id.* Rather, virtual representation 'demands the existence of an express or implied legal relationship in which parties to the first suit are accountable to nonparties who file a subsequent suit raising identical issues.'").  HPS does not allege and presents no evidence that there was an express or implied legal relationship between HPS and KFM, making KFM accountable to HPS regarding the KFM AP.  Accordingly, HPS was not a "technical party" to the KFM AP nor was it in privity to KFM during the KFM AP.  Accordingly, no cause of action in this case is barred by claim preclusion.

### 2.    The Gathering Agreement Claims were not Brought in the KFM AP

HPS alleges that claim preclusion applies because the claims were or could have been

brought in the KFM AP.  These claims could not have been brought in the KFM AP because they are claims against HPS *and HPS was not a party to the KFM AP*.  *CRS Auto Parts, Inc. v. Nat'l Grange Mut. Ins. Co.*, No. 08-2022, 2008 U.S. Dist. LEXIS 78683, at *18-22 (E.D.Pa. Oct. 7, 2008) (even if a third party was an indispensable party to a previous action under Rule 19, "[n]othing in the Rule suggests that the purportedly indispensable, but unjoined party may invoke Rule 19 in a later action in order reap the benefits of claim preclusion.").  Accordingly, the Gathering Agreement claims are not barred by claim preclusion.

### D.   None of the Gathering Agreement Payments Occurred Prior to the Lookback Period of TUFTA Section 24.010

The Defendants each argue that any claims based on Gathering Agreement Payments that occurred prior to August 2015 are barred by the 4 year lookback period of TUFTA § 24.010.  HPS MTD at 2; ARM MTD at ¶ 51.  The FAC, however, does not allege that any Gathering Agreement Payments were made prior to January 2016.  *See* FAC at Ex. 3.  Accordingly, each Gathering Agreement Payment occurred within the 4 year lookback period of TUFTA § 24.010.

### E.   The Adversary Proceeding does not Constitute Impermissible Claim Splitting

HPS recycles an argument from its previous motion to dismiss that this case constitutes "an end-run around" an action against former directors and officers of AMH and its affiliates, *Dunn v. Chappelle, et al.*, Case No. 21-03423 (the "D&O Action"), and that the claims in this case should have been asserted in the D&O Action.  HPS MTD at 25.  HPS offers even less of an argument this time around and cites no supporting authorities.  Although not identified as such, HPS again appears to be making the claims-splitting argument made previously.  Any argument is undeveloped at best and necessarily fails because this case and the D&O Action (i) do not involved any of the same defendants and (ii) do not arise out of the "same nucleus of operative facts."

"Claim-splitting occurs when a single 'cause of action' is split by advancing one part in an

000532

initial suit and another part in a later suit." *Ameritox, Ltd. v. Aegis Scis. Corp.*, No. 3:08-CV-1168-D, 2009 U.S.Dist.LEXIS 13305, at *15-16 (N.D. Tex. Feb. 9, 2009).  For the claim-splitting doctrine to bar a second suit, the suits must have the same parties and claims must"arise[] out of the same transaction or series of transactions."  *Id*. at 16; *Morgan v. Yellowjacket Oilfield Servs., LLC*, No. 2:16-CV-129, 2017 U.S. Dist. LEXIS 89359, at *9-10 (S.D. Tex. June 12, 2017).

Here, there is *no overlap* in the parties to the two actions.  The D&O Action involves causes of action for breach of fiduciary duty against former officers and directors of AMH, AMR, and AMH GP (collectively, the "D&Os"), stemming from AMH's pursuit of an oil and gas drilling program *after* the Business Combination (the "2018 Drilling Program").  *See* D&O Action, Dkt. 50 at 1, 56-59.  In contrast, none of the D&Os are parties to this case, which involves only fraudulent transfer claims against HPS and ARM, none of whom are parties to the D&O Action.

There is also no overlap in the subject matter of the two actions.  The claims in this case are based on distinct transactions between AMH and specific entities owned by the Defendants.  The Trustee does not allege any facts regarding the 2018 Drilling Program or the actions of the D&Os regarding that program.  Likewise, the D&O Action does not concern the transactions at issue in this case.  HPS cannot contend the two cases share the same underlying transactions, much less "the same nucleus of operative facts."  *Petro-Hunt, L.L.C. v. United States*, 365 F.3d 385, 395-396 (5th Cir. 2004).  Accordingly, HPS' passing claim-splitting argument should be rejected.

**F.    The Trustee Should be Granted Leave to Further Amend the FAC if Necessary**

To the extent that the Court determines any portion of the Trustee's claims have not been sufficiently pleaded, the Trustee should be granted leave to further amend the FAC pursuant to FRCP 15.  *Kinder Morgan., Inc. v. Crout*,  814 F.App'x 811, 815 (5th Cir. 2020); *Herrmann Holdings Ltd. v. Lucent Techs., Inc.*, 302 F.3d 552, 566 (5th Cir. 2002).

000533

The only legal argument made by either Defendant for denying leave to amend is HPS'

contention that leave to amend would be futile because the issues concerning claim preclusion and

the statutory look back period cannot be cured.  *See* HPS MTD at 25.  As set forth in sections

IV(C) and (D) above, HPS's arguments regarding claim preclusion and the statutory look back

period fail.  HPS makes no other argument why any alleged infirmities in the FAC could not be

cured as a matter of law.  Accordingly, HPS's request to deny leave to amend should be rejected.

## V.    CONCLUSION

Defendants' request for dismissal of the FAC, and the claims asserted by the Trustee

therein, should be denied.  To the extent the Court finds the Trustee has not sufficiently alleged

any claims, the Trustee respectfully requests leave to amend the FAC to address any deficiencies.

Dated: October 3, 2022                    MINTZ LEVIN COHN FERRIS GLOVSKY AND
                                          POPEO, P.C.

                                          */s/ Joseph R. Dunn*
                                          ──────────────────────────────────
                                          By:   Joseph R. Dunn (*Pro Hac Vice*)
                                                CA State Bar No. 238069
                                                jrdunn@mintz.com
                                                3580 Carmel Mountain Rd.
                                                Suite 300
                                                San Diego, California 93210
                                                T: (858) 314-1500
                                                F: (858) 314-1501

                                                Abigail V. O'Brient (*Pro Hac Vice*)
                                                CA State Bar No. 265704
                                                aobrient@mintz.com
                                                2049 Century Park East
                                                Suite 300
                                                Los Angeles, California 90067
                                                T: (310) 586-3200
                                                F: (310) 586-3202

                                                *Counsel for Plaintiff David Dunn, as Trustee of
                                                the AMH Litigation Trust*

000534

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing *Plaintiff's Omnibus Opposition to Motions of ARM Defendants and HPS Investment Partners, LLC to Dismiss First Amended Complaint [Dkts. 48, 49]* was duly served on all defendants in this case, namely HPS Investment Partners, LLC; ARM Energy Holdings, LLC; ARM Midstream, LLC and Asset Risk Management, through their respective counsel of record, via electronic mail and the Court's electronic filing system, this 3rd day of October, 2022.


Dated: October 3, 2022                              */s/ Andrew B. Levin*
                                                    Andrew B. Levin

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| ALTA MESA RESOURCES, INC., *et al.*, | ) |
| | ) Case No. 19-35133 |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |
| DAVID DUNN, as Trustee of the AMH Litigation Trust, | ) |
| | ) |
| | ) Adv. Pro. No. 21-03909 |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| HPS INVESTMENT PARTNERS, LLC; ARM ENERGY HOLDINGS, LLC; ARM MIDSTREAM, LLC; AND ASSET RISK MANAGEMENT, LLC, | ) **Jury Trial Demanded** |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

## [PROPOSED] ORDER DENYING MOTIONS OF ARM DEFENDANTS AND HPS INVESTMENT PARTNERS, LLC TO DISMISS FIRST AMENDED COMPLAINT [DKTS. 48, 49]

Before the Court are (i) the *Rule 12(b)(6) Motion to Dismiss the Amended Complaint on Behalf of HPS Investment Partners, LLC* [Dkt. 48], filed by Defendant HPS Investment Partners, LLC (the "HPS Motion to Dismiss"); and (ii) the *Rule 12(b)(6) Motion of to Dismiss the First Amended Complaint on Behalf of ARM Defendants* [Dkt. 49], filed by Defendants ARM Energy Holdings, LLC, ARM Midstream, LLC, and Asset Risk Management, LLC (the "ARM Motion to Dismiss" and , together with the ARM Motion to Dismiss, the "Motions to Dismiss"). The Court, having reviewed the Motions to Dismiss, the *Omnibus Opposition to Motions of ARM Defendants and HPS Investment Partners, LLC to Dismiss First Amended Complaint [Dkts. 48, 49]*, all other pleadings, responses, evidence, and papers filed with the Court in this action, the applicable law,

000536

and upon oral argument of the parties at the hearing on the Motions to Dismiss, finds that the

Motions to Dismiss are without merit.  It is hereby order that the Motions to Dismiss are **DENIED.**


Dated:                        _____
                                        Honorable Marvin Isgur
                                        United States Bankruptcy Judge

000537

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| ALTA MESA RESOURCES, INC., *et al.*, | ) |
| | ) Case No. 19-35133 |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |
| DAVID DUNN, as Trustee of the AMH Litigation Trust, | ) |
| | ) |
| | ) Adv. Pro. No. 21-03909 |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| HPS INVESTMENT PARTNERS, LLC; ARM ENERGY HOLDINGS, LLC; ARM MIDSTREAM, LLC; AND ASSET RISK MANAGEMENT, LLC, | ) **Jury Trial Demanded** |
| | ) |
| | ) |
| Defendants. | ) |

### REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S OMNIBUS OPPOSITION TO MOTIONS OF ARM DEFENDANTS AND HPS INVESTMENT PARTNERS, LLC TO DISMISS FIRST AMENDED COMPLAINT [DKTS. 48, 49]

Plaintiff David Dunn (the "Trustee"), the Trustee of the AMH Litigation Trust, hereby requests judicial notice of the following document in support of his omnibus opposition to the motions [Dkts. 48, 49] of Defendant HPS Investment Partners, LLC and Defendants ARM Energy Holdings, LLC, ARM Midstream, LLC, and Asset Risk Management, LLC to dismiss the Trustee's First Amended Complaint [Dkt. 40], filed concurrently herewith:

**Exhibit 1**: Transcript of audio recording [Dkt. 34] of June 8, 2022 hearing before the Honorable Marvin Isgur, United States Bankruptcy Judge, in *Dunn v. HPS Investment Partners, LLC*, Adv. Pro. No. 21-03909, in the United States Bankruptcy Court for the Southern District of Texas (the "Court"), as prepared by Ornelas Reporting Services on September 16, 2022.

1

000538

The Court may take judicial notice at any stage of a proceeding. Fed. R. Evid. 201(d). "The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Further, the Court has authority to take judicial notice of the record of proceedings before the Court, particularly in the same case. *Florida Board of Trustees v. Charley Toppino & Sons, Inc.*, 514 F.2d 700, 704 (5th Cir. 1975) ("It is not error, furthermore, for a court to take judicial notice of related proceedings and records in cases before that court."); *Aloe Creme Laboratories v. Francine Co.*, 425 F.2d 1295 (5th Cir. 1970) (per curiam) ("The District Court clearly had the right to take notice of its own files and records and it had no duty to grind the same corn a second time."). Therefore, the Trustee requests that the Court take judicial notice of **Exhibit 1**.

| | |
|---|---|
| Dated: October 3, 2022 | MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO, P.C. |

*/s/ Joseph R. Dunn*

By:  Joseph R. Dunn (*Pro Hac Vice*)
CA State Bar No. 238069
jrdunn@mintz.com
3580 Carmel Mountain Rd.
Suite 300
San Diego, California 93210
T: (858) 314-1500
F: (858) 314-1501

Abigail V. O'Brient (*Pro Hac Vice*)
CA State Bar No. 265704
aobrient@mintz.com
2049 Century Park East
Suite 300
Los Angeles, California 90067
T: (310) 586-3200
F: (310) 586-3202

*Counsel for Plaintiff David Dunn, as Trustee of the AMH Litigation Trust*

2

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the foregoing *Request for Judicial Notice in Support of Plaintiff's Omnibus Opposition to Motions of ARM Defendants and HPS Investment Partners, LLC to Dismiss First Amended Complaint [Dkts. 48, 49]* was duly served on all defendants in this case, namely HPS Investment Partners, LLC; ARM Energy Holdings, LLC; ARM Midstream, LLC and Asset Risk Management, through their respective counsel of record, via electronic mail and the Court's electronic filing system, this 3rd day of October, 2022.

Dated: October 3, 2022                                  */s/ Andrew B. Levin*
                                                                   Andrew B. Levin

000540

# EXHIBIT 1

000541

1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS

1
2
3  In re:                                    §
4  ALTA MESA RESOURCES, INC., et al          §    Chapter 11
                                             §
5                                            §    Case No. 19-35133
                                             §
6              Debtors.                      §    (Jointly Administered)
                                             §
7  DAVID DUNN, as Trustee of the AMH         §
                                             §    Adv. Pro. No. 21-03909
8              Plaintiff,                     §
                                             §
9  vs                                        §
                                             §    June 8, 2022
10 HPS INVESTMENT PARTNERS, LLC;             §
   ARM ENERGY HOLDINGS, LLC;                 §
11 ARM MIDSTREAM, LLC; AND                   §
   ASSET RISK MANAGEMENT, LLC,               §
12                                           §
               Defendants.                   §
13                                           §

000542

3

MOTION TO DISMISS HEARING
BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

A P P E A R A N C E S:

**_FOR THE PLAINTIFFS:_**
MR. JOSEPH DUNN
MINTZ LEVIN COHN GLOVSKY AND POPEO, PC
3580 Carmel Mountain Rd., Suite 300
San Diego, CA 92130
jrdunn@mintz.com

13
14
15
16
17
18
19
20
21
22
23
24
25

000543

2

**_FOR THE DEFENDANTS:_**
1   MR. BENJAMIN I. FINESTONE
2   Quinn Emanuel, Et Al
3   711 Louisiana, Suite 500
    Houston, TX  77002

4   MR. DAVID BAAY
5   EVERSHEDS SUTHERLAND (US)  LLP
6   1001 Fannin, Suite 3700
    Houston, TX  77002

7
**_COURT REPORTER:_**
8   FTR Gold

9

10      Proceedings reported by electronic sound recording;

11  transcript produced by computer-aided transcription.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

000545

3

1      (*Proceedings before the Court at 1:27 P.M.*)

2          THE COURT:  Good afternoon.  Please be seated.

3      In the 1:30 docket we have Dunn vs HPS.  It is Eversheds'

4      proceedings, 21-3909.

5          Let's go ahead and take appearances, if we could.  We'll

6      start by appearances to the Court.  If you would approach the

7      podium, please.

8          Anyone that wishes to appear by video, please turn on your

9      camera and we'll get to you in a moment.

10          MR. FINESTONE:  Good afternoon, Your Honor.  Ben

11      Finestone, Chris Porter, Courtney Whang, and a group of summer

12      associates from Quinn Emanuel on behalf of HPS.

13   THE COURT:  Thank you, Mr. Finestone.

14        MR. BAAY:  Good afternoon, Your Honor.  David Baay

15   with Eversheds Sutherland on behalf of the ARM defendants.

16        THE COURT:  Good afternoon, Mr. Baay.

17        MR. DUNN:  Good afternoon, Your Honor.  Joseph Dunn,

18   of Mintz Levin, on behalf of plaintiff, the litigation trustee.

19        THE COURT:  Good afternoon, Mr. Dunn.

20        Does anyone wish appear by video or on the phone, if so,

21   please press 5* and turn on your camera.

22        All right.  Have y'all talked about how you want to

23   organize today?

24        MR. BAAY:  We did speak briefly, Your Honor.  I think

25   that whether or not -- I think we should proceed with the

4

1    motion to dismiss, and then proceed to the Rule 26 scheduling

2    conference thereafter.  I don't think there's any objection

3    from the plaintiff.

4         MR. DUNN:  No objection to that, Your Honor.

5         THE COURT:  Okay.  Thank you, sir.

6    All right.  Go ahead.

7         MR. FINESTONE:  For the record, Ben Finestone, with

8    Quinn Emanuel, on behalf of movant HPS.

9         Your Honor, I have a very short -- it's wrong to call it a

10   demonstrative, but it's a -- a few pieces of paper that I

11   stapled together.

12        May I approach?

13          THE COURT:  Yes, sir.

14          MR. FINESTONE:  Okay.  Thank you.

15      Your Honor, what I would like to do today is focus on --

16  or address three points.  Number one is that there should be --

17  there can be no 550 -- section 550(a)(1) liability imposed on

18  my client, which is the theory of the case, Your Honor.

19      Number two is that -- and if I'm right about the first

20  point, if I convince Your Honor that I'm right about the first

21  point, that makes all of the claims go away.

22      My second point is that, which is not applicable to all of

23  the claims.  But my second point will be that there's no

24  fraudulent transfer liability for what our mere preference is,

25  what are mere payments on account of obligations.  And if I'm

5

1    right about that point and not right about the first one, that

2    will make all the claims go away, except for the transfers that

3    are within the one-year prior to the bankruptcy case, because

4    there's an insider preference statute that's been cited to in

5    the complaint.

6         And then the third point is -- I want to touch on

7    insolvency being inadequately pled.  Insolvency, of course, is

8    an important point of fact because it is a triggering factual

9    condition to proceed with constructive fraudulent transfers.

10    And it is, in my humble opinion, the most important piece, the

11    most important badge of fraud, the most important piece of any

12    actual intent fraudulent transfer, because if the entity that's

13    transferring assets is not insolvent -- while statutorily it

14    can be the case that there was somehow an intent to hinder or

15    delay or defraud creditors.  If the entity is an insolvent --

16    it's -- I think it's fair to say it's at least unlikely, and I

17    also think that there are countervailing considerations,

18    allegations in this complaint.  If I'm right about that third

19    one, it will make the complaint go away as well, Your Honor.

20         THE COURT:  On the third one, though, even if you have

21    actual fraud where Rule 9 would apply to at least factual

22    fraud, I don't think Rule 9 would apply to the pleading of

23    insolvency because it's not part of the fraud.  It's just --

24    it's an owner of the claim that is not part of the fraud.  So I

25    think it would be a Rule 8 pleadings standard on that.  Do you

6

think I'm wrong about that?

1

2       MR. FINESTONE:  I really don't think you're wrong,

3   Your Honor.  This is not one of the times where I might suggest

4   that you're wrong.  I agree with your Rule 8, the constructive

5   fraudulent transfer pleadings standard.

6       THE COURT:  Or even for actual as to the part that

7   alleges insolvency.  That's not one of the elements of the

8   fraud itself.

9       MR. FINESTONE:  Well, it is one of the badges of

10  fraud, Your Honor, insolvency.

11      THE COURT:  For a badge of fraud --

12      MR. FINESTONE:  Yeah.

13    THE COURT:  -- it is not an element of fraud, right?

14    MR. FINESTONE:  Right, right.

15    THE COURT:  So I think -- and I'm willing to be

16 diswayed to this, I tend to focus on this coming out, that if

17 you're going to -- if one is going to allege that this transfer

18 was made to steal money from Entity A and put it into Entity B,

19 insolvency is not part of that.  It's just a -- you're not

20 insolvent, then there's no cause of action because it didn't

21 hurt to take money from A to B.  So I don't think you need to

22 prove the who, what, when and where of that.  Although, I think

23 you do need to prove it as to how the money was stolen itself.

24    MR. FINESTONE:  Yeah.  I don't disagree with that,

25 Your Honor.  I think -- I think there may be a situation where

7

1    a plaintiff is attempting to plead sufficiently an actual

2    fraudulent transfer and relying heavily, if not primarily, on

3    insolvency; not the case here.  But if that were the case, then

4    I don't think that would be a way for him to escape the

5    requirement that he's put an actual fraudulent transfer on a

6    piece of paper, and Rule 9 should apply on that if you're

7    making the -- albeit conclusory allegation, that this transfer

8    was done today.

