**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>ALTA MESA RESOURCES, INC., *et al.,*<br><br>　　　　　　　Debtors. | Chapter 11<br><br>Case No. 19-35133<br><br>(Jointly Administered) |
| DAVID DUNN, as Trustee of the AMH Litigation Trust,<br><br>　　　　　　　Plaintiff,<br><br>　　　　v.<br><br>HPS INVESTMENT PARTNERS, LLC;<br>ARM ENERGY HOLDINGS, LLC;<br>ARM MIDSTREAM, LLC; AND<br>ASSET RISK MANAGEMENT, LLC,<br><br>　　　　　　　Defendants. | Adv. No. 21-03909 |

<u>**ARM DEFENDANTS EXHIBIT LIST**</u>

　　　Defendants ARM Energy Holdings, LLC, ARM Midstream, LLC, and Asset Risk Management, LLC (collectively, "ARM") file this Exhibit List for the November 16, 2022 hearing, which is to be held at 1:30 p.m. CT in Courtroom 404 of the United States Courthouse in Houston, Texas.  Attached hereto are true and correct copies of ARM's Exhibits Nos. 1, 2, 3, and 4.  ARM reserves the right to modify, supplement, or amend its Exhibit List prior to the hearing.

| Number | Description | Offered | Objection | Admitted / Not Admitted | Disposition |
|---|---|---|---|---|---|
| 1 | Plaintiff's Complaint (Dkt. 1) | | | | |
| 2 | Plaintiff's First Amended Complaint  (Dkt. 40) | | | | |
| 3 | Transcript of audio recording of June 8, 2022 | | | | |

001855

| | | | | | |
|---|---|---|---|---|---|
| | hearing *Dunn v. HPS Investment Partners, LLC, et al.*, as prepared by Ornelas Reporting Services on September 16, 2022.  (Dkt. 34) | | | | |
| 4 | Official Form 410 Proof of Claim, filed on July 13, 2020 in *In re High Mesa, Inc., et al.*, Case 20-30602 (claim 51-1) | | | | |

Dated: November 15, 2022
          Houston, Texas


                              Respectfully submitted,


                              **EVERSHEDS SUTHERLAND (US) LLP**


                              By:  */s/ David A. Baay*
                                   David A. Baay (TBN 24027050)
                                   Mark D. Sherrill (TBN 24034678)
                                   Jay P. Patel (TBN 24125682)
                                   davidbaay@eversheds-sutherland.com
                                   marksherrill@eversheds-sutherland.com
                                   jaypatel@eversheds-sutherland.com
                                   1001 Fannin Street, Suite 3700
                                   Houston, Texas  70002
                                   Tel: (713) 470-6100
                                   Fax: (713) 654-1301

                              COUNSEL TO ARM ENERGY HOLDINGS,
                              LLC; ARM MIDSTREAM, LLC; AND
                              ASSET RISK MANAGEMENT, LLC

001856

## <u>CERTIFICATE OF SERVICE</u>

I certify that this motion has been served on counsel of record by the Court's ECF system on November 15, 2022.

By: *<u>/s/ David A. Baay</u>*
      David A. Baay

001857

# EXHIBIT 1

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| ALTA MESA RESOURCES, INC., *et al.*, | ) |
| | ) Case No. 19-35133 |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |
| DAVID DUNN, as Trustee of the AMH Litigation Trust, | ) |
| | ) |
| | ) Adv. Pro. No. _____ |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| HPS INVESTMENT PARTNERS, LLC; ARM ENERGY HOLDINGS, LLC; ARM MIDSTREAM, LLC; AND ASSET RISK MANAGEMENT, LLC, | ) **Jury Trial Demanded** |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff David Dunn, as Trustee of the AMH Litigation Trust (the "**Trust**" or "**Plaintiff**"), the successor-in-interest to certain causes of action of Alta Mesa Holdings, LP ("**AMH**"), brings this action against HPS Investment Partners, LLC ("**HPS**"), ARM Energy Holdings, LLC ("**ARM Holdings**"), ARM Midstream, LLC ("**ARM Midstream**") and Asset Risk Management, LLC (together with ARM Holdings and ARM Midstream, "**ARM**"; ARM together with HPS, the "**Defendants**").

## INTRODUCTION

1.     AMH was an oil and gas exploration and production company that filed for bankruptcy in September 2019 after losing hundreds of millions of dollars and writing off billions of dollars in assets.  Indeed, after being valued at more than $2.25 billion in early 2018, AMH's

1

assets were sold in 2020 at liquidation prices for less than $200 million, leaving its creditors, the principal beneficiaries of the Trust, holding the bag. Due to the damages sustained by AMH, including from its resulting bankruptcy, creditors with more than $600 million in claims have been left with unpaid debts.

2.      AMH's ultimate demise was precipitated by years of transactions through which AMH's value was methodically stripped away to benefit the Defendants and other equity owners of AMH and Kingfisher Midstream, LLC ("**KFM**") at the expense of AMH's creditors.

3.      While the harmful actions of those equity holders were broad-reaching, this Complaint focuses on a series of transactions preceding the February 2018 business combination that were intended to, and did in fact, divert cash and other assets of AMH to KFM for the benefit of KFM's shareholders, particularly Defendants, who owned a substantial portion of KFM's equity interests.

4.      First, AMH was caused to enter into certain gathering agreements with KFM beginning in 2015, under which KFM and its shareholders reaped the benefits of exorbitant fees charged to AMH for years, and the onerous terms under which AMH agreed to effectively prop up the value of KFM for a potential sale.  Over $125 million was paid by AMH under these agreements during just a three-year period, and Defendants reaped the fruits of their value diversion strategy when they sold KFM in 2018 and received over $800 million in cash.

5.      Second, in connection with the 2018 business combination, AMH assigned all of its remaining non-STACK assets to High Mesa, Inc. ("**HMI**")—the entity through which HPS invested in AMH and KFM.  Despite that these assets were, at the time, generating positive net cash flow and valued in the tens of millions of dollars, AMH did not receive a penny of consideration from HMI or its shareholder, HPS.

001860

6.       Instead, AMH entered into yet another agreement—a management services agreement with HMI—under which AMH, not HMI or its shareholder (HPS), would bear all of the up-front expenses of operating the newly-assigned non-STACK assets of HMI in exchange for only a nominal, below-market management fee and a right of reimbursement.  But HMI did not reimburse AMH.  HMI refused to pay, and ultimately left AMH with over $10 million of debt owed under the agreement, exclusive of interest, before it entered its own bankruptcy proceedings where that debt has remained unpaid.

7.       Through these transactions, the assets and value of AMH were purposefully and methodically diverted away from AMH, for the benefit of Defendants, in the years leading up to the February 9, 2018 business combination.  Defendants' actions all but ensured that AMH would ultimately lack the capital and liquidity to continue operating its business as a going concern. Sure enough, AMH was forced to file for bankruptcy in 2019 and sell its assets at liquidation prices in 2020.

8.       The Trustee, on behalf of the Trust, the successor-in-interest to the causes of action of AMH and its estate asserted herein, now brings this action to recover the substantial damages suffered as a result of transfers made and transactions entered into for the benefit of the Defendants. These transactions, including the obligations incurred by AMH and the transfers made by AMH, constituted fraudulent transfers under applicable bankruptcy and non-bankruptcy law and should be avoided.

## JURISDICTION AND VENUE

9.       This Court has jurisdiction over this case under 28 U.S.C. § 157 and 1334.  This Complaint asserts core and non-core claims under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(2)(H).

10.       This Court also has jurisdiction over this case under 28 U.S.C. §§ 1332 and 1334 because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and

001861

is between citizens of different states. David Dunn ("**Dunn**"), the Trustee of the Trust, is a citizen of Connecticut. On information and belief, Defendants are citizens of New York and Texas, and no defendant is a citizen of Connecticut.

11.     Venue is proper in this District under 28 U.S.C. § 1409 because AMH's bankruptcy case is pending in this District. Further, on information and belief, a substantial part of the events or omissions giving rise to the claims occurred in this District.

12.     Pursuant to Federal Rule of Bankruptcy Procedure 7008 and Local Rule 7008-1, the Trust states that it hereby consents to the Bankruptcy Court's entry of final orders and judgment in this adversary proceeding, including if it is determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## PARTIES AND RELATED ENTITIES

13.     The Trust was created in connection with the confirmed Chapter 11 plan for Alta Mesa Resources, Inc., and its AMH and Silver Run debtor affiliates[1] (the "**Bankruptcy Plan**"). Dunn was appointed trustee of the Trust on or about June 8, 2020, the effective date of the Bankruptcy Plan.

14.     Under the Bankruptcy Plan, causes of action held by AMH and its estate against certain third parties not released under the Bankruptcy Plan were assigned to the Trust. The Bankruptcy Plan specifically provided that AMH did not release its claim against the Defendants in this action, and that AMH's claims against the Defendants were assigned to the Trust pursuant

---

[1] The debtors in the above-referenced chapter 11 cases are as follows: Alta Mesa Resources, Inc.; Alta Mesa Holdings, LP; Alta Mesa Holdings GP, LLC; OEM GP, LLC; Alta Mesa Finance Services Corp.; Alta Mesa Services, LP; Oklahoma Energy Acquisitions, LP; SRII Opco GP, LLC; SRII Opco, LP; Kingfisher Midstream, LLC; Kingfisher STACK Oil Pipeline, LLC; Oklahoma Produced Water Solutions, LLC; and Cimarron Express Pipeline, LLC.

4

to the Bankruptcy Plan and the order confirming the Bankruptcy Plan, for the benefit of the creditor beneficiaries of the Trust.

15.     On information and belief, defendant HPS Investment Partners, LLC (formerly known as Highbridge Principal Strategies), is a Delaware limited liability company, with its principal place of business in New York.  At all relevant times, HPS was a substantial equity owner of AMH and KFM and identified as one of the "Sponsor Parties" under the Bankruptcy Plan.

16.     On information and belief, defendant ARM Energy Holdings LLC is a Delaware limited liability company, with its principal place of business in Texas.  At all relevant times, ARM Energy Holdings LLC was an affiliate of defendants ARM Midstream and Asset Risk Management, LLC.  ARM was a founder and substantial equity holder of KFM.

17.     On information and belief, defendant ARM Midstream, LLC is a Delaware limited liability company, with its principal place of business in Texas.  At all relevant times, ARM Midstream, LLC was an affiliate of defendants ARM Holdings and Asset Risk Management, LLC. ARM was a founder and substantial equity holder of KFM.

18.     On information and belief, defendant Asset Risk Management, LLC is a Delaware limited liability company, with its principal place of business in Texas.  At all relevant times, Asset Risk Management, LLC was an affiliate of defendants ARM Holdings and ARM Midstream. ARM was a founder and substantial equity holder of KFM.

## FACTUAL BACKGROUND

**A.     Corporate Structures and Value-Stripping Transactions Leading up to the Business Combination in February 2018**

### a.     AMH Ownership Prior to February 2018

19.     Alta Mesa Holdings, GP, LLC ("**AMH GP**") was the sole general partner of AMH. AMH GP's Board of Managers ("**Board**") conducted business on behalf of AMH.  Prior to

5

February 2018, AMH was owned by its President and CEO Harlan Chappelle ("**Chappelle**"), its COO Michael Ellis ("**Ellis**"), and HMI, a privately held Delaware corporation.

20.     During the relevant time period, HMI was owned by HPS, Chappelle, Ellis and, beginning in 2016, Bayou City Energy Management LLC. Together, Chappelle, Ellis and HMI directly and indirectly owned and controlled AMH between 2015 and February 9, 2018.

### b.  The Creation of KFM and Diversion of AMH Value for HPS and ARM

21.     On information and belief, in 2014, AMH decided to ramp up its investment in an area of Oklahoma known as the STACK.[2] To transport its produced gas in Oklahoma, AMH had existing relationships with incumbent gatherers, and its oil was trucked and marketed by various other companies. However, AMH's owners resolved to take more control over AMH's midstream gathering needs. ARM and AMH, through Chappelle, began discussing jointly sponsoring a new entity to serve as AMH's midstream gatherer in the STACK.

22.     On information and belief, ARM saw an opportunity to finance and build out the gathering system, charge above-market rates to recoup its investment quickly, and flip the asset for a premium.  HPS soon jumped on board and agreed to invest, together with ARM, in the build-and-flip initiative, which would ultimately become KFM.

23.     On information and belief, early presentations of the proposed transaction detailed fees to be paid to KFM that were substantially greater than what AMH was being charged by its existing midstream gatherer.  Under the proposal, KFM's owners (including ARM and HPS) would benefit substantially on the back of AMH. HPS, along with Chappelle, championed the KFM project, in large part because Chappelle, together with Ellis and AMH's other owners, would become investors in KFM and realize profits through the exorbitant amounts to be paid by AMH.

---

[2]  STACK is an acronym derived from the Sooner Trend oil field, Anadarko basin, and Canadian and Kingfisher counties. It refers to a geographic area in the Anadarko basin area of Oklahoma.

001864

24.     On information and belief, ARM took full advantage of the conflicting financial interests of AMH's owners and prepared a series of financial analyses touting the purported advantages of paying above-market rates to KFM—appealing to the potential rewards that would flow to AMH's owners *by virtue of their equity stakes in KFM*. These analyses—or "marketing materials," as one ARM official regarded them—were presented to Chappelle and others in the months before any gathering agreements were signed by AMH.

25.     On information and belief, AMH's owners viewed KFM's rate structure with an eye to the benefits those rates would have for KFM and its owners, including HPS, Chappelle and Ellis. The KFM rates—which were substantially above market—were never meaningfully negotiated by AMH.  AMH's Board and owners likewise failed to pursue competitive offers from gatherers other than KFM, and actively spurned offers from other midstream gatherers, including offers of lower gathering rates. Despite KFM's above-market rates, AMH's Board voted to approve the 2015 agreements.

26.     On August 31, 2015, Chappelle executed the 2015 Gas Gathering and Processing Agreement and Crude Oil Gathering Agreement (together, "**2015 Agreements**") on behalf of AMH and, despite his conflicting interests, on behalf of KFM also.

27.     On information and belief, the pricing terms of the 2015 Agreements were virtually identical to those first proposed by ARM.  The gas base rates were well above market rates, and the capital recovery fees in both agreements made the rates exorbitant.  Indeed, the fees were so high that at times AMH was forced to sell its oil and gas at a loss.

28.     Both 2015 Agreements also included purported dedications of leasehold interests along with boilerplate language characterizing the agreements and their dedications as running with the land. These provisions purported to commit AMH, and any successor in interest to AMH,

to paying the inflated rates to benefit KFM. In addition, both 2015 Agreements included a promise by AMH to "convey or assign" easements or rights-of-way to KFM for the purposes of building and maintaining KFM's gathering systems. But, as the agreements explicitly state, the easements or rights-of-way were not conferred by the agreements themselves. Instead, they were to be conveyed to KFM sometime in the future, if at all, and only "where reasonably requested."

29.     On information and belief, within weeks of execution of the 2015 Agreements, AMH's managers openly questioned the exorbitant fees the company had agreed to pay.  For every above-market dollar paid by AMH to KFM, only a small fraction would make it back to AMH.  In effect, the value of AMH's production assets was being diverted to benefit KFM (in which AMH had no equity interest) and KFM's equity ownership, including HPS and ARM.  Indeed, AMH learned that KFM was charging its other customers substantially less than it was charging AMH— which provided the overwhelming majority of KFM's business, and yet paid a higher price.

30.     On information and belief, the exorbitant fees made it difficult for AMH to remain profitable and harmed AMH's long-term value.  AMH was loaded with debt, and nearly all of AMH's cash had been spent on the STACK play, leaving little for day-to-day operations.  By mid-2016, Moody's downgraded AMH's debt, citing a "weak liquidity position, expected deterioration in credit metrics through 2017, and increasing refinancing risk."  KFM's outrageous fees put AMH at risk of breaching its debt covenants.

31.     On information and belief, by the end of 2016, AMH was running at a net loss and was severely inadequately capitalized and cash-flow insolvent.  AMH's financial problems were a concern for HPS.  Between 80% and 90% of KFM's revenue was derived from AMH's gas and oil production, and KFM would be practically worthless if it lost its gathering contract with AMH.

This was a particular concern to HPS, which through its direct equity stake *and* its ownership of HMI held a larger interest in KFM than other owners of HMI.

32.     In addition, around the same time in 2016, a bankruptcy court had entered orders rejecting gathering agreements substantively identical to the 2015 Agreements on the ground that they did not constitute covenants that ran with the land. *In re Sabine Oil & Gas Corp.*, 547 B.R. 66 (Bankr. S.D.N.Y. 2016); *In re Sabine Oil & Gas Corp.*, 550 B.R. 59 (Bankr. S.D.N.Y. 2016). Thus, HPS was concerned that KFM would suffer the same fate if (or more appropriately, when) AMH needed to seek bankruptcy protection. Thus, in 2016, AMH and KFM sought to amend the 2015 Agreements, but did so with an eye towards preserving the value of KFM for the "build-and-flip" objective.

33.     For its part, ARM sought to ensure that any restructuring of KFM rates would not reduce its net present value (and the value of ARM's investment in KFM), and landed on a proposal that would reduce the capital recovery fee in the gas gathering agreement. Critically, however, that proposed rate change was expected to have no negative effect on KFM, as the base gathering rates were actually increased.

34.     On December 1, 2016, AMH executed amended gathering agreements with KFM to supplant the 2015 Agreements (the 2016 Gas Amendment and 2016 Crude Oil Amendment are referred to collectively as the "**2016 Amendments**"). The rate changes set forth in the 2016 Amendments were never approved by the AMH Board or even put to a vote of the AMH Board or AMH's stakeholders.

35.     On information and belief, the 2016 Amendments were also designed, in part, as an attempt to insulate KFM's gathering agreements from challenge in bankruptcy similar to that in *Sabine*. Indeed, HPS threatened to withhold AMH's funding unless it accepted the amendments,

which HPS believed were necessary to protect its investment in KFM. Thus, the 2016 Amendments included a host of additional provisions intended to transform the 2015 Agreements into covenants running with the land, including a purported conveyance of transportation interests. AMH received nothing in exchange for those purported conveyances.

36.     On information and belief, the 2016 Crude Oil Amendment additionally required KFM to construct a system capable of gathering up to 50,000 barrels per day for AMH. KFM failed to construct such a system and never met the capacity threshold, but charged AMH for every barrel of oil that AMH paid another party to transport away—meaning KFM was being paid for doing nothing, and AMH was paying twice to move the same barrel of oil.

37.     On information and belief, between June 2016 and October 2019, AMH paid KFM over $120 million of exorbitant fees just under the gas gathering agreement alone, and millions more for transporting oil that KFM was incapable of transporting (and did not in fact transport).

38.     On information and belief, ARM and HPS profited handsomely from this diversion of value from AMH to KFM, as designed. In connection with the business combination in February 2018, ARM sold its interest in KFM for hundreds of millions in cash and stock—a substantial multiple of the initial capital investment that ARM had made less than three years earlier.

**B.      The February 2018 Business Combination and Related Transactions to Benefit HPS at the Expense of AMH and its Stakeholders**

39.     On February 9, 2018, AMH entered into a business combination with Silver Run II Acquisition Corporation ("**Silver Run**") and KFM (the "**Business Combination**"). Silver Run was a special purpose acquisition vehicle founded and run by Riverstone VI Alta Mesa Holdings, L.P., which had raised over $1 billion through an IPO in 2017. As a result of the Business Combination, AMH and KFM both became wholly-owned subsidiaries of a holding company,

10

SRII Opco, LP ("**SRII Opco**").  AMH continued to be managed by its general partner, AMH GP, which was majority owned and controlled by SRII Opco. The public company formerly known as Silver Run, which was rebranded as Alta Mesa Resources, Inc. ("**AMR**"), owned 100% of SRII Opco's general partner interest and a substantial portion of the limited partner interests in SRII Opco.  AMR was, at all relevant times after February 2018, beneficially owned by a number of entities, with HPS and HMI both holding substantial shares.

40.     The Business Combination stemmed from three related contribution agreements executed on August 16, 2017 memorializing the terms of the Business Combination: the Alta Mesa Contribution Agreement, the Kingfisher Contribution Agreement, and the Riverstone Contribution Agreement (collectively, the "**Contribution Agreements**").  The Contribution Agreements and the terms of the Business Combination transaction embodied therein reflected a structure designed to "cash out" the owners of KFM—who sought to consummate their "build-and-flip" strategy and realize the fruits of propping up KFM on the backs of AMH's creditors—and provide going-forward equity ownership in Silver Run/AMR to AMH's owners.  Over $800 million in cash, along with significant equity, was paid to HPS, ARM and the other KFM owners in consideration for AMR's purchase of KFM and AMH.

41.     In addition, the Business Combination contemplated and involved several related transactions intended to benefit HMI and its owners, including HPS, at the expense of AMH and its creditors.

42.     First, on February 8, 2018—two days after Silver Run stockholders approved the Business Combination through the Contribution Agreements, and one day before the Business Combination closed—AMH assigned its remaining non-STACK assets (the "**Non-STACK Assets**") to High Mesa Holdings, LP ("**HMH**"), a subsidiary of HMI, *for no consideration* (the

001869

"**Non-STACK Assignment**").  Indeed, neither AMH nor HMI obtained any third-party valuation or fairness opinion regarding the zero-dollar price paid by HMI/HMH.  At the time of the assignment, the Non-STACK Assets were valued at tens of millions of dollars and were generating positive cash flow prior to the assignment.

43.     Second, in connection with the Business Combination and the transfer of the Non-STACK Assets by AMH, AMH entered into a management services agreement with HMI (the "**HMI MSA**").  Chappelle signed the HMI MSA on February 9, 2018, on behalf of both AMH and HMI.  Under the HMI MSA, AMH was obligated to provide payroll, expenses, and other services to HMI in exchange for HMI's reimbursement of all expenses AMH incurred on behalf of HMI, along with a nominal $10,000/month management fee.

44.     Specifically, AMH agreed to provide the cash to pay HMI's employees, general and administrative overhead, and service expenses; among the categories for which AMH was entitled to reimbursement were direct payroll, indirect payroll, billable payroll, overhead allocation, and invoices paid on behalf of HMI.  The nominal monthly management fee was also well-below market standards.

45.     On information and belief, HMI was not an operating company prior to assignment of the Non-STACK Assets, and would have been unable to manage its newly-assigned assets without AMH's assistance.  However, AMH never consulted any third parties or did any studies of what an appropriate monthly management fee would be, or whether HMI was able or likely to pay the amounts that would be owed to AMH.  Nor did AMH or its owners (also owners of HMI) seek or offer any guaranty or other security for payment of the obligations to AMH under the HMI MSA.

001870

46.     Instead, and while AMH had no obligation to support HMI (in which it had no interest), or the further operation of the Non-STACK Assets post-assignment, HMI and its owners (including HPS) ensured any financial risk associated with the assignment was borne by AMH and its creditors—not HMI or its shareholders.  Ultimately, the risk thrust on AMH by HMI and its shareholders, including HPS, came home to roost, as HMI failed to pay approximately $10 million owed to AMH under the HMI MSA.

47.     On or about January 24, 2020, HMI commenced a voluntary chapter 7 bankruptcy case in this Court.  The amounts owed to AMH under the HMI MSA, totaling approximately $10 million, exclusive of contractual interest at 10% per annum, remain outstanding and unpaid.

48.     In essence, as a result of the Non-STACK Assignment and the HMI MSA, HMI and its shareholders (including HPS) received the value of the Non-STACK Assets and the services rendered to operate those assets for no consideration.

### JURY TRIAL DEMANDED

49.     The Trust hereby demands a jury trial on all issues.

### CAUSES OF ACTION

### Count 1: Avoidance and Recovery of Fraudulent Transfer against HPS and ARM

### (Gathering Agreements)

### (11 U.S.C. §§ 544, 548, 550; Tex. Bus. & Com. § 24.001, et. seq.)

50.     The Trust repeats and realleges the allegations set forth above.

51.     On information and belief, the 2015 Agreements and 2016 Amendments, as such agreements were further amended from time to time (collectively, the "**Gathering Agreements**"), were devised as a mechanism to divert value away from AMH and its creditors to benefit KFM's owners, particularly HPS and ARM, through exorbitant above-market fees, overbearing terms and obligations imposed on AMH that had no industry precedent.

13

52.     On information and belief, the obligations of AMH under the Gathering Agreements (the "**Gathering Agreement Obligations**"), and the payments made by AMH thereunder, which during the period of September 2015 through September 11, 2019 (the "**AMH Gathering Payments**") totaled over $120 million, were incurred and made with actual intent to hinder, delay, or defraud any entity to which AMH was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

53.     On information and belief, AMH received less than reasonably equivalent value in exchange for incurring the Gathering Agreement Obligations and making the AMH Gathering Payments.

54.     On information and belief, at the time the Gathering Agreement Obligations were incurred, and each of the AMH Gathering Payments were made, AMH (i) was insolvent, or became insolvent as a result of such transfer or obligation, (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with AMH was an unreasonably small capital, or (iii) intended to incur, or believed that AMH would incur, debts that would be beyond AMH's ability to pay as such debts matured.

55.     On information and belief, some or all of the AMH Gathering Payments were made to or for the benefit of an insider for an antecedent debt, when AMH was insolvent, and when KFM, HPS and ARM had reasonable cause to believe AMH was insolvent.

56.     The Gathering Agreement Obligations and the AMH Gathering Payments constitute fraudulent transfers avoidable by Plaintiff under 11 U.S.C. §§ 544, 548 and Tex. Bus. & Com. § 24.001 *et seq*.

001872

57.     The Gathering Agreement Obligations were incurred, and the AMH Gathering Payments were made, for the benefit of HPS and ARM as the owners of KFM and, as applicable, subsequent transferees of any distributions made by KFM of the proceeds of such transfers.

58.     Upon avoidance of the obligations and transfers alleged herein, Plaintiff is entitled to recover judgment from Defendants pursuant to 11 U.S.C. § 550(a)(1) and/or (2).

59.     At the time the Gathering Agreement Obligations were incurred and the Gathering Agreement Payments were made, a creditor existed who held an unsecured claim allowable under 11 U.S.C. § 502.

## Count 2: Avoidance and Recovery of Fraudulent Transfer against HPS

## (Non-STACK Assignment)

## (11 U.S.C. §§ 544, 548, 550; Tex. Bus. & Com. § 24.001, et. seq.)

60.     The Trust repeats and realleges the allegations set forth above.

61.     On information and belief, the Non-STACK Assignment was intended to divert value away from AMH and its creditors to benefit HMI's owners, particularly HPS, by conveying the Non-STACK Assets, which were valued at tens of millions of dollars and were generating positive cash flow, for no consideration.

62.     On information and belief, the transfer of the Non-STACK assets pursuant to the Non-Stack Assignment was made with actual intent to hinder, delay, or defraud any entity to which AMH was or became, on or after the date that such transfer was made, indebted.

63.     On information and belief, AMH received less than reasonably equivalent value in exchange for transferring the Non-STACK Assets pursuant to the Non-STACK Assignment.

64.     On information and belief, at the time of the Non-STACK Assignment, AMH (i) was insolvent, or became insolvent as a result of such transfer, (ii) was engaged in business or a

001873

transaction, or was about to engage in business or a transaction, for which any property remaining with AMH was an unreasonably small capital, or (iii) intended to incur, or believed that AMH would incur, debts that would be beyond AMH's ability to pay as such debts matured.

65.     On information and belief, the Non-STACK Assignment was made in whole or in part, to or for the benefit of an insider for an antecedent debt, when AMH was insolvent, and when HMI and/or HPS had reasonable cause to believe AMH was insolvent.

66.     The Non-STACK Assignment was made for the benefit of HPS as the owner of HMI and, as applicable, subsequent transferee of any distributions made by HMI of the proceeds of such transfer.

67.     The Non-STACK Assignment constitutes a fraudulent transfer avoidable by Plaintiff under 11 U.S.C. §§ 544, 548 and Tex. Bus. & Com. § 24.001 *et seq*.

68.     Upon avoidance of the transfer alleged herein, Plaintiff is entitled to recover judgment from HPS pursuant to 11 U.S.C. § 550(a)(1) and/or (2).

69.     At the time such transfer was made, a creditor existed who held an unsecured claim allowable under 11 U.S.C. § 502.

## Count 3: Avoidance and Recovery of Fraudulent Transfer against HPS

### (HMI MSA)

### (11 U.S.C. §§ 544, 548, 550; Tex. Bus. & Com. § 24.001, et. seq.)

70.     The Trust repeats and realleges the allegations set forth above.

71.     On information and belief, the HMI MSA was a vehicle through which HMI and its shareholder, HPS, shifted the financial burden and risk of operating the Non-STACK Assets to AMH and its creditors.  By executing the HMI MSA, AMH became obligated to pay HMI's employees, general and administrative overhead, and services expenses of operating the Non-

001874

STACK Assets—which had been transferred by AMH for no consideration—in exchange for only a nominal, below-market management fee and a soon-to-be-broken promise of expense reimbursement. Ultimately, HMI failed to pay approximately $10 million owed to AMH under the HMI MSA for services AMH provided and expenses it advanced, despite HMI and its shareholders, including HPS, reaping the benefits of such services.

72.     On information and belief, the obligations of AMH under the HMI MSA (the "**MSA Obligations**"), and the payments made for the benefit of HMI thereunder from the period of February 9, 2018 through termination of the MSA (the "**MSA Payments**"), were incurred and made with actual intent to hinder, delay, or defraud any entity to which AMH was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

73.     On information and belief, AMH received less than reasonably equivalent value in exchange for incurring the MSA Obligations and making the MSA Payments.

74.     On information and belief, at the time the MSA Obligations were incurred, and each of the MSA Payments were made, AMH (i) was insolvent, or became insolvent as a result of such transfer or obligation, (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with AMH was an unreasonably small capital, or (iii) intended to incur, or believed that AMH would incur, debts that would be beyond AMH's ability to pay as such debts matured.

75.     On information and belief, some or all of the MSA Payments were made to or for the benefit of an insider for an antecedent debt, when AMH was insolvent, and when HMI and/or HPS had reasonable cause to believe AMH was insolvent.

76.     The MSA Obligations and the MSA Payments constitute fraudulent transfers avoidable by Plaintiff under 11 U.S.C. §§ 544, 548 and Tex. Bus. & Com. § 24.001 *et seq*.

001875

77.     The MSA Obligations were incurred, and the MSA Payments were made, for the benefit of HPS as the owner of HMI and, as applicable, subsequent transferee of any distributions made by HMI of the proceeds of such transfers.

78.     Upon avoidance of the obligations and transfers alleged herein, Plaintiff is entitled to recover judgment from HPS pursuant to 11 U.S.C. § 550(a)(1) and/or (2).

79.     At the time the MSA Obligations were incurred and the MSA Payments were made, a creditor existed who held an unsecured claim allowable under 11 U.S.C. § 502.

## REQUEST FOR RELIEF

THEREFORE, Plaintiff respectfully prays that Defendants be cited to appear and answer herein, and that upon trial of this cause, judgment be entered in Plaintiff's favor, and against Defendants, for the following:

a.      For a determination that the Gathering Agreement Obligations and AMH Gathering Payments were fraudulent transfers within the meaning of 11 U.S.C. §§ 544, and 548 and Tex. Bus. & Com. § 24.001, *et seq.*, and for entry of judgment against HPS and ARM in the amount of the avoided transfers, but in any event no less than $85 million;

b.      For a determination that the Non-STACK Assignment was a fraudulent transfer within the meaning of 11 U.S.C. §§ 544, and 548 and Tex. Bus. & Com. § 24.001, *et seq.*, and for entry of judgment against HPS in the amount of the avoided transfer, but in any event no less than $42 million;

c.      For a determination that the MSA Obligations and MSA Payments were fraudulent transfers within the meaning of 11 U.S.C. §§ 544, and 548 and Tex. Bus. & Com.

18

001876

§ 24.001, *et seq.*, and for entry of judgment against HPS in the amount of the avoided transfers, but in any event no less than $12 million;

d.  Pre- and post-award interest at the highest rate and amount authorized by applicable law;

e.  An award of costs related to this proceeding, including attorneys' fees, as permitted by contract or applicable law; and

f.  Such other and further relief at law or in equity as the Court deems just and appropriate.

Dated:  September 10, 2021

MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO, PC

*/s/ Joseph R. Dunn*

Joseph R. Dunn (*Pro Hac Vice Pending*)
Attorney-in-Charge
CA State Bar No. 238069
jrdunn@mintz.com
3580 Carmel Mountain Rd.
Suite 300
San Diego, California 93210
T: (858) 314-1500
F: (858) 314-1501

Abigail V. O'Brient (*Pro Hac Vice Pending*)
CA State Bar No. 265704
aobrient@mintz.com
2029 Century Park East
Suite 3100
Los Angeles, California 90067
T: (310) 586-3200
F: (310) 586-3202

001877

# EXHIBIT 2

001878

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| ALTA MESA RESOURCES, INC., *et al.*, | ) |
| | ) Case No. 19-35133 |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |
| DAVID DUNN, as Trustee of the AMH Litigation | ) |
| Trust, | ) |
| | ) Adv. Pro. No. 21-03909 |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| HPS INVESTMENT PARTNERS, LLC; ARM | ) |
| ENERGY HOLDINGS, LLC; ARM | ) **Jury Trial Demanded** |
| MIDSTREAM, LLC; AND ASSET RISK | ) |
| MANAGEMENT, LLC, | ) |
| | ) |
| Defendants. | ) |

## FIRST AMENDED COMPLAINT

Plaintiff David Dunn, as Trustee of the AMH Litigation Trust (the "**Trust**" or "**Plaintiff**"),

the successor-in-interest to certain causes of action of Alta Mesa Holdings, LP ("**AMH**"), Alta

Mesa Holdings GP, LLC, OEM GO, LLC, Alta Mesa Finance Services Corp., Alta Mesa Services,

LP, and Oklahoma Energy Acquisitions, LP ("**OEA**") (collectively, the "**AMH Debtors**"), brings

this action against HPS Investment Partners, LLC ("**HPS**"), ARM Energy Holdings, LLC ("**ARM**

**Holdings**"), ARM Midstream, LLC ("**ARM Midstream**") and Asset Risk Management, LLC

(together with ARM Holdings and ARM Midstream, "**ARM**"; ARM together with HPS, the

"**Defendants**").

1

001879

## INTRODUCTION

1.        AMH was an oil and gas exploration and production company that filed for bankruptcy in September 2019 after losing hundreds of millions of dollars and writing off billions of dollars in assets.  Indeed, after being valued at more than $2.25 billion in early 2018, AMH's assets were sold in 2020 at liquidation prices for less than $200 million, leaving its creditors, the principal beneficiaries of the Trust, holding the bag. Due to the damages sustained by AMH, including from its resulting bankruptcy, creditors with more than $600 million in claims have been left with unpaid debts.

2.        AMH's ultimate demise was precipitated by years of transactions through which AMH's value was methodically stripped away to benefit the Defendants and other equity owners of AMH and Kingfisher Midstream, LLC ("**KFM**") at the expense of AMH's creditors.

3.        While the harmful actions of those equity holders were broad-reaching, this First Amended Complaint focuses on a series of transactions preceding the February 2018 business combination (the "**Business Combination**") that were intended to, and did in fact, divert cash and other assets of the AMH Debtors to KFM for the benefit of KFM's shareholders, particularly Defendants, who owned a substantial portion of KFM's equity interests, as well to subsidiaries of HPS for the benefit of HPS.

4.        First, AMH was caused, through its wholly owned subsidiary OEA, to enter into certain gathering agreements with KFM beginning in 2015, under which KFM and its shareholders reaped the benefits of exorbitant fees charged to AMH for years, and the onerous terms under which AMH agreed to effectively prop up the value of KFM for a potential sale.  Over $147 million was paid to KFM under these agreements during just a three-year period, and Defendants reaped the fruits of their value diversion strategy when they sold KFM in 2018 and received over $800 million in cash, among other consideration.

5.    Second, in connection with the Business Combination, AMH assigned all of its remaining non-STACK assets to High Mesa, Inc. ("**HMI**")—the entity through which HPS invested in AMH and KFM, through its wholly-owned subsidiary High Mesa Holdings, LP ("**HMH**").  Despite that these assets were, at the time, generating positive net cash flow and valued in the tens of millions of dollars, AMH did not receive a penny of consideration from HMI or its shareholder, HPS.

6.    Instead, AMH entered into yet another agreement—a management services agreement with HMI—under which AMH, not HMI or its shareholder (HPS), would bear all of the up-front expenses of operating the newly-assigned non-STACK assets of HMI in exchange for only a nominal, below-market management fee and a right of reimbursement.  But HMI did not reimburse AMH, and ultimately left AMH with approximtely $10 million of debt owed to it under the agreement, exclusive of interest, before HMI entered its own bankruptcy proceedings, where that debt has remained unpaid.

7.    Through these transactions, cash and valuable AMH assets were purposefully and methodically diverted away from AMH, for the benefit of Defendants, in the years leading up to the Business Combination.  Ultimately, AMH lacked the capital and liquidity to continue operating its business as a going concern, and was forced to enter bankruptcy proceedings in 2019, where it sold its assets at liquidation prices in 2020.

8.    The Trustee, on behalf of the Trust, the successor-in-interest to the causes of action of the AMH Debtors and their estates asserted herein, now brings this action to recover the substantial damages suffered as a result of transfers made and transactions entered into for the benefit of the Defendants. These transactions, including the obligations incurred by the AMH

Debtors and the transfers made by the AMH Debtors, constituted fraudulent transfers under applicable bankruptcy and non-bankruptcy law and should be avoided.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this case under 28 U.S.C. § 157 and 1334.  This Complaint asserts core and non-core claims under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(2)(H).

10.     This Court also has jurisdiction over this case under 28 U.S.C. §§ 1332 and 1334 because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.  David Dunn ("**Dunn**"), the Trustee of the Trust, is a citizen of Connecticut. On information and belief, Defendants are citizens of New York and Texas, and no defendant is a citizen of Connecticut.

11.     Venue is proper in this District under 28 U.S.C. § 1409 because AMH's bankruptcy case is pending in this District.  Further, on information and belief, a substantial part of the events or omissions giving rise to the claims occurred in this District.

12.     Pursuant to Federal Rule of Bankruptcy Procedure 7008 and Local Rule 7008-1, Plaintiff states that it hereby consents to the Bankruptcy Court's entry of final orders and judgment in this adversary proceeding, including if it is determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## PARTIES AND RELATED ENTITIES

13.     The Trust was created in connection with the confirmed Chapter 11 plan for Alta Mesa Resources, Inc., and its AMH and Silver Run debtor affiliates[1] (the "**Bankruptcy Plan**").

---

[1] The debtors in the above-referenced chapter 11 cases are as follows: Alta Mesa Resources, Inc.; Alta Mesa Holdings, LP; Alta Mesa Holdings GP, LLC; OEM GP, LLC; Alta Mesa Finance Services Corp.; Alta Mesa Services, LP; Oklahoma Energy Acquisitions, LP; SRII Opco GP, LLC; SRII Opco, LP; Kingfisher

4

Dunn was appointed trustee of the Trust on or about June 8, 2020, the effective date of the Bankruptcy Plan.

14.     Under the Bankruptcy Plan, causes of action held by the AMH Debtors and their estates against certain third parties not released under the Bankruptcy Plan were assigned to the Trust.  The Bankruptcy Plan specifically provided that the AMH Debtors did not release their claims against the Defendants in this action, and that the AMH Debtors' claims against the Defendants were assigned to the Trust pursuant to the Bankruptcy Plan and the order confirming the Bankruptcy Plan, for the benefit of the creditor beneficiaries of the Trust.

15.     On information and belief, defendant HPS Investment Partners, LLC (formerly known as Highbridge Principal Strategies), is a Delaware limited liability company, with its principal place of business in New York.  At all relevant times, HPS was, directly and/or indirectly, a substantial equity owner of, and had substantial control over, AMH, KFM, HMI, and HMH, and is identified as one of the "Sponsor Parties" under the Bankruptcy Plan.

16.     On information and belief, defendant ARM Energy Holdings LLC is a Delaware limited liability company, with its principal place of business in Texas.  At all relevant times, ARM Energy Holdings LLC was an affiliate of defendants ARM Midstream and Asset Risk Management, LLC.  ARM was a founder of KFM and, at all relevant times, ARM was a substantial equity holder of, and had substantial control over, KFM through the ARM defendants named in this First Amended Complaint.

17.     On information and belief, defendant ARM Midstream, LLC is a Delaware limited liability company, with its principal place of business in Texas.  At all relevant times, ARM

---

Midstream, LLC; Kingfisher STACK Oil Pipeline, LLC; Oklahoma Produced Water Solutions, LLC; and Cimarron Express Pipeline, LLC.

001883

Midstream, LLC was an affiliate of defendants ARM Holdings and Asset Risk Management, LLC. ARM was a founder of KFM and, at all relevant times, ARM was a substantial equity holder of, and had substantial control over, KFM through the ARM defendants named in this First Amended Complaint.

18.     On information and belief, defendant Asset Risk Management, LLC is a Delaware limited liability company, with its principal place of business in Texas.  At all relevant times, Asset Risk Management, LLC was an affiliate of defendants ARM Holdings and ARM Midstream. ARM was a founder of KFM and, at all relevant times, ARM was a substantial equity holder of, and had substantial control over, KFM through the ARM defendants named in this First Amended Complaint.

## FACTUAL BACKGROUND

**A.     Corporate Structures and Value-Stripping Transactions Leading up to the Business Combination in February 2018**

**i.     AMH Ownership and Control Prior to the Business Combination**

19.     Prior to February 2018, AMH was primarily owned by (i) its President and CEO Harlan Chappelle ("**Chappelle**"), who directly and indirectly owned 4.5% of AMH's Class A shares; (ii) its COO Michael Ellis ("**Ellis**"), who directly and indirectly owned 85.05% of AMH's Class A shares; and (iii) HMI, a privately held Delaware corporation, which owned 10% of AMH's Class A shares and 100% of AMH's Class B shares.  As set forth in detail below, HPS was a substantial owner of HMI.

20.     Prior to February 2018, Alta Mesa Holdings, GP, LLC ("**AMH GP**") was the sole general partner of AMH. At all relevant times, AMH GP's board of directors ("**AMH GP Board**") *was identical in composition to the board of directors of AMH and HMI*.  Thus, as set forth in the

6

Limited Partnership Agreements of AMH operative at the relevant times discussed herein,[2] AMH GP, as general partner of AMH and its subsidiaries, including OEA, had "full, complete, and exclusive authority to manage and control the business, affairs, and properties of [AMH], to make all decisions regarding the same, and to perform any and all other acts or activities customary or incident to the management of [AMH's] business." Third Amended LP Agreement, at §§ 3.3, 8.1; Fourth Amended LP Agreement, at §§ 3.3, 8.1. *See also*, Sixth Amended LP Agreement, at §3.2 and § 6.1 ("The General Partner shall have the exclusive right, power, and authority to take any action on behalf of the Partnership, other than actions specifically restricted herein."); Seventh Amended LP Agreement, at §3.2 and § 6.1 (same). Subsequent to the execution of the Sixth Amended LP Agreement, the Class A shares and Class B shares in AMH were designated "voting units" and, accordingly, HMI held 100% of the voting Class B shares. Sixth Amended LP Agreement, at § 3.2; Seventh Amended LP Agreement, at § 3.2.

21.     In turn, AMH GP had two members: (i) Alta Mesa Resources, LP ("**Alta Mesa Resources**"), an entity owned by Ellis and his spouse and AMH director, Mickey Ellis; and (ii) HMI. During all relevant times, Alta Mesa Resources held all of the Class A membership interests of AMH GP, and HMI held all of the Class B membership interests of AMH GP. Prior to February 2018, HMI, as the sole holder of Class B membership interests in AMH GP, held voting interests in AMH GP and, as of August 2017, 100% of the voting interests in AMH GP.[3]

---

[2] The Third Amended and Restated Limited Partnership Agreement of Alta Mesa Holdings, LP ("**Third Amended LP Agreement**"), dated as of August 13, 2015; the Fourth Amended and Restated Limited Partnership Agreement of Alta Mesa Holdings, LP ("**Fourth Amended LP Agreement**"), dated as of August 31, 2016; the Sixth Amended and Restated Limited Partnership Agreement of Alta Mesa Holdings, LP ("**Sixth Amended LP Agreement**"), dated as of August 16, 2017; and the Seventh Amended and Restated Limited Partnership Agreement of Alta Mesa Holdings, LP ("**Seventh Amended LP Agreement**"), dated as of February 9, 2018.
[3] *See* Fifth Amended and Restated Limited Liability Company Agreement of Alta Mesa Holdings GP, LLC, dated as of August 16, 2017, at § 3.1(c).

7

ii.     **HMI Ownership and Control Prior to February 2018**

22.     During the relevant time period, HMI was owned by HPS, Chappelle, Ellis and, beginning in 2016, Bayou City Energy Management LLC ("**BCE**").  Prior to February 2018, HPS and BCE together held 100% of the preferred stock of HMI and HPS was the beneficial owner of at least 31% of HMI's common stock.

23.     During the relevant time period, HMI's board of directors was identical in composition to the board of directors of AMH and AMH GP, with each including, among others, Chappelle, Ellis, Michael McCabe (the CFO of AMH) and Don Dimitrievich of HPS.  Thus, as a practical matter, there was only one board of directors controlling each of HMI, AMH, and AMH GP.  Indeed, AMH and HMI did not even conduct distinct board meetings during the relevant time period.

24.     HPS' control over HMI and AMH was prominent.  HPS held substantial voting power through HMI, and participated directly in the decisions of AMH by its board, both at AMH and AMH GP.  Indeed, as HPS would later testify, any board level decision for action taken by AMH/AMH GP would have required the approval of HPS.

iii.    **The Creation of KFM and Diversion of AMH Value for HPS and ARM through the 2015 Agreements.**

25.     On information and belief, in 2014, AMH decided to ramp up its investment in an area of Oklahoma known as the STACK.[4]  To transport its produced gas in Oklahoma, AMH had existing relationships with incumbent gatherers, and its oil was trucked and marketed by various other companies. However, AMH's owners resolved to take more control over AMH's midstream

---

[4] STACK is an acronym derived from the Sooner Trend oil field, Anadarko basin, and Canadian and Kingfisher counties. It refers to a geographic area in the Anadarko basin area of Oklahoma.

001886

gathering needs.   ARM and AMH's owners, through Chappelle, began discussing jointly sponsoring a new entity to serve as AMH's midstream gatherer in the STACK.

26.     On information and belief, ARM saw an opportunity to finance and build out the gathering system, charge above-market rates to recoup its investment quickly, and flip the asset for a premium on a short four-to-five year timeline.  HPS soon jumped on board and together with ARM and HMS Kingfisher Holdco, LLC ("**HMS Kingfisher**")[5], formed KFM.  At all relevant times, KFM was owned by HPS, HMI, and ARM.  In particular, ARM had an approximate 30% interest in KFM, HPS had an approximate 40% direct interest in KFM, and HMI, through its subsidiary HMS Kingfisher, had an approximate 30% interest in KFM.  Accordingly, HPS owned a substantial equity stake in KFM, both directly and indirectly through its ownership of HMI.

27.     Upon information and belief, KFM's board of directors was comprised of two representatives from ARM, two representatives from AMH (Chappelle and Ellis, who also sat on the boards of AMH, AMH GP and HMI), and Don Dimitrievich of HPS (who also sat on the boards of AMH, AMH GP and HMI).  Accordingly, there was substantial overlap between KFM's board of directors and the identical boards of AMH, AMH GP and HMI.  Upon information and belief, prior to the Business Combination, the operations of KFM were managed by ARM.  Indeed, ARM's relationship with KFM was ran deeper than mere equity ownership.  As reflected in KFM's financial statements for 2016 and 2017, Asset Risk Management, LLC charged KFM for use of its facilities, employees and technology, resulting in KFM paying ARM millions in fees during 2016 and 2017 alone. KFM also used another ARM affiliate, ARM Energy Management, LLC, to market production from KFM's producers.

---

[5] HMS Kingfisher was owned 100% by High Mesa Services, LLC, which, in turn was 100% owned by HMI.

28.     At its core, however, the viability of KFM (and the profitability of the venture for HPS, ARM and its affiliates) was dependent on KFM extracting business and fees from AMH; namely, AMH serving as the anchor producer for KFM and providing the vast majority of KFM's revenue.  On information and belief, beginning as early as January 2015, ARM made presentations of the proposed transaction to AMH which detailed fees to be paid to KFM that were substantially greater than what AMH was being charged by its existing midstream gatherer.  Under the proposal, KFM's owners (including ARM and HPS) would benefit substantially on the back of AMH through the exorbitant and unprecedented fees charged by KFM.

29.     HPS, along with Chappelle, championed the KFM project, in large part because Chappelle, together with Ellis, HPS, and AMH's other owners, through their interests in HMI (and in the case of HPS, directly), would become investors in KFM and realize profits through the exorbitant amounts to be paid by AMH.  This dynamic, in which owners of AMH also held interests in KFM, would be fundamental in the formulation of the contractual relationships between AMH and KFM.

30.     On information and belief, ARM took full advantage of the conflicting financial interests of AMH's owners and prepared a series of financial analyses touting the purported advantages of paying above-market rates to KFM—appealing to the potential rewards that would flow to AMH's owners *by virtue of their equity stakes in KFM*. These analyses—or "marketing materials," as one ARM official regarded them—were presented to Chappelle and others in the months before any gathering agreements were signed by AMH.  This gist of these analyses, and hence ARM's pitch to AMH, was plain: the more that AMH paid to KFM, the greater the benefit to KFM's owners, including owners of AMH/HMI, when KFM was eventually sold.  In fact, ARM projected a sale of KFM after five years that would yield a return on investment of 400% to 600%.

001888

31.     On information and belief, AMH's owners viewed KFM's rate structure with an eye to the benefits those rates would have for KFM and its owners, including HPS, with Chappelle explicitly acknowledging that ownership of KFM was "a key deal point and consideration" in formulating the terms of AMH's relationship with KFM.  The overriding concern on the part of AMH was in fact the best interests of KFM and, in turn, KFM's owners.  For instance, AMH rejected a proposed term that would have given it additional control over the gas gathering process because of the concern that it would not benefit KFM's owners.

32.     While Chappelle spearheaded formulation of the relationship with KFM, HPS was not merely a passive interest holder, and was also highly involved in determining the terms of the relationship between AMH and KFM. The results of this process were predictable. The KFM gathering rates and fees—which were substantially above market—were never meaningfully negotiated by AMH.  In fact, the final agreed-to rates were the same as those first proposed by ARM. AMH did not obtain a fairness opinion for the KFM venture, nor did it appoint an independent committee to evaluate the transaction.   AMH's Board and owners likewise failed to pursue competitive offers from gatherers other than KFM, and actively spurned offers from other midstream gatherers, including offers of lower gathering rates.   In fact, AMH rejected a significantly lower offer from one of its existing midstream gatherers for approximately half of KFM's proposed fees.

33.     Despite KFM's above-market rates, AMH's Board, which significantly overlapped with KFM's board of directors and which was identical to the board of directors of HMI, a substantial owner of KFM, voted to approve gathering agreements with KFM.  On August 31, 2015, Chappelle executed that certain *Gas Gathering and Processing Agreement*, by and between OEA and KFM (the "**2015 GGA**"), and that certain *Crude Oil Gathering Agreement*, by and

between OEA and KFM (the "**2015 OGA**" and, together with the 2015 GGA, the, "**2015 Agreements**") on behalf of OEA (AMH's subsidiary) and, despite his conflicting interests, on behalf of KFM, as president and CEO of HMS Kingfisher.  A redacted copy of the 2015 GGA is attached to this First Amended Complaint as Exhibit 1.  A redacted copy of the 2015 OGA is attached to this First Amended Complaint as Exhibit 2.

34.     Compared to similar agreements between AMH and non-KFM midstream gatherers, KFM and non-AMH upstream producers, as well as rates charged by unaffiliated third-party producers and gatherers, the gathering processing fees in the 2015 GGA were considerably higher than market fees for similar services and greatly skewed in favor of KFM.  In fact, on information and belief, the gathering and processing fees in the 2015 GGA were at least a 90% premium to market rates. Unsurprisingly, the fees charged by KFM to AMH were higher than any fees charged by KFM to any other producer.

35.     In addition, the 2015 Agreements included "capital recovery fees" (the "**Capital Recovery Fees**") that are completely foreign to the industry and pushed the obligations to KFM under the 2015 Agreements even farther beyond industry standards, to the detriment of AMH.  *See*, Ex. 1, Schedule 6.1; Ex. 2, § 6.1(b).  Indeed, both AMH and KFM had never entered into any other gathering agreements that required payment of Capital Recovery Fees, and the concept was completely foreign to management personnel at both AMH and KFM.  The cumulative fees were so high that at times AMH was forced to sell its oil and gas at a loss.  Thus, the 2015 Agreements were purposefully structured by the owners of both AMH and KFM, including each of the Defendants, to inequitably benefit KFM at the expense of AMH with both above-market traditional midstream charges and Capital Recovery Fees that were not standard to the industry.  As a result,

pursuant to the 2015 Agreements KFM received payments in amounts clearly in excess of the reasonable value of the services provided by KFM under the 2015 Agreements.

36.    Both 2015 Agreements also included purported dedications of leasehold interests along with boilerplate language characterizing the agreements and their dedications as running with the land. *See*, Ex. 1, § 3.4; Ex. 2, § 3.4.  These provisions purported to commit OEA, and any successor in interest to OEA, to paying the inflated rates in the 2015 Agreements for the benefit of KFM.  *Id*.  In addition, both 2015 Agreements included a promise by OEA to "convey or assign" easements or rights-of-way to KFM for the purposes of building and maintaining KFM's gathering systems. *See*, Ex. 1, § 3.2; Ex. 2, § 3.2.  But, as the 2015 Agreements explicitly state, the easements or rights-of-way were not conferred by the agreements themselves. Instead, they were to be conveyed to KFM sometime in the future, if at all, and only "where reasonably requested." *Id*.

37.    The 2015 Agreements provided that KFM was to submit invoices on a monthly basis for amounts due by AMH/OEA for the preceding month.  *See*, Ex. 1, § 7.1; Ex. 2, § 6.3(a). Payments to KFM were due no later than 15 days from the receipt of each such billing statement or the last day of the month following the statement month.  *See*, Ex. 1, § 7.2; Ex. 2, § 6.3(b). However, the payments to KFM were not made in accordance with the terms of the parties' agreements, and reflected the lack of arm's-length dealing.  Instead, ARM (as the operator of KFM and entity overseeing the sale of AMH's hydrocarbons) simply deducted the amounts purportedly due to KFM under the 2015 GGA from the sale proceeds owed to AMH (the "**Sale Proceeds**"). Set forth on Exhibit 3 to this First Amended Complaint is a ledger of the monthly fees deducted from AMH's Sale Proceeds between January 2016 and November 2016 under the 2015 GGA (the "**2015 GGA Payments**").

13

38.     On information and belief, the exorbitant fees paid by AMH under the 2015 Agreements made it difficult for AMH to remain profitable and harmed AMH's long-term value. AMH was loaded with debt, and nearly all of AMH's cash had been spent on the STACK play, leaving little for day-to-day operations.  By mid-2016, Moody's downgraded AMH's debt, citing a "weak liquidity position, expected deterioration in credit metrics through 2017, and increasing refinancing risk."  KFM's outrageous fees put AMH at serious risk of breaching its debt covenants.

39.     In addition, AMH was consistently running at a net loss in both 2015 and 2016 and was cash-flow insolvent.  Further, on information and belief, AMH was severely inadequately capitalized at this time, with a debt to equity ratio of above 20 to 1.  AMH's financial problems were a concern for HPS.  Between 80% and 90% of KFM's revenue was derived from AMH's gas and oil production, and KFM would be practically worthless if it lost its gathering contracts with AMH. This was a particular concern to HPS, which through its direct equity stake *and* its ownership of HMI held a larger interest in KFM than other owners of HMI.

## iv.     The Continued Diversion of AMH Value for HPS and ARM through the 2016 Amendments.

40.     On information and belief, within weeks of execution of the 2015 Agreements, AMH's managers openly questioned the exorbitant fees that AMH had agreed to pay.  AMH's Tim Turner sent Chappelle multiple internal analyses demonstrating that AMH was worse off under the terms of the 2015 Agreements than under its previous gathering arrangements.  Every above-market dollar paid to KFM benefited KFM's owners, including HPS and ARM, who collectively owned the majority of KFM and controlled its management and operations.  In effect, and as intended, the value of AMH's production assets was being diverted to benefit HPS and ARM.   Indeed, as stated above, AMH learned that KFM was charging its other customers substantially less than it was charging AMH—which provided the overwhelming majority of

KFM's business, and yet paid a higher price. Further, AMH learned that other established midstream gatherers were charging their customers substantially less than KFM was charging AMH.

41.     To add insult to injury, in return for these exorbitantly above-market rates, KFM was failing to provide adequate services. Pipeline construction was inexcusably slow and there were continued operational failures throughout the system. As discussed further below, KFM's oil gathering system was never capable of gathering all of AMH's crude oil.

42.     Notwithstanding KFM's failures, AMH engaged ARM to revise the gathering rates. All the while, however, as a result of the commingled ownership of AMH and KFM, the overall benefit to KFM and its shareholders remained a paramount consideration for both sides. For their part, ARM and HPS sought to ensure that any restructuring of KFM rates would not reduce KFM's net present value (and the value of their respective investments in KFM), and landed on a proposal that would replace the Capital Recovery Fees in the 2015 Agreements with so-called "facility fees" (the "**Facility Fees**"). Critically, however, that proposed fee change was expected to have no negative effect on the revenue that would be captured by KFM, as the base gathering rates under the proposed amendments would actually increase. In fact, the rates under the amendments were an even higher premium (over 100%) to market rates than under the 2015 Agreements. Further, the Facility Fees mirrored the intention and economic impact of the Capital Recovery Fees and, like the Capital Recovery Fees, were completely foreign to the oil and gas midstream industry. As explained by Silver Run Acquisition Corporation II ("**Silver Run**") in its *Proxy Statement Pursuant to Section 14(a) of the Securities and Exchange Act of 1934*, filed with the SEC on October 31, 2017 in anticipation of the Business Combination, "[t]he terms of the arrangement between Alta Mesa and Kingfisher are at rates that are higher than the current market rates for

15

similar arrangements. Therefore, a liability for the premium portion of the arrangement has been reflected for Alta Mesa and an asset for the premium payment terms of the arrangement has been recorded by Kingfisher *for the amount of $254.6 million*." (Emphasis added.)

43.     Once again, ARM's proposed amendments were not seriously negotiated by AMH, who remained under common control.  The rate changes were not approved by AMH's board or even put to a vote of AMH's board or AMH's stakeholders. AMH did not prepare a fairness opinion.  Instead, ARM's proposal was incorporated virtually wholesale into amendments to the 2015 Agreements.

44.     On December 1, 2016, OEA executed that certain *Amended and Restated Gas Gathering and Processing Agreement* (the "**2016 GGA Amendment**") and that certain *Amended and Restated Crude Oil Gathering Agreement* (the "**2016 OGA Amendment**" and, together with the 2016 GGA Amendment, the "**2016 Amendments**") with KFM to supplant the 2015 Agreements. A redacted copy of the 2016 GGA Amendment, without exhibits, is attached to this First Amended Complaint as Exhibit 4.  A redacted copy of the 2016 OGA Amendment, without exhibits, is attached to this First Amended Complaint as Exhibit 5.

45.     As with the 2015 Agreements, HPS was heavily involved in the negotiations and ultimately controlled AMH's decisions with regard to the 2016 Amendments. Indicative of its control on the outcome of the transaction was HPS's reaction to issues raised by *In re Sabine Oil & Gas Corp.*, 547 B.R. 66 (Bankr. S.D.N.Y. 2016), which involved an order issued by a bankruptcy court that rejected gathering agreements substantively identical to the 2015 Agreements on the ground that they did not constitute covenants that ran with the land.  The 2016 Amendments were designed, in part, as an attempt to insulate the 2015 Agreements from challenge in bankruptcy similar to that in *Sabine*.  In particular, HPS was concerned that KFM would suffer

16

the same fate if AMH needed to seek bankruptcy protection. Accordingly, HPS threatened to withhold AMH funding unless AMH accepted the amendments, which HPS believed were necessary to protect its investment in KFM. Thus, the 2016 Amendments included a host of additional provisions intended to transform the 2015 Agreements into covenants running with the land, including a purported conveyance of transportation interests. *See, e.g.*, Ex. 4, Art. III; Ex. 5, Art. III. AMH received nothing in exchange for those purported conveyances.

46.     The 2015 OGA and the 2016 OGA Amendment both additionally required KFM to construct a system capable of gathering up to 50,000 barrels per day for AMH. Ex. 2, § 3.6; Ex. 5, § 4.5. During all relevant times, KFM failed to construct such a system and was never able to gather more than a fraction of the expected capacity. Nonetheless, under the 2016 OGA Amendment, KFM charged AMH for every barrel of oil produced from the designated area, even though KFM did not transport those barrels and AMH had to pay another party to do so. In doing so, KFM relied on a provision in the 2016 OGA Amendment that, according to KFM, required AMH to pay KFM for all oil AMH produced in the dedicated area even if KFM did not, or could not, actually gather such oil. Ex. 5, § 4.8. Accordingly, KFM was in many instances being paid for doing nothing and AMH was paying twice to move the same barrel of oil. In this way, KFM again received payments in amounts clearly disproportionate to the services actually provided by KFM pursuant to the 2015 OGA and the 2016 OGA Amendment.

47.     As it did under the 2015 Agreements, prior to the Business Combination, the amounts owed to KFM under the 2016 Amendments were not invoiced to AMH/OEA, but deducted on a monthly basis by ARM, on behalf of KFM, from the AMH Sale Proceeds. Set forth on Exhibit 3 to this First Amended Complaint is a ledger of the monthly fees deducted from AMH's Sale Proceeds between December 2016 and September 2019 under the 2016 GGA

Amendment, as further amended from time to time (the "**2016 GGA Payments**" and, together with the 2015 GGA Payments, the "**GGA Payments**"). Set forth on Exhibit 6 to this First Amended Complaint is a ledger of the monthly fees deducted from AMH's Sale Proceeds between January 2017 and September 2019 under the 2016 OGA Amendment ("**2016 OGA Payments**" and, together with the GGA Payments, the "**AMH Gathering Payments**").

48.     ARM and HPS profited handsomely from this diversion of value from AMH to KFM, as designed.  In connection with the business combination in February 2018, KFM's owners sold their interest in KFM and received $800 million in cash and substantial stock and other consideration—a substantial multiple of the initial capital investments that Defendants had made less than three years earlier.  This, of course, was the plan from the beginning, to foist above-market fees on AMH and recoup KFM investors' capital investment (plus a hefty profit) in short order.

49.     AMH, on the other hand, suffered tremendously as a result of the gathering agreements with KFM.  In nearly every quarter between 2016 and 2018, AMH lacked sufficient cash flow to meet its upcoming obligations, continued to draw down on its credit facility, and refinanced its debt.  Toward the end of 2017, AMH had only nominal cash to support its operations and its debt-to-equity ratio remained perilously high.

**B.     The February 2018 Business Combination and Related Transactions to Benefit HPS at the Expense of AMH and its Stakeholders**

50.     On February 9, 2018, AMH entered into the Business Combination with Silver Run and KFM.  Silver Run was a special purpose acquisition vehicle founded and run by Riverstone VI Alta Mesa Holdings, L.P., which had raised over $1 billion through an IPO in 2017.  As a result of the Business Combination, AMH and KFM both became wholly-owned subsidiaries of a holding company, SRII Opco, LP ("**SRII Opco**").  AMH continued to be managed by its general

001896

partner, AMH GP, which was majority owned and controlled by SRII Opco. The public company formerly known as Silver Run, which was rebranded as Alta Mesa Resources, Inc. ("**AMR**"), owned 100% of SRII Opco's general partner interest and a substantial portion of the limited partner interests in SRII Opco.  AMR was, at all relevant times after February 2018, beneficially owned by a number of entities, with HPS and HMI both holding substantial shares.

51.    The Business Combination stemmed from three related contribution agreements executed on August 16, 2017 memorializing the terms of the Business Combination: the Alta Mesa Contribution Agreement, the Kingfisher Contribution Agreement, and the Riverstone Contribution Agreement (collectively, the "**Contribution Agreements**").  The Contribution Agreements and the terms of the Business Combination transaction embodied therein reflected a structure designed to "cash out" the owners of KFM—who sought to consummate their "build-and-flip" strategy and realize the fruits of propping up KFM on the backs of AMH's creditors—and provide going-forward equity ownership in Silver Run/AMR to AMH's owners.  Over $800 million in cash, along with significant equity, was paid to HPS, ARM and the other KFM owners in consideration for AMR's purchase of KFM and AMH.

52.    In addition, the Business Combination contemplated and involved several related transactions agreed to in advance of the Business Combination and intended to benefit HMI and its owners, including HPS, at the expense of AMH and its creditors.

53.    <u>First</u>, on February 9, 2018, AMH assigned its remaining non-STACK assets (the "**Non-STACK Assets**")[6] to HMH *for no consideration* (the "**Non-STACK Assignment**")

---

[6] The Non-STACK Assets were comprised of (i) 100% of AMH's right, title, and interest in and to its general partner interests (collectively, the "**Partner Interests**") in Nueces Resources, LP, Aransas Resources, L.P., Petro Acquisitions, LP, Texas Energy Acquisitions, LP, Buckeye Production Company, LP, Navasota Resources, Ltd., LLP, Galveston Bay Resources, LP, Petro Operating Company, LP, Louisiana Exploration & Acquisitions, LP, and Orion Operating Company, LP (collectively, the "**Non-STACK LPs**"); (ii) 100% of AMH's member interests (collectively, the "**Member Interests**") in Alabama Energy Resources LLC, AM Idaho LLC, AMH Energy New

pursuant to two assignment agreements (together, the "**Assignment Agreements**").[7]  HMI owned

91% of HMH's limited partnership interests and 100% of High Mesa Holdings GP, LLC, the

general partner of HMH.  Neither AMH nor HMI obtained any third-party valuation or fairness

opinion regarding the zero-dollar price paid by HMI/HMH.  At the time of the assignment, the

Non-STACK Assets were valued at tens of millions of dollars and were generating positive cash

flow.

54.     Second, in connection with the transfer of the Non-STACK Assets by AMH and,

on information and belief, prior to the Business Combination, AMH agreed to enter into that

certain Management Services Agreement with HMI (the "**HMI MSA**").  A copy of the HMI MSA

is attached as Exhibit 7 to this First Amended Complaint.  Chappelle signed the HMI MSA on

behalf of both AMH, as president and CEO of AMH GP, and HMI, as its president and CEO.

Under the HMI MSA, AMH was obligated to provide payroll, expenses, and other services to HMI

in exchange for HMI's reimbursement of all expenses AMH incurred on behalf of HMI, along

with a nominal $10,000/month management fee.  See Ex. 9, §§ 2.2, 3.1. This nominal monthly

management fee was well-below market standards.

55.     Pursuant to the HMI MSA, HMI agreed to provide funds on a monthly basis or

reimburse AMH for payment of HMI's employees, general and administrative overhead, and

---

Mexico, LLC, Alta Mesa Drilling, LLC, Alta Mesa GP, LLC, Virginia Oil and Gas, LLC, Alta Mesa Energy LLC, LEADS Resources, LLC, AM Michigan LLC, TEA Energy Services LLC, Alta Mesa Acquisition Sub, LLC (collectively, the "**Non-STACK LLCs**"); and (v) the capital, profits, and losses associated with the Partner Interests and the Member Interests.

[7] The Assignment Agreements are (i) that certain Assignment Agreement entered into as of February 8, 2018, by and among AMH, HMH, Alabama Energy Resources LLC, AM Idaho LLC, AMH Energy New Mexico, LLC, Alta Mesa Drilling, LLC, Virginia Oil and Gas, LLC, Alta Mesa GP, LLC, Alta Mesa Energy LLC, TEA Energy Services LLC, AM Michigan LLC, and Alta Mesa Acquisition Sub, LLC (the "**LLC Assignment Agreement**"); and (ii) that certain Assignment Agreement entered into as of February 8, 2018, by and between AMH, HMH, Nueces Resources, LP, Aransas Resources, L.P., Petro Acquisitions, LP, Texas Energy Acquisitions, LP, Buckeye Production Company, LP, Navasota Resources, Ltd., Galveston Bay Resources, LP, Petro Operating Company, LP, Louisiana Exploration & Acquisitions, LP, and Orion Operating Company, LP (the "**LP Assignment Agreement**").

001898

service expenses; among the categories for which AMH was entitled to reimbursement were direct payroll, indirect payroll, billable payroll, overhead allocation, and invoices paid on behalf of HMI. Ex. 9, § 3.2.

56.     By all accounts, there was a lack of considered implementation of the HMI MSA at AMH.  Operationally, very little changed with respect to how AMH managed and accounted for the Non-STACK Assets immediately after the Business Combination and Non-STACK Assignment.  On information and belief, HMI was not an operating company prior to assignment of the Non-STACK Assets, and would have been unable to manage its newly-assigned assets without AMH's assistance.  However, AMH never consulted any third parties or did any studies of what an appropriate monthly management fee would be, or whether HMI was able or likely to pay the amounts that would be owed to AMH.  Nor did AMH or its owners (also owners of HMI) seek or offer any guaranty or other security for payment of the obligations to AMH under the HMI MSA.

57.     Instead, while AMH had no obligation to support HMI (in which it had no interest), or the further operation of the Non-STACK Assets post-assignment, HMI and its owners (including HPS) ensured any financial risk associated with the assignment was borne by AMH and its creditors—not HMI or its shareholders.  Ultimately, the risk thrust on AMH by HMI and its shareholders, including HPS, came home to roost, as HMI failed to pay approximately $10 million owed to AMH under the HMI MSA. Exhibit 8 to this First Amended Complaint sets forth the unpaid amounts owed to AMH under the HMI MSA.

58.     On or about January 24, 2020, HMI commenced a voluntary chapter 7 bankruptcy case in this Court.  The amounts owed to AMH under the HMI MSA, totaling approximately $10 million, exclusive of contractual interest at 10% per annum, remain outstanding and unpaid.

21

59.     Accordingly, pursuant to the terms of the HMI MSA, AMH did not receive reasonably equivalent value for the amounts that it was forced to expend to cover HMI's obligations.  In essence, as a result of the Non-STACK Assignment and the HMI MSA, HMI and its shareholders (including HPS) received the value of the Non-STACK Assets and the services rendered to operate those assets for no consideration.

### C.     Creditor Claims during the Relevant Periods

60.     As early as January 1, 2015, Herbert L. Sadler, Sr., Wilbert L. Crutcher, Stephanie A. Draper, Angela R. Crutcher, Byron E. Crutcher, Arthur L. Najee-Ullah, Ahmed Najee-Ullah, Roosevelt Shields, II, Brian K. Shields, Alden L. Kirk, Loana R. Kirk, Ivan J. Kirk, Patricia A. Lewis, Ruben Lomax, Henrietta L. Spinks, Michael H. Lomax, Wadsworth A. Holmes, IV and Nerissa Holmes (collectively, the "Sadler Heirs") were creditors of the AMH Debtors and remained unpaid creditors as of the commencement of the AMH Debtors' chapter 11 cases (the "**Petition Date**").

61.     As early as January 1, 2015, the North Carolina Department of State Treasurer (the "**NC State Treasurer**") was a creditor of the AMH Debtors and remained an unpaid creditor as of the Petition Date.

62.     As early as March 2015, the State of Connecticut Unclaimed Property Division (the "**CUPD**") was a creditor of the AMH Debtors and remained an unpaid creditor as of the Petition Date.

63.     Beginning on or around December 8, 2016, the holders of those certain 7.875% senior unsecured notes due 2024 issued by AMH and Alta Mesa Finance Services Corp. under the Indenture dated as of December 8, 2016, by and among AMH, Alta Mesa Finance Services Corp., the guarantors named thereunder, and U.S. Bank, N.A., in its capacity as indenture trustee (the

"**Prepetition Senior Notes Claimants**") were creditors of the AMH Debtors and remained an unpaid creditors as of the Petition Date.

64.     As of the Petition Date, the Department of the Treasury – Internal Revenue Service ("**IRS**") held an unpaid creditor claim against the AMH Debtors.

## JURY TRIAL DEMANDED

65.     Plaintiff hereby demands a jury trial on all issues.

## CAUSES OF ACTION

### Count 1: Avoidance and Recovery of Constructive Fraudulent Transfers against all Defendants

### (AMH Gathering Payments)

### (11 U.S.C. §§ 548(a)(1)(B), 550)

66.     Plaintiff hereby repeats and realleges the allegations set forth in paragraphs 1 through 65 above.

67.     At all relevant times, HPS was in control of AMH and its subsidiaries, as alleged herein.  At all relevant times, HPS and ARM were in control of KFM, as alleged herein.

68.     The AMH Debtors received less than reasonably equivalent value in exchange for incurring the obligations under the Gathering Agreements (the "**Gathering Agreement Obligations**") and making the AMH Gathering Payments.  In particular, (i) the gathering and processing fees in the Gathering Agreements were approximately 90-100% higher than market rates, rates paid to non-KFM midstream gatherers, or rates paid to KFM by non-AMH Debtor upstream producers; (ii) the Gathering Agreements required the payment of Capital Recovery Fees or Facility Fees that were completely foreign in the industry and increased the AMH Debtors' price of doing business with KFM even further beyond industry standards; (iii) the 2016 Amendments included provisions intended to transform the 2015 Agreements into covenants

23

running with the land, including a purported conveyance of transportation interests, for which the AMH Debtors received no additional consideration; and (iv) under the 2016 OGA Amendment, KFM was paid for every barrel of oil produced from the designated area, even though KFM did not carry those barrels and AMH paid another party to transport the barrels away.

69.     On information and belief, at the time the Gathering Agreement Obligations were incurred, and each of the AMH Gathering Payments were made, AMH (i) was insolvent, or became insolvent as a result of such transfers or obligations, (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with AMH was an unreasonably small capital, and/or (iii) intended to incur, or believed that AMH would incur, debts that would be beyond AMH's ability to pay as such debts matured.   Among other things, during the relevant period, AMH operated at a net loss and was severely inadequately capitalized, with a debt to equity ratio of at least 20-to-1, and was cash-flow insolvent. Accordingly, on information and belief, AMH and its subsidiaries lacked sufficient cash flow to meet its upcoming obligations, continued to draw down on its credit facility, and refinanced its debt.

70.     The Gathering Agreement Obligations were incurred, and the AMH Gathering Payments made prior to the Business Combination were made, for the intended benefit of HPS and ARM as the controlling equity holders of the closely-held KFM.   At the time the Gathering Agreement Obligations were incurred and the AMH Gathering Payments were made prior to the Business Combination, HPS had control over the AMH Debtors through its equity ownership and Board authority, as described above, and HPS and ARM had control over KFM.

71.     The financial condition of KFM – and of HPS and ARM, as controlling equity owners of the closely-held KFM – was greatly improved as a result of the Gathering Agreement Obligations and the AMH Gathering Payments made prior to the Business Combination.

72.     ARM and HPS actually received quantifiable benefits from the Gathering Agreement Obligations and the AMH Gathering Payments, as the controlling equity owners of KFM, in the form of (i) their respective portions of the value of such transfers to KFM, and the subsequent increase of KFM's enterprise value, to which, as owners of KFM, both ARM and HPS had access, and (ii) the proceeds of the sale of KFM through the Business Combination paid to ARM and HPS as a result of such increase in value.

73.     In addition, ARM and HPS are subsequent transferees to the extent that KFM made any distributions to them of the proceeds of the Gathering Agreement Obligations and the AMH Gathering Payments, including, without limitation, payments made to defendant Asset Risk Management, LLC for overhead expenses which, on information and belief, totaled at least $4,559,186 in 2016 and 2017 alone.

74.     The AMH Gathering Payments that occurred between September 11, 2017 and February 9, 2018, totaling not less than $7,634,360.40, constitute constructive fraudulent transfers avoidable by Plaintiff under 11 U.S.C. § 548(a)(1)(B).

75.     Upon avoidance of such AMH Gathering Payments alleged in this Count 1, Plaintiff is entitled to recover judgment from Defendants pursuant to 11 U.S.C. § 550(a)(1) and/or (2) in an amount of not less than $7,634,360.40.

001903

**Count 2: Avoidance and Recovery of Constructive Fraudulent Transfers against all Defendants**

**(Gathering Agreement Obligation and AMH Gathering Payments)**

**(11 U.S.C. § 544; Tex. Bus. & Com. §§ 24.005(a)(2), 24.006(a), 24.008, 24.009(b))**

76.     Plaintiff hereby repeats and realleges the allegations set forth in paragraphs 1 through 65 above.

77.     At the time all of Gathering Agreement Obligations were incurred and the AMH Gathering Payments were made, creditors existed who held unsecured claims allowable under 11 U.S.C. § 502 and who also held claims against the AMH Debtors as of the Petition Date, namely the Sadler Heirs, the Prepetition Senior Notes Claimants, the CUPD, the NC State Treasurer, and the IRS.

78.     At all relevant times, HPS was in control of AMH and its subsidiaries, as alleged herein.  At all relevant times, HPS and ARM were in control of KFM, as alleged herein.

79.     The AMH Debtors received less than reasonably equivalent value in exchange for incurring the obligations under the Gathering Agreements Obligations and making the AMH Gathering Payments.  In particular, (i) the gathering and processing fees in the Gathering Agreements were approximately 90-100% higher than market rates, rates paid to non-KFM midstream gatherers, or rates paid to KFM by non-AMH Debtor upstream producers; (ii) the Gathering Agreements required the payment of Capital Recovery Fees or Facility Fees that were completely foreign in the industry and increased the AMH Debtors' price of doing business with KFM even further beyond industry standards; (iii) the 2016 Amendments included provisions intended to transform the 2015 Agreements into covenants running with the land, including a purported conveyance of transportation interests, for which the AMH Debtors received no

001904

additional consideration; and (iv) under the 2016 OGA Amendment, KFM was paid for every barrel of oil produced from the designated area, even though KFM did not carry those barrels and AMH paid another party to transport the barrels away.

80.    On information and belief, at the time the Gathering Agreement Obligations were incurred, and each of the AMH Gathering Payments were made, AMH (i) was insolvent or became insolvent as a result of the transfers or obligations, (ii) was engaged or was about to engage in a business or a transaction for which any property remaining with AMH was unreasonably small in relation to the business or transaction, and/or (iii) intended to incur, or believed or reasonably should have believed that AMH would incur, debts beyond AMH's ability to pay as they became due.  Among other things, during the relevant period AMH operated at a net loss and was severely inadequately capitalized, with a debt to equity ratio of at least 20-to-1, and was cash-flow insolvent.  Accordingly, on information and belief, AMH and its subsidiaries lacked sufficient cash flow to meet its upcoming obligations, continued to draw down on its credit facility, and refinanced its debt.

81.    The Gathering Agreement Obligations were incurred, and the AMH Gathering Payments were made, for the intended benefit of HPS and ARM as the controlling equity holders of the closely-held KFM.  At the time the Gathering Agreement Obligations were incurred and the AMH Gathering Payments were made prior to the Business Combination, HPS had control over the AMH Debtors through its equity ownership and Board authority, as described above, and HPS and ARM had control over KFM.

82.    The financial condition of KFM – and of HPS and ARM, as controlling equity owners of the closely-held KFM – was greatly improved as a result of the Gathering Agreement Obligations and the AMH Gathering Payments.

83.    ARM and HPS actually received quantifiable benefits from the Gathering Agreement Obligations and the AMH Gathering Payments, as the controlling equity owners of KFM, in the form of (i) their respective portions of the value of such transfers to KFM, and the subsequent increase of KFM's enterprise value, to which, as owners of KFM, both ARM and HPS had access, and (ii) the proceeds of the sale of KFM through the Business Combination paid to ARM and HPS as a result of such increase in value.

84.    In addition, ARM and HPS are subsequent transferees to the extent that KFM made any distributions to them of the proceeds of the Gathering Agreement Obligations and the AMH Gathering Payments, including, without limitation, payments made to defendant Asset Risk Management, LLC for overhead expenses which, on information and belief, totaled at least $4,559,186 in 2016 and 2017 alone.

85.    The Gathering Agreement Obligations and the AMH Gathering Payments, in an amount of not less than $147,032,580.27, constitute constructive fraudulent transfers avoidable by Plaintiff under Tex. Bus. & Com. §§ 24.005(a)(2), 24.006(a) and 24.008.

86.    Upon avoidance of the obligations and transfers alleged herein, Plaintiff is entitled to recover judgment from Defendants pursuant to Tex. Bus. & Com. § 24.009(b) in an amount not less than $147,032,580.27.

**Count 3: Avoidance and Recovery of Constructive Fraudulent Transfers against HPS**

**(Non-STACK Assignment)**

**(11 U.S.C. §§ 548(a)(1)(B), 550)**

87.    Plaintiff hereby repeats and realleges the allegations set forth in paragraphs 1 through 65 above.

001906

88. AMH received less than reasonably equivalent value in exchange for the Non-STACK Assignment because AMH received no consideration in exchange for such transfers, and the transferred assets were valued at tens of millions of dollars and were generating positive cash flow prior to the assignment.

89. On information and belief, at the time the Non-STACK Assignment was made, AMH (i) was insolvent, or became insolvent as a result of such transfers or obligations, (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with AMH was an unreasonably small capital, or (iii) intended to incur, or believed that AMH would incur, debts that would be beyond AMH's ability to pay as such debts matured.

90. The Non-STACK Assignment was made for the intended benefit of HPS, as a substantial equity owner of HMI and HMH. At the time the Non-STACK Assignment was made, HPS had control over the AMH Debtors and HMI/HMH through its equity ownership and Board authority.

91. The financial conditions of HMI/HMH and HPS, as a substantial equity owner of HMI/HMH, were improved as a result of the Non-STACK Assignment.

92. HPS actually received quantifiable benefits from the Non-STACK Assignment, as a substantial equity owner of HMI/HMH, from its portion of the value of the Non-STACK Assignment to HMH and the subsequent increase of HMH's value, to which, as owner of HMI/HMH, HPS had access.

93. The Non-STACK Assignment constitutes a constructive fraudulent transfer avoidable in its entirety by Plaintiff under 11 U.S.C. § 548(a)(1)(B).

001907

94.     Upon avoidance of the obligations and transfers alleged herein, Plaintiff is entitled to recover judgment from HPS pursuant to 11 U.S.C. § 550(a)(1) and/or (2) for the full value of the Non-STACK Assignment, in an amount to be proven at trial, but in any event no less than $42,000,000.

**Count 4: Avoidance and Recovery of Constructive Fraudulent Transfers against HPS**

**(Non-STACK Assignment)**

**(11 U.S.C. § 544; Tex. Bus. & Com. §§ 24.005(a)(2), 24.006(a), 24.008, 24.009(b))**

95.     Plaintiff hereby repeats and realleges the allegations set forth in paragraphs 1 through 65 above.

96.     At the time the Non-STACK Assignment was made, creditors existed who held unsecured claims allowable under 11 U.S.C. § 502 and who also held claims against the AMH Debtors as of the Petition Date, namely the Sadler Heirs, the Prepetition Senior Notes Claimants, the CUPD, the NC State Treasurer and the IRS.

97.     AMH received less than reasonably equivalent value in exchange for the Non-STACK Assignment because AMH received no consideration in exchange for such transfers, and the transferred assets were valued at tens of millions of dollars and were generating positive cash flow prior to the assignment.

98.     On information and belief, at the time the Non-STACK Assignment made, AMH (i) was insolvent or became insolvent as a result of the transfers or obligations, (ii) was engaged or was about to engage in a business or a transaction for which any property remaining with AMH was unreasonably small in relation to the business or transaction, and/or (iii) intended to incur, or believed or reasonably should have believed that AMH would incur, debts beyond AMH's ability to pay as they became due.

001908

99.     The Non-STACK Assignment was made for the intended benefit of HPS, as a substantial equity owner of HMI and HMH.  At the time the Non-STACK Assignment was made, HPS had control over the AMH Debtors and HMI/HMH through its equity ownership and Board authority.

100.    The financial conditions of HMI/HMH and HPS, as a substantial equity owner of HMI/HMH, were improved as a result of the Non-STACK Assignment.

101.    HPS actually received quantifiable benefits from the Non-STACK Assignment, as a substantial equity owner of HMI/HMH, from its portion of the value of the Non-STACK Assignment to HMH and the subsequent increase of HMH's value, to which, as owner of HMI/HMH, HPS had access.

102.    The Non-STACK Assignment constituted a constructive fraudulent transfer avoidable in its entirety by Plaintiff under Tex. Bus. & Com. §§ 24.005(a)(2), 24.006(a) and 24.008.

103.    Upon avoidance of the obligations and transfers alleged herein, Plaintiff is entitled to recover judgment from Defendants pursuant to Tex. Bus. & Com. §§ 24.009(b) for the full value of the Non-STACK Assignment, in an amount to be proven at trial, but in any event no less than $42,000,000.

**Count 5: Avoidance and Recovery of Constructive Fraudulent Transfers against HPS**

**(HMI MSA)**

**(11 U.S.C. §§ 548(a)(1)(B), 550)**

104.    Plaintiff hereby repeats and realleges the allegations set forth in paragraphs 1 through 65 above.

001909

105.    AMH received less than reasonably equivalent value in exchange for incurring the obligations of AMH under the HMI MSA (the "**MSA Obligations**"), and the payments made by AMH thereunder from the period of February 9, 2018 through termination of the MSA (the "**MSA Payments**").  Through the HMI MSA, AMH shouldered any financial risk associated with the Non-STACK Assignment and HMI/HMH's operation of those assets post-assignment in exchange for a nominal, below-market management fee and unfulfilled, unsecured promises by HMI to make payments to AMH and reimburse AMH's expenses.

106.    On information and belief, at the time AMH incurred the MSA Obligations and made the MSA Payments, AMH (i) was insolvent, or became insolvent as a result of such transfers or obligations, (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with AMH was an unreasonably small capital, or (iii) intended to incur, or believed that AMH would incur, debts that would be beyond AMH's ability to pay as such debts matured.

107.    The MSA Obligations and the MSA Payments were incurred and made for the intended benefit of HPS, as a substantial equity owner of HMI.  At the time the MSA Obligations and the MSA Payments were incurred and made, HPS had control over HMI through its equity ownership and Board authority.

108.    The financial condition of HMI and HPS, as a substantial equity owner of HMI, were improved as a result of AMH's incurrence of the MSA Obligations and making the MSA Payments.

109.    HPS actually received quantifiable benefits from AMH's incurrence of the MSA Obligations and making the MSA Payments, as a substantial equity owner of HMI, from its portion

of the value of the unpaid liabilities shouldered by AMH and the corresponding increase of HMI's value, to which, as owner of HMI, HPS had access.

110.    The MSA Obligations and the MSA Payments, in an amount of not less than $9,785,219.58, constitute constructive fraudulent transfers avoidable by Plaintiff under 11 U.S.C. § 548(a)(1)(B).

111.    Upon avoidance of the obligations and transfers alleged herein, Plaintiff is entitled to recover judgment from HPS pursuant to 11 U.S.C. § 550(a)(1) and/or (2), in an amount no less than $9,785,219.58.

**Count 6: Avoidance and Recovery of Constructive Fraudulent Transfers against HPS**

**(HMI MSA)**

**(11 U.S.C. § 544; Tex. Bus. & Com. §§ 24.005(a)(2), 24.006(a), 24.008, 24.009(b))**

112.    Plaintiff hereby repeats and realleges the allegations set forth in paragraphs 1 through 65 above.

113.    At the time the MSA Obligations and the MSA Payments were incurred and made, creditors existed who held unsecured claims allowable under 11 U.S.C. § 502 and who also held claims against the AMH Debtors as of the Petition Date, namely the Sadler Heirs, the Prepetition Senior Notes Claimants, the CUPD, the NC State Treasurer and the IRS.

114.    AMH received less than reasonably equivalent value in exchange for incurring the MSA Obligations and making the MSA Payments.  Through the HMI MSA, AMH shouldered any financial risk associated with the Non-STACK Assignment and HMI/HMH's operation of those assets post-assignment in exchange for a nominal, below-market management fee and unfulfilled, unsecured promises by HMI to make payments to AMH and reimburse AMH's expenses.

115.    On information and belief, at the time AMH incurred the MSA Obligations and made the MSA Payments, AMH (i) was insolvent or became insolvent as a result of the transfers or obligations, (ii) was engaged or was about to engage in a business or a transaction for which any property remaining with AMH was unreasonably small in relation to the business or transaction, and/or (iii) intended to incur, or believed or reasonably should have believed that AMH would incur, debts beyond AMH's ability to pay as they became due.

116.    The MSA Obligations and the MSA Payments were incurred and made for the intended benefit of HPS, as a substantial equity owner of HMI.  At the time the MSA Obligations and the MSA Payments were incurred and made, HPS had control over HMI through its equity ownership and Board authority.

117.    The financial condition of HMI and HPS, as a substantial equity owner of HMI, were improved as a result of AMH's incurrence of the MSA Obligations and making the MSA Payments.

118.    HPS actually received quantifiable benefits from AMH's incurrence of the MSA Obligations and making the MSA Payments, as a substantial equity owner of HMI, from its portion of the value of the unpaid liabilities shouldered by AMH and the corresponding increase of HMI's value, to which, as owner of HMI, HPS had access.

119.    The MSA Obligations and amounts of the MSA Payments, in an amount of not less than $9,785,219.58, constitute constructive fraudulent transfers avoidable by Plaintiff under Tex. Bus. & Com. §§ 24.005(a)(2) and 24.006(a).

120.    Upon avoidance of the obligations and transfers alleged herein, Plaintiff is entitled to recover judgment from Defendants pursuant to Tex. Bus. & Com. §§ 24.009(b), in an amount no less than $9,785,219.58.

34

## REQUEST FOR RELIEF

THEREFORE, Plaintiff respectfully prays that Defendants be cited to appear and answer herein, and that upon trial of this cause, judgment be entered in Plaintiff's favor, and against Defendants, for the following:

a. For a determination that the Gathering Agreement Obligations and AMH Gathering Payments were fraudulent transfers within the meaning of 11 U.S.C. §§ 544, and 548 and Tex. Bus. & Com. § 24.001, *et seq.*, and for entry of judgment against HPS and ARM in the amount of the avoided transfers, but in any event no less than $7,634,360.40 on Count 1 and $147,032,580.27 on Count 2;

b. For a determination that the Non-STACK Assignment was a fraudulent transfer within the meaning of 11 U.S.C. §§ 544, and 548 and Tex. Bus. & Com. § 24.001, *et seq.*, and for entry of judgment against HPS in the amount of the avoided transfer to be proven at trial, but in any event no less than $42,000,000;

c. For a determination that the MSA Obligations and MSA Payments were fraudulent transfers within the meaning of 11 U.S.C. §§ 544, and 548 and Tex. Bus. & Com. § 24.001, *et seq.*, and for entry of judgment against HPS in the amount of the avoided transfers, but in any event no less than $9,785,219.58;

d. Pre- and post-award interest at the highest rate and amount authorized by applicable law;

e. An award of costs related to this proceeding, including attorneys' fees, as permitted by contract or applicable law; and

f. Such other and further relief at law or in equity as the Court deems just and appropriate.

001913

Dated:  July 11, 2022

MINTZ LEVIN COHN FERRIS GLOVSKY
& POPEO, PC

*/s/ Joseph R. Dunn*
Joseph R. Dunn (*Pro Hac Vice*)
Attorney-in-Charge
CA State Bar No. 238069
jrdunn@mintz.com
3580 Carmel Mountain Rd.
Suite 300
San Diego, California 93210
T: (858) 314-1500
F: (858) 314-1501

Abigail V. O'Brient (*Pro Hac Vice*)
CA State Bar No. 265704
aobrient@mintz.com
2029 Century Park East
Suite 3100
Los Angeles, California 90067
T: (310) 586-3200
F: (310) 586-3202

127395158v.3

36

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing *First Amended Complaint* was duly served on all defendants in this case, namely HPS Investment Partners, LLC; ARM Energy Holdings, LLC; ARM Midstream, LLC and Asset Risk Management, through their respective counsel of record, via electronic mail and the Court's electronic filing system, this 11th day of July, 2022.


Dated: July 11, 2022                           */s/ Andrew B. Levin*
                                               Andrew B. Levin

001915

# EXHIBIT 1

001916

*Execution Version*

# GAS GATHERING AND PROCESSING AGREEMENT

## Oklahoma Energy Acquisitions, LP

## and

## Kingfisher Midstream, LLC

001917

**August 31, 2015**

001918

**TABLE OF CONTENTS**

Article I DEFINITIONS AND INTERPRETATION.....................................................................1
    Section 1.1   Definitions.  The following terms shall have the following meanings
                  unless otherwise indicated: ..........................................................................1
    Section 1.2   Interpretation.................................................................................................8

Article II TERM.............................................................................................................................9
    Section 2.1   Term...............................................................................................................9

Article III GATHERING AND PROCESSING SYSTEM ...........................................................9
    Section 3.1   Construction of Gathering and Processing System.......................................9
    Section 3.2   Easements, Rights-of-Way and Fee Lands. ..................................................9
    Section 3.3   Dedication...................................................................................................10
    Section 3.4   Covenant Running With Land. ...................................................................11
    Section 3.5   Covenant Not to Gather, Market or Process Gas.......................................11
    Section 3.6   Option to Expand Gathering and Processing System. ................................11
    Section 3.7   Title Warranty.............................................................................................12
    Section 3.8   Proceeds of Production. ..............................................................................12
    Section 3.9   Operating Inventory....................................................................................12
    Section 3.10  Receipt Points and Central Receipt Points.................................................12
    Section 3.11  Additional Receipt Points; Obligation to Interconnect.............................13

Article IV GAS QUALITY AND PRESSURE .......................................................................13

Section 4.1   Measurement, Equipment and Testing. ........................................ 13

Section 4.2   Specifications. ........................................................................ 14

Section 4.3   Delivery Pressure. .................................................................. 14

Section 4.4   Compression. ......................................................................... 14

Article V GATHERING, PROCESSING AND DELIVERY ..........................................14

Section 5.1   Delivery, Receipt and Processing of Gas. .................................. 14

Section 5.2   Operational Gas. .................................................................... 15

Section 5.3   Scheduling. ............................................................................ 15

Section 5.4   Equal Receipt and Delivery. .................................................... 15

Section 5.5   Exchange of Information. ......................................................... 16

Section 5.6   Delivery of Residue Gas and NGLs; Thermally Equivalent Volumes. .......... 16

Section 5.7   Commingling. ......................................................................... 16

Section 5.8   Allocation of Volumes Delivered. ............................................. 16

Section 5.9   Allocation of NGLs and Shrinkage. ........................................... 16

Section 5.10  Transfer of Title and Risk of Loss. ........................................... 17

Article VI SERVICE FEES .............................................................................17

Section 6.1   Service Fees. .......................................................................... 17

Section 6.2   Payment for Other Fuel. ......................................................... 17

Section 6.3   Escalation. ............................................................................. 17

Article VII PAYMENT ...................................................................................18

i

Section 7.1     Billing. ..................................................................................................... 18
Section 7.2     Payment. ................................................................................................... 18
Section 7.3     Disputed Amounts. .................................................................................. 18
Section 7.4     Taxes. ........................................................................................................ 18
Section 7.5     Audit. ......................................................................................................... 19

**Article VIII NOTICES** ....................................................................................................19
Section 8.1     Notices. ..................................................................................................... 19

**Article IX FINANCIAL RESPONSIBILITY** ..................................................................19

**Article X INDEMNITY** ....................................................................................................19
Section 10.1    Indemnity. ................................................................................................ 19
Section 10.2    Notification Obligation. ......................................................................... 20

**Article XI CURTAILMENT AND MAINTENANCE** ......................................................20
Section 11.1    Curtailment and Temporary Release of Gas. ..................................... 20
Section 11.2    Maintenance Events. ............................................................................... 21

**Article XII FORCE MAJEURE** .......................................................................................21
Section 12.1    Force Majeure. ........................................................................................ 21

**Article XIII DEFAULT AND TERMINATION** .............................................................22
Section 13.1    Producer Events of Default. ................................................................. 22
Section 13.2    Gatherer's Default Remedies Against Producer. ............................... 22

001921

Section 13.3  Gatherer Events of Default. .................................................................. 22
Section 13.4  Producer Document Rights After a Gatherer Event ......................... 23

Article XIV ASSIGNMENT ................................................................................................... 23
Section 14.1  Assignment. ....................................................................................... 23

Article XV Limitation of liability ............................................................................................ 23
Section 15.1  Limitation of Liability ....................................................................... 23

Article XVI CONFIDENTIALITY ........................................................................................ 23
Section 16.1  Confidentiality. .................................................................................. 23

Article XVII DISPUTE RESOLUTION ................................................................................. 24
Section 17.1  Dispute Resolution. ........................................................................... 24

Article XVIII MISCELLANEOUS ......................................................................................... 24
Section 18.1  Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury
                      Trial.  24
Section 18.2  Survival. ............................................................................................. 25
Section 18.3  No Joint Venture. ............................................................................... 25
Section 18.4  Entire Agreement. .............................................................................. 25
Section 18.5  No Third Party Beneficiaries. ........................................................... 25
Section 18.6  Regulatory Matters. ........................................................................... 25

ii

Section 18.7   Execution in Counterparts................................................................................. 26

Schedule 3.3          Dedicated Area
Schedule 3.4          Form of Memorandum of Gas Gathering and Processing Agreement
Schedule 3.10         Receipt Points
Schedule 3.11(a)      Form of Notice for Designation of Additional Receipt Point
Schedule 4.1          Measurement, Equipment and Testing
Schedule 4.2          Specifications
Schedule 6.1          Service Fees
Schedule 8.1          Notices

001923

iii

001924

## GAS GATHERING AND PROCESSING AGREEMENT

This Gas Gathering and Processing Agreement (this "***Agreement***") is made and entered into this 31st day of August, 2015 (the "***Effective Date***"), by and between Oklahoma Energy Acquisitions, LP, a Texas limited partnership ("***Producer***") and Kingfisher Midstream LLC, a Delaware limited liability company ("***Gatherer***").  Producer and Gatherer may be referred to each individually as a "***Party***," or collectively as the "***Parties***."

## RECITALS

**WHEREAS**, Producer owns, controls or may acquire certain mineral interests and hydrocarbon reserves (collectively, the "***Producer's Interests***," as further defined below), and controls the mineral interests of others (collectively, the "***Other Interests***," as further defined below) in certain lands in Kingfisher, Logan, Canadian, Blaine and Garfield Counties, Oklahoma, described more particularly on **Schedule 3.3** attached hereto (the "***Dedicated Area***"); and

**WHEREAS**, Producer has or contemplates having a supply of natural gas (the "***Gas***") and associated natural gas liquids (the "***NGLs***") from present and future wells located in the Dedicated Area and desires to Dedicate (defined below) the Producer's Interests and Other Interests, and deliver such Gas and NGLs (together, the "***Committed Gas***") to Gatherer for gathering and processing; and

**WHEREAS**, Gatherer shall construct, own and operate Gas gathering and processing facilities (collectively, the "***Gathering and Processing System***," further defined below) capable

001925

of receiving from Producer deliveries of the Committed Gas from the Dedicated Area and subject to the Dedication; and

**WHEREAS**, Producer desires that Gatherer provide gathering and processing services as set forth in this Agreement, and Gatherer desires to provide to Producer gathering and processing services in accordance with the terms and conditions set forth in this Agreement; then

**THEREFORE**, for and in consideration of the mutual covenants set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

**Section 1.1    Definitions**.    The following terms shall have the following meanings unless otherwise indicated:

"*Additional Capacity*" has the meaning set forth in Section 3.6.

"*Additional In-Service Date*" means, with respect to any Additional Capacity, if applicable, the first day of the first full month following the date that Gatherer notifies Producer that such Addition Capacity has been completed and is ready to receive Gas.

1

"*Additional Receipt Point*" has the meaning set forth in Section 3.11(a).

"*Affiliate*" means with respect to a Person, any Person which, directly or indirectly, controls, is controlled by or is under common control with such Person or such Person's members or shareholders. For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such individual or entity, whether through the ownership of voting securities, by contract or otherwise, *provided*, *however*, that for purposes of this Agreement, Producer and Gatherer shall not be considered Affiliates of each other.

"*After-Acquired Interests*" has the meaning set forth in Section 3.3(a).

"*Agreement*" has the meaning set forth in the introductory paragraph.

"*Allocated Actual Quantities*" means, Residue Gas plus NGLs plus Field Fuel plus Plant Fuel plus Operational Gas.

"*Allocated CRP Volume*" has the meaning set forth in Section 5.9(c).

"*Applicable Law*" means any applicable statute, law, principle of common law, rule, regulation, judgment, order, ordinance, requirement, code, writ, injunction, or decree of any Governmental Authority.

"*Btu*" is a British Thermal Unit and means the amount of heat required to raise the temperature of one avoirdupois pound of pure water from fifty-eight and one-half degrees

001927

"***Business Day***" means any day, other than a Saturday or Sunday, that commercial banks in Houston, Texas are open for business.

"***C&O Agreement***" means that certain Operating and Construction Management Agreement dated as of August 31 2015, by and between the Gatherer and Asset Risk Management, LLC and relating to the construction and operation of the Gathering and Processing System, as the same may be amended, restated, modified or otherwise supplemented.

"***Central Receipt Point***" and "***CRP***" has the meaning set forth in Section 3.10.

"***Chisholm Pipeline***" means the downstream NGL pipeline operated by Chisholm Pipeline Co, an affiliate of Phillips 66 Pipeline LLC.

"***Claims***" means any and all demands, claims, judgments, obligations, liabilities, liens, causes of action, lawsuits, arbitrations, mediations, investigations or proceedings (whether at law or in equity).

"***Committed Gas***" is Gas subject to the Dedication.

"***Confidential Information***" has the meaning set forth in Section 16.1.

001928

"**_Contract Year_**" means each calendar year during the Term, the first of which shall commence on the Effective Date and run through December 31 of that year, and then from January 1 through December 31 for each subsequent year thereafter, but for the last Contract Year, from January 1 through the date that this Agreement terminates or expires.

"**_CRP Theoretical Gallons_**" has the meaning set forth in Section 5.9(a)(i).

"**_Cubic Foot_**" or "**_cf_**" means a volume of Gas occupying a space of one (1) cubic foot at a temperature of sixty degrees Fahrenheit (60° F) and at a pressure of fourteen and seventy-three hundredths (14.73) pounds per square inch absolute.

"**_Curtailment Event_**" has the meaning set forth in Section 11.1.

"**_Curtailment Period_**" has the meaning set forth in Section 11.1.

"**_Dedicated Area_**" has the meaning set forth in the Recitals, as further specifically set forth on Schedule 3.3.

"**_Dedicated Wells_**" has the meaning set forth in Section 3.3(b).

"**_Dedication_**" means either the Primary Term Dedication or the Extended Term Dedication, as applicable, based upon the relevant determination time.

"**_Delivered Gas_**" means the quantity of Gas in MMBtu that is received by Gatherer from Producer at each Receipt Point.

001929

"***Dispute***" has the meaning set forth in Section 17.1.

"***Downstream Pipeline***" means Panhandle Eastern Pipeline, Chisholm Pipeline or any other pipeline into which Gatherer may make deliveries of Gas or NGLs under this Agreement for the account of Producer.

"***Equivalent Quantity***" means, on any day the thermally equivalent volume of Delivered Gas at the Receipt Points on such day reflecting Allocated Actual Quantities of Residue Gas plus NGLs determined in accordance with Section 5.9.

"***Extended Term***" has the meaning set forth in Section 2.1.

"***Extended Term Dedication***" has the meaning set forth in Section 3.3(b).

"***FERC***" means the Federal Energy Regulatory Commission, or any successor Governmental Authority.

"***Field Compression Fee***" has the meaning set forth in Schedule 6.1.

"***Field Condensate***" means the low-density mixture of hydrocarbon liquids that are present as gaseous components in the Gas, but have condensed out of the Gas and into the Gathering Pipeline System between a Receipt Point and the Plant inlet.

3

"*Field Fuel*" means ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

"*Final Commercial Operation Date*" has the meaning set forth in the C&O Agreement.

"*Firm*" means a gathering, processing or transportation service that is not subject to being curtailed, interrupted, pro rated or suspended except as expressly provided in this Agreement.

"*Force Majeure*" has the meaning set forth in Section 12.1.

"*Force Majeure Event*" has the meaning set forth in Section 12.1.

"*GAAP*" means generally accepted accounting principles in the United States.

"*Gas*" has the meaning set forth in the Recitals, and further means natural gas consisting predominantly of methane, but including the naturally occurring mixture of NGLs, heavier hydrocarbon gases and any non-combustible gases.

"*Gatherer*" has the meaning set forth in the introductory paragraph.

"*Gatherer Event of Default*" has the meaning set forth in Section 13.3.

"*Gatherer Group*" means any or all of (i) Gatherer, (ii) Gatherer's Affiliates, (iii) any of their respective contractors, and (iv) the officers, directors, employees, agents, advisors, counsel

001931

"***Gathering and Processing Capital Expenditures***" means all expenditures, costs and expenses incurred by or on behalf of Gatherer with respect to the Gathering and Processing System, including costs of rights-of-way and other easements, labor, pipelines, stabilization, Plant, compression, metering and measurement, or interconnection of the Residue Gas Pipeline or NGL Pipeline, that are capitalized on the books and records of Gatherer with respect to the Gathering and Processing System according to GAAP, but specifically excluding all expenditures, costs and expenses incurred by or on behalf of Gatherer with respect to any expansion to the Gathering and Processing System to gather or process third party volumes of Gas that are not attributable to the Interests, provided, however, that in the event that Gatherer undertakes any expansion of the Gathering and Processing System to gather or process third party volumes of Gas that are not attributable to the Interests, and Producer thereafter makes use of the Gathering and Processing System so expanded to accommodate third party volumes of natural gas to gather and process Committed Gas, then Producer's pro rata share of all expenditures, costs and expenses of the expansion shall constitute "Gathering and Processing Capital Expenditures" to the extent agreed upon by the Parties at the time of Producer's connection to such expansion, and, provided, further, that this right and obligation of Producer shall not be in derogation of any of the rights and obligations of the Parties under Section 3.6.

"***Gathering and Processing System***" has the meaning set forth in the Recitals, specifically the (i) Gathering Pipeline System, (ii) Plant, (iii) Residue Gas Pipeline System, (iv)

4

001932

NGL Pipeline System, (v) any NGL storage facilities, (vi) any compression facilities, (vii) any custody transfer units, meters or measurement facilities, and (viii) any other equipment or appurtenances associated with the foregoing.

"**_Gathering Capital Recovery Fee_**" has the meaning set forth in Schedule 6.1.

"**_Gathering Fee_**" has the meaning set forth in Schedule 6.1.

"**_Gathering Pipeline System_**" means the pipelines of various diameters interconnecting the Receipt Point(s) to the Plant, including any compression facilities before the inlet of the Plant.

"**_Governmental Approval_**" means any permit, license, permission, grant or other similar authorization issued by, or required to be issued by, any Governmental Authority and necessary for the performance of the Parties hereunder.

"**_Governmental Authority_**" means any federal, state, county, parish, municipal or other governmental subdivision, or any court or any governmental department, commission, board, bureau, agency or other instrumentality of any federal, state, county, municipal or other governmental subdivision within the United States of America with authority over the Parties and subject matter in question.

"**_GPM_**" means gallons of NGLs per Mcf of Gas.

"**_Gross Heating Value_**" means the number of Btu produced by the complete combustion,

001933

at constant pressure, of the amount of Gas which would occupy a volume of one Cubic Foot at a temperature of sixty degrees Fahrenheit (60°F.) when saturated with water vapor and under a pressure equivalent to fourteen and seventy-three hundredths (14.73) pounds per square inch absolute, under standard gravitational force (acceleration 980.665 centimeters per second per second), with air of the same temperature and pressure as the Gas when the products of combustion are cooled to the initial temperature of the Gas and air and when the water formed by combustion is condensed to the liquid state.  The Gross Heating Value so determined will be corrected from the conditions of testing to that of the actual condition of the Gas delivered, expressed in Btu per Cubic Foot and reported at a pressure base of fourteen and seventy-three hundredths (14.73) pounds per square inch absolute; provided, however, if the water vapor content of the Gas delivered is seven pounds or less per one million Cubic Feet, the Gas will be assumed to be dry.

"*Indemnified Party*" has the meaning set forth in Section 10.2.

"*Indemnifying Party*" has the meaning set forth in Section 10.2.

"*In-Service Date*" means first day of the first full month following the date that Gatherer notifies Producer that the Gathering and Processing System has been completed and is ready to receive and process Committed Gas.

"*Interests*" means Producer's Interests, After-Acquired Interests and Other Interests.

5

"*LAUFG*" means Producer's allocated share of the quantity of "lost and unaccounted for Gas" as a result of leakage, venting, flaring, discrepancies due to meter inaccuracies, shrinkage due to variations of temperature or pressure, or any other reason.

"*Line Fill*" has the meaning set forth in Section 3.9.

"*Losses*" means any and all losses, damages, costs, expenses, liabilities, fines, penalties or judgments of whatever kind or character incurred by a Person or Party with respect to a Claim, including reasonable attorneys' fees, court costs and other reasonable costs and expenses of litigation as such may be awarded by a court.

"*Maintenance Event*" has the meaning set forth in Section 11.2.

"*Mcf*" means one thousand (1,000) Cubic Feet.

"*MMBtu*" means one million (1,000,000) Btu.

"*Natural Gas Liquids*" and "*NGLs*" has the meaning set forth in the recitals, specifically hydrocarbons heavier than methane, such as ethane, propane, normal butane, isobutane, pentanes and heavier hydrocarbons, and mixtures thereof separated into the Y-Grade Stream at the Plant.

"*NGL Content*" means quantity of ethanes and heavier hydrocarbons in Gas at the Receipt Point.

"*NGL Delivery Point*" means the point at which the NGL Pipeline System interconnects with the inlet flange of the measurement facilities of Chisholm Pipeline

001935

with the inlet flange of the measurement facilities of Chisholm Pipeline.

"***NGL Pipeline System***" means approximately 4 miles of pipeline interconnecting the Plant to the NGL Delivery Point.

"***NGL Transportation Fee***" has the meaning set forth in Schedule 6.1.

"***Notice***" has the meaning set forth in Section 8.1.

"***Off-Spec Gas***" has the meaning set forth in Section 4.2(a).

"***Operational Gas***" has the meaning set forth in Section 5.2.

"***Other Fuel***" means electricity consumed in the operation of the Gathering and Processing System or Plant.

"***Other Fuel Fee***" means Producer's allocated share of the actual cost of Other Fuel.

"***Other Interests***" means the interests of Persons in the Dedicated Area other than Producer, but whose interests are represented or controlled by Producer, such working interests, royalty interests, overriding royalty interests, net profits interests or other mineral interests.

"***Overdue Rate***" means rate per annum equal to the lesser of (i) an annual rate equal to four percent (4%) per annum above the "prime rate" specified under the caption "Money Rates"

6

in the *Wall Street Journal* (New York Edition) on the date such payment was required to have been made, or (ii) the maximum rate of interest permitted by Applicable Law.

"***Panhandle Eastern Pipeline***" means the downstream interstate natural gas pipeline operated by Panhandle Eastern Pipe Line Company, LP.

"***Partial Commercial Operation Date***" has the meaning set forth in the C&O Agreement.

"***Partial In-Service Date***" means the first day of the first full month following the date that Gatherer notifies Producer that the Partial Commercial Operation Date has occurred and the Gathering and Processing System is ready to receive Committed Gas.

"***Party***" and "***Parties***" have the meaning set forth in the introductory paragraph.

"***Person***" means any individual, firm, corporation, trust, partnership, limited liability company, association, joint venture, other business enterprise or Governmental Authority.

"***Plant***" means any gas processing plant utilized by Gatherer to process Gas, whether or not owned or operated by Gatherer.

"***Plant Fuel***" means ████████████████████████████████████████

"***Plant Recovery Factor***" has the meaning set forth in Section 5.9(a)(ii).

"***Price Index***" has the meaning set forth in Section 6.3.

001937

"***Primary Term***" has the meaning set forth in Section 2.1.

"***Primary Term Dedication***" has the meaning set forth in Section 3.3(a).

"***Processing Capital Recovery Fee***" has the meaning set forth in Schedule 6.1.

"***Processing Fee***" has the meaning set forth in Schedule 6.1.

"***Producer***" has the meaning set forth in the introductory paragraph.

"***Producer Capacity***" has the meaning set forth in Section 3.6.

"***Producer Event of Default***" has the meaning set forth in Section 13.1.

"***Producer Group***" means any or all of (i) Producer, (ii) Producer's Affiliates, (iii) Producer's contractors and suppliers, of every tier, other than the Gatherer Group, and (iv) the officers, directors, employees, agents, advisors, counsel, consultants, members, shareholders, insurers, invitees or representatives of any of the foregoing.

"***Producer's Interests***" means all mineral interests in lands, leases, wells and Gas that Producer owns or controls in the Dedicated Area.

7

"***Receipt Point***" has the meaning set forth in Section 3.10, as set forth more specifically in Schedule 3.10.

"***Residue Gas***" means Delivered Gas *minus* Field Fuel *minus* Plant Fuel *minus* Operational Gas *minus* LAUFG *minus* Shrinkage, expressed in MMBtu.

"***Residue Gas Delivery Point***" means the point at which the Residue Gas Pipeline System interconnects with the inlet flange of the measurement facilities of Panhandle Eastern Pipeline.

"***Residue Gas Pipeline System***" means approximately 4 miles of pipeline interconnecting the Plant to the Residue Gas Delivery Point.

"***Scheduled Gas***" has the meaning set forth in Section 5.3.

"***Service Fees***" has the meaning set forth in Section 6.1.

"***Shrinkage***" means Producer's allocated share of the MMBtus of the NGLs contained in the Y-Grade Stream that are removed from Gas during processing at the Plant, described more particularly in Section 5.9(b)(ii).

"***Specifications***" has the meaning set forth in Section 4.2(a).

"***Stabilized Field Condensate***" means Field Condensate that has been stabilized before injection into the NGL stream before the NGL Delivery Point.

"***System Capacity***" means the then maximum capacity of the Gathering and Processing

001939

"***System Capacity***" means the then-maximum capacity of the Gathering and Processing System to gather and process Gas, not to exceed the then-determined compression capacity on the Gathering and Processing System, based on NGL Content of Gas of seven (7) GPM.

"***System Pressure***" has the meaning in Section 4.4.

"***Term***" means the Primary Term and any Extended Term.

"***Theoretical Gallons***" means the number of gallons of NGLs that are present in Gas as determined at a particular point.

"***Y-Grade Stream***" means mixed NGLs that have been removed from the Gas at the Plant by means of processing activities, but which have not been separated into individual NGL components.

### Section 1.2    Interpretation.

All references to any agreement or document shall be construed as of the particular time that such agreement or document may then have been executed, amended, varied, supplemented or modified. Terms defined in this Agreement shall have the meanings given therein when used elsewhere in this Agreement. References in the singular shall include the plural, and references to the masculine shall include the feminine, and vice versa. Words denoting natural persons shall include partnerships, firms, companies, corporations, joint ventures, trusts, associations,

8

organizations or other entities. References to a particular article, section, subsection, paragraph, subparagraph or schedule, if any, shall be a reference to such article, section, subsection, paragraph, subparagraph or schedule in and to this Agreement. The words "include" and "including" shall include the phrase "not limited to." Any reference to a Person shall include that Person's successors and assigns or to any Person succeeding to that Person's functions. Any Schedules are fully incorporated and made part of this Agreement. The Schedules shall be read in conjunction with the provisions of the body of this Agreement, and the Schedules and the body of this Agreement shall be interpreted to give effect to the intent of the Parties as evidenced by their terms when taken as a whole, *provided, however*, that in the event of an express and irreconcilable conflict between the terms of a Schedule and the provisions of the body of this Agreement, the provisions of the body of this Agreement shall control.  Capitalized terms appearing in a Schedule shall have the meanings set forth in Section 1.1, unless the context requires otherwise.

## ARTICLE II
## TERM

### Section 2.1    Term.

This Agreement shall be effective as of the Effective Date, and, unless earlier terminated in accordance with any express provision of this Agreement, shall remain in full force and effect for a period of fifteen (15) years from the In-Service Date (the "***Primary Term***"), *provided, however*, that, to the extent that at the end of the Primary Term there are wells then-connected to the Gathering and Processing System and then-producing Gas in commercial (paying) quantities, the Term of this Agreement shall extend for so long as such well(s) continue to produce Gas in

# ARTICLE III
# GATHERING AND PROCESSING SYSTEM

### Section 3.1    Construction of Gathering and Processing System.

Gatherer shall, at its sole cost and expense, design, engineer, construct, equip and modify, or caused to be designed, engineered, constructed, equipped and modified, the Gathering and Processing System.  Gatherer shall exercise commercially reasonable efforts to (a) achieve the Partial Commercial Operation Date by the date that is nine months after the Effective Date and (b) achieve the Final Commercial Operation Date by the date that is twelve months after the Effective Date.

### Section 3.2    Easements, Rights-of-Way and Fee Lands.

To the extent that (a) Producer may do so in compliance with all applicable agreements, and (b) Gatherer's activities on the relevant lands do not unreasonably interfere with Producer's operations, Producer shall, where reasonably requested by Gatherer, (i) convey or assign to Gatherer, to the extent that Producer may do so without payment of monies (unless Gatherer agrees to pay), any easements or rights-of-way for purposes of constructing, owning, operating, repairing, replacing and maintaining any portion of the Gathering and Processing System, and (ii) lease to Gatherer, at a price and upon terms as may be then agreed, such fee lands, or portions

9

thereof, owned by Producer, for purposes of constructing, owning, operating, repairing, replacing and maintaining the Gathering and Processing System.

**Section 3.3     Dedication.**

(a)      For the Primary Term of this Agreement, Producer hereby dedicates to Gatherer all Interests within the Dedicated Area shown on **Schedule 3.3** (the "***Primary Term Dedication***") and shall deliver to Gatherer at the Receipt Point(s) all Committed Gas produced therefrom, *provided* that notwithstanding such Primary Term Dedication, Producer shall have the right to (i) administer the Interests as it deems advisable in its sole discretion, including the right to rework, shut in, plug or abandon any well, (ii) form or participate in the formation of any unit, (iii) to use Gas in its operations, and (iv) deliver Gas that Producer is expressly required to deliver under oil and gas leases, contractual agreements or other legal rights under which Committed Gas is produced; *provided further* that any Interests of Producer or Gas produced therefrom subject to the prior dedication contained in that certain Gas Purchase Agreement dated April 1, 2015 by and between Alta Mesa Holdings, LP and Mustang Gas Products will be excluded from the Primary Term Dedication until such prior dedication terminates or expires, at which time such Gas shall become Committed Gas. If, after the Effective Date and before the end of the Primary Term, Producer or any of its Affiliates acquire mineral interests, including by way of joint venture participation, drill-to-earn rights or other means, within the Dedicated Area (the "***After-Acquired Interests***"), then the After-Acquired Interests and all Gas produced therefrom shall automatically be included in the Primary Term Dedication and become Committed Gas; *provided, however,* if any of the After-Acquired Interests or Gas produced therefrom are subject to a prior written dedication or

Interests or Gas produced therefrom are subject to a prior written dedication or commitment for gathering as of the time of acquisition by Producer, then that Gas will be excluded from the Primary Term Dedication until the prior dedication or commitment terminates or expires, at which time such Gas shall become Committed Gas, *provided further* that if, with respect to any After-Acquired Interests, Producer has the right or ability, without payment of any material fee or penalty, or incurring any other material disadvantage, to terminate any such prior dedication or commitment with respect to the After-Acquired Interests, then Producer shall terminate such dedication or commitment as soon as reasonably practicable.  Producer shall promptly notify Gatherer in writing of any such termination, and identify the After-Acquired Interests.

(b)    For the Extended Term of this Agreement, Producer hereby dedicates to Gatherer all of the wells that constitute Interests and are connected to the Gathering and Processing System at the end of the Primary Term (such wells, the "***Dedicated Wells***", and such dedication, the "***Extended Term Dedication***") and shall deliver to Gatherer at the Receipt Point(s) all Committed Gas produced therefrom; *provided* that notwithstanding such Extended Term Dedication, Producer shall have the right to (i) administer the Dedicated Wells as it deems advisable in its sole discretion, including the right to rework, shut in, plug or abandon any Dedicated Well, (ii) form or participate in the formation of any unit, (iii) to use Gas in its operations, and (iv) deliver Gas that Producer is expressly required to deliver under oil and gas leases, contractual agreements or other legal rights under which Committed Gas is produced.  From and after the end of the Primary Term all Interests within the Dedicated Area other than the Dedicated Wells

10

shall be permanently released from the Dedication, and Producer may take the volumes produced from such Interests (other than the Dedicated Wells) elsewhere.

**Section 3.4     Covenant Running With Land.**

For its Term, this Agreement shall be a covenant running with the land and the Interests and any After-Acquired Interests.  Contemporaneously with the execution of this Agreement, and from time-to-time during the Term if necessary, the Parties shall each execute for recordation in the public records of the Dedicated Area a "short form" memorandum of this Agreement in the form of **Schedule 3.4** attached hereto, identifying the Dedicated Area, the Interests, After-Acquired Interests and wells thereon.  Producer shall cause any conveyance of all or any of the Interests or After-Acquired Interests, or Gas therefrom, to be made expressly subject to this Agreement, and to cause all transferees to execute a written instrument in a form reasonably satisfactory to Gatherer acknowledging the Dedication and such transferees' obligations under this Agreement.  Gatherer shall likewise cause any assignment or conveyance of all or any segment of the Gathering and Processing System to be made expressly subject to this Agreement, and to cause all transferees to execute a written instrument in a form reasonably satisfactory to Producer acknowledging the Dedication and such transferees' obligations under this Agreement.

**Section 3.5     Covenant Not to Gather, Market or Process Gas.**

Producer shall not gather, market or process Committed Gas, or allow Committed Gas to be gathered, marketed or processed, or otherwise cause or allow NGLs or other constituent components of the Gas to be removed from Committed Gas, other than by means of mechanical

**Section 3.6    Option to Expand Gathering and Processing System.**

Gatherer shall gather and process volumes of Committed Gas up to 60 million cf/day on a Firm basis (the "***Producer Capacity***").  All volumes of Committed Gas above the Producer Capacity shall at all times be Committed Gas.  To the extent that Committed Gas shall exceed the Producer Capacity, Gatherer shall have the option to (a) utilize any available System Capacity in excess of the Producer Capacity on a Firm basis, (b) utilize another Plant or Plants to process such Committed Gas, or (c) expand the Gathering and Processing System as many times as necessary by adding additional System Capacity (the "***Additional Capacity***").  In the event that production from the Interests shall exceed the Producer Capacity, Producer shall provide Notice to Gatherer that production exceeds Producer Capacity, and Gatherer shall provide Notice to Producer within sixty (60) days of Gatherer's receipt of Producer's Notice that Gatherer will or will not accept such volumes of Committed Gas or add Additional Capacity.  In the event that Gatherer provides Notice to Producer that it will not accept such volumes of Committed Gas above the Producer Capacity or add Additional Capacity, then the acreage from which the volumes of Committed Gas above the Producer Capacity are directly produced shall be released from the Dedication, and Producer may take such volumes of Committed Gas elsewhere.  In the event that Gatherer provides Notice to Producer that it will accept such volumes of Committed Gas above the Producer Capacity or add Additional Capacity, then, until Gatherer is able to process such Committed Gas, or until the Additional In-Service Date for such Additional

11

Capacity, Producer may deliver any volumes of Committed Gas above the Producer Capacity of the Gathering and Processing System elsewhere, provided that once Gatherer is able to process such volumes of Committed Gas, all such volumes of Committed Gas shall be delivered to Gatherer at a Receipt Point.  **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, PRODUCER'S RIGHT TO TAKE THE AFFECTED VOLUMES OF COMMITTED GAS ELSEWHERE DURING ANY PERIOD WHERE GATHERER REFUSES TO TAKE VOLUMES OF PRODUCER'S COMMITTED GAS THAT EXCEED PRODUCER CAPACITY, AND THE RELEASE FROM DEDICATION, IF APPLICABLE, SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY, AT LAW OR IN EQUITY, WITH RESPECT TO GATHERER'S INABILITY OR REFUSAL TO TAKE VOLUMES OF COMMITTED GAS THAT EXCEED PRODUCER CAPACITY.**

Section 3.7    **Title Warranty.**

Producer represents and warrants to Gatherer that:  (i) it owns, or has the right to dedicate all Interests and Committed Gas dedicated under this Agreement, and to deliver Committed Gas to the Receipt Point(s), free and clear of all liens, encumbrances and claims, (ii) there are no prior dedications or commitments covering any Interests or Committed Gas produced from the Interests  within the Dedicated Area.  Producer shall defend, indemnify, protect and hold harmless Gatherer from and against all claims arising out of any breach of such representation and warranty.

001947

Section 3.8    **Proceeds of Production.**

Producer shall make payment of all royalties, overriding royalties, production payments, and all other payments attributable to the Interests and Committed Gas due to any Person under any leases or agreements in accordance with the terms thereof, and Gatherer shall have no obligations with respect thereto.

### Section 3.9    Operating Inventory.

Producer shall provide, at no cost to Gatherer, Gas and NGLs as line fill (each, the "*Line Fill*") needed to make the Gathering Pipeline System, Residue Gas Pipeline System, NGL Pipeline System, and other portions the Gathering and Processing System operational.  Line fill shall not be considered transportable volume.

### Section 3.10    Receipt Points and Central Receipt Points.

Producer shall install one or more central receipt points (each, a "*Central Receipt Point*" or "*CRP*"), where production from multiple wells is aggregated into a single physical connection to the Gathering and Processing System.  Producer shall connect each CRP to the Gathering and Processing System, and the "*Receipt Point*" for Delivered Gas shall be the point of interconnection between a CRP and the inlet flange of the Gathering and Processing System. The proposed design and a list of initial Receipt Points are set forth in **Schedule 3.10**.

12

**Section 3.11    Additional Receipt Points; Obligation to Interconnect.**

(a)    Producer shall have the right to designate additional Receipt Points (each an "***Additional Receipt Point***"), subject to Gatherer's prior approval, for the purpose of connecting additional wells to the Gathering and Processing System, either by construction of an additional CRP or by interconnection of a well to the Gathering and Processing System, *provided* that Producer shall have given Gatherer prior Notice, in the form set forth in **Schedule 3.11(a)**, of such Additional Receipt Points, and that incremental volumes of Committed Gas added to the Gathering and Processing system will not cause the volumes of Committed Gas to exceed the then-System Capacity of the Gathering and Processing System.

(b)    Upon Gatherer's receipt of any Notice from Producer under subsection (a) above, Gatherer shall have ▮▮▮▮▮▮ days from its receipt of any such Notice to provide return Notice to Producer that Gatherer will or will not interconnect such Additional Receipt Points.

(c)    In the event that Gatherer provides Notice to Producer that Gatherer will make a requested interconnection for such Additional Receipt Point, then Gatherer shall make such interconnection to the Gathering and Processing Agreement as soon as reasonably practicable, but in no event more than ▮▮▮▮▮▮ days from Gatherer's Notice to Producer.

001949

(d)    In the event that Gatherer provides Notice to Producer that Gatherer will not make a requested interconnection for such Additional Receipt Point, then the well in

question shall be released from the Dedication. **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, THE RELEASE FROM DEDICATION SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY, AT LAW OR IN EQUITY, WITH RESPECT TO GATHERER'S REFUSAL TO INTERCONNECT AN ADDITIONAL RECEIPT POINT.**

## ARTICLE IV
## GAS QUALITY AND PRESSURE

**Section 4.1     Measurement, Equipment and Testing.**

(a)     Producer shall be responsible for measurement, equipment and testing at the CRPs, and Gatherer shall be responsible for measurement, equipment and testing downstream of the CRPs, each in accordance with the protocols set forth on **Schedule 4.1**.

(b)     Subject to Producer's safety rules, regulations and procedures, Producer hereby grants to Gatherer, and Gatherer's contractors or agents, a right of entry onto any of the lands covered by the Interests and access to the Producer side of a CRP, as necessary, for the purpose of sampling Gas pursuant to Section 4.2 below, and shall facilitate, as necessary, access with surface owners where requested by Gatherer.

13

**Section 4.2      Specifications.**

(a)      Committed Gas delivered by Producer at the Receipt Points shall meet or exceed the quality requirements set forth in **Schedule 4.2**, and Residue Gas and NGLs delivered to the Delivery Points shall meet the quality requirements, if any, of the Downstream Pipelines (as applicable, the "***Specifications***").  Gatherer shall have a right to reject all Committed Gas that does not meet the Specifications ("***Off-Spec Gas***"), or which causes Residue Gas or NGLs to fail to meet the Specifications of a Downstream Pipeline, and may shut in well(s) of Producer or shut down a Receipt Point or portions of the Gathering and Processing System as necessary to deal with Off-Spec Gas.  The foregoing notwithstanding, Off-Spec Gas shall not be released from the Dedication.

(b)      Except where the average of daily Delivered Gas at a CRP during the prior month has been less than 250 Mcf per day, Gas at each CRP shall be sampled on a quarterly basis.  To the extent the average of daily Delivered Gas at a CRP during the prior month is less than 250 Mcf per day, there shall be no obligation to sample Gas at such CRP.

**Section 4.3      Delivery Pressure.**

Producer shall deliver Gas at the Receipt Point(s) at a pressure sufficient to enter the Gathering and Processing System and shall not exceed the maximum allowable operating pressure of the Gathering and Processing System at such Receipt Point, but in no event less than fifty (50) psig.  Gatherer shall deliver Gas at the Residue Gas Delivery Point(s) at a pressure in accordance with the requirements or directives of the applicable Downstream Pipeline.

**Section 4.4    Compression.**

Gatherer shall install up to seven (7) stages of compression facilities to provide reduced operating pressures at a CRP to at least ███████ psig and to maintain sufficient pressure to operate the Gathering and Processing System (the "*System Pressure*").  Gatherer shall exercise commercially reasonable efforts to install such compression facilities as soon as reasonably practicable.

**ARTICLE V**
**GATHERING, PROCESSING AND DELIVERY**

**Section 5.1    Delivery, Receipt and Processing of Gas.**

Commencing on the In-Service Date, Producer shall deliver or cause to be delivered to the Receipt Point(s) all Committed Gas.  For the Term of this Agreement, Gatherer shall, on a Firm basis up to the Producer Capacity, receive and process the Delivered Gas to separate the NGLs from the Delivered Gas.  If Gatherer enters into any gathering, transportation, processing, marketing or similar agreement with any third party pursuant to which natural gas is received and processed by Gatherer on the Gathering and Processing System on a Firm basis, Gatherer shall deliver to Producer a written notice of such agreement that describes the material terms thereof.  Gatherer shall provide stabilization services for all Field Condensate (the "*Stabilized Field Condensate*"), and Stabilized Field Condensate shall be re-injected into the NGL stream

14

before the NGL Delivery Point, *except* for such NGLs or Field Condensate as may be sold and transported by truck.  The processing services hereunder shall not include processing or treating services for which there is no System Fee expressly set forth on Schedule 6.1, such as treatment for sour gas/hydrogen sulfide ($H_2S$) or other contaminants, or removal of carbon dioxide ($CO_2$), nitrogen (N), or other inert gases or any other types of contaminants.

### Section 5.2    Operational Gas.

Any Delivered Gas consumed by Producer for its operations taken from the Gathering and Processing System as permitted by Section 3.3(iii) (all such Gas, the "***Operational Gas***") shall be metered by Producer at the CRP, and all such volumes shall be communicated to Gatherer by Producer.   Operational Gas shall be accounted for in determining Equivalent Quantities.

### Section 5.3    Scheduling.

Producer shall provide Notice to Gatherer not less than three (3) Business Days prior to the last Business Day of each month of the total volume of Gas (expressed in Mcf per day and MMBtu per day) that Producer expects to deliver in the following month, specifying volumes at each Receipt Point, *provided* that Producer may modify any such nomination upon at least 24 hours advance Notice (all such Gas being "***Scheduled Gas***").  The Parties shall coordinate their respective nomination activities, giving sufficient time to meet the deadlines of the Downstream Pipelines.  If Producer becomes aware that actual deliveries of Committed Gas to the Receipt Point(s) vary by more than five (5%), greater or lesser, of Scheduled Gas, then Producer shall promptly provide Notice to Gatherer, and if Producer fails to give Gatherer any Notice required

by this Section, and Gatherer thereafter incurs any costs or expenses as a result of such a variance from Scheduled Gas of which Gatherer should have received Notice, then Producer shall reimburse Gatherer for such costs or expenses.

### Section 5.4    Equal Receipt and Delivery.

Committed Gas shall be delivered by Producer to and received by Gatherer at the Receipt Points, and Residue Gas and NGLs shall be delivered by Gatherer to and received by Producer at the Residue Gas Delivery Point and NGL Delivery Point in Equivalent Quantities, and Producer shall not be permitted to use the Gathering and Processing System for storage or peaking purposes. To the extent that the volumes of Delivered Gas on any day exceed the Equivalent Quantities of Residue Gas and NGLs being delivered at the Residue Gas Delivery Point and NGL Delivery Point, Gatherer may curtail Delivered Gas until such time as Producer's nominations on Downstream Pipelines bring the Gathering and Processing System into balance. Likewise, to the extent that the volumes of Delivered Gas on any day are less than the Equivalent Quantities of Residue Gas and NGLs being delivered at the Residue Gas Delivery Point and NGL Delivery Point, Gatherer may curtail deliveries of Residue Gas and NGLs until such time as the volumes of Delivered Gas are sufficient to bring the Gathering and Processing System into balance. The Parties acknowledge and agree that a precise balancing may not be possible, but each shall exercise commercially reasonable efforts to maintain the Gathering and Processing System in balance.

15

**Section 5.5    Exchange of Information.**

Each of the Parties shall furnish or cause to be furnished to the other all information as may be reasonably requested and necessary with respect to maintaining the Gathering and Processing System in balance, including meter readings and nominations on Downstream Pipelines.

**Section 5.6    Delivery of Residue Gas and NGLs; Thermally Equivalent Volumes.**

Gatherer shall, as nearly as practicable, deliver to Producer at the respective Residue Gas Delivery Point and NGL Delivery Point, as applicable, Equivalent Quantities of Residue Gas and NGLs. Producer shall be responsible for all nominations of Residue Gas and NGLs for transportation on any Downstream Pipeline, as applicable.

**Section 5.7    Commingling.**

Delivered Gas and NGLs may represent only a portion of Gas and NGLs on the Gathering and Processing System, which may be used by other customers. Subject to its obligations with respect to delivery of Equivalent Quantities, Gatherer shall have the right to commingle Gas and NGLs with Gas and NGLs from other customers.

**Section 5.8    Allocation of Volumes Delivered.**

Subject to Gatherer's obligations to deliver Equivalent Quantities under Section 5.4, Producer shall be credited with Allocated Actual Quantities delivered at the Residue Gas

001955

Delivery Point and NGL Delivery Point, as applicable. As long as there are no third party volumes at the Gathering and Processing System Producer's Allocated Actual Quantity shall be 100%. If third party volumes enter the Gathering and Processing System, Gatherer shall allocate total delivered volumes and component Btu's on a *pro rata* basis (based on Btu content of Gas delivered to the Gathering and Processing System) among all parties then on the Gathering and Processing System.

**Section 5.9    Allocation of NGLs and Shrinkage.**

(a)    The "Allocated ▮▮▮▮ Quantities" of NGLs shall be determined as follows:



(i)

16



(each, the "***Allocated CRP Volume***").

**Section 5.10   Transfer of Title and Risk of Loss.**

Title to Gas, Operational Gas, Field Condensate, Stabilized Field Condensate and NGLs shall always vest in Producer.  Risk of loss shall always be with Producer except when Gatherer is in possession of Gas, NGLs, Field Condensate or Stabilized Field Condensate, in which case risk of loss shall be with Gatherer, provided that Gatherer shall not be responsible for lost volumes of Gas attributable to Shrinkage or LAUFG, or with respect to Operational Gas.  Risk of loss for Gas and NGLs shall transfer to Producer at the Residue Gas and NGL Points of Delivery.

001957

**ARTICLE VI**

**Section 6.1     Service Fees.**

Producer shall pay to Gatherer the following fees (in the aggregate, the "***Service Fees***") set forth on **Schedule 6.1**.

**Section 6.2     Payment for Other Fuel.**

Producer shall pay to Gatherer the Other Fuel Fee, if applicable.

**Section 6.3     Escalation.**

Commencing with the ███████████████ and on January 1 of each Contract Year thereafter, each Service Fee, except for the Other Fuel Fee, shall be automatically adjusted upward ████████████████████████████████████████

██████████████████████████████████████████████████████████████

17

# ARTICLE VII
# PAYMENT

**Section 7.1    Billing.**

As soon as reasonably practicable after the end of a month, Gatherer shall render to Producer a statement for the preceding month, setting forth the following, and including or attaching necessary backup information or calculations:

      (a)      Delivered Gas in both Mcf and MMBtu by CRP;

      (b)      Operational Gas, if any, in both Mcf and MMBtu;

      (c)      Allocated Actual Quantities of Residue Gas, and breaking out the constituent components of the calculation in Section 5.9(b);

      (d)      Allocated Actual Quantities of NGLs, and breaking out the constituent components of the calculation in Section 5.9(a);

      (e)      Allocated CRP Volumes and calculation of the Services Fees due;

      (f)      actual cost of electricity as Other Fuel, and the Other Fuel Fee;

      (g)      aggregate total of all amounts due Gatherer for all Service Fees and Other Fuel Fees; and

### Section 7.2    Payment.

Producer shall pay to Gatherer the full amount due not later than the earlier of (i) fifteen (15) days from Producer's receipt of Gatherer's statement, or (ii) the last day of month following the statement month, *provided* that if such day is not a Business Day, then on the next Business Day.  Any past due amounts shall bear interest at the Overdue Rate from the date due until paid.

### Section 7.3    Disputed Amounts.

If Producer disputes all or a portion of any statement or amount due, it shall pay the undisputed portion, if any, of any such statement, and shall provide Notice to Gatherer of the specific basis for the dispute, including all supporting information, as soon as practicable after becoming aware of the basis for the dispute.  If after resolution of such dispute it is determined that any of the amount in dispute is due and owing, such amount(s) shall bear interest at the Overdue Rate from the date originally due until paid.  In no event shall any statement or invoice be subject to dispute beyond two (2) years from the date of such statement or invoice.

### Section 7.4    Taxes.

Producer shall pay any and all Taxes levied on Committed Gas, Field Condensate, Residue Gas or NGLs.  In the event a Party is required to pay any Tax for which the other Party

18

is responsible hereunder, the responsible Party shall reimburse the paying Party for the same per invoice provided by the paying Party. Each Party shall indemnify, defend and hold harmless the other Party from and against any and all Claims and Losses arising out of or related to Taxes for which the indemnifying Party is responsible hereunder.

        **Section 7.5     Audit.**

        Each Party shall have the right, upon reasonable advance Notice, during normal business hours and not more than two (2) times per Contract Year, at its sole expense and either itself or through its representatives, to audit the books and records of the other Party, at the place where such books and records are ordinarily kept, to the extent reasonably necessary to verify the accuracy of any statement, charge, payment or computation made pursuant to this Agreement, and any such audit must be completed within ninety (90) days of the Notice to the other Party. In the event that an audit is performed, any subsequent audit performed may cover only a time period not covered by a previous audit. In no event shall any statement or invoice be subject to audit beyond two (2) years from the date of such statement or invoice.

**ARTICLE VIII**
**NOTICES**

        **Section 8.1     Notices.**

        Any notice, request, demand, statement, payment or bill provided for in this Agreement, or any notice which a Party may desire to give to the other (each, a "***Notice***"), must be in writing and will be deemed duly made when (i) delivered personally, (ii) upon delivery by the U.S.

Postal Service, certified mail with return receipt, (iii) upon delivery by a recognized overnight courier service with return receipt or (iv) upon receipt by the affected recipient when transmitted by electronic means, to the Persons and addresses set forth on Schedule 8.1. Each of the Parties may, by Notice to the other Party, revise its respective Persons and addresses for delivery of Notices without amendment of this Agreement.

## ARTICLE IX
## FINANCIAL RESPONSIBILITY

### [NOT USED]

## ARTICLE X
## INDEMNITY

**Section 10.1    Indemnity.**

**EXCEPT WHERE OTHERWISE SPECIFICALLY PROVIDED HEREIN, EACH OF PRODUCER AND PRODUCER GROUP, ON THE ONE HAND, AND GATHERER AND GATHERER GROUP, ON THE OTHER HAND, SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS THE OTHER PARTY AND ITS RESPECTIVE PRODUCER GROUP OR GATHERER GROUP, AS THE CASE MAY BE, FROM AND AGAINST ANY AND ALL CLAIMS OF THIRD PARTIES AGAINST THEM, OR DAMAGES SUSTAINED OR INCURRED BY THEM AS A RESULT OF SUCH CLAIMS BY THIRD**

19

**PARTIES, TO THE EXTENT CAUSED BY THE NEGLIGENCE OR WILLFUL MISCONDUCT OF THE INDEMNIFYING PARTY OR ITS RESPECTIVE PRODUCER GROUP OR GATHERER GROUP, AS THE CASE MAY BE, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR THE INDEMNIFYING PARTY'S BREACH OF THIS AGREEMENT. THIS PROVISION SHALL NOT BE CONSTRUED TO RELIEVE ANY INSURER OF ITS OBLIGATION TO PAY CLAIMS CONSISTENT WITH THE PROVISIONS OF A VALID INSURANCE POLICY. A PERSON SEEKING INDEMNITY SHALL FIRST SEEK RECOVERY UNDER ANY APPLICABLE INSURANCE POLICY, AND ANY INDEMNITY OBLIGATION OWED HEREUNDER SHALL BE REDUCED BY THE AMOUNT OF ALL INSURANCE PROCEEDS ACTUALLY RECEIVED BY THE INDEMNIFIED PARTY.**

Section 10.2    Notification Obligation.

The Person entitled to indemnification under Section 10.1 above (the "*Indemnified Party*") shall promptly notify the Party providing indemnity (the "*Indemnifying Party*") of any Claim, and the Indemnifying Party shall have the right to assume the investigation and defense of the Claim, including employing legal counsel of its choice. If the Indemnifying Party does not promptly assume the investigation and defense of the Claim, the Indemnified Party may do so, including employing legal counsel of its choice, at the Indemnifying Party's expense. If the Indemnifying Party assumes the defense of a claim, the Indemnified Party shall nevertheless have the right to employ, at its sole expense, separate legal counsel and participate in the defense of the Claim, provided that control over the process and authority to compromise the Claim shall vest solely in the Indemnifying Party.

### Section 11.1   Curtailment and Temporary Release of Gas.

If for any reason, including Force Majeure or a Maintenance Event, but not for the reasons set forth in Section 3.6, Gatherer needs to curtail receipt, gathering, processing or delivery of Gas on the Gathering and Processing System (each, a "***Curtailment Event***"), (i) Gas deliveries from all Persons that are receiving service on an interruptible or non-Firm basis shall be curtailed prior to any curtailment or interruption of Committed Gas, and (ii) to the extent a third party is receiving service on a Firm basis in accordance with Section 5.1, Producer and such third party shall be curtailed on a *pro rata* basis (based on Btu content of Gas delivered to the Gathering and Processing System).   Prior to the Partial In-Service Date, all volumes of Committed Gas shall be temporarily released from the Dedication and Producer shall be free to dispose of all volumes of Committed Gas under other arrangements during such period.   From and after the Partial In-Service Date and prior to the In-Service Date, all volumes of Committed Gas that are produced from Producer's wells that are not connected to the Receipt Points that are operational and tested as of the Partial In-Service Date shall be temporarily released from the Dedication and Producer shall be free to dispose such volumes of Committed Gas under other arrangements during such period.   At any time after the Partial In-Service Date where Gatherer is unable to accept some or all Committed Gas as a result of a Curtailment Event, Producer shall be free to dispose of such affected volumes under other arrangements during such Curtailment

20

Event (the "***Curtailment Period***").    Gatherer shall notify Producer as soon as reasonably practicable of the circumstances of any Curtailment Event and the beginning and end of any Curtailment Period.  As soon as reasonably practicable after receiving notice of the end of the Curtailment Period, all Gas shall again be subject to the Dedication.  **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, GATHERER'S TEMPORARY RELEASE AND PRODUCER'S RIGHT TO MAKE OTHER ARRANGEMENTS WITH RESPECT TO SUCH AFFECTED VOLUMES SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY AVAILABLE TO PRODUCER, AT LAW OR IN EQUITY, WITH RESPECT TO SUCH AFFECTED VOLUMES.**

**Section 11.2    Maintenance Events.**

Gatherer may, without liability to Producer, interrupt the operation of the Gathering and Processing System for the purpose of performing inspections, pigging, maintenance, testing, alterations, modifications, expansions, connections, repairs or replacements (each, a "***Maintenance Event***"), but such interruption shall be for only such time as may be reasonably necessary.  Gatherer shall give Producer advance written notice of its intention to interrupt operations and of the estimated time thereof, but not less than 24 hours advance notice, except in case of emergency.  Any such Maintenance Events shall not constitute Force Majeure Events, unless such Maintenance Events otherwise meet the definition of a Force Majeure Event.

**ARTICLE XII**
**FORCE MAJEURE**

001965

"***Force Majeure***" shall mean any event or circumstance or combination of events or circumstances (each, a "***Force Majeure Event***") that adversely affects or prevents any Party from performing its obligations in accordance with the terms of this Agreement, but only if and to the extent that such events and circumstances are not within the affected Party's reasonable control.   Force Majeure events shall include act of God, fire, storm of an unusual or extraordinary nature, flood, hurricane, tornado, earthquake, epidemic or other natural disaster, action, delay or inaction of any Governmental Authority, war, invasion, emergency, embargo, sanction, sabotage, insurgency, terrorism, civil war, riot or insurrection of any kind, labor strike, loss of electricity supply, failure of any Downstream Pipeline, inability to obtain rights-of-way after the exercise of commercially reasonable efforts; *provided* that the following shall not constitute a Force Majeure Event: (i) failure to obtain or retain, or a delay in obtaining, any Governmental Approval necessary for performance under this Agreement that was the result of action or inaction by the Party responsible for obtaining such Governmental Approval, or a result of failure to timely apply for any such Governmental Approval, (ii) market conditions for Gas or NGLs, (iii) the inability to obtain a favorable price for or to buy or sell Gas or NGLs, or (iv) economic hardship.   Any obligation of either Party under this Agreement shall be excused only to the extent that the Party's inability to perform is caused by Force Majeure. Each Party shall use all Reasonable Efforts to cure, minimize, mitigate or remedy the effects of Force Majeure. Notwithstanding that Force Majeure may otherwise exist, a Force Majeure Event shall not excuse or delay the payment of money when due by any Party.

21

001966

## ARTICLE XIII
## DEFAULT AND TERMINATION

**Section 13.1    Producer Events of Default.**

A "***Producer Event of Default***" shall be deemed to have occurred if (i) Producer becomes bankrupt or insolvent or takes any corporate action or other steps towards liquidation, winding up, dissolution, reorganization or amalgamation of Producer, making of any bankruptcy administration order, or appointment of a receiver, administrator, trustee or similar officer over all or any material part of the revenues, assets or business of Producer; (ii) an order is made for the winding up, dissolution or liquidation of Producer, or any analogous or equivalent proceedings by whatever name are undertaken in whatever jurisdiction; (iii) Producer is generally unable to pay its debts as they become due, or Producer stops, suspends or threatens to stop or suspend payment of all or a material part of its debts or makes a general assignment of its assets for the benefit of its creditors; or (iv) Producer is in breach of any of its material obligations under this Agreement, and Producer fails to cure such breach within 30 days following Producer's receipt of a Notice from Gatherer to Producer to remedy such event or condition, or if a remedy cannot be effected within such 30 day period, a period of 60 days, provided that Producer has commenced to remedy within such 30 day period and has diligently pursued such remedy during the extended period, provided further that in no event shall the period to cure a breach of an obligation to pay money be more than 10 days total.

**Section 13.2    Gatherer's Default Remedies Against Producer.**

If a Producer Event of Default shall have occurred and be uncured and continuing, and

001967

without prejudice to any other of Gatherer's rights under this Agreement, Gatherer shall have the right to terminate this Agreement upon Notice to Producer.

**Section 13.3   Gatherer Events of Default.**

A "***Gatherer Event of Default***" shall be deemed to have occurred if (i) Gatherer becomes bankrupt or insolvent or takes any corporate action or other steps towards liquidation, winding up, dissolution, reorganization or amalgamation of Gatherer, making of any bankruptcy administration order, or appointment of a receiver, administrator, trustee or similar officer over all or any material part of the revenues, assets or business of Gatherer; (ii) an order is made for the winding up, dissolution or liquidation of Gatherer, or any analogous equivalent proceedings by whatever name are undertaken in whatever jurisdiction; (iii) Gatherer is generally unable to pay its debts as they become due, or Gatherer stops, suspends or threatens to stop or suspend payment of all or a material part of its debts or makes a general assignment of its assets for the benefit of its creditors; or (iv) Gatherer is in breach of any of its material obligations under this Agreement, and Gatherer fails to cure such breach within 30 days following Gatherer's receipt of a Notice from Producer to Gatherer to remedy such event or condition, or if a remedy cannot be effected within such 30 day period, a period of 60 days, provided that Gatherer has commenced to remedy within such 30 day period and diligently pursued such remedy during the extended period, provided further that in no event shall the period to cure a breach of an obligation to pay money be more than 10 days total.

22

001968

**Section 13.4    Producer's Default Rights Against Gatherer.**

If a Gatherer Event of Default shall have occurred and be uncured and continuing, and without prejudice to any other of Producer's rights under this Agreement, Producer shall have the right to terminate this Agreement upon Notice to Gatherer.

**ARTICLE XIV**
**ASSIGNMENT**

**Section 14.1    Assignment.**

Neither Party may assign this Agreement without the other Party's prior written consent, which consent will not be unreasonably withheld, conditioned or delayed.

**ARTICLE XV**
**LIMITATION OF LIABILITY**

**Section 15.1    Limitation of Liability.**

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL, PUNITIVE OR EXEMPLARY DAMAGES OF ANY TYPE, INCLUDING LOST PROFITS OR LOSS OF BUSINESS OPPORTUNITY, IN CONTRACT OR TORT (INCLUDING NEGLIGENCE, JOINT OR SEVERAL OR STRICT LIABILITY) ARISING OUT OF THIS AGREEMENT, PROVIDED THAT THIS LIMITATION SHALL NOT APPLY TO ANY INDEMNITY OBLIGATION SET FORTH HEREIN.

# ARTICLE XVI
## CONFIDENTIALITY

**Section 16.1   Confidentiality.**

Any information belonging to a Party that is confidential and disclosed to the other Party in the course of performance of this Agreement or has been disclosed during the negotiations leading up to this Agreement, including the Agreement itself (collectively, the "***Confidential Information***"), shall be held in confidence and shall not be disclosed to others without the written approval of the disclosing Party. Confidential Information is not information that (i) is already known to the receiving Party at the time of disclosure by the disclosing Party (ii) is now or hereafter becomes available within the public domain other than as a result of a breach of this Agreement, (iii) is received by a Party from a Person under no obligation to keep the Confidential Information confidential, or (iv) is independently developed by a Party without reliance on Confidential Information. A Party shall have the right to disclose Confidential Information without the consent of the disclosing Party to its Lenders, counsel, advisors, consultants, accountants, auditors, officers, directors, members, shareholders and other Persons of responsibility who have a need to know the Confidential Information, *provided* that such Persons agree to keep the Confidential Information confidential, and that the Party shall be responsible for any breaches of this confidentiality obligation by such Persons. A Party shall also have the right to disclose Confidential Information without the consent of the disclosing Party in connection with a subpoena, interrogatory, request for production, civil investigative

23

demand or other such legal process issued by any court or administrative, legislative, investigative or regulatory body, but only to the extent necessary to fully respond thereto and after providing prior Notice to the disclosing Party.  Upon the reasonable request of the disclosing Party, the receiving Party shall, in its sole discretion, either return the Confidential Information or destroy it, *provided* that the receiving Party may retain a copy of Confidential Information as necessary to comply with Applicable Law.

## ARTICLE XVII
## DISPUTE RESOLUTION

**Section 17.1   Dispute Resolution.**

All controversies, disputes or claims between Producer and Gatherer arising out of or in any way relating to this Agreement (each, a "***Dispute***") shall be resolved pursuant to the procedures of this Section 17.1.

(a)     If a Dispute arises between the Parties regarding their respective rights and obligations under this Agreement, the Parties shall use commercially reasonable efforts to reach a reasonable resolution of the Dispute informally.  Initially, the responsible Persons shall attempt to resolve the Dispute themselves. If they are unable to resolve the Dispute within 10 days, then either Party may, by Notice, refer the Dispute to the senior management of the Parties for resolution. If senior management of the Parties are unable to resolve the Dispute within 10 days of such Notice, the provisions of subsection (b) below shall apply.

(b)      Any Dispute not otherwise resolved under subsection (a) above may be submitted by either Party to a court proceeding filed in accordance with applicable law in any court having jurisdiction over the Parties and the subject matter.

## ARTICLE XVIII
## MISCELLANEOUS

**Section 18.1   Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury Trial.**

(a)      THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF OKLAHOMA, EXCLUDING ANY CONFLICTS OF LAWS PROVISIONS CALLING FOR APPLICATION OF THE LAWS OF ANOTHER STATE.

(b)      EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE SOLE AND EXCLUSIVE JURISDICTION OF THE STATE OR FEDERAL COURTS IN HARRIS COUNTY, TEXAS, AND EACH OF THE PARTIES IRREVOCABLY WAIVES ANY OBJECTION TO THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS.

(c)      TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY IRREVOCABLY WAIVES ITS RIGHT TO A TRIAL BY JURY, AND

24

**CONSENTS TO A BENCH TRIAL BY A TRIAL COURT JUDGE, IN RESPECT OF ANY LITIGATION ARISING OUT OF THIS AGREEMENT AND ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT FOR EACH OF THE PARTIES IN ENTERING INTO THIS AGREEMENT.**

**Section 18.2    Survival.**

The provisions of this Agreement shall survive expiration or termination thereof for so long as necessary to give effect to the rights and obligations of the Parties hereunder, but in no event exceeding any applicable statutes of limitation.

**Section 18.3    No Joint Venture.**

Nothing in this Agreement shall create an association, joint venture or partnership between the Parties or impose any partnership obligation or partnership liability on any Party. Neither Party shall have any right, power or authority to enter into any agreement or commitment or act on behalf of or otherwise bind the other Party without such Party's prior written consent.

**Section 18.4    Entire Agreement.**

This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and there are not any oral or written understandings, representations or commitments of any kind, express or implied, which are not expressly set out herein. No modification of this Agreement shall be effective unless in writing and executed by the Parties. This Agreement supersedes any prior agreements of the Parties concerning the subject matter

001973

**Section 18.5   No Third Party Beneficiaries.**

This Agreement is for the sole and exclusive benefit of the Parties, and does not stipulate any benefit in favor of any third parties.

**Section 18.6   Regulatory Matters.**

(a)      Gatherer has informed Producer, and Producer hereby acknowledges and accepts, that the Gathering and Processing System will be an intrastate pipeline system operating only within the State of Oklahoma, and is not intended to be subject to regulation under any Applicable Law by FERC.  Accordingly, as a principal condition to, and in consideration for, the execution of this Agreement by Gatherer, Producer represents, warrants and covenants that (i) the delivery of Producer's Committed Gas hereunder will not subject the Gathering and Processing System or any portion thereof to regulation by FERC as (x) a natural gas company under the Natural Gas Act or (y) a Section 311 transporter under the Natural Gas Policy Act of 1978 and (ii) none of Producer's Committed Gas delivered at one or more Receipt Points is Gas that has been transported by a natural gas company, as defined in the Natural Gas Act, or by a Section 311 transporter under the Natural Gas Policy Act of 1978, at any point prior to such delivery.  In the event that Producer breaches its representation, warranty and covenant contained in this Section 18.6(a), Gatherer, in addition to all other remedies at law or in

25

equity, shall have the right, upon delivery of written notice to Producer, to refuse receipt of Producer's Committed Gas which has caused a breach of such representation, warranty and covenant.  Gatherer's election to refuse receipt of any of Producer's Committed Gas pursuant to this Section 18.6(a)  shall not release Producer from any obligation to indemnify Gatherer for such breach under Article X.

(b)     If any federal or state statute, regulation, or order by a court of law or Governmental Authority directly or indirectly (a) prohibits performance under this Agreement, (b) makes such performance illegal or impossible, or (c) effects a change in a substantive provision of this Agreement that has a significant material adverse impact upon the performance of either Party's obligations under this Agreement, including without limitation the imposition of terms, conditions, or rate restrictions, then the Parties will use all reasonable efforts to revise the Agreement and any other ancillary agreement to the extent necessary so that: (i) performance under the Agreement is no longer prohibited, illegal, impossible, or is no longer impacted in a material adverse fashion, and (ii) this Agreement and any other ancillary agreement is revised in a manner that preserves, to the maximum extent possible, the respective positions of the Parties.  Without liability for its failure to do so, each Party will use reasonable efforts to provide notice to the other Party as to any proposed law, regulations or any regulatory proceedings or actions that could affect the rights and obligations of the Parties.  If the Parties are unable to revise the Agreement in accordance with the above within ninety (90) days following the adoption of any such law, regulation or order of a Governmental Authority, then the Party whose performance is prohibited, illegal, impossible or is impacted in a material adverse fashion will have the right, at its sole discretion, to terminate this Agreement upon written notice to the other Party.

**Section 18.**7    **Execution in Counterparts.**

This Agreement may be executed in counterparts, including by electronic transmission, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement.

[Signature Page Next Page]

26

001976

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed in duplicate originals by its duly authorized officer as of the Effective Date.

**PRODUCER**

**OKLAHOMA ENERGY ACQUISITIONS, LP**

By: Alta Mesa GP, LLC, its general partner

By: _____

Harlan H. Chappelle, Manager

001977

Signature page to Gas Gathering and Processing Agreement

001978

**GATHERER**

**KINGFISHER MIDSTREAM, LLC,** a Delaware
limited liability company

By: HMS KINGFISHER HOLDCO, LLC,
Authorized Member

By: _____
Name:   Harlan H. Chappelle
Title:  President and Chief Executive Officer

**SCHEDULE 3.3**
to
**GAS GATHERING AND PROCESSING AGREEMENT**
**Dated August 31, 2015**
by and between
**OKLAHOMA ENERGY ACQUISITIONS, LP**
and
**KINGFISHER MIDSTREAM LLC**

**DEDICATED AREA**

**[See Attached]**

001981





Blaine, Canadian, Garifield, Kingfisher, Logan Counties

001983

SCHEDULE 3.4
to
GAS GATHERING AND PROCESSING AGREEMENT
Dated August 31, 2015
by and between
OKLAHOMA ENERGY ACQUISITIONS, LP
and
KINGFISHER MIDSTREAM LLC

FORM OF

MEMORANDUM OF GAS GATHERING AND PROCESSING AGREEMENT

| | | |
|---|---|---|
| **STATE OF OKLAHOMA** | § | |
| | § | |
| **COUNTIES OF KINGFISHER,** | § | |
| **LOGAN, CANADIAN, BLAINE** | § | |
| **AND GARFIELD** | § | |

      This **Memorandum of Gas Gathering and Processing Agreement** (this "**Memorandum**") is made and entered into this __ day of _____, 2015, by and between Oklahoma Energy Acquisitions, LP, a Texas limited partnership located at 15021 Katy Freeway, Suite 400, Houston, TX 77094, Attn:  Michael A. McCabe ("**Producer**"), and Kingfisher Midstream LLC, a Delaware

limited liability company located at 20329 State Highway 249, Suite 450, Houston, TX 77070,
as Paul Williams ("Gatherer").
Case 4:24-cv-04092   Document 4-9    Filed on 11/21/24 in TXSD    Page 131 of 582

**WHEREAS**, Producer and Gatherer have entered into a Gas Gathering and Processing Agreement (the "**Agreement**") dated the 31st day of August, 2015 (the "**Effective Date**"); and

**WHEREAS**, Producer and Gatherer desire to file this Memorandum to provide record notice of the Agreement.

1. **Dedication.**

(a) For the Primary Term of the Agreement, Producer has dedicated to Gatherer all of Producer's Interests within the Dedicated Area shown on Exhibit A attached hereto (the "**Primary Term Dedication**") and shall deliver to Gatherer at the Receipt Point(s) all Committed Gas produced therefrom. If, after the Effective Date of the Agreement and before the end of the Primary Term, Producer or any of its Affiliates acquire mineral interests within the Dedicated Area (the "**After-Acquired Interests**"), then the After-Acquired Interests and all Gas produced therefrom shall automatically be included in the Primary Term Dedication and become Committed Gas; *provided, however*, if any of the After-Acquired Interests or Gas produced therefrom are subject to a prior written dedication or commitment for gathering as of the time of acquisition by Producer, then that Gas will be excluded from the Primary Term Dedication until the prior dedication or commitment terminates or expires, at which time such Gas shall become Committed Gas, *provided further* that if, with respect to any After-Acquired

Interests, Producer has the right or ability, without payment of any material fee or penalty, or incurring any other material disadvantage, to terminate any such prior dedication or commitment with respect to the After-Acquired Interests, then Producer shall terminate such dedication or commitment as soon as reasonably practicable.  Producer shall promptly notify Gatherer in writing of any such termination, and identify the After-Acquired Interests.

(b) For the Extended Term of the Agreement, Producer has dedicated to Gatherer all of the wells that constitute Interests and are connected to the Gathering and Processing System at the end of the Primary Term (such wells, the "**Dedicated Wells**", and such dedication, the "**Extended Term Dedication**") and shall deliver to Gatherer at the Receipt Point(s) all Committed Gas produced therefrom.  From and after the end of the Primary Term all Interests within the Dedicated Area shown on Exhibit A attached hereto other than the Dedicated Wells shall be permanently released from the Dedication.

2. **Term.**  The Agreement shall commence as of the Effective Date, and shall remain in full force and effect for fifteen (15) years after the In-Service Date (the "**Primary Term**"), *provided*, *however*, that, to the extent that at the end of the Primary Term there are wells then-connected to the Gathering and Processing System and then-producing Gas in commercial (paying) quantities, the Term of the Agreement shall extend for so long as such well(s) continue to produce Gas in commercial (paying) quantities (the "**Extended Term**").

3. **Incorporation of Agreement and Effect of Memorandum.**  The sole purpose of this Memorandum is to give notice of the existence of the Agreement.  This Memorandum shall not modify in any manner any of the terms and conditions of the Agreement, and nothing in this Memorandum is intended to and shall not be used to interpret the Agreement.  The provisions of the

Agreement are hereby incorporated into this Memorandum as if set out fully herein.  In the event of any conflict between the terms of this Memorandum and the terms of the Agreement, the terms of the Agreement shall govern and control for all purposes.

      **4.**      **Defined Terms.**  All capitalized terms not defined herein shall have the same meaning assigned such terms in the Agreement.

[Signature pages follow]

**IN WITNESS WHEREOF**, this Memorandum is executed by Producer and Gatherer as of the date of acknowledgement of their signatures, but is effective for all purposes as of the Effective Date stated above.

**PRODUCER:**

**OKLAHOMA ENERGY ACQUISITIONS, LP**

**By:** _____
**Name:** _____
**Title:** _____


STATE OF TEXAS                          §
                                        §
COUNTY OF HARRIS                        §

This instrument was acknowledged before me this ___ day of August, 2015 by_____, the _____of Oklahoma Energy Acquisitions, LP, a Texas limited partnership, on behalf of said limited partnership.

In witness whereof I hereunto set my hand and official seal.

001988

NOTARIAL SEAL:

_____
Notary Public in and for the
State of Texas

My Commission Expires: _____
Commission No.: _____

**GATHERER:**

**KINGFISHER MIDSTREAM, LLC**

**By: HMS KINGFISHER HOLDCO, LLC,**
    **Authorized Member**

    **By:** _____
    **Name:** _____
    **Title:** _____

STATE OF TEXAS          §
                                §
COUNTY OF HARRIS      §

This instrument was acknowledged before me this ___ day of August, 2015 by _____, the _____ of HMS Kingfisher HoldCo, LLC, a Delaware limited liability company, authorized member of Kingfisher Midstream, LLC, a Delaware limited liability company, on behalf of said limited liability company.

In witness whereof I hereunto set my hand and official seal.

001990

NOTARIAL SEAL:

State of Texas

My Commission Expires:  _____
Commission No.: _____

_____
Notary Public in and for the
State of Texas

**SCHEDULE 3.10**
to
**GAS GATHERING AND PROCESSING AGREEMENT**
**Dated August 31, 2015**
by and between
**OKLAHOMA ENERGY ACQUISITIONS, LP**
and
**KINGFISHER MIDSTREAM LLC**

**Receipt Points**

| Operator | Receipt Point Name | Unit | Location |
|---|---|---|---|
| Alta Mesa | Lincoln CRP Manifold 1 | Lincoln | T 18N R 6W NE ¼ Section 34 |
| Alta Mesa | Lincoln CRP Manifold 2 | Lincoln | T 17N R 6W NE ¼ Section 3 |
| Alta Mesa | Lincoln CRP Manifold 2A | Lincoln | T 17N R 6W NE ¼ Section 10 |
| Alta Mesa | Lincoln CRP Manifold 3 | Lincoln | T 17N R 6W SE ¼ Section 10 |
| Alta Mesa | Lincoln CRP Manifold 4 | Lincoln | T 18N R 6W NE ¼ Section 36 |
| Alta Mesa | Lincoln CRP Manifold 5 | Lincoln | T 18N R 6W SE ¼ Section 36 |

001992

| Alta Mesa | Lincoln CRP Manifold 7 | Lincoln | T 17N R 5W NW ¼ Section 7 |
| Alta Mesa | Lincoln CRP Manifold 6 | Lincoln | T 17N R 5W SW ¼ Section 7 |
| Alta Mesa | Lincoln CRP Manifold 8 | Lincoln | T 18N R 5W NE ¼ Section 32 |
| Alta Mesa | Lincoln CRP Manifold 9 | Lincoln | T 18N R 5W NW ¼ Section 34 |
| Alta Mesa | Lincoln CRP Manifold 11 | Lincoln | T 18N R 5W SW ¼ Section 33 |
| Alta Mesa | Lincoln CRP Manifold 10 | Lincoln | T 18N R 5W SE ¼ of SW ¼ Section 33 |
| Alta Mesa | Lincoln CRP Manifold 11A | Lincoln | T 17N R 5W SW ¼ Section 4 |
| Alta Mesa | Lincoln CRP Manifold 12 | Lincoln | T 17N R 5W SE ¼ of SW ¼ Section 8 |
| Alta Mesa | Lincoln CRP Manifold 13 | Lincoln | T 17N R 5W NW ¼ Section 20 |
| Alta Mesa | Lincoln CRP Manifold 14 | Lincoln | T 17N R 5W SW ¼ Section 16 |
| Alta Mesa | Lincoln CRP Manifold 15 | Lincoln | T 17N R 5W NE ¼ Section 29 |
| Alta Mesa | Lincoln CRP Manifold 16 | Lincoln | T 17N R 5W SE ¼ Section 22 |
| Alta Mesa | Lincoln CRP Manifold 17 | Lincoln | T 17N R 5W SE ¼ Section 29 |
| Alta Mesa | Lincoln CRP Manifold 18 | Lincoln | T 17N R 5W SW ¼ Section 29 |

| | | | |
|---|---|---|---|
| Alta Mesa 9 | South of Lincoln CRP Manifold 1 | South of Lincoln | T 17N R 6W NE ¼ Section |
| Alta Mesa Section 8 | South of Lincoln CRP Manifold 2 | South of Lincoln | T 17N R 6W NW ¼ |
| Alta Mesa 16 | South of Lincoln CRP Manifold 3 | South of Lincoln | T 17N R 6W SE ¼ Section |
| Alta Mesa Section 20 | South of Lincoln CRP Manifold 4 | South of Lincoln | T 17N R 6W NW ¼ |
| Alta Mesa 26 | South of Lincoln CRP Manifold 5 | South of Lincoln | T 17N R 6W SE ¼ Section |
| Alta Mesa 26 | South of Lincoln CRP Manifold 6 | South of Lincoln | T 17N R 6W NE ¼ Section |
| Alta Mesa Section 34 | South of Lincoln CRP Manifold 7 | South of Lincoln | T 17N R 6W NW ¼ |
| Alta Mesa Section 32 | South of Lincoln CRP Manifold 8 | South of Lincoln | T 17N R 6W NW ¼ |
| Alta Mesa 4 | South of Lincoln CRP Manifold 9 | South of Lincoln | T 16N R 5W NE ¼ Section |

| | | | |
|---|---|---|---|
| Alta Mesa | South of Lincoln CRP Manifold 10 | South of Lincoln | T 16N  5W SW ¼ Section 5 |
| Alta Mesa | South of Lincoln CRP Manifold 11 | South of Lincoln | T 16N R 5W SE ¼ Section 8 |
| Alta Mesa | South of Lincoln CRP Manifold 12 | South of Lincoln | T 16N R 5W NE ¼ Section 9 |
| Alta Mesa | South of Lincoln CRP Manifold 13 | South of Lincoln | T 17N R 5W SE ¼ Section 26 |
| Alta Mesa | South of Lincoln CRP Manifold 14 | South of Lincoln | T 16N R 5W SE ¼ Section 2 |
| Alta Mesa | CRP Manifold NofL-4 | North of Lincoln | T 18N R 5W NW ¼ Section 30 |
| Alta Mesa | CRP Manifold NofL-5 | North of Lincoln | T 18N R 5W NW ¼ Section 18 |
| Alta Mesa | CRP Manifold NofL-6 | North of Lincoln | T 18N R 6W NE ¼ Section 1 |
| Alta Mesa | CRP Manifold NofL-7 | North of Lincoln | T 18N R 5W SE ¼ Section 17 |
| Alta Mesa | CRP Manifold NofL-8 | North of Lincoln | T 18N R 5WNE ¼ Section 8 |
| Alta Mesa | CRP Manifold NofL-9 | North of Lincoln | T 18N R 5W SW ¼ Section 14 |

| Alta Mesa | CRP Manifold NofL-10 | North of Lincoln | T 18N R 5W NE ¼ Section 10 |
| Alta Mesa | CRP Manifold NofL South-1 | North of Lincoln | T 18N R 5W NE ¼ Section 35 |
| Alta Mesa | CRP Manifold NofL South-2 | North of Lincoln | T 17N R 5W SE ¼ Section 2 |
| Alta Mesa | CRP Manifold NofL South-3 | North of Lincoln | T 17N R 5W SW ¼ Section 13 |

001997

**SCHEDULE 3.11(a)**
to
**GAS GATHERING AND PROCESSING AGREEMENT**
**Dated August 31, 2015**
by and between
**OKLAHOMA ENERGY ACQUISITIONS, LP**
and
**KINGFISHER MIDSTREAM LLC**

**FORM OF NOTICE**
**FOR**
**DESIGNATION OF ADDITIONAL RECEIPT POINT**

1.   Operator Contact Name    _____

2.   Phone Numbers    _____

3.   E-Mail    _____

4.   Well and Pad Name    _____

5.   County/Township    _____  001998

6.   Requested Turn on Date

8.	Projected Initial Volume (Mcfd) _____

9.	Projected Initial Volume (Mcfd) _____

10.	Requested GPS of:

a.	Wellhead (if applicable)       _____ 0 _____ , _____ '' - _____ 0 _____ , _____ ''
b.	CRP (if applicable)              _____ 0 _____ , _____ '' - _____ 0 _____ , _____ ''
c.	   Receipt Point Meter         _____ 0 _____ , _____ '' - _____ 0 _____ , _____ ''

11.	Surface site provided by Producer or KFM_____

12.	Planned flow into New or Existing Receipt Point _____

13.	Producer* or KFM** to Connect _____

14.	Estimated Spud and Frac dates _____

15.	BTU Content                      _____

001999

16.    Please attach gas analysis for each well that will flow through the new Receipt Point.  If not yet available, date it will be available:  _____

002000

**SCHEDULE 4.1**
**to**
**GAS GATHERING AND PROCESSING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**MEASUREMENT, EQUIPMENT AND TESTING**

A.      Any terms capitalized in this Schedule shall have the meaning set forth herein, or as indicated by the context, or as set forth in the body of the Agreement.

B.      Producer, or its designee, will maintain and operate the measuring stations at the Central Receipt Point(s) through which the quantity of Gas gathered and processed under this Agreement is measured.  Producer will equip each Central Receipt Point with remote communication facilities and will provide Gatherer with direct access to the data from those facilities.  If desired by Gatherer, Gatherer may install, maintain, and operate, at its own expense, check measuring equipment, provided that Gatherer must install such equipment so as not to interfere with the operation of Producer's or its designee's measuring equipment.  Gatherer will equip all check measuring equipment with remote communication facilities and will provide Producer with direct access to the data from those facilities.  If the measuring stations and/or communication facilities are installed on land not owned by Producer, Gatherer will procure all land rights requested by Producer to place the measuring stations and/or communication facilities on

002002

C.    Each Party will construct, install, and operate its measuring stations and communication facilities in accordance with the following, depending on the type of meters used:

(i)    <u>Orifice Meters</u> – in accordance with ANSI/API 2530 (American Gas Association Report No. 3), *Orifice Metering of Natural Gas and Other Hydrocarbon Fluids*, Second Edition, dated April 2000, and any subsequent amendments, revisions, or modifications thereof, including the use of flange connections.  If Gas pulsation problems occur upstream of the Receipt Points or downstream of the Delivery Points, Gatherer or its designee will take all reasonable industry-standard corrective actions required by Producer to mitigate such pulsation.

(ii)    <u>Electronic Transducers and Flow Computers</u> (solar and otherwise) – in accordance with the applicable American Gas Association standards, including, but not limited to, American Gas Association Measurement Committee Report Nos. 3, 5, 6, and 7, and any subsequent amendments, revisions, or modifications to such standards.

(iii)    <u>Ultrasonic Meters</u> – in accordance with the American Gas Association Measurement Committee Report No. 9, dated 2007, and any subsequent amendments, revisions, or modifications to such report.

AMMBR 0040476

D.      Neither Party is obligated to replace or make any alterations to its measuring equipment as a result of any subsequent amendments, revisions, or modifications of the American Gas Association Reports cited in paragraphs B (i) through B (iii) of this Schedule, unless the Parties mutually agree to a replacement or alteration.

E.      Each Party will give reasonable notice to the other Party in order that such Party may have a representative present to observe any cleaning, changing, repairing, inspecting, testing, calibrating, or adjusting of measuring equipment.  The official charts (recordings) from the measuring equipment will remain the property of the Party owning such or its designee.  Upon a Party's request, the other Party or its designee will submit its records and charts, together with calculations, to the requesting Party for inspection and verification, subject to return to the producing Party or its designee within ten (10) Days after receipt of such records and charts.

F.      Each Party or its designee will verify the accuracy of all measuring equipment belonging to it at reasonable intervals and, if requested, in the presence of a representative of the other Party.  Each Party or its designee will verify the accuracy of the equipment at least once every Contract Year where daily deliveries of Gas at a Receipt Point are less than one thousand (1,000) Mcf per day, unless the other Party requests a special test as described below; *provided, however*, that when daily deliveries of Gas at a Receipt Point average between one thousand (1,000) Mcf per day and five thousand (5,000) Mcf per day during any month, Producer will verify the accuracy of the measuring equipment once every six (6) months; *provided further, however*, that when daily deliveries of Gas at a Receipt Point average greater than five thousand (5,000) Mcf per day during any month, Producer will verify the accuracy of the measuring equipment once every calendar quarter.  If, upon any test, the measuring equipment is found to be inaccurate by two percent (2%) or less, previous readings of the equipment will be deemed correct in computing the deliveries of

Gas under this Agreement, but the equipment will immediately be adjusted to record accurately.  If, upon any test, the measuring equipment is found to be inaccurate by more than one percent (1%) of a recording corresponding to the average hourly flow rate for the period since the last test, the equipment will immediately be adjusted to record accurately and any previous recordings of the equipment will be corrected to zero error for any period which is known definitely or agreed upon, utilizing the procedure set forth in this paragraph.  If the period for correction is not known or agreed upon, the correction will be made for a period covering one-half (1/2) of the time elapsed since the date of the latest test, but not to exceed sixteen (16) Days when the equipment is tested every Month and not to exceed forty-five (45) Days when the equipment is tested every three (3) Months.  If a Party desires a special test of any measuring equipment, such Party will give the other Party at least seventy-two (72) hours' advance notice, and the Parties will cooperate to perform a prompt test of the accuracy of the equipment.  If the measuring equipment so tested is found to be inaccurate by two percent (2%) or less, the requesting Party may bill the other Party for the costs incurred due to the special test, including any labor and transportation costs, and such Party will pay such costs promptly upon receipt of the invoice for such costs.

G.     If, for any reason, any measurement equipment is out of adjustment, out of service, or out of repair, and the total calculated hourly flow rate through each meter run is found to be in error by an amount of the magnitude described in paragraph E of this Schedule, the total quantity of Gas delivered will be re-determined in accordance with the first of the following methods which is feasible:

       (i)     by checking the registration of any check meters, if installed and accurately registering (subject to testing as described in paragraph E of this Schedule); or

       (ii)     by correcting the error by rereading of the official charts, or by straightforward application of a correcting factor to the quantities recorded for the period (if the net percentage of error is ascertainable by calibration, tests, or mathematical calculation); or

       (iii)     by estimating the quantity, based upon deliveries made during periods of similar conditions when the meter was registering accurately.

H.     The Parties or their designees will retain and preserve for a period of at least two (2) years all test data, charts, and other similar records.

I.     The measurements of the quantity and quality of all Gas delivered at the Receipt Points and Delivery Points will be conducted in accordance with the following:

       (i)     The unit of volume for measurement will be one (1) Cubic Foot at an absolute pressure of fourteen and seventy-three hundredths (14.73) pounds per square inch absolute and a temperature of sixty degrees Fahrenheit (60° F). Measured volumes, converted to Mcf, will be multiplied by their Gross Heating Value per Cubic Foot and divided by one thousand (1,000) to determine MMBtu delivered under this Agreement.

       (ii)     Computations for Gas measurement will be made in accordance with paragraphs B(i) through B(iii) of this Schedule corresponding to the type of meters used.

(iii)    The temperature of the Gas will be determined by a recording thermometer installed so that it may record the temperature of the Gas flowing through the meters, or other means of recording temperature as may be mutually agreed upon by the Parties.  The average of the record to the nearest one degree Fahrenheit (1° F), obtained while Gas is being delivered, will be the applicable flowing Gas temperature for the period under consideration.

(iv)    The specific gravity of the Gas will be determined by a recording gravitometer or chromatographic device installed and located at a suitable point to record representing specific gravity of the Gas being metered or, at Producer's or its designee's option, by spot samples or continuous sampling standard type gravity methods.

1.    If a recording gravitometer or chromatographic device is used, the gravity to the nearest one-thousandth (0.001) obtained while Gas is being delivered will be the specific gravity of the Gas sampled for the recording period.

2.    If a continuous sampling method is used, the gravity to the nearest one-thousandth (0.001) will be determined once a Month from a Gas analysis. The result will be applied during the Month for the determination of Gas volumes delivered.

3.      If a spot sample is used, the gravity to the nearest one-thousandth (0.001) will be determined at least once each quarter and will be applied until the next spot sample is taken for the determination of Gas volumes delivered.

(v)      Adjustments to measured Gas volumes for the effects of super compressibility will be made in accordance with accepted American Gas Association standards.  Producer or its designee will obtain appropriate carbon dioxide and nitrogen mole fraction values for the Gas delivered as may be required to compute adjustments in accordance with standard testing procedures. At Producer's or its designee's option, equations for the calculation of super compressibility may be taken from either the API Chapter 14.2 or American Gas Association Report No. 8, Compressibility and Super compressibility for Natural Gas and Other Hydrocarbon Gases, latest revision.

(vi)      For purposes of measurement and meter calibration, the average atmospheric pressure for each Receipt Point and Delivery Point is assumed to be fourteen and four tenths (14.4) pounds per square inch absolute.  If the pressure transmitter being used is capable of measuring actual atmospheric pressure, then actual atmospheric pressure may be used.

(vii)      The Gross Heating Value of the Gas delivered at a Point of Receipt and Point of Delivery will be determined at least once each quarter using either a continuous sampler, spot sampler, or gas chromatograph; provided, however, that when daily deliveries of Gas at any Receipt Point or Delivery Point average five thousand (5,000) Mcf per Day or greater during any Month, the Gross Heating Value of the Gas delivered at that Receipt Point or

002008

(viii)   The physical constants used in Btu computation for a perfect Gas will be derived from the "Table of Physical Constants of Paraffin Hydrocarbons and Other Compounds" as published in the GPA Standard 2145-03 and superseding revisions thereof. The analysis will be complete and individual values in mole percent or fraction of each hydrocarbon compound will be listed through $C_6$.  The $C_6+$ values will be as stated in GPA standard 2261, 7.3.6 Table IV (as may be revised from time to time) or, at Producer's option, by use of an extended analysis.  The analysis will further include the mole fraction or percent individually of additional compounds contained in chromatographically measurable quantity contained in the sample.  The method to be used for chromatographic analysis will be that contained in GPA standard 2261, <u>Analysis for Natural Gas and Similar Gaseous Mixtures by Gas Chromatography</u>, latest revision.

(ix)   Other tests to determine water content, sulfur, and other impurities in the Gas will be conducted in accordance with standard industry testing procedures when requested by either Party.  The Party requested to perform those tests will bear the cost of those tests only if the Gas tested is determined not to be within the quality specification set forth in Schedule 3.1.  If the Gas is within the quality specification, the requesting Party will bear the cost of the tests.

(x)    If, during the term of this Agreement, a new method or technique is developed with respect to gas measurement or the determination of the factors used in gas measurement, then, in Producer's commercially reasonable discretion, the new method or technique may be substituted for the method set forth in this Schedule, provided that the new method or technique is in accordance with accepted standards of the American Gas Association.

002011

**SCHEDULE 4.2**
**to**
**GAS GATHERING AND PROCESSING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**SPECIFICATIONS**

A.    All Delivered Gas shall meet the following specifications:

(i)    Hydrogen Sulfide: The Gas will not contain more than ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as determined by quantitative tests.

(ii)    Total Sulfur: The Gas will not contain more than ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as determined by quantitative tests.

(iii)    Temperature: The Gas will not have a temperature less than the maximum temperature at which a hydrate will form, and in any event not less than ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

002012

(iv)    Carbon Dioxide: The Gas will not contain more than ▮▮▮▮▮▮▮▮

(v)     <u>Oxygen</u>: Producer will make every reasonable effort to keep the Gas free from oxygen. In any event, the Gas will not contain more than ████████████████████████ ████████████████████

(vi)     <u>Nitrogen</u>: The Gas will not contain more than ████████████████████████ ███████

(vii)     <u>Non-hydrocarbons</u>: The Gas will not contain more than ████████████████ ████████████████████████████ including, but not limited to, water, hydrogen sulfide, sulfur, carbon dioxide, oxygen, and nitrogen.

(viii)     <u>Water Vapor Content</u>: The Gas will be free of water and will not contain more than ████████████████████████████████████████████████████

(ix)     <u>Objectionable Liquids and Solids and Dilution</u>: The Gas will be free of objectionable liquids and solids (including free water) and will be commercially free from dust, gums, gum-forming constituents, and other liquids or solid matter which become separated from the Gas in the course of gathering.

(x)     <u>Gross Heating Value</u>: The Gas will not have a Gross Heating Value less than ████████████████████████████████████████

      (xi)    <u>Hazardous Waste</u>: The Gas will not contain hazardous waste as defined in the Resources Conservation and Recovery Act of 1976, 42 USC § 690.1, et seq.

      B.    Gatherer is not obligated to accept at the Receipt Point or deliver at the Delivery Points any Gas tendered by Producer that does not conform to the specifications set forth in this Schedule 3.2. The gas quality specifications set forth in this Schedule 4.2 are the minimum gas quality specifications that are in place as of the Effective Date of this Agreement for the Downstream Pipelines at the Delivery Points.  If the quality specifications of a Downstream Pipeline at a Delivery Point are modified from those in place as of the Effective Date of this Agreement, this Agreement will automatically be amended without further action of the Parties so that the minimum quality specifications set forth in this Schedule 3.2 conform to the modified quality specifications of any Downstream Pipeline.

      C.    Producer will not knowingly deliver Gas to a Receipt Point that fails to meet one or more of the quality specifications set forth in this Schedule 4.2 without the express written consent of Gatherer.  If the Gas delivered at a Receipt Point fails to meet any of the quality specifications stated above, then Gatherer will notify Producer and Producer will make a commercially reasonable effort to correct the Off-Spec Gas.  Gatherer may refuse to accept Producer's Gas to the extent and for so long as Producer is unable to deliver Gas conforming to the applicable specifications. If Gatherer at any time accepts delivery of Off-Spec Gas, such acceptance does not constitute a waiver with respect to any future delivery of Off-Spec Gas.  **NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, IF PRODUCER'S OFF-SPEC GAS IS DELIVERED INTO THE GATHERING AND PROCESSING SYSTEM WITHOUT THE PRIOR EXPRESS APPROVAL OF GATHERER, AND THE QUALITY DEFICIENCY OF THAT GAS DAMAGES ANY PORTION OF THE GATHERING AND PROCESSING**

002014

**SYSTEM, PRODUCER SHALL REIMBURSE GATHERER FOR ALL DAMAGES CAUSED BY, OR TO THE EXTENT CONTRIBUTED TO BY, SUCH OFF-SPEC GAS, INCLUDING, WITHOUT LIMITATION, PHYSICAL DAMAGE TO ANY PIPELINE OR APPURTENANT FACILITIES, AND DAMAGE TO GATHERER'S COMMERCIAL OPERATIONS, AND PRODUCER SHALL REIMBURSE GATHERER FOR ALL COSTS INCURRED BY GATHERER IN PURGING THE GATHERING AND PROCESSING SYSTEM AND IN OTHERWISE DEALING WITH THE OFF-SPEC GAS.**

D.  Any terms capitalized in this Schedule shall have the meaning set forth herein, or as indicated by the context, or as set forth in the body of the Agreement.

**Schedule 6.1**
**to**
**GAS GATHERING AND PROCESSING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**SERVICE FEES**

Any terms capitalized in this Schedule shall have the meaning set forth herein, or as indicated by the context, or as set forth in the body of the Agreement.

The Service Fee for gathering and processing Producer's Gas and delivering to nominated Delivery Points shall be calculated according to the following formula:

Service Fee = (Gathering Fee + Processing Fee + Dehydration Fee + Compression Fee + Gathering Capital Recovery Fee + Processing Capital Recovery Fee + NGL Transport Fee) X the Price Index + Other Fuel Fee

**Gathering Fee ($/MMBtu)**

002016

A gathering fee of ▮▮▮/MMBtu shall be assessed on Allocated CRP Volume.

**Processing Fee ($/MMBtu)**

A processing fee of ████/MMBtu shall be assessed on Allocated CRP Volume.

**Dehydration Fee ($/MMBtu)**

A dehydration fee of ████/MMBTU shall be assessed on Allocated CRP Volume.

**Compression Fee ($/MMBtu)**

Gatherer shall install compression as necessary on Gathering and Processing System as provided in Section 4.4. For any volumes of Allocated CRP Volume a compression fee of ████/MMBtu per stage of compression shall be assessed.

**NGL Transport Fee ($/gallon)**

A transport fee per gallon of NGLs shall be assessed on Producer's Allocated Actual Quantities of NGLs. The NGL Transport Fee shall be ████ per gallon with respect to Producer's Allocated Actual Quantities of NGLs.

**Gathering Capital Recovery Fee ($/MMBtu)**

A Gathering Capital Recovery fee of $█████/MMBtu shall be assessed on Allocated CRP Volume until Gatherer has recovered ████ Gathering and Processing Capital Expenditures across all Service Fees.

**Processing Capital Recovery Fee ($/MMBtu)**

A Processing Capital Recovery fee of $█████/MMBtu shall be assessed on Allocated CRP Volume until Gatherer has recovered ████ Gathering and Processing Capital Expenditures across all Service Fees.

002019

**SCHEDULE 8.1**
**to**
**GAS GATHERING AND PROCESSING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**NOTICES**

<u>**GATHERER:**</u>

<u>Notices & Correspondence</u>:

    Kingfisher Midstream LLC
    c/o Asset Risk Management, LLC
    20329 State Highway 249, Suite 450
    Houston, TX 77070
    Attention: Paul Williams
    Phone: 281-655-3234
    Email: pwilliams@asset-risk.com

<u>Scheduling Department</u>:

    Kingfisher Midstream LLC
    c/o Asset Risk Management, LLC

c/o Asset Risk Management, LLC
20329 State Highway 249, Suite 450
Houston, TX 77070
Attention: Gas Scheduling David Puglia
Phone: 281-655-3216
Email: dpuglia@asset-risk.com

Accounting Matters:

Kingfisher Midstream LLC
c/o Asset Risk Management, LLC
20329 State Highway 249, Suite 450
Houston, TX 77070
Attention: Gas Accounting Mamata Sharma
Phone: 281-655-3221

Payment by ACH:

ABA #:
Bank:
Account #:
Credit To:

[Continued on next page]

**PRODUCER:**

Notices & Correspondence:

    Oklahoma Energy Acquisitions, LP
    c/o Alta Mesa Services, LP
    15021 Katy Freeway
    Suite 400
    Houston, TX 77094
    Attn: David McClure
    Phone: 281-530-0991
    Facsimile: 281-530-5278
    Email: dmcclure@altamesa.net

Billing:

    Oklahoma Energy Acquisitions, LP
    c/o Alta Mesa Services, LP
    15021 Katy Freeway
    Suite 400
    Houston, TX 77094
    Attn:  Michael A. McCabe
    Phone:  (281) 530-0991
    Facsimile: (281) 530-5278
    Email: mmccabe@altamesa.net

Payment by ACH:

Bank:              Union Bank (MUFG)

███████████████████

Account Name:     Alta Mesa Services LP Funding Account

# EXHIBIT 2

*Execution Version*

# CRUDE OIL GATHERING AGREEMENT

## OKLAHOMA ENERGY ACQUISITIONS, LP

## AND

002025

KINGFISHER MIDSTREAM, LLC

**August 31. 2015**

002026

# TABLE OF CONTENTS

Article I

      Definitions and Interpretation ............................................................................1
Section 1.1    Definitions...................................................................................1
Section 1.2    Interpretation...............................................................................6

Article II

      TERM .......................................................................................................7
Section 2.1    Term..........................................................................................7

Article III

      CRUDE GATHERING SYSTEM.......................................................................7
Section 3.1    Construction of Facilities................................................................7
Section 3.2    Easements, Rights-of-Way and Fee Lands. ........................................7
Section 3.3    Dedication..................................................................................7
Section 3.4    Covenant Running With Land. .......................................................8
Section 3.5    Covenant Not to Gather Crude Oil. .................................................9
Section 3.6    Option to Expand Crude Gathering System.......................................9
Section 3.7    Title Warranty.............................................................................10
Section 3.8    Proceeds of Production. .................................................... 002027...10
Section 3.9    Receipt Points and Central Receipt Points........................................10
Section 3.10   Additional Receipt Points: Obligation to Interconnect. .......................10

Section 3.11    Commingling. .................................................................................11

Article IV

                GATHERING AND DELIVERY ................................................................11
Section 4.1    Obligation to Gather; No Treating Services. ...................................11
Section 4.2    Scheduling. ..........................................................................................11
Section 4.3    Separation and Storage. .......................................................................12
Section 4.4    Delivery of Crude. ...............................................................................12
Section 4.5    Measurement, Equipment and Testing. ...............................................13
Section 4.6    Quality. .................................................................................................13
Section 4.7    Delivery Pressure at Receipt Points. ...................................................13
Section 4.8    Operating Inventory. ............................................................................13
Section 4.9    Title and Risk of Loss. .........................................................................14

Article V

                CURTAILMENT AND MAINTENANCE ................................................14
Section 5.1    Curtailment and Temporary Release of Crude Oil. ............................14
Section 5.2    Maintenance Events. ............................................................................14

Article VI

                FEES AND PAYMENT .............................................................................15
Section 6.1    Fees. .....................................................................................................15

i

002028

Section 6.2      Escalation. .................................................................................................15
Section 6.3      Billing and Payment. ...................................................................................15
Section 6.4      Audit. ............................................................................................................16
Section 6.5      Taxes. ...........................................................................................................16

Article VII
                 INDEMNIFICATION ...................................................................................16
Section 7.1      Indemnification. ...........................................................................................16
Section 7.2      Notification Obligation. ...............................................................................17

Article VIII
                 FORCE MAJEURE ......................................................................................17
Section 8.1      Force Majeure. .............................................................................................17

Article IX
                 DEFAULT AND TERMINATION ...............................................................18
Section 9.1      Producer Events of Default. .........................................................................18
Section 9.2      Gatherer's Default Remedies Against Producer. .........................................18
Section 9.3      Gatherer Events of Default. .........................................................................18
Section 9.4      Producer's Default Rights Against Gatherer. ..............................................19

Article X
                 LIMITATION OF LIABILITY ....................................................................19
Section 10.1     Limitation of Liability. ................................................................................19

Article XI   MISCELLANEOUS

Section 11.1    Assignment. ...............................................................................................19
Section 11.2    Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury Trial. ...19
Section 11.3    Dispute Resolution. ....................................................................................20
Section 11.4    Notices. .......................................................................................................20
Section 11.5    Survival. ......................................................................................................20
Section 11.6    No Joint Venture. ........................................................................................20
Section 11.7    Entire Agreement. .......................................................................................20
Section 11.8    No Third Party Beneficiaries. .....................................................................21
Section 11.9    Confidentiality. ...........................................................................................21
Section 11.10   Regulatory Matters. ....................................................................................21
Section 11.11   Execution in Counterparts. .........................................................................22

Schedule 3.3        Dedicated Area
Schedule 3.4        Form of Memorandum of Crude Oil Gathering Agreement
Schedule 3.9        Receipt Points
Schedule 3.10(a)    Designation of Additional Receipt Point
Schedule 4.4(a)     Schematic of Delivery Point
Schedule 4.5(a)     Measurement, Equipment and Testing
Schedule 4.6        Specifications

ii

Schedule 11.4          Notices

iii

## CRUDE OIL GATHERING AGREEMENT

This **Crude Oil Gathering Agreement** (this "*Agreement*") is made and entered into as of the 31st day of August, 2015 (the "*Effective Date*"), by and between Oklahoma Energy Acquisitions, LP, a Texas limited partnership ("*Producer*"), and Kingfisher Midstream LLC, a Delaware limited liability company ("*Gatherer*"). Producer and Gatherer may be referred to each individually as "*Party,*" or collectively as the "*Parties*."

### RECITALS

**WHEREAS**, Producer owns, controls or may acquire certain mineral interests and hydrocarbon reserves (collectively, the "*Producer's Interests*," as further defined below), and controls the mineral interests of others (collectively, the "*Other Interests*," as further defined below) in certain lands in Kingfisher, Logan, Canadian, Blaine and Garfield Counties, Oklahoma, described more particularly on **Schedule 3.3** attached hereto (the "*Dedicated Area*"); and

**WHEREAS**, Producer has or contemplates having a supply of crude oil (the "*Crude Oil*") from present and future wells located in the Dedicated Area and desires to Dedicate (as defined below) the Producer's Interests and Other Interests, and deliver such Crude Oil (the "*Committed Crude*") to Gatherer for gathering; and

**WHEREAS**, Gatherer shall construct, own and operate Crude Oil gathering facilities (collectively, the "*Crude Gathering System*," as further defined below) capable of receiving from Producer deliveries of the Committed Crude from the Dedicated Area and subject to the

Dedication; and

**WHEREAS**, Producer desires that Gatherer provide gathering services as set forth in this Agreement, and Gatherer desires to provide to Producer gathering services in accordance with the terms and conditions set forth in this Agreement; then

**THEREFORE**, for and in consideration of the mutual covenants set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

### Section 1.1    Definitions.

The following terms shall have the following meanings unless otherwise indicated:

"*Additional Capacity*" has the meaning set forth in Section 3.6.

"*Additional Receipt Point*" has the meaning set forth in Section 3.10(a).

"*Affiliate*" means with respect to a Person, any Person which, directly or indirectly, controls, is controlled by or is under common control with such Person or such Person's

1

members or shareholders.   For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such individual or entity, whether through the ownership of voting securities, by contract or otherwise, *provided, however*, that for purposes of this Agreement, Producer and Gatherer shall not be considered Affiliates of each other.

"***After-Acquired Interests***" has the meaning set forth in Section 3.3.

"***Agreement***" has the meaning set forth in the introductory paragraph.

"***Applicable Law***" means any applicable statute, law principle of common law, rule, regulation, judgment, order, ordinance, requirement, code, writ, injunction, or decree of any Governmental Authority.

"***Barrel***" or "***bbl***" means forty-two (42) gallons of 231 cubic inches per gallon at 60 degrees Fahrenheit (60° F).

"***Business Day***" means any day, other than a Saturday or Sunday, that commercial banks in Houston, Texas are open for business.

"***C&O Agreement***" means that certain Operating and Construction Management Agreement dated as of August 31, 2015, by and between the Gatherer and Asset Risk Management, LLC and relating to the construction and operation of the Crude Gathering System, as the same may be amended, restated, modified or otherwise supplemented.

"***Central Receipt Point***" and "***CRP***" has the meaning set forth in Section 3.9.

"***Claims***" means any and all demands, claims, judgments, obligations, liabilities, liens, causes of action, lawsuits, arbitrations, mediations, investigations or proceedings (whether at law or in equity).

"***Committed Crude***" has the meaning set forth in the Recitals.

"***Confidential Information***" has the meaning set forth in Section 11.9.

"***Contract Year***" means each calendar year during the Term, the first of which shall commence on the Effective Date and run through December 31 of that year, and then from January 1 through December 31 for each subsequent year thereafter, but for the last Contract Year, from January 1 through the date that this Agreement terminates or expires.

"***Crude Gathering System***" has the meaning set forth in the Recitals, and further means the (i) Gathering Pipelines, (ii) Storage Facilities, and (iii) custody transfer units, crude pumps, meters or measurement facilities, and (iv) any other equipment or appurtenances associated with the foregoing.

"***Crude Oil***" has the meaning set forth in the Recitals.

"***Curtailment Event***" has the meaning set forth in Section 5.1.

2

"*Curtailment Period*" has the meaning set forth in Section 5.1.

"*Dedicated Area*" has the meaning set forth in the Recitals, as further specifically set forth on **Schedule 3.3**.

"*Dedicated Wells*" has the meaning set forth in Section 3.3(b).

"*Dedication*" means either the Primary Term Dedication or the Extended Term Dedication, as applicable, based upon the relevant determination time.

"*Delivered Crude*" means the quantity of Crude Oil in bbl that is delivered by Gatherer to Producer at the Delivery Point.

"*Delivery Point*" has the meaning set forth in Section 4.4(a).

"*Dispute*" has the meaning set forth in in Section 11.3.

"*Effective Date*" has the meaning set forth in the introductory paragraph.

"*Extended Term*" has the meaning set forth in Section 2.1.

"*Extended Term Dedication*" has the meaning set forth in Section 3.3(b).

"*FERC*" means the Federal Energy Regulatory Commission, or any successor Governmental Authority.

"*Firm*" means a gathering and transportation service that is not subject to being curtailed, interrupted, pro rated or suspended except as expressly provided in this Agreement.

"*Flare Gas*" has the meaning set forth in Section 4.3(a).

"*Force Majeure*" has the meaning set forth in Section 8.1.

"*Force Majeure Event*" has the meaning set forth in Section 8.1.

"*GAAP*" means generally accepted accounting principles in the United States.

"*Gatherer*" has the meaning set forth in the introductory paragraph.

"*Gatherer Event of Default*" has the meaning set forth in Section 9.3.

"*Gatherer Group*" means any or all of (i) Gatherer, (ii) Gatherer's Affiliates, (iii) any or their respective contractors, and (iv) the officers, directors, employees, agents, advisors, counsel, consultants, members, shareholders, insurers, invitees or representatives of any of the foregoing.

"*Gathering Capital Expenditures*" means all expenditures, costs and expenses incurred by or on behalf of Gatherer with respect to the Crude Gathering System, including costs of rights-of-way and other easements, labor, pipelines, metering and measurement, crude pumps, Storage Facilities, and related expenditures, that are capitalized on the books and records of

3

Gatherer with respect to the Crude Gathering System according to GAAP, but specifically excluding all expenditures, costs and expenses incurred by or on behalf of Gatherer with respect to any expansion of the Crude Gathering System to gather third party volumes of Crude Oil that are not attributable to the Interests, provided, however, that in the event that Gatherer undertakes any expansion of the Crude Gathering System to gather third party volumes of crude oil that are not attributable to the Interests, and Producer thereafter makes use of the Crude Gathering System so expanded to accommodate third party volumes of crude oil to gather Committed Crude, then Producer's pro rata share of all expenditures, costs and expenses of the expansion shall constitute "Gathering Capital Expenditures" to the extent agreed upon by the Parties at the time of Producer's connection to such extension, and, provided, further, that this right and obligation of Producer shall not be in derogation of any of the rights and obligations of the Parties under Section 3.6.

"**Gathering Capital Recovery Fee**" has the meaning set forth in Section 6.1(b).

"**Gathering Fee**" has the meaning set forth in Section 6.1(a).

"**Gathering Pipelines**" means the pipelines of various diameters interconnecting the Receipt Point(s) to the Delivery Point.

"**Governmental Approval**" means any permit, license, permission, grant or other similar authorization issued by, or required to be issued by, any Governmental Authority and necessary for the performance of the Parties hereunder.

"**Governmental Authority**" means any federal, state, county, parish, municipal or other

governmental subdivision, or any court or any governmental department, commission, board, bureau, agency or other instrumentality of any federal, state, county, municipal or other governmental subdivision within the United States of America with authority over the Parties and subject matter in question.

"***Indemnified Party***" has the meaning set forth in Section 7.2.

"***Indemnifying Party***" has the meaning set forth in Section 7.2.

"***In-Service Date***" means the first day of the first full month following the date that Gatherer notifies Producer that the Crude Gathering System, or any Additional Capacity, if applicable, has been completed and is ready to receive Committed Crude and ready to redeliver it to Producer at the Delivery Point.

"***Interests***" means Producer's Interests, After-Acquired Interests and Other Interests.

"***Line Fill***" has the meaning set forth in Section 4.8(a).

"***Losses***" means any and all losses, damages, costs, expenses, liabilities, fines, penalties or judgments of whatever kind or character incurred by a Person or Party with respect to a Claim, including reasonable attorneys' fees, court costs and other reasonable costs and expenses of litigation as such may be awarded by a court.

4

"***Maintenance Event***" has the meaning set forth in Section 5.2.

"***Notice***" has the meaning set forth in Section 11.4.

"***Off-Spec Crude Oil***" has the meaning set forth in Section 4.6.

"***Other Fuel***" means electricity consumed in the operation of the Crude Gathering System.

"***Other Fuel Fee***" means Producer's allocated share of the actual cost of Other Fuel.

"***Other Interests***" has the meaning set forth in the Recitals, and further means the interests of Persons in the Dedicated Area other than Producer, but whose interests are represented or controlled by Producer, such working interests, royalty interests, overriding royalty interests, net profits interests or other mineral interests.

"***Overdue Rate***" means a rate per annum equal to the lesser of (i) an annual rate equal to four percent (4%) per annum above the "prime rate" specified under the caption "Money Rates" in the *Wall Street Journal* (New York Edition) on the date such payment was required to have been made, or (ii) the maximum rate of interest permitted by Applicable Law.

"***Party***" and "***Parties***" have the meaning set forth in the introductory paragraph.

"***Person***" means any individual, firm, corporation, trust, partnership, limited liability company, association, joint venture, other business enterprise or Governmental Authority.

002041

"***Pipeline Loss Allowance***" has the meaning set forth in Section 4.9.

"***Price Index***" has the meaning set forth in Section 6.2.

"***Primary Term***" has the meaning set forth in Section 2.1.

"***Primary Term Dedication***" has the meaning set forth in Section 3.3(a).

"***Produced Water***" has the meaning set forth in Section 4.3(c).

"***Producer***" has the meaning set forth in the introductory paragraph.

"***Producer Capacity***" has the meaning set forth in Section 3.6.

"***Producer Event of Default***" has the meaning set forth in Section 9.1.

"***Producer Group***" means any or all of (i) Producer, (ii) Producer's Affiliates, (iii) Producer's contractors and suppliers, of every tier, other than the Gatherer Group, and (iv) the officers, directors, employees, agents, advisors, counsel, consultants, members, shareholders, insurers, invitees or representatives of any of the foregoing.

5

"***Producer's Interests***" has the meaning set forth in the Recitals, and further means all mineral interests in lands, leases, wells and Crude Oil that Producer owns or controls in the Dedicated Area.

"***Receipt Point***" has the meaning set forth in Section 3.9.

"***Received Crude***" means the quantity of Crude Oil in bbl that is delivered by Producer to Gatherer at a Receipt Point.

"***Scheduled Crude***" has the meaning set forth in Section 4.2(a).

"***Separator***" has the meaning set forth in Section 4.3(a).

"***Service Fees***" means Gathering Fee and Gathering Capital Recovery Fee.

"***Specifications***" has the meaning set forth in Section 4.6.

"***Storage Facilities***" has the meaning set forth in Section 4.3(f).

"***System Capacity***" means the then-maximum capacity of the Crude Gathering System to gather Committed Crude, which shall in no event be less than fifty thousand (50,000) Barrels per day.

"***Tank Bottoms***" has the meaning set forth in Section 4.8(b).

"***Tax***" means any current or future taxes, fees, levies, charges, assessments and/or other

002043

"*Tax*" means any current or future taxes, fees, levies, charges, assessments and/or other impositions levied, charged, imposed, assessed or collected by any Governmental Authority having jurisdiction.

"*Term*" means the Primary Term and any Extended Term.

**Section 1.2   Interpretation.**

All references to any agreement or document shall be construed as of the particular time that such agreement or document may then have been executed, amended, varied, supplemented or modified. Terms defined in this Agreement shall have the meanings given therein when used elsewhere in this Agreement. References in the singular shall include the plural, and references to the masculine shall include the feminine, and vice versa. Words denoting natural persons shall include partnerships, firms, companies, corporations, joint ventures, trusts, associations, organizations or other entities. References to a particular article, section, subsection, paragraph, subparagraph or schedule, if any, shall be a reference to such article, section, subsection, paragraph, subparagraph or schedule in and to this Agreement. The words "include" and "including" shall include the phrase "not limited to." Any reference to a Person shall include that Person's successors and assigns or to any Person succeeding to that Person's functions. Any Schedules are fully incorporated and made part of this Agreement. The Schedules shall be read in conjunction with the provisions of the body of this Agreement, and the Schedules and the body of this Agreement shall be interpreted to give effect to the intent of the Parties as evidenced by their terms when taken as a whole, *provided, however,* that in the event of an express and

6

irreconcilable conflict between the terms of a Schedule and the provisions of the body of this Agreement, the provisions of the body of this Agreement shall control. Capitalized terms appearing in a Schedule shall have the meanings set forth in Section 1.1, unless the context requires otherwise.

## ARTICLE II
## TERM

**Section 2.1      Term.**

This Agreement is effective as of the Effective Date, and, unless earlier terminated in accordance with any express provision of this Agreement, shall remain in full force and effect for a period of fifteen (15) years from the In-Service Date (the "***Primary Term***"), *provided, however*, that, to the extent that at the end of the Primary Term there are wells then-connected to the Crude Gathering System and then-producing Crude Oil in commercial (paying) quantities, the Term of this Agreement shall extend for so long as such well(s) continue to produce Crude Oil in commercial (paying) quantities (the "***Extended Term***").

## ARTICLE III
## CRUDE GATHERING SYSTEM

**Section 3.1      Construction of Facilities.**

Gatherer shall, at its sole cost and expense, design, engineer, construct, equip and modify, or caused to be designed, engineered, constructed, equipped and modified, the Crude Gathering

002045

System. Gatherer shall exercise commercially reasonable efforts to (a) achieve the Partial Commercial Operation Date (as defined in the C&O Agreement) by the date that is nine months after the Effective Date and (b) achieve the Final Commercial Operation Date (as defined in the C&O Agreement) by the date that is twelve months after the Effective Date.

### Section 3.2    Easements, Rights-of-Way and Fee Lands.

To the extent that (a) Producer may do so in compliance with all applicable agreements, and (b) Gatherer's activities on the relevant lands do not unreasonably interfere with Producer's operations, Producer shall, where reasonably requested by Gatherer, (i) convey or assign to Gatherer, to the extent that Producer may do so without payment of monies (unless Gatherer agrees to pay), any easements or rights-of-way for purposes of constructing, owning, operating, repairing, replacing and maintaining any portion of the Crude Gathering System, and (ii) lease to Gatherer, at a price and upon terms as may be then agreed, such fee lands, or portions thereof, owned by Producer, for purposes of constructing, owning, operating, repairing, replacing and maintaining the Crude Gathering System.

### Section 3.3    Dedication.

(a)    For the Primary Term of this Agreement, Producer hereby dedicates to Gatherer all Interests within the Dedicated Area shown on **Schedule 3.3** (the "***Primary Term Dedication***") and shall deliver to Gatherer at the Receipt Point(s) all Committed Crude produced therefrom, *provided* that notwithstanding such Primary Term Dedication,

7

002046

Producer shall have the right to (i) administer the Interests as it deems advisable in its sole discretion, including the right to rework, shut in, plug or abandon any well, (ii) form or participate in the formation of any unit, (iii) to use Crude Oil in its operations, and (iv) deliver Crude Oil that Producer is expressly required to deliver under oil and gas leases, contractual agreements or other legal rights under which Committed Gas is produced. If, after the Effective Date, Producer or any of its Affiliates acquire mineral interests, including by way of joint venture participation, drill-to-earn rights or other means, within the Dedicated Area (the "***After-Acquired Interests***"), then the After-Acquired Interests and all Crude Oil produced therefrom shall automatically be included in the Primary Term Dedication and become Committed Crude; *provided, however,* if any of the After-Acquired Interests or Crude Oil produced therefrom are subject to a prior written dedication or commitment for gathering at the time of acquisition by Producer, then that Crude Oil will be excluded from the Primary Term Dedication until the prior dedication or commitment terminates or expires, at which time such Crude Oil shall become Committed Crude, *provided further* that if, with respect to any After-Acquired Interests, Producer has the right or ability, without payment of any material fee or penalty, or incurring any other material disadvantage, to terminate any such prior dedication or commitment with respect to the After-Acquired Interests, then Producer shall terminate such dedication or commitment as soon as reasonably practicable. Producer shall promptly notify Gatherer in writing of any such termination, and identify the After-Acquired Interests.

      (b)     For the Extended Term of this Agreement, Producer hereby dedicates to Gatherer all of the wells that constitute Interests and are connected to the Crude

Gathering System at the end of the Primary Term (such wells, the "**Dedicated Wells**", and such dedication, the "***Extended Term Dedication***") and shall deliver to Gatherer at the Receipt Point(s) all Committed Crude produced therefrom; *provided* that notwithstanding such Extended Term Dedication, Producer shall have the right to (i) administer the Dedicated Wells as it deems advisable in its sole discretion, including the right to rework, shut in, plug or abandon any Dedicated Well, (ii) form or participate in the formation of any unit, (iii) to use Crude Oil in its operations, and (iv) deliver Crude Oil that Producer is expressly required to deliver under oil and gas leases, contractual agreements or other legal rights under which Committed Crude is produced. From and after the end of the Primary Term all Interests within the Dedicated Area other than the Dedicated Wells shall be permanently released from the Dedication, and Producer may take the volumes produced from such Interests (other than the Dedicated Wells) elsewhere.

**Section 3.4     Covenant Running With Land.**

For the Term of this Agreement, this Agreement shall be a covenant running with the land and the Interests and any After-Acquired Interests. Contemporaneously with the execution of this Agreement, and from time-to-time during the Term if necessary, the Parties shall each execute for recordation in the public records of the Dedicated Area a "short form" memorandum of this Agreement in the form of **Schedule 3.4** attached hereto, identifying the Dedicated Area, the Interests, After-Acquired Interests and wells thereon. Producer shall cause any conveyance of all or any of the Interests or After-Acquired Interests, or Crude Oil therefrom, to be made expressly subject to this Agreement, and to cause all transferees to execute a written instrument

8

in a form reasonably satisfactory to Gatherer acknowledging the Dedication and such transferees' obligations under this Agreement.  Gatherer shall likewise cause any assignment or conveyance of all or any segment of the Crude Gathering System to be made expressly subject to this Agreement, and to cause all transferees to execute a written instrument in a form reasonably satisfactory to Producer acknowledging the Dedication and such transferees' obligations under this Agreement.

**Section 3.5    Covenant Not to Gather Crude Oil.**

Producer shall not gather or dispose of Committed Crude, or allow Committed Crude to be gathered or disposed of, prior to delivery to Gatherer at the Receipt Point(s).

**Section 3.6    Option to Expand Crude Gathering System.**

Gatherer shall gather all volumes of Committed Crude up to fifty thousand (50,000) Barrels per day on a Firm basis (the "***Producer Capacity***").  All volumes of Committed Crude above the Producer Capacity shall at all times be Committed Crude.  To the extent that Committed Crude shall exceed the Producer Capacity, Gatherer shall have the option to (a) utilize any available System Capacity in excess of the Producer Capacity on a Firm basis, (b) contract with third Persons to gather such Committed Crude, or (c) expand the Crude Gathering System as many times as necessary by adding additional System Capacity (the "***Additional Capacity***").  In the event that production from the Interests shall exceed the Producer Capacity, Producer shall provide Notice to Gatherer that production exceeds the Producer Capacity, and Gatherer shall provide Notice to Producer within sixty (60) days of Gatherer's receipt of Producer's Notice that Gatherer that will or will not accept such volumes of Committed Crude or

add Additional Capacity.  In the event that Gatherer provides Notice to Producer that it will not accept such volumes of Committed Crude above the Producer Capacity or add Additional Capacity, then the acreage from which the volumes of Committed Crude above the Producer Capacity are directly produced shall be released from the Dedication, and Producer may take such volumes of Committed Crude elsewhere.  In the event that Gatherer provides Notice to Producer that it will accept such volumes of Committed Crude above the Producer Capacity or add Additional Capacity, then, until Gatherer is able to gather such Committed Crude, or until the In-Service Date for such Additional Capacity, Producer may deliver any volumes of Committed Crude above the Producer Capacity elsewhere, *provided* that once Gatherer is able to gather such volumes of Committed Crude, all such volumes of Committed Crude shall be delivered to Gatherer at a Receipt Point.  **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, PRODUCER'S RIGHT TO TAKE THE AFFECTED VOLUMES OF COMMITTED CRUDE ELSEWHERE DURING ANY PERIOD WHERE GATHERER REFUSES TO TAKE VOLUMES OF PRODUCER'S COMMITTED CRUDE THAT EXCEED THE PRODUCER CAPACITY, AND THE RELEASE FROM DEDICATION, IF APPLICABLE, SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY, AT LAW OR IN EQUITY, WITH RESPECT TO GATHERER'S INABILITY OR REFUSAL TO TAKE VOLUMES OF COMMITTED CRUDE THAT EXCEED THE PRODUCER CAPACITY**.

9

**Section 3.7    Title Warranty.**

Producer represents and warrants to Gatherer that:  (i) it owns, or has the right to dedicate all Interests and Committed Crude dedicated under this Agreement, and to deliver Committed Crude to the Receipt Point(s), free and clear of all liens, encumbrances and Claims, (ii) there are no prior dedications or commitments covering any Interests or Committed Crude produced from the Interests within the Dedicated Area.  Producer shall defend, indemnify, protect and hold harmless Gatherer from and against all Claims arising out of any breach of such representation and warranty.

**Section 3.8    Proceeds of Production.**

Producer shall make payment of all royalties, overriding royalties, production payments, and all other payments attributable to the Interests and Committed Crude due to any Person under any leases or agreements in accordance with the terms thereof, and Gatherer shall have no obligations with respect thereto.

**Section 3.9    Receipt Points and Central Receipt Points.**

Producer shall install one or more central receipt points (each, a "***Central Receipt Point***" or "***CRP***"), where production from multiple wells is aggregated into a single physical connection to the Crude Gathering System.  Producer shall connect each CRP to the Crude Gathering System, and the "***Receipt Point***" for Received Crude shall be the point of interconnection between a CRP and the inlet flange of the Crude Gathering System.  The proposed design and a list of initial Receipt Points are set forth in **Schedule 3.9**.

(a)     Producer shall have the right to designate additional Receipt Points (each an "*Additional Receipt Point*"), subject to Gatherer's prior approval, for the purpose of connecting additional wells to the Crude Gathering System, either by construction of an additional CRP or by interconnection of a well to the Crude Gathering System, *provided* that Producer shall have given Gatherer prior Notice, in the form set forth in **Schedule 3.10(a)**, of such Additional Receipt Points, and that incremental volumes of Committed Crude added to the Crude Gathering System will not cause the volumes of Committed Crude to exceed the then-System Capacity of the Crude Gathering System.

(b)     Upon Gatherer's receipt of any Notice from Producer under subsection (a) above, Gatherer shall have thirty (30) days from its receipt of any such Notice to provide return Notice to Producer that Gatherer will or will not interconnect such Additional Receipt Points.

(c)     In the event that Gatherer provides Notice to Producer that Gatherer will make a requested interconnection for such Additional Receipt Point, then Gatherer shall make such interconnection to the Agreement as soon as reasonably practicable, but in no event more than ████████ days from Gatherer's Notice to Producer.

10

(d)      In the event that Gatherer provides Notice to Producer that Gatherer will not make a requested interconnection for such Additional Receipt Point, then the well in question shall be released from the Dedication.  **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, THE RELEASE FROM DEDICATION SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY, AT LAW OR IN EQUITY, WITH RESPECT TO GATHERER'S REFUSAL TO INTERCONNECT AN ADDITIONAL RECEIPT POINT**.

**Section 3.11   Commingling.**

Received Crude may represent only a portion of Crude Oil on the Crude Gathering System, which may be used by other customers.  Subject to its obligations with respect to delivery of Delivered Crude, Gatherer shall have the right to commingle Received Crude with Crude Oil from other customers.

**ARTICLE IV**
**GATHERING AND DELIVERY**

**Section 4.1     Obligation to Gather; No Treating Services.**

Commencing on the In-Service Date, Producer shall deliver or cause to be delivered to the Receipt Point(s) all Committed Crude.  Gatherer shall, on a Firm basis up to the Producer Capacity, receive Delivered Crude from Producer at the Receipt Point(s) (as set forth in Section 3.9 and in **Schedule 3.9**) and transport Received Crude to the Separator, Storage Facilities and

Delivery Point (each defined below), as applicable. If Gatherer enters into any gathering, transportation, marketing or similar agreement with any third party pursuant to which Crude is received by Gatherer on the Crude Gathering System on a Firm basis, Gatherer shall deliver to Producer a written notice of such agreement that describes the material terms thereof. Gatherer shall provide no treating services for which there is no treating fee expressly provided in Section 6.1, such as treatment for sour Crude Oil/ hydrogen sulfide ($H_2S$) or other contaminants or metals, or removal of inert gases or any other contaminants.

**Section 4.2    Scheduling.**

(a)    Not later than the 15th day of a month, Producer shall deliver to Gatherer a Notice indicating the total volumes of Crude Oil expected to be delivered by Producer for gathering the following month (the "***Scheduled Crude***"). The Parties shall coordinate their respective scheduling activities to take into account the needs of downstream transportation resources. If Producer becomes aware that actual deliveries of Committed Crude to the Receipt Point(s) vary by more than five (5%), greater or lesser, of Scheduled Crude, then Producer shall promptly provide Notice to Gatherer, and if Producer fails to give Gatherer any Notice required by this subsection, and Gatherer thereafter incurs any costs or expenses as a result of such a variance from Scheduled Crude of which Gatherer should have received Notice, then Producer shall reimburse Gatherer for such costs or expenses.

11

(b)    Producer shall provide Gatherer with at least three (3) days advance written Notice of the arrival of Producer's downstream transportation at the Delivery Point to receive Delivered Crude in accordance with Section 4.4 below.

**Section 4.3    Separation and Storage.**

(a)    At the Storage Facilities (defined below), Gatherer shall separate natural gas from the Crude Oil through a 2-phase separator unit upstream of the Delivery Point (the "*Separator*").

(b)    Natural gas separated from the Crude Oil (the "*Flare Gas*") shall be flared by Gatherer.

(c)    Producer shall be financially responsible for disposal of water separated from the Crude Oil (the "*Produced Water*") at the Separator drain or at the Storage Facility water sump connection drain.  Gatherer shall dispose of Produced Water in its discretion either by trucking or by interconnection to Producer's disposal system for Produced Water.

(d)    All Producer-arranged transportation shall comply with all site rules and directives of Gatherer in entering, loading while there and exiting Gatherer's premises.

(e)    As needed, Gatherer shall be granted an irrevocable right to interconnect to Producer's disposal system for Produced Water.  Produced Water injected into Producer's disposal system shall be disposed of by Producer at no cost to Gatherer.

(f) After separation, Crude Oil shall be directed to (i) the Crude Oil storage tanks or other facilities within the Crude Gathering System for the purpose of gathering and storage of Committed Crude (the "***Storage Facilities***"), or (ii) the Delivery Point (as defined in Section 4.4 below).

**Section 4.4    Delivery of Crude.**

(a)    Provided that Gatherer shall have received proper Notice under Section 4.2(b) above, Gatherer shall deliver to Producer Delivered Crude FOB Producer's transportation at the outlet flange of the transfer meter connected to the Storage Facilities, as shown more particularly on **Schedule 4.4(a)** (the "***Delivery Point***").

(b)    Producer shall be solely responsible for all arrangements for transportation of Delivered Crude from the Delivery Point. If Producer becomes aware or should have become aware of delays with respect to any scheduled transportation for Delivered Crude, then Producer shall promptly provide Notice to Gatherer, and if Producer fails to give Gatherer any Notice required by this Section, and Gatherer thereafter incurs any costs or expenses as a result of such a delay with respect to transportation of which Gatherer should have received Notice, then Producer shall reimburse Gatherer for such costs or expenses.

12

(c)      All Producer-arranged transportation shall comply with all site rules and directives of Gatherer in entering, loading while there and exiting Gatherer's premises, including that all trucks shall be NSPS Level Tested trucks.

**Section 4.5      Measurement, Equipment and Testing.**

(a)      Producer shall be responsible for measurement, equipment and testing at the CRPs, and Gatherer shall be responsible for measurement, equipment and testing downstream of the CRPs, each in accordance with the protocols set forth on **Schedule 4.5(a)**.

(b)      Subject to Producer's safety rules, regulations and procedures, Producer hereby grants to Gatherer, and Gatherer's contractors or agents, a right of entry onto any of the lands covered by the Interests and access to the Producer side of a CRP, as necessary for the purpose of any sampling of Crude Oil to determine quality in accordance with Section 4.6 below, and shall facilitate, as necessary, access with surface owners where requested by Gatherer.

**Section 4.6      Quality.**

Crude Oil delivered by Producer at the Receipt Points shall meet or exceed the quality requirements set forth in **Schedule 4.6** (the "***Specifications***").  Gatherer shall have a right to reject all Crude Oil delivered by Producer that does not meet the Specifications ("***Off-Spec Crude Oil***"), *provided* that such Off-Spec Crude Oil shall not be released from the Dedication. Crude Oil delivered to Producer at the Delivery Point shall be of a substantially similar grade and

### Section 4.7    Delivery Pressure at Receipt Points.

Producer shall deliver Crude Oil at the Receipt Points at a pressure sufficient to enter the Crude Gathering System and not to exceed the maximum allowable operating pressure of the Crude Gathering System at such points, but in no event to exceed ▒▒▒▒▒▒▒▒▒▒ psig.

### Section 4.8    Operating Inventory.

Producer shall provide, at no cost to Gatherer, Crude Oil as:

(a)    line fill (the "***Line Fill***") needed to make and keep the Crude Gathering System operational; and

(b)    fill for any Storage Facility necessary to float tank roofs to working levels or to safely operate fixed roof tanks (the "***Tank Bottoms***").

(c)    Line Fill and Tank Bottoms shall not be considered transportable volumes.

(d)    Producer's obligation for Line Fill and Tank Bottoms shall be *pro rata* with any third party volumes of Crude Oil gathered on the Crude Gathering System, and, to the extent that Producer has provided all Line Fill and Tank Bottoms, Producer shall be

13

credited for any Line Fill and Tank Bottom volumes attributable to third party volumes of Crude Oil brought onto the Crude Gathering System.

**Section 4.9      Title and Risk of Loss.**

Title to Crude Oil and Produced Water shall always vest in Producer.  Risk of loss shall always be with Producer except when Gatherer is in possession of Crude Oil, in which case risk of loss shall be with Gatherer, *provided* that in no event shall Gatherer be responsible for any lost volumes of (i) Flare Gas or Produced Water, at any point, or (ii) Crude Oil between the Receipt Point(s) and Delivery Point due to (A) evaporation less than or equal to ███████████████ of the volume(s) delivered (the "***Pipeline Loss Allowance***"), or (B) shrinkage in volume of Crude Oil due to separation of Flare Gas and Produced Water.

**ARTICLE V**
**CURTAILMENT AND MAINTENANCE**

**Section 5.1      Curtailment and Temporary Release of Crude Oil.**

If for any reason, including Force Majeure or a Maintenance Event, but not for the reasons set forth in Section 3.6, Gatherer needs to curtail receipt, gathering or delivery of Crude Oil on the Crude Gathering System (each, a "***Curtailment Event***"), (i) Crude Oil deliveries from all Persons that are receiving service on an interruptible basis or non-Firm basis shall be curtailed prior to any curtailment or interruption of Committed Crude, and (ii) to the extent a third party is receiving service on a Firm basis in accordance with Section 4.1, Producer and such third party shall be curtailed on a pro rata basis (based on volumes of Crude Oil delivered to the Crude

Gathering System).  Prior to the In-Service Date, and at any time after the In-Service Date where Gatherer is unable to accept some of Committed Crude as a result of a Curtailment Event, Producer shall be free to dispose of such affected volumes under other arrangements during such Curtailment Event (the "***Curtailment Period***").  Gatherer shall notify Producer as soon as reasonably practicable of the circumstances of any Curtailment Event and the beginning and end of any Curtailment Period.  As soon as reasonably practicable after receiving notice of the end of the Curtailment Period, all Committed Crude shall again be subject to the Dedication.  **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, GATHERER'S TEMPORARY RELEASE AND PRODUCER'S RIGHT TO MAKE OTHER ARRANGEMENTS WITH RESPECT TO SUCH AFFECTED VOLUMES SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY AVAILABLE TO PRODUCER, AT LAW OR IN EQUITY, WITH RESPECT TO SUCH AFFECTED VOLUMES**.

### Section 5.2    Maintenance Events.

Gatherer may, without liability to Producer, interrupt the operation of the Crude Gathering System for the purpose of performing inspections, pigging, maintenance, testing, alterations, modifications, expansions, connections, repairs or replacements (each, a "***Maintenance Event***"), but such interruption shall be for only such time as may be reasonably necessary.  Gatherer shall give Producer advance written notice of its intention to interrupt operations and of the estimated time thereof, but not less than 24 hours advance notice, except in

14

case of emergency.  Any such Maintenance Events shall not constitute Force Majeure Events, unless such Maintenance Events otherwise meet the definition of a Force Majeure Event.

## ARTICLE VI
## FEES AND PAYMENT

**Section 6.1    Fees.**

Producer shall pay to Gatherer the following fees:

(a)    ██████████████ per Barrel of Received Crude for gathering   (the "***Gathering Fee***");

(b)    ██████████████ per Barrel of Received Crude for capital recovery of the Crude Gathering System (the "***Gathering Capital Recovery Fee***"), payable until Gatherer has recovered 1.2X Gathering Capital Expenditures in total accumulated Service Fees; and

(c)    the Other Fuel Fee, if applicable.

**Section 6.2    Escalation.**

Commencing with the ██████████████ and on January 1 of each Contract Year thereafter, each fee set forth in this Agreement shall  be automatically adjusted upward by the

002061

**Section 6.3    Billing and Payment.**

(a)    As soon as reasonably practicable after the end of each month, Gatherer shall render to Producer a statement for the preceding month, setting forth: (i) the total Barrels of Committed Crude received by Gatherer at the Receipt Points and redelivered to the Delivery Point, (ii) the number of Barrels representing the Pipeline Loss Allowance, Line Fill, Tank Bottoms and any other deductions allowed hereunder, (iii) the listing of the fees charged as permitted by Article 6.1 of this Agreement, and (iv) the net amount due Gatherer from Producer.

(b)    Producer shall pay to Gatherer the full amount due not later than the earlier of (i) fifteen (15) days from Producer's receipt of Gatherer's statement, or (ii) the last day of month following the statement month, *provided* that if such day is not a Business Day, then on the next Business Day.  Any past due amounts shall bear interest at the Overdue Rate from the date due until paid.

(c)    If Producer disputes all or a portion of any statement or amount due, it shall pay the undisputed portion, if any, of any such statement, and shall provide Notice to Gatherer of the specific basis for the dispute, including all supporting information, as soon as practicable after becoming aware of the basis for the dispute.  If after resolution

15

of such dispute it is determined that any of the amount in dispute is due and owing, such amount(s) shall bear interest at the Overdue Rate from the date originally due until paid. In no event shall any statement or invoice be subject to dispute beyond two (2) years from the date of such statement or invoice.

**Section 6.4     Audit.**

Each Party shall have the right, upon reasonable advance Notice, during normal business hours and not more than two (2) times per Contract Year, at its sole expense and either itself or through its representatives, to audit the books and records of the other Party, at the place where such books and records are ordinarily kept, to the extent reasonably necessary to verify the accuracy of any statement, charge, payment or computation made pursuant to this Agreement, and any such audit must be completed within ninety (90) days of the Notice to the other Party. In the event that an audit is performed, any subsequent audit performed may cover only a time period not covered by a previous audit.  In no event shall any statement or invoice be subject to audit beyond two (2) years from the date of such statement or invoice.

**Section 6.5     Taxes.**

Producer shall pay any and all Taxes levied on Crude Oil.  In the event a Party  is required to pay any Tax for which the other Party is responsible hereunder, the responsible Party shall reimburse the paying Party for the same per invoice provided by the paying Party.  Each Party shall indemnify, defend and hold harmless the other Party from and against any and all Claims and Losses arising out of or related to Taxes for which the indemnifying Party is responsible hereunder.

**ARTICLE VII**

**INDEMNIFICATION**

Section 7.1    Indemnification.

EXCEPT WHERE OTHERWISE SPECIFICALLY PROVIDED HEREIN, EACH OF PRODUCER AND PRODUCER GROUP, ON THE ONE HAND, AND GATHERER AND GATHERER GROUP, ON THE OTHER HAND, SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS THE OTHER PARTY AND ITS RESPECTIVE PRODUCER GROUP OR GATHERER GROUP, AS THE CASE MAY BE, FROM AND AGAINST ANY AND ALL CLAIMS OF THIRD PARTIES AGAINST THEM, OR DAMAGES SUSTAINED OR INCURRED BY THEM AS A RESULT OF SUCH CLAIMS BY THIRD PARTIES, TO THE EXTENT CAUSED BY THE NEGLIGENCE OR WILLFUL MISCONDUCT OF THE INDEMNIFYING PARTY OR ITS RESPECTIVE PRODUCER GROUP OR GATHERER GROUP, AS THE CASE MAY BE, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR THE INDEMNIFYING PARTY'S BREACH OF THIS AGREEMENT.  THIS PROVISION SHALL NOT BE CONSTRUED TO RELIEVE ANY INSURER OF ITS OBLIGATION TO PAY CLAIMS CONSISTENT WITH THE PROVISIONS OF A VALID INSURANCE POLICY.  A PERSON SEEKING INDEMNITY SHALL FIRST SEEK RECOVERY UNDER ANY APPLICABLE INSURANCE POLICY, AND ANY INDEMNITY OBLIGATION OWED HEREUNDER

16

SHALL BE REDUCED BY THE AMOUNT OF ALL INSURANCE PROCEEDS ACTUALLY RECEIVED BY THE INDEMNIFIED PARTY.

**Section 7.2     Notification Obligation.**

The Person entitled to indemnification under Section 7.1 above (the "***Indemnified Party***") shall promptly notify the Party providing indemnity (the "***Indemnifying Party***") of any Claim, and the Indemnifying Party shall have the right to assume the investigation and defense of the Claim, including employing legal counsel of its choice. If the Indemnifying Party does not promptly assume the investigation and defense of the Claim, the Indemnified Party may do so, including employing legal counsel of its choice, at the Indemnifying Party's expense. If the Indemnifying Party assumes the defense of a claim, the Indemnified Party shall nevertheless have the right to employ, at its sole expense, separate legal counsel and participate in the defense of the Claim, *provided* that control over the process and authority to compromise the Claim shall vest solely in the Indemnifying Party.

## ARTICLE VIII
## FORCE MAJEURE

**Section 8.1     Force Majeure.**

"***Force Majeure***" shall mean any event or circumstance or combination of events or circumstances (each, a "***Force Majeure Event***") that adversely affects or prevents any Party from performing its obligations in accordance with the terms of this Agreement, but only if and to the extent that such events and circumstances are not within the affected Party's reasonable

control.  Force Majeure events shall include act of God, fire, storm of an unusual or extraordinary nature, flood, hurricane, tornado, earthquake, epidemic or other natural disaster, action, delay or inaction of any Governmental Authority, war, invasion, emergency, embargo, sanction, sabotage, insurgency, terrorism, civil war, riot or insurrection of any kind, labor strike, loss of electricity supply, failure of any pipelines or other means of transportation, inability to obtain rights-of-way after the use of commercially reasonable efforts; *provided* that the following shall not constitute a Force Majeure Event: (i) failure to obtain or retain, or a delay in obtaining, any Governmental Approval necessary for performance under this Agreement that was the result of action or inaction by the Party responsible for obtaining such Governmental Approval, or a result of failure to timely apply for any such Governmental Approval, (ii) market conditions for Crude Oil or refined products therefrom, (iii) the inability to obtain a favorable price for or to buy or sell Crude Oil or refined products therefrom, or (iv) economic hardship.  Any obligation of either Party under this Agreement shall be excused only to the extent that the Party's inability to perform is caused by Force Majeure. Each Party shall use all Reasonable Efforts to cure, minimize, mitigate or remedy the effects of Force Majeure.  Notwithstanding that Force Majeure may otherwise exist, a Force Majeure Event shall not excuse or delay the payment of money when due by any Party.

17

## ARTICLE IX
## DEFAULT AND TERMINATION

**Section 9.1     Producer Events of Default.**

A "***Producer Event of Default***" shall be deemed to have occurred if (i) Producer becomes bankrupt or insolvent or takes any corporate action or other steps towards liquidation, winding up, dissolution, reorganization or amalgamation of Producer, making of any bankruptcy administration order, or appointment of a receiver, administrator, trustee or similar officer over all or any material part of the revenues, assets or business of Producer; (ii) an order is made for the winding up, dissolution or liquidation of Producer, or any analogous or equivalent proceedings by whatever name are undertaken in whatever jurisdiction; (iii) Producer is generally unable to pay its debts as they become due, or Producer stops, suspends or threatens to stop or suspend payment of all or a material part of its debts or makes a general assignment of its assets for the benefit of its creditors; or (iv) Producer is in breach of its material obligations under this Agreement, and Producer fails to cure such breach within 30 days following Producer's receipt of a Notice from Gatherer to Producer to remedy such event or condition, or if a remedy cannot be effected within such 30 day period, a period of 60 days, *provided* that Producer has commenced to remedy within such 30 day period and has diligently pursued such remedy during the extended period, and *provided further*, that in no event shall the period to cure a breach of an obligation to pay money be more than 10 days total.

**Section 9.2     Gatherer's Default Remedies Against Producer.**

If a Producer Event of Default shall have occurred and be uncured and continuing, and

002067

without prejudice to any other of Gatherer's rights under this Agreement, Gatherer shall have the right to terminate this Agreement upon Notice to Producer.

**Section 9.3    Gatherer Events of Default.**

A "***Gatherer Event of Default***" shall be deemed to have occurred if (i) Gatherer becomes bankrupt or insolvent or takes any corporate action or other steps towards liquidation, winding up, dissolution, reorganization or amalgamation of Gatherer, making of any bankruptcy administration order, or appointment of a receiver, administrator, trustee or similar officer over all or any material part of the revenues, assets or business of Gatherer; (ii) an order is made for the winding up, dissolution or liquidation of Gatherer, or any analogous equivalent proceedings by whatever name are undertaken in whatever jurisdiction; (iii) Gatherer is generally unable to pay its debts as they become due, or Gatherer stops, suspends or threatens to stop or suspend payment of all or a material part of its debts or makes a general assignment of its assets for the benefit of its creditors; or (iv) Gatherer is in breach of any of its material obligations under this Agreement, and Gatherer fails to cure such breach within 30 days following Gatherer's receipt of a Notice from Producer to Gatherer to remedy such event or condition, or if a remedy cannot be effected within such 30 day period, a period of 60 days, *provided* that Gatherer has commenced to remedy within such 30 day period and diligently pursued such remedy during the extended period, *provided further* that in no event shall the period to cure a breach of an obligation to pay money be more than 10 days total.

18

**Section 9.4    Producer's Default Rights Against Gatherer.**

Except where a specific remedy has been set forth herein, if a Gatherer Event of Default shall have occurred and be uncured and continuing, and without prejudice to any other of Producer's rights under this Agreement, Producer shall have the right to terminate this Agreement upon Notice to Gatherer.

**ARTICLE X**
**LIMITATION OF LIABILITY**

**Section 10.1    Limitation of Liability.**

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL, PUNITIVE OR EXEMPLARY DAMAGES OF ANY TYPE, INCLUDING LOST PROFITS OR LOSS OF BUSINESS OPPORTUNITY, IN CONTRACT OR TORT (INCLUDING NEGLIGENCE, JOINT OR SEVERAL, OR STRICT LIABILITY) ARISING OUT OF THIS AGREEMENT, *PROVIDED* THAT THIS LIMITATION SHALL NOT APPLY TO ANY INDEMNITY OBLIGATION SET FORTH HEREIN.

**ARTICLE XI**
**MISCELLANEOUS**

**Section 11.1    Assignment.**

002069

Neither Party may assign this Agreement without the express written consent of the other

Party, which consent shall not be unreasonably withheld, conditioned or delayed.

**Section 11.2   Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury Trial.**

(a)    THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF OKLAHOMA, EXCLUDING ANY CONFLICTS OF LAWS PROVISIONS CALLING FOR APPLICATION OF THE LAWS OF ANOTHER STATE.

(b)    EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE SOLE AND EXCLUSIVE JURISDICTION OF THE STATE OR FEDERAL COURTS IN HARRIS COUNTY, TEXAS, AND EACH OF THE PARTIES IRREVOCABLY WAIVES ANY OBJECTION TO THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS.

(c)    TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY IRREVOCABLY WAIVES ITS RIGHT TO A TRIAL BY JURY, AND CONSENTS TO A BENCH TRIAL BY A TRIAL COURT JUDGE, IN RESPECT OF ANY LITIGATION ARISING OUT OF THIS AGREEMENT AND ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT FOR EACH OF THE PARTIES IN ENTERING INTO THIS AGREEMENT.

19

**Section 11.3    Dispute Resolution.**

All controversies, disputes or Claims between Producer and Gatherer arising out of or in any way relating to this Agreement (each, a "***Dispute***") shall be resolved pursuant to the procedures of this Section 11.3.

(a)    If a Dispute arises between the Parties regarding their respective rights and obligations under this Agreement, the Parties shall use commercially reasonable efforts to reach a reasonable resolution of the Dispute informally.  Initially, the responsible Persons shall attempt to resolve the Dispute themselves. If they are unable to resolve the Dispute within 10 days, then either Party may, by Notice, refer the Dispute to the senior management of the Parties for resolution. If senior management of the Parties are unable to resolve the Dispute within 10 days of such Notice, the provisions of subsection (b) below shall apply.

(b)    Any Dispute not otherwise resolved under subsection (a) above may be submitted by either Party to a court proceeding filed in accordance with Applicable Law in any court having jurisdiction over the Parties and the subject matter.

**Section 11.4    Notices.**

Any notice, request, demand, statement, payment or bill provided for in this Agreement, or any notice which a Party may desire to give to the other (each, a "***Notice***"), must be in writing and will be deemed duly made when (i) delivered personally, (ii) upon delivery by the U.S. Postal Service, certified mail with return receipt, (iii) upon delivery by a recognized overnight

courier service with return receipt, or (iv) upon receipt by the directed recipient when transmitted by electronic means, to the address shown on Schedule 11.4.

### Section 11.5   Survival.

The provisions of this Agreement shall survive expiration or termination thereof for so long as necessary to give effect to the rights and obligations of the Parties hereunder, but in no event exceeding any applicable statutes of limitation.

### Section 11.6   No Joint Venture.

Nothing in this Agreement shall create an association, joint venture or partnership between the Parties or impose any partnership obligation or partnership liability on any Party. Neither Party shall have any right, power or authority to enter into any agreement or commitment or act on behalf of or otherwise bind the other Party without such Party's prior written consent.

### Section 11.7   Entire Agreement.

This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and there are not any oral or written understandings, representations or commitments of any kind, express or implied, which are not expressly set out herein. No modification of this Agreement shall be effective unless in writing and executed by the Parties.

20

This Agreement supersedes any prior agreements of the Parties concerning the subject matter hereof.

**Section 11.8    No Third Party Beneficiaries.**

This Agreement is for the sole and exclusive benefit of the Parties, and does not stipulate any benefit in favor of any third parties.

**Section 11.9    Confidentiality.**

Any information belonging to a Party that is confidential and disclosed to the other Party in the course of performance of this Agreement or has been disclosed during the negotiations leading up to this Agreement, including the Agreement itself (collectively, the "***Confidential Information***"), shall be held in confidence and shall not be disclosed to others without the written approval of the disclosing Party. Confidential Information is not information that (i) is already known to the receiving Party at the time of disclosure by the disclosing Party (ii) is now or hereafter becomes available within the public domain other than as a result of a breach of this Agreement, (iii) is received by a Party from a Person under no obligation to keep the Confidential Information confidential, or (iv) is independently developed by a Party without reliance on Confidential Information. A Party shall have the right to disclose Confidential Information without the consent of the disclosing Party to its Lenders, counsel, advisors, consultants, accountants, auditors, officers, directors, members, shareholders and other Persons of responsibility who have a need to know the Confidential Information, *provided* that such Persons agree to keep the Confidential Information confidential, and that the Party shall be responsible for any breaches of this confidentiality obligation by such Persons. A Party shall

also have the right to disclose Confidential Information without the consent of the disclosing Party in connection with a subpoena, interrogatory, request for production, civil investigative demand or other such legal process issued by any court or administrative, legislative, investigative or regulatory body, but only to the extent necessary to fully respond thereto and after providing prior Notice to the disclosing Party.  Upon the reasonable request of the disclosing Party, the receiving Party shall, in its sole discretion, either return the Confidential Information or destroy it, *provided* that the receiving Party may retain a copy of Confidential Information as necessary to comply with Applicable Law.

### Section 11.10  Regulatory Matters.

(a)    Gatherer has informed Producer, and Producer hereby acknowledges and accepts, that the Crude Gathering System will be an intrastate pipeline system operating only within the State of Oklahoma, and is not intended to be subject to regulation under any Applicable Law by FERC. Accordingly, as a principal condition to, and in consideration for, the execution of this Agreement by Gatherer, Producer represents, warrants and covenants that (i) none of Producer's Committed Crude delivered hereunder has been or will be dedicated to or delivered in interstate commerce, (ii) at the time Producer's Committed Crude is delivered at the Receipt Points, Producer shall not have identified any destination for Producer's Committed Crude which is outside the State of Oklahoma and Producer does not intend to deliver any of Producer's Committed Crude to be sold, transported or otherwise moved outside the State of Oklahoma, (iii) all of

21

Producer's Committed Crude delivered to Gatherer under this Agreement shall be produced in the State of Oklahoma, and (iv) Producer's Committed Crude delivered hereunder is not intended to be transported or sold in interstate commerce in any manner which will subject the Crude Gathering System to regulation by FERC. In the event that Producer breaches its representation, warranty and covenant contained in this Section 11.10(a), Gatherer, in addition to all other remedies at law or in equity, shall have the right, upon delivery of written notice to Producer, to refuse receipt of Producer's Committed Crude which has caused a breach of such representation, warranty and covenant. Gatherer's election to refuse receipt of any of Producer's Committed Crude pursuant to this Section 11.10(a) shall not release Producer from any obligation to indemnify Gatherer for such breach under Article VII.

(b)      If any federal or state statute, regulation, or order by a court of law or Governmental Authority directly or indirectly (a) prohibits performance under this Agreement, (b) makes such performance illegal or impossible, or (c) effects a change in a substantive provision of this Agreement that has a significant material adverse impact upon the performance of either Party's obligations under this Agreement, including without limitation the imposition of terms, conditions, or rate restrictions, then the Parties will use all reasonable efforts to revise the Agreement and any other ancillary agreement to the extent necessary so that: (i) performance under the Agreement is no longer prohibited, illegal, impossible, or is no longer impacted in a material adverse fashion, and (ii) this Agreement and any other ancillary agreement is revised in a manner that preserves, to the maximum extent possible, the respective positions of the Parties. Without liability for its failure to do so, each Party will use reasonable efforts to

002075

provide notice to the other Party as to any proposed law, regulations or any regulatory proceedings or actions that could affect the rights and obligations of the Parties. If the Parties are unable to revise the Agreement in accordance with the above within ninety (90) Days following the adoption of any such law, regulation or order of a Governmental Authority, then the Party whose performance is prohibited, illegal, impossible or is impacted in a material adverse fashion will have the right, at its sole discretion, to terminate this Agreement upon written notice to the other Party.

**Section 11.11  Execution in Counterparts.**

This Agreement may be executed in counterparts, including by electronic transmission, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement.

[Signature Page Next Page]

22

002076

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed in duplicate originals by its duly authorized officer as of the Effective Date.

**PRODUCER**

**OKLAHOMA ENERGY ACQUISITIONS, LP**

By: Alta Mesa GP, LLC, its general partner

By: _____

Harlan H. Chappelle, Manager

002077

Signature page to Crude Oil Gathering Agreement

**GATHERER**

**KINGFISHER MIDSTREAM, LLC**, a Delaware
limited liability company

By:  HMS KINGFISHER HOLDCO, LLC,
Authorized Member

By: _____
Name:   Harlan H. Chappelle
Title:  President and Chief Executive Officer

Signature Page to Crude Oil Gathering Agreement

**SCHEDULE 3.3**
to
**CRUDE OIL GATHERING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**DEDICATED AREA**

**[See Attached]**

002081





Blaine, Canadian,
Garifield, Kingfisher,
Logan Counties

SCHEDULE 3.4
to
CRUDE OIL GATHERING AGREEMENT
Dated August 31, 2015
by and between
OKLAHOMA ENERGY ACQUISITIONS, LP
and
KINGFISHER MIDSTREAM LLC

FORM OF
MEMORANDUM OF CRUDE OIL GATHERING AGREEMENT

| | |
|---|---|
| **STATE OF OKLAHOMA** | § |
| | § |
| **COUNTIES OF KINGFISHER,** | § |
| **LOGAN, CANADIAN, BLAINE** | § |
| **AND GARFIELD** | § |

       This **Memorandum of Crude Oil Gathering Agreement** (this "***Memorandum***") is made and entered into this __ day of _____, 2015, by and between Oklahoma Energy Acquisitions, LP, a Texas limited partnership located at 15021 Katy Freeway, Suite 400, Houston, TX 77094, Attn: Michael A. McCabe ("***Producer***"), and Kingfisher Midstream LLC, a

002084

Delaware limited liability company located at 20329 State Highway 249, Suite 450, Houston, TX 77070, Attn: Paul Williams ("*Gatherer*").

Case 4:24-cv-04092    Document 4-9    Filed on 11/21/24 in TXSD    Page 231 of 582

**WHEREAS**, Producer and Gatherer have entered into a Crude Oil Gathering Agreement (the "*Agreement*") dated the 31st day of August, 2015 (the "*Effective Date*"); and

**WHEREAS**, Producer and Gatherer desire to file this Memorandum to provide record notice of the Agreement.

1.    **Dedication**.

(a)  For the Primary Term of the Agreement, Producer has dedicated to Gatherer all of Producer's Interests within the Dedicated Area shown on Exhibit A attached hereto (the "*Primary Term Dedication*") and shall deliver to Gatherer at the Receipt Point(s) all Committed Crude produced therefrom. If, after the Effective Date of the Agreement and before the end of the Primary Term, Producer or any of its Affiliates acquire mineral interests within the Dedicated Area (the "*After-Acquired Interests*"), then the After-Acquired Interests and all Crude Oil produced therefrom shall automatically be included in the Primary Term Dedication and become Committed Crude; *provided, however*, if any of the After-Acquired Interests or Crude Oil produced therefrom are subject to a prior written dedication or commitment for gathering as of the time of acquisition by Producer, then that Crude Oil will be excluded from the Primary Term Dedication until the prior dedication or commitment terminates or expires, at which time such Crude Oil shall become Committed Crude,

*provided further* that if, with respect to any After-Acquired Interests, Producer has the right or ability, without payment of any material fee or penalty, or incurring any other material disadvantage, to terminate any such prior dedication or commitment with respect to the After-Acquired Interests, then Producer shall terminate such dedication or commitment as soon as reasonably practicable. Producer shall promptly notify Gatherer in writing of any such termination, and identify the After-Acquired Interests.

(b) For the Extended Term of the Agreement, Producer has dedicated to Gatherer all of the wells that constitute Interests and are connected to the Crude Gathering System at the end of the Primary Term (such wells, "***Dedicated Wells***", and such dedication, the "***Extended Term Dedication***") and shall deliver to Gatherer at the Receipt Point(s) all Committed Crude produced therefrom. From and after the end of the Primary Term all Interests within the Dedicated Area shown on Exhibit A attached hereto other than the Dedicated Wells shall be permanently released from the Dedication.

2.    **Term**. The Agreement shall commence as of the Effective Date, and shall remain in full force and effect for fifteen (15) years after the In-Service Date (the "***Primary Term***"), *provided, however*, that, to the extent that at the end of the Primary Term there are wells then-connected to the Crude Gathering System and then-producing Crude Oil in commercial (paying) quantities, the Term of the Agreement shall extend for so long as such well(s) continue to produce Crude Oil in commercial (paying) quantities (the "***Extended Term***").

3.    **Incorporation of Agreement and Effect of Memorandum**. The sole purpose of this Memorandum is to give notice of the existence of the Agreement. This Memorandum shall not modify in any manner any of the terms and conditions of the Agreement, and nothing in this

Memorandum is intended to and shall not be used to interpret the Agreement.  The provisions of the Agreement are hereby incorporated into this Memorandum as if set out fully herein.  In the event of any conflict between the terms of this Memorandum and the terms of the Agreement, the terms of the Agreement shall govern and control for all purposes.

    **4.**    **Defined Terms**.  All capitalized terms not defined herein shall have the same meaning assigned such terms in the Agreement.

[Signature pages follow]

      **IN WITNESS WHEREOF**, this Memorandum is executed by Producer and Gatherer as of the date of acknowledgement of their signatures, but is effective for all purposes as of the Effective Date stated above.

**PRODUCER:**

**OKLAHOMA ENERGY ACQUISITIONS, LP**

By: _____
Name: _____
Title: _____

STATE OF TEXAS                                    §
                                                              §
COUNTY OF HARRIS                               §

This instrument was acknowledged before me this ___ day of August, 2015 by_____
_____, the _____of Oklahoma Energy Acquisitions, LP, a Texas limited partnership, on behalf of said limited partnership.

In witness whereof I hereunto set my hand and official seal.

002088

NOTARIAL SEAL:                                    _____
                                                              Notary Public in and for the

Notary Public in and for the
State of Texas

My Commission Expires: _____
Commission No.: _____

002089

**GATHERER:**

**KINGFISHER MIDSTREAM, LLC**

**By: HMS KINGFISHER HOLDCO, LLC,**
    **Authorized Member**

    **By:** _____
    **Name:** _____
    **Title:** _____

STATE OF TEXAS                   §
                                                §
COUNTY OF HARRIS            §

This instrument was acknowledged before me this ___ day of August, 2015 by _____ _____, the _____ of HMS Kingfisher HoldCo, LLC,  a Delaware limited liability company, authorized member of Kingfisher Midstream, LLC, a Delaware limited liability company, on behalf of said limited liability company.

In witness whereof I hereunto set my hand and official seal.

002090

NOTARIAL SEAL

NOTARIAL SEAL:

_____

Notary Public/in and for the
State of Texas

My Commission Expires: _____

Commission No.: _____

**SCHEDULE 3.9**
to
**CRUDE OIL GATHERING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**Receipt Points**

| Operator | Receipt Point Name | Unit | Location |
|----------|--------------------|------|----------|
| Alta Mesa | Lincoln CRP Manifold 1 | Lincoln | T 18N R 6W NE ¼ Section 34 |
| Alta Mesa | Lincoln CRP Manifold 2 | Lincoln | T 17N R 6W NE ¼ Section 3 |
| Alta Mesa | Lincoln CRP Manifold 2A | Lincoln | T 17N R 6W NE ¼ Section 10 |
| Alta Mesa | Lincoln CRP Manifold 3 | Lincoln | T 17N R 6W SE ¼ Section 10 |
| Alta Mesa | Lincoln CRP Manifold 4 | Lincoln | T 18N R 6W NE ¼ Section 36 |
| Alta Mesa | Lincoln CRP Manifold 5 | Lincoln | T 18N R 6W SE ¼ Section 36 |
| Alta Mesa | Lincoln CRP Manifold 7 | Lincoln | T 17N R 5W NW ¼ Section 7 |

002092

| | | | |
|---|---|---|---|
| Alta Mesa | Lincoln CRP Manifold 8 | Lincoln | T 18N R 5W NE ¼ Section 32 |
| Alta Mesa | Lincoln CRP Manifold 9 | Lincoln | T 18N R 5W NW ¼ Section 34 |
| Alta Mesa | Lincoln CRP Manifold 11 | Lincoln | T 18N R 5W SW ¼ Section 33 |
| Alta Mesa | Lincoln CRP Manifold 10 | Lincoln | T 18N R 5W SE ¼ of SW ¼ Section 33 |
| Alta Mesa | Lincoln CRP Manifold 11A | Lincoln | T 17N R 5W SW ¼ Section 4 |
| Alta Mesa | Lincoln CRP Manifold 12 | Lincoln | T 17N R 5W SE ¼ of SW ¼ Section 8 |
| Alta Mesa | Lincoln CRP Manifold 13 | Lincoln | T 17N R 5W NW ¼ Section 20 |
| Alta Mesa | Lincoln CRP Manifold 14 | Lincoln | T 17N R 5W SW ¼ Section 16 |
| Alta Mesa | Lincoln CRP Manifold 15 | Lincoln | T 17N R 5W NE ¼ Section 29 |
| Alta Mesa | Lincoln CRP Manifold 16 | Lincoln | T 17N R 5W SE ¼ Section 22 |
| Alta Mesa | Lincoln CRP Manifold 17 | Lincoln | T 17N R 5W SE ¼ Section 29 |
| Alta Mesa | Lincoln CRP Manifold 18 | Lincoln | T 17N R 5W SW ¼ Section 29 |

| Alta Mesa Section 9 | South of Lincoln CRP Manifold 1 | South of Lincoln | T 17N R 6W NE ¼ |
|---|---|---|---|
| Alta Mesa Section 8 | South of Lincoln CRP Manifold 2 | South of Lincoln | T 17N R 6W NW ¼ |
| Alta Mesa Section 16 | South of Lincoln CRP Manifold 3 | South of Lincoln | T 17N R 6W SE ¼ |
| Alta Mesa Section 20 | South of Lincoln CRP Manifold 4 | South of Lincoln | T 17N R 6W NW ¼ |
| Alta Mesa Section 26 | South of Lincoln CRP Manifold 5 | South of Lincoln | T 17N R 6W SE ¼ |
| Alta Mesa Section 26 | South of Lincoln CRP Manifold 6 | South of Lincoln | T 17N R 6W NE ¼ |
| Alta Mesa Section 34 | South of Lincoln CRP Manifold 7 | South of Lincoln | T 17N R 6W NW ¼ |
| Alta Mesa Section 32 | South of Lincoln CRP Manifold 8 | South of Lincoln | T 17N R 6W NW ¼ |
| Alta Mesa Section 4 | South of Lincoln CRP Manifold 9 | South of Lincoln | T 16N R 5W NE ¼ |

002094

Alta Mesa    South of Lincoln CRP Manifold 10   South of Lincoln      T 16N  5W SW ¼

Section 5

| Alta Mesa Section 8 | South of Lincoln CRP Manifold 11 | South of Lincoln | T 16N R 5W SE ¼ |
| --- | --- | --- | --- |
| Alta Mesa Section 9 | South of Lincoln CRP Manifold 12 | South of Lincoln | T 16N R 5W NE ¼ |
| Alta Mesa Section 26 | South of Lincoln CRP Manifold 13 | South of Lincoln | T 17N R 5W SE ¼ |
| Alta Mesa Section 2 | South of Lincoln CRP Manifold 14 | South of Lincoln | T 16N R 5W SE ¼ |
| Alta Mesa | CRP Manifold NofL-4 | North of Lincoln | T 18N R 5W NW ¼ Section 30 |
| Alta Mesa | CRP Manifold NofL-5 | North of Lincoln | T 18N R 5W NW ¼ Section 18 |
| Alta Mesa | CRP Manifold NofL-6 | North of Lincoln | T 18N R 6W NE ¼ Section 1 |
| Alta Mesa | CRP Manifold NofL-7 | North of Lincoln | T 18N R 5W SE ¼ Section 17 |
| Alta Mesa | CRP Manifold NofL-8 | North of Lincoln | T 18N R 5WNE ¼ Section 8 |

| | | | |
|---|---|---|---|
| Alta Mesa | CRP Manifold NofL-9 | North of Lincoln | T 18N R 5W SW ¼ Section 14 |
| Alta Mesa | CRP Manifold NofL-10 | North of Lincoln | T 18N R 5W NE ¼ Section 10 |
| Alta Mesa | CRP Manifold NofL South-1 | North of Lincoln | T 18N R 5W NE ¼ Section 35 |
| Alta Mesa | CRP Manifold NofL South-2 | North of Lincoln | T 17N R 5W SE ¼ Section 2 |
| Alta Mesa | CRP Manifold NofL South-3 | North of Lincoln | T 17N R 5W SW ¼ Section 13 |

**SCHEDULE 3.10(a)**
**to**
**CRUDE OIL GATHERING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**FORM OF NOTICE**
**FOR**
**DESIGNATION OF ADDITIONAL RECEIPT POINT**

1.    Operator Contact Name    _____

2.    Phone Numbers    _____

3.    E-Mail    _____

4.    Well and Pad Name    _____

5.    County/Township    _____

002098

6.    Requested Turn on Date _____

7.    Number of Wells _____

8.    Projected Initial Volume (bbl/d) _____

9.    Requested GPS of:

      a.    Wellhead (if applicable)                ___ ° ___ ' ___ '' - ___ ° ___ ' ___ ''

      b.    CRP (if applicable)                     ___ ° ___ ' ___ '' - ___ ° ___ ' ___ ''

      c.    Receipt Point Meter              ___ ° ___ ' ___ '' - ___ ° ___ ' ___ ''

10.    Surface site provided by Producer or Gatherer _____

11.    Planned flow into new Receipt Point or existing Receipt Point _____

12.    Producer or Gatherer to Connect _____

13.    Estimated Spud and Completion dates _____

**SCHEDULE 4.4(a)**
to
**CRUDE OIL GATHERING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**SCHEMATIC OF DELIVERY POINT**

002101

Outlet flange of transfer meter

**Deliver**

Trucking Delivery Point FOB



Demarcation

Producer Takes Delivery

Kingfisher M (installed an

002102

**ery Point Plan View**



Storage Facility

Midstream System
d owned by Gatherer)

## SCHEDULE 4.5(a)
to
## CRUDE OIL GATHERING AGREEMENT
Dated August 31, 2015
by and between
## OKLAHOMA ENERGY ACQUISITIONS, LP
and
## KINGFISHER MIDSTREAM LLC

## MEASUREMENT, EQUIPMENT AND TESTING

A.    Any terms capitalized in this Schedule shall have the meaning set forth herein, or as indicated by the context, or as set forth in the body of the Agreement.

B.    Measurement.  Producer shall own, operate and maintain control and custody of any measurement point at the CRP and shall measure or cause to be measured all Crude Oil delivered hereunder in accordance with industry standards using measurement facilities at the CRP.  Quantities, quality and gravities of Crude Oil delivered hereunder shall be determined in accordance with generally accepted industry practices in effect at the time and place of delivery, using the latest test methods and standards from ASTM International and the API Manual of Petroleum Measurement Standards.  Gatherer shall be given reasonable prior Notice of any measurement or testing to be made hereunder by Producer or its representative.  Gatherer may have a representative present to witness all measurement and testing by Producer or its representative, but in the absence of a Gatherer representative, the measurement and testing as

002104

made by Producer or its representative shall be accepted and considered as correct absent manifest error. For pricing purposes only, unless otherwise specified in this Agreement, all Crude Oil received hereunder during any month shall be considered to have been received in equal daily quantities during such month.

C.    Calibration.   At least semi-annually or as otherwise may be required by Applicable Laws, Producer or Producer's designee shall verify the calibration of all of its meters at the CRP. With respect to any test made hereunder, a result within plus or minus one quarter of one percent (0.25%) of the previous meter calibration shall be considered correct.

D.    Corrections.   If upon calibration the result exceeds plus or minus one quarter of one percent (0.25%) of the previous meter calibration, then any previous recording of such equipment shall be corrected for any period which is known or agreed upon, but in case the period is not known or agreed upon, such correction shall apply to one-half (1/2) the total volume measured since the date of the last calibration. However, the period for this correction shall not exceed ninety (90) days.

**SCHEDULE 4.6**
**to**
**CRUDE OIL GATHERING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**SPECIFICATIONS**

      A.      Any terms capitalized in this Schedule shall have the meaning set forth herein, or as indicated by the context, or as set forth in the body of the Agreement.

      B.      Gatherer may, from time to time, and without Notice to Producer, test Producer's Crude Oil for the purpose of confirming whether it conforms to the Specifications.  Crude Oil delivered by Producer to Gatherer hereunder shall comply with the more stringent of (1) the requirements of any receiving transporter, (2) the requirements of any Applicable Laws or Governmental Authority, and (3) the following specifications: (a) be merchantable, of a quality acceptable to receiving transporters, in its natural produced state after normal oilfield separation and treating, and commercially free of dirt, sediment and chemicals foreign to virgin Crude Oil including chlorinated and/or oxygenated hydrocarbons, lead and hazardous or industrial wastes, (b) not contain more than

003106

as determined by the average of the representative samples; and (c) have a Reid Vapor Pressure of not more than ███████

C.    IF PRODUCER DELIVERS CRUDE THAT DOES NOT CONFORM TO THE FOREGOING SPECIFICATIONS, PRODUCER WILL BE RESPONSIBLE FOR ALL LIABILITY AND COSTS INCURRED BY GATHERER WITH RESPECT TO THE NON-CONFORMING CRUDE, INCLUDING WITHOUT LIMITATION, COSTS TO DISPOSE OF THE NON-CONFORMING CRUDE, AND COSTS TO REMOVE ANY CONTAMINATION FROM GATHERER'S CRUDE SYSTEM. GATHERER IS UNDER NO OBLIGATION TO ACCEPT SUCH NON-CONFORMING CRUDE, AND GATHERER'S NON-ACCEPTANCE OF NON-CONFORMING CRUDE SHALL NOT BE CONSIDERED A FAILURE OF GATHERER TO RECEIVE COMMITTED CRUDE, NOR SHALL SUCH NON-ACCEPTANCE BY GATHERER BE CONSIDERED AN EVENT OF FORCE MAJEURE, AS DEFINED HEREIN, SUFFICIENT TO RELIEVE PRODUCER OF ITS PERFORMANCE OBLIGATIONS UNDER THE AGREEMENT.

**SCHEDULE 11.4**
**to**
**CRUDE OIL GATHERING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**NOTICES**

**GATHERER:**

Notices & Correspondence:

    Kingfisher Midstream LLC
    c/o Asset Risk Management, LLC
    20329 State Highway 249, Suite 450
    Houston, TX 77070
    Attention: Paul Williams
    Phone: 281-655-3234
    Email: pwilliams@asset-risk.com

002108

Scheduling Department:

Kingfisher Midstream LLC
c/o Asset Risk Management, LLC
20329 State Highway 249, Suite 450
Houston, TX 77070
Attention: Oil Scheduling David Puglia
Phone: 281-655-3216
Email: dpuglia@asset-risk.com

Accounting Matters:

    Kingfisher Midstream LLC
    c/o Asset Risk Management, LLC
    20329 State Highway 249, Suite 450
    Houston, TX 77070
    Attention: Oil Accounting Mamata Sharma
    Phone: 281-655-3221

Payment by ACH:



[Continued on next page]

**PRODUCER:**

Notices & Correspondence:

    Oklahoma Energy Acquisitions, LP
    c/o Alta Mesa Services, LP
    15021 Katy Freeway
    Suite 400
    Houston, TX 77094
    Attn: David McClure
    Phone: 281-530-0991
    Facsimile: 281-530-5278
    Email: dmcclure@altamesa.net

Billing:

    Oklahoma Energy Acquisitions, LP
    c/o Alta Mesa Services, LP
    15021 Katy Freeway
    Suite 400
    Houston, TX 77094
    Attn: Michael A. McCabe
    Phone: (281) 530-0991
    Facsimile: (281) 530-5278
    Email: mmccabe@altamesa.net

002110

Bank:                Union Bank (MUFG)

Account Name:    Alta Mesa Services LP Funding Account

CONFIDENTIAL

AMRAP-1450419
AMRBK-0019432

002111

# EXHIBIT 3

*Dunn v. HPS Investment Partners, LLC, et al.*
Adv. Pro. No. 21-03909
First Amended Complaint
Exhibit 3
GGA Payments

| Payment Date | Payment Amount |
|---|---:|
| January 2016 | $41,847.59 |
| February 2016 | $36,704.24 |
| March 2016 | $30,180.71 |
| April 2016 | $39,880.94 |
| May 2016 | $43,218.27 |
| June 2016 | $1,010,275.34 |
| July 2016 | $1,482,788.28 |
| August 2016 | $1,998,518.97 |
| September 2016 | $1,730,535.86 |
| October 2016 | $2,318,415.33 |
| November 2016 | $2,803,952.29 |
| December 2016 | $2,808,710.75 |
| January 2017 | $2,208,318.10 |
| February 2017 | $2,214,293.48 |
| March 2017 | $2,653,495.50 |
| April 2017 | $2,666,530.30 |
| May 2017 | $2,935,518.53 |
| June 2017 | $2,936,756.47 |
| July 2017 | $3,102,627.44 |
| August 2017 | $3,427,240.55 |
| September 2017 | $3,053,860.57 |
| October 2017 | $0.00 |
| November 2017 | $0.00 |
| December 2017 | $0.00 |
| January 2018 | $4,107,701.76 |
| February 2018 | $3,972,386.26 |
| March 2018 | $4,344,507.60 |
| April 2018 | $4,378,879.19 |
| May 2018 | $4,652,526.84 |
| June 2018 | $4,639,606.77 |
| July 2018 | $5,472,912.75 |
| August 2018 | $5,683,907.33 |
| September 2018 | $6,306,112.56 |
| October 2018 | $6,530,867.17 |
| November 2018 | $6,036,898.50 |
| December 2018 | $6,666,750.92 |
| January 2019 | $6,764,307.16 |
| February 2019 | $6,245,708.50 |
| March 2019 | $0.00 |

002113

| Payment Date | Payment Amount |
|---|---|
| April 2019 | $6,573,442.44 |
| May 2019 | $0.00 |
| June 2019 | $0.00 |
| July 2019 | $6,079,839.29 |
| August 2019 | $6,138,386.27 |
| September 2019 | $6,229,961.54 |
| **TOTAL** | **$140,368,972.36** |

# EXHIBIT 4

002115

**AMENDED AND RESTATED**

**GAS GATHERING AND PROCESSING AGREEMENT**

**Oklahoma Energy Acquisitions, LP**

**and**

**Kingfisher Midstream LLC**

002116

**Effective as of**

**December 1, 2016**

**December 1, 2016**

002117

**TABLE OF CONTENTS**

ARTICLE I  DEFINITIONS AND INTERPRETATION .............................................................2
    Section 1.1    Definitions...........................................................................................2
    Section 1.2    Interpretation.....................................................................................10

ARTICLE II  TERM ...................................................................................................................10
    Section 2.1    Term..................................................................................................10

ARTICLE III  GRANT OF TRANSPORTATION RiGHT ......................................................11
    Section 3.1    Conveyance of Transportation Right ...............................................11
    Section 3.2    Real Interests ...................................................................................11

ARTICLE IV  GATHERING AND PROCESSING SYSTEM ..................................................12
    Section 4.1    Construction of Gathering and Processing System.........................12
    Section 4.2    Easements, Rights-of-Way and Fee Lands ......................................12
    Section 4.3    Dedication ........................................................................................12
    Section 4.4    Covenant Running With Land ..........................................................14
    Section 4.5    Covenant Not to Process Committed Gas........................................14
    Section 4.6    Option to Expand Gathering and Processing System ......................14
    Section 4.7    Title Warranty ..................................................................................15
    Section 4.8    Proceeds of Production ....................................................................16
    Section 4.9    Operating Inventory .........................................................................16
    Section 4.10    Receipt Points .................................................................................16
    Section 4.11    New Receipt Points; Obligation to Interconnect.............................16

002118

Section 4.11    New Receipt Points, Obligation to Interconnect ....................................16
Section 4.12    Additional Wells ..................................................................................18
Section 4.13    Buy-Back Gas .......................................................................................19

ARTICLE V  GAS QUALITY AND PRESSURE.......................................................19
Section 5.1    Measurement, Equipment and Testing ...................................................19
Section 5.2    Specifications.........................................................................................20
Section 5.3    Delivery Pressure ..................................................................................20
Section 5.4    Compression ..........................................................................................20
Section 5.5    Pressure .................................................................................................20

ARTICLE VI  GATHERING, PROCESSING AND DELIVERY ...............................21
Section 6.1    Delivery, Receipt and Processing of Gas and Purchase of Products .........21
Section 6.2    Scheduling and Imbalances....................................................................22
Section 6.3    Exchange of Information ........................................................................23
Section 6.4    Commingling .........................................................................................23
Section 6.5    Allocations .............................................................................................24
Section 6.6    Transfer of Title and Risk of Loss ..........................................................24

ARTICLE VII  SERVICE FEES ...................................................................................25
Section 7.1    Service Fees ...........................................................................................25
Section 7.2    Payment for Other Fuel .........................................................................25
Section 7.3    Escalation...............................................................................................25

i

ARTICLE VIII  PAYMENT ....................................................................................................25
    Section 8.1    Billing ........................................................................................25
    Section 8.2    Payment......................................................................................26
    Section 8.3    Disputed Amounts .....................................................................26
    Section 8.4    Taxes .........................................................................................26
    Section 8.5    Audit ..........................................................................................26

ARTICLE IX  NOTICES........................................................................................................27
    Section 9.1    Notices ......................................................................................27

ARTICLE X  FINANCIAL RESPONSIBILITY ...................................................................27

ARTICLE XI  INDEMNITY ..................................................................................................27
    Section 11.1    Indemnity ..................................................................................27
    Section 11.2    Notification Obligation ..............................................................28

ARTICLE XII  CURTAILMENT AND MAINTENANCE ....................................................28
    Section 12.1    Curtailment and Temporary Release of Gas ............................28
    Section 12.2    Maintenance Events ..................................................................29

ARTICLE XIII  FORCE MAJEURE ......................................................................................29
    Section 13.1    Force Majeure ...........................................................................29

ARTICLE XIV  DEFAULT AND TERMINATION ...............................................................29
    Section 14.1    Producer Events of Default.......................................................29

Section 14.1    Producer Events of Default ......................................................29
Section 14.2    Gatherer's Default Remedies Against Producer ...........................30
Section 14.3    Gatherer Events of Default .......................................................30
Section 14.4    Producer's Default Rights Against Gatherer ...............................30

ARTICLE XV  ASSIGNMENT .......................................................................................31
Section 15.1    Assignment ............................................................................31

ARTICLE XVI  LIMITATION OF LIABILITY ...............................................................31
Section 16.1    Limitation of Liability..............................................................31

ARTICLE XVII  CONFIDENTIALITY ............................................................................31
Section 17.1    Confidentiality .......................................................................31

ARTICLE XVIII  DISPUTE RESOLUTION .....................................................................32
Section 18.1    Dispute Resolution ..................................................................32

ARTICLE XIX  MISCELLANEOUS ..............................................................................32
Section 19.1    Governing Law; Consent to Jurisdiction and Venue; Waiver of
                Jury Trial .............................................................................32
Section 19.2    Survival .................................................................................33
Section 19.3    No Joint Venture ....................................................................33
Section 19.4    Entire Agreement ...................................................................33
Section 19.5    No Third Party Beneficiaries ....................................................33

ii

002121

Section 19.6    Regulatory Matters.................................................................................33
Section 19.7    Execution in Counterparts.....................................................................34

Schedule A-1        Condensate Delivery Points
Schedule A-2        Residue Gas Delivery Points
Schedule A-3        NGL Delivery Points
Schedule 1.1        Producer's Interests
Schedule 4.3        Dedicated Area
Schedule 4.4        Form of Memorandum of Gas Gathering and Processing Agreement
Schedule 4.10       Receipt Points
Schedule 4.11(a)    Form of Notice for Designation of New Receipt Point
Schedule 4.11(b)    Specified Area
Schedule 4.12       New Well Notification Form
Schedule 5.1        Measurement, Equipment and Testing
Schedule 5.2        Specifications
Schedule 6.1        Service Fees
Schedule 8.1        Notices

002122

iii

**AMENDED AND RESTATED**
**GAS GATHERING AND PROCESSING AGREEMENT**

This Amended and Restated Gas Gathering and Processing Agreement (this "***Agreement***") is made and entered into this 3ʳᵈ day of February, 2017, but effective as of December 1, 2016 (the "***Effective Date***"), by and between Oklahoma Energy Acquisitions, LP, a Texas limited partnership ("***Producer***") and Kingfisher Midstream LLC, a Delaware limited liability company ("***Gatherer***").   Producer and Gatherer may be referred to each individually as a "***Party***," or collectively as the "***Parties***."

**RECITALS**

**WHEREAS**, the Parties entered into that certain Gas Gathering and Processing Agreement dated as of August 31, 2015 (the "***Original Agreement***"), and the Parties now desire to amend and restate the Original Agreement in its entirety to be effective for all purposes as of the Effective Date as provided herein; and

**WHEREAS**, Producer owns, controls or may acquire certain oil and gas leasehold interests and other mineral interests and hydrocarbon reserves (collectively, the "***Producer's Interests***," as further defined below), and controls the oil, gas and mineral interests of others (collectively, the "***Other Interests***," as further defined below) in certain lands in Kingfisher, Logan, Canadian, Blaine and Garfield Counties, Oklahoma, described more particularly on **Schedule 4.3** attached hereto (the "***Dedicated Area***"); and

002124

**WHEREAS**, Producer desires to have Gatherer gather, transport and process natural gas

**WHEREAS**, Producer desires to have Gatherer gather, transport and process natural gas (the "***Gas***") and associated natural gas liquids (the "***NGLs***") from the Interests from present and future wells located in the Dedicated Area, and to induce Gatherer to perform the covenants contained in this Agreement, desires, subject to the terms herein, to convey to Gatherer the sole and exclusive right to transport Gas and NGLs from the Interests, Dedicate (defined below) to Gatherer the Producer's Interests and Other Interests, deliver such Gas and NGLs to Gatherer for gathering and processing, and sell Residue Gas, NGLs and Condensate to Gatherer at the Receipt Points; and

**WHEREAS**, Gatherer shall construct, own and operate Gas gathering and processing facilities (collectively, the "***Gathering and Processing System***," as further defined below) capable of receiving from Producer deliveries of the Committed Gas from the Dedicated Area and subject to the Dedication; and

**WHEREAS**, Producer desires that Gatherer provide gathering and processing services and purchase Residue Gas (or to deliver in-kind, at Producer's direction, such Residue Gas), NGLs, and Condensate from Producer as set forth in this Agreement, and Gatherer desires to provide to Producer gathering and processing services and to purchase Residue Gas, NGLs, and Condensate from Producer in accordance with the terms and conditions set forth in this Agreement; then

**THEREFORE**, for and in consideration of the mutual covenants set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree that the Original Agreement is hereby amended and restated in its entirety as follows:

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

**Section 1.1        Definitions.**

The following terms shall have the following meanings unless otherwise indicated:

"***Additional Capacity***" has the meaning set forth in Section 4.6.

"***Additional In-Service Date***" means, with respect to any Additional Capacity, if applicable, the first Day of the first full Month following the date that Gatherer notifies Producer that such Additional Capacity has been completed and is ready to receive Gas.

"***Affiliate***" means with respect to a Person, any Person which, directly or indirectly, controls, is controlled by or is under common control with such Person or such Person's members or shareholders.  For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such individual or entity, whether through the ownership of voting securities, by contract or otherwise, *provided*, *however*, that for purposes of this Agreement, Producer and Gatherer shall not be considered Affiliates of each other.

"***After-Acquired Interests***" has the meaning set forth in Section 4.3(b).

"***Agreement***" has the meaning set forth in the introductory paragraph.

002126

"**Allocated Gallons**" means the quantity of NGLs in Gallons recovered, which shall be determined for each NGL component by multiplying (x) the Plant Inlet Volume by (y) the GPM of such NGL component contained in the quantities of Committed Gas processed hereunder; by (z) the Plant Recovery Factor.

"**Allocated Volume**" has the meaning set forth in Section 6.5(b).

"**Applicable Law**" means any applicable statute, law, principle of common law, rule, regulation, judgment, order, ordinance, requirement, code, writ, injunction, or decree of any Governmental Authority.

"**Btu**" is a British Thermal Unit and means the amount of heat required to raise the temperature of one avoirdupois pound of pure water from fifty-eight and one-half degrees Fahrenheit (58.5° F) to fifty-nine and one-half degrees Fahrenheit (59.5° F) at a constant pressure of fourteen and sixty-five hundredths (14.65) pounds per square inch absolute.

"**Business Day**" means any Day, other than a Saturday or Sunday, that commercial banks in Houston, Texas are open for business.

"**Buy-Back Gas**" means low pressure Gas sourced from Gatherer's Gathering and Processing system downstream of the Receipt Points, but upstream of Gatherer's compression and dehydration facilities which is measured and returned to Producer for the purpose of well operation or well enhancement.

2

"***Buy-Back Meter***" means the sales point located in the Dedicated Area where Producer elects to receive Buy-Back Gas from Gatherer's Gathering and Processing System.

"***Buy-Back Service Fee***" has the meaning set forth in Schedule 7.1.

"***Buy-Back Volume***" means the difference between the volume of Buy-Back Gas at the Buy-Back Meter (Point B) measured in MMBtu and the volume of Gas at the Receipt Point (Point A) measured in MMBtu for a respective Receipt Point (Buy-Back Volume = Point B – Point A). If the Buy-Back Volume is negative, then the Buy-Back Volume will be considered to be zero.

"***Chisholm Pipeline***" means the downstream NGL pipeline operated by Chisholm Pipeline Co, an affiliate of Phillips 66 Pipeline LLC.

"***Claims***" means any and all demands, claims, judgments, obligations, liabilities, liens, causes of action, lawsuits, arbitrations, mediations, investigations or proceedings (whether at law or in equity).

"***Committed Gas***" is Gas and NGLs subject to the Dedication.

"***Completed Well***" as used herein, shall mean any new Well that has been drilled, fracked, and is deemed ready to flow into the Gathering and Processing System, subject to the Specifications.

002128

"***Condensate***" means non-stabilized or stabilized condensate components incidental to the Gathering and Processing System.

"*Condensate Delivery Points*" means those points of delivery for third-party sales of Condensate set forth on Schedule A-1, as the Parties may mutually agree to modify from time to time.

"*Condensate Net Sales Price*" means the price a third party is contractually obligated to pay to Gatherer for Condensate, less Condensate Transportation Fee.

"*Condensate Transportation Fee*" means fees incurred by Gatherer in connection with the transportation of Condensate to the Condensate Delivery Point, which shall be passed through without markup to Producer.

"*Confidential Information*" has the meaning set forth in Section 17.1.

"*Contract Pressure*" has the meaning set forth in Section 5.5(b).

"*Contract Year*" means each calendar year during the Term, the first of which shall commence on the Effective Date and run through December 31 of that year, and then from January 1 through December 31 for each subsequent year thereafter, but for the last Contract Year, from January 1 through the date that this Agreement terminates or expires.

3

"***Cubic Foot***" or "***cf***" means a volume of Gas occupying a space of one (1) cubic foot at a temperature of sixty degrees Fahrenheit (60° F) and at a pressure of fourteen and sixty-five hundredths (14.65) pounds per square inch absolute.

"***Curtailment Event***" has the meaning set forth in Section 12.1.

"***Curtailment Period***" has the meaning set forth in Section 12.1.

"***Day***" or "***Daily***" means a 24-hour period beginning at 9:00 a.m. Central Time on a calendar day and ending at 9:00 a.m. Central Time on the next succeeding calendar day.

"***Dedicated Area***" has the meaning set forth in the Recitals, as further specifically set forth on Schedule 4.3.

"***Dedicated Wells***" has the meaning set forth in Section 4.3(c).

"***Dedication***" has the meaning set forth in Section 4.3(a).

"***Delivered Gas***" means the quantity of Gas in MMBtu that is received by Gatherer from Producer at each Receipt Point.

"***Dispute***" has the meaning set forth in Section 18.1.

"***Downstream Pipeline***" means Panhandle Eastern Pipeline, Chisholm Pipeline or any other pipeline into which Gatherer may make deliveries of Gas, NGLs, or Condensate under this

002130

Agreement for the account of Producer.

"*Easements*" has the meaning set forth in Section 4.2(a).

"*Effective Date*" has the meaning set forth in the introductory paragraph.

"*Existing Equipment*" has the meaning set forth in Section 5.1(c).

"*Extended Term*" has the meaning set forth in Section 2.1.

"*FERC*" means the Federal Energy Regulatory Commission, or any successor Governmental Authority.

"*Field FL&U*" means the Producer's allocated quantity of field fuel plus lost and unaccounted for Gas in MMBtu on an actual basis with a cap up to ████████████ of the Receipt Point Volumes.  The field fuel component will include, but is not limited to, compressor fuel, dehydration fuel and stabilizer system fuel.

"*Firm*" means a gathering, processing or transportation service that is not subject to being curtailed, interrupted, prorated or suspended except as expressly provided in this Agreement.

"*Force Majeure*" has the meaning set forth in Section 13.1.

"*Force Majeure Event*" has the meaning set forth in Section 13.1.

4

"*Gallon*" means one (1) U.S. gallon.

"*Gas*" has the meaning set forth in the Recitals, and further means natural gas consisting predominantly of methane, but including the naturally occurring mixture of NGLs, heavier hydrocarbon gases and any non-combustible gases.

"*Gatherer*" has the meaning set forth in the introductory paragraph.

"*Gatherer Event of Default*" has the meaning set forth in Section 14.3.

"*Gatherer Group*" means any or all of (i) Gatherer, (ii) Gatherer's Affiliates, (iii) any of their respective contractors, and (iv) the officers, directors, employees, agents, advisors, counsel, consultants, members, shareholders, insurers, invitees or representatives of any of the foregoing.

"*Gathering and Processing System*" has the meaning set forth in the Recitals, specifically the (i) Gathering Pipeline System, (ii) Plant, (iii) Residue Gas Pipeline System, (iv) NGL Pipeline System, (v) any NGL storage facilities, (vi) any compression facilities, (vii) any custody transfer units, meters or measurement facilities, and (viii) any other equipment or appurtenances associated with the foregoing.

"*Gathering Fee*" has the meaning set forth in Schedule 7.1.

"*Gathering Pipeline System*" means the pipelines of various diameters interconnecting the Receipt Point(s) to the Plant, including any compression facilities before the inlet of the Plant.

"***Governmental Approval***" means any permit, license, permission, grant or other similar authorization issued by, or required to be issued by, any Governmental Authority and necessary for the performance of the Parties hereunder.

"***Governmental Authority***" means any federal, state, county, parish, municipal or other governmental subdivision, or any court or any governmental department, commission, board, bureau, agency or other instrumentality of any federal, state, county, municipal or other governmental subdivision within the United States of America with authority over the Parties and subject matter in question.

"***GPM***" means gallons of NGLs per Mcf of Gas.

"***Gross Heating Value***" means the number of Btu produced by the complete combustion, at constant pressure, of the amount of Gas which would occupy a volume of one Cubic Foot at a temperature of sixty degrees Fahrenheit (60° F) when saturated with water vapor and at a pressure equivalent to fourteen and sixty-five hundredths (14.65) pounds per square inch absolute, under standard gravitational force (acceleration 980.665 centimeters per second per second), with air of the same temperature and pressure as the Gas when the products of combustion are cooled to the initial temperature of the Gas and air and when the water formed by combustion is condensed to the liquid state. The Gross Heating Value so determined will be corrected from the conditions of testing to that of the actual condition of the Gas delivered, expressed in Btu per Cubic Foot and reported at a pressure base of fourteen and sixty-five hundredths (14.65) pounds per square inch

5

002133

absolute; provided, however, if the water vapor content of the Gas delivered is seven pounds or less per one million Cubic Feet, the Gas will be assumed to be dry.

"*Indemnified Party*" has the meaning set forth in Section 11.2.

"*Indemnifying Party*" has the meaning set forth in Section 11.2.

"**In-Service Date**" means first Day of the first full Month following the date that Gatherer notifies Producer that the Gathering and Processing System has been completed and is ready to receive and process Committed Gas.

"*Interests*" means Producer's Interests, After-Acquired Interests and Other Interests.

"*Line Fill*" has the meaning set forth in Section 4.9(a).

"*Losses*" means any and all losses, damages, costs, expenses, liabilities, fines, penalties or judgments of whatever kind or character, including reasonable attorneys' fees, court costs and other reasonable costs and expenses of defending against any Claim.

"*Maintenance Event*" has the meaning set forth in Section 12.2.

"**MAOP**" means the maximum allowable operating pressure in psig at such Receipt Points in effect from time to time, as set forth in notices from KFM to Customer, but in no event less than fifty (50) psig.

"***Mcf***" means one thousand (1,000) Cubic Feet.

"***MMBtu***" means one million (1,000,000) Btu.

"***Month***" or "***Monthly***" means a period beginning at 9:00 a.m. Central Time on the first Day of a calendar month and ending at 9:00 a.m. Central Time on the first Day of the next succeeding calendar month.

"***Mustang***" means Mustang Gas Products LLC.

"***Mustang Agreement***" means that certain Gas Purchase Agreement dated April 1, 2015, by and between Alta Mesa Holdings, LP and Mustang pursuant to which Producer has dedicated Gas and NGLs to Mustang produced from the wells identified on Schedule 1.1.

"***New Receipt Point***" has the meaning set forth in Section 4.11.

"***New Receipt Point Notification***" has the meaning set forth in Section 4.11(a).

"***New Well Notification***" has the meaning set forth in Schedule 4.12

"***NGL Content***" means quantity of ethanes and heavier hydrocarbons in Gas at the Receipt Point.

6

"***NGL Delivery Point***" means those points of delivery for third party sales of NGL set forth on Schedule A-3, as the Parties may mutually agree to modify from time to time.

"***NGL Index Price***" means ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ of the Monthly average of the applicable daily posting or other index price(s) received by Gatherer for each component of NGL, including any deductions for Affiliate or marketing charges and any deduction for third party transportation, fractionation and marketing charges, which will be passed through to Producer without markup.  The Parties acknowledge and agree that the daily posting applicable to NGL during the Term of this Agreement shall be the "Conway In-Well Spot Gas Liquids Prices for any Current Month" as published by OPIS.

"***NGL Pipeline System***" means the pipeline(s) interconnecting the Plant to the NGL Delivery Point(s).

"***NGLs***" has the meaning set forth in the recitals, specifically hydrocarbons heavier than methane, such as ethane, propane, normal butane, isobutane, pentanes and heavier hydrocarbons, and mixtures thereof separated into the Y-Grade Stream at the Plant.

"***Notice***" has the meaning set forth in Section 9.1.

"***Notification Date***" has the meaning set forth in Section 4.11(a).

"***NRP Connection Fee***" has the meaning set forth in Section 4.11(b).

"***Off-Spec Gas***" has the meaning set forth in Section 5.2.

002136

"***Original Agreement***" has the meaning set forth in the Recitals.

"***Original Date***" means August 31, 2015.

"***Other Fuel***" means electricity consumed in the operation of the Gathering and Processing System or Plant.

"***Other Fuel Fee***" means Producer's allocated share of the actual cost of Other Fuel.

"***Other Interests***" means the interests of Persons in the Dedicated Area other than Producer, but whose interests are represented or controlled by Producer, including working interests, royalty interests, overriding royalty interests, net profits interests or other mineral interests to the extent such interests were not granted by, through or under Producer after the Original Date, *provided* nothing in this Agreement is intended to impair, impede or affect the rights of the owners of the Other Interests to take Gas, NGLs or hydrocarbons in-kind and/or to sell gas, NGLs or hydrocarbons for their own account.

"***Overdue Rate***" means rate per annum equal to the lesser of (i) an annual rate equal to four percent (4%) per annum above the "prime rate" specified under the caption "Money Rates" in the *Wall Street Journal* (New York Edition) on the date such payment was required to have been made, or (ii) the maximum rate of interest permitted by Applicable Law.

7

"***Panhandle Eastern Pipeline***" means the downstream interstate natural gas pipeline operated by Panhandle Eastern Pipe Line Company, LP.

"***Partial In-Service Date***" means the first day of the first full Month following the date that Gatherer notifies Producer that the Partial Commercial Operation Date has occurred and the Gathering and Processing System is ready to receive Committed Gas.

"***Party***" and "***Parties***" have the meaning set forth in the introductory paragraph.

"***Person***" means any individual, firm, corporation, trust, partnership, limited liability company, association, joint venture, other business enterprise or Governmental Authority.

"***Plant***" means any gas processing plant utilized by Gatherer to process Gas, whether or not owned or operated by Gatherer.

"***Plant FL&U***" means the Producer's allocated quantity of Plant fuel plus lost and unaccounted for Gas in MMBtu on an actual basis with a cap up to ██████████████ ██████ of the Plant Inlet Volume.

"***Plant Inlet Volume***" means the volume in MMBtu of Committed Gas received and accepted at the Receipt Points less Field FL&U and Condensate.

"***Plant Recovery Factor***" means an amount determined ████████████

002138

"*Price Index*" has the meaning set forth in Section 7.3.

"*Primary Term*" has the meaning set forth in Section 2.1.

"*Processing Fee*" has the meaning set forth in Schedule 7.1.

"*Producer*" has the meaning set forth in the introductory paragraph.

"*Producer Capacity*" has the meaning set forth in Section 4.6.

"*Producer Event of Default*" has the meaning set forth in Section 14.1.

"*Producer Group*" means any or all of (i) Producer, (ii) Producer's Affiliates, (iii) Producer's contractors and suppliers, of every tier, other than the Gatherer Group, and (iv) the officers, directors, employees, agents, advisors, counsel, consultants, members, shareholders, insurers, invitees or representatives of any of the foregoing.

"*Producer's In-Kind Option*" has the meaning set forth in Section 6.1(e).

"*Producer's Interests*" means all oil and gas leasehold interests and other mineral interests in lands, leases, wells and Gas that Producer owned as of the Original Date in the Dedicated Area, including the oil and gas leasehold interests and other mineral interests set forth on Schedule 1.1.

8

"***Receipt Point***" means the points located within the Dedicated Area where Producer elects in its sole and reasonable discretion to deliver Producer's Gas to Gatherer and where Gatherer may receive Producer's Gas in accordance with the terms of this Agreement. At Producer's election, a Receipt Point for particular volumes of Producer's Gas may be the inlet of Gatherer's facilities at the interconnection of Producer's central production facilities with the Gathering and Processing System or may be at the inlet of Gatherer's facilities at the interconnection with the Gathering and Processing System of Producer's individual well separation equipment located downstream of Producer's Wells.

"***Receipt Point Volume***" means the quantity of Committed Gas, expressed in MMBtu, received and accepted by Gatherer at the Receipt Points.

"***Residue Gas***" means the total Receipt Point Volume *minus* Field FL&U *minus* Condensate *minus* Plant FL&U *minus* Buy-Back Volume Gas *minus* Shrinkage, expressed in MMBtu.

"***Residue Gas Delivery Point***" means those points of delivery for third party sales of Residue Gas set forth on Schedule A-2, as the Parties may mutually agree to modify from time to time.

"***Residue Gas Index Price***" means ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

002140

"***Residue Gas Pipeline System***" means the pipeline(s) interconnecting the Plant to the Residue Gas Delivery Point(s)

"***Residue Gas Transportation Fee***" means a transportation fee equal to ███████ per MMBtu, initially, which amount shall be adjusted by Gatherer from time to time to reflect any applicable third party transport tariffs for Residue Gas incurred by Gatherer, which shall be passed through without mark-up to Producer.

"***Service Fees***" has the meaning set forth in Section 7.1.

"***Shrinkage***" means the decrease in Committed Gas volume as adjusted for heating content that results from the conversion of liquefiable hydrocarbons in the Gas into NGLs.

"***Specifications***" has the meaning set forth in Section 5.2.

"***Specified Area***" has the meaning set forth in Section 4.11(b).

"***System Capacity***" means the then-maximum capacity of the Gathering and Processing System to gather and process Gas, not to exceed the then-determined compression capacity on the Gathering and Processing System, based on NGL Content of Gas of seven (7) GPM.

"***System Pressure***" has the meaning set forth in Section 5.4.

"***Taxes***" means all gross production, severance, conservation, and similar taxes measured by or based upon production, together with all taxes on the right or privilege of ownership of Gas,

9

or upon the services rendered herein, including gathering, transportation, handling, transmission, dehydration, compression, processing, treating, conditioning, distribution, sale, use, receipt, delivery or redelivery of Gas, including all of the foregoing now existing or in the future imposed or promulgated.

"***Term***" means the Primary Term and any Extended Term.

"***Theoretical Gallons***" means the number of gallons of NGLs that are present in Gas as determined at a particular point, as determined by multiplying: (i) the GPM as determined by chromatographic analysis or gas sampling at each Receipt Point, by (ii) the Plant Inlet Volume (in Mcf) from such well at the Receipt Point for the Month.

"***Transportation Interests***" has the meaning set forth in Section 3.1(a).

"***Wells***" shall mean any well classified by any governmental authority or under any applicable Law as a gas well in which gas produced therefrom has been Dedicated to Gatherer under this Agreement, whether such well now exists or is hereafter drilled.

"***Y-Grade Stream***" means mixed NGLs that have been removed from the Gas at the Plant by means of processing activities, but which have not been separated into individual NGL components.

**Section 1.2     Interpretation.**

002142

References in the singular shall include the plural, and references to the masculine shall

include the feminine, and vice versa. Words denoting natural persons shall include partnerships, firms, companies, corporations, joint ventures, trusts, associations, organizations or other entities. References to a particular article, section, subsection, paragraph, subparagraph or schedule, if any, shall be a reference to such article, section, subsection, paragraph, subparagraph or schedule in and to this Agreement. The words "include" and "including" shall include the phrase "not limited to." Any reference to a Person shall include that Person's successors and assigns or to any Person succeeding to that Person's functions. Any Schedules are fully incorporated and made part of this Agreement. The Schedules shall be read in conjunction with the provisions of the body of this Agreement, and the Schedules and the body of this Agreement shall be interpreted to give effect to the intent of the Parties as evidenced by their terms when taken as a whole, *provided, however,* that in the event of an express and irreconcilable conflict between the terms of a Schedule and the provisions of the body of this Agreement, the provisions of the body of this Agreement shall control.  Capitalized terms appearing in a Schedule shall have the meanings set forth in Section 1.1, unless the context requires otherwise.

**ARTICLE II**
**TERM**

**Section 2.1       Term.**

This Agreement shall be effective as of the Original Date, and, unless earlier terminated in accordance with any express provision of this Agreement, shall remain in full force and effect for a period of fifteen (15) years from the In-Service Date (the "***Primary Term***"), *provided, however,*

10

that, to the extent that at the end of the Primary Term there are Wells then-connected to the Gathering and Processing System and then-producing Gas and NGLs in commercial (paying) quantities, the term of this Agreement shall extend for so long as such Well(s) continue to produce Gas or NGLs in commercial (paying) quantities (the "***Extended Term***").

## ARTICLE III
## GRANT OF TRANSPORTATION RIGHT

**Section 3.1**          **Conveyance of Transportation Right.**

(a)          For good and valuable consideration paid by Gatherer, the receipt and sufficiency of which are hereby acknowledged, Producer grants, bargains, sells, conveys, transfers, assigns and delivers unto Gatherer, as of the Original Date until the end of the Term, unless earlier reverted in accordance with Section 4.11(f), the sole and exclusive right to transport minerals from the Producer's Interests and After-Acquired Interests, specifically the right to gather, process, stabilize, dehydrate, compress, meter, measure and store Gas and NGLs that may be produced and saved therefrom (the "***Transportation Interests***").

(b)          At the end of the Primary Term, the Transportation Interests will revert automatically to Producer or the other applicable owners thereof save and except the Transportation Interests insofar only as Gas and NGLs that may be produced and saved from the Dedicated Wells, which shall continue until the end of the Extended Term. At the end of the Extended Term or upon the earlier termination of this Agreement in

002144

accordance with any express provision of this Agreement, all of Gatherer's remaining Transportation Interests will revert automatically to Producer or the other applicable owners thereof and Gatherer shall execute and deliver to Producer a recordable release and quitclaim in and to any rights, including Transportation Interests, in the Interests.

(c)    The Transportation Interests conveyed to Gatherer are subject to (i) any valid and enforceable prior dedication in favor of Mustang under the Mustang Agreement, (ii) with respect to any After-Acquired Interests within the Dedicated Area, any valid and enforceable prior written dedication or commitment for gathering of Gas, NGLs, and other minerals as of the time of the acquisition by Producer, (iii) Producer's right to transfer Gas and NGLs produced from the Interests that Producer is expressly required to deliver under the oil and gas leasehold interests and other mineral interests comprising the Interests, (iv) with respect to the Other Interests, the rights of the owners of such Other Interests to take in kind and separately dispose of their share of Gas and NGLs produced from the Dedicated Area and (v) the terms and conditions of this Agreement.

**Section 3.2    Real Interests.**

Producer and Gatherer intend that the conveyance of the Transportation Interests be a conveyance of a portion of Producer's real property interests included in the Interests (including the interests of others whose interests are represented or controlled by Producer insofar only as Producer has the power and authority to grant Transportation Interest in the interests of such third

11

parties). Producer and Gatherer agree that Gatherer has a determinable real property interest carved out of the Interests.

# ARTICLE IV
# GATHERING AND PROCESSING SYSTEM

**Section 4.1        Construction of Gathering and Processing System.**

Gatherer shall, at its sole cost and expense, design, engineer, construct, equip and modify, or caused to be designed, engineered, constructed, equipped and modified, the Gathering and Processing System.  Gatherer shall exercise commercially reasonable efforts to (a) achieve the Partial Commercial Operation Date by the date that is nine (9) Months after the Effective Date and (b) achieve the Final Commercial Operation Date by the date that is twelve (12) Months after the Effective Date.

**Section 4.2        Easements, Rights-of-Way and Fee Lands.**

(a)        To the extent that (i) Producer may do so in compliance with all applicable agreements, and (ii) Gatherer's activities on the relevant lands do not unreasonably interfere with Producer's operations, Producer, from the Original Date until the end of the Term, unless earlier reverted in accordance with this Agreement, hereby conveys and assigns to Gatherer, to the extent that Producer may do so without payment of monies (unless Gatherer agrees to pay), an exclusive easement and right-of-way in and to the surface of the Interests for purposes of constructing, owning, operating, repairing, replacing

and maintaining pipelines and other facilities for gathering, processing, stabilizing, dehydrating, compressing, metering, measuring, storing and redelivering to Producer all Gas and NGLs that may be produced and saved from the Interests, including the Gathering and Processing System (the "**Easements**"); *provided, however*, an Easement shall be non-exclusive to the extent that (x) Producer requires access to the surface of the Interests to install Receipt Points, connect any wells to Receipt Points or connect Receipt Points to the Gathering and Processing System, in each case, in accordance with the express terms of this Agreement or (y) any easement or right-of-way conveyed to Mustang under the Mustang Agreement, covers the same portion of the surface of the Interests as such Easement. At the end of the Primary Term, all of the Easements will revert automatically to Producer or the owners of such applicable rights except to the extent such easements and rights-of-way are necessary for owning, operating, repairing, replacing and maintaining any portion of the Gathering and Processing System used to provide service under this Agreement to the Dedicated Wells, and such easements and rights-of-way shall continue until the end of the Term. At the end of the Term, Gatherer's easements and rights-of-way will revert automatically to Producer or the other applicable owners thereof.

**Section 4.3        Dedication.**

(a)        For the Term of this Agreement, Producer hereby dedicates to Gatherer all Gas and NGLs that may be produced and saved from the Interests for the purpose of gathering, processing, stabilizing, dehydrating, compressing, metering, measuring, storing and acquiring from Producer such Gas and NGLs, for delivery to Gatherer at the Receipt

12

Point(s) all Committed Gas as and when produced and saved (the "***Dedication***"), *provided* that notwithstanding the Dedication, Producer, as the owner of the Gas, NGLs, and other minerals, shall continue to retain its right to (i) administer the Interests as it deems advisable in its sole discretion, including the right to rework, shut in, plug or abandon any well, (ii) form or participate in the formation of any unit, (iii) use Gas and NGLs in its operations, and (iv) deliver Gas and NGLs that Producer is expressly required to deliver under oil and gas leases, contractual agreements or other legal rights under which Committed Gas and NGLs are produced, in each case to the extent such leases, agreements and rights existed prior to the Original Date and only until such leases, agreements or commitments expire or are terminated; *provided further* that the Dedication is subject to (w) any valid and enforceable prior written dedication in favor of Mustang under the Mustang Agreement, (x) with respect to any After-Acquired Interests within the Dedicated Area, any valid and enforceable prior written dedication or commitment for gathering processing or sale of Gas, NGLs, and minerals as of the time of the acquisition by Producer, (y) Producer's right to transfer Gas and NGLs produced from the Interests that Producer is expressly required to deliver under the oil and gas leasehold interests and other mineral interests comprising the Interests and (z) with respect to the Other Interests, the rights of the owners of such Other Interests, to take in-kind and separately dispose of their share of Gas and NGLs produced from the Other Interests.

(b)    If, after the Original Date and before the end of the Primary Term, Producer acquires (x) oil and gas leasehold or other mineral interests, including by way of joint venture participation, drill-to-earn rights or other means, within the Dedicated Area or (y) interests of Persons in the Dedicated Area other than Producer but whose interests are

represented or controlled by Producer insofar as Producer has the power and authority to dedicate an interest in such third parties in the *After-Acquired Interests*, effective simultaneously with the acquisition of the After-Acquired Interests by Producer, Producer hereby dedicates to Gatherer all Gas and NGLs that may be produced and saved from such After-Acquired Interests for the purpose of gathering, processing, stabilizing, dehydrating, compressing, metering, measuring, storing and acquiring from Producer such Gas and NGLs, for delivery to Gatherer at the Receipt Point(s) all Committed Gas as and when produced and saved, *provided, however*, to the extent that any of the After-Acquired Interests or Gas in the Dedicated Area are subject to any valid and enforceable prior written dedication or commitment for gathering as of the time of acquisition by Producer, then such dedication or commitment shall be senior to the Dedication until such prior dedication or commitment terminates or expires, *provided further* that if, with respect to any After-Acquired Interests, Producer has the right or ability, without payment of any material fee or penalty, or incurring any other material disadvantage, to terminate any such valid and binding prior dedication or commitment with respect to the After-Acquired Interests, then Producer shall terminate such dedication or commitment as soon as reasonably practicable. Producer shall promptly notify Gatherer in writing of any such termination, and identify the After-Acquired Interests.

(c)     At the end of the Primary Term, the Dedication shall terminate automatically except to the extent of all Gas and NGLs that may be produced from the Interests through any well in the Dedicated Area connected to the Gathering and Processing

13

System at the end of the Primary Term (such wells, the "***Dedicated Wells***").  From and after the end of the Term, all Interests shall be permanently released from the Dedication.

(d)    In connection with any After-Acquired Interests, Producer and Gatherer shall execute and deliver any additional documents and instruments and perform any additional acts that may become reasonably necessary or appropriate to evidence of record, and ratify with respect to such After-Acquired Interests, the grant of the Dedication, Transportation Interests and Easements granted under the terms of this Agreement.

**Section 4.4        Covenant Running With Land.**

For the Term, the Dedication under this Agreement shall be a covenant running with the land and the Interests and shall be binding on successors and assignees of the Parties. Contemporaneously with the execution of this Agreement, and from time-to-time during the Term if necessary, the Parties shall each execute for recordation in the public records of the Dedicated Area a "short form" memorandum of this Agreement in the form of **Schedule 4.4** attached hereto, identifying the Dedicated Area, the Interests, After-Acquired Interests and wells thereon.  Producer shall cause any conveyance of all or any of the Producer's Interests or After-Acquired Interests, to be made expressly subject to this Agreement, and to cause all transferees to execute a written instrument in a form reasonably satisfactory to Gatherer acknowledging (i) the conveyance of the Transportation Interests and the Easements, (ii) the Dedication and (iii) such transferees' obligations under this Agreement.  Gatherer shall likewise cause any assignment or conveyance of the Transportation Interests, the Dedication or all or any segment of the Gathering and Processing System to be made expressly subject to this Agreement, and to cause all transferees to execute a

002150

written instrument in a form reasonably satisfactory to Producer acknowledging such transferees'
obligations under this Agreement. The Parties shall reasonably cooperate to amend and
record such "short form" memorandum, as may be necessary in connection with the creation of
any New Receipt Points or the drilling of any new wells in accordance with Sections 4.11 and
4.12.

**Section 4.5      Covenant Not to Process Committed Gas.**

Producer shall not process Committed Gas, or allow Committed Gas to be processed, or
otherwise cause or allow NGLs or other constituent components of the Gas to be removed from
Committed Gas, other than by means of mechanical separation at the well head, prior to delivery
to Gatherer at the Receipt Point(s).

**Section 4.6      Option to Expand Gathering and Processing System.**

Gatherer shall gather and process volumes of Committed Gas up to 260 million cf/day on
a Firm basis when the System Capacity is capable of processing such volumes (the "***Producer
Capacity***").  All volumes of Committed Gas above the Producer Capacity shall at all times be
Committed Gas.  To the extent that Committed Gas shall exceed the Producer Capacity, Gatherer
shall have the option to (a) utilize any System Capacity in excess of the Producer Capacity, (b)
utilize another Plant or Plants to process such Committed Gas, or (c) expand the Gathering and
Processing System as many times as necessary by adding additional System Capacity (the
"***Additional Capacity***").  In the event that production from the Interests shall exceed the Producer

14

Capacity, Producer shall provide no less than six (6) months' prior Notice to Gatherer that production exceeds Producer Capacity, and Gatherer shall provide Notice to Producer within sixty (60) Days of Gatherer's receipt of Producer's Notice that Gatherer will or will not accept such volumes of Committed Gas or add Additional Capacity.  In the event that Gatherer provides Notice to Producer that it will not accept such volumes of Committed Gas above the Producer Capacity or add Additional Capacity, then the well bore from which the volumes of Committed Gas above the Producer Capacity are directly produced shall be released from the Dedication, and Producer may take such volumes of Committed Gas elsewhere.  In the event that Gatherer provides Notice to Producer that it will accept such volumes of Committed Gas above the Producer Capacity or add Additional Capacity, then, until Gatherer is able to process such Committed Gas, or until the Additional In-Service Date for such Additional Capacity, Producer may deliver any volumes of Committed Gas above the Producer Capacity of the Gathering and Processing System elsewhere, provided that once Gatherer is able to process such volumes of Committed Gas, all such volumes of Committed Gas shall be delivered to Gatherer at a Receipt Point.  **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, PRODUCER'S RIGHT TO TAKE THE AFFECTED VOLUMES OF COMMITTED GAS ELSEWHERE DURING ANY PERIOD WHERE GATHERER REFUSES TO TAKE VOLUMES OF PRODUCER'S COMMITTED GAS THAT EXCEED PRODUCER CAPACITY, AND THE RELEASE FROM DEDICATION, IF APPLICABLE, SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY, AT LAW OR IN EQUITY, WITH RESPECT TO GATHERER'S INABILITY OR REFUSAL TO TAKE VOLUMES OF COMMITTED GAS THAT EXCEED PRODUCER CAPACITY.**

**Section 4.7        Title Warranty.**

      Producer represents and warrants to Gatherer that: (i) it owns Producer's Interests, (ii) has the right to convey the Transportation Interests and the Easements, (iii) has the right to dedicate all Producer's Interests and Gas and NGLs dedicated under this Agreement, and to deliver Committed Gas to the Receipt Point(s), free and clear of all liens, encumbrances and claims by, through and under Producer except for: (A) "Permitted Liens" as defined under the Sixth Amended and Restated Credit Agreement among Alta Mesa Holdings, LP, as Borrower, Wells Fargo Bank, N.A. and the lenders party thereto from time to time, dated May 13, 2010, as amended from time to time; (B) "Permitted Liens" as defined under the Note Purchase Agreement dated August 31, 2015 among HMS Kingfisher Holdco, LLC, the holders thereunder from time to time and the agent for such holders, as amended from time to time; and (C) statutory lien and owner rights under 52 Okla. Stat. §§549.1, *et seq.* and 570.1, *et seq.*; and (iv) there are no valid and enforceable dedications or commitments existing as of the Original Date covering any of Producer's Interests or Gas or NGLs produced from the Producer's Interests within the Dedicated Area, except for (x) such dedications or commitments in favor of Mustang, if any (excluding the Mustang Agreement), that would not result in Producer delivering to Gatherer materially less volumes of Gas and NGLs than would have been delivered by Producer as Committed Gas if such prior dedications and commitment had not existed as of the Original Date, and (y) the Mustang Agreement.

15

### Section 4.8          Proceeds of Production.

Producer shall make payment of all royalties, overriding royalties, production payments, and all other payments attributable to the Interests and Committed Gas due to any Person under any leases or agreements in accordance with the terms thereof, and Gatherer shall have no obligations with respect thereto.

### Section 4.9          Operating Inventory.

To the extent that it is necessary for the operation of the Gathering and Processing System, Producer shall be responsible for providing Dedicated Gas to be used as line fill (the "*Line Fill*") in the Gathering and Processing System.  To the extent that other customers of Gatherer are also utilizing the Gathering and Processing System, the amount of Dedicated Gas provided by Producer for Line Fill shall be pro rata with the volume of Gas being supplied by other customers of Gatherer in the Gathering and Processing System.

### Section 4.10          Receipt Points.

The proposed design and a list of initial Receipt Points are set forth in **Schedule 4.10**.

### Section 4.11          New Receipt Points; Obligation to Interconnect.

As to Completed Wells operated by Producer, the Parties shall use the following process for connecting new Receipt Points to the Gathering and Processing System (each, a "*New Receipt Point*"):

(a)     Producer shall provide written notice to Gatherer for New Receipt Points in the Dedicated Area as follows: (1) no later than ███████████ Days prior to the expected date of first flow to Gatherer setting forth the expected date of first flow for New Receipt Points within the Specified Area; or (2) no later than ███████████████████ days prior to the expected date of first flow to Gatherer setting forth the expected date of first flow for New Receipt Points outside the Specified Area (as applicable, the "***Notification Date***"), location and volume profile for such Receipt Point in the form attached hereto as Schedule 4.11(a) (an "***New Receipt Point Notification***").

(b)     Upon Gatherer's receipt of any New Receipt Point Notification from Producer under subsection (a) above that is within the boundaries of the area depicted on the map attached hereto as Schedule 4.11(b) (the "***Specified Area***"), Gatherer shall provide Producer with a cost (the "***NRP Connection Fee***"), schedule, and scope of work required to connect each New Receipt Point to the Gathering and Processing System within ███████ days of receiving Producer's New Receipt Point Notification.  Producer may elect to either (i) have Gatherer perform the scope of work required to connect the New Receipt Point into the Gathering and Processing System and reimburse Gatherer the NRP Connection Fee in accordance with Section 4.11(c), (ii) have Gatherer perform the scope of work required to connect the New Receipt Point and pay Gatherer ██████ per MMBtu of Delivered Gas until the NRP Connection Fee has been paid in full, or (iii) perform the

16

scope of work required to connect the New Receipt Point into the Gathering and Processing System by itself.  If Producer elects to perform the interconnection itself, it shall ensure that the New Receipt Point is assigned to Gatherer upon completion.  If Producer elects item (ii) above, then Producer shall (y) connect to the New Receipt Point no later than ███ ██████████████████ ) days after the New Receipt Point is completed, and (z) if, after █████████████ months from the connection date, the volume of Delivered Gas is insufficient to reimburse the NRP Connection Fee in full, then Producer shall promptly pay Gatherer the unpaid remaining portion of the NRP Connection Fee.  Producer shall notify Gatherer of its decision to either have Gatherer perform the scope of work, or if Producer will perform the scope of work, no later than ████████ days after receiving the NRP Connection Fee from Gatherer.

(c)      In the event Producer elects to have Gatherer perform the scope of work required to connect a New Receipt Point in the Specified Area into the Gathering and Processing System in accordance with Section 4.11(b)(i) above, then Producer shall pay Gatherer's estimated NRP Connection Fee no less than ten (10) days prior to Gatherer's commencement of its scope of work.  Following Gatherer's completion of its scope of work and the date of first flow from such New Receipt Point, Gatherer shall submit a final invoice and any supporting documentation regarding the actual costs and expenses associated with such NRP Connection Fee in accordance with Section 8.3.  If the actual NRP Connection Fee is greater than the estimated NRP Connection Fee, then Producer shall pay the difference to Gatherer within fifteen (15) days from Producer's receipt of Gatherer's statement.  If the actual NRP Connection Fee is less than the estimated NRP Connection Fee, then Gatherer shall pay the difference to Producer within fifteen (15) days

from Producer's receipt of Gatherer's statement. Any disputes related to the final NRP Connection Fee shall be resolved in accordance with Section 4.11.

Case 4:24-cv-04092    Document 41-9    Filed on 11/13/24 in TXSD    Page 303 of 582

(d)      Upon Gatherer's receipt of any New Receipt Point Notification from Producer under subsection (a) above that is not within the Specified Area, the Parties shall reasonably consult with each other and mutually determine whether to connect such New Receipt Point to the Gathering and Processing System, timing of such connection, and allocation of costs.

(e)      After the Notification Date, if (i) Producer has delivered a New Receipt Point Notification in the Dedicated Area in the time period in Section 4.11(a) above and (ii) Gatherer has not connected such New Receipt Point to the Gathering and Processing System within ▉▉▉▉▉▉▉ Days after the Notification Date, except for reasons due to Force Majeure, then Gatherer shall discount the then-applicable Gathering Fee by ▉▉▉ per MMBtu for Producer's Gas delivered to the New Receipt Point. Such discounted Gathering Fee shall apply on a Daily basis, equal to the number of Days after the date the Completed Well is capable of flowing to that New Receipt Point. If the New Receipt Point Notification is received by Gatherer less than ▉▉▉▉▉▉▉ Days prior to the required first flow date, then Gatherer shall not be required to discount the Gathering Fee for a period of ▉▉▉▉▉▉ Days from the Notification Date.

(f)      In the event that Gatherer provides Notice to Producer that Gatherer will not make a requested interconnection for any New Receipt Point within the Dedicated

17

Area, then, effective simultaneously with the delivery of such Notice, (i) the ▮▮ in question shall be released from the Dedication, (ii) the Transportation Rights insofar only as Gas and NGLs that may be produced and saved from the ▮▮ in question shall automatically revert back to Producer and (iii) any Easement rights hereunder to the extent necessary for purposes of Producer or any third party constructing, owning, operating, repairing, replacing and maintaining pipelines and other facilities for gathering, processing, stabilizing, dehydrating, compressing, metering, measuring, storing and redelivering to Producer all Gas and NGLs that may be produced and saved from such ▮▮ in question shall automatically revert back to Producer. In connection with the release of Transportation Interests or Easements pursuant to this Section 4.11(f), Producer and Gatherer shall execute and deliver any additional documents and instruments and perform any additional acts that may become reasonably necessary or appropriate to effectuate the reversion of Transportation Interests and Easements with respect thereto. **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, THE RELEASE FROM DEDICATION SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY, AT LAW OR IN EQUITY, WITH RESPECT TO GATHERER'S REFUSAL TO INTERCONNECT A NEW RECEIPT POINT.**

### Section 4.12    Additional Wells.

(a)    No later than seventy (70) Days prior to drilling any Well in the Dedicated Area, Producer shall provide written notice to Gatherer setting forth the location, expected date of first flow to Gatherer, expected date of interconnection to a Receipt Point,

Schedule 4.09 the "New Well Notification")

applicable Receipt Point and volume profile for such Well in the form attached hereto as Schedule 4.09 the "New Well Notification").

(b)      Upon receipt of any New Well Notification for a Well that is not operated by Producer, Gatherer shall have the option, exercisable in its sole discretion at any time within ▮▮▮▮▮ days following receipt of such New Well Notification from Producer, to interconnect the Gathering and Processing System to such Wells at its sole cost and expense.  If Gatherer does not exercise the option set forth in this Section 4.12(b), then (i) such ▮▮▮ shall be released from the Dedication, (ii) the Transportation Interests insofar only as Gas and NGLs that may be produced and saved from the ▮▮ shall automatically revert back to Producer and (iii) any Easement rights hereunder to the extent necessary for purposes of Producer or any third party constructing, owning, operating, repairing, replacing and maintaining pipelines and other facilities for gathering, separating, metering, measuring, storing and redelivering to Producer all Gas and NGLs that may be produced and saved from such ▮▮ shall automatically revert back to Producer.  In connection with the release of Transportation Interests or Easements pursuant to this Section 4.12(b), Producer and Gatherer shall execute and deliver any additional documents and instruments and perform any additional acts that may become reasonably necessary or appropriate to effectuate the reversion of Transportation Interests and Easements with respect thereto. **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, THE RELEASE OF A WELL FROM DEDICATION SHALL BE PRODUCER'S SOLE AND EXCLUSIVE**

18

**REMEDY, AT LAW OR IN EQUITY, WITH RESPECT TO GATHERER'S ELECTION TO INTERCONNECT A NON-OPERATED WELL**.

       **Section 4.13**       **Buy-Back Gas.**  At any time and from time to time during the term hereof, Producer may request Gatherer to deliver to Producer Buy-Back Gas from Gatherer's Gathering and Processing System. Such service shall be offered by Gatherer to Producer in accordance with the following terms and conditions:

       (a)      Upon such request, (x) Gatherer shall: install, own, operate and maintain a Buy-Back Meter at each Receipt Point; and (y) Producer shall connect to Gatherer's Buy-Back Meter(s) and shall install, own, operate and maintain at Producer's sole expense all necessary equipment and facilities downstream of all such Buy-Back Meter(s), including, without limitation, compression facilities and equipment.

       (b)      Producer shall pay Gatherer the "***Buy-Back Service Fee***" and "***Buy-Back Meter Fee***" as set forth in **Schedule 7.1**.

       (c)      Each Receipt Point Meter shall be equipped with a Buy-Back Meter. Following the Effective Date, to the extent Producer desires Gatherer to install one or more new Buy-Back Meters in connection with an New Receipt Point, Producer shall specify same in such New Receipt Point Notification.

**ARTICLE V**
**GAS QUALITY AND PRESSURE**

002160

(a)    Gatherer shall be responsible for measurement, equipment and testing at the Receipt Points and downstream of the Receipt Points, each in accordance with the protocols set forth on **Schedule 5.1**.

(b)    Subject to Producer's safety rules, regulations and procedures, Producer hereby grants to Gatherer, and Gatherer's contractors or agents, a right of entry onto any of the lands covered by the Interests and access to the Producer side of a Receipt Point, as necessary, for the purpose of sampling Gas pursuant to Section 5.2 below, and shall facilitate, as necessary, access with surface owners where requested by Gatherer.

(c)    Gatherer and Producer shall exercise good faith efforts to identify all existing Receipt Point instruments, equipment, well pad meters, and other assets owned by Producer that are necessary for Gatherer to perform its obligations hereunder (the "***Existing Equipment***") and Producer and Gatherer shall reasonably cooperate to take any and all actions needed to transfer, convey, and assign to Gatherer, at no cost, all right, title, and interest in and to such Existing Equipment prior to the In-Service Date. Producer acknowledges and agrees that any existing Receipt Point that is assigned to Gatherer will be exempt from the Contract Pressure requirements set forth in Section 5.5 to the point where it connects to the Gatherer-installed system where the pressure will be subject to the Contract Pressure requirements.

19

**Section 5.2          Specifications.**

Committed Gas delivered by Producer at the Receipt Points shall meet or exceed the quality requirements set forth in **Schedule 5.2**, and Residue Gas and NGLs delivered to the Residue Gas Delivery Point and NGL Delivery Point shall meet the quality requirements, if any, of the Downstream Pipelines (as applicable, the "***Specifications***").  Gatherer shall have a right to reject all Committed Gas that does not meet the Specifications ("***Off-Spec Gas***"), or which causes Residue Gas or NGLs to fail to meet the Specifications of a Downstream Pipeline, and may shut in well(s) of Producer or shut down a Receipt Point or portions of the Gathering and Processing System as necessary to deal with Off-Spec Gas.  The foregoing notwithstanding, Off-Spec Gas shall not be released from the Dedication.

**Section 5.3          Delivery Pressure.**

Producer shall deliver Gas at the Receipt Point(s) at a pressure sufficient to enter the Gathering and Processing System and shall not exceed the maximum allowable operating pressure of the Gathering and Processing System at such Receipt Point, but in no event less than fifty (50) psig.  Gatherer shall deliver Gas at the Residue Gas Delivery Point(s) at a pressure in accordance with the requirements or directives of the applicable Downstream Pipeline.

**Section 5.4          Compression.**

Gatherer shall install three (3) stages of field compression to provide reduced operating pressures at a Receipt Point to at least ████████ psig (the "***System Pressure***").  Gatherer shall exercise commercially reasonable efforts to install such compression facilities as soon as

Gatherer shall install one (1) stage of residue compression at the Plant facility.

**Section 5.5        Pressure.**

As to Completed Wells operated by Producer:

(a)    Producer shall deliver, or cause to be delivered, to Gatherer the Gas to be gathered and/or processed at the line pressures existing in the Gathering and Processing System as such pressure may exist from time to time not to exceed the MAOP of the Gathering and Processing System at such Receipt Point.  Producer shall install, operate, and maintain, at its sole expense, such pressure regulating devices as may be necessary to regulate the pressure of gas prior to delivery to Gatherer so as not to exceed the MAOP of the Gathering and Processing System at such Receipt Point.  If Producer fails to regulate such pressure at any time during the term of this Agreement, then Gatherer may install shut-in or other pressure relieving devices at the Receipt Point(s) upstream of the measurement device.

(b)    <u>Pressure Discount</u>.  Subject to a ███████ Day grace period after a Well connection, if the Monthly average pressure measured on the Gathering and processing System at any Receipt Point exceeds ██████████ psig ("**Contract Pressure**"), Customer shall provide written notice to KFM.  If pressures at such Receipt Point

20

002163

still exceed ████████████ psig ████████ days after Producer's Notice is received, Gatherer shall discount the then-applicable Service Fee for the impacted Receipt Point as described below when pressures fall into the below ranges:

| Pressure Range | Applicable Fee Discount |
|:---:|:---:|
| 76 – 100 | ████████ |
| 101 – 120 | ████████ |
| ≥ 121 | ████████ |

(c)    Such discounted Service Fee shall apply on a Daily basis and only for so long as the affected Receipt Point experiences greater than the thresholds set forth herein, including the historical days within the ██████████████ day periods specified above.  If Gatherer fails to maintain the Monthly average pressures below ████████████████ psig at any Receipt Point for a period of ████████████████ ██████ days or longer, Producer has the right to request in writing to have the Receipt Point permanently released from the Dedicated Area and this Agreement.  If Producer's Well(s) is shut-in and not capable of flowing for reasons controlled by Gatherer, this will be considered a pressure range greater than or equal to ███ psig.

(d)    Producer and Gatherer understand that the pressure at each Producer operated Receipt Point may be affected by the initial production from Wells recently connected by Producer to the Gathering and Processing System.  As a result, all the

Producer operated Receipt Points within a single section of land in which the combined volume from all newly connected Wells within that section of land exceeds ██ Mcf per Day shall be excluded from the determination of a pressure discount and for any newly connected Wells within a single section of land in which the combined volume from all newly connected Wells within that section of land is less than ██ Mcf per Day, Gatherer shall have a period of ██████ days to correct the issue before it is subject to the discounted  Service Fee set forth in Section 5.5(b).

## ARTICLE VI
## GATHERING, PROCESSING AND DELIVERY

**Section 6.1      Delivery, Receipt and Processing of Gas and Purchase of Products.**

(a)      Commencing on the In-Service Date, as to Completed Wells operated by Producer, Producer shall deliver or cause to be delivered to the Receipt Point(s) all Committed Gas and for the Term of this Agreement, Gatherer shall, on a Firm basis up to the Producer Capacity, gather and process the Delivered Gas to separate the NGLs from the Delivered Gas.  If Gatherer enters into any gathering, transportation, processing, marketing or similar agreement with any third party pursuant to which natural gas is received and processed by Gatherer on the Gathering and Processing System on a Firm

21

basis, Gatherer shall deliver to Producer a written notice of such agreement that describes the material terms thereof.

(b)    Gatherer shall acquire and take title to NGLs from Producer at the Receipt Point.  As consideration for the acquisition of NGLs, Gatherer shall pay Producer an amount equal to the Allocated Gallons of each NGL, multiplied by the NGL Index Price.

(c)    Gatherer shall acquire and take title to Residue Gas from Producer at the Receipt Point.  As consideration for the acquisition of Residue Gas that is not taken in-kind pursuant to Section 6.1(e), Gatherer shall pay Producer the Residue Gas Index Price, less the Residue Gas Transportation Fee.

(d)    If Condensate is blended and sold with crude oil, then Gatherer shall acquire and take title to the Condensate at the Receipt Point.  As consideration for the acquisition of Condensate, Gatherer shall pay Producer the Condensate Net Sales Price.  If Condensate is sold as NGL, then the terms of Section 6.1(b) above shall control.

(e)    Notwithstanding any provisions to the contrary in this Agreement, Producer shall have the option, exercisable upon sixty (60) Days' prior written notice, to take delivery of its Residue Gas in-kind at the Residue Gas Delivery Point (or at such other delivery point as may be mutually agreed by the Parties) for a six (6) Month period commencing on the earlier of April 1st or October 1st of any calendar year ("***Producer's In-Kind Option***").  During any such six (6) Month period that Producer's In-Kind Option is in effect, Gatherer shall deliver to Producer Residue Gas at the Residue Gas Delivery

002166

Point, and, in connection therewith: (i) Producer shall make (or cause to be made) all necessary arrangements for the transportation, fractionation, and marketing of such Residue Gas downstream of the Residue Gas Delivery Point, (ii) Producer shall take (or cause to be taken) Residue Gas ratably seven (7) Days a week by pipeline; (iii) Gatherer shall not be obligated to provide any storage to Producer or to construct or install any other facilities that Producer may require to take in-kind, (iv) title to such Residue Gas shall remain in Producer or its Affiliates, and (v) Gatherer shall have no obligation other than supplying Residue Gas to the Residue Gas Delivery Point for delivery to Producer or for Producer's account. Gatherer shall continue to deliver such Residue Gas for each successive six (6) Month period thereafter, until such time as Producer elects for Gatherer to purchase such Residue Gas by providing written notice to Gatherer at least sixty (60) Days prior to the end of the then-current six (6) Month period that Producer's In-Kind Option is in effect. Producer acknowledges and agrees that upon exercise of Producer's In-Kind Option, it shall be responsible for and pay or reimburse Gatherer for any and all fees, penalties or expenses incurred by Gatherer as a result of Producer's election of Producer's In-Kind Option, including any Residue Gas Transportation Fee incurred by Gatherer, and Producer agrees that it shall be solely responsible for all royalty payments, production payments, Taxes, and any other payments due or owing on Residue Gas taken in kind.

**Section 6.2** **Scheduling and Imbalances.**

(a) In the event Producer elects to take its Residue Gas in kind pursuant to Section 6.1(e), Producer will be responsible for nominations (including nomination

22

adjustments) required each Month to the Gathering and Processing System. Producer will use its commercially reasonable efforts to avoid the occurrence of any imbalance and will not intentionally create any imbalances.  Any imbalances caused by Producer will be settled in the Month such imbalance was incurred in accordance with Section 6.2(b). Producer hereby agrees to indemnify, defend and hold the Gatherer Group harmless from and against all Losses due to imbalances occurring with respect to Dedicated Gas.

(b)    The Parties recognize that certain Gas imbalances may occur between the quantity of the Residue Gas received by Gatherer (the "**Net Receipt**"), and the Residue Gas nominated by Producer for delivery by Gatherer to the Residue Gas Delivery Point(s) ("**Net Nomination**"). Throughout each Month the Parties agree to actively communicate and cooperate with each other, and with any interconnecting pipeline, to review appropriate data to identify any imbalance, and to eliminate or remedy any imbalance as soon as either Party becomes aware of an imbalance. The Parties further agree to manage daily receipts and deliveries so that the imbalances shall be kept as near to zero as practicable. At the end of each Month, any imbalance in MMBtus between the Net Receipt and the Net Nomination (with such difference being referred to as the "**Imbalance**") shall be balanced by means of a payment to Producer from Gatherer or a payment to Gatherer from Producer, as applicable, valued at the Cash-Out Price (as defined below). To the extent that the Monthly Net Receipt amounts are greater than the Monthly Net Nomination amounts, a payment shall be due Producer, and Gatherer will make such payment to Producer for the imbalance based on the difference between the Monthly Net Receipt amounts and the Monthly Net Nomination amounts, multiplied by the Cash-Out Price during the applicable Month in which the volume imbalance was generated. To the extent the Monthly Net

Receipt amounts are less than the Monthly Net Nomination amounts, a payment shall be due Gatherer and Gatherer will invoice Producer for the imbalance based on the difference between the Monthly Net Receipt amounts and the Monthly Net Nomination amounts, multiplied by the Cash-Out Price during the applicable Month in which the volume imbalance was generated. As used in this Agreement, the "**Cash-Out Price**" shall be determined as to each applicable Month and shall mean a price per MMBtu equal to either (l) if the receiving pipeline's applicable cash-out price is not imposed for the applicable Month(s), the price will be the daily index price averaged for such Month for the applicable receiving pipeline as published in the Daily Price Survey section of Platt's Gas Daily, or (2) if the receiving pipeline's applicable cash-out price is imposed for the applicable Month(s), that price will be the Cash-Out Price. Should the information necessary to calculate the Cash-Out Price not exist for the receiving pipeline or cease to be available, Gatherer and Producer shall work in good faith to determine a comparable substitute publication and/or daily posting(s) or other indexes providing equivalent data.

       **Section 6.3**           **Exchange of Information.**

Each of the Parties shall furnish or cause to be furnished to the other all information as may be reasonably requested and necessary with respect to maintaining the Gathering and Processing System in balance, including meter readings and nominations on Downstream Pipelines.

       **Section 6.4**           **Commingling.**

002169

Delivered Gas and NGLs may represent only a portion of Gas and NGLs on the Gathering and Processing System, which may be used by other customers, and Gatherer shall have the right to commingle Gas and NGLs with Gas and NGLs from other customers downstream of appropriate metering by Producer and/or Gatherer.

**Section 6.5      Allocations.**

(a)      Producer acknowledges that any reductions in volumes of Gas attributable to Condensate shall be shared and allocated among Gatherer's customers and other third parties whose Gas is gathered on the Gathering and Processing System in the proportion to the C6+ constituents contained in the Gas delivered by each such shipper to the Gathering and Processing System. Such allocations shall be based on the most recent quality analysis available to Gatherer for such Gas.

(b)      Each Month, Gatherer shall allocate back to each Receipt Point the Allocated Gallons of NGL and MMBtu's of Residue Gas for such Month (each, the "***Allocated Volume***").

(i)      Gatherer shall allocate NGLs to each Receipt Point by multiplying the total number of Gallons of NGLs allocated to the Receipt Point for a production Month by a fraction, the numerator of which is the Theoretical Gallons in the Committed Gas delivered to such Receipt Point during such production Month, and the denominator of which is the Theoretical Gallons in all Receipt Point Volumes during such production Month.

002170

(ii)     Gatherer shall allocate Residue Gas to each Receipt Point by multiplying the quantity of Residue Gas delivered to the Receipt Point by a fraction, the numerator of which is the total theoretical methane quantity contained in Committed Gas delivered to such Receipt Point during such production Month, and the denominator of which is the total methane quantity contained in all Receipt Point Volumes during such production Month.

(c)     Each Month, Gatherer shall provide to Producer a monthly allocation statement that includes total volume of all Receipt Points, total Residue Gas Delivered, total NGLs delivered, and allocated volumes back to each Receipt Point.

**Section 6.6          Transfer of Title and Risk of Loss.**

(a)     Producer shall have and retain title, custody and risk of loss to all Gas and any hydrocarbons attributable thereto, including NGLs, Condensate and Residue Gas, upstream of the Receipt Points.  Gatherer shall take title, custody and risk of loss to all Gas, NGLs, Condensate and Residue Gas, as applicable, at the applicable Receipt Points.

(b)     If Producer elects to take their Residue Gas in Kind, then title to the Residue Gas shall remain with the Producer, and Producer shall take custody and risk of loss to such Residue Gas at the Residue Gas Delivery Point.

24

**ARTICLE VII**
**SERVICE FEES**

**Section 7.1**        **Service Fees.**

Producer shall pay to Gatherer the following fees (in the aggregate, the "***Service Fees***") set forth on **Schedule 7.1**.

**Section 7.2**        **Payment for Other Fuel.**

Producer shall pay to Gatherer the Other Fuel Fee, if applicable.

**Section 7.3**        **Escalation.**

Commencing on █████████████, and then  each Contract Year thereafter, each Service Fee, except for the Other Fuel Fee, shall be  automatically  adjusted  upward  by  ██████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

**ARTICLE VIII**
**PAYMENT**

002172

**Section 8.1**        **Billing.**

As soon as reasonably practicable after the end of a Month, Gatherer shall render to Producer a statement for the preceding Month, setting forth the following, and including or attaching necessary backup information or calculations:

      (a)     Delivered Gas in both Mcf and MMBtu by Receipt Point;

      (b)     Buy-Back Gas, if any, in both Mcf and MMBtu;

      (c)     Total Residue Gas delivered to the Residue Gas Delivery Points;

      (d)     Allocations of Residue Gas, and breaking out the constituent components of the calculation in accordance with Section 6.5(c);

      (e)     Total NGLs delivered to the NGL Delivery Points;

      (f)     Allocated Gallons of NGLs, and breaking out the constituent components of the calculation;

      (g)     Allocated Condensate;

      (h)     actual cost of electricity as Other Fuel, and the Other Fuel Fee;

      (i)     aggregate total of all amounts due Gatherer for all Service Fees, Buy-Back Service Fees and Other Fuel Fees; and

25

002173

(j)      the net payment owed by Producer.

**Section 8.2        Payment.**

Producer shall pay to Gatherer the full amount due not later than the earlier of (i) fifteen (15) Days from Producer's receipt of Gatherer's statement, or (ii) the last Day of Month following the statement Month, *provided* that if such Day is not a Business Day, then on the next Business Day.  Any past due amounts shall bear interest at the Overdue Rate from the date due until paid.

**Section 8.3        Disputed Amounts.**

If Producer disputes all or a portion of any statement or amount due, it shall pay the undisputed portion, if any, of any such statement, and shall provide Notice to Gatherer of the specific basis for the dispute, including all supporting information, as soon as practicable after becoming aware of the basis for the dispute.  If after resolution of such dispute it is determined that any of the amount in dispute is due and owing, such amount(s) shall bear interest at the Overdue Rate from the date originally due until paid.  In no event shall any statement or invoice be subject to dispute beyond two (2) years from the date of such statement or invoice.

**Section 8.4        Taxes.**

Producer shall pay any and all Taxes levied against or with respect to the Committed Gas, Condensate, Residue Gas or NGLs (including all constituents and products thereof) delivered or services provided under this Agreement.  Gatherer shall not become liable for such Taxes, unless (i) designated to remit those Taxes on behalf of Producer or (ii) by mutual agreement between the

(i) designated to remit those Taxes on behalf of Producer or (ii) by mutual agreement between the Parties or by any duly constituted jurisdictional Agency having authority to impose such obligations on Gatherer, including the Oklahoma Tax Commission, in which event the amount of such Taxes remitted on Producer's behalf shall be (i) reimbursed by Producer upon receipt of invoice, with corresponding documentation from Gatherer setting forth such payments, or (ii) deducted from amounts otherwise due Producer under this Agreement.  Producer will reimburse Gatherer for any additional, increased or subsequently applicable Taxes, assessments, fees or other charges (excluding Gatherer's corporate income Taxes), arising after the date hereof that are lawfully levied upon and/or paid by Gatherer or its Affiliates with respect to its gathering, processing and delivery services hereunder insofar and only insofar as such additional, increased or subsequently applicable Taxes are based upon or attributable to the quantities or value of Committed Gas or the NGLs and Residue Gas attributable thereto.  Gatherer shall be solely responsible for ad valorem tax assessed on the value of the Gathering and Processing System, and all its components. Each Party shall indemnify, defend and hold harmless the other Party from and against any and all Claims and Losses arising out of or related to Taxes for which the indemnifying Party is responsible hereunder.

> **Section 8.5**     **Audit.**

Each Party shall have the right, upon reasonable advance Notice, during normal business hours and not more than two (2) times per Contract Year, at its sole expense and either itself or through its representatives, to audit the books and records of the other Party, at the place where such books and records are ordinarily kept, to the extent reasonably necessary to verify the accuracy of any statement, charge, payment or computation made pursuant to this Agreement, and

26

any such audit must be completed within ninety (90) Days of the Notice to the other Party.  In the event that an audit is performed, any subsequent audit performed may cover only a time period not covered by a previous audit.  In no event shall any statement or invoice be subject to audit beyond two (2) years from the date of such statement or invoice.

**ARTICLE IX**
**NOTICES**

        **Section 9.1**        **Notices.**

        Any notice, request, demand, statement, payment or bill provided for in this Agreement, or any notice which a Party may desire to give to the other (each, a "***Notice***"), must be in writing and will be deemed duly made when (i) delivered personally, (ii) upon delivery by the U.S. Postal Service, certified mail with return receipt, (iii) upon delivery by a recognized overnight courier service with return receipt, or (iv) upon receipt by the directed recipient when transmitted by electronic means, to the Persons and addresses set forth on Schedule 9.1.  Each of the Parties may, by Notice to the other Party, revise its respective Persons and addresses for delivery of Notices without amendment of this Agreement.

**ARTICLE X**
**FINANCIAL RESPONSIBILITY**

**[NOT USED]**

**ARTICLE XI**

002176

ARTICLE 11
INDEMNITY

Section 11.1      Indemnity.

EXCEPT WHERE OTHERWISE SPECIFICALLY PROVIDED HEREIN, EACH OF PRODUCER AND PRODUCER GROUP, ON THE ONE HAND, AND GATHERER AND GATHERER GROUP, ON THE OTHER HAND, SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS THE OTHER PARTY AND ITS RESPECTIVE PRODUCER GROUP OR GATHERER GROUP, AS THE CASE MAY BE, FROM AND AGAINST ANY AND ALL CLAIMS OF THIRD PARTIES AGAINST THEM, OR DAMAGES SUSTAINED OR INCURRED BY THEM AS A RESULT OF SUCH CLAIMS BY THIRD PARTIES, TO THE EXTENT CAUSED BY THE NEGLIGENCE OR WILLFUL MISCONDUCT OF THE INDEMNIFYING PARTY OR ITS RESPECTIVE PRODUCER GROUP OR GATHERER GROUP, AS THE CASE MAY BE, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR THE INDEMNIFYING PARTY'S BREACH OF THIS AGREEMENT.  THIS PROVISION SHALL NOT BE CONSTRUED TO RELIEVE ANY INSURER OF ITS OBLIGATION TO PAY CLAIMS CONSISTENT WITH THE PROVISIONS OF A VALID INSURANCE POLICY.  A PERSON SEEKING INDEMNITY SHALL FIRST SEEK RECOVERY UNDER ANY APPLICABLE INSURANCE POLICY, AND ANY INDEMNITY OBLIGATION OWED HEREUNDER SHALL BE REDUCED BY THE AMOUNT OF ALL INSURANCE PROCEEDS ACTUALLY RECEIVED BY THE INDEMNIFIED PARTY.

002177

**Section 11.2          Notification Obligation.**

The Person entitled to indemnification under Section 11.1 above (the "***Indemnified Party***") shall promptly notify the Party providing indemnity (the "***Indemnifying Party***") of any Claim, and the Indemnifying Party shall have the right to assume the investigation and defense of the Claim, including employing legal counsel of its choice. If the Indemnifying Party does not promptly assume the investigation and defense of the Claim, the Indemnified Party may do so, including employing legal counsel of its choice, at the Indemnifying Party's expense. If the Indemnifying Party assumes the defense of a claim, the Indemnified Party shall nevertheless have the right to employ, at its sole expense, separate legal counsel and participate in the defense of the Claim, provided that control over the process and authority to compromise the Claim shall vest solely in the Indemnifying Party.

**ARTICLE XII**
**CURTAILMENT AND MAINTENANCE**

**Section 12.1          Curtailment and Temporary Release of Gas.**

If for any reason, including Force Majeure or a Maintenance Event, but not for the reasons set forth in Section 4.6, Gatherer needs to curtail receipt, gathering, processing or delivery of Gas on the Gathering and Processing System (each, a "***Curtailment Event***"), (i) Gas deliveries from all Persons that are receiving service on an interruptible or non-Firm basis shall be curtailed prior to any curtailment or interruption of Committed Gas, and (ii) to the extent a third party is receiving service on a Firm basis in accordance with Section 6.1, Producer and such third party shall be

002178

curtailed on a *pro rata* basis (based on Btu content of Gas delivered to the Gathering and Processing System). Prior to the Partial In-Service Date, all volumes of Committed Gas shall be temporarily released from the Dedication and Producer shall be free to dispose of all volumes of Committed Gas under other arrangements during such period.  From and after the Partial In-Service Date and prior to the In-Service Date, all volumes of Committed Gas that are produced from Producer's wells that are not connected to the Receipt Points that are operational and tested as of the Partial In-Service Date shall be temporarily released from the Dedication and Producer shall be free to dispose such volumes of Committed Gas under other arrangements during such period.  At any time after the Partial In-Service Date where Gatherer is unable to accept some or all Committed Gas as a result of a Curtailment Event, Producer shall be free to dispose of such affected volumes under other arrangements during such Curtailment Event (the "***Curtailment Period***").  Gatherer shall notify Producer as soon as reasonably practicable of the circumstances of any Curtailment Event and the beginning and end of any Curtailment Period.  If Gatherer notifies Producer that the Curtailment Period shall exceed ████████ days and/or if such Curtailment Period actually exceeds ██████ days, Producer may enter into interim contracts with other purchasers, processors or gatherers as to the released volumes of Committed Gas and shall exercise commercially reasonable efforts to negotiate the shortest term reasonably practicable, but in no event shall the term exceed ████████  As soon as reasonably practicable after receiving notice of the end of the Curtailment Period, and subject to the expiration of any interim contracts with purchasers, processors or gatherers, all Gas shall again be subject to the Dedication.  **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, GATHERER'S TEMPORARY RELEASE AND PRODUCER'S RIGHT TO MAKE**

28

**OTHER ARRANGEMENTS WITH RESPECT TO SUCH AFFECTED VOLUMES SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY AVAILABLE TO PRODUCER, AT LAW OR IN EQUITY, WITH RESPECT TO SUCH AFFECTED VOLUMES.**

   **Section 12.2  Maintenance Events.**

   Gatherer may, without liability to Producer, interrupt the operation of the Gathering and Processing System for the purpose of performing inspections, pigging, maintenance, testing, alterations, modifications, expansions, connections, repairs or replacements (each, a "***Maintenance Event***"), but such interruption shall be for only such time as may be reasonably necessary. Gatherer shall give Producer advance written notice of its intention to interrupt operations and of the estimated time thereof, but not less than 24 hours advance notice, except in case of emergency. Any such Maintenance Events shall not constitute Force Majeure Events, unless such Maintenance Events otherwise meet the definition of a Force Majeure Event.

**ARTICLE XIII**
**FORCE MAJEURE**

   **Section 13.1  Force Majeure.**

   "***Force Majeure***" shall mean any event or circumstance or combination of events or circumstances (each, a "***Force Majeure Event***") that adversely affects or prevents any Party from performing its obligations in accordance with the terms of this Agreement, but only if and to the extent that such events and circumstances are not within the affected Party's reasonable control

extent that such events and circumstances are not within the affected Party's reasonable control. Force Majeure events shall include act of God, fire, storm of an unusual or extraordinary nature, flood, hurricane, tornado, earthquake, epidemic or other natural disaster, action, delay or inaction of any Governmental Authority, war, invasion, emergency, embargo, sanction, sabotage, insurgency, terrorism, civil war, riot or insurrection of any kind, labor strike, loss of electricity supply, failure of any Downstream Pipeline, inability to obtain rights-of-way at reasonable cost and after the exercise of reasonable diligence; *provided* that the following shall not constitute a Force Majeure Event: (i) failure to obtain or retain, or a delay in obtaining, any Governmental Approval necessary for performance under this Agreement that was the result of action or inaction by the Party responsible for obtaining such Governmental Approval, or a result of failure to timely apply for any such Governmental Approval, (ii) market conditions for Gas or NGLs, (iii) the inability to obtain a favorable price for or to buy or sell Gas or NGLs, or (iv) economic hardship. Any obligation of either Party under this Agreement shall be excused only to the extent that the Party's inability to perform is caused by Force Majeure. Each Party shall use all reasonable efforts to cure, minimize, mitigate or remedy the effects of Force Majeure.  Notwithstanding that Force Majeure may otherwise exist, a Force Majeure Event shall not excuse or delay the payment of money when due by any Party.

**ARTICLE XIV**
**DEFAULT AND TERMINATION**

Section 14.1        **Producer Events of Default.**

29

002181

A "***Producer Event of Default***" shall be deemed to have occurred if (i) Producer becomes bankrupt or insolvent or takes any corporate action or other steps towards liquidation, winding up, dissolution, reorganization or amalgamation of Producer, making of any bankruptcy administration order, or appointment of a receiver, administrator, trustee or similar officer over all or any material part of the revenues, assets or business of Producer; (ii) an order is made for the winding up, dissolution or liquidation of Producer, or any analogous or equivalent proceedings by whatever name are undertaken in whatever jurisdiction; (iii) Producer is generally unable to pay its debts as they become due, or Producer stops, suspends or threatens to stop or suspend payment of all or a material part of its debts or makes a general assignment of its assets for the benefit of its creditors; or (iv) Producer is in breach of any of its material obligations under this Agreement, and Producer fails to cure such breach within ██████ following Producer's receipt of a Notice from Gatherer to Producer to remedy such event or condition, or if a remedy cannot be effected within such ██████, a period of ██████, provided that Producer has commenced to remedy within such ██████████ and has diligently pursued such remedy during the extended period, provided further that in no event shall the period to cure a breach of an obligation to pay money be more than ██████ total.

### Section 14.2    Gatherer's Default Remedies Against Producer.

If a Producer Event of Default shall have occurred and be uncured and continuing, and without prejudice to any other of Gatherer's rights under this Agreement, Gatherer shall have the right to terminate this Agreement upon Notice to Producer.

002182

### Section 14.3    Gatherer Events of Default.

A "***Gatherer Event of Default***" shall be deemed to have occurred if (i) Gatherer becomes bankrupt or insolvent or takes any corporate action or other steps towards liquidation, winding up, dissolution, reorganization or amalgamation of Gatherer, making of any bankruptcy administration order, or appointment of a receiver, administrator, trustee or similar officer over all or any material part of the revenues, assets or business of Gatherer; (ii) an order is made for the winding up, dissolution or liquidation of Gatherer, or any analogous equivalent proceedings by whatever name are undertaken in whatever jurisdiction; (iii) Gatherer is generally unable to pay its debts as they become due, or Gatherer stops, suspends or threatens to stop or suspend payment of all or a material part of its debts or makes a general assignment of its assets for the benefit of its creditors; or (iv) Gatherer is in breach of any of its material obligations under this Agreement, and Gatherer fails to cure such breach within ███████ following Gatherer's receipt of a Notice from Producer to Gatherer to remedy such event or condition, or if a remedy cannot be effected within such ██ period, a period of ███████, provided that Gatherer has commenced to remedy within such ██████ period and diligently pursued such remedy during the extended period, provided further that in no event shall the period to cure a breach of an obligation to pay money be more than ██ █████ total.

### Section 14.4    Producer's Default Rights Against Gatherer.

If a Gatherer Event of Default shall have occurred and be uncured and continuing, and without prejudice to any other of Producer's rights under this Agreement, Producer shall have the right to terminate this Agreement upon Notice to Gatherer.

002183

**ARTICLE XV**
**ASSIGNMENT**

**Section 15.1        Assignment.**

Neither Party may assign this Agreement, in whole or in part, without the other Party's prior written consent, which consent will not be unreasonably withheld, conditioned or delayed. Subject to this Section 15.1, this Agreement is binding upon, inures to the benefit of and is enforceable by the Parties and their respective successors and permitted assigns.

**ARTICLE XVI**
**LIMITATION OF LIABILITY**

**Section 16.1        Limitation of Liability.**

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL, PUNITIVE OR EXEMPLARY DAMAGES OF ANY TYPE, INCLUDING LOST PROFITS OR LOSS OF BUSINESS OPPORTUNITY, IN CONTRACT OR TORT (INCLUDING NEGLIGENCE, JOINT OR SEVERAL, OR STRICT LIABILITY) ARISING OUT OF THIS AGREEMENT, PROVIDED THAT THIS LIMITATION SHALL NOT APPLY TO ANY INDEMNITY OBLIGATION SET FORTH HEREIN.

**ARTICLE XVII**
**CONFIDENTIALITY**

002184

**Section 17.1        Confidentiality.**

Any information belonging to a Party that is confidential and disclosed to the other Party in the course of performance of this Agreement or has been disclosed during the negotiations leading up to this Agreement, including the Agreement itself (collectively, the "***Confidential Information***"), shall be held in confidence and shall not be disclosed to others without the written approval of the disclosing Party. Confidential Information is not information that (i) is already known to the receiving Party at the time of disclosure by the disclosing Party (ii) is now or hereafter becomes available within the public domain other than as a result of a breach of this Agreement, (iii) is received by a Party from a Person under no obligation to keep the Confidential Information confidential, or (iv) is independently developed by a Party without reliance on Confidential Information. A Party shall have the right to disclose Confidential Information without the consent of the disclosing Party to its lenders, counsel, advisors, consultants, accountants, auditors, officers, directors, members, shareholders and other Persons of responsibility who have a need to know the Confidential Information, *provided* that such Persons agree to keep the Confidential Information confidential, and that the Party shall be responsible for any breaches of this confidentiality obligation by such Persons.  A Party shall also have the right to disclose Confidential Information without the consent of the disclosing Party in connection with a subpoena, interrogatory, request for production, civil investigative demand or other such legal process issued by any court or administrative, legislative, investigative or regulatory body, but only to the extent necessary to fully respond thereto and after providing prior Notice to the disclosing Party.  Upon the reasonable request of the disclosing Party, the receiving Party shall, in its sole discretion, either return the

31

Confidential Information or destroy it, *provided* that the receiving Party may retain a copy of Confidential Information as necessary to comply with Applicable Law.

## ARTICLE XVIII
## DISPUTE RESOLUTION

**Section 18.1        Dispute Resolution.**

All controversies, disputes or claims between Producer and Gatherer arising out of or in any way relating to this Agreement (each, a "***Dispute***") shall be resolved pursuant to the procedures of this Section  18.1.

(a)        If a Dispute arises between the Parties regarding their respective rights and obligations under this Agreement, the Parties shall use commercially reasonable efforts to reach a reasonable resolution of the Dispute informally.  Initially, the responsible Persons shall attempt to resolve the Dispute themselves. If they are unable to resolve the Dispute within 10 Days, then either Party may, by Notice, refer the Dispute to the senior management of the Parties for resolution. If senior management of the Parties are unable to resolve the Dispute within 10 Days of such Notice, the provisions of subsection (b) below shall apply.

(b)        Any Dispute not otherwise resolved under subsection (a) above may be submitted by either Party to a court proceeding filed in accordance with Applicable Law in any court having jurisdiction over the Parties and the subject matter.

002186

**ARTICLE XIX**
**MISCELLANEOUS**

    **Section 19.1**      **Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury Trial.**

    (a)    THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF OKLAHOMA AND ITS REGULATORY AGENCIES HAVING JURISDICTION OVER THE INTERESTS, EXCLUDING ANY CONFLICTS OF LAWS PROVISIONS CALLING FOR APPLICATION OF THE LAWS OF ANOTHER STATE.

    (b)    EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE SOLE AND EXCLUSIVE JURISDICTION OF THE STATE OR FEDERAL COURTS IN HARRIS COUNTY, TEXAS, AND EACH OF THE PARTIES IRREVOCABLY WAIVES ANY OBJECTION TO THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS.

    (c)    TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY IRREVOCABLY WAIVES ITS RIGHT TO A TRIAL BY JURY, AND CONSENTS TO A BENCH TRIAL BY A TRIAL COURT JUDGE, IN RESPECT OF ANY LITIGATION ARISING OUT OF THIS AGREEMENT AND ACKNOWLEDGES

32

THAT THIS WAIVER IS A MATERIAL INDUCEMENT FOR EACH OF THE PARTIES IN ENTERING INTO THIS AGREEMENT.

**Section 19.2        Survival.**

The provisions of this Agreement shall survive expiration or termination thereof for so long as necessary to give effect to the rights and obligations of the Parties hereunder, but in no event exceeding any applicable statutes of limitation.

**Section 19.3        No Joint Venture.**

Nothing in this Agreement shall create an association, joint venture or partnership between the Parties or impose any partnership obligation or partnership liability on any Party. Neither Party shall have any right, power or authority to enter into any agreement or commitment or act on behalf of or otherwise bind the other Party without such Party's prior written consent.

**Section 19.4        Entire Agreement.**

This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and there are not any oral or written understandings, representations or commitments of any kind, express or implied, which are not expressly set out herein. No modification of this Agreement shall be effective unless in writing and executed by the Parties. This Agreement restates the Original Agreement and supersedes any prior agreements of the Parties concerning the subject matter hereof.

This Agreement is for the sole and exclusive benefit of the Parties, and does not stipulate any benefit in favor of any third parties.

**Section 19.6        Regulatory Matters.**

(a)        Gatherer has informed Producer, and Producer hereby acknowledges and accepts, that the Gathering and Processing System will be an intrastate pipeline system operating only within the State of Oklahoma, and is not intended to be subject to regulation under any Applicable Law by FERC.  Accordingly, as a principal condition to, and in consideration for, the execution of this Agreement by Gatherer, Producer represents, warrants and covenants that (i) the delivery of Producer's Committed Gas hereunder will not subject the Gathering and Processing System or any portion thereof to regulation by FERC as (x) a natural gas company under the Natural Gas Act or (y) a Section 311 transporter under the Natural Gas Policy Act of 1978 and (ii) none of Producer's Committed Gas delivered at one or more Receipt Points is Gas that has been transported by a natural gas company, as defined in the Natural Gas Act, or by a Section 311 transporter under the Natural Gas Policy Act of 1978, at any point prior to such delivery.  In the event that Producer breaches its representation, warranty and covenant contained in this Section 19.6 (a), Gatherer, in addition to all other remedies at law or in equity, shall have the right, upon delivery of written notice to Producer, to refuse receipt of Producer's Committed Gas which has caused a breach of such representation, warranty and covenant.  Gatherer's

33

election to refuse receipt of any of Producer's Committed Gas pursuant to this Section 19.6 (a) shall not release Producer from any obligation to indemnify Gatherer for such breach under Article X.

(b)    If any federal or state statute, regulation, or order by a court of law or Governmental Authority directly or indirectly (a) prohibits performance under this Agreement, (b) makes such performance illegal or impossible, or (c) effects a change in a substantive provision of this Agreement that has a significant material adverse impact upon the performance of either Party's obligations under this Agreement, including without limitation the imposition of terms, conditions, or rate restrictions, then the Parties will use all reasonable efforts to revise the Agreement and any other ancillary agreement to the extent necessary so that: (i) performance under the Agreement is no longer prohibited, illegal, impossible, or is no longer impacted in a material adverse fashion, and (ii) this Agreement and any other ancillary agreement is revised in a manner that preserves, to the maximum extent possible, the respective positions of the Parties. Without liability for its failure to do so, each Party will use reasonable efforts to provide notice to the other Party as to any proposed law, regulations or any regulatory proceedings or actions that could affect the rights and obligations of the Parties. If the Parties are unable to revise the Agreement in accordance with the above within ninety (90) Days following the adoption of any such law, regulation or order of a Governmental Authority, then the Party whose performance is prohibited, illegal, impossible or is impacted in a material adverse fashion will have the right, at its sole discretion, to terminate this Agreement upon written notice to the other Party.

**Section 19.7**          **Execution in Counterparts.**
This Agreement may be executed in counterparts, including by electronic transmission, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement.

[Signature Page Next Page]

34

IN WINESS WHEREOF, each of the Parties has caused this Agreement to be executed in duplicate originals by its duly authorized officer as of the Effective Date.

**PRODUCER**

**OKLAHOMA ENERGY ACQUISITIONS, LP**

By: Alta Mesa GP, LLC, its general partner

By: _____

David McClure, *Vice President - Facilities & Midstream*

002192

**GATHERER**

**KINGFISHER MIDSTREAM, LLC**, a Delaware
limited liability company

By: _____
Name: Taylor Tipton
Title: President

002194

2

**Schedule 7.1**
**to**
**AMENDED AND RESTATED**
**GAS GATHERING AND PROCESSING AGREEMENT**
**Effective December 1, 2016**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**SERVICE FEES**

Any terms capitalized in this Schedule shall have the meaning set forth herein, or as indicated by the context, or as set forth in the body of the Agreement.

The Service Fee for gathering and processing Producer's Gas shall be as follows:

Service Fee = (Gathering Fee + Processing Fee + Dehydration Fee + Compression Fee + Facility Fee) X the Price Index + Other Fuel Fee + Buy-Back Service Fee + Buy-Back Meter Fee

**Gathering Fee ($/MMBtu)**

A Gathering Fee of ▮▮▮▮▮MMBtu shall be assessed on all Receipt Point Volumes.

002196

**Processing Fee ($/MMBtu)**

**Processing Fee ($/MMBtu)**

A Processing Fee of ████/MMBtu shall be assessed on all Receipt Point Volumes.

**Dehydration Fee ($/MMBtu)**

A Dehydration Fee of ████/MMBtu shall be assessed on all Receipt Point Volumes.

**Compression Fee ($/MMBtu)**

Gatherer shall install compression as necessary on the Gathering and Processing System as provided in Section 5.4.  For all Receipt Point Volumes, a Compression Fee of ████MMBtu per stage of compression shall be assessed.

**Facility Fee ($/MMBtu)**

A Facility Fee of ████MMBtu shall be assessed on all Receipt Point Volumes for Calendar Years 2017, 2018, 2019 and 2020, after which such Facility Service Fee shall be removed entirely from the Service Fees.

**Buy-Back Service Fee ($/MMBtu)**

A Buy-Back Service Fee ████████████████████████████████ ████████████████████████████  The Buy-Back Service Fee will be invoiced and settled Monthly.

**Buy-Back Meter Fee ($/Month)**

3

002197

A Buy-Back Meter Fee of ███ Dollars per Month for each Buy-Back Meter (whether or not Gas is then being delivered through such meter) until such time as Producer requests in writing that Gatherer permanently disconnect said Buy-Back Meter

4

002199

# EXHIBIT 5

002200

**AMENDED AND RESTATED**

**CRUDE OIL GATHERING AGREEMENT**

**OKLAHOMA ENERGY ACQUISITIONS, LP**

**AND**

002201

AND

**KINGFISHER MIDSTREAM, LLC**

**Effective as of
December 1, 2016**

## TABLE OF CONTENTS

Article I

DEFINITIONS AND INTERPRETATION ......................................................2

Section 1.1      Definitions..................................................................................2
Section 1.2      Interpretation...............................................................................7

Article II

TERM ..........................................................................................................7

Section 2.1      Term............................................................................................7

Article III

GRANT OF TRANSPORTATION RIGHT..................................................7

Section 3.1      Conveyance of Transportation Right. ........................................7
Section 3.2      Real Interests..............................................................................8

Article IV

CRUDE GATHERING SYSTEM .................................................................8

Section 4.1      Reserved......................................................................................8
Section 4.2      Easements, Rights-of-Way and Fee Lands. ...............................8
Section 4.3      Dedication....................................................................................9
Section 4.4      Covenant Running With Land. .................................................10
Section 4.5      Option to Expand Crude Gathering System..............................10
Section 4.6      Title Warranty...........................................................................11
Section 4.7      Proceeds of Production..............................................................12

002203

Section 4.7          Proceeds of Production. ....................................................12
Section 4.8          Receipt Points. ..............................................................12
Section 4.9          Additional Receipt Points; Obligation to Interconnect. ............12
Section 4.10         Additional Wells. ...........................................................14
Section 4.11         Commingling. ................................................................15

Article V                GATHERING AND DELIVERY .......................................................15
Section 5.1          Obligation to Gather; No Treating Services. ........................15
Section 5.2          Scheduling. ...................................................................15
Section 5.3          Delivery of Crude. ..........................................................16
Section 5.4          Measurement, Equipment and Testing. .............................16
Section 5.5          Quality. .......................................................................16
Section 5.6          Delivery Pressure at Receipt Points. ................................17
Section 5.7          Operating Inventory. ......................................................17
Section 5.8          Title and Risk of Loss. ...................................................17
Section 5.9          LACT Electricity. ...........................................................17
Section 5.10         Truck Stations. ..............................................................17
Section 5.11         System Losses. ..............................................................18

Article VI               CURTAILMENT AND MAINTENANCE ...........................................18
Section 6.1          Curtailment and Temporary Release of Crude Oil. ...............18

i

002204

Section 6.2          Maintenance Events..............................................................................19

Article VII

                      FEES AND PAYMENT ...........................................................................19
Section 7.1          Fees...........................................................................................................19
Section 7.2          Escalation.................................................................................................20
Section 7.3          Billing and Payment................................................................................20
Section 7.4          Audit.........................................................................................................20
Section 7.5          Taxes.........................................................................................................21

Article VIII

                      INDEMNIFICATION...............................................................................21
Section 8.1          Indemnification........................................................................................21
Section 8.2          Notification Obligation...........................................................................21

Article IX

                      FORCE MAJEURE ...................................................................................22
Section 9.1          Force Majeure..........................................................................................22

Article X

                      DEFAULT AND TERMINATION..........................................................22
Section 10.1         Producer Events of Default.....................................................................22
Section 10.2         Gatherer's Default Remedies Against Producer...................................23
Section 10.3         Gatherer Events of Default......................................................................23
Section 10.4         Producer's Default Rights Against Gatherer........................................23

002205

Section 10.4        Producer's Default Rights Against Gatherer. ...................................23

Article XI

                    ASSIGNMENT.................................................................................23
Section 11.1        Assignment ....................................................................................23

Article XII

                    LIMITATION OF LIABILITY ......................................................24
Section 12.1        Limitation of Liability....................................................................24

Article XIII

                    MISCELLANEOUS .......................................................................24
Section 13.1        Assignment. ....................................................................................24
Section 13.2        Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury
                    Trial.................................................................................................24
Section 13.3        Dispute Resolution..........................................................................25
Section 13.4        Notices. ...........................................................................................25
Section 13.5        Survival. ..........................................................................................25
Section 13.6        No Joint Venture. ............................................................................25
Section 13.7        Entire Agreement. ...........................................................................25
Section 13.8        No Third Party Beneficiaries. .........................................................26
Section 13.9        Confidentiality. ...............................................................................26
Section 13.10       Regulatory Matters..........................................................................26

ii

38627407.2

Section 13.11        Execution in Counterparts..................................................................27

Schedule 1.1            Producer's Interests
Schedule 4.3            Dedicated Area
Schedule 4.4            Form of Memorandum of Crude Oil Gathering Agreement
Schedule 4.8(a)         Specified Area
Schedule 4.8(b)         Receipt Points
Schedule 4.9(a)         Designation of Additional Receipt Point
Schedule 4.10           Form of Notice for New Wells
Schedule 5.3(a)         Schematic of Delivery Point
Schedule 5.4(a)         Measurement, Equipment and Testing
Schedule 5.5            Specifications
Schedule 13.4           Notices

iii

38627407.2

## AMENDED AND RESTATED CRUDE OIL GATHERING AGREEMENT

This **Amended and Restated Crude Oil Gathering Agreement** (this "*Agreement*") is made and entered into as of the 3rd day of February, 2017, but effective as of December 1, 2016 (the "*Effective Date*"), by and between Oklahoma Energy Acquisitions, LP, a Texas limited partnership ("*Producer*"), and Kingfisher Midstream LLC, a Delaware limited liability company ("*Gatherer*"). Producer and Gatherer may be referred to each individually as a "*Party*," or collectively as the "*Parties*."

## RECITALS

**WHEREAS**, the Parties entered into that certain Crude Oil Gathering Agreement dated as of August 31, 2015 (the "*Original Agreement*"), and the Parties now desire to amend and restate the Original Agreement in its entirety to be effective for all purposes as of the Effective Date as provided herein; and

**WHEREAS**, Producer owns, controls or may acquire certain oil and gas leasehold interests and other mineral interests and hydrocarbon reserves (collectively, the "*Producer's Interests*," as further defined below), and controls the oil, gas and mineral interests of others (collectively, the "*Other Interests*," as further defined below) in certain lands in Kingfisher, Logan, Canadian, Blaine and Garfield Counties, Oklahoma, described more particularly on **Schedule 4.3** attached hereto (the "*Dedicated Area*"); and

**WHEREAS**, Producer desires to have Gatherer gather and transport the crude oil from the

002209

Producer's Interests (the "***Crude Oil***") from present and future wells located in the Dedicated Area and to induce Gatherer to perform the covenants contained in this Agreement, Producer is subject to the terms herein, to convey to Gatherer the sole and exclusive right to transport Crude Oil from the Interests, Dedicate (defined below) to Gatherer the Producer's Interests and deliver such Crude Oil (the "***Committed Crude***") to Gatherer for gathering; and

**WHEREAS**, Gatherer shall construct, own and operate Crude Oil gathering facilities (collectively, the "***Crude Gathering System***," as further defined below) capable of receiving from Producer deliveries of the Committed Crude from the Dedicated Area and subject to the Dedication; and

**WHEREAS**, Producer desires that Gatherer provide gathering services as set forth in this Agreement, and Gatherer desires to provide to Producer gathering services in accordance with the terms and conditions set forth in this Agreement; then

**THEREFORE**, for and in consideration of the mutual covenants set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree that the Original Agreement is hereby amended and restated in its entirety as follows:

1

# ARTICLE I
# DEFINITIONS AND INTERPRETATION

**Section 1.1          Definitions.**

The following terms shall have the following meanings unless otherwise indicated:

"***Actual Loss Percentage***" means a percentage determined by dividing the amount of Actual Losses by the Received Crude for any period of time.

"***Actual Losses***" means any loss of Received Crude that is experienced in the day-to-day operation of the Crude Gathering System, including losses due to evaporation, clingage, shrinkage, line-loss, discoloration, or deterioration of the Crude Oil while in the Gatherer's custody.

"***Additional Capacity***" has the meaning set forth in Section 4.5.

"***Additional Receipt Point***" has the meaning set forth in Section 4.9.

"***Additional Receipt Point Notification***" has the meaning set forth in Section 4.9(a).

"***Affiliate***" means with respect to a Person, any Person which, directly or indirectly, controls, is controlled by or is under common control with such Person or such Person's members or shareholders.  For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such individual or entity, whether through the ownership of voting securities, by contract or otherwise,

*provided, however*, that for purposes of this Agreement, Producer and Gatherer shall not be considered Affiliates of each other.

"***After-Acquired Interests***" has the meaning set forth in Section 4.3(b).

"***Agreement***" has the meaning set forth in the introductory paragraph.

"***Applicable Law***" means any applicable statute, law principle of common law, rule, regulation, judgment, order, ordinance, requirement, code, writ, injunction, or decree of any Governmental Authority.

"***Barrel***" or "***bbl***" means forty-two (42) gallons of 231 cubic inches per gallon at 60 degrees Fahrenheit (60° F).

"***Business Day***" means any day, other than a Saturday or Sunday, that commercial banks in Houston, Texas are open for business.

"***Claims***" means any and all demands, claims, judgments, obligations, liabilities, liens, causes of action, lawsuits, arbitrations, mediations, investigations or proceedings (whether at law or in equity).

"***Committed Crude***" is Crude Oil subject to the Dedication.

"***Confidential Information***" has the meaning set forth in Section 13.9.

2

"**_Contract Year_**" means each calendar year during the Term, the first of which shall commence on the Effective Date and run through December 31 of that year, and then from January 1 through December 31 for each subsequent year thereafter, but for the last Contract Year, from January 1 through the date that this Agreement terminates or expires.

"**_Crude Gathering System_**" has the meaning set forth in the Recitals, and further means the (i) Gathering Pipelines, Easements, and rights of way; (ii) storage facilities, (iii) LACT units, crude pumps, meters or measurement facilities, and (iv) any other equipment or appurtenances associated with the foregoing.

"**_Crude Oil_**" has the meaning set forth in the Recitals.

"**_Curtailment Event_**" has the meaning set forth in Section 6.1.

"**_Curtailment Period_**" has the meaning set forth in Section 6.1.

"**_Cushing Pipeline_**" means that certain long-haul pipeline connecting the Crude Gathering System to Cushing, Oklahoma.

"**_Dedicated Area_**" has the meaning set forth in the Recitals, as further specifically set forth on **Schedule 4.3**.

"**_Dedicated Wells_**" has the meaning set forth in Section 4.3(c).

"**_Dedication_**" has the meaning as set forth in Section 4.3(a).

002213

"*Delivered Crude*" means that quantity of Crude Oil that is delivered by Gatherer to Producer at the Delivery Point.

"*Delivery Point*" has the meaning set forth in Section 5.3(a).

"*Dispute*" has the meaning set forth in Section 13.3.

"*Easements*" has the meaning set forth in Section 4.2(a).

"*Effective Date*" has the meaning set forth in the introductory paragraph.

"*Extended Term*" has the meaning set forth in Section 2.1.

"*FERC*" means the Federal Energy Regulatory Commission, or any successor Governmental Authority.

"*Firm*" means a gathering and transportation service that is not subject to being curtailed, interrupted, pro rated or suspended except as expressly provided in this Agreement.

"*Force Majeure*" has the meaning set forth in Section 9.1.

"*Force Majeure Event*" has the meaning set forth in Section 9.1.

3

002214

"*GAAP*" means generally accepted accounting principles in the United States.

"*Gatherer*" has the meaning set forth in the introductory paragraph.

"*Gatherer Event of Default*" has the meaning set forth in Section 10.3.

"*Gatherer Group*" means any or all of (i) Gatherer, (ii) Gatherer's Affiliates, (iii) any of their respective contractors, and (iv) the officers, directors, employees, agents, advisors, counsel, consultants, members, shareholders, insurers, invitees or representatives of any of the foregoing.

"*Gathering Fee*" has the meaning set forth in Section 7.1(b)(i).

"*Gathering Pipelines*" means the pipelines of various diameters interconnecting the Receipt Point(s) to the Delivery Point.

"*Governmental Approval*" means any permit, license, permission, grant or other similar authorization issued by, or required to be issued by, any Governmental Authority and necessary for the performance of the Parties hereunder.

"*Governmental Authority*" means any federal, state, county, parish, municipal or other governmental subdivision, or any court or any governmental department, commission, board, bureau, agency or other instrumentality of any federal, state, county, municipal or other governmental subdivision within the United States of America with authority over the Parties and subject matter in question.

"***Indemnified Party***" has the meaning set forth in Section 8.2.

"***Indemnifying Party***" has the meaning set forth in Section 8.2.

"***Initial Fee***" has the meaning set forth in Section 7.1(a).

"***In-Service Date***" means the first day of the first full month following the date that Gatherer notifies Producer that the Crude Gathering System, or any Additional Capacity, if applicable, has been completed and is ready to receive Committed Crude and ready to redeliver it to Producer at the Delivery Point.

"***Interests***" means Producer's Interests, After-Acquired Interests and Other Interests.

"***LACT Unit***" means any lease automatic custody transfer unit, including measurement and sampling devices, pump(s), flow computer, and associated equipment, at a Receipt Point or the Delivery Point.

"***Line Fill***" has the meaning set forth in Section 5.7(a).

"***Loss Payment***" has the meaning set forth in Section 5.11(b).

"***Losses***" means any and all losses, damages, costs, expenses, liabilities, fines, penalties or judgments of whatever kind or character, including reasonable attorneys' fees, court costs and other reasonable costs and expenses of defending against any Claim.

4

"***Maintenance Event***" has the meaning set forth in Section 6.2.

"***New Well Notice***" has the meaning set forth in Section 4.10(a).

"***Non-Operated Well***" means any well that is subject to the Dedication that is not a Producer Operated Well.

"***Notice***" has the meaning set forth in Section 13.4.

"***Notification Date***" has the meaning set forth in Section 4.9(a).

"***Off-Spec Crude Oil***" has the meaning set forth in Section 5.5.

"***Original Agreement***" has the meaning set forth in the recitals.

"***Original Date***" means August 31, 2015.

"***Other Interests***" means the interests of Persons in the Dedicated Area other than Producer, but whose interests may be represented or controlled under a written or implied agreement with Producer and/or by statute, including working interests, royalty interests, overriding royalty interests, net profits interests or other mineral interests to the extent such interests were not granted by, through or under Producer after the Original Date. Nothing in this Agreement is intended to impair or impede the rights of the owners of the Other Interests to take Crude Oil in-kind and/or to sell Crude Oil at the well site for their own account.

"***Overdue Rate***" means a rate per annum equal to the lesser of (i) an annual rate equal to four percent (4%) over the annual rate of interest specified under the caption "Money Rates" in the *Wall Street Journal* (New York Edition) on the date such payment was required to have been made, or (ii) the maximum rate of interest permitted by Applicable Law.

"***Party***" and "***Parties***" have the meaning set forth in the introductory paragraph.

"***Person***" means any individual, firm, corporation, trust, partnership, limited liability company, association, joint venture, other business enterprise or Governmental Authority.

"***Pipeline Injection Station***" has the meaning set forth in Section 5.10.

"***Pipeline Loss Allowance***" means (a) for Received Crude with an API gravity of between thirty-six (36) and forty-four and nine-tenths (44.9) degrees, ▮▮▮▮▮▮▮▮▮▮ of the Receipt Point volume(s) delivered, and (b) for Received Crude with an API gravity of between forty-five (45) and forty-eight (48) degrees, ▮▮▮▮▮▮▮▮ of the Receipt Point volume(s) delivered.

"***Price Index***" has the meaning set forth in Section 7.2.

"***Primary Term***" has the meaning set forth in Section 2.1.

"***Producer***" has the meaning set forth in the introductory paragraph.

"***Producer Capacity***" has the meaning set forth in Section 4.5.

5

"***Producer Event of Default***" has the meaning set forth in Section 10.1.

"***Producer Group***" means any or all of (i) Producer, (ii) Producer's Affiliates, (iii) Producer's contractors and suppliers, of every tier, other than the Gatherer Group, and (iv) the officers, directors, employees, agents, advisors, counsel, consultants, members, shareholders, insurers, invitees or representatives of any of the foregoing.

"***Producer Operated Well***" means any well that is subject to the Dedication that is operated by Producer.

"***Producer's Interests***" means all oil and gas leasehold interests and other mineral interests in lands, leases, wells and Crude Oil that Producer owned as of the Original Date in the Dedicated Area, including the oil and gas leasehold interests and other minerals interests set forth on Schedule 1.1.

"***Receipt Point***" means the points located within the Dedicated Area where Producer elects in its sole and reasonable discretion to deliver Producer's Oil to Gatherer and where Gatherer may receive Producer's Oil in accordance with the terms of this Agreement. At Producer's election, a Receipt Point for particular volumes of Producer's Oil may be the inlet of Gatherer's facilities at the interconnection of Producer's central production facilities with the Crude Gathering System or may be at the inlet of Gatherer's facilities at the interconnection with the Crude Gathering System of Producer's individual well separation equipment located downstream of Producer's wells.

002219

"***Received Crude***" means the quantity of Crude Oil in bbl that is delivered by Producer to Gatherer at a Receipt Point.

"***Scheduled Crude***" has the meaning set forth in Section 5.2(a).

"***Specifications***" has the meaning set forth in Section 5.5.

"***Specified Area***" has the meaning set forth in Section 4.8(a).

"***System Capacity***" means the then-maximum capacity of the Crude Gathering System to gather and redeliver to Producer Committed Crude, which shall in no event be less than fifty thousand (50,000) Barrels per day.

"***Tank Bottoms***" has the meaning set forth in Section 5.7(b).

"***Tax***" means any current or future taxes, fees, levies, charges, assessments and/or other impositions levied, charged, imposed, assessed or collected by any Governmental Authority having jurisdiction.

"***Term***" means the Primary Term and any Extended Term.

"***Transportation Interests***" has the meaning set forth in Section 3.1(a).

"***Trigger Date***" has the meaning set forth in Section 7.1(a).

6

002220

"***Trucking Fee***" has the meaning set forth in Section 7.1(b)(iii).

**Section 1.2        Interpretation.**

References in the singular shall include the plural, and references to the masculine shall include the feminine, and vice versa. Words denoting natural persons shall include partnerships, firms, companies, corporations, joint ventures, trusts, associations, organizations or other entities. References to a particular article, section, subsection, paragraph, subparagraph or schedule, if any, shall be a reference to such article, section, subsection, paragraph, subparagraph or schedule in and to this Agreement. The words "include" and "including" shall include the phrase "not limited to." Any reference to a Person shall include that Person's successors and assigns or to any Person succeeding to that Person's functions. Any Schedules are fully incorporated and made part of this Agreement. The Schedules shall be read in conjunction with the provisions of the body of this Agreement, and the Schedules and the body of this Agreement shall be interpreted to give effect to the intent of the Parties as evidenced by their terms when taken as a whole, *provided, however*, that in the event of an express and irreconcilable conflict between the terms of a Schedule and the provisions of the body of this Agreement, the provisions of the body of this Agreement shall control. Capitalized terms appearing in a Schedule shall have the meanings set forth in Section 1.1, unless the context requires otherwise. Words that have a well-known technical, trade or industry meaning shall be given that meaning, unless it would conflict with an express provision of this Agreement, in which case the express provision of this Agreement shall control. The section headings in this Agreement have been inserted for the convenience of the Parties and shall not define, limit or extend interpretation of the corresponding Section, Exhibit or this Agreement.

**ARTICLE II**

## ARTICLE II
## TERM

**Section 2.1      Term.**

This Agreement shall be effective as of the Original Date, and, unless earlier terminated in accordance with any express provision of this Agreement, shall remain in full force and effect for a period of fifteen (15) years from the In-Service Date (the "***Primary Term***"), *provided, however*, that, to the extent that at the end of the Primary Term there are wells then-connected to the Crude Gathering System and then-producing Crude Oil in commercial (paying) quantities, the term of this Agreement shall extend, but only to such connected and producing wells, for so long as such well(s) continue to produce Crude Oil in commercial (paying) quantities (the "***Extended Term***").

## ARTICLE III
## GRANT OF TRANSPORTATION RIGHT

**Section 3.1      Conveyance of Transportation Right.**

(a)         For good and valuable consideration paid by Gatherer, the receipt and sufficiency of which are hereby acknowledged, Producer grants, bargains, sells, conveys, transfers, assigns and delivers unto Gatherer, as of the Original Date until the end of the Term, unless earlier reverted in accordance with Section 4.9(f), the sole and exclusive right to transport Crude Oil produced from the Producer's Interests and After-Acquired Interests, specifically the right to

7

gather, separate, meter, measure and store such Crude Oil that may be produced and saved therefrom (the "***Transportation Interests***").

(b)        At the end of the Primary Term, the Dedication shall terminate and the Transportation Interests and Easements will revert automatically to Producer or the other applicable owners thereof save and except the Transportation Interests and Easements insofar only as Crude Oil that may be produced and saved from the Dedicated Wells, which shall continue until the end of the Extended Term.  At the end of the Extended Term for any Dedicated Well or upon the earlier termination of this Agreement in accordance with any express provision of this Agreement, Gatherer's remaining Transportation Interests and Easements related to any Dedicated Well for which the Extended Term has terminated and/or as to any Interests affected by an earlier termination will revert automatically to Producer or the other applicable owners thereof and Gatherer shall execute and deliver to Producer a recordable release and quitclaim in and to any rights, including Transportation Interests, in the Interests that have been terminated.

(c)        The Transportation Interests conveyed to Gatherer are subject to (i) with respect to any After-Acquired Interests within the Dedicated Area, any valid and enforceable prior written dedication or commitment for gathering of Crude Oil, and other minerals as of the time of the acquisition by Producer, (ii) Producer's right to transfer Crude Oil produced from the Interests that Producer is expressly required to deliver under the oil and gas leasehold interests and other mineral interests comprising the Interests, (iii) with respect to the Other Interests, the rights of the owners of such Other Interests to take in kind and separately dispose of their share of Crude Oil produced from the Dedicated Area and (iv) the terms and conditions of this Agreement.

002223

**Section 3.2     Real Interests**. Producer and Gatherer intend that the conveyance of the Transportation Interests be a conveyance of a portion of Producer's real property interests included in the Interests (including the interests of others whose interests are represented or controlled by Producer insofar only as Producer has the power and authority to grant Transportation Interest in the interests of such third parties). Producer and Gatherer agree that Gatherer has a determinable real property interest carved out of the Interests.

# ARTICLE IV
# CRUDE GATHERING SYSTEM

**Section 4.1     Reserved**

**Section 4.2     Easements, Rights-of-Way and Fee Lands.**

(a)     To the extent that (i) Producer may do so in compliance with all applicable agreements, and (ii) Gatherer's activities on the relevant lands do not unreasonably interfere with Producer's operations, Producer, from the Original Date until the end of the Term, unless earlier reverted in accordance with the terms of this Agreement, hereby conveys and assigns to Gatherer, to the extent that Producer may do so without payment of monies (unless Gatherer agrees to pay), an exclusive easement and right-of-way in and to the surface of the Interests for purposes of constructing, owning, operating, repairing, replacing and maintaining pipelines and other facilities for gathering, separating, metering, measuring, storing and redelivering to Producer

8

all Crude Oil that may be produced from and saved from the Interests, including the Crude Gathering System (the "***Easements***"); *provided, however*, an Easement shall be non-exclusive to the extent that Producer requires access to the surface of the Interests to install Receipt Points, connect any wells to Receipt Points or connect Receipt Points to the Crude Gathering System, in each case, in accordance with the express terms of the Agreement.

(b)     At the end of the Primary Term, all of the Easements will revert automatically to Producer or the owners of such applicable rights except to the extent such easements and rights-of-way are necessary for owning, operating, repairing, replacing and maintaining any portion of the Crude Gathering System used to provide service under this Agreement to the Dedicated Wells, and such easements and rights-of-way shall continue until the end of the Term.  At the end of the Term, Gatherer's easements and rights-of-way will revert automatically to Producer or the other applicable owners thereof.

**Section 4.3       Dedication.**

(a)     For the Term of this Agreement, Producer hereby dedicates to Gatherer all of Producer's Crude Oil that may be produced and saved from the Interests for the purpose of gathering, separating, metering, measuring, storing and redelivering to Producer such Crude Oil, for delivery to Gatherer at the Receipt Point(s) all Committed Crude as and when produced and saved (the "***Dedication***"), *provided* that notwithstanding the Dedication, Producer shall continue to retain its right to (i) administer the Interests as it deems advisable in its sole discretion, including the right to rework, shut in, plug or abandon any well, (ii) form or participate in the formation of any unit, whether operated by Producer or third-party, (iii) use Crude Oil in its operations, and (iv)

deliver Crude Oil that Producer is expressly required to deliver under oil and gas leases, contractual agreements, or other legal rights under which Committed Crude is produced, in each case to the extent such leases, agreements and rights existed prior to the Original Date and only until such leases, agreements or commitments expire or are terminated; *provided further* that the Dedication is subject to (x) with respect to any After-Acquired Interests within the Dedicated Area, any valid and enforceable prior written dedication or commitment for gathering of Crude Oil and other hydrocarbons as of the time of the acquisition by Producer, (y) Producer's right to transfer Crude Oil produced from the Interests that Producer is expressly required to deliver under the oil and gas leasehold interests and other mineral interests comprising the Interests and (z) with respect to the Other Interests, the rights of the owners of such Other Interests to take in-kind and separately dispose of their share of Crude Oil produced from the Other Interests.

(b)      If, after the Original Date and before the end of the Primary Term, Producer acquires oil and gas leasehold, other mineral interests, or the right to produce from a unitized common source of supply on behalf of all owners within the unit, including by way of joint venture participation, operating agreements, pooling agreements, farm outs, unitization, drill-to-earn rights or other means, within the Dedicated Area, but only to the extent Producer has acquired the authority to produce, save, market, and sell Crude Oil attributable to such interests (the "***After-Acquired Interests***"), effective simultaneously with the acquisition of the After-Acquired Interests by Producer, Producer hereby dedicates to Gatherer all Crude Oil that may be produced and saved from such After-Acquired Interests for the purpose of gathering, metering, measuring, storing and redelivering to Producer such Crude Oil, for delivery to Gatherer at the Receipt Point(s) all Committed Crude as and when produced and saved, *provided*, *however*, to the

9

extent that any of the After-Acquired Interests or Crude Oil in the Dedicated Area are subject to any valid and enforceable prior written dedication, contract, or commitment for gathering as of the time of acquisition by Producer, then such dedication, contract, or commitment shall be senior to the Dedication until such prior dedication or commitment terminates or expires, *provided further* that if, with respect to any After-Acquired Interests, Producer has the right or ability, without payment of any material fee or penalty, or incurring any other material disadvantage, to terminate any such valid and binding prior dedication or commitment with respect to the After-Acquired Interests, then Producer shall terminate such dedication or commitment as soon as reasonably practicable.  Producer shall promptly notify Gatherer in writing of any such termination, and identify the After-Acquired Interests.

(c)       At the end of the Primary Term, the Dedication shall terminate automatically except to the extent of all Crude Oil that may be produced from the Interests through any wells in the Dedicated Area connected to the Crude Gathering System at the end of the Primary Term (such wells, the "***Dedicated Wells***").  From and after the end of the Term, all Interests shall be permanently released from the Dedication.

(d)       In connection with any After-Acquired Interests, Producer and Gatherer shall execute and deliver any additional documents and instruments and perform any additional acts that may become reasonably necessary or appropriate to evidence of record, and ratify with respect to such After-Acquired Interests, the grant of the Dedication, Transportation Interests and Easements granted under the terms of this Agreement.

002227

**Section 4.4       Covenant Running With Land.**

For the Term, the Dedication under this Agreement shall be a covenant running with the land and the Interests and shall be binding on successors and assignees of the Parties. Contemporaneously with the execution of this Agreement, and from time-to-time during the Term if necessary, the Parties shall each execute for recordation in the public records of the Dedicated Area a "short form" memorandum of this Agreement in the form of **Schedule 4.4** attached hereto, identifying the Dedicated Area, the Interests, After-Acquired Interests and wells thereon.  Producer shall cause any conveyance of all or any of the Producer's Interests or After-Acquired Interests, to be made expressly subject to this Agreement, and to cause all transferees to execute a written instrument in a form reasonably satisfactory to Gatherer acknowledging (i) the conveyance of the Transportation Interests and the Easements, (ii) the Dedication and (iii) such transferees' obligations under this Agreement.  Gatherer shall likewise cause any assignment or conveyance of the Transportation Interests, the Dedication or all or any segment of the Crude Gathering System to be made expressly subject to this Agreement, and to cause all transferees to execute a written instrument in a form reasonably satisfactory to Producer acknowledging such transferees' obligations under this Agreement.

> **Section 4.5        Option to Expand Crude Gathering System.**

Gatherer shall gather all volumes of Committed Crude up to fifty thousand (50,000) Barrels per day on a Firm basis (the "***Producer Capacity***").  All volumes of Committed Crude above the Producer Capacity shall at all times be Committed Crude.  To the extent that Committed Crude shall exceed the Producer Capacity, Gatherer shall have the option to (a) utilize any available

10

System Capacity in excess of the Producer Capacity on a Firm basis, (b) contract with third Persons to gather such Committed Crude, or (c) expand the Crude Gathering System as many times as necessary by adding additional System Capacity (the "***Additional Capacity***").  In the event that production from the Interests shall exceed the Producer Capacity, Producer shall provide Notice to Gatherer that production exceeds the Producer Capacity, and Gatherer shall provide Notice to Producer within sixty (60) days of Gatherer's receipt of Producer's Notice that Gatherer will or will not accept such volumes of Committed Crude or add Additional Capacity.  In the event that Gatherer provides Notice to Producer that it will not accept such volumes of Committed Crude above the Producer Capacity or add Additional Capacity, then the acreage from which the volumes of Committed Crude above the Producer Capacity are directly produced shall be released from the Dedication (Gatherer shall promptly file an appropriate Memorandum of Release in the records of the County Clerk of the County where the Acreage is located), and Producer may take such volumes of Committed Crude elsewhere.  In the event that Gatherer provides Notice to Producer that it will accept such volumes of Committed Crude above the Producer Capacity or add Additional Capacity, then, until Gatherer is able to gather such Committed Crude, or until the In-Service Date for such Additional Capacity, Producer may deliver or sell any volumes of Committed Crude above the Producer Capacity elsewhere under contracts with third-party purchasers or transporters having a term of no longer than one (1) year, *provided* that once Gatherer is able to gather such volumes of Committed Crude, all such volumes of Committed Crude shall be delivered to Gatherer at a Receipt Point upon termination of Producer's sale or transport contract.  **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, PRODUCER'S RIGHT TO TAKE THE AFFECTED VOLUMES OF COMMITTED CRUDE ELSEWHERE DURING ANY PERIOD WHERE GATHERER REFUSES TO TAKE VOLUMES OF PRODUCER'S**

COMMITTED CRUDE THAT EXCEED THE PRODUCER CAPACITY, AND THE RELEASE FROM DEDICATION, IF APPLICABLE, SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY, AT LAW OR IN EQUITY, WITH RESPECT TO GATHERER'S INABILITY OR REFUSAL TO TAKE VOLUMES OF COMMITTED CRUDE THAT EXCEED THE PRODUCER CAPACITY**.

Section 4.6        Title Warranty.

Producer represents and warrants to Gatherer that: (i) it owns Producer's Interests, (ii) has the right to convey the Transportation Interests and the Easements, (iii) has the right to dedicate all of Producer's Interests and Crude Oil dedicated under this Agreement, and to deliver Producer's Committed Crude to the Receipt Point(s), free and clear of all liens, encumbrances and claims except for (A) "Permitted Liens" as defined under the Sixth Amended and Restated Credit Agreement among Alta Mesa Holdings, LP, as Borrower, Wells Fargo Bank, N.A. and the lenders party thereto from time to time, dated May 13, 2010, as amended from time to time and (B) "Permitted Liens" as defined under the Note Purchase Agreement dated August 31, 2015 among HMS Kingfisher Holdco, LLC, the holders thereunder from time to time and the agent for such holders, as amended from time to time, (C) statutory lien rights under 52 Okla. Stat. §§549.1, *et seq.* and 570.1, *et seq.*, and (v) there are no valid and enforceable dedications or commitments existing as of the Original Date covering any of Producer's Interests or Crude Oil produced from the Producer's Interests within the Dedicated Area. Producer shall defend, indemnify, protect and hold harmless Gatherer from and against all claims arising out of any breach of such representation and warranty.

11

**Section 4.7        Proceeds of Production.**

Producer shall make payment of all royalties, overriding royalties, production payments, and all other payments attributable to the Interests and Committed Crude due to any Person under any leases or agreements in accordance with the terms thereof, and Gatherer shall have no obligations with respect thereto.

**Section 4.8        Receipt Points.**

(a)        Except as otherwise provided herein and subject to Section 4.10(b), Producer shall be obligated to connect all wells that constitute Interests within the boundaries of the area depicted on the map attached hereto as **Schedule 4.8(a)** (the "***Specified Area***") into a Gatherer provided Receipt Point of the Crude Gathering System in accordance with the following timeline: (i) for wells that were completed between June 30, 2016 and December 31, 2016, no later than June 30, 2017, and (ii) for wells completed from and after January 1, 2017, no later than 120-days following the date of completion of such well.  Notwithstanding the foregoing, if Producer reasonably determines that it is not capable of interconnecting any such well within time periods set forth in subclauses (i) or (ii) above, then it may request that Gatherer perform the scope of work required to connect the well into the Crude Gathering System, Producer shall reimburse all of Gatherer's costs and expenses related to such work, without additional markup, in accordance with Section 4.9(c).

(b)        The list of initial Receipt Points are set forth in **Schedule 4.8(b)**.  Gatherer shall install, own, operate and maintain all LACT Units at the Receipt Points.  Notwithstanding

002231

anything to the contrary in this Agreement, in the event Producer does not connect any well located in the Specified Area to the Receipt Points in accordance with the time periods set forth in Section 4.8(a)(i) and (ii), Gatherer shall nonetheless be entitled to charge any and all applicable fees set forth in Article 7 in connection with any Crude Oil that produced from that well within the Specified Area.

Case 4:24-cv-04092    Document 1-9    Filed 01/21/24 in TXSD    Page 378 of 582

**Section 4.9        Additional Receipt Points; Obligation to Interconnect.**

The Parties shall use the following process for connecting new Receipt Points to the Crude Gathering System that are located within the Dedicated Area ("***Additional Receipt Points***"):

(a)        Producer shall provide written notice to Gatherer for Additional Receipt Points in the Dedicated Area as follows: (1) no later than ▮▮▮▮▮▮▮▮▮▮▮ Days prior to the expected date of first flow to Gatherer setting forth the expected date of first flow for Additional Receipt Points within the Specified Area; or (2) no later than ▮▮▮▮▮▮▮▮▮▮▮▮ days prior to the expected date of first flow to Gatherer setting forth the expected date of first flow for Additional Receipt Points outside the Specified Area (as applicable, the "***Notification Date***"), location and volume profile for such Receipt Point in the form attached hereto as Schedule 4.9(a) (an "***Additional Receipt Point Notification***"). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12

       (b)      Upon Gatherer's receipt of any Additional Receipt Point Notification from Producer under subsection (a) above that is within the Specified Area, Gatherer shall provide Producer with a cost (the "***ARP Connection Fee***"), schedule, and scope of work required to connect each new Receipt Point to the Crude Gathering System within ▇▇▇▇ days of receiving Producer's notice. Producer may elect to either (i) have Gatherer perform the scope of work required to connect the Additional Receipt Point into the Crude Gathering System and reimburse Gatherer the ARP Connection Fee in accordance with Section 4.9(c), (ii) have Gatherer perform the scope of work required to connect the Additional Receipt Point and pay Gatherer one dollar ($1.00) per Barrel of Received Crude until the ARP Connection Fee has been paid in full, or (iii) perform the scope of work required to connect the Additional Receipt Point into the Crude Gathering System by itself. If Producer elects to perform the interconnection itself, it shall ensure that any LACT Units at the Additional Receipt Point is assigned to Gatherer upon completion. If Producer elects item (ii) above, then Producer shall (y) connect to the Receipt Point no later than ▇▇▇▇▇▇▇▇ days after the Receipt Point is completed, and (z) if, after ▇▇▇▇ ▇▇ months, the volume of Producer's Oil is insufficient to reimburse the ARP Connection Fee in full, then Producer shall promptly pay Gatherer the unpaid remaining portion of the ARP Connection Fee. Producer shall notify Gatherer of its decision to either have Gatherer perform the scope of work, or if Producer will perform the scope of work, no later than ten (10) days after receiving the ARP Connection Fee from Gatherer.

       (c)      In the event Producer elects to have Gatherer perform the scope of work required to connect the Additional Receipt Point in the Specified Area into the Crude Gathering System in accordance with Section 4.9(b)(i) above, then Producer shall pay Gatherer's estimated ARP Connection Fee no less than ten (10) days prior to Gatherer's commencement of

its scope of work.  Following Gatherer's completion of its scope of work and the date of first flow from such Additional Receipt Point, Gatherer shall submit a final invoice and any supporting documentation regarding the actual costs and expenses associated with such ARP Connection Fee in accordance with Section 7.3.  If the actual ARP Connection Fee is greater than the estimated ARP Connection Fee, then Producer shall pay the difference to Gatherer within fifteen (15) days from Producer's receipt of Gatherer's statement.  If the actual ARP Connection Fee is less than the estimated ARP Connection Fee, then Gatherer shall pay the difference to Producer within fifteen (15) days from Producer's receipt of Gatherer's statement.  Any disputes related to the final ARP Connection Fee shall be resolved in accordance with Section 7.3(c).

(d)     Upon Gatherer's receipt of any Additional Receipt Point Notification from Producer under subsection (a) above that is not within the Specified Area, the Parties shall reasonably consult with each other and mutually determine whether to connect such Additional Receipt Point to the Crude Gathering System, timing of such connection, and allocation of costs.

(e)     After the Notification Date, if (i) Producer has delivered an Additional Receipt Point Notification in the Dedicated Area in the time period in Section 4.9(a) above and (ii) Gatherer has not connected such Additional Receipt Point to the Crude Gathering System within ninety (90) Days after the Notification Date, except for reasons due to Force Majeure, then Gatherer shall discount the then-applicable Gathering Fee by $0.10 per Barrel for Producer's Crude Oil delivered to the Additional Receipt Point.  Such discounted Gathering Fee shall apply on a Daily basis, equal to the number of Days after the date the Completed Well is capable of flowing to that Additional Receipt Point.  If the Additional Receipt Point Notification is received

13

by Gatherer less than ▉▉▉▉▉▉▉▉ Days prior to the required first flow date, then Gatherer shall not be required to discount the Gathering Fee for a period of ▉▉▉▉▉▉▉▉ Days from the Notification Date.

(f)     In the event that Gatherer provides Notice to Producer that Gatherer will not make a requested interconnection for any Additional Receipt Point within the Dedicated Area, then, effective simultaneously with the delivery of such Notice, (i) the well and unitized acreage associated with such well in question shall be released from the Dedication, (ii) the Transportation Interests insofar only as Crude Oil that may be produced and saved from the well and unitized acreage in question shall automatically revert back to Producer and (iii) any Easement rights hereunder to the extent necessary for purposes of Producer or any third party constructing, owning, operating, repairing, replacing and maintaining pipelines and other facilities for gathering, separating, metering, measuring, storing and redelivering to Producer all Crude Oil that may be produced and saved from such well and unitized acreage in question shall automatically revert back to Producer.  In connection with the release of Transportation Interests or Easements pursuant to this Section 4.9(f), Producer and Gatherer shall execute and deliver any additional documents and instruments and perform any additional acts that may become reasonably necessary or appropriate to effectuate the reversion of Transportation Interests and Easements with respect thereto.  **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, THE RELEASE OF A WELL FROM DEDICATION SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY, AT LAW OR IN EQUITY, WITH RESPECT TO GATHERER'S REFUSAL TO INTERCONNECT AN ADDITIONAL RECEIPT POINT.**

**Section 4.10    Additional Wells.**

(a)    No later than ████████ days prior to drilling any well in the Dedicated Area, Producer shall provide written notice to Gatherer setting forth the location, expected date of first flow to Gatherer, expected date of interconnection to a Receipt Point, applicable Receipt Point and volume profile for such well in the form attached hereto as **Schedule 4.10** (a "*New Well Notice*").

(b)    Upon receipt of any New Well Notice for a Non-Operated Well, Gatherer shall have the option, exercisable in its sole discretion at any time within ████████ days following receipt of such New Well Notice from Producer, to interconnect the Crude Gathering System to such Non-Operated Wells at its sole cost and expense.  If Gatherer does not exercise the option set forth in this Section 4.10(b), then (i) ████████████████ shall be released from the Dedication, (ii) the Transportation Interests insofar only as Crude Oil that may be produced and saved from the ████████████████ shall automatically revert back to Producer and (iii) any Easement rights hereunder to the extent necessary for purposes of Producer or any third party constructing, owning, operating, repairing, replacing and maintaining pipelines and other facilities for gathering, separating, metering, measuring, storing and redelivering to Producer all Crude Oil that may be produced and saved from such ████████████████ shall automatically revert back to Producer.  In connection with the release of Transportation Interests or Easements pursuant to this Section 4.10(b), Producer and Gatherer shall execute and deliver any additional documents and instruments and perform any additional acts that may become reasonably necessary or appropriate to effectuate the reversion of Transportation Interests and Easements with respect thereto.  **THE**

14

PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, THE RELEASE OF A WELL FROM DEDICATION SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY, AT LAW OR IN EQUITY, WITH RESPECT TO GATHERER'S ELECTION TO INTERCONNECT A NON-OPERATED WELL.

Section 4.11        Commingling.

Received Crude may represent only a portion of Crude Oil on the Crude Gathering System, which may be used by other customers. Subject to Gatherer's obligations with respect to delivery of Delivered Crude under this Agreement, Gatherer shall have the right to commingle Received Crude with Crude Oil from other customers.

ARTICLE V
GATHERING AND DELIVERY

Section 5.1        Obligation to Gather; No Treating Services.

Commencing on the In-Service Date, Producer shall deliver or cause to be delivered to the Receipt Point(s) all Committed Crude. Gatherer shall, on a Firm basis up to the Producer Capacity, receive Delivered Crude from Producer at the Receipt Point(s) (as set forth in Section 4.8(b) and in **Schedule 4.8(b)**) and transport Received Crude to the Delivery Point. If Gatherer enters into any gathering, transportation, marketing or similar agreement with any third party pursuant to which crude oil is received by Gatherer on the Crude Gathering System on a Firm basis, Gatherer shall deliver to Producer a written notice of such agreement that describes the material terms

Case 4:24-cv-04092   Document 4-9   Filed on 11/21/24 in TXSD   Page 384 of 582

thereof. Gatherer shall provide no treating services for which there is no treating fee expressly provided in Section 7.1, such as treatment for sour Crude Oil/ hydrogen sulfide ($H_2S$) or other contaminants or metals, or removal of inert gases or any other contaminants.

    **Section 5.2     Scheduling.**

    (a)         Not later than the fifteenth (15th) day of a month, Producer shall deliver to Gatherer a Notice indicating the total volumes of Crude Oil expected to be delivered by Producer for gathering the following month (the "***Scheduled Crude***").  The Parties shall coordinate their respective scheduling activities to take into account the needs of downstream transportation resources.  If Producer becomes aware that actual deliveries of Committed Crude to the Receipt Point(s) vary by more than five (5%), greater or lesser, of Scheduled Crude, then Producer shall promptly provide Notice to Gatherer of such variance (which can be delivered by email), and if Producer fails to give Gatherer any Notice required by this subsection, and Gatherer thereafter incurs any costs or expenses as a result of such a variance from Scheduled Crude of which Gatherer should have received Notice, then Producer shall reimburse Gatherer for such costs or expenses.

    (b)         Producer shall provide Gatherer with at least three (3) days advance written Notice (which can be delivered by email) of the arrival of Producer's downstream transportation at the Delivery Point to receive Delivered Crude in accordance with Section 5.3 below.

15

002238

**Section 5.3**       **Delivery of Crude.**

(a)        Provided that Gatherer shall have received proper Notice under Section 5.2(b) above, Gatherer shall deliver to Producer Delivered Crude FOB Producer's transportation at the outlet flange of the transfer meter connected to the Crude Gathering System, as shown more particularly on **Schedule 5.3(a)** (the "***Delivery Point***").

(b)        Producer shall be solely responsible for all arrangements for transportation of Delivered Crude from the Delivery Point. If Producer becomes aware or should have become aware of delays with respect to any scheduled transportation for Delivered Crude, then Producer shall promptly provide Notice to Gatherer, and if Producer fails to give Gatherer any Notice required by this Section, and Gatherer thereafter incurs any costs or expenses as a result of such a delay with respect to transportation of which Gatherer should have received Notice, then Producer shall reimburse Gatherer for such costs or expenses.

(c)        All Producer-arranged transportation shall comply with all site rules and directives of Gatherer in entering, loading while there and exiting Gatherer's premises, including that all trucks shall be NSPS Level Tested trucks.

**Section 5.4**       **Measurement, Equipment and Testing.**

(a)        Gatherer shall be responsible for measurement, equipment and testing at the Receipt Points and at the Delivery Point, each in accordance with the protocols set forth on **Schedule 5.4(a)**.

(b)        Subject to Producer's safety, rules, regulations and procedures, Producer hereby grants to Gatherer, and Gatherer's contractors or agents, a right of entry onto any of the lands covered by the Interests and access to the Producer side of a Receipt Point, as necessary for the purpose of any sampling of Crude Oil to determine quality in accordance with Section 5.5 below, and shall facilitate, as necessary, access with surface owners where requested by Gatherer.

Section 5.5        **Quality.**

Crude Oil delivered by Producer at the Receipt Points shall meet or exceed the quality requirements set forth in **Schedule 5.5** (the "***Specifications***").  Gatherer shall have a right to reject all Crude Oil delivered by Producer that does not meet the Specifications ("***Off-Spec Crude Oil***"). If necessary, Producer shall install, own and maintain Crude Oil storage tanks at each Receipt Point (the "***Producer Tanks***") for purposes of accepting any Off-Spec Crude Oil from Gatherer. Gatherer shall divert all Off-Spec Crude Oil that is rejected in accordance with this Section 5.5 to a Producer Tank and Producer shall be responsible for cleaning and processing of the Off-Spec Crude Oil.  Gatherer shall have no obligation to accept delivery of any Crude Oil unless and until it satisfies the Specifications.  Off-Spec Crude Oil shall not be released from the Dedication so long as Producer's cost to clean or process Off-Spec Crude Oil does not exceed the difference in price Producer could receive for such Off-Spec Crude Oil if sold to a third-party without cleaning or processing as compared to the price to be received by Producer for cleaned and processed Off-Spec Crude Oil at the Delivery Point.  If the cost to clean or process Off-Spec Crude Oil exceeds the difference in price, then the Off-Spec Crude Oil shall be released by Gatherer from the Dedication.  Crude Oil delivered to Producer at the Delivery Point shall be of a substantially similar

16

grade and quality to that of Received Crude. Producer agrees to indemnify and hold the Gatherer harmless from any losses resulting from the delivery of Off-Spec Crude Oil in accordance with Schedule 5.5.

**Section 5.6    Delivery Pressure at Receipt Points.**

Producer shall deliver Crude Oil at the Receipt Points at a pressure sufficient to enter the Crude Gathering System and not to exceed the maximum allowable operating pressure of the Crude Gathering System at such points, but in no event to exceed ██████████████ sig.

**Section 5.7    Operating Inventory.**

Producer shall provide, at no cost to Gatherer, Crude Oil as:

(a)        line fill (the "*Line Fill*") needed to make and keep the Crude Gathering System operational; and

(b)        fill for any storage facility at the Crude Gathering System necessary to float tank roofs to working levels or to safely operate fixed roof tanks (the "*Tank Bottoms*").

(c)        Line Fill and Tank Bottoms shall not be considered transportable volumes.

002241

(d)        Producer's obligation for Line Fill and Tank Bottoms shall be *pro rata* with any third party volumes of Crude Oil gathered on the Crude Gathering System, and, to the

extent that Producer has provided all Line Fill and Tank Bottoms, Producer shall be credited for any Line Fill and Tank Bottom volumes attributable to third-party volumes of Crude Oil brought onto the Crude Gathering System.

### Section 5.8    Title and Risk of Loss.

Title to Crude Oil shall always vest in Producer. Risk of loss shall always be with Producer except when Gatherer is in possession of Crude Oil, in which case risk of loss shall be with Gatherer. Producer shall be solely responsible for, and shall make all necessary arrangements at and downstream of the Delivery Points for receipt, further transportation and marketing of Committed Crude.

### Section 5.9    LACT Electricity.

████ shall arrange for the supply of, and pay all costs associated with supplying, the power needed to enable ████ to operate its LACT Units, including providing generators and associated equipment at well locations.

### Section 5.10    Truck Stations.

Subject to the terms and conditions of this Agreement, following the in-service date of the Cushing Pipeline, Gatherer agrees, at its sole cost and expense, to install ████ truck injection stations (each, a "*Pipeline Injection Station*").

17

002242

**Section 5.11        System Losses.**

(a)        Gatherer shall measure and record all Actual Losses of Committed Crude during the Term for purposes of preparing a virtual reserve of volumes in accordance with this Section 5.11.  Promptly following each month, Gatherer shall provide Producer with its calculation of Actual Losses and deliver a monthly statement of volumes (the "***Volume Bank***") determined in accordance with the following:

(i)        If, following any month, the Pipeline Loss Allowance exceeds the Actual Loss Percentage, then the amount of such difference shall be added as a positive number to the Volume Bank.

(ii)        If, following any month, the Actual Loss Percentage exceeds the Pipeline Loss Allowance, then the amount of such difference shall be deducted from the Volume Bank.

(b)        Following each month during the Term, (i) if the Volume Bank is a positive number, then no payment shall be due and payable from Gatherer and such amount shall be carried over and added to the Volume Bank for the next month, and (ii) if the Volume Bank is a negative number, then Gatherer shall pay Producer an amount equal to the amount of Barrels of Crude Oil losses in the Volume Bank, multiplied by the monthly average sales price for Producer's Oil (a "***Loss Payment***").  If any Loss Payment is due and payable, it shall be billed in accordance with Section 7.3.

(c)        On each anniversary of the Effective Date, the amount in the Volume Bank shall

002243

(c)     On each anniversary of the Effective Date, the amount in the Volume Bank shall be adjusted by calculating the average amount in the Volume Bank each month during the prior twelve (12) months and multiplying such average by ▓▓▓▓.  Two (2) years following the initial adjustment to the Volume Bank and every two (2) years thereafter, the Parties shall mutually assess and determine whether the method set forth in this Section 5.11(c) for adjusting the Volume Bank on a yearly basis should be modified.  The Parties shall reasonably confer and mutually decide regarding whether and how the Volume Bank may be adjusted thereafter.

**ARTICLE VI**
**CURTAILMENT AND MAINTENANCE**

**Section 6.1          Curtailment and Temporary Release of Crude Oil.**

If for any reason, including Force Majeure or a Maintenance Event, but not for the reasons set forth in Section 4.5, Gatherer needs to curtail receipt, gathering or delivery of Crude Oil on the Crude Gathering System (each, a "**Curtailment Event**"), (i) Crude Oil deliveries from all Persons that are receiving service on an interruptible basis or non-Firm basis shall be curtailed prior to any curtailment or interruption of Committed Crude, and (ii) to the extent a third party is receiving service on a Firm basis in accordance with Section 5.1, Producer and such third party shall be curtailed on a pro rata basis (based on volumes of Crude Oil delivered to the Crude Gathering System).  Prior to the In-Service Date, and at any time after the In-Service Date where Gatherer is unable to accept some or all Committed Crude as a result of a Curtailment Event, Producer shall be free to dispose of such affected volumes under other arrangements during such Curtailment Event (the "**Curtailment Period**").  Gatherer shall notify Producer as soon as reasonably

18

practicable of the circumstances of any Curtailment Event and the beginning and end of any Curtailment Period.  If Gatherer notifies Producer that the Curtailment Period shall exceed ███████ ████ and/or if such Curtailment Period actually exceeds ████████████ Producer may enter into alternative contracts with other purchasers or transporters with a term not to exceed ████ ███ As soon as reasonably practicable after receiving notice of the end of the Curtailment Period, and subject to the expiration of any alternative contracts with other purchasers or transporters, all Committed Crude shall again be subject to the Dedication.  **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, GATHERER'S TEMPORARY RELEASE AND PRODUCER'S RIGHT TO MAKE OTHER ARRANGEMENTS WITH RESPECT TO SUCH AFFECTED VOLUMES SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY AVAILABLE TO PRODUCER, AT LAW OR IN EQUITY, WITH RESPECT TO SUCH AFFECTED VOLUMES.**

**Section 6.2      Maintenance Events.**

Gatherer may, without liability to Producer, interrupt the operation of the Crude Gathering System for the purpose of performing inspections, pigging, maintenance, testing, alterations, modifications, expansions, connections, repairs or replacements (each, a "***Maintenance Event***"), but such interruption shall be for only such time as may be reasonably necessary.  Gatherer shall give Producer advance written notice of its intention to interrupt operations and of the estimated time thereof, but not less than forty-eight (48) hours advance notice, except in case of emergency. Any such Maintenance Events shall not constitute Force Majeure Events, unless such Maintenance Events otherwise meet the definition of a Force Majeure Event.

# ARTICLE VII
## FEES AND PAYMENT

**Section 7.1    Fees.**

(a)    Prior to the earlier of (x) the commencement of the in-service date of the Cushing Pipeline, or (y) one (1) year following the Effective Date (the earlier of which shall be the "**Trigger Date**"), Producer shall pay to Gatherer a fee of one dollar and twenty-five cents ($1.25) per Barrel of Received Crude (the "**Initial Fee**").

(b)    From and after the Trigger Date, Producer shall pay to Gatherer the following fees:

(i)    two dollars ($2.00) per Barrel of Received Crude for the duration of the Term (the "**Gathering Fee**");

(ii)    fifteen cents ($0.15) per Barrel of Crude Oil injected at any of Gatherer's Pipeline Injection Stations;

(iii)    an amount to be mutually agreed upon based upon then-prevailing market rates following completion of the Pipeline Injection Stations for transportation of the Crude Oil gathered by Gatherer's trucks and injected into the Crude Gathering System (the "**Trucking Fee**");

19

(iv)    Fees will not be charged to Producer for Line Fill or Tank Bottoms volumes until such volumes are redelivered at the Delivery Point.

**Section 7.2        Escalation.**

Commencing with the ████████████████ and on January 1 of each Contract Year thereafter, each fee set forth in this Agreement shall be automatically adjusted upward by ██



**Section 7.3        Billing and Payment.**

(a)        As soon as reasonably practicable after the end of each month, Gatherer shall render to Producer a statement for the preceding month, setting forth: (i) the total Barrels of Committed Crude received by Gatherer at each of the Receipt Points and the total Barrels of Committed Crude redelivered to the Delivery Point, (ii) the number of Barrels representing the Pipeline Loss Allowance, Line Fill, Tank Bottoms and any other deductions allowed hereunder, (iii) the listing of the fees charged as permitted by Section 7.1 of this Agreement, (iv) any Loss Payment, if applicable, and (v) the net amount due Gatherer from Producer.

(b)        Producer shall pay to Gatherer the full amount due not later than the earlier of (i) fifteen (15) days from Producer's receipt of Gatherer's statement, or (ii) the last day of month following the statement month, *provided* that if such day is not a Business Day, then on the next Business Day.  Any past due amounts shall bear interest at the Overdue Rate from the

the next Business Day.  Any past due amounts shall bear interest at the Overdue Rate from the date due until paid.

(c)       If Producer disputes all or a portion of any statement or amount due, it shall pay the undisputed portion, if any, of any such statement, and shall provide Notice to Gatherer of the specific basis for the dispute, including all supporting information, as soon as practicable after becoming aware of the basis for the dispute.  If after resolution of such dispute it is determined that any of the amount in dispute is due and owing, such amount(s) shall bear interest at the Overdue Rate from the date originally due until paid.  In no event shall any statement or invoice be subject to dispute beyond two (2) years from the date of such statement or invoice.

<b>Section 7.4</b>          <b>Audit.</b>

Each Party shall have the right, upon reasonable advance Notice, during normal business hours and not more than two (2) times per Contract Year, at its sole expense and either itself or through its representatives, to audit the books and records of the other Party, at the place where such books and records are ordinarily kept, to the extent reasonably necessary to verify the accuracy of any statement, charge, payment or computation made pursuant to this Agreement, and any such audit must be completed within ninety (90) days of the Notice to the other Party.  In the event that an audit is performed, any subsequent audit performed may cover only a time period not covered by a previous audit.  In no event shall any statement or invoice be subject to audit beyond two (2) years from the date of such statement or invoice.

20

**Section 7.5**        **Taxes.**

Producer shall pay any and all Taxes levied on Crude Oil.  Gatherer shall not become liable for such Taxes, unless (i) designated to remit those Taxes on behalf of Producer or (ii) by mutual agreement between the Parties or by any duly constituted jurisdictional agency having authority to impose such obligations on Gatherer, including the Oklahoma Tax Commission, in which event the amount of such Taxes remitted on Producer's behalf shall be (i) reimbursed by Producer upon receipt of invoice, with corresponding documentation from Gatherer setting forth such payments, or (ii) deducted from amounts otherwise due Producer under this Agreement.  Producer will reimburse Gatherer for any additional, increased or subsequently applicable Taxes, assessments, fees or other charges (excluding Gatherer's corporate income Taxes), arising after the date hereof that are lawfully levied upon and/or paid by Gatherer or its Affiliates with respect to its gathering, processing and delivery services hereunder insofar and only insofar as such additional, increased or subsequently applicable Taxes are based upon or attributable to the quantities or value of Committed Crude attributable thereto.  Gatherer shall be solely responsible for ad valorem tax assessed on the value of the Crude Gathering System, and all its components. Each Party shall indemnify, defend and hold harmless the other Party from and against any and all Claims and Losses arising out of or related to Taxes for which the indemnifying Party is responsible hereunder.

## ARTICLE VIII
## INDEMNIFICATION

**Section 8.1**        **Indemnification.**

**EXCEPT WHERE OTHERWISE SPECIFICALLY PROVIDED HEREIN, EACH**

002249

**EXCEPT WHERE OTHERWISE SPECIFICALLY PROVIDED HEREIN, EACH OF PRODUCER AND PRODUCER GROUP, ON THE ONE HAND, AND GATHERER AND GATHERER GROUP, ON THE OTHER HAND, SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS THE OTHER PARTY AND ITS RESPECTIVE PRODUCER GROUP OR GATHERER GROUP, AS THE CASE MAY BE, FROM AND AGAINST ANY AND ALL CLAIMS OF THIRD PARTIES AGAINST THEM, OR DAMAGES SUSTAINED OR INCURRED BY THEM AS A RESULT OF SUCH CLAIMS BY THIRD PARTIES, TO THE EXTENT CAUSED BY THE NEGLIGENCE OR WILLFUL MISCONDUCT OF THE INDEMNIFYING PARTY OR ITS RESPECTIVE PRODUCER GROUP OR GATHERER GROUP, AS THE CASE MAY BE, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR THE INDEMNIFYING PARTY'S BREACH OF THIS AGREEMENT.  THIS PROVISION SHALL NOT BE CONSTRUED TO RELIEVE ANY INSURER OF ITS OBLIGATION TO PAY CLAIMS CONSISTENT WITH THE PROVISIONS OF A VALID INSURANCE POLICY.  A PERSON SEEKING INDEMNITY SHALL FIRST SEEK RECOVERY UNDER ANY APPLICABLE INSURANCE POLICY, AND ANY INDEMNITY OBLIGATION OWED HEREUNDER SHALL BE REDUCED BY THE AMOUNT OF ALL INSURANCE PROCEEDS ACTUALLY RECEIVED BY THE INDEMNIFIED PARTY**.

Section 8.2    Notification Obligation.

The Person entitled to indemnification under Section 8.1 above (the "***Indemnified Party***") shall promptly notify the Party providing indemnity (the "***Indemnifying Party***") of any Claim, and

21

the Indemnifying Party shall have the right to assume the investigation and defense of the Claim, including employing legal counsel of its choice. If the Indemnifying Party does not promptly assume the investigation and defense of the Claim, the Indemnified Party may do so, including employing legal counsel of its choice, at the Indemnifying Party's expense. If the Indemnifying Party assumes the defense of a claim, the Indemnified Party shall nevertheless have the right to employ, at its sole expense, separate legal counsel and participate in the defense of the Claim, *provided* that control over the process and authority to compromise the Claim shall vest solely in the Indemnifying Party.

### ARTICLE IX
### FORCE MAJEURE

Section 9.1          Force Majeure.

"***Force Majeure***" shall mean any event or circumstance or combination of events or circumstances (each, a "***Force Majeure Event***") that adversely affects or prevents any Party from performing its obligations in accordance with the terms of this Agreement, but only if and to the extent that such events and circumstances are not within the affected Party's reasonable control. Force Majeure Events shall include act of God, fire, storm of an unusual or extraordinary nature, flood, hurricane, tornado, earthquake, epidemic or other natural disaster, action, delay or inaction of any Governmental Authority, war, invasion, emergency, embargo, sanction, sabotage, insurgency, terrorism, civil war, riot or insurrection of any kind, labor strike, loss of electricity supply, failure of any pipelines or other means of transportation, inability to obtain rights-of-way after the use of commercially reasonable efforts; *provided* that the following shall not constitute a

002251

Force Majeure Event: (i) failure to obtain or retain, or a delay in obtaining, any Governmental Approval necessary for performance under this Agreement that was the result of action or inaction by the Party responsible for obtaining such Governmental Approval, or a result of failure to timely apply for any such Governmental Approval, (ii) market conditions for Crude Oil or refined products therefrom, (iii) the inability to obtain a favorable price for or to buy or sell Crude Oil or refined products therefrom, or (iv) economic hardship. Any obligation of either Party under this Agreement shall be excused only to the extent that the Party's inability to perform is caused by Force Majeure. Each Party shall use all reasonable efforts to cure, minimize, mitigate or remedy the effects of Force Majeure. Notwithstanding that Force Majeure may otherwise exist, a Force Majeure Event shall not excuse or delay the payment of money when due by any Party.

## ARTICLE X
## DEFAULT AND TERMINATION

**Section 10.1      Producer Events of Default.**

A "***Producer Event of Default***" shall be deemed to have occurred if (i) Producer becomes bankrupt or insolvent or takes any corporate action or other steps towards liquidation, winding up, dissolution, reorganization or amalgamation of Producer, making of any bankruptcy administration order, or appointment of a receiver, administrator, trustee or similar officer over all or any material part of the revenues, assets or business of Producer; (ii) an order is made for the winding up, dissolution or liquidation of Producer, or any analogous or equivalent proceedings by whatever name are undertaken in whatever jurisdiction; (iii) Producer is generally unable to pay

22

its debts as they become due, or Producer stops, suspends or threatens to stop or suspend payment of all or a material part of its debts or makes a general assignment of its assets for the benefit of its creditors; or (iv) Producer is in breach of its material obligations under this Agreement, and Producer fails to cure such breach within 30 days following Producer's receipt of a Notice from Gatherer to Producer to remedy such event or condition, or if a remedy cannot be effected within such 30 day period, a period of 60 days, *provided* that Producer has commenced to remedy within such 30 day period and has diligently pursued such remedy during the extended period, and *provided further*, that in no event shall the period to cure a breach of an obligation to pay money be more than 10 days total.

### Section 10.2     Gatherer's Default Remedies Against Producer.

If a Producer Event of Default shall have occurred and be uncured and continuing, and without prejudice to any other of Gatherer's rights under this Agreement, Gatherer shall have the right to terminate this Agreement upon Notice to Producer.

### Section 10.3     Gatherer Events of Default.

A "***Gatherer Event of Default***" shall be deemed to have occurred if (i) Gatherer becomes bankrupt or insolvent or takes any corporate action or other steps towards liquidation, winding up, dissolution, reorganization or amalgamation of Gatherer, making of any bankruptcy administration order, or appointment of a receiver, administrator, trustee or similar officer over all or any material part of the revenues, assets or business of Gatherer; (ii) an order is made for the winding up, dissolution or liquidation of Gatherer, or any analogous equivalent proceedings by whatever name

002253

are undertaken in whatever jurisdiction, (iii) Gatherer is generally unable to pay its debts as they become due, or Gatherer stops, suspends or threatens to stop or suspend payment of all or a material part of its debts or makes a general assignment of its assets for the benefit of its creditors; or (iv) Gatherer is in breach of any of its material obligations under this Agreement, and Gatherer fails to cure such breach within 30 days following Gatherer's receipt of a Notice from Producer to Gatherer to remedy such event or condition, or if a remedy cannot be effected within such 30 day period, a period of 60 days, *provided* that Gatherer has commenced to remedy within such 30 day period and diligently pursued such remedy during the extended period, *provided further* that in no event shall the period to cure a breach of an obligation to pay money be more than 10 days total.

### Section 10.4     Producer's Default Rights Against Gatherer.

Except where a specific remedy has been set forth herein, if a Gatherer Event of Default shall have occurred and be uncured and continuing, and without prejudice to any other of Producer's rights under this Agreement, Producer shall have the right to terminate this Agreement upon Notice to Gatherer.

**ARTICLE XI**
**ASSIGNMENT**

### Section 11.1     Assignment

Neither Party may assign this Agreement, in whole or in part, without the other Party's prior written consent, which consent will not be unreasonably withheld, conditioned or delayed.

23

Subject to this Section 11.1, this Agreement is binding upon, inures to the benefit of and is enforceable by the Parties and their respective successors and permitted assigns.

## ARTICLE XII
## LIMITATION OF LIABILITY

Section 12.1    **Limitation of Liability.**

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL, PUNITIVE OR EXEMPLARY DAMAGES OF ANY TYPE, INCLUDING LOST PROFITS OR LOSS OF BUSINESS OPPORTUNITY, IN CONTRACT OR TORT (INCLUDING NEGLIGENCE, JOINT OR SEVERAL, OR STRICT LIABILITY) ARISING OUT OF THIS AGREEMENT, *PROVIDED* THAT THIS LIMITATION SHALL NOT APPLY TO ANY INDEMNITY OBLIGATION SET FORTH HEREIN.

## ARTICLE XIII
## MISCELLANEOUS

Section 13.1    **Assignment.**

Neither Party may assign this Agreement without the express written consent of the other Party, which consent shall not be unreasonably withheld, conditioned or delayed.

002255

Section 13.2    **Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury Trial.**

(a)      THIS AGREEMENT SHALL BE SUBJECT TO AND GOVERNED BY THE LAWS OF THE STATE OF OKLAHOMA AND ITS REGULATORY AGENCIES HAVING JURISDICTION OVER THE INTERESTS AND OTHER INTERESTS, EXCLUDING ANY CONFLICTS OF LAWS PROVISIONS CALLING FOR APPLICATION OF THE LAWS OF ANOTHER STATE.

(b)      EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE SOLE AND EXCLUSIVE JURISDICTION OF THE STATE OR FEDERAL COURTS IN HARRIS COUNTY, TEXAS, AND EACH OF THE PARTIES IRREVOCABLY WAIVES ANY OBJECTION TO THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS.

(c)      TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY IRREVOCABLY WAIVES ITS RIGHT TO A TRIAL BY JURY, AND CONSENTS TO A BENCH TRIAL BY A TRIAL COURT JUDGE, IN RESPECT OF ANY LITIGATION ARISING OUT OF THIS AGREEMENT AND ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT FOR EACH OF THE PARTIES IN ENTERING INTO THIS AGREEMENT.

24

**Section 13.3     Dispute Resolution.**

All controversies, disputes or Claims between Producer and Gatherer arising out of or in any way relating to this Agreement (each, a "***Dispute***") shall be resolved pursuant to the procedures of this Section 13.3.

(a)          If a Dispute arises between the Parties regarding their respective rights and obligations under this Agreement, the Parties shall use commercially reasonable efforts to reach a reasonable resolution of the Dispute informally.  Initially, the responsible Persons shall attempt to resolve the Dispute themselves. If they are unable to resolve the Dispute within 10 days, then either Party may, by Notice, refer the Dispute to the senior management of the Parties for resolution. If senior management of the Parties are unable to resolve the Dispute within 10 days of such Notice, the provisions of subsection (b) below shall apply.

(b)          Any Dispute not otherwise resolved under subsection (a) above may be submitted by either Party to a court proceeding filed in accordance with Applicable Law in any court having jurisdiction over the Parties and the subject matter.

**Section 13.4     Notices.**

Any notice, request, demand, statement, payment or bill provided for in this Agreement, or any notice which a Party may desire to give to the other (each, a "***Notice***"), must be in writing and will be deemed duly made when (i) delivered personally, (ii) upon delivery by the U.S. Postal Service, certified mail with return receipt, (iii) upon delivery by a recognized overnight courier service with return receipt, or (iv) upon receipt by the directed recipient when transmitted by

service with return receipt, or (iv) upon receipt by the directed recipient when transmitted by electronic means to the addresses shown on **Schedule 13.4**.

Case 4:24-cv-04092    Document 4-9    Filed on 11/21/24 in TXSD    Page 404 of 582

Section 13.5        Survival.

The provisions of this Agreement shall survive expiration or termination thereof for so long as necessary to give effect to the rights and obligations of the Parties hereunder, but in no event exceeding any applicable statutes of limitation.

Section 13.6        No Joint Venture.

Nothing in this Agreement shall create an association, joint venture or partnership between the Parties or impose any partnership obligation or partnership liability on any Party. Neither Party shall have any right, power or authority to enter into any agreement or commitment or act on behalf of or otherwise bind the other Party without such Party's prior written consent.

Section 13.7        Entire Agreement.

This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and there are not any oral or written understandings, representations or commitments of any kind, express or implied, which are not expressly set out herein. No modification of this Agreement shall be effective unless in writing and executed by the Parties. This Agreement restates the Original Agreement and supersedes any prior agreements of the Parties concerning the subject matter hereof.

25

**Section 13.8        No Third Party Beneficiaries.**

This Agreement is for the sole and exclusive benefit of the Parties, and does not stipulate any benefit in favor of any third parties.

**Section 13.9        Confidentiality.**

Any information belonging to a Party that is confidential and disclosed to the other Party in the course of performance of this Agreement or has been disclosed during the negotiations leading up to this Agreement, including the Agreement itself (collectively, the "***Confidential Information***"), shall be held in confidence and shall not be disclosed to others without the written approval of the disclosing Party. Confidential Information is not information that (i) is already known to the receiving Party at the time of disclosure by the disclosing Party (ii) is now or hereafter becomes available within the public domain other than as a result of a breach of this Agreement, (iii) is received by a Party from a Person under no obligation to keep the Confidential Information confidential, or (iv) is independently developed by a Party without reliance on Confidential Information. A Party shall have the right to disclose Confidential Information without the consent of the disclosing Party to its lenders, counsel, advisors, consultants, accountants, auditors, officers, directors, members, shareholders and other Persons of responsibility who have a need to know the Confidential Information, *provided* that such Persons agree to keep the Confidential Information confidential, and that the Party shall be responsible for any breaches of this confidentiality obligation by such Persons.  A Party shall also have the right to disclose Confidential Information without the consent of the disclosing Party in connection with a subpoena, interrogatory, request for production, civil investigative demand or other such legal process issued by any court or

administrative, legislative, investigative or regulatory body, but only to the extent necessary to fully respond thereto, and after providing prior Notice to the disclosing Party. Upon the reasonable request of the disclosing Party, the receiving Party shall, in its sole discretion, either return the Confidential Information or destroy it, *provided* that the receiving Party may retain a copy of Confidential Information as necessary to comply with Applicable Law.

### Section 13.10   Regulatory Matters.

(a)         Gatherer has informed Producer, and Producer hereby acknowledges and accepts, that the Crude Gathering System will be an intrastate pipeline system operating only within the State of Oklahoma, and is not intended to be subject to regulation under any Applicable Law by FERC. Accordingly, as a principal condition to, and in consideration for, the execution of this Agreement by Gatherer, Producer represents, warrants and covenants that (i) none of Producer's Committed Crude delivered hereunder has been or will be dedicated to or delivered in interstate commerce, (ii) at the time Producer's Committed Crude is delivered at the Receipt Points, Producer shall not have identified any destination for Producer's Committed Crude which is outside the State of Oklahoma and Producer does not intend to deliver any of Producer's Committed Crude to be sold, transported or otherwise moved outside the State of Oklahoma, (iii) all of Producer's Committed Crude delivered to Gatherer under this Agreement shall be produced in the State of Oklahoma, and (iv) Producer's Committed Crude delivered hereunder is not intended to be transported or sold in interstate commerce in any manner which will subject the Crude Gathering System to regulation by FERC.   In the event that Producer breaches its representation, warranty and covenant contained in this Section 13.10(a), Gatherer, in addition to

26

all other remedies at law or in equity, shall have the right, upon delivery of written notice to Producer, to refuse receipt of Producer's Committed Crude which has caused a breach of such representation, warranty and covenant. Gatherer's election to refuse receipt of any of Producer's Committed Crude pursuant to this Section 13.10(a) shall not release Producer from any obligation to indemnify Gatherer for such breach under Article VII.

(b)        If any federal or state statute, regulation, or order by a court of law or Governmental Authority directly or indirectly (a) prohibits performance under this Agreement, (b) makes such performance illegal or impossible, or (c) effects a change in a substantive provision of this Agreement that has a significant material adverse impact upon the performance of either Party's obligations under this Agreement, including without limitation the imposition of terms, conditions, or rate restrictions, then the Parties will use all reasonable efforts to revise the Agreement and any other ancillary agreement to the extent necessary so that: (i) performance under the Agreement is no longer prohibited, illegal, impossible, or is no longer impacted in a material adverse fashion, and (ii) this Agreement and any other ancillary agreement is revised in a manner that preserves, to the maximum extent possible, the respective positions of the Parties. Without liability for its failure to do so, each Party will use reasonable efforts to provide notice to the other Party as to any proposed law, regulations or any regulatory proceedings or actions that could affect the rights and obligations of the Parties. If the Parties are unable to revise the Agreement in accordance with the above within ninety (90) days following the adoption of any such law, regulation or order of a Governmental Authority, then the Party whose performance is prohibited, illegal, impossible or is impacted in a material adverse fashion will have the right, at its sole discretion, to terminate this Agreement upon written notice to the other Party.

**Section 13.11      Execution in Counterparts.**

This Agreement may be executed in counterparts, including by electronic transmission, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement.

[Signature Page Next Page]

27

IN WINESS WHEREOF, each of the Parties has caused this Agreement to be executed in duplicate originals by its duly authorized officer as of the Effective Date.

**PRODUCER**

**OKLAHOMA ENERGY ACQUISITIONS, LP**

By: Alta Mesa GP, LLC, its general partner

By: _____

David McClure, *Vice President - Facilities + Midstream*

002263

Signature Page to Crude Gathering Agreement

002264

**GATHERER**

**KINGFISHER MIDSTREAM, LLC**, a Delaware
limited liability company

By: _____
Name:  Taylor Tipton
Title:  President

Signature Page to Crude Gathering Agreement

38627407.2

002266

# EXHIBIT 6

002267

*Dunn v. HPS Investment Partners, LLC, et al.*
Adv. Pro. No. 21-03909
First Amended Complaint
Exhibit 6
2016 OGA Payments

| Payment Date | Payment Amount |
| --- | --- |
| January 2017 | $1,706.30 |
| February 2017 | $55,757.54 |
| March 2017 | $100,877.29 |
| April 2017 | $56,422.43 |
| May 2017 | $0.00 |
| June 2017 | $39,997.89 |
| July 2017 | $40,588.23 |
| August 2017 | $361,215.02 |
| September 2017 | $63,327.04 |
| October 2017 | $77,270.12 |
| November 2017 | $80,199.69 |
| December 2017 | $112,415.94 |
| January 2018 | $139,585.28 |
| February 2018 | $168,700.74 |
| March 2018 | $184,982.64 |
| April 2018 | $219,247.70 |
| May 2018 | $211,073.66 |
| June 2018 | $215,731.66 |
| July 2018 | $423,499.58 |
| August 2018 | $502,012.46 |
| September 2018 | $361,343.08 |
| October 2018 | $432,311.86 |
| November 2018 | $355,197.12 |
| December 2018 | $358,388.28 |
| January 2019 | $402,485.04 |
| February 2019 | $368,001.50 |
| March 2019 | $418,995.24 |
| April 2019 | $421,123.58 |
| May 2019 | $432,930.94 |
| June 2019 | $33,862.86 |
| July 2019 | $7,292.10 |
| August 2019 | $17,065.10 |
| September 2019 | $0.00 |
| **TOTAL** | **$6,663,607.91** |

# EXHIBIT 7

002269

**Exhibit 10.9**

*Execution Version*

---

**MANAGEMENT SERVICES AGREEMENT**

---

By and Between:

**ALTA MESA HOLDINGS, LP,**
as the "<u>Agent</u>"

and

**HIGH MESA, INC.,**
as the "<u>Company</u>"

February 9, 2018

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| ARTICLE 1 DEFINITIONS | | 1 |
| 1.1 | Certain Defined Terms | 1 |
| 1.2 | Interpretation | 5 |
| ARTICLE 2 SERVICES | | 6 |
| 2.1 | Engagement | 6 |
| 2.2 | Services | 6 |
| 2.3 | Limitation on Powers and Duties | 8 |
| 2.4 | Independent Contractor Status | 8 |
| 2.5 | Performance of Services by Affiliates; Retention of Professionals | 9 |
| 2.6 | Standard of Care | 9 |
| 2.7 | Exculpation | 9 |
| 2.8 | Indemnification; Disclaimer | 10 |
| 2.9 | Responsibilities of the Company | 11 |
| 2.10 | Changes to Services | 11 |
| 2.11 | Document Retention | 11 |
| ARTICLE 3 COMPENSATION AND EXPENSE REIMBURSEMENT | | 11 |
| 3.1 | Management Fee | 11 |
| 3.2 | Expenses | 12 |
| 3.3 | Use of Company Funds | 13 |
| 3.4 | Invoices; Penalty Rate | 13 |
| 3.5 | Disputed Invoices | 13 |
| 3.6 | Taxes | 14 |
| 3.7 | Audit Rights | 14 |
| 3.8 | Insurance | 14 |
| ARTICLE 4 TERM AND TERMINATION | | 14 |
| 4.1 | Term | 14 |
| 4.2 | Termination | 14 |
| 4.3 | Effect of Termination | 15 |
| 4.4 | Transition Obligations | 15 |
| 4.5 | Survival | 15 |
| ARTICLE 5 MISCELLANEOUS | | 16 |
| 5.1 | Force Majeure | 16 |
| 5.2 | Entire Agreement | 16 |
| 5.3 | Amendment | 16 |
| 5.4 | Waiver | 16 |
| 5.5 | Assignability | 16 |
| 5.6 | Parties in Interest | 17 |
| 5.7 | Binding Effect | 17 |
| 5.8 | Notices | 17 |

i

5.9     Severability of Provisions                                                                    17
5.10    Governing Law                                                                                 17
5.11    Consent to Jurisdiction                                                                       17
5.12    WAIVER OF JURY TRIAL                                                                           18
5.13    Proprietary Information                                                                        18
5.14    Confidentiality                                                                               19
5.15    Further Assurances                                                                            19
5.16    Advice of Counsel                                                                             20
5.17    Counterparts                                                                                  20


ANNEX I          INSURANCE
ANNEX II         AGENT SERVICE EMPLOYEES
ANNEX III        ANNUAL BUDGET

*****

ii

## MANAGEMENT SERVICES AGREEMENT

THIS MANAGEMENT SERVICES AGREEMENT (as the same may be amended, restated or otherwise modified, this "Agreement") is made and entered into as of the 9th day of February, 2018 (the "Effective Date"), by and between Alta Mesa Holdings, LP, a Texas limited partnership (the "Agent"), and High Mesa, Inc., a Delaware corporation (the "Company"). The Agent and the Company are referred to individually herein as a "Party" and collectively as the "Parties".

WHEREAS, the Agent, High Mesa Holdings, L.P., a Delaware limited partnership and an Affiliate (as defined herein) of the Company ("Contributor"), and certain other parties are party to that certain Contribution Agreement dated as of August 8, 2017 (as the same may be amended, restated or otherwise modified, the "Contribution Agreement");

WHEREAS, entry into this Agreement in connection with the closing of the transactions contemplated by the Contribution Agreement was a material inducement to Contributor's entry into the Contribution Agreement;

WHEREAS, prior to the closing of the transactions contemplated by, and pursuant to the terms of, the Contribution Agreement, the Agent distributed to the Company certain oil and gas properties and related assets (the "Distributed Assets");

WHEREAS, prior to the date hereof, the Company operated the Northwest Gas Processing System (the "NGPS Assets");

WHEREAS, during the Term (as defined herein), the Company desires to engage the Agent to provide or cause to be provided certain administrative, management and operational services necessary to manage the Business (as defined herein) of the Company and, other than the AMH Group (as defined herein), its subsidiaries (collectively, the "Company Group"), and the Agent is willing to render such administrative, management and operational services, subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants, agreements and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1 Certain Defined Terms. As used in this Agreement (including the recitals hereof), the following terms shall have the respective meanings assigned to them in this Section 1.1:

"Affiliate" of any specified entity means any other entity directly or indirectly controlling or controlled by or under direct or indirect common control with such specified entity and "control", when used with respect to any specified entity, means the power to direct the management and policies of such entity, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing. For the purposes of this Agreement, (i) neither any

1

member of the Company Group nor any member of the AMH Group shall be considered an Affiliate of (A) Bayou City or (B) Highbridge and (ii) (A) no member of the Company Group shall be considered an Affiliate of any member of the AMH Group and (B) no member of the AMH Group shall be considered an Affiliate of any member of the Company Group.

"Agent" has the meaning given to such term in the Preamble.

"Agent Expenses" has the meaning given to such term in Section 3.2(a).

"Agent Service Employee" means an individual employed by the Agent or one of its Affiliates that is actively engaged in the provision of Services during the Term.

"Agreement" has the meaning given to such term in the Preamble.

"AMH Group" means Silver Run Acquisition Corp II, SRII Opco, LP and any of their respective subsidiaries, including the Agent.

"Annual Budget" means the budget attached as Annex III as may be modified in writing by both the Agent and the Company from time to time.

"Assets" means the Distributed Assets, the NGPS Assets and any other assets acquired by the Company through lease swaps, drilling wells or installation of a production facility.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy."

"Bankruptcy Event" means, when used with respect to a Person, that (a) such Person has (i) applied for or consented to the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property, (ii) admitted in writing its inability to pay its debts as such debts become due, (iii) made a general assignment for the benefit of its creditors, (iv) commenced a voluntary case under the Bankruptcy Code, (v) filed a petition seeking to take advantage, as a debtor, of any other law relating to bankruptcy, insolvency, reorganization, winding-up or composition or readjustment of debts, or (vi) failed to controvert in a timely and appropriate manner, or acquiesced in writing to, any petition filed against it in an involuntary case under the Bankruptcy Code; or (b) a proceeding or case has been commenced without the application or consent of such Person in any court of competent jurisdiction seeking (i) its liquidation, reorganization, dissolution, winding-up, or the composition or readjustment of its debts, or (ii) the appointment of a trustee, receiver, custodian or the like of such Person under any law relating to bankruptcy, insolvency, reorganization, winding-up or the composition or readjustment of its debts, and such proceeding or case shall continue undismissed, or any order, judgment or decree approving or ordering any of the foregoing shall be entered and continue unstayed and in effect, for a period of ninety (90) or more consecutive days.

"Bayou City" means Bayou City Energy Management, LLC and any of its controlled subsidiaries.

"Board" means the Board of Directors of the Company as established pursuant to the Company Agreement.

2

002274

"<u>Business</u>" means the business of the Company Group.

"<u>Business Day</u>" means a day other than a Saturday, Sunday, or other day on which commercial banks in the State of Texas are authorized or required to close for the general transaction of banking business.

"<u>Claim</u>" has the meaning given to such term in <u>Section 2.8(a)</u>.

"<u>Company</u>" has the meaning given to such term in the Preamble.

"<u>Company Agreement</u>" means that certain Fifth Amended and Restated Stockholders Agreement dated as of the Effective Date by and among High Mesa Inc., HPS Investment Partners, LLC, Bayou City Energy Management, LLC and each of the Stockholders signatory thereto, including all schedules and annexes hereto, as the same may be amended, restated, or otherwise modified from time to time (provided that the Agent shall have received a copy of the Company Agreement prior to the Execution Date and shall have no obligation with respect to any such amendments, restatements or other modifications entered into after the date hereof).

"<u>Company Group</u>" has the meaning given to such term in the Recitals.

"<u>Confidential Information</u>" has the meaning given to such term in <u>Section 5.14</u>.

"<u>Damages</u>" has the meaning given to such term in <u>Section 2.8(a)</u>.

"<u>Disclosing Party</u>" has the meaning given to such term in <u>Section 5.14</u>.

"<u>Effective Date</u>" has the meaning given to such term in the Preamble.

"<u>Emergency</u>" means taking any and all actions and making repairs, including implementing an emergency shutdown of any or all of the Assets, that are required or appropriate to avoid, prevent or mitigate (a) imminent harm to persons or property, including injury, illness or death or damage to the Assets or an environmental condition; (b) violation of any applicable Law that could reasonably be expected to result in a material loss or liability to the Company; or (c) curtailment of service on the Assets.

"<u>Exculpatee</u>" has the meaning given to such term in <u>Section 2.7(a)</u>.

"<u>Force Majeure</u>" means any cause or causes beyond the reasonable control of a Party that prevents or hinders the Party from performing its duties, obligations and services under this Agreement, including: (i) acts of God, (ii) landslides, lightning, earthquakes, tornadoes, named tropical storms and hurricanes, flood, fire or explosion, (iii) war or threat of war (declared or undeclared), invasion, riot, terrorist attack or other civil unrest, (iv) Governmental Order or Law, (v) actions, embargoes or blockades in effect on or after the date of this Agreement, (vi) action by any Governmental Authority, (vii) national or regional emergency, (viii) strikes, labor stoppages or slowdowns or other industrial disturbances, and (ix) shortage of adequate power or transportation facilities.

3

002275

"<u>Fundamental Change</u>" means, with respect to an entity, the sale of such entity, in one transaction or a series of related transactions, whether structured as (a) a sale or other transfer of all or substantially all of the equity securities of the entity (including by way of merger, consolidation, share exchange, or similar transaction), (b) the sale or other transfer of all or substantially all of the assets of the entity promptly followed by a dissolution and liquidation of the entity, (c) the sale of all or substantially all of the Assets or (d) a combination of any of the foregoing.

"<u>Governmental Authority</u>" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof, or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government.

"<u>Governmental Order</u>" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"<u>Highbridge</u>" means HPS Investment Partners, LLC and any of its controlled subsidiaries.

"<u>Indemnitee(s)</u>" has the meaning given to such term in <u>Section 2.8(a)</u>.

"<u>Initial Term</u>" has the meaning given to such term in <u>Section 4.1</u>.

"<u>Intellectual Property Rights</u>" has the meaning given to such term in <u>Section 5.13(b)</u>.

"<u>Law</u>" means any statute, law, principle of common law, rule, regulation, judgment, order, ordinance, requirement, code, writ, injunction, or decree of any Governmental Authority.

"<u>Management Fee</u>" has the meaning given to such term in <u>Section 3.1</u>.

"<u>Monthly Estimate</u>" has the meaning given to such term in <u>Section 3.2(b)</u>.

"<u>Monthly Funding Amount</u>" means, with respect to a calendar month, an amount equal to (a) the Monthly Estimate for such calendar month, *plus* (b) a reasonable contingency amount, which shall not exceed 5% of the Monthly Estimate for such calendar month, *less* (c) the amounts (if any) by which any prior calendar month's Monthly Estimate or Shortfall Estimate exceeded the actual expenditures paid in the calendar month to which such prior Monthly Estimate or Shortfall Estimate relates and which excess has not been applied pursuant to this clause (c) to reduce a subsequent calendar month's Monthly Funding Amount.

"<u>Parties</u>" has the meaning given to such term in the Preamble.

"<u>Party</u>" has the meaning given to such term in the Preamble.

"<u>Penalty Rate</u>" has the meaning given to such term in <u>Section 3.4</u>.

4

002276

"Person" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"Proprietary Information" means any patent, copyright and other intellectual property rights in the methodologies, processes, models, strategic plans and other information about the disclosing Party's business, industry, products and services, plans, specifications, operation methods, pricing, costs, techniques, manuals, know-how and other intellectual property, in written, oral or other tangible form, provided by one Party to another Party or its representative.

"Receiving Party" has the meaning given to such term in Section 5.14.

"Renewal Term" has the meaning given to such term in Section 4.1.

"Representatives" has the meaning given to such term in Section 5.14.

"Service Percentage" has the meaning given to such term in Section 3.2(c).

"Services" has the meaning given to such term in Section 2.2.

"Term" means the period commencing on the Effective Date and ending on the termination or expiration of this Agreement.

"Third Party" means any Person that is not a Party.

"Work Product" has the meaning given to such term in Section 5.13(b).

1.2 Interpretation. In this Agreement, except to the extent the context otherwise requires: (a) any reference to an Article, a Section, a Schedule or an Annex is a reference to an article or section hereof, or a schedule or an annex hereto, respectively, and to a subsection or a clause is, unless otherwise stated, a reference to a subsection or a clause of the Section or subsection in which the reference appears; (b) the words "hereof", "herein", "hereto", "hereunder" and the like mean and refer to this Agreement as a whole and not merely to the specific Article, Section, subsection, paragraph or clause in which the respective word appears; (c) the meaning of defined terms shall be equally applicable to both the singular and plural forms of the terms defined; (d) the words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation;" (e) references to agreements and other contractual instruments shall be deemed to include all subsequent amendments and other modifications thereto, but only to the extent such amendments and other modifications are not prohibited by the terms of this Agreement; (f) references to statutes or regulations are to be construed as including all statutory and regulatory provisions consolidating, amending or replacing the statute or regulation referred to; (g) any table of contents, captions and headings are for convenience of reference only and shall not affect the interpretation or construction of this Agreement; and (h) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including", the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including".

**ARTICLE 2**
**SERVICES**

2.1 Engagement. On the terms and subject to the conditions and qualifications set forth in this Agreement, the Company hereby engages Agent, acting directly or through its Affiliates and their respective employees, agents, contractors or independent Third Parties, and Agent hereby accepts such engagement, to provide Services to the Company Group.

2.2 <u>Services</u>. Except as otherwise limited by this Agreement or the Company Agreement and subject to the last sentence of this Section 2.2, the Agent shall, in accordance with the standards set forth in <u>Section 2.6</u>, take all appropriate actions on behalf of the Company Group to supervise and administer the business, operations and affairs of the Company Group, including the following matters (in each case, as directed and supervised by the Board) (collectively, the "<u>Services</u>"):

(a) establishing and maintaining the books and records, including accounting, contract and other records and files necessary and appropriate for the proper conduct by the Company Group of its business and operations (including keeping a full and complete accounting of all revenues and income of the Company Group, costs incurred by or on behalf of the Company Group and costs incurred by or on behalf of the Agent in connection with the performance by the Agent of the Services);

(b) Monitor the receipts, income and expenditures of the Company Group;

(c) Provide, or arrange for Third Party professionals, Third Party service providers, and legal, human resources, land, operations, purchasing, communications, information system, technical and other services as may be necessary to properly carry on the business and operations of the Company Group;

(d) Supervise, manage, direct and operate all aspects of the day-to-day management and administration of the Company Group;

(e) Supervise, manage and administer activities necessary for the Company Group to comply with and perform all of the Company Group's obligations, responsibilities and covenants under any agreement binding upon the Company Group;

(f) Provide such clerical, bookkeeping, and contract administration services as are necessary and appropriate for the conduct of the Company Group's business;

(g) File, or cause to be filed, all necessary or appropriate filings with federal, state and local authorities under Applicable Law to maintain the Company Group's existence, its qualification to do business, and its registration under any assumed or fictitious name;

(h) File and record, or cause to be filed and recorded, such documents and papers as are necessary and appropriate to evidence the Company Group's ownership of any of its assets;

6

002278

(i) Give and receive notices, execute drawdown certificates, furnish required reports and information and monitor compliance on behalf of the Company Group as required or permitted by any agreement binding upon the Company Group;

(j) Assist in the making of all filings and in the obtaining of all licenses, permits and approvals from any Governmental Authority as may be necessary or appropriate under Applicable Law in connection with the operations or business of the Company Group and submit any application, filing or notice for the renewal of any existing licenses or permits;

(k) Administer the Company Group's performance of its obligations under any agreement binding upon the Company Group;

(l) Review and provide support for the implementation of the Company Group's insurance program, including obtaining and maintaining for the Company Group all insurance required to be maintained by the Company Group, conducting periodic risk management surveys of the operations of the Company Group, handling all claims and insuring proper collection for any insurance coverage, and providing copies of policies, endorsements, inspections, claims, quotes and other reports or documentation related to the Company Group;

(m) Review the provision of services by the Company Group's accountants, including the examination by such accountants of the financial records and statements of the Company Group;

(n) Make such reports and recommendations to the Board and officers of the Company Group , including concerning the performance of the independent accountants, as the Board or the officers of the Company Group may reasonably request or deem appropriate;

(o) File, or cause to be filed, with the appropriate Governmental Authorities, all required federal, state, and local tax returns for the Company Group including cooperating with professional service providers engaged by the Company Group, providing the Board with drafts of each income tax return twenty (20) days prior to the last date on which such tax return can be timely filed and each other tax return five (5) days prior to the last date on which tax return can be timely filed, for the Board's review and approval, informing the Board in a timely manner of any tax issues that arise and meeting the tax information and tax return reporting deadlines;

(p) Make available such information regarding the Company Group, and available to the Agent, as may be requested by the Board, the officers of the Company Group, or the Company Group's attorneys;

(q) Provide such assistance to the Company Group's counsel and auditors as generally may be required to properly carry on the business and operations of the Company Group;

(r) Assist in the representation of the Company Group before any Governmental Authority; and

7

(s) Perform such other acts which are necessary or appropriate to carry out its obligations hereunder.

Notwithstanding anything to the contrary in this Agreement, the Agent shall not be obligated to provide any Services the provision of which would violate any Laws. Notwithstanding anything to the contrary in this Agreement, except in the case of an Emergency, the Agent shall not be obligated to provide any Services for which funding is not provided pursuant to ARTICLE 3.

2.3 <u>Limitation on Powers and Duties</u>. Notwithstanding the provisions of <u>Sections 2.1</u> and <u>2.2</u>, without the prior approval of the Board (such approval to be provided or withheld in accordance with the terms of the Company Agreement), the Agent shall not:

(a) amend, change or modify this Agreement;

(b) initiate any claim or lawsuit by any member of the Company Group;

(c) take any action on behalf of the Company or any of its Affiliates that, if taken by the Company or any of its Affiliates, would require Unanimous Consent (as defined in the Company Agreement); or

(d) commence on behalf of any member of the Company Group, or cause any member of the Company Group to commence, any Bankruptcy Event, reorganization, arrangement, insolvency, or receivership proceeding under the laws of the United States of America or any other country or any state or province thereof.

2.4 <u>Independent Contractor Status</u>. Notwithstanding anything in this Agreement to the contrary, (a) the relationship of the Agent to the Company Group shall be and remain that of an independent contractor; (b) neither the Agent, any of its Affiliates nor any of their respective directors, managers, officers, employees or agents shall be deemed to be an employee of the Company Group; and (c) nothing herein shall be deemed or construed to create an agency, partnership, joint venture or similar relationship under applicable state Law between the Agent, on the one hand, and the Company Group, on the other hand, or to cause any Party to be responsible in any way for the debts and obligations of the other Party. All debts and liabilities to Third Parties required or permitted to be incurred by the Agent under this Agreement in the course of providing the Services shall be the debts and liabilities of the Company Group, and the Agent shall not be liable for any such obligations by reason of providing Services on behalf of the Company Group. Nothing stated in this Agreement shall operate to create any special or fiduciary duty between the Parties. At all times during the performance of Services by the Agent, all persons performing such Services who shall be in the employ or under the control of the Agent or its Affiliates (including Agent Service Employees, agents, contractors, temporary employees and consultants), shall not be deemed, solely because of the provision of such Services, to be an employee of the Company and shall not be entitled to any payment, benefit or perquisite directly from the Company on account of such Services, including participation in any employee benefit and pension plans maintained by the Company or any Affiliate of the Company.

8

2.5 <u>Performance of Services by Affiliates; Retention of Professionals</u>. Subject to the limitations of <u>Sections 2.1</u>, <u>2.2</u> and <u>2.3</u>, (a) in discharging its obligations hereunder, the Agent may engage any of its Affiliates or any Third Party professionals and other service providers to perform Services on its behalf and (b) the Company hereby appoints the Agent during the Term to act as its agent in connection with the Company Group's retention of any such Third Party professionals and other service providers which, as determined by the Agent in its discretion but subject to the Annual Budget, are needed to perform the Services; provided, however, that Agent shall be responsible for Services rendered by its Affiliates, Third Party professionals or other service providers. All costs or fees payable to such Affiliates, professionals and other service providers shall be borne by the Company Group.

2.6 <u>Standard of Care</u>. In supervising, administering and managing the business and affairs of the Company Group pursuant to this <u>ARTICLE</u> 2, the Agent shall perform all of its duties in accordance with reasonable and prudent practices, as relevant to the Services, of the oil and gas industry, and in material compliance with all applicable Laws and the terms of this Agreement. Agent will (a) maintain separate accounts, financial statements, books and records from those of the Company Group and (b) prevent any funds or accounts of the Company Group from being commingled with the funds or accounts of Agent.

2.7 <u>Exculpation</u>.

(a) Neither the Agent, its Affiliates, nor its or their respective partners, members, officers, directors, managers, employees or agents (individually and collectively referred to as an "<u>Exculpatee</u>"), shall be liable, responsible, or accountable in damages or otherwise to the Company Group, or its owners, members, employees, agents or assigns, for any action taken or failure to act **(EVEN IF SUCH ACTION OR FAILURE TO ACT CONSTITUTED THE SOLE, CONCURRENT OR COMPARATIVE NEGLIGENCE OF THE AGENT OR SUCH EXCULPATEE)** in connection with the Services provided hereunder, unless such act or failure to act was the result of fraud, willful misconduct or gross negligence on the part of the Exculpatee. The Exculpatees shall have no liability whatsoever under this Agreement for failing to act (or limiting its actions) hereunder, and no obligation to provide any Services, when funds fully covering the Agent's Services for any such action have not been included in an Annual Budget and provided to the Agent pursuant to this Agreement.

(b) IN NO EVENT SHALL THE EXCULPATEE EVER BE LIABLE TO ANY SUCH PERSON OR ENTITY, OR ANY OTHER PARTY UNDER THIS AGREEMENT OR IN CONNECTION WITH SERVICES PROVIDED HEREUNDER, FOR ANY PUNITIVE, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR INDIRECT DAMAGES IN TORT, CONTRACT OR OTHERWISE, UNLESS SUCH PUNITIVE, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR INDIRECT DAMAGES IN TORT, CONTRACT OR OTHERWISE ARE CLAIMED BY A THIRD PARTY AND SUCH DAMAGES TO SUCH THIRD PARTY WERE THE RESULT OF FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE ON THE PART OF SUCH EXCULPATEE. TO THE EXTENT PERMITTED BY LAW, THE COMPANY HEREBY WAIVES THE PROVISIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES CONSUMER PROTECTION ACT, §§ 17.41, ET. SEQ., OF THE TEXAS BUSINESS AND COMMERCE CODE (OTHER THAN SECTION 17.555). The exculpation provided by this <u>Section 2.7</u> shall continue as to an Exculpatee who has ceased to serve in such capacity, and shall inure to the benefit of the heirs, successors, assigns, administrators and personal representatives of the Exculpatees.

9

2.8 <u>Indemnification; Disclaimer.</u> Without limiting <u>Section 2.7</u>:

(a) THE COMPANY SHALL RELEASE, INDEMNIFY, DEFEND AND HOLD HARMLESS THE AGENT AND ITS OWNERS, OFFICERS, MEMBERS, MANAGERS, DIRECTORS, SHAREHOLDERS, AFFILIATES, EMPLOYEES AND AGENTS (IN THIS <u>SECTION 2.8</u> SOMETIMES INDIVIDUALLY REFERRED TO AS AN "<u>INDEMNITEE</u>" AND COLLECTIVELY AS THE "<u>INDEMNITEES</u>") FROM AND AGAINST ANY AND ALL LOSSES, LIABILITIES, EXPENSES, DAMAGES, JUDGMENTS, FINES, SETTLEMENTS AND OTHER AMOUNTS (INCLUDING REASONABLE ATTORNEYS' FEES AND EXPENSES) (COLLECTIVELY, THE "<u>DAMAGES</u>") ARISING FROM ANY CLAIMS, DEMANDS, ACTIONS, SUITS OR PROCEEDINGS, CIVIL, CRIMINAL, ADMINISTRATIVE OR INVESTIGATIVE (EACH, A "<u>CLAIM</u>"), IN WHICH THE INDEMNITEE IS OR MAY BE INVOLVED, OR THREATENED TO BE INVOLVED, AS A PARTY OR OTHERWISE, BY REASON OF OR IN ANY WAY ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE AGENT'S SERVICES HEREUNDER, INCLUDING CLAIMS FOR PERSONAL INJURY OR DEATH OF ANY PERSONS ARISING IN CONNECTION WITH THE PERFORMANCE OF THE SERVICES; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT NO INDEMNITEE SHALL BE INDEMNIFIED BY THE COMPANY FOR ANY ACTS OR OMISSIONS BY THE INDEMNITEE THAT CONSTITUTE FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE ON THE PART OF SUCH INDEMNITEE.

(b) THE PARTIES RECOGNIZE AND AGREE THAT AN INDEMNITEE MAY BE ENTITLED TO INDEMNIFICATION FROM ACTS OR OMISSIONS THAT MAY GIVE RISE TO ORDINARY, CONCURRENT OR COMPARATIVE NEGLIGENCE, AND THIS <u>SECTION 2.8</u> DOES NOT LIMIT ANY OTHER INDEMNIFICATION OBLIGATION THAT IS AVAILABLE TO THE INDEMNITEE.   THE LIMITATIONS ON LIABILITY AND INDEMNITIES IN THIS AGREEMENT ARE INTENDED TO BE ENFORCEABLE AGAINST THE PARTIES IN ACCORDANCE WITH THE EXPRESS TERMS AND SCOPE THEREOF NOTWITHSTANDING ANY EXPRESS NEGLIGENCE RULE OR ANY SIMILAR DIRECTIVE THAT WOULD PROHIBIT OR OTHERWISE LIMIT INDEMNITIES BECAUSE OF THE NEGLIGENCE (WHETHER SOLE, JOINT OR CONCURRENT OR ACTIVE OR PASSIVE) OR OTHER FAULT OR STRICT LIABILITY OF ANY OF THE INDEMNIFIED PARTIES. THE PARTIES AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE OR ENFORCEABLE, THE PROVISIONS IN THIS AGREEMENT IN ALL-CAPS FONT ARE "CONSPICUOUS" FOR THE PURPOSE OF ANY APPLICABLE LAW.

(c) Expenses incurred by an Indemnitee in defending or investigating a threatened or pending Claim for which the Indemnitee seeks indemnification pursuant to this <u>Section 2.8</u> shall be paid by the Company Group in advance of the final disposition of such Claim upon receipt of an undertaking by or on behalf of such Indemnitee to repay such amount if it shall ultimately be finally determined that such Indemnitee is not entitled to be indemnified by the Company Group.

10

(d) The indemnification provided by this <u>Section 2.8</u> shall continue as to an Indemnitee who has ceased to serve in such capacity, and shall inure to the benefit of the heirs, successors, assigns, administrators and personal representatives of the Indemnitees.

(e) THE AGENT SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED (i) RELATING TO THE SERVICES, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, (ii) RELATING TO THE RESULTS TO BE OBTAINED FROM THE SERVICES, AND (iii) THAT THE SERVICES ARE ERROR-FREE OR NON-INTERRUPTIBLE.

2.10 <u>Responsibilities of the Company</u>. The Company shall provide the Agent reasonable access to any data, information, materials and access to any systems or personnel that the Agent determines is reasonably necessary or appropriate for the Agent to perform the Services hereunder. To the extent the Agent shall have charge or possession of any of the Company Group's assets in connection with the provision of the Services pursuant to this Agreement, the Agent shall (i) hold such assets in the name and for the benefit of the Company Group and (ii) separately maintain and not commingle such assets with any assets of the Agent or any other Person. The Company Group is solely responsible for the accuracy and completeness of any and all such data that it submits to the Agent. The Company shall, upon reasonable notice, give the Agent and its Affiliates reasonable access, during regular business hours and at such other times as are reasonably required, to the relevant premises, including the Assets, to the extent reasonably necessary for the purposes of providing and receiving Services.

2.11 <u>Changes to Services</u>. Additions or changes to the Services listed in this <u>ARTICLE 2</u> may be made at any time by amending the Agreement in accordance with <u>Section 5.3</u>. Such additions or changes, including any fees or fee adjustments related to such additions or changes, shall be agreed between the Parties before any work commences.

2.12 <u>Document Retention</u>. The Parties shall retain documents and other information relating to the Services for at least the time period that is required by applicable Law. Promptly following termination of this Agreement under <u>Section 4.2</u>, the Agent shall deliver to such Person as the Company may designate in writing, copies of all title files, division order files, well files, production records, equipment inventories, and production, severance, and ad valorem tax records pertaining to the assets of the Company Group and other information about the assets and operations of the Company Group reasonably requested by the Company (which are in the possession of the Agent).

## ARTICLE 3
## COMPENSATION AND EXPENSE REIMBURSEMENT

3.1 <u>Management Fee</u>. As consideration for the Services rendered by the Agent to the Company under this Agreement, the Company shall pay the Agent a management fee in the amount of $10,000 per month (the "<u>Management Fee</u>"). On or before the first day of each month during the Term, the Company shall remit to the Agent the Management Fee for such month; provided that with respect to the payment to be made for the first month of the Initial Term, the Company shall remit to the Agent, upon execution of this Agreement, the pro-rated portion of the Management Fee for such month for the period of time from and including the date hereof to the end of such month.

11

3.2 Underline{Expenses}.

(a) In addition to the Management Fee, the Company shall be responsible for the following costs and expenses incurred by the Agent in providing the Services: (i) the proportionate, fully-burdened costs and expenses (as reasonably incurred by the Agent) of the Agent Service Employees, including any overtime, bonuses or incentive compensation and the costs of employee benefits (including workers compensation) provided to the Agent Service Employees; provided, that the proportion of such costs and expenses as to an Agent Service Employee that may be properly allocable to the Company shall be determined by multiplying the amount of such costs and expenses by the Service Percentage, (ii) to the extent that any Agent Service Employee was primarily dedicated to the provision of Services and the management of the Business, any severance costs associated with such Agent Service Employee to the extent any Asset with which such Agent Service Employee provided services is no longer owned or operated by the Company or such Agent Service Employee no longer provides services with respect to such Asset, (iii) all direct expenses incurred by the Agent in providing the Services and payable to Third Parties, (iv) reimbursement of properly incurred and allocated general and administrative overhead; provided, that the proportion of such overhead as to an Agent Service Employee that may be properly allocable to the Company shall be determined by multiplying the amount of such overhead by the Service Percentage, and (v) any other costs and expenses required to be reimbursed to the Agent by the Company pursuant to this Agreement or as actually incurred by the Agent in connection with its provision of the Services, in each case, in accordance with and subject to the Annual Budget then in effect or in connection with an Emergency (collectively, the "Agent Expenses").

(b) At least five Business Days prior to the commencement of each calendar month, the Agent shall prepare and deliver to the Company, (i) a notice of the estimated amount of Agent Expenses anticipated to be paid in such calendar month (the "Monthly Estimate"), (ii) the Monthly Funding Amount for such calendar month and (iii) reasonable supporting documentation for the expenses covered in such Monthly Estimate. On or before the first day of each month during the Term, the Company shall remit to the Agent the Monthly Estimate for such month. For the avoidance of doubt, the Agent shall not be required to advance any direct expenses.

(c) If the Agent reasonably believes that the deposits made pursuant to Section 3.2(b) will be insufficient to satisfy the projected costs and expenses to be paid during the then current calendar month pursuant to the Monthly Estimate, then the Agent shall prepare and deliver to the Company, a notice of the estimated amount of the shortfall for such calendar month (a "Shortfall Estimate"). The Company shall cause the Shortfall Estimate to be deposited in the Management Account within five (5) Business Days of the day the Company received notice thereof from the Agent.

12

(d) The Parties acknowledge that attached as <u>Annex II</u> is a schedule setting forth those Agent Service Employees that provided Services with respect to the Assets prior to the date of the Contribution Agreement and the approximate percentage of each such Agent Service Employee's time that was allocated to the provision of the Services with respect to the Assets prior to date of the Contribution Agreement (the "<u>Service Percentage</u>"). For the avoidance of doubt, the Annual Budget shall include the percentage of each Agent Service Employee's time allocated to the Services, which may not be the percentage set forth on <u>Annex II</u>.

3.3 <u>Use of Company Funds</u>. Subject to the terms and conditions of this Agreement, the Agent will pay the costs incurred in performing the Services as they become due and payable by the applicable member of the Company Group, and all local, state and federal taxes incurred related thereto, from the applicable Company Group bank account(s), and the Agent will have the right to withdraw funds from such account(s) for such purposes. The Agent will not make any expenditure of, or otherwise use, any funds of any Company Group member, except for (a) expenditures contemplated by the applicable Annual Budget and this Agreement and (b) expenditures required in the event of an Emergency.

3.4 <u>Invoices; Penalty Rate</u>. The Company Group agrees to pay interest at the rate of 10% per year (or the maximum rate permitted by applicable Law, whichever is less) for all amounts not paid within thirty (30) days from the date of the invoice therefor (the "<u>Penalty Rate</u>").

3.5 <u>Disputed Invoices</u>.

(a) In the event that the Company disputes in good faith all or any portion of an invoice submitted by Agent for reimbursable expenses, other than expenses incurred in connection with an Emergency, the Company Group may withhold payment of the amount disputed by the Company in good faith and such withheld payments shall not be subject to the Penalty Rate; <u>provided</u> that the Company gives Agent written notice of its disagreement with the disputed amount, stating the reasons therefor in reasonable detail and providing supporting documentation as appropriate. If Agent agrees in writing with the Company, then the Company Group shall not be required to pay the disputed amount to Agent. The Agent and the Company shall endeavor in good faith to promptly settle any disputed amount. If any such amount withheld is subsequently determined by agreement of the Parties or otherwise to have been unjustifiably withheld, then the Company Group shall promptly pay Agent the amount withheld plus the Penalty Rate from the date that such amount should have been paid until the date of such payment.

(b) If, within twenty (20) days after receipt of any written exception pursuant to <u>Section 3.5(a)</u>, the Company and Agent have been unable to resolve any dispute, and if (i) such dispute relates to whether amounts were properly charged or services actually performed and (ii) the aggregate amount in dispute exceeds $100,000, either of Company or Agent may submit the dispute to an independent Third Party auditing firm that is mutually agreeable to the Board, on the one hand, and Agent, on the other hand. The Parties shall cooperate with such auditing firm and shall provide such auditing firm access to such books and records as may be reasonably necessary to permit a determination by such auditing firm. The resolution by the auditing firm shall be final and binding on the Parties and the Parties shall each be responsible for 50% of such auditing firm's fees for such review and determination.

13

002285

3.6 <u>Taxes</u>. In addition to all charges specified in this <u>ARTICLE 3</u>, the Company Group shall pay or reimburse the Agent for all state or local, sales and use taxes, or amounts levied in lieu thereof, based on charges set forth in this <u>ARTICLE 3</u>; provided, however, the Company Group shall have no responsibility for taxes imposed on the Agent's net income by any taxing authority.

3.7 <u>Audit Rights</u>. At any time during the Term and for a period of one (1) year following the termination of this Agreement, the Company shall have the right, exercisable at its option and expense, to review and copy the records of the Company Group maintained by the Agent (so long as, with respect to any period following the Term, such records have not been delivered by the Agent pursuant to <u>Section 2.11</u>), and if necessary, to verify the performance by the Agent of its obligations under this Agreement, and to audit such records. This audit right may be exercised from time to time (but in no event more than once in any calendar quarter) during normal business hours upon reasonable notice to the Agent. The Company shall use its commercially reasonable efforts to conduct any such audit or examination in a manner that minimizes the inconvenience or disruption to the Agent.

3.8 <u>Insurance</u>. Throughout the Term, (a) the Company shall maintain, at its sole cost, insurance covering the Assets and the Business as a reasonably prudent owner or operator of assets similar to the Assets would maintain, and (b) the Agent shall maintain the insurance coverage set out on <u>Annex I</u>, and the Company shall reimburse the Agent for the portion of its insurance premiums attributable to such coverage. In each of the insurance policies required by this <u>Section 3.8</u>, the Party holding the insurance will waive and require its insurers to waive any right of subrogation or recovery against, and name as an additional insured, the other Party (and if applicable the Indemnitees). Upon a Party's reasonable request, the other Party will deliver copies of all insurance policies and certificates of insurance required by this <u>Section 3.8</u>.

## ARTICLE 4
## TERM AND TERMINATION

4.1 <u>Term</u>. This Agreement shall commence on the Effective Date and continue in effect for an initial period of one hundred eighty (180) days (the "<u>Initial Term</u>"). Thereafter, this Agreement shall automatically renew for additional consecutive one hundred eighty (180) day periods (each, a "<u>Renewal Term</u>"), unless terminated by either Party upon at least ninety (90) days written notice to the other Party prior to the end of the Initial Term or any Renewal Term.

4.2 <u>Termination</u>. Notwithstanding <u>Section 4.1</u>, this Agreement shall terminate upon the earliest to occur of the following:

(a) The mutual written agreement of the Parties, effective as of the date so mutually agreed;

(b) By election of the Company:

(i) upon the Agent's material breach of this Agreement, if such breach is not remedied within sixty (60) days after the Agent's receipt of the Company's written notice thereof, or such longer period as is reasonably required to cure such breach; <u>provided</u> that the Agent commences to cure such breach within such 60-day period and proceeds with due diligence to cure such breach and such breach is continuing at the time notice of termination is delivered to the Agent,

14

(ii) upon the occurrence of a Fundamental Change with respect to the Company or the Agent, or

(iii) upon the occurrence of a Bankruptcy Event with respect to either the Company or the Agent.

(c) By election of the Agent:

(i) upon the Company's material breach of this Agreement, if such breach is not remedied within sixty (60) days after the Company's receipt of the Agent's written notice thereof, or such longer period as is reasonably required to cure such breach; provided that the Company commences to cure such breach within such 60-day period and proceeds with due diligence to cure such breach and such breach is continuing at the time notice of termination is delivered to the Company,

(ii) upon the failure of the Company to pay any Management Fee or, subject to Section 3.5, any Monthly Expense to the Agent within ten (10) Business Days of its due date;

(iii) upon the occurrence of a Fundamental Change with respect to the Company, or

(iv) upon the occurrence of a Bankruptcy Event with respect to either the Company or the Agent.

4.3 <u>Effect of Termination</u>. If this Agreement is terminated in accordance with <u>Section 4.2</u> above, all rights and obligations under this Agreement shall cease except for (a) obligations that expressly survive termination of this Agreement, including as provided in <u>Section 4.5</u>; (b) liabilities and obligations that have accrued prior to such termination, including the obligation to pay any amounts that have become due and payable prior to such termination; and (c) the obligation to pay any portion of the Agent's costs and expenses that has accrued prior to such termination, even if such portion has not become due and payable at that time.

4.4 <u>Transition Obligations</u>. For a period of not more than sixty (60) days after the termination of this Agreement, the Agent shall take all actions that the Company reasonably requests to effect the transition of the Services hereunder to a successor provider or providers of such services, as reasonably designated by the Company, in an orderly and expeditious manner.

4.5 <u>Survival</u>. Upon the termination or expiration of this Agreement, all amounts payable to the Agent pursuant to <u>ARTICLE 3</u> (other than interest that accrues on unpaid amounts) shall cease to accrue. However, the Company Group shall (a) pay the Agent for all Services performed up through the termination or expiration date (including any transition period pursuant to <u>Section 4.4</u>) and (b) subject to <u>Section 3.5</u>, reimburse the Agent for all costs and expenses reimbursable pursuant to <u>Section 3.4</u> that are incurred or are otherwise attributable to the period on or prior to the termination or expiration date (including any transition period pursuant to <u>Section 4.4</u>). The provisions of <u>Sections 2.7</u>, <u>2.8</u>, <u>3.7</u> <u>4.3</u>, this <u>Section 4.5</u>, and <u>ARTICLE</u> 5 (other than <u>Section 5.1</u>) shall survive termination or expiration of this Agreement indefinitely or for such shorter period provided in such Section.

15

**ARTICLE 5**
**MISCELLANEOUS**

5.1 <u>Force Majeure</u>. The obligations of a Party under this Agreement shall be suspended during the period and to the extent that the Agent is prevented due to a Force Majeure; <u>provided</u>, <u>however</u>, that a Party shall not be excused by Force Majeure from any obligation to pay money incurred prior to the Force Majeure. The Party suffering a Force Majeure shall give notice of suspension as soon as reasonably practicable to the other Party stating the date and extent of such suspension and the cause thereof, and shall exercise due diligence to end its inability to perform as promptly as practicable. Notwithstanding the foregoing, a Party is not required to settle any strike, lockout or other labor dispute in which it may be involved. The Term (including the Initial Term or Renewal Term, as applicable) shall be automatically extended for a period of time equal to the time lost by reason of the suspension not to exceed ninety (90) days.

5.2 <u>Entire Agreement</u>. This Agreement constitutes the complete and exclusive statement of agreement among, and supersedes all prior written and oral agreements or statements by and among, the Parties with respect to the subject matter herein. No representation, promise, inducement, statement or intention, condition or warranty has been made by or on behalf of either Party that is not set forth in this Agreement or the documents referred to herein.

5.3 <u>Amendment</u>. This Agreement may not be amended or modified except by a written instrument specifically referring to this Agreement and executed by all of the Parties.

5.4 <u>Waiver</u>. The failure of either Party at any time or from time to time to require performance of the other Party's obligations under this Agreement shall in no manner affect the right to enforce any provision of this Agreement at any subsequent time, and the waiver of any rights arising out of any breach shall not be construed as a waiver of any rights arising out of any subsequent breach.

5.5 <u>Assignability</u>. Neither Party may assign, delegate or transfer (by merger, operation of Law or otherwise) its respective rights or delegate its respective obligations under this Agreement without the express prior written consent of the other Party. Notwithstanding the foregoing, the Agent may assign its rights and obligations under this Agreement, in whole or in part, to an Affiliate without the prior written consent of the Company; provided that no such assignment will relieve the Agent of its obligations under this Agreement. Any purported assignment, delegation, or transfer in contravention of this <u>Section 5.5</u> shall be void and unenforceable. The foregoing provisions of this <u>Section 5.5</u> are not intended to prohibit or restrict the Agent from engaging subcontractors or Affiliates to perform some or all of the Services; <u>provided</u> that the Agent shall remain fully responsible and liable for performance of any such Services as if such subcontracted activities had been performed directly by the Agent.

16

5.6 <u>Parties in Interest</u>. Except for <u>Sections 2.7</u> and <u>2.8</u>, the provisions of this Agreement are solely for the benefit of the Parties and their respective successors and permitted assigns, and are not intended to confer upon any other Person any third party beneficiary rights under this Agreement.

5.7 <u>Binding Effect</u>. This Agreement shall inure to the benefit of and shall be binding upon the Parties and their respective successors and permitted assigns.

5.8 <u>Notices</u>. All notices, requests, demands or other communications provided for hereunder shall be in writing. Notices may be given by personal delivery, by overnight courier, by electronic mail with acknowledgement of receipt requested or received, or by certified or registered United Sates mail, return receipt requested. Except as otherwise expressly provided herein, notice shall be deemed to have been given (a) if by personal delivery, on the date of delivery; (b) if by overnight courier, on the earlier of the date delivery is first attempted or the next Business Day after the same has been delivered to a reputable commercial overnight courier; (c) if by electronic mail, on the date of such transmission if sent by 5:00 p.m. (Houston time) on a Business Day, or if sent thereafter, on the next Business Day; and (d) if by certified or registered United States Mail, on the earlier of the date delivery is first attempted or three (3) Business Days after delivery to the United States Post Office, postage prepaid, return receipt requested. Notices shall be sent to the intended recipient at the addresses set forth below its signature on the signature page, or to the most recent addresses which the indented recipient has provided to the other parties for purposes of, and in accordance with, this <u>Section 5.8</u>.

5.9 <u>Severability of Provisions</u>. If any provision of this Agreement is held to be invalid, prohibited, or otherwise unenforceable by a court of competent jurisdiction, this Agreement shall be considered divisible and such provision shall be deemed inoperative to the extent it is deemed invalid, prohibited, or unenforceable, and in all other respects this Agreement shall remain in full force and effect; <u>provided</u>, <u>however</u>, that if any such provision may be made enforceable by limitation thereof, then such provision shall be deemed to be so limited and shall be reformed, construed and enforced to the maximum extent permitted by applicable Law.

5.10 <u>Governing Law</u>. This Agreement, and any instrument or agreement required hereunder (to the extent not expressly provided for therein), shall be governed by, and construed under, the internal laws of the State of Texas, without reference to conflicts of laws rules thereof.

5.11 <u>Consent to Jurisdiction</u>. Each Party irrevocably consents and agrees that any action, proceeding, or other litigation by or against any other Party or Parties with respect to any claim or cause of action based upon or arising out of or related to this Agreement or the transactions contemplated hereby, shall be brought and tried exclusively in the federal or state courts located in the City of Houston, County of Harris, in the State of Texas, and any such legal action or proceeding may be removed to the aforesaid courts. By execution and delivery of the Agreement, each Party accepts, for itself and in respect of its property, generally and unconditionally, the exclusive jurisdiction of the aforesaid courts. Each Party hereby irrevocably waives (a) any objection which it may now or hereafter have to the laying of venue with respect any such action, proceeding, or litigation arising out of or in connection with this Agreement or the transactions contemplated hereby brought in the aforesaid courts, and (b) any right to stay or dismiss any such action, proceeding, or litigation brought before the aforesaid courts on the basis

17

of *forum non-conveniens*. Each Party further agrees that personal jurisdiction over it may be affected by service of process by certified mail, postage prepaid, addressed as provided in <u>Section 5.8</u> of this Agreement, and when so made shall be as if served upon it personally within the State of Texas.

5.12 <u>WAIVER OF JURY TRIAL</u>. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HEREBY WAIVES ITS RIGHTS TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY A PARTY AGAINST THE OTHER PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. EACH PARTY HEREBY AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS <u>SECTION 5.12</u> AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT, OR ANY PROVISION HEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THIS AGREEMENT. EACH PARTY ACKNOWLEDGES THAT THE FOREGOING WAIVER CONSTITUTES A MATERIAL CONSIDERATION FOR THE OTHER PARTY EXECUTING THIS AGREEMENT.

5.13 <u>Proprietary Information</u>.

(a) The Company acknowledges that all Proprietary Information provided or created by the Agent in rendering Services shall be the sole and exclusive property of the Agent. Each Party agrees to honor the other Party's copyrights, patents, and trademarks, and will not use the other Party's Proprietary Information without the other Party's prior written consent except in the course of rendering or receiving Services hereunder.

(b) The Company acknowledges and agrees that all writings, works of authorship, technology, inventions, discoveries, ideas and other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, amended, conceived or reduced to practice by Agent or any of its employees, either individually or jointly with others, during the Term and relating in any way to the Services or the business or contemplated business, research or development of the Agent (regardless of when or where the work product is prepared or whose equipment or other resources is used in preparing the same), all printed, physical and electronic copies, all improvements, rights and claims related to the foregoing, and any other tangible embodiments thereof (collectively, "<u>Work Product</u>"), as well as any and all rights in and to copyrights, trade secrets, trademarks (and related goodwill), mask works, patents and other intellectual property rights therein arising in any jurisdiction throughout the world and all related rights of priority under international conventions with respect thereto, including all pending and future applications and registrations therefor, and continuations, divisions, continuations-in-part, reissues, extensions and renewals thereof (collectively, "<u>Intellectual Property Rights</u>"), shall be the sole and exclusive property of the Agent. The Company hereby

18

irrevocably assigns to the Agent, for no additional consideration, the Company Group's entire right, title and interest in and to all Work Product and Intellectual Property Rights therein, including the right to sue, counterclaim and recover for all past, present and future infringement, misappropriation or dilution thereof, and all rights corresponding thereto throughout the world. Nothing contained in this Agreement shall be construed to reduce or limit the Agent's rights, title or interest in any Work Product or Intellectual Property Rights so as to be less in any respect than the Agent would have had in the absence of this Agreement.

5.14 <u>Confidentiality</u>. Except as specifically provided in this Agreement, the Parties agree that any and all information that is not otherwise publicly available ("<u>Confidential Information</u>") communicated by one Party or its employees or representatives (the "<u>Disclosing Party</u>") to the other Party or its employees or representatives (the "<u>Receiving Party</u>"), whether disclosed before or after the Effective Date, (a) shall be treated as confidential, proprietary, and trade secret information of Disclosing Party, (b) shall be held in strict confidence by the Receiving Party, (c) shall be used only for purposes of this Agreement by the Receiving Party, and (d) that no Confidential Information, including the provisions of this Agreement and the Proprietary Information, shall be disclosed by the Receiving Party, its affiliates, subsidiaries or contractors, and each of their respective directors, officers, employees, consultants, agents, or representatives ("<u>Representatives</u>"), without the prior written consent of the Disclosing Party, except as may be necessary by reason of legal, accounting or regulatory requirements beyond the reasonable control of the Receiving Party. The Receiving Party shall limit access to the Disclosing Party's Confidential Information to only those of its Representatives that are bound by obligations that are substantially similar to those contained in this <u>Section 5.14</u>. The Receiving Party shall safeguard Confidential Information with at least the same degree of care (which shall always be at least a reasonable amount of care) that it uses to safeguard its own confidential, proprietary, and trade secret information of a similar nature. This <u>Section 5.14</u> shall not apply to information (i) which is in the public domain (other than through its unauthorized disclosure by Receiving Party or its Representatives), (ii) which the Receiving Party legitimately had in its possession prior to receiving it from the Disclosing Party, (iii) which the Receiving Party legitimately obtained from a Third Party who rightfully acquired such information, or (iv) which the Receiving Party independently developed without reference to the information received from the Disclosing Party. If the Receiving Party must disclose any Confidential Information pursuant to applicable Law or regulation or by operation of Law, the Receiving Party may disclose only such minimum Confidential Information as is legally required; <u>provided</u> that the Receiving Party shall provide reasonable notice to the Disclosing Party of such requirement and a reasonable opportunity to object to such disclosure. In any event, the Receiving Party shall be fully liable for any breach of this Agreement by its Representatives and agrees, at its sole expense, to take all reasonable measures to restrain its Representatives from any prohibited or unauthorized disclosure or use of the Disclosing Party's Confidential Information. This <u>Section 5.14</u> shall survive the termination of this Agreement for a period of one (1) year.

5.15 <u>Further Assurances</u>. The Parties agree to execute such additional instruments, agreements and documents, and to take such other actions, as may be necessary to effect the purposes of this Agreement.

19

    5.16 <u>Advice of Counsel</u>. The Parties have read this Agreement and have voluntarily executed this Agreement. In making this Agreement, the Parties have obtained the advice of legal counsel and agree that this Agreement is the product of arms-length negotiations. This Agreement was drafted by counsel for the Parties and there shall not be a presumption or construction against any Party; each Party hereby expressly waiving the doctrine of *contra proferentem* with respect to the interpretation and application of this Agreement.

    5.17 <u>Counterparts</u>. This Agreement and any amendment, waivers, consents or supplements hereto or in connection herewith may be executed by one or more of the Parties on any number of separate counterparts, by facsimile or email, and all of said counterparts taken together shall be deemed to constitute one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signatures are physically attached to the same document. A facsimile or portable document format ("pdf") signature page shall constitute an original for purposes hereof.

[SIGNATURES TO FOLLOW]

20

IN WITNESS WHEREOF, the Parties have caused this Management Services Agreement to be executed by a duly authorized officer, to be effective as of the Effective Date first written above.

*AGENT:*

ALTA MESA HOLDINGS, LP
a Texas limited partnership

By: Alta Mesa Holdings GP, LLC, its general partner

By:     /s/ Harlan H. Chappelle
Name:  Harlan H. Chappelle
Title:    President and Chief Executive Officer

Address:  15021 Katy Freeway
               Suite 400
               Houston, TX 77094
               Attn:   Harlan H. Chappelle
               Phone:  (281) 530-0991
               Email:  hchappelle@altamesa.net

*Signature Page to Management Services Agreement*

**COMPANY:**

HIGH MESA INC.
a Delaware corporation

By:   /s/ Harlan H. Chappelle
Name:  Harlan H. Chappelle
Title:   President and Chief Executive Officer

<u>Address</u>:

          Attn: Harlan H. Chappelle
          Phone: (281) 530-0991
          Email: hchappelle@altamesa.net

*with copies to:*

<u>Address</u>: HPS Investment Partners, LLC
          40 West 57th Street 33rd Floor
          New York, NY 10019
          Attn: Jeff Hostettler
          Phone: (212) 287-6747
          Email: jeff.hostettler@hpspartners.com

*and*

<u>Address</u>: Bayou City Energy Management, LLC
          1201 Louisiana Street, Suite 3308
          Houston, TX 77002
          Attn: William W. McMullen
          Phone: (713) 400-8210
          Email: will@bayoucityenergy.com

*Signature Page to Management Services Agreement*

**Annex I**
**Insurance**

| | |
|---|---|
| 1. General Liability | $1,000,000/occurrence |
| | $2,000,000 policy aggregate |
| | $1,000,000 Employee benefits |
| 2. Umbrella Liability | $74,000,000 occurrence/aggregate |
| 3. Excess Liability | $51,000,000 occurrence/aggregate |
| 4. Workers Compensation | Workers Comp: Statutory |
| | Employers Liability: $1,000,000 |
| 5. Commercial Auto | Liability $1,000,000 combined single limit |
| 6. Oil Spill Financial Responsibility | $35,000,000 per occurrence |
| 7. Excess Care Custody & Control | $35,000,000 per occurrence |
| 8. Commercial Property | Building/Contents Value |

9. Energy Package

*A. Control of Well*

<u>Drilling Wells</u>

| | |
|---|---|
| Area 3 Wells | 50,000,000 |
| Wells with CWC AFE greater than $10,000,000 excluding Area 3 and Vertical Oklahoma Wells | $40,000,000 |
| Wells with CWC AFE greater than $7,000,000 but not exceeding $10,000,000 excluding Area 3 and Vertical Oklahoma Wells | $30,000,000 |
| Wells with CWC AFE greater than $4,000,000 but not exceeding $7,000,000 excluding Area 3 and | |
| Vertical Oklahoma Wells | $20,000,000 |
| Wells with CWC AFE not exceeding $4,000,000 excluding Area 3 but including | |
| Vertical Oklahoma Wells | $15,000,000 |

<u>All Other Wells</u>

| | |
|---|---|
| Area 3 Wells | $50,000,000 |
| CL&F B-1 and CL&F C-1 Wells | $20,000,000 |
| Area 2 Wet | $20,000,000 |
| Onshore, but excluding Vertical | |
| Oklahoma Wells | $10,000,000 |
| Vertical Oklahoma Wells | $5,000,000 |
| Care Custody and Control | $25,000,000 |

*B. Offshore Property*

| | |
|---|---|
| Platforms, Caissons, Equipment - Pre 2000 | $370,000 |

| | |
|---|---|
| Platforms, Caissons, Equipment - Post 2000 | $2,230,000 |
| Pipelines | $400,000 |
| Oil in Storage | $500,000 |
| Compressors | $1,351,875 |
| Total Loss Only - Platforms | $9,066,125 |
| *C. Onshore Property* | |
| General Property | $14,783,600 |
| Contractors Equipment | $1,873,000 |
| Kingfisher SWD Facilities | $5,000,000 |
| Idaho Treating Facility | $10,784,493 |
| Compressors | $20,023,003 |
| *D. Business Interruption* | |
| Idaho Treating Facility | $15,000,000 |

**Annex II**
**Agent Service Employees**

| Employee | Function | FTE% |
|---|---|---|
| **DIRECT ADMINISTRATION AND OPERATIONS** | | |
| BHUIYAN, MOFAZZAL H | Engineering | 100% |
| BROWN, TOMMY | Engineering | 100% |
| COLOTTA, WENDY F | Engineering | 100% |
| DANFORD, MATTHEW D | Engineering | 100% |
| ERSKINE, RODNEY | Engineering | 100% |
| GORE, MITCHELL EUGENE | Engineering | 100% |
| HAYES, DALE R | Engineering | 100% |
| HYNES, CHRISTA R | Engineering | 100% |
| JAMESON, MAX | Engineering | 100% |
| JANIK, JEFFREY | Engineering | 100% |
| JOHNSON, JERRY | Engineering | 100% |
| KASSAB, DIANE M | Engineering | 100% |
| KENT, JENNIE L | Engineering | 100% |
| KOSIER, KLINTON R | Engineering | 100% |
| LOVE, GARLAND L | Engineering | 100% |
| MANNING, DEBRA A | Engineering | 100% |
| NATH, JOSHUA A | Engineering | 100% |
| OREILLY, DALE S | Engineering | 100% |
| PULLEN, SCOTT | Engineering | 100% |
| SMITH, KATHRYN R | Engineering | 100% |
| SMITH, WENDELL | Engineering | 100% |
| WEIBEL, BENNY j | Engineering | 100% |
| BELVEAL, DONALD | Florida Field Operations | 100% |
| CAWTHON JR, ROBERT A | Florida Field Operations | 100% |
| ELLIS, JAMES | Florida Field Operations | 100% |
| LECCESE, MYLES | Florida Field Operations | 100% |
| LEE, GUY M | Florida Field Operations | 100% |
| LEE, JOSEPH | Florida Field Operations | 100% |
| PUGH, RONALD E | Florida Field Operations | 100% |
| SIMPSON, TONEY | Florida Field Operations | 100% |
| SLADE, TERRY | Florida Field Operations | 100% |
| STRENGTH, BILLIE | Florida Field Operations | 100% |
| STRENGTH, RUFUS | Florida Field Operations | 100% |
| STRENGTH, TERRY | Florida Field Operations | 100% |
| WATSON JR, DENNIS L | Florida Field Operations | 100% |
| WETZEL, MICHAEL | Florida Field Operations | 100% |
| KRAMBERGER, JOHN | Geology | 100% |
| LUECK, EVERETT | Geology | 100% |
| MCMENNAMY, MICHAEL H | Geology | 100% |
| YANTOSCA, JOHN | Geology | 100% |
| MOORE III, WADE L | Land | 100% |
| PEPPER, DAVID S | Land | 100% |
| WIGHT, DAVID | Land | 100% |
| ZATARAIN, LEE | Land | 100% |
| DAVIS, JEREMY T | Little Willow Field Operations | 100% |
| DUDLEY, JOSHUA CLAYTON | Little Willow Field Operations | 100% |
| HALL, ADAM SCOTT | Little Willow Field Operations | 100% |
| JAGGERS, MARK WILLIAM | Northwest Gas Management | 100% |
| MEYER, CHRISTIE LYNN | Northwest Gas Management | 100% |
| NEGRON, PHILLIP J | Northwest Gas Management | 100% |
| TAYLOR III, AUSTIN | Northwest Gas Management | 100% |
| HARRIS, PATRICK | Northwest Gas Plant | 100% |
| HARTUNG, TYLER | Northwest Gas Plant | 100% |
| HENDRICKS, WILLIAM | Northwest Gas Plant | 100% |
| JENSEN, TAYLOR WILLIAM | Northwest Gas Plant | 100% |

| | | |
|---|---|---|
| JOHANEK, DANIEL P | Northwest Gas Plant | 100% |
| JOHNSON, EDWARD CHARLES | Northwest Gas Plant | 100% |
| BACCIGALOPI, MICHAEL J | Weeks Island Field Operations | 100% |
| BONSALL, LANCE PAUL | Weeks Island Field Operations | 100% |
| BOUDREAUX, KEATON KYLE | Weeks Island Field Operations | 100% |
| BRIDGES, CHADDUN | Weeks Island Field Operations | 100% |
| CLARK, CECIL JOSEPH | Weeks Island Field Operations | 100% |
| CLEMENT, DAVID | Weeks Island Field Operations | 100% |

| Employee | Function | FTE% |
|----------|----------|------|
| DERISE, ROSS SIDNEY | Weeks Island Field Operations | 100% |
| DETIVEAUX, JAIME J | Weeks Island Field Operations | 100% |
| DOXEY, CHRISTOPHER C | Weeks Island Field Operations | 100% |
| GEORGE, RAYMOND | Weeks Island Field Operations | 100% |
| HILL, DALE | Weeks Island Field Operations | 100% |
| KIDDER, BROCK L | Weeks Island Field Operations | 100% |
| LABOVE, CHARLES EVANS | Weeks Island Field Operations | 100% |
| LANDRY, GERRIT G | Weeks Island Field Operations | 100% |
| LEBLANC, TODD | Weeks Island Field Operations | 100% |
| MCDANIEL, JEREMY CHARLES | Weeks Island Field Operations | 100% |
| MEYERS, TAMMY M | Weeks Island Field Operations | 100% |
| MHIRE, JOSEPH W | Weeks Island Field Operations | 100% |
| MUDD, KELVIN T | Weeks Island Field Operations | 100% |
| MUFFOLETTO, MARY IRMA | Weeks Island Field Operations | 100% |
| NUNEZ, DANIEL G | Weeks Island Field Operations | 100% |
| OZENNE JR, WALLACE | Weeks Island Field Operations | 100% |
| RUTHERFORD, JAMES | Weeks Island Field Operations | 100% |
| STURLESE, ANTHONY C | Weeks Island Field Operations | 100% |
| STURLESE, JOSEPH | Weeks Island Field Operations | 100% |
| **INDIRECT ADMINISTRATION AND OPERATIONS** | | |
| ARNOLD, MELISSA RENEE | Accounting | 11% |
| BARROW, MARLA | Accounting | 11% |
| BLAIR, WANDA MOREY | Accounting | 11% |
| DALE, RICHARD S | Accounting | 11% |
| ETHRIDGE, MITCHELL C | Accounting | 11% |
| GAITHER, CHELSEA | Accounting | 11% |
| GORE, CAROL LOUISE | Accounting | 11% |
| GULIZIA, JESSICA MICHELLE | Accounting | 11% |
| JACOBS, PATRICIA ELAINE | Accounting | 11% |
| KALISH, SCOTT S | Accounting | 11% |
| LANCON, LINDA MARIE | Accounting | 11% |
| LITTEKEN, ADELA S | Accounting | 11% |
| LUTKENHAUS, CHARLENE A | Accounting | 11% |
| MEDINA, DIANA DIZON | Accounting | 11% |
| MUNGIA, RICHARD | Accounting | 11% |
| NGO, HANG | Accounting | 11% |
| PANACCIONE, ROBERT J | Accounting | 11% |
| RIOS, REYNALDO | Accounting | 11% |
| SHINN, SHANN K | Accounting | 11% |
| SMITH, RONALD J | Accounting | 11% |
| SPAIN, AMY | Accounting | 11% |
| TEMPLE, DANIEL E | Accounting | 11% |
| THOMAS, ASHLEY | Accounting | 11% |
| TRAN, ANTHONY M | Accounting | 11% |
| VALENTINE, SCOTT RICK | Accounting | 11% |
| WONG, MICHELLE | Accounting | 11% |
| COWAND, SCOTT | Acquisitions & Divestitures | 6% |
| RICKS, RICHARD | Acquisitions & Divestitures | 6% |
| BALDAUFF, JOHN J | Engineering | 9% |
| BREAUX, ALLEN D | Engineering | 9% |
| COLE JR, HOMER E | Engineering | 9% |
| COLE, AMY LYNN | Engineering | 9% |
| CORSEY, GREGORY | Engineering | 9% |
| DELOSANGELESMARTINEZ, MARIA | Engineering | 9% |
| HUSSER, ALEXIS S | Engineering | 9% |
| JOHNSON, JUSTIN LEE | Engineering | 9% |
| KEY, DONNA LYNN | Engineering | 9% |
| LOUDERMAN, RONDA G | Engineering | 9% |
| MCCLURE, DAVID | Engineering | 9% |

| | | |
|---|---|---|
| MOORE JR, WADE LEVI | Engineering | 9% |
| NOYNAERT, JARED MICHAEL | Engineering | 9% |
| SHORT, TAMARA L | Engineering | 9% |
| WALKER, ERIKA A | Engineering | 9% |
| WON, SUYOUN | Engineering | 9% |
| CHAPPELLE, HARLAN | Executive | 6% |
| ELLIS, MICHAEL | Executive | 6% |
| FREW, MARCIA | Executive | 6% |
| MCCABE, MICHAEL A | Executive | 6% |

| Employee | Function | FTE% |
|---|---|---|
| ALSARRAF, TAMARA | Finance | 11% |
| BRIDGES, DUSTIN WARREN | Finance | 11% |
| COOK, JENNIFER LYNNE | Geology | 9% |
| KOSIER, KARL | Geology | 9% |
| SMITH, DAVID | Geology | 9% |
| ADAMS, SUELLEN C | Human Resources | 11% |
| HAYES, ANGELA S | Human Resources | 11% |
| MARTIN, SHANNON LEIGH | Human Resources | 11% |
| LY, VI VAN | Information Technology | 11% |
| REYNOLDS, CHARLES ERIC | Information Technology | 11% |
| SERR, HUNTER W | Information Technology | 11% |
| SPARKS-ERICKSON, CHERYL | Information Technology | 11% |
| TIPPETT, DAVID WAYNE | Information Technology | 11% |
| WINGERSON JR, DANIEL D | Information Technology | 11% |
| WEAVER, LANCE L | Investor Relations | 11% |
| MURRELL, FRANK | Land | 9% |
| ARD, DEBRA J | Land Administration | 11% |
| BIGHAM, PATRICIA A | Land Administration | 11% |
| BRANDT, MARSHAL STEPHEN | Land Administration | 11% |
| BURNHAM, LINDA G | Land Administration | 11% |
| CATHEY, BELINDA J | Land Administration | 11% |
| EBEN, JOYCE SHARON | Land Administration | 11% |
| GAY, SHERRY ELLEN | Land Administration | 11% |
| GENTRY, CATHERINE O | Land Administration | 11% |
| GREER, SONYA LORRIANE | Land Administration | 11% |
| GRIFFIN, SANDY LYNN | Land Administration | 11% |
| HARRIS, SHERRI LOCHABAY | Land Administration | 11% |
| JOHNSON, KYMBERLEY DIANE | Land Administration | 11% |
| JOHNSON, LINDA JORDAN | Land Administration | 11% |
| JOY, MANDY MICHELLE | Land Administration | 11% |
| KEITH, LA WANDA JEAN | Land Administration | 11% |
| KELLY, LIZBETH | Land Administration | 11% |
| MCCLENDON, NELLIE VIRGINIA | Land Administration | 11% |
| PLEDGER JR, ROBERT ALAN | Land Administration | 11% |
| RAMOS, CHRISTY | Land Administration | 11% |
| RODGERS, BARBARA E | Land Administration | 11% |
| STEELE, CAROL M | Land Administration | 11% |
| TAYLOR, MARK D | Land Administration | 11% |
| VAUGHN, STEPHANIE L | Land Administration | 11% |
| VELTMAN, VANESSA V | Land Administration | 11% |
| WALKER, TIMOTHY NICHOLAS | Land Administration | 11% |
| WESTFAHL, SHARYN KAYE | Land Administration | 11% |
| PHILLIPS, MICHAEL A | Marketing | 11% |
| CUTLER, CATRENA P | Production | 11% |
| HANEY, GERALD ROBERT | Production | 11% |
| LOWMAN, YASAMAN A | Production | 11% |
| SMITH, CURTIS GLEN | Production | 11% |
| STALL, REBECCA | Production | 11% |
| WALTERS, ELISA HUGO | Production | 11% |
| DESCAMP, KAREN ANNETTE | Purchasing | 11% |
| EDWARDS, KRYSTAL MARIE | Purchasing | 11% |
| HEARD, DARAY A | Purchasing | 11% |
| MCKEAN, DANIEL J | Purchasing | 11% |
| MOAK JR, TACITUS WESLEY | Purchasing | 11% |
| NOVAK, JEFFERY | Purchasing | 11% |
| HEBERT, DEBBIE | Records Management | 11% |
| WALKER-OSTERTAG, JENNIFER KATHL | Records Management | 11% |
| ALBERS, JOHN AUGUST | Reservoir Engineering | 6% |
| BRUNS, SIMMONS AARON | Reservoir Engineering | 6% |

| | | |
|---|---|---|
| FLORES, TAMI Y | Reservoir Engineering | 6% |
| TURNER, TIM | Reservoir Engineering | 6% |
| JACKSON, SUSAN C | Risk Management | 11% |
| MARTINEZ, RACHEL | Risk Management | 11% |

# EXHIBIT 8

002303

Case 21-03909   Document 40-3   Filed in TXSB on 07/11/22   Page 2 of 2

*Dunn v. HPS Investment Partners, LLC, et al.*
Adv. Pro. No. 21-03909
First Amended Complaint
Exhibit 8
HMI MSA Accrued and Outstanding Fees and Expenses

| Accrual Month | Payroll | Management Fee | Overhead | Vendor Invoice Payments | Other[1] | Total |
|---|---|---|---|---|---|---|
| February 2018 | $135,638.62 | $10,000.00 | $331,021.31 | $4,388,289.25 | $0.00 | $4,864,949.18 |
| March 2018 | $813,941.65 | $10,000.00 | $133,821.00 | $1,135,895.63 | $776,923.90 | $2,870,582.18 |
| April 2018 | $466,806.00 | $10,000.00 | $164,732.00 | $92,288.04 | $0.00 | $733,826.04 |
| May 2018 | $549,313.12 | $10,000.00 | $31,439.00 | $453,327.24 | $500,953.47 | $1,545,032.83 |
| June 2018 | $547,416.00 | $10,000.00 | $25,830.00 | $117,079.04 | $0.00 | $700,325.04 |
| July 2018 | $593,837.00 | $10,000.00 | $270,913.00 | $85,686.12 | $0.00 | $960,436.12 |
| August 2018 | $721,423.00 | $10,000.00 | $190,594.00 | $100,358.14 | $0.00 | $1,022,375.14 |
| September 2018 | $482,807.00 | $10,000.00 | $244,957.00 | $99,229.56 | $0.00 | $836,993.56 |
| October 2018 | $414,748.00 | $10,000.00 | $87,331.00 | $169,053.76 | $0.00 | $681,132.76 |
| November 2018 | $400,634.00 | $10,000.00 | -$419,940.00 | $631,074.02 | $0.00 | $621,768.02 |
| December 2018 | $433,569.00 | $10,000.00 | $75,231.00 | $3,517.11 | $0.00 | $522,317.11 |
| January 2019 | $458,012.00 | $10,000.00 | $33,989.26 | $3,419.98 | $0.00 | $505,421.24 |
| February 2019 | $329,935.00 | $10,000.00 | $0.00 | $13,126.27 | $0.00 | $353,061.27 |
| **Total** | $6,348,080.39 | $130,000.00 | $1,169,918.57 | $7,292,344.16 | $1,277,877.37 | **$16,218,220.49** |

**Payments Made by HMI**    -$6,433,000.91

**Total Outstanding**    **$9,785,219.58**

[1] Comprised of (i) a duplicate payment in the amount of $776,923.90 made to the HMI Wells Fargo bank account ending in 2929 on or about March 1, 2018 and (ii) $500,953.47 deposited in error in the HMI Wells Fargo bank account ending in 2929 on or about May 10, 2018.  These amounts were never returned by HMI to AMH.

002304

# EXHIBIT 3

1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS

1

2

3  In re:                                     §
4  ALTA MESA RESOURCES, INC., et al           §  Chapter 11
                                              §
5                                             §  Case No. 19-35133
          Debtors.                            §
6                                             §  (Jointly Administered)
                                              §
7  DAVID DUNN, as Trustee of the AMH          §  Adv. Pro. No. 21-03909
                                              §
8          Plaintiff,                         §
                                              §
9  vs                                         §  June 8, 2022
                                              §
10 HPS INVESTMENT PARTNERS, LLC;              §
   ARM ENERGY HOLDINGS, LLC;                  §
11 ARM MIDSTREAM, LLC; AND                    §
   ASSET RISK MANAGEMENT, LLC,                §
12                                            §
          Defendants.                         §
                                              §

3

MOTION TO DISMISS HEARING
BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE


A P P E A R A N C E S:


***FOR THE PLAINTIFFS:***
MR. JOSEPH DUNN
MINTZ LEVIN COHN GLOVSKY AND POPEO, PC
3580 Carmel Mountain Rd., Suite 300
San Diego, CA  92130
jrdunn@mintz.com

13
14
15
16
17
18
19
20
21
22
23
24
25

```
1   FOR THE DEFENDANTS:
    MR. BENJAMIN I. FINESTONE
2   Quinn Emanuel, Et Al
    711 Louisiana, Suite 500
3   Houston, TX 77002

4   MR. DAVID BAAY
    EVERSHEDS SUTHERLAND (US) LLP
5   1001 Fannin, Suite 3700
    Houston, TX 77002

6

7

    COURT REPORTER:
8   FTR Gold

9

10

11          Proceedings reported by electronic sound recording;

12  transcript produced by computer-aided transcription.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1    (*Proceedings before the Court at 1:27 P.M.*)

2        THE COURT:  Good afternoon.  Please be seated.

3    In the 1:30 docket we have Dunn vs HPS.  It is Eversheds'

4    proceedings, 21-3909.

5        Let's go ahead and take appearances, if we could.  We'll

6    start by appearances to the Court.  If you would approach the

7    podium, please.

8        Anyone that wishes to appear by video, please turn on your

9    camera and we'll get to you in a moment.

10        MR. FINESTONE:  Good afternoon, Your Honor.  Ben

11    Finestone, Chris Porter, Courtney Whang, and a group of summer

12    associates from Quinn Emanuel on behalf of HPS.

13          THE COURT:  Thank you, Mr. Finestone.

14          MR. BAAY:  Good afternoon, Your Honor.  David Baay

15   with Eversheds Sutherland on behalf of the ARM defendants.

16          THE COURT:  Good afternoon, Mr. Baay.

17          MR. DUNN:  Good afternoon, Your Honor.  Joseph Dunn,

18   of Mintz Levin, on behalf of plaintiff, the litigation trustee.

19          THE COURT:  Good afternoon, Mr. Dunn.

20          Does anyone wish appear by video or on the phone, if so,

21   please press 5* and turn on your camera.

22          All right.  Have y'all talked about how you want to

23   organize today?

24          MR. BAAY:  We did speak briefly, Your Honor.  I think

25   that whether or not -- I think we should proceed with the

002310

4

1    motion to dismiss, and then proceed to the Rule 26 scheduling

2    conference thereafter.  I don't think there's any objection

3    from the plaintiff.

4         MR. DUNN:  No objection to that, Your Honor.

5         THE COURT:  Okay.  Thank you, sir.

6    All right.  Go ahead.

7         MR. FINESTONE:  For the record, Ben Finestone, with

8    Quinn Emanuel, on behalf of movant HPS.

9         Your Honor, I have a very short -- it's wrong to call it a

10   demonstrative, but it's a -- a few pieces of paper that I

11   stapled together.

12        May I approach?

13          THE COURT:  Yes, sir.

14          MR. FINESTONE:  Okay.  Thank you.

15     Your Honor, what I would like to do today is focus on --

16   or address three points.  Number one is that there should be --

17   there can be no 550 -- section 550(a)(1) liability imposed on

18   my client, which is the theory of the case, Your Honor.

19     Number two is that -- and if I'm right about the first

20   point, if I convince Your Honor that I'm right about the first

21   point, that makes all of the claims go away.

22     My second point is that, which is not applicable to all of

23   the claims.  But my second point will be that there's no

24   fraudulent transfer liability for what our mere preference is,

25   what are mere payments on account of obligations.  And if I'm

002312

5

1   right about that point and not right about the first one, that

2   will make all the claims go away, except for the transfers that

3   are within the one-year prior to the bankruptcy case, because

4   there's an insider preference statute that's been cited to in

5   the complaint.

6        And then the third point is -- I want to touch on

7   insolvency being inadequately pled.  Insolvency, of course, is

8   an important point of fact because it is a triggering factual

9   condition to proceed with constructive fraudulent transfers.

10   And it is, in my humble opinion, the most important piece, the

11   most important badge of fraud, the most important piece of any

12   actual intent fraudulent transfer, because if the entity that's

13    transferring assets is not insolvent -- while statutorily it

14    can be the case that there was somehow an intent to hinder or

15    delay or defraud creditors.  If the entity is an insolvent --

16    it's -- I think it's fair to say it's at least unlikely, and I

17    also think that there are countervailing considerations,

18    allegations in this complaint.  If I'm right about that third

19    one, it will make the complaint go away as well, Your Honor.

20        THE COURT:  On the third one, though, even if you have

21    actual fraud where Rule 9 would apply to at least factual

22    fraud, I don't think Rule 9 would apply to the pleading of

23    insolvency because it's not part of the fraud.  It's just --

24    it's an owner of the claim that is not part of the fraud.  So I

25    think it would be a Rule 8 pleadings standard on that.  Do you

6

1    think I'm wrong about that?

2              MR. FINESTONE:  I really don't think you're wrong,

3    Your Honor.  This is not one of the times where I might suggest

4    that you're wrong.  I agree with your Rule 8, the constructive

5    fraudulent transfer pleadings standard.

6              THE COURT:  Or even for actual as to the part that

7    alleges insolvency.  That's not one of the elements of the

8    fraud itself.

9              MR. FINESTONE:  Well, it is one of the badges of

10    fraud, Your Honor, insolvency.

11              THE COURT:  For a badge of fraud --

12              MR. FINESTONE:  Yeah.

13    THE COURT:  -- it is not an element of fraud, right?

14    MR. FINESTONE:  Right, right.

15    THE COURT:  So I think -- and I'm willing to be

16  diswayed to this, I tend to focus on this coming out, that if

17  you're going to -- if one is going to allege that this transfer

18  was made to steal money from Entity A and put it into Entity B,

19  insolvency is not part of that.  It's just a -- you're not

20  insolvent, then there's no cause of action because it didn't

21  hurt to take money from A to B.  So I don't think you need to

22  prove the who, what, when and where of that.  Although, I think

23  you do need to prove it as to how the money was stolen itself.

24    MR. FINESTONE:  Yeah.  I don't disagree with that,

25  Your Honor.  I think -- I think there may be a situation where

7

1    a plaintiff is attempting to plead sufficiently an actual

2    fraudulent transfer and relying heavily, if not primarily, on

3    insolvency; not the case here.  But if that were the case, then

4    I don't think that would be a way for him to escape the

5    requirement that he's put an actual fraudulent transfer on a

6    piece of paper, and Rule 9 should apply on that if you're

7    making the -- albeit conclusory allegation, that this transfer

8    was done today.

9         THE COURT:  I guess I'll worry about that too.  In

10   this case, insolvency is a Rule 8 standard, I think, right?

11        MR. FINESTONE:  I agree, Your Honor.

12        THE COURT:  Okay.

13    MR. FINESTONE:  Okay.  Your Honor, so starting on the

14    first one, which we feel confident about, Your Honor, but just

15    to sort of lay some background.  HPS, our client -- and this is

16    true also for my co-defendant here, Your Honor.  But I'm not

17    going to carry the word of my co-defendant, but I will for the

18    sake of organizing and for the sake of helping out the Court, I

19    will do my best to call out where things are true for both

20    defendants.

21        HPS is just a mere shareholder here, Your Honor, of a

22    transferee.  HPS is not a direct door immediate transferee.

23    That's undisputed.  You can't find that allegation in the

24    complaint.  And so there are three buckets of transfers, Your

25    Honor.  There are the gathering payments, which are payments

8

1    that were made from the E & P Company, both of these were

2    gathers that were before Your Honor.  So I will proceed to use

3    initials.  But there are gathering payments that were made from

4    AMH to KRM, Kingfisher.  I don't represent Kingfisher.  I

5    represent an indirect shareholder of Kingfisher.  So I'm just a

6    shareholder of the recipient of the gathering payments.

7        The second bucket is the non-STACK asset transfer.  That

8    also was a transfer from debtor, AMH, not to my client, HPS,

9    but to other debtors, not debtors in possession, Chapter 7

10    debtors.  And those debtors are called High Mesa Holding, HMH,

11    and HMI, and my client is merely an indirect shareholder of

12    those Chapter 7 debtors, Your Honor.  So not a recipient of

13    those transfers either.

14         And then the third one, the MSA payments, those are

15    payments from debtor AMH to undisclosed third parties that

16    we're not even a shareholder of, as far as we know, because

17    those third parties are not disclosed.

18         The complaint does say that those transfer -- that those

19    MSA payments were made for the benefit of -- in this instance,

20    not for HPS, but they say were made for the benefit of

21    Chapter 7 debtor HMI.

22         So I think those are sort of dead, in any event, because

23    he's already alleged that they were for the benefit of somebody

24    other than my client, but we'll come back to that third

25    category.

9

1           The initial point I just want to establish, which is

2    undisputed and fairly easy to establish is, we're not an

3    immediate transferee, which is obviously the classic -- the

4    classic target and the first target for avoidance actions.

5    It's when discouragement makes the most sense.

6           We're also not a subsequent transferee, Your Honor.

7    That's not alleged in the complaint anywhere.  So none of these

8    payments were subsequently transferred from those debtors to my

9    client.

10          There is some noise in the pleadings, Your Honor, that may

11   be in discovery.  They will discover that we are a subsequent

12   transferee -- not an issue for today.

13    And, also, I will say, just to flag the issue, assuming

14    arguendo or hypothetically that we -- it is somehow alleged at

15    some future date that we are a subsequent transferee of these

16    transfers from AMH to former debtor in possession of Kingfisher

17    or Chapter 7 debtors, HMH and HMI, I think plaintiff is going

18    to have an automatic stay issue there.  Those transfers from

19    those debtors to us, those hypothetical transfers, Your Honor,

20    because they're not alleged and I don't know about them.

21    That's -- that's a different debtor that gets to pursue them,

22    and I don't -- I think the automatic stay will -- will protect

23    those debtors from competition from this AMH debtor.  That's

24    just an interesting intellectual issue that's not for today.

25        The important issue for today is we're not an immediate

002322

10

1    transferee and we're not a subsequent transferee, Your Honor.

2        So I know as, Your Honor knows, what we are alleged to be

3    is that last clause of 550(a)(1), it's referred to as a

4    trust -- as a transferee beneficiary or a transfer beneficiary

5    in that statutory language is the entity for whose benefit such

6    transfer was made.

7        So we start the statute, of course, we just read the

8    language of the statute into the -- into the record.  And the

9    next place we go are to courts that are important to this

10   Court, and that may have given this Court guidance as to how to

11   interpret the language, the entity for whose benefit such

12   transfer was made.

13    I know one court that's important to this court, based

14    upon my experience before this Court, and that's the Fifth

15    Circuit Court of Appeals.  And so that's the very modest

16    handout that I gave to Your Honor.  The Fifth Circuit has

17    provided guidance as to the interpretation of the statutory

18    language, the entity for whose benefit such transfer was made.

19    Your Honor, it comes from the *Janvey vs Libian Investment*

20    *Authority* case from 2016.  And it starts off, Your Honor, by

21    saying something that other Circuit Court of Appeals have said

22    as well, which is that the typical use of this statutory

23    language is when a non-debtor -- it's usually the parent of the

24    transfer or debtor, but it doesn't happen to be.  A non-debtor

25    has guaranteed an obligation of the debtor in possession, such

002324

11

1    that when the debtor in possession pays off one of its

2    creditors, that non-debtor guarantor gets an independent

3    benefit reduction of that non-debtor's debt.  And that's

4    something that Congress has saw fit unquestionably, and the

5    Circuit Court of Appeals has saw fit to say that's as good as

6    receiving a transfer because you've got -- you've got a

7    benefit, an independent benefit based upon that payment.

8         It is also undisputed or at least I'll just say unalleged,

9    that's probably more accurate for today than saying undisputed.

10   I never like when lawyers on the other side of me say things

11   are undisputed without asking my permission.  So I'll just say

12   it's unalleged HPS did not guarantee any of AMH's debts.  And

13    more specifically, they didn't guarantee the obligations that

14    AMH was subject to, under the gathering agreements under the

15    MSA agreement or -- or have anything to do with the non-STACK

16    assets.

17         So I think we start off pretty strong here, Your Honor,

18    that we're not a 550(a)(1) entity because we're not the typical

19    550(a)(1) entity.  Other Courts of Appeals use fancier words

20    than the Fifth Circuit, like the ones I have difficult time

21    pronouncing, like paradigmatic.  I never know if the G is

22    silent.  But we're not the paradigmatic 550(a)(1) entity here.

23         So what are we really, Your Honor, what -- the complaint

24    really tells the story, as Your Honor alluded to, is that

25    debtor KFM was paying too much money to -- withdrawn.

002326

12

1        Debtor AWH was paying too much money to debtor KFM.  KFM

2   was getting fat and AWH was -- at the expense of AWH.  AWH was

3   getting skinny.  And because we're a shareholder of KFM, the

4   value -- indirect shareholder -- the value of our indirect

5   shares were growing in value.  As we -- as we pumped up the

6   worth of KFM pursuant to these transfers that were alleged to

7   be above market, KFM become more valuable and we received the

8   benefit out of that.

9        Now, on this page, Your Honor, this first -- it's page 2,

10  I wrote two words, independent and derivative, because they

11  reminded me -- those words are used in another area of case law

12  that I know Your Honor is familiar with.  And it's sort of the

13    reverse of what we're dealing with here.  Those words are used

14    in the three Fifth Circuit decisions:  Seven Seas Petroleum,

15    Lothian Oil, and Buccaneer Resources.  My favorite of the

16    three, Buccaneer Resources.  And those cases talk about how --

17    whether it's a shareholder or a creditor, they don't have

18    standing.  That shareholder and creditor don't have standing to

19    complain about the opposite of what happened here.  Not

20    appreciation of the shareholder value, but diminution in the

21    shareholder value because the corporate entities assets have

22    been diminished.  And so this is really the opposite of that.

23        And taking a step back.  The law is clear.  You,

24    shareholder, don't get to complain when the value of your

25    shares have decreased because the corporate entity transferred

13

1   assets.  I think, Your Honor, that it's similarly unfair for me

2   as a shareholder to be sued because, as alleged, the value of

3   my shares increased.  That would be an asymmetric aspect of the

4   law that I don't think would be grounded in policy and neither

5   does the Fifth Circuit.  But with the Fifth Circuit, I just --

6   I really want to stress the Fifth Circuit saying, there has to

7   be an independent benefit with -- if the only benefit is

8   derivative, appreciation of the stock value, *Janvey* has said

9   you're not a 550(a)(1) transferee, Your Honor.

10      Turning to the next page, because there are other courts

11  from outside of the Fifth Circuit, primarily, there are other

12  courts who have not been so strict or rigid as the Fifth

13    Circuit and they have, I believe, in certain instances allowed

14    550(a)(1) liability to attach merely because an entity was the

15    shareholder and they, I suppose, received the increase in the

16    value of the shares.

17        But, again, sticking with *Janvey*, Your Honor, they

18    endorse -- they don't endorse those cases.  And, in fact, what

19    they called the right approach is what the *In Re Hanson* court

20    from the Northern District of Illinois said, which is, You can

21    vote someone liable under 550(a)(1) for -- you actually receive

22    some distributions of the transferred property -- now,

23    permittedly, that's kind of like a subsequent transferee but

24    it's what the Court said -- or alterego, or, of course, the

25    paradigmatic or the typical instance -- the typical scenario

14

1    where you received an independent benefit because your

2    guarantee liability was reduced.

3         And this *In Re Hanson* case that the Fifth Circuit endorsed

4    and cited and called the "right approach" is the case, Your

5    Honor, that expressly disapproves of the *McCook Metals* case,

6    which is plaintiff's primary case.

7         So in our briefing, I think we gave it a little bit of

8    short shrift to say *In Re Hanson* and other bankruptcy court

9    case from the Northern District of Illinois, it was

10   Judge Goldgar disapproved of Judge Wedoff's prior case

11   *In Re Hanson.* It's much stronger than that and much better for

12   us, HPS, in this case because *Janvey*, the Fifth Circuit Court

13    of Appeals endorsed Judge Goldgar and called that the right

14    approach, Your Honor.

15         So I don't think -- stopping here -- hypothetically

16    stopping here, I won't stop here, Your Honor.  But if I were

17    less complete in doing my job for my client, I think I could

18    stop here and say that under *Janvey vs Libian Investment*

19    *Authority*, because we're not alleged to be a guarantor of the

20    debtor AMH's obligations.  Because there was no alterego

21    allegation here and there couldn't be, and because we're not an

22    immediate or subsequent transferee, I don't believe that the

23    Fifth Circuit's discussion of 550(a)(1) allows room for what

24    the trustee is trying to do here.  But I won't stop there, Your

25    Honor, because --

15

1        THE COURT:  Just to be sure.  This is not a 550(a)(1)

2  discussion -- right? -- by the Fifth Circuit?  This is a

3  receivership discussion?

4        MR. FINESTONE:  They -- we hope.

5        THE COURT:  It may be the same, but it isn't literally

6  a 550(a)(1) -- Jarvey isn't a 550(a)(1) case law.

7        MR. FINESTONE:  It's a great technical point, Your

8  Honor, but it is addressed by the Fifth Circuit.  They were --

9  it's a Texas uniform fraudulent transfer case and the Fifth

10  Circuit, end of discussion, says, with better language than I'm

11  going to remember, it says, "The Texas uniform fraudulent

12  transfer case comes from the same ancestry as bankruptcy law."

13    And you've seen that concept. So it's the same language,

14    agreed, Your Honor.

15         THE COURT: I just don't think it's literally a

16    550(a)(1) case that we're talking about.

17         MR. FINESTONE: Agreed, it's not literally, and I

18    think -- this is the Sanford receivership and I'm sure why it

19    dawned on Your Honor.

20         THE COURT: Right.

21         MR. FINESTONE: So same textual language. And I will

22    say, Your Honor, if you flip back to the second slide, just

23    illustrate the point, although the Court is right, it's not

24    technically a bankruptcy case or a Title 11 case. Look at that

25    first quote in the context of bankruptcy. So they are -- they

16

1    are having the discussion, and they're doing it for

2    jurisdictional purposes.  They're doing it for a pretty

3    important reason, jurisdictional purposes in that receivership

4    case.  But Your Honor is right.

5         So, but as I was saying, I wasn't planning on stopping

6    there, Your Honor.  I was going to -- of course, we'll talk

7    about -- let's look at the cases that the trustee does say.

8    And before we go -- what I'm going to say about all of the

9    cases that the trustee cites that -- that depart from or are

10   more liberal in terms of acknowledging the potential for

11   550(a)(1) liability, they are all going to -- and factually,

12   they're all going to turn on control of the -- of the

13    beneficiary, not just of the transferor but of the transferee.

14    There's double control in both of those cases.

15         And I don't think that I need double control.  I'll show

16    you when I go into the allegations of the trustee's complaint.

17    But it is a matter of fact that there's double control in all

18    of those cases.

19         Before I go through those cases, last page on this dec,

20    Your Honor, and then we can put it a side, because I love the

21    Janvey case, Your Honor.  Janvey says, "Even if Libian

22    Investment Authority itself owned and controls LFICO's assets,"

23    that's the transferee, LIFCO.  So that's control of transferee.

24    Janvey says, even that, they would not have received the

25    benefit of the transferor, they're focused on corporate

17

1    separateness, the Fifth Circuit was, Your Honor.

2         So subject to the technical distinction that Your Honor

3    raised, the Fifth Circuit says even control doesn't matter.

4    But going quickly through the cases that the trustee cites,

5    Your Honor, I'll just read some experts from each one.

6         *Esse vs Empire Energy*, here, the -- here, the transferred

7    asset was the Mallet Prospect Oil & Gas Field, Your Honor.  And

8    the Court said, the uncontested evidence demonstrates that

9    members of the Esse family were the only shareholders of both

10   Westgate and 5(e) with Brent and Todd controlling the vast

11   majority of the shares of both.

12        So that's not the case here.  I will get to the complaint

13    to support my assertion to your Honor, that that's not the case

14    here.  But it is not for HPS, nor for my co-defendant, Your

15    Honor.

16           And before I leave Esse, I will say that *Janvey* casts that

17    case a side expressly for the additional reason that those

18    shareholders in the *Esse* case have also waived any argument

19    that they were not transferor beneficiaries.  I don't know why

20    they waived it, Your Honor.  I couldn't figure it out, but the

21    Fifth Circuit is pretty good with its review of the record and

22    they say that that argument was waived.

23           Blast Fitness Group, bankruptcy case from -- from

24    New England, Your Honor, the trustee has also pleaded that

25    Mr. Dickson controlled the cap real estate entities.  That's

18

1    the recipient, and Mr. Dickson also controlled the debtor,

2    Blast Fitness, BFG as referred to in -- in the opinion.

3        So he was on both sides.  That makes sense, Your Honor.

4    We're starting to approach alterego when the beneficiary

5    controls both the transferor and the transferee.

6        *Union Tank Car Company*, by a judge that I know Your Honor

7    respects very much, Judge Rosenthal.  *Union Tank* argues that

8    Maxwell is liable because he had sole control over New Defco

9    and sole ownership over New Defco partners, which he caused to

10   transfer L.L.C. assets from New Defco to other

11   entities indirectly owned or controlled.  Judge Rosenthal says

12   that Maxwell admitted sole control or ownership of many of the

13    transferee defendants.

14         Judge Rosenthal also denied the defendant's summary

15    judgment motion on alterego.  So alterego was also alive in

16    Judge Rosenthal's case, which the Fifth Circuit said was a

17    potential basis to keep 550(a)(1) claims alive.

18         And, finally with *McCook Metals*, Your Honor, Michael Linch

19    was the -- was the controlling entity and the alleged

20    transferor beneficiary.  Michael Linch controlled both entities

21    and he transferred the right to buy the interest in the

22    Smalter, which was in satisfaction of certain antitrust claims.

23         So all of those cases have control, not just on the

24    transferor side but on the transferee side.

25         And before I go to the trustee's complaint, I'll just --

002340

19

1    *Juice Janvey*, one more time to say, I don't even think *Janvey*

2    cares about control, but the trustee's case is certainly due.

3        Let's go to the complaint, Your Honor.  Paragraph 19 --

4    paragraph 19 says Alta Maze, a holding GP, was the sole general

5    partner of AWH, which is the debtor transferor.  So in a legal

6    matter, Your Honor, control of the debtor was this GP.  I'm not

7    sure whether that moves Your Honor very much or not.  It's a

8    little -- a little raw and legally.

9        But so, I'll go further, Your Honor, because that GP has a

10   board of managers that conducted business on behalf of AWH.

11   That's the trustee's allegation.  HPS, Your Honor, my client,

12   is not on the board of managers, is not the general parent

13    itself.  My client doesn't have a human on that board or

14    managers.  So we did not control AWH, Your Honor.  And his own

15    allegations show the Court who did, in fact, control AWH.

16        Paragraph 39, following the business combination, AWH

17    continued to be managed by its general partner, AWH GP.  That's

18    the same general partner that's not my client, not my

19    co-defendant's client, has its own board of managers with a

20    bunch of sophisticated humans on it, none of which are

21    appointed or representatives of our client, Your Honor.

22        So control of the transferor is established, it's alleged,

23    19 and 39.  It's not me.  It's not my esteemed co-defendant,

24    Your Honor.

25        That gets me out of all of these cases because he's got to

20

1    have control on transferor and transferee.  But even if it

2    didn't, the complaint doesn't touch control of transferee.  It

3    doesn't say who controlled Kingfisher.  Kingfisher, I will

4    say -- strike this from the record, because it's no the

5    complaint.  The complaint's -- I won't be cute about it.

6          The complaint doesn't say who controlled Kingfisher, Your

7    Honor.  In the absence of any allegation of who controlled

8    Kingfisher, and with Your Honor's knowledge of the

9    sophisticated nature of these entities, let's presume -- I

10   presume there was a board of directors controlling Kingfisher.

11         But in any event, the easy thing to say is this complaint

12   does not allege control by HPS over the transferee.  So I think

13    he falls on both ends of control, which is what his own cases

14    require him to do, Your Honor.

15         I guess -- I guess I'll just stop and make one passing

16    policy point.  If we are going to start allowing -- if we're

17    not going to file *Janvey* and we are going to start allowing

18    shareholders to be sued for avoidance actions merely because it

19    is alleged that value of their direct or indirect equity

20    interests were increased, that's going to be a very, very

21    expensive -- expansion of avoidance actions.

22         In this case, there are -- they chose to sue the -- what

23    they perceive to be the deep pocketed shareholders.  But there

24    are instances in which there are public shareholders -- in this

25    case, after the business combination, there were public

21

1    shareholders and this is going to be quite the -- this is quite

2    the interpretation of 550(a)(1) that they're asking the Court

3    to endorse, even if it weren't already disfavored by the Fifth

4    Circuit, Your Honor.

5         So I think stopping here, Your Honor, that covers all of

6    the transfers and the complaint, because all of them were made

7    to either subsidiaries or entities other than my client.

8         The one thing I'll add, and I don't like to do this

9    because it is -- it is, perhaps, suggesting something less than

10   confidence, but -- but I am going to do it anyway to be safe,

11   Your Honor.

12        Even if we assume that -- even if we assume that the fact

13    that when this business combination actually occurred in

14    February of 2018 and all of these entities contributed -- the

15    existing shareholders of AMH contributed their shares, the

16    existing shareholders of Kingfisher contributed its shares, the

17    Silver Run that had a billion dollars in its pocket contributed

18    its cash -- though, preview, that's a big problem for the

19    plaintiff on the insolvency, but we'll come back to that.    And

20    some shareholders sold some of their shares.    Everybody took

21    equity back, everybody believed in the solvency of this.    But

22    some shares -- some of the KFM shareholders took equity back.

23    And that's their attempt, I think -- sorry, took some cash

24    back.    And that's their attempt to reconcile this to *McCook*

25    *Metals*.

22

1    The thing that I'll say about that is, that doesn't change

2    the fact that that is still -- that is still the derivative

3    benefit, the increase in this share price, the fact that it was

4    monetized by selling it to another shareholder, an alien to the

5    estate -- these are proceeds that were -- it's not like a

6    leverage buyout where the debtor assets produced a dividend,

7    this was a sale to Silver Run which put billion dollars in.

8    Even if somehow that keeps them in the game for certain

9    transfers, if for some reason *McCook Metals* trumps all these

10   other cases, even though there's no control on either side,

11   that is no application for the MSA payments.  Those were

12   post-business combinations.  I don't see how the MSA payments

13    can survive, under any of the cases, can impose 550(a)(1)

14    liability.

15          Same thing on the non-STACK assets.  That's post-business

16    combination.  There was no monetization with anybody

17    post-business combination.  And on the gathering payments too,

18    Your Honor, he's pled them from 2015, when the gathering

19    agreement was entered into, to the petition date 9/11/2019.

20          The business combination was February 2018.  That's when

21    some shares were sold by shareholders for cash.  After that, so

22    long as in February of 2018 to September of 2019, there was no

23    monetization of any alleged derivative gain in share price.  So

24    I don't think any of those could survive under the most liberal

25    *McCook Metals* standards.

002348

23

1          So big chunk of those gathering payments, no monetization,

2     no accessible benefit, no realized benefit.  They have to go

3     under anything.  The MSA payments and the non-STACK assets,

4     they have to go under anything.  They're just transfers to

5     entities that aren't before your court and no shareholder

6     realized, in any articulable way, the alleged shareholder

7     appreciation, Your Honor.  So that is 550(a)(1), Your Honor.  I

8     think it clears up the whole complaint.

9          Switching to the second issue that I wanted to talk about,

10    Your Honor.  As Your Honor will remember from the litigation

11    between the two debtors in possession before Your Honor, the

12    gathering agreement between Alta Mesa Holdings and Kingfisher

13    was entered into in August of 2015.  That's -- that's beyond

14    four years in advance of September 11, 2019.  He cannot avoid

15    that obligation because it's outside of the -- outside of the

16    period.  And so what that means is that outside of the look

17    back period under 554(a), incorporating taxes uniform

18    fraudulent transfer.

19         So what it means -- what it means, Your Honor, is that all

20    of these payments, the gathering payments, they were on account

21    of obligations that under state law are rock solid.  Federal

22    law doesn't come in -- doesn't get to come in and intervene and

23    undo it.  So these are preferences.  Those preferences, now, if

24    they're beyond the year, they stand.

25         We cited *Dual D. Health,* we cited Second Circuit Case law

24

1      *HPE Leasing and Boston Trading* from -- from then Judge Briar,

2      about how -- when payments are made on account of valid

3      unavoidable obligations, the creditors got value.  The

4      creditors that are looking for the trustee to recover value for

5      them, they got value.  These obligations were paid and

6      satisfied.  So up to a year prior to the bankruptcy case, these

7      obligations were not -- these obligations were there and these

8      payments were made on account of the obligations.

9           He talks about the 2016 amendment, but if we assume for

10     the sake of the analysis that he can avoid that, the 2015

11     agreement is still there and these are all preferences, Your

12     Honor.  So I don't think -- I don't think it works for him,

13    your Honor. But I feel the 550(a)(1) allows the Court to skip

14    that analysis, in any event, Your Honor.

15        Third category, Your Honor, which is insolvency, which is

16    where Your Honor started. Insolvency really is insufficiently

17    pled here. Paragraph 31 is where the allegation lies, Your

18    Honor. It's on information and belief, it says, "By the end of

19    2016." Let me just stop there. That's another reason why the

20    2015 gathering agreement can't be avoided because he doesn't

21    plead insolvency until the end of 2016.

22        But putting that a side a second -- for a second, Your

23    Honor, he says AMH was running at a net loss and was severely

24    inadequately capitalized in cash flow insolvent. But he

25    doesn't explain what debts could not be paid. He just -- it's

25

1    just conclusory, cash flow insolvent.  It's a one sentence

2    allegation of insolvency.  And if that were the end of my

3    argument, I don't know whether that would be enough to convince

4    Your Honor.  But this is where I think insolvency really falls

5    apart for him.  That was the end of 2016, that one or two

6    sentence conclusory allegation of insolvency.  Here's where --

7    here's where the allegation of insolvency becomes implausible,

8    Your Honor.

9        One year later, February 2018, a year and a couple of

10   months, there's a billion dollars put in by the Silver Run

11   special purpose acquisition vehicle.  Those acquisition

12   vehicles require their shareholders -- that had already gone

13  public, this is all in his complaint. What's not in his

14  complaint, though, is that whoever -- whoever the governing

15  board is of Silver Run had to agree to pour a billion dollars

16  into this combination behind all of the debt, this was an

17  inequity investment, Your Honor.

18          THE COURT: Where is this billion dollars in the

19  complaint?

20          MR. FINESTONE: Paragraph 39, Your Honor.

21          THE COURT: All right.

22          MR. FINESTONE: It talks about Silver -- Silver Run

23  had raised over $1 billion, and Silver Run became the parent of

24  both Alta Mesa and Kingfisher, Your Honor. That's how it

25  bought the stock.

26

1          THE COURT:  I don't think it says they put all that

2     money into this investment.  I'm not sure that matters, but I

3     don't think it says that.

4          MR. FINESTONE:  Let me refer Your Honor to the end of

5     paragraph 40, over $800 million -- the last sentence of

6     paragraph 40, over $800 million in cash, along with significant

7     equity was paid to the shareholders, Your Honor.  There's the

8     shareholder purchase.  And these are pretty big chunks of

9     change.  I don't think the trustee is going to deny that that

10    $800 million came from Silver Run.  The -- where did the other

11    $200 -- $200 million go, Your Honor?

12         In this complaint, it also alleges that the -- that there

13    was debt -- that there was debt satisfied at AWH.  It was more

14    than $200 million, because River Stone put in another

15    $400 million.  Nobody, no sophisticated entity thought this was

16    entity was insolvent in 2018.  The notion that it was insolvent

17    in 2016, Your Honor, is there are competing allegations in the

18    complaint that I don't think allow that to survive a

19    plausibility analysis, Your Honor.  And I'll also, just

20    sticking with that last sentence in paragraph 40, where he says

21    $800 million in cash was paid to HPS and the other KKM owners.

22    Do you see where it says along with significant equity?  Every

23    single one of these shareholders, Your Honor, that sold their

24    shares to this spec for $800 million also kept equity.  They

25    also let their position ride significantly after this business

27

1    combination, ultimately losing it all when -- when these cases

2    filed -- pursuant to what happened between 2018 and when these

3    debtors ended up before Your Honor's court.

4        So just to sum up, Your Honor, 550(a)(1), we believe,

5    knocks out every single one of these transfers that were

6    alleged because my clients didn't receive one of them.  And

7    taking his allegations as true, one of my client's entities

8    received some stock appreciation.  By the way, we also held

9    shares in the other ones.  So I think they cancel each other

10    out.  But even if the stock appreciation in one is enough, Your

11    Honor, that's just -- that's just derivative.  That's not

12    enough for 550(a)(1) liability.  That makes all of these claims

13    go away.  All of the transfers up to a year before the

14    bankruptcy case were mere preferences not fraudulent transfers.

15    That only works within a year, Your Honor, insolvency

16    insufficiently pled.

17        So those were the three points from our papers that I

18    wanted to highlight for the Court.

19        THE COURT:  Could you, for a moment, take a look

20    at 550(a)(1), and it describes the entity for whose benefit the

21    transfer was made.  And your description focused more on

22    entities that received a benefit.  Is there a difference in the

23    analysis, from looking at who received the benefit from -- for

24    whose benefit the transfer was made, which implies a state of

25    mind that I'm trying to help out a particular group as opposed

28

1    to a particular group did get helped out.

2         Do you follow the question?

3              MR. FINESTONE:  One hundred percent and --

4              THE COURT:  And what does the case law say about sort

5    of the specific meaning for whose benefit the transfer was

6    made?

7              MR. FINESTONE:  What Your Honor is pointing out is

8    that I skipped over something to my own clients's detriment.  I

9    gave the -- I gave the trustee a free one on that.  But I'll go

10   to *McCook Metals*, which is a case that we've already said the

11   Fifth Circuit doesn't favor.

12        But what *McCook Metals* says is that it's not -- you're

13    right, the statutory language suggests that there's an intent

14    aspect to this.  But what *McCook Metals* says is let's --

15    avoidance actions are about -- avoidance actions are about

16    taking something back from someone who actually received the

17    benefit.  So it's not enough to say this transfer was intended

18    to benefit some other party.  *McCook Metals* then says, you

19    actually have to have received that benefit.  So I jumped over

20    intent.

21         THE COURT:  I'm thinking the other way.  What if you

22    received the benefit but the transfer wasn't intended for your

23    benefit; it was intended for other purpose and it had, as

24    you've described it, a derivative benefit?  Does that change

25    anything?

29

1          MR. FINESTONE:  I think -- I think there needs to be

2    intent.  It's not enough -- you have to allege intent, that

3    there was an intent to benefit the shareholders.  You have to

4    hit both, Your Honor, at least under *McCook Metals*.  But I

5    definitely think you have to allege intent.

6          And, here, Your Honor, I have to say, this is -- I want to

7    touch on a comment that Your Honor actually made yesterday in a

8    different case.  The notion here that the board of AMH intended

9    to pump up the value of Kingfisher at the detriment -- to the

10   detriment of AMH, it doesn't make a whole lot of sense, because

11   these, very much like other upstream companies that are

12   conjoined with midstream companies, are just that; they're

13      conjoined. They're stuck together, inflating the value of one

14      while deflating the other one is not a rational business

15      decision.

16          And if you -- going back to the actual allegations in this

17      complaint, what actually happened, they sold them both, that's

18      in those paragraphs we were looking for.  They sold them both

19      to Silver Run.  So even if they were pumping up the value of

20      one, it was to the detriment of another.  The intent really

21      can't be there.  They sold it to the same entity that was

22      paying for the consolidated shares in both, Your Honor.

23          So let me just use a poor analogy.  If I have two bulls,

24      Your Honor, or two cattle and I'm feeding -- and I only have so

25      much food, so much stock to feed them and I feed -- and I start

1   increasing the amount that I'm feeding one of them and getting

2   that one really attractive to go to market but it's at the

3   expense of the other one, the other one is starting to show its

4   ribs.  When I actually go to the market to sell these -- to

5   sell these two piece of livestock together to one purchaser,

6   which has to be the case here and is what happened, I'm not

7   actually getting more, Your Honor.  The purchaser may pay me

8   more for one and less for the other, but he's buying them

9   together.  It's not actually increasing the proceeds here.

10           THE COURT:  Okay.  Thank you, Mr. Finestone.

11      MR. FINESTONE:  Thank you, Judge.

12      MR. BAAY:  Good afternoon, Your Honor.

13    David Eady for the ARM defendants.

14         Mr. Finestone and HPS made all the arguments we intend to

15    make on three points he laid out, so I'll be very brief, Your

16    Honor, and rise only to make these points.

17         The first of which is that it all -- all those arguments

18    do apply, except that they're in a more narrow fashion to the

19    ARM defendants because the ARM defendants are named in only

20    Count One of plaintiff's petition.

21         And as I read plaintiff's opposition, they concede they

22    were not the immediate transferor or the subsequent transferee,

23    and yet they focus -- and so they focus on us being the

24    transferor beneficiary.

25         And Mr. Finestone covered that in depth.  The only

31

1    addition that I would make to that argument comes from ARM's

2    reply, and it's a case in our 22nd paragraph, *In Re Halperin vs*

3    *Moreno.*  It's not Fifth Circuit, but it simply stands for the

4    proposition that the transfers -- in *In Re Halperin*, the

5    transfers in question were monetary payments made by the

6    defendant to an L.L.C., in which the defendant owned a

7    50 percent equity interest.

8        The Court there held that merely owning an equity interest

9    is insufficient to show an actual benefit received; and

10   instead, the trustee must prove that the defendant received an

11   actual benefit from those payments.

12       And we don't believe that -- even if allowed to amend

13    their petition or complaint, that the plaintiffs would be able

14    to make that showing here, Your Honor, given the facts and

15    given that ARM, like HPS, was just simply a shareholder of KFM.

16         The other thing I would say, though, the point I want to

17    make, Your Honor, is that there is requests made in the

18    opposition to amend the petition.  And our position, ARM's

19    position is that would not solve the problem here because in

20    plaintiff's opposition, they preview exactly how they would

21    amend their complaint, in our opinion.  And even if they're

22    allowed to make the arguments they now make in their opposition

23    and burn those into their complaint, it doesn't carry the day,

24    it doesn't satisfy the burdens for all the reasons that have

25    been spoken in this court today.  And so for that reason we

32

1   don't think that remedy is appropriate.

2          THE COURT:  Mr. Baay, thank you.

3          MR. BAAY:  Thank you.

4          THE COURT:  Mr. Dunn?

5          MR. DUNN:  Thank you, Your Honor.  Joseph Dunn on

6   behalf of the plaintiff.

7      I'll just follow suit with the three points that HPS

8   started with, because I think those are the hot button issues

9   that came out of the briefing.

10     I think there's, frankly, a fair amount of common ground

11  between the parties on how to read *Janvey*, for instance.  Many

12  times the language has been used, including just now by ARM's

13    counsel, about the concept of not holding a defendant or the

14    inability to hold the defendant liable as a mere shareholder.

15    And I believe that is what *Janvey* is saying, is that the mere

16    status of a shareholder without more is not enough to make

17    someone a transfer beneficiary under section 550, although,

18    Section 550 as Your Honor noted, wasn't really at issue in the

19    *Janvey* case.  And, you know, there is language at the end of

20    the *Janvey* opinion -- I don't have a demonstrative for Your

21    Honor so I'll just read it.  And I think this really sums up

22    what the concern of the court there and some of the other

23    courts that have been noted really was.  And they cite *Colean*

24    (phonetic) on bankruptcy, the Fifth Circuit, in saying, quote,

25    "Any approach that permits recovery based merely on the intent

33

1    of the debtor/transferor without any benefit being conferred on

2    the third party, results in the harsh outcome that the third

3    party can be liable for the return of an avoidable transfer

4    without having received any benefit, which is generally

5    contrary to the discouragement remedy of avoidance actions."

6         Now, what *Janvey* is really wrestling with is -- and keyed

7    in on is the *Paradigm* case, and this has been discussed.

8         And the case law that we've cited and the defendants have

9    cited, and the *Paradigm* case is, in fact, the case of a

10   guarantor whose obligations and debts are satisfied by a

11   transfer to a separate entity.  But that's where we part ways

12   with the defense because what *Janvey* did not do is limit the

13    recovery under 550 or a state law corollary to a *Paradigm* case.

14    In fact, there has been no case law that's cited that limits it

15    to that *Paradigm* case.

16         Now, I think what the Courts have done is approach this in

17    a pragmatic way and said, you know, there's a spectrum of

18    potential possibilities where someone may be sued as a transfer

19    beneficiary. And what the courts, I think, have uniformly

20    said, and we agree to not dispute, is that mere shareholder

21    status is not enough. Just sitting there as a shareholder and

22    not receiving any actual benefit, not participating, not

23    controlling, not doing anything else but merely holding a share

24    is not enough. And that makes sense. Shareholders are public

25    corporations. They have no idea what the company is doing,

34

1    what transfers they may be receiving in the ordinary course of

2    business, preference is fraudulent, conveyance is -- it doesn't

3    make sense for them to be exposed to transfer beneficiary

4    status and potential liability.  And so in that case, mere

5    shareholder status is not enough.

6         But then on the other end of the spectrum, you have the

7    cases that we discussed in our briefing, including the *McCook*

8    *Metals* case, which the Court need not adopt formally that --

9    what those cases illustrate is that we have closely held

10   companies, whether they're sole shareholder companies or

11   they're several shareholders.  There's an element of control

12   and there's an element of intention in the beneficiary and

13   their receipt of the benefit that was intended under the

14   transfer.

15        THE COURT:  So does that mean that we -- the argument

16   that I heard, mainly, from Mr. Finestone on this issue is, do

17   we skip through everything and pierce the veil for every time

18   that a closely-held corporation receives a payment?

19        MR. DUNN:  No, Your Honor.  But --

20        THE COURT:  Why would we treat the shareholders -- the

21   innocent shareholders of a closely-held corporation different

22   than the innocent shareholders of a publically traded

23   corporation?  What is the distinction there?

24        MR. DUNN:  I think to qualifier, Your Honor, is maybe

25   the key to that, which is the innocent shareholder.  And HPS

002372

35

1    did a good job painting itself today as a passive shareholder

2    in KFM.

3        THE COURT:  Where in your pleadings do you have Rule 9

4    allegations that this was done with fraudulent intent, HPS?

5        MR. DUNN:  Well, we talk about HPS's involvement both

6    as a shareholder of -- in the AWH -- let me --

7        THE COURT:  Where is the Rule 9 allegation?  You say

8    in here in broad language that they do things, but that's not

9    going to set aside Rule 9.  So where do you set aside Rule 9 as

10   to either entity that I should treat these guys any different

11   than I would -- because unless you meet Rule 9, I think I have

12   to treat them the same as I would public shareholders.  So how

13    do you meet Rule 9 with respect to that?

14          MR. DUNN:  Well, Your Honor, starting at paragraph 21

15    of the complaint we talk about the creation of KFM by the same

16    shareholders who were also controlling AWH at the time.  So

17    Mr. Chappelle.

18          THE COURT:  Go ahead.  But that's not fraud.  Where is

19    the fraud?

20          MR. DUNN:  Your Honor, going through this entire

21    section, I'm happy to walk through it, but to summarize our

22    allegations, the allegations are that the plan --

23          THE COURT:  Actually, in variance, I would rather take

24    the time to walk through it because Rule 9 makes me determine

25    whether you have the who, what, when, and where in here.  And I

002374

36

1    don't think you do.  I'm not suggesting you can't have that,

2    but I don't know that you do have it.  And telling me an

3    overview isn't going to get me there at all.  Because the

4    overview is these guys don't love each other, it's closely held

5    and, therefore, you should take their money away.  I need to

6    see the Rule 9 allegations, which I missed when I read through

7    it.

8         MR. DUNN:  Right.  So, Your Honor, in paragraph 23,

9    the complaint alleges that early presentations of a proposed

10   transaction.

11        THE COURT:  By whom?  When?  And where?  Rule 9.  You

12   make Rule 8 allegations here.  Where are the Rule 9

13    allegations?

14         MR. DUNN:  Yes, Your Honor.  If we need to clarify the

15    who made the early presentations, we'll be happy to do that.

16         THE COURT:  Was it made by --

17         MR. DUNN:  These are proposals.

18         THE COURT:  -- ARM?  Was it made by Mr. Finestone's

19    client?  Who made them?

20         MR. DUNN:  This is by the owners of AMH who are

21    considering creating the KFM as the midstream gatherer and the

22    rates that would be paid to KFM under that proposal, including

23    the backing of HPS.  So HPS, KFM -- excuse me HPS, ARM,

24    Chappelle and Ellis, through HMI, were all the equity owners of

25    KMF at the time.

37

1    And the allegations in paragraph 23 and 24 go to the

2    discussions that were having -- that were taking place between

3    these owners, and we can flesh this out if Your Honor thinks

4    it's necessary.

5    THE COURT:  I don't even see that it's a close call to

6    Rule 9.  I'm begging you to show me how you do.  Because read

7    24.  It says -- you think that ARM took full advantage of

8    things without any backup for that.  And then you say one ARM

9    official, we don't identify when he said it, Rule 9 is very

10   specific about what has to happen.  I don't see where you view

11   Rule 9.  It's almost like we're going to ignore Rule 9.  And I

12   don't see how I can under your theory.

13          MR. DUNN:  I'm certainly not intending to ignore

14  Rule 9, Your Honor.

15      As you said, to the extent we need to specify and clarify

16  who were involved in these transaction -- excuse me, these

17  discussions, the --

18          THE COURT:  Let's take 25, on information and belief,

19  but you don't tell me what that's based on.

20      AMH's owners, you can't send rate structure within the

21  benefits that those rates would have for KFM and its owners,

22  including HPS, Chappelle and Ellis.  Where does that come from?

23  That's a pretty interesting sentence.  It doesn't come close to

24  meeting Rule 9.

25          MR. DUNN:  Yes, Your Honor.  I suppose going back to,

38

1    you know, the issue where this Rule 9 discussion started with

2    respect to the control.  What the complaint does allege is the

3    uniformity of ownership and control at both entities.

4         THE COURT:  It doesn't let uniformity of ownership,

5    and it can't be that every time you have uniformity of

6    ownership and there's a transfer we pierce the veil.

7         MR. DUNN:  Certainly not.

8         THE COURT:  It's really inconsistent with Texas law,

9    for example.

10        MR. DUNN:  I couldn't agree more.  It -- and it's not

11   about piercing the veil here and holding them liable.

12        THE COURT:  If you're holding them liable for the

13    debt, it's quasi piercing the veil without any showing of any

14    fraud that would meet a Rule 9 standard.

15        MR. DUNN:  Well, to be fair, Your Honor, it's not that

16    we're saying these shareholders are liable for all of the debts

17    of the company.  It's --

18        THE COURT:  They're liable for these debts.

19        MR. DUNN:  It's transfer specific.

20        THE COURT:  And you won't say why.

21        MR. DUNN:  It's -- it seems we haven't said why in

22    clear enough fashion, Your Honor, is what I'm taking from you.

23    And we're happy to --

24        THE COURT:  Unless you're not alleging fraud, but I

25    think you're pretty specific that you say in your complaint

39

1    we're alleging fraud conduct on their part, right?  Or are you

2    not alleging fraud?

3        MR. DUNN:  No, that's correct.  There are constructive

4    fraud claims which I --

5        THE COURT:  You're alleging actual fraud?

6        MR. DUNN:  Yes, Your Honor.  So the actual fraud

7    and --

8        THE COURT:  Actual fraud, you have to meet Rule 9 for

9    it, right?

10       MR. DUNN:  And so our view is we have alleged to

11   badges of fraud and the circumstances surrounding those badges

12   of fraud in the complaint, as Your Honor noted earlier.  I

13    believe your Honor was saying, that those badges of fraud don't

14    need to be pled with Rule 9 particularity.  But we have laid

15    out the chronology, we have laid out the ownership structure,

16    the ownership on both sides, the involvement of the parties,

17    the benefit that was intended and the benefit that was

18    received.  And that's what we were focused on before --

19         THE COURT:    With a generic claim.  And I know I said

20    this and I should quit saying it, but you've done that

21    generically and the law doesn't make that good enough.  And

22    maybe more troubling for me is the law doesn't open up

23    discovery for you until you meet Rule 9.  So you can't make

24    general allegations and then expect to fill in the interstitial

25    parts after discovery.  You have to make the Rule 9 allegations

40

1    that suffice under Rule 9, and then you get discovery.  But you

2    can't start with the generic complaint, get discovery and then

3    go to Rule 9.  And, that, I think is what you're asking me to

4    let you do.

5         MR. DUNN:  What I'm offering, Your Honor, is if Your

6    Honor believes that the amendment is necessary to fill in those

7    gaps now, then we're happy to do that.  And it was more

8    important to us, I suppose, in the complaint to elucidate on

9    what the intent was informing this entity, entering into these

10   agreements, and ultimately transferring the value away from AMH

11   over to KFM where there's a separate holding base, separate

12   equity holders.  ARM was not involved over on the AMA side.

13      And, ultimately, there -- there may have been -- we

14   believe there was, you know, value to put in the value from AMH

15   over into this separate entity which was ultimately sold off.

16      You know, counsel for HPS used the analogy of the bulls.

17   That analogy only works if you assume that the same bull and

18   the same ownership and same bull and they're the same value.

19   You lose one -- one goes up in value and other one goes down.

20   Well, that may not have been the same in terms of the desperate

21   equity ownership at the two entities.  They may have seen KFM

22   as a much easier boat to build and ultimately sell off.  In

23   which case it makes a lot of sense, to divert value away from

24   AMH because there's a bigger paycheck at the end of the day.

25      So, Your Honor, on the 550 point, if I can go back to

41

1    that, Your Honor noted the intent and that's what -- what we

2    were focused on in the complaint and it sounds like we need to

3    allege with more specificity, was the intent of who was going

4    to be benefited by this transfer.  And there's -- no case

5    that's been cited that says this only applies in a case where

6    there's a -- a guarantor whose debts are being satisfied under

7    the transfer; instead, there are a host of cases that look at

8    it more pragmatically of was this intended to benefit this

9    specific shareholder?  Did they actually have control of the

10   situation?  Were they actively involved in the transaction, and

11   then ultimately did they benefit, whether it was derivative,

12   whether it was actual or not?

13    I will say, you know, the case law, HPS is correct, that

14    in many of these cases discussing transfer beneficiary status

15    under 550 or under state law corollaries, we are talking about

16    sole shareholders are closely held shareholder companies.  And,

17    you know, we believe that's -- that's essentially what we have

18    here.

19        And what was also kind of not discussed during HPS's

20    presentation raise the fact that they were on both sides of

21    this transaction.  And, you know, there's a difference between

22    just being a passive shareholder sitting there and ultimately

23    getting an increase in the value of those shares, and someone

24    who's on the transferor side of the equation, ultimately you're

25    receiving the benefit --

42

1          THE COURT:  Show me -- show me where in the complaint

2   you allege that HPS was in control of such, under Rule 9.

3          MR. DUNN:  Your Honor, I won't waste time flipping --

4   I'm not sure that we meet what you're -- what you're speaking

5   of in terms of the Rule 9 as to their control of AMH, if that's

6   what you're asking.

7          THE COURT:  Well, is that part of the fraud?  Maybe

8   it's not.

9          MR. DUNN:  It's not necessary.  What's necessary is

10  that --

11         THE COURT:  It's not necessary to what?

12         MR. DUNN:  To establish the actual intent to hinder,

13  delay of defraud under the statute.  It's not necessary that

14  they are in control of AMH.  The reality is that they had --

15       THE COURT:  So what is necessary to establish the --

16  you're not arguing hindering, you're not arguing delay.  You're

17  arguing defraud, right?

18       MR. DUNN:  Right.

19       THE COURT:  So what's necessary to prove defraud?

20       MR. BAAY:  Those badges of fraud, Your Honor, that are

21  set out and recognized.  So an insider relationship or a close

22  relationship under the -- under the factors that have been --

23  that is the fraud that have been recognized in this circuit;

24  insolvency, less than reasonably equivalent value in exchange

25  for the transfers.

002388

43

1    So -- so each of those badges of fraud are -- are from

2    what the inference is drawn, that there was actual intent to

3    hinder, delay or defraud. And that actual intent -- I don't

4    think there's a dispute, intent is not something that has to be

5    pled with particularity under Rule 9.

6    If Your Honor believes that under Rule 9 we need to --

7    THE COURT: No. I think Rule 9 excludes state of mind

8    issues. Show me where your badges of fraud are listed in the

9    complaint.

10    MR. DUNN: Sorry. One second, Your Honor.

11    So in the complaint, Your Honor, we -- we -- starting at

12    section -- well, paragraph 21 of the complaint is where we

13    start to walk through and describe the scheme to which the --

14    I'll just stick with the gathering agreement transfers.  KFM

15    being developed, the ownership of KFM, ultimately the -- the

16    rewards that would flow to AWH's owners by virtue of their

17    equity stakes in KFM in section -- or paragraph 24 of the

18    complaint, Your Honor.

19        *(Alarm is set off)*

20        THE COURT:  I think there must be something wrong with

21    the fire system.  That went off this morning once as well.  I

22    don't think you did that, Mr. Dunn.

23        MR. DUNN:  I hope not.

24        In paragraph 29, Your Honor, where plaintiff alleges that,

25    you know, of every above market dollar paid by AWH, KFM only a

002390

44

1    small fraction makes it back to AMH.  In fact, the production

2    assets were being diverted to benefit KFM, in which AMH had no

3    equity interest, and KFM's equity ownership included HPS and

4    ARM.

5        AMH knew that KFM was charging its other customers

6    substantially less than it was charging AMH.

7        THE COURT:  But, again, I guess I should quit because

8    these are just all conclusionary statements that don't give

9    who, what, when, where, right?  All of those.

10       MR. BAAY:  If Your Honor believes that more detail is

11   necessary --

12       THE COURT:  I know you said that, but it isn't just

13    that I believe it, objectively you don't meet Rule 9.  And if

14    you want to tell me that I'm wrong, I would much rather be --

15    that you tell me, no, we meet Rule 9, then say I want more.

16    It's not that I want more.  I want to know if you met Rule 9.

17    I don't see where you come close to meeting Rule 9.

18         MR. DUNN:  Well, I suppose our view, Your Honor, was

19    that the allegations in the complaint paint enough of a

20    picture.  These are not mystery transactions to the defendants

21    in this case.

22         THE COURT:  They are to me.

23         MR. DUNN:  I understand, Your Honor.  But going back

24    to the pleadings standard, really, what is focused on is enough

25    detail for the defendants to be able to formulate a response to

002392

45

1    the allegations.

2         THE COURT:  No.  That's Rule 8.  That's not Rule 9.

3         MR. DUNN:  I understand.  The who, what, where and

4    when of an actual fraud claim is relaxed in certain

5    circumstances, including in actual, you know, fraudulent

6    transfers situations.  It's --

7         THE COURT:  I'm not aware of that.  Is there case law

8    that tells me that I should not apply Rule 9 to an actual

9    fraudulent?  Because I know there's case law that doesn't

10    apply, nor have I repeatedly applied it in constructive

11    fraudulent transfer.  But I've consistently applied it in

12    actual -- I know the Fifth Circuit said, point blank, it

13    applies in actual. But I certainly don't know of any relax

14    standard in the Fifth Circuit.

15         MR. DUNN:  Well, what the courts have said and we

16    cited the cases in our papers -- we'll just find it, Your

17    Honor.  I apologize.

18         What the cases say is that where -- where the intent of

19    the transferor debtors is being alleged by the trustee, a

20    stranger to the transaction, that the pleading standard is --

21    is relaxed in those circumstances.  It's appropriate to relax

22    them in those circumstances.  It's also appropriate to relax in

23    the circumstances where the information that is at question,

24    some of the who, what, where, when is within the possession of

25    the defendants.  And we've cited cases in our brief, Your

46

1    Honor.    The *Katchadurian* case, and then the *Askanase* case

2    A-S-K-A-N-A-S-E, this is on page 11 of our brief, which says,

3    you know, pleadings is sufficient under Rule 9(b) if it

4    identifies the circumstances constituting fraud, so that the

5    defendant can prepare an adequate answer from the allegations.

6    And our view is that, you know, the defendants in these case

7    are well familiar with the transactions at issue.  Are able to

8    respond to this, as counsel has done today, and in the briefing

9    about the background of these transactions and appears very

10   clear from their statements and from their briefing, that they

11   understand what the plaintiff's legal theory is with respect to

12   these particular transactions.

13    And so for that reason, as we stated in our brief, we

14    thought our pleading meets the Rule 9(b) standard, under these

15    circumstances, where you have a trustee bringing a fraudulent

16    transfer claims based on actual fraud, the badges of fraud

17    which don't need to be pled with particularity.

18        So if I could, Your Honor, unless you want -- you would

19    like to stay on the Rule 9.

20        THE COURT:  No, that's fine.  Go ahead.

21        MR. DUNN:  Let me turn back to the 550 issue, and it's

22    just notes that the policy argument that HPS made is really a

23    strawman.  We're not, as they said, not advocating that a mere

24    shareholder status exposes that shareholder to potential

25    liability for a fraudulent transfer made to the underlying

47

1    company.  But in these cases and in the cases that have

2    ultimately found transfer beneficiary status as to the

3    defendants, they really focus on the intent, was there an

4    intent to benefit that particular shareholder?  And we believe

5    that we've pled that.

6         And, also, was there an actual receipt of that -- of that

7    benefit.  And as noted earlier, you know, the complaint alleges

8    that there was a cash out of that value that was built up over

9    on the KFM side under the gathering agreements on the backs of

10   AMH and its creditors.

11        Just moving on, Your Honor, to the second argument that

12   HPS made, really relating to payments under contracts.  So --

13    so one thing I will note, he briefly touched on it. But, first

14    of all, let me concede that the 2015 gathering agreements are

15    outside of the look-back period.    That is true.    That contract

16    is outside the look-back period.

17        The 2016 amended and restating gathering agreements are

18    not outside.    And what the plaintiff has alleged and part of

19    the claims here is to avoid the occurrence of obligations under

20    those amended and restated obligations -- excuse me, amended

21    and restated gathering agreements, which were significant.

22    Significant fees that were agreed to in the connection with the

23    2016 gathering agreements, the covenants that were granted in

24    connection with the *Sabine* decision, which I know Your Honor is

25    familiar with and previously wrestled with.

48

1          And so while it's true -- so I'm going to kind of

2    bifurcate this and talk about 2016 going forward.  The reality

3    is, if ultimately the trustee prevails in avoiding the

4    occurrence of those obligations, then there's no antecedent

5    debt being paid pursuant to any payments that were made to KFM

6    under that agreement, and it's really a question of was there

7    reasonably equivalent value?  Was there adequate value or was

8    AMH indeed paying exorbitant rates for gathering and processing

9    under those 2016 agreements.

10         Now, going back to 2015, and we're really talking about a

11   short time frame in which payments were made under the 2015

12   agreements.  I believe, offhand, I think it was between

13    June 2016 and December 2016.  And they were significant, but

14    the case law that we've cited makes it clear that there's an

15    ability, even if that original contract can't be avoided, that

16    there is the ability to analyze and potentially avoid the

17    payments made, even though it was governed and the rates may

18    have been governed by another agreement.

19        And in our papers, Your Honor, we cited the *RML* case from

20    the Third Circuit.  And in that case, there were -- there was a

21    contract and there were fees that were paid pursuant to a

22    commitment letter with -- commitment letter with a potential

23    lender.  And they were avoidable as fraudulent conveyance in

24    those fees, even though they were paid pursuant to a contract,

25    were independently analyzed by the Court as to whether there

49

1    was adequate value given in exchange for those fees.  And,

2    ultimately, with respect to most of those fees, the Court

3    concluded that there wasn't sufficient value given because the

4    possibility of the loan funding was so conditioned and

5    hypothetical, that there was no real value for paying over

6    those monies, even though it was done pursuant to a -- a

7    written agreement.

8        I think where this, you know, may make more sense, to

9    limit it to this dollar for dollar reduction of obligation is

10   where you are talking about a loan transaction or a repayment

11   schedule, an installment agreement, where you have, you know,

12   set payments that are supposed to be made and the payment by

13    the debtor of a scheduled payment under that agreement is
14    dollar for dollar satisfaction of that obligation.  It's a
15    different situation with the gathering agreements.  The
16    gathering agreements may have set rates and may have had
17    obligations under the 2015 agreements to give all of the oil
18    and gas gathering and processing business to KFM.  But
19    ultimately, the payments that were being made were on account
20    of services that had not been rendered yet or they were
21    rendered later in time.  And so each of those is an independent
22    debt that potentially arose under that 2015 agreement and could
23    be analyzed under the case law that we've cited as to whether
24    there was reasonably equivalent value given in exchange for
25    those payments.

50

1          And the other case I would cite you to with Judge

2     Wallrat's (phonetic) decision in *EBC 1, Inc.*, cited in our

3     brief, where she -- it says, "Transfer may be fraudulent, even

4     if it was made in accordance with the terms of the contract

5     between the parties."  And, there, the debtor had paid for

6     advertising services pursuant to an advertising contract.  And

7     the question -- there was a question of fact, ultimately, as to

8     whether the debtor actually received services of equivalent

9     value.

10         I'll note, you know, also, this relates to that first

11    bucket of payments under the 2016 gathering agreements.  But

12    there are allegations in our complaint and evidence that, in

13    fact, payments were being made for services that were never

14    rendered.

15        There was a contemplation that KFM would be transporting

16    various oil shipments under the crude oil gathering agreement

17    in 2016.  And, ultimately, AWH ended up paying another party to

18    do it as well as KFM.

19        So for that reason, it's not an isolated look at, well,

20    there happened to be a contract and so anything that's paid

21    under the contract can't be avoided.  In that case, you're

22    basically saying the parties can paper over the contract any

23    inequitable or imbalanced financial arrangement they may come

24    to and isolate it from a fraudulent transfer liability.

25        And then, Your Honor, let me just hit -- I'm sorry.  Give

51

1    me a moment.  I guess, Your Honor, I'll just clarify for -- for

2    our purposes, you know, the -- ultimately what brings these

3    defendants within the scope of liability as transfer

4    beneficiaries under the statute is really the intention to

5    directly benefit them as part of this -- the gathering

6    agreement.

7         I want to kind of shift a little bit to HMI because HPS

8    mentioned, you know, those two others sets of transactions.

9    And what is not, I suppose, mentioned there is, HMI was also on

10   both sides.  HMI, HPS owned an equity interest in HMI.  HPS

11   owned an equity interest through HMI on the AMH -- AMH side as

12   well.  And the claims there relating to the non-STACK asset

13    transfer and the HMI MSA, I think, are fairly straightforward,

14    and I think they're adequately pled in the complaint in that

15    the transfers were made for no consideration.  There were

16    transfers that were made under the HMI MSA to benefit HMI, but

17    never -- and to shareholders HPS.  But there was no assurance.

18    In fact, it was the intention this was never going to be paid

19    out.  In fact, there was upward of $10 million of liability

20    that was incurred under the HMI MSA that was never repaid.

21    And, ultimately, AWH and its creditors were left holding the

22    bag.

23        And, you know, the complaint alleges -- and I'll just

24    point Your Honor to the specific paragraphs.  With respect to

25    the non-STACK asset transfer, there were no third party

52

1    valuations or fairness opinions regarding the zero dollar price

2    that was paid by HMI and AWH at the time of the assignment when

3    the complaint alleges the non-STACK assets were valued at tens

4    of millions of dollars, generating positive cash flow.

5           And then with respect to the MSA, there was no ability to

6    try to short up payment for AWH under this MSA.  And it can be

7    inferred from the circumstances and was alleged, that, in fact,

8    there was no intent, ultimately, for these payments to ever be

9    made to AWH.  AWH was much like the KFM situation left to

10   shoulder the financial burden of the relationship and the

11   operation of the non-STACK assets going forward and did, in

12   fact, do so.

13        And then, finally, I just want to note, Your Honor, the --

14   there was a comment made about subsequent transferees.  One

15   thing is -- obviously, we have no disagreement, that the

16   complaint, as it stated at this point, is alleging claims

17   against these defendants in their capacity as transfer

18   beneficiaries under 550.

19        We reserved our right, obviously, to amend.  I don't think

20   we need to, but reserve our right to amend, to add claims as

21   against these entities as subsequent transferees, to the extent

22   we discover that evidence, that's obviously information that's

23   within the possession of the defendants.  But I will note that

24   what has come to light since we filed or complaint and we noted

25   this in our -- in our brief, is that the HMI trustee in his

53

1    case, has filed a series or adversary proceedings and has

2    included, you know, allegations in those cases, regarding the

3    receipt by HPS of amounts from the sale of these non-STACK

4    assets.  So it's obviously something we're continuing to

5    explore, but I just wanted to say we agree that the complaint

6    in its present case -- present form does not seek to avoid and

7    recover transfers from these defendants as subsequent

8    transferees, but, obviously, reserve the right to do so if the

9    evidence justifies it.

10        That's all I had, unless Your Honor has any questions.

11        THE COURT:  No.  Thank you.

12        How long do you need to file a complaint that you

13    believe -- and I appreciate Mr. Baay's argument that I

14    shouldn't give you the opportunity, but the search is

15    essentially set up.  So I'm going to give you the opportunity.

16    What's -- how long do you need to file a complaint that meets

17    the requirements of Rule 9 so that I can determine sufficiency,

18    having given you a full opportunity to amend?

19            MR. DUNN:  Thirty days, Your Honor?

20            THE COURT:  Fine with me.

21            Virtually, all of the issues today turn on whether Rule 9

22    allegations can be made.  I think that goes towards the

23    550(a)(1) allegations.  Because if there was actual fraud that

24    led to the intended beneficiary receiving a benefit through

25    actual fraudulent conduct, then I don't need to worry, as I

54

1    think Mr. Dunn has correctly argued about whether they were

2    actual subsequent transferees, they were the beneficiary

3    transferees, but that's going to require the Rule 9 showing.

4         I find the Rule 9 showing is not here, but you should be

5    given an opportunity to replead on that.  But you can't have a

6    fraudulent transfer with respect to contracts.  That one

7    depends, in my view, if you had a mandatory payment under a

8    contract, then I think that the argument being made by

9    Mr. Finestone is correct.

10        On the other hand, if you had optional payments, depending

11   upon what you ordered and you ordered things that were

12   overpriced, that might very well be fraudulent payment.  But I

13    don't have those allegations in here under Rule 9 to know what

14    specifically was done in the implementation of the contract in

15    furtherance of fraud.  But to the extent that they were all

16    mandatory payments, I don't follow the argument that it would

17    be anything other than a potential preference.

18        With respect to the argument that you need to actually

19    plead insolvency, I think that depends.  I don't know that

20    you've done it much with just a conclusionary statement.  I

21    would urge you to bolster that.  I don't think it needs to meet

22    Rule 9, as to whether just a shareholder can have liability.  I

23    find that they cannot if it's solely because they're a

24    shareholder.  But your argument is you're trying to prove more

25    than that and I accept you're trying to prove more than that

55

1    and I'm going to give you the opportunity to prove more than

2    that, but you're going to have to meet Rule 9.  So I'll give

3    you 30 days to do it.  That means that by July 11th an amended

4    complaint must be filed that meets Rule 9.  I am not going to

5    issue a scheduling order.  I am explicitly not opening

6    discovery.  It is my view that the Fifth Circuit has held you

7    don't open the discovery window to allow people to prove

8    Rule 9.  They've got to make sufficient Rule 9 allegations to

9    then have the discovery door opened.

10        The answer date will run from the date on which it is

11   filed.  And, of course, in lieu of an answer to the amended

12   complaint, I recognize that I'm probably going to get

13    additional motions to dismiss and I'll deal with that when it

14    happens.  But if you want to file it sooner than the 30 days,

15    then it will just run in accordance with the rules as to their

16    answer.

17         I appreciate the presentation today, and that's what I'm

18    going to do with these allegations.  So I will -- I'm sure to

19    see y'all again.  Thank you.

20              MR. FINESTONE:  Thank you, Your Honor.

21              MR BUY:  Thank you, Your Honor.

22              (End of proceedings at 2:53 P.M.)

23

24

25

56

-oOo-

1

2

3    I, court approved transcriber, certify that the foregoing

4    is a correct transcript from the electronic sound recording of

5    the proceedings in the above-entitled matter.

6

7    DATE: September 16, 2022

8

9    *Letitia "Tish" Monciváis*
     *Ornelas Reporting Services*
10   U.S. Official Court Reporter
     P. O. Box 831124
11   San Antonio, TX   78283-1124
     512/550-6886

12

13
14
15
16
17
18
19
20
21
22
23
24
25

002416

# EXHIBIT 4

002417

Fill in this information to identify the case:

| | |
|---|---|
| Debtor 1 | High Mesa, Inc. |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Southern District of Texas |
| Case number | 20-30602 |

.ed States Courts
Southern District of Texas
**FILED**

**JUL 13 2020**

David J. Bradley, Clerk of Court

## Official Form 410
# Proof of Claim
04/19

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
|---|---|

| 1. Who is the current creditor? | The AMH Litigation Trust |
|---|---|
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor    Alta Mesa Holdings, LP |

| 2. Has this claim been acquired from someone else? | ☐ No |
|---|---|
| | ☒ Yes. From whom?    Alta Mesa Holdings, LP, pursuant to the confirmed plan of liquidation in Bankr. S.D. Tex. Case No. 19-35133 (MI) |

| 3. Where should notices and payments to the creditor be sent? | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|---|
| Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Joseph R. Dunn, Esq.<br>Name | David M. Dunn, c/o Joseph R. Dunn, Esq.<br>Name |
| | 3580 Carmel Mountain Road, Suite 300<br>Number       Street | 3580 Carmel Mountain Road, Suite 300<br>Number       Street |
| | San Diego       CA       92130<br>City       State       ZIP Code | San Diego       CA       92130<br>City       State       ZIP Code |
| | Contact phone   858-314-1500 | Contact phone   N/A |
| | Contact email   jrdunn@mintz.com | Contact email   amtrust@outlook.com |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |

| 4. Does this claim amend one already filed? | ☒ No |
|---|---|
| | ☐ Yes. Claim number on court claims registry (if known) _____    Filed on _____ MM / DD / YYYY |

| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☒ No |
|---|---|
| | ☐ Yes. Who made the earlier filing?    _____ |

Official Form 410                    Proof of Claim                    page 1


American LegalNet, Inc.
www.FormsWorkFlow.com

DocuSign Envelope ID: B5943D9C-ADBF-4BE5-B8F1-739BEFD52681

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☒ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____

**7. How much is the claim?**   $ <u>at least $10,630,000</u> . **Does this amount include interest or other charges?**

☐ No

☒ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

<u>See Addendum.</u>

**9. Is all or part of the claim secured?**

☒ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**   $ _____

**Amount of the claim that is secured:**   $ _____

**Amount of the claim that is unsecured:**   $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $ _____

**Annual Interest Rate** (when case was filed) _____ %

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☒ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $ _____

**11. Is this claim subject to a right of setoff?**

☒ No

☐ Yes. Identify the property: _____

---

Official Form 410                                      Proof of Claim                                      page 2

American LegalNet, Inc.
www.FormsWorkFlow.com

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☒ No | |
|---|---|---|
| | ☐ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_____) that applies. | $ _____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.
☒ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  07/13/2020
                  MM / DD / YYYY

DocuSigned by:

_____
Signature

Print the name of the person who is completing and signing this claim:

| Name | David | M. | Dunn |
|---|---|---|---|
| | First name | Middle name | Last name |

Title    Trustee of the AMH Litigation Trust

Company    N/A
           Identify the corporate servicer as the company if the authorized agent is a servicer.

Address    c/o    Joseph R. Dunn, Esq., 3580 Carmel Mountain Road, Suite 300
           Number    Street

           San Diego                    CA          92130
           City                         State       ZIP Code

Contact phone    N/A                    Email    amhtrust@outlook.com

002420


American LegalNet, Inc.
www.FormsWorkFlow.com

*In re High Mesa Inc.*
United States Bankruptcy Court for the Southern District of Texas
Case No. 20-30602

## ADDENDUM TO THE PROOF OF CLAIM OF
## THE AMH LITIGATION TRUST

      This proof of claim (the "<u>Proof of Claim</u>") is filed on behalf of the AMH Litigation Trust ("<u>Claimant</u>") by David M. Dunn, the Litigation Trustee of the AMH Litigation Trust, against the bankruptcy estate of High Mesa Inc. ("<u>Debtor</u>"), and is for an unsecured claim of not less than **$10,630,000** (the "<u>Claim</u>").

      Claimant was formed pursuant to (a) the *First Amended Joint Plan of Liquidation of Alta Mesa Resources, Inc. and its AMH and SRII Debtor Affiliates under Chapter 11 of the Bankruptcy Code*, dated May 24, 2020 (the "<u>AMH Plan</u>") filed in *In re Alta Mesa Resources, Inc., et al.*, Bankr. S.D. Tex. Case No. 19-35133 (MI) (the "<u>Alta Mesa Cases</u>") as Docket No. 1757; (b) the *Findings of Fact, Conclusions of Law, and Order (I) Approving the AMR/AMH Debtors' Disclosure Statement and (II) Confirming the First Amended Joint Plan of Liquidation of Alta Mesa Resources, Inc. and its AMH and SRII Debtor Affiliates under Chapter 11 of the Bankruptcy Code* entered on May 27, 2020 in the Alta Mesa Cases as Docket No. 1777; and (c) the AMH Litigation Trust Agreement dated as of June 8, 2020 filed as Exhibit 3 to Docket No. 1761 in the Alta Mesa Cases. Pursuant to the AMH Plan and the AMH Litigation Trust Agreement, on June 8, 2020, all AMH Litigation Trust Causes of Action (as defined in the AMH Plan) vested in the AMH Litigation Trust. The AMH Litigation Trust Causes of Action include, but are not limited to, all claims and causes of action against the Debtor and its subsidiaries. [Alta Mesa Cases, Dkt. 1761, Ex. 5A, at Schedule 5(ii)]

      Because Claimant was formed only approximately one month prior to the claims bar date in the Debtor's case, Claimant's investigation regarding the bases for and amount and priority of the Claim is ongoing, including whether such Claim constitutes an administrative expense of the Debtor's Estate. Therefore, Claimant submits this Proof of Claim to preserve, and hereby asserts, any and all rights and remedies against the Debtor and the Debtor's Estate to recover damages suffered by Claimant as a result of the Debtor's actions or as otherwise available under applicable law. Claimant will amend this Proof of Claim as additional facts become known.

      As of the date of this Proof of Claim, the Claim is known to arise from the following:

- In connection with the Business Combination (as defined below), Alta Mesa Holdings, LP ("<u>AMH</u>") entered into a management services agreement with the Debtor (the "<u>HMI MSA</u>"). Under its terms, AMH was to provide payroll, expenses, and other services to the Debtor; in exchange, the Debtor was to reimburse AMH for all expenses it incurred on behalf of the Debtor and to pay AMH a $10,000 per month management fee. AMH terminated the HMI MSA in early 2019. On April 23, 2019, AMH sued the Debtor in Harris County, Texas for, among other things, breaching the HMI MSA by failing to pay AMH approximately $10,000,000 owed for services rendered by AMH under the HMI MSA. A copy of the second amended petition in that action (the "<u>Harris County Action</u>"), without exhibits, is attached hereto as **Exhibit 1**. In addition, pursuant to § 3.4 of the HMI MSA, the Debtor is liable for unpaid interest at the rate of 10% per annum on all amounts due under the HMI MSA.

- As noted above, the HMI MSA requires the Debtor to pay AMH a $10,000 per month management fee. In negotiating the HMI MSA, the Debtor stood on both sides of the transaction because the Debtor's affiliate High Mesa Holdings, L.P. was a partner in AMH. The Debtor breached its fiduciary duties to AMH by

requiring the Debtor to pay AMH a below-market rate for the management services rendered by AMH. Compensatory damages for this breach are estimated to be between $630,000 and $1,375,000.

- On or about February 8, 2018, AMH assigned certain oil and gas properties in a number of states, including Texas, Idaho, Louisiana, Florida, Michigan, New Mexico, and Colorado (the "Non-STACK Assets") to High Mesa Holdings, L.P., which was owned and controlled by the Debtor. The Non-STACK Assets were transferred for no consideration, giving rise to potential claims by Claimant for fraudulent transfer and breach of fiduciary duty. As of the date of this Claim, the amount of Claimant's claims against the Debtor for such amounts are unliquidated and unknown.

- In February 2018, AMH and certain affiliates (the "Alta Mesa Parties") consummated a series of corporate restructuring transactions that began in 2017 (the "Business Combination"). Further detail regarding the Business Combination can be found in the *Declaration of John C. Regan, Chief Financial Officer of the Debtors, in Support of the Chapter 11 Petitions and First Day Pleadings* filed as Docket No. 16 in the Alta Mesa Cases. In connection with the Business Combination, the Debtor may be liable to Claimant for damages arising from the Debtor's intentional and constructive fraud, negligent misrepresentation, breach of fiduciary duty, and any other claims as identified in the AMH Litigation Trust Schedule of Retained and Assigned Causes of Action filed at Docket No. 1761-5, Ex. 5A, Schedule 5(ii) in the Alta Mesa Cases. As of the date of this Claim, the amount of Claimant's claims against the Debtor for such amounts are unliquidated and unknown.

- Claimant and the Debtor are co-guarantors of certain surety bonds, including surety bonds covering oil and gas assets, for which the surety requested collateral of approximately $15 million. Claimant reserves all rights against the Debtor related to such surety bonds. As of the date of this Claim, the amount of Claimant's claims against the Debtor for such amounts are unliquidated and unknown.

- As noted above, the Non-STACK assets were assigned to High Mesa Holdings, L.P., which was owned and controlled by the Debtor. Claimant reserves the right to assert all claims related to the assignment of the Non-STACK Assets, including, but not limited to claims related to the Debtor's failure to obtain licenses and other rights related to the Non-STACK Assets. As of the date of this Claim, the amount of Claimant's claims against the Debtor for such amounts are unliquidated and unknown.

Claimant is informed and believes that the Debtor is already in possession of all material documents supporting the Claim. Copies of other relevant documents supporting the Claim in the possession of Claimant will be made available to Debtor upon written request to Claimant's counsel.

In addition to the reservations of right above, Claimant generally reserves the right to amend and/or supplement this Proof of Claim (including, but not limited to, for purposes of fixing the amount of interest or additional fees, costs, and expenses referred to herein) at any time and in any manner and/or to file additional proofs of claim for any additional claims which may be based on the same or additional documents or grounds of liability. Claimant reserves the right to assert any of the foregoing amounts constitute administrative expenses of the Debtor's Estate entitled to priority under 11 U.S.C. §§ 503 and 507. Claimant reserves all rights and

claims against all third parties, including any affiliates, parent companies, subsidiaries, officers and/or directors of the Debtor.

This Proof of Claim is filed to protect Claimant from forfeiture of any claim Claimant may have against the Debtor's estate. Filing of this Proof of Claim is <u>not</u> (a) a waiver or release of Claimant's rights against any person, entity or property; (b) a waiver or release of Claimant's right to have any and all final orders in any and all core or non-core matters entered only after *de novo* review by a United States District Court Judge; (c) a consent by Claimant to the jurisdiction of this Court for any purpose other than with respect to this Proof of Claim; (d) a waiver of any right to adjudication and liquidation of the Claim in a venue other than this Court; (e) an election of remedy; (f) a waiver or release of any rights which Claimant may have to a jury trial; (g) a waiver of any right of Claimant to pursue any other party; or (h) a waiver of the right to move to withdraw the reference or seek abstention with respect to the subject matter of this Proof of Claim, any objection thereto, or any other proceedings which may be commenced in these cases against or otherwise involving Claimant.

All notices to Claimant should be sent to Joseph R. Dunn, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 3580 Carmel Mountain Road, Suite 300, San Diego, California 92130.

# EXHIBIT 1

CAUSE NO. 2019-28398

| | | |
|---|---|---|
| **ALTA MESA HOLDINGS, LP** | § | **IN THE DISTRICT COURT** |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **333rd JUDICIAL DISTRICT** |
| | § | |
| **HIGH MESA SERVICES, LLC,** | § | |
| **HIGH MESA, INC., HIGH MESA** | § | |
| **HOLDINGS, LP, and HIGH** | § | |
| **MESA HOLDINGS GP, LLC,** | § | **HARRIS COUNTY, TEXAS** |

*Defendants.*

## PLAINTIFF'S SECOND AMENDED PETITION

Plaintiff Alta Mesa Holdings, LP files its Second Amended Petition against Defendants High Mesa Services, LLC, High Mesa, Inc., High Mesa Holdings, LP, and High Mesa Holdings GP, LLC, and for causes of action would respectfully show the following:

### DISCOVERY PLAN

1.     Plaintiff intends to conduct discovery pursuant to Rule 190.4 (Level 3) of the Texas Rules of Civil Procedure.

### RULE 47 STATEMENT

2.     Pursuant to Texas Rule of Civil Procedure 47, Plaintiff seeks monetary relief over $1 million.

### PARTIES

3.     Plaintiff Alta Mesa Holdings, LP ("Alta Mesa") is a Texas limited partnership with its principal place of business located in Houston, Texas.

4.     Defendant High Mesa Services, LLC ("High Mesa Services") is a Delaware limited liability company with its principal place of business, principal office, and home office located in

002425

Harris County, Texas at 16600 Park Row, Houston, Texas 77084. High Mesa Services has appeared and answered and may be served with this amended petition through its counsel.

5.      Defendant High Mesa, Inc. ("High Mesa") is a Delaware corporation with its principal place of business, principal office, and home office located in Harris County, Texas at 16600 Park Row, Houston, Texas 77084. High Mesa has appeared and answered and may be served with this amended petition through its counsel.

6.      Defendant High Mesa Holdings, LP is a Delaware limited partnership with its principal place of business, principal office, and home office located in Harris County, Texas at 16600 Park Row, Houston, Texas 77084. High Mesa Holdings, LP has appeared and answered and may be served with this amended petition through its counsel.

7.      Defendant High Mesa Holdings GP, LLC is a Delaware limited liability company and the general partner of High Mesa Holdings, LP, with its principal place of business, principal office, and home office located in Harris County, Texas at 16600 Park Row, Houston, Texas 77084. High Mesa Holdings GP, LLC has appeared and answered and may be served with this amended petition through its counsel.

8.      Defendants High Mesa Holdings, LP and its general partner, High Mesa Holdings GP, LLC, shall be collectively referred to herein as "High Mesa Holdings."

### JURISDICTION & VENUE

9.      This Court has personal jurisdiction over all parties. This Court has subject matter jurisdiction because the damages and relief sought are within the jurisdictional limits of this Court.

10.     Venue is proper in Harris County, Texas pursuant to Section 15.020 of the Texas Civil Practice & Remedies Code because this case arises from a "major transaction" and the parties agreed in writing that a suit arising from the transaction must be brought in this county.

Alternatively, venue is proper in Harris County, Texas pursuant to Section 15.002(a)(3) of the Texas Civil Practice & Remedies Code because Defendants' principal offices are located in Harris County, Texas. In the further alternative, venue is proper in Harris County, Texas pursuant to Section 15.002(a)(1) of the Texas Civil Practice & Remedies Code because all or a substantial part of the events or omissions giving rise to the claims occurred in Harris County, Texas.

FACTS

**A.     The 2014 Promissory Note**

11.     In 2014, Alta Mesa sold an oil and gas processing plant and related properties located in Idaho to one of its subsidiaries, Northwest Gas Processing, LLC ("NWGP"), for $33.5 million. To close the purchase, NWGP paid $25 million in cash and executed a promissory note payable to Alta Mesa in the principal amount of $8.5 million (the "2014 Promissory Note"). Alta Mesa is the owner and holder of the 2014 Promissory Note, and the only entity entitled to enforce its terms.

12.     Pursuant to an Assignment and Assumption Agreement, effective December 31, 2014, High Mesa Services (Defendant herein and an affiliate of NWGP) agreed to assume all of NWGP's obligations under the 2014 Promissory Note. It is undisputed that upon execution of the Assignment and Assumption Agreement, High Mesa Services became the maker of the 2014 Promissory Note and bound to pay all sums due thereunder to Alta Mesa. It is also undisputed that Alta Mesa remains the payee under the 2014 Promissory Note. Significantly, the 2014 Promissory Note does not allow its assignment to any entity other than High Mesa Services.

**B.     The 2017 Promissory Note**

13.     In September 2017, NWGP borrowed $1,515,000 from Alta Mesa, and the loan was documented in a promissory note executed by NWGP and payable to Alta Mesa (the "2017

Promissory Note" and together with the 2014 Promissory Note, the "Notes"). Alta Mesa is the owner and holder of the 2017 Promissory Note, and the only entity entitled to enforce its terms.

14.    A couple of months later, High Mesa Services agreed to assume all of NWGP's obligations under the 2017 Promissory Note pursuant to an Assignment and Assumption Agreement, effective November 8, 2017. It is undisputed that upon execution of the Assignment and Assumption Agreement, High Mesa Services became the maker of the 2017 Promissory Note and bound to pay all sums due thereunder to Alta Mesa. It is also undisputed that Alta Mesa remains the payee under the 2017 Promissory Note. As with the 2014 Promissory Note, the 2017 Promissory Note allows for an assignment exclusively to High Mesa Services.

**C.    High Mesa Services has breached and/or repudiated the Notes**

15.    The Notes represent over $10 million of loans made by Alta Mesa to High Mesa Services, for which Alta Mesa is entitled to be repaid. The Notes were executed by Harlan H. Chappelle, as President and Chief Executive Officer of NWGP, the original maker under both Notes.[1] At the time he signed the Notes, Mr. Chappelle was also the President and CEO of Alta Mesa (the payee under the Notes) and a member if its governing board, which means Mr. Chappelle was on both sides of the Notes transactions. At the same time, Mr. Chappelle was also the President and CEO of various High Mesa entities, including the current maker of the Notes (High Mesa Services, LLC), and remains a member of the governing boards of those High Mesa entities.

16.    The 2017 Promissory Note matured and became due and payable to Alta Mesa on February 28, 2019. Despite demand, High Mesa Services refused to pay the amounts due under

---

[1] NWGP, the original maker of the Notes, is now an affiliate of High Mesa Services, LLC, the current maker of the Notes.

the 2017 Promissory Note.  In addition, High Mesa Services has unequivocally stated it will not pay the 2014 Promissory Note upon maturity, constituting an anticipatory repudiation.  Based on High Mesa Services' defaults, Alta Mesa brings this lawsuit to enforce the Notes.

**D.    The Contribution Agreement and the subsequent Assignment Agreements**

17.    On August 16, 2017, Alta Mesa and Defendant High Mesa Holdings, along with their respective general partners, as well as Alta Mesa Resources, Inc. (f/k/a Silver Run Acquisition Corporation II) ("AMR"), entered into a Contribution Agreement, the purpose of which was to effectuate a reorganization in advance of AMR's acquisition of Alta Mesa and its affiliate, Kingfisher Midstream, LLC ("Kingfisher").  More specifically, the Contribution Agreement was designed to separate and vest ownership of the oil and gas assets located in Oklahoma (the "STACK Assets") in Alta Mesa (and its affiliates), and separate and vest ownership of the oil and gas assets located elsewhere (the "Non-STACK Assets") in High Mesa Holdings (and its affiliates).[2]  This separation of the oil and gas assets allowed AMR, a publicly-traded company, to acquire the equity of Alta Mesa and Kingfisher in February 2018.  Thus, AMR (through its subsidiaries Alta Mesa and Kingfisher) ended up owning the STACK Assets, and High Mesa Holdings (and its affiliates) ended up owning the Non-STACK Assets.

18.    As a result of these transactions, High Mesa Holdings assumed all the liabilities associated with the Non-STACK Assets, including the Transferred Interests and the Transferred Liabilities (as those terms are defined in the operative contracts).  High Mesa Holdings also became obligated to indemnify and hold Alta Mesa and its affiliates harmless against any and all claims, losses or damages arising out of or related to those assets and liabilities.

---

[2] The "STACK" play is located in the Anadarko Basin area of Oklahoma.  "STACK" is derived from <u>S</u>ooner <u>T</u>rend (oil field), <u>A</u>nadarko (basin), <u>C</u>anadian and <u>K</u>ingfisher (counties).

19.     More specifically, by two Assignment Agreements dated effective February 8, 2018, Alta Mesa assigned to High Mesa Holdings all of its right, title and interest in and to the Holdings LLCs and the Holdings Partnerships (as those terms are defined in the Assignment Agreements), which included all oil and gas assets not located in Oklahoma (defined as the "Transferred Interests"), together with "any and all obligations and liabilities, whether arising before, on or after the Effective Date, of the [Holdings LLCs and the Holdings Partnerships], Alta Mesa Holdings, LP or any other predecessor companies or businesses or any of their Affiliates to the extent relating to, resulting from or arising out of the present, past or future operation, conduct or actions of any business or asset . . ., including the Transferred Liabilities, . . . ." True and correct copies of the Assignment Agreements are attached hereto as <u>Exhibit A</u> and <u>Exhibit B</u>, and incorporated herein by reference.

20.     In addition, Section 5 of the Assignment Agreements obligate High Mesa Holdings to fully indemnify and hold harmless Alta Mesa "and each partner, officer, director, member and manager thereof from and against any and all loss, damages or liability due to or arising out of or related to (i) the Transferred Liabilities, and (ii) a breach of any obligation, representation or warranty of or by [High Mesa Holdings]."

21.     In connection with the transactions described above, High Mesa Holdings became obligated to provide its own surety bonds and/or letters of credit covering the Transferred Interests and/or the Transferred Liabilities necessary to comply with regulatory and/or contractual requirements to own and operate those assets, and facilitate the release of any surety bonds and/or letters of credit provided by Alta Mesa relating to those assets and liabilities. These obligations were consistent with High Mesa Holdings' acquisition of ownership of the Transferred Interests

002430

and assumption of the Transferred Liabilities, and Alta Mesa's divestiture of those assets and liabilities.

22.    Despite repeated demands, High Mesa Holdings has refused to provide its own surety bonds and/or letters of credit covering its ownership and operation of the Transferred Interests and/or the Transferred Liabilities, and has further refused to take the steps necessary to release Alta Mesa from any bonding obligations relating to said assets and liabilities.

**E.    The Management Services Agreement**

23.    As part of the transactions described above, effective February 9, 2018, Alta Mesa and Defendant High Mesa entered into a Management Services Agreement (the "MSA"), whereby Alta Mesa agreed to provide certain administrative, management, and operational services to High Mesa and High Mesa agreed to pay for those services. A true and correct copy of the MSA is attached hereto as Exhibit C and incorporated herein by reference.

24.    Under the MSA, Alta Mesa (among other activities) paid certain invoices submitted by third-party vendors for goods and services provided to High Mesa (or on its behalf), and High Mesa agreed to reimburse Alta Mesa for those payments. In addition, Alta Mesa provided and/or incurred certain G&A costs and overhead expenses on behalf of High Mesa, for which High Mesa was obligated to compensate Alta Mesa under the MSA. By agreement, the parties terminated the MSA as of January 31, 2019.

25.    High Mesa acknowledged its obligations to Alta Mesa under the MSA and paid certain amounts due thereunder. Despite demand, however, High Mesa has failed and refused to pay Alta Mesa all amounts due and owing under the MSA. As of the filing of this suit, High Mesa owed Alta Mesa approximately $10 million under the MSA, including accrued interest, which High Mesa has refused to pay.

CAUSES OF ACTION

26.    All factual allegations in this petition are incorporated into each cause of action below.

**A.    Count 1 – Repudiation and/or Breach of the Notes (High Mesa Services)**

27.    Alta Mesa is the legal owner and holder of the 2014 Promissory Note and the 2017 Promissory Note and entitled to receive and recover all amounts due thereunder.  High Mesa Services is the maker under the Notes.

28.    High Mesa Services has anticipatorily repudiated and breached its obligations under the 2014 Promissory Note.

29.    High Mesa Services has failed to timely remit payment of all amounts due and owing to Alta Mesa under the 2017 Promissory Note.

30.    High Mesa Services' repudiation and/or breach of the Notes has been the proximate cause of actual damages to Alta Mesa in excess of the minimum jurisdictional limits of this Court.

**B.    Count 2 – Repudiation and/or Breach of the Assignment Agreements (High Mesa Holdings)**

31.    The Assignment Agreements are binding and enforceable contracts.

32.    High Mesa Holdings has breached and/or repudiated the Assignment Agreements as set forth herein, including by: (a) failing to assume and satisfy all liabilities associated with the Transferred Interests and/or the Transferred Liabilities; (b) refusing to indemnify and hold Alta Mesa and its affiliates harmless from all claims, losses or damages arising out of or related to the Transferred Interests and/or the Transferred Liabilities; and (c) failing to provide its own surety bonds and/or letters of credit covering the Transferred Interests and/or the Transferred Liabilities, and refusing to take the steps necessary to release Alta Mesa from any bonding obligations relating to said assets and liabilities.

33.    High Mesa Holdings' repudiation and/or breach of the Assignment Agreements has been the proximate cause of actual damages to Alta Mesa in excess of the minimum jurisdiction limits of this Court. High Mesa Holdings GP, LLC, as general partner, is jointly and severally liable for all damages caused by or awarded against High Mesa Holdings, LP.

**C.    Count 3 – Declaratory Judgment (High Mesa Holdings)**

34.    As shown herein, various disputes have arisen regarding the rights, status and obligations of the parties under the Assignment Agreements. Pursuant to Chapter 37 of the Texas Civil Practice & Remedies Code, Alta Mesa seeks a declaratory judgment as follows:

      a.    The Assignment Agreements are valid and enforceable, and remain in effect for all purposes;

      b.    High Mesa Holdings assumed and must satisfy all liabilities associated with the Transferred Interests and/or the Transferred Liabilities;

      c.    High Mesa Holdings must indemnify and hold Alta Mesa and its affiliates harmless from all claims, losses or damages arising out of or related to the Transferred Interests and/or the Transferred Liabilities; and

      d.    High Mesa Holdings is required to provide its own surety bonds and/or letters of credit covering the Transferred Interests and/or the Transferred Liabilities, and must take the steps necessary to release Alta Mesa from any bonding obligations relating to said assets and liabilities.

**D.    Count 4 – Breach of the MSA (High Mesa)**

35.    Prior to its termination, Alta Mesa and High Mesa were parties to a valid and enforceable contract, namely the MSA. Alta Mesa fully performed its obligations under the MSA.

36.      Pursuant to the express terms of the MSA, High Mesa is obligated to reimburse Alta Mesa for third-party invoices paid by Alta Mesa for goods and services provided to High Mesa, and High Mesa is also obligated to pay Alta Mesa for the administrative, management, and operational services provided by Alta Mesa thereunder.  High Mesa has breached the MSA by failing and refusing to pay to Alta Mesa the amounts due and owing under the contract, which total approximately $10 million, including accrued interest.

37.      High Mesa's breach of the MSA has been the proximate cause of actual damages to Alta Mesa in excess of the minimum jurisdictional limits of this Court.

## ATTORNEY'S FEES

38.      Pursuant to Section 38.001 *et. seq.* of the Texas Civil Practice & Remedies Code, as well as the terms of the Notes, Alta Mesa is entitled to recover its reasonable and necessary attorney's fees and costs incurred in this case.

## CONDITIONS PRECEDENT

39.      All conditions precedent to Alta Mesa's right to recover the relief requested herein have been performed, have occurred, have been excused, or have been waived.

## PRAYER

40.      Alta Mesa respectfully requests that Defendants be cited to appear and answer, and that upon final trial hereof, judgment be entered in favor of Alta Mesa and against Defendants for:

   a.      all damages proved at trial;

   b.      declaratory relief as set forth herein;

   c.      reasonable and necessary attorney's fees and expenses;

   d.      costs of court;

e.     prejudgment and post-judgment interest at the maximum amount allowed

by law; and

f.     all other relief, at law or in equity, to which Alta Mesa may be justly entitled.

Respectfully Submitted,

**GRAY REED & McGRAW LLP**

By: /s/ *James J. Ormiston*
    James J. Ormiston
    Texas Bar No. 15307500
    jormiston@grayreed.com
    Jonathan M. Hyman
    Texas Bar No. 24032455
    jhyman@grayreed.com
    Kelley Clark Morris
    Texas Bar No. 24087306
    kmorris@grayreed.com
    1300 Post Oak Blvd., Suite 2000
    Houston, Texas 77056
    (713) 986-7000 (Telephone)
    (713) 986-7100 (Telefax)

**ATTORNEYS FOR PLAINTIFF**
**ALTA MESA HOLDINGS, LP**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served on the following counsel of record (1) through the electronic filing manager (www.efiletexas.gov), and (2) via e-mail on this 18th day of October, 2019:

Jeff Joyce
Joyce + McFarland LLP
712 Main, Suite 1500
Houston, Texas 77002
jjoyce@jmlawyers.com

**Attorneys for Defendants**

David E. Harrell
Brandon Renken
Locke Lord LLP
2800 JPMorgan Chase Tower
60 Travis Street
Houston, Texas  77002
dharrell@lockelord.com
brenken@lockelord.com

**Attorneys for Intervenor**

/s/ *James J. Ormiston*
James J. Ormiston

002436