## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| ALTA MESA RESOURCES, INC., *et al.*, | ) |
| | ) Case No. 19-35133 |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |
| DAVID DUNN, as Trustee of the AMH Litigation Trust, | ) |
| | ) |
| | ) Adv. Pro. No. 21-03909 |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| HPS INVESTMENT PARTNERS, LLC; ARM ENERGY HOLDINGS, LLC; ARM MIDSTREAM, LLC; AND ASSET RISK MANAGEMENT, LLC, | ) **Jury Trial Demanded** |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

## SECOND AMENDED COMPLAINT

Plaintiff David Dunn, as Trustee of the AMH Litigation Trust (the "**Trust**" or "**Plaintiff**"), the successor-in-interest to certain causes of action of Alta Mesa Holdings, LP ("**AMH**"), Alta Mesa Holdings GP, LLC, OEM GO, LLC, Alta Mesa Finance Services Corp., Alta Mesa Services, LP, and Oklahoma Energy Acquisitions, LP ("**OEA**") (collectively, the "**AMH Debtors**"), brings this action against HPS Investment Partners, LLC ("**HPS**"), ARM Energy Holdings, LLC ("**ARM Holdings**"), ARM Midstream, LLC ("**ARM Midstream**") and Asset Risk Management, LLC (together with ARM Holdings and ARM Midstream, "**ARM**"; ARM together with HPS, the "**Defendants**").

002437

## INTRODUCTION

1.      AMH was an oil and gas exploration and production company that filed for bankruptcy in September 2019 after losing hundreds of millions of dollars and writing off billions of dollars in assets.  Indeed, after being valued at more than $2.25 billion in early 2018, AMH's assets were sold in 2020 at liquidation prices for less than $200 million, leaving its creditors, the principal beneficiaries of the Trust, holding the bag. Due to the damages sustained by AMH, including from its resulting bankruptcy, creditors with more than $600 million in claims have been left with unpaid debts.

2.      AMH's ultimate demise was precipitated by years of transactions through which AMH's value was methodically stripped away to benefit the Defendants and other equity owners of AMH and Kingfisher Midstream, LLC ("**KFM**") at the expense of AMH's creditors.

3.      While the harmful actions of those equity holders were broad-reaching, this Second Amended Complaint focuses on a series of transactions preceding the February 2018 business combination (the "**Business Combination**") that were intended to, and did in fact, divert cash and other assets of the AMH Debtors to KFM for the benefit of KFM's shareholders, particularly Defendants, who owned a substantial portion of KFM's equity interests.

4.      Specifically, AMH was caused, through its wholly owned subsidiary OEA, to enter into certain gathering agreements with KFM beginning in 2015, under which KFM and its shareholders reaped the benefits of exorbitant fees charged to AMH for years.  The diversion of assets away from AMH to KFM was calculated to confer a direct benefit of the Defendants, who sought prop up the value of KFM with AMH's assets, and then effectuate a sale of KFM that would confer a direct, cash benefit on KFM's shareholders.  Over $147 million was paid to KFM under these agreements during just a three-year period, and Defendants reaped the intended fruits of their value diversion strategy when they sold KFM in 2018 and received over $800 million in cash

2

(including over $606 million paid to HPS and over $92.2 million paid to ARM), among other consideration.

5.    Through these gathering agreements and the transactions thereunder, cash and valuable AMH assets were purposefully and methodically diverted away from AMH, for the benefit of Defendants, in the years leading up to the Business Combination.  Ultimately, AMH lacked the capital and liquidity to continue operating its business as a going concern, and was forced to enter bankruptcy proceedings in 2019, where it sold its assets at liquidation prices in 2020.

6.    The Trustee, on behalf of the Trust, the successor-in-interest to the causes of action of the AMH Debtors and their estates asserted herein, now brings this action to recover the substantial damages suffered as a result of transfers made and transactions entered into for the benefit of the Defendants. These transactions, including the obligations incurred by the AMH Debtors and the transfers made by the AMH Debtors, constituted fraudulent transfers under applicable bankruptcy and non-bankruptcy law and should be avoided.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over this case under 28 U.S.C. § 157 and 1334.  This Complaint asserts core and non-core claims under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(2)(H).

8.    This Court also has jurisdiction over this case under 28 U.S.C. §§ 1332 and 1334 because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.  David Dunn ("**Dunn**"), the Trustee of the Trust, is a citizen

002439

of Connecticut. On information and belief, Defendants are citizens of New York and Texas, and no defendant is a citizen of Connecticut.

9.      Venue is proper in this District under 28 U.S.C. § 1409 because AMH's bankruptcy case is pending in this District. Further, on information and belief, a substantial part of the events or omissions giving rise to the claims occurred in this District.

10.    Pursuant to Federal Rule of Bankruptcy Procedure 7008 and Local Rule 7008-1, Plaintiff states that it hereby consents to the Bankruptcy Court's entry of final orders and judgment in this adversary proceeding, including if it is determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## PARTIES AND RELATED ENTITIES

11.    The Trust was created in connection with the confirmed Chapter 11 plan for Alta Mesa Resources, Inc., and its AMH and Silver Run debtor affiliates[1] (the "**Bankruptcy Plan**"). Dunn was appointed trustee of the Trust on or about June 8, 2020, the effective date of the Bankruptcy Plan.

12.    Under the Bankruptcy Plan, causes of action held by the AMH Debtors and their estates against certain third parties not released under the Bankruptcy Plan were assigned to the Trust. The Bankruptcy Plan specifically provided that the AMH Debtors did not release their claims against the Defendants in this action, and that the AMH Debtors' claims against the

---

[1] The debtors in the above-referenced chapter 11 cases are as follows: Alta Mesa Resources, Inc.; Alta Mesa Holdings, LP; Alta Mesa Holdings GP, LLC; OEM GP, LLC; Alta Mesa Finance Services Corp.; Alta Mesa Services, LP; Oklahoma Energy Acquisitions, LP; SRII Opco GP, LLC; SRII Opco, LP; Kingfisher Midstream, LLC; Kingfisher STACK Oil Pipeline, LLC; Oklahoma Produced Water Solutions, LLC; and Cimarron Express Pipeline, LLC.

002440

Defendants were assigned to the Trust pursuant to the Bankruptcy Plan and the order confirming the Bankruptcy Plan, for the benefit of the creditor beneficiaries of the Trust.

13.     On information and belief, defendant HPS Investment Partners, LLC (formerly known as Highbridge Principal Strategies), is a Delaware limited liability company, with its principal place of business in New York.  At all relevant times, HPS was, directly and/or indirectly, a substantial equity owner of, and had substantial control over, AMH, KFM, and High Mesa, Inc. ("**HMI**"), and is identified as one of the "Sponsor Parties" under the Bankruptcy Plan.

14.     On information and belief, defendant ARM Energy Holdings LLC is a Delaware limited liability company, with its principal place of business in Texas.  At all relevant times, ARM Energy Holdings LLC was an affiliate of defendants ARM Midstream and Asset Risk Management, LLC.  ARM was a founder of KFM and, at all relevant times, ARM was a substantial equity holder of, and had substantial control over, KFM through the ARM defendants named in this Second Amended Complaint.

15.     On information and belief, defendant ARM Midstream, LLC is a Delaware limited liability company, with its principal place of business in Texas.  At all relevant times, ARM Midstream, LLC was an affiliate of defendants ARM Holdings and Asset Risk Management, LLC. ARM was a founder of KFM and, at all relevant times, ARM was a substantial equity holder of, and had substantial control over, KFM through the ARM defendants named in this Second Amended Complaint.

16.     On information and belief, defendant Asset Risk Management, LLC is a Delaware limited liability company, with its principal place of business in Texas.  At all relevant times, Asset Risk Management, LLC was an affiliate of defendants ARM Holdings and ARM Midstream. ARM was a founder of KFM and, at all relevant times, ARM was a substantial equity holder of,

002441

and had substantial control over, KFM through the ARM defendants named in this Second Amended Complaint.

## FACTUAL BACKGROUND

**A.     Corporate Structures and Value-Stripping Transactions Leading up to the Business Combination in February 2018**

**i.     AMH Ownership and Control Prior to the Business Combination**

17.     Prior to February 2018, AMH was primarily owned by (i) its President and CEO Harlan Chappelle ("**Chappelle**"), who directly and indirectly owned 4.5% of AMH's Class A shares; (ii) its COO Michael Ellis ("**Ellis**"), who directly and indirectly owned 85.05% of AMH's Class A shares; and (iii) HMI, a privately held Delaware corporation, which owned 10% of AMH's Class A shares and 100% of AMH's Class B shares.  As set forth in detail below, HPS was a substantial owner of HMI.

18.     Prior to February 2018, Alta Mesa Holdings, GP, LLC ("**AMH GP**") was the sole general partner of AMH. At all relevant times, AMH GP's board of directors ("**AMH GP Board**") _was identical in composition to the board of directors of AMH and HMI_.  Thus, as set forth in the Limited Partnership Agreements of AMH operative at the relevant times discussed herein,[2] AMH GP, as general partner of AMH and its subsidiaries, including OEA, had "full, complete, and exclusive authority to manage and control the business, affairs, and properties of [AMH], to make all decisions regarding the same, and to perform any and all other acts or activities customary or incident to the management of [AMH's] business."  Third Amended LP Agreement, at §§ 3.3, 8.1; Fourth Amended LP Agreement, at §§ 3.3, 8.1. _See also_, Sixth Amended LP Agreement, at §3.2

---

[2] The Third Amended and Restated Limited Partnership Agreement of Alta Mesa Holdings, LP ("**Third Amended LP Agreement**"), dated as of August 13, 2015; the Fourth Amended and Restated Limited Partnership Agreement of Alta Mesa Holdings, LP ("**Fourth Amended LP Agreement**"), dated as of August 31, 2016; the Sixth Amended and Restated Limited Partnership Agreement of Alta Mesa Holdings, LP ("**Sixth Amended LP Agreement**"), dated as of August 16, 2017; and the Seventh Amended and Restated Limited Partnership Agreement of Alta Mesa Holdings, LP ("**Seventh Amended LP Agreement**"), dated as of February 9, 2018.

002442

and § 6.1 ("The General Partner shall have the exclusive right, power, and authority to take any action on behalf of the Partnership, other than actions specifically restricted herein."); Seventh Amended LP Agreement, at §3.2 and § 6.1 (same). Subsequent to the execution of the Sixth Amended LP Agreement, the Class A shares and Class B shares in AMH were designated "voting units" and, accordingly, HMI held 100% of the voting Class B shares. Sixth Amended LP Agreement, at § 3.2; Seventh Amended LP Agreement, at § 3.2.

19.     In turn, AMH GP had two members: (i) Alta Mesa Resources, LP ("**Alta Mesa Resources**"), an entity owned by Ellis and his spouse and AMH director, Mickey Ellis; and (ii) HMI. During all relevant times, Alta Mesa Resources held all of the Class A membership interests of AMH GP, and HMI held all of the Class B membership interests of AMH GP. Prior to February 2018, HMI, as the sole holder of Class B membership interests in AMH GP, held voting interests in AMH GP and, as of August 2017, 100% of the voting interests in AMH GP.[3]

**ii.     HMI Ownership and Control Prior to February 2018**

20.     During the relevant time period, HMI was owned by HPS, Chappelle, Ellis and, beginning in 2016, Bayou City Energy Management LLC ("**BCE**"). Prior to February 2018, HPS and BCE together held 100% of the preferred stock of HMI and HPS was the beneficial owner of at least 31% of HMI's common stock.

21.     During the relevant time period, HMI's board of directors was identical in composition to the board of directors of AMH and AMH GP, with each including, among others, Chappelle, Ellis, Michael McCabe (the CFO of AMH) and Don Dimitrievich of HPS. Thus, as a practical matter, there was only one board of directors controlling each of HMI, AMH, and AMH

---

[3] *See* Fifth Amended and Restated Limited Liability Company Agreement of Alta Mesa Holdings GP, LLC, dated as of August 16, 2017, at § 3.1(c).

002443

GP.  Indeed, AMH and HMI did not even conduct distinct board meetings during the relevant time period.

22.     HPS' control over HMI and AMH was prominent.  HPS held substantial voting power through HMI, and participated directly in the decisions of AMH by its board, both at AMH and AMH GP.  Indeed, as HPS would later testify, any board level decision for action taken by AMH/AMH GP would have required the approval of HPS.

### iii.     The Creation of KFM and Diversion of AMH Value for HPS and ARM through the 2015 Agreements.

23.     On information and belief, in 2014, AMH decided to ramp up its investment in an area of Oklahoma known as the STACK.[4]  To transport its produced gas in Oklahoma, AMH had existing relationships with incumbent gatherers, and its oil was trucked and marketed by various other companies. However, AMH's owners resolved to take more control over AMH's midstream gathering needs.  ARM and AMH's owners, through Chappelle, began discussing jointly sponsoring a new entity to serve as AMH's midstream gatherer in the STACK.

24.     On information and belief, ARM saw an opportunity to finance and build out the gathering system, charge above-market rates to recoup its investment quickly, and flip the asset for a premium on a short four-to-five year timeline.  HPS soon jumped on board and together with ARM and HMS Kingfisher Holdco, LLC ("**HMS Kingfisher**")[5], formed KFM.  At all relevant times, KFM was owned by HPS, HMI, and ARM.  In particular, ARM had an approximate 30% interest in KFM, HPS had an approximate 40% direct interest in KFM, and HMI, through its subsidiary HMS Kingfisher, had an approximate 30% interest in KFM.  Accordingly, HPS owned a substantial equity stake in KFM, both directly and indirectly through its ownership of HMI.

---

[4] STACK is an acronym derived from the Sooner Trend oil field, Anadarko basin, and Canadian and Kingfisher counties. It refers to a geographic area in the Anadarko basin area of Oklahoma.

[5] HMS Kingfisher was owned 100% by High Mesa Services, LLC, which, in turn was 100% owned by HMI.

002444

25.     Upon information and belief, KFM's board of directors was comprised of two representatives from ARM, two representatives from AMH (Chappelle and Ellis, who also sat on the boards of AMH, AMH GP and HMI), and Don Dimitrievich of HPS (who also sat on the boards of AMH, AMH GP and HMI).  Accordingly, there was substantial overlap between KFM's board of directors and the identical boards of AMH, AMH GP and HMI.  Upon information and belief, prior to the Business Combination, the operations of KFM were managed by ARM.  Indeed, ARM's relationship with KFM was ran deeper than mere equity ownership.  As reflected in KFM's financial statements for 2016 and 2017, Asset Risk Management, LLC charged KFM for use of its facilities, employees and technology, resulting in KFM paying ARM millions in fees during 2016 and 2017 alone.  KFM also used another ARM affiliate, ARM Energy Management, LLC, to market production from KFM's producers.

26.     At its core, however, the viability of KFM (and the profitability of the venture for HPS, ARM and its affiliates) was dependent on KFM extracting business and fees from AMH; namely, AMH serving as the anchor producer for KFM and providing the vast majority of KFM's revenue.  On information and belief, beginning as early as January 2015, ARM made presentations of the proposed transaction to AMH which detailed fees to be paid to KFM that were substantially greater than what AMH was being charged by its existing midstream gatherer.  Under the proposal, KFM's owners (including ARM and HPS) would benefit substantially on the back of AMH through the exorbitant and unprecedented fees charged by KFM.

27.     HPS, along with Chappelle, championed the KFM project, in large part because Chappelle, together with Ellis, HPS, and AMH's other owners, through their interests in HMI (and in the case of HPS, directly), would become investors in KFM and realize profits through the exorbitant amounts to be paid by AMH.  This dynamic, in which owners of AMH also held

9

interests in KFM, would be fundamental in the formulation of the contractual relationships between AMH and KFM.

28.    In addition, HPS and ARM were highly incentivized to divert value away from AMH to KFM.  For its part, HPS owned a substantially higher equity stake in KFM (approximately 40% directly and at least 31% of HMI's stake) than it did in AMH, where it owned equity only through HMI's stake.  Thus, each dollar of value at KFM was worth considerably more to HPS than that same dollar of value at AMH.  ARM's incentives were even more imbalanced, as it did not hold any conflicting equity interest in AMH.  In an exit scenario where both AMH and KFM were being acquired (as with the Business Combination later in February 2018), ARM's sole interest would be to extract as much value as possible from KFM and to maximize the consideration paid for KFM and its operations – not AMH.

29.    In addition, HPS and ARM knew that midstream companies like KFM are valued at much higher multiples than upstream companies.  Thus, HPS and KFM were motivated to increase KFM's earnings as much and as quickly as possible to maximize potential sale consideration, even if that required KFM to charge AMH exorbitant fees and impose onerous terms on their gathering relationship.

30.    On information and belief, ARM took full advantage of the conflicting financial interests of AMH's owners and prepared a series of financial analyses touting the purported advantages of paying above-market rates to KFM—appealing to the potential rewards that would flow to AMH's owners *by virtue of their equity stakes in KFM*. These analyses—or "marketing materials," as one ARM official regarded them—were presented to Chappelle and others in the months before any gathering agreements were signed by AMH.  This gist of these analyses, and hence ARM's pitch to AMH, was plain: the more that AMH paid to KFM, the greater the benefit

10

to KFM's owners, including owners of AMH/HMI, when KFM was eventually sold. In fact, ARM projected a sale of KFM after five years that would yield a return on investment of 400% to 600%.

31.     On information and belief, AMH's owners viewed KFM's rate structure with an eye to the benefits those rates would have for KFM and its owners, including HPS, with Chappelle explicitly acknowledging that ownership of KFM was "a key deal point and consideration" in formulating the terms of AMH's relationship with KFM. The overriding concern on the part of AMH was in fact the best interests of KFM and, in turn, KFM's owners. For instance, AMH rejected a proposed term that would have given it additional control over the gas gathering process because of the concern that it would not benefit KFM's owners.

32.     While Chappelle spearheaded formulation of the relationship with KFM, HPS was not merely a passive interest holder, and was also highly involved in determining the terms of the relationship between AMH and KFM. The results of this process were predictable. The KFM gathering rates and fees—which were substantially above market—were never meaningfully negotiated by AMH. In fact, the final agreed-to rates were the same as those first proposed by ARM. AMH did not obtain a fairness opinion for the KFM venture, nor did it appoint an independent committee to evaluate the transaction. AMH's Board and owners likewise failed to pursue competitive offers from gatherers other than KFM, and actively spurned offers from other midstream gatherers, including offers of lower gathering rates. In fact, AMH rejected a significantly lower offer from one of its existing midstream gatherers for approximately half of KFM's proposed fees.

33.     Despite KFM's above-market rates, AMH's Board, which significantly overlapped with KFM's board of directors and which was identical to the board of directors of HMI, a substantial owner of KFM, voted to approve gathering agreements with KFM. On August 31,

002447

2015, Chappelle executed that certain *Gas Gathering and Processing Agreement*, by and between OEA and KFM (the "**2015 GGA**"), and that certain *Crude Oil Gathering Agreement*, by and between OEA and KFM (the "**2015 OGA**" and, together with the 2015 GGA, the, "**2015 Agreements**") on behalf of OEA (AMH's subsidiary) and, despite his conflicting interests, on behalf of KFM, as president and CEO of HMS Kingfisher. A redacted copy of the 2015 GGA is attached to this Second Amended Complaint as Exhibit 1. A redacted copy of the 2015 OGA is attached to this Second Amended Complaint as Exhibit 2.

34. Compared to similar agreements between AMH and non-KFM midstream gatherers, KFM and non-AMH upstream producers, as well as rates charged by unaffiliated third-party producers and gatherers, the gathering processing fees in the 2015 GGA were considerably higher than market fees for similar services and greatly skewed in favor of KFM. In fact, on information and belief, the gathering and processing fees in the 2015 GGA were at least a 90% premium to market rates. Unsurprisingly, the fees charged by KFM to AMH were higher than any fees charged by KFM to any other producer.

35. In addition, the 2015 Agreements included "capital recovery fees" (the "**Capital Recovery Fees**") that are completely foreign to the industry and pushed the obligations to KFM under the 2015 Agreements even farther beyond industry standards, to the detriment of AMH. *See*, Ex. 1, Schedule 6.1; Ex. 2, § 6.1(b). Indeed, both AMH and KFM had never entered into any other gathering agreements that required payment of Capital Recovery Fees, and the concept was completely foreign to management personnel at both AMH and KFM. The cumulative fees were so high that at times AMH was forced to sell its oil and gas at a loss. Thus, the 2015 Agreements were purposefully structured by the owners of both AMH and KFM, including each of the Defendants, to inequitably benefit KFM at the expense of AMH with both above-market traditional

12

midstream charges and Capital Recovery Fees that were not standard to the industry. As a result, pursuant to the 2015 Agreements KFM received payments in amounts clearly in excess of the reasonable value of the services provided by KFM under the 2015 Agreements.

36.     Both 2015 Agreements also included purported dedications of leasehold interests along with boilerplate language characterizing the agreements and their dedications as running with the land. *See*, Ex. 1, § 3.4; Ex. 2, § 3.4. These provisions purported to commit OEA, and any successor in interest to OEA, to paying the inflated rates in the 2015 Agreements for the benefit of KFM. *Id*. In addition, both 2015 Agreements included a promise by OEA to "convey or assign" easements or rights-of-way to KFM for the purposes of building and maintaining KFM's gathering systems. *See*, Ex. 1, § 3.2; Ex. 2, § 3.2. But, as the 2015 Agreements explicitly state, the easements or rights-of-way were not conferred by the agreements themselves. Instead, they were to be conveyed to KFM sometime in the future, if at all, and only "where reasonably requested." *Id*.

37.     The 2015 Agreements provided that KFM was to submit invoices on a monthly basis for amounts due by AMH/OEA for the preceding month. *See*, Ex. 1, § 7.1; Ex. 2, § 6.3(a). Payments to KFM were due no later than 15 days from the receipt of each such billing statement or the last day of the month following the statement month. *See*, Ex. 1, § 7.2; Ex. 2, § 6.3(b). However, the payments to KFM were not made in accordance with the terms of the parties' agreements, and reflected the lack of arm's-length dealing. Instead, ARM (as the operator of KFM and entity overseeing the sale of AMH's hydrocarbons) simply deducted the amounts purportedly due to KFM under the 2015 GGA from the sale proceeds owed to AMH (the "**Sale Proceeds**"). Set forth on Exhibit 3 to this Second Amended Complaint is a ledger of the monthly fees deducted from AMH's Sale Proceeds between January 2016 and November 2016 under the 2015 GGA (the "**2015 GGA Payments**").

002449

38.     On information and belief, the exorbitant fees paid by AMH under the 2015 Agreements made it difficult for AMH to remain profitable and harmed AMH's long-term value. AMH was loaded with debt, and nearly all of AMH's cash had been spent on the STACK play, leaving little for day-to-day operations.  By mid-2016, Moody's downgraded AMH's debt, citing a "weak liquidity position, expected deterioration in credit metrics through 2017, and increasing refinancing risk."  KFM's outrageous fees put AMH at serious risk of breaching its debt covenants.

39.     In addition, AMH was consistently running at a net loss in both 2015 and 2016 and was cash-flow insolvent.  Further, on information and belief, AMH was severely inadequately capitalized at this time, with a debt to equity ratio of above 20 to 1.  AMH's financial problems were a concern for HPS.  Between 80% and 90% of KFM's revenue was derived from AMH's gas and oil production, and KFM would be practically worthless if it lost its gathering contracts with AMH. This was a particular concern to HPS, which through its direct equity stake *and* its ownership of HMI held a larger interest in KFM than other owners of HMI.

### iv.     The Continued Diversion of AMH Value for HPS and ARM through the 2016 Amendments.

40.     On information and belief, within weeks of execution of the 2015 Agreements, AMH's managers openly questioned the exorbitant fees that AMH had agreed to pay.  AMH's Tim Turner sent Chappelle multiple internal analyses demonstrating that AMH was worse off under the terms of the 2015 Agreements than under its previous gathering arrangements.  Every above-market dollar paid to KFM benefited KFM's owners, including HPS and ARM, who collectively owned the majority of KFM and controlled its management and operations.  In effect, and as intended, the value of AMH's production assets was being diverted to benefit HPS and ARM.  Indeed, as stated above, AMH learned that KFM was charging its other customers substantially less than it was charging AMH—which provided the overwhelming majority of

14

KFM's business, and yet paid a higher price.  Further, AMH learned that other established midstream gatherers were charging their customers substantially less than KFM was charging AMH.

41.     To add insult to injury, in return for these exorbitantly above-market rates, KFM was failing to provide adequate services.  Pipeline construction was inexcusably slow and there were continued operational failures throughout the system.  As discussed further below, KFM's oil gathering system was never capable of gathering all of AMH's crude oil.

42.     Notwithstanding KFM's failures, AMH engaged ARM to revise the gathering rates. All the while, however, as a result of the commingled ownership of AMH and KFM, the overall benefit to KFM and its shareholders remained a paramount consideration for both sides.  For their part, ARM and HPS sought to ensure that any restructuring of KFM rates would not reduce KFM's net present value (and the value of their respective investments in KFM), and landed on a proposal that would replace the Capital Recovery Fees in the 2015 Agreements with so-called "facility fees" (the "**Facility Fees**").  Critically, however, that proposed fee change was expected to have no negative effect on the revenue that would be captured by KFM, as the base gathering rates under the proposed amendments would actually increase.   In fact, the rates under the amendments were an even higher premium (over 100%) to market rates than under the 2015 Agreements.  Further, the Facility Fees mirrored the intention and economic impact of the Capital Recovery Fees and, like the Capital Recovery Fees, were completely foreign to the oil and gas midstream industry.  As explained by Silver Run Acquisition Corporation II ("**Silver Run**") in its *Proxy Statement Pursuant to Section 14(a) of the Securities and Exchange Act of 1934*, filed with the SEC on October 31, 2017 in anticipation of the Business Combination, "[t]he terms of the arrangement between Alta Mesa and Kingfisher are at rates that are higher than the current market rates for

similar arrangements. Therefore, a liability for the premium portion of the arrangement has been reflected for Alta Mesa and an asset for the premium payment terms of the arrangement has been recorded by Kingfisher *for the amount of $254.6 million*." (Emphasis added.)

43.    The premium paid to KFM by AMH, of course, was by design.  HPS and ARM (along with the other KFM shareholders) held an overwhelming interest in maximizing earnings at KFM.  HPS held a much larger equity stake at KFM than it did at AMH, and ARM *only* held an equity stake at KFM.  In addition, HPS and ARM had their eyes on an exit for KFM, where each dollar of earnings would garner a much higher multiple in a sale than it ever would at AMH.

44.    Once again, ARM's proposed amendments were not seriously negotiated by AMH, who remained under common control.  The rate changes were not approved by AMH's board or even put to a vote of AMH's board or AMH's stakeholders. AMH did not prepare a fairness opinion.  Instead, ARM's proposal was incorporated virtually wholesale into amendments to the 2015 Agreements.

45.    On December 1, 2016, OEA executed that certain *Amended and Restated Gas Gathering and Processing Agreement* (the "**2016 GGA Amendment**") and that certain *Amended and Restated Crude Oil Gathering Agreement* (the "**2016 OGA Amendment**" and, together with the 2016 GGA Amendment, the "**2016 Amendments**") with KFM to supplant the 2015 Agreements. A redacted copy of the 2016 GGA Amendment, without exhibits, is attached to this Second Amended Complaint as Exhibit 4.  A redacted copy of the 2016 OGA Amendment, without exhibits, is attached to this Second Amended Complaint as Exhibit 5.

46.    As with the 2015 Agreements, HPS was heavily involved in the negotiations and ultimately controlled AMH's decisions with regard to the 2016 Amendments. Indicative of its control on the outcome of the transaction was HPS's reaction to issues raised by *In re Sabine Oil*

16

*& Gas Corp.*, 547 B.R. 66 (Bankr. S.D.N.Y. 2016), which involved an order issued by a bankruptcy court that rejected gathering agreements substantively identical to the 2015 Agreements on the ground that they did not constitute covenants that ran with the land. The 2016 Amendments were designed, in part, as an attempt to insulate the 2015 Agreements from challenge in bankruptcy similar to that in *Sabine*. In particular, HPS was concerned that KFM would suffer the same fate if AMH needed to seek bankruptcy protection. Accordingly, HPS threatened to withhold AMH funding unless AMH accepted the amendments, which HPS believed were necessary to protect its investment in KFM and the value that a potential acquirer would place on KFM's future earnings in an exit scenario. Thus, the 2016 Amendments included a host of additional provisions intended to transform the 2015 Agreements into covenants running with the land, including a purported conveyance of transportation interests. *See*, *e.g.*, Ex. 4, Art. III; Ex. 5, Art. III. AMH received nothing in exchange for those purported conveyances.

47.     The 2015 OGA and the 2016 OGA Amendment both additionally required KFM to construct a system capable of gathering up to 50,000 barrels per day for AMH. Ex. 2, § 3.6; Ex. 5, § 4.5. During all relevant times, KFM failed to construct such a system and was never able to gather more than a fraction of the expected capacity. Nonetheless, under the 2016 OGA Amendment, KFM charged AMH for every barrel of oil produced from the designated area, even though KFM did not transport those barrels and AMH had to pay another party to do so. In doing so, KFM relied on a provision in the 2016 OGA Amendment that, according to KFM, required AMH to pay KFM for all oil AMH produced in the dedicated area even if KFM did not, or could not, actually gather such oil. Ex. 5, § 4.8. Accordingly, KFM was in many instances being paid for doing nothing and AMH was paying twice to move the same barrel of oil. In this way, KFM

17

again received payments in amounts clearly disproportionate to the services actually provided by KFM pursuant to the 2015 OGA and the 2016 OGA Amendment.

48.     As it did under the 2015 Agreements, prior to the Business Combination, the amounts owed to KFM under the 2016 Amendments were not invoiced to AMH/OEA, but deducted on a monthly basis by ARM, on behalf of KFM, from the AMH Sale Proceeds.  Set forth on Exhibit 3 to this Second Amended Complaint is a ledger of the monthly fees deducted from AMH's Sale Proceeds between December 2016 and September 2019 under the 2016 GGA Amendment, as further amended from time to time (the "**2016 GGA Payments**" and, together with the 2015 GGA Payments, the "**GGA Payments**").  Set forth on Exhibit 6 to this Second Amended Complaint is a ledger of the monthly fees deducted from AMH's Sale Proceeds between January 2017 and September 2019 under the 2016 OGA Amendment ("**2016 OGA Payments**" and, together with the GGA Payments, the "**AMH Gathering Payments**").

49.     As designed, ARM and HPS profited handsomely from this diversion of value from AMH to KFM.  Leading up to the Business Combination in February 2018, KFM's owners negotiated a transaction structure that ensured HPS and ARM would effectively "cash out" their equity investment in KFM made less than three years earlier (and the value diverted under the Gathering Agreements), and ultimately landed on a structure whereby KFM would be acquired primarily for cash, while AMH would be acquired primarily for equity.  This, of course, was the plan from the beginning, to foist above-market fees on AMH and recoup KFM investors' capital investment (plus a hefty profit) in short order.

50.     AMH, on the other hand, suffered tremendously as a result of the gathering agreements with KFM.  In nearly every quarter between 2016 and 2018, AMH lacked sufficient cash flow to meet its upcoming obligations, continued to draw down on its credit facility, and

002454

refinanced its debt. Toward the end of 2017, AMH had only nominal cash to support its operations and its debt-to-equity ratio remained perilously high.

      **B.**      **The February 2018 Business Combination**

     51.     On February 9, 2018, AMH entered into the Business Combination with Silver Run and KFM. Silver Run was a special purpose acquisition vehicle founded and run by Riverstone VI Alta Mesa Holdings, L.P., which had raised over $1 billion through an IPO in 2017. As a result of the Business Combination, AMH and KFM both became wholly-owned subsidiaries of a holding company, SRII Opco, LP ("**SRII Opco**"). AMH continued to be managed by its general partner, AMH GP, which was majority owned and controlled by SRII Opco. The public company formerly known as Silver Run, which was rebranded as Alta Mesa Resources, Inc. ("**AMR**"), owned 100% of SRII Opco's general partner interest and a substantial portion of the limited partner interests in SRII Opco. AMR was, at all relevant times after February 2018, beneficially owned by a number of entities, with HPS and HMI both holding substantial shares.

     52.     The Business Combination stemmed from three related contribution agreements executed on August 16, 2017 memorializing the terms of the Business Combination: the Alta Mesa Contribution Agreement, the Kingfisher Contribution Agreement, and the Riverstone Contribution Agreement (collectively, the "**Contribution Agreements**"). The Contribution Agreements and the terms of the Business Combination transaction embodied therein reflected a structure designed to "cash out" the owners of KFM—who sought to consummate their "build-and-flip" strategy and realize the fruits of propping up KFM on the backs of AMH's creditors—and provide going-forward equity ownership in Silver Run/AMR to AMH's owners.

     53.     Specifically, at the closing of the Business Combination, 138,402,398 common units in SRII Opco were issued to High Mesa Holdings, LP, while KFM Holdco, LLC received 55 million common units in SRII Opco as well as $814.8 million in cash. On information and belief,

002455

nearly $700 million of this cash was immediately distributed to Defendants, with HPS receiving at least $606 million and ARM receiving at least $92.2 million.  In addition to these substantial cash distributions, shares of stock valued at $177.1 million and $95.8 million, respectively, were distributed to HPS and ARM upon the closing of the Business Combination.

## C. Creditor Claims during the Relevant Periods

54.     As early as January 1, 2015, Herbert L. Sadler, Sr., Wilbert L. Crutcher, Stephanie A. Draper, Angela R. Crutcher, Byron E. Crutcher, Arthur L. Najee-Ullah, Ahmed Najee-Ullah, Roosevelt Shields, II, Brian K. Shields, Alden L. Kirk, Loana R. Kirk, Ivan J. Kirk, Patricia A. Lewis, Ruben Lomax, Henrietta L. Spinks, Michael H. Lomax, Wadsworth A. Holmes, IV and Nerissa Holmes (collectively, the "Sadler Heirs") were creditors of the AMH Debtors and remained unpaid creditors as of the commencement of the AMH Debtors' chapter 11 cases (the "**Petition Date**").

55.     As early as January 1, 2015, the North Carolina Department of State Treasurer (the "**NC State Treasurer**") was a creditor of the AMH Debtors and remained an unpaid creditor as of the Petition Date.

56.     As early as March 2015, the State of Connecticut Unclaimed Property Division (the "**CUPD**") was a creditor of the AMH Debtors and remained an unpaid creditor as of the Petition Date.

57.     Beginning on or around December 8, 2016, the holders of those certain 7.875% senior unsecured notes due 2024 issued by AMH and Alta Mesa Finance Services Corp. under the Indenture dated as of December 8, 2016, by and among AMH, Alta Mesa Finance Services Corp., the guarantors named thereunder, and U.S. Bank, N.A., in its capacity as indenture trustee (the

20

002456

"**Prepetition Senior Notes Claimants**") were creditors of the AMH Debtors and remained an unpaid creditors as of the Petition Date.

58.     As of the Petition Date, the Department of the Treasury – Internal Revenue Service ("**IRS**") held an unpaid creditor claim against the AMH Debtors.

## JURY TRIAL DEMANDED

59.     Plaintiff hereby demands a jury trial on all issues.

## CAUSES OF ACTION

## Count 1: Avoidance and Recovery of Constructive Fraudulent Transfers against all Defendants

## (AMH Gathering Payments)

## (11 U.S.C. §§ 548(a)(1)(B), 550)

60.     Plaintiff hereby repeats and realleges the allegations set forth in paragraphs 1 through 59 above.

61.     At all relevant times, HPS was in control of AMH and its subsidiaries, as alleged herein.  At all relevant times, HPS and ARM were in control of KFM, as alleged herein.

62.     The AMH Debtors received less than reasonably equivalent value in exchange for incurring the obligations under the Gathering Agreements (the "**Gathering Agreement Obligations**") and making the AMH Gathering Payments.  In particular, (i) the gathering and processing fees in the Gathering Agreements were approximately 90-100% higher than market rates, rates paid to non-KFM midstream gatherers, or rates paid to KFM by non-AMH Debtor upstream producers; (ii) the Gathering Agreements required the payment of Capital Recovery Fees or Facility Fees that were completely foreign in the industry and increased the AMH Debtors' price of doing business with KFM even further beyond industry standards; (iii) the 2016 Amendments included provisions intended to transform the 2015 Agreements into covenants

21

running with the land, including a purported conveyance of transportation interests, for which the AMH Debtors received no additional consideration; and (iv) under the 2016 OGA Amendment, KFM was paid for every barrel of oil produced from the designated area, even though KFM did not carry those barrels and AMH paid another party to transport the barrels away.

63.    On information and belief, at the time the Gathering Agreement Obligations were incurred, and each of the AMH Gathering Payments were made, AMH (i) was insolvent, or became insolvent as a result of such transfers or obligations, (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with AMH was an unreasonably small capital, and/or (iii) intended to incur, or believed that AMH would incur, debts that would be beyond AMH's ability to pay as such debts matured.  Among other things, during the relevant period, AMH operated at a net loss and was severely inadequately capitalized, with a debt to equity ratio of at least 20-to-1, and was cash-flow insolvent. Accordingly, on information and belief, AMH and its subsidiaries lacked sufficient cash flow to meet its upcoming obligations, continued to draw down on its credit facility, and refinanced its debt.

64.    The Gathering Agreement Obligations were incurred, and the AMH Gathering Payments made prior to the Business Combination were made, for the intended benefit of HPS and ARM as the controlling equity holders of the closely-held KFM.  At the time the Gathering Agreement Obligations were incurred and the AMH Gathering Payments were made prior to the Business Combination, HPS had control over the AMH Debtors through its equity ownership and Board authority, as described above, and HPS and ARM had control over KFM.

002458

65.    The financial condition of KFM – and of HPS and ARM, as controlling equity owners of the closely-held KFM – was greatly improved as a result of the Gathering Agreement Obligations and the AMH Gathering Payments made prior to the Business Combination.

66.    ARM and HPS received a direct, quantifiable benefit from the Gathering Agreement Obligations and the AMH Gathering Payments in the form of the proceeds of the sale of KFM through the Business Combination.  Specifically, in consideration for the sale of 100% of the economic interest in KFM, upon the closing of the Business Combination, on information and belief, HPS received cash of at least $606 million and stock valued at an additional $177.1 million, and ARM received cash of at least $92.2 million and stock valued at an additional $95.8 million. The Trustee is informed and believes that, absent the Gathering Agreement Obligations and the AMH Gathering Payments, ARM and HPS would not have been able to consummate the sale of KFM and receive the proceeds therefrom or, in the alternative, the proceeds therefrom would have been a fraction of the actual proceeds received by ARM and HPS, which amount will be proven at trial.

67.    In addition, ARM and HPS are subsequent transferees to the extent that KFM made any distributions to them of the proceeds of the Gathering Agreement Obligations and the AMH Gathering Payments, including, without limitation, payments made to defendant Asset Risk Management, LLC for overhead expenses which, on information and belief, totaled at least $4,559,186 in 2016 and 2017 alone.

68.    The AMH Gathering Payments that occurred between September 11, 2017 and February 9, 2018, totaling not less than $7,634,360.40, constitute constructive fraudulent transfers avoidable by Plaintiff under 11 U.S.C. § 548(a)(1)(B).

002459

69.     Upon avoidance of such AMH Gathering Payments alleged in this Count 1, Plaintiff is entitled to recover judgment from Defendants pursuant to 11 U.S.C. § 550(a)(1) and/or (2) in an amount of not less than $7,634,360.40.

**Count 2: Avoidance and Recovery of Constructive Fraudulent Transfers against all Defendants**

**(Gathering Agreement Obligation and AMH Gathering Payments)**

**(11 U.S.C. § 544; Tex. Bus. & Com. §§ 24.005(a)(2), 24.006(a), 24.008, 24.009(b))**

70.     Plaintiff hereby repeats and realleges the allegations set forth in paragraphs 1 through 69 above.

71.     At the time all of Gathering Agreement Obligations were incurred and the AMH Gathering Payments were made, creditors existed who held unsecured claims allowable under 11 U.S.C. § 502 and who also held claims against the AMH Debtors as of the Petition Date, namely the Sadler Heirs, the Prepetition Senior Notes Claimants, the CUPD, the NC State Treasurer, and the IRS.

72.     At all relevant times, HPS was in control of AMH and its subsidiaries, as alleged herein.  At all relevant times, HPS and ARM were in control of KFM, as alleged herein.

73.     The AMH Debtors received less than reasonably equivalent value in exchange for incurring the obligations under the Gathering Agreements Obligations and making the AMH Gathering Payments.  In particular, (i) the gathering and processing fees in the Gathering Agreements were approximately 90-100% higher than market rates, rates paid to non-KFM midstream gatherers, or rates paid to KFM by non-AMH Debtor upstream producers; (ii) the Gathering Agreements required the payment of Capital Recovery Fees or Facility Fees that were completely foreign in the industry and increased the AMH Debtors' price of doing business with

002460

KFM even further beyond industry standards; (iii) the 2016 Amendments included provisions intended to transform the 2015 Agreements into covenants running with the land, including a purported conveyance of transportation interests, for which the AMH Debtors received no additional consideration; and (iv) under the 2016 OGA Amendment, KFM was paid for every barrel of oil produced from the designated area, even though KFM did not carry those barrels and AMH paid another party to transport the barrels away.

74.     On information and belief, at the time the Gathering Agreement Obligations were incurred, and each of the AMH Gathering Payments were made, AMH (i) was insolvent or became insolvent as a result of the transfers or obligations, (ii) was engaged or was about to engage in a business or a transaction for which any property remaining with AMH was unreasonably small in relation to the business or transaction, and/or (iii) intended to incur, or believed or reasonably should have believed that AMH would incur, debts beyond AMH's ability to pay as they became due.  Among other things, during the relevant period AMH operated at a net loss and was severely inadequately capitalized, with a debt to equity ratio of at least 20-to-1, and was cash-flow insolvent. Accordingly, on information and belief, AMH and its subsidiaries lacked sufficient cash flow to meet its upcoming obligations, continued to draw down on its credit facility, and refinanced its debt.

75.     The Gathering Agreement Obligations were incurred, and the AMH Gathering Payments were made, for the intended benefit of HPS and ARM as the controlling equity holders of the closely-held KFM.  At the time the Gathering Agreement Obligations were incurred and the AMH Gathering Payments were made prior to the Business Combination, HPS had control over the AMH Debtors through its equity ownership and Board authority, as described above, and HPS and ARM had control over KFM.

002461

76.     The financial condition of KFM – and of HPS and ARM, as controlling equity owners of the closely-held KFM – was greatly improved as a result of the Gathering Agreement Obligations and the AMH Gathering Payments.

77.     ARM and HPS received a direct, quantifiable benefit from the Gathering Agreement Obligations and the AMH Gathering Payments in the form of the proceeds of the sale of KFM through the Business Combination.  Specifically, in consideration for the sale of 100% of the economic interest in KFM, upon the closing of the Business Combination, on information and belief, HPS received cash of at least $606 million and stock valued at an additional $177.1 million, and ARM received cash of at least $92.2 million and stock valued at an additional $95.8 million. The Trustee is informed and believes that, absent the Gathering Agreement Obligations and the AMH Gathering Payments, ARM and HPS would not have been able to consummate the sale of KFM and receive the proceeds therefrom or, in the alternative, the proceeds therefrom would have been a fraction of the actual proceeds received by ARM and HPS, which amount will be proven at trial.

78.     In addition, ARM and HPS are subsequent transferees to the extent that KFM made any distributions to them of the proceeds of the Gathering Agreement Obligations and the AMH Gathering Payments, including, without limitation, payments made to defendant Asset Risk Management, LLC for overhead expenses which, on information and belief, totaled at least $4,559,186 in 2016 and 2017 alone.

79.     The Gathering Agreement Obligations and the AMH Gathering Payments, in an amount of not less than $147,032,580.27, constitute constructive fraudulent transfers avoidable by Plaintiff under Tex. Bus. & Com. §§ 24.005(a)(2), 24.006(a) and 24.008.

002462

80.     Upon avoidance of the obligations and transfers alleged herein, Plaintiff is entitled to recover judgment from Defendants pursuant to Tex. Bus. & Com. § 24.009(b) in an amount not less than $147,032,580.27.

## REQUEST FOR RELIEF

THEREFORE, Plaintiff respectfully prays that Defendants be cited to appear and answer herein, and that upon trial of this cause, judgment be entered in Plaintiff's favor, and against Defendants, for the following:

a.     For a determination that the Gathering Agreement Obligations and AMH Gathering Payments were fraudulent transfers within the meaning of 11 U.S.C. §§ 544, and 548 and Tex. Bus. & Com. § 24.001, *et seq.*, and for entry of judgment against HPS and ARM in the amount of the avoided transfers, but in any event no less than $7,634,360.40 on Count 1 and $147,032,580.27 on Count 2;

d.     Pre- and post-award interest at the highest rate and amount authorized by applicable law;

e.     An award of costs related to this proceeding, including attorneys' fees, as permitted by contract or applicable law; and

f.     Such other and further relief at law or in equity as the Court deems just and appropriate.

002463

Dated:  March 24, 2023

MINTZ LEVIN COHN FERRIS GLOVSKY
& POPEO, PC

*/s/ Joseph R. Dunn*

Joseph R. Dunn (*Pro Hac Vice*)
Attorney-in-Charge
CA State Bar No. 238069
jrdunn@mintz.com
3580 Carmel Mountain Rd.
Suite 300
San Diego, California 93210
T: (858) 314-1500
F: (858) 314-1501

002464

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing *Second Amended Complaint* was duly served on all defendants in this case, namely HPS Investment Partners, LLC; ARM Energy Holdings, LLC; ARM Midstream, LLC and Asset Risk Management, through their respective counsel of record, via electronic mail and the Court's electronic filing system, this 24th day of March, 2023.


Dated: March 24, 2023                          */s/ Joseph R. Dunn*
                                               Joseph R. Dunn


503676380v.2

29

002465

# EXHIBIT 1

*Execution Version*

**GAS GATHERING AND PROCESSING AGREEMENT**

**Oklahoma Energy Acquisitions, LP**

**and**

002467

**Kingfisher Midstream LLC**

**August 31, 2015**

002468

**TABLE OF CONTENTS**

Article I DEFINITIONS AND INTERPRETATION ....................................................... 1
    Section 1.1   Definitions.  The following terms shall have the following meanings
                unless otherwise indicated: ................................................................ 1
    Section 1.2   Interpretation. ....................................................................................... 8

Article II TERM ............................................................................................................. 9
    Section 2.1   Term. ...................................................................................................... 9

Article III GATHERING AND PROCESSING SYSTEM ............................................. 9
    Section 3.1   Construction of Gathering and Processing System ............................... 9
    Section 3.2   Easements, Rights-of-Way and Fee Lands. ..................................... 9
    Section 3.3   Dedication. ........................................................................................ 10
    Section 3.4   Covenant Running With Land. ........................................................ 11
    Section 3.5   Covenant Not to Gather, Market or Process Gas. .......................... 11
    Section 3.6   Option to Expand Gathering and Processing System. .................... 11
    Section 3.7   Title Warranty. ................................................................................ 12
    Section 3.8   Proceeds of Production. ................................................................... 12
    Section 3.9   Operating Inventory. ....................................................................... 12
    Section 3.10  Receipt Points and Central Receipt Points ..................................... 12
    Section 3.11  Additional Receipt Points; Obligation to Interconnect. ................. 13

Article IV GAS QUALITY AND PRESSURE .............................................................. 13

002469

Section 4.1    Measurement, Equipment and Testing. ......................................... 13
Section 4.2    Specifications. .................................................................................. 14
Section 4.3    Delivery Pressure. ............................................................................ 14
Section 4.4    Compression. .................................................................................... 14

Article V GATHERING, PROCESSING AND DELIVERY ...................................... 14
Section 5.1    Delivery, Receipt and Processing of Gas. ........................................ 14
Section 5.2    Operational Gas. .............................................................................. 15
Section 5.3    Scheduling. ...................................................................................... 15
Section 5.4    Equal Receipt and Delivery. ............................................................ 15
Section 5.5    Exchange of Information. ................................................................. 16
Section 5.6    Delivery of Residue Gas and NGLs; Thermally Equivalent Volumes. .......... 16
Section 5.7    Commingling. ................................................................................... 16
Section 5.8    Allocation of Volumes Delivered. ................................................... 16
Section 5.9    Allocation of NGLs and Shrinkage. ................................................ 16
Section 5.10   Transfer of Title and Risk of Loss. ................................................. 17

Article VI SERVICE FEES ........................................................................................ 17
Section 6.1    Service Fees. .................................................................................... 17
Section 6.2    Payment for Other Fuel. .................................................................. 17
Section 6.3    Escalation. ....................................................................................... 17

Article VII PAYMENT ............................................................................................... 18

i

002470

Section 7.1    Billing. ................................................................................................ 18
Section 7.2    Payment................................................................................................ 18
Section 7.3    Disputed Amounts. ............................................................................... 18
Section 7.4    Taxes. ................................................................................................... 18
Section 7.5    Audit. ................................................................................................... 19

Article VIII NOTICES............................................................................................. 19
Section 8.1    Notices. ................................................................................................ 19

Article IX FINANCIAL RESPONSIBILITY ............................................................ 19

Article X INDEMNITY ........................................................................................... 19
Section 10.1    Indemnity. ........................................................................................... 19
Section 10.2    Notification Obligation. ...................................................................... 20

Article XI CURTAILMENT AND MAINTENANCE................................................. 20
Section 11.1    Curtailment and Temporary Release of Gas. ....................................... 20
Section 11.2    Maintenance Events. ........................................................................... 21

Article XII FORCE MAJEURE................................................................................. 21
Section 12.1    Force Majeure. .................................................................................... 21

Article XIII DEFAULT AND TERMINATION ......................................................... 22
Section 13.1    Producer Events of Default................................................................. 22
Section 13.2    Gatherer's Default Remedies Against Producer. ................................. 22

Second Produced Document Rights Agreement of 11/21/24

Section 13.3   Gatherer Events of Default. ...........................................................22

Article XIV ASSIGNMENT.................................................................................................23
    Section 14.1   Assignment. ............................................................................................ 23

Article XV Limitation of liability .........................................................................................23
    Section 15.1   Limitation of Liability.......................................................................... 23

Article XVI CONFIDENTIALITY .......................................................................................23
    Section 16.1   Confidentiality. ...................................................................................... 23

Article XVII DISPUTE RESOLUTION ...............................................................................24
    Section 17.1   Dispute Resolution.................................................................................. 24

Article XVIII MISCELLANEOUS ........................................................................................24
    Section 18.1   Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury
        Trial.   24
    Section 18.2   Survival. .................................................................................................. 25
    Section 18.3   No Joint Venture. ..................................................................................... 25
    Section 18.4   Entire Agreement. .................................................................................... 25
    Section 18.5   No Third Party Beneficiaries. .................................................................. 25
    Section 18.6   Regulatory Matters................................................................................... 25

ii

002472

Section 18.7   Execution in Counterparts....................................................................... 26

Schedule 3.3        Dedicated Area
Schedule 3.4        Form of Memorandum of Gas Gathering and Processing Agreement
Schedule 3.10       Receipt Points
Schedule 3.11(a)    Form of Notice for Designation of Additional Receipt Point
Schedule 4.1        Measurement, Equipment and Testing
Schedule 4.2        Specifications
Schedule 6.1        Service Fees
Schedule 8.1        Notices

iii

## GAS GATHERING AND PROCESSING AGREEMENT

This Gas Gathering and Processing Agreement (this "***Agreement***") is made and entered into this 31st day of August, 2015 (the "***Effective Date***"), by and between Oklahoma Energy Acquisitions, LP, a Texas limited partnership ("***Producer***") and Kingfisher Midstream LLC, a Delaware limited liability company ("***Gatherer***"). Producer and Gatherer may be referred to each individually as a "***Party***," or collectively as the "***Parties***."

## RECITALS

**WHEREAS**, Producer owns, controls or may acquire certain mineral interests and hydrocarbon reserves (collectively, the "***Producer's Interests***," as further defined below), and controls the mineral interests of others (collectively, the "***Other Interests***," as further defined below) in certain lands in Kingfisher, Logan, Canadian, Blaine and Garfield Counties, Oklahoma, described more particularly on **Schedule 3.3** attached hereto (the "***Dedicated Area***"); and

**WHEREAS**, Producer has or contemplates having a supply of natural gas (the "***Gas***") and associated natural gas liquids (the "***NGLs***") from present and future wells located in the Dedicated Area and desires to Dedicate (defined below) the Producer's Interests and Other Interests, and deliver such Gas and NGLs (together, the "***Committed Gas***") to Gatherer for gathering and processing; and

**WHEREAS**, Gatherer shall construct, own and operate Gas gathering and processing facilities (collectively, the "***Gathering and Processing System***," further defined below) capable

002475

of receiving from Producer deliveries of the Committed Gas from the Dedicated Area and

subject to the Dedication; and

**WHEREAS**, Producer desires that Gatherer provide gathering and processing services as set forth in this Agreement, and Gatherer desires to provide to Producer gathering and processing services in accordance with the terms and conditions set forth in this Agreement; then

**THEREFORE**, for and in consideration of the mutual covenants set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**ARTICLE I**
**DEFINITIONS AND INTERPRETATION**

**Section 1.1    Definitions.** The following terms shall have the following meanings unless otherwise indicated:

"*Additional Capacity*" has the meaning set forth in Section 3.6.

"*Additional In-Service Date*" means, with respect to any Additional Capacity, if applicable, the first day of the first full month following the date that Gatherer notifies Producer that such Addition Capacity has been completed and is ready to receive Gas.

1

"***Additional Receipt Point***" has the meaning set forth in Section 3.11(a).

"***Affiliate***" means with respect to a Person, any Person which, directly or indirectly, controls, is controlled by or is under common control with such Person or such Person's members or shareholders.   For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such individual or entity, whether through the ownership of voting securities, by contract or otherwise, *provided*, *however*, that for purposes of this Agreement, Producer and Gatherer shall not be considered Affiliates of each other.

"***After-Acquired Interests***" has the meaning set forth in Section 3.3(a).

"***Agreement***" has the meaning set forth in the introductory paragraph.

"***Allocated Actual Quantities***" means, Residue Gas plus NGLs plus Field Fuel plus Plant Fuel plus Operational Gas.

"***Allocated CRP Volume***" has the meaning set forth in Section 5.9(c).

"***Applicable Law***" means any applicable statute, law, principle of common law, rule, regulation, judgment, order, ordinance, requirement, code, writ, injunction, or decree of any Governmental Authority.

002477

"***Btu***" is a British Thermal Unit and means the amount of heat required to raise the temperature of one avoirdupois pound of pure water from fifty-eight and one-half degrees

Fahrenheit (58.5° F) to fifty-nine and one-half degrees Fahrenheit (59.5° F) at a constant pressure of fourteen and seventy-three hundredths (14.73) pounds per square inch absolute.

"*Business Day*" means any day, other than a Saturday or Sunday, that commercial banks in Houston, Texas are open for business.

"*C&O Agreement*" means that certain Operating and Construction Management Agreement dated as of August 31 2015, by and between the Gatherer and Asset Risk Management, LLC and relating to the construction and operation of the Gathering and Processing System, as the same may be amended, restated, modified or otherwise supplemented.

"*Central Receipt Point*" and "*CRP*" has the meaning set forth in Section 3.10.

"*Chisholm Pipeline*" means the downstream NGL pipeline operated by Chisholm Pipeline Co, an affiliate of Phillips 66 Pipeline LLC.

"*Claims*" means any and all demands, claims, judgments, obligations, liabilities, liens, causes of action, lawsuits, arbitrations, mediations, investigations or proceedings (whether at law or in equity).

"*Committed Gas*" is Gas subject to the Dedication.

"*Confidential Information*" has the meaning set forth in Section 16.1.

2

002478

"***Contract Year***" means each calendar year during the Term, the first of which shall commence on the Effective Date and run through December 31 of that year, and then from January 1 through December 31 for each subsequent year thereafter, but for the last Contract Year, from January 1 through the date that this Agreement terminates or expires.

"***CRP Theoretical Gallons***" has the meaning set forth in Section 5.9(a)(i).

"***Cubic Foot***" or "***cf***" means a volume of Gas occupying a space of one (1) cubic foot at a temperature of sixty degrees Fahrenheit (60° F) and at a pressure of fourteen and seventy-three hundredths (14.73) pounds per square inch absolute.

"***Curtailment Event***" has the meaning set forth in Section 11.1.

"***Curtailment Period***" has the meaning set forth in Section 11.1.

"***Dedicated Area***" has the meaning set forth in the Recitals, as further specifically set forth on Schedule 3.3.

"***Dedicated Wells***" has the meaning set forth in Section 3.3(b).

"***Dedication***" means either the Primary Term Dedication or the Extended Term Dedication, as applicable, based upon the relevant determination time.

"***Delivered Gas***" means the quantity of Gas in MMBtu that is received by Gatherer from Producer at each Receipt Point.

002479

"*Downstream Pipeline*" means Panhandle Eastern Pipeline, Chisholm Pipeline or any other pipeline into which Gatherer may make deliveries of Gas or NGLs under this Agreement for the account of Producer.

"*Equivalent Quantity*" means, on any day the thermally equivalent volume of Delivered Gas at the Receipt Points on such day reflecting Allocated Actual Quantities of Residue Gas plus NGLs determined in accordance with Section 5.9.

"*Extended Term*" has the meaning set forth in Section 2.1.

"*Extended Term Dedication*" has the meaning set forth in Section 3.3(b).

"*FERC*" means the Federal Energy Regulatory Commission, or any successor Governmental Authority.

"*Field Compression Fee*" has the meaning set forth in Schedule 6.1.

"*Field Condensate*" means the low-density mixture of hydrocarbon liquids that are present as gaseous components in the Gas, but have condensed out of the Gas and into the Gathering Pipeline System between a Receipt Point and the Plant inlet.

3

"***Field Fuel***" means ████████████████████████████████████████

████████████████████████████████████████████████████████

"***Final Commercial Operation Date***" has the meaning set forth in the C&O Agreement.

"***Firm***" means a gathering, processing or transportation service that is not subject to being curtailed, interrupted, pro rated or suspended except as expressly provided in this Agreement.

"***Force Majeure***" has the meaning set forth in Section 12.1.

"***Force Majeure Event***" has the meaning set forth in Section 12.1.

"***GAAP***" means generally accepted accounting principles in the United States.

"***Gas***" has the meaning set forth in the Recitals, and further means natural gas consisting predominantly of methane, but including the naturally occurring mixture of NGLs, heavier hydrocarbon gases and any non-combustible gases.

"***Gatherer***" has the meaning set forth in the introductory paragraph.

"***Gatherer Event of Default***" has the meaning set forth in Section 13.3.

002481

"***Gatherer Group***" means any or all of (i) Gatherer, (ii) Gatherer's Affiliates, (iii) any of their respective contractors, and (iv) the officers, directors, employees, agents, advisors, counsel

"***Gathering and Processing Capital Expenditures***" means all expenditures, costs and expenses incurred by or on behalf of Gatherer with respect to the Gathering and Processing System, including costs of rights-of-way and other easements, labor, pipelines, stabilization, Plant, compression, metering and measurement, or interconnection of the Residue Gas Pipeline or NGL Pipeline, that are capitalized on the books and records of Gatherer with respect to the Gathering and Processing System according to GAAP, but specifically excluding all expenditures, costs and expenses incurred by or on behalf of Gatherer with respect to any expansion to the Gathering and Processing System to gather or process third party volumes of Gas that are not attributable to the Interests, provided, however, that in the event that Gatherer undertakes any expansion of the Gathering and Processing System to gather or process third party volumes of Gas that are not attributable to the Interests, and Producer thereafter makes use of the Gathering and Processing System so expanded to accommodate third party volumes of natural gas to gather and process Committed Gas, then Producer's pro rata share of all expenditures, costs and expenses of the expansion shall constitute "Gathering and Processing Capital Expenditures" to the extent agreed upon by the Parties at the time of Producer's connection to such expansion, and, provided, further, that this right and obligation of Producer shall not be in derogation of any of the rights and obligations of the Parties under Section 3.6.

"***Gathering and Processing System***" has the meaning set forth in the Recitals, specifically the (i) Gathering Pipeline System, (ii) Plant, (iii) Residue Gas Pipeline System, (iv)

002482

NGL Pipeline System, (v) any NGL storage facilities, (vi) any compression facilities, (vii) any custody transfer units, meters or measurement facilities, and (viii) any other equipment or appurtenances associated with the foregoing.

"***Gathering Capital Recovery Fee***" has the meaning set forth in Schedule 6.1.

"***Gathering Fee***" has the meaning set forth in Schedule 6.1.

"***Gathering Pipeline System***" means the pipelines of various diameters interconnecting the Receipt Point(s) to the Plant, including any compression facilities before the inlet of the Plant.

"***Governmental Approval***" means any permit, license, permission, grant or other similar authorization issued by, or required to be issued by, any Governmental Authority and necessary for the performance of the Parties hereunder.

"***Governmental Authority***" means any federal, state, county, parish, municipal or other governmental subdivision, or any court or any governmental department, commission, board, bureau, agency or other instrumentality of any federal, state, county, municipal or other governmental subdivision within the United States of America with authority over the Parties and subject matter in question.

"***GPM***" means gallons of NGLs per Mcf of Gas.

"***Gross Heating Value***" means the number of Btu produced by the complete combustion,

002483

at constant pressure, of the amount of Gas which would occupy a volume of one Cubic Foot at a temperature of sixty degrees Fahrenheit (60° F.) when saturated with water vapor, at a pressure equivalent to fourteen and seventy-three hundredths (14.73) pounds per square inch absolute, under standard gravitational force (acceleration 980.665 centimeters per second per second), with air of the same temperature and pressure as the Gas when the products of combustion are cooled to the initial temperature of the Gas and air and when the water formed by combustion is condensed to the liquid state.  The Gross Heating Value so determined will be corrected from the conditions of testing to that of the actual condition of the Gas delivered, expressed in Btu per Cubic Foot and reported at a pressure base of fourteen and seventy-three hundredths (14.73) pounds per square inch absolute; provided, however, if the water vapor content of the Gas delivered is seven pounds or less per one million Cubic Feet, the Gas will be assumed to be dry.

"*Indemnified Party*" has the meaning set forth in Section 10.2.

"*Indemnifying Party*" has the meaning set forth in Section 10.2.

"*In-Service Date*" means first day of the first full month following the date that Gatherer notifies Producer that the Gathering and Processing System has been completed and is ready to receive and process Committed Gas.

"*Interests*" means Producer's Interests, After-Acquired Interests and Other Interests.

5

"***LAUFG***" means Producer's allocated share of the quantity of "lost and unaccounted for Gas" as a result of leakage, venting, flaring, discrepancies due to meter inaccuracies, shrinkage due to variations of temperature or pressure, or any other reason.

"***Line Fill***" has the meaning set forth in Section 3.9.

"***Losses***" means any and all losses, damages, costs, expenses, liabilities, fines, penalties or judgments of whatever kind or character incurred by a Person or Party with respect to a Claim, including reasonable attorneys' fees, court costs and other reasonable costs and expenses of litigation as such may be awarded by a court.

"***Maintenance Event***" has the meaning set forth in Section 11.2.

"***Mcf***" means one thousand (1,000) Cubic Feet.

"***MMBtu***" means one million (1,000,000) Btu.

"***Natural Gas Liquids***" and "***NGLs***" has the meaning set forth in the recitals, specifically hydrocarbons heavier than methane, such as ethane, propane, normal butane, isobutane, pentanes and heavier hydrocarbons, and mixtures thereof separated into the Y-Grade Stream at the Plant.

"***NGL Content***" means quantity of ethanes and heavier hydrocarbons in Gas at the Receipt Point.

002485

"***NGL Delivery Point***" means the point at which the NGL Pipeline System interconnects

"*NGL Pipeline System*" means approximately 4 miles of pipeline interconnecting the Plant to the NGL Delivery Point.

"*NGL Transportation Fee*" has the meaning set forth in Schedule 6.1.

"*Notice*" has the meaning set forth in Section 8.1.

"*Off-Spec Gas*" has the meaning set forth in Section 4.2(a).

"*Operational Gas*" has the meaning set forth in Section 5.2.

"*Other Fuel*" means electricity consumed in the operation of the Gathering and Processing System or Plant.

"*Other Fuel Fee*" means Producer's allocated share of the actual cost of Other Fuel.

"*Other Interests*" means the interests of Persons in the Dedicated Area other than Producer, but whose interests are represented or controlled by Producer, such working interests, royalty interests, overriding royalty interests, net profits interests or other mineral interests.

"*Overdue Rate*" means rate per annum equal to the lesser of (i) an annual rate equal to four percent (4%) per annum above the "prime rate" specified under the caption "Money Rates"

6

002486

in the *Wall Street Journal* (New York Edition) on the date such payment was required to have been made, or (ii) the maximum rate of interest permitted by Applicable Law.

"***Panhandle Eastern Pipeline***" means the downstream interstate natural gas pipeline operated by Panhandle Eastern Pipe Line Company, LP.

"***Partial Commercial Operation Date***" has the meaning set forth in the C&O Agreement.

"***Partial In-Service Date***" means the first day of the first full month following the date that Gatherer notifies Producer that the Partial Commercial Operation Date has occurred and the Gathering and Processing System is ready to receive Committed Gas.

"***Party***" and "***Parties***" have the meaning set forth in the introductory paragraph.

"***Person***" means any individual, firm, corporation, trust, partnership, limited liability company, association, joint venture, other business enterprise or Governmental Authority.

"***Plant***" means any gas processing plant utilized by Gatherer to process Gas, whether or not owned or operated by Gatherer.

"***Plant Fuel***" means ██████████████████████████████████████

"***Plant Recovery Factor***" has the meaning set forth in Section 5.9(a)(ii).

"***Price Index***" has the meaning set forth in Section 6.3.

002487

"*Price Index*" has the meaning set forth in Section 6.5.

"*Primary Term*" has the meaning set forth in Section 2.1.

"*Primary Term Dedication*" has the meaning set forth in Section 3.3(a).

"*Processing Capital Recovery Fee*" has the meaning set forth in Schedule 6.1.

"*Processing Fee*" has the meaning set forth in Schedule 6.1.

"*Producer*" has the meaning set forth in the introductory paragraph.

"*Producer Capacity*" has the meaning set forth in Section 3.6.

"*Producer Event of Default*" has the meaning set forth in Section 13.1.

"*Producer Group*" means any or all of (i) Producer, (ii) Producer's Affiliates, (iii) Producer's contractors and suppliers, of every tier, other than the Gatherer Group, and (iv) the officers, directors, employees, agents, advisors, counsel, consultants, members, shareholders, insurers, invitees or representatives of any of the foregoing.

"*Producer's Interests*" means all mineral interests in lands, leases, wells and Gas that Producer owns or controls in the Dedicated Area.

7

"***Receipt Point***" has the meaning set forth in Section 3.10, as set forth more specifically in Schedule 3.10.

"***Residue Gas***" means Delivered Gas *minus* Field Fuel *minus* Plant Fuel *minus* Operational Gas *minus* LAUFG *minus* Shrinkage, expressed in MMBtu.

"***Residue Gas Delivery Point***" means the point at which the Residue Gas Pipeline System interconnects with the inlet flange of the measurement facilities of Panhandle Eastern Pipeline.

"***Residue Gas Pipeline System***" means approximately 4 miles of pipeline interconnecting the Plant to the Residue Gas Delivery Point.

"***Scheduled Gas***" has the meaning set forth in Section 5.3.

"***Service Fees***" has the meaning set forth in Section 6.1.

"***Shrinkage***" means Producer's allocated share of the MMBtus of the NGLs contained in the Y-Grade Stream that are removed from Gas during processing at the Plant, described more particularly in Section 5.9(b)(ii).

"***Specifications***" has the meaning set forth in Section 4.2(a).

"***Stabilized Field Condensate***" means Field Condensate that has been stabilized before injection into the NGL stream before the NGL Delivery Point.

002489

"***System Capacity***" means the then maximum capacity of the Gathering and Processing

"***System Capacity***" means the then-maximum capacity of the Gathering and Processing System to gather and process Gas, not to exceed the then-determined compression capacity on the Gathering and Processing System, based on NGL Content of Gas of seven (7) GPM.

"***System Pressure***" has the meaning in Section 4.4.

"***Term***" means the Primary Term and any Extended Term.

"***Theoretical Gallons***" means the number of gallons of NGLs that are present in Gas as determined at a particular point.

"***Y-Grade Stream***" means mixed NGLs that have been removed from the Gas at the Plant by means of processing activities, but which have not been separated into individual NGL components.

**Section 1.2    Interpretation.**

All references to any agreement or document shall be construed as of the particular time that such agreement or document may then have been executed, amended, varied, supplemented or modified. Terms defined in this Agreement shall have the meanings given therein when used elsewhere in this Agreement. References in the singular shall include the plural, and references to the masculine shall include the feminine, and vice versa. Words denoting natural persons shall include partnerships, firms, companies, corporations, joint ventures, trusts, associations,

8

organizations or other entities. References to a particular article, section, subsection, paragraph, subparagraph or schedule, if any, shall be a reference to such article, section, subsection, paragraph, subparagraph or schedule in and to this Agreement. The words "include" and "including" shall include the phrase "not limited to." Any reference to a Person shall include that Person's successors and assigns or to any Person succeeding to that Person's functions. Any Schedules are fully incorporated and made part of this Agreement. The Schedules shall be read in conjunction with the provisions of the body of this Agreement, and the Schedules and the body of this Agreement shall be interpreted to give effect to the intent of the Parties as evidenced by their terms when taken as a whole, *provided*, *however*, that in the event of an express and irreconcilable conflict between the terms of a Schedule and the provisions of the body of this Agreement, the provisions of the body of this Agreement shall control.   Capitalized terms appearing in a Schedule shall have the meanings set forth in Section 1.1, unless the context requires otherwise.

## ARTICLE II
## TERM

**Section 2.1     Term.**

This Agreement shall be effective as of the Effective Date, and, unless earlier terminated in accordance with any express provision of this Agreement, shall remain in full force and effect for a period of fifteen (15) years from the In-Service Date (the "***Primary Term***"), *provided*, *however*, that, to the extent that at the end of the Primary Term there are wells then-connected to the Gathering and Processing System and then-producing Gas in commercial (paying) quantities, the Term of this Agreement shall extend for so long as such well(s) continue to produce Gas in

commercial (paying) quantities (the "***Extended Term***").

**ARTICLE III**
**GATHERING AND PROCESSING SYSTEM**

**Section 3.1     Construction of Gathering and Processing System.**

Gatherer shall, at its sole cost and expense, design, engineer, construct, equip and modify, or caused to be designed, engineered, constructed, equipped and modified, the Gathering and Processing System.  Gatherer shall exercise commercially reasonable efforts to (a) achieve the Partial Commercial Operation Date by the date that is nine months after the Effective Date and (b) achieve the Final Commercial Operation Date by the date that is twelve months after the Effective Date.

**Section 3.2     Easements, Rights-of-Way and Fee Lands.**

To the extent that (a) Producer may do so in compliance with all applicable agreements, and (b) Gatherer's activities on the relevant lands do not unreasonably interfere with Producer's operations, Producer shall, where reasonably requested by Gatherer, (i) convey or assign to Gatherer, to the extent that Producer may do so without payment of monies (unless Gatherer agrees to pay), any easements or rights-of-way for purposes of constructing, owning, operating, repairing, replacing and maintaining any portion of the Gathering and Processing System, and (ii) lease to Gatherer, at a price and upon terms as may be then agreed, such fee lands, or portions

9

thereof, owned by Producer, for purposes of constructing, owning, operating, repairing, replacing and maintaining the Gathering and Processing System.

**Section 3.3    Dedication.**

(a)      For the Primary Term of this Agreement, Producer hereby dedicates to Gatherer all Interests within the Dedicated Area shown on **Schedule 3.3** (the "***Primary Term Dedication***") and shall deliver to Gatherer at the Receipt Point(s) all Committed Gas produced therefrom, *provided* that notwithstanding such Primary Term Dedication, Producer shall have the right to (i) administer the Interests as it deems advisable in its sole discretion, including the right to rework, shut in, plug or abandon any well, (ii) form or participate in the formation of any unit, (iii) to use Gas in its operations, and (iv) deliver Gas that Producer is expressly required to deliver under oil and gas leases, contractual agreements or other legal rights under which Committed Gas is produced; *provided further* that any Interests of Producer or Gas produced therefrom subject to the prior dedication contained in that certain Gas Purchase Agreement dated April 1, 2015 by and between Alta Mesa Holdings, LP and Mustang Gas Products will be excluded from the Primary Term Dedication until such prior dedication terminates or expires, at which time such Gas shall become Committed Gas. If, after the Effective Date and before the end of the Primary Term, Producer or any of its Affiliates acquire mineral interests, including by way of joint venture participation, drill-to-earn rights or other means, within the Dedicated Area (the "***After-Acquired Interests***"), then the After-Acquired Interests and all Gas produced therefrom shall automatically be included in the Primary Term Dedication and become Committed Gas; *provided*, *however*, if any of the After-Acquired Interests or Gas produced therefrom are subject to a prior written dedication or

002493

Interests or Gas produced therefrom are subject to a prior written dedication or commitment for gathering as of the time of acquisition by Producer, then that Gas will be excluded from the Primary Term Dedication until the prior dedication or commitment terminates or expires, at which time such Gas shall become Committed Gas, *provided further* that if, with respect to any After-Acquired Interests, Producer has the right or ability, without payment of any material fee or penalty, or incurring any other material disadvantage, to terminate any such prior dedication or commitment with respect to the After-Acquired Interests, then Producer shall terminate such dedication or commitment as soon as reasonably practicable.  Producer shall promptly notify Gatherer in writing of any such termination, and identify the After-Acquired Interests.

(b)     For the Extended Term of this Agreement, Producer hereby dedicates to Gatherer all of the wells that constitute Interests and are connected to the Gathering and Processing System at the end of the Primary Term (such wells, the "***Dedicated Wells***", and such dedication, the "***Extended Term Dedication***") and shall deliver to Gatherer at the Receipt Point(s) all Committed Gas produced therefrom; *provided* that notwithstanding such Extended Term Dedication, Producer shall have the right to (i) administer the Dedicated Wells as it deems advisable in its sole discretion, including the right to rework, shut in, plug or abandon any Dedicated Well, (ii) form or participate in the formation of any unit, (iii) to use Gas in its operations, and (iv) deliver Gas that Producer is expressly required to deliver under oil and gas leases, contractual agreements or other legal rights under which Committed Gas is produced.  From and after the end of the Primary Term all Interests within the Dedicated Area other than the Dedicated Wells

10

shall be permanently released from the Dedication, and Producer may take the volumes produced from such Interests (other than the Dedicated Wells) elsewhere.

**Section 3.4    Covenant Running With Land.**

For its Term, this Agreement shall be a covenant running with the land and the Interests and any After-Acquired Interests. Contemporaneously with the execution of this Agreement, and from time-to-time during the Term if necessary, the Parties shall each execute for recordation in the public records of the Dedicated Area a "short form" memorandum of this Agreement in the form of **Schedule 3.4** attached hereto, identifying the Dedicated Area, the Interests, After-Acquired Interests and wells thereon. Producer shall cause any conveyance of all or any of the Interests or After-Acquired Interests, or Gas therefrom, to be made expressly subject to this Agreement, and to cause all transferees to execute a written instrument in a form reasonably satisfactory to Gatherer acknowledging the Dedication and such transferees' obligations under this Agreement. Gatherer shall likewise cause any assignment or conveyance of all or any segment of the Gathering and Processing System to be made expressly subject to this Agreement, and to cause all transferees to execute a written instrument in a form reasonably satisfactory to Producer acknowledging the Dedication and such transferees' obligations under this Agreement.

**Section 3.5    Covenant Not to Gather, Market or Process Gas.**

Producer shall not gather, market or process Committed Gas, or allow Committed Gas to be gathered, marketed or processed, or otherwise cause or allow NGLs or other constituent components of the Gas to be removed from Committed Gas, other than by means of mechanical

**Section 3.6    Option to Expand Gathering and Processing System.**

Gatherer shall gather and process volumes of Committed Gas up to 60 million cf/day on a Firm basis (the "***Producer Capacity***").  All volumes of Committed Gas above the Producer Capacity shall at all times be Committed Gas.  To the extent that Committed Gas shall exceed the Producer Capacity, Gatherer shall have the option to (a) utilize any available System Capacity in excess of the Producer Capacity on a Firm basis, (b) utilize another Plant or Plants to process such Committed Gas, or (c) expand the Gathering and Processing System as many times as necessary by adding additional System Capacity (the "***Additional Capacity***").  In the event that production from the Interests shall exceed the Producer Capacity, Producer shall provide Notice to Gatherer that production exceeds Producer Capacity, and Gatherer shall provide Notice to Producer within sixty (60) days of Gatherer's receipt of Producer's Notice that Gatherer will or will not accept such volumes of Committed Gas or add Additional Capacity.  In the event that Gatherer provides Notice to Producer that it will not accept such volumes of Committed Gas above the Producer Capacity or add Additional Capacity, then the acreage from which the volumes of Committed Gas are directly produced shall be released from the Dedication, and Producer may take such volumes of Committed Gas elsewhere.  In the event that Gatherer provides Notice to Producer that it will accept such volumes of Committed Gas above the Producer Capacity or add Additional Capacity, then, until Gatherer is able to process such Committed Gas, or until the Additional In-Service Date for such Additional

11

Capacity, Producer may deliver any volumes of Committed Gas above the Producer Capacity of the Gathering and Processing System elsewhere, provided that once Gatherer is able to process such volumes of Committed Gas, all such volumes of Committed Gas shall be delivered to Gatherer at a Receipt Point.  **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, PRODUCER'S RIGHT TO TAKE THE AFFECTED VOLUMES OF COMMITTED GAS ELSEWHERE DURING ANY PERIOD WHERE GATHERER REFUSES TO TAKE VOLUMES OF PRODUCER'S COMMITTED GAS THAT EXCEED PRODUCER CAPACITY, AND THE RELEASE FROM DEDICATION, IF APPLICABLE, SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY, AT LAW OR IN EQUITY, WITH RESPECT TO GATHERER'S INABILITY OR REFUSAL TO TAKE VOLUMES OF COMMITTED GAS THAT EXCEED PRODUCER CAPACITY.**

**Section 3.7    Title Warranty.**

Producer represents and warrants to Gatherer that:  (i) it owns, or has the right to dedicate all Interests and Committed Gas dedicated under this Agreement, and to deliver Committed Gas to the Receipt Point(s), free and clear of all liens, encumbrances and claims, (ii) there are no prior dedications or commitments covering any Interests or Committed Gas produced from the Interests  within the Dedicated Area.  Producer shall defend, indemnify, protect and hold harmless Gatherer from and against all claims arising out of any breach of such representation and warranty.

002497

**Section 3.8    Proceeds of Production.**

Producer shall make payment of all royalties, overriding royalties, production payments, and all other payments attributable to the interests and Committed Gas due to any Person under any leases or agreements in accordance with the terms thereof, and Gatherer shall have no obligations with respect thereto.

### Section 3.9    Operating Inventory.

Producer shall provide, at no cost to Gatherer, Gas and NGLs as line fill (each, the "*Line Fill*") needed to make the Gathering Pipeline System, Residue Gas Pipeline System, NGL Pipeline System, and other portions the Gathering and Processing System operational.  Line fill shall not be considered transportable volume.

### Section 3.10   Receipt Points and Central Receipt Points.

Producer shall install one or more central receipt points (each, a "*Central Receipt Point*" or "*CRP*"), where production from multiple wells is aggregated into a single physical connection to the Gathering and Processing System.  Producer shall connect each CRP to the Gathering and Processing System, and the "*Receipt Point*" for Delivered Gas shall be the point of interconnection between a CRP and the inlet flange of the Gathering and Processing System. The proposed design and a list of initial Receipt Points are set forth in **Schedule 3.10**.

12

**Section 3.11    Additional Receipt Points; Obligation to Interconnect.**

(a)    Producer shall have the right to designate additional Receipt Points (each an "***Additional Receipt Point***"), subject to Gatherer's prior approval, for the purpose of connecting additional wells to the Gathering and Processing System, either by construction of an additional CRP or by interconnection of a well to the Gathering and Processing System, *provided* that Producer shall have given Gatherer prior Notice, in the form set forth in **Schedule 3.11(a)**, of such Additional Receipt Points, and that incremental volumes of Committed Gas added to the Gathering and Processing system will not cause the volumes of Committed Gas to exceed the then-System Capacity of the Gathering and Processing System.

(b)    Upon Gatherer's receipt of any Notice from Producer under subsection (a) above, Gatherer shall have ████████ days from its receipt of any such Notice to provide return Notice to Producer that Gatherer will or will not interconnect such Additional Receipt Points.

(c)    In the event that Gatherer provides Notice to Producer that Gatherer will make a requested interconnection for such Additional Receipt Point, then Gatherer shall make such interconnection to the Gathering and Processing Agreement as soon as reasonably practicable, but in no event more than ████████ days from Gatherer's Notice to Producer.

002499

(d)    In the event that Gatherer provides Notice to Producer that Gatherer will not make a requested interconnection for such Additional Receipt Point, then the well in

question shall be released from the Dedication. **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, THE RELEASE FROM DEDICATION SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY, AT LAW OR IN EQUITY, WITH RESPECT TO GATHERER'S REFUSAL TO INTERCONNECT AN ADDITIONAL RECEIPT POINT.**

## ARTICLE IV
## GAS QUALITY AND PRESSURE

**Section 4.1    Measurement, Equipment and Testing.**

(a)    Producer shall be responsible for measurement, equipment and testing at the CRPs, and Gatherer shall be responsible for measurement, equipment and testing downstream of the CRPs, each in accordance with the protocols set forth on **Schedule 4.1**.

(b)    Subject to Producer's safety rules, regulations and procedures, Producer hereby grants to Gatherer, and Gatherer's contractors or agents, a right of entry onto any of the lands covered by the Interests and access to the Producer side of a CRP, as necessary, for the purpose of sampling Gas pursuant to Section 4.2 below, and shall facilitate, as necessary, access with surface owners where requested by Gatherer.

13

**Section 4.2     Specifications.**

(a)     Committed Gas delivered by Producer at the Receipt Points shall meet or exceed the quality requirements set forth in **Schedule 4.2**, and Residue Gas and NGLs delivered to the Delivery Points shall meet the quality requirements, if any, of the Downstream Pipelines (as applicable, the "***Specifications***").  Gatherer shall have a right to reject all Committed Gas that does not meet the Specifications ("***Off-Spec Gas***"), or which causes Residue Gas or NGLs to fail to meet the Specifications of a Downstream Pipeline, and may shut in well(s) of Producer or shut down a Receipt Point or portions of the Gathering and Processing System as necessary to deal with Off-Spec Gas.   The foregoing notwithstanding, Off-Spec Gas shall not be released from the Dedication.

(b)     Except where the average of daily Delivered Gas at a CRP during the prior month has been less than 250 Mcf per day, Gas at each CRP shall be sampled on a quarterly basis.   To the extent the average of daily Delivered Gas at a CRP during the prior month is less than 250 Mcf per day, there shall be no obligation to sample Gas at such CRP.

**Section 4.3     Delivery Pressure.**

Producer shall deliver Gas at the Receipt Point(s) at a pressure sufficient to enter the Gathering and Processing System and shall not exceed the maximum allowable operating pressure of the Gathering and Processing System at such Receipt Point, but in no event less than fifty (50) psig.  Gatherer shall deliver Gas at the Residue Gas Delivery Point(s) at a pressure in accordance with the requirements or directives of the applicable Downstream Pipeline.

**Section 4.4    Compression.**

Gatherer shall install up to seven (7) stages of compression facilities to provide reduced operating pressures at a CRP to at least ████████ psig and to maintain sufficient pressure to operate the Gathering and Processing System (the "*System Pressure*").  Gatherer shall exercise commercially reasonable efforts to install such compression facilities as soon as reasonably practicable.

## ARTICLE V
## GATHERING, PROCESSING AND DELIVERY

**Section 5.1    Delivery, Receipt and Processing of Gas.**

Commencing on the In-Service Date, Producer shall deliver or cause to be delivered to the Receipt Point(s) all Committed Gas.  For the Term of this Agreement, Gatherer shall, on a Firm basis up to the Producer Capacity, receive and process the Delivered Gas to separate the NGLs from the Delivered Gas.  If Gatherer enters into any gathering, transportation, processing, marketing or similar agreement with any third party pursuant to which natural gas is received and processed by Gatherer on the Gathering and Processing System on a Firm basis, Gatherer shall deliver to Producer a written notice of such agreement that describes the material terms thereof.  Gatherer shall provide stabilization services for all Field Condensate (the "*Stabilized Field Condensate*"), and Stabilized Field Condensate shall be re-injected into the NGL stream

14

before the NGL Delivery Point, *except* for such NGLs or Field Condensate as may be sold and transported by truck.  The processing services hereunder shall not include processing or treating services for which there is no System Fee expressly set forth on Schedule 6.1, such as treatment for sour gas/hydrogen sulfide ($H_2S$) or other contaminants, or removal of carbon dioxide ($CO_2$), nitrogen (N), or other inert gases or any other types of contaminants.

>    **Section 5.2     Operational Gas.**

Any Delivered Gas consumed by Producer for its operations taken from the Gathering and Processing System as permitted by Section 3.3(iii) (all such Gas, the "***Operational Gas***") shall be metered by Producer at the CRP, and all such volumes shall be communicated to Gatherer by Producer.   Operational Gas shall be accounted for in determining Equivalent Quantities.

>    **Section 5.3     Scheduling.**

Producer shall provide Notice to Gatherer not less than three (3) Business Days prior to the last Business Day of each month of the total volume of Gas (expressed in Mcf per day and MMBtu per day) that Producer expects to deliver in the following month, specifying volumes at each Receipt Point, *provided* that Producer may modify any such nomination upon at least 24 hours advance Notice (all such Gas being "***Scheduled Gas***").   The Parties shall coordinate their respective nomination activities, giving sufficient time to meet the deadlines of the Downstream Pipelines.   If Producer becomes aware that actual deliveries of Committed Gas to the Receipt Point(s) vary by more than five (5%), greater or lesser, of Scheduled Gas, then Producer shall promptly provide Notice to Gatherer, and if Producer fails to give Gatherer any Notice required

by this Section, and Gatherer thereafter incurs any costs or expenses as a result of such a variance from Scheduled Gas of which Gatherer should have received Notice, then Producer shall reimburse Gatherer for such costs or expenses.

**Section 5.4    Equal Receipt and Delivery.**

Committed Gas shall be delivered by Producer to and received by Gatherer at the Receipt Points, and Residue Gas and NGLs shall be delivered by Gatherer to and received by Producer at the Residue Gas Delivery Point and NGL Delivery Point in Equivalent Quantities, and Producer shall not be permitted to use the Gathering and Processing System for storage or peaking purposes. To the extent that the volumes of Delivered Gas on any day exceed the Equivalent Quantities of Residue Gas and NGLs being delivered at the Residue Gas Delivery Point and NGL Delivery Point, Gatherer may curtail Delivered Gas until such time as Producer's nominations on Downstream Pipelines bring the Gathering and Processing System into balance. Likewise, to the extent that the volumes of Delivered Gas on any day are less than the Equivalent Quantities of Residue Gas and NGLs being delivered at the Residue Gas Delivery Point and NGL Delivery Point, Gatherer may curtail deliveries of Residue Gas and NGLs until such time as the volumes of Delivered Gas are sufficient to bring the Gathering and Processing System into balance. The Parties acknowledge and agree that a precise balancing may not be possible, but each shall exercise commercially reasonable efforts to maintain the Gathering and Processing System in balance.

15

**Section 5.5     Exchange of Information.**

Each of the Parties shall furnish or cause to be furnished to the other all information as may be reasonably requested and necessary with respect to maintaining the Gathering and Processing System in balance, including meter readings and nominations on Downstream Pipelines.

**Section 5.6     Delivery of Residue Gas and NGLs; Thermally Equivalent Volumes.**

Gatherer shall, as nearly as practicable, deliver to Producer at the respective Residue Gas Delivery Point and NGL Delivery Point, as applicable, Equivalent Quantities of Residue Gas and NGLs. Producer shall be responsible for all nominations of Residue Gas and NGLs for transportation on any Downstream Pipeline, as applicable.

**Section 5.7     Commingling.**

Delivered Gas and NGLs may represent only a portion of Gas and NGLs on the Gathering and Processing System, which may be used by other customers.  Subject to its obligations with respect to delivery of Equivalent Quantities, Gatherer shall have the right to commingle Gas and NGLs with Gas and NGLs from other customers.

**Section 5.8     Allocation of Volumes Delivered.**

Subject to Gatherer's obligations to deliver Equivalent Quantities under Section 5.4, Producer shall be credited with Allocated Actual Quantities delivered at the Residue Gas

002505

Delivery Point and NGL Delivery Point, as applicable. As long as there are no third party
volumes in the Gathering and Process G System Producer's Allocated Actual Percentage shall
be 100%. If third party volumes enter the Gathering and Processing System, Gatherer shall
allocate total delivered volumes and component Btu's on a *pro rata* basis (based on Btu content
of Gas delivered to the Gathering and Processing System) among all parties then on the
Gathering and Processing System.

**Section 5.9    Allocation of NGLs and Shrinkage.**

(a)    The "Allocated ▮▮▮ Quantities" of NGLs shall be determined as
follows:



16



(each, the "***Allocated CRP Volume***").

**Section 5.10    Transfer of Title and Risk of Loss.**

Title to Gas, Operational Gas, Field Condensate, Stabilized Field Condensate and NGLs shall always vest in Producer. Risk of loss shall always be with Producer except when Gatherer is in possession of Gas, NGLs, Field Condensate or Stabilized Field Condensate, in which case risk of loss shall be with Gatherer, provided that Gatherer shall not be responsible for lost volumes of Gas attributable to Shrinkage or LAUFG, or with respect to Operational Gas. Risk of loss for Gas and NGLs shall transfer to Producer at the Residue Gas and NGL Points of Delivery.

002507

**ARTICLE VI**

**Section 6.1      Service Fees.**

Producer shall pay to Gatherer the following fees (in the aggregate, the "***Service Fees***") set forth on **Schedule 6.1**.

**Section 6.2      Payment for Other Fuel.**

Producer shall pay to Gatherer the Other Fuel Fee, if applicable.

**Section 6.3      Escalation.**

Commencing with the ███████████████ and on January 1 of each Contract Year thereafter, each Service Fee, except for the Other Fuel Fee, shall be automatically adjusted upward ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

17

**ARTICLE VII**
**PAYMENT**

**Section 7.1    Billing.**

As soon as reasonably practicable after the end of a month, Gatherer shall render to Producer a statement for the preceding month, setting forth the following, and including or attaching necessary backup information or calculations:

        (a)      Delivered Gas in both Mcf and MMBtu by CRP;

        (b)      Operational Gas, if any, in both Mcf and MMBtu;

        (c)      Allocated Actual Quantities of Residue Gas, and breaking out the constituent components of the calculation in Section 5.9(b);

        (d)      Allocated Actual Quantities of NGLs, and breaking out the constituent components of the calculation in Section 5.9(a);

        (e)      Allocated CRP Volumes and calculation of the Services Fees due;

        (f)      actual cost of electricity as Other Fuel, and the Other Fuel Fee;

        (g)      aggregate total of all amounts due Gatherer for all Service Fees and Other Fuel Fees; and

(h)    the net amount owed by Producer.

**Section 7.2    Payment.**

Producer shall pay to Gatherer the full amount due not later than the earlier of (i) fifteen (15) days from Producer's receipt of Gatherer's statement, or (ii) the last day of month following the statement month, *provided* that if such day is not a Business Day, then on the next Business Day.  Any past due amounts shall bear interest at the Overdue Rate from the date due until paid.

**Section 7.3    Disputed Amounts.**

If Producer disputes all or a portion of any statement or amount due, it shall pay the undisputed portion, if any, of any such statement, and shall provide Notice to Gatherer of the specific basis for the dispute, including all supporting information, as soon as practicable after becoming aware of the basis for the dispute.  If after resolution of such dispute it is determined that any of the amount in dispute is due and owing, such amount(s) shall bear interest at the Overdue Rate from the date originally due until paid.  In no event shall any statement or invoice be subject to dispute beyond two (2) years from the date of such statement or invoice.

**Section 7.4    Taxes.**

Producer shall pay any and all Taxes levied on Committed Gas, Field Condensate, Residue Gas or NGLs.  In the event a Party is required to pay any Tax for which the other Party

18

002510

is responsible hereunder, the responsible Party shall reimburse the paying Party for the same per invoice provided by the paying Party.  Each Party shall indemnify, defend and hold harmless the other Party from and against any and all Claims and Losses arising out of or related to Taxes for which the indemnifying Party is responsible hereunder.

**Section 7.5     Audit.**

Each Party shall have the right, upon reasonable advance Notice, during normal business hours and not more than two (2) times per Contract Year, at its sole expense and either itself or through its representatives, to audit the books and records of the other Party, at the place where such books and records are ordinarily kept, to the extent reasonably necessary to verify the accuracy of any statement, charge, payment or computation made pursuant to this Agreement, and any such audit must be completed within ninety (90) days of the Notice to the other Party. In the event that an audit is performed, any subsequent audit performed may cover only a time period not covered by a previous audit.  In no event shall any statement or invoice be subject to audit beyond two (2) years from the date of such statement or invoice.

**ARTICLE VIII**
**NOTICES**

**Section 8.1     Notices.**

Any notice, request, demand, statement, payment or bill provided for in this Agreement, or any notice which a Party may desire to give to the other (each, a "***Notice***"), must be in writing and will be deemed duly made when (i) delivered personally, (ii) upon delivery by the U.S.

Postal Service, certified mail with return receipt, (iii) upon delivery by a recognized overnight courier service with return receipt or (iv) upon receipt by the directed recipient if/as transmitted by electronic means, to the Persons and addresses set forth on Schedule 8.1.  Each of the Parties may, by Notice to the other Party, revise its respective Persons and addresses for delivery of Notices without amendment of this Agreement.

ARTICLE IX
FINANCIAL RESPONSIBILITY

[NOT USED]

ARTICLE X
INDEMNITY

**Section 10.1   Indemnity.**

**EXCEPT WHERE OTHERWISE SPECIFICALLY PROVIDED HEREIN, EACH OF PRODUCER AND PRODUCER GROUP, ON THE ONE HAND, AND GATHERER AND GATHERER GROUP, ON THE OTHER HAND, SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS THE OTHER PARTY AND ITS RESPECTIVE PRODUCER GROUP OR GATHERER GROUP, AS THE CASE MAY BE, FROM AND AGAINST ANY AND ALL CLAIMS OF THIRD PARTIES AGAINST THEM, OR DAMAGES SUSTAINED OR INCURRED BY THEM AS A RESULT OF SUCH CLAIMS BY THIRD**

19

002512

PARTIES, TO THE EXTENT CAUSED BY THE NEGLIGENCE OR WILLFUL MISCONDUCT OF THE INDEMNIFYING PARTY OR ITS RESPECTIVE PRODUCER GROUP OR GATHERER GROUP, AS THE CASE MAY BE, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR THE INDEMNIFYING PARTY'S BREACH OF THIS AGREEMENT. THIS PROVISION SHALL NOT BE CONSTRUED TO RELIEVE ANY INSURER OF ITS OBLIGATION TO PAY CLAIMS CONSISTENT WITH THE PROVISIONS OF A VALID INSURANCE POLICY. A PERSON SEEKING INDEMNITY SHALL FIRST SEEK RECOVERY UNDER ANY APPLICABLE INSURANCE POLICY, AND ANY INDEMNITY OBLIGATION OWED HEREUNDER SHALL BE REDUCED BY THE AMOUNT OF ALL INSURANCE PROCEEDS ACTUALLY RECEIVED BY THE INDEMNIFIED PARTY.

### Section 10.2   Notification Obligation.

The Person entitled to indemnification under Section 10.1 above (the "***Indemnified Party***") shall promptly notify the Party providing indemnity (the "***Indemnifying Party***") of any Claim, and the Indemnifying Party shall have the right to assume the investigation and defense of the Claim, including employing legal counsel of its choice. If the Indemnifying Party does not promptly assume the investigation and defense of the Claim, the Indemnified Party may do so, including employing legal counsel of its choice, at the Indemnifying Party's expense. If the Indemnifying Party assumes the defense of a claim, the Indemnified Party shall nevertheless have the right to employ, at its sole expense, separate legal counsel and participate in the defense of the Claim, provided that control over the process and authority to compromise the Claim shall vest solely in the Indemnifying Party.

008513

# ARTICLE XI
## CURTAILMENT AND MAINTENANCE

### Section 11.1    Curtailment and Temporary Release of Gas.

If for any reason, including Force Majeure or a Maintenance Event, but not for the reasons set forth in Section 3.6, Gatherer needs to curtail receipt, gathering, processing or delivery of Gas on the Gathering and Processing System (each, a "***Curtailment Event***"), (i) Gas deliveries from all Persons that are receiving service on an interruptible or non-Firm basis shall be curtailed prior to any curtailment or interruption of Committed Gas, and (ii) to the extent a third party is receiving service on a Firm basis in accordance with Section 5.1, Producer and such third party shall be curtailed on a *pro rata* basis (based on Btu content of Gas delivered to the Gathering and Processing System).    Prior to the Partial In-Service Date, all volumes of Committed Gas shall be temporarily released from the Dedication and Producer shall be free to dispose of all volumes of Committed Gas under other arrangements during such period.    From and after the Partial In-Service Date and prior to the In-Service Date, all volumes of Committed Gas that are produced from Producer's wells that are not connected to the Receipt Points that are operational and tested as of the Partial In-Service Date shall be temporarily released from the Dedication and Producer shall be free to dispose such volumes of Committed Gas under other arrangements during such period.    At any time after the Partial In-Service Date where Gatherer is unable to accept some or all Committed Gas as a result of a Curtailment Event, Producer shall be free to dispose of such affected volumes under other arrangements during such Curtailment

20

Event (the "***Curtailment Period***").  Gatherer shall notify Producer as soon as reasonably practicable of the circumstances of any Curtailment Event and the beginning and end of any Curtailment Period.  As soon as reasonably practicable after receiving notice of the end of the Curtailment Period, all Gas shall again be subject to the Dedication.  **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, GATHERER'S TEMPORARY RELEASE AND PRODUCER'S RIGHT TO MAKE OTHER ARRANGEMENTS WITH RESPECT TO SUCH AFFECTED VOLUMES SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY AVAILABLE TO PRODUCER, AT LAW OR IN EQUITY, WITH RESPECT TO SUCH AFFECTED VOLUMES.**

**Section 11.2    Maintenance Events.**

Gatherer may, without liability to Producer, interrupt the operation of the Gathering and Processing System for the purpose of performing inspections, pigging, maintenance, testing, alterations, modifications, expansions, connections, repairs or replacements (each, a "***Maintenance Event***"), but such interruption shall be for only such time as may be reasonably necessary.  Gatherer shall give Producer advance written notice of its intention to interrupt operations and of the estimated time thereof, but not less than 24 hours advance notice, except in case of emergency.  Any such Maintenance Events shall not constitute Force Majeure Events, unless such Maintenance Events otherwise meet the definition of a Force Majeure Event.

**ARTICLE XII**
**FORCE MAJEURE**

002515

**Section 12.1     Force Majeure.**

"*Force Majeure*" shall mean any event or circumstance or combination of events or circumstances (each, a "*Force Majeure Event*") that adversely affects or prevents any Party from performing its obligations in accordance with the terms of this Agreement, but only if and to the extent that such events and circumstances are not within the affected Party's reasonable control.    Force Majeure events shall include act of God, fire, storm of an unusual or extraordinary nature, flood, hurricane, tornado, earthquake, epidemic or other natural disaster, action, delay or inaction of any Governmental Authority, war, invasion, emergency, embargo, sanction, sabotage, insurgency, terrorism, civil war, riot or insurrection of any kind, labor strike, loss of electricity supply, failure of any Downstream Pipeline, inability to obtain rights-of-way after the exercise of commercially reasonable efforts; *provided* that the following shall not constitute a Force Majeure Event: (i) failure to obtain or retain, or a delay in obtaining, any Governmental Approval necessary for performance under this Agreement that was the result of action or inaction by the Party responsible for obtaining such Governmental Approval, or a result of failure to timely apply for any such Governmental Approval, (ii) market conditions for Gas or NGLs, (iii) the inability to obtain a favorable price for or to buy or sell Gas or NGLs, or (iv) economic hardship.    Any obligation of either Party under this Agreement shall be excused only to the extent that the Party's inability to perform is caused by Force Majeure. Each Party shall use all Reasonable Efforts to cure, minimize, mitigate or remedy the effects of Force Majeure. Notwithstanding that Force Majeure may otherwise exist, a Force Majeure Event shall not excuse or delay the payment of money when due by any Party.

21

## ARTICLE XIII
## DEFAULT AND TERMINATION

**Section 13.1    Producer Events of Default.**

A "***Producer Event of Default***" shall be deemed to have occurred if (i) Producer becomes bankrupt or insolvent or takes any corporate action or other steps towards liquidation, winding up, dissolution, reorganization or amalgamation of Producer, making of any bankruptcy administration order, or appointment of a receiver, administrator, trustee or similar officer over all or any material part of the revenues, assets or business of Producer; (ii) an order is made for the winding up, dissolution or liquidation of Producer, or any analogous or equivalent proceedings by whatever name are undertaken in whatever jurisdiction; (iii) Producer is generally unable to pay its debts as they become due, or Producer stops, suspends or threatens to stop or suspend payment of all or a material part of its debts or makes a general assignment of its assets for the benefit of its creditors; or (iv) Producer is in breach of any of its material obligations under this Agreement, and Producer fails to cure such breach within 30 days following Producer's receipt of a Notice from Gatherer to Producer to remedy such event or condition, or if a remedy cannot be effected within such 30 day period, a period of 60 days, provided that Producer has commenced to remedy within such 30 day period and has diligently pursued such remedy during the extended period, provided further that in no event shall the period to cure a breach of an obligation to pay money be more than 10 days total.

**Section 13.2    Gatherer's Default Remedies Against Producer.**

002517

If a Producer Event of Default shall have occurred and be uncured and continuing, and

without prejudice to any other of Gatherer's rights under this Agreement. Gatherer shall have the right to terminate this Agreement upon Notice to Producer.

### Section 13.3   Gatherer Events of Default.

A "***Gatherer Event of Default***" shall be deemed to have occurred if (i) Gatherer becomes bankrupt or insolvent or takes any corporate action or other steps towards liquidation, winding up, dissolution, reorganization or amalgamation of Gatherer, making of any bankruptcy administration order, or appointment of a receiver, administrator, trustee or similar officer over all or any material part of the revenues, assets or business of Gatherer; (ii) an order is made for the winding up, dissolution or liquidation of Gatherer, or any analogous equivalent proceedings by whatever name are undertaken in whatever jurisdiction; (iii) Gatherer is generally unable to pay its debts as they become due, or Gatherer stops, suspends or threatens to stop or suspend payment of all or a material part of its debts or makes a general assignment of its assets for the benefit of its creditors; or (iv) Gatherer is in breach of any of its material obligations under this Agreement, and Gatherer fails to cure such breach within 30 days following Gatherer's receipt of a Notice from Producer to Gatherer to remedy such event or condition, or if a remedy cannot be effected within such 30 day period, a period of 60 days, provided that Gatherer has commenced to remedy within such 30 day period and diligently pursued such remedy during the extended period, provided further that in no event shall the period to cure a breach of an obligation to pay money be more than 10 days total.

22

**Section 13.4     Producer's Default Rights Against Gatherer.**

If a Gatherer Event of Default shall have occurred and be uncured and continuing, and without prejudice to any other of Producer's rights under this Agreement, Producer shall have the right to terminate this Agreement upon Notice to Gatherer.

**ARTICLE XIV**
**ASSIGNMENT**

**Section 14.1     Assignment.**

Neither Party may assign this Agreement without the other Party's prior written consent, which consent will not be unreasonably withheld, conditioned or delayed.

**ARTICLE XV**
**LIMITATION OF LIABILITY**

**Section 15.1     Limitation of Liability.**

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL, PUNITIVE OR EXEMPLARY DAMAGES OF ANY TYPE, INCLUDING LOST PROFITS OR LOSS OF BUSINESS OPPORTUNITY, IN CONTRACT OR TORT (INCLUDING NEGLIGENCE, JOINT OR SEVERAL OR STRICT LIABILITY) ARISING OUT OF THIS AGREEMENT, PROVIDED THAT THIS LIMITATION SHALL NOT APPLY TO ANY INDEMNITY OBLIGATION SET FORTH HEREIN.

**ARTICLE XVI**
**CONFIDENTIALITY**

### Section 16.1   Confidentiality.

Any information belonging to a Party that is confidential and disclosed to the other Party in the course of performance of this Agreement or has been disclosed during the negotiations leading up to this Agreement, including the Agreement itself (collectively, the "***Confidential Information***"), shall be held in confidence and shall not be disclosed to others without the written approval of the disclosing Party. Confidential Information is not information that (i) is already known to the receiving Party at the time of disclosure by the disclosing Party (ii) is now or hereafter becomes available within the public domain other than as a result of a breach of this Agreement, (iii) is received by a Party from a Person under no obligation to keep the Confidential Information confidential, or (iv) is independently developed by a Party without reliance on Confidential Information. A Party shall have the right to disclose Confidential Information without the consent of the disclosing Party to its Lenders, counsel, advisors, consultants, accountants, auditors, officers, directors, members, shareholders and other Persons of responsibility who have a need to know the Confidential Information, *provided* that such Persons agree to keep the Confidential Information confidential, and that the Party shall be responsible for any breaches of this confidentiality obligation by such Persons. A Party shall also have the right to disclose Confidential Information without the consent of the disclosing Party in connection with a subpoena, interrogatory, request for production, civil investigative

23

demand or other such legal process issued by any court or administrative, legislative, investigative or regulatory body, but only to the extent necessary to fully respond thereto and after providing prior Notice to the disclosing Party.  Upon the reasonable request of the disclosing Party, the receiving Party shall, in its sole discretion, either return the Confidential Information or destroy it, *provided* that the receiving Party may retain a copy of Confidential Information as necessary to comply with Applicable Law.

**ARTICLE XVII**
**DISPUTE RESOLUTION**

**Section 17.1   Dispute Resolution.**

All controversies, disputes or claims between Producer and Gatherer arising out of or in any way relating to this Agreement (each, a "***Dispute***") shall be resolved pursuant to the procedures of this Section 17.1.

(a)      If a Dispute arises between the Parties regarding their respective rights and obligations under this Agreement, the Parties shall use commercially reasonable efforts to reach a reasonable resolution of the Dispute informally.  Initially, the responsible Persons shall attempt to resolve the Dispute themselves. If they are unable to resolve the Dispute within 10 days, then either Party may, by Notice, refer the Dispute to the senior management of the Parties for resolution. If senior management of the Parties are unable to resolve the Dispute within 10 days of such Notice, the provisions of subsection (b) below shall apply.

(b)    Any Dispute not otherwise resolved under subsection (a) above may be submitted by either Party in a court proceeding filed in accordance with Applicable Law in any court having jurisdiction over the Parties and the subject matter.

## ARTICLE XVIII
## MISCELLANEOUS

**Section 18.1   Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury Trial.**

(a)    **THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF OKLAHOMA, EXCLUDING ANY CONFLICTS OF LAWS PROVISIONS CALLING FOR APPLICATION OF THE LAWS OF ANOTHER STATE.**

(b)    **EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE SOLE AND EXCLUSIVE JURISDICTION OF THE STATE OR FEDERAL COURTS IN HARRIS COUNTY, TEXAS, AND EACH OF THE PARTIES IRREVOCABLY WAIVES ANY OBJECTION TO THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS.**

(c)    **TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY IRREVOCABLY WAIVES ITS RIGHT TO A TRIAL BY JURY, AND**

24

CONSENTS TO A BENCH TRIAL BY A TRIAL COURT JUDGE, IN RESPECT OF ANY LITIGATION ARISING OUT OF THIS AGREEMENT AND ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT FOR EACH OF THE PARTIES IN ENTERING INTO THIS AGREEMENT.

**Section 18.2    Survival.**

The provisions of this Agreement shall survive expiration or termination thereof for so long as necessary to give effect to the rights and obligations of the Parties hereunder, but in no event exceeding any applicable statutes of limitation.

**Section 18.3    No Joint Venture.**

Nothing in this Agreement shall create an association, joint venture or partnership between the Parties or impose any partnership obligation or partnership liability on any Party. Neither Party shall have any right, power or authority to enter into any agreement or commitment or act on behalf of or otherwise bind the other Party without such Party's prior written consent.

**Section 18.4    Entire Agreement.**

This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and there are not any oral or written understandings, representations or commitments of any kind, express or implied, which are not expressly set out herein. No modification of this Agreement shall be effective unless in writing and executed by the Parties. This Agreement supersedes any prior agreements of the Parties concerning the subject matter

002523

**Section 18.5    No Third Party Beneficiaries.**

This Agreement is for the sole and exclusive benefit of the Parties, and does not stipulate any benefit in favor of any third parties.

**Section 18.6    Regulatory Matters.**

(a)    Gatherer has informed Producer, and Producer hereby acknowledges and accepts, that the Gathering and Processing System will be an intrastate pipeline system operating only within the State of Oklahoma, and is not intended to be subject to regulation under any Applicable Law by FERC.  Accordingly, as a principal condition to, and in consideration for, the execution of this Agreement by Gatherer, Producer represents, warrants and covenants that (i) the delivery of Producer's Committed Gas hereunder will not subject the Gathering and Processing System or any portion thereof to regulation by FERC as (x) a natural gas company under the Natural Gas Act or (y) a Section 311 transporter under the Natural Gas Policy Act of 1978 and (ii) none of Producer's Committed Gas delivered at one or more Receipt Points is Gas that has been transported by a natural gas company, as defined in the Natural Gas Act, or by a Section 311 transporter under the Natural Gas Policy Act of 1978, at any point prior to such delivery.  In the event that Producer breaches its representation, warranty and covenant contained in this Section 18.6(a), Gatherer, in addition to all other remedies at law or in

25

equity, shall have the right, upon delivery of written notice to Producer, to refuse receipt of Producer's Committed Gas which has caused a breach of such representation, warranty and covenant. Gatherer's election to refuse receipt of any of Producer's Committed Gas pursuant to this Section 18.6(a) shall not release Producer from any obligation to indemnify Gatherer for such breach under Article X.

(b)    If any federal or state statute, regulation, or order by a court of law or Governmental Authority directly or indirectly (a) prohibits performance under this Agreement, (b) makes such performance illegal or impossible, or (c) effects a change in a substantive provision of this Agreement that has a significant material adverse impact upon the performance of either Party's obligations under this Agreement, including without limitation the imposition of terms, conditions, or rate restrictions, then the Parties will use all reasonable efforts to revise the Agreement and any other ancillary agreement to the extent necessary so that: (i) performance under the Agreement is no longer prohibited, illegal, impossible, or is no longer impacted in a material adverse fashion, and (ii) this Agreement and any other ancillary agreement is revised in a manner that preserves, to the maximum extent possible, the respective positions of the Parties. Without liability for its failure to do so, each Party will use reasonable efforts to provide notice to the other Party as to any proposed law, regulations or any regulatory proceedings or actions that could affect the rights and obligations of the Parties. If the Parties are unable to revise the Agreement in accordance with the above within ninety (90) days following the adoption of any such law, regulation or order of a Governmental Authority, then the Party whose performance is prohibited, illegal, impossible or is impacted in a material adverse fashion will have the right, at its sole discretion, to terminate this Agreement upon written notice to the other Party.

**Section 18.7    Execution in Counterparts.**

This Agreement may be executed in counterparts, including by electronic transmission, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement.

[Signature Page Next Page]

26

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed in duplicate originals by its duly authorized officer as of the Effective Date.

**PRODUCER**

**OKLAHOMA ENERGY ACQUISITIONS, LP**

By: Alta Mesa GP, LLC, its general partner

By: _____

Harlan H. Chappelle, Manager

002527

Signature page to Gas Gathering and Processing Agreement

**GATHERER**

**KINGFISHER MIDSTREAM, LLC**, a Delaware
limited liability company

By:  HMS KINGFISHER HOLDCO, LLC,
Authorized Member

By: _____
Name:   Harlan H. Chappelle
Title:  President and Chief Executive Officer

002529

**SCHEDULE 3.3**
to
**GAS GATHERING AND PROCESSING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**DEDICATED AREA**

**[See Attached]**

002531





Blaine, Canadian, Garifield, Kingfisher, Logan Counties

002533

**SCHEDULE 3.4**
to
**GAS GATHERING AND PROCESSING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
and
**KINGFISHER MIDSTREAM LLC**

**FORM OF**

**MEMORANDUM OF GAS GATHERING AND PROCESSING AGREEMENT**

| | |
|---|---|
| **STATE OF OKLAHOMA** | § |
| | § |
| **COUNTIES OF KINGFISHER,** | § |
| **LOGAN, CANADIAN, BLAINE** | § |
| **AND GARFIELD** | § |

This **Memorandum of Gas Gathering and Processing Agreement** (this **"Memorandum"**) is made and entered into this __ day of _____, 2015, by and between Oklahoma Energy Acquisitions, LP, a Texas limited partnership located at 15021 Katy Freeway, Suite 400, Houston, TX 77094, Attn: Michael A. McCabe ("**Producer**"), and Kingfisher Midstream LLC, a Delaware

limited liability company located at 20329 State Highway 249, Suite 450, Houston, TX 77070, as Paul Williams ("Gatherer").

Case 4:24-cv-04092   Document 4-10   Filed on 11/21/24 in TXSD   Page 99 of 382

**WHEREAS**, Producer and Gatherer have entered into a Gas Gathering and Processing Agreement (the "**Agreement**") dated the 31st day of August, 2015 (the "**Effective Date**"); and

**WHEREAS**, Producer and Gatherer desire to file this Memorandum to provide record notice of the Agreement.

1.      **Dedication.**

(a) For the Primary Term of the Agreement, Producer has dedicated to Gatherer all of Producer's Interests within the Dedicated Area shown on Exhibit A attached hereto (the "**Primary Term Dedication**") and shall deliver to Gatherer at the Receipt Point(s) all Committed Gas produced therefrom.  If, after the Effective Date of the Agreement and before the end of the Primary Term, Producer or any of its Affiliates acquire mineral interests within the Dedicated Area (the "**After-Acquired Interests**"), then the After-Acquired Interests and all Gas produced therefrom shall automatically be included in the Primary Term Dedication and become Committed Gas; *provided, however*, if any of the After-Acquired Interests or Gas produced therefrom are subject to a prior written dedication or commitment for gathering as of the time of acquisition by Producer, then that Gas will be excluded from the Primary Term Dedication until the prior dedication or commitment terminates or expires, at which time such Gas shall become Committed Gas, *provided further* that if, with respect to any After-Acquired

Interests, Producer has the right or ability, without payment of any material fee or penalty, or incurring any other material disadvantage, to terminate any such prior dedication or commitment with respect to the After-Acquired Interests, then Producer shall terminate such dedication or commitment as soon as reasonably practicable. Producer shall promptly notify Gatherer in writing of any such termination, and identify the After-Acquired Interests.

(b) For the Extended Term of the Agreement, Producer has dedicated to Gatherer all of the wells that constitute Interests and are connected to the Gathering and Processing System at the end of the Primary Term (such wells, the "**Dedicated Wells**", and such dedication, the "**Extended Term Dedication**") and shall deliver to Gatherer at the Receipt Point(s) all Committed Gas produced therefrom. From and after the end of the Primary Term all Interests within the Dedicated Area shown on Exhibit A attached hereto other than the Dedicated Wells shall be permanently released from the Dedication.

2.    **Term.** The Agreement shall commence as of the Effective Date, and shall remain in full force and effect for fifteen (15) years after the In-Service Date (the "**Primary Term**"), *provided*, *however*, that, to the extent that at the end of the Primary Term there are wells then-connected to the Gathering and Processing System and then-producing Gas in commercial (paying) quantities, the Term of the Agreement shall extend for so long as such well(s) continue to produce Gas in commercial (paying) quantities (the "**Extended Term**").

3.    **Incorporation of Agreement and Effect of Memorandum.** The sole purpose of this Memorandum is to give notice of the existence of the Agreement. This Memorandum shall not modify in any manner any of the terms and conditions of the Agreement, and nothing in this Memorandum is intended to and shall not be used to interpret the Agreement. The provisions of the

Agreement are hereby incorporated into this Memorandum as if set out fully herein.  In the event of any conflict between the terms of this Memorandum and the terms of the Agreement, the terms of the Agreement shall govern and control for all purposes.

    **4.    Defined Terms.**   All capitalized terms not defined herein shall have the same meaning assigned such terms in the Agreement.

[Signature pages follow]

     **IN WITNESS WHEREOF**, this Memorandum is executed by Producer and Gatherer as of the date of acknowledgement of their signatures, but is effective for all purposes as of the Effective Date stated above.

**PRODUCER:**

**OKLAHOMA ENERGY ACQUISITIONS, LP**

**By:** _____

**Name:** _____

**Title:** _____

STATE OF TEXAS                                §
                                              §
COUNTY OF HARRIS                              §

This instrument was acknowledged before me this ___ day of August, 2015 by_____, the _____of Oklahoma Energy Acquisitions, LP, a Texas limited partnership, on behalf of said limited partnership.

In witness whereof I hereunto set my hand and official seal.

002538

NOTARIAL SEAL:

_____
Notary Public in and for the
State of Texas

My Commission Expires: _____
Commission No.: _____

002539

**GATHERER:**

**KINGFISHER MIDSTREAM, LLC**

**By: HMS KINGFISHER HOLDCO, LLC,**
    **Authorized Member**

    **By:** _____

    **Name:** _____

    **Title:** _____

STATE OF TEXAS                §
                                    §
COUNTY OF HARRIS         §

This instrument was acknowledged before me this ___ day of August, 2015 by _____, the _____ of HMS Kingfisher HoldCo, LLC, a Delaware limited liability company, authorized member of Kingfisher Midstream, LLC, a Delaware limited liability company, on behalf of said limited liability company.

In witness whereof I hereunto set my hand and official seal.

002540

NOTARIAL SEAL:

_____
Notary Public in and for the
State of Texas

My Commission Expires:  _____

Commission No.: _____

**SCHEDULE 3.10**
to
**GAS GATHERING AND PROCESSING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**Receipt Points**

| Operator | Receipt Point Name | Unit | Location |
|----------|-------------------|------|----------|
| Alta Mesa | Lincoln CRP Manifold 1 | Lincoln | T 18N R 6W NE ¼ Section 34 |
| Alta Mesa | Lincoln CRP Manifold 2 | Lincoln | T 17N R 6W NE ¼ Section 3 |
| Alta Mesa | Lincoln CRP Manifold 2A | Lincoln | T 17N R 6W NE ¼ Section 10 |
| Alta Mesa | Lincoln CRP Manifold 3 | Lincoln | T 17N R 6W SE ¼ Section 10 |
| Alta Mesa | Lincoln CRP Manifold 4 | Lincoln | T 18N R 6W NE ¼ Section 36 |
| Alta Mesa | Lincoln CRP Manifold 5 | Lincoln | T 18N R 6W SE ¼ Section 36 |

002542

| Alta Mesa | Lincoln CRP Manifold 7 | Lincoln | T 17N R 5W NW ¼ Section 7 |
| Alta Mesa | Lincoln CRP Manifold 6 | Lincoln | T 17N R 5W SW ¼ Section 7 |
| Alta Mesa | Lincoln CRP Manifold 8 | Lincoln | T 18N R 5W NE ¼ Section 32 |
| Alta Mesa | Lincoln CRP Manifold 9 | Lincoln | T 18N R 5W NW ¼ Section 34 |
| Alta Mesa | Lincoln CRP Manifold 11 | Lincoln | T 18N R 5W SW ¼ Section 33 |
| Alta Mesa | Lincoln CRP Manifold 10 | Lincoln | T 18N R 5W SE ¼ of SW ¼ Section 33 |
| Alta Mesa | Lincoln CRP Manifold 11A | Lincoln | T 17N R 5W SW ¼ Section 4 |
| Alta Mesa | Lincoln CRP Manifold 12 | Lincoln | T 17N R 5W SE ¼ of SW ¼ Section 8 |
| Alta Mesa | Lincoln CRP Manifold 13 | Lincoln | T 17N R 5W NW ¼ Section 20 |
| Alta Mesa | Lincoln CRP Manifold 14 | Lincoln | T 17N R 5W SW ¼ Section 16 |
| Alta Mesa | Lincoln CRP Manifold 15 | Lincoln | T 17N R 5W NE ¼ Section 29 |
| Alta Mesa | Lincoln CRP Manifold 16 | Lincoln | T 17N R 5W SE ¼ Section 22 |
| Alta Mesa | Lincoln CRP Manifold 17 | Lincoln | T 17N R 5W SE ¼ Section 29 |
| Alta Mesa | Lincoln CRP Manifold 18 | Lincoln | T 17N R 5W SW ¼ Section 29 |

| Alta Mesa 9 | South of Lincoln CRP Manifold 1 | South of Lincoln | T 17N R 6W NE ¼ Section |
| Alta Mesa Section 8 | South of Lincoln CRP Manifold 2 | South of Lincoln | T 17N R 6W NW ¼ |
| Alta Mesa 16 | South of Lincoln CRP Manifold 3 | South of Lincoln | T 17N R 6W SE ¼ Section |
| Alta Mesa Section 20 | South of Lincoln CRP Manifold 4 | South of Lincoln | T 17N R 6W NW ¼ |
| Alta Mesa 26 | South of Lincoln CRP Manifold 5 | South of Lincoln | T 17N R 6W SE ¼ Section |
| Alta Mesa 26 | South of Lincoln CRP Manifold 6 | South of Lincoln | T 17N R 6W NE ¼ Section |
| Alta Mesa Section 34 | South of Lincoln CRP Manifold 7 | South of Lincoln | T 17N R 6W NW ¼ |
| Alta Mesa Section 32 | South of Lincoln CRP Manifold 8 | South of Lincoln | T 17N R 6W NW ¼ |
| Alta Mesa 4 | South of Lincoln CRP Manifold 9 | South of Lincoln | T 16N R 5W NE ¼ Section |

| | | | |
|---|---|---|---|
| Alta Mesa | South of Lincoln CRP Manifold 10 | South of Lincoln | T 16N  5W SW ¼ Section 5 |
| Alta Mesa 8 | South of Lincoln CRP Manifold 11 | South of Lincoln | T 16N R 5W SE ¼ Section |
| Alta Mesa 9 | South of Lincoln CRP Manifold 12 | South of Lincoln | T 16N R 5W NE ¼ Section |
| Alta Mesa 26 | South of Lincoln CRP Manifold 13 | South of Lincoln | T 17N R 5W SE ¼ Section |
| Alta Mesa 2 | South of Lincoln CRP Manifold 14 | South of Lincoln | T 16N R 5W SE ¼ Section |
| Alta Mesa | CRP Manifold NofL-4 | North of Lincoln | T 18N R 5W NW ¼ Section 30 |
| Alta Mesa | CRP Manifold NofL-5 | North of Lincoln | T 18N R 5W NW ¼ Section 18 |
| Alta Mesa | CRP Manifold NofL-6 | North of Lincoln | T 18N R 6W NE ¼ Section 1 |
| Alta Mesa | CRP Manifold NofL-7 | North of Lincoln | T 18N R 5W SE ¼ Section 17 |
| Alta Mesa | CRP Manifold NofL-8 | North of Lincoln | T 18N R 5WNE ¼ Section 8 |
| Alta Mesa | CRP Manifold NofL-9 | North of Lincoln | T 18N R 5W SW ¼ Section 14 |

| Alta Mesa | CRP Manifold NofL-10 | North of Lincoln | T 18N R 5W NE ¼ Section 10 |
| Alta Mesa | CRP Manifold NofL South-1 | North of Lincoln | T 18N R 5W NE ¼ Section 35 |
| Alta Mesa | CRP Manifold NofL South-2 | North of Lincoln | T 17N R 5W SE ¼ Section 2 |
| Alta Mesa | CRP Manifold NofL South-3 | North of Lincoln | T 17N R 5W SW ¼ Section 13 |

002547

**SCHEDULE 3.11(a)**
**to**
**GAS GATHERING AND PROCESSING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**FORM OF NOTICE**
**FOR**
**DESIGNATION OF ADDITIONAL RECEIPT POINT**

1.    Operator Contact Name    _____

2.    Phone Numbers    _____

3.    E-Mail    _____

4.    Well and Pad Name    _____

5.    County/Township    _____    002548

6.    Requested Turn on Date

7.  Number of Wells _____

8.  Projected Initial Volume (Mcfd) _____

9.  Projected Initial Volume (Mcfd) _____

10. Requested GPS of:

a.  Wellhead (if applicable)          _____ ° _____ , _____ " - _____ ° _____ , _____ "
b.  CRP (if applicable)               _____ ° _____ , _____ " - _____ ° _____ , _____ "
c.   Receipt Point Meter             _____ ° _____ , _____ " - _____ ° _____ , _____ "

11. Surface site provided by Producer or KFM_____

12. Planned flow into New or Existing Receipt Point _____

13. Producer* or KFM** to Connect _____

14. Estimated Spud and Frac dates _____

15. BTU Content              _____

16.     Please attach gas analysis for each well that will flow through the new Receipt Point.  If not yet available, date it will be available:  _____

002551

**SCHEDULE 4.1**
**to**
**GAS GATHERING AND PROCESSING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**MEASUREMENT, EQUIPMENT AND TESTING**

A.     Any terms capitalized in this Schedule shall have the meaning set forth herein, or as indicated by the context, or as set forth in the body of the Agreement.

B.     Producer, or its designee, will maintain and operate the measuring stations at the Central Receipt Point(s) through which the quantity of Gas gathered and processed under this Agreement is measured. Producer will equip each Central Receipt Point with remote communication facilities and will provide Gatherer with direct access to the data from those facilities. If desired by Gatherer, Gatherer may install, maintain, and operate, at its own expense, check measuring equipment, provided that Gatherer must install such equipment so as not to interfere with the operation of Producer's or its designee's measuring equipment. Gatherer will equip all check measuring equipment with remote communication facilities and will provide Producer with direct access to the data from those facilities. If the measuring stations and/or communication facilities are installed on land not owned by Producer, Gatherer will procure all land rights requested by Producer to place the measuring stations and/or communication facilities on

such property and to enable Producer to operate and access such measuring stations and/or
communications facilities through the term of this Agreement.

Case 4:24-cv-04092    Document 4-10    Filed on 11/21/24 in TXSD    Page 117 of 382

C. Each Party will construct, install, and operate its measuring stations and
communication facilities in accordance with the following, depending on the type of meters used:

(i)    <u>Orifice Meters</u> – in accordance with ANSI/API 2530 (American Gas
Association Report No. 3), *Orifice Metering of Natural Gas and Other Hydrocarbon Fluids*,
Second Edition, dated April 2000, and any subsequent amendments, revisions,
or modifications thereof, including the use of flange connections.  If Gas pulsation problems
occur upstream of the Receipt Points or downstream of the Delivery Points, Gatherer or its
designee will take all reasonable industry-standard corrective actions required by Producer
to mitigate such pulsation.

(ii)    <u>Electronic Transducers and Flow Computers</u> (solar and otherwise) – in
accordance with the applicable American Gas Association standards, including, but not
limited to, American Gas Association Measurement Committee Report Nos. 3, 5, 6, and 7,
and any subsequent amendments, revisions, or modifications to such standards.

(iii)    <u>Ultrasonic Meters</u> – in accordance with the American Gas Association
Measurement Committee Report No. 9, dated 2007, and any subsequent amendments,
revisions, or modifications to such report.

D.    Neither Party is obligated to replace or make any alterations to its measuring equipment as a result of any subsequent amendments, revisions, or modifications of the American Gas Association Reports cited in paragraphs B (i) through B (iii) of this Schedule, unless the Parties mutually agree to a replacement or alteration.

E.    Each Party will give reasonable notice to the other Party in order that such Party may have a representative present to observe any cleaning, changing, repairing, inspecting, testing, calibrating, or adjusting of measuring equipment.  The official charts (recordings) from the measuring equipment will remain the property of the Party owning such or its designee.  Upon a Party's request, the other Party or its designee will submit its records and charts, together with calculations, to the requesting Party for inspection and verification, subject to return to the producing Party or its designee within ten (10) Days after receipt  of such records and charts.

F.    Each Party or its designee will verify the accuracy of all measuring equipment belonging to it at reasonable intervals and, if requested, in the presence of a representative of the other Party.  Each Party or its designee will verify the accuracy of the equipment at least once every Contract Year where daily deliveries of Gas at a Receipt Point are less than one thousand (1,000) Mcf per day, unless the other Party requests a special test as described below; *provided, however*, that when daily deliveries of Gas at a Receipt Point average between one thousand (1,000) Mcf per day and five thousand (5,000) Mcf per day during any month, Producer will verify the accuracy of the measuring equipment once every six (6) months; *provided further, however*, that when daily deliveries of Gas at a Receipt Point average greater than five thousand (5,000) Mcf per day during any month, Producer will verify the accuracy of the measuring equipment once every calendar quarter.  If, upon any test, the measuring equipment is found to be inaccurate by two percent (2%) or less, previous readings of the equipment will be deemed correct in computing the deliveries of

Gas under this Agreement, but the equipment will immediately be adjusted to record accurately.  If, upon test, the measuring equipment is found to be inaccurate by more than two percent (2%) of a recording corresponding to the average hourly flow rate for the period since the last test, the equipment will immediately be adjusted to record accurately and any previous recordings of the equipment will be corrected to zero error for any period which is known definitely or agreed upon, utilizing the procedure set forth in this paragraph.  If the period for correction is not known or agreed upon, the correction will be made for a period covering one-half (1/2) of the time elapsed since the date of the latest test, but not to exceed sixteen (16) Days when the equipment is tested every Month and not to exceed forty-five (45) Days when the equipment is tested every three (3) Months.  If a Party desires a special test of any measuring equipment, such Party will give the other Party at least seventy-two (72) hours' advance notice, and the Parties will cooperate to perform a prompt test of the accuracy of the equipment.  If the measuring equipment so tested is found to be inaccurate by two percent (2%) or less, the requesting Party may bill the other Party for the costs incurred due to the special test, including any labor and transportation costs, and such Party will pay such costs promptly upon receipt of the invoice for such costs.

G.    If, for any reason, any measurement equipment is out of adjustment, out of service, or out of repair, and the total calculated hourly flow rate through each meter run is found to be in error by an amount of the magnitude described in paragraph E of this Schedule, the total quantity of Gas delivered will be re-determined in accordance with the first of the following methods which is feasible:

(i)    by checking the registration of any check meters, if installed and accurately registering (subject to testing as described in paragraph E of this Schedule); or

(ii)    by correcting the error by rereading of the official charts, or by straightforward application of a correcting factor to the quantities recorded for the period (if the net percentage of error is ascertainable by calibration, tests, or mathematical calculation); or

(iii)    by estimating the quantity, based upon deliveries made during periods of similar conditions when the meter was registering accurately.

H.    The Parties or their designees will retain and preserve for a period of at least two (2) years all test data, charts, and other similar records.

I.    The measurements of the quantity and quality of all Gas delivered at the Receipt Points and Delivery Points will be conducted in accordance with the following:

(i)    The unit of volume for measurement will be one (1) Cubic Foot at an absolute pressure of fourteen and seventy-three hundredths (14.73) pounds per square inch absolute and a temperature of sixty degrees Fahrenheit (60° F). Measured volumes, converted to Mcf, will be multiplied by their Gross Heating Value per Cubic Foot and divided by one thousand (1,000) to determine MMBtu delivered under this Agreement.

(ii)    Computations for Gas measurement will be made in accordance with paragraphs B(i) through B(iii) of this Schedule corresponding to the type of meters used.

(iii)     The temperature of the Gas will be determined by a recording thermometer installed so that it may record the temperature of the Gas flowing through the meters, or other means of recording temperature as may be mutually agreed upon by the Parties.  The average of the record to the nearest one degree Fahrenheit (1° F), obtained while Gas is being delivered, will be the applicable flowing Gas temperature for the period under consideration.

(iv)     The specific gravity of the Gas will be determined by a recording gravitometer or chromatographic device installed and located at a suitable point to record representing specific gravity of the Gas being metered or, at Producer's or its designee's option, by spot samples or continuous sampling standard type gravity methods.

1.     If a recording gravitometer or chromatographic device is used, the gravity to the nearest one-thousandth (0.001) obtained while Gas is being delivered will be the specific gravity of the Gas sampled for the recording period.

2.     If a continuous sampling method is used, the gravity to the nearest one-thousandth (0.001) will be determined once a Month from a Gas analysis. The result will be applied during the Month for the determination of Gas volumes delivered.

3. If a spot sample is used, the gravity to the nearest one-thousandth (0.001) will be determined at least once each quarter and will be applied until the next spot sample is taken for the determination of Gas volumes delivered.

(v) Adjustments to measured Gas volumes for the effects of super compressibility will be made in accordance with accepted American Gas Association standards. Producer or its designee will obtain appropriate carbon dioxide and nitrogen mole fraction values for the Gas delivered as may be required to compute adjustments in accordance with standard testing procedures. At Producer's or its designee's option, equations for the calculation of super compressibility may be taken from either the API Chapter 14.2 or American Gas Association Report No. 8, Compressibility and Super compressibility for Natural Gas and Other Hydrocarbon Gases, latest revision.

(vi) For purposes of measurement and meter calibration, the average atmospheric pressure for each Receipt Point and Delivery Point is assumed to be fourteen and four tenths (14.4) pounds per square inch absolute. If the pressure transmitter being used is capable of measuring actual atmospheric pressure, then actual atmospheric pressure may be used.

(vii) The Gross Heating Value of the Gas delivered at a Point of Receipt and Point of Delivery will be determined at least once each quarter using either a continuous sampler, spot sampler, or gas chromatograph; provided, however, that when daily deliveries of Gas at any Receipt Point or Delivery Point average five thousand (5,000) Mcf per Day or greater during any Month, the Gross Heating Value of the Gas delivered at that Receipt Point or

Delivery Point will be taken at least Monthly at a suitable point on the facilities to be representative of the Gas being metered.

Case 4:24-cv-04092   Document 4-10   Filed on 11/21/24 in TXSD   Page 123 of 382

(viii)    The physical constants used in Btu computation for a perfect Gas will be derived from the "Table of Physical Constants of Paraffin Hydrocarbons and Other Compounds" as published in the GPA Standard 2145-03 and superseding revisions thereof. The analysis will be complete and individual values in mole percent or fraction of each hydrocarbon compound will be listed through $C_6$.  The $C_6+$ values will be as stated in GPA standard 2261, 7.3.6 Table IV (as may be revised from time to time) or, at Producer's option, by use of an extended analysis.  The analysis will further include the mole fraction or percent individually of additional compounds contained in chromatographically measurable quantity contained in the sample.  The method to be used for chromatographic analysis will be that contained in GPA standard 2261, <u>Analysis for Natural Gas and Similar Gaseous Mixtures by Gas Chromatography</u>, latest revision.

(ix)    Other tests to determine water content, sulfur, and other impurities in the Gas will be conducted in accordance with standard industry testing procedures when requested by either Party.  The Party requested to perform those tests will bear the cost of those tests only if the Gas tested is determined not to be within the quality specification set forth in Schedule 3.1.  If the Gas is within the quality specification, the requesting Party will bear the cost of the tests.

      (x)     If, during the term of this Agreement, a new method or technique is developed with respect to gas measurement or the determination of the factors used in gas measurement, then, in Producer's commercially reasonable discretion, the new method or technique may be substituted for the method set forth in this Schedule, provided that the new method or technique is in accordance with accepted standards of the American Gas Association.

002561

**SCHEDULE 4.2**
**to**
**GAS GATHERING AND PROCESSING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**SPECIFICATIONS**

A.      All Delivered Gas shall meet the following specifications:

     (i)      Hydrogen Sulfide: The Gas will not contain more than ███████████ ████████████████████████████████████████ as determined by quantitative tests.

     (ii)      Total Sulfur: The Gas will not contain more than ██████████████ ████████████████ as determined by quantitative tests.

     (iii)      Temperature: The Gas will not have a temperature less than the maximum temperature at which a hydrate will form, and in any event not less than ██████████ █████████████████████████

002562

     (iv)      Carbon Dioxide: The Gas will not contain more than ██████████

(v)    <u>Oxygen</u>: Producer will make every reasonable effort to keep the Gas free from oxygen. In any event, the Gas will not contain more than ███████████████████ ████████████████████.

(vi)    <u>Nitrogen</u>: The Gas will not contain more than ████████████████████ ████████.

(vii)    <u>Non-hydrocarbons</u>: The Gas will not contain more than ███████████████ ████████████████████ including, but not limited to, water, hydrogen sulfide, sulfur, carbon dioxide, oxygen, and nitrogen.

(viii)    <u>Water Vapor Content</u>: The Gas will be free of water and will not contain more than ███████████████████████████████████████████████████.

(ix)    <u>Objectionable Liquids and Solids and Dilution</u>: The Gas will be free of objectionable liquids and solids (including free water) and will be commercially free from dust, gums, gum-forming constituents, and other liquids or solid matter which become separated from the Gas in the course of gathering.

(x)    <u>Gross Heating Value</u>: The Gas will not have a Gross Heating Value less than ███████████████████████████████████████.

(xi)     <u>Hazardous Waste</u>: The Gas will not contain hazardous waste as defined in the Resources Conservation and Recovery Act of 1976, 42 USC § 690.1, et seq.

B.     Gatherer is not obligated to accept at the Receipt Point or deliver at the Delivery Points any Gas tendered by Producer that does not conform to the specifications set forth in this Schedule 3.2. The gas quality specifications set forth in this Schedule 4.2 are the minimum gas quality specifications that are in place as of the Effective Date of this Agreement for the Downstream Pipelines at the Delivery Points.  If the quality specifications of a Downstream Pipeline at a Delivery Point are modified from those in place as of the Effective Date of this Agreement, this Agreement will automatically be amended without further action of the Parties so that the minimum quality specifications set forth in this Schedule 3.2 conform to the modified quality specifications of any Downstream Pipeline.

C.     Producer will not knowingly deliver Gas to a Receipt Point that fails to meet one or more of the quality specifications set forth in this Schedule 4.2 without the express written consent of Gatherer.  If the Gas delivered at a Receipt Point fails to meet any of the quality specifications stated above, then Gatherer will notify Producer and Producer will make a commercially reasonable effort to correct the Off-Spec Gas.  Gatherer may refuse to accept Producer's Gas to the extent and for so long as Producer is unable to deliver Gas conforming to the applicable specifications. If Gatherer at any time accepts delivery of Off-Spec Gas, such acceptance does not constitute a waiver with respect to any future delivery of Off-Spec Gas.  **NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, IF PRODUCER'S OFF-SPEC GAS IS DELIVERED INTO THE GATHERING AND PROCESSING SYSTEM WITHOUT THE PRIOR EXPRESS APPROVAL OF GATHERER, AND THE QUALITY DEFICIENCY OF THAT GAS DAMAGES ANY PORTION OF THE GATHERING AND PROCESSING**

002564

**SYSTEM, PRODUCER SHALL REIMBURSE GATHERER FOR ALL DAMAGES CAUSED BY OR CONTRIBUTED TO BY SUCH OFF-SPEC GAS, INCLUDING, WITHOUT LIMITATION, PHYSICAL DAMAGE TO ANY PIPELINE OR APPURTENANT FACILITIES, AND DAMAGE TO GATHERER'S COMMERCIAL OPERATIONS, AND PRODUCER SHALL REIMBURSE GATHERER FOR ALL COSTS INCURRED BY GATHERER IN PURGING THE GATHERING AND PROCESSING SYSTEM AND IN OTHERWISE DEALING WITH THE OFF-SPEC GAS.**

D.      Any terms capitalized in this Schedule shall have the meaning set forth herein, or as indicated by the context, or as set forth in the body of the Agreement.

Schedule 6.1
to
GAS GATHERING AND PROCESSING AGREEMENT
Dated August 31, 2015
by and between
OKLAHOMA ENERGY ACQUISITIONS, LP
and
KINGFISHER MIDSTREAM LLC

SERVICE FEES

Any terms capitalized in this Schedule shall have the meaning set forth herein, or as indicated by the context, or as set forth in the body of the Agreement.

The Service Fee for gathering and processing Producer's Gas and delivering to nominated Delivery Points shall be calculated according to the following formula:

Service Fee = (Gathering Fee + Processing Fee + Dehydration Fee + Compression Fee + Gathering Capital Recovery Fee + Processing Capital Recovery Fee + NGL Transport Fee) X the Price Index + Other Fuel Fee

**Gathering Fee ($/MMBtu)**

A gathering fee of ███/MMBtu shall be assessed on Allocated CRP Volume.

002566

**Processing Fee ($/MMBtu)**

A processing fee of ███/MMBtu shall be assessed on Allocated CRP Volume.

**Dehydration Fee ($/MMBtu)**

A dehydration fee of ███/MMBTU shall be assessed on Allocated CRP Volume.

**Compression Fee ($/MMBtu)**

Gatherer shall install compression as necessary on Gathering and Processing System as provided in Section 4.4. For any volumes of Allocated CRP Volume a compression fee of ███/MMBtu per stage of compression shall be assessed.

**NGL Transport Fee ($/gallon)**

A transport fee per gallon of NGLs shall be assessed on Producer's Allocated Actual Quantities of NGLs. The NGL Transport Fee shall be ███ per gallon with respect to Producer's Allocated Actual Quantities of NGLs.

**Gathering Capital Recovery Fee ($/MMBtu)**

A Gathering Capital Recovery fee of $█████/MMBtu shall be assessed on Allocated CRP Volume until Gatherer has recovered █████ Gathering and Processing Capital Expenditures across all Service Fees.

**Processing Capital Recovery Fee ($/MMBtu)**

A Processing Capital Recovery fee of $█████/MMBtu shall be assessed on Allocated CRP Volume until Gatherer has recovered █████ Gathering and Processing Capital Expenditures across all Service Fees.

002569

**SCHEDULE 8.1**
**to**
**GAS GATHERING AND PROCESSING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**NOTICES**

**GATHERER:**

Notices & Correspondence:

    Kingfisher Midstream LLC
    c/o Asset Risk Management, LLC
    20329 State Highway 249, Suite 450
    Houston, TX 77070
    Attention: Paul Williams
    Phone: 281-655-3234
    Email: pwilliams@asset-risk.com

Scheduling Department:

    Kingfisher Midstream LLC
    c/o Asset Risk Management, LLC

002570

c/o Asset Risk Management, LLC
20329 State Highway 249, Suite 450
Houston, TX 77070
Attention: Gas Scheduling David Puglia
Phone: 281-655-3216
Email: dpuglia@asset-risk.com

Accounting Matters:

Kingfisher Midstream LLC
c/o Asset Risk Management, LLC
20329 State Highway 249, Suite 450
Houston, TX 77070
Attention: Gas Accounting Mamata Sharma
Phone: 281-655-3221

Payment by ACH:

ABA #:
Bank:
Account #:
Credit To:

[Continued on next page]

002571

**PRODUCER:**

Notices & Correspondence:

    Oklahoma Energy Acquisitions, LP
    c/o Alta Mesa Services, LP
    15021 Katy Freeway
    Suite 400
    Houston, TX 77094
    Attn: David McClure
    Phone: 281-530-0991
    Facsimile: 281-530-5278
    Email: dmcclure@altamesa.net

Billing:

    Oklahoma Energy Acquisitions, LP
    c/o Alta Mesa Services, LP
    15021 Katy Freeway
    Suite 400
    Houston, TX 77094
    Attn:  Michael A. McCabe
    Phone:  (281) 530-0991
    Facsimile: (281) 530-5278
    Email: mmccabe@altamesa.net

002572

Payment by ACH:

Bank:          Union Bank (MUFG)

Account Name:   Alta Mesa Services LP Funding Account

# EXHIBIT 2

*Execution Version*

# CRUDE OIL GATHERING AGREEMENT

## OKLAHOMA ENERGY ACQUISITIONS, LP

## AND

002575

**KINGFISHER MIDSTREAM, LLC**

**August 31. 2015**

002576

# TABLE OF CONTENTS

Article I

    Definitions and Interpretation ............................................................1
    Section 1.1    Definitions...................................................................1
    Section 1.2    Interpretation..............................................................6

Article II

    TERM ................................................................................................7
    Section 2.1    Term...........................................................................7

Article III

    CRUDE GATHERING SYSTEM........................................................7
    Section 3.1    Construction of Facilities...........................................7
    Section 3.2    Easements, Rights-of-Way and Fee Lands..................7
    Section 3.3    Dedication..................................................................7
    Section 3.4    Covenant Running With Land.....................................8
    Section 3.5    Covenant Not to Gather Crude Oil.............................9
    Section 3.6    Option to Expand Crude Gathering System................9
    Section 3.7    Title Warranty...........................................................10
    Section 3.8    Proceeds of Production..............................................10
    Section 3.9    Receipt Points and Central Receipt Points.................10
    Section 3.10    Additional Receipt Points; Obligation to Interconnect.............10

Section 3.11    Commingling...................................................................11

Article IV
              GATHERING AND DELIVERY...............................................11
    Section 4.1    Obligation to Gather; No Treating Services. ...................11
    Section 4.2    Scheduling..............................................................11
    Section 4.3    Separation and Storage. ...........................................12
    Section 4.4    Delivery of Crude. ...................................................12
    Section 4.5    Measurement, Equipment and Testing. ........................13
    Section 4.6    Quality..................................................................13
    Section 4.7    Delivery Pressure at Receipt Points..............................13
    Section 4.8    Operating Inventory. ...............................................13
    Section 4.9    Title and Risk of Loss. ............................................14

Article V
              CURTAILMENT AND MAINTENANCE.....................................14
    Section 5.1    Curtailment and Temporary Release of Crude Oil. ............14
    Section 5.2    Maintenance Events. ...............................................14

Article VI
              FEES AND PAYMENT ........................................................15
    Section 6.1    Fees. ....................................................................15

i

Section 6.2       Escalation. ...................................................................................15
Section 6.3       Billing and Payment. .....................................................................15
Section 6.4       Audit. .............................................................................................16
Section 6.5       Taxes. .............................................................................................16

Article VII

          INDEMNIFICATION. ....................................................................................16
Section 7.1       Indemnification. ............................................................................16
Section 7.2       Notification Obligation. ................................................................17

Article VIII

          FORCE MAJEURE ........................................................................................17
Section 8.1       Force Majeure. ..............................................................................17

Article IX

          DEFAULT AND TERMINATION .................................................................18
Section 9.1       Producer Events of Default. ..........................................................18
Section 9.2       Gatherer's Default Remedies Against Producer. ...........................18
Section 9.3       Gatherer Events of Default. ...........................................................18
Section 9.4       Producer's Default Rights Against Gatherer. .................................19

Article X

          LIMITATION OF LIABILITY .....................................................................19
Section 10.1      Limitation of Liability. ..................................................................19

Article XI MISCELLANEOUS

Section 11.1    Assignment. ..................................................................19
Section 11.2    Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury Trial. ...19
Section 11.3    Dispute Resolution. .........................................................20
Section 11.4    Notices. ........................................................................20
Section 11.5    Survival. .......................................................................20
Section 11.6    No Joint Venture. ...........................................................20
Section 11.7    Entire Agreement. ..........................................................20
Section 11.8    No Third Party Beneficiaries. ...........................................21
Section 11.9    Confidentiality. ..............................................................21
Section 11.10   Regulatory Matters. ........................................................21
Section 11.11   Execution in Counterparts. ...............................................22


Schedule 3.3        Dedicated Area
Schedule 3.4        Form of Memorandum of Crude Oil Gathering Agreement
Schedule 3.9        Receipt Points
Schedule 3.10(a)    Designation of Additional Receipt Point
Schedule 4.4(a)     Schematic of Delivery Point
Schedule 4.5(a)     Measurement, Equipment and Testing
Schedule 4.6        Specifications

ii

002580

Schedule 11.4        Notices

iii

## CRUDE OIL GATHERING AGREEMENT

This **Crude Oil Gathering Agreement** (this "*Agreement*") is made and entered into as of the 31st day of August, 2015 (the "*Effective Date*"), by and between Oklahoma Energy Acquisitions, LP, a Texas limited partnership ("*Producer*"), and Kingfisher Midstream LLC, a Delaware limited liability company ("*Gatherer*"). Producer and Gatherer may be referred to each individually as "*Party,*" or collectively as the "*Parties*."

## RECITALS

**WHEREAS**, Producer owns, controls or may acquire certain mineral interests and hydrocarbon reserves (collectively, the "*Producer's Interests*," as further defined below), and controls the mineral interests of others (collectively, the "*Other Interests*," as further defined below) in certain lands in Kingfisher, Logan, Canadian, Blaine and Garfield Counties, Oklahoma, described more particularly on **Schedule 3.3** attached hereto (the "*Dedicated Area*"); and

**WHEREAS**, Producer has or contemplates having a supply of crude oil (the "*Crude Oil*") from present and future wells located in the Dedicated Area and desires to Dedicate (as defined below) the Producer's Interests and Other Interests, and deliver such Crude Oil (the "*Committed Crude*") to Gatherer for gathering; and

**WHEREAS**, Gatherer shall construct, own and operate Crude Oil gathering facilities (collectively, the "*Crude Gathering System*," as further defined below) capable of receiving from Producer deliveries of the Committed Crude from the Dedicated Area and subject to the

Dedication; and

**WHEREAS**, Producer desires that Gatherer provide gathering services as set forth in this Agreement, and Gatherer desires to provide to Producer gathering services in accordance with the terms and conditions set forth in this Agreement; then

**THEREFORE**, for and in consideration of the mutual covenants set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

# ARTICLE I
# DEFINITIONS AND INTERPRETATION

## Section 1.1    Definitions.

The following terms shall have the following meanings unless otherwise indicated:

"***Additional Capacity***" has the meaning set forth in Section 3.6.

"***Additional Receipt Point***" has the meaning set forth in Section 3.10(a).

"***Affiliate***" means with respect to a Person, any Person which, directly or indirectly, controls, is controlled by or is under common control with such Person or such Person's

1

members or shareholders. For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such individual or entity, whether through the ownership of voting securities, by contract or otherwise, *provided, however*, that for purposes of this Agreement, Producer and Gatherer shall not be considered Affiliates of each other.

"*After-Acquired Interests*" has the meaning set forth in Section 3.3.

"*Agreement*" has the meaning set forth in the introductory paragraph.

"*Applicable Law*" means any applicable statute, law principle of common law, rule, regulation, judgment, order, ordinance, requirement, code, writ, injunction, or decree of any Governmental Authority.

"*Barrel*" or "*bbl*" means forty-two (42) gallons of 231 cubic inches per gallon at 60 degrees Fahrenheit (60° F).

"*Business Day*" means any day, other than a Saturday or Sunday, that commercial banks in Houston, Texas are open for business.

"*C&O Agreement*" means that certain Operating and Construction Management Agreement dated as of August 31, 2015, by and between the Gatherer and Asset Risk Management, LLC and relating to the construction and operation of the Crude Gathering System, as the same may be amended, restated, modified or otherwise supplemented.

002585

"***Central Receipt Point***" and "***CRP***" has the meaning set forth in Section 3.9.

"***Claims***" means any and all demands, claims, judgments, obligations, liabilities, liens, causes of action, lawsuits, arbitrations, mediations, investigations or proceedings (whether at law or in equity).

"***Committed Crude***" has the meaning set forth in the Recitals.

"***Confidential Information***" has the meaning set forth in Section 11.9.

"***Contract Year***" means each calendar year during the Term, the first of which shall commence on the Effective Date and run through December 31 of that year, and then from January 1 through December 31 for each subsequent year thereafter, but for the last Contract Year, from January 1 through the date that this Agreement terminates or expires.

"***Crude Gathering System***" has the meaning set forth in the Recitals, and further means the (i) Gathering Pipelines, (ii) Storage Facilities, and (iii) custody transfer units, crude pumps, meters or measurement facilities, and (iv) any other equipment or appurtenances associated with the foregoing.

"***Crude Oil***" has the meaning set forth in the Recitals.

"***Curtailment Event***" has the meaning set forth in Section 5.1.

2

"***Curtailment Period***" has the meaning set forth in Section 5.1.

"***Dedicated Area***" has the meaning set forth in the Recitals, as further specifically set forth on **Schedule 3.3**.

"***Dedicated Wells***" has the meaning set forth in Section 3.3(b).

"***Dedication***" means either the Primary Term Dedication or the Extended Term Dedication, as applicable, based upon the relevant determination time.

"***Delivered Crude***" means the quantity of Crude Oil in bbl that is delivered by Gatherer to Producer at the Delivery Point.

"***Delivery Point***" has the meaning set forth in Section 4.4(a).

"***Dispute***" has the meaning set forth in in Section 11.3.

"***Effective Date***" has the meaning set forth in the introductory paragraph.

"***Extended Term***" has the meaning set forth in Section 2.1.

"***Extended Term Dedication***" has the meaning set forth in Section 3.3(b).

"***FERC***" means the Federal Energy Regulatory Commission, or any successor Governmental Authority.

"***Firm***" means a gathering and transportation service that is not subject to being curtailed, interrupted, pro rated or suspended except as expressly provided in this Agreement.

"***Flare Gas***" has the meaning set forth in Section 4.3(a).

"***Force Majeure***" has the meaning set forth in Section 8.1.

"***Force Majeure Event***" has the meaning set forth in Section 8.1.

"***GAAP***" means generally accepted accounting principles in the United States.

"***Gatherer***" has the meaning set forth in the introductory paragraph.

"***Gatherer Event of Default***" has the meaning set forth in Section 9.3.

"***Gatherer Group***" means any or all of (i) Gatherer, (ii) Gatherer's Affiliates, (iii) any or their respective contractors, and (iv) the officers, directors, employees, agents, advisors, counsel, consultants, members, shareholders, insurers, invitees or representatives of any of the foregoing.

"***Gathering Capital Expenditures***" means all expenditures, costs and expenses incurred by or on behalf of Gatherer with respect to the Crude Gathering System, including costs of rights-of-way and other easements, labor, pipelines, metering and measurement, crude pumps, Storage Facilities, and related expenditures, that are capitalized on the books and records of

3

Gatherer with respect to the Crude Gathering System according to GAAP, but specifically excluding all expenditures, costs and expenses incurred by or on behalf of Gatherer with respect to any expansion of the Crude Gathering System to gather third party volumes of Crude Oil that are not attributable to the Interests, provided, however, that in the event that Gatherer undertakes any expansion of the Crude Gathering System to gather third party volumes of crude oil that are not attributable to the Interests, and Producer thereafter makes use of the Crude Gathering System so expanded to accommodate third party volumes of crude oil to gather Committed Crude, then Producer's pro rata share of all expenditures, costs and expenses of the expansion shall constitute "Gathering Capital Expenditures" to the extent agreed upon by the Parties at the time of Producer's connection to such extension, and, provided, further, that this right and obligation of Producer shall not be in derogation of any of the rights and obligations of the Parties under Section 3.6.

"***Gathering Capital Recovery Fee***" has the meaning set forth in Section 6.1(b).

"***Gathering Fee***" has the meaning set forth in Section 6.1(a).

"***Gathering Pipelines***" means the pipelines of various diameters interconnecting the Receipt Point(s) to the Delivery Point.

"***Governmental Approval***" means any permit, license, permission, grant or other similar authorization issued by, or required to be issued by, any Governmental Authority and necessary for the performance of the Parties hereunder.

"***Governmental Authority***" means any federal, state, county, parish, municipal or other

002589

governmental subdivision, or any court or any governmental department, commission, board, bureau, agency or other instrumentality of any federal, state, county, municipal or other governmental subdivision within the United States of America with authority over the Parties and subject matter in question.

"***Indemnified Party***" has the meaning set forth in Section 7.2.

"***Indemnifying Party***" has the meaning set forth in Section 7.2.

"***In-Service Date***" means the first day of the first full month following the date that Gatherer notifies Producer that the Crude Gathering System, or any Additional Capacity, if applicable, has been completed and is ready to receive Committed Crude and ready to redeliver it to Producer at the Delivery Point.

"***Interests***" means Producer's Interests, After-Acquired Interests and Other Interests.

"***Line Fill***" has the meaning set forth in Section 4.8(a).

"***Losses***" means any and all losses, damages, costs, expenses, liabilities, fines, penalties or judgments of whatever kind or character incurred by a Person or Party with respect to a Claim, including reasonable attorneys' fees, court costs and other reasonable costs and expenses of litigation as such may be awarded by a court.

4

"***Maintenance Event***" has the meaning set forth in Section 5.2.

"***Notice***" has the meaning set forth in Section 11.4.

"***Off-Spec Crude Oil***" has the meaning set forth in Section 4.6.

"***Other Fuel***" means electricity consumed in the operation of the Crude Gathering System.

"***Other Fuel Fee***" means Producer's allocated share of the actual cost of Other Fuel.

"***Other Interests***" has the meaning set forth in the Recitals, and further means the interests of Persons in the Dedicated Area other than Producer, but whose interests are represented or controlled by Producer, such working interests, royalty interests, overriding royalty interests, net profits interests or other mineral interests.

"***Overdue Rate***" means a rate per annum equal to the lesser of (i) an annual rate equal to four percent (4%) per annum above the "prime rate" specified under the caption "Money Rates" in the *Wall Street Journal* (New York Edition) on the date such payment was required to have been made, or (ii) the maximum rate of interest permitted by Applicable Law.

"***Party***" and "***Parties***" have the meaning set forth in the introductory paragraph.

"***Person***" means any individual, firm, corporation, trust, partnership, limited liability company, association, joint venture, other business enterprise or Governmental Authority.

"***Pipeline Loss Allowance***" has the meaning set forth in Section 4.9.

"***Price Index***" has the meaning set forth in Section 6.2.

"***Primary Term***" has the meaning set forth in Section 2.1.

"***Primary Term Dedication***" has the meaning set forth in Section 3.3(a).

"***Produced Water***" has the meaning set forth in Section 4.3(c).

"***Producer***" has the meaning set forth in the introductory paragraph.

"***Producer Capacity***" has the meaning set forth in Section 3.6.

"***Producer Event of Default***" has the meaning set forth in Section 9.1.

"***Producer Group***" means any or all of (i) Producer, (ii) Producer's Affiliates, (iii) Producer's contractors and suppliers, of every tier, other than the Gatherer Group, and (iv) the officers, directors, employees, agents, advisors, counsel, consultants, members, shareholders, insurers, invitees or representatives of any of the foregoing.

5

"**_Producer's Interests_**" has the meaning set forth in the Recitals, and further means all mineral interests in lands, leases, wells and Crude Oil that Producer owns or controls in the Dedicated Area.

"**_Receipt Point_**" has the meaning set forth in Section 3.9.

"**_Received Crude_**" means the quantity of Crude Oil in bbl that is delivered by Producer to Gatherer at a Receipt Point.

"**_Scheduled Crude_**" has the meaning set forth in Section 4.2(a).

"**_Separator_**" has the meaning set forth in Section 4.3(a).

"**_Service Fees_**" means Gathering Fee and Gathering Capital Recovery Fee.

"**_Specifications_**" has the meaning set forth in Section 4.6.

"**_Storage Facilities_**" has the meaning set forth in Section 4.3(f).

"**_System Capacity_**" means the then-maximum capacity of the Crude Gathering System to gather Committed Crude, which shall in no event be less than fifty thousand (50,000) Barrels per day.

"**_Tank Bottoms_**" has the meaning set forth in Section 4.8(b).

"**_Tax_**" means any current or future taxes, fees, levies, charges, assessments and/or other

002593

impositions levied, charged, imposed, assessed or collected by any Governmental Authority having jurisdiction.

"*Term*" means the Primary Term and any Extended Term.

### Section 1.2    Interpretation.

All references to any agreement or document shall be construed as of the particular time that such agreement or document may then have been executed, amended, varied, supplemented or modified. Terms defined in this Agreement shall have the meanings given therein when used elsewhere in this Agreement. References in the singular shall include the plural, and references to the masculine shall include the feminine, and vice versa. Words denoting natural persons shall include partnerships, firms, companies, corporations, joint ventures, trusts, associations, organizations or other entities. References to a particular article, section, subsection, paragraph, subparagraph or schedule, if any, shall be a reference to such article, section, subsection, paragraph, subparagraph or schedule in and to this Agreement. The words "include" and "including" shall include the phrase "not limited to." Any reference to a Person shall include that Person's successors and assigns or to any Person succeeding to that Person's functions. Any Schedules are fully incorporated and made part of this Agreement. The Schedules shall be read in conjunction with the provisions of the body of this Agreement, and the Schedules and the body of this Agreement shall be interpreted to give effect to the intent of the Parties as evidenced by their terms when taken as a whole, *provided, however*, that in the event of an express and

6

irreconcilable conflict between the terms of a Schedule and the provisions of the body of this Agreement, the provisions of the body of this Agreement shall control. Capitalized terms appearing in a Schedule shall have the meanings set forth in Section 1.1, unless the context requires otherwise.

**ARTICLE II**
**TERM**

**Section 2.1     Term.**

This Agreement is effective as of the Effective Date, and, unless earlier terminated in accordance with any express provision of this Agreement, shall remain in full force and effect for a period of fifteen (15) years from the In-Service Date (the "***Primary Term***"), *provided, however*, that, to the extent that at the end of the Primary Term there are wells then-connected to the Crude Gathering System and then-producing Crude Oil in commercial (paying) quantities, the Term of this Agreement shall extend for so long as such well(s) continue to produce Crude Oil in commercial (paying) quantities (the "***Extended Term***").

**ARTICLE III**
**CRUDE GATHERING SYSTEM**

**Section 3.1     Construction of Facilities.**

Gatherer shall, at its sole cost and expense, design, engineer, construct, equip and modify, or caused to be designed, engineered, constructed, equipped and modified, the Crude Gathering

002595

System. Gatherer shall exercise commercially reasonable efforts to (a) achieve the Partial Commercial Operation Date (as defined in the C&O Agreement) by the date that is six months after the Effective Date and (b) achieve the Final Commercial Operation Date (as defined in the C&O Agreement) by the date that is twelve months after the Effective Date.

### Section 3.2    Easements, Rights-of-Way and Fee Lands.

To the extent that (a) Producer may do so in compliance with all applicable agreements, and (b) Gatherer's activities on the relevant lands do not unreasonably interfere with Producer's operations, Producer shall, where reasonably requested by Gatherer, (i) convey or assign to Gatherer, to the extent that Producer may do so without payment of monies (unless Gatherer agrees to pay), any easements or rights-of-way for purposes of constructing, owning, operating, repairing, replacing and maintaining any portion of the Crude Gathering System, and (ii) lease to Gatherer, at a price and upon terms as may be then agreed, such fee lands, or portions thereof, owned by Producer, for purposes of constructing, owning, operating, repairing, replacing and maintaining the Crude Gathering System.

### Section 3.3    Dedication.

(a)    For the Primary Term of this Agreement, Producer hereby dedicates to Gatherer all Interests within the Dedicated Area shown on **Schedule 3.3** (the "***Primary Term Dedication***") and shall deliver to Gatherer at the Receipt Point(s) all Committed Crude produced therefrom, *provided* that notwithstanding such Primary Term Dedication,

7

Producer shall have the right to (i) administer the Interests as it deems advisable in its sole discretion, including the right to rework, shut in, plug or abandon any well, (ii) form or participate in the formation of any unit, (iii) to use Crude Oil in its operations, and (iv) deliver Crude Oil that Producer is expressly required to deliver under oil and gas leases, contractual agreements or other legal rights under which Committed Gas is produced. If, after the Effective Date, Producer or any of its Affiliates acquire mineral interests, including by way of joint venture participation, drill-to-earn rights or other means, within the Dedicated Area (the "***After-Acquired Interests***"), then the After-Acquired Interests and all Crude Oil produced therefrom shall automatically be included in the Primary Term Dedication and become Committed Crude; *provided, however*, if any of the After-Acquired Interests or Crude Oil produced therefrom are subject to a prior written dedication or commitment for gathering as of the time of acquisition by Producer, then that Crude Oil will be excluded from the Primary Term Dedication until the prior dedication or commitment terminates or expires, at which time such Crude Oil shall become Committed Crude, *provided further* that if, with respect to any After-Acquired Interests, Producer has the right or ability, without payment of any material fee or penalty, or incurring any other material disadvantage, to terminate any such prior dedication or commitment with respect to the After-Acquired Interests, then Producer shall terminate such dedication or commitment as soon as reasonably practicable. Producer shall promptly notify Gatherer in writing of any such termination, and identify the After-Acquired Interests.

(b)    For the Extended Term of this Agreement, Producer hereby dedicates to Gatherer all of the wells that constitute Interests and are connected to the Crude Gathering System at the end of the Primary Term (such wells, the "***Dedicated Wells***", and

002597

Gathering System at the end of the Primary Term (such wells, the "**_Dedicated Wells_**", and such dedication, the "**_Extended Term Dedication_**") and shall deliver to Gatherer at the Receipt Point(s) all Committed Crude produced therefrom; *provided* that notwithstanding such Extended Term Dedication, Producer shall have the right to (i) administer the Dedicated Wells as it deems advisable in its sole discretion, including the right to rework, shut in, plug or abandon any Dedicated Well, (ii) form or participate in the formation of any unit, (iii) to use Crude Oil in its operations, and (iv) deliver Crude Oil that Producer is expressly required to deliver under oil and gas leases, contractual agreements or other legal rights under which Committed Crude is produced.  From and after the end of the Primary Term all Interests within the Dedicated Area other than the Dedicated Wells shall be permanently released from the Dedication, and Producer may take the volumes produced from such Interests (other than the Dedicated Wells) elsewhere.

**Section 3.4    Covenant Running With Land.**

For the Term of this Agreement, this Agreement shall be a covenant running with the land and the Interests and any After-Acquired Interests.  Contemporaneously with the execution of this Agreement, and from time-to-time during the Term if necessary, the Parties shall each execute for recordation in the public records of the Dedicated Area a "short form" memorandum of this Agreement in the form of **Schedule 3.4** attached hereto, identifying the Dedicated Area, the Interests, After-Acquired Interests and wells thereon.  Producer shall cause any conveyance of all or any of the Interests or After-Acquired Interests, or Crude Oil therefrom, to be made expressly subject to this Agreement, and to cause all transferees to execute a written instrument

8

in a form reasonably satisfactory to Gatherer acknowledging the Dedication and such transferees' obligations under this Agreement.  Gatherer shall likewise cause any assignment or conveyance of all or any segment of the Crude Gathering System to be made expressly subject to this Agreement, and to cause all transferees to execute a written instrument in a form reasonably satisfactory to Producer acknowledging the Dedication and such transferees' obligations under this Agreement.

**Section 3.5     Covenant Not to Gather Crude Oil.**

Producer shall not gather or dispose of Committed Crude, or allow Committed Crude to be gathered or disposed of, prior to delivery to Gatherer at the Receipt Point(s).

**Section 3.6     Option to Expand Crude Gathering System.**

Gatherer shall gather all volumes of Committed Crude up to fifty thousand (50,000) Barrels per day on a Firm basis (the "***Producer Capacity***").  All volumes of Committed Crude above the Producer Capacity shall at all times be Committed Crude.  To the extent that Committed Crude shall exceed the Producer Capacity, Gatherer shall have the option to (a) utilize any available System Capacity in excess of the Producer Capacity on a Firm basis, (b) contract with third Persons to gather such Committed Crude, or (c) expand the Crude Gathering System as many times as necessary by adding additional System Capacity (the "***Additional Capacity***").  In the event that production from the Interests shall exceed the Producer Capacity, Producer shall provide Notice to Gatherer that production exceeds the Producer Capacity, and Gatherer shall provide Notice to Producer within sixty (60) days of Gatherer's receipt of Producer's Notice that Gatherer that will or will not accept such volumes of Committed Crude or

add Additional Capacity. In the event that Gatherer provides Notice to Producer that it will not accept such volumes of Committed Crude above the Producer Capacity or add Additional Capacity, then the acreage from which the volumes of Committed Crude above the Producer Capacity are directly produced shall be released from the Dedication, and Producer may take such volumes of Committed Crude elsewhere. In the event that Gatherer provides Notice to Producer that it will accept such volumes of Committed Crude above the Producer Capacity or add Additional Capacity, then, until Gatherer is able to gather such Committed Crude, or until the In-Service Date for such Additional Capacity, Producer may deliver any volumes of Committed Crude above the Producer Capacity elsewhere, *provided* that once Gatherer is able to gather such volumes of Committed Crude, all such volumes of Committed Crude shall be delivered to Gatherer at a Receipt Point. **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, PRODUCER'S RIGHT TO TAKE THE AFFECTED VOLUMES OF COMMITTED CRUDE ELSEWHERE DURING ANY PERIOD WHERE GATHERER REFUSES TO TAKE VOLUMES OF PRODUCER'S COMMITTED CRUDE THAT EXCEED THE PRODUCER CAPACITY, AND THE RELEASE FROM DEDICATION, IF APPLICABLE, SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY, AT LAW OR IN EQUITY, WITH RESPECT TO GATHERER'S INABILITY OR REFUSAL TO TAKE VOLUMES OF COMMITTED CRUDE THAT EXCEED THE PRODUCER CAPACITY**.

9

**Section 3.7     Title Warranty.**

Producer represents and warrants to Gatherer that:  (i) it owns, or has the right to dedicate all Interests and Committed Crude dedicated under this Agreement, and to deliver Committed Crude to the Receipt Point(s), free and clear of all liens, encumbrances and Claims, (ii) there are no prior dedications or commitments covering any Interests or Committed Crude produced from the Interests within the Dedicated Area.  Producer shall defend, indemnify, protect and hold harmless Gatherer from and against all Claims arising out of any breach of such representation and warranty.

**Section 3.8     Proceeds of Production.**

Producer shall make payment of all royalties, overriding royalties, production payments, and all other payments attributable to the Interests and Committed Crude due to any Person under any leases or agreements in accordance with the terms thereof, and Gatherer shall have no obligations with respect thereto.

**Section 3.9     Receipt Points and Central Receipt Points.**

Producer shall install one or more central receipt points (each, a "***Central Receipt Point***" or "***CRP***"), where production from multiple wells is aggregated into a single physical connection to the Crude Gathering System.  Producer shall connect each CRP to the Crude Gathering System, and the "***Receipt Point***" for Received Crude shall be the point of interconnection between a CRP and the inlet flange of the Crude Gathering System.  The proposed design and a list of initial Receipt Points are set forth in **Schedule 3.9**.

(a)     Producer shall have the right to designate additional Receipt Points (each an "**_Additional Receipt Point_**"), subject to Gatherer's prior approval, for the purpose of connecting additional wells to the Crude Gathering System, either by construction of an additional CRP or by interconnection of a well to the Crude Gathering System, *provided* that Producer shall have given Gatherer prior Notice, in the form set forth in **Schedule 3.10(a)**, of such Additional Receipt Points, and that incremental volumes of Committed Crude added to the Crude Gathering System will not cause the volumes of Committed Crude to exceed the then-System Capacity of the Crude Gathering System.

(b)     Upon Gatherer's receipt of any Notice from Producer under subsection (a) above, Gatherer shall have thirty (30) days from its receipt of any such Notice to provide return Notice to Producer that Gatherer will or will not interconnect such Additional Receipt Points.

(c)     In the event that Gatherer provides Notice to Producer that Gatherer will make a requested interconnection for such Additional Receipt Point, then Gatherer shall make such interconnection to the Agreement as soon as reasonably practicable, but in no event more than ▮▮▮▮▮▮ days from Gatherer's Notice to Producer.

10

002602

(d)     In the event that Gatherer provides Notice to Producer that Gatherer will not make a requested interconnection for such Additional Receipt Point, then the well in question shall be released from the Dedication.  **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, THE RELEASE FROM DEDICATION SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY, AT LAW OR IN EQUITY, WITH RESPECT TO GATHERER'S REFUSAL TO INTERCONNECT AN ADDITIONAL RECEIPT POINT**.

**Section 3.11    Commingling.**

Received Crude may represent only a portion of Crude Oil on the Crude Gathering System, which may be used by other customers.  Subject to its obligations with respect to delivery of Delivered Crude, Gatherer shall have the right to commingle Received Crude with Crude Oil from other customers.

**ARTICLE IV**
**GATHERING AND DELIVERY**

**Section 4.1    Obligation to Gather; No Treating Services.**

Commencing on the In-Service Date, Producer shall deliver or cause to be delivered to the Receipt Point(s) all Committed Crude.  Gatherer shall, on a Firm basis up to the Producer Capacity, receive Delivered Crude from Producer at the Receipt Point(s) (as set forth in Section 3.9 and in **Schedule 3.9**) and transport Received Crude to the Separator, Storage Facilities and

Delivery Point (each defined below), as applicable. If Gatherer enters into any gathering, transportation or marketing Documents agreement with any third party pursuant to which Crude Oil is received by Gatherer on the Crude Gathering System on a Firm basis, Gatherer shall deliver to Producer a written notice of such agreement that describes the material terms thereof. Gatherer shall provide no treating services for which there is no treating fee expressly provided in Section 6.1, such as treatment for sour Crude Oil/ hydrogen sulfide ($H_2S$) or other contaminants or metals, or removal of inert gases or any other contaminants.

**Section 4.2      Scheduling.**

(a)      Not later than the 15th day of a month, Producer shall deliver to Gatherer a Notice indicating the total volumes of Crude Oil expected to be delivered by Producer for gathering the following month (the "***Scheduled Crude***"). The Parties shall coordinate their respective scheduling activities to take into account the needs of downstream transportation resources. If Producer becomes aware that actual deliveries of Committed Crude to the Receipt Point(s) vary by more than five (5%), greater or lesser, of Scheduled Crude, then Producer shall promptly provide Notice to Gatherer, and if Producer fails to give Gatherer any Notice required by this subsection, and Gatherer thereafter incurs any costs or expenses as a result of such a variance from Scheduled Crude of which Gatherer should have received Notice, then Producer shall reimburse Gatherer for such costs or expenses.

11

(b)     Producer shall provide Gatherer with at least three (3) days advance written Notice of the arrival of Producer's downstream transportation at the Delivery Point to receive Delivered Crude in accordance with Section 4.4 below.

**Section 4.3     Separation and Storage.**

(a)     At the Storage Facilities (defined below), Gatherer shall separate natural gas from the Crude Oil through a 2-phase separator unit upstream of the Delivery Point (the "*Separator*").

(b)     Natural gas separated from the Crude Oil (the "*Flare Gas*") shall be flared by Gatherer.

(c)     Producer shall be financially responsible for disposal of water separated from the Crude Oil (the "*Produced Water*") at the Separator drain or at the Storage Facility water sump connection drain.  Gatherer shall dispose of Produced Water in its discretion either by trucking or by interconnection to Producer's disposal system for Produced Water.

(d)     All Producer-arranged transportation shall comply with all site rules and directives of Gatherer in entering, loading while there and exiting Gatherer's premises.

(e)     As needed, Gatherer shall be granted an irrevocable right to interconnect to Producer's disposal system for Produced Water.  Produced Water injected into Producer's disposal system shall be disposed of by Producer at no cost to Gatherer.

tanks or other facilities within the Crude Gathering System for the purpose of gathering and storage of Committed Crude (the "***Storage Facilities***"), or (ii) the Delivery Point (as defined in Section 4.4 below).

**Section 4.4    Delivery of Crude.**

(a)    Provided that Gatherer shall have received proper Notice under Section 4.2(b) above, Gatherer shall deliver to Producer Delivered Crude FOB Producer's transportation at the outlet flange of the transfer meter connected to the Storage Facilities, as shown more particularly on **Schedule 4.4(a)** (the "***Delivery Point***").

(b)    Producer shall be solely responsible for all arrangements for transportation of Delivered Crude from the Delivery Point. If Producer becomes aware or should have become aware of delays with respect to any scheduled transportation for Delivered Crude, then Producer shall promptly provide Notice to Gatherer, and if Producer fails to give Gatherer any Notice required by this Section, and Gatherer thereafter incurs any costs or expenses as a result of such a delay with respect to transportation of which Gatherer should have received Notice, then Producer shall reimburse Gatherer for such costs or expenses.

12

(c)     All Producer-arranged transportation shall comply with all site rules and directives of Gatherer in entering, loading while there and exiting Gatherer's premises, including that all trucks shall be NSPS Level Tested trucks.

**Section 4.5    Measurement, Equipment and Testing.**

(a)     Producer shall be responsible for measurement, equipment and testing at the CRPs, and Gatherer shall be responsible for measurement, equipment and testing downstream of the CRPs, each in accordance with the protocols set forth on **Schedule 4.5(a)**.

(b)     Subject to Producer's safety rules, regulations and procedures, Producer hereby grants to Gatherer, and Gatherer's contractors or agents, a right of entry onto any of the lands covered by the Interests and access to the Producer side of a CRP, as necessary for the purpose of any sampling of Crude Oil to determine quality in accordance with Section 4.6 below, and shall facilitate, as necessary, access with surface owners where requested by Gatherer.

**Section 4.6    Quality.**

Crude Oil delivered by Producer at the Receipt Points shall meet or exceed the quality requirements set forth in **Schedule 4.6** (the "***Specifications***").  Gatherer shall have a right to reject all Crude Oil delivered by Producer that does not meet the Specifications ("***Off-Spec Crude Oil***"), *provided* that such Off-Spec Crude Oil shall not be released from the Dedication. Crude Oil delivered to Producer at the Delivery Point shall be of a substantially similar grade and

quality to that of Received Crude.

**Section 4.7    Delivery Pressure at Receipt Points.**

Producer shall deliver Crude Oil at the Receipt Points at a pressure sufficient to enter the Crude Gathering System and not to exceed the maximum allowable operating pressure of the Crude Gathering System at such points, but in no event to exceed ███████████████ psig.

**Section 4.8    Operating Inventory.**

Producer shall provide, at no cost to Gatherer, Crude Oil as:

(a)    line fill (the "***Line Fill***") needed to make and keep the Crude Gathering System operational; and

(b)    fill for any Storage Facility necessary to float tank roofs to working levels or to safely operate fixed roof tanks (the "***Tank Bottoms***").

(c)    Line Fill and Tank Bottoms shall not be considered transportable volumes.

(d)    Producer's obligation for Line Fill and Tank Bottoms shall be *pro rata* with any third party volumes of Crude Oil gathered on the Crude Gathering System, and, to the extent that Producer has provided all Line Fill and Tank Bottoms, Producer shall be

13

credited for any Line Fill and Tank Bottom volumes attributable to third party volumes of Crude Oil brought onto the Crude Gathering System.

**Section 4.9    Title and Risk of Loss.**

Title to Crude Oil and Produced Water shall always vest in Producer.  Risk of loss shall always be with Producer except when Gatherer is in possession of Crude Oil, in which case risk of loss shall be with Gatherer, *provided* that in no event shall Gatherer be responsible for any lost volumes of (i) Flare Gas or Produced Water, at any point, or (ii) Crude Oil between the Receipt Point(s) and Delivery Point due to (A) evaporation less than or equal to ███████████████ of the volume(s) delivered (the "***Pipeline Loss Allowance***"), or (B) shrinkage in volume of Crude Oil due to separation of Flare Gas and Produced Water.

**ARTICLE V**
**CURTAILMENT AND MAINTENANCE**

**Section 5.1    Curtailment and Temporary Release of Crude Oil.**

If for any reason, including Force Majeure or a Maintenance Event, but not for the reasons set forth in Section 3.6, Gatherer needs to curtail receipt, gathering or delivery of Crude Oil on the Crude Gathering System (each, a "***Curtailment Event***"), (i) Crude Oil deliveries from all Persons that are receiving service on an interruptible basis or non-Firm basis shall be curtailed prior to any curtailment or interruption of Committed Crude, and (ii) to the extent a third party is receiving service on a Firm basis in accordance with Section 4.1, Producer and such third party shall be curtailed on a pro rata basis (based on volumes of Crude Oil delivered to the Crude

Gathering System).  Prior to the In-Service Date, and at any time after the In-Service Date where Gatherer is unable to accept some or all Committed Crude as a result of a Curtailment Event, Producer shall be free to dispose of such affected volumes under other arrangements during such Curtailment Event (the "**Curtailment Period**").  Gatherer shall notify Producer as soon as reasonably practicable of the circumstances of any Curtailment Event and the beginning and end of any Curtailment Period.  As soon as reasonably practicable after receiving notice of the end of the Curtailment Period, all Committed Crude shall again be subject to the Dedication.  **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, GATHERER'S TEMPORARY RELEASE AND PRODUCER'S RIGHT TO MAKE OTHER ARRANGEMENTS WITH RESPECT TO SUCH AFFECTED VOLUMES SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY AVAILABLE TO PRODUCER, AT LAW OR IN EQUITY, WITH RESPECT TO SUCH AFFECTED VOLUMES**.

### Section 5.2    Maintenance Events.

Gatherer may, without liability to Producer, interrupt the operation of the Crude Gathering System for the purpose of performing inspections, pigging, maintenance, testing, alterations, modifications, expansions, connections, repairs or replacements (each, a "**Maintenance Event**"), but such interruption shall be for only such time as may be reasonably necessary.  Gatherer shall give Producer advance written notice of its intention to interrupt operations and of the estimated time thereof, but not less than 24 hours advance notice, except in

14

002610

case of emergency.  Any such Maintenance Events shall not constitute Force Majeure Events, unless such Maintenance Events otherwise meet the definition of a Force Majeure Event.

## ARTICLE VI
## FEES AND PAYMENT

**Section 6.1    Fees.**

Producer shall pay to Gatherer the following fees:

(a)    ███████████ per Barrel of Received Crude for gathering   (the "***Gathering Fee***");

(b)    ███████████ per Barrel of Received Crude for capital recovery of the Crude Gathering System (the "***Gathering Capital Recovery Fee***"), payable until Gatherer has recovered 1.2X Gathering Capital Expenditures in total accumulated Service Fees; and

(c)    the Other Fuel Fee, if applicable.

**Section 6.2    Escalation.**

Commencing with the ███████████ and on January 1 of each Contract Year thereafter, each fee set forth in this Agreement shall be automatically adjusted upward by the

**Section 6.3     Billing and Payment.**

(a)     As soon as reasonably practicable after the end of each month, Gatherer shall render to Producer a statement for the preceding month, setting forth: (i) the total Barrels of Committed Crude received by Gatherer at the Receipt Points and redelivered to the Delivery Point, (ii) the number of Barrels representing the Pipeline Loss Allowance, Line Fill, Tank Bottoms and any other deductions allowed hereunder, (iii) the listing of the fees charged as permitted by Article 6.1 of this Agreement, and (iv) the net amount due Gatherer from Producer.

(b)     Producer shall pay to Gatherer the full amount due not later than the earlier of (i) fifteen (15) days from Producer's receipt of Gatherer's statement, or (ii) the last day of month following the statement month, *provided* that if such day is not a Business Day, then on the next Business Day.  Any past due amounts shall bear interest at the Overdue Rate from the date due until paid.

(c)     If Producer disputes all or a portion of any statement or amount due, it shall pay the undisputed portion, if any, of any such statement, and shall provide Notice to Gatherer of the specific basis for the dispute, including all supporting information, as soon as practicable after becoming aware of the basis for the dispute.  If after resolution

15

of such dispute it is determined that any of the amount in dispute is due and owing, such amount(s) shall bear interest at the Overdue Rate from the date originally due until paid. In no event shall any statement or invoice be subject to dispute beyond two (2) years from the date of such statement or invoice.

**Section 6.4     Audit.**

Each Party shall have the right, upon reasonable advance Notice, during normal business hours and not more than two (2) times per Contract Year, at its sole expense and either itself or through its representatives, to audit the books and records of the other Party, at the place where such books and records are ordinarily kept, to the extent reasonably necessary to verify the accuracy of any statement, charge, payment or computation made pursuant to this Agreement, and any such audit must be completed within ninety (90) days of the Notice to the other Party. In the event that an audit is performed, any subsequent audit performed may cover only a time period not covered by a previous audit.  In no event shall any statement or invoice be subject to audit beyond two (2) years from the date of such statement or invoice.

**Section 6.5     Taxes.**

Producer shall pay any and all Taxes levied on Crude Oil.  In the event a Party  is required to pay any Tax for which the other Party is responsible hereunder, the responsible Party shall reimburse the paying Party for the same per invoice provided by the paying Party.  Each Party shall indemnify, defend and hold harmless the other Party from and against any and all Claims and Losses arising out of or related to Taxes for which the indemnifying Party is responsible hereunder.

**ARTICLE VII**
**INDEMNIFICATION**

Section 7.1    Indemnification.

EXCEPT WHERE OTHERWISE SPECIFICALLY PROVIDED HEREIN, EACH OF PRODUCER AND PRODUCER GROUP, ON THE ONE HAND, AND GATHERER AND GATHERER GROUP, ON THE OTHER HAND, SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS THE OTHER PARTY AND ITS RESPECTIVE PRODUCER GROUP OR GATHERER GROUP, AS THE CASE MAY BE, FROM AND AGAINST ANY AND ALL CLAIMS OF THIRD PARTIES AGAINST THEM, OR DAMAGES SUSTAINED OR INCURRED BY THEM AS A RESULT OF SUCH CLAIMS BY THIRD PARTIES, TO THE EXTENT CAUSED BY THE NEGLIGENCE OR WILLFUL MISCONDUCT OF THE INDEMNIFYING PARTY OR ITS RESPECTIVE PRODUCER GROUP OR GATHERER GROUP, AS THE CASE MAY BE, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR THE INDEMNIFYING PARTY'S BREACH OF THIS AGREEMENT.  THIS PROVISION SHALL NOT BE CONSTRUED TO RELIEVE ANY INSURER OF ITS OBLIGATION TO PAY CLAIMS CONSISTENT WITH THE PROVISIONS OF A VALID INSURANCE POLICY.  A PERSON SEEKING INDEMNITY SHALL FIRST SEEK RECOVERY UNDER ANY APPLICABLE INSURANCE POLICY, AND ANY INDEMNITY OBLIGATION OWED HEREUNDER

16

**SHALL BE REDUCED BY THE AMOUNT OF ALL INSURANCE PROCEEDS ACTUALLY RECEIVED BY THE INDEMNIFIED PARTY**.

      **Section 7.2     Notification Obligation.**

      The Person entitled to indemnification under Section 7.1 above (the "***Indemnified Party***") shall promptly notify the Party providing indemnity (the "***Indemnifying Party***") of any Claim, and the Indemnifying Party shall have the right to assume the investigation and defense of the Claim, including employing legal counsel of its choice. If the Indemnifying Party does not promptly assume the investigation and defense of the Claim, the Indemnified Party may do so, including employing legal counsel of its choice, at the Indemnifying Party's expense. If the Indemnifying Party assumes the defense of a claim, the Indemnified Party shall nevertheless have the right to employ, at its sole expense, separate legal counsel and participate in the defense of the Claim, *provided* that control over the process and authority to compromise the Claim shall vest solely in the Indemnifying Party.

**ARTICLE VIII**
**FORCE MAJEURE**

      **Section 8.1     Force Majeure.**

      "***Force Majeure***" shall mean any event or circumstance or combination of events or circumstances (each, a "***Force Majeure Event***") that adversely affects or prevents any Party from performing its obligations in accordance with the terms of this Agreement, but only if and to the extent that such events and circumstances are not within the affected Party's reasonable

control. Force Majeure events shall include act of God, fire, storm of an unusual or extraordinary nature, flood, hurricane, tornado, earthquake, epidemic or other natural disaster, action, delay or inaction of any Governmental Authority, war, invasion, emergency, embargo, sanction, sabotage, insurgency, terrorism, civil war, riot or insurrection of any kind, labor strike, loss of electricity supply, failure of any pipelines or other means of transportation, inability to obtain rights-of-way after the use of commercially reasonable efforts; *provided* that the following shall not constitute a Force Majeure Event: (i) failure to obtain or retain, or a delay in obtaining, any Governmental Approval necessary for performance under this Agreement that was the result of action or inaction by the Party responsible for obtaining such Governmental Approval, or a result of failure to timely apply for any such Governmental Approval, (ii) market conditions for Crude Oil or refined products therefrom, (iii) the inability to obtain a favorable price for or to buy or sell Crude Oil or refined products therefrom, or (iv) economic hardship. Any obligation of either Party under this Agreement shall be excused only to the extent that the Party's inability to perform is caused by Force Majeure. Each Party shall use all Reasonable Efforts to cure, minimize, mitigate or remedy the effects of Force Majeure. Notwithstanding that Force Majeure may otherwise exist, a Force Majeure Event shall not excuse or delay the payment of money when due by any Party.

17

## ARTICLE IX
## DEFAULT AND TERMINATION

**Section 9.1    Producer Events of Default.**

A "***Producer Event of Default***" shall be deemed to have occurred if (i) Producer becomes bankrupt or insolvent or takes any corporate action or other steps towards liquidation, winding up, dissolution, reorganization or amalgamation of Producer, making of any bankruptcy administration order, or appointment of a receiver, administrator, trustee or similar officer over all or any material part of the revenues, assets or business of Producer; (ii) an order is made for the winding up, dissolution or liquidation of Producer, or any analogous or equivalent proceedings by whatever name are undertaken in whatever jurisdiction; (iii) Producer is generally unable to pay its debts as they become due, or Producer stops, suspends or threatens to stop or suspend payment of all or a material part of its debts or makes a general assignment of its assets for the benefit of its creditors; or (iv) Producer is in breach of its material obligations under this Agreement, and Producer fails to cure such breach within 30 days following Producer's receipt of a Notice from Gatherer to Producer to remedy such event or condition, or if a remedy cannot be effected within such 30 day period, a period of 60 days, *provided* that Producer has commenced to remedy within such 30 day period and has diligently pursued such remedy during the extended period, and *provided further*, that in no event shall the period to cure a breach of an obligation to pay money be more than 10 days total.

**Section 9.2    Gatherer's Default Remedies Against Producer.**

If a Producer Event of Default shall have occurred and be uncured and continuing, and

002617

without prejudice to any other of Gatherer's rights under this Agreement, Gatherer shall have the right to terminate this Agreement upon Notice to Producer.

**Section 9.3    Gatherer Events of Default.**

A "***Gatherer Event of Default***" shall be deemed to have occurred if (i) Gatherer becomes bankrupt or insolvent or takes any corporate action or other steps towards liquidation, winding up, dissolution, reorganization or amalgamation of Gatherer, making of any bankruptcy administration order, or appointment of a receiver, administrator, trustee or similar officer over all or any material part of the revenues, assets or business of Gatherer; (ii) an order is made for the winding up, dissolution or liquidation of Gatherer, or any analogous equivalent proceedings by whatever name are undertaken in whatever jurisdiction; (iii) Gatherer is generally unable to pay its debts as they become due, or Gatherer stops, suspends or threatens to stop or suspend payment of all or a material part of its debts or makes a general assignment of its assets for the benefit of its creditors; or (iv) Gatherer is in breach of any of its material obligations under this Agreement, and Gatherer fails to cure such breach within 30 days following Gatherer's receipt of a Notice from Producer to Gatherer to remedy such event or condition, or if a remedy cannot be effected within such 30 day period, a period of 60 days, *provided* that Gatherer has commenced to remedy within such 30 day period and diligently pursued such remedy during the extended period, *provided further* that in no event shall the period to cure a breach of an obligation to pay money be more than 10 days total.

18

**Section 9.4    Producer's Default Rights Against Gatherer.**

Except where a specific remedy has been set forth herein, if a Gatherer Event of Default shall have occurred and be uncured and continuing, and without prejudice to any other of Producer's rights under this Agreement, Producer shall have the right to terminate this Agreement upon Notice to Gatherer.

**ARTICLE X**
**LIMITATION OF LIABILITY**

**Section 10.1    Limitation of Liability.**

**NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL, PUNITIVE OR EXEMPLARY DAMAGES OF ANY TYPE, INCLUDING LOST PROFITS OR LOSS OF BUSINESS OPPORTUNITY, IN CONTRACT OR TORT (INCLUDING NEGLIGENCE, JOINT OR SEVERAL, OR STRICT LIABILITY) ARISING OUT OF THIS AGREEMENT, *PROVIDED* THAT THIS LIMITATION SHALL NOT APPLY TO ANY INDEMNITY OBLIGATION SET FORTH HEREIN.**

**ARTICLE XI**
**MISCELLANEOUS**

**Section 11.1    Assignment.**

002619

Neither Party may assign this Agreement without the express written consent of the other

Party, which consent shall not be unreasonably withheld, conditioned or delayed.

**Section 11.2    Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury Trial.**

(a)    **THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF OKLAHOMA, EXCLUDING ANY CONFLICTS OF LAWS PROVISIONS CALLING FOR APPLICATION OF THE LAWS OF ANOTHER STATE.**

(b)    **EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE SOLE AND EXCLUSIVE JURISDICTION OF THE STATE OR FEDERAL COURTS IN HARRIS COUNTY, TEXAS, AND EACH OF THE PARTIES IRREVOCABLY WAIVES ANY OBJECTION TO THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS.**

(c)    **TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY IRREVOCABLY WAIVES ITS RIGHT TO A TRIAL BY JURY, AND CONSENTS TO A BENCH TRIAL BY A TRIAL COURT JUDGE, IN RESPECT OF ANY LITIGATION ARISING OUT OF THIS AGREEMENT AND ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT FOR EACH OF THE PARTIES IN ENTERING INTO THIS AGREEMENT.**

19

**Section 11.3    Dispute Resolution.**

All controversies, disputes or Claims between Producer and Gatherer arising out of or in any way relating to this Agreement (each, a "***Dispute***") shall be resolved pursuant to the procedures of this Section 11.3.

(a)    If a Dispute arises between the Parties regarding their respective rights and obligations under this Agreement, the Parties shall use commercially reasonable efforts to reach a reasonable resolution of the Dispute informally.  Initially, the responsible Persons shall attempt to resolve the Dispute themselves. If they are unable to resolve the Dispute within 10 days, then either Party may, by Notice, refer the Dispute to the senior management of the Parties for resolution. If senior management of the Parties are unable to resolve the Dispute within 10 days of such Notice, the provisions of subsection (b) below shall apply.

(b)    Any Dispute not otherwise resolved under subsection (a) above may be submitted by either Party to a court proceeding filed in accordance with Applicable Law in any court having jurisdiction over the Parties and the subject matter.

**Section 11.4    Notices.**

Any notice, request, demand, statement, payment or bill provided for in this Agreement, or any notice which a Party may desire to give to the other (each, a "***Notice***"), must be in writing and will be deemed duly made when (i) delivered personally, (ii) upon delivery by the U.S. Postal Service, certified mail with return receipt, (iii) upon delivery by a recognized overnight

courier service with return receipt, or (iv) upon receipt by the directed recipient when transmitted by electronic means, to the addresses shown on Schedule 11.1.

### Section 11.5    Survival.

The provisions of this Agreement shall survive expiration or termination thereof for so long as necessary to give effect to the rights and obligations of the Parties hereunder, but in no event exceeding any applicable statutes of limitation.

### Section 11.6    No Joint Venture.

Nothing in this Agreement shall create an association, joint venture or partnership between the Parties or impose any partnership obligation or partnership liability on any Party. Neither Party shall have any right, power or authority to enter into any agreement or commitment or act on behalf of or otherwise bind the other Party without such Party's prior written consent.

### Section 11.7    Entire Agreement.

This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and there are not any oral or written understandings, representations or commitments of any kind, express or implied, which are not expressly set out herein. No modification of this Agreement shall be effective unless in writing and executed by the Parties.

20

This Agreement supersedes any prior agreements of the Parties concerning the subject matter hereof.

### Section 11.8   No Third Party Beneficiaries.

This Agreement is for the sole and exclusive benefit of the Parties, and does not stipulate any benefit in favor of any third parties.

### Section 11.9   Confidentiality.

Any information belonging to a Party that is confidential and disclosed to the other Party in the course of performance of this Agreement or has been disclosed during the negotiations leading up to this Agreement, including the Agreement itself (collectively, the "***Confidential Information***"), shall be held in confidence and shall not be disclosed to others without the written approval of the disclosing Party. Confidential Information is not information that (i) is already known to the receiving Party at the time of disclosure by the disclosing Party (ii) is now or hereafter becomes available within the public domain other than as a result of a breach of this Agreement, (iii) is received by a Party from a Person under no obligation to keep the Confidential Information confidential, or (iv) is independently developed by a Party without reliance on Confidential Information. A Party shall have the right to disclose Confidential Information without the consent of the disclosing Party to its Lenders, counsel, advisors, consultants, accountants, auditors, officers, directors, members, shareholders and other Persons of responsibility who have a need to know the Confidential Information, *provided* that such Persons agree to keep the Confidential Information confidential, and that the Party shall be responsible for any breaches of this confidentiality obligation by such Persons. A Party shall

also have the right to disclose Confidential Information without the consent of the disclosing Party in connection with a subpoena, interrogatory, request for production, civil investigative demand or other such legal process issued by any court or administrative, legislative, investigative or regulatory body, but only to the extent necessary to fully respond thereto and after providing prior Notice to the disclosing Party.  Upon the reasonable request of the disclosing Party, the receiving Party shall, in its sole discretion, either return the Confidential Information or destroy it, *provided* that the receiving Party may retain a copy of Confidential Information as necessary to comply with Applicable Law.

### Section 11.10  Regulatory Matters.

(a)     Gatherer has informed Producer, and Producer hereby acknowledges and accepts, that the Crude Gathering System will be an intrastate pipeline system operating only within the State of Oklahoma, and is not intended to be subject to regulation under any Applicable Law by FERC. Accordingly, as a principal condition to, and in consideration for, the execution of this Agreement by Gatherer, Producer represents, warrants and covenants that (i) none of Producer's Committed Crude delivered hereunder has been or will be dedicated to or delivered in interstate commerce, (ii) at the time Producer's Committed Crude is delivered at the Receipt Points, Producer shall not have identified any destination for Producer's Committed Crude which is outside the State of Oklahoma and Producer does not intend to deliver any of Producer's Committed Crude to be sold, transported or otherwise moved outside the State of Oklahoma, (iii) all of

21

Producer's Committed Crude delivered to Gatherer under this Agreement shall be produced in the State of Oklahoma, and (iv) Producer's Committed Crude delivered hereunder is not intended to be transported or sold in interstate commerce in any manner which will subject the Crude Gathering System to regulation by FERC. In the event that Producer breaches its representation, warranty and covenant contained in this Section 11.10(a), Gatherer, in addition to all other remedies at law or in equity, shall have the right, upon delivery of written notice to Producer, to refuse receipt of Producer's Committed Crude which has caused a breach of such representation, warranty and covenant. Gatherer's election to refuse receipt of any of Producer's Committed Crude pursuant to this Section 11.10(a) shall not release Producer from any obligation to indemnify Gatherer for such breach under Article VII.

(b)     If any federal or state statute, regulation, or order by a court of law or Governmental Authority directly or indirectly (a) prohibits performance under this Agreement, (b) makes such performance illegal or impossible, or (c) effects a change in a substantive provision of this Agreement that has a significant material adverse impact upon the performance of either Party's obligations under this Agreement, including without limitation the imposition of terms, conditions, or rate restrictions, then the Parties will use all reasonable efforts to revise the Agreement and any other ancillary agreement to the extent necessary so that: (i) performance under the Agreement is no longer prohibited, illegal, impossible, or is no longer impacted in a material adverse fashion, and (ii) this Agreement and any other ancillary agreement is revised in a manner that preserves, to the maximum extent possible, the respective positions of the Parties. Without liability for its failure to do so, each Party will use reasonable efforts to provide notice to the other Party as to any proposed law, regulations or any regulatory

provide notice to the other Party as to any proposed law, regulations or any regulatory proceedings or actions that could affect the rights and obligations of the Parties. If the Parties are unable to revise the Agreement in accordance with the above within ninety (90) Days following the adoption of any such law, regulation or order of a Governmental Authority, then the Party whose performance is prohibited, illegal, impossible or is impacted in a material adverse fashion will have the right, at its sole discretion, to terminate this Agreement upon written notice to the other Party.

**Section 11.11  Execution in Counterparts.**

This Agreement may be executed in counterparts, including by electronic transmission, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement.

[Signature Page Next Page]

22

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed in duplicate originals by its duly authorized officer as of the Effective Date.

**PRODUCER**

**OKLAHOMA ENERGY ACQUISITIONS, LP**

By: Alta Mesa GP, LLC, its general partner

By: _____

Harlan H. Chappelle, Manager

Signature page to Crude Oil Gathering Agreement

002628

**GATHERER**

**KINGFISHER MIDSTREAM, LLC**, a Delaware
limited liability company

By: HMS KINGFISHER HOLDCO, LLC,
Authorized Member

By: _____
Name: Harlan H. Chappelle
Title: President and Chief Executive Officer

Signature Page to Crude Oil Gathering Agreement

**SCHEDULE 3.3**
to
**CRUDE OIL GATHERING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
and
**KINGFISHER MIDSTREAM LLC**

**DEDICATED AREA**

**[See Attached]**

002631





Blaine, Canadian,
Garifield, Kingfisher,
Logan Counties

**SCHEDULE 3.4**
**to**

**CRUDE OIL GATHERING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**FORM OF**
**MEMORANDUM OF CRUDE OIL GATHERING AGREEMENT**

| | |
|---|---|
| **STATE OF OKLAHOMA** | § |
| | § |
| **COUNTIES OF KINGFISHER,** | § |
| **LOGAN, CANADIAN, BLAINE** | § |
| **AND GARFIELD** | § |

      This **Memorandum of Crude Oil Gathering Agreement** (this "***Memorandum***") is made and entered into this __ day of _____, 2015, by and between Oklahoma Energy Acquisitions, LP, a Texas limited partnership located at 15021 Katy Freeway, Suite 400, Houston, TX 77094, Attn: Michael A. McCabe ("***Producer***"), and Kingfisher Midstream LLC, a Delaware limited liability company located at 20329 State Highway 249, Suite 450, Houston, TX

002634

Delaware limited liability company located at 20329 State Highway 249, Suite 450, Houston, TX 77070, Attn. Paul Williams ("**Gatherer**").

Case 4:24-cv-04092    Document 4-10    Filed on 11/21/24 in TXSD    Page 199 of 382

**WHEREAS**, Producer and Gatherer have entered into a Crude Oil Gathering Agreement (the "**Agreement**") dated the 31st day of August, 2015 (the "**Effective Date**"); and

**WHEREAS**, Producer and Gatherer desire to file this Memorandum to provide record notice of the Agreement.

1.      **Dedication**.

(a)  For the Primary Term of the Agreement, Producer has dedicated to Gatherer all of Producer's Interests within the Dedicated Area shown on Exhibit A attached hereto (the "**Primary Term Dedication**") and shall deliver to Gatherer at the Receipt Point(s) all Committed Crude produced therefrom. If, after the Effective Date of the Agreement and before the end of the Primary Term, Producer or any of its Affiliates acquire mineral interests within the Dedicated Area (the "**After-Acquired Interests**"), then the After-Acquired Interests and all Crude Oil produced therefrom shall automatically be included in the Primary Term Dedication and become Committed Crude; *provided, however*, if any of the After-Acquired Interests or Crude Oil produced therefrom are subject to a prior written dedication or commitment for gathering as of the time of acquisition by Producer, then that Crude Oil will be excluded from the Primary Term Dedication until the prior dedication or commitment terminates or expires, at which time such Crude Oil shall become Committed Crude,

*provided further* that if, with respect to any After-Acquired Interests, Producer has the right or ability, without payment of any material fee or penalty, or incurring any other material disadvantage, to terminate any such prior dedication or commitment with respect to the After-Acquired Interests, then Producer shall terminate such dedication or commitment as soon as reasonably practicable. Producer shall promptly notify Gatherer in writing of any such termination, and identify the After-Acquired Interests.

(b) For the Extended Term of the Agreement, Producer has dedicated to Gatherer all of the wells that constitute Interests and are connected to the Crude Gathering System at the end of the Primary Term (such wells, "***Dedicated Wells***", and such dedication, the "***Extended Term Dedication***") and shall deliver to Gatherer at the Receipt Point(s) all Committed Crude produced therefrom. From and after the end of the Primary Term all Interests within the Dedicated Area shown on Exhibit A attached hereto other than the Dedicated Wells shall be permanently released from the Dedication.

2.      **Term**.  The Agreement shall commence as of the Effective Date, and shall remain in full force and effect for fifteen (15) years after the In-Service Date (the "***Primary Term***"), *provided, however*, that, to the extent that at the end of the Primary Term there are wells then-connected to the Crude Gathering System and then-producing Crude Oil in commercial (paying) quantities, the Term of the Agreement shall extend for so long as such well(s) continue to produce Crude Oil in commercial (paying) quantities (the "***Extended Term***").

3.      **Incorporation of Agreement and Effect of Memorandum**.  The sole purpose of this Memorandum is to give notice of the existence of the Agreement.  This Memorandum shall not modify in any manner any of the terms and conditions of the Agreement, and nothing in this

Memorandum is intended to and shall not be used to interpret the Agreement. The provisions of the Agreement are hereby incorporated into this Memorandum as if set out fully herein. In the event of any conflict between the terms of this Memorandum and the terms of the Agreement, the terms of the Agreement shall govern and control for all purposes.

    **4.**    **Defined Terms.** All capitalized terms not defined herein shall have the same meaning assigned such terms in the Agreement.

[Signature pages follow]

002637

**IN WITNESS WHEREOF**, this Memorandum is executed by Producer and Gatherer as of the date of acknowledgement of their signatures, but is effective for all purposes as of the Effective Date stated above.

**PRODUCER:**

**OKLAHOMA ENERGY ACQUISITIONS, LP**

By: _____

Name: _____

Title: _____

STATE OF TEXAS                          §
                                        §
COUNTY OF HARRIS                        §

This instrument was acknowledged before me this ___ day of August, 2015 by_____ _____, the _____of Oklahoma Energy Acquisitions, LP, a Texas limited partnership, on behalf of said limited partnership.

In witness whereof I hereunto set my hand and official seal.

002638

NOTARIAL SEAL:                          _____
                                        Notary Public in and for the

Notary Public in and for the
State of Texas

My Commission Expires:  _____
Commission No.: _____

002639

**GATHERER:**

**KINGFISHER MIDSTREAM, LLC**

**By: HMS KINGFISHER HOLDCO, LLC,**
    **Authorized Member**

      **By:** _____
      **Name:** _____
      **Title:** _____

STATE OF TEXAS               §
                                       §
COUNTY OF HARRIS          §

This instrument was acknowledged before me this ___ day of August, 2015 by _____ _____, the _____ of HMS Kingfisher HoldCo, LLC,  a Delaware limited liability company, authorized member of Kingfisher Midstream, LLC, a Delaware limited liability company, on behalf of said limited liability company.

In witness whereof I hereunto set my hand and official seal.

NOTARIAL SEAL:

_____
Notary Public in and for the
State of Texas

My Commission Expires: _____
Commission No.: _____

**SCHEDULE 3.9**
**to**
**CRUDE OIL GATHERING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**Receipt Points**

| Operator | Receipt Point Name | Unit | Location |
|----------|--------------------|------|----------|
| Alta Mesa | Lincoln CRP Manifold 1 | Lincoln | T 18N R 6W NE ¼ Section 34 |
| Alta Mesa | Lincoln CRP Manifold 2 | Lincoln | T 17N R 6W NE ¼ Section 3 |
| Alta Mesa | Lincoln CRP Manifold 2A | Lincoln | T 17N R 6W NE ¼ Section 10 |
| Alta Mesa | Lincoln CRP Manifold 3 | Lincoln | T 17N R 6W SE ¼ Section 10 |
| Alta Mesa | Lincoln CRP Manifold 4 | Lincoln | T 18N R 6W NE ¼ Section 36 |
| Alta Mesa | Lincoln CRP Manifold 5 | Lincoln | T 18N R 6W SE ¼ Section 36 |
| Alta Mesa | Lincoln CRP Manifold 7 | Lincoln | T 17N R 5W NW ¼ Section 7 |

002642

| Alta Mesa | Lincoln CRP Manifold 8 | Lincoln | T 18N R 5W NE ¼ Section 32 |
| Alta Mesa | Lincoln CRP Manifold 9 | Lincoln | T 18N R 5W NW ¼ Section 34 |
| Alta Mesa | Lincoln CRP Manifold 11 | Lincoln | T 18N R 5W SW ¼ Section 33 |
| Alta Mesa | Lincoln CRP Manifold 10 | Lincoln | T 18N R 5W SE ¼ of SW ¼ Section 33 |
| Alta Mesa | Lincoln CRP Manifold 11A | Lincoln | T 17N R 5W SW ¼ Section 4 |
| Alta Mesa | Lincoln CRP Manifold 12 | Lincoln | T 17N R 5W SE ¼ of SW ¼ Section 8 |
| Alta Mesa | Lincoln CRP Manifold 13 | Lincoln | T 17N R 5W NW ¼ Section 20 |
| Alta Mesa | Lincoln CRP Manifold 14 | Lincoln | T 17N R 5W SW ¼ Section 16 |
| Alta Mesa | Lincoln CRP Manifold 15 | Lincoln | T 17N R 5W NE ¼ Section 29 |
| Alta Mesa | Lincoln CRP Manifold 16 | Lincoln | T 17N R 5W SE ¼ Section 22 |
| Alta Mesa | Lincoln CRP Manifold 17 | Lincoln | T 17N R 5W SE ¼ Section 29 |
| Alta Mesa | Lincoln CRP Manifold 18 | Lincoln | T 17N R 5W SW ¼ Section 29 |

| | | | |
|---|---|---|---|
| Alta Mesa Section 9 | South of Lincoln CRP Manifold 1 | South of Lincoln | T 17N R 6W NE ¼ |
| Alta Mesa Section 8 | South of Lincoln CRP Manifold 2 | South of Lincoln | T 17N R 6W NW ¼ |
| Alta Mesa Section 16 | South of Lincoln CRP Manifold 3 | South of Lincoln | T 17N R 6W SE ¼ |
| Alta Mesa Section 20 | South of Lincoln CRP Manifold 4 | South of Lincoln | T 17N R 6W NW ¼ |
| Alta Mesa Section 26 | South of Lincoln CRP Manifold 5 | South of Lincoln | T 17N R 6W SE ¼ |
| Alta Mesa Section 26 | South of Lincoln CRP Manifold 6 | South of Lincoln | T 17N R 6W NE ¼ |
| Alta Mesa Section 34 | South of Lincoln CRP Manifold 7 | South of Lincoln | T 17N R 6W NW ¼ |
| Alta Mesa Section 32 | South of Lincoln CRP Manifold 8 | South of Lincoln | T 17N R 6W NW ¼ |
| Alta Mesa Section 4 | South of Lincoln CRP Manifold 9 | South of Lincoln | T 16N R 5W NE ¼ |

| | | | |
|---|---|---|---|
| Alta Mesa Section 5 | South of Lincoln CRP Manifold 10 | South of Lincoln | T 16N  5W SW ¼ |
| Alta Mesa Section 8 | South of Lincoln CRP Manifold 11 | South of Lincoln | T 16N R 5W SE ¼ |
| Alta Mesa Section 9 | South of Lincoln CRP Manifold 12 | South of Lincoln | T 16N R 5W NE ¼ |
| Alta Mesa Section 26 | South of Lincoln CRP Manifold 13 | South of Lincoln | T 17N R 5W SE ¼ |
| Alta Mesa Section 2 | South of Lincoln CRP Manifold 14 | South of Lincoln | T 16N R 5W SE ¼ |
| Alta Mesa | CRP Manifold NofL-4 | North of Lincoln | T 18N R 5W NW ¼ Section 30 |
| Alta Mesa | CRP Manifold NofL-5 | North of Lincoln | T 18N R 5W NW ¼ Section 18 |
| Alta Mesa | CRP Manifold NofL-6 | North of Lincoln | T 18N R 6W NE ¼ Section 1 |
| Alta Mesa | CRP Manifold NofL-7 | North of Lincoln | T 18N R 5W SE ¼ Section 17 |
| Alta Mesa | CRP Manifold NofL-8 | North of Lincoln | T 18N R 5WNE ¼ Section 8 |

| | | | |
|---|---|---|---|
| Alta Mesa | CRP Manifold NofL-9 | North of Lincoln | T 18N R 5W SW ¼ Section 14 |
| Alta Mesa | CRP Manifold NofL-10 | North of Lincoln | T 18N R 5W NE ¼ Section 10 |
| Alta Mesa | CRP Manifold NofL South-1 | North of Lincoln | T 18N R 5W NE ¼ Section 35 |
| Alta Mesa | CRP Manifold NofL South-2 | North of Lincoln | T 17N R 5W SE ¼ Section 2 |
| Alta Mesa | CRP Manifold NofL South-3 | North of Lincoln | T 17N R 5W SW ¼ Section 13 |

**SCHEDULE 3.10(a)**
**to**
**CRUDE OIL GATHERING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**FORM OF NOTICE**
**FOR**
**DESIGNATION OF ADDITIONAL RECEIPT POINT**

1.    Operator Contact Name    _____

2.    Phone Numbers    _____

3.    E-Mail    _____

4.    Well and Pad Name    _____

5.    County/Township    _____

002648

6.     Requested Turn on Date _____

7.     Number of Wells _____

8.     Projected Initial Volume (bbl/d) _____

9.     Requested GPS of:

     a.     Wellhead (if applicable)    _____ ° _____ ' _____ '' _ _____ ° _____ ' _____ ''
     b.     CRP (if applicable)    _____ ° _____ ' _____ '' _ _____ ° _____ ' _____ ''
     c.     Receipt Point Meter    _____ ° _____ ' _____ '' _ _____ ° _____ ' _____ ''

10.    Surface site provided by Producer or Gatherer _____

11.    Planned flow into new Receipt Point or existing Receipt Point _____

12.    Producer or Gatherer to Connect _____

13.    Estimated Spud and Completion dates _____

002649

**SCHEDULE 4.4(a)**
to
**CRUDE OIL GATHERING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**SCHEMATIC OF DELIVERY POINT**

002651

Outlet flange of transfer meter

**Delive**

Trucking Delivery Point FOB



Demarcation

Producer Takes Delivery

Kingfisher M
(installed an

002652

**ery Point Plan View**



Storage Facility

Midstream System
d owned by Gatherer)

002653

**SCHEDULE 4.5(a)**
**to**
**CRUDE OIL GATHERING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**MEASUREMENT, EQUIPMENT AND TESTING**

A.    Any terms capitalized in this Schedule shall have the meaning set forth herein, or as indicated by the context, or as set forth in the body of the Agreement.

B.    Measurement.  Producer shall own, operate and maintain control and custody of any measurement point at the CRP and shall measure or cause to be measured all Crude Oil delivered hereunder in accordance with industry standards using measurement facilities at the CRP.  Quantities, quality and gravities of Crude Oil delivered hereunder shall be determined in accordance with generally accepted industry practices in effect at the time and place of delivery, using the latest test methods and standards from ASTM International and the API Manual of Petroleum Measurement Standards.  Gatherer shall be given reasonable prior Notice of any measurement or testing to be made hereunder by Producer or its representative.  Gatherer may have a representative present to witness all measurement and testing by Producer or its representative, but in the absence of a Gatherer representative, the measurement and testing as made by Producer or its representative shall be accepted and considered as correct absent

made by Producer or its representative shall be accepted and considered as correct absent manifest error. For pricing purposes only, unless otherwise specified in this Agreement, all Crude Oil received hereunder during any month shall be considered to have been received in equal daily quantities during such month.

C.    Calibration.    At least semi-annually or as otherwise may be required by Applicable Laws, Producer or Producer's designee shall verify the calibration of all of its meters at the CRP. With respect to any test made hereunder, a result within plus or minus one quarter of one percent (0.25%) of the previous meter calibration shall be considered correct.

D.    Corrections.    If upon calibration the result exceeds plus or minus one quarter of one percent (0.25%) of the previous meter calibration, then any previous recording of such equipment shall be corrected for any period which is known or agreed upon, but in case the period is not known or agreed upon, such correction shall apply to one-half (1/2) the total volume measured since the date of the last calibration. However, the period for this correction shall not exceed ninety (90) days.

**SCHEDULE 4.6**
to
**CRUDE OIL GATHERING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**SPECIFICATIONS**

A.      Any terms capitalized in this Schedule shall have the meaning set forth herein, or as indicated by the context, or as set forth in the body of the Agreement.

B.      Gatherer may, from time to time, and without Notice to Producer, test Producer's Crude Oil for the purpose of confirming whether it conforms to the Specifications.  Crude Oil delivered by Producer to Gatherer hereunder shall comply with the more stringent of (1) the requirements of any receiving transporter, (2) the requirements of any Applicable Laws or Governmental Authority, and (3) the following specifications: (a) be merchantable, of a quality acceptable to receiving transporters, in its natural produced state after normal oilfield separation and treating, and commercially free of dirt, sediment and chemicals foreign to virgin Crude Oil including chlorinated and/or oxygenated hydrocarbons, lead and hazardous or industrial wastes, (b) not contain more than

as determined by the average of the representative samples; and (c) have a Reid Vapor Pressure of not more than ▮▮▮▮▮

C.   **IF PRODUCER DELIVERS CRUDE THAT DOES NOT CONFORM TO THE FOREGOING SPECIFICATIONS, PRODUCER WILL BE RESPONSIBLE FOR ALL LIABILITY AND COSTS INCURRED BY GATHERER WITH RESPECT TO THE NON-CONFORMING CRUDE, INCLUDING WITHOUT LIMITATION, COSTS TO DISPOSE OF THE NON-CONFORMING CRUDE, AND COSTS TO REMOVE ANY CONTAMINATION FROM GATHERER'S CRUDE SYSTEM. GATHERER IS UNDER NO OBLIGATION TO ACCEPT SUCH NON-CONFORMING CRUDE, AND GATHERER'S NON-ACCEPTANCE OF NON-CONFORMING CRUDE SHALL NOT BE CONSIDERED A FAILURE OF GATHERER TO RECEIVE COMMITTED CRUDE, NOR SHALL SUCH NON-ACCEPTANCE BY GATHERER BE CONSIDERED AN EVENT OF FORCE MAJEURE, AS DEFINED HEREIN, SUFFICIENT TO RELIEVE PRODUCER OF ITS PERFORMANCE OBLIGATIONS UNDER THE AGREEMENT.**

**SCHEDULE 11.4**
**to**
**CRUDE OIL GATHERING AGREEMENT**
**Dated August 31, 2015**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**NOTICES**

<u>**GATHERER:**</u>

<u>Notices & Correspondence</u>:

     Kingfisher Midstream LLC
     c/o Asset Risk Management, LLC
     20329 State Highway 249, Suite 450
     Houston, TX 77070
     Attention: Paul Williams
     Phone: 281-655-3234
     Email: pwilliams@asset-risk.com

<u>Scheduling Department</u>:

002658

Kingfisher Midstream LLC
c/o Asset Risk Management, LLC
20329 State Highway 249, Suite 450
Houston, TX 77070
Attention: Oil Scheduling David Puglia
Phone: 281-655-3216
Email: dpuglia@asset-risk.com

<u>Accounting Matters</u>:

Kingfisher Midstream LLC
c/o Asset Risk Management, LLC
20329 State Highway 249, Suite 450
Houston, TX 77070
Attention: Oil Accounting Mamata Sharma
Phone: 281-655-3221

<u>Payment by ACH</u>:



[Continued on next page]

**PRODUCER:**

Notices & Correspondence:

 Oklahoma Energy Acquisitions, LP
 c/o Alta Mesa Services, LP
 15021 Katy Freeway
 Suite 400
 Houston, TX 77094
 Attn: David McClure
 Phone: 281-530-0991
 Facsimile: 281-530-5278
 Email: dmcclure@altamesa.net

Billing:

 Oklahoma Energy Acquisitions, LP
 c/o Alta Mesa Services, LP
 15021 Katy Freeway
 Suite 400
 Houston, TX 77094
 Attn: Michael A. McCabe
 Phone: (281) 530-0991
 Facsimile: (281) 530-5278
 Email: mmccabe@altamesa.net

Bank:              Union Bank (MUFG)

Account Name:      Alta Mesa Services LP Funding Account

CONFIDENTIAL

AMRAP-1450419
AMRBK-0019432

002661

# EXHIBIT 3

*Dunn v. HPS Investment Partners, LLC, et al.*
Adv. Pro. No. 21-03909

Exhibit 3
GGA Payments

| Payment Date | Payment Amount |
|---|---:|
| January 2016 | $41,847.59 |
| February 2016 | $36,704.24 |
| March 2016 | $30,180.71 |
| April 2016 | $39,880.94 |
| May 2016 | $43,218.27 |
| June 2016 | $1,010,275.34 |
| July 2016 | $1,482,788.28 |
| August 2016 | $1,998,518.97 |
| September 2016 | $1,730,535.86 |
| October 2016 | $2,318,415.33 |
| November 2016 | $2,803,952.29 |
| December 2016 | $2,808,710.75 |
| January 2017 | $2,208,318.10 |
| February 2017 | $2,214,293.48 |
| March 2017 | $2,653,495.50 |
| April 2017 | $2,666,530.30 |
| May 2017 | $2,935,518.53 |
| June 2017 | $2,936,756.47 |
| July 2017 | $3,102,627.44 |
| August 2017 | $3,427,840.55 |
| September 2017 | $3,053,860.57 |
| October 2017 | $0.00 |
| November 2017 | $0.00 |
| December 2017 | $0.00 |
| January 2018 | $4,107,701.76 |
| February 2018 | $3,972,386.26 |
| March 2018 | $4,344,507.60 |
| April 2018 | $4,378,879.19 |
| May 2018 | $4,652,526.84 |
| June 2018 | $4,639,606.77 |
| July 2018 | $5,472,912.75 |
| August 2018 | $5,683,907.33 |
| September 2018 | $6,306,112.56 |
| October 2018 | $6,530,867.17 |
| November 2018 | $6,036,898.50 |
| December 2018 | $6,666,750.92 |
| January 2019 | $6,764,307.16 |
| February 2019 | $6,245,708.50 |
| March 2019 | $0.00 |

| Payment Date | Payment Amount |
|---|---:|
| April 2019 | $6,573,442.44 |
| May 2019 | $0.00 |
| June 2019 | $0.00 |
| July 2019 | $6,079,839.29 |
| August 2019 | $6,138,386.27 |
| September 2019 | $6,229,961.54 |
| **TOTAL** | **$140,368,972.36** |

# EXHIBIT 4

002665

**AMENDED AND RESTATED**

**GAS GATHERING AND PROCESSING AGREEMENT**

**Oklahoma Energy Acquisitions, LP**

**and**

**Kingfisher Midstream LLC**

**Effective as of**

**December 1, 2016**

002666

002667

**TABLE OF CONTENTS**

ARTICLE I  DEFINITIONS AND INTERPRETATION ................................................................2
    Section 1.1    Definitions .................................................................................2
    Section 1.2    Interpretation ..........................................................................10

ARTICLE II  TERM ...................................................................................................................10
    Section 2.1    Term .......................................................................................10

ARTICLE III  GRANT OF TRANSPORTATION RiGHT ........................................................11
    Section 3.1    Conveyance of Transportation Right .....................................11
    Section 3.2    Real Interests .........................................................................11

ARTICLE IV  GATHERING AND PROCESSING SYSTEM ...................................................12
    Section 4.1    Construction of Gathering and Processing System ...............12
    Section 4.2    Easements, Rights-of-Way and Fee Lands ...........................12
    Section 4.3    Dedication ..............................................................................12
    Section 4.4    Covenant Running With Land ................................................14
    Section 4.5    Covenant Not to Process Committed Gas...............................14
    Section 4.6    Option to Expand Gathering and Processing System .............14
    Section 4.7    Title Warranty ........................................................................15
    Section 4.8    Proceeds of Production ...........................................................16
    Section 4.9    Operating Inventory ...............................................................16
    Section 4.10   Receipt Points ........................................................................16
    Section 4.11   New Receipt Points; Obligation to Interconnect ...................16

002668

Section 4.11  New Receipt Points, Obligation to Interconnect ......................................18
Section 4.12  Additional Wells ..............................................................................18
Section 4.13  Buy-Back Gas ...................................................................................19

ARTICLE V  GAS QUALITY AND PRESSURE.................................................................19
Section 5.1  Measurement, Equipment and Testing ..................................................19
Section 5.2  Specifications ....................................................................................20
Section 5.3  Delivery Pressure ...............................................................................20
Section 5.4  Compression .....................................................................................20
Section 5.5  Pressure ...........................................................................................20

ARTICLE VI  GATHERING, PROCESSING AND DELIVERY ............................................21
Section 6.1  Delivery, Receipt and Processing of Gas and Purchase of Products .........21
Section 6.2  Scheduling and Imbalances..................................................................22
Section 6.3  Exchange of Information ......................................................................23
Section 6.4  Commingling .....................................................................................23
Section 6.5  Allocations ........................................................................................24
Section 6.6  Transfer of Title and Risk of Loss .........................................................24

ARTICLE VII  SERVICE FEES ....................................................................................25
Section 7.1  Service Fees ......................................................................................25
Section 7.2  Payment for Other Fuel ......................................................................25
Section 7.3  Escalation .........................................................................................25

i

ARTICLE VIII  PAYMENT ...................................................................................................25

    Section 8.1    Billing ...............................................................................................25

    Section 8.2    Payment.............................................................................................26

    Section 8.3    Disputed Amounts ...........................................................................26

    Section 8.4    Taxes ................................................................................................26

    Section 8.5    Audit ................................................................................................26

ARTICLE IX  NOTICES.......................................................................................................27

    Section 9.1    Notices .............................................................................................27

ARTICLE X  FINANCIAL RESPONSIBILITY ...................................................................27

ARTICLE XI  INDEMNITY ..................................................................................................27

    Section 11.1    Indemnity ........................................................................................27

    Section 11.2    Notification Obligation ..................................................................28

ARTICLE XII  CURTAILMENT AND MAINTENANCE ....................................................28

    Section 12.1    Curtailment and Temporary Release of Gas.................................28

    Section 12.2    Maintenance Events .......................................................................29

ARTICLE XIII  FORCE MAJEURE .....................................................................................29

    Section 13.1    Force Majeure .................................................................................29

ARTICLE XIV  DEFAULT AND TERMINATION ...............................................................29

    Section 14.1    Producer Events of Default............................................................29

002670

Section 14.1   Producer Events of Default ............................................................30

Section 14.2   Gatherer's Default Remedies Against Producer .........................30

Section 14.3   Gatherer Events of Default ...........................................................30

Section 14.4   Producer's Default Rights Against Gatherer ..............................30

ARTICLE XV  ASSIGNMENT ............................................................................31

Section 15.1   Assignment ..................................................................................31

ARTICLE XVI  LIMITATION OF LIABILITY ...................................................31

Section 16.1   Limitation of Liability..................................................................31

ARTICLE XVII  CONFIDENTIALITY ................................................................31

Section 17.1   Confidentiality .............................................................................31

ARTICLE XVIII  DISPUTE RESOLUTION .......................................................32

Section 18.1   Dispute Resolution .......................................................................32

ARTICLE XIX  MISCELLANEOUS ...................................................................32

Section 19.1   Governing Law; Consent to Jurisdiction and Venue; Waiver of
Jury Trial .....................................................................................32

Section 19.2   Survival .......................................................................................33

Section 19.3   No Joint Venture .........................................................................33

Section 19.4   Entire Agreement ........................................................................33

Section 19.5   No Third Party Beneficiaries ......................................................33

ii

Section 19.6   Regulatory Matters.................................................................................33
Section 19.7   Execution in Counterparts........................................................................34


Schedule A-1          Condensate Delivery Points
Schedule A-2          Residue Gas Delivery Points
Schedule A-3          NGL Delivery Points
Schedule 1.1          Producer's Interests
Schedule 4.3          Dedicated Area
Schedule 4.4          Form of Memorandum of Gas Gathering and Processing Agreement
Schedule 4.10         Receipt Points
Schedule 4.11(a)      Form of Notice for Designation of New Receipt Point
Schedule 4.11(b)      Specified Area
Schedule 4.12         New Well Notification Form
Schedule 5.1          Measurement, Equipment and Testing
Schedule 5.2          Specifications
Schedule 6.1          Service Fees
Schedule 8.1          Notices

iii

002673

### AMENDED AND RESTATED
### GAS GATHERING AND PROCESSING AGREEMENT

This Amended and Restated Gas Gathering and Processing Agreement (this "*Agreement*") is made and entered into this 3rd day of February, 2017, but effective as of December 1, 2016 (the "*Effective Date*"), by and between Oklahoma Energy Acquisitions, LP, a Texas limited partnership ("*Producer*") and Kingfisher Midstream LLC, a Delaware limited liability company ("*Gatherer*"). Producer and Gatherer may be referred to each individually as a "*Party*," or collectively as the "*Parties*."

### RECITALS

**WHEREAS**, the Parties entered into that certain Gas Gathering and Processing Agreement dated as of August 31, 2015 (the "*Original Agreement*"), and the Parties now desire to amend and restate the Original Agreement in its entirety to be effective for all purposes as of the Effective Date as provided herein; and

**WHEREAS**, Producer owns, controls or may acquire certain oil and gas leasehold interests and other mineral interests and hydrocarbon reserves (collectively, the "*Producer's Interests*," as further defined below), and controls the oil, gas and mineral interests of others (collectively, the "*Other Interests*," as further defined below) in certain lands in Kingfisher, Logan, Canadian, Blaine and Garfield Counties, Oklahoma, described more particularly on **Schedule 4.3** attached hereto (the "*Dedicated Area*"); and

002674

**WHEREAS**, Producer desires to have Gatherer gather, transport and process natural gas

**WHEREAS**, Producer desires to have Gatherer gather, transport and process natural gas (the "***Gas***") and associated natural gas liquids (the "***NGLs***") from the Interests from present and future wells located in the Dedicated Area, and to induce Gatherer to perform the covenants contained in this Agreement, desires, subject to the terms herein, to convey to Gatherer the sole and exclusive right to transport Gas and NGLs from the Interests, Dedicate (defined below) to Gatherer the Producer's Interests and Other Interests, deliver such Gas and NGLs to Gatherer for gathering and processing, and sell Residue Gas, NGLs and Condensate to Gatherer at the Receipt Points; and

**WHEREAS**, Gatherer shall construct, own and operate Gas gathering and processing facilities (collectively, the "***Gathering and Processing System***," as further defined below) capable of receiving from Producer deliveries of the Committed Gas from the Dedicated Area and subject to the Dedication; and

**WHEREAS**, Producer desires that Gatherer provide gathering and processing services and purchase Residue Gas (or to deliver in-kind, at Producer's direction, such Residue Gas), NGLs, and Condensate from Producer as set forth in this Agreement, and Gatherer desires to provide to Producer gathering and processing services and to purchase Residue Gas, NGLs, and Condensate from Producer in accordance with the terms and conditions set forth in this Agreement; then

**THEREFORE**, for and in consideration of the mutual covenants set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree that the Original Agreement is hereby amended and restated in its entirety as follows:

# ARTICLE I
# DEFINITIONS AND INTERPRETATION

**Section 1.1**    **Definitions.**

The following terms shall have the following meanings unless otherwise indicated:

"***Additional Capacity***" has the meaning set forth in Section 4.6.

"***Additional In-Service Date***" means, with respect to any Additional Capacity, if applicable, the first Day of the first full Month following the date that Gatherer notifies Producer that such Additional Capacity has been completed and is ready to receive Gas.

"***Affiliate***" means with respect to a Person, any Person which, directly or indirectly, controls, is controlled by or is under common control with such Person or such Person's members or shareholders.  For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such individual or entity, whether through the ownership of voting securities, by contract or otherwise, *provided*, *however*, that for purposes of this Agreement, Producer and Gatherer shall not be considered Affiliates of each other.

"***After-Acquired Interests***" has the meaning set forth in Section 4.3(b).

"***Agreement***" has the meaning set forth in the introductory paragraph.

002676

"***Allocated Gallons***" means the quantity of NGLs in Gallons recovered, which shall be determined for each NGL component by multiplying (x) the Plant Inlet Volume, by (y) the GPM of such NGL component contained in the quantities of Committed Gas processed hereunder; by (z) the Plant Recovery Factor.

"***Allocated Volume***" has the meaning set forth in Section 6.5(b).

"***Applicable Law***" means any applicable statute, law, principle of common law, rule, regulation, judgment, order, ordinance, requirement, code, writ, injunction, or decree of any Governmental Authority.

"***Btu***" is a British Thermal Unit and means the amount of heat required to raise the temperature of one avoirdupois pound of pure water from fifty-eight and one-half degrees Fahrenheit (58.5° F) to fifty-nine and one-half degrees Fahrenheit (59.5° F) at a constant pressure of fourteen and sixty-five hundredths (14.65) pounds per square inch absolute.

"***Business Day***" means any Day, other than a Saturday or Sunday, that commercial banks in Houston, Texas are open for business.

"***Buy-Back Gas***" means low pressure Gas sourced from Gatherer's Gathering and Processing system downstream of the Receipt Points, but upstream of Gatherer's compression and dehydration facilities which is measured and returned to Producer for the purpose of well operation or well enhancement.

002677

"***Buy-Back Meter***" means the sales point located in the Dedicated Area where Producer elects to receive Buy-Back Gas from Gatherer's Gathering and Processing System.

"***Buy-Back Service Fee***" has the meaning set forth in Schedule 7.1.

"***Buy-Back Volume***" means the difference between the volume of Buy-Back Gas at the Buy-Back Meter (Point B) measured in MMBtu and the volume of Gas at the Receipt Point (Point A) measured in MMBtu for a respective Receipt Point (Buy-Back Volume = Point B – Point A). If the Buy-Back Volume is negative, then the Buy-Back Volume will be considered to be zero.

"***Chisholm Pipeline***" means the downstream NGL pipeline operated by Chisholm Pipeline Co, an affiliate of Phillips 66 Pipeline LLC.

"***Claims***" means any and all demands, claims, judgments, obligations, liabilities, liens, causes of action, lawsuits, arbitrations, mediations, investigations or proceedings (whether at law or in equity).

"***Committed Gas***" is Gas and NGLs subject to the Dedication.

"***Completed Well***" as used herein, shall mean any new Well that has been drilled, fracked, and is deemed ready to flow into the Gathering and Processing System, subject to the Specifications.

002678

"***Condensate***" means non-stabilized or stabilized condensate components incidental to the Gathering and Processing System.

"***Condensate Delivery Points***" means those points of delivery for third-party sales of Condensate set forth on Schedule A-1, as the Parties may mutually agree to modify from time to time.

"***Condensate Net Sales Price***" means the price a third party is contractually obligated to pay to Gatherer for Condensate, less Condensate Transportation Fee.

"***Condensate Transportation Fee***" means fees incurred by Gatherer in connection with the transportation of Condensate to the Condensate Delivery Point, which shall be passed through without markup to Producer.

"***Confidential Information***" has the meaning set forth in Section 17.1.

"***Contract Pressure***" has the meaning set forth in Section 5.5(b).

"***Contract Year***" means each calendar year during the Term, the first of which shall commence on the Effective Date and run through December 31 of that year, and then from January 1 through December 31 for each subsequent year thereafter, but for the last Contract Year, from January 1 through the date that this Agreement terminates or expires.

3

"***Cubic Foot***" or "***cf***" means a volume of Gas occupying a space of one (1) cubic foot at a temperature of sixty degrees Fahrenheit (60° F) and at a pressure of fourteen and sixty-five hundredths (14.65) pounds per square inch absolute.

"***Curtailment Event***" has the meaning set forth in Section 12.1.

"***Curtailment Period***" has the meaning set forth in Section 12.1.

"***Day***" or "***Daily***" means a 24-hour period beginning at 9:00 a.m. Central Time on a calendar day and ending at 9:00 a.m. Central Time on the next succeeding calendar day.

"***Dedicated Area***" has the meaning set forth in the Recitals, as further specifically set forth on Schedule 4.3.

"***Dedicated Wells***" has the meaning set forth in Section 4.3(c).

"***Dedication"*** has the meaning set forth in Section 4.3(a).

"***Delivered Gas***" means the quantity of Gas in MMBtu that is received by Gatherer from Producer at each Receipt Point.

"***Dispute***" has the meaning set forth in Section 18.1.

002680

"***Downstream Pipeline***" means Panhandle Eastern Pipeline, Chisholm Pipeline or any other pipeline into which Gatherer may make deliveries of Gas, NGLs, or Condensate under this

Agreement for the account of Producer.

"***Easements***" has the meaning set forth in Section 4.2(a).

"***Effective Date***" has the meaning set forth in the introductory paragraph.

"***Existing Equipment***" has the meaning set forth in Section 5.1(c).

"***Extended Term***" has the meaning set forth in Section 2.1.

"***FERC***" means the Federal Energy Regulatory Commission, or any successor Governmental Authority.

"***Field FL&U***" means the Producer's allocated quantity of field fuel plus lost and unaccounted for Gas in MMBtu on an actual basis with a cap up to ████████████ of the Receipt Point Volumes. The field fuel component will include, but is not limited to, compressor fuel, dehydration fuel and stabilizer system fuel.

"***Firm***" means a gathering, processing or transportation service that is not subject to being curtailed, interrupted, prorated or suspended except as expressly provided in this Agreement.

"***Force Majeure***" has the meaning set forth in Section 13.1.

"***Force Majeure Event***" has the meaning set forth in Section 13.1.

"***Gallon***" means one (1) U.S. gallon.

"***Gas***" has the meaning set forth in the Recitals, and further means natural gas consisting predominantly of methane, but including the naturally occurring mixture of NGLs, heavier hydrocarbon gases and any non-combustible gases.

"***Gatherer***" has the meaning set forth in the introductory paragraph.

"***Gatherer Event of Default***" has the meaning set forth in Section 14.3.

"***Gatherer Group***" means any or all of (i) Gatherer, (ii) Gatherer's Affiliates, (iii) any of their respective contractors, and (iv) the officers, directors, employees, agents, advisors, counsel, consultants, members, shareholders, insurers, invitees or representatives of any of the foregoing.

"***Gathering and Processing System***" has the meaning set forth in the Recitals, specifically the (i) Gathering Pipeline System, (ii) Plant, (iii) Residue Gas Pipeline System, (iv) NGL Pipeline System, (v) any NGL storage facilities, (vi) any compression facilities, (vii) any custody transfer units, meters or measurement facilities, and (viii) any other equipment or appurtenances associated with the foregoing.

"***Gathering Fee***" has the meaning set forth in Schedule 7.1.

"***Gathering Pipeline System***" means the pipelines of various diameters interconnecting the Receipt Point(s) to the Plant, including any compression facilities before the inlet of the Plant.

"***Governmental Approval***" means any permit, license, permission, grant or other similar authorization issued by, or required to be issued by, any Governmental Authority and necessary for the performance of the Parties hereunder.

"***Governmental Authority***" means any federal, state, county, parish, municipal or other governmental subdivision, or any court or any governmental department, commission, board, bureau, agency or other instrumentality of any federal, state, county, municipal or other governmental subdivision within the United States of America with authority over the Parties and subject matter in question.

"***GPM***" means gallons of NGLs per Mcf of Gas.

"***Gross Heating Value***" means the number of Btu produced by the complete combustion, at constant pressure, of the amount of Gas which would occupy a volume of one Cubic Foot at a temperature of sixty degrees Fahrenheit (60° F) when saturated with water vapor and at a pressure equivalent to fourteen and sixty-five hundredths (14.65) pounds per square inch absolute, under standard gravitational force (acceleration 980.665 centimeters per second per second), with air of the same temperature and pressure as the Gas when the products of combustion are cooled to the initial temperature of the Gas and air and when the water formed by combustion is condensed to the liquid state. The Gross Heating Value so determined will be corrected from the conditions of testing to that of the actual condition of the Gas delivered, expressed in Btu per Cubic Foot and reported at a pressure base of fourteen and sixty-five hundredths (14.65) pounds per square inch

5

absolute; provided, however, if the water vapor content of the Gas delivered is seven pounds or less per one million Cubic Feet, the Gas will be assumed to be dry.

"*Indemnified Party*" has the meaning set forth in Section 11.2.

"*Indemnifying Party*" has the meaning set forth in Section 11.2.

"**In-Service Date**" means first Day of the first full Month following the date that Gatherer notifies Producer that the Gathering and Processing System has been completed and is ready to receive and process Committed Gas.

"*Interests*" means Producer's Interests, After-Acquired Interests and Other Interests.

"*Line Fill*" has the meaning set forth in Section 4.9(a).

"*Losses*" means any and all losses, damages, costs, expenses, liabilities, fines, penalties or judgments of whatever kind or character, including reasonable attorneys' fees, court costs and other reasonable costs and expenses of defending against any Claim.

"*Maintenance Event*" has the meaning set forth in Section 12.2.

"**MAOP**" means the maximum allowable operating pressure in psig at such Receipt Points in effect from time to time, as set forth in notices from KFM to Customer, but in no event less than fifty (50) psig.

"***Mcf***" means one thousand (1,000) Cubic Feet.

"***MMBtu***" means one million (1,000,000) Btu.

"***Month***" or "***Monthly***" means a period beginning at 9:00 a.m. Central Time on the first Day of a calendar month and ending at 9:00 a.m. Central Time on the first Day of the next succeeding calendar month.

"***Mustang***" means Mustang Gas Products LLC.

"***Mustang Agreement***" means that certain Gas Purchase Agreement dated April 1, 2015, by and between Alta Mesa Holdings, LP and Mustang pursuant to which Producer has dedicated Gas and NGLs to Mustang produced from the wells identified on Schedule 1.1.

"***New Receipt Point***" has the meaning set forth in Section 4.11.

"***New Receipt Point Notification***" has the meaning set forth in Section 4.11(a).

"***New Well Notification***" has the meaning set forth in Schedule 4.12

"***NGL Content***" means quantity of ethanes and heavier hydrocarbons in Gas at the Receipt Point.

6

"***NGL Delivery Point***" means those points of delivery for third party sales of NGL set forth on Schedule A-3, as the Parties may mutually agree to modify from time to time.

"***NGL Index Price***" means ███████████████ of the Monthly average of the applicable daily posting or other index price(s) received by Gatherer for each component of NGL, including any deductions for Affiliate or marketing charges and any deduction for third party transportation, fractionation and marketing charges, which will be passed through to Producer without markup.  The Parties acknowledge and agree that the daily posting applicable to NGL during the Term of this Agreement shall be the "Conway In-Well Spot Gas Liquids Prices for any Current Month" as published by OPIS.

"***NGL Pipeline System***" means the pipeline(s) interconnecting the Plant to the NGL Delivery Point(s).

"***NGLs***" has the meaning set forth in the recitals, specifically hydrocarbons heavier than methane, such as ethane, propane, normal butane, isobutane, pentanes and heavier hydrocarbons, and mixtures thereof separated into the Y-Grade Stream at the Plant.

"***Notice***" has the meaning set forth in Section 9.1.

"***Notification Date***" has the meaning set forth in Section 4.11(a).

"***NRP Connection Fee***" has the meaning set forth in Section 4.11(b).

"***Off-Spec Gas***" has the meaning set forth in Section 5.2.

002686

"***Original Agreement***" has the meaning set forth in the Recitals.

"***Original Date***" means August 31, 2015.

"***Other Fuel***" means electricity consumed in the operation of the Gathering and Processing System or Plant.

"***Other Fuel Fee***" means Producer's allocated share of the actual cost of Other Fuel.

"***Other Interests***" means the interests of Persons in the Dedicated Area other than Producer, but whose interests are represented or controlled by Producer, including working interests, royalty interests, overriding royalty interests, net profits interests or other mineral interests to the extent such interests were not granted by, through or under Producer after the Original Date, *provided* nothing in this Agreement is intended to impair, impede or affect the rights of the owners of the Other Interests to take Gas, NGLs or hydrocarbons in-kind and/or to sell gas, NGLs or hydrocarbons for their own account.

"***Overdue Rate***" means rate per annum equal to the lesser of (i) an annual rate equal to four percent (4%) per annum above the "prime rate" specified under the caption "Money Rates" in the *Wall Street Journal* (New York Edition) on the date such payment was required to have been made, or (ii) the maximum rate of interest permitted by Applicable Law.

7

"*Panhandle Eastern Pipeline*" means the downstream interstate natural gas pipeline operated by Panhandle Eastern Pipe Line Company, LP.

"*Partial In-Service Date*" means the first day of the first full Month following the date that Gatherer notifies Producer that the Partial Commercial Operation Date has occurred and the Gathering and Processing System is ready to receive Committed Gas.

"*Party*" and "*Parties*" have the meaning set forth in the introductory paragraph.

"*Person*" means any individual, firm, corporation, trust, partnership, limited liability company, association, joint venture, other business enterprise or Governmental Authority.

"*Plant*" means any gas processing plant utilized by Gatherer to process Gas, whether or not owned or operated by Gatherer.

"*Plant FL&U*" means the Producer's allocated quantity of Plant fuel plus lost and unaccounted for Gas in MMBtu on an actual basis with a cap up to ███████████████ ██████ of the Plant Inlet Volume.

"*Plant Inlet Volume*" means the volume in MMBtu of Committed Gas received and accepted at the Receipt Points less Field FL&U and Condensate.

"*Plant Recovery Factor*" means an amount determined ██████████

002688

"***Price Index***" has the meaning set forth in Section 7.3.

"***Primary Term***" has the meaning set forth in Section 2.1.

"***Processing Fee***" has the meaning set forth in Schedule 7.1.

"***Producer***" has the meaning set forth in the introductory paragraph.

"***Producer Capacity***" has the meaning set forth in Section 4.6.

"***Producer Event of Default***" has the meaning set forth in Section 14.1.

"***Producer Group***" means any or all of (i) Producer, (ii) Producer's Affiliates, (iii) Producer's contractors and suppliers, of every tier, other than the Gatherer Group, and (iv) the officers, directors, employees, agents, advisors, counsel, consultants, members, shareholders, insurers, invitees or representatives of any of the foregoing.

"***Producer's In-Kind Option***" has the meaning set forth in Section 6.1(e).

"***Producer's Interests***" means all oil and gas leasehold interests and other mineral interests in lands, leases, wells and Gas that Producer owned as of the Original Date in the Dedicated Area, including the oil and gas leasehold interests and other mineral interests set forth on Schedule 1.1.

"**_Receipt Point_**" means the points located within the Dedicated Area where Producer elects in its sole and reasonable discretion to deliver Producer's Gas to Gatherer and where Gatherer may receive Producer's Gas in accordance with the terms of this Agreement. At Producer's election, a Receipt Point for particular volumes of Producer's Gas may be the inlet of Gatherer's facilities at the interconnection of Producer's central production facilities with the Gathering and Processing System or may be at the inlet of Gatherer's facilities at the interconnection with the Gathering and Processing System of Producer's individual well separation equipment located downstream of Producer's Wells.

"**_Receipt Point Volume_**" means the quantity of Committed Gas, expressed in MMBtu, received and accepted by Gatherer at the Receipt Points.

"**_Residue Gas_**" means the total Receipt Point Volume _minus_ Field FL&U _minus_ Condensate _minus_ Plant FL&U _minus_ Buy-Back Volume Gas _minus_ Shrinkage, expressed in MMBtu.

"**_Residue Gas Delivery Point_**" means those points of delivery for third party sales of Residue Gas set forth on Schedule A-2, as the Parties may mutually agree to modify from time to time.

"**_Residue Gas Index Price_**" means ███████████████████████████████

002690

"**_Residue Gas Pipeline System_**" means the pipeline(s) interconnecting the Plant to the Residue Gas Delivery Point(s)

"***Residue Gas Transportation Fee***" means a transportation fee equal to ███████████ per MMBtu, initially, which amount shall be adjusted by Gatherer from time to time to reflect any applicable third party transport tariffs for Residue Gas incurred by Gatherer, which shall be passed through without mark-up to Producer.

"***Service Fees***" has the meaning set forth in Section 7.1.

"***Shrinkage***" means the decrease in Committed Gas volume as adjusted for heating content that results from the conversion of liquefiable hydrocarbons in the Gas into NGLs.

"***Specifications***" has the meaning set forth in Section 5.2.

"***Specified Area***" has the meaning set forth in Section 4.11(b).

"***System Capacity***" means the then-maximum capacity of the Gathering and Processing System to gather and process Gas, not to exceed the then-determined compression capacity on the Gathering and Processing System, based on NGL Content of Gas of seven (7) GPM.

"***System Pressure***" has the meaning set forth in Section 5.4.

"***Taxes***" means all gross production, severance, conservation, and similar taxes measured by or based upon production, together with all taxes on the right or privilege of ownership of Gas,

9

or upon the services rendered herein, including gathering, transportation, handling, transmission, dehydration, compression, processing, treating, conditioning, distribution, sale, use, receipt, delivery or redelivery of Gas, including all of the foregoing now existing or in the future imposed or promulgated.

"*Term*" means the Primary Term and any Extended Term.

"*Theoretical Gallons*" means the number of gallons of NGLs that are present in Gas as determined at a particular point, as determined by multiplying: (i) the GPM as determined by chromatographic analysis or gas sampling at each Receipt Point, by (ii) the Plant Inlet Volume (in Mcf) from such well at the Receipt Point for the Month.

"*Transportation Interests*" has the meaning set forth in Section 3.1(a).

"*Wells*" shall mean any well classified by any governmental authority or under any applicable Law as a gas well in which gas produced therefrom has been Dedicated to Gatherer under this Agreement, whether such well now exists or is hereafter drilled.

"*Y-Grade Stream*" means mixed NGLs that have been removed from the Gas at the Plant by means of processing activities, but which have not been separated into individual NGL components.

**Section 1.2    Interpretation.**

002692

References in the singular shall include the plural, and references to the masculine shall

include the feminine, and vice versa. Words denoting natural persons shall include partnerships, firms, companies, corporations, joint ventures, trusts, associations, organizations or other entities. References to a particular article, section, subsection, paragraph, subparagraph or schedule, if any, shall be a reference to such article, section, subsection, paragraph, subparagraph or schedule in and to this Agreement. The words "include" and "including" shall include the phrase "not limited to." Any reference to a Person shall include that Person's successors and assigns or to any Person succeeding to that Person's functions. Any Schedules are fully incorporated and made part of this Agreement. The Schedules shall be read in conjunction with the provisions of the body of this Agreement, and the Schedules and the body of this Agreement shall be interpreted to give effect to the intent of the Parties as evidenced by their terms when taken as a whole, *provided, however*, that in the event of an express and irreconcilable conflict between the terms of a Schedule and the provisions of the body of this Agreement, the provisions of the body of this Agreement shall control.  Capitalized terms appearing in a Schedule shall have the meanings set forth in Section 1.1, unless the context requires otherwise.

**ARTICLE II**
**TERM**

**Section 2.1**      **Term.**

This Agreement shall be effective as of the Original Date, and, unless earlier terminated in accordance with any express provision of this Agreement, shall remain in full force and effect for a period of fifteen (15) years from the In-Service Date (the "***Primary Term***"), *provided, however*,

10

that, to the extent that at the end of the Primary Term there are Wells then-connected to the Gathering and Processing System and then-producing Gas and NGLs in commercial (paying) quantities, the term of this Agreement shall extend for so long as such Well(s) continue to produce Gas or NGLs in commercial (paying) quantities (the "***Extended Term***").

## ARTICLE III
## GRANT OF TRANSPORTATION RIGHT

**Section 3.1**        **Conveyance of Transportation Right.**

(a)        For good and valuable consideration paid by Gatherer, the receipt and sufficiency of which are hereby acknowledged, Producer grants, bargains, sells, conveys, transfers, assigns and delivers unto Gatherer, as of the Original Date until the end of the Term, unless earlier reverted in accordance with Section 4.11(f), the sole and exclusive right to transport minerals from the Producer's Interests and After-Acquired Interests, specifically the right to gather, process, stabilize, dehydrate, compress, meter, measure and store Gas and NGLs that may be produced and saved therefrom (the "***Transportation Interests***").

(b)        At the end of the Primary Term, the Transportation Interests will revert automatically to Producer or the other applicable owners thereof save and except the Transportation Interests insofar only as Gas and NGLs that may be produced and saved from the Dedicated Wells, which shall continue until the end of the Extended Term. At the end of the Extended Term or upon the earlier termination of this Agreement in

002694

accordance with any express provision of this Agreement, all of Gatherer's remaining Transportation Interests will revert automatically to Producer or the other applicable owners thereof and Gatherer shall execute and deliver to Producer a recordable release and quitclaim in and to any rights, including Transportation Interests, in the Interests.

(c)     The Transportation Interests conveyed to Gatherer are subject to (i) any valid and enforceable prior dedication in favor of Mustang under the Mustang Agreement, (ii) with respect to any After-Acquired Interests within the Dedicated Area, any valid and enforceable prior written dedication or commitment for gathering of Gas, NGLs, and other minerals as of the time of the acquisition by Producer, (iii) Producer's right to transfer Gas and NGLs produced from the Interests that Producer is expressly required to deliver under the oil and gas leasehold interests and other mineral interests comprising the Interests, (iv) with respect to the Other Interests, the rights of the owners of such Other Interests to take in kind and separately dispose of their share of Gas and NGLs produced from the Dedicated Area and (v) the terms and conditions of this Agreement.

**Section 3.2      Real Interests.**

Producer and Gatherer intend that the conveyance of the Transportation Interests be a conveyance of a portion of Producer's real property interests included in the Interests (including the interests of others whose interests are represented or controlled by Producer insofar only as Producer has the power and authority to grant Transportation Interest in the interests of such third

11

parties). Producer and Gatherer agree that Gatherer has a determinable real property interest carved out of the Interests.

## ARTICLE IV
## GATHERING AND PROCESSING SYSTEM

Section 4.1        **Construction of Gathering and Processing System.**

Gatherer shall, at its sole cost and expense, design, engineer, construct, equip and modify, or caused to be designed, engineered, constructed, equipped and modified, the Gathering and Processing System.  Gatherer shall exercise commercially reasonable efforts to (a) achieve the Partial Commercial Operation Date by the date that is nine (9) Months after the Effective Date and (b) achieve the Final Commercial Operation Date by the date that is twelve (12) Months after the Effective Date.

Section 4.2        **Easements, Rights-of-Way and Fee Lands.**

(a)        To the extent that (i) Producer may do so in compliance with all applicable agreements, and (ii) Gatherer's activities on the relevant lands do not unreasonably interfere with Producer's operations, Producer, from the Original Date until the end of the Term, unless earlier reverted in accordance with this Agreement, hereby conveys and assigns to Gatherer, to the extent that Producer may do so without payment of monies (unless Gatherer agrees to pay), an exclusive easement and right-of-way in and to the surface of the Interests for purposes of constructing, owning, operating, repairing, replacing and maintaining pipelines and other facilities for gathering, processing, stabilizing

002898

and maintaining pipelines and other facilities for gathering, processing, stabilizing, dehydrating, compressing, metering, measuring, storing and redelivering to Producer all Gas and NGLs that may be produced and saved from the Interests, including the Gathering and Processing System (the "**Easements**"); *provided, however*, an Easement shall be non-exclusive to the extent that (x) Producer requires access to the surface of the Interests to install Receipt Points, connect any wells to Receipt Points or connect Receipt Points to the Gathering and Processing System, in each case, in accordance with the express terms of this Agreement or (y) any easement or right-of-way conveyed to Mustang under the Mustang Agreement, covers the same portion of the surface of the Interests as such Easement. At the end of the Primary Term, all of the Easements will revert automatically to Producer or the owners of such applicable rights except to the extent such easements and rights-of-way are necessary for owning, operating, repairing, replacing and maintaining any portion of the Gathering and Processing System used to provide service under this Agreement to the Dedicated Wells, and such easements and rights-of-way shall continue until the end of the Term. At the end of the Term, Gatherer's easements and rights-of-way will revert automatically to Producer or the other applicable owners thereof.

　　　　**Section 4.3**　　　　**Dedication.**

　　　　(a)　　　　For the Term of this Agreement, Producer hereby dedicates to Gatherer all Gas and NGLs that may be produced and saved from the Interests for the purpose of gathering, processing, stabilizing, dehydrating, compressing, metering, measuring, storing and acquiring from Producer such Gas and NGLs, for delivery to Gatherer at the Receipt

12

002697

Point(s) all Committed Gas as and when produced and saved (the "***Dedication***"), *provided* that notwithstanding the Dedication, Producer, as the owner of the Gas, NGLs, and other minerals, shall continue to retain its right to (i) administer the Interests as it deems advisable in its sole discretion, including the right to rework, shut in, plug or abandon any well, (ii) form or participate in the formation of any unit, (iii) use Gas and NGLs in its operations, and (iv) deliver Gas and NGLs that Producer is expressly required to deliver under oil and gas leases, contractual agreements or other legal rights under which Committed Gas and NGLs are produced, in each case to the extent such leases, agreements and rights existed prior to the Original Date and only until such leases, agreements or commitments expire or are terminated; *provided further* that the Dedication is subject to (w) any valid and enforceable prior written dedication in favor of Mustang under the Mustang Agreement, (x) with respect to any After-Acquired Interests within the Dedicated Area, any valid and enforceable prior written dedication or commitment for gathering processing or sale of Gas, NGLs, and minerals as of the time of the acquisition by Producer, (y) Producer's right to transfer Gas and NGLs produced from the Interests that Producer is expressly required to deliver under the oil and gas leasehold interests and other mineral interests comprising the Interests and (z) with respect to the Other Interests, the rights of the owners of such Other Interests, to take in-kind and separately dispose of their share of Gas and NGLs produced from the Other Interests.

(b)     If, after the Original Date and before the end of the Primary Term, Producer acquires (x) oil and gas leasehold or other mineral interests, including by way of joint venture participation, drill-to-earn rights or other means, within the Dedicated Area or (y) interests of Persons in the Dedicated Area other than Producer but whose interests are

represented or controlled by Producer insofar as Producer has the power and authority to dedicate such interest to third parties (the "*After-Acquired Interests*"). Effective simultaneously with the acquisition of the After-Acquired Interests by Producer, Producer hereby dedicates to Gatherer all Gas and NGLs that may be produced and saved from such After-Acquired Interests for the purpose of gathering, processing, stabilizing, dehydrating, compressing, metering, measuring, storing and acquiring from Producer such Gas and NGLs, for delivery to Gatherer at the Receipt Point(s) all Committed Gas as and when produced and saved, *provided, however*, to the extent that any of the After-Acquired Interests or Gas in the Dedicated Area are subject to any valid and enforceable prior written dedication or commitment for gathering as of the time of acquisition by Producer, then such dedication or commitment shall be senior to the Dedication until such prior dedication or commitment terminates or expires, *provided further* that if, with respect to any After-Acquired Interests, Producer has the right or ability, without payment of any material fee or penalty, or incurring any other material disadvantage, to terminate any such valid and binding prior dedication or commitment with respect to the After-Acquired Interests, then Producer shall terminate such dedication or commitment as soon as reasonably practicable. Producer shall promptly notify Gatherer in writing of any such termination, and identify the After-Acquired Interests.

(c)     At the end of the Primary Term, the Dedication shall terminate automatically except to the extent of all Gas and NGLs that may be produced from the Interests through any well in the Dedicated Area connected to the Gathering and Processing

13

002699

System at the end of the Primary Term (such wells, the "***Dedicated Wells***").  From and after the end of the Term, all Interests shall be permanently released from the Dedication.

(d)    In connection with any After-Acquired Interests, Producer and Gatherer shall execute and deliver any additional documents and instruments and perform any additional acts that may become reasonably necessary or appropriate to evidence of record, and ratify with respect to such After-Acquired Interests, the grant of the Dedication, Transportation Interests and Easements granted under the terms of this Agreement.

### Section 4.4        Covenant Running With Land.

For the Term, the Dedication under this Agreement shall be a covenant running with the land and the Interests and shall be binding on successors and assignees of the Parties. Contemporaneously with the execution of this Agreement, and from time-to-time during the Term if necessary, the Parties shall each execute for recordation in the public records of the Dedicated Area a "short form" memorandum of this Agreement in the form of **Schedule 4.4** attached hereto, identifying the Dedicated Area, the Interests, After-Acquired Interests and wells thereon.  Producer shall cause any conveyance of all or any of the Producer's Interests or After-Acquired Interests, to be made expressly subject to this Agreement, and to cause all transferees to execute a written instrument in a form reasonably satisfactory to Gatherer acknowledging (i) the conveyance of the Transportation Interests and the Easements, (ii) the Dedication and (iii) such transferees' obligations under this Agreement.  Gatherer shall likewise cause any assignment or conveyance of the Transportation Interests, the Dedication or all or any segment of the Gathering and Processing System to be made expressly subject to this Agreement, and to cause all transferees to execute a

002700

written instrument in a form reasonably satisfactory to Producer acknowledging such transferees'
obligations under this Agreement. The Parties shall reasonably cooperate to amend, restate and
record such "short form" memorandum, as may be necessary in connection with the creation of
any New Receipt Points or the drilling of any new wells in accordance with Sections 4.11 and
4.12.

### Section 4.5      Covenant Not to Process Committed Gas.

Producer shall not process Committed Gas, or allow Committed Gas to be processed, or
otherwise cause or allow NGLs or other constituent components of the Gas to be removed from
Committed Gas, other than by means of mechanical separation at the well head, prior to delivery
to Gatherer at the Receipt Point(s).

### Section 4.6      Option to Expand Gathering and Processing System.

Gatherer shall gather and process volumes of Committed Gas up to 260 million cf/day on
a Firm basis when the System Capacity is capable of processing such volumes (the "*Producer
Capacity*"). All volumes of Committed Gas above the Producer Capacity shall at all times be
Committed Gas. To the extent that Committed Gas shall exceed the Producer Capacity, Gatherer
shall have the option to (a) utilize any System Capacity in excess of the Producer Capacity, (b)
utilize another Plant or Plants to process such Committed Gas, or (c) expand the Gathering and
Processing System as many times as necessary by adding additional System Capacity (the
"*Additional Capacity*"). In the event that production from the Interests shall exceed the Producer

14

Capacity, Producer shall provide no less than six (6) months' prior Notice to Gatherer that production exceeds Producer Capacity, and Gatherer shall provide Notice to Producer within sixty (60) Days of Gatherer's receipt of Producer's Notice that Gatherer will or will not accept such volumes of Committed Gas or add Additional Capacity. In the event that Gatherer provides Notice to Producer that it will not accept such volumes of Committed Gas above the Producer Capacity or add Additional Capacity, then the well bore from which the volumes of Committed Gas above the Producer Capacity are directly produced shall be released from the Dedication, and Producer may take such volumes of Committed Gas elsewhere. In the event that Gatherer provides Notice to Producer that it will accept such volumes of Committed Gas above the Producer Capacity or add Additional Capacity, then, until Gatherer is able to process such Committed Gas, or until the Additional In-Service Date for such Additional Capacity, Producer may deliver any volumes of Committed Gas above the Producer Capacity of the Gathering and Processing System elsewhere, provided that once Gatherer is able to process such volumes of Committed Gas, all such volumes of Committed Gas shall be delivered to Gatherer at a Receipt Point. **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, PRODUCER'S RIGHT TO TAKE THE AFFECTED VOLUMES OF COMMITTED GAS ELSEWHERE DURING ANY PERIOD WHERE GATHERER REFUSES TO TAKE VOLUMES OF PRODUCER'S COMMITTED GAS THAT EXCEED PRODUCER CAPACITY, AND THE RELEASE FROM DEDICATION, IF APPLICABLE, SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY, AT LAW OR IN EQUITY, WITH RESPECT TO GATHERER'S INABILITY OR REFUSAL TO TAKE VOLUMES OF COMMITTED GAS THAT EXCEED PRODUCER CAPACITY.**

**Section 4.7**      **Title Warranty.**

Producer represents and warrants to Gatherer that:  (i) it owns Producer's Interests, (ii) has the right to convey the Transportation Interests and the Easements, (iii) has the right to dedicate all Producer's Interests and Gas and NGLs dedicated under this Agreement, and to deliver Committed Gas to the Receipt Point(s), free and clear of all liens, encumbrances and claims by, through and under Producer except for: (A) "Permitted Liens" as defined under the Sixth Amended and Restated Credit Agreement among Alta Mesa Holdings, LP, as Borrower, Wells Fargo Bank, N.A. and the lenders party thereto from time to time, dated May 13, 2010, as amended from time to time; (B) "Permitted Liens" as defined under the Note Purchase Agreement dated August 31, 2015 among HMS Kingfisher Holdco, LLC, the holders thereunder from time to time and the agent for such holders, as amended from time to time; and (C) statutory lien and owner rights under 52 Okla. Stat. §§549.1, *et seq.* and 570.1, *et seq.*; and (iv) there are no valid and enforceable dedications or commitments existing as of the Original Date covering any of Producer's Interests or Gas or NGLs produced from the Producer's Interests within the Dedicated Area, except for (x) such dedications or commitments in favor of Mustang, if any (excluding the Mustang Agreement), that would not result in Producer delivering to Gatherer materially less volumes of Gas and NGLs than would have been delivered by Producer as Committed Gas if such prior dedications and commitment had not existed as of the Original Date, and (y) the Mustang Agreement.

15

**Section 4.8**         **Proceeds of Production.**

Producer shall make payment of all royalties, overriding royalties, production payments, and all other payments attributable to the Interests and Committed Gas due to any Person under any leases or agreements in accordance with the terms thereof, and Gatherer shall have no obligations with respect thereto.

**Section 4.9**         **Operating Inventory.**

To the extent that it is necessary for the operation of the Gathering and Processing System, Producer shall be responsible for providing Dedicated Gas to be used as line fill (the "***Line Fill***") in the Gathering and Processing System.  To the extent that other customers of Gatherer are also utilizing the Gathering and Processing System, the amount of Dedicated Gas provided by Producer for Line Fill shall be pro rata with the volume of Gas being supplied by other customers of Gatherer in the Gathering and Processing System.

**Section 4.10**        **Receipt Points.**

The proposed design and a list of initial Receipt Points are set forth in **Schedule 4.10**.

**Section 4.11**        **New Receipt Points; Obligation to Interconnect.**

As to Completed Wells operated by Producer, the Parties shall use the following process for connecting new Receipt Points to the Gathering and Processing System (each, a "***New Receipt Point***"):

(a)    Producer shall provide written notice to Gatherer for New Receipt Points in the Dedicated Area as follows: (1) no later than █████████ Days prior to the expected date of first flow to Gatherer setting forth the expected date of first flow for New Receipt Points within the Specified Area; or (2) no later than █████████████████ days prior to the expected date of first flow to Gatherer setting forth the expected date of first flow for New Receipt Points outside the Specified Area (as applicable, the "***Notification Date***"), location and volume profile for such Receipt Point in the form attached hereto as Schedule 4.11(a) (an "***New Receipt Point Notification***").

███████████████████████████████████████████████████████
███████████████████████████████████████████████

      (b)    Upon Gatherer's receipt of any New Receipt Point Notification from Producer under subsection (a) above that is within the boundaries of the area depicted on the map attached hereto as Schedule 4.11(b) (the "***Specified Area***"), Gatherer shall provide Producer with a cost (the "***NRP Connection Fee***"), schedule, and scope of work required to connect each New Receipt Point to the Gathering and Processing System within █████████ days of receiving Producer's New Receipt Point Notification.  Producer may elect to either (i) have Gatherer perform the scope of work required to connect the New Receipt Point into the Gathering and Processing System and reimburse Gatherer the NRP Connection Fee in accordance with Section 4.11(c), (ii) have Gatherer perform the scope of work required to connect the New Receipt Point and pay Gatherer ███████ per MMBtu of Delivered Gas until the NRP Connection Fee has been paid in full, or (iii) perform the

16

scope of work required to connect the New Receipt Point into the Gathering and Processing System by itself. If Producer elects to perform the interconnection itself, it shall ensure that the New Receipt Point is assigned to Gatherer upon completion. If Producer elects item (ii) above, then Producer shall (y) connect to the New Receipt Point no later than ███ ███████████████) days after the New Receipt Point is completed, and (z) if, after ██████████ months from the connection date, the volume of Delivered Gas is insufficient to reimburse the NRP Connection Fee in full, then Producer shall promptly pay Gatherer the unpaid remaining portion of the NRP Connection Fee. Producer shall notify Gatherer of its decision to either have Gatherer perform the scope of work, or if Producer will perform the scope of work, no later than ████████ days after receiving the NRP Connection Fee from Gatherer.

(c)    In the event Producer elects to have Gatherer perform the scope of work required to connect a New Receipt Point in the Specified Area into the Gathering and Processing System in accordance with Section 4.11(b)(i) above, then Producer shall pay Gatherer's estimated NRP Connection Fee no less than ten (10) days prior to Gatherer's commencement of its scope of work. Following Gatherer's completion of its scope of work and the date of first flow from such New Receipt Point, Gatherer shall submit a final invoice and any supporting documentation regarding the actual costs and expenses associated with such NRP Connection Fee in accordance with Section 8.3. If the actual NRP Connection Fee is greater than the estimated NRP Connection Fee, then Producer shall pay the difference to Gatherer within fifteen (15) days from Producer's receipt of Gatherer's statement. If the actual NRP Connection Fee is less than the estimated NRP Connection Fee, then Gatherer shall pay the difference to Producer within fifteen (15) days

from Producer's receipt of Gatherer's statement. Any disputes related to the final NRP connection fee shall be resolved in accordance with Section 3.

(d)    Upon Gatherer's receipt of any New Receipt Point Notification from Producer under subsection (a) above that is not within the Specified Area, the Parties shall reasonably consult with each other and mutually determine whether to connect such New Receipt Point to the Gathering and Processing System, timing of such connection, and allocation of costs.

(e)    After the Notification Date, if (i) Producer has delivered a New Receipt Point Notification in the Dedicated Area in the time period in Section 4.11(a) above and (ii) Gatherer has not connected such New Receipt Point to the Gathering and Processing System within ████████ Days after the Notification Date, except for reasons due to Force Majeure, then Gatherer shall discount the then-applicable Gathering Fee by ████ per MMBtu for Producer's Gas delivered to the New Receipt Point. Such discounted Gathering Fee shall apply on a Daily basis, equal to the number of Days after the date the Completed Well is capable of flowing to that New Receipt Point. If the New Receipt Point Notification is received by Gatherer less than ████████ Days prior to the required first flow date, then Gatherer shall not be required to discount the Gathering Fee for a period of ████████ Days from the Notification Date.

(f)    In the event that Gatherer provides Notice to Producer that Gatherer will not make a requested interconnection for any New Receipt Point within the Dedicated

17

Area, then, effective simultaneously with the delivery of such Notice, (i) the ███ in question shall be released from the Dedication, (ii) the Transportation Rights insofar only as Gas and NGLs that may be produced and saved from the ███ in question shall automatically revert back to Producer and (iii) any Easement rights hereunder to the extent necessary for purposes of Producer or any third party constructing, owning, operating, repairing, replacing and maintaining pipelines and other facilities for gathering, processing, stabilizing, dehydrating, compressing, metering, measuring, storing and redelivering to Producer all Gas and NGLs that may be produced and saved from such ███ in question shall automatically revert back to Producer. In connection with the release of Transportation Interests or Easements pursuant to this Section 4.11(f), Producer and Gatherer shall execute and deliver any additional documents and instruments and perform any additional acts that may become reasonably necessary or appropriate to effectuate the reversion of Transportation Interests and Easements with respect thereto. **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, THE RELEASE FROM DEDICATION SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY, AT LAW OR IN EQUITY, WITH RESPECT TO GATHERER'S REFUSAL TO INTERCONNECT A NEW RECEIPT POINT.**

**Section 4.12    Additional Wells.**

(a)    No later than seventy (70) Days prior to drilling any Well in the Dedicated Area, Producer shall provide written notice to Gatherer setting forth the location, expected date of first flow to Gatherer, expected date of interconnection to a Receipt Point,

(b)     Upon receipt of any New Well Notification for a Well that is not operated by Producer, Gatherer shall have the option, exercisable in its sole discretion at any time within ███████days following receipt of such New Well Notification from Producer, to interconnect the Gathering and Processing System to such Wells at its sole cost and expense.  If Gatherer does not exercise the option set forth in this Section 4.12(b), then (i) such ████ shall be released from the Dedication, (ii) the Transportation Interests insofar only as Gas and NGLs that may be produced and saved from the ████ shall automatically revert back to Producer and (iii) any Easement rights hereunder to the extent necessary for purposes of Producer or any third party constructing, owning, operating, repairing, replacing and maintaining pipelines and other facilities for gathering, separating, metering, measuring, storing and redelivering to Producer all Gas and NGLs that may be produced and saved from such ████ shall automatically revert back to Producer.  In connection with the release of Transportation Interests or Easements pursuant to this Section 4.12(b), Producer and Gatherer shall execute and deliver any additional documents and instruments and perform any additional acts that may become reasonably necessary or appropriate to effectuate the reversion of Transportation Interests and Easements with respect thereto. **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, THE RELEASE OF A WELL FROM DEDICATION SHALL BE PRODUCER'S SOLE AND EXCLUSIVE**

18

**REMEDY, AT LAW OR IN EQUITY, WITH RESPECT TO GATHERER'S ELECTION TO INTERCONNECT A NON-OPERATED WELL**.

Section 4.13    **Buy-Back Gas.**    At any time and from time to time during the term hereof, Producer may request Gatherer to deliver to Producer Buy-Back Gas from Gatherer's Gathering and Processing System. Such service shall be offered by Gatherer to Producer in accordance with the following terms and conditions:

(a)    Upon such request, (x) Gatherer shall: install, own, operate and maintain a Buy-Back Meter at each Receipt Point; and (y) Producer shall connect to Gatherer's Buy-Back Meter(s) and shall install, own, operate and maintain at Producer's sole expense all necessary equipment and facilities downstream of all such Buy-Back Meter(s), including, without limitation, compression facilities and equipment.

(b)    Producer shall pay Gatherer the "***Buy-Back Service Fee***" and "***Buy-Back Meter Fee***" as set forth in **Schedule 7.1**.

(c)    Each Receipt Point Meter shall be equipped with a Buy-Back Meter. Following the Effective Date, to the extent Producer desires Gatherer to install one or more new Buy-Back Meters in connection with an New Receipt Point, Producer shall specify same in such New Receipt Point Notification.

**ARTICLE V**
**GAS QUALITY AND PRESSURE**

002710

(a)      Gatherer shall be responsible for measurement, equipment and testing at the Receipt Points and downstream of the Receipt Points, each in accordance with the protocols set forth on **Schedule 5.1**.

(b)      Subject to Producer's safety rules, regulations and procedures, Producer hereby grants to Gatherer, and Gatherer's contractors or agents, a right of entry onto any of the lands covered by the Interests and access to the Producer side of a Receipt Point, as necessary, for the purpose of sampling Gas pursuant to Section 5.2 below, and shall facilitate, as necessary, access with surface owners where requested by Gatherer.

(c)      Gatherer and Producer shall exercise good faith efforts to identify all existing Receipt Point instruments, equipment, well pad meters, and other assets owned by Producer that are necessary for Gatherer to perform its obligations hereunder (the "***Existing Equipment***") and Producer and Gatherer shall reasonably cooperate to take any and all actions needed to transfer, convey, and assign to Gatherer, at no cost, all right, title, and interest in and to such Existing Equipment prior to the In-Service Date.  Producer acknowledges and agrees that any existing Receipt Point that is assigned to Gatherer will be exempt from the Contract Pressure requirements set forth in Section 5.5 to the point where it connects to the Gatherer-installed system where the pressure will be subject to the Contract Pressure requirements.

19

**Section 5.2        Specifications.**

Committed Gas delivered by Producer at the Receipt Points shall meet or exceed the quality requirements set forth in **Schedule  5.2**, and Residue Gas and NGLs delivered to the Residue Gas Delivery Point and NGL Delivery Point shall meet the quality requirements, if any, of the Downstream Pipelines (as applicable, the "***Specifications***").  Gatherer shall have a right to reject all Committed Gas that does not meet the Specifications ("***Off-Spec Gas***"), or which causes Residue Gas or NGLs to fail to meet the Specifications of a Downstream Pipeline, and may shut in well(s) of Producer or shut down a Receipt Point or portions of the Gathering and Processing System as necessary to deal with Off-Spec Gas.  The foregoing notwithstanding, Off-Spec Gas shall not be released from the Dedication.

**Section 5.3        Delivery Pressure.**

Producer shall deliver Gas at the Receipt Point(s) at a pressure sufficient to enter the Gathering and Processing System and shall not exceed the maximum allowable operating pressure of the Gathering and Processing System at such Receipt Point, but in no event less than fifty (50) psig.  Gatherer shall deliver Gas at the Residue Gas Delivery Point(s) at a pressure in accordance with the requirements or directives of the applicable Downstream Pipeline.

**Section 5.4        Compression.**

Gatherer shall install three (3) stages of field compression to provide reduced operating pressures at a Receipt Point to at least ███████████ psig (the "***System Pressure***").  Gatherer shall exercise commercially reasonable efforts to install such compression facilities as soon as

shall exercise commercially reasonable efforts to install such compression facilities as soon as
reasonably practicable.

Gatherer shall install one (1) stage of residue compression at the Plant facility.

### Section 5.5        Pressure.

As to Completed Wells operated by Producer:

(a)    Producer shall deliver, or cause to be delivered, to Gatherer the Gas to be gathered and/or processed at the line pressures existing in the Gathering and Processing System as such pressure may exist from time to time not to exceed the MAOP of the Gathering and Processing System at such Receipt Point.   Producer shall install, operate, and maintain, at its sole expense, such pressure regulating devices as may be necessary to regulate the pressure of gas prior to delivery to Gatherer so as not to exceed the MAOP of the Gathering and Processing System at such Receipt Point. If Producer fails to regulate such pressure at any time during the term of this Agreement, then Gatherer may install shut-in or other pressure relieving devices at the Receipt Point(s) upstream of the measurement device.

(b)    <u>Pressure Discount</u>. Subject to a ███████ Day grace period after a Well connection, if the Monthly average pressure measured on the Gathering and processing System at any Receipt Point exceeds ████████████ psig ("***Contract Pressure***"), Customer shall provide written notice to KFM.   If pressures at such Receipt Point

20

002713

still exceed ████████████ psig ████████ days after Producer's Notice is received, Gatherer shall discount the then-applicable Service Fee for the impacted Receipt Point as described below when pressures fall into the below ranges:

| Pressure Range | Applicable Fee Discount |
|:---:|:---:|
| 76 – 100 | ███████ |
| 101 – 120 | ███████ |
| ≥ 121 | ███████ |

(c)     Such discounted Service Fee shall apply on a Daily basis and only for so long as the affected Receipt Point experiences greater than the thresholds set forth herein, including the historical days within the ████████████████ day periods specified above.  If Gatherer fails to maintain the Monthly average pressures below ████████████ psig at any Receipt Point for a period of ████████████████ ██████ days or longer, Producer has the right to request in writing to have the Receipt Point permanently released from the Dedicated Area and this Agreement. If Producer's Well(s) is shut-in and not capable of flowing for reasons controlled by Gatherer, this will be considered a pressure range greater than or equal to ████ psig.

(d)     Producer and Gatherer understand that the pressure at each Producer operated Receipt Point may be affected by the initial production from Wells recently connected by Producer to the Gathering and Processing System.  As a result, all the

connected by Producer to the Gathering and Processing System.  As a result, for the Producer operated Receipt Points within a single section of land in which the combined volume from all newly connected Wells within that section of land exceeds ▮ Mcf per Day shall be excluded from the determination of a pressure discount and for any newly connected Wells within a single section of land in which the combined volume from all newly connected Wells within that section of land is less than ▮ Mcf per Day, Gatherer shall have a period of ▮ days to correct the issue before it is subject to the discounted  Service Fee set forth in Section 5.5(b).

## ARTICLE VI
## GATHERING, PROCESSING AND DELIVERY

**Section 6.1        Delivery, Receipt and Processing of Gas and Purchase of Products.**

(a)    Commencing on the In-Service Date, as to Completed Wells operated by Producer, Producer shall deliver or cause to be delivered to the Receipt Point(s) all Committed Gas and for the Term of this Agreement, Gatherer shall, on a Firm basis up to the Producer Capacity, gather and process the Delivered Gas to separate the NGLs from the Delivered Gas.  If Gatherer enters into any gathering, transportation, processing, marketing or similar agreement with any third party pursuant to which natural gas is received and processed by Gatherer on the Gathering and Processing System on a Firm

21

basis, Gatherer shall deliver to Producer a written notice of such agreement that describes the material terms thereof.

(b)    Gatherer shall acquire and take title to NGLs from Producer at the Receipt Point.  As consideration for the acquisition of NGLs, Gatherer shall pay Producer an amount equal to the Allocated Gallons of each NGL, multiplied by the NGL Index Price.

(c)    Gatherer shall acquire and take title to Residue Gas from Producer at the Receipt Point.  As consideration for the acquisition of Residue Gas that is not taken in-kind pursuant to Section 6.1(e), Gatherer shall pay Producer the Residue Gas Index Price, less the Residue Gas Transportation Fee.

(d)    If Condensate is blended and sold with crude oil, then Gatherer shall acquire and take title to the Condensate at the Receipt Point.  As consideration for the acquisition of Condensate, Gatherer shall pay Producer the Condensate Net Sales Price.  If Condensate is sold as NGL, then the terms of Section 6.1(b) above shall control.

(e)    Notwithstanding any provisions to the contrary in this Agreement, Producer shall have the option, exercisable upon sixty (60) Days' prior written notice, to take delivery of its Residue Gas in-kind at the Residue Gas Delivery Point (or at such other delivery point as may be mutually agreed by the Parties) for a six (6) Month period commencing on the earlier of April 1st or October 1st of any calendar year ("***Producer's In-Kind Option***").  During any such six (6) Month period that Producer's In-Kind Option is in effect, Gatherer shall deliver to Producer Residue Gas at the Residue Gas Delivery

002716

Point, and, in connection therewith: (i) Producer shall make (or cause to be made) all necessary arrangements for the transportation, fractionation and marketing of such Residue Gas downstream of the Residue Gas Delivery Point, (ii) Producer shall take (or cause to be taken) Residue Gas ratably seven (7) Days a week by pipeline; (iii) Gatherer shall not be obligated to provide any storage to Producer or to construct or install any other facilities that Producer may require to take in-kind, (iv) title to such Residue Gas shall remain in Producer or its Affiliates, and (v) Gatherer shall have no obligation other than supplying Residue Gas to the Residue Gas Delivery Point for delivery to Producer or for Producer's account.  Gatherer shall continue to deliver such Residue Gas for each successive six (6) Month period thereafter, until such time as Producer elects for Gatherer to purchase such Residue Gas by providing written notice to Gatherer at least sixty (60) Days prior to the end of the then-current six (6) Month period that Producer's In-Kind Option is in effect. Producer acknowledges and agrees that upon exercise of Producer's In-Kind Option, it shall be responsible for and pay or reimburse Gatherer for any and all fees, penalties or expenses incurred by Gatherer as a result of Producer's election of Producer's In-Kind Option, including any Residue Gas Transportation Fee incurred by Gatherer, and Producer agrees that it shall be solely responsible for all royalty payments, production payments, Taxes, and any other payments due or owing on Residue Gas taken in kind.

**Section 6.2      Scheduling and Imbalances.**

(a)      In the event Producer elects to take its Residue Gas in kind pursuant to Section 6.1(e), Producer will be responsible for nominations (including nomination

22

adjustments) required each Month to the Gathering and Processing System. Producer will use its commercially reasonable efforts to avoid the occurrence of any imbalance and will not intentionally create any imbalances.   Any imbalances caused by Producer will be settled in the Month such imbalance was incurred in accordance with Section 6.2(b). Producer hereby agrees to indemnify, defend and hold the Gatherer Group harmless from and against all Losses due to imbalances occurring with respect to Dedicated Gas.

(b)     The Parties recognize that certain Gas imbalances may occur between the quantity of the Residue Gas received by Gatherer (the "***Net Receipt***"), and the Residue Gas nominated by Producer for delivery by Gatherer to the Residue Gas Delivery Point(s) ("***Net Nomination***"). Throughout each Month the Parties agree to actively communicate and cooperate with each other, and with any interconnecting pipeline, to review appropriate data to identify any imbalance, and to eliminate or remedy any imbalance as soon as either Party becomes aware of an imbalance. The Parties further agree to manage daily receipts and deliveries so that the imbalances shall be kept as near to zero as practicable. At the end of each Month, any imbalance in MMBtus between the Net Receipt and the Net Nomination (with such difference being referred to as the "***Imbalance***") shall be balanced by means of a payment to Producer from Gatherer or a payment to Gatherer from Producer, as applicable, valued at the Cash-Out Price (as defined below). To the extent that the Monthly Net Receipt amounts are greater than the Monthly Net Nomination amounts, a payment shall be due Producer, and Gatherer will make such payment to Producer for the imbalance based on the difference between the Monthly Net Receipt amounts and the Monthly Net Nomination amounts, multiplied by the Cash-Out Price during the applicable Month in which the volume imbalance was generated. To the extent the Monthly Net

Receipt amounts are less than the Monthly Net Nomination amounts, a payment shall be made Gatherer and Gatherer will invoice Producer for the imbalance based on the difference between the Monthly Net Receipt amounts and the Monthly Net Nomination amounts, multiplied by the Cash-Out Price during the applicable Month in which the volume imbalance was generated. As used in this Agreement, the "**Cash-Out Price**" shall be determined as to each applicable Month and shall mean a price per MMBtu equal to either (l) if the receiving pipeline's applicable cash-out price is not imposed for the applicable Month(s), the price will be the daily index price averaged for such Month for the applicable receiving pipeline as published in the Daily Price Survey section of Platt's Gas Daily, or (2) if the receiving pipeline's applicable cash-out price is imposed for the applicable Month(s), that price will be the Cash-Out Price. Should the information necessary to calculate the Cash-Out Price not exist for the receiving pipeline or cease to be available, Gatherer and Producer shall work in good faith to determine a comparable substitute publication and/or daily posting(s) or other indexes providing equivalent data.

**Section 6.3**      **Exchange of Information.**

Each of the Parties shall furnish or cause to be furnished to the other all information as may be reasonably requested and necessary with respect to maintaining the Gathering and Processing System in balance, including meter readings and nominations on Downstream Pipelines.

**Section 6.4**      **Commingling.**

23

Delivered Gas and NGLs may represent only a portion of Gas and NGLs on the Gathering and Processing System, which may be used by other customers, and Gatherer shall have the right to commingle Gas and NGLs with Gas and NGLs from other customers downstream of appropriate metering by Producer and/or Gatherer.

**Section 6.5**     **Allocations.**

(a)     Producer acknowledges that any reductions in volumes of Gas attributable to Condensate shall be shared and allocated among Gatherer's customers and other third parties whose Gas is gathered on the Gathering and Processing System in the proportion to the C6+ constituents contained in the Gas delivered by each such shipper to the Gathering and Processing System. Such allocations shall be based on the most recent quality analysis available to Gatherer for such Gas.

(b)     Each Month, Gatherer shall allocate back to each Receipt Point the Allocated Gallons of NGL and MMBtu's of Residue Gas for such Month (each, the "***Allocated Volume***").

(i)     Gatherer shall allocate NGLs to each Receipt Point by multiplying the total number of Gallons of NGLs allocated to the Receipt Point for a production Month by a fraction, the numerator of which is the Theoretical Gallons in the Committed Gas delivered to such Receipt Point during such production Month, and the denominator of which is the Theoretical Gallons in all Receipt Point Volumes during such production Month.

002720

(ii)     Gatherer shall allocate Residue Gas to each Receipt Point by multiplying the quantity of Residue Gas delivered to the Receipt Point by a fraction, the numerator of which is the total theoretical methane quantity contained in Committed Gas delivered to such Receipt Point during such production Month, and the denominator of which is the total methane quantity contained in all Receipt Point Volumes during such production Month.

(c)     Each Month, Gatherer shall provide to Producer a monthly allocation statement that includes total volume of all Receipt Points, total Residue Gas Delivered, total NGLs delivered, and allocated volumes back to each Receipt Point.

**Section 6.6     Transfer of Title and Risk of Loss.**

(a)     Producer shall have and retain title, custody and risk of loss to all Gas and any hydrocarbons attributable thereto, including NGLs, Condensate and Residue Gas, upstream of the Receipt Points.  Gatherer shall take title, custody and risk of loss to all Gas, NGLs, Condensate and Residue Gas, as applicable, at the applicable Receipt Points.

(b)     If Producer elects to take their Residue Gas in Kind, then title to the Residue Gas shall remain with the Producer, and Producer shall take custody and risk of loss to such Residue Gas at the Residue Gas Delivery Point.

24

## ARTICLE VII
## SERVICE FEES

**Section 7.1**          **Service Fees.**

Producer shall pay to Gatherer the following fees (in the aggregate, the "***Service Fees***") set forth on **Schedule 7.1**.

**Section 7.2**          **Payment for Other Fuel.**

Producer shall pay to Gatherer the Other Fuel Fee, if applicable.

**Section 7.3**          **Escalation.**

Commencing on ██████████, and then  each Contract Year thereafter, each Service Fee, except for the Other Fuel Fee, shall be  automatically  adjusted  upward  by ████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████

## ARTICLE VIII
## PAYMENT

002722

**Section 8.1**          **Billing.**

As soon as reasonably practicable after the end of a Month, Gatherer shall render to Producer a statement for the preceding Month, setting forth the following, and providing or attaching necessary backup information or calculations:

(a)    Delivered Gas in both Mcf and MMBtu by Receipt Point;

(b)    Buy-Back Gas, if any, in both Mcf and MMBtu;

(c)    Total Residue Gas delivered to the Residue Gas Delivery Points;

(d)    Allocations of Residue Gas, and breaking out the constituent components of the calculation in accordance with Section 6.5(c);

(e)    Total NGLs delivered to the NGL Delivery Points;

(f)    Allocated Gallons of NGLs, and breaking out the constituent components of the calculation;

(g)    Allocated Condensate;

(h)    actual cost of electricity as Other Fuel, and the Other Fuel Fee;

(i)    aggregate total of all amounts due Gatherer for all Service Fees, Buy-Back Service Fees and Other Fuel Fees; and

25

002723

(j)       the net payment owed by Producer.

**Section 8.2      Payment.**

Producer shall pay to Gatherer the full amount due not later than the earlier of (i) fifteen (15) Days from Producer's receipt of Gatherer's statement, or (ii) the last Day of Month following the statement Month, *provided* that if such Day is not a Business Day, then on the next Business Day. Any past due amounts shall bear interest at the Overdue Rate from the date due until paid.

**Section 8.3      Disputed Amounts.**

If Producer disputes all or a portion of any statement or amount due, it shall pay the undisputed portion, if any, of any such statement, and shall provide Notice to Gatherer of the specific basis for the dispute, including all supporting information, as soon as practicable after becoming aware of the basis for the dispute. If after resolution of such dispute it is determined that any of the amount in dispute is due and owing, such amount(s) shall bear interest at the Overdue Rate from the date originally due until paid. In no event shall any statement or invoice be subject to dispute beyond two (2) years from the date of such statement or invoice.

**Section 8.4      Taxes.**

Producer shall pay any and all Taxes levied against or with respect to the Committed Gas, Condensate, Residue Gas or NGLs (including all constituents and products thereof) delivered or services provided under this Agreement. Gatherer shall not become liable for such Taxes, unless (i) designated to remit those Taxes on behalf of Producer or (ii) by mutual agreement between the

(i) designated to remit those Taxes on behalf of Producer or (ii) by mutual agreement between the Parties or by any duly constituted jurisdictional agency having authority to impose such obligations on Gatherer, including the Oklahoma Tax Commission, in which event the amount of such Taxes remitted on Producer's behalf shall be (i) reimbursed by Producer upon receipt of invoice, with corresponding documentation from Gatherer setting forth such payments, or (ii) deducted from amounts otherwise due Producer under this Agreement.  Producer will reimburse Gatherer for any additional, increased or subsequently applicable Taxes, assessments, fees or other charges (excluding Gatherer's corporate income Taxes), arising after the date hereof that are lawfully levied upon and/or paid by Gatherer or its Affiliates with respect to its gathering, processing and delivery services hereunder insofar and only insofar as such additional, increased or subsequently applicable Taxes are based upon or attributable to the quantities or value of Committed Gas or the NGLs and Residue Gas attributable thereto.  Gatherer shall be solely responsible for ad valorem tax assessed on the value of the Gathering and Processing System, and all its components. Each Party shall indemnify, defend and hold harmless the other Party from and against any and all Claims and Losses arising out of or related to Taxes for which the indemnifying Party is responsible hereunder.

       **Section 8.5**       **Audit.**

       Each Party shall have the right, upon reasonable advance Notice, during normal business hours and not more than two (2) times per Contract Year, at its sole expense and either itself or through its representatives, to audit the books and records of the other Party, at the place where such books and records are ordinarily kept, to the extent reasonably necessary to verify the accuracy of any statement, charge, payment or computation made pursuant to this Agreement, and

any such audit must be completed within ninety (90) Days of the Notice to the other Party.  In the event that an audit is performed, any subsequent audit performed may cover only a time period not covered by a previous audit.  In no event shall any statement or invoice be subject to audit beyond two (2) years from the date of such statement or invoice.

## ARTICLE IX
## NOTICES

**Section 9.1        Notices.**

Any notice, request, demand, statement, payment or bill provided for in this Agreement, or any notice which a Party may desire to give to the other (each, a "***Notice***"), must be in writing and will be deemed duly made when (i) delivered personally, (ii) upon delivery by the U.S. Postal Service, certified mail with return receipt, (iii) upon delivery by a recognized overnight courier service with return receipt, or (iv) upon receipt by the directed recipient when transmitted by electronic means, to the Persons and addresses set forth on Schedule 9.1.  Each of the Parties may, by Notice to the other Party, revise its respective Persons and addresses for delivery of Notices without amendment of this Agreement.

## ARTICLE X
## FINANCIAL RESPONSIBILITY

**[NOT USED]**

002726

## ARTICLE XI

**ARTICLE 11**
**INDEMNITY**

Section 11.1        Indemnity.

EXCEPT WHERE OTHERWISE SPECIFICALLY PROVIDED HEREIN, EACH OF PRODUCER AND PRODUCER GROUP, ON THE ONE HAND, AND GATHERER AND GATHERER GROUP, ON THE OTHER HAND, SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS THE OTHER PARTY AND ITS RESPECTIVE PRODUCER GROUP OR GATHERER GROUP, AS THE CASE MAY BE, FROM AND AGAINST ANY AND ALL CLAIMS OF THIRD PARTIES AGAINST THEM, OR DAMAGES SUSTAINED OR INCURRED BY THEM AS A RESULT OF SUCH CLAIMS BY THIRD PARTIES, TO THE EXTENT CAUSED BY THE NEGLIGENCE OR WILLFUL MISCONDUCT OF THE INDEMNIFYING PARTY OR ITS RESPECTIVE PRODUCER GROUP OR GATHERER GROUP, AS THE CASE MAY BE, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR THE INDEMNIFYING PARTY'S BREACH OF THIS AGREEMENT.  THIS PROVISION SHALL NOT BE CONSTRUED TO RELIEVE ANY INSURER OF ITS OBLIGATION TO PAY CLAIMS CONSISTENT WITH THE PROVISIONS OF A VALID INSURANCE POLICY.  A PERSON SEEKING INDEMNITY SHALL FIRST SEEK RECOVERY UNDER ANY APPLICABLE INSURANCE POLICY, AND ANY INDEMNITY OBLIGATION OWED HEREUNDER SHALL BE REDUCED BY THE AMOUNT OF ALL INSURANCE PROCEEDS ACTUALLY RECEIVED BY THE INDEMNIFIED PARTY.

27

**Section 11.2        Notification Obligation.**

The Person entitled to indemnification under Section 11.1 above (the "***Indemnified Party***") shall promptly notify the Party providing indemnity (the "***Indemnifying Party***") of any Claim, and the Indemnifying Party shall have the right to assume the investigation and defense of the Claim, including employing legal counsel of its choice. If the Indemnifying Party does not promptly assume the investigation and defense of the Claim, the Indemnified Party may do so, including employing legal counsel of its choice, at the Indemnifying Party's expense. If the Indemnifying Party assumes the defense of a claim, the Indemnified Party shall nevertheless have the right to employ, at its sole expense, separate legal counsel and participate in the defense of the Claim, provided that control over the process and authority to compromise the Claim shall vest solely in the Indemnifying Party.

**ARTICLE XII**
**CURTAILMENT AND MAINTENANCE**

**Section 12.1        Curtailment and Temporary Release of Gas.**

If for any reason, including Force Majeure or a Maintenance Event, but not for the reasons set forth in Section 4.6, Gatherer needs to curtail receipt, gathering, processing or delivery of Gas on the Gathering and Processing System (each, a "***Curtailment Event***"), (i) Gas deliveries from all Persons that are receiving service on an interruptible or non-Firm basis shall be curtailed prior to any curtailment or interruption of Committed Gas, and (ii) to the extent a third party is receiving service on a Firm basis in accordance with Section 6.1, Producer and such third party shall be

Case 4:24-cv-04092   Document 4-10   Filed on 11/21/24 in TXSD   Page 293 of 382

curtailed on a *pro rata* basis (based on Btu content of Gas delivered to the Gathering and Processing System). Prior to the Partial In-Service Date, all volumes of Committed Gas shall be temporarily released from the Dedication and Producer shall be free to dispose of all volumes of Committed Gas under other arrangements during such period. From and after the Partial In-Service Date and prior to the In-Service Date, all volumes of Committed Gas that are produced from Producer's wells that are not connected to the Receipt Points that are operational and tested as of the Partial In-Service Date shall be temporarily released from the Dedication and Producer shall be free to dispose such volumes of Committed Gas under other arrangements during such period. At any time after the Partial In-Service Date where Gatherer is unable to accept some or all Committed Gas as a result of a Curtailment Event, Producer shall be free to dispose of such affected volumes under other arrangements during such Curtailment Event (the "**Curtailment Period**"). Gatherer shall notify Producer as soon as reasonably practicable of the circumstances of any Curtailment Event and the beginning and end of any Curtailment Period. If Gatherer notifies Producer that the Curtailment Period shall exceed ████████ days and/or if such Curtailment Period actually exceeds ███████ days, Producer may enter into interim contracts with other purchasers, processors or gatherers as to the released volumes of Committed Gas and shall exercise commercially reasonable efforts to negotiate the shortest term reasonably practicable, but in no event shall the term exceed ██████████ As soon as reasonably practicable after receiving notice of the end of the Curtailment Period, and subject to the expiration of any interim contracts with purchasers, processors or gatherers, all Gas shall again be subject to the Dedication. **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, GATHERER'S TEMPORARY RELEASE AND PRODUCER'S RIGHT TO MAKE**

28

**OTHER ARRANGEMENTS WITH RESPECT TO SUCH AFFECTED VOLUMES SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY AVAILABLE TO PRODUCER, AT LAW OR IN EQUITY, WITH RESPECT TO SUCH AFFECTED VOLUMES.**

 **Section 12.2    Maintenance Events.**

 Gatherer may, without liability to Producer, interrupt the operation of the Gathering and Processing System for the purpose of performing inspections, pigging, maintenance, testing, alterations, modifications, expansions, connections, repairs or replacements (each, a "***Maintenance Event***"), but such interruption shall be for only such time as may be reasonably necessary.  Gatherer shall give Producer advance written notice of its intention to interrupt operations and of the estimated time thereof, but not less than 24 hours advance notice, except in case of emergency.  Any such Maintenance Events shall not constitute Force Majeure Events, unless such Maintenance Events otherwise meet the definition of a Force Majeure Event.

**ARTICLE XIII**
**FORCE MAJEURE**

 **Section 13.1    Force Majeure.**

 "***Force Majeure***" shall mean any event or circumstance or combination of events or circumstances (each, a "***Force Majeure Event***") that adversely affects or prevents any Party from performing its obligations in accordance with the terms of this Agreement, but only if and to the extent that such events and circumstances are not within the affected Party's reasonable control

002730

extent that such events and circumstances are not within the affected Party's reasonable control. Force Majeure events shall include act of God, fire, storm of an unusual or extraordinary nature, flood, hurricane, tornado, earthquake, epidemic or other natural disaster, action, delay or inaction of any Governmental Authority, war, invasion, emergency, embargo, sanction, sabotage, insurgency, terrorism, civil war, riot or insurrection of any kind, labor strike, loss of electricity supply, failure of any Downstream Pipeline, inability to obtain rights-of-way at reasonable cost and after the exercise of reasonable diligence; *provided* that the following shall not constitute a Force Majeure Event: (i) failure to obtain or retain, or a delay in obtaining, any Governmental Approval necessary for performance under this Agreement that was the result of action or inaction by the Party responsible for obtaining such Governmental Approval, or a result of failure to timely apply for any such Governmental Approval, (ii) market conditions for Gas or NGLs, (iii) the inability to obtain a favorable price for or to buy or sell Gas or NGLs, or (iv) economic hardship. Any obligation of either Party under this Agreement shall be excused only to the extent that the Party's inability to perform is caused by Force Majeure. Each Party shall use all reasonable efforts to cure, minimize, mitigate or remedy the effects of Force Majeure.  Notwithstanding that Force Majeure may otherwise exist, a Force Majeure Event shall not excuse or delay the payment of money when due by any Party.

**ARTICLE XIV**
**DEFAULT AND TERMINATION**

Section 14.1       **Producer Events of Default.**

29

A "***Producer Event of Default***" shall be deemed to have occurred if (i) Producer becomes bankrupt or insolvent or takes any corporate action or other steps towards liquidation, winding up, dissolution, reorganization or amalgamation of Producer, making of any bankruptcy administration order, or appointment of a receiver, administrator, trustee or similar officer over all or any material part of the revenues, assets or business of Producer; (ii) an order is made for the winding up, dissolution or liquidation of Producer, or any analogous or equivalent proceedings by whatever name are undertaken in whatever jurisdiction; (iii) Producer is generally unable to pay its debts as they become due, or Producer stops, suspends or threatens to stop or suspend payment of all or a material part of its debts or makes a general assignment of its assets for the benefit of its creditors; or (iv) Producer is in breach of any of its material obligations under this Agreement, and Producer fails to cure such breach within ███████ following Producer's receipt of a Notice from Gatherer to Producer to remedy such event or condition, or if a remedy cannot be effected within such ███████, a period of ███████, provided that Producer has commenced to remedy within such ████████████ and has diligently pursued such remedy during the extended period, provided further that in no event shall the period to cure a breach of an obligation to pay money be more than ███████ total.

### Section 14.2        Gatherer's Default Remedies Against Producer.

If a Producer Event of Default shall have occurred and be uncured and continuing, and without prejudice to any other of Gatherer's rights under this Agreement, Gatherer shall have the right to terminate this Agreement upon Notice to Producer.

### Section 14.3        Gatherer Events of Default.

A "*Gatherer Event of Default*" shall be deemed to have occurred if (i) Gatherer becomes bankrupt or insolvent or takes any corporate action or other steps towards liquidation, winding up, dissolution, reorganization or amalgamation of Gatherer, making of any bankruptcy administration order, or appointment of a receiver, administrator, trustee or similar officer over all or any material part of the revenues, assets or business of Gatherer; (ii) an order is made for the winding up, dissolution or liquidation of Gatherer, or any analogous equivalent proceedings by whatever name are undertaken in whatever jurisdiction; (iii) Gatherer is generally unable to pay its debts as they become due, or Gatherer stops, suspends or threatens to stop or suspend payment of all or a material part of its debts or makes a general assignment of its assets for the benefit of its creditors; or (iv) Gatherer is in breach of any of its material obligations under this Agreement, and Gatherer fails to cure such breach within ███████ following Gatherer's receipt of a Notice from Producer to Gatherer to remedy such event or condition, or if a remedy cannot be effected within such ██ period, a period of ████████, provided that Gatherer has commenced to remedy within such █████ period and diligently pursued such remedy during the extended period, provided further that in no event shall the period to cure a breach of an obligation to pay money be more than ██ █████ total.

### Section 14.4        Producer's Default Rights Against Gatherer.

If a Gatherer Event of Default shall have occurred and be uncured and continuing, and without prejudice to any other of Producer's rights under this Agreement, Producer shall have the right to terminate this Agreement upon Notice to Gatherer.

## ARTICLE XV
## ASSIGNMENT

**Section 15.1          Assignment.**

Neither Party may assign this Agreement, in whole or in part, without the other Party's prior written consent, which consent will not be unreasonably withheld, conditioned or delayed. Subject to this Section 15.1, this Agreement is binding upon, inures to the benefit of and is enforceable by the Parties and their respective successors and permitted assigns.

## ARTICLE XVI
## LIMITATION OF LIABILITY

**Section 16.1          Limitation of Liability.**

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL, PUNITIVE OR EXEMPLARY DAMAGES OF ANY TYPE, INCLUDING LOST PROFITS OR LOSS OF BUSINESS OPPORTUNITY, IN CONTRACT OR TORT (INCLUDING NEGLIGENCE, JOINT OR SEVERAL, OR STRICT LIABILITY) ARISING OUT OF THIS AGREEMENT, PROVIDED THAT THIS LIMITATION SHALL NOT APPLY TO ANY INDEMNITY OBLIGATION SET FORTH HEREIN.

## ARTICLE XVII
## CONFIDENTIALITY

002734

Any information belonging to a Party that is confidential and disclosed to the other Party in the course of performance of this Agreement or has been disclosed during the negotiations leading up to this Agreement, including the Agreement itself (collectively, the "***Confidential Information***"), shall be held in confidence and shall not be disclosed to others without the written approval of the disclosing Party. Confidential Information is not information that (i) is already known to the receiving Party at the time of disclosure by the disclosing Party (ii) is now or hereafter becomes available within the public domain other than as a result of a breach of this Agreement, (iii) is received by a Party from a Person under no obligation to keep the Confidential Information confidential, or (iv) is independently developed by a Party without reliance on Confidential Information. A Party shall have the right to disclose Confidential Information without the consent of the disclosing Party to its lenders, counsel, advisors, consultants, accountants, auditors, officers, directors, members, shareholders and other Persons of responsibility who have a need to know the Confidential Information, *provided* that such Persons agree to keep the Confidential Information confidential, and that the Party shall be responsible for any breaches of this confidentiality obligation by such Persons.  A Party shall also have the right to disclose Confidential Information without the consent of the disclosing Party in connection with a subpoena, interrogatory, request for production, civil investigative demand or other such legal process issued by any court or administrative, legislative, investigative or regulatory body, but only to the extent necessary to fully respond thereto and after providing prior Notice to the disclosing Party.  Upon the reasonable request of the disclosing Party, the receiving Party shall, in its sole discretion, either return the

002735

Confidential Information or destroy it, *provided* that the receiving Party may retain a copy of Confidential Information as necessary to comply with Applicable Law.

## ARTICLE XVIII
## DISPUTE RESOLUTION

**Section 18.1        Dispute Resolution.**

All controversies, disputes or claims between Producer and Gatherer arising out of or in any way relating to this Agreement (each, a "***Dispute***") shall be resolved pursuant to the procedures of this Section  18.1.

(a)        If a Dispute arises between the Parties regarding their respective rights and obligations under this Agreement, the Parties shall use commercially reasonable efforts to reach a reasonable resolution of the Dispute informally.  Initially, the responsible Persons shall attempt to resolve the Dispute themselves. If they are unable to resolve the Dispute within 10 Days, then either Party may, by Notice, refer the Dispute to the senior management of the Parties for resolution. If senior management of the Parties are unable to resolve the Dispute within 10 Days of such Notice, the provisions of subsection (b) below shall apply.

(b)        Any Dispute not otherwise resolved under subsection (a) above may be submitted by either Party to a court proceeding filed in accordance with Applicable Law in any court having jurisdiction over the Parties and the subject matter.

002736

**Section 19.1        Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury Trial.**

(a)    THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF OKLAHOMA AND ITS REGULATORY AGENCIES HAVING JURISDICTION OVER THE INTERESTS, EXCLUDING ANY CONFLICTS OF LAWS PROVISIONS CALLING FOR APPLICATION OF THE LAWS OF ANOTHER STATE.

(b)    EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE SOLE AND EXCLUSIVE JURISDICTION OF THE STATE OR FEDERAL COURTS IN HARRIS COUNTY, TEXAS, AND EACH OF THE PARTIES IRREVOCABLY WAIVES ANY OBJECTION TO THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS.

(c)    TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY IRREVOCABLY WAIVES ITS RIGHT TO A TRIAL BY JURY, AND CONSENTS TO A BENCH TRIAL BY A TRIAL COURT JUDGE, IN RESPECT OF ANY LITIGATION ARISING OUT OF THIS AGREEMENT AND ACKNOWLEDGES

32

THAT THIS WAIVER IS A MATERIAL INDUCEMENT FOR EACH OF THE PARTIES IN ENTERING INTO THIS AGREEMENT.

Section 19.2    Survival.

The provisions of this Agreement shall survive expiration or termination thereof for so long as necessary to give effect to the rights and obligations of the Parties hereunder, but in no event exceeding any applicable statutes of limitation.

Section 19.3    No Joint Venture.

Nothing in this Agreement shall create an association, joint venture or partnership between the Parties or impose any partnership obligation or partnership liability on any Party. Neither Party shall have any right, power or authority to enter into any agreement or commitment or act on behalf of or otherwise bind the other Party without such Party's prior written consent.

Section 19.4    Entire Agreement.

This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and there are not any oral or written understandings, representations or commitments of any kind, express or implied, which are not expressly set out herein. No modification of this Agreement shall be effective unless in writing and executed by the Parties. This Agreement restates the Original Agreement and supersedes any prior agreements of the Parties concerning the subject matter hereof.

This Agreement is for the sole and exclusive benefit of the Parties, and does not stipulate any benefit in favor of any third parties.

**Section 19.6**      **Regulatory Matters.**

(a)      Gatherer has informed Producer, and Producer hereby acknowledges and accepts, that the Gathering and Processing System will be an intrastate pipeline system operating only within the State of Oklahoma, and is not intended to be subject to regulation under any Applicable Law by FERC. Accordingly, as a principal condition to, and in consideration for, the execution of this Agreement by Gatherer, Producer represents, warrants and covenants that (i) the delivery of Producer's Committed Gas hereunder will not subject the Gathering and Processing System or any portion thereof to regulation by FERC as (x) a natural gas company under the Natural Gas Act or (y) a Section 311 transporter under the Natural Gas Policy Act of 1978 and (ii) none of Producer's Committed Gas delivered at one or more Receipt Points is Gas that has been transported by a natural gas company, as defined in the Natural Gas Act, or by a Section 311 transporter under the Natural Gas Policy Act of 1978, at any point prior to such delivery. In the event that Producer breaches its representation, warranty and covenant contained in this Section 19.6 (a), Gatherer, in addition to all other remedies at law or in equity, shall have the right, upon delivery of written notice to Producer, to refuse receipt of Producer's Committed Gas which has caused a breach of such representation, warranty and covenant. Gatherer's

33

election to refuse receipt of any of Producer's Committed Gas pursuant to this Section 19.6 (a) shall not release Producer from any obligation to indemnify Gatherer for such breach under Article X.

(b)      If any federal or state statute, regulation, or order by a court of law or Governmental Authority directly or indirectly (a) prohibits performance under this Agreement, (b) makes such performance illegal or impossible, or (c) effects a change in a substantive provision of this Agreement that has a significant material adverse impact upon the performance of either Party's obligations under this Agreement, including without limitation the imposition of terms, conditions, or rate restrictions, then the Parties will use all reasonable efforts to revise the Agreement and any other ancillary agreement to the extent necessary so that: (i) performance under the Agreement is no longer prohibited, illegal, impossible, or is no longer impacted in a material adverse fashion, and (ii) this Agreement and any other ancillary agreement is revised in a manner that preserves, to the maximum extent possible, the respective positions of the Parties.  Without liability for its failure to do so, each Party will use reasonable efforts to provide notice to the other Party as to any proposed law, regulations or any regulatory proceedings or actions that could affect the rights and obligations of the Parties.  If the Parties are unable to revise the Agreement in accordance with the above within ninety (90) Days following the adoption of any such law, regulation or order of a Governmental Authority, then the Party whose performance is prohibited, illegal, impossible or is impacted in a material adverse fashion will have the right, at its sole discretion, to terminate this Agreement upon written notice to the other Party.

**Section 19.7        Execution in Counterparts.**
This Agreement may be executed in counterparts, including by electronic transmission, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement.

[Signature Page Next Page]

34

IN WINESS WHEREOF, each of the Parties has caused this Agreement to be executed in duplicate originals by its duly authorized officer as of the Effective Date.

**PRODUCER**

**OKLAHOMA ENERGY ACQUISITIONS, LP**

By: Alta Mesa GP, LLC, its general partner

By: _____

David McClure, *Vice President - Facilities & Midstream*

002743

**GATHERER**

**KINGFISHER MIDSTREAM, LLC**, a Delaware limited liability company

By: _____
Name: Taylor Tipton
Title: President

002744

2

**Schedule 7.1**
**to**
**AMENDED AND RESTATED**
**GAS GATHERING AND PROCESSING AGREEMENT**
**Effective December 1, 2016**
**by and between**
**OKLAHOMA ENERGY ACQUISITIONS, LP**
**and**
**KINGFISHER MIDSTREAM LLC**

**SERVICE FEES**

Any terms capitalized in this Schedule shall have the meaning set forth herein, or as indicated by the context, or as set forth in the body of the Agreement.

The Service Fee for gathering and processing Producer's Gas shall be as follows:

Service Fee = (Gathering Fee + Processing Fee + Dehydration Fee + Compression Fee + Facility Fee) X the Price Index + Other Fuel Fee + Buy-Back Service Fee + Buy-Back Meter Fee

**Gathering Fee ($/MMBtu)**

A Gathering Fee of ███ MMBtu shall be assessed on all Receipt Point Volumes.

002746

**Processing Fee ($/MMBtu)**



**Processing Fee ($/MMBtu)**

A Processing Fee of ▮▮▮▮/MMBtu shall be assessed on all Receipt Point Volumes.

**Dehydration Fee ($/MMBtu)**

A Dehydration Fee of ▮▮▮▮/MMBtu shall be assessed on all Receipt Point Volumes.

**Compression Fee ($/MMBtu)**

Gatherer shall install compression as necessary on the Gathering and Processing System as provided in Section 5.4.  For all Receipt Point Volumes, a Compression Fee of ▮▮▮▮MMBtu per stage of compression shall be assessed.

**Facility Fee ($/MMBtu)**

A Facility Fee of ▮▮▮▮MMBtu shall be assessed on all Receipt Point Volumes for Calendar Years 2017, 2018, 2019 and 2020, after which such Facility Service Fee shall be removed entirely from the Service Fees.

**Buy-Back Service Fee ($/MMBtu)**

A Buy-Back Service Fee ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  The Buy-Back Service Fee will be invoiced and settled Monthly.

**Buy-Back Meter Fee ($/Month)**

3

002747

A Buy-Back Meter Fee of ██ Dollars per Month for each Buy-Back Meter (whether or not Gas is then being delivered through such meter) until such time as Producer requests in writing that Gatherer permanently disconnect said Buy-Back Meter

4

# EXHIBIT 5

**AMENDED AND RESTATED**

**CRUDE OIL GATHERING AGREEMENT**

**OKLAHOMA ENERGY ACQUISITIONS, LP**

002751

**AND**

AND

**KINGFISHER MIDSTREAM, LLC**

**Effective as of**
**December 1, 2016**

**TABLE OF CONTENTS**

Article I

DEFINITIONS AND INTERPRETATION ..................................................2
    Section 1.1    Definitions.................................................................................2
    Section 1.2    Interpretation...........................................................................7

Article II

TERM ....................................................................................................7
    Section 2.1    Term.........................................................................................7

Article III

GRANT OF TRANSPORTATION RIGHT ...............................................7
    Section 3.1    Conveyance of Transportation Right. .....................................7
    Section 3.2    Real Interests...........................................................................8

Article IV

CRUDE GATHERING SYSTEM ...............................................................8
    Section 4.1    Reserved...................................................................................8
    Section 4.2    Easements, Rights-of-Way and Fee Lands. ...........................8
    Section 4.3    Dedication................................................................................9
    Section 4.4    Covenant Running With Land. ..............................................10
    Section 4.5    Option to Expand Crude Gathering System..........................10
    Section 4.6    Title Warranty........................................................................11
    Section 4.7    Proceeds of Production............................................................12

002753

Section 4.7        Proceeds of Production. ...........................................................12
Section 4.8        Receipt Points. ........................................................................12
Section 4.9        Additional Receipt Points; Obligation to Interconnect. ............12
Section 4.10       Additional Wells. .....................................................................14
Section 4.11       Commingling. ..........................................................................15

Article V                  GATHERING AND DELIVERY........................................................15
Section 5.1        Obligation to Gather; No Treating Services. .............................15
Section 5.2        Scheduling. ..............................................................................15
Section 5.3        Delivery of Crude. ....................................................................16
Section 5.4        Measurement, Equipment and Testing. .....................................16
Section 5.5        Quality. ....................................................................................16
Section 5.6        Delivery Pressure at Receipt Points. ........................................17
Section 5.7        Operating Inventory. .................................................................17
Section 5.8        Title and Risk of Loss. ..............................................................17
Section 5.9        LACT Electricity. .....................................................................17
Section 5.10       Truck Stations. .........................................................................17
Section 5.11       System Losses. .........................................................................18

Article VI                 CURTAILMENT AND MAINTENANCE .........................................18
Section 6.1        Curtailment and Temporary Release of Crude Oil. ...................18

i

002754

Section 6.2          Maintenance Events. ..............................................................................19

Article VII

                     FEES AND PAYMENT ..........................................................................19
Section 7.1          Fees. ....................................................................................................19
Section 7.2          Escalation. ...........................................................................................20
Section 7.3          Billing and Payment. ...........................................................................20
Section 7.4          Audit. ...................................................................................................20
Section 7.5          Taxes. ...................................................................................................21

Article VIII

                     INDEMNIFICATION .............................................................................21
Section 8.1          Indemnification. ..................................................................................21
Section 8.2          Notification Obligation. ......................................................................21

Article IX

                     FORCE MAJEURE ................................................................................22
Section 9.1          Force Majeure. .....................................................................................22

Article X

                     DEFAULT AND TERMINATION .........................................................22
Section 10.1         Producer Events of Default. .................................................................22
Section 10.2         Gatherer's Default Remedies Against Producer. ................................23
Section 10.3         Gatherer Events of Default. .................................................................23
Section 10.4         Producer's Default Rights Against Gatherer. .....................................23

002755

Article XI

    ASSIGNMENT ............................................................................... 23

    Section 11.1      Assignment ......................................................................... 23

Article XII

    LIMITATION OF LIABILITY ........................................................ 24

    Section 12.1      Limitation of Liability ......................................................... 24

Article XIII

    MISCELLANEOUS ......................................................................... 24

    Section 13.1      Assignment. ......................................................................... 24

    Section 13.2      Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury Trial. ....................................................................................... 24

    Section 13.3      Dispute Resolution. ............................................................. 25

    Section 13.4      Notices. ................................................................................ 25

    Section 13.5      Survival. ............................................................................... 25

    Section 13.6      No Joint Venture. ................................................................. 25

    Section 13.7      Entire Agreement. ............................................................... 25

    Section 13.8      No Third Party Beneficiaries. ............................................. 26

    Section 13.9      Confidentiality. ................................................................... 26

    Section 13.10     Regulatory Matters. ............................................................ 26

ii

38627407.2

Section 13.11        Execution in Counterparts..........................................................................27

Schedule 1.1            Producer's Interests
Schedule 4.3            Dedicated Area
Schedule 4.4            Form of Memorandum of Crude Oil Gathering Agreement
Schedule 4.8(a)         Specified Area
Schedule 4.8(b)         Receipt Points
Schedule 4.9(a)         Designation of Additional Receipt Point
Schedule 4.10           Form of Notice for New Wells
Schedule 5.3(a)         Schematic of Delivery Point
Schedule 5.4(a)         Measurement, Equipment and Testing
Schedule 5.5            Specifications
Schedule 13.4           Notices

iii

002758

## AMENDED AND RESTATED CRUDE OIL GATHERING AGREEMENT

This **Amended and Restated Crude Oil Gathering Agreement** (this "*Agreement*") is made and entered into as of the 3rd day of February, 2017, but effective as of December 1, 2016 (the "*Effective Date*"), by and between Oklahoma Energy Acquisitions, LP, a Texas limited partnership ("*Producer*"), and Kingfisher Midstream LLC, a Delaware limited liability company ("*Gatherer*"). Producer and Gatherer may be referred to each individually as a "*Party*," or collectively as the "*Parties*."

## RECITALS

**WHEREAS**, the Parties entered into that certain Crude Oil Gathering Agreement dated as of August 31, 2015 (the "*Original Agreement*"), and the Parties now desire to amend and restate the Original Agreement in its entirety to be effective for all purposes as of the Effective Date as provided herein; and

**WHEREAS**, Producer owns, controls or may acquire certain oil and gas leasehold interests and other mineral interests and hydrocarbon reserves (collectively, the "*Producer's Interests*," as further defined below), and controls the oil, gas and mineral interests of others (collectively, the "*Other Interests*," as further defined below) in certain lands in Kingfisher, Logan, Canadian, Blaine and Garfield Counties, Oklahoma, described more particularly on **Schedule 4.3** attached hereto (the "*Dedicated Area*"); and

**WHEREAS**, Producer desires to have Gatherer gather and transport the crude oil from the

002759

Producer's Interests (the "***Crude Oil***") from present and future wells located in the Dedicated Area and to induce Gatherer to perform the covenants contained in this Agreement, desires, subject to the terms herein, to convey to Gatherer the sole and exclusive right to transport Crude Oil from the Interests, Dedicate (defined below) to Gatherer the Producer's Interests and deliver such Crude Oil (the "***Committed Crude***") to Gatherer for gathering; and

     **WHEREAS**, Gatherer shall construct, own and operate Crude Oil gathering facilities (collectively, the "***Crude Gathering System***," as further defined below) capable of receiving from Producer deliveries of the Committed Crude from the Dedicated Area and subject to the Dedication; and

     **WHEREAS**, Producer desires that Gatherer provide gathering services as set forth in this Agreement, and Gatherer desires to provide to Producer gathering services in accordance with the terms and conditions set forth in this Agreement; then

     **THEREFORE**, for and in consideration of the mutual covenants set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree that the Original Agreement is hereby amended and restated in its entirety as follows:

1

# ARTICLE I
# DEFINITIONS AND INTERPRETATION

**Section 1.1     Definitions.**

The following terms shall have the following meanings unless otherwise indicated:

"***Actual Loss Percentage***" means a percentage determined by dividing the amount of Actual Losses by the Received Crude for any period of time.

"***Actual Losses***" means any loss of Received Crude that is experienced in the day-to-day operation of the Crude Gathering System, including losses due to evaporation, clingage, shrinkage, line-loss, discoloration, or deterioration of the Crude Oil while in the Gatherer's custody.

"***Additional Capacity***" has the meaning set forth in Section 4.5.

"***Additional Receipt Point***" has the meaning set forth in Section 4.9.

"***Additional Receipt Point Notification***" has the meaning set forth in Section 4.9(a).

"***Affiliate***" means with respect to a Person, any Person which, directly or indirectly, controls, is controlled by or is under common control with such Person or such Person's members or shareholders. For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such individual or entity, whether through the ownership of voting securities, by contract or otherwise,

*provided, however*, that for purposes of this Agreement, Producer and Gatherer shall not be considered Affiliates of each other.

"*After-Acquired Interests*" has the meaning set forth in Section 4.3(b).

"*Agreement*" has the meaning set forth in the introductory paragraph.

"*Applicable Law*" means any applicable statute, law principle of common law, rule, regulation, judgment, order, ordinance, requirement, code, writ, injunction, or decree of any Governmental Authority.

"*Barrel*" or "*bbl*" means forty-two (42) gallons of 231 cubic inches per gallon at 60 degrees Fahrenheit (60° F).

"*Business Day*" means any day, other than a Saturday or Sunday, that commercial banks in Houston, Texas are open for business.

"*Claims*" means any and all demands, claims, judgments, obligations, liabilities, liens, causes of action, lawsuits, arbitrations, mediations, investigations or proceedings (whether at law or in equity).

"*Committed Crude*" is Crude Oil subject to the Dedication.

"*Confidential Information*" has the meaning set forth in Section 13.9.

2

"*Contract Year*" means each calendar year during the Term, the first of which shall commence on the Effective Date and run through December 31 of that year, and then from January 1 through December 31 for each subsequent year thereafter, but for the last Contract Year, from January 1 through the date that this Agreement terminates or expires.

"*Crude Gathering System*" has the meaning set forth in the Recitals, and further means the (i) Gathering Pipelines, Easements, and rights of way; (ii) storage facilities, (iii) LACT units, crude pumps, meters or measurement facilities, and (iv) any other equipment or appurtenances associated with the foregoing.

"*Crude Oil*" has the meaning set forth in the Recitals.

"*Curtailment Event*" has the meaning set forth in Section 6.1.

"*Curtailment Period*" has the meaning set forth in Section 6.1.

"*Cushing Pipeline*" means that certain long-haul pipeline connecting the Crude Gathering System to Cushing, Oklahoma.

"*Dedicated Area*" has the meaning set forth in the Recitals, as further specifically set forth on **Schedule 4.3**.

"*Dedicated Wells*" has the meaning set forth in Section 4.3(c).

"*Dedication*" has the meaning as set forth in Section 4.3(a).

002763

"*Delivered Crude*" means the quantity of Crude Oil delivered by a Producer at the Delivery Point.

"*Delivery Point*" has the meaning set forth in Section 5.3(a).

"*Dispute*" has the meaning set forth in Section 13.3.

"*Easements*" has the meaning set forth in Section 4.2(a).

"*Effective Date*" has the meaning set forth in the introductory paragraph.

"*Extended Term*" has the meaning set forth in Section 2.1.

"*FERC*" means the Federal Energy Regulatory Commission, or any successor Governmental Authority.

"*Firm*" means a gathering and transportation service that is not subject to being curtailed, interrupted, pro rated or suspended except as expressly provided in this Agreement.

"*Force Majeure*" has the meaning set forth in Section 9.1.

"*Force Majeure Event*" has the meaning set forth in Section 9.1.

3

002764

"***GAAP***" means generally accepted accounting principles in the United States.

"***Gatherer***" has the meaning set forth in the introductory paragraph.

"***Gatherer Event of Default***" has the meaning set forth in Section 10.3.

"***Gatherer Group***" means any or all of (i) Gatherer, (ii) Gatherer's Affiliates, (iii) any of their respective contractors, and (iv) the officers, directors, employees, agents, advisors, counsel, consultants, members, shareholders, insurers, invitees or representatives of any of the foregoing.

"***Gathering Fee***" has the meaning set forth in Section 7.1(b)(i).

"***Gathering Pipelines***" means the pipelines of various diameters interconnecting the Receipt Point(s) to the Delivery Point.

"***Governmental Approval***" means any permit, license, permission, grant or other similar authorization issued by, or required to be issued by, any Governmental Authority and necessary for the performance of the Parties hereunder.

"***Governmental Authority***" means any federal, state, county, parish, municipal or other governmental subdivision, or any court or any governmental department, commission, board, bureau, agency or other instrumentality of any federal, state, county, municipal or other governmental subdivision within the United States of America with authority over the Parties and subject matter in question.

"*Indemnified Party*" has the meaning set forth in Section 8.2.

"*Indemnifying Party*" has the meaning set forth in Section 8.2.

"*Initial Fee*" has the meaning set forth in Section 7.1(a).

"*In-Service Date*" means the first day of the first full month following the date that Gatherer notifies Producer that the Crude Gathering System, or any Additional Capacity, if applicable, has been completed and is ready to receive Committed Crude and ready to redeliver it to Producer at the Delivery Point.

"*Interests*" means Producer's Interests, After-Acquired Interests and Other Interests.

"*LACT Unit*" means any lease automatic custody transfer unit, including measurement and sampling devices, pump(s), flow computer, and associated equipment, at a Receipt Point or the Delivery Point.

"*Line Fill*" has the meaning set forth in Section 5.7(a).

"*Loss Payment*" has the meaning set forth in Section 5.11(b).

"*Losses*" means any and all losses, damages, costs, expenses, liabilities, fines, penalties or judgments of whatever kind or character, including reasonable attorneys' fees, court costs and other reasonable costs and expenses of defending against any Claim.

4

"*Maintenance Event*" has the meaning set forth in Section 6.2.

"*New Well Notice*" has the meaning set forth in Section 4.10(a).

"*Non-Operated Well*" means any well that is subject to the Dedication that is not a Producer Operated Well.

"*Notice*" has the meaning set forth in Section 13.4.

"*Notification Date*" has the meaning set forth in Section 4.9(a).

"*Off-Spec Crude Oil*" has the meaning set forth in Section 5.5.

"*Original Agreement*" has the meaning set forth in the recitals.

"*Original Date*" means August 31, 2015.

"*Other Interests*" means the interests of Persons in the Dedicated Area other than Producer, but whose interests may be represented or controlled under a written or implied agreement with Producer and/or by statute, including working interests, royalty interests, overriding royalty interests, net profits interests or other mineral interests to the extent such interests were not granted by, through or under Producer after the Original Date. Nothing in this Agreement is intended to impair or impede the rights of the owners of the Other Interests to take Crude Oil in-kind and/or to sell Crude Oil at the well site for their own account.

　
"***Overdue Rate***" means a rate per annum equal to the lesser of (i) an annual rate equal to the per annum prime rate of interest as specified under the caption "Money Rates" in the *Wall Street Journal* (New York Edition) on the date such payment was required to have been made, or (ii) the maximum rate of interest permitted by Applicable Law.

"***Party***" and "***Parties***" have the meaning set forth in the introductory paragraph.

"***Person***" means any individual, firm, corporation, trust, partnership, limited liability company, association, joint venture, other business enterprise or Governmental Authority.

"***Pipeline Injection Station***" has the meaning set forth in Section 5.10.

"***Pipeline Loss Allowance***" means (a) for Received Crude with an API gravity of between thirty-six (36) and forty-four and nine-tenths (44.9) degrees, ███████████████ of the Receipt Point volume(s) delivered, and (b) for Received Crude with an API gravity of between forty-five (45) and forty-eight (48) degrees, ███████████████ of the Receipt Point volume(s) delivered.

"***Price Index***" has the meaning set forth in Section 7.2.

"***Primary Term***" has the meaning set forth in Section 2.1.

"***Producer***" has the meaning set forth in the introductory paragraph.

"***Producer Capacity***" has the meaning set forth in Section 4.5.

5

"**_Producer Event of Default_**" has the meaning set forth in Section 10.1.

"**_Producer Group_**" means any or all of (i) Producer, (ii) Producer's Affiliates, (iii) Producer's contractors and suppliers, of every tier, other than the Gatherer Group, and (iv) the officers, directors, employees, agents, advisors, counsel, consultants, members, shareholders, insurers, invitees or representatives of any of the foregoing.

"**_Producer Operated Well_**" means any well that is subject to the Dedication that is operated by Producer.

"**_Producer's Interests_**" means all oil and gas leasehold interests and other mineral interests in lands, leases, wells and Crude Oil that Producer owned as of the Original Date in the Dedicated Area, including the oil and gas leasehold interests and other minerals interests set forth on Schedule 1.1.

"**_Receipt Point_**" means the points located within the Dedicated Area where Producer elects in its sole and reasonable discretion to deliver Producer's Oil to Gatherer and where Gatherer may receive Producer's Oil in accordance with the terms of this Agreement. At Producer's election, a Receipt Point for particular volumes of Producer's Oil may be the inlet of Gatherer's facilities at the interconnection of Producer's central production facilities with the Crude Gathering System or may be at the inlet of Gatherer's facilities at the interconnection with the Crude Gathering System of Producer's individual well separation equipment located downstream of Producer's wells.

002769

"**_Received Crude_**" means the quantity of Crude Oil in bbl that is delivered by Producer to Gatherer at a Receipt Point.

"*Scheduled Crude*" has the meaning set forth in Section 5.2(a).

"*Specifications*" has the meaning set forth in Section 5.5.

"*Specified Area*" has the meaning set forth in Section 4.8(a).

"*System Capacity*" means the then-maximum capacity of the Crude Gathering System to gather and redeliver to Producer Committed Crude, which shall in no event be less than fifty thousand (50,000) Barrels per day.

"*Tank Bottoms*" has the meaning set forth in Section 5.7(b).

"*Tax*" means any current or future taxes, fees, levies, charges, assessments and/or other impositions levied, charged, imposed, assessed or collected by any Governmental Authority having jurisdiction.

"*Term*" means the Primary Term and any Extended Term.

"*Transportation Interests*" has the meaning set forth in Section 3.1(a).

"*Trigger Date*" has the meaning set forth in Section 7.1(a).

6

"***Trucking Fee***" has the meaning set forth in Section 7.1(b)(iii).

**Section 1.2          Interpretation.**

References in the singular shall include the plural, and references to the masculine shall include the feminine, and vice versa. Words denoting natural persons shall include partnerships, firms, companies, corporations, joint ventures, trusts, associations, organizations or other entities. References to a particular article, section, subsection, paragraph, subparagraph or schedule, if any, shall be a reference to such article, section, subsection, paragraph, subparagraph or schedule in and to this Agreement. The words "include" and "including" shall include the phrase "not limited to." Any reference to a Person shall include that Person's successors and assigns or to any Person succeeding to that Person's functions. Any Schedules are fully incorporated and made part of this Agreement. The Schedules shall be read in conjunction with the provisions of the body of this Agreement, and the Schedules and the body of this Agreement shall be interpreted to give effect to the intent of the Parties as evidenced by their terms when taken as a whole, *provided, however*, that in the event of an express and irreconcilable conflict between the terms of a Schedule and the provisions of the body of this Agreement, the provisions of the body of this Agreement shall control. Capitalized terms appearing in a Schedule shall have the meanings set forth in Section 1.1, unless the context requires otherwise. Words that have a well-known technical, trade or industry meaning shall be given that meaning, unless it would conflict with an express provision of this Agreement, in which case the express provision of this Agreement shall control. The section headings in this Agreement have been inserted for the convenience of the Parties and shall not define, limit or extend interpretation of the corresponding Section, Exhibit or this Agreement.

**ARTICLE II**

**ARTICLE II**
**TERM**

**Section 2.1     Term.**

This Agreement shall be effective as of the Original Date, and, unless earlier terminated in accordance with any express provision of this Agreement, shall remain in full force and effect for a period of fifteen (15) years from the In-Service Date (the "***Primary Term***"), *provided, however*, that, to the extent that at the end of the Primary Term there are wells then-connected to the Crude Gathering System and then-producing Crude Oil in commercial (paying) quantities, the term of this Agreement shall extend, but only to such connected and producing wells, for so long as such well(s) continue to produce Crude Oil in commercial (paying) quantities (the "***Extended Term***").

**ARTICLE III**
**GRANT OF TRANSPORTATION RIGHT**

**Section 3.1     Conveyance of Transportation Right.**

(a)          For good and valuable consideration paid by Gatherer, the receipt and sufficiency of which are hereby acknowledged, Producer grants, bargains, sells, conveys, transfers, assigns and delivers unto Gatherer, as of the Original Date until the end of the Term, unless earlier reverted in accordance with Section 4.9(f), the sole and exclusive right to transport Crude Oil produced from the Producer's Interests and After-Acquired Interests, specifically the right to

7

gather, separate, meter, measure and store such Crude Oil that may be produced and saved therefrom (the "***Transportation Interests***").

(b)         At the end of the Primary Term, the Dedication shall terminate and the Transportation Interests and Easements will revert automatically to Producer or the other applicable owners thereof save and except the Transportation Interests and Easements insofar only as Crude Oil that may be produced and saved from the Dedicated Wells, which shall continue until the end of the Extended Term.  At the end of the Extended Term for any Dedicated Well or upon the earlier termination of this Agreement in accordance with any express provision of this Agreement, Gatherer's remaining Transportation Interests and Easements related to any Dedicated Well for which the Extended Term has terminated and/or as to any Interests affected by an earlier termination will revert automatically to Producer or the other applicable owners thereof and Gatherer shall execute and deliver to Producer a recordable release and quitclaim in and to any rights, including Transportation Interests, in the Interests that have been terminated.

(c)         The Transportation Interests conveyed to Gatherer are subject to (i) with respect to any After-Acquired Interests within the Dedicated Area, any valid and enforceable prior written dedication or commitment for gathering of Crude Oil, and other minerals as of the time of the acquisition by Producer, (ii) Producer's right to transfer Crude Oil produced from the Interests that Producer is expressly required to deliver under the oil and gas leasehold interests and other mineral interests comprising the Interests, (iii) with respect to the Other Interests, the rights of the owners of such Other Interests to take in kind and separately dispose of their share of Crude Oil produced from the Dedicated Area and (iv) the terms and conditions of this Agreement.

Section 2.2

**Section 3.2    Real Interests**. Producer and Gatherer intend that the conveyance of the Transportation Interests be a conveyance of a portion of Producer's real property interests included in the Interests (including the interests of others whose interests are represented or controlled by Producer insofar only as Producer has the power and authority to grant Transportation Interest in the interests of such third parties). Producer and Gatherer agree that Gatherer has a determinable real property interest carved out of the Interests.

# ARTICLE IV
# CRUDE GATHERING SYSTEM

**Section 4.1    Reserved**

**Section 4.2    Easements, Rights-of-Way and Fee Lands.**

(a)       To the extent that (i) Producer may do so in compliance with all applicable agreements, and (ii) Gatherer's activities on the relevant lands do not unreasonably interfere with Producer's operations, Producer, from the Original Date until the end of the Term, unless earlier reverted in accordance with the terms of this Agreement, hereby conveys and assigns to Gatherer, to the extent that Producer may do so without payment of monies (unless Gatherer agrees to pay), an exclusive easement and right-of-way in and to the surface of the Interests for purposes of constructing, owning, operating, repairing, replacing and maintaining pipelines and other facilities for gathering, separating, metering, measuring, storing and redelivering to Producer

8

all Crude Oil that may be produced from and saved from the Interests, including the Crude Gathering System (the "***Easements***"); *provided, however*, an Easement shall be non-exclusive to the extent that Producer requires access to the surface of the Interests to install Receipt Points, connect any wells to Receipt Points or connect Receipt Points to the Crude Gathering System, in each case, in accordance with the express terms of the Agreement.

(b)    At the end of the Primary Term, all of the Easements will revert automatically to Producer or the owners of such applicable rights except to the extent such easements and rights-of-way are necessary for owning, operating, repairing, replacing and maintaining any portion of the Crude Gathering System used to provide service under this Agreement to the Dedicated Wells, and such easements and rights-of-way shall continue until the end of the Term.  At the end of the Term, Gatherer's easements and rights-of-way will revert automatically to Producer or the other applicable owners thereof.

**Section 4.3    Dedication.**

(a)    For the Term of this Agreement, Producer hereby dedicates to Gatherer all of Producer's Crude Oil that may be produced and saved from the Interests for the purpose of gathering, separating, metering, measuring, storing and redelivering to Producer such Crude Oil, for delivery to Gatherer at the Receipt Point(s) all Committed Crude as and when produced and saved (the "***Dedication***"), *provided* that notwithstanding the Dedication, Producer shall continue to retain its right to (i) administer the Interests as it deems advisable in its sole discretion, including the right to rework, shut in, plug or abandon any well, (ii) form or participate in the formation of any unit, whether operated by Producer or third-party, (iii) use Crude Oil in its operations, and (iv)

.002775

deliver Crude Oil that Producer is expressly required to deliver under oil and gas leases, contractual agreements, or other legal rights under which Committed Crude is produced, in each case to the extent such leases, agreements and rights existed prior to the Original Date and only until such leases, agreements or commitments expire or are terminated; *provided further* that the Dedication is subject to (x) with respect to any After-Acquired Interests within the Dedicated Area, any valid and enforceable prior written dedication or commitment for gathering of Crude Oil and other hydrocarbons as of the time of the acquisition by Producer, (y) Producer's right to transfer Crude Oil produced from the Interests that Producer is expressly required to deliver under the oil and gas leasehold interests and other mineral interests comprising the Interests and (z) with respect to the Other Interests, the rights of the owners of such Other Interests to take in-kind and separately dispose of their share of Crude Oil produced from the Other Interests.

(b)     If, after the Original Date and before the end of the Primary Term, Producer acquires oil and gas leasehold, other mineral interests, or the right to produce from a unitized common source of supply on behalf of all owners within the unit, including by way of joint venture participation, operating agreements, pooling agreements, farm outs, unitization, drill-to-earn rights or other means, within the Dedicated Area, but only to the extent Producer has acquired the authority to produce, save, market, and sell Crude Oil attributable to such interests (the "***After-Acquired Interests***"), effective simultaneously with the acquisition of the After-Acquired Interests by Producer, Producer hereby dedicates to Gatherer all Crude Oil that may be produced and saved from such After-Acquired Interests for the purpose of gathering, metering, measuring, storing and redelivering to Producer such Crude Oil, for delivery to Gatherer at the Receipt Point(s) all Committed Crude as and when produced and saved, *provided, however*, to the

9

extent that any of the After-Acquired Interests or Crude Oil in the Dedicated Area are subject to any valid and enforceable prior written dedication, contract, or commitment for gathering as of the time of acquisition by Producer, then such dedication, contract, or commitment shall be senior to the Dedication until such prior dedication or commitment terminates or expires, *provided further* that if, with respect to any After-Acquired Interests, Producer has the right or ability, without payment of any material fee or penalty, or incurring any other material disadvantage, to terminate any such valid and binding prior dedication or commitment with respect to the After-Acquired Interests, then Producer shall terminate such dedication or commitment as soon as reasonably practicable.  Producer shall promptly notify Gatherer in writing of any such termination, and identify the After-Acquired Interests.

(c)    At the end of the Primary Term, the Dedication shall terminate automatically except to the extent of all Crude Oil that may be produced from the Interests through any wells in the Dedicated Area connected to the Crude Gathering System at the end of the Primary Term (such wells, the "***Dedicated Wells***").  From and after the end of the Term, all Interests shall be permanently released from the Dedication.

(d)    In connection with any After-Acquired Interests, Producer and Gatherer shall execute and deliver any additional documents and instruments and perform any additional acts that may become reasonably necessary or appropriate to evidence of record, and ratify with respect to such After-Acquired Interests, the grant of the Dedication, Transportation Interests and Easements granted under the terms of this Agreement.

002777

**Section 4.4        Covenant Running With Land.**

For the Term, the Dedication under this Agreement shall be a covenant running with the land and the Interests and shall be binding on successors and assignees of the Parties. Contemporaneously with the execution of this Agreement, and from time-to-time during the Term if necessary, the Parties shall each execute for recordation in the public records of the Dedicated Area a "short form" memorandum of this Agreement in the form of **Schedule 4.4** attached hereto, identifying the Dedicated Area, the Interests, After-Acquired Interests and wells thereon. Producer shall cause any conveyance of all or any of the Producer's Interests or After-Acquired Interests, to be made expressly subject to this Agreement, and to cause all transferees to execute a written instrument in a form reasonably satisfactory to Gatherer acknowledging (i) the conveyance of the Transportation Interests and the Easements, (ii) the Dedication and (iii) such transferees' obligations under this Agreement. Gatherer shall likewise cause any assignment or conveyance of the Transportation Interests, the Dedication or all or any segment of the Crude Gathering System to be made expressly subject to this Agreement, and to cause all transferees to execute a written instrument in a form reasonably satisfactory to Producer acknowledging such transferees' obligations under this Agreement.

> **Section 4.5**      **Option to Expand Crude Gathering System.**

Gatherer shall gather all volumes of Committed Crude up to fifty thousand (50,000) Barrels per day on a Firm basis (the "***Producer Capacity***"). All volumes of Committed Crude above the Producer Capacity shall at all times be Committed Crude. To the extent that Committed Crude shall exceed the Producer Capacity, Gatherer shall have the option to (a) utilize any available

10

System Capacity in excess of the Producer Capacity on a Firm basis, (b) contract with third Persons to gather such Committed Crude, or (c) expand the Crude Gathering System as many times as necessary by adding additional System Capacity (the "***Additional Capacity***"). In the event that production from the Interests shall exceed the Producer Capacity, Producer shall provide Notice to Gatherer that production exceeds the Producer Capacity, and Gatherer shall provide Notice to Producer within sixty (60) days of Gatherer's receipt of Producer's Notice that Gatherer will or will not accept such volumes of Committed Crude or add Additional Capacity. In the event that Gatherer provides Notice to Producer that it will not accept such volumes of Committed Crude above the Producer Capacity or add Additional Capacity, then the acreage from which the volumes of Committed Crude above the Producer Capacity are directly produced shall be released from the Dedication (Gatherer shall promptly file an appropriate Memorandum of Release in the records of the County Clerk of the County where the Acreage is located), and Producer may take such volumes of Committed Crude elsewhere. In the event that Gatherer provides Notice to Producer that it will accept such volumes of Committed Crude above the Producer Capacity or add Additional Capacity, then, until Gatherer is able to gather such Committed Crude, or until the In-Service Date for such Additional Capacity, Producer may deliver or sell any volumes of Committed Crude above the Producer Capacity elsewhere under contracts with third-party purchasers or transporters having a term of no longer than one (1) year, *provided* that once Gatherer is able to gather such volumes of Committed Crude, all such volumes of Committed Crude shall be delivered to Gatherer at a Receipt Point upon termination of Producer's sale or transport contract. **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, PRODUCER'S RIGHT TO TAKE THE AFFECTED VOLUMES OF COMMITTED CRUDE ELSEWHERE DURING ANY PERIOD WHERE GATHERER REFUSES TO TAKE VOLUMES OF PRODUCER'S**

**COMMITTED CRUDE THAT EXCEED THE PRODUCER CAPACITY, AND THE RELEASE FROM DEDICATION, IF APPLICABLE, SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY, AT LAW OR IN EQUITY, WITH RESPECT TO GATHERER'S INABILITY OR REFUSAL TO TAKE VOLUMES OF COMMITTED CRUDE THAT EXCEED THE PRODUCER CAPACITY**.

Section 4.6        Title Warranty.

Producer represents and warrants to Gatherer that: (i) it owns Producer's Interests, (ii) has the right to convey the Transportation Interests and the Easements, (iii) has the right to dedicate all of Producer's Interests and Crude Oil dedicated under this Agreement, and to deliver Producer's Committed Crude to the Receipt Point(s), free and clear of all liens, encumbrances and claims except for (A) "Permitted Liens" as defined under the Sixth Amended and Restated Credit Agreement among Alta Mesa Holdings, LP, as Borrower, Wells Fargo Bank, N.A. and the lenders party thereto from time to time, dated May 13, 2010, as amended from time to time and (B) "Permitted Liens" as defined under the Note Purchase Agreement dated August 31, 2015 among HMS Kingfisher Holdco, LLC, the holders thereunder from time to time and the agent for such holders, as amended from time to time, (C) statutory lien rights under 52 Okla. Stat. §§549.1, *et seq.* and 570.1, *et seq.*, and (v) there are no valid and enforceable dedications or commitments existing as of the Original Date covering any of Producer's Interests or Crude Oil produced from the Producer's Interests within the Dedicated Area. Producer shall defend, indemnify, protect and hold harmless Gatherer from and against all claims arising out of any breach of such representation and warranty.

11

**Section 4.7        Proceeds of Production.**

Producer shall make payment of all royalties, overriding royalties, production payments, and all other payments attributable to the Interests and Committed Crude due to any Person under any leases or agreements in accordance with the terms thereof, and Gatherer shall have no obligations with respect thereto.

**Section 4.8        Receipt Points.**

(a)        Except as otherwise provided herein and subject to Section 4.10(b), Producer shall be obligated to connect all wells that constitute Interests within the boundaries of the area depicted on the map attached hereto as **Schedule 4.8(a)** (the "*Specified Area*") into a Gatherer provided Receipt Point of the Crude Gathering System in accordance with the following timeline: (i) for wells that were completed between June 30, 2016 and December 31, 2016, no later than June 30, 2017, and (ii) for wells completed from and after January 1, 2017, no later than 120-days following the date of completion of such well. Notwithstanding the foregoing, if Producer reasonably determines that it is not capable of interconnecting any such well within time periods set forth in subclauses (i) or (ii) above, then it may request that Gatherer perform the scope of work required to connect the well into the Crude Gathering System, Producer shall reimburse all of Gatherer's costs and expenses related to such work, without additional markup, in accordance with Section 4.9(c).

(b)        The list of initial Receipt Points are set forth in **Schedule 4.8(b)**. Gatherer shall install, own, operate and maintain all LACT Units at the Receipt Points. Notwithstanding

002781

anything to the contrary in this Agreement, in the event Producer does not connect any well located in the Specified Area to the Receipt Points in accordance with the time periods set forth in Sections 4.8(a)(i) and (ii), Gatherer shall nonetheless be entitled to charge any and all applicable fees set forth in Article 7 in connection with any Crude Oil that produced from that well within the Specified Area.

<strong>Section 4.9       Additional Receipt Points; Obligation to Interconnect.</strong>

The Parties shall use the following process for connecting new Receipt Points to the Crude Gathering System that are located within the Dedicated Area ("***Additional Receipt Points***"):

(a)       Producer shall provide written notice to Gatherer for Additional Receipt Points in the Dedicated Area as follows: (1) no later than ███████████ Days prior to the expected date of first flow to Gatherer setting forth the expected date of first flow for Additional Receipt Points within the Specified Area; or (2) no later than ███████████ days prior to the expected date of first flow to Gatherer setting forth the expected date of first flow for Additional Receipt Points outside the Specified Area (as applicable, the "***Notification Date***"), location and volume profile for such Receipt Point in the form attached hereto as Schedule 4.9(a) (an "***Additional Receipt Point Notification***"). ██████████████████████ ███████████████████████████████████████████ ████████████████████

12

(b)     Upon Gatherer's receipt of any Additional Receipt Point Notification from Producer under subsection (a) above that is within the Specified Area, Gatherer shall provide Producer with a cost (the "*ARP Connection Fee*"), schedule, and scope of work required to connect each new Receipt Point to the Crude Gathering System within ▮▮▮▮ days of receiving Producer's notice.    Producer may elect to either (i) have Gatherer perform the scope of work required to connect the Additional Receipt Point into the Crude Gathering System and reimburse Gatherer the ARP Connection Fee in accordance with Section 4.9(c), (ii) have Gatherer perform the scope of work required to connect the Additional Receipt Point and pay Gatherer one dollar ($1.00) per Barrel of Received Crude until the ARP Connection Fee has been paid in full, or (iii) perform the scope of work required to connect the Additional Receipt Point into the Crude Gathering System by itself.  If Producer elects to perform the interconnection itself, it shall ensure that any LACT Units at the Additional Receipt Point is assigned to Gatherer upon completion.  If Producer elects item (ii) above, then Producer shall (y) connect to the Receipt Point no later than ▮▮▮▮▮▮▮▮ days after the Receipt Point is completed, and (z) if, after ▮▮▮▮ months, the volume of Producer's Oil is insufficient to reimburse the ARP Connection Fee in full, then Producer shall promptly pay Gatherer the unpaid remaining portion of the ARP Connection Fee.  Producer shall notify Gatherer of its decision to either have Gatherer perform the scope of work, or if Producer will perform the scope of work, no later than ten (10) days after receiving the ARP Connection Fee from Gatherer.

(c)     In the event Producer elects to have Gatherer perform the scope of work required to connect the Additional Receipt Point in the Specified Area into the Crude Gathering System in accordance with Section 4.9(b)(i) above, then Producer shall pay Gatherer's estimated ARP Connection Fee no less than ten (10) days prior to Gatherer's commencement of

its scope of work. Following Gatherer's completion of its scope of work and the date of first flow thereunder, Gatherer shall submit to Producer an appropriate documentation regarding the actual costs and expenses associated with such ARP Connection Fee in accordance with Section 7.3. If the actual ARP Connection Fee is greater than the estimated ARP Connection Fee, then Producer shall pay the difference to Gatherer within fifteen (15) days from Producer's receipt of Gatherer's statement. If the actual ARP Connection Fee is less than the estimated ARP Connection Fee, then Gatherer shall pay the difference to Producer within fifteen (15) days from Producer's receipt of Gatherer's statement. Any disputes related to the final ARP Connection Fee shall be resolved in accordance with Section 7.3(c).

(d)     Upon Gatherer's receipt of any Additional Receipt Point Notification from Producer under subsection (a) above that is not within the Specified Area, the Parties shall reasonably consult with each other and mutually determine whether to connect such Additional Receipt Point to the Crude Gathering System, timing of such connection, and allocation of costs.

(e)     After the Notification Date, if (i) Producer has delivered an Additional Receipt Point Notification in the Dedicated Area in the time period in Section 4.9(a) above and (ii) Gatherer has not connected such Additional Receipt Point to the Crude Gathering System within ninety (90) Days after the Notification Date, except for reasons due to Force Majeure, then Gatherer shall discount the then-applicable Gathering Fee by $0.10 per Barrel for Producer's Crude Oil delivered to the Additional Receipt Point. Such discounted Gathering Fee shall apply on a Daily basis, equal to the number of Days after the date the Completed Well is capable of flowing to that Additional Receipt Point. If the Additional Receipt Point Notification is received

13

002784

by Gatherer less than ███████████ Days prior to the required first flow date, then Gatherer shall not be required to discount the Gathering Fee for a period of ███████████ Days from the Notification Date.

(f)     In the event that Gatherer provides Notice to Producer that Gatherer will not make a requested interconnection for any Additional Receipt Point within the Dedicated Area, then, effective simultaneously with the delivery of such Notice, (i) the well and unitized acreage associated with such well in question shall be released from the Dedication, (ii) the Transportation Interests insofar only as Crude Oil that may be produced and saved from the well and unitized acreage in question shall automatically revert back to Producer and (iii) any Easement rights hereunder to the extent necessary for purposes of Producer or any third party constructing, owning, operating, repairing, replacing and maintaining pipelines and other facilities for gathering, separating, metering, measuring, storing and redelivering to Producer all Crude Oil that may be produced and saved from such well and unitized acreage in question shall automatically revert back to Producer.  In connection with the release of Transportation Interests or Easements pursuant to this Section 4.9(f), Producer and Gatherer shall execute and deliver any additional documents and instruments and perform any additional acts that may become reasonably necessary or appropriate to effectuate the reversion of Transportation Interests and Easements with respect thereto.  **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, THE RELEASE OF A WELL FROM DEDICATION SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY, AT LAW OR IN EQUITY, WITH RESPECT TO GATHERER'S REFUSAL TO INTERCONNECT AN ADDITIONAL RECEIPT POINT.**

**Section 4.10      Additional Wells.**

(a)      No later than ███████ days prior to drilling any well in the Dedicated Area, Producer shall provide written notice to Gatherer setting forth the location, expected date of first flow to Gatherer, expected date of interconnection to a Receipt Point, applicable Receipt Point and volume profile for such well in the form attached hereto as **Schedule 4.10** (a "***New Well Notice***").

(b)      Upon receipt of any New Well Notice for a Non-Operated Well, Gatherer shall have the option, exercisable in its sole discretion at any time within ███████ days following receipt of such New Well Notice from Producer, to interconnect the Crude Gathering System to such Non-Operated Wells at its sole cost and expense.  If Gatherer does not exercise the option set forth in this Section 4.10(b), then (i) ████████████████ shall be released from the Dedication, (ii) the Transportation Interests insofar only as Crude Oil that may be produced and saved from the ████████████ shall automatically revert back to Producer and (iii) any Easement rights hereunder to the extent necessary for purposes of Producer or any third party constructing, owning, operating, repairing, replacing and maintaining pipelines and other facilities for gathering, separating, metering, measuring, storing and redelivering to Producer all Crude Oil that may be produced and saved from such ████████████ shall automatically revert back to Producer.  In connection with the release of Transportation Interests or Easements pursuant to this Section 4.10(b), Producer and Gatherer shall execute and deliver any additional documents and instruments and perform any additional acts that may become reasonably necessary or appropriate to effectuate the reversion of Transportation Interests and Easements with respect thereto.  **THE**

14

PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, THE RELEASE OF A WELL FROM DEDICATION SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY, AT LAW OR IN EQUITY, WITH RESPECT TO GATHERER'S ELECTION TO INTERCONNECT A NON-OPERATED WELL.

Section 4.11     Commingling.

Received Crude may represent only a portion of Crude Oil on the Crude Gathering System, which may be used by other customers.  Subject to Gatherer's obligations with respect to delivery of Delivered Crude under this Agreement, Gatherer shall have the right to commingle Received Crude with Crude Oil from other customers.

ARTICLE V
GATHERING AND DELIVERY

Section 5.1     Obligation to Gather; No Treating Services.

Commencing on the In-Service Date, Producer shall deliver or cause to be delivered to the Receipt Point(s) all Committed Crude.  Gatherer shall, on a Firm basis up to the Producer Capacity, receive Delivered Crude from Producer at the Receipt Point(s) (as set forth in Section 4.8(b) and in **Schedule 4.8(b))** and transport Received Crude to the Delivery Point.  If Gatherer enters into any gathering, transportation, marketing or similar agreement with any third party pursuant to which crude oil is received by Gatherer on the Crude Gathering System on a Firm basis, Gatherer shall deliver to Producer a written notice of such agreement that describes the material terms

002787

shall deliver to Producer a written notice of such agreement that describes the material terms thereof. Gatherer shall provide no treating services for which there is no treating fee expressly provided in Section 7.1, such as treatment for sour Crude Oil/ hydrogen sulfide ($H_2S$) or other contaminants or metals, or removal of inert gases or any other contaminants.

>    **Section 5.2**          **Scheduling.**

>          (a)          Not later than the fifteenth (15th) day of a month, Producer shall deliver to Gatherer a Notice indicating the total volumes of Crude Oil expected to be delivered by Producer for gathering the following month (the "***Scheduled Crude***"). The Parties shall coordinate their respective scheduling activities to take into account the needs of downstream transportation resources. If Producer becomes aware that actual deliveries of Committed Crude to the Receipt Point(s) vary by more than five (5%), greater or lesser, of Scheduled Crude, then Producer shall promptly provide Notice to Gatherer of such variance (which can be delivered by email), and if Producer fails to give Gatherer any Notice required by this subsection, and Gatherer thereafter incurs any costs or expenses as a result of such a variance from Scheduled Crude of which Gatherer should have received Notice, then Producer shall reimburse Gatherer for such costs or expenses.

>          (b)          Producer shall provide Gatherer with at least three (3) days advance written Notice (which can be delivered by email) of the arrival of Producer's downstream transportation at the Delivery Point to receive Delivered Crude in accordance with Section 5.3 below.

15

**Section 5.3**      **Delivery of Crude.**

(a)      Provided that Gatherer shall have received proper Notice under Section 5.2(b) above, Gatherer shall deliver to Producer Delivered Crude FOB Producer's transportation at the outlet flange of the transfer meter connected to the Crude Gathering System, as shown more particularly on **Schedule 5.3(a)** (the "***Delivery Point***").

(b)      Producer shall be solely responsible for all arrangements for transportation of Delivered Crude from the Delivery Point. If Producer becomes aware or should have become aware of delays with respect to any scheduled transportation for Delivered Crude, then Producer shall promptly provide Notice to Gatherer, and if Producer fails to give Gatherer any Notice required by this Section, and Gatherer thereafter incurs any costs or expenses as a result of such a delay with respect to transportation of which Gatherer should have received Notice, then Producer shall reimburse Gatherer for such costs or expenses.

(c)      All Producer-arranged transportation shall comply with all site rules and directives of Gatherer in entering, loading while there and exiting Gatherer's premises, including that all trucks shall be NSPS Level Tested trucks.

**Section 5.4**      **Measurement, Equipment and Testing.**

(a)      Gatherer shall be responsible for measurement, equipment and testing at the Receipt Points and at the Delivery Point, each in accordance with the protocols set forth on **Schedule 5.4(a)**.

(b)      Subject to Producer's safety rules, regulations and procedures, Producer hereby grants to Gatherer, and Gatherer's contractors or agents, a right of entry onto any of the lands covered by the Interests and access to the Producer side of a Receipt Point, as necessary for the purpose of any sampling of Crude Oil to determine quality in accordance with Section 5.5 below, and shall facilitate, as necessary, access with surface owners where requested by Gatherer.

> **Section 5.5      Quality.**

Crude Oil delivered by Producer at the Receipt Points shall meet or exceed the quality requirements set forth in **Schedule 5.5** (the "***Specifications***").  Gatherer shall have a right to reject all Crude Oil delivered by Producer that does not meet the Specifications ("***Off-Spec Crude Oil***"). If necessary, Producer shall install, own and maintain Crude Oil storage tanks at each Receipt Point (the "***Producer Tanks***") for purposes of accepting any Off-Spec Crude Oil from Gatherer. Gatherer shall divert all Off-Spec Crude Oil that is rejected in accordance with this Section 5.5 to a Producer Tank and Producer shall be responsible for cleaning and processing of the Off-Spec Crude Oil.  Gatherer shall have no obligation to accept delivery of any Crude Oil unless and until it satisfies the Specifications.  Off-Spec Crude Oil shall not be released from the Dedication so long as Producer's cost to clean or process Off-Spec Crude Oil does not exceed the difference in price Producer could receive for such Off-Spec Crude Oil if sold to a third-party without cleaning or processing as compared to the price to be received by Producer for cleaned and processed Off-Spec Crude Oil at the Delivery Point.  If the cost to clean or process Off-Spec Crude Oil exceeds the difference in price, then the Off-Spec Crude Oil shall be released by Gatherer from the Dedication. Crude Oil delivered to Producer at the Delivery Point shall be of a substantially similar

16

grade and quality to that of Received Crude.  Producer agrees to indemnify and hold the Gatherer harmless from any losses resulting from the delivery of Off-Spec Crude Oil in accordance with Schedule 5.5.

**Section 5.6    Delivery Pressure at Receipt Points.**

Producer shall deliver Crude Oil at the Receipt Points at a pressure sufficient to enter the Crude Gathering System and not to exceed the maximum allowable operating pressure of the Crude Gathering System at such points, but in no event to exceed ███████████ sig.

**Section 5.7    Operating Inventory.**

Producer shall provide, at no cost to Gatherer, Crude Oil as:

(a)    line fill (the "***Line Fill***") needed to make and keep the Crude Gathering System operational; and

(b)    fill for any storage facility at the Crude Gathering System necessary to float tank roofs to working levels or to safely operate fixed roof tanks (the "***Tank Bottoms***").

(c)    Line Fill and Tank Bottoms shall not be considered transportable volumes.

002791

(d)    Producer's obligation for Line Fill and Tank Bottoms shall be *pro rata* with any third party volumes of Crude Oil gathered on the Crude Gathering System, and, to the

extent that Producer has provided all Line Fill and Tank Bottoms, Producer shall be credited for any Line Fill and Tank Bottom Volumes attributable to third party Volumes of Crude Oil brought onto the Crude Gathering System.

**Section 5.8     Title and Risk of Loss.**

Title to Crude Oil shall always vest in Producer.  Risk of loss shall always be with Producer except when Gatherer is in possession of Crude Oil, in which case risk of loss shall be with Gatherer.  Producer shall be solely responsible for, and shall make all necessary arrangements at and downstream of the Delivery Points for receipt, further transportation and marketing of Committed Crude.

**Section 5.9     LACT Electricity.**

██████ shall arrange for the supply of, and pay all costs associated with supplying, the power needed to enable ██████ to operate its LACT Units, including providing generators and associated equipment at well locations.

**Section 5.10     Truck Stations.**

Subject to the terms and conditions of this Agreement, following the in-service date of the Cushing Pipeline, Gatherer agrees, at its sole cost and expense, to install ██████ truck injection stations (each, a "***Pipeline Injection Station***").

17

002792

**Section 5.11      System Losses.**

(a)      Gatherer shall measure and record all Actual Losses of Committed Crude during the Term for purposes of preparing a virtual reserve of volumes in accordance with this Section 5.11.  Promptly following each month, Gatherer shall provide Producer with its calculation of Actual Losses and deliver a monthly statement of volumes (the "***Volume Bank***") determined in accordance with the following:

(i)      If, following any month, the Pipeline Loss Allowance exceeds the Actual Loss Percentage, then the amount of such difference shall be added as a positive number to the Volume Bank.

(ii)      If, following any month, the Actual Loss Percentage exceeds the Pipeline Loss Allowance, then the amount of such difference shall be deducted from the Volume Bank.

(b)      Following each month during the Term, (i) if the Volume Bank is a positive number, then no payment shall be due and payable from Gatherer and such amount shall be carried over and added to the Volume Bank for the next month, and (ii) if the Volume Bank is a negative number, then Gatherer shall pay Producer an amount equal to the amount of Barrels of Crude Oil losses in the Volume Bank, multiplied by the monthly average sales price for Producer's Oil (a "***Loss Payment***").  If any Loss Payment is due and payable, it shall be billed in accordance with Section 7.3.

002793

(c)      On each anniversary of the Effective Date, the amount in the Volume Bank shall

(c)     On each anniversary of the Effective Date, the amount in the Volume Bank shall be adjusted by calculating the average amount in the Volume Bank each month during the prior twelve (12) months and multiplying such average by ████ Two (2) years following the initial adjustment to the Volume Bank and every two (2) years thereafter, the Parties shall mutually assess and determine whether the method set forth in this Section 5.11(c) for adjusting the Volume Bank on a yearly basis should be modified.  The Parties shall reasonably confer and mutually decide regarding whether and how the Volume Bank may be adjusted thereafter.

## ARTICLE VI
## CURTAILMENT AND MAINTENANCE

**Section 6.1        Curtailment and Temporary Release of Crude Oil.**

If for any reason, including Force Majeure or a Maintenance Event, but not for the reasons set forth in Section 4.5, Gatherer needs to curtail receipt, gathering or delivery of Crude Oil on the Crude Gathering System (each, a "*Curtailment Event*"), (i) Crude Oil deliveries from all Persons that are receiving service on an interruptible basis or non-Firm basis shall be curtailed prior to any curtailment or interruption of Committed Crude, and (ii) to the extent a third party is receiving service on a Firm basis in accordance with Section 5.1, Producer and such third party shall be curtailed on a pro rata basis (based on volumes of Crude Oil delivered to the Crude Gathering System).  Prior to the In-Service Date, and at any time after the In-Service Date where Gatherer is unable to accept some or all Committed Crude as a result of a Curtailment Event, Producer shall be free to dispose of such affected volumes under other arrangements during such Curtailment Event (the "*Curtailment Period*").  Gatherer shall notify Producer as soon as reasonably

18

practicable of the circumstances of any Curtailment Event and the beginning and end of any Curtailment Period.  If Gatherer notifies Producer that the Curtailment Period shall exceed ███████ ████████ and/or if such Curtailment Period actually exceeds █████████████ Producer may enter into alternative contracts with other purchasers or transporters with a term not to exceed █████ ████  As soon as reasonably practicable after receiving notice of the end of the Curtailment Period, and subject to the expiration of any alternative contracts with other purchasers or transporters, all Committed Crude shall again be subject to the Dedication.  **THE PARTIES ACKNOWLEDGE AND AGREE THAT, NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, GATHERER'S TEMPORARY RELEASE AND PRODUCER'S RIGHT TO MAKE OTHER ARRANGEMENTS WITH RESPECT TO SUCH AFFECTED VOLUMES SHALL BE PRODUCER'S SOLE AND EXCLUSIVE REMEDY AVAILABLE TO PRODUCER, AT LAW OR IN EQUITY, WITH RESPECT TO SUCH AFFECTED VOLUMES.**

        **Section 6.2        Maintenance Events.**

        Gatherer may, without liability to Producer, interrupt the operation of the Crude Gathering System for the purpose of performing inspections, pigging, maintenance, testing, alterations, modifications, expansions, connections, repairs or replacements (each, a "***Maintenance Event***"), but such interruption shall be for only such time as may be reasonably necessary.  Gatherer shall give Producer advance written notice of its intention to interrupt operations and of the estimated time thereof, but not less than forty-eight (48) hours advance notice, except in case of emergency.  Any such Maintenance Events shall not constitute Force Majeure Events, unless such Maintenance Events otherwise meet the definition of a Force Majeure Event.

**ARTICLE VII**

**FEES AND PAYMENT**

   **Section 7.1   Fees.**

   (a)  Prior to the earlier of (x) the commencement of the in-service date of the Cushing Pipeline, or (y) one (1) year following the Effective Date (the earlier of which shall be the "***Trigger Date***"), Producer shall pay to Gatherer a fee of one dollar and twenty-five cents ($1.25) per Barrel of Received Crude (the "***Initial Fee***").

   (b)  From and after the Trigger Date, Producer shall pay to Gatherer the following fees:

      (i)  two dollars ($2.00) per Barrel of Received Crude for the duration of the Term (the "***Gathering Fee***");

      (ii)  fifteen cents ($0.15) per Barrel of Crude Oil injected at any of Gatherer's Pipeline Injection Stations;

      (iii)  an amount to be mutually agreed upon based upon then-prevailing market rates following completion of the Pipeline Injection Stations for transportation of the Crude Oil gathered by Gatherer's trucks and injected into the Crude Gathering System (the "***Trucking Fee***");

19

(iv)     Fees will not be charged to Producer for Line Fill or Tank Bottoms volumes until such volumes are redelivered at the Delivery Point.

**Section 7.2          Escalation.**

Commencing with the ███████████████████ and on January 1 of each Contract Year thereafter, each fee set forth in this Agreement shall be automatically adjusted upward by ██



**Section 7.3          Billing and Payment.**

(a)          As soon as reasonably practicable after the end of each month, Gatherer shall render to Producer a statement for the preceding month, setting forth: (i) the total Barrels of Committed Crude received by Gatherer at each of the Receipt Points and the total Barrels of Committed Crude redelivered to the Delivery Point, (ii) the number of Barrels representing the Pipeline Loss Allowance, Line Fill, Tank Bottoms and any other deductions allowed hereunder, (iii) the listing of the fees charged as permitted by Section 7.1 of this Agreement, (iv) any Loss Payment, if applicable, and (v) the net amount due Gatherer from Producer.

(b)          Producer shall pay to Gatherer the full amount due not later than the earlier of (i) fifteen (15) days from Producer's receipt of Gatherer's statement, or (ii) the last day of month following the statement month, *provided* that if such day is not a Business Day, then on the next Business Day. Any past due amounts shall bear interest at the Overdue Rate from the

the next Business Day. Any past due amounts shall bear interest at the Overdue Rate from the date due until paid.

(c)        If Producer disputes all or a portion of any statement or amount due, it shall pay the undisputed portion, if any, of any such statement, and shall provide Notice to Gatherer of the specific basis for the dispute, including all supporting information, as soon as practicable after becoming aware of the basis for the dispute.  If after resolution of such dispute it is determined that any of the amount in dispute is due and owing, such amount(s) shall bear interest at the Overdue Rate from the date originally due until paid.  In no event shall any statement or invoice be subject to dispute beyond two (2) years from the date of such statement or invoice.

Section 7.4        Audit.

Each Party shall have the right, upon reasonable advance Notice, during normal business hours and not more than two (2) times per Contract Year, at its sole expense and either itself or through its representatives, to audit the books and records of the other Party, at the place where such books and records are ordinarily kept, to the extent reasonably necessary to verify the accuracy of any statement, charge, payment or computation made pursuant to this Agreement, and any such audit must be completed within ninety (90) days of the Notice to the other Party.  In the event that an audit is performed, any subsequent audit performed may cover only a time period not covered by a previous audit.  In no event shall any statement or invoice be subject to audit beyond two (2) years from the date of such statement or invoice.

20

### Section 7.5          Taxes.

Producer shall pay any and all Taxes levied on Crude Oil.  Gatherer shall not become liable for such Taxes, unless (i) designated to remit those Taxes on behalf of Producer or (ii) by mutual agreement between the Parties or by any duly constituted jurisdictional agency having authority to impose such obligations on Gatherer, including the Oklahoma Tax Commission, in which event the amount of such Taxes remitted on Producer's behalf shall be (i) reimbursed by Producer upon receipt of invoice, with corresponding documentation from Gatherer setting forth such payments, or (ii) deducted from amounts otherwise due Producer under this Agreement.  Producer will reimburse Gatherer for any additional, increased or subsequently applicable Taxes, assessments, fees or other charges (excluding Gatherer's corporate income Taxes), arising after the date hereof that are lawfully levied upon and/or paid by Gatherer or its Affiliates with respect to its gathering, processing and delivery services hereunder insofar and only insofar as such additional, increased or subsequently applicable Taxes are based upon or attributable to the quantities or value of Committed Crude attributable thereto.  Gatherer shall be solely responsible for ad valorem tax assessed on the value of the Crude Gathering System, and all its components. Each Party shall indemnify, defend and hold harmless the other Party from and against any and all Claims and Losses arising out of or related to Taxes for which the indemnifying Party is responsible hereunder.

## ARTICLE VIII
## INDEMNIFICATION

### Section 8.1          Indemnification.

002799

**EXCEPT WHERE OTHERWISE SPECIFICALLY PROVIDED HEREIN, EACH**

**EXCEPT WHERE OTHERWISE SPECIFICALLY PROVIDED HEREIN, EACH OF PRODUCER AND PRODUCER GROUP, ON THE ONE HAND, AND GATHERER AND GATHERER GROUP, ON THE OTHER HAND, SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS THE OTHER PARTY AND ITS RESPECTIVE PRODUCER GROUP OR GATHERER GROUP, AS THE CASE MAY BE, FROM AND AGAINST ANY AND ALL CLAIMS OF THIRD PARTIES AGAINST THEM, OR DAMAGES SUSTAINED OR INCURRED BY THEM AS A RESULT OF SUCH CLAIMS BY THIRD PARTIES, TO THE EXTENT CAUSED BY THE NEGLIGENCE OR WILLFUL MISCONDUCT OF THE INDEMNIFYING PARTY OR ITS RESPECTIVE PRODUCER GROUP OR GATHERER GROUP, AS THE CASE MAY BE, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR THE INDEMNIFYING PARTY'S BREACH OF THIS AGREEMENT.  THIS PROVISION SHALL NOT BE CONSTRUED TO RELIEVE ANY INSURER OF ITS OBLIGATION TO PAY CLAIMS CONSISTENT WITH THE PROVISIONS OF A VALID INSURANCE POLICY.  A PERSON SEEKING INDEMNITY SHALL FIRST SEEK RECOVERY UNDER ANY APPLICABLE INSURANCE POLICY, AND ANY INDEMNITY OBLIGATION OWED HEREUNDER SHALL BE REDUCED BY THE AMOUNT OF ALL INSURANCE PROCEEDS ACTUALLY RECEIVED BY THE INDEMNIFIED PARTY**.

    **Section 8.2**       **Notification Obligation.**

The Person entitled to indemnification under Section 8.1 above (the "***Indemnified Party***") shall promptly notify the Party providing indemnity (the "***Indemnifying Party***") of any Claim, and

21

the Indemnifying Party shall have the right to assume the investigation and defense of the Claim, including employing legal counsel of its choice. If the Indemnifying Party does not promptly assume the investigation and defense of the Claim, the Indemnified Party may do so, including employing legal counsel of its choice, at the Indemnifying Party's expense. If the Indemnifying Party assumes the defense of a claim, the Indemnified Party shall nevertheless have the right to employ, at its sole expense, separate legal counsel and participate in the defense of the Claim, *provided* that control over the process and authority to compromise the Claim shall vest solely in the Indemnifying Party.

**ARTICLE IX**
**FORCE MAJEURE**

**Section 9.1       Force Majeure.**

"***Force Majeure***" shall mean any event or circumstance or combination of events or circumstances (each, a "***Force Majeure Event***") that adversely affects or prevents any Party from performing its obligations in accordance with the terms of this Agreement, but only if and to the extent that such events and circumstances are not within the affected Party's reasonable control. Force Majeure Events shall include act of God, fire, storm of an unusual or extraordinary nature, flood, hurricane, tornado, earthquake, epidemic or other natural disaster, action, delay or inaction of any Governmental Authority, war, invasion, emergency, embargo, sanction, sabotage, insurgency, terrorism, civil war, riot or insurrection of any kind, labor strike, loss of electricity supply, failure of any pipelines or other means of transportation, inability to obtain rights-of-way after the use of commercially reasonable efforts; *provided* that the following shall not constitute a

Force Majeure Event: (i) failure to obtain or retain, or a delay in obtaining, any Governmental Approval necessary for performance under this Agreement to the result of actions or inaction by the Party responsible for obtaining such Governmental Approval, or a result of failure to timely apply for any such Governmental Approval, (ii) market conditions for Crude Oil or refined products therefrom, (iii) the inability to obtain a favorable price for or to buy or sell Crude Oil or refined products therefrom, or (iv) economic hardship. Any obligation of either Party under this Agreement shall be excused only to the extent that the Party's inability to perform is caused by Force Majeure. Each Party shall use all reasonable efforts to cure, minimize, mitigate or remedy the effects of Force Majeure. Notwithstanding that Force Majeure may otherwise exist, a Force Majeure Event shall not excuse or delay the payment of money when due by any Party.

## ARTICLE X
## DEFAULT AND TERMINATION

### Section 10.1    Producer Events of Default.

A "***Producer Event of Default***" shall be deemed to have occurred if (i) Producer becomes bankrupt or insolvent or takes any corporate action or other steps towards liquidation, winding up, dissolution, reorganization or amalgamation of Producer, making of any bankruptcy administration order, or appointment of a receiver, administrator, trustee or similar officer over all or any material part of the revenues, assets or business of Producer; (ii) an order is made for the winding up, dissolution or liquidation of Producer, or any analogous or equivalent proceedings by whatever name are undertaken in whatever jurisdiction; (iii) Producer is generally unable to pay

002802

its debts as they become due, or Producer stops, suspends or threatens to stop or suspend payment of all or a material part of its debts or makes a general assignment of its assets for the benefit of its creditors; or (iv) Producer is in breach of its material obligations under this Agreement, and Producer fails to cure such breach within 30 days following Producer's receipt of a Notice from Gatherer to Producer to remedy such event or condition, or if a remedy cannot be effected within such 30 day period, a period of 60 days, *provided* that Producer has commenced to remedy within such 30 day period and has diligently pursued such remedy during the extended period, and *provided further*, that in no event shall the period to cure a breach of an obligation to pay money be more than 10 days total.

### Section 10.2     Gatherer's Default Remedies Against Producer.

If a Producer Event of Default shall have occurred and be uncured and continuing, and without prejudice to any other of Gatherer's rights under this Agreement, Gatherer shall have the right to terminate this Agreement upon Notice to Producer.

### Section 10.3     Gatherer Events of Default.

A "***Gatherer Event of Default***" shall be deemed to have occurred if (i) Gatherer becomes bankrupt or insolvent or takes any corporate action or other steps towards liquidation, winding up, dissolution, reorganization or amalgamation of Gatherer, making of any bankruptcy administration order, or appointment of a receiver, administrator, trustee or similar officer over all or any material part of the revenues, assets or business of Gatherer; (ii) an order is made for the winding up, dissolution or liquidation of Gatherer, or any analogous equivalent proceedings by whatever name

002803

are undertaken in whatever jurisdiction, (iii) Gatherer is generally unable to pay its debts as they become due, or Gatherer stops, suspends or threatens to stop or suspend payment of all or a material part of its debts or makes a general assignment of its assets for the benefit of its creditors; or (iv) Gatherer is in breach of any of its material obligations under this Agreement, and Gatherer fails to cure such breach within 30 days following Gatherer's receipt of a Notice from Producer to Gatherer to remedy such event or condition, or if a remedy cannot be effected within such 30 day period, a period of 60 days, *provided* that Gatherer has commenced to remedy within such 30 day period and diligently pursued such remedy during the extended period, *provided further* that in no event shall the period to cure a breach of an obligation to pay money be more than 10 days total.

### Section 10.4    Producer's Default Rights Against Gatherer.

Except where a specific remedy has been set forth herein, if a Gatherer Event of Default shall have occurred and be uncured and continuing, and without prejudice to any other of Producer's rights under this Agreement, Producer shall have the right to terminate this Agreement upon Notice to Gatherer.

### ARTICLE XI
### ASSIGNMENT

### Section 11.1    Assignment

Neither Party may assign this Agreement, in whole or in part, without the other Party's prior written consent, which consent will not be unreasonably withheld, conditioned or delayed.

23

Subject to this Section 11.1, this Agreement is binding upon, inures to the benefit of and is enforceable by the Parties and their respective successors and permitted assigns.

**ARTICLE XII**
**LIMITATION OF LIABILITY**

        **Section 12.1**        **Limitation of Liability.**

        **Notwithstanding anything herein to the contrary, neither Party shall be liable to the other Party for special, indirect, consequential, incidental, punitive or exemplary damages of any type, including lost profits or loss of business opportunity, in contract or tort (including negligence, joint or several, or strict liability) arising out of this agreement,** *provided* **that this limitation shall not apply to any indemnity obligation set forth herein.**

**ARTICLE XIII**
**MISCELLANEOUS**

        **Section 13.1**        **Assignment.**

        Neither Party may assign this Agreement without the express written consent of the other Party, which consent shall not be unreasonably withheld, conditioned or delayed.

        **Section 13.2**        **Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury Trial.**

(a) **THIS AGREEMENT SHALL BE SUBJECT TO AND GOVERNED BY THE LAWS OF THE STATE OF OKLAHOMA AND ITS REGULATORY AGENCIES HAVING JURISDICTION OVER THE INTERESTS AND OTHER INTERESTS, EXCLUDING ANY CONFLICTS OF LAWS PROVISIONS CALLING FOR APPLICATION OF THE LAWS OF ANOTHER STATE.**

(b) **EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE SOLE AND EXCLUSIVE JURISDICTION OF THE STATE OR FEDERAL COURTS IN HARRIS COUNTY, TEXAS, AND EACH OF THE PARTIES IRREVOCABLY WAIVES ANY OBJECTION TO THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS.**

(c) **TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY IRREVOCABLY WAIVES ITS RIGHT TO A TRIAL BY JURY, AND CONSENTS TO A BENCH TRIAL BY A TRIAL COURT JUDGE, IN RESPECT OF ANY LITIGATION ARISING OUT OF THIS AGREEMENT AND ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT FOR EACH OF THE PARTIES IN ENTERING INTO THIS AGREEMENT.**

24

**Section 13.3    Dispute Resolution.**

All controversies, disputes or Claims between Producer and Gatherer arising out of or in any way relating to this Agreement (each, a "**_Dispute_**") shall be resolved pursuant to the procedures of this Section 13.3.

(a)    If a Dispute arises between the Parties regarding their respective rights and obligations under this Agreement, the Parties shall use commercially reasonable efforts to reach a reasonable resolution of the Dispute informally.  Initially, the responsible Persons shall attempt to resolve the Dispute themselves. If they are unable to resolve the Dispute within 10 days, then either Party may, by Notice, refer the Dispute to the senior management of the Parties for resolution. If senior management of the Parties are unable to resolve the Dispute within 10 days of such Notice, the provisions of subsection (b) below shall apply.

(b)    Any Dispute not otherwise resolved under subsection (a) above may be submitted by either Party to a court proceeding filed in accordance with Applicable Law in any court having jurisdiction over the Parties and the subject matter.

**Section 13.4    Notices.**

Any notice, request, demand, statement, payment or bill provided for in this Agreement, or any notice which a Party may desire to give to the other (each, a "**_Notice_**"), must be in writing and will be deemed duly made when (i) delivered personally, (ii) upon delivery by the U.S. Postal Service, certified mail with return receipt, (iii) upon delivery by a recognized overnight courier service with return receipt, or (iv) upon receipt by the directed recipient when transmitted by

service with return receipt, or (iv) upon receipt by the directed recipient when transmitted by electronic means to the addresses shown on **Schedule 13.4**.

Case 4:24-cv-04092    Document 4-10    Filed on 11/21/24 in TXSD    Page 372 of 382

Section 13.5        Survival.

The provisions of this Agreement shall survive expiration or termination thereof for so long as necessary to give effect to the rights and obligations of the Parties hereunder, but in no event exceeding any applicable statutes of limitation.

Section 13.6        No Joint Venture.

Nothing in this Agreement shall create an association, joint venture or partnership between the Parties or impose any partnership obligation or partnership liability on any Party. Neither Party shall have any right, power or authority to enter into any agreement or commitment or act on behalf of or otherwise bind the other Party without such Party's prior written consent.

Section 13.7        Entire Agreement.

This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and there are not any oral or written understandings, representations or commitments of any kind, express or implied, which are not expressly set out herein. No modification of this Agreement shall be effective unless in writing and executed by the Parties. This Agreement restates the Original Agreement and supersedes any prior agreements of the Parties concerning the subject matter hereof.

25

Section 13.8    **No Third Party Beneficiaries.**

This Agreement is for the sole and exclusive benefit of the Parties, and does not stipulate any benefit in favor of any third parties.

Section 13.9    **Confidentiality.**

Any information belonging to a Party that is confidential and disclosed to the other Party in the course of performance of this Agreement or has been disclosed during the negotiations leading up to this Agreement, including the Agreement itself (collectively, the "***Confidential Information***"), shall be held in confidence and shall not be disclosed to others without the written approval of the disclosing Party. Confidential Information is not information that (i) is already known to the receiving Party at the time of disclosure by the disclosing Party (ii) is now or hereafter becomes available within the public domain other than as a result of a breach of this Agreement, (iii) is received by a Party from a Person under no obligation to keep the Confidential Information confidential, or (iv) is independently developed by a Party without reliance on Confidential Information. A Party shall have the right to disclose Confidential Information without the consent of the disclosing Party to its lenders, counsel, advisors, consultants, accountants, auditors, officers, directors, members, shareholders and other Persons of responsibility who have a need to know the Confidential Information, *provided* that such Persons agree to keep the Confidential Information confidential, and that the Party shall be responsible for any breaches of this confidentiality obligation by such Persons.  A Party shall also have the right to disclose Confidential Information without the consent of the disclosing Party in connection with a subpoena, interrogatory, request for production, civil investigative demand or other such legal process issued by any court or

002809

administrative, legislative, investigative or regulatory body, but only to the extent necessary to fully respond thereto and after providing prior notice to the disclosing Party. Upon the reasonable request of the disclosing Party, the receiving Party shall, in its sole discretion, either return the Confidential Information or destroy it, *provided* that the receiving Party may retain a copy of Confidential Information as necessary to comply with Applicable Law.

 **Section 13.10 Regulatory Matters.**

 (a) Gatherer has informed Producer, and Producer hereby acknowledges and accepts, that the Crude Gathering System will be an intrastate pipeline system operating only within the State of Oklahoma, and is not intended to be subject to regulation under any Applicable Law by FERC. Accordingly, as a principal condition to, and in consideration for, the execution of this Agreement by Gatherer, Producer represents, warrants and covenants that (i) none of Producer's Committed Crude delivered hereunder has been or will be dedicated to or delivered in interstate commerce, (ii) at the time Producer's Committed Crude is delivered at the Receipt Points, Producer shall not have identified any destination for Producer's Committed Crude which is outside the State of Oklahoma and Producer does not intend to deliver any of Producer's Committed Crude to be sold, transported or otherwise moved outside the State of Oklahoma, (iii) all of Producer's Committed Crude delivered to Gatherer under this Agreement shall be produced in the State of Oklahoma, and (iv) Producer's Committed Crude delivered hereunder is not intended to be transported or sold in interstate commerce in any manner which will subject the Crude Gathering System to regulation by FERC. In the event that Producer breaches its representation, warranty and covenant contained in this Section 13.10(a), Gatherer, in addition to

26

all other remedies at law or in equity, shall have the right, upon delivery of written notice to Producer, to refuse receipt of Producer's Committed Crude which has caused a breach of such representation, warranty and covenant. Gatherer's election to refuse receipt of any of Producer's Committed Crude pursuant to this Section 13.10(a) shall not release Producer from any obligation to indemnify Gatherer for such breach under Article VII.

(b)    If any federal or state statute, regulation, or order by a court of law or Governmental Authority directly or indirectly (a) prohibits performance under this Agreement, (b) makes such performance illegal or impossible, or (c) effects a change in a substantive provision of this Agreement that has a significant material adverse impact upon the performance of either Party's obligations under this Agreement, including without limitation the imposition of terms, conditions, or rate restrictions, then the Parties will use all reasonable efforts to revise the Agreement and any other ancillary agreement to the extent necessary so that: (i) performance under the Agreement is no longer prohibited, illegal, impossible, or is no longer impacted in a material adverse fashion, and (ii) this Agreement and any other ancillary agreement is revised in a manner that preserves, to the maximum extent possible, the respective positions of the Parties. Without liability for its failure to do so, each Party will use reasonable efforts to provide notice to the other Party as to any proposed law, regulations or any regulatory proceedings or actions that could affect the rights and obligations of the Parties. If the Parties are unable to revise the Agreement in accordance with the above within ninety (90) days following the adoption of any such law, regulation or order of a Governmental Authority, then the Party whose performance is prohibited, illegal, impossible or is impacted in a material adverse fashion will have the right, at its sole discretion, to terminate this Agreement upon written notice to the other Party.

**Section 13.11     Execution in Counterparts.**

This Agreement may be executed in counterparts, including by electronic transmission, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement.

[Signature Page Next Page]

27

IN WINESS WHEREOF, each of the Parties has caused this Agreement to be executed in duplicate originals by its duly authorized officer as of the Effective Date.

**PRODUCER**

**OKLAHOMA ENERGY ACQUISITIONS, LP**

By: Alta Mesa GP, LLC, its general partner

By: _____

David McClure, *Vice President - Facilities + Midstream*

002813

Signature Page to Crude Gathering Agreement

002814

**GATHERER**

**KINGFISHER MIDSTREAM, LLC,** a Delaware
limited liability company

By: _____
Name:  Taylor Tipton
Title:  President

Signature Page to Crude Gathering Agreement

38627407.2

002816

# EXHIBIT 6

*Dunn v. HPS Investment Partners, LLC, et al.*
Adv. Pro. No. 21-03909

Exhibit 6
2016 OGA Payments

| Payment Date | Payment Amount |
|---|---|
| January 2017 | $1,706.30 |
| February 2017 | $55,757.54 |
| March 2017 | $100,877.29 |
| April 2017 | $56,422.43 |
| May 2017 | $0.00 |
| June 2017 | $39,997.89 |
| July 2017 | $40,588.23 |
| August 2017 | $361,215.02 |
| September 2017 | $63,327.04 |
| October 2017 | $77,270.12 |
| November 2017 | $80,199.69 |
| December 2017 | $112,415.94 |
| January 2018 | $139,585.28 |
| February 2018 | $168,700.74 |
| March 2018 | $184,982.64 |
| April 2018 | $219,247.70 |
| May 2018 | $211,073.66 |
| June 2018 | $215,731.66 |
| July 2018 | $423,499.58 |
| August 2018 | $502,012.46 |
| September 2018 | $361,343.08 |
| October 2018 | $432,311.86 |
| November 2018 | $355,197.12 |
| December 2018 | $358,388.28 |
| January 2019 | $402,485.04 |
| February 2019 | $368,001.50 |
| March 2019 | $418,995.24 |
| April 2019 | $421,123.58 |
| May 2019 | $432,930.94 |
| June 2019 | $33,862.86 |
| July 2019 | $7,292.10 |
| August 2019 | $17,065.10 |
| September 2019 | $0.00 |
| **TOTAL** | **$6,663,607.91** |

002818