## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| ALTA MESA RESOURCES, INC., *et al.,* | Case No. 19-35133 |
| Debtors. | (Jointly Administered) |
| DAVID DUNN, as Trustee of the AMH Litigation Trust, | |
| Plaintiff, | Adv. No. 21-03909 |
| v. | |
| HPS INVESTMENT PARTNERS, LLC; ARM ENERGY HOLDINGS, LLC; ARM MIDSTREAM, LLC; AND ASSET RISK MANAGEMENT, LLC, | |
| Defendants. | |

## RULE 12(B)(6) MOTION TO DISMISS THE SECOND AMENDED COMPLAINT ON BEHALF OF ARM DEFENDANTS

This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.

Represented parties should act through their attorney.

There will be a hearing on this motion on **July 17, 2023** at **9:00 a.m.** central time in person at Courtroom 404, 515 Rusk, Houston, TX 77002 or remotely via GoToMeeting at http://www.gotomeet.me/JudgeIsgur, or Phone at 832-917-1510, access code: 954554.

## TABLE OF CONTENTS

INTRODUCTORY STATEMENT ..................................................................................1

BACKGROUND AND PROCEDURAL HISTORY .......................................................4

    I.     AMH Gathering Agreements and Amendments .........................................4
    II.    AMH Bankruptcy and Subsequent Litigation ...........................................5

LEGAL STANDARDS .................................................................................................7

    I.     Motion to Dismiss .....................................................................................7
    II.    Federal Rule of Civil Procedure 8 .............................................................7

ARGUMENT .................................................................................................................8

    I.     Trustee's SAC fails to state a claim with regard to recovery from ARM
           under Section 550 of the Bankruptcy Code or Section 24.009(b) of the
           TUFTA. ......................................................................................................8

    II.    Trustee's SAC fails to adequately plead facts plausibly suggesting the
           Gathering Agreement Obligations and AMH Gathering Payments were
           constructively fraudulent transfers ..........................................................16

    III.   The SAC should be dismissed because the Gathering Agreements fall
           outside the applicable look-back periods under Federal and
           Texas Law. ...............................................................................................21

CONCLUSION ...........................................................................................................24

002820

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aphton Corp. v. Sonafi Pasteur (In re Aphton Corp.)*,
  423 B.R. 76 (Bankr. D. Del. 2010) .......................................................................26

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................................15, 16, 24

*In re ATP Oil & Gas Corp.*,
  711 F.App'x. 216 (5th Cir. 2017) ...................................................................28, 29

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..............................................................................................16

*Blackburn v. City of Marshall*,
  42 F3d 925 (5th Cir. 1995) ...................................................................................15

*Boston Trading Grp., Inc. v. Burnazos*,
  835 F.2d 1504 (1st Cir. 1987) (Breyer, J.)..........................................................31

*Brown v. Douglas (In re Specialty Select Care Ctr. Of San Antonio, LLC)*,
  Nos. 17-44248-ELM, 20-04060, 2021 Bankr. LEXIS 1933 (Bankr. N.D. Tex.
  2021) .....................................................................................................................26

*In re Crescent Resources, LLC v. Pruet*,
  2012 WL 195528 (Bankr. W.D. Tex. Jan. 23, 2012)......................................26, 27

*Dorsey v. Portfolio Equities, Inc.*,
  540 F.3d 333 (5th Cir. 2008) ...............................................................................15

*In re Dual D Health Care Operations, Inc.*,
  2021 WL 3083344 (Bankr. N.D. Tex. July 21, 2021) ..........................................31

*Faulkner v. Korman (In re Heritage Org., LLC)*,
  413 B.R. 438 (Bankr. N.D. Tex. 2009)................................................................19

*German Pellets La. LLC v. Wessel GMBH (In re La. Pellets, Inc.)*,
  838 Fed. Appx. 45 (5th Cir. 2020)...................................................................26, 27

*Great Lakes Dredge & Dock Co. LLC v. La. State*,
  624 F.3d 201 (5th Cir. 2010) ...............................................................................15

*In re Gulf Fleet Holdings, Inc.*,
  491 B.R. 747 (Bankr. W.D. La. 2013) ...................................................................31

002821

*Halperin v. Moreno (In re Green Field Energy Servs.)*,
　Nos. 13-12783 (KG), 15-50262 (KG), 2018 Bankr. LEXIS 517 (Bankr. D.
　Del. 2018) ........................................................................................................22

*In re Hansen*,
　341 B.R. 638 (N.D. Ill. 2006) ......................................................................20, 21

*HBE Leasing Corp. v. Frank*,
　48 F.3d 623 (2d Cir. 1995)..................................................................................31

*Janvey v. Libyan Inv. Auth.*,
　840 F.3d 248 (5th Cir. 2016) ......................................................................19, 20, 21

*In re Juliet Homes, LP*,
　2010 WL 5256806 (Bankr. S.D. Tex. Dec. 16, 2010) ........................................30

*Katchadurian v. NGP Energy Capital Mgmt., LLC (In re Northstar Offshore
　Grp., LLC)*,
　616 B.R. 695 (Bankr. S.D. Tex. 2020) ....................................................16, 28, 29

*Lo v. Lee*,
　234 Cal. Rptr. 3d 824 (2018) ..............................................................................24

*Lormand v. US Unwired, Inc.*,
　565 F.3d 228 (5th Cir. 2009) ..............................................................................25

*Marwil v. Oncale (In re Life Fund 5.1 LLC)*,
　Nos. 09-B-32672, 10-A-4s, 2010 Bankr. LEXIS 1938 (Bankr. N.D. Ill. 2010)....................28

*In re McCook Metals, LLC*,
　319 B.R. 570 (Bankr. N.D. Ill. 2005) ..............................................................21, 22, 23

*Reily v. Kapila (In re Int'l Mgmt. Assocs.)*,
　399 F.3d 1288 (11th Cir. 2005) ..........................................................................19

*Wolcott v. Sebelius*,
　635 F.3d 757 (5th Cir. 2011) ..............................................................................15

**Statutes**

11 U.S.C. § 502..........................................................................................................13

11 U.S.C. § 544..........................................................................................................14

11 U.S.C. § 546..........................................................................................................30

11 U.S.C. § 548............................................................................11, 14, 25, 26, 30, 31

002822

11 U.S.C. § 550 ............................................................11, 14, 16, 17, 19, 20, 21, 22, 23

Tex. Bus. & Com. Code § 24.005(a)(2) ....................................................................25

Tex. Bus. & Com. Code § 24.010(a) ...................................................................30, 31

Tex. Bus. & Com. Code § 24.009(b) .........................................................11, 16, 17

Tex. Bus. & Com. Code § 24.0010(2) .....................................................................11

Tex. Bus. & Com. Code § 24.010§ 24.010(a)(1), (2) .............................................31

Texas Uniform Fraudulent Transfer Act §§ 24.005(a)(2), 24.006(a), 24.008,
    24.009(b) .............................................................................................................14

TUFTA ................................................................................................... *passim*

## Other Authorities

Fed. R. Civ. P. 8(a)(2) ......................................................................................16, 24

Fed. R. Civ. P. 8(a)(2) ......................................................................................16, 24

Fed. R. Civ. P. 12(b)(6) ...........................................................................................15

Federal Rule of Bankruptcy Procedure 7012(b)(6) .................................................9

002823

Pursuant to Federal Rule of Civil Procedure 12(b)(6), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7012(b)(6), Defendants ARM Energy Holdings, LLC, ARM Midstream, LLC, and Asset Risk Management, LLC (collectively, "ARM") file this Motion to Dismiss the Second Amended Complaint (ECF No. 70) (hereinafter "SAC"), filed by Plaintiff David Dunn, as Trustee of the AMH Litigation Trust (the "Trustee" or "Plaintiff"), for Failure to State a Claim and ask that the Court dismiss with prejudice all claims asserted against them and respectfully state as follows:

## INTRODUCTORY STATEMENT

This is Trustee's third attempt at asserting claims against ARM for alleged fraudulent transfers. Trustee filed the original complaint (ECF No. 1) (hereinafter "Original Complaint") in September 2021, two years after Alta Mesa Holdings, LP ("AMH") filed for bankruptcy, asserting claims for actual and constructive fraudulent transfers against ARM and other Defendants (collectively, the "Defendants"). Upon reviewing the Defendants' motions to dismiss the Original Complaint, in June 2022, this Court dismissed the action from the Bench, holding Trustee failed to plead his actual fraudulent transfer claims with particularity sufficient to satisfy Rule 9(b) but provided Trustee with opportunity to amend. *See* ECF No. 33.

Thereafter, on July 11, 2022, Trustee filed his First Amended Complaint (ECF No. 40) (hereinafter "FAC") in an attempt to cure his deficient pleading. Rather than amending his Original Complaint to satisfy the Rule 9(b) pleading standard, Trustee abandoned his claims for actual fraudulent transfer, leaving only claims for constructive fraudulent transfer—hoping this would absolve the need to satisfy the Rule 9(b) standard. Again, upon reviewing Defendants' motions to dismiss the FAC, in March 2023, this Court dismissed the action entirely, holding Trustee failed to plead that he may recover from ARM for constructive fraudulent transfer on his

1

theory that defendants were transfer beneficiaries. *See* ECF No. 63. Although the Court allowed Trustee the narrow ability to amend—limited to showing how the shareholder-defendants received a direct benefit from the alleged constructive fraudulent transfers, Trustee fails to do so in his SAC.

As he did in the Original Complaint and FAC, Trustee fails yet again to plead sufficiently that he can recover from ARM for any of the alleged constructive fraudulent transfers based on Trustee's theory that ARM was a transfer beneficiary. The minimal additions in Trustee's SAC do not cure the deficiencies as set forth in the Court's Memorandum Opinion. Rather than amending his FAC to allege how ARM received a direct benefit from the alleged constructive fraudulent transfers, Trustee merely recites the same conclusory allegations—tweaking some language—and entirely abandons Counts III-VI. More specifically, in the SAC, Trustee adds additional conclusory allegations regarding direct benefit, irrelevant facts about ownership structures, and irrelevant and insufficient facts about AMH's finances, none of which can repair the deficiencies of the FAC nor meet instructions as set forth in the Court's Order.[1]

Similar to the Original Complaint and FAC, the SAC alleges that certain transactions allegedly undertaken by AMH were fraudulent transfers and asserts that they (somehow) benefited ARM. Specifically, Trustee claims that AMH entered into certain oil and gas gathering agreements in 2015 and 2016 Amendments under which AMH made payments to Kingfisher Midstream, LLC ("KFM"), an entity in which ARM held an interest. Although Trustee sprinkles the words "direct benefit" somewhat randomly throughout the SAC, it still fails to state a claim for which relief can be granted. As such, ARM's third motion to dismiss should be granted with prejudice for the following reasons:

---

[1] *See* ECF No. 64 (Limiting Trustee's leave to file an amended complaint to: "[a]ny amended complaint must set forth a plausible basis as to what direct benefit was received by the Defendants from alleged constructive fraudulent transfers" and further providing that "[n]o other amendments are authorized.").

002825

First, Trustee still fails to plead facts that identify transfers made to, or for the benefit of, ARM, pursuant to Section 550 of the Code and Section 24.009(b) of TUFTA. As he did in the Original Complaint and FAC, Trustee merely alleges that ARM held an interest in KFM, and that KFM supposedly received avoidable transfers. These allegations, however, are insufficient as a matter of law because it fails to show any transfers were made for the benefit of ARM. Thus, even if Trustee had alleged avoidable transfers—which he has not—he pleads no basis for recovering transfers from ARM, and his claims against ARM should be dismissed in their entirety.

Second, Trustee still fails to adequately plead constructive fraudulent transfers under the Bankruptcy Code and TUFTA because he fails to allege facts sufficient to show that the relevant transaction was for less than reasonably equivalent value, nor that AMH was insolvent or undercapitalized at the time the transactions occurred. Trustee cannot meet his burden of pleading AMH's financial condition by relying merely on AMH's cash flow, debt-to-equity ratio, or the fact that AMH ultimately filed for bankruptcy.

Third, Trustee still cannot assert claims under section 548 of the Bankruptcy Code and TUFTA § 24.0010(2) because the alleged transactions occurred outside the look-back period. Count I purports to reach the Gathering Agreement Obligations and AMH Gathering Payments under the 2015 Agreements and 2016 Amendments under Section 548, but these were indisputably incurred before September 11, 2017, and therefore outside Section 548's two-year look-back period. *See* 11 U.S.C. § 548. Similarly, in Count II, the obligations under the 2015 Agreements were incurred outside TUFTA's four-year look-back period for constructive fraud claims. *See* Tex. Bus. Comm. Code § 24.0010(2).

As such, Trustee's SAC fails to cure the defects from the FAC and fails to state claims for which relief may be granted. The Court should therefore dismiss Trustee's SAC with prejudice.

3

## BACKGROUND AND PROCEDURAL HISTORY

**I.    AMH Gathering Agreements and Amendments**

1.      Prior to the February 2018 Business Combination, AMH was owned by its president and CEO, Harlan Chappelle, its COO, Michael Ellis, and High Mesa Inc. ("HMI"). SAC, ¶ 17. Alta Mesa Holdings, GP, LLC (AMH GP) was the sole general partner of AMH and had "full, complete, and exclusive authority to manage and control the business, affairs, and properties of [AMH], to make all decisions regarding the same, and to perform any and all other acts or activities customary or incident to the management of [AMH's] business." *Id.* ¶ 18.

2.      In 2014, ARM Defendants and AMH's owners, through Chappelle, "began discussing jointly sponsoring a new entity" to meet AMH's midstream gathering needs. *Id.* ¶¶ 23-24. This entity became KFM, and "ARM had an approximate 30% interest in KFM." *Id.* ¶ 24.

3.      On August 31, 2015, AMH, through affiliated entities, and KFM allegedly executed the Gas Gathering and Processing Agreement ("2015 GGA") and the Crude Oil Gathering Agreement ("2015 OGA", collectively the "2015 Agreements"). *Id.* ¶ 33. Under the 2015 Agreements, AMH allegedly would pay KFM certain gathering rates and capital recovery fees and "convey or assign" rights-of-way to KFM to build and maintain KFM's gathering systems "where reasonably requested." *Id.* ¶¶ 34-36.

4.      On December 1, 2016, AMH and KFM agreed to amend the 2015 Agreements by executing the Amended and Restated Gas Gathering and Processing Agreement ("2016 GGA Amendment" and Amended and Restated Crude Oil Gathering Agreement ("2016 OGA Amendment", collectively the "2016 Amendments"). *Id.* ¶ 45. The 2016 Amendments allegedly decreased the capital recovery fee and increased the gathering rates under the 2015 Agreements, and required KFM to complete construction of a crude oil gathering system for AMH. *Id.* ¶¶ 45-50.

4

## II.    **AMH Bankruptcy and Subsequent Litigation**

5.    On September 11, 2019 (the "Petition Date"), Alta Mesa Holdings, LP ("AMH") and certain of the other Debtors[2] filed voluntary petitions in the United States Bankruptcy Court for the Southern District of Texas for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Although certain Debtors filed their voluntary bankruptcy petitions on a later date, September 11, 2019 is the only pertinent petition date for purposes of this adversary proceeding.

6.    On May 27, 2020, the Court entered its Findings of Fact, Conclusions of Law, and Order (I) Approving the AMR/AMH Debtors' Disclosure Statement and (II) Confirming the First Amended Joint Plan of Liquidation of Alta Meta Resources, Inc. and its AMH and SRII Debtor Affiliates under Chapter 11 of the Bankruptcy Code.

7.    On September 10, 2021, Trustee filed his Original Complaint (ECF No. 1) to Avoid and Recover Transfers Pursuant to 11 U.S.C. §§ 544, 548, 550, Tex.  Bus. & Com. § 24.001, et. seq., and to Disallow Claims Pursuant to 11 U.S.C. § 502 against Defendants.  The Defendants separately filed motions to dismiss the Original Complaint.

8.    The Court held a joint oral hearing on June 8, 2022, and held, from the Bench, that the Original Complaint failed to allege facts sufficient to satisfy Rule 9's heightened pleading standard, and granted the motions to dismiss.  The Court expressed skepticism that Trustee could plead actionable fraudulent transfer claims, but granted Trustee leave to amend—demanding Trustee to file an amended complaint that meets the pleading standard of Federal Rules of Civil

---

[2] The Debtors in this Chapter 11 case are as follows: Alta Mesa Resources, Inc.; Alta Mesa Holdings, LP; Alta Mesa Holdings GP, LLC; OEM GP, LLC; Alta Mesa Finance Services Corp.; Alta Mesa Services, LP; Oklahoma Energy Acquisitions, LP; SRII Opco GP, LLC; SRII Opco, LP; Kingfisher Midstream, LLC; Kingfisher STACK Oil Pipeline, LLC; Oklahoma Produced Water Solutions, LLC; and Cimarron Express Pipeline, LLC.  The location of the Debtors' corporate headquarters and service address is 15021 Katy Freeway, 4th Floor, Houston, Texas 77094.

002828

Procedures Rule 9.  *See* ECF No. 33.

9.      Trustee filed his FAC on July 11, 2022.  The FAC included six causes of action, but only Counts I and II asserted claims against ARM for alleged constructive fraudulent transfer. Unlike the Original Complaint, where Trustee was claiming actual fraudulent transfer, the FAC on its face, limited the claims to constructive fraudulent transfer—abandoning the actual fraudulent transfer claims in hopes of pleading under a lower standard.

10.     Following a joint oral hearing on November 16, 2022, the Court took the matter under advisement, and on March 3, 2023, the Court granted ARM's motion to dismiss the FAC holding Trustee's FAC, nonetheless, still failed to state a plausible claim for constructive fraudulent transfer.  *See* ECF No. 63.  The Court expressed skepticism that Trustee could plead actionable, constructive fraudulent transfer claims for which relief can be granted based on Trustee's theory that defendants were transfer beneficiaries, but granted Trustee leave to amend— limiting Trustee to amend with respect to plausible basis as to what direct benefit was received by the Defendants from the alleged constructive fraudulent transfers.  *See* ECF No. 63, 64.

11.     Trustee filed his SAC on March 24, 2022.  The SAC includes only two causes of actions—removing Counts III to VI from the FAC.  Similar to the FAC, in both Count I and II, Trustee asserts constructive fraudulent transfer claims against ARM.  In Count I, the fraudulent transfer claims are asserted under the Bankruptcy Code 11 U.S.C. §§ 548(a)(1)(B) and § 550 for avoidance and recovery of "AMH Gathering Payments" (as defined in the SAC).  In Count II, the fraudulent transfer claims are asserted both under the Bankruptcy Code 11 U.S.C. § 544 and the Texas Uniform Fraudulent Transfer Act ("TUFTA") §§ 24.005(a)(2), 24.006(a), 24.008, 24.009(b)) for avoidance and recovery of "Gathering Agreement Obligations" and "AMH Gathering Payments" (as defined in the SAC).

002829

12.      Although Trustee was granted leave to amend, Trustee still fails to state a plausible claim for constructive fraudulent transfer and further fails to plead a plausible basis as to what direct benefit ARM received from the alleged constructive fraudulent transfers.  By this Motion, ARM requests that the Court dismiss the SAC with prejudice.

## LEGAL STANDARDS

### I.     Motion to Dismiss

13.      Federal Rule of Civil Procedures 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."  Fed.  R. Civ. P. 12(b)(6).  When ruling on a 12(b)(6) motion, the Court may consider "the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Wolcott v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (internal citations and quotations omitted).  The Court should not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions."*Great Lakes Dredge & Dock Co. LLC v. La. State*, 624 F.3d 201, 210 (5th Cir. 2010) (internal quotations omitted).  Similarly, legal conclusions masquerading as factual conclusions need not be treated as true.  *See Blackburn v. City of Marshall*, 42 F3d 925, 931 (5th Cir. 1995); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Although well-pleaded facts are viewed in the light most favorable to the plaintiff, the Court should "not strain to find inferences favorable to the plaintiff."  *Dorsey v. Portfolio Equities, Inc*., 540 F.3d 333, 338 (5th Cir. 2008) (internal quotations omitted).  Even taking Trustee's allegations as true, which they are not, Trustee's SAC must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) because it fails to state a claim on which relief can be granted against Defendant.

### II.     Federal Rule of Civil Procedure 8

14.      Rule 8 of the Federal Rules of Civil Procedure requires that a pleading stating a claim for relief contain "a short and plain statement of the claim showing that the pleader is entitled

002830

to relief…."Fed. R. Civ. P. 8(a)(2).   The United States Supreme Court has interpreted Rule 8 as requiring more than mere "labels and conclusions" or "formulaic recitation of the elements of a cause of action."  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007).   Instead, to survive a motion to dismiss, the pleading "must contain sufficient factual matter…to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is plausible when the complaint contains facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."*Id.*  While not requiring the plaintiff to show it is probable the defendant caused the harm, liability must be more than a "sheer possibility" to satisfy the plausibility requirement.  *Id.*  Rule 8 does not permit a plaintiff to proceed with a lawsuit based on "nothing more than conclusions."  *Id.* at 679.

15.    Further, this Court granted Trustee leave to amend the FAC with instructions limiting "[a]ny amended complaint must set forth a plausible basis as to what direct benefit was received by the Defendants from alleged constructive fraudulent transfers" and further provided that "[n]o other amendments are authorized."  *See* ECF No. 64.  As set forth in detail below, Trustee's SAC fails to meet the requirements of Rule 8 and the Court's Order, and as such, should be dismissed with prejudice.

**ARGUMENT**

**I.    Trustee's SAC fails to state a claim with regard to recovery from ARM under Section 550 of the Bankruptcy Code or Section 24.009(b) of the TUFTA.**

16.    Section 550(a) of the Bankruptcy Code allows Trustee to recover from an initial transferee or "entity for whose ***benefit*** such transfer was made," or from a subsequent transferee, "a mediate or immediate transferee."  *See* 11 U.S.C. § 550(a); *Northstar*, 616 B.R. at 729-30.  TUFTA's recovery statute is substantively the same. TEX. BUS. & COMM. CODE § 24.009(b).  To meet his burden under section 550(a), Trustee would need to prove the underlying ***avoidance***

8

*claim*, and that ARM was an initial transferee, the entity for whose benefit the relevant transfers were made, an immediate transferee, or a mediate transferee.

17.     Putting aside the underlying avoidance claim requirement (discussed below), the SAC contains no guidance as to how or why ARM is a defendant for the recovery of alleged transfers. The only relevant statement in the SAC is the conclusory statement: "Upon avoidance of such AMH Gathering Payments alleged in this Count I, Plaintiff is entitled to recover judgment from Defendants pursuant to 11 U.S.C. §§ 550(a)(1) and/or (2)…" SAC, ¶ 69. It is unclear whether Trustee's theory of the case is that ARM is an initial transferee, a benefit transferee, or something subsequent. As in the Original Complaint and FAC, Trustee again pleads only that ARM held certain minority equity interests in entities that allegedly received fraudulent transfers. *See* SAC, ¶ 24 ("ARM had an approximate 30% interest in KFM…"). As a matter of law, that is insufficient to hold ARM liable under Section 550 of the Bankruptcy Code or Section 24.009(b) of TUFTA. The Court can dismiss all of Trustee's claims against ARM for this reason alone.

18.     As noted above, Count I and II of the SAC aim to avoid transfers and obligations related to the vaguely and ambiguously defined "AMH Gathering Payments" and "Gathering Agreement Obligations." SAC, ¶¶ 60-80. The SAC defines the "AMH Gathering Payments" to collectively mean the "GGA Payments" (which includes the "2015 GGA Payments" under the "2015 GGA" and the "2016 GGA Payments" under the "2016 GGA Amendment") and the "2016 OGA Payments" under the "2016 OGA Amendment." SAC, ¶¶ 33, 37, 45, 48. 2015 GGA is defined as the 2015 *Gas Gathering and Processing Agreement* entered into on August 31, 2015, and 2016 GGA Amendment is defined as the 2016 *Amended and Restated Gas Gathering and Processing Agreement* entered into on December 1, 2016, both between OEA and Kingfisher Midstream, LLC ("KFM"). *See id.* A copy of the 2015 Agreements (including 2015 GGA and

9

002832

2015 OGA and 2016 Amendments (including 2016 GGA Amendment and 20016 OGA Amendment) were attached to the SAC as Exhibits No. 1 & 2 and Exhibits No. 4 & 5, respectively. *See* SAC, attached Exhibits. Upon review of the agreements, it is clear that ARM was not a party to such contract(s)—rather, the only parties listed on all agreements was "Oklahoma Energy Acquisitions, LP" (OEA) and "Kingfisher Midstream LLC" ("KFM"). *See id.* Based on the lack of contractual privity, it seems highly unlikely that ARM was an initial transferee. Further, the SAC makes clear that the initial transferees of the alleged transactions did not include ARM, but rather KFM. SAC, ¶¶ 37, 48.