9        THE COURT:  I guess I'll worry about that too.  In

10   this case, insolvency is a Rule 8 standard, I think, right?

11       MR. FINESTONE:  I agree, Your Honor.

12       THE COURT:  Okay.

13          MR. FINESTONE:  Okay.  Your Honor, so starting on the

14    first one, which we feel confident about, Your Honor, but just

15    to sort of lay some background.  HPS, our client -- and this is

16    true also for my co-defendant here, Your Honor.  But I'm not

17    going to carry the word of my co-defendant, but I will for the

18    sake of organizing and for the sake of helping out the Court, I

19    will do my best to call out where things are true for both

20    defendants.

21          HPS is just a mere shareholder here, Your Honor, of a

22    transferee.  HPS is not a direct door immediate transferee.

23    That's undisputed.  You can't find that allegation in the

24    complaint.  And so there are three buckets of transfers, Your

25    Honor.  There are the gathering payments, which are payments

8

1    that were made from the E & P Company, both of these were

2    gathers that were before Your Honor.  So I will proceed to use

3    initials.  But there are gathering payments that were made from

4    AMH to KFM, Kingfisher.  I don't represent Kingfisher.  I

5    represent an indirect shareholder of Kingfisher.  So I'm just a

6    shareholder of the recipient of the gathering payments.

7        The second bucket is the non-STACK asset transfer.  That

8    also was a transfer from debtor, AMH, not to my client, HPS,

9    but to other debtors, not debtors in possession, Chapter 7

10   debtors.  And those debtors are called High Mesa Holding, HMH,

11   and HMI, and my client is merely an indirect shareholder of

12   those Chapter 7 debtors, Your Honor.  So not a recipient of

13    those transfers either.

14         And then the third one, the MSA payments, those are

15    payments from debtor AMH to undisclosed third parties that

16    we're not even a shareholder of, as far as we know, because

17    those third parties are not disclosed.

18         The complaint does say that those transfer -- that those

19    MSA payments were made for the benefit of -- in this instance,

20    not for HPS, but they say were made for the benefit of

21    Chapter 7 debtor HMI.

22         So I think those are sort of dead, in any event, because

23    he's already alleged that they were for the benefit of somebody

24    other than my client, but we'll come back to that third

25    category.

000557

9

1          The initial point I just want to establish, which is

2    undisputed and fairly easy to establish is, we're not an

3    immediate transferee, which is obviously the classic -- the

4    classic target and the first target for avoidance actions.

5    It's when discouragement makes the most sense.

6          We're also not a subsequent transferee, Your Honor.

7    That's not alleged in the complaint anywhere.  So none of these

8    payments were subsequently transferred from those debtors to my

9    client.

10         There is some noise in the pleadings, Your Honor, that may

11   be in discovery.  They will discover that we are a subsequent

12   transferee -- not an issue for today.

13    And, also, I will say, just to flag the issue, assuming

14    arguendo or hypothetically that we -- it is somehow alleged at

15    some future date that we are a subsequent transferee of these

16    transfers from AMH to former debtor in possession of Kingfisher

17    or Chapter 7 debtors, HWH and HMI, I think plaintiff is going

18    to have an automatic stay issue there.  Those transfers from

19    those debtors to us, those hypothetical transfers, Your Honor,

20    because they're not alleged and I don't know about them.

21    That's -- that's a different debtor that gets to pursue them,

22    and I don't -- I think the automatic stay will -- will protect

23    those debtors from competition from this AMH debtor.  That's

24    just an interesting intellectual issue that's not for today.

25        The important issue for today is we're not an immediate

10

1    transferee and we're not a subsequent transferee, Your Honor.

2         So I know as, Your Honor knows, what we are alleged to be

3    is that last clause of 550(a)(1), it's referred to as a

4    trust -- as a transferee beneficiary or a transfer beneficiary

5    in that statutory language is the entity for whose benefit such

6    transfer was made.

7         So we start the statute, of course, we just read the

8    language of the statute into the -- into the record.  And the

9    next place we go are to courts that are important to this

10   Court, and that may have given this Court guidance as to how to

11   interpret the language, the entity for whose benefit such

12   transfer was made.

13    I know one court that's important to this court, based

14    upon my experience before this Court, and that's the Fifth

15    Circuit Court of Appeals.  And so that's the very modest

16    handout that I gave to Your Honor.  The Fifth Circuit has

17    provided guidance as to the interpretation of the statutory

18    language, the entity for whose benefit such transfer was made.

19    Your Honor, it comes from the *Janvey vs Libian Investment*

20    *Authority* case from 2016.  And it starts off, Your Honor, by

21    saying something that other Circuit Court of Appeals have said

22    as well, which is that the typical use of this statutory

23    language is when a non-debtor -- it's usually the parent of the

24    transfer or debtor, but it doesn't happen to be.  A non-debtor

25    has guaranteed an obligation of the debtor in possession, such

11

1    that when the debtor in possession pays off one of its

2    creditors, that non-debtor guarantor gets an independent

3    benefit reduction of that non-debtor's debt.  And that's

4    something that Congress has saw fit unquestionably, and the

5    Circuit Court of Appeals has saw fit to say that's as good as

6    receiving a transfer because you've got -- you've got a

7    benefit, an independent benefit based upon that payment.

8         It is also undisputed or at least I'll just say unalleged,

9    that's probably more accurate for today than saying undisputed.

10   I never like when lawyers on the other side of me say things

11   are undisputed without asking my permission.  So I'll just say

12   it's unalleged HPS did not guarantee any of AMH's debts.  And

13    more specifically, they didn't guarantee the obligations that

14    AMH was subject to, under the gathering agreements under the

15    MSA agreement or -- or have anything to do with the non-STACK

16    assets.

17         So I think we start off pretty strong here, Your Honor,

18    that we're not a 550(a)(1) entity because we're not the typical

19    550(a)(1) entity.  Other Courts of Appeals use fancier words

20    than the Fifth Circuit, like the ones I have difficult time

21    pronouncing, like paradigmatic.  I never know if the G is

22    silent.  But we're not the paradigmatic 550(a)(1) entity here.

23         So what are we really, Your Honor, what -- the complaint

24    really tells the story, as Your Honor alluded to, is that

25    debtor KFM was paying too much money to -- withdrawn.

1    Debtor AWH was paying too much money to debtor KFM.  KFM

2    was getting fat and AWH was -- at the expense of AWH.  AWH was

3    getting skinny.  And because we're a shareholder of KFM, the

4    value -- indirect shareholder -- the value of our indirect

5    shares were growing in value.  As we -- as we pumped up the

6    worth of KFM pursuant to these transfers that were alleged to

7    be above market, KFM become more valuable and we received the

8    benefit out of that.

9        Now, on this page, Your Honor, this first -- it's page 2,

10   I wrote two words, independent and derivative, because they

11   reminded me -- those words are used in another area of case law

12   that I know Your Honor is familiar with.  And it's sort of the

13    reverse of what we're dealing with here.  Those words are used

14    in the three Fifth Circuit decisions:  Seven Seas Petroleum,

15    Lothian Oil, and Buccaneer Resources.  My favorite of the

16    three, Buccaneer Resources.  And those cases talk about how --

17    whether it's a shareholder or a creditor, they don't have

18    standing.  That shareholder and creditor don't have standing to

19    complain about the opposite of what happened here.  Not

20    appreciation of the shareholder value, but diminution in the

21    shareholder value because the corporate entities assets have

22    been diminished.  And so this is really the opposite of that.

23         And taking a step back.  The law is clear.  You,

24    shareholder, don't get to complain when the value of your

25    shares have decreased because the corporate entity transferred

13

1    assets.  I think, Your Honor, that it's similarly unfair for me

2    as a shareholder to be sued because, as alleged, the value of

3    my shares increased.  That would be an asymmetric aspect of the

4    law that I don't think would be grounded in policy and neither

5    does the Fifth Circuit.  But with the Fifth Circuit, I just --

6    I really want to stress the Fifth Circuit saying, there has to

7    be an independent benefit with -- if the only benefit is

8    derivative, appreciation of the stock value, *Janvey* has said

9    you're not a 550(a)(1) transferee, Your Honor.

10          Turning to the next page, because there are other courts

11   from outside of the Fifth Circuit, primarily, there are other

12   courts who have not been so strict or rigid as the Fifth

13  circuit and they have, I believe, in certain instances allowed

14  550(a)(1) liability to attach merely because an entity was the

15  shareholder and they, I suppose, received the increase in the

16  value of the shares.

17      But, again, sticking with *Janvey*, Your Honor, they

18  endorse -- they don't endorse those cases.  And, in fact, what

19  they called the right approach is what the *In Re Hanson* court

20  from the Northern District of Illinois said, which is, You can

21  vote someone liable under 550(a)(1) for -- you actually receive

22  some distributions of the transferred property -- now,

23  permittedly, that's kind of like a subsequent transferee but

24  it's what the Court said -- or alterego, or, of course, the

25  paradigmatic or the typical instance -- the typical scenario

14

1  where you received an independent benefit because your

2  guarantee liability was reduced.

3      And this *In Re Hanson* case that the Fifth Circuit endorsed

4  and cited and called the "right approach" is the case, Your

5  Honor, that expressly disapproves of the *McCook Metals* case,

6  which is plaintiff's primary case.

7      So in our briefing, I think we gave it a little bit of

8  short shrift to say *In Re Hanson* and other bankruptcy court

9  case from the Northern District of Illinois, it was

10 Judge Goldgar disapproved of Judge Wedoff's prior case

11 *In Re Hanson.*  It's much stronger than that and much better for

12 us, HPS, in this case because *Janvey*, the Fifth Circuit Court

13    of Appeals endorsed Judge Goldgar and called that the right

14    approach, Your Honor.

15         So I don't think -- stopping here -- hypothetically

16    stopping here, I won't stop here, Your Honor.  But if I were

17    less complete in doing my job for my client, I think I could

18    stop here and say that under *Janvey vs Libian Investment*

19    *Authority*, because we're not alleged to be a guarantor of the

20    debtor AMH's obligations.  Because there was no alterego

21    allegation here and there couldn't be, and because we're not an

22    immediate or subsequent transferee, I don't believe that the

23    Fifth Circuit's discussion of 550(a)(1) allows room for what

24    the trustee is trying to do here.  But I won't stop there, Your

25    Honor, because --

15

1        THE COURT:  Just to be sure.  This is not a 550(a)(1)

2    discussion -- right? -- by the Fifth Circuit?  This is a

3    receivership discussion?

4        MR. FINESTONE:  They -- we hope.

5        THE COURT:  It may be the same, but it isn't literally

6    a 550(a)(1) -- Janvey isn't a 550(a)(1) case law.

7        MR. FINESTONE:  It's a great technical point, Your

8    Honor, but it is addressed by the Fifth Circuit.  They were --

9    it's a Texas uniform fraudulent transfer case and the Fifth

10   Circuit, end of discussion, says, with better language than I'm

11   going to remember, it says, "The Texas uniform fraudulent

12   transfer case comes from the same ancestry as bankruptcy law."

13    And you've seen that concept.  So it's the same language,

14    agreed, Your Honor.

15        THE COURT:  I just don't think it's literally a

16    550(a)(1) case that we're talking about.

17        MR. FINESTONE:  Agreed, it's not literally, and I

18    think -- this is the Sanford receivership and I'm sure why it

19    dawned on Your Honor.

20        THE COURT:  Right.

21        MR. FINESTONE:  So same textual language.  And I will

22    say, Your Honor, if you flip back to the second slide, just

23    illustrate the point, although the Court is right, it's not

24    technically a bankruptcy case or a Title 11 case.  Look at that

25    first quote in the context of bankruptcy.  So they are -- they

000571

16

1    are having the discussion, and they're doing it for

2    jurisdictional purposes.  They're doing it for a pretty

3    important reason, jurisdictional purposes in that receivership

4    case.  But Your Honor is right.

5        So, but as I was saying, I wasn't planning on stopping

6    there, Your Honor.  I was going to -- of course, we'll talk

7    about -- let's look at the cases that the trustee does say.

8    And before we go -- what I'm going to say about all of the

9    cases that the trustee cites that -- that depart from or are

10   more liberal in terms of acknowledging the potential for

11   550(a)(1) liability, they are all going to -- and factually,

12   they're all going to turn on control of the -- of the

13    beneficiary, not just of the transferor but of the transferee.

14    There's double control in both of those cases.

15        And I don't think that I need double control.  I'll show

16    you when I go into the allegations of the trustee's complaint.

17    But it is a matter of fact that there's double control in all

18    of those cases.

19        Before I go through those cases, last page on this dec,

20    Your Honor, and then we can put it a side, because I love the

21    Janvey case, Your Honor.  Janvey says, "Even if Libian

22    Investment Authority itself owned and controls LFICO's assets,"

23    that's the transferee, LIFCO.  So that's control of transferee.

24    Janvey says, even that, they would not have received the

25    benefit of the transferor, they're focused on corporate

000573

17

1    separateness, the Fifth Circuit was, Your Honor.

2        So subject to the technical distinction that Your Honor

3    raised, the Fifth Circuit says even control doesn't matter.

4    But going quickly through the cases that the trustee cites,

5    Your Honor, I'll just read some experts from each one.

6        *Esse vs Empire Energy*, here, the -- here, the transferred

7    asset was the Mallet Prospect Oil & Gas Field, Your Honor.  And

8    the Court said, the uncontested evidence demonstrates that

9    members of the Esse family were the only shareholders of both

10    Westgate and 5(e) with Brent and Todd controlling the vast

11    majority of the shares of both.

12        So that's not the case here.  I will get to the complaint

13    to support my assertion to your Honor, that that's not the case

14    here.  But it is not for HPS, nor for my co-defendant, Your

15    Honor.

16            And before I leave Esse, I will say that *Janvey* casts that

17    case a side expressly for the additional reason that those

18    shareholders in the *Esse* case have also waived any argument

19    that they were not transferor beneficiaries.  I don't know why

20    they waived it, Your Honor.  I couldn't figure it out, but the

21    Fifth Circuit is pretty good with its review of the record and

22    they say that that argument was waived.

23            Blast Fitness Group, bankruptcy case from -- from

24    New England, Your Honor, the trustee has also pleaded that

25    Mr. Dickson controlled the cap real estate entities.  That's

18

1    the recipient, and Mr. Dickson also controlled the debtor,

2    Blast Fitness, BFG as referred to in -- in the opinion.

3        So he was on both sides.  That makes sense, Your Honor.

4    We're starting to approach alterego when the beneficiary

5    controls both the transferor and the transferee.

6        *Union Tank Car Company*, by a judge that I know Your Honor

7    respects very much, Judge Rosenthal.  *Union Tank* argues that

8    Maxwell is liable because he had sole control over New Defco

9    and sole ownership over New Defco partners, which he caused to

10   transfer L.L.C. assets from New Defco to other

11   entities indirectly owned or controlled.  Judge Rosenthal says

12   that Maxwell admitted sole control or ownership of many of the

13   transferee defendants.

14        Judge Rosenthal also denied the defendant's summary

15   judgment motion on alterego.  So alterego was also alive in

16   Judge Rosenthal's case, which the Fifth Circuit said was a

17   potential basis to keep 550(a)(1) claims alive.

18        And, finally with *McCook Metals*, Your Honor, Michael Linch

19   was the -- was the controlling entity and the alleged

20   transferor beneficiary.  Michael Linch controlled both entities

21   and he transferred the right to buy the interest in the

22   Smalter, which was in satisfaction of certain antitrust claims.

23        So all of those cases have control, not just on the

24   transferor side but on the transferee side.

25        And before I go to the trustee's complaint, I'll just --

000577

1    *Juice Janvey*, one more time to say, I don't even think *Janvey*

2    cares about control, but the trustee's case is certainly due.

3        Let's go to the complaint, Your Honor.  Paragraph 19 --

4    paragraph 19 says Alta Maze, a holding GP, was the sole general

5    partner of AWH, which is the debtor transferor.  So in a legal

6    matter, Your Honor, control of the debtor was this GP.  I'm not

7    sure whether that moves Your Honor very much or not.  It's a

8    little -- a little raw and legally.

9        But so, I'll go further, Your Honor, because that GP has a

10   board of managers that conducted business on behalf of AWH.

11   That's the trustee's allegation.  HPS, Your Honor, my client,

12   is not on the board of managers, is not the general parent

13    itself. My client doesn't have a human on that board or

14    managers. So we did not control AWH, Your Honor. And his own

15    allegations show the Court who did, in fact, control AWH.

16         Paragraph 39, following the business combination, AWH

17    continued to be managed by its general partner, AWH GP. That's

18    the same general partner that's not my client, not my

19    co-defendant's client, has its own board of managers with a

20    bunch of sophisticated humans on it, none of which are

21    appointed or representatives of our client, Your Honor.

22         So control of the transferor is established, it's alleged,

23    19 and 39. It's not me. It's not my esteemed co-defendant,

24    Your Honor.

25         That gets me out of all of these cases because he's got to

20

1    have control on transferor and transferee.  But even if it

2    didn't, the complaint doesn't touch control of transferee.  It

3    doesn't say who controlled Kingfisher.  Kingfisher, I will

4    say -- strike this from the record, because it's no the

5    complaint.  The complaint's -- I won't be cute about it.

6        The complaint doesn't say who controlled Kingfisher, Your

7    Honor.  In the absence of any allegation of who controlled

8    Kingfisher, and with Your Honor's knowledge of the

9    sophisticated nature of these entities, let's presume -- I

10   presume there was a board of directors controlling Kingfisher.

11       But in any event, the easy thing to say is this complaint

12   does not allege control by HPS over the transferee.  So I think

13    he falls on both ends of control, which is what his own cases

14    require him to do, Your Honor.

15         I guess -- I guess I'll just stop and make one passing

16    policy point.  If we are going to start allowing -- if we're

17    not going to file *Janvey* and we are going to start allowing

18    shareholders to be sued for avoidance actions merely because it

19    is alleged that value of their direct or indirect equity

20    interests were increased, that's going to be a very, very

21    expensive -- expansion of avoidance actions.

22         In this case, there are -- they chose to sue the -- what

23    they perceive to be the deep pocketed shareholders.  But there

24    are instances in which there are public shareholders -- in this

25    case, after the business combination, there were public

000581

21

1    shareholders and this is going to be quite the -- this is quite

2    the interpretation of 550(a)(1) that they're asking the Court

3    to endorse, even if it weren't already disfavored by the Fifth

4    Circuit, Your Honor.

5        So I think stopping here, Your Honor, that covers all of

6    the transfers and the complaint, because all of them were made

7    to either subsidiaries or entities other than my client.

8        The one thing I'll add, and I don't like to do this

9    because it is -- it is, perhaps, suggesting something less than

10   confidence, but -- but I am going to do it anyway to be safe,

11   Your Honor.

12       Even if we assume that -- even if we assume that the fact

13    that when this business combination actually occurred in

14    February of 2018 and all of these entities contributed -- the

15    existing shareholders of AMH contributed their shares, the

16    existing shareholders of Kingfisher contributed its shares, the

17    Silver Run that had a billion dollars in its pocket contributed

18    its cash -- though, preview, that's a big problem for the

19    plaintiff on the insolvency, but we'll come back to that.    And

20    some shareholders sold some of their shares.    Everybody took

21    equity back, everybody believed in the solvency of this.    But

22    some shares -- some of the KFM shareholders took equity back.

23    And that's their attempt, I think -- sorry, took some cash

24    back.    And that's their attempt to reconcile this to *McCook*

25    *Metals*.