19. In addition, as required by Section 550 and Section 24.009(b) of TUFTA, if ARM was an immediate or mediate transferee, then the SAC is required to provide details concerning how the relevant funds were transferred from the initial transferee to ARM. Here, however, there is no such detail. Trustee also fails to plead that the ARM Defendants are liable as subsequent transferees, as he fails to allege facts establishing any initial transfers were avoidable or that KFM made any subsequent transfers to ARM. The only relevant statement in the SAC is the conclusory statement: "In addition, ARM and HPS are subsequent transferees to the extent that KFM made any distributions to them of the proceeds of the Gathering Agreement Obligations and the AMH Gathering Payments…." SAC, ¶¶ 67, 78. Such statements, beginning with the language "to the extent that…," are nothing more than conclusory allegations, and fail to establish if or how ARM was a subsequent transferee.

20. Here, Trustee (albeit incorrectly) relies on the unsupported theory that ARM was a ***transfer beneficiary*** (*i.e.*, an entity for whose benefit the alleged transfers were made). Although Trustee was given the opportunity to re-plead, Trustee failed for the third time to plead that ARM was a transfer beneficiary.

002833

### A.    ARM is not a transfer beneficiary under Fifth Circuit precedent.

21.    A beneficiary entity under section 550(a) "is typically the guarantor of a debt that was extinguished by the transfer." *Janvey v. Libyan Inv. Auth.*, 840 F.3d 248, 265 (5th Cir. 2016); *see also Reily v. Kapila (In re Int'l Mgmt. Assocs.)*, 399 F.3d 1288, 1292 (11th Cir. 2005) (stating "[t]he paradigm case of a benefit under § 550(a) is the benefit to a guarantor by the payment of the underlying debt of the debtor."). A subsequent transferee "cannot be an 'entity for whose benefit' the initial transfer was made, even if the subsequent transferee actually receives a benefit from the initial transfer." *Faulkner v. Korman (In re Heritage Org., LLC)*, 413 B.R. 438, 495 (Bankr. N.D. Tex. 2009).

22.    Trustee fails to allege that ARM guaranteed the debt owed by AMH, nor that ARM received any particular benefit from the initial transfers. Rather, Trustee relies on conclusory assertions about financial benefit and control to allege ARM was a transfer beneficiary. Although Trustee was provided opportunity to re-plead allegations to show how ARM received a direct benefit, Trustee repeats the same conclusory allegations about how ARM allegedly benefitted, either entirely repeating the same allegations or making slight revisions:

| Allegation in the FAC | "New" Allegation in the SAC |
|---|---|
| "Every above-market dollar paid to KFM benefited KFM's owners, including HPS and ARM, who collectively owned the majority of KFM and controlled its management and operations. In effect, and as intended, the value of AMH's production assets was being diverted to benefit HPS and ARM." FAC, ¶ 40. | "Every above-market dollar paid to KFM benefited KFM's owners, including HPS and ARM, who collectively owned the majority of KFM and controlled its management and operations. In effect, and as intended, the value of AMH's production assets was being diverted to benefit HPS and ARM." SAC, ¶ 40. |
| "The Gathering Agreement Obligations were incurred, and the AMH Gathering Payments made prior to the Business Combination were made, for the ***intended benefit*** of HPS and ARM as the controlling equity holders of the closely-held KFM." FAC, ¶¶ 70, 81. | "The Gathering Agreement Obligations were incurred, and the AMH Gathering Payments made prior to the Business Combination were made, for the ***intended benefit*** of HPS and ARM as the controlling equity holders of the closely-held KFM." SAC, ¶¶ 64, 75. |

002834

| | |
|---|---|
| "ARM and HPS actually received quantifiable benefits from the Gathering Agreement Obligations and the AMH Gathering Payments, as the controlling equity owners of KFM, in the form of (i) their respective portions of the value of such transfers to KFM, and the subsequent increase of KFM's enterprise value, to which, as owners of KFM, both ARM and HPS had access, and (ii) the proceeds of the sale of KFM through the Business Combination paid to ARM and HPS as a result of such increase in value." FAC, ¶¶ 72, 83. | "ARM and HPS received a ***direct***, quantifiable benefit from the Gathering Agreement Obligations and the AMH Gathering Payments in the form of the proceeds of the sale of KFM through the Business Combination. Specifically, in consideration for the sale of 100% of the economic interest in KFM, upon the closing of the Business Combination, on information and belief, HPS received cash of at least $606 million and stock valued at an additional $177.1 million, and ARM received cash of at least $92.2 million and stock valued at an additional $95.8 million. The Trustee is informed and believes that, absent the Gathering Agreement Obligations and the AMH Gathering Payments, ARM and HPS would not have been able to consummate the sale of KFM and receive the proceeds therefrom or, in the alternative, the proceeds therefrom would have been a fraction of the actual proceeds received by ARM and HPS, which amount will be proven at trial." SAC, ¶¶ 66, 77. |

These allegations in Trustee's SAC are nothing more than conclusory assertions that ARM somehow benefitted on the back of KFM without actually alleging any facts to show how or when ARM benefited from the alleged transfers.

23.     Further, Trustee's reliance on ARM's equity interest in KFM and any degree of control (which was non-existent) is misplaced. *See* SAC, ¶¶ 26, 61, 64-65, 72, 75-76. In *Janvey*, the Fifth Circuit applied corporate separateness to the question of whether a shareholder is the beneficiary of an avoidable transfer to that entity. *Janvey v. Libyan Inv. Auth.*, 840 F.3d 248, 266 (5th Cir. 2016). The court in *Janvey*, relying on *In re Hansen*, 341 B.R. 638, 645 (N.D. Ill. 2006), held that "[n]othing in section 550(a)(1) indicates that corporate form can be thrust aside and all voidable transfers to a corporation recovered from its shareholders on the mere assumption that shareholders somehow automatically 'benefit' from such transfers." *Id.* Accordingly, a

12

shareholder such as ARM—even one that exercises some degree of control over an entity—is not, without more, the beneficiary of a transfer to that entity. *See id.* As such, even though ARM owns a 30% equity interest in KFM, without more, it does not qualify as a transfer beneficiary.

**B.    ARM is not a transfer beneficiary under the *McCook Metals* Test.**

24.    Based on Trustee's opposition to ARM's first motion to dismiss, and the inclusion of conclusory allegations in each Count of the SAC regarding ARM's control and quantifiable benefit (described above), Trustee might argue that this Court should disregard the Fifth Circuit's opinion in *Janvey* and instead follow a test set forth in *In re McCook Metals, LLC*, 319 B.R. 570 (Bankr. N.D. Ill. 2005), which—unlike the approach in *In re Hansen*—neither this Court nor the Fifth Circuit has cited in any published order, much less adopted. *Cf. Janvey*, 840 F.3d at 266 (describing *Hansen* as "the right approach.").

25.    Even if one assumes the *McCook Metals* test is applicable in this Court, Trustee fails to plead facts to show that ARM would qualify as a transfer beneficiary. Under *McCook Metals*, a transfer beneficiary is said to have received the requisite "benefit" if the benefit is (1) actually received by the beneficiary, (2) is quantifiable, and (3) is accessible to the beneficiary. *McCook Metals*, 319 B.R. at 590. In addressing the first prong, the *McCook Metals* court stated that a benefit from a challenged transfer is actually received "when a transfer to a third party increases the beneficiary's assets." *Id.* at 591. In *McCook Metals*, the ultimate beneficiary, Lynch, received a right to purchase assets from another entity, Longview. The plaintiff alleged that this right to purchase was fraudulently transferred. At trial, the court found that Lynch was a transfer beneficiary and *actually received* the benefit primarily because Lynch was the majority owner of the LLC and because Lynch had significant control over the transferee entity. Here, Trustee's allegations are insufficient.

13

26.    First, as with the FAC, the SAC still fails to allege any facts that ARM actually received a direct benefit from AMH's transfers to KFM.  Rather, Trustee merely re-alleges that ARM, as an owner of KFM, received a respective portion of the value of the transfers made by AMH to KFM after the sale of KFM in connection with the Business Combination.  This Court has already rejected the Trustee's theory that ARM can be held liable as a direct beneficiary on the grounds that the sale allegedly increased the value of KFM, and that ARM received proceeds from the ultimate sale of KFM.  *See* ECF No. 63.

27.    Further, Trustee's allegation that ARM received an actual benefit from the increase of KFM's assets in connection with the sale of KFM pursuant to the Business Combination fails under the *McCook Metals* test.  The *McCook Metals* court held that "an actual benefit rather than a merely intended one must be received in order for the beneficiary to be liable under § 550(a)(1)." Plaintiff has failed to plead any facts to show that any increase in ARM's assets due to the sale of KFM pursuant to Business Combination would be considered an actual benefit rather than an intended or incidental benefit.

28.    In any event, Trustee's allegation that ARM received an actual benefit merely because ARM owned a 30% equity interest in KFM is insufficient to pass the muster of the first prong.  In *Halperin v. Moreno (In re Green Field Energy Servs.)*, Nos. 13-12783 (KG), 15-50262 (KG), 2018 Bankr. LEXIS 517, at *5 (Bankr. D. Del. 2018), the transfers in question were monetary payments made by the defendant to an LLC, in which the defendant owned a 50% equity interest.  The court held that merely owning an equity interest is insufficient to show "actual benefit" received, and instead, Trustee must prove that the defendant received an actual benefit from those payments.  *Id.*  (holding that Trustee's claim that the defendant was the ultimate beneficiary simply because he held a 50% stake was held to be "too conclusory" at this stage of

14

the proceedings; the court held that at trial, Trustee must prove that "an actual benefit rather than a merely intended one" was received by the defendant).

29.     Second, with respect to the second prong, the *McCook Metals* court held that for "purposes of 11 U.S.C.S. § 550, a corollary to the disgorgement-based requirement that a benefit actually be received is a requirement that it be quantifiable.  A merely theoretical benefit is not sufficient since it would not be subject to disgorgement." *McCook Metals*, 319 B.R. at 570.  Here, Trustee merely alleges that the direct, quantifiable benefit obtained by ARM from the Gathering Agreement Obligations and AMH Gathering Payments came "in the form of the proceeds of the sale of KFM through the Business Combination.  Specifically, in consideration for the sale of 100% of the economic interest in KFM, upon the closing of the Business Combination, on information and belief, HPS received cash of at least $606 million and stock valued at an additional $177.1 million, and ARM received cash of at least $92.2 million and stock valued at an additional $95.8 million.  The SAC indicates that Trustee is informed and believes that, absent the Gathering Agreement Obligations and the AMH Gathering Payments, ARM and HPS would not have been able to consummate the sale of KFM and receive the proceeds therefrom -- or, in the alternative, the proceeds therefrom would have been a fraction of the actual proceeds received by ARM and HPS, which amount will be proven at trial."  SAC, ¶¶ 66, 77.  Trustee's allegations, however, are nothing more than conclusory allegations based on a theoretical benefit.

30.     Third, with respect to the third prong, the *McCook Metals* court held "[e]ven if a quantifiable benefit is actually received, it could not fairly be disgorged if the beneficiary never had *access* to it." *McCook Metals*, 319 B.R. at 570.  In *McCook*, the court held that Lynch's ability to significantly "control" the entity was determinative of whether Lynch had "access" to the benefit.  In this case, Trustee alleges merely that ARM had "access" to the benefit because ARM

15

was an equity owner of KFM and received the benefits of the Gathering Agreement Obligation and AMH Gathering Payments in connection with the sale of KFM during the Business Combination. First, it is inaccurate to say that ARM was a primary equity holder—considering the fact that Trustee himself acknowledges that ARM merely owned approximately 30% equity in KFM. SAC, ¶ 24. Second, none of these (conclusory) allegations are enough to allow the court to draw a plausible inference that ARM was a transfer beneficiary. For example, in *Lo v. Lee*, 234 Cal. Rptr. 3d 824, 830 (2018), the court held that defendant did not have access to the benefit because the "funds were transmitted directly to Northeastern… [defendant] had no control over the funds that [plaintiff] transferred… and the SAC [did] not allege that [defendant] had access to these funds at any point in time." Similarly, ARM did not have access to any benefit, because the Gathering Agreement Obligations and AMH Gathering Payments were transmitted to KFM—not ARM—and because ARM did not have "control" over KFM or the funds AMH transferred at any point in time. As such, Trustee has failed to re-plead sufficient facts to show that ARM would qualify as a transfer beneficiary.

II. **Trustee's SAC fails to plead facts plausibly suggesting the Gathering Agreement Obligations and AMH Gathering Payments were constructively fraudulent transfers.**

31. To avoid dismissal for failure to state a claim, a plaintiff must meet the pleading requirements under Rule 8(a)(2) of the Federal Rules of Civil Procedure. Rule 8(a)(2) requires a plaintiff to plead "a short and plain statement of the claim showing that the pleader is entitled to relief." In *Ashcroft v. Iqbal*, the Supreme Court held that Rule 8(a)(2) requires that "the well-pleaded facts" must "permit the court to infer more than the mere possibility of misconduct." *Iqbal,* 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). "Only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* (citing *Twombly*, 550 U.S. at 556). "[A] complaint does not need detailed factual allegations, but must provide the plaintiff's grounds for

16

entitlement to relief—including factual allegations that when assumed to be true raise a right to relief above the speculative level." *Lormand v. US Unwired, Inc*., 565 F.3d 228, 232 (5th Cir. 2009) (internal quotation marks omitted).

32.     To establish a claim for a constructively fraudulent transfer under either Section 548 of the Bankruptcy Code or TUFTA, a plaintiff must plead sufficient facts, provide evidence and establish each element under section 548(a)(1)(B) and section 24.005(a)(2) of TUFTA.

33.     Section 548(a)(1)(B) of the Bankruptcy Code provides, in relevant part, that:

> The Trustee may avoid any transfer ... of an interest of the debtor in property ... that was made ... on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily ... received less than a reasonably equivalent value in exchange for the transfer ...; and ... was insolvent on the date that such transfer was made ..., or became insolvent as a result of such transfer ...; was engaged in business ... for which any property remaining with the debtor was an unreasonably small capital; [or] intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured....

11 U.S.C. § 548(a)(1)(B)(i), (ii)(I)-(III).

34. Similarly, Section 24.005 of TUFTA provides, in relevant part, that:

> A transfer made ... by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made ..., if the debtor made the transfer ... without receiving a reasonably equivalent value in exchange for the transfer ..., and the debtor ... was engaged ... in a business ... for which the remaining assets of the debtor were unreasonably small in relation to the business ...; or ... intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Tex. Bus. & Com. Code § 24.005(a)(2).

35.     Based upon the statutory language set out above, Trustee's claims for the avoidance as constructively fraudulent transfers requires proof of, among other things, (i) the Debtor's receipt of less than reasonably equivalent value in exchange for each of the contractual payments allegedly

17

made by the Debtors, and (ii) that the Debtor was financially vulnerable or insolvent at the time of the transaction.

**A.      Trustee fails to allege transfers for less than reasonably equivalent value.**

36.      "Whether a debtor received reasonably equivalent value is a two-part inquiry:  (1) whether the debtor received value, and (2) whether that value was reasonably equivalent." *German Pellets La. LLC v. Wessel GMBH (In re La. Pellets, Inc.)*, 838 Fed. Appx. 45, 49 (5th Cir. 2020). In relation to the first prong of the inquiry, Section 548(d)(2) of the Bankruptcy Code defines "value" as including the "satisfaction ... of a present or antecedent debt of the debtor." *Brown v. Douglas (In re Specialty Select Care Ctr. Of San Antonio, LLC)*, Nos. 17-44248-ELM, 20-04060, 2021 Bankr. LEXIS 1933, at *28 (Bankr. N.D. Tex.  2021).  In relation to the second prong of the inquiry, "[f]or any such value to be reasonably equivalent, the debtor must receive 'value that is substantially comparable to the worth of the transferred property.'"  *Id.*  In general, plaintiffs run afoul of the plausibility standards if they neglect to adequately allege any of these facts: (1) asset transferred, (2) date of transfer, (3) recipient of transferred asset, (4) value of the asset transferred, and (5) value of the asset received.  *Aphton Corp. v. Sonafi Pasteur (In re Aphton Corp.)*, 423 B.R. 76, 93 (Bankr. D. Del. 2010).

37.      With respect to the reasonably equivalent value requirement, Trustee has followed the same defective pleading approach as the plaintiff in *In re Crescent Resources, LLC v. Pruet*, 2012 WL 195528 (Bankr. W.D. Tex. Jan. 23, 2012).  There, the plaintiff litigation trust alleged the "general conclusory allegations of insolvency and reasonably equivalent value." *Id*. at *8.  The court granted a motion to dismiss, finding that the "Trust fails to support its allegations with factual assertions." *Id*. at *9.

38.      In a conclusory fashion, Trustee makes the following allegation:  "The AMH Debtors received less than reasonably equivalent value in exchange for incurring the obligations

002841

under the Gathering Agreements Obligations and making the AMH Gathering Payments." SAC,

¶¶ 62; 73. The only details accompanying this conclusory allegation are:

> "(i) the gathering and processing fees in the Gathering Agreements were approximately 90-100% higher than market rates, rates paid to non-KFM midstream gatherers, or rates paid to KFM by non-AMH Debtor upstream producers;
>
> (ii) the Gathering Agreements required the payment of Capital Recovery Fees or Facility Fees that were completely foreign in the industry and increased the AMH Debtors' price of doing business with KFM even further beyond industry standards;
>
> (iii) the 2016 Amendments included provisions intended to transform the 2015 Agreements into covenants running with the land, including a purported conveyance of transportation interests, for which the AMH Debtors received no additional consideration; and
>
> (iv) under the 2016 OGA Amendment, KFM was paid for every barrel of oil produced from the designated area, even though KFM did not carry those barrels and AMH paid another party to transport the barrels away."

*Id.*

39.     Each of these statements is nothing more than a conclusory allegation, to which Trustee fails to append sufficient facts. More specifically, there are no details explaining how the processing fees in the Gathering Agreement were higher than the market rates. Trustee fails to allege how market value was determined and offers no facts suggesting the purported "market" value is the sole measure of reasonably equivalent value. Further, payments made pursuant to the 2016 Amendments are payments in satisfaction of an antecedent contractual liability, which cannot support a fraudulent transfer claim, *La. Pellets*, 838 F. App'x at 52, and Trustee fails to plausibly allege that an arm's length transaction would not yield similar terms. Accordingly, Trustee has not adequately alleged that AMH received less than reasonably equivalent value for the Gathering Agreements.

19

**B.     Trustee fails to plead the insolvency element of constructive fraudulent transfer.**

40.     In addition to alleging that the debtor did not receive reasonably equivalent value, a plaintiff must also allege facts concerning the debtor's insolvency at the date of the transfer. *Marwil v. Oncale (In re Life Fund 5.1 LLC)*, Nos. 09-B-32672, 10-A-4s, 2010 Bankr. LEXIS 1938, at *20 (Bankr. N.D. Ill. 2010).  In other words, to plausibly allege a constructively fraudulent transfer, Trustee is required to plead sufficient factual content that would enable the Court to reasonably infer AMH's insolvency or inadequate capitalization at the time of the transfers.  *See Katchadurian v. NGP Energy Capital Mgmt., LLC (In re Northstar Offshore Grp., LLC)*, 616 B.R. 695, 737-38 (Bankr. S.D. Tex. 2020) (stating "[t]o prevail on a constructively fraudulent transfer claim, Trustee must prove insolvency on the date of the transfer").  *See also In re ATP Oil & Gas Corp.*, 711 F.App'x. 216, 223 (5th Cir. 2017) (affirming dismissal of constructive fraudulent transfer claim because "Trustee failed to present any financial data showing that ATP was actually insolvent or had little capital when making the complained-of bonus payments"); *Cyr*, 602 B.R. at 332 (dismissing constructive fraudulent transfer claim because the "Trustee presented no allegations regarding the value of the … debt relative to the value of the … assets at the time the transfers were made").

41.     Trustee alleges only that "[o]n information and belief, at the time the Gathering Agreement Obligations were incurred, and each of the AMH Gathering Payments were made, AMH (i) was insolvent, or became insolvent as a result of such transfers or obligations, (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with AMH was an unreasonably small capital, and/or (iii) intended to incur, or believed that AMH would incur, debts that would be beyond AMH's ability to pay as such debts matured."  SAC, ¶¶ 63, 74.  Further, Trustee alleges that "[a]mong other things, during

20

002843

the relevant period, AMH operated at a net loss and was severely inadequately capitalized, with a debt to equity ratio of at least 20-to-1, and was cash-flow insolvent… [a]ccordingly, on information and belief, AMH and its subsidiaries lacked sufficient cash flow to meet its upcoming obligations, continued to draw down on its credit facility, and refinanced its debt." *Id*.

42.     Here, Trustee has not adequately alleged that AMH was insolvent or financially vulnerable on the dates AMH incurred the obligations or made the transfers at issue.  As to the 2015 Agreements, Trustee purports to plead AMH's financial condition by repeating verbatim the statutory provisions (on information and belief) without supporting facts.  *See* SAC, ¶ 63, 74.  As to the 2016 Amendments, Trustee claims "[b]y mid-2016, Moody's downgraded AMH's debt, citing a 'weak liquidity position, expected deterioration in credit metrics through 2017, and increasing refinancing risk.'"  *Id.*  ¶ 38.  But "weak" liquidity—on which Trustee fails to elaborate—asserts at most that AMH had less cash than it would have liked but simply does not plead insolvency or undercapitalization, nor even failure to make a single debt payment.  Trustee, therefore, has failed to allege facts sufficient to raise a plausible inference that AMH was insolvent or that AMH did not receive reasonably equivalent value in connection with the transfers.

43.     *Finally*, even accepting Trustee's conclusory allegations of AMH's financial condition as true, the SAC still fails to allege that AMH was insolvent.  None of the assertions about AMH leads to the conclusion that "the sum of its liabilities [was] greater than the sum of its **assets** at fair valuation."  *Northstar*, 616 B.R. at 737 (emphasis added) (quotation omitted).

44.     Accordingly, Trustee fails to plausibly plead AMH received less reasonably equivalent value and its insolvency at the time of any of the alleged fraudulent transfers.  As such, the Court should dismiss Trustee's SAC.

**III.     The SAC should be dismissed because the Gathering Agreements fall outside the applicable look-back periods under Federal and Texas Law.**

21

002844

45.     Under Section 548 of the Bankruptcy Code, a trustee may seek to avoid a transfer "that was made or incurred on or within two years before the date of the filing of the petition." 11 U.S.C. § 548(a)(1).    Under Section 24.010(a) of TUFTA, a fraudulent transfer claim is extinguished unless brought under (i) Sections 24.005(a)(1) or (a)(2), or 24.006(a), within four years after the transfer or incurrence of the obligation (where, as here, the discovery rule is inapplicable); or (ii) Section 24.006(b), within one year after the transfer.  Tex. Bus. & Com. Code § 24.010(a).  Further, Section 546(a) of the Bankruptcy Code, 11 U.S.C. § 546(a), provides that any such claims must be asserted within two years of the petition date if the claim was viable at the petition date.  *See, e.g.*, *In re Juliet Homes, LP*, 2010 WL 5256806, at *17 (Bankr. S.D. Tex. Dec. 16, 2010) (trustee has two years to assert state-law fraudulent transfer if "the claim is still viable under state law by the time Trustee brings the action.").

46.     Here, the Petition Date was September 11, 2019.  Accordingly, the look-back period under Section 548 goes to September 11, 2017, and under TUFTA goes to September 11, 2015.  In the SAC, Trustee attempted to separate the look-back periods applicable under Section 548(a)(1) of the Code and Section 24.010(a)(2) of TUFTA.

47.     In Count I, Trustee seeks to avoid under Section 548: (i) the Gathering Agreement Obligations arising under the 2015 Agreements and 2016 Amendments, and (ii) the AMH Gathering Payments made in connection with those agreements.  SAC, ¶¶ 60-69.  Avoidance claims under Section 548 may be asserted for obligations incurred, or transfers made only up to two years before the Petition Date.  *See* 11 U.S.C. § 548(a)(1).  Here, two years before the Petition Date was September 11, 2017.  Trustee alleges the 2015 Agreements were executed on August 31, 2015, and the 2016 Amendments on December 1, 2016—both more than two years before the Petition Date.  AMH thus initially incurred the Gathering Obligations and AMH Gathering

22

002845

Payments more than two years before the September 11, 2019 Petition Date, and thus outside the two-year look-back period under Section 548(a)(1).