22

1     The thing that I'll say about that is, that doesn't change

2     the fact that that is still -- that is still the derivative

3     benefit, the increase in this share price, the fact that it was

4     monetized by selling it to another shareholder, an alien to the

5     estate -- these are proceeds that were -- it's not like a

6     leverage buyout where the debtor assets produced a dividend,

7     this was a sale to Silver Run which put billion dollars in.

8     Even if somehow that keeps them in the game for certain

9     transfers, if for some reason *McCook Metals* trumps all these

10    other cases, even though there's no control on either side,

11    that is no application for the MSA payments.  Those were

12    post-business combinations.  I don't see how the MSA payments

13   can survive, under any of the cases, can impose 550(a)(1)

14   liability.

15       Same thing on the non-STACK assets.  That's post-business

16   combination.  There was no monetization with anybody

17   post-business combination.  And on the gathering payments too,

18   Your Honor, he's pled them from 2015, when the gathering

19   agreement was entered into, to the petition date 9/11/2019.

20       The business combination was February 2018.  That's when

21   some shares were sold by shareholders for cash.  After that, so

22   long as in February of 2018 to September of 2019, there was no

23   monetization of any alleged derivative gain in share price.  So

24   I don't think any of those could survive under the most liberal

25   *McCook Metals* standards.

23

1          So big chunk of those gathering payments, no monetization,

2   no accessible benefit, no realized benefit.  They have to go

3   under anything.  The MSA payments and the non-STACK assets,

4   they have to go under anything.  They're just transfers to

5   entities that aren't before your court and no shareholder

6   realized, in any articulable way, the alleged shareholder

7   appreciation, Your Honor.  So that is 550(a)(1), Your Honor.  I

8   think it clears up the whole complaint.

9          Switching to the second issue that I wanted to talk about,

10   Your Honor.  As Your Honor will remember from the litigation

11   between the two debtors in possession before Your Honor, the

12   gathering agreement between Alta Mesa Holdings and Kingfisher

13    was entered into in August of 2015.   That's -- that's beyond

14    four years in advance of September 11, 2019.   He cannot avoid

15    that obligation because it's outside of the -- outside of the

16    period.   And so what that means is that outside of the look

17    back period under 554(a), incorporating taxes uniform

18    fraudulent transfer.

19        So what it means -- what it means, Your Honor, is that all

20    of these payments, the gathering payments, they were on account

21    of obligations that under state law are rock solid.   Federal

22    law doesn't come in -- doesn't get to come in and intervene and

23    undo it.   So these are preferences.   Those preferences, now, if

24    they're beyond the year, they stand.

25        We cited *Dual D. Health*, we cited Second Circuit Case law

000587

24

1    *HPE Leasing and Boston Trading* from -- from then Judge Briar,

2    about how -- when payments are made on account of valid

3    unavoidable obligations, the creditors got value.  The

4    creditors that are looking for the trustee to recover value for

5    them, they got value.  These obligations were paid and

6    satisfied.  So up to a year prior to the bankruptcy case, these

7    obligations were not -- these obligations were there and these

8    payments were made on account of the obligations.

9         He talks about the 2016 amendment, but if we assume for

10   the sake of the analysis that he can avoid that, the 2015

11   agreement is still there and these are all preferences, Your

12   Honor.  So I don't think -- I don't think it works for him,

13 Your Honor. But I feel the 550(a)(1) allows the court to skip

14 that analysis, in any event, Your Honor.

15      Third category, Your Honor, which is insolvency, which is

16 where Your Honor started. Insolvency really is insufficiently

17 pled here. Paragraph 31 is where the allegation lies, Your

18 Honor. It's on information and belief, it says, "By the end of

19 2016." Let me just stop there. That's another reason why the

20 2015 gathering agreement can't be avoided because he doesn't

21 plead insolvency until the end of 2016.

22      But putting that a side a second -- for a second, Your

23 Honor, he says AMH was running at a net loss and was severely

24 inadequately capitalized in cash flow insolvent. But he

25 doesn't explain what debts could not be paid. He just -- it's

000589

25

1    just conclusory, cash flow insolvent.  It's a one sentence

2    allegation of insolvency.  And if that were the end of my

3    argument, I don't know whether that would be enough to convince

4    Your Honor.  But this is where I think insolvency really falls

5    apart for him.  That was the end of 2016, that one or two

6    sentence conclusory allegation of insolvency.  Here's where --

7    here's where the allegation of insolvency becomes implausible,

8    Your Honor.

9        One year later, February 2018, a year and a couple of

10   months, there's a billion dollars put in by the Silver Run

11   special purpose acquisition vehicle.  Those acquisition

12   vehicles require their shareholders -- that had already gone

13  public, this is all in his complaint.  What's not in his

14  complaint, though, is that whoever -- whoever the governing

15  board is of Silver Run had to agree to pour a billion dollars

16  into this combination behind all of the debt, this was an

17  inequity investment, Your Honor.

18       THE COURT:  Where is this billion dollars in the

19  complaint?

20          MR. FINESTONE:  Paragraph 39, Your Honor.

21          THE COURT:  All right.

22          MR. FINESTONE:  It talks about Silver -- Silver Run

23  had raised over $1 billion, and Silver Run became the parent of

24  both Alta Mesa and Kingfisher, Your Honor.  That's how it

25  bought the stock.

26

1            THE COURT:  I don't think it says they put all that

2    money into this investment.  I'm not sure that matters, but I

3    don't think it says that.

4            MR. FINESTONE:  Let me refer Your Honor to the end of

5    paragraph 40, over $800 million -- the last sentence of

6    paragraph 40, over $800 million in cash, along with significant

7    equity was paid to the shareholders, Your Honor.  There's the

8    shareholder purchase.  And these are pretty big chunks of

9    change.  I don't think the trustee is going to deny that that

10    $800 million came from Silver Run.  The -- where did the other

11    $200 -- $200 million go, Your Honor?

12            In this complaint, it also alleges that the -- that there

13  was debt -- that there was debt satisfied at AWH.  It was more

14  than $200 million, because River Stone put in another

15  $400 million.  Nobody, no sophisticated entity thought this was

16  entity was insolvent in 2016, Your Honor.  The notion that it was insolvent

17  in 2016, Your Honor, is there are competing allegations in the

18  complaint that I don't think allow that to survive a

19  plausibility analysis, Your Honor.  And I'll also, just

20  sticking with that last sentence in paragraph 40, where he says

21  $800 million in cash was paid to HPS and the other KFM owners.

22  Do you see where it says along with significant equity?  Every

23  single one of these shareholders, Your Honor, that sold their

24  shares to this spec for $800 million also kept equity.  They

25  also let their position ride significantly after this business

27

1    combination, ultimately losing it all when -- when these cases

2    filed -- pursuant to what happened between 2018 and when these

3    debtors ended up before Your Honor's court.

4        So just to sum up, Your Honor, 550(a)(1), we believe,

5    knocks out every single one of these transfers that were

6    alleged because my clients didn't receive one of them.  And

7    taking his allegations as true, one of my client's entities

8    received some stock appreciation.  By the way, we also held

9    shares in the other ones.  So I think they cancel each other

10   out.  But even if the stock appreciation in one is enough, Your

11   Honor, that's just -- that's just derivative.  That's not

12   enough for 550(a)(1) liability.  That makes all of these claims

13    go away. All of the transfers up to a year before the

14    bankruptcy case were mere preferences not fraudulent transfers.

15    That only works within a year, Your Honor, insolvency

16    insufficiently pled.

17        So those were the three points from our papers that I

18    wanted to highlight for the Court.

19        THE COURT:  Could you, for a moment, take a look

20    at 550(a)(1), and it describes the entity for whose benefit the

21    transfer was made.  And your description focused more on

22    entities that received a benefit.  Is there a difference in the

23    analysis, from looking at who received the benefit from -- for

24    whose benefit the transfer was made, which implies a state of

25    mind that I'm trying to help out a particular group as opposed

28

1    to a particular group did get helped out.

2    Do you follow the question?

3         MR. FINESTONE:  One hundred percent and --

4         THE COURT:  And what does the case law say about sort

5    of the specific meaning for whose benefit the transfer was

6    made?

7         MR. FINESTONE:  What Your Honor is pointing out is

8    that I skipped over something to my own clients's detriment.  I

9    gave the -- I gave the trustee a free one on that.  But I'll go

10   to *McCook Metals*, which is a case that we've already said the

11   Fifth Circuit doesn't favor.

12   But what *McCook Metals* says is that it's not -- you're

13    right, the statutory language suggests that there's an intent

14    aspect to this.  But what *McCook Metals* says is let's --

15    avoidance actions are about -- avoidance actions are about

16    taking something back from someone who actually received the

17    benefit.  So it's not enough to say this transfer was intended

18    to benefit some other party.  *McCook Metals* then says, you

19    actually have to have received that benefit.  So I jumped over

20    intent.

21         THE COURT:  I'm thinking the other way.  What if you

22    received the benefit but the transfer wasn't intended for your

23    benefit; it was intended for other purpose and it had, as

24    you've described it, a derivative benefit?  Does that change

25    anything?

000597

29

1          MR. FINESTONE:  I think -- I think there needs to be

2    intent.  It's not enough -- you have to allege intent, that

3    there was an intent to benefit the shareholders.  You have to

4    hit both, Your Honor, at least under *McCook Metals*.  But I

5    definitely think you have to allege intent.

6          And, here, Your Honor, I have to say, this is -- I want to

7    touch on a comment that Your Honor actually made yesterday in a

8    different case.  The notion here that the board of AMH intended

9    to pump up the value of Kingfisher at the detriment -- to the

10   detriment of AMH, it doesn't make a whole lot of sense, because

11   these, very much like other upstream companies that are

12   conjoined with midstream companies, are just that; they're

13  conjoined.  They're stuck together, inflating the value of one

14  while deflating the other one is not a rational business

15  decision.

16      And if you -- going back to the actual allegations in this

17  complaint, what actually happened, they sold them both, that's

18  in those paragraphs we were looking for.  They sold them both

19  to Silver Run.  So even if they were pumping up the value of

20  one, it was to the detriment of another.  The intent really

21  can't be there.  They sold it to the same entity that was

22  paying for the consolidated shares in both, Your Honor.

23      So let me just use a poor analogy.  If I have two bulls,

24  Your Honor, or two cattle and I'm feeding -- and I only have so

25  much food, so much stock to feed them and I feed -- and I start

30

1    increasing the amount that I'm feeding one of them and getting

2    that one really attractive to go to market but it's at the

3    expense of the other one, the other one is starting to show its

4    ribs.  When I actually go to the market to sell these -- to

5    sell these two piece of livestock together to one purchaser,

6    which has to be the case here and is what happened, I'm not

7    actually getting more, Your Honor.  The purchaser may pay me

8    more for one and less for the other, but he's buying them

9    together.  It's not actually increasing the proceeds here.

10             THE COURT:  Okay.  Thank you, Mr. Finestone.

11             MR. FINESTONE:  Thank you, Judge.

12             MR. BAAY:  Good afternoon, Your Honor.

13    David Baay for the ARM defendants.

14         Mr. Finestone and HPS made all the arguments we intend to

15    make on three points he laid out, so I'll be very brief, Your

16    Honor, and rise only to make these points.

17         The first of which is that it all -- all those arguments

18    do apply, except that they're in a more narrow fashion to the

19    ARM defendants because the ARM defendants are named in only

20    Count One of plaintiff's petition.

21         And as I read plaintiff's opposition, they concede they

22    were not the immediate transferor or the subsequent transferee,

23    and yet they focus -- and so they focus on us being the

24    transferor beneficiary.

25         And Mr. Finestone covered that in depth.  The only

31

1    addition that I would make to that argument comes from ARM's

2    reply, and it's a case in our 22nd paragraph, *In Re Halperin vs*

3    *Moreno*.  It's not Fifth Circuit, but it simply stands for the

4    proposition that the transfers -- in *In Re Halperin*, the

5    transfers in question were monetary payments made by the

6    defendant to an L.L.C., in which the defendant owned a

7    50 percent equity interest.

8        The Court there held that merely owning an equity interest

9    is insufficient to show an actual benefit received; and

10   instead, the trustee must prove that the defendant received an

11   actual benefit from those payments.

12       And we don't believe that -- even if allowed to amend

13    their petition or complaint, that the plaintiffs would be able

14    to make that showing here, Your Honor, given the facts and

15    given that ARM, like HPS, was just simply a shareholder of KFM.

16         The other thing I would say, though, the point I want to

17    make, Your Honor, is that there is requests made in the

18    opposition to amend the petition.  And our position, ARM's

19    position is that would not solve the problem here because in

20    plaintiff's opposition, they preview exactly how they would

21    amend their complaint, in our opinion.  And even if they're

22    allowed to make the arguments they now make in their opposition

23    and burn those into their complaint, it doesn't carry the day,

24    it doesn't satisfy the burdens for all the reasons that have

25    been spoken in this court today.  And so for that reason we

32

1    don't think that remedy is appropriate.

2         THE COURT:  Mr. Baay, thank you.

3         MR. BAAY:  Thank you.

4         THE COURT:  Mr. Dunn?

5         MR. DUNN:  Thank you, Your Honor.  Joseph Dunn on

6    behalf of the plaintiff.

7         I'll just follow suit with the three points that HPS

8    started with, because I think those are the hot button issues

9    that came out of the briefing.

10        I think there's, frankly, a fair amount of common ground

11   between the parties on how to read *Janvey*, for instance.  Many

12   times the language has been used, including just now by ARM's

13    counsel, about the concept of not holding a defendant or the

14    inability to hold the defendant liable as a mere shareholder.

15    And I believe that is what *Janvey* is saying, is that the mere

16    status of a shareholder without more is not enough to make

17    someone a transfer beneficiary under section 550, although,

18    Section 550 as Your Honor noted, wasn't really at issue in the

19    *Janvey* case.  And, you know, there is language at the end of

20    the *Janvey* opinion -- I don't have a demonstrative for Your

21    Honor so I'll just read it.  And I think this really sums up

22    what the concern of the court there and some of the other

23    courts that have been noted really was.  And they cite *Colean*

24    (phonetic) on bankruptcy, the Fifth Circuit, in saying, quote,

25    "Any approach that permits recovery based merely on the intent

33

1    of the debtor/transferor without any benefit being conferred on

2    the third party, results in the harsh outcome that the third

3    party can be liable for the return of an avoidable transfer

4    without having received any benefit, which is generally

5    contrary to the discouragement remedy of avoidance actions."

6        Now, what *Janvey* is really wrestling with is -- and keyed

7    in on is the *Paradigm* case, and this has been discussed.

8        And the case law that we've cited and the defendants have

9    cited, and the *Paradigm* case is, in fact, the case of a

10   guarantor whose obligations and debts are satisfied by a

11   transfer to a separate entity. But that's where we part ways

12   with the defense because what *Janvey* did not do is limit the

13    recovery under 550 or a state law corollary to a *Paradigm* case.

14    In fact, there has been no case law that's cited that limits it

15    to that *Paradigm* case.

16         Now, I think what the Courts have done is approach this in

17    a pragmatic way and said, you know, there's a spectrum of

18    potential possibilities where someone may be sued as a transfer

19    beneficiary.  And what the courts, I think, have uniformly

20    said, and we agree to not dispute, is that mere shareholder

21    status is not enough.  Just sitting there as a shareholder and

22    not receiving any actual benefit, not participating, not

23    controlling, not doing anything else but merely holding a share

24    is not enough.  And that makes sense.  Shareholders are public

25    corporations.  They have no idea what the company is doing,

000607

34

1     what transfers they may be receiving in the ordinary course of

2     business, preference is fraudulent, conveyance is -- it doesn't

3     make sense for them to be exposed to transfer beneficiary

4     status and potential liability.  And so in that case, mere

5     shareholder status is not enough.

6         But then on the other end of the spectrum, you have the

7     cases that we discussed in our briefing, including the *McCook*

8     *Metals* case, which the Court need not adopt formally that --

9     what those cases illustrate is that we have closely held

10    companies, whether they're sole shareholder companies or

11    they're several shareholders.  There's an element of control

12    and there's an element of intention in the beneficiary and

13    their receipt of the benefit that was intended under the

14    transfer.

15         THE COURT:  So does that mean that we -- the argument

16    that I heard, mainly, from Mr. Finestone on this issue is, do

17    we skip through everything and pierce the veil for every time

18    that a closely-held corporation receives a payment?

19         MR. DUNN:  No, Your Honor.  But --

20         THE COURT:  Why would we treat the shareholders -- the

21    innocent shareholders of a closely-held corporation different

22    than the innocent shareholders of a publicly traded

23    corporation?  What is the distinction there?

24         MR. DUNN:  I think to qualifier, Your Honor, is maybe

25    the key to that, which is the innocent shareholder.  And HPS

did a good job painting itself today as a passive shareholder

in KFM.

      THE COURT: Where in your pleadings do you have Rule 9

allegations that this was done with fraudulent intent, HPS?

      MR. DUNN: Well, we talk about HPS's involvement both

as a shareholder of -- in the AWH --  let me --

      THE COURT: Where is the Rule 9 allegation? You say

in here in broad language that they do things, but that's not

going to set aside Rule 9. So where do you set aside Rule 9 as

to either entity that I should treat these guys any different

than I would -- because unless you meet Rule 9, I think I have

to treat them the same as I would public shareholders. So how

13    do you meet Rule 9 with respect to that?

14          MR. DUNN:  Well, Your Honor, starting at paragraph 21

15    of the complaint we talk about the creation of KFM by the same

16    shareholders who were also controlling AWH at the time.  So

17    Mr. Chappelle.

18          THE COURT:  Go ahead.  But that's not fraud.  Where is

19    the fraud?

20          MR. DUNN:  Your Honor, going through this entire

21    section, I'm happy to walk through it, but to summarize our

22    allegations, the allegations are that the plan --

23          THE COURT:  Actually, in variance, I would rather take

24    the time to walk through it because Rule 9 makes me determine

25    whether you have the who, what, when, and where in here.  And I

36

1    don't think you do.  I'm not suggesting you can't have that,

2    but I don't know that you do have it.  And telling me an

3    overview isn't going to get me there at all.  Because the

4    overview is these guys don't love each other, it's closely held

5    and, therefore, you should take their money away.  I need to

6    see the Rule 9 allegations, which I missed when I read through

7    it.

8         MR. DUNN:  Right.  So, Your Honor, in paragraph 23,

9    the complaint alleges that early presentations of a proposed

10   transaction.

11        THE COURT:  By whom?  When?  And where?  Rule 9.  You

12   make Rule 8 allegations here.  Where are the Rule 9

13    allegations?

14           MR. DUNN: Yes, Your Honor. If we need to clarify the

15    who made the early presentations, we'll be happy to do that.

16           THE COURT: Was it made by --

17           MR. DUNN: These are proposals.

18           THE COURT: -- ARM? Was it made by Mr. Finestone's

19    client? Who made them?

20           MR. DUNN: This is by the owners of AMH who are

21    considering creating the KFM as the midstream gatherer and the

22    rates that would be paid to KFM under that proposal, including

23    the backing of HPS. So HPS, KFM -- excuse me HPS, ARM,

24    Chappelle and Ellis, through HMI, were all the equity owners of

25    KMF at the time.

37

1        And the allegations in paragraph 23 and 24 go to the

2   discussions that were having -- that were taking place between

3   these owners, and we can flesh this out if Your Honor thinks

4   it's necessary.

5        THE COURT:  I don't even see that it's a close call to

6   Rule 9.  I'm begging you to show me how you do.  Because read

7   24.  It says -- you think that ARM took full advantage of

8   things without any backup for that.  And then you say one ARM

9   official, we don't identify when he said it, Rule 9 is very

10  specific about what has to happen.  I don't see where you view

11  Rule 9.  It's almost like we're going to ignore Rule 9.  And I

12  don't see how I can under your theory.

13          MR. DUNN:    I'm certainly not intending to ignore

14    Rule 9, Your Honor.

15          As you said, to the extent we need to specify and clarify

16    who were involved in these transaction -- excuse me, these

17    discussions, the --

18          THE COURT:    Let's take 25, on information and belief,

19    but you don't tell me what that's based on.