48.     In addition, because the 2015 Agreements and 2016 Amendments are unavoidable under Section 548, any and all AMH Gathering Payments made in satisfaction of those obligations constitute "dollar-for-dollar satisfaction of the contractual liability imposed under the terms of the applicable" 2015 Agreement and 2016 Amendments, and are not fraudulent as a matter of law. *In re Dual D Health Care Operations, Inc.*, 2021 WL 3083344, at \*10 (Bankr. N.D. Tex. July 21, 2021); *see also HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d Cir. 1995) ("[E]ven the preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance, whether or not it prejudices other creditors"); *Boston Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1509 (1st Cir. 1987) (Breyer, J.) (the "basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy *some* of his creditors; it normally does not try to choose among them"); *In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747, 766 (Bankr. W.D. La. 2013) (dismissing section 544 and 548 fraudulent transfer claims premised on payments of obligations fixed under contract).

49.     In Count II, Trustee seeks to avoid under Sections 24.005(a)(2) and 24.006(a) of TUFTA:  (i) the Gathering Agreement Obligations arising under the 2015 Agreements and 2016 Amendments, and (ii) the AMH Gathering Payments made in connection with those agreements. SAC, ¶¶ 70-80.  The four-year limitation under TUFTA Section 24.010(a) precludes Trustee's fraudulent transfer claims arising from the execution of the 2015 Agreements, because those claims lapsed on August 31, 2019. *See* Tex. Bus. & Com. Code § 24.010§ 24.010(a)(1), (2).  And any AMH Gathering Payments made outside that look-back period are also time barred.  Count II,

002846

therefore, is untimely and should be dismissed as to the 2015 Agreement and AMH Gathering Payments made before September 11, 2015.

## CONCLUSION

As Trustee has failed to adequately re-plead allegations showing how the shareholder-defendants received a direct benefit from the alleged constructive fraudulent transfers under Trustee's transfer beneficiary theory, the SAC fails (again) to state a claim upon which relief may be granted.

WHEREFORE, ARM requests that all claims asserted by Trustee in the SAC be dismissed for failing to state a claim upon which relief may be granted, that the Court grant her attorneys' fees and costs to the extent permitted under applicable law, and for all other relief, in law or in equity, to which ARM may be entitled.

Dated:  April 24, 2023

Respectfully submitted,

**EVERSHEDS SUTHERLAND (US) LLP**

/s/ David A. Baay
David A. Baay (TBN 24027050)
Mark D. Sherrill (TBN 24035678)
Jay P. Patel (TBN 24125682)
davidbaay@eversheds-sutherland.com
marksherrill@eversheds-sutherland.com
jaypatel@eversheds-sutherland.com
1001 Fannin Street, Suite 3700
Houston, Texas 70002
Tel:  (713) 470-6100
Fax:  (713) 654-1301

**COUNSEL TO ARM ENERGY HOLDINGS, LLC; ARM MIDSTREAM, LLC; AND ASSET RISK MANAGEMENT, LLC**

002847

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| ALTA MESA RESOURCES, INC., *et al.,* | Case No. 19-35133 |
| Debtors. | (Jointly Administered) |
| DAVID DUNN, as Trustee of the AMH Litigation Trust, | |
| Plaintiff, | Adv. No. 21-03909 |
| v. | |
| HPS INVESTMENT PARTNERS, LLC; ARM ENERGY HOLDINGS, LLC; ARM MIDSTREAM, LLC; AND ASSET RISK MANAGEMENT, LLC, | |
| Defendants. | |

**ORDER**

On this day, the Court considered Defendants ARM Energy Holdings, LLC, ARM Midstream, LLC, and Asset Risk Management, LLC's (collectively, "ARM") 12(B)(6) Motion to Dismiss Plaintiff's Second Amended Complaint. Based upon the Court's review of the pleadings and the controlling case law, the Court finds that the motion should be granted.

It is therefore ORDERED that the causes of action filed against ARM are dismissed with prejudice.

Signed on this _____ day of _____ 2023.

_____
UNITED STATES BANKRUPTCY JUDGE

002848

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| ALTA MESA RESOURCES, INC., *et al.,* | Case No. 19-35133 |
| Debtors. | (Jointly Administered) |
| DAVID DUNN, as Trustee of the AMH Litigation Trust,<br><br>Plaintiff,<br><br>v.<br><br>HPS INVESTMENT PARTNERS, LLC; ARM ENERGY HOLDINGS, LLC; ARM MIDSTREAM, LLC; AND ASSET RISK MANAGEMENT, LLC,<br><br>Defendants. | Adv. No. 21-03909 |

**RULE 12(b)(6) MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**
**ON BEHALF OF HPS INVESTMENT PARTNERS, LLC**

> This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you.* Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.
>
> Represented parties should act through their attorney.
>
> There will be a hearing on this motion on July 17, 2023 at 9:00 a.m. central time in person at Courtroom 404, 515 Rusk, Houston, TX 77002.

\* But see ECF No. 72 (Order on Joint Scheduling Stipulation).

002849

## TABLE OF CONTENTS

PAGE

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 3

I.     THE TRUSTEE'S INITIAL PLEADINGS ...................................................... 3

   A.    The Original and First Amended Complaints Are Dismissed ...................... 3

   B.    The Court Dismisses the FAC and Grants Leave to Amend on Narrow Grounds........... 4

   C.    The Trustee Files the Operative Second Amended Complaint ...................... 4

LEGAL STANDARD ................................................................................................ 5

ARGUMENT ............................................................................................................ 5

I.     THE SAC FAILS TO PLEAD THAT HPS WAS A DIRECT BENEFICIARY OF
THE GATHERING AGREEMENTS BETWEEN AMH AND KFM .................................... 7

   A.    The Trustee's Failure to Pierce the Corporate Veil Between KFM and HPS is Fatal to
   the Trustee's Constructive Fraudulent Transfer Claims ............................................ 7

   B.    The Trustee Fails to Plead That HPS Received a Direct Benefit From the Gathering
   Agreements ............................................................................................................ 8

II.    FURTHER AMENDMENT WOULD BE FUTILE ......................................... 12

CONCLUSION ........................................................................................................ 13

002850

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................. 5

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*,
  497 F.3d 546 (5th Cir. 2007) ............................................................................. 5

*In re ATP Oil & Gas Corp.*,
  2013 WL 5310194 (Bankr. S.D. Tex. Sept. 18, 2013) ............................. 5

*In re Giant Gray, Inc.*,
  629 B.R. 814 (S.D. Tex. 2020) ......................................................................... 5

*In re Hansen*,
  341 B.R. 638 (N.D. Ill. 2006) ..................................................................... 7, 8

*In re Life Partners Holdings, Inc.*,
  926 F.3d 103 (5th Cir. 2019) ............................................................................ 5

*In re McCook Metals, LLC*,
  319 B.R. 570 (Bankr. N.D. Ill. 2005) ........................................................ 9

*In re Uplift RX, LLC*,
  625 B.R. 364 (Bankr. S.D. Tex. 2021) ........................................................ 13

*Janvey v. Libyan Investment Authority*,
  840 F.3d 248 (5th Cir. 2016) .......................................................... 2, 8, 10, 12

*Matter of Ritz*,
  832 F. 3d 560 (5th Cir. 2016) ........................................................................ 7

### STATUTORY AUTHORITIES

11 U.S.C. § 548 ....................................................................................................... 3

11 U.S.C. § 548(a)(1)(B)(i) ................................................................................. 5

11 U.S.C. § 550(a) .............................................................................................. 5, 8

F.R.C.P. 9(b) ........................................................................................................... 4

F.R.C.P. 12(b)(6) ............................................................................................. 1, 3, 5

TEX. BUS. & COM. CODE § 24.009(b) ........................................................ 6

TEX. BUS. & COM. CODE § 24.010(a)(2) ..................................................... 3

ii

HPS Investment Partners, LLC ("HPS") respectfully submits this motion to dismiss the Second Amended Complaint (ECF No. 70) ("SAC") filed by Plaintiff David Dunn, as Trustee of the AMH Litigation Trust, pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6).

## <u>INTRODUCTION</u>

This is the Trustee's third attempt to assert fraudulent transfer claims against HPS. The Trustee's first complaint asserted claims of actual and constructive fraud against HPS arising from three separate categories of supposedly fraudulent transfers. The Court dismissed that complaint for failing to meet the standard for pleading fraud under Rule 9(b). The Trustee next filed a First Amended Complaint ("FAC") that asserted the same categories of fraudulent transfers but abandoned any allegations of fraud, relying solely on a theory of constructive fraudulent transfer. The Court dismissed those claims as well, holding that this time the Trustee failed to plead that HPS—which was an investor in the entities that allegedly received the transfers—was a direct beneficiary of any alleged transfers pursuant to Section 550 of the Code and its TUFTA analog. The Court granted leave for the Trustee to try to remedy this specific deficiency.

The Second Amended Complaint ("SAC") fails again, however, to plead that HPS was a direct beneficiary of any alleged transfers. To start, the SAC now jettisons allegations arising from all alleged transfers apart from certain oil and gas gathering agreements between a subsidiary of Alta Mesa Holdings, Inc. ("AMH")—the entity on whose behalf the Trustee asserts causes of action—and Kingfisher Midstream, LLC ("KFM") that allegedly siphoned value from AMH in favor of KFM. The Trustee's claim is that HPS is a direct beneficiary of these transfers because, upon the sale of AMH and KFM to a Special Purpose Acquisition Company ("SPAC") named Silver Run II, HPS supposedly received a distribution of certain proceeds. This theory fails for two main reasons:

002852

*First*, this Court has already rejected it.  In its Memorandum Opinion dated March 3, 2023 (ECF No. 63) ("Memo Opinion" or "Mem. Op."), the Court explained that, under the FAC, "every shareholder of every corporation that receives a distribution would 'benefit' from any increase in the value of the corporation if the corporation received a constructively fraudulent transfer," and that, rather, "[t]o reach any value in the hands of a shareholder on the theory that they are a transfer beneficiary, [the Trustee] would need to pierce the [corporate] veil."  Mem. Op. 14.  The Trustee did not even attempt to pierce the corporate veil in the FAC, and the SAC's limited additional allegations likewise make no such effort.

*Second*, the Trustee still fails to plead that HPS received any direct benefit.  The Trustee's limited additional allegations in the SAC apparently also seek to support theories that the Memo Opinion already rejected, including that (i) intent to benefit HPS, (ii) HPS's interests in KFM, or (iii) HPS's purported control over AMH or KFM could be sufficient to plead that HPS was a direct beneficiary of transfers to KFM.  Indeed, in *Janvey v. Libyan Investment Authority*, the Fifth Circuit found that a purported derivative benefit—such as an increase in value at the transferee entity—to a defendant entity similarly situated to HPS was insufficient to plead that the defendant was a direct beneficiary of a transfer.  840 F.3d 248, 265-66 (5th Cir. 2016); *see also* Mem. Op. at 14, 16 ("The idea of a derivative benefit has been rejected by the Fifth Circuit....").

Despite two opportunities to amend his original complaint and years to revise his theories, the Trustee's additional allegations are little more than window dressing that support neither the veil-piercing necessary to recover against HPS, nor any theory of direct benefit not already rejected by this Court.  The Court should dismiss the Trustee's causes of action with prejudice.[1]

---

[1] In light of the Memo Opinion's focus on Section 550(a), and the narrow permissible scope of the Trustee's leave to amend, HPS has not included in this Memorandum of Law a detailed discussion of other potential grounds for dismissal.  Those grounds are set forth in the Rule

2

## BACKGROUND

I.    **THE TRUSTEE'S INITIAL PLEADINGS**

    A.    **The Original and First Amended Complaints Are Dismissed**

On September 11, 2019, AMH and Alta Mesa Resources, Inc., among others, filed for protection under Chapter 11. *See AMR, Inc.*, No. 4:19-bk-35133. Two days before the expiration of the statute of limitations, the Trustee initiated this action to avoid and recover certain alleged actual and constructive fraudulent transfers relating to (i) certain oil and gas gathering agreements between a subsidiary of AMH and KFM (the "Gathering Agreements");[2] (ii) transfers from AMH to High Mesa Inc. ("HMI") and/or affiliated entities of certain oil and gas properties with interests outside of the STACK drilling region in Oklahoma (the "Non-STACK Assets"); and (iii) a management services agreement between AMH and HMI (the "Management Agreement"). *See* ECF No. 1. The Court dismissed the Trustee's original complaint from the Bench in June 2022 for failing to plead fraudulent transfers with the particularity necessary to satisfy Rule 9(b). *See* ECF No. 33.

---

12(b)(6) Motion to Dismiss the Amended Complaint on Behalf of HPS Investment Partners, LLC dated August 25, 2022 (ECF No. 48), and include that Counts I and II are barred, in whole or in part, by: (i) 11 U.S.C. § 548 and TEX. BUS. & COM. CODE § 24.010(a)(2); (ii) claim preclusion, (iii) the Trustee's failure plausibly to allege that AMH obtained from any identified transactions less than reasonably equivalent value; and (iv) the Trustee's failure to plead that AMH was insolvent. HPS incorporates those arguments herein by reference.

    [2] The Gas Gathering Agreement comprise the Gas Gathering and Processing and Crude Oil Gathering Agreements executed on August 31, 2015 (the "2015 Agreements"), and amendments to the 2015 Agreements executed on December 1, 2016 (the "2016 Amendments"). Under the 2015 Agreements, AMH allegedly agreed to pay certain gathering rates and "capital recovery fees" and to "convey or assign" KFM easements or rights-of-way for future "gathering systems." SAC ¶¶ 34-36. The 2016 Amendments allegedly (i) decreased the capital recovery fee and increased the gathering rates under the 2015 Agreements and (ii) required KFM to complete construction of a crude oil gathering system for AMH. *Id.* ¶¶ 47-49.

002854

Rather than attempt to meet Rule 9(b)'s standard for actual fraud, the Trustee's First Amended Complaint ("FAC"), filed in July 2022, abandoned the actual fraud allegations and, on largely the same facts, alleged these transfers were constructively fraudulent. *See* ECF No. 40.

**B.    The Court Dismisses the FAC and Grants Leave to Amend on Narrow Grounds**

The Court dismissed the FAC in an order issued March 3, 2023 (the "Order"). *See* ECF No. 64. The accompanying Memo Opinion held that the Trustee failed to plead that HPS was a direct beneficiary (or subsequent transferee) of any of the alleged transfers, *see* ECF No. 63 at 15, rejecting various assertions that an intent to benefit HPS, HPS's purported control over AMH and KFM, or the supposed receipt of proceeds from the ultimate sale of KFM could plausibly plead an "actual benefit received by" HPS. *Id.* at 13. Indeed, the Court found that the Trustee's theory required the Trustee to pierce the corporate veil between KFM and the HPS-affiliated funds that invested in KFM, which the FAC—and now the SAC—did not even attempt to do. The Court dismissed the FAC but granted the Trustee leave to amend in order to "set forth a plausible basis as to what direct benefit was received by the Defendants from alleged constructive fraudulent transfers." ECF No. 64, ¶ 2.

**C.    The Trustee Files the Operative Second Amended Complaint**

The Trustee filed the SAC on March 24, 2023. ECF No. 70. The SAC further narrows the Trustee's claims, abandoning all allegations about the Non-STACK Assets or the Management Agreement. The remaining two counts seek only to avoid the Gathering Agreements and related payments as constructive fraudulent transfers under the Bankruptcy Code and TUFTA. *See* SAC ¶¶ 60-80. The SAC introduces a handful of purportedly "new" facts, but these either are (i) alleged in some fashion in the FAC or (ii) facts that the Opinion makes clear are insufficient to plead that HPS is a direct beneficiary. And the SAC maintains the theory espoused in the FAC—which this

4

Court rejected—that HPS was a direct beneficiary of the Gathering Agreements because they increased the value at KFM, which value HPS allegedly realized at least in part after the sale of KFM.[3]  SAC ¶¶ 4-5.

## LEGAL STANDARD

The "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *See In re Life Partners Holdings, Inc.*, 926 F.3d 103, 116 (5th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Although the Court must accept as true a plaintiff's well-pled factual allegations on a Rule 12(b)(6) motion to dismiss, *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 550 (5th Cir. 2007), the Court need not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions."  *Id.* (quotations omitted).  And under no circumstances is a court required to "accept as true a legal conclusion couched as a factual allegation."  *In re ATP Oil & Gas Corp.*, 2013 WL 5310194, at *4 (Bankr. S.D. Tex. Sept. 18, 2013) (quotation omitted).  Applying this standard, the Trustee's remaining claims should be dismissed as against HPS.

## ARGUMENT

To avoid a transfer as constructively fraudulent, the Trustee must allege the debtor "received less than a reasonably equivalent value in exchange" for a transfer when the debtor was either insolvent, undercapitalized, or otherwise financially vulnerable.  *See* 11 U.S.C. § 548(a)(1)(B)(i); *In re Giant Gray, Inc.*, 629 B.R. 814, 851 (S.D. Tex. 2020).  Even if the transfer is avoidable, however, Section 550(a) of the Code allows the trustee to recover only from (i) an initial transferee, (ii) "the entity for whose benefit such transfer was made," or (iii) "any immediate

---

[3] HPS also incorporates by reference any additional arguments made in the Rule 12(b)(6) motion to dismiss filed today on behalf of the ARM Defendants.

002856

or mediate transferee." TUFTA's recovery statute is substantively the same. TEX. BUS.& COM. CODE § 24.009(b).

The Trustee identifies as constructive fraudulent transfers the Gathering Agreements and related payments described above. The Trustee does not attempt to assert that HPS was an initial transferee, but rather that these constituted transfers of value from AMH to KFM. SAC ¶¶ 64-66. And although the Trustee speculates that HPS was a subsequent transferee, the SAC includes no facts identifying any such transfers. *See, e.g.*, SAC ¶¶ 67, 78 (assuming, without factual support, subsequent transfers of initial transfers to KFM).

Accordingly, the sole remaining Counts of the SAC seek to hold HPS liable as a direct beneficiary for allegedly constructive fraudulent transfers arising from the Gathering Agreements. SAC ¶ 66. Like the FAC, the SAC seeks to hold HPS liable under the theory that the Gathering Agreements and related payments increased KFM's value at the expense of AMH, and that HPS benefited from the alleged increase at KFM upon the ultimate sale of KFM and alleged distribution to HPS of proceeds from that sale. *See* SAC ¶¶ 60-80.[4] But the Memo Opinion held that this theory was insufficient to plead that HPS was a direct beneficiary of the Gathering Agreements, and the Trustee's largely decorative amendments fail to remedy this deficiency.

The SAC should therefore be dismissed, with prejudice.

---

[4] The Trustee quantifies these proceeds as consisting of a cash distribution of at least $606 million to HPS, along with shares of stock valued at $177.1 million, purportedly "in consideration for the sale of 100% of the economic interest in KFM." *See id.* ¶¶ 53, 66, 77. Although the Court need not reach this issue for purposes of granting HPS's motion, this is a mischaracterization. The vast majority of consideration paid to funds managed by HPS from the sale of KFM comprised settlement of the debt owed by KFM, pursuant to the agreed-upon terms governing principal and interest, among other things. The Trustee's characterization that HPS's funds received a $606 million "distribution" of cash is incorrect.

6

## I.    THE SAC FAILS TO PLEAD THAT HPS WAS A DIRECT BENEFICIARY OF THE GATHERING AGREEMENTS BETWEEN AMH AND KFM

### A.    The Trustee's Failure to Pierce the Corporate Veil Between KFM and HPS is Fatal to the Trustee's Constructive Fraudulent Transfer Claims

As discussed above, this Court has already rejected the Trustee's theory that HPS can be held liable as a direct beneficiary of the Gathering Agreements on the grounds that they allegedly increased the value of KFM, and that HPS received proceeds from the ultimate sale of KFM.  Mem. Op. at 14 ("As the complaint is written, every shareholder of every corporation that receives a distribution would 'benefit' from any increase in the value of the corporation if the corporation received a constructively fraudulent transfer."); *see also id.* n.6 ("The theory is that the gathering agreements constituted constructive fraud, and the defendants are transfer beneficiaries to the extent that those constructively fraudulent transfers increased the value of KFM, the entity in which they were shareholders.").  This Court further explained that "[t]o reach any value in the hands of a shareholder on the theory that they are a transfer beneficiary, [the Trustee] would need to pierce the [corporate] veil." *Id.* (citing *In re Hansen*, 341 B.R. 638, 645 (N.D. Ill. 2006)).  Yet, the Court found that the FAC "brings no veil-piercing claim, which would at the very least present a high bar if veil-piercing would even apply in the context of constructive fraud."  *Id.*

Here, as with the Trustee's previous pleadings, the Trustee makes no attempt to pierce the corporate veil of KFM to reach any value that HPS-managed funds supposedly received as investors in KFM.  Notably, even veil-piercing might not be sufficient: this Court also cites *Matter of Ritz*, 832 F. 3d 560 (5th Cir. 2016) for the proposition that "veil-piercing is only an available remedy to collect from shareholders where the plaintiff can show that the shareholder engaged in actual fraud."  Mem. Op. at 14-15.  But the Trustee abandoned any notion of pleading fraud of any kind in the FAC, and makes no effort to revive those allegations here.

002858

The Trustee's failure to allege facts supporting his sole potential route to reach any value at HPS—piercing the veil between KFM and the HPS-related funds that invested in KFM—requires dismissal of the SAC under controlling Fifth Circuit precedent, Section 550(a), and its TUFTA analog.  *See Janvey*, 840 F.3d at 266; *Hansen*, 341 B.R. at 645.

### B.    The Trustee Fails to Plead That HPS Received a Direct Benefit From the Gathering Agreements

Setting aside the dispositive veil-piercing deficiency, the SAC, like its predecessors, fails to plead that HPS received any direct benefit from the alleged constructive fraudulent transfers. The Memo Opinion rejected each of the Trustee's assertions, finding insufficient the allegations that (i) the Gathering Agreements were intended to benefit HPS, Mem. Op. at 12 ("To state that a transfer is merely intended to benefit a particular party is therefore not enough—a defendant cannot be reasonably expected to disgorge beneficial intent."); (ii) "mere ownership" in KFM is sufficient to allege that HPS received a benefit, *see id.*, and (iii) that "'control'" is "enough to make a defendant a transfer beneficiary," particularly where, as here "the complaint does not allege actual fraud, so intent is irrelevant." *Id.* at 13.

Despite the opportunity to replead to try to allege facts that would support veil-piercing and a plausible theory of direct benefit, the SAC deletes a substantial portion of the FAC and adds just a handful of new substantive paragraphs.  These lightly revised assertions either repeat allegations from the dismissed FAC, or add marginal facts that the Memo Opinion has made clear are insufficient to plead that HPS is a direct beneficiary of the Gathering Agreements—much less to pierce the corporate veil.

To start, several "new" paragraphs in the SAC merely paraphrase allegations from the FAC, as illustrated below:

8

| "New" Allegation in the SAC | Allegation in the FAC |
|---|---|
| "HPS and KFM were motivated to increase KFM's earnings as much and as quickly as possible to maximize [KFM's] potential sale consideration…" (¶ 29).<br><br>"HPS and ARM had their eyes on an exit for KFM, where each dollar of earnings would garner a much higher multiple in a sale than it ever would at AMH…" (¶ 43). | "[T]he more that AMH paid to KFM, the greater the benefit to KFM's owners, including owners of AMH/HMI, when KFM was eventually sold." (¶ 30) |
| "Leading up to the Business Combination in February 2018, KFM's owners negotiated a transaction structure that ensured HPS and ARM would effectively "cash out" their equity investment in KFM made less than three years earlier (and the value diverted under the Gathering Agreements)…" (¶ 29). | "The Contribution Agreements and the terms of the Business Combination transaction embodied therein reflected a structure designed to "cash out" the owners of KFM—who sought to consummate their "build-and-flip" strategy and realize the fruits of propping up KFM on the backs of AMH's creditors…" (¶ 51). |
| HPS and ARM were **highly incentivized** to divert value away from AMH to KFM" because HPS owned a substantially higher equity stake in KFM …. than it did in AMH, where it owned equity only through HMI's stake (¶ 28).<br><br>"HPS and ARM (along with the other KFM shareholders) held an overwhelming interest in maximizing earnings at KFM.  HPS held a much larger equity stake at KFM than it did at AMH, and ARM only held an equity stake at KFM" (¶ 43). | "[T]his First Amended Complaint focuses on a series of transactions preceding the February 2018 business combination … that were intended to, and did in fact, divert cash and other assets of the AMH Debtors to KFM for the benefit of KFM's shareholders, particularly Defendants, who owned a substantial portion of KFM's equity interests, as well to subsidiaries of HPS for the benefit of HPS" (¶ 4). |

These already-rejected allegations assert that (i) the alleged transfers were intended to benefit HPS via KFM, and (ii) because the Gathering Agreements augmented KFM's value, HPS became a beneficiary of those transfers through the value and/or sale of KFM.  But, as addressed above, alleging that the Gathering Agreements were intended to benefit HPS is insufficient to plead recovery from a transfer beneficiary.  Mem. Op. at 11-12 (citing *In re McCook Metals, LLC*, 319 B.R. 570, 591 (Bankr. N.D. Ill. 2005)).  Further, as also addressed above, the Court rejected the theory that mere distributions, without more, constitute direct benefits from the specific

transfers at issue.  Mem Op. at 13-14; *see also id.* at 12 ("[S]hareholders are not liable for transfers made to a corporation unless they actually receive distributions of the transferred property.") (citing *Janvey*, 840 F.3d at 266)).  These allegations, even though rephrased for the SAC, remain insufficient to plead that HPS was a direct beneficiary of the Gathering Agreements.