20          AMH's owners, you can't send rate structure within the

21    benefits that those rates would have for KFM and its owners,

22    including HPS, Chappelle and Ellis.    Where does that come from?

23    That's a pretty interesting sentence.    It doesn't come close to

24    meeting Rule 9.

25          MR. DUNN:    Yes, Your Honor.    I suppose going back to,

000615

38

1    you know, the issue where this Rule 9 discussion started with

2    respect to the control.  What the complaint does allege is the

3    uniformity of ownership and control at both entities.

4         THE COURT:  It doesn't let uniformity of ownership,

5    and it can't be that every time you have uniformity of

6    ownership and there's a transfer we pierce the veil.

7         MR. DUNN:  Certainly not.

8         THE COURT:  It's really inconsistent with Texas law,

9    for example.

10         MR. DUNN:  I couldn't agree more.  It -- and it's not

11    about piercing the veil here and holding them liable.

12         THE COURT:  If you're holding them liable for the

13    debt, it's quasi piercing the veil without any showing or any

14    fraud that would meet a Rule 9 standard.

15         MR. DUNN:  Well, to be fair, Your Honor, it's not that

16    we're saying these shareholders are liable for all of the debts

17    of the company.  It's --

18         THE COURT:  They're liable for these debts.

19         MR. DUNN:  It's transfer specific.

20         THE COURT:  And you won't say why.

21         MR. DUNN:  It's -- it seems we haven't said why in

22    clear enough fashion, Your Honor, is what I'm taking from you.

23    And we're happy to --

24         THE COURT:  Unless you're not alleging fraud, but I

25    think you're pretty specific that you say in your complaint

000617

39

1    we're alleging fraud conduct on their part, right?  Or are you

2    not alleging fraud?

3         MR. DUNN:  No, that's correct.  There are constructive

4    fraud claims which I --

5         THE COURT:  You're alleging actual fraud?

6         MR. DUNN:  Yes, Your Honor.  So the actual fraud

7    and --

8         THE COURT:  Actual fraud, you have to meet Rule 9 for

9    it, right?

10        MR. DUNN:  And so our view is we have alleged to

11   badges of fraud and the circumstances surrounding those badges

12   of fraud in the complaint, as Your Honor noted earlier.  I

13  believe your Honor was saying, that those badges of fraud don't

14  need to be pled with Rule 9 particularity.  But we have laid

15  out the chronology, we have laid out the ownership structure,

16  the ownership on both sides, the involvement of the parties,

17  the benefit that was intended and the benefit that was

18  received.  And that's what we were focused on before --

19          THE COURT:  With a generic claim.  And I know I said

20  this and I should quit saying it, but you've done that

21  generically and the law doesn't make that good enough.  And

22  maybe more troubling for me is the law doesn't open up

23  discovery for you until you meet Rule 9.  So you can't make

24  general allegations and then expect to fill in the interstitial

25  parts after discovery.  You have to make the Rule 9 allegations

40

1    that suffice under Rule 9, and then you get discovery. But you

2    can't start with the generic complaint, get discovery and then

3    go to Rule 9. And, that, I think is what you're asking me to

4    let you do.

5         MR. DUNN: What I'm offering, Your Honor, is if Your

6    Honor believes that the amendment is necessary to fill in those

7    gaps now, then we're happy to do that. And it was more

8    important to us, I suppose, in the complaint to elucidate on

9    what the intent was informing this entity, entering into these

10   agreements, and ultimately transferring the value away from AMH

11   over to KFM where there's a separate holding base, separate

12   equity holders. ARM was not involved over on the AMA side.

13      And, ultimately, there -- there may have been -- we

14  believe there was, you know, value to put in the value from AMH

15  over into this separate entity which was ultimately sold off.

16      You know, counsel for HPS used the analogy of the bulls.

17  That analogy only works if you assume that the same bull and

18  the same ownership and same bull and they're the same value.

19  You lose one -- one goes up in value and other one goes down.

20  Well, that may not have been the same in terms of the desperate

21  equity ownership at the two entities.  They may have seen KFM

22  as a much easier boat to build and ultimately sell off.  In

23  which case it makes a lot of sense, to divert value away from

24  AMH because there's a bigger paycheck at the end of the day.

25      So, Your Honor, on the 550 point, if I can go back to

41

1    that, Your Honor noted the intent and that's what -- what we

2    were focused on in the complaint and it sounds like we need to

3    allege with more specificity, was the intent of who was going

4    to be benefited by this transfer.  And there's -- no case

5    that's been cited that says this only applies in a case where

6    there's a -- a guarantor whose debts are being satisfied under

7    the transfer; instead, there are a host of cases that look at

8    it more pragmatically of was this intended to benefit this

9    specific shareholder?  Did they actually have control of the

10   situation?  Were they actively involved in the transaction, and

11   then ultimately did they benefit, whether it was derivative,

12   whether it was actual or not?

13    I will say, you know, the case law, HPS is correct, that

14    in many of these cases discussing transfer beneficiary status

15    under 550 or under state law corollaries, we are talking about

16    sole shareholders are closely held shareholder companies.  And,

17    you know, we believe that's -- that's essentially what we have

18    here.

19         And what was also kind of not discussed during HPS's

20    presentation raise the fact that they were on both sides of

21    this transaction.  And, you know, there's a difference between

22    just being a passive shareholder sitting there and ultimately

23    getting an increase in the value of those shares, and someone

24    who's on the transferor side of the equation, ultimately you're

25    receiving the benefit --

42

1      THE COURT: Show me -- show me where in the complaint

2  you allege that HPS was in control of such, under Rule 9.

3      MR. DUNN: Your Honor, I won't waste time flipping --

4  I'm not sure that we meet what you're -- what you're speaking

5  of in terms of the Rule 9 as to their control of AWH, if that's

6  what you're asking.

7      THE COURT: Well, is that part of the fraud? Maybe

8  it's not.

9      MR. DUNN: It's not necessary. What's necessary is

10  that --

11      THE COURT: It's not necessary to what?

12      MR. DUNN: To establish the actual intent to hinder,

000624

13    delay or defraud under the statute. It's not necessary that

14    they are in control of AMH. The reality is that they had --

15         THE COURT: So what is necessary to establish the --

16    you're not arguing hindering, you're not arguing delay. You're

17    arguing defraud, right?

18         MR. DUNN: Right.

19         THE COURT: So what's necessary to prove defraud?

20         MR. BAAY: Those badges of fraud, Your Honor, that are

21    set out and recognized. So an insider relationship or a close

22    relationship under the -- under the factors that have been --

23    that is the fraud that have been recognized in this circuit;

24    insolvency, less than reasonably equivalent value in exchange

25    for the transfers.

43

1    So -- so each of those badges of fraud are -- are from

2    what the inference is drawn, that there was actual intent to

3    hinder, delay or defraud.  And that actual intent -- I don't

4    think there's a dispute, intent is not something that has to be

5    pled with particularity under Rule 9.

6    If Your Honor believes that under Rule 9 we need to --

7    THE COURT:  No.  I think Rule 9 excludes state of mind

8    issues.  Show me where your badges of fraud are listed in the

9    complaint.

10   MR. DUNN:  Sorry.  One second, Your Honor.

11   So in the complaint, Your Honor, we -- we -- starting at

12   section -- well, paragraph 21 of the complaint is where we

13    start to walk through and describe the scheme to which the --

14    I'll just stick with the gathering agreement transfers.  KFM

15    being developed, the ownership of KFM, ultimately the -- the

16    rewards that would flow to AWH's owners by virtue of their

17    equity stakes in KFM in section -- or paragraph 24 of the

18    complaint, Your Honor.

19        (Alarm is set off)

20        THE COURT:  I think there must be something wrong with

21    the fire system.  That went off this morning once as well.  I

22    don't think you did that, Mr. Dunn.

23        MR. DUNN:  I hope not.

24        In paragraph 29, Your Honor, where plaintiff alleges that,

25    you know, of every above market dollar paid by AWH, KFM only a

44

1    small fraction makes it back to AWH.  In fact, the production

2    assets were being diverted to benefit KFM, in which AWH had no

3    equity interest, and KFM's equity ownership included HPS and

4    ARM.

5        AWH knew that KFM was charging its other customers

6    substantially less than it was charging AWH.

7        THE COURT:  But, again, I guess I should quit because

8    these are just all conclusory statements that don't give

9    who, what, when, where, right?  All of those.

10       MR. BAAY:  If Your Honor believes that more detail is

11   necessary --

12       THE COURT:  I know you said that, but it isn't just

13    that I believe it, objectively you don't meet Rule 9.  And if

14    you want to tell me that I'm wrong, I would much rather be --

15    that you tell me, no, we meet Rule 9, then say I want more.

16    It's not that I want more.  I want to know if you met Rule 9.

17    I don't see where you come close to meeting Rule 9.

18        MR. DUNN:  Well, I suppose our view, Your Honor, was

19    that the allegations in the complaint paint enough of a

20    picture.  These are not mystery transactions to the defendants

21    in this case.

22        THE COURT:  They are to me.

23        MR. DUNN:  I understand, Your Honor.  But going back

24    to the pleadings standard, really, what is focused on is enough

25    detail for the defendants to be able to formulate a response to

45

1    the allegations.

2        THE COURT:  No.  That's Rule 8.  That's not Rule 9.

3        MR. DUNN:  I understand.  The who, what, where and

4    when of an actual fraud claim is relaxed in certain

5    circumstances, including in actual, you know, fraudulent

6    transfers situations.  It's --

7        THE COURT:  I'm not aware of that.  Is there case law

8    that tells me that I should not apply Rule 9 to an actual

9    fraudulent?  Because I know there's case law that doesn't

10   apply, nor have I repeatedly applied it in constructive

11   fraudulent transfer.  But I've consistently applied it in

12   actual -- I know the Fifth Circuit said, point blank, it

13    applies in actual. But I certainly don't know of any relax

14    standard in the Fifth Circuit.

15         MR. DUNN:  Well, what the courts have said and we

16    cited the cases in our papers -- we'll just find it, Your

17    Honor.  I apologize.

18         What the cases say is that where -- where the intent of

19    the transferor debtors is being alleged by the trustee, a

20    stranger to the transaction, that the pleading standard is --

21    is relaxed in those circumstances.  It's appropriate to relax

22    them in those circumstances.  It's also appropriate to relax in

23    the circumstances where the information that is at question,

24    some of the who, what, where, when is within the possession of

25    the defendants.  And we've cited cases in our brief, Your

000631

46

1    Honor.    The *Katchadurian* case, and then the *Askanase* case

2    A-S-K-A-N-A-S-E, this is on page 11 of our brief, which says,

3    you know, pleadings is sufficient under Rule 9(b) if it

4    identifies the circumstances constituting fraud, so that the

5    defendant can prepare an adequate answer from the allegations.

6    And our view is that, you know, the defendants in these case

7    are well familiar with the transactions at issue.  Are able to

8    respond to this, as counsel has done today, and in the briefing

9    about the background of these transactions and appears very

10    clear from their statements and from their briefing, that they

11    understand what the plaintiff's legal theory is with respect to

12    these particular transactions.

13    And so for that reason, as we stated in our brief, we

14    thought our pleading meets the Rule 9(b) standard, under these

15    circumstances, where you have a trustee bringing a fraudulent

16    transfer claims based on actual fraud, the badges of fraud

17    which don't need to be pled with particularity.

18        So if I could, Your Honor, unless you want -- you would

19    like to stay on the Rule 9.

20        THE COURT:  No, that's fine.  Go ahead.

21        MR. DUNN:  Let me turn back to the 550 issue, and it's

22    just notes that the policy argument that HPS made is really a

23    strawman.  We're not, as they said, not advocating that a mere

24    shareholder status exposes that shareholder to potential

25    liability for a fraudulent transfer made to the underlying

47

1    company.  But in these cases and in the cases that have

2    ultimately found transfer beneficiary status as to the

3    defendants, they really focus on the intent, was there an

4    intent to benefit that particular shareholder?  And we believe

5    that we've pled that.

6        And, also, was there an actual receipt of that -- of that

7    benefit.  And as noted earlier, you know, the complaint alleges

8    that there was a cash out of that value that was built up over

9    on the KFM side under the gathering agreements on the backs of

10   AMH and its creditors.

11       Just moving on, Your Honor, to the second argument that

12   HPS made, really relating to payments under contracts.  So --

13    so one thing I will note, he briefly touched on it. But, first

14    of all, let me concede that the 2015 gathering agreements are

15    outside of the look-back period.    That is true.    That contract

16    is outside the look-back period.

17        The 2016 amended and restating gathering agreements are

18    not outside.    And what the plaintiff has alleged and part of

19    the claims here is to avoid the occurrence of obligations under

20    those amended and restated obligations -- excuse me, amended

21    and restated gathering agreements, which were significant.

22    Significant fees that were agreed to in the connection with the

23    2016 gathering agreements, the covenants that were granted in

24    connection with the *Sabine* decision, which I know Your Honor is

25    familiar with and previously wrestled with.

48

1          And so while it's true -- so I'm going to kind of

2     bifurcate this and talk about 2016 going forward.  The reality

3     is, if ultimately the trustee prevails in avoiding the

4     occurrence of those obligations, then there's no antecedent

5     debt being paid pursuant to any payments that were made to KFM

6     under that agreement, and it's really a question of was there

7     reasonably equivalent value?  Was there adequate value or was

8     AMH indeed paying exorbitant rates for gathering and processing

9     under those 2016 agreements.

10          Now, going back to 2015, and we're really talking about a

11    short time frame in which payments were made under the 2015

12    agreements.  I believe, offhand, I think it was between

13    June 2016 and December 2016. And they were significant, but

14    the case law that we've cited makes it clear that there's an

15    ability, even if that original contract can't be avoided, that

16    there is the ability to analyze and potentially avoid the

17    payments made, even though it was governed and the rates may

18    have been governed by another agreement.

19        And in our papers, Your Honor, we cited the *RML* case from

20    the Third Circuit. And in that case, there were -- there was a

21    contract and there were fees that were paid pursuant to a

22    commitment letter with -- commitment letter with a potential

23    lender. And they were avoidable as fraudulent conveyance in

24    those fees, even though they were paid pursuant to a contract,

25    were independently analyzed by the Court as to whether there

49

1    was adequate value given in exchange for those fees.  And,

2    ultimately, with respect to most of those fees, the Court

3    concluded that there wasn't sufficient value given because the

4    possibility of the loan funding was so conditioned and

5    hypothetical, that there was no real value for paying over

6    those monies, even though it was done pursuant to a -- a

7    written agreement.

8        I think where this, you know, may make more sense, to

9    limit it to this dollar for dollar reduction of obligation is

10   where you are talking about a loan transaction or a repayment

11   schedule, an installment agreement, where you have, you know,

12   set payments that are supposed to be made and the payment by

13    the debtor of a scheduled payment under that agreement is

14    dollar for dollar satisfaction of that obligation.  It's a

15    different situation with the gathering agreements.  The

16    gathering agreements may have set rates and may have had

17    obligations under the 2015 agreements to give all of the oil

18    and gas gathering and processing business to KFM.  But

19    ultimately, the payments that were being made were on account

20    of services that had not been rendered yet or they were

21    rendered later in time.  And so each of those is an independent

22    debt that potentially arose under that 2015 agreement and could

23    be analyzed under the case law that we've cited as to whether

24    there was reasonably equivalent value given in exchange for

25    those payments.

000639

50

1          And the other case I would cite you to with Judge

2     Wallrat's (phonetic) decision in *EBC 1, Inc.*, cited in our

3     brief, where she -- it says, "Transfer may be fraudulent, even

4     if it was made in accordance with the terms of the contract

5     between the parties." And, there, the debtor had paid for

6     advertising services pursuant to an advertising contract. And

7     the question -- there was a question of fact, ultimately, as to

8     whether the debtor actually received services of equivalent

9     value.

10          I'll note, you know, also, this relates to that first

11     bucket of payments under the 2016 gathering agreements. But

12     there are allegations in our complaint and evidence that, in

13  fact, payments were being made for services that were never

14  rendered.

15      There was a contemplation that KFM would be transporting

16  various oil shipments under the crude oil gathering agreement

17  in 2016.  And, ultimately, AWH ended up paying another party to

18  do it as well as KFM.

19      So for that reason, it's not an isolated look at, well,

20  there happened to be a contract and so anything that's paid

21  under the contract can't be avoided.  In that case, you're

22  basically saying the parties can paper over the contract any

23  inequitable or imbalanced financial arrangement they may come

24  to and isolate it from a fraudulent transfer liability.

25      And then, Your Honor, let me just hit -- I'm sorry.  Give

51

1    me a moment.  I guess, Your Honor, I'll just clarify for -- for

2    our purposes, you know, the -- ultimately what brings these

3    defendants within the scope of liability as transfer

4    beneficiaries under the statute is really the intention to

5    directly benefit them as part of this -- the gathering

6    agreement.

7         I want to kind of shift a little bit to HMI because HPS

8    mentioned, you know, those two others sets of transactions.

9    And what is not, I suppose, mentioned there is, HMI was also on

10   both sides.  HMI, HPS owned an equity interest in HMI.  HPS

11   owned an equity interest through HMI on the AMH -- AMH side as

12   well.  And the claims there relating to the non-STACK asset

13    transfer and the HMI MSA, I think, are fairly straightforward,

14    and I think they're adequately pled in the complaint in that

15    the transfers were made for no consideration.  There were

16    transfers that were made under the HMI MSA to benefit HMI, but

17    never -- and to shareholders HPS.  But there was no assurance.

18    In fact, it was the intention this was never going to be paid

19    out.  In fact, there was upward of $10 million of liability

20    that was incurred under the HMI MSA that was never repaid.

21    And, ultimately, AWH and its creditors were left holding the

22    bag.

23        And, you know, the complaint alleges -- and I'll just

24    point Your Honor to the specific paragraphs.  With respect to

25    the non-STACK asset transfer, there were no third party

52

1   valuations or fairness opinions regarding the zero dollar price

2   that was paid by HMI and AWH at the time of the assignment when

3   the complaint alleges the non-STACK assets were valued at tens

4   of millions of dollars, generating positive cash flow.

5        And then with respect to the MSA, there was no ability to

6   try to short up payment for AWH under this MSA.   And it can be

7   inferred from the circumstances and was alleged, that, in fact,

8   there was no intent, ultimately, for these payments to ever be

9   made to AWH.   AWH was much like the KFM situation left to

10   shoulder the financial burden of the relationship and the

11   operation of the non-STACK assets going forward and did, in

12   fact, do so.

13    And then, finally, I just want to note, Your Honor, the --

14    there was a comment made about subsequent transferees.  One

15    thing is -- obviously, we have no disagreement, that the

16    complaint, as it stated at this point, is alleging claims

17    against these defendants in their capacity as transfer

18    beneficiaries under 550.

19        We reserved our right, obviously, to amend.  I don't think

20    we need to, but reserve our right to amend, to add claims as

21    against these entities as subsequent transferees, to the extent

22    we discover that evidence, that's obviously information that's

23    within the possession of the defendants.  But I will note that

24    what has come to light since we filed or complaint and we noted

25    this in our -- in our brief, is that the HMI trustee in his

000645

53

1    case, has filed a series or adversary proceedings and has

2    included, you know, allegations in those cases, regarding the

3    receipt by HPS of amounts from the sale of these non-STACK

4    assets.  So it's obviously something we're continuing to

5    explore, but I just wanted to say we agree that the complaint

6    in its present case -- present form does not seek to avoid and

7    recover transfers from these defendants as subsequent

8    transferees, but, obviously, reserve the right to do so if the

9    evidence justifies it.

10          That's all I had, unless Your Honor has any questions.

11          THE COURT:  No.  Thank you.

12          How long do you need to file a complaint that you

13    believe -- and I appreciate Mr. Eaay's argument that I

14    shouldn't give you the opportunity, but the search is

15    essentially set up.  So I'm going to give you the opportunity.