The paragraphs that appear to assert previously unalleged facts likewise fail to offer any support for holding HPS liable as a direct beneficiary of transfers to KFM:

*First*, the Trustee asserts that HPS sought to divert assets from AMH to increase the value of KFM and effect a sale of KFM that would confer a direct, cash benefit on KFM's shareholders. *See* SAC ¶¶ 4, 29, 43, 46, 49.  The Trustee adds that Defendants intended to prop up the value of KFM at the expense of AMH.  *See e.g., id.* ¶ 4 ("The diversion of assets away from AMH to KFM was *calculated* to confer a direct benefit of the Defendants….."); ¶ 29 ("HPS and KFM *were motivated* to increase KFM's earnings as much and as quickly as possible….."); ¶ 43 ("The premium paid to KFM by AMH, of course, was *by design*….  HPS and ARM *had their eyes on an exit* for KFM"); ¶ 49 (This, of course, *was the plan* from the beginning…..") (emphases added).  As noted above and in the Memo Opinion, "intent is irrelevant" where the Complaint does not allege actual fraud.  *See supra* at 8; Mem. Op. at 13.  Thus, the Trustee's allegations that the Gathering Agreements were part of Defendants' intentional plan to maximize the sale price of KFM—which are, in any case, conclusory—are irrelevant to whether HPS received a "direct, cash benefit" from those alleged transfers.

Indeed, the sole benefit the Trustee purports to identify is the "cash benefit" that allegedly resulted from a potential sale of KFM.  But the Fifth Circuit in *Janvey*, and this Court in the Memo Opinion, found precisely this sort of alleged derivative benefit is insufficient to plead that HPS was a direct beneficiary of a transfer to KFM.  *See Janvey*, 840 F.3d 248; Mem. Op. at 16; *see also*

*id.* at 13 (rejecting the notion that "[t]he base fact of a sale price … reflects value (a benefit) that the defendants received as a result of payments made under the gathering agreements"). The Trustee's assertion that HPS intended to benefit from a sale of KFM does not plead that HPS received a direct benefit from any alleged transfer of value to KFM via the Gathering Agreements.

***Second***, the Trustee claims that HPS sought to divert value from AMH to KFM because HPS allegedly "owned a substantially higher equity stake in KFM" than it did in AMH. *See* SAC ¶¶ 28, 43. The Trustee adds that, accordingly, HPS was "***highly incentivized*** to divert value away from AMH to KFM" and that the premium paid by AMH to KFM under the Gathering Agreements was "***by design***" to allegedly maximize earnings at KFM. See *id.* As noted above, HPS's intent is irrelevant to its beneficiary status. *See supra* at 8, 10; Mem. Op. at 13.

Further, the Trustee fails to support his assertions concerning HPS's relative equity holdings in AMH and KFM. Although he alleges that HPS held a 40% interest in KFM and a 31% interest in HMI common stock (SAC ¶¶ 20, 28), he nowhere pleads HPS's equity stake in AMH. As pleaded, therefore, the SAC alleges no basis on which to conclude that HPS held a greater equity interest in KFM than in AMH, as necessary to support the allegations that a dollar at KFM was more valuable to HPS than a dollar of value at AMH. *See id.* ¶ 28. But even if the Trustee had pleaded that HPS held a greater interest in KFM, the Trustee cannot, as noted above, allege that a simple increase in the value of KFM constitutes a direct benefit to HPS.

***Third***, the Trustee now alleges that HPS received at least $606 million in cash distributions and stock valued at $177.71 million upon the closing of the Business Combination "in consideration for the sale of 100% of the economic interest in KFM." *Id.* ¶¶ 66, 77.[5] To start, as

---

[5] Again, although the Court need not reach this, it is a mischaracterization. *See supra* at note 3 and accompanying text.

002862

the Memo Opinion explains, even if "Dunn did demonstrate how that value would be allocated"—meaning how the parties to the sale might have allocated the sale consideration between AMH and KFM—"he would then need to connect that increase in value to the alleged fraudulent transfers," and again, to "reach any value in the hands of a shareholder . . . Dunn would need to pierce the veil." Mem. Opp. 14. As noted above, the Trustee does not even try to pierce the veil. And again, the Court has rejected the notion that "the base fact of a sale price … reflects value (a benefit) that the defendants received as a result of payments made under the gathering agreements." *Id.* at 13. Although the Trustee purports to allege the amount of consideration allocated to KFM, SAC ¶ 4, the Trustee does not allege whether the parties to the transaction actually ascribed greater value to KFM and less to AMH as result of the Gathering Agreements.

*Finally*, the Trustee asserts—on information and belief—that Defendants would not have been able to consummate the sale of KFM, or would have received less in proceeds, absent the Gathering Agreements. *See id.* ¶¶ 66, 77. This additional conclusory and speculative assertion cannot compensate for failing to provide factual support for its claim that HPS was a direct beneficiary of the Gathering Agreements. Further, although the Trustee alleges that increasing the value of KFM at the expense of AMH was favorable to HPS due to HPS's equity interest at KFM, the Trustee nowhere alleges—beyond various conclusory assertions—that the parties to the sale ever allocated value to AMH and KFM based in any part on the Gathering Agreements. And, at best, this assertion relates to the intent behind the Gathering Agreements—which, as noted above, is irrelevant to the direct beneficiary question because the Trustee no longer alleges actual fraudulent transfers. *See supra* at 8, 10-11; Memo Op. at 14.

## II.    FURTHER AMENDMENT WOULD BE FUTILE

The SAC fails to cure the pleading deficiencies that have persisted despite multiple attempts at repleading. Despite having almost four years to investigate his claim, the Trustee still

12

has not identified any direct benefit to HPS from the alleged fraudulent transfers, much less made any effort to pierce the corporate veil between KFM and its investors.  The Trustee's persistent inability to plead causes of action—even on the narrow grounds specified by the Court—demonstrate that any opportunity to amend would be futile  The Court should therefore deny leave for further amendment and dismiss the claims against HPS once and for all with prejudice.  *In re Uplift RX, LLC*, 625 B.R. 364, 375 (Bankr. S.D. Tex. 2021).

## **CONCLUSION**

For these reasons, the Second Amended Complaint should be dismissed with prejudice.

Dated:    April 24, 2023                     Respectfully submitted,

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

/s/ *Karl S. Stern*
Karl S. Stern (attorney in charge) (SBN 19175665)
Christopher D. Porter (SBN 24070437)
711 Louisiana Street, Suite 500
Houston, TX 77002
Telephone:    (713) 221-7000
Facsimile:    (713) 221-7100
Email: karlstern@quinnemanuel.com
christopherporter@quinnemanuel.com

**-AND-**

Michael B. Carlinsky (*pro hac vice*)
Benjamin I. Finestone (*pro hac vice*)
Jacob J. Waldman (*pro hac vice*)
Courtney C. Whang (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:    (212) 849-7000
Facsimile:    (212) 849-7100
Email: michaelcarlinsky@quinnemanuel.com
benjaminfinestone@quinnemanuel.com
jacobwaldman@quinnemanuel.com
courtneywhang@quinnemanuel.com

**COUNSEL TO HPS INVESTMENT PARTNERS, LLC**

**<u>CERTIFICATE OF SERVICE</u>**

I certify that this motion has been served on counsel of record by the Court's ECF system on April 24, 2023.

/s/ Karl S. Stern
By: Karl S. Stern

14

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| ALTA MESA RESOURCES, INC., *et al.*, | ) |
| | ) Case No. 19-35133 |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |
| DAVID DUNN, as Trustee of the AMH Litigation Trust, | ) |
| | ) |
| | ) Adv. Pro. No. 21-03909 |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| HPS INVESTMENT PARTNERS, LLC; ARM ENERGY HOLDINGS, LLC; ARM MIDSTREAM, LLC; AND ASSET RISK MANAGEMENT, LLC, | ) **Jury Trial Demanded** |
| | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S OMNIBUS OPPOSITION**
**TO MOTIONS OF ARM DEFENDANTS AND HPS INVESTMENT PARTNERS, LLC**
**TO DISMISS SECOND AMENDED COMPLAINT [ECF NOS. 74, 75]**

002866

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     FACTUAL BACKGROUND ...............................................................................2

      A.    Procedural Background..............................................................................2

      B.    Factual Allegations ....................................................................................4

          1.    Organizational Structure of AMH and KFM .................................4

          2.    Defendants' Imbalanced Incentives to Divert Value from AMH
             through the KFM Gathering Relationship ....................................6

          3.    The 2015 Gathering Agreements ...................................................8

          4.    The 2016 Gathering Agreements ...................................................9

          5.    Defendants Receive the Benefits of the Transfers and Obligations
             under the Gathering Agreements .................................................11

III.    LEGAL STANDARD ON MOTION TO DISMISS .........................................12

IV.     ARGUMENT .....................................................................................................13

      A.    The Trustee Can Recover from Defendants as Transfer Beneficiaries.................13

          1.    The SAC Was Amended in Accordance with the FAC Order.................13

          2.    The SAC Satisfies the Trustee's Pleading Burden .....................17

      B.    The SAC Adequately Alleges the Elements of the Trustee's Claims.................21

          1.    The SAC Adequately Alleges Facts regarding Lack of Reasonably
             Equivalent Value for the Fraudulent Transfers..........................21

          2.    The SAC Sufficiently Alleges AMH's Relevant Financial
             Condition.....................................................................................23

          3.    The Obligations and Transfers which are the Subject of the
             Trustee's Claims were Incurred or Occurred within the Statutory
             Lookback.....................................................................................25

      C.    The Trustee Should be Granted Leave to Further Amend the SAC if
        Necessary .................................................................................................28

V.      CONCLUSION..................................................................................................29

002867

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................12, 14, 15

*Baldi v. Lynch (In re McCook Metals, L.L.C.),*
    319 B.R. 570 (Bankr. N.D. Ill. 2005) ....................................................17, 20, 21

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ...............................................................................................12

*Cantu v. Ford Motor Co. (In re Cantu),*
    Nos. 08-70260, 08-07030, 2009 Bankr. LEXIS 1071 (Bankr. S.D. Tex. Apr. 17, 2009) .......12

*EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.),*
    356 B.R. 631 (Bankr. D. Del. 2006) ....................................................................26

*German Pellets La. LLC v. Wessel GMBH (In re La. Pellets, Inc.),*
    838 F. App'x. 45 (5th Cir. 2020) ...................................................................26, 27

*Greg's Ballroom v. Showalter (In re Villarreal),*
    Nos. 08-70002, 08-7001, 2008 Bankr. LEXIS 694 (Bankr. S.D. Tex. Mar. 14, 2008)...........12

*Halperin v. Moreno (In re Green Field Energy Servs.),*
    Nos. 13-12783 (KG), 15-50262 (KG), 2015 Bankr. LEXIS 2914 (Bankr. D. Del. Aug. 31, 2015) ...............................................................................................................24

*Herrmann Holdings Ltd. v. Lucent Techs., Inc.,*
    302 F.3d 552 (5th Cir. 2002) ................................................................................28

*In re ATP Oil & Gas Corp.,*
    711 F. App'x. 216 (5th Cir. 2017) .......................................................................25

*In re Crescent Resources, LLC v. Pruet,*
    Nos. 09-11507-CAG, 11-01082-CAG, 2012 WL 195528 (Bankr. W.D. Tex. Jan. 23, 2012) ...........................................................................................21, 22

*In re Cyr,*
    602 B.R. 315 (Bankr. W.D. Tex. 2019) ..............................................................25

*In re R.M.L., Inc.,*
    92 F.3d 139 (3d Cir. 1996) ...................................................................................26

*Janvey v. Libyan Inv. Auth.,*
    840 F.3d 248 (5th Cir. 2016) ..........................................................14, 17, 18, 20

002868

*Katchadurian v. NGP Energy Capital Mgmt., LLC (In re Northstar Offshore Grp., LLC)*,
    616 B.R. 695 (Bankr. S.D. Tex. 2020) ..................................................................24, 25

*Kinder Morgan., Inc. v. Crout*,
    814 F. App'x 811 (5th Cir. 2020) .............................................................................28

*Lowrey v. Texas A&M Univ. Sys.*,
    117 F.3d 242 (5th Cir. 1997) ...................................................................................12

*Rizack v. Starr Indem. & Liab. Co. (In re Grandparents.com, Inc.)*,
    614 B.R. 625 (Bankr. S.D. Fla. 2020) ...............................................................26, 27

*Schecter v. 5841 Building Corp.* (*In re Hansen*),
    341 B.R. 638 (Bankr. N.D. Ill. 2006) ......................................................................17

*Schott v. Massengale*,
    No. 18-759-JWD-RLB, 2019 U.S. Dist. LEXIS 166736 (M.D. La. Sept. 27, 2019) .............25

*Smith v. Morris R Greenhaw Oil and Gas, Inc. (In re Greenhaw Energy, Inc.)*,
    359 B.R. 636 (Bankr. S.D. Tex. 2007) ....................................................................12

*Think3 Litig. Trust v. Zuccarello (In re Think3, Inc.)*,
    529 B.R. 147 (Bankr. W.D. Tex. 2015).....................................................................24

*Yamin v. Carroll Wayne Conn, L.P*,
    574 S.W.3d 50 (Tex. Ct. App. 2018) ........................................................................18

*Yaquinto v. CBS Radio, Inc. (In re Tex. E&P Operating, Inc.)*,
    Nos. 17-34386-SGJ-7, 19-03226-SGJ, 2022 Bankr. LEXIS 1932 (Bankr. N.D. Tex. July 13,
    2022) ......................................................................................................................23

## STATUTES

11 U.S.C. § 544 ......................................................................................................4

11 U.S.C. § 548 ...................................................................................................4, 25

11 U.S.C. § 550 ...................................................................................................4, 17

Tex. Bus. & Comm. Code § 24.003 ..........................................................................24

Tex. Bus. & Comm. Code § 24.005 ...................................................................4, 5, 6, 7

Tex. Bus. & Comm. Code § 24.006 ...................................................................4, 5, 6, 7

Tex. Bus. & Comm. Code § 24.008 ...................................................................4, 5, 6, 7

Tex. Bus. & Comm. Code § 24.009 ...............................................................4, 5, 6, 7, 17

002869

Tex. Bus. & Comm. Code § 24.010 .......................................................................26, 27

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 8 ........................................................................ *passim*

Federal Rule of Civil Procedure 9 ..........................................................................3

Federal Rule of Civil Procedure 12 ........................................................................12

Federal Rule of Civil Procedure 15 ........................................................................29

002870

Plaintiff David Dunn (the "Trustee"), as Trustee of the AMH Litigation Trust (the "Trust"), submits this omnibus opposition (the "Opposition") to the motions [ECF Nos. 74, 75] of Defendants HPS Investment Partners, LLC ("HPS") and ARM Energy Holdings, LLC, ARM Midstream, LLC, and Asset Risk Management, LLC (collectively "ARM", and together with HPS, the "Defendants") to dismiss the Trustee's Second Amended Complaint (the "SAC"). [ECF No. 70][1]

## I.    INTRODUCTION

Between 2016 and early 2018, over $140 million of funds and other assets were methodically stripped away from Alta Mesa Holdings, LP (together with its affiliated debtors, "AMH" or the "AMH Debtors") to benefit Defendants, as owners of AMH's midstream gatherer, Kingfisher Midstream, LLC ("KFM").  Defendants' objective was simple: to prop up the value of KFM as quickly as possible on the backs of AMH and its creditors, and then capture that value through a cash-out sale of KFM.

Defendants were highly incentivized to shift AMH assets and value to KFM.  HPS owned a substantially higher percentage of KFM (directly, and indirectly through High Mesa Inc. ("HMI")) than it did in AMH (through HMI), and ARM had no ownership interest in AMH.  Defendants also knew that midstream companies like KFM were valued at much higher multiples than upstream companies like AMH.  Thus, every dollar of value at KFM was worth considerably more to Defendants than that same dollar at AMH.

To execute the plan, HPS leveraged its control on both sides, and AMH entered into woefully one-sided gathering agreements requiring it to pay KFM tens of millions of dollars in

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the SAC.  The motions to dismiss filed by HPS and ARM are referred to herein respectively as the "HPS MTD" and the "ARM MTD," and collectively as the "MTDs."

002871

exorbitant and sometimes novel fees, at times for services KFM never even provided. AMH and its creditors, of course, did not receive reasonably equivalent value for such payments or its excessive obligations under the agreements, and AMH was left with inadequate resources to support its business. Ultimately, in early 2018, Defendants cashed out the assets diverted to KFM, sold their interests in KFM at a value inflated by the fraudulent transfers from AMH, and received hundreds of millions in cash and other proceeds per their design.

The Trustee brought this action seeking disgorgement of the fraudulent transfers under the gathering agreements. Following the Court's ruling on Defendants' motions to dismiss the First Amended Complaint, the Trustee amended his pleading to remedy the limited deficiencies identified in that ruling. The SAC now contains detailed facts demonstrating that HPS and ARM are each entities for whose benefit the fraudulent transfers under the gathering agreements were made, consistent with the Court's prior ruling on the First Amended Complaint.

Despite these amendments, Defendants again seek to extricate themselves from this case by effectively reading transfer beneficiary liability out of the Bankruptcy Code and TUFTA. Defendants' narrow construction of the Court's prior holding and the case law on which it is based should be rejected. And Defendants' requests for dismissal on various other grounds previously raised in response to the First Amended Complaint – grounds the Court did not find constituted a basis for dismissal of that pleading – should again be rejected.

The Trustee respectfully requests the Court deny Defendants' MTDs so this case can proceed on the merits, and the Trustee may pursue a judgment compelling repayment of the substantial benefit Defendants received at the expense of AMH's creditors.

## II.    FACTUAL BACKGROUND

### A.    Procedural Background

The Trust was created in connection with the Chapter 11 plan (the "Plan") of AMH and its

002872

debtor affiliates, effective as of June 8, 2020 (the "Effective Date").  [SAC at ¶ 13]  The Trust was established to provide a vehicle to pursue recoveries to mitigate the substantial losses suffered by certain creditor beneficiaries from the AMH Debtors' collapse.  On the Effective Date, the Trustee was appointed as the Litigation Trustee and causes of action held by the AMH Debtors, including Oklahoma Energy Acquisitions, LP ("OEA"), and their estates against certain third parties were assigned to the Trust.  [*Id*. at ¶¶ 13-14]  There is no dispute the Plan preserved and vested in the Trust the claims against Defendants in this action.  [*Id*. at ¶ 14]

On September 10, 2021, the Trustee filed the initial Complaint (the "Initial Complaint"), asserting causes of action for the avoidance of actual and constructive fraudulent transfers under the Bankruptcy Code and Texas Uniform Fraudulent Transfer Act ("TUFTA") related to certain Gathering Agreements (defined below), among other transfers. [ECF No. 1]

On March 7, 2022, the Defendants filed motions to dismiss the Initial Complaint [ECF Nos. 19, 20] (the "Initial MTDs").  On June 8, 2022, the Court held a hearing on Initial MTDs (the "Initial MTD Hearing"), at which the Court granted the Trustee leave to amend to plead his claims with more particularity, finding the Trustee had not met the Rule 9 standard applicable to *actual* fraudulent transfer claims. [ECF No. 33]

On July 11, 2022, the Trustee filed his First Amended Complaint ("FAC"), asserting six causes of action to avoid and recover constructive fraudulent transfers under the Bankruptcy Code and TUFTA.[2]  [ECF No. 40]  On August 25, 2022, the Defendants filed motions to dismiss the FAC [ECF Nos. 48, 49] (the "FAC MTDs").  On November 16, 2022, the Court held a hearing on the FAC MTDs.

---

[2]  The FAC did not assert *actual* fraudulent transfer claims like the Initial Complaint.  Instead, the FAC asserted only causes of action to avoid and recover constructive fraudulent transfers relating to the Gathering Agreements, the "HMI MSA" (as defined in the FAC) and the "Non-STACK Assets" (as defined in the FAC).

002873

On March 3, 2023, the Court issued a memorandum opinion [ECF No. 63] (the "FAC Opinion") and accompanying order [ECF No. 64] (the "FAC Order") dismissing the FAC without prejudice, and granting the Trustee leave to amend the FAC to "set forth a plausible basis as to what direct benefit was received by the Defendants from the alleged constructive fraudulent transfers." [See FAC Order.]

### B.    Factual Allegations

On March 24, 2023, the Trustee filed the SAC, asserting two causes of action to avoid and recover constructive fraudulent transfers relating to the Gathering Agreements under the Bankruptcy Code (11 U.S.C. §§ 544, 548(a)(1)(B) and 550), and the TUFTA (Tex. Bus. & Comm. Code §§ 24.005(a)(2), 24.006(a), 24.008, and 24.009(b)).[3]  The Trustee's claims arise from a series of transactions by which valuable assets were transferred from AMH to KFM for the purpose of directly benefitting Defendants, as the entities that controlled and primarily owned KFM.  The factual bases for the SAC's claims are summarized below.

### 1.    Organizational Structure of AMH and KFM

Prior to February 2018, AMH was primarily owned by (i) its President and CEO Harlan Chappelle ("Chappelle"); (ii) its COO Michael Ellis ("Ellis"); and (iii) HMI, a privately held Delaware corporation, which owned 10% of AMH's Class A shares and 100% of AMH's Class B shares. [SAC, at ¶ 17]  During this time, HPS was a substantial owner of HMI.  [Id.]

Alta Mesa Holdings, GP, LLC ("AMH GP") was the sole general partner of Alta Mesa Holdings, LP.  [Id. at ¶ 18]  At all relevant times, AMH GP's board of directors ("AMH GP Board") was identical to the boards of directors of AMH and HMI.  [Id.]  AMH GP, as general

---

[3]  Based on the reasoning of the Court set forth in the FAC Opinion and the limited grant of leave to amend set forth in the FAC Order, the SAC did not reassert causes of action to avoid and recover constructive fraudulent transfers relating to the HMI MSA and Non-STACK Assets.  Thus, the causes of action in the SAC focus only on the obligations incurred and transfers made in relation to the Gathering Agreements.

002874

partner of AMH, had "full, complete, and exclusive authority to manage and control the business, affairs, and properties of [AMH], to make all decisions regarding the same, and to perform any and all other acts or activities customary or incident to the management of [AMH's] business." [*Id*.]

In turn, AMH GP had two members: (i) Alta Mesa Resources, LP ("Alta Mesa Resources") and (ii) HMI. [*Id*. at ¶ 19]  HMI held all of the Class B membership interests of AMH GP. [*Id*.] Prior to February 2018, HMI, as the sole holder of Class B membership interests in AMH GP, held voting interests in AMH GP and, as of August 2017, 100% of the voting interests in AMH GP. [*Id*.]

HMI was owned by HPS, Chappelle, Ellis and, by 2016, Bayou City Energy Management LLC ("BCE"). [*Id*. at ¶ 20]  Prior to February 2018, HPS and BCE held 100% of the preferred stock of HMI and HPS was the beneficial owner of at least 31% of HMI's common stock. [*Id*.]

HMI's board was identical to the boards of AMH and AMH GP, with Chappelle, Ellis, the CFO of AMH, and Don Dimitrievich of HPS as their board members. [*Id*. at ¶ 21]  As a practical matter, there was only one board of directors for HMI, AMH, and AMH GP.  Indeed, AMH and HMI did not even conduct distinct board meetings during the relevant time period. [*Id*.]

Accordingly, HPS controlled HMI and AMH, holding substantial voting power through HMI, and participated directly in the decisions of AMH by its board, both at AMH and AMH GP. Any board level decisions made by AMH would have required HPS' approval. [*Id*. at ¶ 22]

In 2014, ARM and AMH's owners, including HPS, began discussing joint sponsorship of an entity to serve as AMH's midstream gatherer in the STACK region of Oklahoma. [*Id*. at ¶ 23] HPS, ARM, and HMS Kingfisher Holdco, LLC ("HMS Kingfisher")[4] formed KFM. [*Id*. at ¶ 24]

---

[4] HMS Kingfisher was owned 100% by High Mesa Services, LLC, which was 100% owned by HMI. *Id*.

At all relevant times, KFM was owned by HPS, with a 40% direct interest, HMI, with a 30% interest through its subsidiary HMS Kingfisher, and ARM, with a 30% interest. [*Id*.] HPS owned a substantial equity stake in KFM, both directly and indirectly through its ownership of HMI.