16    What's -- how long do you need to file a complaint that meets

17    the requirements of Rule 9 so that I can determine sufficiency,

18    having given you a full opportunity to amend?

19         MR. DUNN:  Thirty days, Your Honor?

20         THE COURT:  Fine with me.

21    Virtually, all of the issues today turn on whether Rule 9

22    allegations can be made.  I think that goes towards the

23    550(a)(1) allegations.  Because if there was actual fraud that

24    led to the intended beneficiary receiving a benefit through

25    actual fraudulent conduct, then I don't need to worry, as I

54

1    think Mr. Dunn has correctly argued about whether they were

2    actual subsequent transferees, they were the beneficiary

3    transferees, but that's going to require the Rule 9 showing.

4        I find the Rule 9 showing is not here, but you should be

5    given an opportunity to replead on that.  But you can't have a

6    fraudulent transfer with respect to contracts.  That one

7    depends, in my view, if you had a mandatory payment under a

8    contract, then I think that the argument being made by

9    Mr. Finestone is correct.

10        On the other hand, if you had optional payments, depending

11    upon what you ordered and you ordered things that were

12    overpriced, that might very well be fraudulent payment.  But I

13  don't have those allegations in here under Rule 9 to know what

14  specifically was done in the implementation of the contract in

15  furtherance of fraud.  But to the extent that they were all

16  mandatory payments, I don't follow the argument that it would

17  be anything other than a potential preference.

18      With respect to the argument that you need to actually

19  plead insolvency, I think that depends.  I don't know that

20  you've done it much with just a conclusionary statement.  I

21  would urge you to bolster that.  I don't think it needs to meet

22  Rule 9, as to whether just a shareholder can have liability.  I

23  find that they cannot if it's solely because they're a

24  shareholder.  But your argument is you're trying to prove more

25  than that and I accept you're trying to prove more than that

55

1    and I'm going to give you the opportunity to prove more than

2    that, but you're going to have to meet Rule 9.  So I'll give

3    you 30 days to do it.  That means that by July 11th an amended

4    complaint must be filed that meets Rule 9.  I am not going to

5    issue a scheduling order.  I am explicitly not opening

6    discovery.  It is my view that the Fifth Circuit has held you

7    don't open the discovery window to allow people to prove

8    Rule 9.  They've got to make sufficient Rule 9 allegations to

9    then have the discovery door opened.

10        The answer date will run from the date on which it is

11   filed.  And, of course, in lieu of an answer to the amended

12   complaint, I recognize that I'm probably going to get

13  additional motions to dismiss and I'll deal with that when it

14  happens.  But if you want to file it sooner than the 30 days,

15  then it will just run in accordance with the rules as to their

16  answer.

17      I appreciate the presentation today, and that's what I'm

18  going to do with these allegations.  So I will -- I'm sure to

19  see y'all again.  Thank you.

20          MR. FINESTONE:  Thank you, Your Honor.

21          MR BUY:  Thank you, Your Honor.

22          (End of proceedings at 2:53 P.M.)

23

24

25

56

-oOo-

1

2

3     I, court approved transcriber, certify that the foregoing

4   is a correct transcript from the electronic sound recording of

5   the proceedings in the above-entitled matter.

6

7   DATE: September 16, 2022

8

9   *Letitia "Tish" Mancivais*
    *Ornelas Reporting Services*
    U.S. Official Court Reporter
10  P. O. Box 831124
    San Antonio, TX  78283-1124
11  512/550-6886

12

13

14

15

16

17

18

19

20

21

22

23

24

25

000653

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| ALTA MESA RESOURCES, INC., *et al.*, | ) |
| | ) Case No. 19-35133 |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |
| DAVID DUNN, as Trustee of the AMH Litigation Trust, | ) |
| | ) |
| | ) Adv. Pro. No. 21-03909 |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| HPS INVESTMENT PARTNERS, LLC; ARM ENERGY HOLDINGS, LLC; ARM MIDSTREAM, LLC; AND ASSET RISK MANAGEMENT, LLC, | ) **Jury Trial Demanded** |
| | ) |
| | ) |
| Defendants. | ) |

## [PROPOSED] ORDER GRANTING REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S OMNIBUS OPPOSITION TO MOTIONS OF ARM DEFENDANTS AND HPS INVESTMENT PARTNERS, LLC TO DISMISS FIRST AMENDED COMPLAINT [DKTS. 48, 49]

Before the Court is the *Request for Judicial Notice in Support of Plaintiff's Omnibus Opposition to Motions of ARM Defendants and HPS Investment Partners, LLC to Dismiss First Amended Complaint [Dkts. 48, 49]* filed by Plaintiff David Dunn (the "Trustee"), the Trustee of the AMH Litigation Trust (the "RFJN"). The Court, having reviewed the RFJN, all other pleadings, responses, evidence, and papers filed with the Court in this action, the applicable law, and upon oral argument of the parties, hereby orders that the RFJN is **GRANTED.**

Dated: _____

_____
Honorable Marvin Isgur
United States Bankruptcy Judge

1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| ALTA MESA RESOURCES, INC., *et al.,* | Case No. 19-35133 |
| Debtors. | (Jointly Administered) |
| DAVID DUNN, as Trustee of the AMH Litigation Trust, | |
| Plaintiff, | Adv. No. 21-03909 |
| v. | |
| HPS INVESTMENT PARTNERS, LLC; ARM ENERGY HOLDINGS, LLC; ARM MIDSTREAM, LLC; AND ASSET RISK MANAGEMENT, LLC, | |
| Defendants. | |

**REPLY IN SUPPORT OF RULE 12(b)(6) MOTION TO DISMISS THE AMENDED COMPLAINT ON BEHALF OF HPS INVESTMENT PARTNERS, LLC**

## <u>TABLE OF CONTENTS</u>

<b>Page</b>

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................3

I.    THE COURT'S RECENT DECISION IN *DUNN V. CHAPPELLE* STRONGLY SUPPORTS DISMISSAL IN THIS ACTION ...............................................................3

II.   HPS IS NOT A TRANSFER BENEFICIARY UNDER THE CODE SECTION 550 OR TUFTA SECTION 24.009(B)................................................................................4

    A.    The Trustee Fails To Pierce The Veil As To KFM, HMI, and HMH, Which Is Fatal To His Theory That HPS Is A Transfer Beneficiary.......................4

    B.    The Trustee Fails To Plead That HPS "Controlled" The Relevant Entities, Which Would In Any Case Be Insufficient To Find HPS Is A Transfer Beneficiary ................................................................................................6

    C.    The Trustee Fails To Establish HPS Is A Transfer Beneficiary Under The Flawed *McCook* Test .............................................................................8

III.   THE TRUSTEE CANNOT AVOID THE GATHERING AGREEMENTS....................10

    A.    Counts I and II Are Barred By Claim Preclusion ....................................10

    B.    Counts I and II Are Time-Barred Under the Bankruptcy Code and TUFTA ........12

IV.   THE TRUSTEE FAILS ADEQUATELY TO PLEAD CONSTRUCTIVE FRAUD ..................................................................................................................13

    A.    The Trustee Misconstrues The Applicable Legal Standard ....................13

    B.    The Trustee Fails To Plead Lack Of Reasonably Equivalent Value ....................13

    C.    The Trustee Fails To Plead AMH's Financial Condition ......................15

V.    FURTHER AMENDMENT WOULD BE FUTILE............................................16

CONCLUSION..........................................................................................................16

000656

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### CASES

*In re Alta Mesa Res.*,
    613 B.R. 90 (Bankr. S.D. Tex. 2019) ..................................................................... 11

*In re Arete Healthcare LLC*,
    2022 WL 362924 (Bankr. W.D. Tex. Feb. 7, 2022) ............................................... 16

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................................................ 13

*In re Blast Fitness Grp.*,
    603 B.R. 219 (Bankr. D. Mass. 2019) ..................................................................... 6

*Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*,
    869 F.3d 381 (5th Cir. 2017) ................................................................................. 13

*Bonded Fin. Services, Inc. v. European Am. Bank*,
    838 F.2d 890 (7th Cir. 1988) ................................................................................... 9

*Butler v. Endeavor Air, Inc.*,
    805 F. App'x 274 (5th Cir. 2020) ......................................................................... 11

*Citizens Nat'l Bank of Tex. v. NXS Constr., Inc.*,
    387 S.W.3d 74 (Tex. App.—Houston [14th] 2012, pet. denied) ............................. 9

*In re Cyr*,
    602 B.R. 315 (Bankr. W.D. Tex. 2019) ........................................................... 15, 16

*Dole Food Co. v. Patrickson*,
    538 U.S. 468 (2003).................................................................................................. 7

*In re Dual D Health Care Ops., Inc.*,
    2021 WL 3083344 (Bankr. N.D. Tex. July 21, 2021) ...................................... 13, 14

*Dunn v. Chappelle*,
    2022 WL 7750353 (Bankr. S.D. Tex. Oct. 13, 2022)............................. 1, 3, 4, 6, 11

*Esse v. Empire Energy III, Ltd.*,
    333 S.W.3d 166 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)..................... 6

*In re Green Field Energy Services, Inc.*,
    2018 WL 1116374 (Bankr. D. Del. Feb. 27, 2018) .............................................. 10

*In re Gulf Fleet Holdings, Inc.*,
    491 B.R. 747 (Bankr. W.D. La. 2013) ...................................................... 12, 13, 14

*In re Hansen*,
    341 B.R. 638 (Bankr. N.D. Ill. 2006) ................................................................. 5, 8

*In re Hinsley*,
    201 F.3d 638 (5th Cir. 2000) ................................................................................. 15

000657

*Janvey v. Libyan Inv. Auth.*,
    840 F.3d 248 (5th Cir. 2016) ..................................................... 1, 4, 5, 6

*In re Jones*,
    2019 WL 1167812 (Bankr. N.D. Tex. Mar. 11, 2019) ........................... 14

*In re Kevco Inc.*,
    113 F. App'x 29 (5th Cir. 2004) ..................................................... 4

*In re Kevco, Inc.*,
    309 B.R. 458 (Bankr. N.D. Tex. 2004) ............................................. 4

*In re La. Highway St Gabriel, LLC*,
    2021 WL 2546027 (Bankr. M.D. La. June 21, 2021) ........................... 11

*In re La. Pellets, Inc.*,
    2019 WL 2565670 (Bankr. W.D. La. June 20, 2019) ..................... 14, 15

*Matter of La. Pellets, Inc.*,
    838 F. App'x 45 (5th Cir. 2020) ............................................. 13, 14, 15

*Meza v. Gen. Battery Corp.*,
    908 F.2d 1262 (5th Cir. 1990) ..................................................... 10

*N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*,
    2016 WL 9330500 (S.D. Tex. Sept. 28, 2016) ................................. 11

*In re Northstar*,
    616 B.R. 695 (Bankr. S.D. Tex. 2020) ........................................... 15

*Omran v. Wyche*,
    745 F. App'x 225 (5th Cir. 2018) ................................................ 12

*In re Paige*,
    610 F.3d 865 (5th Cir. 2010) ..................................................... 11

*Pam Cap. Funding, L.P. v. Nat'l Gypsum Co.*,
    2003 WL 23784080 (N.D. Tex. Sept. 30, 2003) ............................... 4

*In re Peregrine Fin. Group, Inc.*,
    589 B.R. 360 (Bankr. N.D. Ill. 2018) ............................................. 9

*In re Schooler*,
    2013 WL 176139 (Bankr. S.D. Tex. Jan. 16, 2013) ........................... 5

*Seidel v. Byron*,
    405 B.R. 277 (N.D. Ill. 2009) ................................................... 8, 9

*Slay v. Burnett Tr.*,
    187 S.W.2d 377 (Tex. 1945) ..................................................... 11

*Southmark Props. v. Charles House Corp.*,
    742 F.2d 862 (5th Cir. 1984) ..................................................... 11

*Southwest Airlines Co. v. Tex. Int'l Airlines, Inc.*,
    546 F.2d 84 (5th Cir. 1977) ..................................................... 11

000658

*In re Specialty Select Care Ctr. of San Antonio, LLC*,
   2021 WL 3083522 (Bankr. N.D. Tex. July 21, 2021) .......................................................... 14

*Steiner v. Southmark Corp.*,
   734 F. Supp. 269 (N.D. Tex. 1990) ....................................................................................... 9

*Stevens v. Bank of Am., N.A.*,
   587 F. App'x 130 (5th Cir. 2014) ........................................................................................ 12

*Tenneco Inc. v. Enter. Products Co.*,
   925 S.W.2d 640 (Tex. 1996)................................................................................................. 7

*Texas v. Dep't of Labor*,
   929 F.3d 205 (5th Cir. 2019) ............................................................................................. 11

*Union Tank Car Co. v. Maxwell*,
   2021 WL 2044345 (S.D. Tex. May 21, 2021) ...................................................................... 6

*United States v. M/Y Galactica Star*,
   13 F.4th 448 (5th Cir. 2021) ...................................................................................... 6, 7, 8, 9

*In re Uplift RX, LLC*,
   625 B.R. 364 (Bankr. S.D. Tex. 2021) ............................................................................... 16

*Waggoner v. Denbury Onshore, LLC*,
   612 F. App'x 734 (5th Cir. 2015) ....................................................................................... 16

*Williams v. Performance Diesel, Inc.*,
   2002 WL 596414 (Tex. App.—Houston [14th Dist.] Apr. 18, 2002, no pet.) ......................... 5

### RULES/STATUTES

11 U.S.C. § 548 ......................................................................................................................... 2

11 U.S.C. § 550......................................................................................................... 1, 3, 4, 5, 10

Fed. R. Civ. P. 12(b)(6)................................................................................................ 1, 2, 13, 15

Tex. Bus. & Com. Code § 24.010(a)(2).......................................................................................... 2

Tex. Bus. & Com. Code § 24.009..................................................................................... 1, 3, 4, 5, 10

Tex. Bus. Org. Code § 21.223(a)(2)) .............................................................................................. 6

### OTHER AUTHORITIES

1 Fletcher Cyc. Corp. § 31 ..................................................................................................... 7, 10

000659

HPS respectfully submits this reply memorandum of law in support of its motion to dismiss the Trustee's First Amended Complaint (ECF No. 40) ("AC") pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]

## INTRODUCTION

The First Amended Complaint's additional conclusory assertions, and bare statements of the elements of the Trustee's claims, fail to cure the substantial pleading deficiencies in the Initial Complaint, and so fail to establish that Alta Mesa Holdings LP ("AMH") made any fraudulent transfers at all, much less any that can be recovered from HPS. Notably, the Trustee's claim has only deteriorated further since the Amended Complaint was filed with the decision in *Dunn v. Chappelle*, 2022 WL 7750353 (Bankr. S.D. Tex. Oct. 13, 2022), in which this Court dismissed the Trustee's breach of fiduciary duty claims against Don Dimitrievich. The Court should likewise enter a full and final dismissal of the Trustee's claims against HPS for the following reasons:

*First*, the Trustee cannot recover from HPS under Section 550 of the Code or Section 24.009(b) of TUFTA because HPS is not a beneficiary of any of the alleged transactions. Under binding Fifth Circuit authority, the Trustee would need to pierce the corporate veil to hold HPS liable for transfers made to entities in which HPS (or funds it manages) holds an ownership stake. *See Janvey v. Libyan Inv. Auth.*, 840 F.3d 248, 266 (5th Cir. 2016). There is no serious dispute that the Trustee fails to make a dent in the well-settled corporate separation between HPS and the entities that received any alleged transfers, and the Trustee does not meaningfully contest his failure to plead that HPS was an initial or subsequent transferee under Section 550. *See* ECF. No. 53 (the "Opposition" or "Opp.") at 24. The Trustee instead attempts to avoid *Janvey* altogether

---

[1] Capitalized terms have the same meaning as in the Rule 12(b)(6) Motion to Dismiss the Amended Complaint filed by HPS. ECF No. 48 ("MTD").

1

by arguing that HPS was a transfer beneficiary because it had "control" over the transferee entities. But the Trustee fails to plead any such control, which in any case is insufficient as a matter of law to make HPS liable for any alleged fraudulent transfers.

*Second*, the Trustee does not, and cannot, remedy that Counts I and II are untimely under the Bankruptcy Code's two-year lookback period as to the Gathering Agreements, and untimely under TUFTA's four-year lookback period as to obligations incurred under the 2015 Gathering Agreements. *See* 11 U.S.C. § 548; TEX. BUS. & COM. CODE § 24.010(a)(2). And the Trustee offers no meaningful response to the fact that any timely payments constituted inactionable, dollar-for-dollar satisfaction of antecedent obligations.

*Third*, claim preclusion bars Counts I and II in their entirety. AMH previously asserted, and dismissed with prejudice, nearly identical claims against KFM, and here the Trustee has merely moved those claims up the corporate chain to an entity that is not bankrupt.

*Finally*, it is unsurprising that the Trustee has failed to plead the elements of constructive fraudulent transfer—including a lack of reasonably equivalent value and insolvency of the transferor—given the Trustee's apparent reliance on bare "notice pleading," which is insufficient under Rule 12(b)(6). Rather, it is well-settled that the Trustee must—but fails to—state a claim for relief that is plausible on its face. But the Trustee offers only conclusions, legal assertions, or allegations that are not relevant to the actual elements of his claims. He therefore fails to satisfy *any* pleading standard, much less establish the plausibility necessary to survive this Motion.

The AC should therefore be dismissed, with prejudice.

2

## ARGUMENT

**I.    THE COURT'S RECENT DECISION IN *DUNN V. CHAPPELLE* STRONGLY SUPPORTS DISMISSAL IN THIS ACTION**

On October 13, 2022, this court dismissed the claims against Mr. Dimitrievich in *Dunn v. Chappelle*. 2022 WL 7750353, at *1, 11. There, the Trustee alleged claims for breach of fiduciary duty against the directors of AMR (an indirect parent of AMH), including Mr. Dimitrievich, for approving and continuing to operate a drilling program in connection with the 2018 Business Combination. *Id.* at *1-2; *see also* MTD at 7, 25.

Several holdings in *Chappelle* effectively dispose of the Trustee's argument in this case. For instance, the Court there found that AMH's general partner—AMH GP—controlled AMH, which means that HPS did ***not*** control AMH. 2022 WL 7750353, at *5 (AMH limited partnership agreement "clarifies in section 6.2 that the 'General Partner [AMH GP] shall manage and control [AMH] and its business and affairs.'") (quoting ECF No. 72-2 at 12). Here, that holding disposes of the Trustee's argument that HPS "controlled" AMH, which is the Trustee's sole reason for purporting to hold HPS liable under Section 550 of the Bankruptcy Code and Section 24.009(b) under TUFTA. *See* MTD at 4 (arguing HPS cannot control AMH because AMH GP is the "exclusive" controller of AMH).

The Court in *Chappelle* also recognized the well-settled principle that the corporate veil must be pierced before liability can be imposed on an equity holder (much less the director of an equity holder); the Trustee failed to pierce the veil in *Chappelle* and does not even try to do so here. *See* 2022 WL 7750353, at *6-7; MTD at 11-12 (Trustee relies on theories that disregard business organizations law). As in *Chappelle*, the Trustee's failure to pierce the veil here dooms his claims against HPS. *See*, 2022 WL 7750353, at *6-7; MTD at 11-12. And the Court correctly surmised in *Chappelle* that the Trustee's claims against AMR's directors were an attempt to

3

circumvent the "release from liability under the plan" to "both AMR and [AMH] GP."  2022 WL 7750353, at *7 (citations omitted); *see also id.* at *6 ("Dunn is attempting to sue AMR's officers and directors directly because no derivative suit exists as a result of the release [of all liability to AMR.]").  Similarly, the Trustee here seeks recovery from HPS because he cannot recover from the bankrupt entities KFM, HMI, or HMH.  *See also* MTD at 15-16 (claims related to transfers to KFM are barred by claim preclusion).