KFM's board was comprised of two representatives from ARM, two representatives from AMH (Chappelle and Ellis, who also sat on the boards of AMH, AMH GP and HMI), and Don Dimitrievich of HPS (who also sat on the boards of AMH, AMH GP and HMI). [*Id*. at ¶ 25] Accordingly, there was substantial overlap between KFM's board and the identical boards of AMH, AMH GP and HMI. Prior to the Business Combination, ARM managed the operations of KFM. [*Id*.] ARM's relationship with KFM went beyond equity ownership, as demonstrated by the fact that (i) Asset Risk Management, LLC charged KFM for use of its facilities, employees and technology, resulting in KFM paying ARM millions in fees, and (ii) KFM used another ARM affiliate, ARM Energy Management, LLC, to market production from KFM's producers. [*Id*.]

### 2.    Defendants' Imbalanced Incentives to Divert Value from AMH through the KFM Gathering Relationship

As early as January 2015, ARM made presentations of the proposed transaction to AMH, detailing fees that were substantially greater than what AMH was being charged by its existing midstream gatherer. [*Id*. at ¶ 27] Under the proposal, KFM's owners (including ARM and HPS) would benefit substantially on the back of AMH through exorbitant and unprecedented fees. [*Id*.] HPS, along with Chappelle, championed the KFM project because AMH's owners, through their interests in HMI (and in the case of HPS, directly), would become investors in KFM and realize profits through the exorbitant amounts to be paid by AMH. [*Id*.]

The opportunity was extraordinary and obvious, as HPS and ARM were highly incentivized to divert value away from AMH to KFM, as it would benefit them directly. [*Id*. at ¶ 28] For its part, HPS owned a substantially higher equity stake in KFM (approximately 40%

6

directly and at least 31% of HMI's stake) than it did in AMH, where it owned equity only through HMI's stake.  [*Id*.]  Thus, *each dollar of value at KFM was worth considerably more to HPS than that same dollar of value at AMH*.  [*Id*.]  ARM's incentives were even more imbalanced, as it did not hold any conflicting equity interest in AMH.  *Id*.  In an exit scenario where both AMH and KFM were being acquired (*e.g.*, the Business Combination that would occur in February 2018), ARM's sole interest would be to extract as much value as possible from KFM and to maximize the consideration paid for KFM and its operations – not AMH.  [*Id*.]

In addition, both Defendants knew that midstream companies like KFM are valued at much higher multiples than upstream companies like AMH.  [*Id*. at ¶ 29.]  Thus, Defendants were motivated to increase KFM's earnings as much and as quickly as possible to maximize potential sale consideration, even if that required KFM to charge AMH exorbitant fees and impose onerous terms on their gathering relationship.  [*Id*.]

ARM prepared a series of financial analyses touting the purported advantages of paying above-market rates to KFM by emphasizing the potential rewards that would flow to AMH's owners by virtue of their equity stakes in KFM.  [*Id*. at ¶ 30]  These analyses were presented to Chappelle and others and focused on the fact that the more that AMH paid to KFM, the greater the benefit to KFM's owners when KFM was eventually sold.  [*Id*.]  The overriding concern was the best interests of KFM and KFM's owners, with Chappelle explicitly acknowledging that ownership of KFM was "a key deal point and consideration" in the negotiations.  [*Id*. at ¶ 31]

HPS was highly involved in setting the terms between AMH and KFM.  [*Id*. at ¶ 32]  As a result, the final terms were never meaningfully negotiated by AMH.  In fact, they were the same as those first proposed by ARM.  [*Id*.]  AMH did not obtain a fairness opinion or appoint an independent committee to evaluate the transaction.  [*Id*.]  AMH failed to pursue competitive offers

7

from other gatherers and spurned lower offers from other gatherers.  [*Id.*]

### 3.    The 2015 Gathering Agreements

On August 31, 2015, Chappelle executed the *Gas Gathering and Processing Agreement*, by and between OEA and KFM (the "2015 GGA"), and the *Crude Oil Gathering Agreement*, by and between OEA and KFM (the "2015 OGA" and, together with the 2015 GGA, the, "2015 Agreements") on behalf of OEA (AMH's subsidiary), and on behalf of KFM. [*Id.* at ¶ 33]

Compared to similar agreements between AMH and non-KFM midstream gatherers, KFM and non-AMH upstream producers, as well as unaffiliated third-party producers and gatherers, the gathering fees in the 2015 GGA were at least a 90% premium to market rates.  [*Id.* at ¶ 34]  The fees charged by KFM to AMH were higher than fees charged by KFM to any other producer.  [*Id.*]

In addition, the 2015 Agreements included "capital recovery fees" (the "Capital Recovery Fees") that are completely foreign to the industry.  [*Id.* at ¶ 35]  Neither AMH nor KFM entered into any other gathering agreements that included Capital Recovery Fees, and the concept was foreign to management personnel at both AMH and KFM.  [*Id.*]  The 2015 Agreements inequitably benefited KFM at the expense of AMH with above-market fees and non-standard fees.  As a result, KFM received payments in amounts clearly in excess of the reasonable value of the services it provided.

The 2015 Agreements provided that KFM was to submit invoices on a monthly basis for amounts due by AMH/OEA for the preceding month.  [*Id.* at ¶ 37]  Instead, ARM (as the operator of KFM and entity overseeing the sale of AMH's hydrocarbons) deducted the amounts purportedly due to KFM under the 2015 GGA from the hydrocarbon sale proceeds owed to AMH (the "Sale Proceeds").  [*Id.*]

The exorbitant fees paid by AMH made it difficult for AMH to remain profitable and harmed AMH's long-term value.  [*Id.* at ¶ 38]  AMH was loaded with debt that left little for day-

8

to-day operations.  [*Id*.]  By mid-2016, Moody's downgraded AMH's debt, citing a "weak liquidity position, expected deterioration in credit metrics through 2017, and increasing refinancing risk." [*Id*.]  AMH was at serious risk of breaching its debt covenants.  [*Id*.]  AMH was consistently running at a net loss in both 2015 and 2016 and was cash-flow insolvent.  [*Id*. at ¶ 39]  AMH was severely inadequately capitalized at this time, with a debt to equity ratio of above 20 to 1.  [*Id*.]

Within weeks of execution of the 2015 Agreements, AMH's managers openly questioned the exorbitant fees that AMH had agreed to pay.  [*Id*. at ¶ 40]  AMH further learned that KFM was charging its other customers substantially less than it was charging AMH and that other midstream gatherers were charging their customers substantially less than KFM was charging AMH.  [*Id*.]

**4.    The 2016 Gathering Agreements**

Thereafter, AMH engaged ARM to revise the agreements.  [*Id*. at ¶ 42]  As before, the benefit to KFM and its owners remained the top consideration for both sides.  *Id*.  ARM and HPS proposed replacing the Capital Recovery Fees in the 2015 Agreements with so-called "facility fees" (the "Facility Fees"), which would have no negative effect on KFM's revenue.  [*Id*.]  In fact, the rates under the amendments were an even higher premium (over 100%) to market rates the prior rates.  [*Id*.]  The Facility Fees were also completely foreign to the industry.  [*Id*.]

The premium paid to KFM by AMH was by design.  [*Id*. at ¶ 43]  Defendants held an overwhelming interest in maximizing earnings at KFM because HPS held a much larger equity stake at KFM than it did at AMH, and ARM only held an equity stake at KFM.  [*Id*.]  In addition, Defendants' sights were, from the start, set on an exit for KFM, where each dollar of earnings would garner a much higher multiple in a sale than it ever would at AMH.  [*Id*.]

The proposed amendments were not seriously negotiated by AMH, who remained under common control with KFM.  [*Id*. at ¶ 44]  The rate changes were not approved by AMH's board or even put to a vote of AMH's board or AMH's stakeholders.  [*Id*.]  AMH did not prepare a

9

fairness opinion. [*Id.*]    ARM's proposal was incorporated virtually wholesale into the amendments. [*Id.*]

On December 1, 2016, OEA executed the *Amended and Restated Gas Gathering and Processing Agreement* (the "2016 GGA Amendment") and the *Amended and Restated Crude Oil Gathering Agreement* (the "2016 OGA Amendment" and, together with the 2016 GGA Amendment, the "2016 Amendments"; together with the 2015 Agreements, the "Gathering Agreements") with KFM to supplant the 2015 Agreements. [*Id.* at ¶ 45]

HPS was heavily involved in the negotiations and ultimately controlled AMH's decisions with regard to the 2016 Amendments, as indicated by HPS's threat to withhold AMH funding unless AMH accepted the amendments that HPS demanded, which were intended to protect the value a potential acquirer would place on KFM's future earnings.  [*Id.* at ¶ 46]  The 2016 Amendments included additional provisions intended to transform the 2015 Agreements into covenants running with the land, including a purported conveyance of transportation interests. [*Id.*] AMH received nothing in exchange for those purported conveyances (the "Conveyances"). [*Id.*]

The 2015 OGA and the 2016 OGA Amendment also required KFM to construct a system capable of gathering up to 50,000 barrels of oil per day for AMH.  [*Id.* at ¶ 47]  KFM failed to construct such a system and was never able to gather more than a fraction of the expected capacity. [*Id.*]  Nonetheless, under the 2016 OGA Amendment, KFM charged AMH for every barrel of oil produced from the designated area, even though KFM did not transport those barrels.  [*Id.*] Accordingly, KFM received payments clearly disproportionate to the services provided.  [*Id.*]

As with the 2015 Agreements, prior to the Business Combination, the amounts owed to KFM under the 2016 Amendments were not invoiced to AMH/OEA, but were deducted on a

002880

monthly basis by ARM, on behalf of KFM, from the AMH Sale Proceeds. [*Id*. at ¶ 48]

### 5. Defendants Receive the Benefits of the Transfers and Obligations under the Gathering Agreements

Ultimately, Defendants negotiated and consummated an exit transaction whereby Defendants received the spoils of propping up the value of KFM at the expense of AMH. Specifically, on February 9, 2018, AMH entered into a business combination with Silver Run II Acquisition Corporation ("Silver Run") and KFM (the "Business Combination"). [*Id*. at ¶ 51] As a result, AMH and KFM both became wholly-owned subsidiaries of a holding company, SRII Opco, LP ("SRII Opco"). [*Id*.]

The Business Combination was structured to ensure KFM was acquired primarily for cash (to be paid primarily to Defendants), and AMH was acquired primarily for equity in the newly-combined entity. [*Id*. at ¶ 49] The structure was a culmination of Defendants' "build-and-flip strategy" to capitalize on the higher price multiple for the midstream company (KFM) and allowed Defendants to receive the direct, quantifiable benefits of the obligations incurred and transfers made by AMH under the Gathering Agreements. [*Id*. at ¶ 52] To wit, KFM Holdco, LLC received, among other things, $814.8 million in cash proceeds, with nearly $700 million of this cash immediately distributed to Defendants. [*Id*. at ¶ 53] HPS received at least $606 million of that cash, and ARM received at least $92.2 million. [*Id*.] In addition to these substantial cash distributions, shares of stock valued at $177.1 million and $95.8 million, respectively, were distributed to HPS and ARM upon the closing of the Business Combination. [*Id*.]

In the end, Defendants profited handsomely from the transfer of value from AMH to KFM, as designed. Indeed, absent the Gathering Agreement Obligations and the AMH Gathering Payments, Defendants would not have been able to consummate the sale of KFM and receive the significant proceeds therefrom or, in the alternative, the proceeds therefrom would have been a

11

fraction of the actual proceeds received by Defendants.  [*Id*. at ¶¶ 66, 77]

AMH, on the other hand, suffered tremendously as a result of the Gathering Agreements. In nearly every quarter between 2016 and 2018, AMH lacked sufficient cash flow to meet its upcoming obligations, continued to draw down on its credit facility, and refinanced its debt.  [*Id*. at ¶ 50]  Toward the end of 2017, AMH had only nominal cash to support its operations and its debt-to-equity ratio remained perilously high.  [*Id*.]

## III.   LEGAL STANDARD ON MOTION TO DISMISS

"A motion to dismiss under rule 12(b)(6) 'is viewed with disfavor and is rarely granted'", and "[t]he complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true."  *Lowrey v. Texas A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997) (citation omitted).  "When evaluating Rule 12(b)(6) motions, the Court should not grant a dismissal 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  *Smith v. Morris R Greenhaw Oil and Gas, Inc. (In re Greenhaw Energy, Inc.)*, 359 B.R. 636, 643 (Bankr. S.D. Tex. 2007).

This Court has already ruled that Rule 8's pleading standard applies to the constructive fraudulent transfer claims asserted in the SAC.  [FAC Opinion at 9]  Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Cantu v. Ford Motor Co. (In re Cantu)*, Nos. 08-70260, 08-07030, 2009 Bankr. LEXIS 1071, at *4 (Bankr. S.D. Tex. Apr. 17, 2009), *quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* FAC Opinion at 10-11; *Greg's Ballroom v. Showalter (In re Villarreal)*, Nos. 08-70002, 08-7001, 2008 Bankr. LEXIS 694, at *10 (Bankr. S.D. Tex. Mar. 14, 2008); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (Rule 8(a)(2) requires only enough facts "to 'state a claim to relief that is plausible on its face'").

002882

## IV.    ARGUMENT

In their MTDs, Defendants contend the SAC does not meet the pleading standard for claims against "transfer beneficiaries" articulated by the Court in its FAC Opinion.  As set forth below, Defendants' narrow construction of the Court's FAC Opinion would render the statutory remedies against transfer beneficiaries virtually meaningless.  Instead, the SAC complies with the Court's directive, as it sufficiently and plausibly alleges both (i) Defendants' receipt of actual benefits from diversion of value through the constructively fraudulent transfers, and (ii) the quantifiable value actually received by HPS and ARM in the form of proceeds from the Business Combination.

In addition, ARM separately contends the SAC must be dismissed because certain elements of the Trustee's claims have not been adequately alleged, and that claims to avoid certain transfers are barred by the statutory lookback periods under the Bankruptcy Code and TUFTA.[5]  These same arguments were previously raised in response to the FAC, and the Court did not dismiss the FAC on such grounds or direct the Trustee to amend his pleading to cure any purported deficiency.[6]  Regardless, as set forth below, these arguments still lack merit and should be rejected.

### A.    The Trustee Can Recover from Defendants as Transfer Beneficiaries

### 1.    The SAC Was Amended in Accordance with the FAC Order

In the FAC Opinion, the Court explained the circumstances under which a shareholder of

---

[5]   HPS indicated in footnote 1 of its MTD that it "incorporates" other arguments previously made in its motion to dismiss the FAC.  [HPS MTD at 3, n.1]  Setting aside whether such arguments are still viable in light of the Court's ruling on that prior motion, HPS, as the moving party, had the burden of developing those arguments in its briefing and applying them to the new pleading at issue (the SAC).  HPS's attempt to invoke grounds for dismissal it did not brief in its instant motion should be rejected.

[6]   To the contrary, after considering the arguments by Defendants in their prior FAC MTDs, the Court expressly limited the Trustee's scope of leave to amend (and, therefore, the directive to amend) to addressing the Court's ruling regarding the allegations of Defendants' status as transfer beneficiaries.  [*See* FAC Order ("Dunn is granted leave to file an amended complaint not later than March 17, 2023. Any amended complaint must set forth a plausible basis as to what direct benefit was received by the Defendants from alleged constructive fraudulent transfers. *No other amendments are authorized*.") (emphasis added)]

13

a closely-held company can be liable as a transfer beneficiary for fraudulent transfers made to such company.  The Court largely relied on and ultimately adopted the conclusion of the Fifth Circuit in *Janvey v. Libyan Inv. Auth.*, 840 F.3d 248 (5th Cir. 2016) ("*Janvey*"),[7] namely that a shareholder can be held liable as a transfer beneficiary only if the shareholder actually received a quantifiable benefit from the transfer aside from the shareholder's mere ownership of an interest in the transferee corporation.  [FAC Opinion at 12 ("Without some theory beyond the mere ownership of an interest in the corporation which actually received a transfer, the owner cannot be automatically assumed to have received a benefit."), citing *Janvey*, 840 F.3d at 266.]  The Court also reiterated the requirement that, in pleading receipt of an "actual benefit," a plaintiff must comply with the plausibility standard articulated in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and allege facts which "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

Ultimately, the Court concluded the FAC was deficient in two respects.  First, the Court found the "base fact of the sale price" of KFM ($800 million) and allegations of Defendants' receipt of the sale proceeds did not, without more, plausibly plead Defendants' receipt of an actual benefit of the fraudulent transfers relating to the Gathering Agreements.  [FAC Opinion at 13-14] Namely, the Court noted "the shareholder-defendants here also held interest in AMH,"[8] and that "realization of AMH's decreased value at the time of the [Business Combination] would counter-balance the increase in value of KFM." [*Id*. at 14]  The Court specifically noted that "at least with respect to HPS, the complaint does not make clear exactly why or how HPS would benefit from

---

[7]    While *Janvey* considered only TUFTA claims, the Court applied *Janvey*'s rationale and conclusion to the claims asserted by the Trustee in the FAC under both the Bankruptcy Code and TUFTA.  [FAC Opinion at 12, n.4.]

[8] As discussed below, ARM did not own any interest in AMH, and HPS's percentage equity stake in AMH was far less than its stake in KFM.

002884

the increased value of KFM if the trade-off was a decrease in value of AMH." [*Id*.]

Second, the Court found the FAC did not sufficiently plead Defendants' actual receipt of a quantifiable benefit from the fraudulent transfers made by AMH, in that the Trustee had not connected the increase in value at KFM to the Defendants other than through mere ownership. [*Id*. at 14]  However, the Court granted the Trustee leave to amend on the basis that "there might be a scenario in which, through their respective positions of control, the defendants might be transfer beneficiaries…of payments made under the gathering agreement with KFM…" [*Id*. at 15]

The SAC specifically addressed the deficiencies identified by the Court in the FAC Opinion.  With respect to the plausibility of the benefit received by Defendants, the SAC detailed why the diversion of value to KFM under the Gathering Agreements did not simply "counter-balance" any decrease in value at AMH:

- First, ARM was not a shareholder at AMH.  [SAC at ¶¶ 28, 43] Thus, it benefited from every dollar of value diverted to KFM, where it held a substantial (30%) equity stake, managed KFM's operations, and charged substantial fees to KFM for use of its facilities, employees and technology, including at least $4,559,186 in 2016 and 2017 alone.  [*Id*. at ¶¶ 25, 28, 43, 67, 78]  ARM was exclusively interested in extracting as much value as possible from AMH to maximize the consideration paid for KFM and its operations in any exit scenario. [*Id*. at ¶¶ 28, 43]

- Second, HPS owned a substantially higher equity stake in KFM (approximately 40% directly and at least 31% of HMI's stake in KFM) than it did in AMH, where it owned equity only through HMI.  [SAC at ¶¶ 19-20, 28, 43]  Thus, a dollar of value at KFM was worth more to HPS than the same dollar at AMH.  [*Id*. at ¶¶ 28, 43]

15

002885

- And third, both Defendants knew that midstream companies, like KFM, are valued in an exit scenario at much higher multiples than upstream companies like AMH. [SAC at ¶ 29]  Thus, Defendants were motivated to increase KFM's earnings as much and as quickly as possible to maximize potential sale consideration, even if that required KFM to charge AMH exorbitant fees and impose onerous terms on their gathering relationship.  [*Id*.]

These allegations, taken as true, establish a plausible basis for concluding Defendants benefitted from the increased value of KFM at the expense of AMH and its creditors.  Defendants had every incentive to prop up KFM so they could extract the benefits of the Gathering Agreements when they cashed-out their equity interests through the Business Combination.[9]

The SAC also details the actual, quantifiable benefit received by each of HPS and ARM as a result of the value extracted from AMH under the Gathering Agreements.  The SAC alleges at least $606 million of cash proceeds and stock valued at $177.1 million were distributed to HPS, and at least $92.2 million of cash proceeds and stock valued at $95.8 million were distributed to ARM, in consideration of the value of KFM in the Business Combination.  [SAC at ¶¶ 53, 66, 77] The sale proceeds received by Defendants reflected the value diverted from AMH through the Gathering Agreement Obligations and the AMH Gathering Payments in order to increase the cash paid for KFM in an exit scenario such as the Business Combination, and constituted the actual and intended distribution of that diverted value to Defendants.  [*Id*. at ¶¶ 30-31, 53, 66, 77] Defendants would not have been able to consummate the sale of KFM and receive that distribution without

---

[9]  In fact, Defendants were focused on the exit from KFM since the beginning.  Even ARM's pre-contract analyses of the proposed above-market rates emphasized the benefit that would be realized by KFM shareholders when KFM was sold.  [SAC at ¶ 30]

002886

the diversion of value through the Gathering Agreements.[10]  [*Id.* at ¶¶ 66, 77]

### 2.    The SAC Satisfies the Trustee's Pleading Burden

Defendants predictably construe the FAC Opinion and the case law upon which it is based in the most restrictive fashion possible, seeking to effectively limit transfer beneficiary liability under the Bankruptcy Code and TUFTA to only the classic example where a guarantor benefits by being relieved of an obligation through a fraudulent transfer to a third party.  *See* FAC Opinion at 12 (citing *Schecter v. 5841 Building Corp.* (*In re Hansen*), 341 B.R. 638, 643 (Bankr. N.D. Ill. 2006).  Neither the FAC Opinion nor the case law is so limiting, and Defendants' repeated mischaracterization of the detailed allegations in the SAC as merely "conclusory" should be rejected.

HPS first argues that the FAC Opinion required the Trustee to plead facts sufficient to pierce the corporate veil under applicable state law to hold Defendants liable as transfer beneficiaries.  [HPS MTD at 7-8]  Under HPS's construction of the Court's ruling, transfer beneficiary liability under Section 550 and the TUFTA would not exist except in cases where liability is premised on discharge of a guaranty or other debt of a third party.[11]  A plaintiff alleging a shareholder's liability for a fraudulent transfer to the company under a veil-piercing theory is

---

[10]  The SAC alleges, in the alternative, that in the absence of the fraudulent transfers made relating to the Gathering Agreements – *i.e.*, if AMH had paid market rates and agreed to market terms for KFM's gathering services, and KFM had performed all services for which it had been paid – the distributions to Defendants would have been a fraction of the actual distributions they received.  [SAC at ¶¶ 66, 77]  The Trustee submits that the referenced delta, if any, is quantifiable through expert opinion, and need not be alleged with specificity at the pleading stage under Rule 8.  [FAC Opinion at 11 ("The concept of disgorgement requires that an actual, quantifiable benefit is conferred upon a party which must then be disgorged."), citing *Baldi v. Lynch* (*In re McCook Metals, L.L.C.*), 319 B.R. 570, 591 (Bankr. N.D. Ill. 2005) ("*McCook*").]

[11]  *Janvey* and its progeny did not limit transfer beneficiary liability to only defendants who had guaranteed a debt that was satisfied through an alleged fraudulent transfer.  While *Janvey* noted that such scenarios were the paradigm cases of transfer beneficiary liability, it did not limit a plaintiff's recovery to only those scenarios.  And the legislatures that enacted the statutes did not use limiting language in Section 550 or the TUFTA to limit application to only those paradigm cases – instead allowing courts to impose liability on other persons or entities "for whose benefit such transfer was made."  11 U.S.C. § 550(a)(1); Tex. Bus. & Comm. Code § 24.009(b)(1).

effectively alleging the shareholder is liable as an *initial transferee* alongside the company whose

veil is being pierced and in whose shoes they stand. *See, e.g.*, *Yamin v. Carroll Wayne Conn, L.P*,

574 S.W.3d 50, 66 (Tex. Ct. App. 2018) ("[A] court will 'pierce the corporate veil' by holding a

shareholder liable for the corporation's debt, effectively placing the shareholder in the shoes of the

corporation").

The Court's discussion of veil-piercing in the FAC Opinion addressed the scenario where

the *only* "benefit" alleged to have been received by the shareholder defendant was a correlating

increase in the value of the enterprise. [FAC Opinion at 14] The Court's ruling reflected the view

in *Janvey* that mere passive share ownership of the transferee entity is insufficient, on its own, to

confer transfer beneficiary status, as doing so would potentially expose unwitting shareholders to

liability for fraudulent transfers to the company. *See, e.g.*, *Janvey,* 840 F.3d at 265 (rejecting the

argument that status as a passive shareholder of the initial transferee, with no involvement in the

transfers is, alone, enough to establish that the passive shareholder was a beneficiary of the

transfer).[12] In other words, the Court (as in *Janvey*) was addressing a scenario where the defendant

shareholder's receipt of a "benefit" would be presumed. [FAC Opinion at 12 ("Without some

theory beyond the mere ownership of an interest in the corporation which actually received a

transfer, the owner cannot be automatically assumed to have received a benefit.").]