Finally, as established in the MTD, the facts of this case and *Chappelle* overlap significantly, and the Trustee asserted this action to seek discovery that was otherwise stayed in the *Chappelle* action.  *See id.* at 7, 25; *see also* Initial Motion at 8-9.  The Trustee's assertion that there is no overlap, Opp. 34, ignores that Claims III and IV arise out of the Business Combination, the same transaction at issue in *Chappelle*.  2022 WL 7750353, at *1-2.  The Trustee should have amended his complaint in *Chappelle* to assert the claims raised here, and this overlapping, subsequent litigation should be recognized as an end-run around the now-dismissed *Chappelle* action and likewise brought to a conclusion.  *Cf. In re Kevco, Inc.*, 309 B.R. 458, 465-66 (Bankr. N.D. Tex. 2004), *aff'd sub nom. Pam Cap. Funding, L.P. v. Nat'l Gypsum Co.*, 2003 WL 23784080 (N.D. Tex. Sept. 30, 2003), *aff'd sub nom. In re Kevco Inc.*, 113 F. App'x 29 (5th Cir. 2004).

## II.    HPS IS NOT A TRANSFER BENEFICIARY UNDER THE CODE SECTION 550 OR TUFTA SECTION 24.009(B)

### A.    The Trustee Fails To Pierce The Veil As To KFM, HMI, and HMH, Which Is Fatal To His Theory That HPS Is A Transfer Beneficiary

The Motion (and Initial Motion) make clear that, under binding Fifth Circuit authority, "shareholders, officers, and directors are ***not*** liable for transfers to their corporation [or other business entity] unless they actually received distributions of the transferred property . . . or a

000663

showing can be made to pierce the corporate veil."[2]  *Janvey*, 840 F.3d at 266 (emphasis added) (quotation omitted).  The Trustee concedes that HPS is not an initial transferee, Opp. 24, and offers only speculation that HPS is a subsequent transferee.  *See* MTD at 10.  And the Trustee does not even attempt to pierce the corporate veil between any transferee and HPS (or any of its managed funds).  *See* Opp. at 24-30; *see also* MTD at 11-12.  The Trustee therefore cannot recover against HPS as to any asserted fraudulent transfers.

The Trustee's only rebuttal consists of self-serving misinterpretations of the Motion's dispositive authority.  *See* Opp. at 25 n.14.  For instance, the alleged beneficiary in *Janvey* was not an "unwitting or passive shareholder[]" of a public company, *see id.*, but the "***only shareholder***" of the initial transferee.  840 F.3d at 255 (emphasis added).  Likewise, as stated in the MTD, the alleged transfer beneficiary in *In re Hansen* was "***the president and major shareholder***" of both the transferee and the transferor.  341 B.R. 638, 641 (Bankr. N.D. Ill. 2006) (emphasis added); MTD at 12.  The Trustee pleads nothing close to this level of involvement as to HPS.

As explained in the MTD, HPS' alleged control of AMH, KFM, HMI, and HMH—even assuming it were sufficiently pleaded—cannot by itself support an alter ego theory, and therefore cannot support the Trustee's constructive fraudulent transfer claims against HPS.  MTD at 11-12; *see also*, *e.g.*, *In re Schooler*, 2013 WL 176139, at *5 (Bankr. S.D. Tex. Jan. 16, 2013) ("[U]nity of financial interest, ownership and control" of a company "alone is not sufficient to support an alter ego theory.").  To be sure, the Fifth Circuit, Texas business organizations law, and this Court

---

[2] *Janvey* addresses recovery under Section 24.009(b) of TUFTA, but, as the Fifth Circuit has explained, TUFTA and the Code "are of common ancestry; [and so] cases under one are considered authoritative under the other."  840 F.3d at 265 (internal quotations and citations omitted); *see also Williams v. Performance Diesel, Inc.*, 2002 WL 596414, at *5 & n.12 (Tex. App.—Houston [14th Dist.] Apr. 18, 2002, no pet.).  For this issue, Section 24.009(b) and Section 550 both "refer to the person for whose benefit [a] transfer was made."  *Janvey*, 840 F.3d at 265 (internal quotations and citations omitted).

000664

all recognize corporate separateness and limited liability for shareholders like HPS. *See, e.g.*, *United States v. M/Y Galactica Star*, 13 F.4th 448, 456 (5th Cir. 2021); *Union Tank Car Co. v. Maxwell*, 2021 WL 2044345, at *13-14 (S.D. Tex. May 21, 2021) (discussing constructive fraudulent transfer claims against an LLC owner under Texas Business Organizations Code § 21.223(a)(2)); *Chappelle*, 2022 WL 7750353, at *6.

This Court therefore should follow the "right approach," as handed down by the Fifth Circuit, and conclude that HPS cannot be a transfer beneficiary of any transfer received by KFM, HMI, or HMH because the Trustee did not even attempt to pierce the corporate veil between any of those entities and HPS or its managed funds. *Janvey*, 840 F.3d at 266.

**B.    The Trustee Fails To Plead That HPS "Controlled" The Relevant Entities, Which Would In Any Case Be Insufficient To Find HPS Is A Transfer Beneficiary**

The Trustee's argument that HPS was a transfer beneficiary because it controlled AMH and KFM, HMI, and HMH is inapposite and not plausibly pleaded. First, the Trustee's argument is contrary to the well-established Texas and Fifth Circuit law discussed above. Second, the Trustee's cases do not support his argument that control of the transferee entity, without more, is sufficient for the alleged controller to be a transfer beneficiary.[3] *See* Opp. at 25-26.

The Trustee's "controller" theory also fails for the simple reason that the Trustee fails plausibly to plead control. The Trustee states that HPS controlled each of AMH, KFM, HMH, and

---

[3] In *Union Tank*, Judge Rosenthal correctly analyzed whether veil piercing was appropriate as to the owner and controller of the LLC, and did not simply rely on control as the Trustee implies. 2021 WL 2044345, at *13-14. And, in *Esse v. Empire Energy III, Ltd.*, the Court of Appeals did not substantively rule on whether control was sufficient to be a transfer beneficiary, but rather found the issue was waived by the appellant. 333 S.W.3d 166, 181 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Even in *In re Blast Fitness Grp.*, 603 B.R. 219 (Bankr. D. Mass. 2019), the trustee sufficiently alleged that the corporate veil should be pierced as to the supposed transfer beneficiary, consistent with *Janvey*. *See id.* at 245-47.

6

HMI through ownership, "controlling voting rights," "controlling overlapping boards of directors," and threats to withhold funding. Opp. at 26. This list of conclusory control allegations is insufficient for many reasons.

First, the Trustee alleges the AMH limited partnership agreement vested AMH GP—not HPS—with "full, complete, and *exclusive* authority to manage and control" of AMH. AC ¶ 20 (emphasis added).

Second, the Trustee offers not a single non-conclusory allegation that HPS controlled AMH, KFM, HMI, or HMH. MTD at 4-5.

Third, the Trustee's argument that HPS' control arises from ownership fails because HPS *did not own* AMH or HMH as a matter of law. The MTD makes clear—and the Trustee does not respond—that HPS did not own the assets that were, in turn, owned by KFM or HMI (*i.e.*, HMI's ownership interests in AMH or HMH). *M/Y Galactica*, 13 F.4th at 456.[4] Nor did the Trustee allege that HPS owned a majority stake in KFM or HMI. And there are also no allegations that HPS held any voting rights in *any* of the four entities.[5] *See* AC ¶¶ 20, 21, 22, 26. Similarly, the Trustee's contention that HPS controlled the so-called "overlapping boards of directors" appears for the first time in his Opposition, and is absent from the AC. *See* AC ¶¶ 20, 23, 24, 27, 33 (noting simply that Mr. Dimitrievich served on the multi-director boards).

Finally, the Trustee's allegations that HPS somehow "threatened to withhold" some unspecified funding from AMH in connection with the 2016 Amendments is devoid of facts, including, for instance, the funding to which AMH was supposedly entitled, its amount, when HPS

---

[4] *See also*, *e.g.*, *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003); *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 645 (Tex. 1996); 1 Fletcher Cyc. Corp. § 31.

[5] Again, HPS did not own any of the voting shares that HMI allegedly owned. *M/Y Galactica Star*, 13 F.4th at 456; *supra*, note 4.

7

allegedly threatened to withhold it, why HPS was supposed to pay those funds to AMH in the first place, who at HPS made such a threat, or whether it was or could have been carried out. *See* Opp. at 26; AC ¶ 45. The Trustee also fails to explain how this one-time allegation indicates HPS' control of AMH. And the AC nowhere alleges how HPS' supposed threat supports allegations that HPS controlled KFM, HMI, or HMH. The Trustee's "controller" theory thus fails as a matter of law and fact.

### C.    The Trustee Fails To Establish HPS Is A Transfer Beneficiary Under The Flawed *McCook* Test

As explained in the MTD, the *McCook* test—which "ignore[s] the fundamental nature of corporations," *In re Hansen*, 341 B.R. at 645—has never been adopted or even cited in a published case by this Court or by the Fifth Circuit. MTD at 12. The Trustee nevertheless asks the Court to disregard contrary, binding Fifth Circuit precedent and Texas business organizations law, and follow the *McCook* test based on three out of-circuit bankruptcy court opinions. Opp. at 26-30.

The Trustee fails to support plank one of *McCook*: that HPS received any benefit from the transfers. MTD 13. The Trustee's sole response is that HPS, as owner of an interest in KFM and HMI, benefits directly from an increase in the value of assets owned by KFM, HMI, and HMH (assets in which the Trustee nowhere pleads HPS had an interest). *See* Opp. at 27-28 (KFM), 29 (HMI and HMH). This assertion fails under the Texas Business Organizations Code, basic corporations law, and as a matter of logic. *See, e.g.*, *M/Y Galactica Star*, 13 F.4th at 456.

The Trustee also continues to argue that HPS received actual benefits from the Gathering Agreements because the Gathering Agreements allegedly increased the value of KFM, which HPS later sold along with AMH in a single transaction, in connection with the 2018 Business Combination. Opp. at 28. But the Trustee fails to overcome the dispositive principle that an entity that "simply 'receives the money later on' is not a transfer beneficiary." *Seidel v. Byron*, 405 B.R.

000667

277, 292 (N.D. Ill. 2009) (quoting *Bonded Fin. Servs., Inc. v. Eur. Am. Bank*, 838 F.2d 890, 896 (7th Cir. 1988)).  Rather, "[t]he entity must benefit from the transfer directly, not indirectly, ***as soon as the transfer is made*****.**"  *In re Peregrine Fin. Grp., Inc.*, 589 B.R. 360, 380 (Bankr. N.D. Ill. 2018) (emphasis added) (citation omitted).  *Citizens Nat'l Bank of Tex. v. NXS Constr., Inc.*, does not compel a different result because there was no indication in that case that the defendant received money or any other benefit after the transfer; in fact, the defendant was a party to the transfer transaction.  387 S.W.3d 74, 79, 85 (Tex. App.—Houston [14th] 2012, pet. denied). Further, the Trustee's position is ***still*** that HPS benefited because the Gathering Agreements allowed HPS to siphon value from AMH and transfer it to KFM—which assertion makes no economic sense given the Trustee's own allegations that HPS then sold its interests in both entities simultaneously in a single transaction.  MTD at 13.

The Trustee also fails to allege the second *McCook* criterion:  that HPS received a quantifiable benefit from any transaction.  *See* MTD at 14.  Once again, since HPS did not own the assets that were owned by HMI or KFM, HPS did not receive a benefit from the alleged increase in value of HMI's or KFM's assets.  *See, e.g.*, *M/Y Galactica Star*, 13 F.4th at 456; *supra*, note 4.  The Trustee responds that the benefit need only be capable of being quantified, not actually quantified in the AC, particularly because the amount is "within the Defendants' knowledge." Opp. at 28-30 (quoting *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 273 (N.D. Tex. 1990)).[6]  For the reasons stated in the MTD, this fails to plausibly plead the second criterion.  MTD at 14.

Finally, HPS established in the MTD that the AC contains no allegations that HPS had actual access to the alleged benefit held by KFM, HMI, or HMH.  *Id.* at 14-15.  The Trustee argues

---

[6] In *Steiner*, the Court was discussing relaxing the requirement that "allegations of fraud cannot be based upon information and belief," if the matter is "within the opposing party's knowledge."  734 F. Supp. at 273.

000668

that HPS' alleged control is sufficient to satisfy this element under *McCook*.  Opp. at 29.  Even assuming HPS did control KFM, HMI, or HMH (it did not, as discussed above), the Trustee fails to address *In re Green Field Energy Servs., Inc.*, which held that control alone is not enough to satisfy the actual access element.  2018 WL 1116374, at *3 (Bankr. D. Del. Feb. 27, 2018); *see also* 1 Fletcher Cyc. Corp. § 31 ("Shareholders, even a controlling shareholder, cannot transfer or assign the corporation's properties and rights . . . .").

The Trustee failed to plead that HPS was a transfer beneficiary.  The Trustee therefore cannot recover from HPS under the Code 550 or TUFTA Section 24.009.  This failing alone warrants dismissal of all of the Trustee's fraudulent transfer claims against HPS.

## III.    THE TRUSTEE CANNOT AVOID THE GATHERING AGREEMENTS

### A.    Counts I and II Are Barred By Claim Preclusion

The MTD makes clear that in *KFM II*, AMH (Trustee's predecessor in interest) (i) asserted claims for constructive fraudulent transfer (ii) arising from the 2016 Amendments and related transfers, (iii) under TUFTA, and (iv) against KFM.  MTD at 15-16; *KFM II* (4:19-ap-03684) at ECF No. 1.  Here, the Trustee asserts (i) claims for constructive fraudulent transfer (ii) arising from the 2016 Amendments and related transfers, (iii) under TUFTA, and (iv) against HPS, on the grounds that HPS held an equity stake in KFM.  AC ¶¶ 76-86.  In other words, having failed to hold KFM liable, the Trustee has simply shifted his claims up the corporate chain.  This wasteful re-litigation is precisely what claim preclusion is intended to prevent.

The elements of claim preclusion are therefore clear.  As the MTD established, HPS was in privity with KFM at the time of *KFM II* because HPS' "interests," as a "non-party defendant" were "adequately represented by a party to the original suit"—KFM.  *Butler v. Endeavor Air, Inc.*, 805 F. App'x 274, 277 (5th Cir. 2020) (quoting *Meza v. Gen. Battery Corp.*, 908 F.2d 1262, 1266 (5th Cir. 1990)); *see also id.* at 277-78 ("Adequate representation may occur where a party to the

10

original suit is so closely aligned to the non-party's interests as to be his virtual representative.")
(quotation omitted).  Indeed, the substantive constructive fraudulent transfer claims and defenses
in *KFM II* are necessarily substantially the same as those at issue in Counts I and II, given the
Trustee has simply taken his claim up the corporate structure.[7]

The Trustee's own allegations make clear that KFM adequately represented HPS in *KFM
II*.  To support his "transfer beneficiary" allegations, the Trustee asserts—indeed, must assert—
that HPS controlled KFM, and that transfers to KFM were effectively transfers to HPS.  *See* AC
¶¶ 70-72, 81-83; Opp. at 26-29.  The Trustee cannot simultaneously disclaim that HPS was an
informal party and/or in privity with KFM in *KFM II*.  *See Slay v. Burnett Tr.*, 187 S.W.2d 377,
383 (Tex. 1945).  And the Trustee's denial that HPS participated in that action, Opp. at 31, is
inconsistent with the facts.  *See* MTD 15; *see also KFM I* (No. 4:19-ap-03609) Oct. 7, 2019
Courtroom Minutes (HPS attended a substantive status conference); *In re Alta Mesa Res.*, 613 B.R.
90, 106-07 (Bankr. S.D. Tex. 2019) (discussing actions and testimony of HPS employee, Jeff
Hostettler, in KFM adversary proceedings); *Southmark Props. v. Charles House Corp.*, 742 F.2d
862, 869-70 (5th Cir. 1984); *In re Paige*, 610 F.3d 865, 871 (5th Cir. 2010).[8]

---

[7] *In re La. Highway St Gabriel, LLC*, 2021 WL 2546027, at *4-5 (Bankr. M.D. La. June
21, 2021) does not help the Trustee, as there the court dealt with the relationship between a parent
company and its subsidiary, and found that the two ***were in privity***.  Similarly, the Trustee's other
cases are inapposite because HPS and KFM are far more closely aligned than two distinct private
persons in a lease transaction, two unrelated hospitals, or an individual and the Department of
Labor.  *Sw. Airlines Co. v. Tex. Int'l Airlines, Inc.*, 546 F.2d 84, 96 (5th Cir. 1977); *N. Cypress
Med. Ctr. Operating Co. v. Cigna Healthcare*, 2016 WL 9330500, at *4 (S.D. Tex. Sept. 28, 2016),
*aff'd*, 952 F.3d 708 (5th Cir. 2020); *Texas v. Dep't of Labor*, 929 F.3d 205, 211 (5th Cir. 2019).

[8] The Trustee's assertion that HPS did not own KFM after the Business Combination, Opp.
at 31, is contrary to the Trustee's claims that HPS owned and controlled KFM after the Business
Combination through an ownership interest in AMR.  *See Dunn v. Chappelle*, No. 4:21-ap-3423,
at ECF No. 50 ¶¶ 3, 87 (alleging that KFM's "former owners" received equity in AMR—KFM's
post-Business Combination parent entity).

000670

The MTD also makes clear that Counts I and II (concerning the Gathering Agreements) were, or **could have been**, brought by AMH in *KFM II*.  MTD at 16.  In response, the Trustee asserts only that AMH could not have raised the claims in this case in *KFM II* because they are claims against HPS.  Opp. 33.  The Trustee's apparent assertion that claim preclusion applies only where the parties are *identical*—rather than "technical" or in privity—is inconsistent with the law that governs the first element of claim preclusion; the Opposition concedes as much by spending two pages on "technical" parties and privity.  Opp. 30-32.  Regardless, privity arguments miss the point:  the critical issue for the "same claim" element is whether two actions are based on the same nucleus of operative facts.  *Omran v. Wyche*, 745 F. App'x 225, 226 (5th Cir. 2018).  As detailed above, the Trustee's current claims are essentially a minor variation on the *KFM II* claims.  And the Trustee offers no reason beyond his misplaced privity assertions that he could not have brought fraudulent transfer claims in *KFM II* against KFM arising from the 2015 Gathering Agreements and related Gathering Payments under TUFTA **and** the Code.  *See* MTD at 7, 16; *see also Stevens v. Bank of Am., N.A.*, 587 F. App'x 130, 133-34 (5th Cir. 2014) (restyling a complaint cannot avoid claim preclusion).

## B.    Counts I and II Are Time-Barred Under the Bankruptcy Code and TUFTA

HPS established in both the Initial Motion and MTD that the Trustee cannot avoid the Gathering Agreements and related Gathering Payments that fall outside the relevant lookback periods under the Code or TUFTA.  *See* Initial Mot. at 9-11; MTD at 16-17.  The Trustee does not seriously dispute this, arguing instead that payments under the Gathering Agreements were made within TUFTA's four-year lookback period.  *See* Opp. at 33 (citing AC, Ex. 3).  But this argument fails to address that payments under the Gathering Agreements were in satisfaction of an antecedent debt, and therefore not avoidable under TUFTA.  *See In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747, 765–66 (Bankr. W.D. La. 2013) (rejecting the trustee's argument that, even if the

000671

underlying agreements were time-barred, the trustee could still avoid individual payments that were made pursuant to those agreements and within the relevant lookback period).  As explained below, *infra.* at 13-14 & n.9, the payments under the Gathering Agreements constitute "dollar-for-dollar satisfaction" of AMH's contractual obligations, and as such, are not fraudulent as a matter of law.  *See In re Dual D Health Care Ops., Inc.*, 2021 WL 3083344, at *10-11 (Bankr. N.D. Tex. July 21, 2021).