The Trustee's theory in the SAC is not based on Defendants' passive share ownership, nor

does the SAC allege that the only presumed benefit received by Defendants was their pro rata share

---

[12]  In its MTD, HPS contends the Fifth Circuit in *Janvey* found that a shareholder's receipt of a "cash benefit" flowing from a fraudulent transfer, as alleged in the SAC, is insufficient to invoke transfer beneficiary liability. [HPS MTD at 10] To the contrary, *Janvey* addressed only the situation where no distribution of value was made to the shareholder, and liability was instead premised on mere share ownership. *Janvey*, 840 F.3d at 266 (citing Collier on Bankruptcy ¶ 550.02[4] for the notion that there must be an actual benefit conferred on the transfer beneficiary such that disgorgement is appropriate); *see also* FAC Opinion at 12 ("In *Janvey*, the Fifth Circuit held that shareholders are not liable for transfers made to a corporation *unless they actually receive distributions of the transferred property*.") (emphasis added).

002888

of an increase in the value of the KFM enterprise. The SAC alleges the active roles of Defendants in diverting value from AMH to KFM, and receipt of the benefits of that diversion in the form of cash proceeds. The SAC alleges the intended benefit of the obligations and payments under the Gathering Agreements was, from the start, the value that would flow through to Defendants from a sale of KFM in the form of proceeds. [SAC at ¶¶ 28-29, 43, 49, 52] The SAC also alleges Defendants in fact received that value when, as intended, KFM was propped up at the expense of AMH and sold through the Business Combination. [*Id.* at ¶¶ 53, 66, 77] The benefit to Defendants was not presumed or passive – they actually received distributions of the transferred value from AMH through a process they designed and controlled. The absence of a veil-piercing claim in the SAC is of no moment under the Trustee's theory.

Defendants also contend the Trustee's allegations of the "intent" behind the Gathering Agreements and the diversion of value to KFM is "irrelevant" to whether the SAC states a cognizable claim. *See, e.g.*, HPS MTD at 10-11. While the FAC Opinion noted that the intent of the parties is "irrelevant" in establishing benefit in the constructive fraud context (unlike with actual fraud claims) [FAC Opinion at 13],[13] the intended benefit of the Gathering Agreements and related transfers is relevant here for two reasons. First, the SAC's allegations of Defendants' intentional diversion of value from AMH, for the purpose of capturing that value through a sale of KFM, is directly relevant to the plausibility requirement identified by the Court in its FAC Opinion. The Trustee submits these allegations, coupled with the details of Defendants' overwhelming incentive to shift value to the midstream entity, KFM, in which they held more substantial equity interests, address the plausibility issues raised by the Court in ruling on the FAC.

---

[13]    In the portion of the FAC Opinion discussing the relevance of "intent," the Court was making the point that an intended benefit on the defendant, on its own, was insufficient to support transfer beneficiary liability. The Court then immediately went on to state that "[w]hat is relevant to recovery from a transfer beneficiary on a theory of constructive fraudulent transfer is the actual benefit received by the defendant." [FAC Opinion at 13]

002889

Second, the Defendants' intent from the outset – to capture the diverted value through a sale of KFM – is relevant to identifying the actual benefit received by Defendants from the fraudulent transfers. The *Janvey* and *McCook* decisions cited in the FAC Opinion, and the Court's ruling on the FAC, require a transfer beneficiary defendant to have received an actual, quantifiable benefit from the alleged transfer. Here, the SAC asserts that Defendants were not mere passive shareholders, but intended to and then actually received the benefit of the fraudulent transfers when they cashed out their equity interests and received distributions of the transferred value in connection with the Business Combination. [SAC at ¶¶ 28-29, 43, 49, 52-53, 66, 77] While Defendants' intent is not a material element of a constructive fraudulent transfer claim, it is relevant to identifying the "benefit" actually received by Defendants from the obligations and transfers under the Gathering Agreements, and their liability as transfer beneficiaries.

For its part, HPS also contends the SAC does not sufficiently allege HPS's disparate percentage ownership of AMH and KFM. [HPS MTD at 11] Not so. The SAC alleges specific facts regarding HPS's ownership of AMH through HMI [*e.g.*, SAC at ¶¶ 19-20], and its direct and indirect ownership of KFM [*Id*. at ¶ 24].

Likewise, HPS argues the SAC fails to allege "whether the parties to the [Business Combination] actually ascribed greater value to KFM and less to AMH as a result of the Gathering Agreements," or "that the parties to the [Business Combination] ever allocated value to AMH and KFM based in any part on the Gathering Agreements." [HPS MTD at 12] HPS's argument misses the mark. Whether AMH was valued less in the Business Combination as a result of the fraudulent transfers under the Gathering Agreement is an issue that would have affected AMH's pre-sale shareholders. The relevant inquiry is whether and to what extent the incurrence of obligations and diversion of funds in favor of KFM under the Gathering Agreements resulted in higher cash

20

proceeds paid to Defendants when KFM was sold.  While the exact extent of the increased cash paid to Defendants will be proven by the Trustee at trial, as with any claim for damages, the SAC sufficiently alleges that absent the fraudulent transfers, Defendants would not have been able to consummate the sale of KFM or, in the alternative, the proceeds of that sale would have been significantly smaller than what Defendants received.  [*Id*. at ¶¶ 66, 77]

Finally, ARM contends that it is not a transfer beneficiary under the test articulated in *McCook*.  [ARM MTD at ¶¶ 24-30]  ARM's contention is based primarily on its repeated assertion that its receipt of almost $200 million of proceeds from cashing out its ownership of KFM was not an "actual benefit," but merely "incidental" or "theoretical."  [*Id*. at ¶¶ 27, 29]  As set forth above, ARM's argument rings hollow in light of its *actual* receipt of the exact benefit Defendants intended would be conferred on them from the start.

### B.    The SAC Adequately Alleges the Elements of the Trustee's Claims

#### 1.    The SAC Adequately Alleges Facts regarding Lack of Reasonably Equivalent Value for the Fraudulent Transfers

ARM half-heartedly contends the SAC contains insufficient allegations that AMH received less than reasonably equivalent value for each of the obligations and transfers at issue in the SAC. [ARM MTD at ¶¶ 36-39]  ARM compares the SAC with the pleading at issue in *In re Crescent Resources, LLC v. Pruet*, Nos. 09-11507-CAG, 11-01082-CAG, 2012 WL 195528 (Bankr. W.D. Tex. Jan. 23, 2012).  [ARM MTD at ¶ 37.]  There, the court found the plaintiff had insufficiently pleaded lack of reasonably equivalent value because the complaint included *only* bare, conclusory statements regarding a lack of reasonably equivalent value without *any* supporting factual assertions.  *See Crescent Resources*, 2012 WL 195528, at *26-27 (the complaint only stated "[t]he Debtor or Debtors identified on Exhibit B received less than the reasonably equivalent value in exchange for the Transfer(s).").

002891

In contrast to *Crescent*, the SAC here details how AMH did not receive reasonably equivalent value for the Gathering Agreement Obligations or the AMH Gathering Payments. Specifically, the SAC alleges: (1) the gathering and processing fees paid by AMH pursuant to the Gathering Agreements were exorbitant and approximately 90%-100% higher than market rates;[14] (ii) the Gathering Agreements required the payment of Capital Recovery Fees or Facility Fees that were completely foreign in the industry and increased AMH's price of doing business with KFM even further beyond industry standards; (iii) the Gathering Agreements included the Conveyances for which AMH received *no* consideration; and (iv) the 2016 OGA Amendment required AMH to pay KFM (and that AMH did pay KFM) for barrels of oil, up to 50,000 a day, that KFM did not transport.  [SAC, at ¶¶ 34-36, 42, 47, 62, 73]

In the face of these allegations, ARM argues the SAC fails to allege exactly "how the processing fees…were higher than the market rates," exactly "how market value was determined," or that market value "is the sole measure of reasonably equivalent value." [ARM MTD at ¶ 39] ARM's musings are not aimed at clarifying any actual ambiguity in the pleading, or addressed to any insufficiency as a matter of law.  They are part of ARM's larger, unsupported argument that the Trustee must set forth his entire case-in-chief in his pleading.  This is not the law.

The SAC undoubtedly meets the Rule 8 standard and gives ARM fair notice of what the Trustee's claims are and the grounds upon which they rest.  ARM cites no authority that the Trustee must plead with specificity "how market value was determined." [ARM MTD at ¶ 39] Even if the Trustee were required to so allege, the SAC alleges the fees in the Gathering Agreements were considerably higher than market rates, *i.e.*, rates for similar services charged by non-KFM

---

[14]   Whether the applicable rates under the Gathering Agreements were within the range of market rates is ultimately a question of fact, and the Trustee has alleged the gathering rates at issue here were well outside the range of arm's length market rates.

gatherers to AMH, by KFM to non-AMH producers, and by third-party gatherers to third-party producers.  [SAC at ¶ 34]

Further, the Trustee does not assert that market value is the "sole measure of reasonably equivalent value."  Market value is *one* measure of reasonably equivalent value, but the SAC also alleges lack of reasonably equivalent value based on the unprecedented Capital Recovery Fees or Facility Fees, the transfer of the Conveyances for no consideration, and the payment of fees for services KFM did not and could not provide.[15]  [SAC at ¶¶ 35, 42, 46, 47, 62, 73]

The SAC's allegations are undoubtedly sufficient to apprise ARM of the basis for the Trustee's assertion that AMH did not receive reasonably equivalent value in exchange for the Gathering Agreement Obligations or the AMH Gathering Payments.  *Yaquinto v. CBS Radio, Inc. (In re Tex. E&P Operating, Inc.)*, Nos. 17-34386-SGJ-7, 19-03226-SGJ, 2022 Bankr. LEXIS 1932, at *47 (Bankr. N.D. Tex. July 13, 2022) ("Under TUFTA, the 'reasonably equivalent value' requirement is satisfied when the transferee fully performs in an arm's-length transaction in the ordinary course of its business at market rates. Under the Bankruptcy Code, 'reasonably equivalent value' means that 'the debtor has received value that is substantially comparable to the worth of the transferred property.'").  ARM's contention that these detailed facts are "nothing more than a conclusory allegation" rings hollow and should again be rejected.[16]

### 2.    The SAC Sufficiently Alleges AMH's Relevant Financial Condition

ARM also renews its contention that the Trustee has failed to allege adequate facts regarding AMH's insolvency.  [ARM MTD at ¶¶ 40-43]  This argument should again be rejected.

---

[15]  The SAC also contains factual allegations that none of the transactions were conducted at arm's length due to the overlapping control and ownership of AMH, KFM and HMI.  [SAC at ¶¶ 17-22, 25, 27-33, 42, 44, 46]

[16]  ARM states in passing that "payments made pursuant to the 2016 Amendments are payments in satisfaction of an antecedent contractual liability, which cannot support a fraudulent transfer claim…"  [ARM MTD at ¶ 39]  This undeveloped argument should be rejected.

23

002893

Insolvency is "generally a factual determination not appropriate for resolution in a motion for dismiss." *Halperin v. Moreno (In re Green Field Energy Servs.)*, Nos. 13-12783 (KG), 15-50262 (KG), 2015 Bankr. LEXIS 2914, at *26-27 (Bankr. D. Del. Aug. 31, 2015). The SAC contains both specific and general allegations of AMH's insolvency and financial condition at the time of the obligations and transfers at issue.

The SAC alleges that "AMH was *running at a net loss* in both 2015 and 2016 and *was cash-flow insolvent . . .* AMH was *severely inadequately capitalized at this time, with a debt to equity ratio of above 20 to 1*." [SAC at ¶¶ 38-39 (emphasis added)] The SAC also alleges that "[i]n nearly every quarter between 2016 and 2018, *AMH lacked sufficient cash flow to meet its upcoming obligations*, continued to draw down on its credit facility, and refinanced its debt. Toward the end of 2017, *AMH had only nominal cash to support its operations and its debt-to-equity ratio remained perilously high*." [*Id*. at ¶ 50 (emphasis added)] The allegations that AMH lacked sufficient cash flow and/or capital to meet its upcoming obligations are alone sufficient to establish a presumption of insolvency. *See* Tex. Bus. & Comm. Code § 24.003(b) ("A debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent."); *see also* SAC at ¶¶ 63, 74; *Katchadurian v. NGP Energy Capital Mgmt., LLC (In re Northstar Offshore Grp., LLC)*, 616 B.R. 695, 738 (Bankr. S.D. Tex. 2020) (allegation that the transferor "had insufficient funds to meet its obligations with respect to the bank and the working capital deficit under the purchase agreement" as sufficient to plead insolvency for a constructive fraudulent transfer claim if coupled with an affirmative pleading of insolvency); *Think3 Litig. Trust v. Zuccarello (In re Think3, Inc.)*, 529 B.R. 147, 200-201 (Bankr. W.D. Tex. 2015) (allegations that transferor was insolvent and could not pay its debts as they came due, together with allegations of multiple indications of "severe financial distress" of the transferor, are sufficient to plead

24

insolvency for constructive fraudulent transfer claims under Rule 8(a)(2)); *Schott v. Massengale*, No. 18-759-JWD-RLB, 2019 U.S. Dist. LEXIS 166736, at *59 (M.D. La. Sept. 27, 2019) (allegations that the transferor was unable to make payments as they came due and "a conclusory allegation that [the transferor] was insolvent or became insolvent as a result of the [transfers]" are sufficient to plead a constructive fraudulent transfer claim under the standards of Rule 8(a)(2)).[17] The Trustee's allegations of AMH's insolvency or other financial condition at the relevant times are sufficient under the applicable Rule 8 pleading standard.

> **3.** **The Obligations and Transfers which are the Subject of the Trustee's Claims were Incurred or Occurred within the Statutory Lookback**

ARM also recycles verbatim its prior argument that the Trustee's claims should be dismissed, in part or in whole, based on the statutory lookback periods under the Bankruptcy Code (two years) and TUFTA (four years). *Compare* ECF No. 49 at ¶¶ 47-51, *with* ECF No. 74 at ¶¶ 45-49. As before, ARM's arguments have no merit.

Count I asserts claims under Bankruptcy Code section 548 and seeks to avoid only those AMH Gathering Payments that were made by AMH to KFM between September 11, 2017 and February 9, 2018, which transfers are detailed on Exhibit 6 to the SAC. [SAC at ¶¶ 68-69, Ex. 6] Thus, the transfers which are the subject of Count I clearly fall within the two-year statutory lookback period applicable to that claim.

Count II asserts claims under the TUFTA and seeks to avoid all of the AMH Gathering Payments made under the Gathering Agreements. ARM argues that any claims based on AMH

---

[17]    In contrast, the cases cited by ARM involved allegations less substantial than those in the SAC regarding insolvency. *Northstar Offshore Grp., LLC*, 616 B.R. at 738 (bare allegation that transferor "had insufficient funds to meet its obligations" was insufficient but granting leave to amend); *In re ATP Oil & Gas Corp.*, 711 F. App'x. 216, 223 (5th Cir. 2017) (conclusory allegations that the transferor "was insolvent or had unreasonably small capital at the time of the" transfers was insufficient *in a third amended complaint*); *In re Cyr*, 602 B.R. 315, 332 (Bankr. W.D. Tex. 2019) (allegation that transferor subsequently filed for bankruptcy was insufficient on its own and granting leave to amend).

Gathering Payments made before September 11, 2015 are barred by the four-year lookback period of TUFTA § 24.010.  [ARM MTD at ¶ 49]  The SAC, however, does not allege any Gathering Agreement Payments were made prior to January 2016.  [SAC at Exs. 3, 6]  Accordingly, each AMH Gathering Payment occurred within the four-year lookback period of TUFTA § 24.010.

Finally, the Trustee concedes AMH entered into the 2015 Gathering Agreements outside of the four-year lookback under the TUFTA, and the Trustee does not seek to avoid those agreements or the obligations incurred by AMH therein.[18]  However, the Trustee's inability to avoid the 2015 Gathering Agreements does not insulate payments made by AMH thereunder from the Trustee's avoidance powers. "The existence of a binding contract does not foreclose a fraudulent conveyance claim if the elements of the cause of action for constructive fraud are met . . . A transfer made pursuant to a contract may still be avoidable as a fraudulent transfer if the evidence demonstrates the exchange is not for reasonably equivalent value." *Rizack v. Starr Indem. & Liab. Co. (In re Grandparents.com, Inc.)*, 614 B.R. 625, 631-32 (Bankr. S.D. Fla. 2020); *EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.)*, 356 B.R. 631, 640 (Bankr. D. Del. 2006) ("A transfer may be fraudulent even if it is made in accordance with the terms of a contract between the parties."); *In re R.M.L., Inc.*, 92 F.3d 139, 148 (3d Cir. 1996) (non-refundable fees paid pursuant to commitment letter were nonetheless avoidable as fraudulent conveyances because they did not confer reasonably equivalent value on the debtor).  Even the case cited by ARM, *German Pellets La. LLC v. Wessel GMBH (In re La. Pellets, Inc.)*, 838 F. App'x. 45 (5th Cir. 2020), acknowledges that a reduction of antecedent debt is a made for reasonably equivalent value only if "*the debt itself was based upon value.*" 838 F. App'x. at 49 (emphasis added).

---

[18]     In contrast, the Trustee independently seeks to avoid the obligations incurred by AMH under the 2016 Amendments, which were executed within the applicable statute of limitations. [SAC at Count II]

002896

In *Rizack*, plaintiff sought to avoid transfers made under a valid agreement, alleging the debtor had not received reasonably equivalent value because the agreed-to services were not provided "and that the value of the services actually provided . . . were less than contemplated . . . and were less than the reasonably equivalent value of the dollars paid by the Debtor for those services." 614 B.R. at 630. In holding that the existence of an underlying contract does not bar a fraudulent transfer claim, the court noted that "just like payment for services under a contract do[es] not always bar a claim for breach of contract, neither does it necessarily bar a claim for constructive fraud, *if* the plaintiff proves the elements of *that* cause of action." *Id*. at 632 (emphasis in original).

Similarly, the Trustee alleges each of the AMH Gathering Payments independently satisfies the elements of a constructive fraudulent transfer claim, in that the value AMH received for such payments was not equivalent to the amount of those transfers. The SAC alleges payments made by AMH under the Gathering Agreements were at exorbitant above-market rates, included additional fees that are completely foreign to the industry, and in some cases were made for services that were never rendered. [SAC at ¶¶ 34, 35, 42, 46-47] These were not fixed payments like one may find under a loan agreement or, as in *In re La. Pellets, Inc.*, under a predetermined payment schedule. The subject payments here were instead made for services ostensibly (but not always) rendered by KFM. 838 F. App'x. at 49; *see also* SAC at Ex. 1, Schedule 6.1; Ex. 2, Schedule 7.1; Ex. 4, Section 6.1; Ex. 5, Section 7.1.

As the Court noted at the June 8, 2022 hearing on the Initial MTDs, "if you had an optional payment [under a pre-existing contract], depending on what you ordered and you ordered things that were overpriced, that might very well be a fraudulent payment . . ." [ECF No. 53 at Ex. 1, 54:10-12] Such is the case here. The payments made by AMH under the Gathering Agreements

27

were based on AMH's delivery to KFM of oil and gas for gathering, and AMH had discretion regarding how it managed its oil and gas interests.[19]    In other words, those payments were dependent on the gathering *requested* by AMH, and the SAC clearly alleges AMH paid overpriced rates for those services.  Thus, regardless of whether the *obligations* under the 2015 Gathering Agreements are avoidable, the SAC alleges facts which support the avoidance of *payments* made pursuant to those agreements.[20]

### C.    The Trustee Should be Granted Leave to Further Amend the SAC if Necessary

To the extent that the Court determines any portion of the Trustee's claims have not been sufficiently pleaded, or that any portion of the SAC requires clarification, the Trustee should be granted leave to further amend the SAC pursuant to FRCP 15.  *Kinder Morgan., Inc. v. Crout*,  814 F. App'x 811, 815 (5th Cir. 2020); *Herrmann Holdings Ltd. v. Lucent Techs., Inc.*, 302 F.3d 552, 566 (5th Cir. 2002).  HPS contends any amendment would be futile, but cites only the fact that the Trustee has made prior amendments, and reiterates its argument that the Trustee has not cured the deficiencies identified in the FAC Opinion.

The Court's FAC Opinion addressed, for the first time, the transfer beneficiary issue and directed the Trustee to amend his pleading to address that sole issue.  While the Trustee believes he has done so in accordance with the Court's ruling, the Trustee should be given leave to amend in the event the Court finds the SAC did not resolve the issues articulated by the Court.

Accordingly, HPS's request to deny leave to amend should be rejected.

---

[19]  *See* SAC at Ex. 1, Section 3.3(a); Ex. 2, Section 3.3(a); Ex. 4, Section 4.3(a); Ex. 5, Section 4.3(a).

[20]  ARM's contention that the existence of an underlying contract prevents examination of individual payments made under that business relationship would mean that the Court could not examine payments alleged to be made where no actual services were rendered – simply because the payments were made at the rates agreed to under the contract. That is not the law, and ARM cites no authority otherwise.

28

## V.    CONCLUSION

Defendants' request for dismissal of the SAC, and the claims asserted by the Trustee therein, should be denied.  To the extent the Court finds the Trustee has not sufficiently alleged his claims, the Trustee respectfully requests leave to amend the SAC to address any deficiencies.

Dated: May 26, 2023

MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO, P.C.

*/s/ Joseph R. Dunn*

By:    Joseph R. Dunn (*Pro Hac Vice*)
CA State Bar No. 238069
jrdunn@mintz.com
3580 Carmel Mountain Rd.
Suite 300
San Diego, California 93210
T: (858) 314-1500
F: (858) 314-1501

*Counsel for Plaintiff David Dunn, as Trustee of the AMH Litigation Trust*

002899

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing *Plaintiff's Omnibus Opposition to Motions of ARM Defendants and HPS Investment Partners, LLC to Dismiss Second Amended Complaint [ECF Nos. 74, 75]* was duly served on all defendants in this case, namely HPS Investment Partners, LLC; ARM Energy Holdings, LLC; ARM Midstream, LLC and Asset Risk Management, through their respective counsel of record, via electronic mail and the Court's electronic filing system, this 26th day of May, 2023.


Dated: May 26, 2023                              */s/ Joseph R. Dunn*
                                                 Joseph R. Dunn

002900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| ALTA MESA RESOURCES, INC., *et al.*, | ) |
| | ) Case No. 19-35133 |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |
| DAVID DUNN, as Trustee of the AMH Litigation Trust, | ) |
| | ) |
| | ) Adv. Pro. No. 21-03909 |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| HPS INVESTMENT PARTNERS, LLC; ARM ENERGY HOLDINGS, LLC; ARM MIDSTREAM, LLC; AND ASSET RISK MANAGEMENT, LLC, | ) **Jury Trial Demanded** |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

**[PROPOSED] ORDER DENYING MOTIONS OF ARM DEFENDANTS**
**AND HPS INVESTMENT PARTNERS, LLC TO DISMISS**
**SECOND AMENDED COMPLAINT [DKTS. 74, 75]**

Before the Court are (i) the *Rule 12(b)(6) Motion to Dismiss the Second Amended Complaint on Behalf of HPS Investment Partners, LLC* [Dkt. 75], filed by Defendant HPS Investment Partners, LLC (the "HPS Motion to Dismiss"); and (ii) the *Rule 12(b)(6) Motion of to Dismiss the Second Amended Complaint on Behalf of ARM Defendants* [Dkt. 74], filed by Defendants ARM Energy Holdings, LLC, ARM Midstream, LLC, and Asset Risk Management, LLC (the "ARM Motion to Dismiss" and , together with the ARM Motion to Dismiss, the "Motions to Dismiss"). The Court, having reviewed the Motions to Dismiss, the *Omnibus Opposition to Motions of ARM Defendants and HPS Investment Partners, LLC to Dismiss Second Amended Complaint [Dkts. 74, 75]*, filed by Plaintiff David Dunn (the "Trustee"), the Trustee of the AMH

1

Litigation Trust, all other pleadings, responses, evidence, and papers filed with the Court in this action, the applicable law, and upon oral argument of the parties at the hearing on the Motions to Dismiss, finds that the Motions to Dismiss are without merit.  It is hereby order that the Motions to Dismiss are **DENIED.**


Dated:                                          _____
                                                            Honorable Marvin Isgur
                                                            United States Bankruptcy Judge

002902

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| ALTA MESA RESOURCES, INC., *et al.,* | Case No. 19-35133 |
| Debtors. | (Jointly Administered) |
| DAVID DUNN, as Trustee of the AMH Litigation Trust, | |
| Plaintiff, | Adv. No. 21-03909 |
| v. | |
| HPS INVESTMENT PARTNERS, LLC; ARM ENERGY HOLDINGS, LLC; ARM MIDSTREAM, LLC; AND ASSET RISK MANAGEMENT, LLC, | |
| Defendants. | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF RULE 12(b)(6)**
**MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**
**ON BEHALF OF HPS INVESTMENT PARTNERS, LLC**

This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you.* Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.