## IV.    THE TRUSTEE FAILS ADEQUATELY TO PLEAD CONSTRUCTIVE FRAUD

### A.    The Trustee Misconstrues The Applicable Legal Standard

The Court granted the Trustee leave to amend specifically to replead allegations that "meet [R]ule 9."  MTD at 8 (quoting ECF No. 33).  The Trustee's repeated assertion that Defendants have "notice" of the claims against them is contrary to this instruction, and also fundamentally misconstrues his pleading burden under Rule 12(b)(6), which demands "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted); *see also Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 385 (5th Cir. 2017) ("[A] complaint may simultaneously satisfy Rule 8's technical requirements but fail to state a claim under Rule 12(b)(6).") (citation omitted); *see, e.g.*, Opp. at 2, 11, 17, 18, 28-30.  And even Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678-79.  As explained below, the Trustee has offered no non-conclusory factual allegations to support his fraudulent transfer claims.

### B.    The Trustee Fails To Plead Lack Of Reasonably Equivalent Value

The MTD makes clear that the Trustee has failed to plead a transfer made for less than reasonably equivalent value.  *See* MTD at 19-22.  Contrary to the Trustee's out-of-circuit authority, Opp. 19-20, payments on antecedent contractual liability constitute dollar-for-dollar reduction of

000672

an obligation and cannot support a fraudulent transfer claim. *See Matter of La. Pellets, Inc.*, 838 F. App'x 45, 52 (5th Cir. 2020) (payments not constructively fraudulent where debtor received "dollar-for-dollar reduction" of obligation to pay under prior agreement); *see also In re Gulf Fleet*, 491 B.R. at 765-67 (same).[9]  Here, the Trustee concedes that payments were "based on AMH's delivery to KFM of oil and gas for gathering" and "dependent on the gathering *requested* by AMH."  Opp. at 20-21 (emphasis in original).  Likewise, the HMI MSA established AMH's obligation to provide payroll, expenses, and other services in exchange for HMI's reimbursement and a monthly management fee.  AC ¶ 54.  Thus, AMH "undisputedly received 'value' in exchange for the Contractual Payments because each of the payments resulted in the satisfaction of contractual obligations incurred under the terms of the [agreements]."  *In re Specialty Select Care*, 2021 WL 3083522, at *12.

Regardless, the Trustee offers only insufficient conclusory allegations in support of this argument.  He asserts, for instance, that fees under the Gathering Agreements were not "within the range" that AMH would have exchanged in an arm's length transaction, and that rates were "above market" or otherwise excessive, without any facts about, for instance, prevailing market rates.  *See* Opp. at 15.  The same is true for the Trustee's contention that AMH received "no value" for the expenses it advanced to HMI that HMI would reimburse under the HMI MSA.  *See* Opp. at 18.  The allegation that HMI ultimately did not reimburse AMH does not change that AMH made payments based on an "expected future benefit," and therefore satisfied "reasonably equivalent value."  *See In re La. Pellets, Inc.*, 2019 WL 2565670, at *3 (Bankr. W.D. La. June 20, 2019) ("[P]ayments under a contract may constitute 'reasonably equivalent value' based on the expected

---

[9] *See also In re Dual D Health Care*, 2021 WL 3083344, at *11 (same); *In re Specialty Select Care Ctr. of San Antonio, LLC*, 2021 WL 3083522, at *12 (Bankr. N.D. Tex. July 21, 2021) (same); *In re Jones*, 2019 WL 1167812, at *8 (Bankr. N.D. Tex. Mar. 11, 2019) (same).

14

future benefit, notwithstanding the fact that the Debtor may go into bankruptcy before that benefit is realized."), *aff'd sub nom. Matter of La. Pellets, Inc.*, 838 F. App'x 45.  Finally, the Trustee disregards binding Fifth Circuit precedent in arguing that the "net effect" of the assignment of so-called Non-STACK assets—which "net effect" the Trustee fails to plead—is not relevant to determining whether AMH received reasonably equivalent value.  Opp. at 16-17.  In fact, "[t]he proper focus is on the net effect of the transfers on the debtor's estate."  *See In re Hinsley*, 201 F.3d 638, 644 (5th Cir. 2000).

### C.    The Trustee Fails To Plead AMH's Financial Condition

The MTD established that the Trustee has failed to sufficiently plead that AMH was insolvent during the relevant time periods.  *See* MTD at 22-25.  The allegations in the AC concerning AMH's financial condition are made on information and belief—without reference to facts that support that belief—and despite the Trustee's undoubted access to the financial records of the entity he represents.  The Trustee's assertions are contrary to other allegations in the AC that AMH was valued at $2.25 billion in early 2018 and that the Non-STACK assets were worth tens of millions of dollars at the time of the assignment.  *See* AC ¶¶ 1, 53.  And the AC offers no allegations as to how assignment of the Non-STACK assets, or the HMI MSA, affected AMH's financial condition or rendered "the sum of its liabilities [] greater than the sum of its assets at fair valuation."  *See In re Northstar*, 616 B.R. 695, 724 (Bankr. S.D. Tex. 2020).

The Trustee falls back on the assertion that insolvency is a factual determination not appropriate for resolution on a motion to dismiss.  Opp. at 21.  But insolvency allegations are not exempt from the pleading requirements of Rule 12(b)(6), and courts routinely find that a party has failed to plead the insolvency element of constructive fraud where, as here, the complaint does not allege the debtor's assets relative to its liabilities.  *See, e.g.*, *In re Cyr*, 602 B.R. 315, 332 (Bankr. W.D. Tex. 2019) (where trustee "presented no allegations regarding the value of the [] debt relative

000674

to the value of the [debtor's] assets at the time the transfers were made," the trustee failed to plead insolvency for a constructive fraudulent transfer). The Trustee also attempts to plead insolvency by reciting statutory requirements and citing paragraphs from the AC without further explanation. *See* Opp. at 22. These formulaic responses are insufficient to plead insolvency even under Rule 8. *In re Arete Healthcare LLC*, 2022 WL 362924, at *10 (Bankr. W.D. Tex. Feb. 7, 2022). And even the cases cited by the Trustee confirm that insolvency is based on a debtor's inability to pay debts as they become due and not, as the Trustee's alleges, a lack of sufficient cash flow or capitalization. *See* Opp. at 22-23.

## V.    FURTHER AMENDMENT WOULD BE FUTILE

Despite years to investigate his claims and a prior opportunity to amend, the AC provides no plausible support for a constructive fraudulent transfer claim. The current amendments consist largely of additional, insufficient conclusions and recitations of legal elements. The AC thus continues to fall far short of stating a claim. Regardless, no amendment can change the fact that HPS is not a transfer beneficiary under the Code or TUFTA as a matter of law, nor that the Gathering Agreements are unavoidable as a matter of procedure and according to statute. And the Trustee has failed to identify any grounds for amendment or what facts he would plead, or to explain how an amendment could cure these repeated deficiencies. *See* Opp. at 34-35. The Court should deny the Trustee's cursory request to file yet another defective complaint and deny the claims against HPS with prejudice. *See In re Uplift RX, LLC*, 625 B.R. 364, 375 (Bankr. S.D. Tex. 2021); *Waggoner v. Denbury Onshore, LLC*, 612 F. App'x 734, 740-41 (5th Cir. 2015).

## CONCLUSION

For these reasons, HPS respectfully seeks an Order dismissing the First Amended Complaint with prejudice.

000675

Dated:     October 28, 2022                    Respectfully submitted,

                                               **QUINN EMANUEL URQUHART &
                                               SULLIVAN, LLP**

                                               /s/ *Karl S. Stern*
                                               Karl S. Stern (attorney in charge) (SBN 19175665)
                                               Christopher D. Porter (SBN 24070437)
                                               711 Louisiana Street, Suite 500
                                               Houston, TX 77002
                                               Telephone:     (713) 221-7000
                                               Facsimile:     (713) 221-7100
                                               Email: karlstern@quinnemanuel.com
                                               christopherporter@quinnemanuel.com

                                               **-AND-**

                                               Michael B. Carlinsky (*pro hac vice*)
                                               Benjamin I. Finestone (*pro hac vice*)
                                               Jacob J. Waldman (*pro hac vice*)
                                               Courtney C. Whang (*pro hac vice*)
                                               51 Madison Avenue, 22nd Floor
                                               New York, NY 10010
                                               Telephone:     (212) 849-7000
                                               Facsimile:     (212) 849-7100
                                               Email: michaelcarlinsky@quinnemanuel.com
                                               benjaminfinestone@quinnemanuel.com
                                               jacobwaldman@quinnemanuel.com
                                               courtneywhang@quinnemanuel.com

                                               **COUNSEL TO HPS INVESTMENT PARTNERS, LLC**

000676

## **CERTIFICATE OF SERVICE**

I certify that this motion has been served on counsel of record by the Court's ECF system on October 28, 2022.

/s/ Karl S. Stern
By: Karl S. Stern

18

000677

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| ALTA MESA RESOURCES, INC., *et al.,* | Case No. 19-35133 |
| Debtors. | (Jointly Administered) |
| DAVID DUNN, as Trustee of the AMH Litigation Trust, | |
| Plaintiff, | Adv. No. 21-03909 |
| v. | |
| HPS INVESTMENT PARTNERS, LLC; ARM ENERGY HOLDINGS, LLC; ARM MIDSTREAM, LLC; AND ASSET RISK MANAGEMENT, LLC, | |
| Defendants. | |

**REPLY IN SUPPORT OF ARM DEFENDANTS' RULE 12(B)(6)**
**MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**
[Relates to ECF No. 49]

Defendants ARM Energy Holdings, LLC, ARM Midstream, LLC, and Asset Risk Management, LLC (collectively, "ARM") file this Reply in Support of their Rule 12(b)(6) Motion to Dismiss the First Amended Complaint for Failure to State a Claim [ECF No. 49] (the "Motion") and ask that the Court dismiss with prejudice all claims asserted against them by Plaintiff David Dunn (the "Trustee"), as Trustee of the AMH Litigation Trust (the "Trust") in Trustee's First Amended Complaint [ECF No. 40] (the "FAC"), and respectfully state as follows:

000678

## INTRODUCTION

1.        Trustee's Opposition[1] provides no legal basis for allowing this flawed lawsuit to proceed.  Trustee's Opposition is primarily comprised of recycled challenges to ARM Defendants Rule 12(b)(6) Motion to Dismiss the Original Complaint [ECF No. 19], with Trustee alleging the same conclusory allegations as before, as a basis for his fraudulent transfer claims.  Rather than presenting any evidence that ARM either controlled AMH, pushed AMH to undertake the alleged transactions, or benefitted from the alleged transactions undertaken by AMH, Trustee merely recites seven pages of factual background—copying and pasting conclusory allegations from the FAC.[2]

2.        Trustee was granted leave to amend his Original Complaint [ECF No. 1] with particularity to satisfy Rule 9(b)—a more stringent pleading standard.  Rather than amending his Original Complaint to satisfy the Rule 9(b) pleading standard, Trustee abandoned his claims for actual fraudulent transfer, asserting only claims for constructive fraudulent transfer—hoping that would absolve the need to satisfy Rule 9(b).  Trustee's Opposition attempts to assert that only Rule 8(a)(2) applies to the FAC in it its entirety and asserts that Trustee adequately alleged facts supporting each element of his claim under the relaxed general pleading standard of Rule 8(a)(2).[3] On the contrary, ARM's arguments in favor of dismissal of Trustee's claims expressly assume the truth of Trustee's factual allegations.  Even if each of Trustee's factual allegations is true, Trustee's claim for fraudulent transfer remains implausible on its face.

---

[1] Plaintiff's Omnibus Opposition to Motions of ARM Defendants and HPS Investment Partners, LLC to Dismiss First Amended Complaint [ECF No. 52] (the "Opposition").
[2] *See* Opposition, at 3-10.
[3] *See* Opposition, at 13.

000679

3.      Similar to the Original Complaint, Trustee's FAC alleges that certain transactions allegedly undertaken by AMH are fraudulent transfers and asserts that they (somehow) benefitted ARM—without providing any basis or pleading of how ARM benefitted or how ARM had control over AMH to obtain such fraudulent benefits.

4.      More specifically, Trustee claims that ARM caused AMH to make fraudulent transfers under certain oil and gas gathering agreements in 2015 ("2015 Agreements") and certain amendments thereto in 2016 ("2016 Amendments") (collectively "Gathering Agreements") under which AMH incurred contractual obligations and was contractually required to make payments as set forth in the Gathering Agreements to Kingfisher Midstream, LLC ("KFM"), an entity in which ARM held a 30% interest.  At a minimum, Trustee fails to address in his Opposition—nor can he cure—the following fatal defects of the FAC:

A.      **Elements of Constructive Fraudulent Transfer:** Trustee merely regurgitates his legal conclusion that AMH was "insolvent" at the time of the alleged fraudulent transfers and that the transactions were for less than "reasonably equivalent" value.  Trustee cannot meet his burden of pleading AMH's financial condition by relying merely on AMH's cash flow, debt-to-equity ratio, or the fact that AMH ultimately filed for bankruptcy (more than four years after entry into 2015 Agreements).  Trustee has access to AMH's entire financial records, yet he pleads no facts supporting his conclusion of "insolvency."  Further, his own allegations in the FAC render any claim of insolvency facially implausible.  Trustee's claim for constructive fraudulent transfer should be dismissed.

B.      **Transfer Beneficiary:** Trustee admits that ARM was not an initial or subsequent transferee of the alleged fraudulent transfers and that the payments were made by AMH to KFM pursuant to the Gathering Agreements.  Even when relying on the "beneficiary transferee" theory, Trustee's FAC fails to allege how any transfers benefited ARM, nor that ARM had the prerequisite control to enforce any of the alleged fraudulent transfers.  Trustee has no legal basis for recovery from ARM when he pleads no facts supporting his naked conclusion that ARM "benefitted" from the payments under the Gathering Agreements.  Trustee's claim against ARM based on contractual payments required under the Gathering Agreements to KFM should be dismissed as a matter of law.

000680

5.      Instead of addressing the legal flaws detailed above, Trustee resorts to regurgitating his legal conclusions and recycling the same challenges from Trustee's Original Opposition [ECF No. 22]—essentially masquerading legal conclusions as factual allegations and hoping that discovery will unearth facts to support his unfounded legal conclusions.  Trustee also rebrands the FAC's conclusory allegations as factual allegations, claiming that this Court must accept them as true.  On the contrary, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."[4]  Legal conclusions must be accepted as true only when they are supported by factual allegations—which is exactly what the FAC omits.[5]  It is only "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[6]  The additional conclusory allegations in Trustee's FAC and Opposition do not come close to repairing the deficiencies as required by this Court.  As such, Trustee's claims against ARM should now fully and finally be dismissed.

## ARGUMENT AND AUTHORITIES

I.      **Trustee's FAC fails to adequately plead facts plausibly suggesting the Gathering Agreement Obligations and AMH Gathering Payments were constructively fraudulent transfers.**

6.      To establish a claim for a constructively fraudulent transfer under either section 548 of the Bankruptcy Code or section 24.005 of the TUFTA, a plaintiff must plead sufficient facts and provide evidence that it received less than reasonably equivalent value for the transfer and one of four additional factors—such as being financially vulnerable or insolvent at the time of the

---

[4] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
[5] *See id.* at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (explaining that the burden rests on the plaintiff to provide a complaint with "enough factual matter (taken as true) to suggest that [the plaintiff] is entitled to relief.").
[6] *Ashcroft*, 556 U.S. at 678 (emphasis added). *See also R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) ("[W]e will not strain to find inferences favorable to the plaintiffs and we will not accept conclusory allegations, unwarranted deductions, or legal conclusions.").

4

transaction.[7]  In both Counts I and II of the FAC,[8] Trustee asserts constructive fraudulent claims against ARM—alleging that AMH received less than reasonably equivalent value for the alleged transfers, and that as a result of the AMH Gathering Payments and Gathering Agreement Obligations, the Debtor became insolvent and undercapitalized.

**A.    Trustee pleads only conclusions devoid of facts regarding the Absence of Reasonably Equivalent Value with respect to the AMH Gathering Payments and Gathering Agreement Obligations.**

7.    Trustee's Opposition claims that the FAC adequately pleads details of how AMH did not receive reasonably equivalent value with respect to the AMH Gathering Payments and Gathering Agreement Obligations but quotes nothing more than conclusory statements, insufficient to meet the requirements of Rule 8.  More specifically, Trustee contends that the FAC adequately alleges:

> (1) that the gathering and processing fees paid by AMH pursuant to the Gathering Agreements were exorbitant and approximately 90%-100% higher than market rates; (ii) that the Gathering Agreements required the payment of Capital Recovery Fees or Facility Fees that were completely foreign in the industry and increased AMH's price of doing business with KFM even further beyond industry standards; (iii) that the Gathering Agreements included the Conveyances for which AMH received no consideration; and (iv) that the 2016 OGA Amendment required AMH to pay KFM (and that AMH did pay KFM) for barrels of oil, up to 50,000 a day, that KFM did not transport.[9]

---

[7] 11 U.S.C. § 548(a)(1)(B)(i), (ii)(I)-(III); TEX. BUS. & COMM. CODE § 24.005(a)(2).

[8] In Count I, the fraudulent transfer claims are asserted under the Bankruptcy Code 11 U.S.C. § 548(a)(1)(B) and § 550 for avoidance and recovery of "AMH Gathering Payments" (as defined in the FAC).  In Count II, the fraudulent transfer claims are asserted both under the Bankruptcy Code 11 U.S.C. § 544 and the Texas Uniform Fraudulent Transfer Act ("TUFTA") §§ 24.005(a)(2), 24.006(a), 24.008, 24.009(b)) for avoidance and recovery of "Gathering Agreement Obligations" and "AMH Gathering Payments" (as defined in the FAC).

[9] Opposition, at 14.  Notably, Trustee made identical claims in its Original Opposition.  *See* ECF No. 22, at 19 ("The Complaint alleges the gathering and processing fees agreed to and paid by AMH pursuant to the Gathering Agreements were exorbitant and well above-market, that the Gathering Agreements included the Conveyances for which AMH received no consideration, and that the 2016 Crude Oil Amendment required AMH to pay KFM (and that AMH did pay KFM) for barrels of oil, up to 50,000 a day, that KFM was required to transport but which KFM did not transport.").

000682

8.     Trustee contends such allegations detail how and why AMH did not receive reasonably equivalent value.  Such conclusory allegations do nothing more than provide a basis for dismissal, however—as such conclusory allegations are based on Trustee's interpretation of a valid contractual obligation and payments made thereunder between AMH and KFM without showing anything more.

9.     In addition, as stated in ARM's Motion, plaintiffs generally run afoul of the plausibility standards if they neglect to adequately allege facts about the: (a) asset transferred, (b) date of transfer, (c) recipient of transferred asset, (d) value of the asset transferred, or (e) value of the asset received.[10]  Here, Trustee failed to plead such facts, and rather than addressing the plausibility standard in *Aphton*—which he cannot—Trustee merely argues that *Aphton* is non-binding without citing any authority holding as such.[11]  Trustee goes one step further by arguing that "[n]onetheless, FAC's allegations do satisfy the *Aphton* plausibility standard, alleging that ARM, on behalf of KFM, deducted the amounts on a monthly basis from sale proceeds owed to AMH, and the monthly amounts of such deductions."[12]  Such deductions, if any, were made pursuant to a valid contractual agreement and, in any event, still fail to meet the standard articulated in *Aphton*.  Trustee's Opposition and FAC merely include vague allegations about the maximum possible aggregate value transferred by AMH to KFM, and it generally identifies the asset transferred and the recipient of the transfers.  There is no mention, however, of the dates of the transfers, the value of each individual transfer, nor the value of the asset (or service) received in return, and therefore fails to state a claim for less than reasonably equivalent value.