Represented parties should act through their attorney.

There will be a hearing on this motion on July 17, 2023 at 9:00 a.m. central time in person at Courtroom 404, 515 Rusk, Houston, TX 77002.

\* But see ECF No. 72 (Order on Joint Scheduling Stipulation).

HPS Investment Partners, LLC ("HPS") respectfully submits this reply memorandum of law in support of its motion to dismiss the Second Amended Complaint (ECF No. 70) ("SAC").

## INTRODUCTION

The Trustee effectively concedes his failure to plead that HPS was a transfer beneficiary of the Gathering Agreements,[1] and of related payments and transfers of value from AMH to KFM allegedly made under those agreements. As the Opposition makes clear, the Trustee's claim is that (i) the Gathering Agreements and related payments increased the value of KFM at the expense of AMH, and (ii) HPS received proceeds from the sale of KFM. *See* Opp. at 16.[2]

This Court has, however, rejected this theory of pleading transfer beneficiary status because "every shareholder of every corporation that receives a distribution would 'benefit' from any increase in the value of the corporation if the corporation received a constructively fraudulent transfer." *In re Alta Mesa Resources, Inc.*, 2023 WL 2359022, at *7 (Bankr. S.D. Tex. Mar. 3, 2023) ("Memo Opinion" or "Mem Op."). The same Memo Opinion further explains that "[t]o reach any value in the hands of a shareholder on the theory that they are a transfer beneficiary, [the Trustee] would need to pierce the veil." *Id.*

But rather than argue he has alleged facts that remedy this deficiency, the Trustee reiterates insufficient allegations or flat-out disagrees with the Memo Opinion, which itself remains grounded in well-reasoned law from the Court of Appeals for the Fifth Circuit. Indeed, the Trustee fails to cite a single case in which an entity in HPS's position is found to be a transfer beneficiary. The Trustee's request to break new ground under Section 550 and TUFTA should be rejected and this action fully and finally dismissed.

---

[1] Capitalized terms have the same meaning as in the Moving Brief (ECF No. 74).

[2] The Moving Brief is cited herein as "Mot. __"; the Opposition is cited as "Opp. __".

## ARGUMENT[3]

### I. THE TRUSTEE FAILS TO PLEAD THAT HPS IS A TRANSFER BENEFICIARY OF ANY ALLEGED TRANSFER FROM AMH TO KFM

The Court has already rejected the Trustee's theory for pleading that HPS was a transfer beneficiary under Section 550 and TUFTA. The Trustee's theory is that "[t]he sale proceeds received by Defendants" for AMH and KFM "reflected the value diverted from AMH through the [Gathering Agreements] in order to increase the cash paid for KFM" and "constituted the actual and intended distribution of that diverted value to Defendants." Opp. at 16.

The Court's Memo Opinion held that this theory does not support a plausible claim that any Defendant received an "actual benefit as result of the transfer." Mem. Op. at *7; *see also* Mot. at 8. The Court summarized the Trustee's argument, as stated in his Opposition to the motion to dismiss the FAC, as that "defendants did receive an actual benefit in the form of the increased value of KFM," which Defendants "realized . . . at the time of the business combination because the increase in KFM's value was supposedly reflected in the $800,000,000.00 sale price." Mem. Op. at *7. The Court concluded that "[t]his theory falls short of the plausibility standard for several reasons," including: ***First***, that the Trustee failed to plead any benefit to HPS from decreasing the value of AMH only to sell its interests in both AMH and KFM in the Business Combination; and ***Second***, that the Trustee failed to "connect" the increase in value at KFM "to the alleged fraudulent transfers." *Id.*; *see also* Mot. at 10-11. The TAC fails to remedy these deficiencies.

To try to remedy the first deficiency, the Trustee points to allegations that (i) HPS held a larger equity stake in KFM than in AMH, so allegedly "a dollar of value at KFM was worth more to HPS than the same dollar at AMH," and (ii) "midstream companies, like KFM, are valued in an

---

[3] HPS incorporates by reference arguments in the reply brief filed by the ARM Defendants.

002905

exit scenario at much higher multiples than upstream companies like AMH." Opp. at 15. These assertions fail for several reasons.

First, the Trustee offers no support for his assumption that a dollar paid by AMH to KFM under the Gathering Agreements depleted the value of AMH by a dollar, and increased the value of KFM by a corresponding dollar. The Trustee offers no specific allegations about the effect, if any, the Gathering Agreements had on the profit-and-loss, balance sheet, or other value-determining measurements of either entity, beyond general assertions that AMH made large payments to KFM and that AMH later went bankrupt. SAC ¶¶ 4, 5.

Second, the Trustee's bare assertion that companies "like KFM" would be valued more highly "in an exit scenario"—an allegation that was completely conclusory in the Complaint, and remains so in the Opposition—offers no facts about the values of either AMH or KFM, nor specifies the "exit scenario" in which the Trustee's assertion holds true—including whether that would be the case in the Business Combination.[4]

Third, as the Motion made clear, the Trustee fails to allege what value the parties to the Business Combination actually ascribed to AMH or KFM, including whether they even factored the Gathering Agreements into valuing AMH or KFM. Mot. at 12. The Trustee responds that "[w]hether AMH was valued less in the Business Combination as a result of the fraudulent transfers under the Gathering Agreements is an issue that would have affected AMH's pre-sale shareholders," and that the "relevant inquiry is whether and to what extent the incurrence of obligations and diversion of funds in favor of KFM under the Gathering Agreements resulted in

---

[4] The Opposition reiterates the Complaint's conclusory assertion that Defendants "would not have been able to consummate the sale of KFM and receive that distribution without the diversion of value through the Gathering Agreements." Opp. at 16-17. The Trustee has never offered facts supporting this claim beyond his own supposition. *See* Mot. at 12.

002906

higher cash proceeds paid to Defendants when KFM was sold." Opp. at 20-21. But the Trustee offers a distinction without a difference: the value of each entity at the time of the Business Combination is determined by the purchaser and seller, and the Trustee offers no allegations that any participant in the Business Combination factored the Gathering Agreements, nor any payments made thereunder, into the value of either entity. Indeed, the Trustee fails to allege with any specificity any facts concerning the value of either entity. *See* Mot. at 12.[5]

Finally, the Trustee never quantifies HPS's actual interest in AMH, and so fails to plead why HPS would deplete the value of AMH in favor of KFM, only to sell both in one transaction. Mot. 11. The Trustee responds only that the SAC "alleges specific facts regarding HPS' [*sic*] ownership of AMH through HMI and its direct and indirect ownership of KFM," Opp. at 20—none of which addresses this basic failure.

Even if the Trustee had remedied the foregoing deficiency, the Trustee still fails "to connect that increase in value" at KFM "to the alleged fraudulent transfers." Mem. Op. at *7. As discussed above, under the Trustee's theory that HPS benefited from transfers to KFM through proceeds from the sale of that entity, any shareholder "that receives a distribution would 'benefit' from any increase in the value of the corporation if the corporation received a constructively fraudulent transfer." *Id.* But this is "not the type of tangible benefit that is required," and the Trustee's theory "appears to run afoul of the Fifth Circuit's teachings." *Id.* Instead, "[t]o reach any value in the hands of a shareholder on the theory that they are a transfer beneficiary, Dunn would need to pierce the veil." *Id.* at *7, 8 ("While there might be a scenario in which, through their respective positions of control, the defendants might be transfer beneficiaries or subsequent transferees of payments

---

[5] The Opposition continues to mischaracterize the proceeds received by HPS in connection with the Business Combination. *See* Mot. at 6 n.4.

002907

made under the gathering agreement with KFM, the complaint has not plead sufficient facts to support that legal conclusion, particularly in light of the veil-piercing issue.").

Rather than identify allegations that satisfy the Court's veil-piercing discussion, the Trustee simply disagrees with the Court. *See, e.g.*, Opp. at 19 ("The absence of a veil-piercing claim in the SAC is of no moment under the Trustee's theory."). For instance, the Trustee argues that if veil-piercing were required to sustain his claims, "transfer beneficiary liability under Section 550 and the TUFTA would not exist except in cases where liability is premised on the discharge of a guaranty or other debt of a third party." Opp. at 17. The Trustee's claim that the veil-piercing requirement is unduly limiting, however, appears to rest entirely upon the circular assertion that it excludes the Trustee's constructive fraudulent transfer claim. The Trustee even acknowledges that the scenarios he notes—discharge of a guaranty or other third-party debt—are "the paradigm cases of transfer beneficiary liability." *Id.* at 17 n.11. But the Trustee offers no reason for the Court to extend transfer beneficiary liability beyond those "paradigm" cases—given a trustee's ability to pursue remedies against direct and subsequent transferees—much less any reason to do so here. The Trustee thus fails to identify any reason for the Court to reconsider its veil-piercing analysis. Notably, the Trustee's argument that veil-piercing is "effectively alleging the shareholder is liable as an *initial transferee*," Opp. at 18 (emphasis in original), is in no way inconsistent with the conclusion that veil-piercing is necessary to reach an equity holder under the circumstances present here—if anything, it supports that a trustee's ability to pursue direct and subsequent transferees is largely sufficient.

Indeed, notably absent from the Opposition is a single case in which a party similarly situated to HPS has been found liable as a transfer beneficiary under Section 550 or TUFTA. The Trustee's argument that neither Section 550, TUFTA, nor "*Janvey* and its progeny," *id.*, at 17 n.11

5

(citing *Janvey v. Libyan Inv. Auth.*, 840 F.3d 248 (5th Cir. 2016), limits transfer beneficiary status to the two "paradigm" scenarios noted above in no way means that *Janvey supports* the Trustee's demand to ignore veil-piercing, and to open every seller of an equity interest to potential transfer beneficiary liability for selling that interest. *Id.* The Trustee's assertion that *Janvey* "addressed only the situation where no distribution of value was made to the shareholder, and liability was instead premised on mere share ownership," *id.* at 18 n.12, is likewise unhelpful in light of this Court's acknowledgment of *Janvey*'s additional finding that mere control, even if alleged, and even if it exceeds mere passive shareholding, is insufficient for transfer beneficiary liability. Mem. Op. at *12; *see also Janvey*, 840 F.3d at 265-66 (rejecting notion that increase in value at transferee is sufficient to allege that an equity holder is a transfer beneficiary); Mem. Op. at *14, 16 ("The idea of a derivative benefit has been rejected by the Fifth Circuit . . . .").

Beyond disagreeing with the Court, the Trustee fails to address critical portions of the Court's Memo Opinion that dispose of his claims. The Trustee claims the Memo Opinion "addressed the scenario where the *only* 'benefit' alleged to have been received by the shareholder defendant was a correlating increase in the value of the enterprise," and its decision was based solely on "mere passive share ownership" on the part of Defendants. Opp. at 18. But, as discussed above, the Memo Opinion explains that, beyond the necessity of veil-piercing (even if it were possible here),[6] the Trustee must do more than allege that constructive fraudulent transfers augmented KFM's value and that Defendants realized value from the sale of KFM. Mem. Op. at *7. The Trustee also claims that he alleges the "active roles of Defendants in diverting value from AMH to KFM," which does not remedy the failure to plead that the Trustee alleges, at most,

---

[6] *See* Mem. Op. at 8 (citing *Spring St. Partners-IV, L.P. v. Lam*, 730 F.3d 427, 442-44 (5th Cir. 2013) to note an "absence of the veil-piercing remedy in cases of constructive fraud").

002909

Defendants' realization of value from the sale of KFM, nor address that any allegations of intent are not relevant here, as discussed below. *See Bonded Fin. Servs. v. European Am. Bank,* 838 F.2d 890, 896 (7th Cir. 1988) ("Someone who receives the money later on is not an 'entity for whose benefit such transfer was made'; only a person who receives a benefit from the initial transfer is within this language."). Indeed, the Trustee made similar allegations in the dismissed FAC. *See* Mot. 9 (chart); Compl. ¶ 51; Mem. Op. at *6 (noting the FAC allegations that "HPS participated in the transactions as something more than a passive shareholder").

The Trustee likewise appears to disagree with the Memo Opinion's finding that "the complaint does not allege actual fraud, so intent is irrelevant." Mem. Op. at *6. Indeed, the Opposition relies heavily on the assertion that HPS intentionally transferred value from AMH to KFM in anticipation of selling the entities. *See, e.g.*, Opp. at 16 ("every incentive to prop up KFM"); *id.* at 19 ("intended benefit"); *id.* ("overwhelming incentive"). The Trustee acknowledges the Court's statement on this issue, but nonetheless argues that intent is relevant to "the plausibility requirement identified by the Court" and to "identifying the actual benefit received by Defendants from the fraudulent transfers." *Id.* at 20. But the "plausibility requirement identified by the Court" is, in fact, the standard in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), which requires the Trustee plausibly to allege each element of his claim; facts unrelated to those elements do not support plausibility. And the Court has already found that the Trustee's theory—that "defendants realized th[e] increase in value" at KFM upon its sale in the Business Combination—did not "***plausibly*** plead the receipt of an actual benefit as a result of the transfer." Mem. Op. at *7 (emphasis added). The Trustee's reference to intent cannot make the Trustee's claim plausible.

## II.    FURTHER AMENDMENT WOULD BE FUTILE

The Court should exercise its discretion to deny leave for further amendment. The prior amendments consisted largely of abandoning large portions of the original claims and making

002910

cosmetic changes to the remainder (with allegations the Trustee could have asserted originally). *See, e.g.*, Mot. at 9 (listing handful of arguably additional allegations); *In re Artho*, 587 B.R. 866, 890 (Bankr. N.D. Tex. 2018) ("[T]he law supports the Court's exercise of discretion to deny leave to amend when the plaintiff has been given a previous opportunity to correct deficiencies."). Indeed, the Trustee's Opposition is based in large part on *disagreeing* with the Court about what is required to plead his claim, which further indicates the Trustee is unable to allege supporting facts. And the Opposition's perfunctory amendment request would be insufficient even if it were a motion. *See Burke v. Ocwen Loan Serv., L.L.C.*, 855 F. App'x 180, 187 (5th Cir. 2021) (affirming denial of leave where the "motion did not explain what new facts they would allege nor attach a proposed amended complaint"); *Welsh v. Collier*, 2021 WL 2134160, at *1 (W.D. Tex. Apr. 23, 2021) (denying third amendment request where plaintiff "has not shown how his proposed amendments would survive a motion to dismiss"); *In re Artho*, 587 B.R. 866 at 890 (no leave absent "proposed amendments to the complaint" or "additional facts that could survive" a motion).

There is no reason to believe that additional opportunities to amend will cure the pleading deficiencies, nor any reason to afford the Trustee another opportunity to do so.

## CONCLUSION

For these reasons, the Second Amended Complaint should be dismissed with prejudice.

Dated:    June 16, 2023                Respectfully submitted,

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

/s/ *Karl S. Stern*
Karl S. Stern (attorney in charge) (SBN 19175665)
Christopher D. Porter (SBN 24070437)
711 Louisiana Street, Suite 500
Houston, TX 77002
Telephone:    (713) 221-7000
Facsimile:    (713) 221-7100
Email: karlstern@quinnemanuel.com

8

christopherporter@quinnemanuel.com

**-AND-**

Michael B. Carlinsky (*pro hac vice*)
Benjamin I. Finestone (*pro hac vice*)
Jacob J. Waldman (*pro hac vice*)
Courtney C. Whang (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:    (212) 849-7000
Facsimile:    (212) 849-7100
Email: michaelcarlinsky@quinnemanuel.com
benjaminfinestone@quinnemanuel.com
jacobwaldman@quinnemanuel.com
courtneywhang@quinnemanuel.com

**COUNSEL TO HPS INVESTMENT PARTNERS, LLC**

9

## CERTIFICATE OF SERVICE

I certify that this motion has been served on counsel of record by the Court's ECF system on June 16, 2023.

/s/ Karl S. Stern
By: Karl S. Stern

002913

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>ALTA MESA RESOURCES, INC., *et al.,*<br><br>Debtors. | Chapter 11<br><br>Case No. 19-35133<br><br>(Jointly Administered) |
| DAVID DUNN, as Trustee of the AMH Litigation Trust,<br><br>Plaintiff,<br><br>v.<br><br>HPS INVESTMENT PARTNERS, LLC; ARM ENERGY HOLDINGS, LLC; ARM MIDSTREAM, LLC; AND ASSET RISK MANAGEMENT, LLC,<br><br>Defendants. | Adv. No. 21-03909 |

**REPLY IN SUPPORT OF ARM DEFENDANTS' RULE 12(B)(6)**
**MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**
[Relates to ECF No. 74]

Defendants ARM Energy Holdings, LLC, ARM Midstream, LLC, and Asset Risk Management, LLC (collectively, "ARM") file this Reply in Support of their Rule 12(b)(6) Motion to Dismiss the Second Amended Complaint for Failure to State a Claim [ECF No. 74] (the "Motion") and ask that the Court dismiss with prejudice all claims asserted against them by Plaintiff David Dunn (the "Trustee"), as Trustee of the AMH Litigation Trust (the "Trust") in Trustee's Second Amended Complaint [ECF No. 70] (the "SAC"), and respectfully state as follows:

1

002914

## INTRODUCTION

1.    Trustee's Opposition[1] yet again provides no legal basis for allowing this flawed lawsuit to proceed.  Trustee's Opposition predominantly encompasses recycled challenges to ARM Defendants' Rule 12(b)(6) Motion to Dismiss the Original Complaint [ECF No. 19] and ARM Defendants' Rule 12(b)(6) Motion to Dismiss the First Amended Complaint [ECF No. 49], with Trustee alleging the same conclusory allegations as bases for his fraudulent transfer claims. Rather than pleading a plausible basis as to what ***direct benefit*** ARM received from the alleged fraudulent transfers or presenting any factual evidence that ARM either controlled AMH or pushed AMH to undertake the alleged transactions, Trustee merely recites nine and a half pages of factual background—copying and pasting conclusory allegations from the SAC.[2]

2.    Trustee was granted leave to amend his First Amended Complaint [ECF No. 40] (hereinafter "FAC") limited to re-pleading how ARM, as a shareholder-defendant, received a direct benefit from the alleged constructive fraudulent transfers.[3]  Rather than amending his FAC to plead how ARM received a direct benefit from the alleged constructive fraudulent transfers, Trustee merely recites the same conclusory allegations and sprinkles the words "direct benefit" somewhat randomly throughout the SAC in an attempt to support his flawed theory that ARM was a transfer beneficiary.  The minimal additions in Trustee's SAC and arguments in Trustee's Opposition nonetheless fail to cure the deficiencies outlined in the Court's Memorandum Opinion [ECF No. 63].[4]

---

[1] Plaintiff's Omnibus Opposition to Motions of ARM Defendants and HPS Investment Partners, LLC to Dismiss Second Amended Complaint [ECF No. 77] (the "Opposition").

[2] *See* Opposition, at 3-12.

[3] *See* ECF No. 64, at 1 (Limiting Trustee's leave to file an amended complaint to: "[a]ny amended complaint must set forth a plausible basis as to what direct benefit was received by the Defendants from alleged constructive fraudulent transfers" and further providing that "[n]o other amendments are authorized.").

[4] *See* ECF No. 63, at 17 (Court providing "Dunn the narrow ability to replead allegations showing how the shareholder-defendants received a direct benefit from the alleged constructive fraudulent transfers.").

002915

3.    Trustee's Opposition attempts to argue that his SAC was amended in accordance with the Court's Order, and that it sufficiently and plausibly alleges how ARM received an actual benefit from the fraudulent transfers and direct quantifiable value in the form of proceeds from the Business Combination.[5]    Trustee further attempts to argue that ARM construes the Court's Opinion and the case law upon which it is based in the most restrictive fashion and mischaracterizes Trustee's factual allegations in the SAC.[6]    On the contrary, ARM's arguments in favor of dismissal of Trustee's claims expressly agree with the Court's Opinion and expressly assume the truth in Trustee's factual allegations.    Even if each of Trustee's factual allegations are true, Trustee's claim for constructive fraudulent transfer remains implausible on its face.

4.    Similar to the FAC, Trustee's SAC alleges that certain transactions allegedly undertaken by AMH are fraudulent transfers and asserts that they (somehow) benefitted ARM—without providing any basis or pleading how ARM received a direct benefit or how ARM had control over AMH to obtain such fraudulent benefits.    More specifically, Trustee claims that ARM caused AMH to make fraudulent transfers under certain oil and gas gathering agreements in 2015 ("2015 Agreements") and certain amendments thereto in 2016 ("2016 Amendments" and collectively with the 2015 Agreements, the "Gathering Agreements").    Trustee further claims that under the Gathering Agreements, AMH incurred contractual obligations to make payments to Kingfisher Midstream, LLC ("KFM"), an entity in which ARM held a minority 30% equity interest.    At a minimum, Trustee fails to address in his Opposition—nor can he cure—the following fatal defects of the SAC:

A.    **Transfer Beneficiary:** Trustee fails to plead how ARM received a direct benefit with quantifiable value or how ARM qualifies as a transfer beneficiary. Even when relying on Trustee's conclusory allegations that Defendants benefited from the increased value of KFM at the expense of AMH in support

---

[5] *See* Opposition, at 13.
[6] *See* Opposition, at 17.

3

002916

of his "transfer beneficiary" theory, Trustee's SAC still fails to allege how any transfers were made for the direct benefit of ARM without relying on "intent" (which is irrelevant for constructive fraudulent claims) or that ARM had the prerequisite control to enforce any of the alleged fraudulent transfers. Trustee has no legal basis for recovery from ARM, and he pleads no facts supporting his naked conclusion that ARM directly benefitted only when it cashed-out its equity interests incidentally through the Business Combination.

**B.    Elements of Constructive Fraudulent Transfer:** Trustee merely regurgitates his legal conclusion that AMH was "insolvent" at the time of the alleged fraudulent transfers and that the transactions were for less than "reasonably equivalent" value. Trustee cannot meet his burden of pleading AMH's financial condition by relying merely on AMH's cash flow, debt-to-equity ratio, or the fact that AMH ultimately filed for bankruptcy (more than four years after entry into 2015 Agreements). Trustee has access to AMH's entire financial records, yet he pleads no facts supporting his conclusion of "insolvency." Further, his own allegations in the SAC render any claim of insolvency facially implausible.

5.    Instead of addressing the legal flaws detailed above, Trustee resorts to repeating his legal conclusions and recycling the same challenges from Trustee's Opposition to Defendants Motion to Dismiss the Original Complaint [ECF No. 22] and Trustee's Opposition to Defendants Motion to Dismiss the First Amended Complaint [ECF No. 52]—essentially masquerading legal conclusions as factual allegations and hoping that discovery will unearth facts to support his unfounded legal conclusions. Trustee also rebrands the SAC's conclusory allegations as factual allegations, claiming that this Court must accept them as true. On the contrary, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."[7] Legal conclusions must be accepted as true only when they are supported by factual allegations—which is exactly what the SAC omits.[8] It is only "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[9]

---

[7] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[8] *See id.* at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (explaining that the burden rests on the plaintiff to provide a complaint with "enough factual matter (taken as true) to suggest that [the plaintiff] is entitled to relief.").

[9] *Ashcroft*, 556 U.S. at 678. *See also R2 Invs. LDC v. Phillips,* 401 F.3d 638, 642 (5th Cir. 2005) ("[W]e will not strain to find inferences favorable to the plaintiffs and we will not accept conclusory allegations, unwarranted deductions, or legal conclusions.").

002917

The additional conclusory allegations in Trustee's SAC and Opposition do not come close to repairing the deficiencies that this Court requires. As such, Trustee's claims against ARM should now fully and finally be dismissed.

## ARGUMENT AND AUTHORITIES

**I.**      <u>**Trustee fails to plead a plausible basis for how ARM Defendants qualify as Transfer Beneficiaries or any factual allegations showing how ARM received a direct benefit.**</u>

6.      Trustee's Opposition begins by arguing the "SAC complies with the Court's directive, as it sufficiently and plausibly alleges both (i) Defendants' receipt of actual benefits form diversion of value through the constructively fraudulent transfers, and (ii) the quantifiable value actually received by… ARM in the form of proceeds from the Business Combination."[10] Not so. Under the TUFTA and the Bankruptcy Code, Trustee is limited to recovery from ARM for the AMH Gathering Payments and Gathering Agreement Obligations made to KFM only if AMH made those payments for the benefit of ARM.[11] To plausibly allege—as Rule 8 requires—that the payments to KFM were made for the benefit of ARM, Trustee must allege facts explaining how or why those payments were made for ARM's benefit.[12] Trustee, however, alleges no facts supporting his conclusory allegations that ARM directly benefitted from the payments made to KFM or that the payments were made for ARM's direct benefit. Instead, Trustee relies on assertions this Court has previously rejected.