---

[10] *Aphton Corp. v. Sonafi Pasteur (In re Aphton Corp.)*, 423 B.R. 76, 93 (Bankr. D. Del. 2010).
[11] *See* Opposition, at 16.
[12] *Id.*

000683

10.     Further, Trustee's Opposition cites to an array of case law—attempting to argue that the existence of a binding contract does not foreclose a fraudulent transfer claim.[13]  Even assuming that is true, this Court stated at the initial Motion to Dismiss hearing: "you can't have a fraudulent transfer with respect to contacts" where mandatory payments under a contract are required.[14]  Further, this Court went on to note that in some cases where the parties have contracted for "optional payments," depending on certain factors, including what was ordered and whether it was overpriced, there may be fraudulent payments—however, such allegations should be made under the Rule 9 pleading standard.[15]  Here, Trustee's Opposition does nothing more than rely on inadequate case law and conclusory allegations to argue that payments made to KFM under the Gathering Agreements were "optional payments."  As such, the Court should dismiss Trustee's claim.

**B.     Trustee pleads only conclusions devoid of facts regarding AMH's financial condition and insolvency at the time of the AMH Gathering Payments and Gathering Agreement Obligation.**

11.     Trustee contends that the FAC adequately pleads both specific and general allegations of AMH's financial condition and insolvency at the time of the alleged fraudulent transfers,[16] but quotes nothing more than bald conclusions.  The FAC pleads only that AMH was running at a net loss in both 2015 and 2016 and was cash-flow insolvent, that AMH was inadequately capitalized, with a debt-to-equity ratio of above 20 to 1, and that AMH lacked

---

[13] *See* Opposition, at 18-19.
[14] *See* ECF No. 53, RFJN, at 54 ("[Y]ou can't have a fraudulent transfer with respect to contacts. That one depends, in my view, if you have a mandatory payment under a contract, then I think that the argument being made by Mr. Finestone is correct" and "to the extent that they were all mandatory payments, I don't follow the argument that it would be anything other than a potential preference.").
[15] *See* ECF No. 53, RFJN, at 54 ("… if you had optional payments, depending upon what you ordered and you ordered things that were overpriced, that might very well be fraudulent payment.  But I don't have those allegations in here under Rule 9 to know what specifically was done in the implementation of the contact in furtherance of fraud.").
[16] *See* Opposition, at 21.

000684

sufficient cash flow to meet its upcoming obligations,[17] and thereby became insolvent after the AMH Gathering Payments and Gathering Agreement Obligations.[18]  "To prevail on a constructively fraudulent transfer claim, Trustee must prove insolvency *on the date of the transfer*."[19]  Trustee has failed to do so.

12.    Further, the legal term "insolvent" is not a factual allegation, and this Court need not accept as true such a legal conclusion nor make any inference from it.[20]  At most, the FAC recites legal tests when alleging that AMH was insolvent, inadequately capitalized, and unable to pay its debts as they came due.  There is not a single fact pleaded, however, that establishes AMH's actual insolvency, and, more importantly, that ARM played a role in causing such insolvency.  In general, an oil and gas company operating at a net loss in any given year is not uncommon and conclusory allegations that transferor was insolvent or in debt certainly does not prove insolvency.[21]  In addition, Trustee merely pleading AMH's debt-to-equity ratio was above 20 to 1, without any further context, does little in the way of proving financial hardship, let alone insolvency.[22]

13.    Nor can Trustee rely on any allegation that ARM had reasonable cause to believe AMH was insolvent.  As with Trustee's other conclusory allegations regarding AMH's insolvency, that allegation is a legal conclusion that is not entitled to any presumption of truth.  The FAC alleges no facts showing that AMH was actually insolvent at the time of the transfer.  As the litigation trustee and the successor in interest to AMH's bankruptcy estate, Trustee has access to

---

[17] *See* FAC, at ¶¶ 38-39, 49.

[18] *See* Opposition, at 21-22.

[19] *In re Northstar Offshore Grp., LLC*, 616 B.R. 695, 737-38 (Bankr. S.D. Tex. 2020) (emphasis added).

[20] *See Ashcroft*, 556 U.S. at 678-79.

[21] *In re ATP Oil & Gas Corp.*, 711 F.App'x. 216, 223 (5th Cir. 2017) (conclusory allegations that the transferor "was insolvent or had unreasonably small capital at the time of the" transfers was insufficient to establish insolvency).

[22] *In re Northstar Offshore Grp., LLC*, 616 B.R. 695 at 738 (explaining how merely alleging insufficient funds to meet financial obligations is insufficient to establish insolvency).

000685

AMH's financial records and could surely allege facts supporting insolvency if they existed. Yet he fails to present any data showing that AMH was actually insolvent at any relevant point in time on or around the date of the transfer. Without a specific reference to AMH's financial condition at the time of the alleged transfers—which Trustee should be capable of making, in light of his access to AMH's financial books and records—Trustee cannot plausibly show that AMH was insolvent at the time of the transfers nor that ARM had reasonable cause to believe AMH was insolvent.[23]

## II.    Trustee cannot recover from ARM Defendants for the AMH Gathering Payments and Gathering Agreement Obligations made to KFM absent factual allegations demonstrating that ARM received a direct and quantifiable benefit.

14.    Similar to the arguments in Trustee's Original Opposition [ECF No. 22], here in Trustee's current Opposition, Trustee acknowledges that ARM was not the initial transferee of the alleged fraudulent transfers made by AMH to KFM, a different legal entity.[24] As such, TUFTA and the Bankruptcy Code would allow recovery from ARM for the AMH Gathering Payments and Gathering Agreement Obligations made to KFM only if AMH made those payments for the benefit of ARM.[25] To plausibly allege—as Rule 8 requires—that the payments to KFM were made for the benefit of ARM, Trustee must allege facts explaining how or why those payments were made for ARM's benefit.[26] Trustee, however, alleges no facts supporting his conclusory allegations that ARM personally benefitted from the payments made to KFM or that the payments were made for

---

[23] *In re ATP Oil & Gas Corp.*, 711 F. App'x at 223 (finding that "Plaintiff cannot plausibly show that ATP was insolvent at the time of the transfers" when "Plaintiff failed to present any financial data showing that ATP was actually insolvent or had little capital when making the [transfers]").

[24] *See* Opposition, at 24-25.

[25] *See* Tex. Bus. & Com. Code Ann. §§ 24.008, 24.009 (West 2017) (allowing recovery for fraudulent transfers against a transferee or the person for whose benefit the transfer was made); 11 U.S.C. § 550(a)(1)-(2) (allowing recovery for a transfer avoided under 11 U.S.C. § 544(b) only from a transferee or the entity for whose benefit the transfer was made).

[26] *See Clapper v. Am Realty Inv'rs, Inc.*, 3:14-CV-2970-D, 2016 WL 302313, at *12-13 (N.D. Tex. Jan. 25, 2016) (dismissing claim under TUFTA against defendants who were not transferees of assets fraudulently transferred when there were no facts explaining how the alleged fraudulent transfers resulted in any benefit to any defendant).

000686

ARM's benefit.  The only allegations in Trustee's FAC and Opposition with respect to "control" are that KFM was controlled by ARM and that the benefits were "accessible" to ARM as a 30% equity owner of KFM.[27]  Those allegations, however—which are nothing more than legal conclusions—cannot satisfy Trustee's burden under Rule 8 to plead supporting facts.[28]

15.     Trustee alleges that ARM received derivative and indirect benefits by causing AMH to make payments to KFM, in the form of compensation in part from the "sale of their respective shares of KFM pursuant to the Business Combination."[29]  Those are not the type of benefits warranting beneficiary liability under TUFTA or the Bankruptcy Code.  Those alleged benefits are neither (a) benefits independent of the benefit KFM (the transferee) received; nor (b) benefits directly resulting from the payments to KFM.[30]  Therefore, ARM's alleged receipt of any compensation in part from the sale of KFM would not constitute a benefit from the Gathering Agreements.

16.     Moreover, it is worth emphasizing that the Business Combination occurred years after the start of the Gathering Agreement Obligations and AMH Gathering Payments, at which time no such transaction was even contemplated.  Trustee's theory that ARM caused AMH to enter into the Gathering Agreements to reap the fraudulent benefits via a future business transaction that was not even yet contemplated is completely implausible.

17.     As addressed in ARM's Motion, Trustee attempts to argue that this Court should disregard the Fifth Circuit's opinion in *Janvey* and instead follow a test set forth in *In re McCook*

---

[27] *See* Opposition, at 5.
[28] *See Clapper*, 2016 WL 302313, at *12-13.
[29] Opposition, at 28.
[30] *Seidel v. Byron*, 405 B.R. 277, 292 (N.D. Ill. 2009) (explaining how allegations regarding simply receiving money at a later time is insufficient to qualify party as a beneficiary of the previous transfers);  *In re Bullion Rsrv. of N. Am.*, 922 F.2d 544, 548 (9th Cir. 1991) (explaining beneficiary status applies "only [to] a person who receives a benefit from the initial transfer").

000687

*Metals.*[31]  The *McCook* opinion, however, has not been adopted or cited by this Court or the Fifth

Circuit.  In *Janvey v. Libyan Investment Authority*,[32] the Fifth Circuit held that the sole and

controlling shareholder of a company that received a fraudulent transfer was not liable as an

intended beneficiary of the fraudulent transfer.  *Janvey* reached that holding not only because

shareholder status alone failed to qualify as a benefit under TUFTA,[33] but also because the court

determined that the shareholder's controlling ownership interest in the transferee did not equate to

a benefit for the shareholder that was independent of the benefit that the transferee received.[34]  The

Fifth Circuit explained that the "independent benefit" required to invoke beneficiary liability under

TUFTA is the type of benefit that would result to a guarantor "[w]hen a debtor transfers assets to

a creditor to satisfy a guaranteed debt."[35]  The guarantor's benefit from the fraudulent transfer is

independent of the transferee creditor's benefit because "[t]he creditor, as transferee, receives the

assets, and the guarantor, as the beneficiary, retains assets that it would otherwise have lost as a

result of the debtor's insolvency."[36]  In contrast, the alleged benefits here—compensation in part

from the much later sale of ARM's interest in KFM pursuant to the Business Combination—

derives solely from ARM's alleged affiliation with KFM (the transferee) and thus provides no

legal basis for beneficiary liability.  Each of the cases Trustee cites in his Opposition found

beneficiary liability not because, as Trustee argues, the beneficiaries direct or control the transfer

and receive pecuniary benefits, but instead because the beneficiaries obtained benefits directly

resulting from the transfer.  "The benefit must derive directly from the transfer, not from the use

---

[31] Motion, at 18.

[32] *Janvey v. Libyan Invest. Auth.*, 840 F.3d 248, 266 (5th Cir. 2016).

[33] *Id.*

[34] *Id.* at 266.

[35] *Id.*

[36] *Id.*

000688

to which it is put by the transferee."[37]  As such, only someone who receives a benefit from the initial transfer is a person for whose benefit the transfer was made.[38]

18.    In his Opposition, Trustee attempts to argue that he is entitled to recovery from ARM as an entity that "benefitted from the Fraudulent Transfers," referring to ARM as, by design, a "Transfer Beneficiary."[39]  In support, Trustee argues the law concerning a Trustee's ability to recover from entities who benefitted from a fraudulent transfer does not limit Transfer Beneficiary cases to guarantee scenarios.  Instead, Trustee attempts to argue that he may pursue a claim against ARM as a Transfer Beneficiary under both the Bankruptcy Code and TUFTA pursuant to a three-prong test established in *Baldi v. Lynch (In re McCook Metals, L.L.C.)*, 319 B.R. 570 (Bankr. N.D. Ill. 2005).[40]  Trustee fails to cite any authority, however, that the *McCook Metals* test is applied in Texas courts or by courts nationwide.

19.    Even if one assumes the *McCook Metals* test is applicable in this Court, Trustee fails to plead facts to show that ARM would qualify as a Transfer Beneficiary.  Under *McCook Metals*, a Transfer Beneficiary is said to have received the requisite "benefit" if the benefit is (1) actually received by the beneficiary, (2) is quantifiable, and (3) is accessible to the beneficiary.[41]  In addressing the first prong, the *McCook Metals* court stated that a benefit from a challenged

---

[37] *In re Mastro*, No. ADV 09-01577, 2011 WL 3300370, at *9–10 (B.A.P. 9th Cir. Mar. 1, 2011) ("The benefit must derive directly from the transfer, not from the use to which it is put by the transferee. Someone who receives the money later on is not an entity for whose benefit such transfer was made."). *See also In re The Heritage Org., L.L.C.*, 413 B.R. 438, 495 (Bankr. N.D. Tex. 2009) ("The phrase 'entity for whose benefit such transfer was made' does 'not simply reference the next pair of hands; it references entities that benefit as guarantors of the debtor or otherwise, without ever holding the funds.' . . . Nor is an unquantifiable advantage the sort of 'benefit' contemplated by § 550. Rather, the common example of the sort of 'benefit' contemplated by Congress in enacting § 550 is the benefit to the guarantor by the payment of the underlying debt of the debtor."); *Mack v. Newton*, 737 F.2d 1343, 1359-60 (5th Cir. 1984) (rejecting as too broad the trustee's allegation that the principals in a partnership had received an incidental benefit from auctioning off cattle and using the proceeds to operate their dairy enterprise, deeming this "an incidental, unquantifiable, and remote benefit bearing no necessary correspondence to the value of the property transferred or received").

[38] *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 896 (7th Cir. 1988).

[39] Opposition, at 24.

[40] *See* Opposition, at 25.

[41] *McCook Metals*, 319 B.R. at 590.

000689

transfer is actually received "when a transfer to a third party increases the beneficiary's assets." *Id.* at 591. In *McCook Metals*, the ultimate beneficiary, Lynch, received a right to purchase assets from another entity, Longview. The plaintiff alleged that the right to purchase was fraudulently transferred. At trial, the court found that Lynch was a Transfer Beneficiary and *actually received* the benefit primarily because Lynch was the majority owner of the LLC and because Lynch had significant control over the transferee entity. In contrast, Trustee's Opposition alleges only that ARM, as a 30% equity owner of KFM, received a respective portion of the value of the transfers made by AMH to KFM after the sale of KFM in connection with the Business Combination. Trustee fails to plead facts to show how the payments made pursuant to the Gathering Agreements directly increased ARM's assets. Further, Trustee's allegation that ARM received an actual benefit from the increase of KFM's assets in connection with the sale of KFM pursuant to the Business Combination fails under the *McCook Metals* test. The *McCook Metals* court held that "an actual benefit rather than a merely intended one must be received in order for the beneficiary to be liable under § 550(a)(1)." Trustee has failed to plead any facts to show that any increase in ARM's assets due to the sale of KFM pursuant to Business Combination would be considered an actual benefit rather than an intended or incidental benefit.

20.     In any event, Trustee's allegation that ARM received an actual benefit merely because ARM owned a minority equity interest is insufficient to pass the muster of the first prong. In *Halperin v. Moreno (In re Green Field Energy Servs.)*,[42] the transfers in question were monetary payments made by the defendant to an LLC, in which the defendant owned a 50% equity interest. The court held that merely owning an equity interest is insufficient to show "actual benefit" received, and instead, the Trustee must prove that the defendant received an actual benefit from

---

[42] *Halperin v. Moreno (In re Green Field Energy Servs.)*, Nos. 13-12783 (KG), 15-50262 (KG), 2018 Bankr. LEXIS 517, at *5 (Bankr. D. Del. 2018),

000690

those payments.[43]   The court further held that the Trustee's claim that the defendant was the ultimate beneficiary simply because he held a 50% stake was held to be "too conclusory" at this stage of the proceedings and that  at trial, the Trustee must prove "an actual benefit rather than a merely intended one" was received by the defendant.[44]   Similarly, Trustee's Opposition fails to prove that ARM received an actual benefit from the alleged fraudulent payments made to KFM by merely relying on the alleged fact that ARM held a 30% equity interest in KFM.

21.      With respect to the second prong, the *McCook Metals* court held that for "purposes of 11 U.S.C.S. § 550, a corollary to the disgorgement-based requirement that a benefit actually be received is a requirement that it be quantifiable.  A merely theoretical benefit is not sufficient since it would not be subject to disgorgement."[45]   The court grappled with the value of the interest Lynch acquired when he obtained the right to purchase Longview's assets.  The court used an expert's detailed report to help calculate the value of Longview's operations.  By using that valuation, the court found that Lynch's right in the assets could be quantified should he be found to be an ultimate beneficiary.   Here, Trustee alleges that the benefit obtained by ARM from the Gathering Agreement Transfers "is the increase in KFM's value attributable to the Gathering Agreement Transfers."[46]   Trustee's allegation is nothing more than a conclusory allegation based on a theoretical benefit.

22.      With respect to the third prong, the *McCook Metals* court held "[e]ven if a quantifiable benefit is actually received, it could not fairly be disgorged if the beneficiary never had *access* to it."[47]   The court held that Lynch's ability to significantly "control" the entity was

---

[43] *Id.*
[44] *Id.*
[45] *McCook Metals*, 319 B.R. at 570.
[46] Opposition, at 28.
[47] *McCook Metals*, 319 B.R. at 570.

000691

determinative of whether Lynch had "access" to the benefit.  In contrast, here, Trustee alleges merely that ARM had "access" to the benefit because ARM was a "primary equity holder of KFM and controlled KFM"[48] and received the benefits of the Gathering Agreement Transfers in connection with the sale of its interest in KFM to the Business Combination.  First, it is inaccurate to say that ARM was a primary equity holder when the Trustee has repeatedly stated that ARM owned only a 30% equity stake in KFM.[49]

23.    Second, neither of those (conclusory) allegations are enough to allow the court to draw a plausible inference that ARM was a Transfer Beneficiary.  For example, in *Lo v. Lee*,[50] the court held that defendant did not have access to the benefit because the "funds were transmitted directly to Northeastern… [defendant] had no control over the funds that [plaintiff] transferred… and the FAC [did] not allege that [defendant] had access to these funds at any point in time."  Similarly, ARM did not have access to the benefit since the AMH Gathering Payments and Gathering Agreement Obligations were transmitted to KFM—not ARM—and because ARM did not have "control" over KFM or the funds AMH transferred at any point in time.  As such, Trustee fails to plead sufficient facts to show that ARM would qualify as a Transfer Beneficiary.

## CONCLUSION

24.    As Trustee has failed to adequately plead a plausible claim against ARM, the FAC does not state a claim upon which relief may be granted.  As such, Trustee's claims should also be dismissed.

WHEREFORE, ARM requests that the claims asserted by the Trustee in his FAC be dismissed for failing to state a claim upon which relief may be granted, that the Court grant her

---

[48] Opposition, at 29.
[49] Opposition, at 5.
[50] *Lo v. Lee*, 234 Cal. Rptr. 3d 824, 830 (2018).

15

attorneys' fees and costs to the extent permitted under applicable law, and for all other relief, in law or in equity, to which the Defendants may be entitled.

Dated: October 28, 2022
      Houston, Texas

                    Respectfully submitted,

                    **EVERSHEDS SUTHERLAND (US) LLP**

                    By:  */s/ David A. Baay*
                      David A. Baay (TBN 24027050)
                      Mark D. Sherrill (TBN 24034678)
                      Jay P. Patel (TBN 24125682)
                      davidbaay@eversheds-sutherland.com
                      marksherrill@eversheds-sutherland.com
                      jaypatel@eversheds-sutherland.com
                      1001 Fannin Street, Suite 3700
                      Houston, Texas  70002
                      Tel: (713) 470-6100
                      Fax: (713) 654-1301

                    COUNSEL TO ARM ENERGY HOLDINGS, LLC; ARM MIDSTREAM, LLC; AND ASSET RISK MANAGEMENT, LLC

000693