---

[10] *See* Opposition, at 13.

[11] *See* Tex. Bus. & Com. Code Ann. §§ 24.008, 24.009 (West 2017) (allowing recovery for fraudulent transfers against a transferee or the person for whose benefit the transfer was made); 11 U.S.C. § 550(a)(1)-(2) (allowing recovery for a transfer avoided under 11 U.S.C. § 544(b) only from a transferee or the entity for whose benefit the transfer was made).

[12] *See Clapper v. Am Realty Inv'rs, Inc.*, 3:14-CV-2970-D, 2016 WL 302313, at *12-13 (N.D. Tex. Jan. 25, 2016) (dismissing claim under TUFTA against defendants who were not transferees of assets fraudulently transferred when there were no facts explaining how the alleged fraudulent transfers resulted in any benefit to any defendant).

002918

7.      *First*, with respect to plausibility of the benefit received by ARM, Trustee argues that the SAC details why the alleged diversion of value to KFM under the Gathering Agreements did not simply "counter-balance" any decrease in value at AMH, reasoning that:

- "ARM was not a shareholder at AMH… [t]hus, it benefited from every dollar of value diverted to KFM, where it held a substantial (30%) equity stake, managed KFM's operations, and charged substantial fees to KFM… ARM was exclusively interested in extracting as much value as possible from AMH to maximize the consideration paid for KFM and its operations in any exit scenario."[13]

- "Defendants knew that midstream companies, like KFM, are valued in an exit scenario at much higher multiples than upstream companies like AMH… [t]hus, Defendants were motivated to increase KFM's earnings as much and as quickly as possible to maximize potential sale consideration, even if that required KFM to charge AMH exorbitant fees and impose onerous terms on their gathering relationship."[14]

However, similar to the FAC, these allegations merely re-assert that the alleged transfers were "intended" to benefit ARM via KFM and that ARM allegedly became a beneficiary of those transfers through the value and/or sale of KFM—nothing more.  This Court has previously made clear that such allegations are insufficient to hold ARM liable as a direct beneficiary of the Gathering Agreements on the grounds that the transfers allegedly increased the value of KFM and that ARM received proceeds from the ultimate sale of KFM.[15]  Merely alleging that the Gathering Agreements were intended to benefit ARM is insufficient to plead recovery from a transfer beneficiary "[w]ithout some theory beyond the mere ownership of an interest."[16]

8.      Further, Trustee fails to provide any backing for his apparent assumption that ARM benefitted from every dollar of value diverted to KFM by AMH under the Gathering Agreements.

---

[13] *See* Opposition, at 15.

[14] *See* Opposition, at 16.

[15] *See* ECF No. 63, at 11-12 ("To state that a transfer is merely intended to benefit a particular party is therefore not enough—a defendant cannot be reasonably expected to disgorge beneficial intent…. Without some theory beyond the mere ownership of an interest in the corporation which actually received a transfer, the owner cannot be automatically assumed to have received a benefit."); *see also Schechter v. 5841 Building Corp. (In re Hansen)*, 341 B.R. 638, 645-46 (Bankr. N.D. Ill. 2006).

[16] *See* ECF No. 63, at 12.

002919

Trustee fails to plead any specifics as to what effect, if any, the Gathering Agreements had on AMH or KFM's financials, or other value-determining measurements of either entity, beyond general assertions that ARM was "exclusively interested in extracting" value from AMH and that ARM was "motivated to increase KFM's earnings" to maximize potential sale consideration.[17]

9.       Similarly, Trustee's contention that "Defendants had every incentive to prop up KFM so they could extract the benefits of the Gathering Agreements when they cashed-out their equity interests through the Business Combination"[18] is also insufficient to plead recovery from a transfer beneficiary.  As noted in this Court's Memorandum Opinion, "intent is irrelevant" where the Complaint does not allege actual fraud.[19]  Thus, Trustee's allegations that ARM was motivated to increase KFM's earnings and that the Gathering Agreements were part of ARM's intentional plan to maximize the sale price of KFM—which are, in any case, conclusory—are nonetheless irrelevant as to whether ARM received a direct benefit from those alleged transfers.  Moreover, it is worth emphasizing that the Business Combination occurred years after the start of the Gathering Agreement Obligations and AMH Gathering Payments, at which time no such transaction was even contemplated.  Trustee's theory that ARM caused AMH to enter into the Gathering Agreements to reap the fraudulent benefits via a future business transaction that was not even contemplated is completely implausible.

10.      **Second**, with respect to pleading actual, quantifiable benefit from the alleged transfers, Trustee argues that ARM received $92.2 million in cash proceeds and stock valued at $95.8 million in consideration of the value of KFM in the Business Combination and that "[t]he sales proceeds received by Defendants reflect[s] the value diverted from AMH through the

---

[17] *See* Opposition, at 15-16.
[18] *See* Opposition, at 16.
[19] *See* ECF No. 63, at 13.

Gathering Agreement Obligations and the AMH Gathering Payments in order to increase the cash paid for KFM in an exit scenario such as the Business Combination, and constituted the actual and intended distribution of that diverted value to Defendants."[20]  Although Trustee alleges that increasing the value of KFM at the expense of AMH was favorable to ARM due to ARM's 30% equity interest in KFM, Trustee nowhere alleges—beyond speculative and conclusory assertions— that the parties to the sale ever allocated value to AMH and KFM based in any part on the Gathering Agreements.  In fact, the sole benefit Trustee purports to identify is the "cash benefit" that allegedly resulted from a potential sale of KFM.  This Court has previously made clear that such allegations based on sales proceeds are insufficient to hold ARM liable under a direct transfer beneficiary theory.[21]  In addition, Trustee fails to "demonstrate how [the] value would be allocated" and further fails to "connect [the] increase in value to the alleged fraudulent transfers" as required by this Court.[22]  Further, Trustee's contention that "Defendants would not have been able to consummate the sale of KFM and receive that distribution without the diversion of value through the Gathering Agreements"[23] is nothing more than pure speculation.  Trustee cannot rely on such speculative, conclusory allegations for its claim that ARM was a direct beneficiary of the Gathering Agreements.[24]

11.    Trustee further attempts to argue Defendants' "intent" is relevant with respect to his constructive fraudulent transfer claims—asserting that the benefit ARM received was "not presumed or passive" and that ARM received the distributions of the transferred value from AMH "through a process [ARM] designed and controlled."[25]  First, the only allegations in Trustee's SAC

---

[20] *See* Opposition, at 16.
[21] *See* ECF No. 63, at 13 (Rejecting the notion that "the base fact of the sale price… reflects value (a benefit) that the defendants received as a result of payments made under the gathering agreements.").
[22] *See* ECF No. 63, at 14.
[23] *See* Opposition, at 16-17.
[24] *Janvey v. Libyan Inv. Auth.*, 840 F.3d 248, 267 (5th Cir. 2016).
[25] *See* Opposition, at 18-19.

002921

and Opposition with respect to "control" are that KFM was (allegedly) controlled by ARM and that ARM held a 30% equity stake in KFM.[26]  These allegations, however—which are nothing more than legal conclusions—cannot satisfy Trustee's burden under Rule 8 to plead supporting facts.[27]  In *Janvey v. Libyan Investment Authority*,[28] the Fifth Circuit held that the sole and controlling shareholder of a company that received a fraudulent transfer was not liable as an intended beneficiary of the fraudulent transfer.  *Janvey* reached that holding not only because shareholder status alone failed to qualify as a benefit under TUFTA,[29] but also because the court determined that the shareholder's controlling ownership interest in the transferee did not equate to a benefit for the shareholder that was independent of the benefit that the transferee received.[30]  The Fifth Circuit explained that the "independent benefit" required to invoke beneficiary liability under TUFTA is the type of benefit that would result to a guarantor "[w]hen a debtor transfers assets to a creditor to satisfy a guaranteed debt."[31]  The guarantor's benefit from the fraudulent transfer is independent of the transferee creditor's benefit because "[t]he creditor, as transferee, receives the assets, and the guarantor, as the beneficiary, retains assets that it would otherwise have lost as a result of the debtor's insolvency."[32]

12.     In contrast, the alleged benefits here—compensation in part from the much later sale of ARM's interest in KFM pursuant to the Business Combination—derives solely from ARM's alleged affiliation with KFM (the transferee) and thus provides no legal basis for beneficiary liability.  More specifically, Trustee merely re-alleges that ARM received benefits by causing AMH to make payments to KFM, in the form of sales proceeds in part from the sale of

---

[26] *See* Opposition, at 15.
[27] *See Clapper*, 2016 WL 302313, at *12-13.
[28] *Janvey*, 840 F.3d at 266.
[29] *Id.*
[30] *Id.* at 266.
[31] *Id.*
[32] *Id.*

002922

ARM's respective shares of KFM pursuant to the Business Combination—the same conclusory and speculative assertions this Court rejected.[33]  Those are not the type of benefits warranting beneficiary liability under TUFTA or the Bankruptcy Code.  Those alleged benefits are neither (a) benefits independent of the benefit KFM (the transferee) received; nor (b) benefits directly resulting from the payments to KFM.[34]  "The benefit must derive directly from the transfer, not from the use to which it is put by the transferee."[35]  Only someone who receives a benefit from the initial transfer is a person for whose benefit the transfer was made.[36]  Therefore, ARM's alleged receipt of any compensation in part from the sale of KFM would not constitute a benefit from the Gathering Agreements.

13.    Further, Trustee's allegation that ARM received an actual benefit from the increase of KFM's assets in connection with the sale of KFM pursuant to the Business Combination fails under the *McCook Metals* test.  The *McCook Metals* court held that "an actual benefit rather than a merely intended one must be received in order for the beneficiary to be liable under § 550(a)(1)."[37]  Trustee has failed to plead any facts to show that any increase in ARM's assets due

---

[33] *See* ECF No. 63, at 13-14.

[34] *Seidel v. Byron*, 405 B.R. 277, 292 (N.D. Ill. 2009) (explaining how allegations regarding simply receiving money at a later time is insufficient to qualify party as a beneficiary of the previous transfers); *In re Bullion Rsrv. of N. Am.*, 922 F.2d 544, 548 (9th Cir. 1991) (explaining beneficiary status applies "only [to] a person who receives a benefit from the initial transfer").

[35] *Mastro v. Rigby (In re Mastro)*, No. ADV 09-01577, 2011 WL 3300370, at *9–10 (B.A.P. 9th Cir. Mar. 1, 2011) ("The benefit must derive directly from the transfer, not from the use to which it is put by the transferee. Someone who receives the money later on is not an entity for whose benefit such transfer was made.").  *See also In re The Heritage Org., L.L.C.*, 413 B.R. 438, 495 (Bankr. N.D. Tex. 2009) ("The phrase 'entity for whose benefit such transfer was made' does 'not simply reference the next pair of hands; it references entities that benefit as guarantors of the debtor or otherwise, without ever holding the funds.' . . . Nor is an unquantifiable advantage the sort of 'benefit' contemplated by § 550. Rather, the common example of the sort of 'benefit' contemplated by Congress in enacting § 550 is the benefit to the guarantor by the payment of the underlying debt of the debtor."); *Mack v. Newton*, 737 F.2d 1343, 1359-60 (5th Cir. 1984) (rejecting as too broad the trustee's allegation that the principals in a partnership had received an incidental benefit from auctioning off cattle and using the proceeds to operate their dairy enterprise, deeming this "an incidental, unquantifiable, and remote benefit bearing no necessary correspondence to the value of the property transferred or received").

[36] *Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d 890, 896 (7th Cir. 1988).

[37] *Baldi v. Lynch (In re McCook Metals, L.L.C.)*, 319 B.R. 570, 591 (Bankr. N.D. Ill. 2005).

10

to the sale of KFM pursuant to Business Combination would be considered an actual benefit rather than an intended or incidental benefit.

14.    In addition, Trustee's allegation that ARM received an actual benefit merely because ARM owned an equity interest is insufficient to pass the *McCook Metals* test. In *Halperin v. Moreno (In re Green Field Energy Servs.)*,[38] the transfers in question were monetary payments made by the defendant to an LLC, in which the defendant owned a 50% equity interest. The court held that merely owning an equity interest is insufficient to show "actual benefit" received, and instead, the trustee must prove that the defendant received an actual benefit from those payments.[39] The court further held that the trustee's claim that the defendant was the ultimate beneficiary simply because he held a 50% stake was held to be "too conclusory" at this stage of the proceedings and that at trial, the trustee must prove "an actual benefit rather than a merely intended one" was received by the defendant.[40] Similarly, Trustee's Opposition fails to prove that ARM received an actual benefit from the alleged fraudulent payments made to KFM by merely relying on the alleged facts that ARM held a 30% equity interest in KFM. As such, Trustee fails to plead sufficient facts to show that ARM would qualify as a transfer beneficiary.

## II.    Trustee's SAC fails to adequately plead facts plausibly suggesting the Gathering Agreement Obligations and AMH Gathering Payments were constructively fraudulent transfers.

15.    To establish a claim for a constructively fraudulent transfer under either section 548 of the Bankruptcy Code or section 24.005 of the TUFTA, a plaintiff must plead sufficient facts and provide evidence that it received less than reasonably equivalent value for the transfer and one of four additional factors—such as being financially vulnerable or insolvent at the time of the

---

[38] *Halperin v. Moreno (In re Green Field Energy Services, Inc.)*, No. 13-12783 (KG), 2018 WL 1116374, at *2 (Bankr. D. Del. Feb. 27, 2018).
[39] *Id.*
[40] *Id.*

11

transaction.[41]  In both Counts I and II of the SAC,[42] Trustee asserts constructive fraudulent claims against ARM—alleging that AMH received less than reasonably equivalent value for the alleged transfers, and that as a result of the AMH Gathering Payments and Gathering Agreement Obligations, the Debtor became insolvent and undercapitalized.

### A.  Trustee pleads only conclusions devoid of facts regarding the Absence of Reasonably Equivalent Value with respect to the AMH Gathering Payments and Gathering Agreement Obligations.

16.    Trustee's Opposition claims that the SAC adequately pleads details of how AMH did not receive reasonably equivalent value with respect to the AMH Gathering Payments and Gathering Agreement Obligations but quotes nothing more than conclusory statements, insufficient to meet the requirements of Rule 8.  More specifically, Trustee contends that the SAC adequately alleges:

> (1) the gathering and processing fees paid by AMH pursuant to the Gathering Agreements were exorbitant and approximately 90%-100% higher than market rates; (ii) the Gathering Agreements required the payment of Capital Recovery Fees or Facility Fees that were completely foreign in the industry and increased AMH's price of doing business with KFM even further beyond industry standards; (iii) the Gathering Agreements included the Conveyances for which AMH received no consideration; and (iv) the 2016 OGA Amendment required AMH to pay KFM (and that AMH did pay KFM) for barrels of oil, up to 50,000 a day, that KFM did not transport.[43]

---

[41] 11 U.S.C. § 548(a)(1)(B)(i), (ii)(I)-(III); TEX. BUS. & COMM. CODE § 24.005(a)(2).

[42] In Count I, the fraudulent transfer claims are asserted under the Bankruptcy Code 11 U.S.C. § 548(a)(1)(B) and § 550 for avoidance and recovery of "AMH Gathering Payments" (as defined in the SAC).  In Count II, the fraudulent transfer claims are asserted both under the Bankruptcy Code 11 U.S.C. § 544 and the Texas Uniform Fraudulent Transfer Act ("TUFTA") §§ 24.005(a)(2), 24.006(a), 24.008, 24.009(b)) for avoidance and recovery of "Gathering Agreement Obligations" and "AMH Gathering Payments" (as defined in the SAC).

[43] *See* Opposition, at 22.  Notably, Trustee made identical claims in his prior two Oppositions.  *See* ECF No. 22, at 19 ("The Complaint alleges the gathering and processing fees agreed to and paid by AMH pursuant to the Gathering Agreements were exorbitant and well above-market, that the Gathering Agreements included the Conveyances for which AMH received no consideration, and that the 2016 Crude Oil Amendment required AMH to pay KFM (and that AMH did pay KFM) for barrels of oil, up to 50,000 a day, that KFM was required to transport but which KFM did not transport."); ECF No. 52, at 14 ("The FAC alleges (1) that the gathering and processing fees paid by AMH pursuant to the Gathering Agreements were exorbitant and approximately 90%-100% higher than market rates; (ii) that the Gathering Agreements required the payment of Capital Recovery Fees or Facility Fees that were completely

002925

17.     Trustee contends such allegations detail how and why AMH did not receive reasonably equivalent value for the Gathering Agreement Obligations or the AMH Gathering Payments.  Such conclusory allegations do nothing more than provide a basis for dismissal, however—as they are based only on Trustee's interpretation of a valid contractual obligation and payments made thereunder between AMH and KFM without showing anything more.

18.     In addition, as stated in ARM's Motion, plaintiffs generally run afoul of the plausibility standards if they neglect to adequately allege facts about the: (a) asset transferred, (b) date of transfer, (c) recipient of the transferred asset, (d) value of the asset transferred, or (e) value of the asset received.[44]  Here, Trustee not only failed to plead such facts—which he cannot—he completely failed to address the *Aphton* plausibility standard and arguments in ARM's Motion.[45]

19.     Trustee's Opposition and SAC merely include vague allegations about the maximum possible aggregate value transferred by AMH to KFM, and it generally identifies the asset transferred and the recipient of the transfers.  There is no mention, however, of the dates of the transfers, the value of each individual transfer, nor the value of the asset (or service) received in return, and therefore fails to state a claim for less than reasonably equivalent value.

20.     Further, Trustee's Opposition cites to an array of case law—attempting to argue that the existence of a binding contract does not foreclose a fraudulent transfer claim.[46]  Even assuming that is true, this Court stated at the initial Motion to Dismiss hearing: "you can't have a

---

foreign in the industry and increased AMH's price of doing business with KFM even further beyond industry standards; (iii) that the Gathering Agreements included the Conveyances for which AMH received no consideration; and (iv) that the 2016 OGA Amendment required AMH to pay KFM (and that AMH did pay KFM) for barrels of oil, up to 50,000 a day, that KFM did not transport.").

[44] *Aphton Corp. v. Sonafi Pasteur (In re Aphton Corp.)*, 423 B.R. 76, 89-93 (Bankr. D. Del. 2010).

[45] Notably, Trustee previously addressed the *Aphton* standard in his prior Opposition.  *See* ECF No. 52, at 16 (arguing the *Aphton* is non-binding without citing any authority holding the same… and further arguing that the "FAC's allegations do satisfy the *Aphton* plausibility standard, alleging that ARM, on behalf of KFM, deducted the amounts on a monthly basis from sale proceeds owed to AMH, and the monthly amounts of such deductions.").

[46] *See* Opposition, at 26.

13

fraudulent transfer with respect to contacts" where mandatory payments under a contract are required.[47]  Further, this Court went on to note that in some cases where the parties have contracted for "optional payments," depending on certain factors, including what was ordered and whether it was overpriced, there may be fraudulent payments—however, such allegations should be made under the Rule 9 pleading standard.[48]  Here, Trustee's Opposition does nothing more than rely on inadequate case law and conclusory allegations to argue that payments made to KFM under the Gathering Agreements were "optional payments."  As such, the Court should dismiss Trustee's claim.

> **B.**      **Trustee pleads only conclusions devoid of facts regarding AMH's financial condition and insolvency at the time of the AMH Gathering Payments and Gathering Agreement Obligation.**

21.      Trustee contends that the SAC adequately pleads both specific and general allegations of AMH's financial condition and insolvency at the time of the alleged fraudulent transfers,[49] but quotes nothing more than bald conclusions.  The SAC pleads only that "AMH was running at a net loss in both 2015 and 2016 and was cash-flow insolvent," that "AMH was severely inadequately capitalized, with a debt-to-equity ratio of above 20 to 1," that "AMH lacked sufficient cash flow to meet its upcoming obligations…," and that "AMH had only nominal cash to support its operations and its debt-to-equity ratio remained perilously high" and thereby became insolvent after the AMH Gathering Payments and Gathering Agreement Obligations.[50]  "To prevail on a

---

[47] *See* ECF No. 33, RFJN, at 54 ("[Y]ou can't have a fraudulent transfer with respect to contacts. That one depends, in my view, if you have a mandatory payment under a contract, then I think that the argument being made by Mr. Finestone is correct" and "to the extent that they were all mandatory payments, I don't follow the argument that it would be anything other than a potential preference.").
[48] *See* ECF No. 33, RFJN, at 54 ("… if you had optional payments, depending upon what you ordered and you ordered things that were overpriced, that might very well be fraudulent payment.  But I don't have those allegations in here under Rule 9 to know what specifically was done in the implementation of the contact in furtherance of fraud.").
[49] *See* Opposition, at 23-24.
[50] *See* Opposition, at 24-25.

constructively fraudulent transfer claim, the Trustee must prove insolvency **on the date of the transfer**."[51]  Trustee has failed to do so.

22.    Further, the legal term "insolvent" is not a factual allegation, and this Court need not accept as true such a legal conclusion nor make any inference from it.[52]  At most, the SAC recites legal tests when alleging that AMH was insolvent, inadequately capitalized, and unable to pay its debts as they came due.  There is not a single fact pleaded, however, that establishes AMH's actual insolvency, and, more importantly, that ARM played a role in causing such insolvency.  In general, an oil and gas company operating at a net loss in any given year is not uncommon, and conclusory allegations that the transferor was insolvent or in debt certainly does not prove insolvency.[53]  In addition, Trustee merely pleading AMH's debt-to-equity ratio was above 20 to 1, without any further context, does little in the way of proving financial hardship, let alone insolvency.[54]

23.    Nor can Trustee rely on any allegation that ARM had reasonable cause to believe AMH was insolvent.  As with Trustee's other conclusory allegations regarding AMH's insolvency, that allegation is a legal conclusion that is not entitled to any presumption of truth.  The SAC alleges no facts showing that AMH was actually insolvent at the time of the transfer.  As the litigation trustee and the successor in interest to AMH's bankruptcy estate, Trustee has access to AMH's financial records and could undoubtedly allege facts supporting insolvency if they existed.  Yet he fails to present any data showing that AMH was actually insolvent at any relevant point in

---

[51] *Katchadurian v. NGP Energy Capital Mgmt., LLC* (*In re Northstar Offshore Grp., LLC*), 616 B.R. 695, 737-38 (Bankr. S.D. Tex. 2020) (citing *Rodriguez v. Cyr (In re Cyr),* 602 B.R. 315, 326 (Bankr. W.D. Tex. 2019)) (emphasis added).
[52] *See Ashcroft*, 556 U.S. at 678-79.
[53] *Tow v. Bulmahn (In re ATP Oil & Gas Corp.)*, 711 F App'x 216, 223 (5th Cir. 2017) (holding conclusory allegations that the transferor "was insolvent or had unreasonably small capital at the time of the [transfer]" was insufficient to establish insolvency).
[54] *In re Northstar Offshore Grp., LLC*, 616 B.R. at 738 (explaining how merely alleging insufficient funds to meet financial obligations is insufficient to establish insolvency).

002928

time on or around the date of the transfer.  Without a specific reference to AMH's financial condition at the time of the alleged transfers—which Trustee should be capable of making, in light of his access to AMH's financial books and records—Trustee cannot plausibly show that AMH was insolvent at the time of the transfers nor that ARM had reasonable cause to believe AMH was insolvent.[55]

**CONCLUSION**

As Trustee has failed to adequately plead a plausible claim against ARM, the SAC does not state a claim upon which relief may be granted.  As such, Trustee's claims should be dismissed.

---

[55] *In re ATP Oil & Gas Corp.*, 711 F. App'x at 223 (finding that "Trustee cannot plausibly show that ATP was insolvent at the time of the transfers" when "Trustee failed to present any financial data showing that ATP was actually insolvent or had little capital when making the [transfers]").

002929

WHEREFORE, ARM requests that the claims asserted by the Trustee in his SAC be dismissed for failing to state a claim upon which relief may be granted, that the Court grant her attorneys' fees and costs to the extent permitted under applicable law, and for all other relief, in law or in equity, to which ARM Defendants may be entitled.

Dated: June 16, 2023
Houston, Texas

Respectfully submitted,

**EVERSHEDS SUTHERLAND (US) LLP**

By: */s/ David A. Baay*
David A. Baay (TBN 24027050)
Mark D. Sherrill (TBN 24034678)
Jay P. Patel (TBN 24125682)
davidbaay@eversheds-sutherland.com
marksherrill@eversheds-sutherland.com
jaypatel@eversheds-sutherland.com
1001 Fannin Street, Suite 3700
Houston, Texas 70002
Tel: (713) 470-6100
Fax: (713) 654-1301

COUNSEL TO ARM ENERGY HOLDINGS, LLC; ARM MIDSTREAM, LLC; AND ASSET RISK MANAGEMENT, LLC

17